# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YAMIL LUNA GUTIERREZ
Naval Station Guantanamo Bay
Guantanamo Bay, Cuba;

RAFAEL ANGEL LOPEZ OCON
Naval Station Guantanamo Bay
Guantanamo Bay, Cuba;

*Plaintiffs-Petitioners*, *on behalf of themselves and
all others similarly situated,*

v.

KRISTI NOEM, Secretary of the U.S. Department
of Homeland Security, in her official capacity,
245 Murray Lane, SW
Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane, SW
Washington, DC 20528;

TODD LYONS, Acting Director and Senior Official
Performing the Duties of the Director of U.S.
Immigration and Customs Enforcement, in his
official capacity,
500 12th Street, SW
Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th Street, SW
Washington, DC 20536;

PETE HEGSETH, Secretary of Defense, in his
official capacity,
1000 Defense Pentagon
Washington, DC 20301; and

U.S. DEPARTMENT OF DEFENSE,
1000 Defense Pentagon

Case No. 1:25-cv-1766

**CLASS ACTION COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF AND
PETITION FOR WRIT OF HABEAS
CORPUS**

Washington, DC 20301;

MARCO RUBIO, Secretary of State, in his official
capacity
2201 C Street, NW
Washington, DC 20520; and

U.S. STATE DEPARTMENT
2201 C Street, NW
Washington, DC 20520;

*Defendants-Respondents*.

## INTRODUCTION

1.    This class action lawsuit challenges the government's detention of civil
immigration detainees at U.S. Naval Station Guantánamo Bay, Cuba ("Guantánamo").

2.    Plaintiffs-Petitioners ("Plaintiffs") and the proposed class members are noncitizens
held in civil detention at Guantánamo under the Immigration and Nationality Act ("INA"). Until
recently, they were detained at immigration detention facilities inside the United States. But
instead of continuing to detain them there while making arrangements to effectuate their removal,
the government has flown them hundreds of miles away to detention facilities at Guantánamo Bay,
Cuba, for no legitimate purpose. At Guantánamo, Plaintiffs are surrounded by military officials,
deprived of in-person contact with legal counsel, and subject to punitive conditions of
confinement, including in facilities previously used by the military to hold law-of-war detainees.

3.    Plaintiffs bring this case on behalf of themselves and a similarly situated class of
"all immigration detainees originally apprehended and detained in the United States, and who are,
or will be held at Naval Station Guantánamo Bay, Cuba." They do not challenge the government's
authority to detain them on U.S. soil or to directly remove them to their home country or to another
statutorily authorized country. What they challenge is the government's unprecedented and

unlawful decision to hold them in a detention facility at Guantánamo—which, under the INA, and for purposes of the application of that statute, is not the United States. Immigration detention outside the United States is straightforwardly illegal under the statute. Moreover, the government's use of Guantánamo for immigration detention is arbitrary and capricious, lacks any legitimate purpose, and imposes punitive detention conditions on immigration detainees in violation of their constitutional rights.

4.     Never before this Administration has the federal government moved noncitizens apprehended and detained in the United States on civil immigration charges to Guantánamo, or to any other facility outside the United States, for the purpose of civil immigration detention. Nor is there any legitimate reason to do so. The government has ample detention capacity inside the United States, which is far less costly and poses none of the logistical hurdles attendant to detaining people at Guantánamo.

5.     In attempting to justify the transfers, the government has claimed that the individuals it is sending to Guantánamo are members of gangs and dangerous criminals—the "worst of the worst." That characterization has been proven wrong. Regardless, it is legally irrelevant because the government lacks statutory authority to send *any* immigration detainees from the United States to Guantánamo.

6.     The government has devoted massive military and immigration enforcement resources—reportedly over $40 million to date—to move detainees to an offshore base that does not have the infrastructure to accommodate these individuals, let alone the 30,000 people that the Administration has stated it seeks to ultimately detain there. The government's real reason for holding immigration detainees at Guantánamo is to instill fear in the immigrant population. That is not conjecture; it is government policy. For example, after a visit to Guantánamo, Department

of Homeland Security Secretary Kristi Noem posted a warning on social media that she "was just in Cuba" watching immigrants "being unloaded off a flight at GITMO," and that noncitizens should "not come to this country or we will hunt you down, find you, and lock you up." Sec'y Kristi Noem (@Sec_Noem), X (Feb. 10, 2025, 8:54 AM ET), https://x.com/Sec_Noem/status/1888949747169300667 [https://perma.cc/UP4M-8KR3].

7.      What has been revealed thus far about the conditions at Guantánamo by immigrant detainees is disturbing. Immigrants detained at Guantánamo are primarily guarded by military personnel, and subject to significant abuse and mistreatment. Detainees who have spoken out about the conditions of their confinement have faced retaliation and punishment, including solitary confinement and restraint chairs. Immigrants detained at Guantánamo's Camp 6, a maximum-security prison previously used by the military to hold law-of-war detainees, are permitted only one hour per day of recreation in an indoor cage. Immigrants detained at the Migrant Operations Center at Guantánamo are confined in small barracks-style units and permitted to go outside for only one hour a day in a small recreation pen, in sight of armed military personnel and guard dogs. Detainees receive insufficient food, go hungry, lack clean clothes and are denied basic possessions, including religious materials, writing implements, and legal documents. Several detainees have attempted suicide at Guantánamo, or have suffered significant post-traumatic symptoms after release.

8.      Plaintiffs seek this Court's intervention to put a stop to their unlawful detention at Guantánamo and to prevent the government from further imposing unlawful and unconstitutional detention at Guantánamo on other immigrants.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq.* (habeas

corpus), U.S. Const. art. I, § 9, cl. 2 (Suspension Clause), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), and 28 U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. §§ 702, 706.

10.    The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; 28 U.S.C. § 1331; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants-Respondents ("Defendants") are agencies of the United States or officers of agencies of the United States, Defendants reside in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### A.    <u>Plaintiffs-Petitioners</u>

12.    Plaintiff Yamil Luna Gutierrez is a Nicaraguan national currently held in immigration detention by the federal government at Guantánamo. Prior to his detention at Guantánamo, he was held at the Farmville Detention Center in Farmville, Virginia, and the Alexandria Staging Facility in Alexandria, Louisiana.

13.    Plaintiff Rafael Angel Lopez Ocon is a Nicaraguan national currently held in immigration detention by the federal government at Guantánamo. Prior to his detention at Guantánamo, he was held at the Farmville Detention Center in Farmville, Virginia, and the Alexandria Staging Facility in Alexandria, Louisiana.

### B.    <u>Defendants-Respondents</u>

14.    Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). In this capacity, Defendant Noem is the legal custodian of Plaintiffs and the members

of the putative class. Defendant Noem is sued in her official capacity.

15.    Defendant DHS is a federal executive agency responsible for, among other things, enforcing federal immigration laws and overseeing lawful immigration to the United States. Defendant DHS is a legal custodian of Plaintiffs and the members of the putative class.

16.    Defendant Todd Lyons is Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement ("ICE"). Defendant Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Defendant Lyons is a legal custodian of Plaintiffs and the members of the putative class. Defendant Lyons is sued in his official capacity.

17.    Defendant ICE is a federal law enforcement agency within DHS. Defendant ICE is responsible for the enforcement of immigration laws, including the detention and removal of immigrants. Defendant ICE is a legal custodian of Plaintiffs and the members of the putative class.

18.    Defendant Pete Hegseth is the United States Secretary of Defense. In this capacity, Defendant Hegseth maintains custody and control over Plaintiffs and the members of the putative class. Defendant Hegseth is sued in his official capacity.

19.    Defendant U.S. Department of Defense ("DOD") is a federal agency responsible for the Naval Station at Guantánamo Bay. Defendant DOD is a legal custodian of Plaintiffs and the members of the putative class.

20.    Defendant Marco Rubio is the United States Secretary of State. In this capacity, Defendant Rubio maintains custody and control over Plaintiffs and the members of the putative class.

21.    Defendant U.S. Department of State is a federal agency responsible for the resettlement of refugees detained at Guantánamo. Defendant U.S. Department of State is a legal

6

custodian of Plaintiffs and the members of the putative class.

## STATEMENT OF FACTS

22.     The Guantánamo Bay Naval Station is a U.S. military base in Guantánamo Bay, Cuba. It is the site of a U.S. military prison at which the U.S. government has asserted law-of-war detention authority since 2001.

23.     Until February of this year, the government had never used Guantánamo to detain noncitizens apprehended and detained in the United States under the Immigration and Nationality Act ("INA"). Although the government has used Guantánamo to house migrants interdicted on the high seas outside of U.S. territorial waters, these individuals had never stepped foot on U.S. soil; moreover, the government has consistently maintained that interdicted migrants are not being detained under, and are not subject to, the INA.

24.     On January 29, 2025, President Trump issued a Memorandum directing the Secretary of Defense and Secretary of Homeland Security "to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity and to provide additional detention space for high-priority criminal aliens unlawfully present in the United States," and declared his intention to hold as many as 30,000 immigrants at Guantánamo. *See* Memorandum, on Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity, 2025 Daily Comp. Pres. Doc. 200 (Jan. 29, 2025), *see* https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/                [https://perma.cc/D2P3-45SN] ("Memorandum"). The Memorandum did not direct the agencies to hold immigrant detainees on the side of the base where law-of-war detainees are held or to transfer immigrant detainees who are not "high-priority criminal aliens."

25.     On February 4, 2025, the government announced that it had transferred ten immigrant detainees from Fort Bliss, Texas, to Guantánamo. U.S. Customs and Border Patrol ("CBP") posted on social media videos of the transfer of these ten individuals, shackled and in chains, onto a military plane, stating that "[f]lights to Guantanamo Bay have begun." CBP (@CBP), X (Feb. 4, 2025, 7:35 PM ET), https://x.com/CBP/status/1886936769242845237 [https://perma.cc/8A6Z-3BND].

26.     Soon after, the government publicly alleged that these ten individuals were members of Tren de Aragua, a Venezuelan gang, but otherwise refused to respond to inquiries regarding the identities of these individuals, their immigration status, the nature of the legal proceedings against them, the legal authority under which they were held, or how long they would be held at Guantánamo. *See* C. Todd Lopez, *First Flight of Illegal Aliens Arrives at Guantanamo*, DOD News (Feb. 5, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4055497/first-flight-of-illegal-aliens-arrives-at-guantanamo. A closer examination revealed that the government's allegations of gang membership were dubious at best, based merely on tattoos or birthplace in the Venezuelan state of "Aragua." *See* Silvia Foster-Frau et al., *Relatives and Record Cast Doubt on Guantanamo Migrants Being 'Worst of the Worst'*, Washington Post (Feb. 16, 2025), https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/ [https://perma.cc/W3CDHVNX].

27.     The government has referred to the immigrant detainees held at Guantánamo as "the worst of the worst," and "high-threat" criminals who crossed the border to bring "violence and mayhem to our communities." *Id.* Secretary Noem, for instance, has repeatedly referred to Guantánamo detainees as murderers, rapists, pedophiles, child traffickers, and drug traffickers.

*See, e.g.,* Sec'y Kristi Noem (@Sec_Noem), X (Feb. 9, 2025, 12:12 PM ET), https://x.com/Sec_Noem/status/1888637061453762584 [https://perma.cc/F99Z-CMHG].

28.    However, the government has admitted that many of the immigrant detainees held at Guantánamo are "low-risk," with no criminal record other than an immigration violation. *See* Camilo Montoya-Galvez, *U.S. Sending Nonviolent, "Low-Risk" Migrants to Guantánamo, Despite Vow to Detain "the Worst" There*, CBS News (Feb. 12, 2025), https://www.cbsnews.com/news/guantanamo-bay-migrants-trump/    [https://perma.cc/5HM5-VVRM].

29.    Indeed, the government's criteria for detention of immigrants at Guantánamo is not predicated on an individual assessment of detainees' criminal history or conduct at all—and can be based solely on their nationality. A Memorandum of Understanding between DHS and DOD, dated March 7, 2025, reveals that the government created broad criteria for the detention of immigrants at Guantánamo that does not require any individualized review. *See* Memorandum of Understanding ("MOU"), DOD Support at Naval Station Guantanamo Bay (NSGB) to Immigration and Customs Enforcement (ICE) for DHS/ICE Detention of Illegal Aliens Subject to Final    Orders    of    Removal,    March    7,    2025,    *available    at* https://www.cbsnews.com/news/guantanamo-trump-migrants-without-criminal-records.    The MOU broadly permits the detention of immigrants at Guantánamo where the government merely "asserts" that the immigrant is "*from a country* where the preponderance of aliens from that country enter the United States" by having "paid a [transnational criminal organization] to be smuggled into the United States." *See* MOU at 1-2 (emphasis added).

30.    No operational justification exists for using Guantánamo to detain immigrants. The operational reasons that typically drive ICE detention decisions—such as reducing costs,

streamlining removals, or expanding detention capacity—are not present here. In fact, detention at Guantánamo has astronomically increased costs, with no appreciable benefit.

31.    Since February 4, 2025, the government has held approximately 500 people in immigration detention at Guantánamo, at a reported cost of more than $40 million, or approximately $100,000 per day per detainee. In contrast, immigration detention at a U.S.-based detention facility costs, on average, $165 per day per detainee. *See* Ted Hesson, *Trump Migrant Detentions at Guantanamo Bay Cost $100,000 Per Person Daily, Senator Says*, Reuters (May 20, 2025), https://www.reuters.com/world/us/trump-migrant-detentions-guantanamo-bay-cost-100000-per-person-daily-senator-2025-05-20/.

32.    Nor has detention at Guantánamo streamlined the removal process. In fact, the government has transferred immigrants held at Guantánamo *back to* immigration detention facilities in the United States so they could be removed from there. *See, e.g.* Bernd Debusmann Jr., *Migrants Held at Guantanamo Transferred to U.S.*, BBC News (Mar. 13, 2025), https://www.bbc.com/news/articles/cjw21y5043yo.

33.    After a Congressional delegation visit to Guantánamo, Senator Jack Reed noted in May 2025 that "[i]t is obvious Guantanamo Bay is an illogical location to detain migrants. The staggering financial cost to fly these migrants out of the United States and detain them at Guantanamo Bay—a mission costing tens of millions of dollars a month—is an insult to American taxpayers." 171 Cong. Rec. S2820 (daily ed. May 8, 2025) (statement of Sen. Jack Reed). Senator Richard Blumenthal noted that the government had spent approximately $21 million between January and April 2025 to transport around 400 immigrants to Guantánamo, about half of whom were flown back to the United States. *Senate Homeland Security and Government Affairs on DHS FY26 Budget,* PoliticoPro (May 20, 2025).

34. Detention at Guantánamo is not necessary to meet ICE's detention capacity needs.

35. Even if additional capacity were necessary, ICE has numerous less expensive and more straightforward avenues for increasing detention capacity. Expanding detention capacity at Guantánamo is particularly expensive and logistically complex due to the island's remote location and unique staffing needs. The government recently entered into several contracts for even more bed space within the United States—adding detention capacity to an already-expansive network.

36. Government officials have recognized that it would be an immense practical undertaking to prepare the isolated Navy base at Guantánamo for the arrival of tens of thousands of immigrants. Numerous reports have confirmed that there is not enough water, food, or other supplies on the base to accommodate tens of thousands of new people, and that most supplies would need to be brought in by barge. When the government first began sending immigrants to Guantánamo in February, it was reportedly erecting tents with basic sleeping pads, as well as makeshift latrines and outdoor showers. The plan to erect tents was reportedly halted in March 2025, given concerns that the tents would not meet ICE's detention standards.

37. Nor is detention at Guantánamo necessary to properly stage removal flights. Shuttling noncitizens through Guantánamo *adds* expense and logistical complications. Instead of detaining noncitizens in one of the many available facilities near an ICE Air hub in the United States and transporting them via inexpensive ground transportation to removal flights, the government is opting to pay for an additional flight to Guantánamo as well as the more expensive detention costs at Guantánamo. According to figures provided to Congress by the Department of Defense, the government has spent at least $21 million transporting migrants to Guantánamo on military aircraft. *See* Courtney Kube, *Pentagon Spent At Least $21 Million on Flights to Guantanamo, Which Currently Holds 32 Migrants*, NBC News (May 12, 2025),

https://www.nbcnews.com/politics/national-security/pentagon-spent-least-21-million-flights-

guantanamo-currently-holds-32-rcna206187.

38.    Defendants' public statements make clear that the reason for detention at

Guantánamo is not for a permissible purpose, but rather, to deter would-be migrants from coming

to the United States and to coerce those already present in the United States into self-deporting or

accepting deportation to a dangerous third country rather than face the terrifying prospect of time

at Guantánamo.

39.    For example, Defendant Hegseth has stated that Guantánamo "represents

deterrence," and that the Guantánamo mission is "central . . . to the message we're sending to the

world – which is that our border is closed." ShaTyra Reed-Cox, *SECDEF Hegseth Visits Naval

Station    Guantanamo    Bay*,    U.S.    Army    (Feb.    26,    2025),

https://www.army.mil/article/283368/secdef_hegseth_visits_naval_station_guantanamo_bay;

Matthew Olay, *Hegseth Visits Guantanamo Bay, Engages with Troops*, DOD News (Feb. 26,

2025),    https://www.defense.gov/News/News-Stories/Article/Article/4078647/hegseth-visits-

guantanamo-bay-engages-with-troops/; *see also* DOD Rapid Response (@dodrapidresponse), X

(Feb. 26, 2025, 7:14 PM ET), https://x.com/DODResponse/status/1894903965441306703

[https://perma.cc/EED5-NT62] (quoting Secretary Hegseth: "If you break the law, if you are a

criminal, you could find your way to Guantanamo Bay. You don't want to be at Guantanamo

Bay.").

40.    Likewise, after a visit to Guantánamo, Defendant Noem posted a warning on social

media that she "was just in Cuba" and that noncitizens should "not come to this country or we will

hunt you down, find you, and lock you up." Sec'y Kristi Noem (@Sec_Noem), X (Feb. 9, 2025,

12:12 PM ET), https://x.com/Sec_Noem/status/1888637061453762584 [https://perma.cc/F99Z-

CMHG].

41.    President Trump has been equally explicit. In explaining the decision to detain immigrants at Guantánamo, he stated, "we don't want them coming back," ". . . . [s]o we're going to send them to Guantanamo . . . it's a tough place to get out." Bernd Debusmann Jr. & Will Grant, *Trump Says U.S. Will Send Some Migrants to Guantanamo Bay*, BBC News (Jan. 29, 2025), https://www.bbc.com/news/articles/c5yelgxk3rlo.

42.    More recently, a DHS press release stated, "If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now." Press Release, DHS, 100 Days of Fighting Fake News (Apr. 30, 2025), https://www.dhs.gov/news/2025/04/30/100-days-fighting-fake-news [https://perma.cc/2SLZ-CZKN].

43.    In effect, the government is perversely utilizing Guantánamo's well-known history as a site of abuse and mistreatment, including as the location of two former CIA "black sites," to frighten immigrants.

44.    The government has also subjected immigrant detainees held at Guantánamo to punitive conditions. Individuals currently and formerly detained at Guantánamo report that the conditions are far worse than those they experienced in ICE detention or other carceral facilities in the United States. And although the government has claimed that immigrants are detained a Guantánamo on a "temporary" basis en route to a final destination, some detainees have been held at Guantánamo for as long as six weeks.

45.    Guantánamo has two different areas that are used for detention. On the Windward side of the base, there is a maximum-security prison that houses the government's military detainees and includes what is known as "Camp 6." On the separate Leeward side of the base is the Migrant Operations Center ("MOC"), where migrants interdicted on the high seas have

traditionally been held. Immigrant detainees held at both the MOC and Camp 6 are primarily guarded by military personnel.

46.     The Camp 6 prison is a facility previously used to hold law-of-war detainees by the military. Immigrants detained at Camp 6 have reported significant abuse and mistreatment from officers. For example, detainees who have complained about conditions or mistreatment to officers have been tied to restraint chairs for hours. Guards have reportedly withheld water from detainees as a form of punishment. One officer slammed a radio against a detainee's hand, fracturing his hand. One detainee was beaten up so badly that he tried to harm himself twice in two weeks. Although the government has stated that it no longer uses the restraint chair, having instituted in its place the use of a solitary confinement unit, it has not disavowed use of the restraint chair in the future.

47.     Immigrants detained at the MOC are confined in small, barracks-style units, with several people held in each room. They are permitted to leave their units for at most a one-hour period per day when they are released into a small recreation pen, surrounded by armed military personnel and guard dogs. They are also invasively searched when returning to the unit from recreation, including a pat down of their genitals. Detainees held at the MOC have reported insults and taunting by guards, who have threatened to shoot them, all the while without any information on how much longer they would be subjected to these conditions.

48.     Immigrants detained at Guantánamo are denied basic necessities. Detainees receive insufficient food, and go hungry. Some have lost as many as 10-20 pounds in the matter of a few weeks. Unlike other detention facilities or prisons, no commissary is available at Guantánamo, so detainees are unable to supplement the limited meals with food to meet their nutritional needs. Detainees are provided with a change of clothes only approximately once per week, and are

provided no cleaning materials to maintain their cells, which are infested with rodents.

49.     Unlike at other immigration detention facilities or prisons, immigrants detained at Guantánamo are also denied activities to keep themselves occupied, and are not allowed basic possessions such as Bibles or other religious materials, or pencils or paper. Detainees are not allowed to keep any property including hygiene materials such as toothbrushes or soap, and may access these materials only with a guard's permission. Although officials permit detainees to have one piece of soap each week for showering, detainees must turn in the soap to guards after showering, and cannot use it to wash their hands at other times.

50.     Detainees are not allowed to keep legal materials, or other reading materials, and there is no law library.

51.     Detainees are also kept in the dark about information as basic as the time of day. Officers at Guantánamo will not provide them with this information, nor with information about their immigration cases; what will happen to them; or where they will be taken next.

52.     Detainees are provided no way to make medical requests.

53.     As a consequence of the restrictive conditions at Guantánamo, and lack of information about when their confinement might end, several detainees have attempted suicide at Guantánamo, or have suffered significant post-traumatic symptoms after release.

## CLASS ALLEGATIONS

54.     Plaintiffs bring this action under the Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

55.     Plaintiffs propose to represent the following proposed class: "All immigration detainees originally apprehended and detained in the United States, and who are, or will be held at Naval Station Guantánamo Bay, Cuba."

56.    The proposed class satisfies the requirements of Rule 23(a) because the class is so numerous that joinder of all members is impracticable. There are currently approximately 70 immigrants detained at Guantánamo. The proposed class also includes numerous future immigrant detainees who will become members of the class at the time they are transferred at Guantánamo. The government has already detained at least 500 people at Guantánamo and stated that it intends to continue detaining immigrants at Guantánamo. Camp 6 alone has capacity to hold up to 175 people at a time, while the MOC has capacity to hold 50 people at a time. The government also has capacity to hold 520 more people in additional facilities at MOC East and MOC West, for a combined capacity total of 745 people, not counting additional facilities that may become available. The proposed class is fluid, as the government has regularly transported detainees to and from Guantánamo, making joinder of all members not only impracticable but impossible.

57.    The proposed class satisfies the commonality requirements of Rule 23(a)(2). The members of the class are subject to a common practice: immigration detention at Guantánamo. The suit also raises questions of law common to members of the proposed class, including whether the government's policies and practices violate the INA, the APA, and the Fifth Amendment of the U.S. Constitution.

58.    The proposed class satisfies the typicality requirements of Rule 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class. Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injuries (immigration detention at Guantánamo and its associated detention conditions), based on the same government policy and practice, which is unlawful as to the entire class, because they violate the INA, the APA, and Fifth Amendment of the U.S. Constitution.

59.    The proposed class satisfies the adequacy requirements of Rule 23(a)(4). The

representative Plaintiffs seek the same relief as the other members of the class—among other things, an order declaring unlawful their detention at Guantánamo and the government's policies and practices with respect to their detention at Guantánamo. In defending their rights, Plaintiffs will defend the rights of all proposed class members fairly and adequately.

60.     The proposed class is represented by experienced attorneys from the American Civil Liberties Union, the American Civil Liberties Union of the District of Columbia, the Center for Constitutional Rights (CCR), and the International Refugee Assistance Project. Proposed class counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

61.     The proposed class also satisfies Rule 23(b)(2). Defendants have acted on grounds generally applicable to the class by subjecting them to the same policies and practices with respect to detention of immigrants at Guantánamo. Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Detention Without Statutory Authority

62.     There is no statutory authority for the government's use of Naval Station Guantánamo Bay, Cuba, to detain noncitizens who are awaiting removal under the Immigration and Nationality Act ("INA"). The base is not part of the United States for purposes of the INA. 8 U.S.C. § 1101(a)(38). And the INA does not authorize use of immigration detention facilities outside U.S. territory for individuals who have been ordered removed and are "pending removal." Indeed, the government has never before used a detention facility outside of the United States to detain noncitizens for immigration purposes.

17

63.     The plain language of the statute and its structure compel the conclusion that detention of individuals with final removal orders is authorized only in detention facilities inside the United States. *See* 8 U.S.C. § 1231(g)(1) (authorizing the Attorney General to arrange for detention facilities to detain individuals "pending removal"); 8 U.S.C. § 1101(g) (providing that once an individual who has been ordered removed has "left the United States," they are considered to be removed).

64.     Moreover, were there any doubt as to whether the statute authorizes detention of individuals with final removal orders in facilities outside the United States, it would be dispelled by the presumption against extraterritorial application. Thus, the INA does not authorize the use of Naval Station Guantánamo Bay to detain Plaintiffs and the class they seek to represent and such detention is contrary to law under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A). The Court may also grant relief under its equitable powers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

## COUNT II
## Violation of the Administrative Procedure Act

65.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

66.     Defendants have failed to articulate reasoned explanations for their decisions, which represent changes in the agencies' policies; have considered factors that Congress did not intend to be considered; have entirely failed to consider important aspects of the problem; and have offered explanations for their decisions that run counter to the evidence before the agencies.

67.     Detention of immigrants at Guantánamo is an illogical and unreasonable choice when considering ICE's detention capacity and the agency's own stated operational objectives. It is far more costly and logistically complex than detaining and removing individuals from within

the United States.

68.     In addition, by detaining individuals at Guantánamo who are not "high-risk criminal" detainees, and holding them at Camp 6 on the military side of the base (and not solely at the MOC), Defendants have acted well beyond the scope of the President's Memorandum.

69.     Defendants' actions are arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A).

## COUNT III
### Violation of Fifth Amendment Due Process

70.     Immigration detention is subject to the due process constraints applicable to other forms of civil detention, and must therefore be justified by a legitimate regulatory, nonpunitive purpose. *See Bell v. Wolfish*, 441 U.S. 520, 535, 538-39 (1979); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 210 (D.D.C. 2020); *D.A.M. v. Barr*, 474 F. Supp. 3d. 45, 63 (D.D.C. 2020).

71.     The government has identified no legitimate purpose that is served by holding immigrant detainees at Guantánamo, rather than at detention facilities inside the United States. Instead, Defendants are using the threat of detention at Guantánamo to frighten immigrants, deter future migration, induce self-deportation, and coerce people in detention to give up claims against removal and accept deportation elsewhere. These are impermissible justifications for civil immigration detention.

72.     The government's detention of immigrants at Guantánamo is also subjecting them to punitive conditions that violate their due process rights as civil detainees. *See Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *C.G.B.*, 464 F. Supp. 3d at 210; *D.A.M.*, 474 F. Supp. 3d. at 63. Detainees at Guantánamo are subject to more restrictive and abusive conditions than they would face in U.S. prisons and immigration detention facilities—hallmarks of punitive detention. *Cf. Wong Wing v. United States*, 163 U.S. 228, 237 (1896).

73.     Detention of immigrants at Guantánamo constitutes unlawful punishment, in violation of the Fifth Amendment to the U.S. Constitution.

## COUNT IV
## Violation of Habeas Corpus

74.     Immigration detainees have the right to challenge the legality of their transfer and detention or raise other claims related to their detention, including their conditions of confinement.

75.     The transfer of immigration detainees from the United States to Guantánamo has violated and continues to violate their right to habeas corpus. *See* U.S. Const. art. I, § 9, cl. 2 (Suspension Clause); 28 U.S.C. § 2241.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ask the Court to:

76.     Enter judgment for Plaintiffs and the class they seek to represent and against Defendants;

77.     Declare that Defendants' detention of Plaintiffs and class members at Guantánamo violates the Immigration and Nationality Act, the Administrative Procedure Act, and the Fifth Amendment;

78.     Vacate Defendants' policy of transferring immigration detainees from the United States to Guantánamo and detaining them there;

79.     Enjoin Defendants from detaining Plaintiffs and any class members at Guantánamo;

80.     Grant a writ of habeas corpus to Plaintiffs and the class that enjoins Defendants from detaining them at Guantánamo;

81.     Award Plaintiffs reasonable attorneys' fees, costs, and other disbursements pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and/or any other applicable law; and

82.    Grant any other and further relief that this Court deems just and proper.

Dated: June 4, 2025

Eunice H. Cho (D.C. Bar No. 1708073)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th floor
Washington, DC 20005
(202) 546-6616
echo@aclu.org

My Khanh Ngo (D.C. Bar No. CA00219)
Kyle Virgien*
Noelle Smith*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org
nsmith@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Deepa Alagesan (D.D.C. Bar No. NY0261)
Kimberly Grano (D.D.C. Bar No. NY0512)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No.
NY0224)
Judy Rabinovitz*
Noor Zafar*
Omar C. Jadwat*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon*
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, Floor 7
New York, NY 10012
T: (212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

Jessica Myers Vosburgh*
Center for Constitutional Rights
P.O. Box 486
Birmingham, AL 35201
212.614.6492
jvosburgh@ccrjustice.org

*Attorneys for Plaintiffs-Petitioners*

21

Telephone: (516) 838-7044
dalagesan@refugeerights.org          *Pro bono representation certificates
kgrano@refugeerights.org             forthcoming