# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| YAMIL LUNA GUTIERREZ, *et al.*, | ) | |
| | ) | |
| *Plaintiffs-Petitioners, on behalf of themselves and all others similarly situated*, | ) | |
| | ) | Case No. 1:25-cv-01766-SLS |
| v. | ) | |
| | ) | |
| KRISTI NOEM, Secretary of Homeland Security, in her official capacity, *et al.*, | ) | |
| | ) | |
| *Defendants-Respondents.* | ) | |

## PLAINTIFFS-PETITIONERS' OPPOSITION TO
## MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ................................................................................................................3

    I.      Legal and Statutory Background................................................................3

      A. Guantánamo is Outside the United States..........................................................3

      B. The INA Authorizes Detention Before—Not After—Removal..........................3

    II.     Factual Background ..................................................................................5

    III.    Procedural Background ............................................................................8

LEGAL STANDARD........................................................................................................9

ARGUMENT ...................................................................................................................10

    I.      Plaintiffs' Claims Are Justiciable. ........................................................10

      A.   Plaintiffs' Claims Are Not Moot...........................................................10

      B.   Plaintiffs Have Standing. ......................................................................13

    II.     The INA Does Not Strip the Court of Jurisdiction Over Plaintiffs' Claims. ................16

    III.    Plaintiffs State a Claim Under the INA Because Defendants Lack Authority to Detain Extraterritorially. ................21

    IV.    Plaintiffs State a Claim Under the APA.................................................32

      A.   The Government's Policy of Using Guantánamo for Immigration Detention Constitutes Final Agency Action. ................33

      B.   Extraterritorial Detention at Guantánamo is Not Committed to Agency Discretion.....35

      C.   Defendants' Implementation of President Trump's Memorandum is Arbitrary and Capricious. ................36

    V.     Plaintiffs State a Substantive Due Process Claim of Punitive Detention. ................38

      A.   Plaintiffs Have a Liberty Interest Against Punitive Detention.......................38

      B.   Plaintiffs Have Alleged Sufficient Facts to Show Punitive Detention. .........39

CONCLUSION.................................................................................................................44

i

# TABLE OF AUTHORITIES

## Cases

*Abdullah v. Trump,*
   No. 25-5002, 2025 WL 914093 (D.C. Cir. Mar. 24, 2025) ................................................... 10

*Abitron Austria GmbH v. Hetronic Int'l Inc.,*
   600 U.S. 412 (2023) ........................................................................................................ 22, 25

*Aguilar v. U.S. Immig. & Cust. Enforcement,*
   510 F.3d 1 (1st Cir. 2007) ............................................................................................... 19, 20

*Aguilera-Ruiz v. Ashcroft,*
   348 F.3d 835 (9th Cir. 2003) .................................................................................................. 28

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,*
   766 F. Supp. 3d 74, 83 (D.D.C. 2025) ............................................................................ 37, 38

*Am. Bioscience, Inc. v. Thompson,*
   243 F.3d 579 (D.C. Cir. 2001) ............................................................................................... 32

*Am. Nat'l Ins. Co. v. F.D.I.C.,*
   642 F.3d 1137 (D.C. Cir. 2011) ............................................................................................... 9

*Ams. for Immigrant Just. v. U.S. Dep't Homeland Sec.,*
   No. 22-3118, 2023 WL 1438376 (D.D.C. Feb. 1, 2023) ........................................................ 39

*Arce v. U.S.,*
   899 F.3d 796 (9th Cir. 2019) .................................................................................................. 17

*Arizonans for Off. Eng. v. Arizona,*
   520 U.S. 43 (1997) .................................................................................................................. 10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................................................................. 9

*Attias v. Carefirst, Inc.,*
   865 F.3d 620 (D.C. Cir. 2017) ............................................................................................... 14

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................................................................. 9

*Bell v. Wolfish,*
   441 U.S. 520 (1979) ......................................................................................................... passim

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................................................ 34

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ................................................................................................................ 32

*Block v. Rutherford,*
   468 U.S. 576 (1984) .......................................................................................................... 38, 41

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ............................................................................................. 33

*Bowrin v. U.S. I.N.S.*,
    194 F.3d 483 (4th Cir. 1999) ............................................................................. 17

*Brennan v. City of New York*,
    No. 19-CV-02054 (NGG) (CLP), 2023 WL 5672590 (E.D.N.Y. Sept. 1, 2023) ................. 15

*Brown v. Plata*,
    563 U.S. 493 (2011) ............................................................................................. 42

*Chamber of Commerce of the U.S. v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011) ........................................................................... 14

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................................... 13

*Clark v. Martinez*,
    543 U.S. 371 (2005) ............................................................................................. 27

*Cnty. of Riverside v. McLaughlin*,
    500 U.S. 44 (1991) ............................................................................................... 11

*Cuban Am. Bar Ass'n v. Christopher*,
    43 F.3d 1412 (11th Cir. 1995), 1994 WL 16506602 ......................................... 28

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) ......................................................... 16, 17, 38

*D.L. v. District of Columbia*,
    302 F.R.D. 1 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017) ..................... 13

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018) ............................................................. 16, 20

*Dellis v. Corr. Corp. of Am.*,
    257 F.3d 508 (6th Cir. 2001) ............................................................................. 43

*Demore v. Kim*,
    538 U.S. 510 (2003) ............................................................................................... 5

*Dep't Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ............................................................................. 16, 34, 35, 36

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ......................................................................................... 35

*Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*,
    445 U.S. 326 (1980) ............................................................................................. 12

*E.E.O.C. v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991) ............................................................................... 22, 25, 26

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) ............................................................................. 6, 9

*E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*,
  950 F.3d 177 (3d Cir. 2020)..................................................................................... 18

*Edison C. F. v. Decker*,
  No. 20-15455, 2021 WL 1997386 (D.N.J. May 19, 2021).................................... 20

*Espinoza Escalona v. Noem*,
  No. 25-cv-604 (D.D.C. Mar. 10, 2025) ......................................................... 21, 40

*Food & Water Watch, Inc., v. Vilsack,*,
  808 F.3d 905 (D.C. Cir. 2015)................................................................................ 14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................................ 10

*Gandarillas-Zambrana v. Bd. Immig. Appeals*,
  44 F.3d 1251 (4th Cir. 1995) .................................................................................. 20

*Garcia v. Att'y Gen.*,
  553 F.3d 724 (3d Cir. 2009).................................................................................... 17

*Garvey v. Admin. Rev. Bd.*,
  56 F.4th 110 (D.C. Cir. 2022)................................................................................. 25

*Genesis Healthcare Corp. v. Symczyk*,
  569 U.S. 66 (2013).................................................................................................. 11

*Gomez v. Trump*,
  No. 20-CV-01419 (APM), 2020 WL 12919371 (D.D.C. Aug. 13, 2020) ............ 37

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020)................................................................................ 36

*Green v. Johnson*,
  977 F.2d 1383 (10th Cir. 1992) .............................................................................. 43

*Guangzu Zheng v. Decker*,
  No. 14cv4663, 2014 WL 7190993 (S.D.N.Y. Dec. 12, 2014)............................... 17

*Gul v. Obama*,
  652 F.3d 12 (D.C. Cir. 2011) .................................................................................. 10

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993)................................................................................................ 26

*Helling v. McKinney*,
  509 U.S. 25 (1993).................................................................................................. 42

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.*,
  709 F.3d 44 (D.C. Cir. 2013).................................................................................. 32

*Hinton v. District of Columbia*,
  567 F. Supp. 3d 30 (D.D.C. 2021) .......................................................................... 13

*Humane Soc'y of the U.S. v. Vilsack*,
  797 F.3d 4 (D.C. Cir. 2015) .................................................................................... 14

*Hurd v. District of Columbia*,
   864 F.3d 671 (D.C. Cir. 2017) ........................................................... 41

*J.D. v. Azar*,
   925 F.3d at 1308 ........................................................................ 10, 11, 12

*J.E.F.M. v. Lynch*,
   837 F.3d 1026 (9th Cir. 2016) ............................................................ 19

*Jacinto-Castanon de Nolasco v. U.S. Immigration and Customs Enf't*,
   319 F. Supp. 3d 491 (D.D.C. 2018) .................................................... 40

*Jacquet v. Hodgson*,
   No. Civ.A. 03–11568RWZ, 2003 WL 22290360 (D. Mass. Oct. 6, 2003). ........................... 17

*Jama v. Immigr. & Naturalization Servs.*,
   329 F.3d 630 (8th Cir. 2003) ......................................................... 17, 19

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ............................................................... 4, 18, 19

*Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*,
   402 F.3d 1249 (D.C. Cir. 2005) ........................................................... 9

*Judulang v. Holder*,
   565 U.S. 42 (2011) .......................................................................... 36

*Kansas v. Crane*,
   534 U.S. 407 (2002) ....................................................................... 40

*Kingslev v. Hendrickson*,
   576 U.S. 389 (2015) ............................................................. 38, 39, 43

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ................................................................... 22, 26

*Kucana v. Holder*,
   558 U.S. 233 (2010) ....................................................................... 20

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
   507 F. Supp. 3d 1 (D.D.C. 2020) ...................................................... 34

*Lewis v. Casey*,
   518 U.S. 343 (1996) ....................................................................... 15

*Lewis v. U.S. Parole Comm'n*,
   743 F. Supp. 3d 181 (D.D.C. 2024) .................................................. 13

*Lucero v. Bureau of Collection Recovery, Inc.*,
   639 F.3d 1239 (10th Cir. 2011) ........................................................ 12

*Ly v. Hansen*,
   351 F.3d 263 (6th Cir. 2003) ............................................................ 31

*Madu v. U.S. Att'y Gen.*,
   470 F.3d 1362 (11th Cir. 2006) ........................................................ 17

*Melgar-Salmeron v. Bondi*,
  No. 23-7792 (2d Cir. May 28, 2025) ................................................................ 28

*Menoken v. Dhillon*,
  975 F.3d 1 (D.C. Cir. 2020) ........................................................................... 43

*Microsoft Corp. v. AT&T Corp.*,
  550 U.S. 437 (2007) ..................................................................................... 23

*Mons v. McAleenan*,
  No. 19-1593 (JEB), 2019 WL 4225322 (D.D.C. Sept. 5, 2019) ....................... 11, 12

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .................................................................................. 14, 15

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ................................................................. 21, 22, 23, 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................................... 37

*Nagahi v. Immigr. & Naturalization Servs.*,
  219 F.3d 1166 (10th Cir. 2000) ...................................................................... 25

*Nat. L. Party of U.S. v. Fed. Election Comn'n*,
  111 F. Supp. 2d 33 (D.D.C. 2000) ................................................................. 13

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  763 F. Supp. 3d 36 (D.D.C. 2025) ................................................................. 13

*Nicusor-Remus v. Sessions*,
  902 F.3d 895 (9th Cir. 2018) ......................................................................... 28

*Nielsen v. Preap*,
  586 U.S. 392 (2019) ..................................................................................... 18

*Noem v. Al Otro Lado*,
  138 F.4th 1102 (9th Cir. 2025) ...................................................................... 23

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................... 18

*O.M.G. v. Wolf*,
  474 F. Supp. 3d 274 (D.D.C. 2020) ............................................................... 38

*Physicians for Soc. Responsibility v. Wheeler*,
  956 F.3d. 634 (D.C. Cir. 2020) ...................................................................... 35

*Pitts v. Terrible Herbst, Inc.*,
  653 F.3d 1081 (9th Cir. 2011) ....................................................................... 12

*R.I.L.-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ......................................................... passim

*Rady v. Ashcroft*,
  193 F. Supp. 2d 454 (D. Conn. 2002) ............................................................ 20

*Ramirez v. U.S. Immigr. & Customs Enf't,*
 310 F. Supp. 3d 7 (D.D.C. 2018) ............................................................................ 34, 35

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem,*
 No. CV 25-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025) ................................ 34, 35

*Reno v. Am.-Arab Anti-Discrim. Comm. (AADC),*
 525 U.S. 471 (1999) ...................................................................................... 16, 17, 18

*Reyna ex rel. J.F.G. v. Hott,*
 921 F.3d 204 (4th Cir. 2019) .................................................................................... 20

*Richardson v. Bledsoe,*
 829 F.3d 273 (3d Cir. 2016) .............................................................................. 12, 13

*RJR Nabisco Inc. v. v. European Community,*
 579 U.S. 325 (2016) ........................................................................................ 21, 22

*Robbins v. Reagan,*
 780 F.2d 37 (D.C. Cir. 1985) .................................................................................... 36

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.,*
 No. CV 18-760 (CKK), 2020 WL 3265533 (D.D.C. June 17, 2020) ................................ 43

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.,*
 605 F. Supp. 3d 157 (D.D.C. 2022) ............................................................................ 19

*Sale v. Haitian Centers Council, Inc.,*
 509 U.S. 155 (1993) .............................................................................. 21, 23, 25, 30

*Seretse-Khama v. Ashcroft,*
 215 F. Supp. 2d 37 (D.D.C. 2002) .............................................................................. 31

*Sissel v. U.S. Dep't of Health & Hum. Servs.,*
 760 F.3d 1 (D.C. Cir. 2014) ...................................................................................... 9

*Small v. United States,*
 544 U.S. 385 (2005) ................................................................................................ 31

*Smith v. United States,*
 507 U.S. 197 (1993) .............................................................................. 21, 29, 32

*Sosna v. Iowa,*
 419 U.S. 393 (1975) ................................................................................................ 11

*Stone v. U.S. Dep't of State,*
 No. CV 21-3244 (RC), 2022 WL 4534732 (D.D.C. Sept. 28, 2022) .............................. 32

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ................................................................................................ 14

*Swedish Am. Hosp. v. Sebelius,*
 691 F. Supp. 2d 80 (D.D.C. 2010) .............................................................................. 32

*Thorpe v. District of Columbia,*
 916 F. Supp. 2d 65 (D.D.C. 2013) .............................................................................. 12

vii

*Thorpe v. District of Columbia*,
   303 F.R.D. 120 (D.D.C. 2014) ......................................................................... 15

*United States v. Al-Imam*,
   373 F. Supp. 3d 247 (D.D.C. 2019) ........................................................... 22, 26

*United States v. Bowman*,
   260 U.S. 94 (1922) ........................................................................................ 26

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ...................................................................................... 31

*Van Dinh v. Reno*,
   197 F.3d 427 (10th Cir. 1999) ...................................................................... 20

*Von Colln v. Cnty. of Ventura*,
   189 F.R.D. 583 (C.D. Cal. 1999) .................................................................. 43

*Wilson v. Gordon*,
   822 F.3d 934 (6th Cir. 2016) ........................................................................ 12

*Wood v. United States*,
   175 F. App'x 419 (2d Cir. 2006) .................................................................. 20

*Xiao Ji Chen v. U.S. Dep't of Justice*,
   434 F.3d 144 (2d Cir. 2006) .......................................................................... 19

*Youngberg v. Romeo*,
   457 U.S. 307 (1982) ...................................................................................... 43

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ................................................................................. passim

*Zeidman v. J. Ray McDermott & Co.*,
   651 F.2d 1030 (5th Cir. 1981) ...................................................................... 13

**Statutes**

5 U.S.C. § 701 ........................................................................................................ 35

8 U.S.C. § 1101 ................................................................................................ passim

8 U.S.C. § 1103 ............................................................................................... 24, 25

8 U.S.C. § 1225 ............................................................................................. 3, 4, 24

8 U.S.C. § 1226 ...................................................................................................... 3, 4

8 U.S.C. § 1229 ......................................................................................................... 3

8 U.S.C. § 1231 ................................................................................................ passim

8 U.S.C. § 1252 ................................................................................................ passim

8 U.S.C. § 1253 ............................................................................................... 23, 30

8 U.S.C. Chapter 12 ................................................................................................. 3

Pub. L. No. 107-40, 115 Stat. 224 (2001) ............................................................. 6

Restatement (Fourth) of the Foreign Relations Law of the United States § 404 (Am. L. Inst. 2018) ................................................................................................................... 24

**Other Authorities**

"Pending," *Black's Law Dictionary* (12th ed. 2024) ................................................... 27

"Pending," *Webster's Third International Dictionary of the English Language* (1993)............. 27

Dep't of Navy, U.S. Naval Station, Guantanamo Bay, Cuba Instruction 5500.1D (May 18, 2021) ...................................................................................................................... 6

H.R. Rep. No. 104-828 (1996).................................................................................... 31

H.R. Rep. No. 109-72, at 175 (2005) (Conf. Rep.), *reprinted in* 2005 U.S.C.C.A.N. 240, 299 .. 19

ICE, *Annual Report Fiscal Year 2024* (Dec. 19, 2024) ........................................... 3, 31

ICE, *Enforcement and Removal Operations* (last updated Apr. 28, 2025), https://perma.cc/HG34-VPJJ ............................................................................................................... 23

Letter from Sens. Gary C. Peters & Alex Padilla to President Donald J. Trump (May 2, 2025)... 8

Off. of Legal Counsel, Status of Guantanamo Bay 1 (Oct. 27, 1981) ........................................ 22

Press Release, U.S. Dep't of Homeland Sec., *DHS Releases Names of Worst of the Worst Convicted Criminal Illegal Aliens Detained at Guantanamo Bay* (Jul. 8, 2025) ................... 40

**Rules**

Federal Rule of Civil Procedure 12 .......................................................... 9, 39, 41, 43

Local Civil Rule 7.................................................................................................... 32, 35

## INTRODUCTION

This case challenges the government's unprecedented attempt to offshore our immigration detention system to the notorious military base at Guantánamo Bay, Cuba ("Guantánamo") located outside the United States. Plaintiffs-Petitioners ("Plaintiffs") are noncitizens who were detained at facilities inside the United States before being flown hundreds of miles away to the isolated base at Guantánamo where they are surrounded by military guards, deprived of regular contact with the outside world, and subject to punitive conditions of confinement in facilities previously used by the military to hold law-of-war detainees. Defendants-Respondents ("Defendants") have publicly boasted that they have instituted detention at Guantánamo to send a message to migrants to self-deport or stay away from the United States. Defendants also do not contest that, until this year, the government has never asserted authority to detain individuals outside the United States for civil immigration detention. Plaintiffs bring this putative class action to challenge this detention policy that exceeds the limits on detention set by our immigration laws, arbitrarily breaks from decades-long practice of confining immigration detention to U.S. territory, and violates the Constitution's prohibition against punitive civil detention.

The Court should deny Defendants' motion to dismiss because none of their arguments under Rule 12(b)(1) or 12(b)(6) pass muster.

Starting with Defendants' threshold justiciability arguments: Plaintiffs' claims, brought on behalf of a putative class of detained immigrants, are not moot under the well-established "inherently transitory" and "picking off" exceptions to mootness. Plaintiffs had standing when they filed their complaint because they were then detained at Guantánamo and were being harmed by Defendants' illegal and punitive detention there. They filed their motion for class certification while they were still detained at Guantánamo. If the Court grants class certification—which it

should for the reasons elaborated in Plaintiffs' concurrent briefing, *see* ECF Nos. 4, 30—the case is not moot and can move forward. Were it otherwise, Defendants could continue mooting out individual plaintiffs by transferring them from Guantánamo one by one and forever evading judicial review.

Nor does the Immigration and Nationality Act ("INA") strip the Court of jurisdiction because none of the INA provisions cited by the government bars review of the kind of systemic challenge at issue here. And Defendants' threshold arguments against an Administrative Procedure Act ("APA") cause of action likewise fail because Plaintiffs are challenging final agency action that is not committed to agency discretion.

Defendants' arguments fare no better on the merits. First, the INA does not authorize the use of an extraterritorial detention facility, and it certainly does not contain the requisite clear evidence of congressional intent required to overcome the presumption against extraterritorial application of U.S. laws. Second, Plaintiffs bring a textbook arbitrary and capricious claim, which Defendants cannot defeat on the merits without producing the administrative record ("AR"). Finally, Defendants ignore Supreme Court and Circuit case law prohibiting the punitive detention of civil detainees like Plaintiffs. Any factual disputes that Defendants raise as to the conditions on the ground would, of course, not be proper to decide on a motion to dismiss.

The Court should deny Defendants' motion in its entirety and direct Defendants to produce the certified AR within seven days of its order so that Plaintiffs may move expeditiously for summary judgment. This is especially urgent given Defendants' stated plans to expand detention at Guantánamo despite the lack of any legal authority to do so and the threat of worsening conditions at the facility.

## BACKGROUND

**I.    Legal and Statutory Background**

### A.  Guantánamo is Outside the United States.

There is no dispute between the parties that Guantánamo is outside the United States for purposes of the INA. In the INA, Congress enacted a comprehensive system governing the admission, presence, detention, and removal of noncitizens in the United States. *See* 8 U.S.C. ch. 12. The INA defines the term "United States," "when used in a geographical sense," as "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." 8 U.S.C. § 1101(a)(38). As Defendants acknowledge, Defs.' Mot. to Dismiss ("Mot.") 21, ECF No. 29. this does not include all U.S. territories, like American Samoa, nor does it include U.S. military bases on foreign territory, like the Guantánamo Bay Naval Station in Cuba. The INA's definition thus clarifies when a noncitizen is "present in the United States," *id.* § 1225(a)(1), "arrives in the United States," *id.*, and is "removed from the United States," *id.* §§ 1225(b)(1)(B)(iii)(I), 1226a(a), 1229a(a)(3).

### B. The INA Authorizes Detention Before—Not After—Removal.

The INA defines when removal occurs. Specifically, Section 1101(g) provides that one has been "deported or removed" once they have "left the United States." 8 U.S.C. § 1101(g). Consistent with that provision, Defendant U.S. Immigration and Customs Enforcement ("ICE") itself defines removal as "the compulsory and confirmed movement of an inadmissible or deportable noncitizen out of the United States." ICE, *Annual Report Fiscal Year 2024* at 30 (Dec. 19, 2024) ("*ICE Annual Report 2024*"), https://www.ice.gov/doclib/eoy/ iceAnnualReportFY2024.pdf.

3

The INA further provides that detention may only occur "pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). Thus, when individuals are in proceedings to determine whether they will receive a removal order, they may be held in "appropriate places of detention," *id.* § 1231(g)(1), which in turn are defined as "[d]etention facilities" such as a "prison, jail, detention center, or other comparable facility suitable for such use," *id.* § 1231(g)(2); *see also, e.g.*, *id.* § 1225(b)(1)(B)(ii), (iii)(IV) (individuals placed into expedited removal proceedings "shall be detained pending a final determination of credible fear of persecution," and if they pass a credible fear screening, "for further consideration of the application for asylum"); *id.* §§ 1225(b)(2)(A), 1226(a), 1226a(a)(2) (authorizing detention "for a proceeding under Section 240," "pending a decision on whether the [noncitizen] is to be removed;" or "until the Attorney General determines that the [noncitizen] [may] no longer . . . be certified [as an alien terrorist]"); *id.* § 1226(c) (authorizing detention of noncitizens who have committed crimes). As the Supreme Court recently summarized, "U.S. immigration law authorizes the Government to detain certain [noncitizens] seeking admission into the country . . . [and] to detain certain [noncitizens] already in the country pending the outcome of removal proceedings." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018).

Similarly, individuals may be detained in such facilities after receiving a removal order "pending" their removal from the United States. 8 U.S.C. § 1231(g)(1); *see also, e.g. id.* § 1231(a)(1)(A), (2)(A) (mandating detention during the 90-day "removal period" within which the government "shall remove" an individual who has been ordered removed), *id.* § 1231(a)(6) (authorizing detention of certain individuals "beyond the removal period"); *id.* § 1225(b)(1)(B)(iii)(IV) (mandating detention of individuals with expedited removal orders "until removed"); *id.* § 1226a(a)(2) (requiring that the government "maintain custody" of individuals

certified as terrorists "until the [noncitizen] is removed from the United States"). The purpose of detention in these circumstances is to ensure that the noncitizen is present "at the moment of removal." *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001); *see also Demore v. Kim*, 538 U.S. 510, 528 (2003) (detention pending removal proceedings "serves the purpose of preventing [flight] . . . , thus increasing the chance that, if ordered removed, the [noncitizens] will be successfully removed").

In short, the INA does not authorize the use of detention facilities once removal has occurred, but only "pending removal" (§ 1231(g)(1)), which in turn occurs when the individual has "left the United States" (§ 1101(g)). And no provision of the INA includes any language indicating that noncitizens may be held at permanent facilities outside the United States for the purpose of detention under the statute. The INA provides only that individuals who are in the process of removal should be "guard[ed] safely" during "transport to [their final] destination," 8 U.S.C. § 1231(d)(3), but—as discussed below—that is not what Defendants are engaged in at Guantánamo.

## II.     Factual Background

Until this year, the government had never used detention facilities outside the United States to detain noncitizens pursuant to the INA. *See* Compl. ¶ 4, ECF No. 1. That changed after January 29, 2025, when President Donald Trump issued a Memorandum directing the Secretary of Defense and Secretary of Homeland Security "to take all appropriate actions to expand the Migrant Operations Center [("MOC")] at Naval Station Guantanamo Bay to full capacity and to provide additional detention space for high-priority criminal aliens unlawfully present in the United States." *Id*. ¶ 24. The Memorandum stated an intent to detain as many as 30,000 immigration detainees at Guantánamo. *Id*. A Memorandum of Understanding ("MOU") between the

Department of Homeland Security ("DHS") and the Department of Defense ("DOD"), dated March 7, 2025, for "DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal" confirms that DHS has legal custody over noncitizens with final orders of removal at Guantánamo. *Id.* ¶ 29. Since then, the government has transferred well over 500 immigration detainees with final removal orders from detention facilities in the United States and held them at Guantánamo. *Id.* ¶ 31.

The government's use of Guantánamo to detain noncitizens under the INA—a civil immigration statute—stands in stark contrast to its prior, far more limited uses of the base.

In 2001, in the wake of the September 11 terrorist attacks, the United States government established a military prison on Guantánamo to hold law-of-war detainees pursuant to the 2001 Authority for Use of Military Force ("AUMF"). *See* Pub. L. No. 107-40, 115 Stat. 224 (2001). The military has held these law-of-war detainees at Guantánamo in a maximum-security prison complex with several buildings, including what is now referred to as "Camp 6" (or "Camp VI"). Compl. ¶¶ 22, 46.

The United States has also used Guantánamo to house migrants interdicted on the high seas who—unlike Plaintiffs and the proposed class—have never set foot on U.S. soil. *Id.* ¶ 23. Although the government has held these interdicted migrants at the MOC, it has consistently maintained that they "are not detained," but are merely "temporarily housed" on Guantánamo. *See* Dep't of Navy, U.S. Naval Station, Guantanamo Bay, Cuba Instruction 5500.1D at 4 (May 18, 2021), https://perma.cc/LE94-SKSR.[1]

---

[1] The Court may consider this policy document in evaluating Defendants' motion to dismiss as it is a government document of which the court may "take judicial notice." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

When the first immigration detainees were sent to Guantánamo on February 4, 2025, U.S. Customs and Border Patrol ("CBP") posted videos of them on social media, shackled and in chains, being transferred onto a military plane, stating that "[f]lights to Guantanamo Bay have begun." Compl. ¶ 25. And since then, Defendants have continued to hold out potential detention at Guantánamo (and its notorious reputation from the post-9/11 period) as a way to deter migrants from coming to or remaining in the United States, warning that noncitizens should "not come to this country or we will hunt you down, find you, and lock you up" in Guantánamo. *Id.* ¶¶ 38–42. The government is now using both Camp 6 and the MOC to hold immigration detainees transferred from ICE custody inside the United States. *Id.* ¶ 45.

The government has publicly referred to the immigration detainees held at Guantánamo as "the worst of the worst," and "high-threat" criminals who crossed the border to bring "violence and mayhem to our communities." *Id.* ¶ 27. But despite these statements, Defendants have detained people at Guantánamo who they acknowledge are "low-risk," with no record of encounters with law enforcement other than with immigration officials. *Id.* ¶ 28.

Moreover, while the government has asserted a need for detention at Guantánamo "to accomplish the President's priority of completing removals of individuals with final orders of removal," Mot. 24 (citing MOU), a large number of the detainees sent to Guantánamo, purportedly to stage for removal, have later been returned to detention facilities inside the United States. Compl. ¶ 33. Indeed, between January and April 2025, the government spent approximately $21 million on transportation alone to fly approximately 400 immigrants to Guantánamo, about half of whom were later flown *back* to the United States. *Id.* This underscores the lack of operational justification for immigration detention at Guantánamo, which is not only prohibitively expensive but also operationally more complicated. *Id.* ¶¶ 30–32.

The costs of the government's Guantánamo efforts continue to mount. Just more than one month into the operation, the government had spent approximately $40 million to transfer and detain immigration detainees at Guantánamo—at a reported $100,000 per day for each detainee, 600 times the cost of detention in the United States. Compl. ¶ 31; *see* Letter from Sens. Gary C. Peters & Alex Padilla to President Donald J. Trump (May 2, 2025), *available at* https://www.hsgac.senate.gov/wp-content/uploads/250502GTMO.pdf. Despite these exorbitant costs, the government has publicly stated that it plans to continue transferring immigration detainees from the United States to Guantánamo. *Id.* ¶¶ 41–42.

And the costs are not just financial. As detailed in Plaintiffs' complaint, immigration detainees at Guantánamo face detention conditions substantively worse than what they experience in detention facilities inside the United States. *Id.* ¶ 44. Detainees are primarily guarded by military personnel, *id.* ¶ 45, and detainees have reported significant abuse and mistreatment including invasive searches, excessive restraints, denial of basic necessities, and limited access to the outside world and legal materials, *id.* ¶¶ 46–52. Detainees have even attempted suicide as a result of the restrictive conditions at Guantánamo. *Id.* ¶ 53.

## III.    Procedural Background

Plaintiffs are noncitizens with final orders of removal who were apprehended in the United States and previously held in immigration detention facilities in the United States before being transferred to and detained at Guantánamo. Compl. ¶¶ 12–13. On June 4, 2025, Plaintiffs filed a challenge to the government's unprecedented use of Guantánamo for their detention. *Id.* ¶¶ 1–3. As set forth in their pending motion for class certification, Plaintiffs seek to represent the class of "[a]ll immigration detainees originally apprehended and detained in the United States, and who

are, or will be held at Naval Station Guantánamo Bay, Cuba." Mot. for Class Cert. 2, ECF No. 4. Their motion for class certification is fully briefed and pending. *See id.*; Reply, ECF No. 30.

## LEGAL STANDARD

Defendants seek to dismiss Plaintiffs' complaint under Rule 12(b)(1) on standing, mootness, and jurisdictional theories, and under Rule 12(b)(6) as to Plaintiffs' statutory, APA and constitutional claims.

Plaintiffs prevail on a Rule 12(b)(1) motion if they can establish jurisdiction, "assum[ing] the truth of all material factual allegations in the complaint and constru[ing] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged . . . ." *Am. Nat'l Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation marks and citations omitted). "While the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction, the court must still accept all of the factual allegations in the complaint as true." *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (cleaned up).

To survive dismissal under Rule 12(b)(6), Plaintiffs need simply allege sufficient facts in the complaint to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

I.  **Plaintiffs' Claims Are Justiciable.**

    A.    **Plaintiffs' Claims Are Not Moot.**

The government argues that Plaintiffs' claims are moot because the Named Plaintiffs "have departed" from Guantánamo and were removed to other countries. Defs.' Mot. to Dismiss, Mot. 7. But because it was *Defendants* who removed them, and because the Named Plaintiffs represent a putative Plaintiff class (which the government's argument essentially ignores), two exceptions to mootness apply.[2]

First, notwithstanding the removal of the Named Plaintiffs, there is still a live controversy between the Plaintiff class members detained at Guantánamo and Defendants—and that is enough to keep the case from being moot.

Under the "inherently transitory" exception to mootness, the Named Plaintiffs' removal from Guantánamo after their complaint and motion for class certification were filed (but before the Court could resolve the motion or the government's motion to dismiss the complaint) does not negate their ability to serve as class representatives or prevent the class complaint from moving forward. As discussed in Plaintiffs' reply in support of class certification, ECF No. 30 at 2–6, it is well-established that "where a named plaintiff's claim is 'inherently transitory,' and becomes moot prior to certification, a motion for certification may 'relate back' to the filing of the complaint." *J.D. v. Azar*, 925 F.3d at 1308 (cleaned up) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569

---

[2] None of the cases the government cites in support of its mootness argument involved a class complaint. *See, e.g.*, *Gul v. Obama*, 652 F.3d 12 (D.C. Cir. 2011) (non-class habeas action); *Abdullah v. Trump*, No. 25-5002, 2025 WL 914093 (D.C. Cir. Mar. 24, 2025) (same). And almost all of them explicitly distinguish mootness in the class context from mootness as it applies in ordinary litigation. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 192 (2000); *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 72 n.27 (1997).

U.S. 66, 71 n.2 (2013)); *see also Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991); *Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975). Under the inherently transitory exception, the certified "class is deemed to have attained" a "'legal status separate from the interest asserted' by the representatives" on the date the complaint was filed. *J.D.*, 925 F.3d at 1307–08 (quoting *Sosna*, 419 U.S. at 399). Notably, "the Supreme Court specifically 'crafted the exception in injunctive class actions,' such as this one, 'challenging criminal and immigration detention procedures.'" *Mons v. McAleenan*, No. 19-1593 (JEB), 2019 WL 4225322, at *6 (D.D.C. Sept. 5, 2019) (citations omitted).

Here, the inherently transitory exception applies because (1) "the individual claim might end before the district court has a reasonable amount of time to decide class certification" and (2) "some class members will retain a live claim at every stage of litigation." *J.D.*, 925 F.3d at 1311.

When Defendants transferred Mr. Luna Gutierrez and Mr. Lopez Ocon in June 2025, they had been detained for 37 and 13 days at Guantánamo, respectively, and Defendants effectuated both transfers well before they even submitted their opposition to the motion for class certification on July 25 and their motion to dismiss on August 8. Some detainees have been held for as long as six weeks. Compl. ¶ 44. This all falls squarely within the length of time courts have found to be inherently transitory. *See, e.g.*, *J.D.*, 925 F.3d at 1311 ("one-year immigration detention" and "a full term of pregnancy, let alone *the remaining weeks* for obtaining a pre-viability abortion" (emphasis added)); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 183 (D.D.C. 2015) (period of detention lasting "weeks or months"); *Mons*, 2019 WL 4225322, at *7 (applying exception to claims that "most likely" remained live for a maximum of six months). Application of the exception is particularly warranted here because class members spend "uncertain and unpredictable" periods of time at Guantánamo, so it is "largely impossible" for a court to determine

in advance whose claims will be live past the outer boundary of an inherently transitory period. *Id*.; *see also Thorpe v. District of Columbia*, 916 F. Supp. 2d 65, 67 (D.D.C. 2013) (applying exception where "length of any individual's stay" was "impossible to predict"). And Plaintiffs also satisfy the second requirement, that "some class members will retain a live claim at every stage of litigation," *J.D.*, 925 F.3d at 1311, because Defendants continue to transfer individuals from immigration detention in the United States to Guantánamo and subject them to *ultra vires* and punitive detention there.

Second, the "picking off" exception to mootness also applies. *See Wilson v. Gordon*, 822 F.3d 934, 947 (6th Cir. 2016) (describing when "a defendant picks off named plaintiffs in a class action before the class is certified" by "strategically mooting named plaintiffs' claims in an attempt to avoid a class action"). The Supreme Court has held that defendants cannot use "picking off" tactics to moot a case. *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980). "Requiring multiple plaintiffs to bring separate actions, which effectively could be 'picked off' by a defendant[]," would "waste . . . judicial resources" and "frustrate the objectives of class actions." *Id.; see Richardson v. Bledsoe*, 829 F.3d 273, 279–80 (3d Cir. 2016) (applying the picking off exception when the named class representative was transferred out of a penitentiary before the class was certified); *Wilson*, 822 F.3d at 947–52 (affirming the application of the picking off exception when named plaintiffs received relief before certification); *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1250 (10th Cir. 2011) (applying picking off exception when defendant offered full amount of requested relief to named plaintiff before class certification); *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090–92 (9th Cir. 2011) (same);

*Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1050 (5th Cir. 1981) (same).[3] Like the "inherently transitory" exception, the "picking off" exception enables courts to relate the liveness of claims back to the filing of the complaint. *See, e.g.*, *Wilson*, 822 F.3d at 948; *Richardson*, 829 F.3d at 286.

      The government's actions show that the exception applies here. The government removed both Named Plaintiffs after they filed the complaint and sought class certification, and then opposed certification and moved to dismiss the complaint on the basis of those removals. But Defendants do not dispute that the government plans to continue transferring individuals for detention at Guantánamo. Under Defendants' view, Guantánamo detainees will have to keep filing new cases that the government could simply moot at will through transfers from Guantánamo, frustrating review and expending litigants' and judicial resources. This is precisely the situation that the "picking off" exception (like the "inherently transitory" one) is meant to prevent.[4]

      **B.    Plaintiffs Have Standing.**

      "Standing is 'assessed as of the time a suit commences,' meaning that post-complaint events will not deprive a plaintiff of standing." *Nat'l Council of Nonprofits v. Off. Of Mgmt. & Budget*, 763 F. Supp. 3d 36, 45 (D.D.C. 2025) (quoting *Chamber of Commerce of the U.S. v. EPA*,

---

[3] The D.C. Circuit has not yet addressed the "picking off exception." *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 194 n.4 (D.D.C. 2024) (Lamberth, J.).

[4] Plaintiffs do not maintain this suit, as Defendants suggest, under the collateral consequences doctrine. *Contra* Mot. 7–8. Defendants' argument regarding the lack of "real and immediate" "injury or threat of injury" under the *City of Los Angeles v. Lyons* test is also irrelevant because that case addressed standing, not mootness. 461 U.S. 95, 96 (1983). But standing is "assessed as of the time a suit commences," and, as discussed below, Plaintiffs were detained at Guantánamo and had standing at the time of the filing of the suit. *Hinton v. District of Columbia*, 567 F. Supp. 3d 30, 48 (D.D.C. 2021) (quoting *D.L. v. District of Columbia*, 302 F.R.D. 1, 19 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017)); *see also Nat. L. Party of U.S. v. Fed. Election Comm'n*, 111 F. Supp. 2d 33, 40 (D.D.C. 2000).

642 F.3d 192, 200 (D.C. Cir. 2011)). The Plaintiffs here undoubtedly had standing when they filed this lawsuit.

For standing, "the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). An imminent injury is one that is either "certainly impending" or there is a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). At the pleading stage, a plaintiff need only "state a plausible claim" that each of the standing elements is present. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (quoting *Food & Water Watch, Inc., v. Vilsack,*, 808 F.3d 905, 913 (D.C. Cir. 2015) and *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)).

Here, Plaintiffs had standing to bring all of their claims: (1) that the government lacks statutory authority to detain them at Guantánamo, *see* Compl. ¶¶ 62–64; (2) that the government has detained them at Guantánamo in violation of the Administrative Procedure Act, *id*. ¶¶ 65–69; (3) that their detention at Guantánamo constitutes unlawful punishment in violation of their Fifth Amendment right to substantive due process, *id*. ¶¶ 70–73; and (4) that their detention constitutes a violation of habeas corpus, *id*. ¶¶ 74–75. At the time they filed the complaint, Named Plaintiffs were detained at Guantánamo, and the very fact of their detention forms the basis of their injury and claims. *See id.* ¶¶ 62–75. That is enough for standing.

Defendants argue that because neither Named Plaintiff was detained specifically at the MOC, they lack standing with respect to at least some of their claims based on minor differences between Defendants' provision of legal calls, telephone access, and security protocols between Camp 6 and the MOC. Mot. 9. But Defendants miss the point: the central injury suffered by Plaintiffs is the very fact of their detention at Guantánamo in the first place—regardless of whether

14

it is at the MOC or Camp 6 side of the facility. The agency actions that Plaintiffs challenge in their complaint do not vary between Camp 6 and the MOC. For instance: if the INA does not authorize detention at Guantánamo, it does not matter where on the base they are detained; similarly, if Defendants are detaining people at Guantánamo for a nonpermissive purpose to deter migrants, that too applies at both sides of the facility. Moreover, the government's citation of *Brennan v. City of New York*, No. 19-CV-02054 (NGG) (CLP), 2023 WL 5672590 (E.D.N.Y. Sept. 1, 2023), is inapposite; there, "[n]one of the Named Plaintiffs were detained at [a particular facility] at the time they brought th[e] suit," *id.* at *10, but here, Defendants concede that both Named Plaintiffs were detained at Guantánamo at the time they filed the complaint. *See* Mot. 5.

Defendants' final argument against standing—which is applicable only to Plaintiffs' punitive-detention argument—boils down to insisting that the two Named Plaintiffs did not "allege[] suffering" from *all* of the unconstitutional conditions suffered by the class. Mot. 10. That is not a standing argument, but an argument against the class typicality requirement, which Plaintiffs have addressed in their class certification briefs. *See* ECF No. 28 at 28–30 (government's argument on the same basis); ECF No. 30 at 13–14 (explaining why that argument fails in the class typicality context, too). For standing at the "pleading stage," all Plaintiffs must do is make "general factual allegations of injury resulting from the defendant's conduct . . . , for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim[s]." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quotation omitted); *see Thorpe v. District of Columbia*, 303 F.R.D. 120, 143 (D.D.C. 2014). They have done that with respect to each claim and form of relief sought here regarding their detention at Guantánamo. *See Monsanto Co.*, 561 U.S. at 153.

II.      **The INA Does Not Strip the Court of Jurisdiction Over Plaintiffs' Claims.**

Defendants are wrong that the Court lacks jurisdiction either under the APA or in habeas over Plaintiffs' challenge to detention at Guantánamo. As an initial matter, this case is not about individual discretionary decisions over where a noncitizen is detained. Rather, Plaintiffs have brought a challenge to Defendants' use of an overseas detention facility for civil immigration detention. None of the INA provisions cited by the government, Mot. 10–13, bars review of the legality of a detention policy or practice. Because Plaintiffs raise nondiscretionary statutory, APA, and constitutional claims, this case falls well within the kind of legal challenge that courts regularly review. *See, e.g.*, *Zadvydas*, 533 U.S. at 688; *Damus v. Nielsen*, 313 F. Supp. 3d 317, 327–28 (D.D.C. 2018); *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 60 (D.D.C. 2020).

A.      8 U.S.C. § 1252(g)

Section 1252(g) does not bar review for three separate and independent reasons.

First, detention-related decisions, including location of detention, are not among the actions to which § 1252(g) applies. The statute "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrim. Comm. (AADC)*, 525 U.S. 471, 482 (1999) (citing 8 U.S.C. § 1252(g)). As the Supreme Court explained, § 1252(g) is "narrow[]" and directed "against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Id.* at 482, 485 n.9. Though Defendants try to paint detention at Guantánamo as a discretionary part of the removal process, the Supreme Court has already "rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'" *Dep't Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting *AADC*, 525 U.S. at 482). Thus, courts have reviewed a number

16

of actions that relate to the removal process over the government's objection. *See, e.g.*, *id.* (rescission of policy that deferred removal); *Zadvydas*, 533 U.S. at 688 (immigration detention); *Jama v. Immigr. & Naturalization Servs.*, 329 F.3d 630, 632 (8th Cir. 2003), *aff'd sub. nom. Jama v. Immigr. & Cust. Enforcement*, 543 U.S. 335 (2005) (whether removal was statutorily authorized); *D.A.M.*, 474 F. Supp. 3d at 60 (challenge to the "physical manner of [] deportation"). Likewise, § 1252(g) does not address detention location and does not bar review here. [5]

Second, § 1252(g) applies only to "discretionary determinations," *AADC*, 525 U.S. at 485, but Plaintiffs are bringing statutory and constitutional challenges to *nondiscretionary* actions. As noted, the Supreme Court has interpreted § 1252(g) to address decisions involving prosecutorial discretion, where the action is within the government's discretion to make. *Id.* at 485 n.9, 486–87. But it does not reach claims that challenge the government's authority to take the action in the first instance—here, whether detention at Guantánamo is authorized by the INA, or comports with the APA and due process. Defendants do not have discretion to violate legal limits. *See, e.g.*, *Zadvydas*, 533 U.S. at 688 ("[T]he extent of that [detention] authority is not a matter of discretion."); *Bowrin v. U.S. I.N.S.*, 194 F.3d 483, 488 (4th Cir. 1999) ("§ 1252(g) does not apply to agency interpretations of statutes . . . ."); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) (§ 1252(g) "does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions"); *Garcia v. Att'y Gen.*, 553 F.3d 724, 729 (3d Cir. 2009) (same); *Arce v. U.S.*, 899 F.3d 796, 800–01 (9th Cir. 2019) (same); *D.A.M.*, 474 F. Supp. 3d at 60 (same).

---

[5] Defendants' cases, Mot. 11–12, do not compel a different result: *Guangzu Zheng v. Decker*, did not address § 1252(g) or *AADC*, No. 14cv4663, 2014 WL 7190993 (S.D.N.Y. Dec. 12, 2014); and *Jacquet v. Hodgson*, provided no analysis, let alone address *AADC*. No. Civ.A. 03–11568RWZ, 2003 WL 22290360 (D. Mass. Oct. 6, 2003).

Third, § 1252(g) is not a wholesale bar on judicial review, but a channeling provision designed to "mak[e] it clear that [the] specified decisions and actions . . . are covered by the 'zipper' clause" of the companion provision, 8 U.S.C. § 1252(b)(9). *AADC*, 525 U.S. at 483 (emphasis omitted). But, as discussed below and contrary to Defendants' assertions, § 1252(b)(9) does not apply to Plaintiffs' claims.

B.    8 U.S.C. § 1252(b)(9)

Section 1252(b)(9) is a channeling provision that funnels certain challenges to removal orders to the courts of appeals by petitions for review ("PFR")—but it is not "a shorthand for any agency action that might ultimately facilitate the removal of a class of aliens." *O.A. v. Trump*, 404 F. Supp. 3d 109, 132 (D.D.C. 2019) ("Just as it was 'implausible' in *AADC* to construe 'the mention of three discrete events along the road to deportation' in § 1252(g) as 'a shorthand way of referring to all claims arising from deportation proceedings,' it is implausible to construe § 1252(b)(9)'s mention of an 'action taken' or a 'proceeding brought to remove an alien' as shorthand for any agency action that might ultimately facilitate the removal of a class of aliens." (quoting *AADC*, 525 U.S. at 482) (emphasis omitted)). It does not bar challenges to the legality of detention. *See*, *e.g.*, *Jennings*, 583 U.S. at 293–94 (plurality opinion) (rejecting government's expansive interpretation of § 1252(b)(9) and affirming district court jurisdiction over a challenge to immigration detention); *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (finding 1252(b)(9) did not preclude review of detention challenge). Nor does it preclude district court review where a claim cannot meaningfully be brought through the PFR process. *See*, *e.g*., *Jennings*, 583 U.S. at 293–94 (rejecting government's expansive interpretation of § 1252(b)(9) and affirming district court jurisdiction over a challenge to immigration detention because it could not be brought by PFR); *E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec*., 950 F.3d 177, 186 (3d Cir. 2020) (§ 1252(b)(9)

18

does not "strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside review of a final order of removal").

Here, Plaintiffs do not challenge their final orders of removal but only whether they can be detained extraterritorially while the government makes arrangements for their removal. "The question is not whether *detention* is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action," *Jennings*, 583 U.S. at 295 n.3—and here, the legal questions arise from the legality of Plaintiffs' detention at Guantánamo. Indeed, in enacting the REAL ID Act of 2005, Congress "stated unequivocally" that § 1252(b)(9) "should not be read to preclude . . . challenges to detention," because detention claims are "independent of challenges to removal orders." *Aguilar v. U.S. Immig. & Cust. Enforcement*, 510 F.3d 1, 11 (1st Cir. 2007) (citing H.R. Rep. No. 109-72, at 175 (2005) (Conf. Rep.)), *reprinted in* 2005 U.S.C.C.A.N. 240, 299)); *cf.* Mot. 13 (citing *Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 151 n.3 (2d Cir. 2006)). Moreover, Plaintiffs' challenge to extraterritorial detention arose *after* their removal proceedings concluded. *See Jama*, 329 F.3d at 337; *Zadvydas*, 533 U.S. at 684–86. Critically, Defendants do not explain how Plaintiffs could raise this claim in their removal proceedings at all, and their cited cases only confirm that § 1252(b)(9) poses no barrier here. Mot. 13; *see also S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, 605 F. Supp. 3d 157, 167 (D.D.C. 2022) (distinguishing cases like *J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016), because they "center[] on the process due in removal proceedings").

C.    8 U.S.C. § 1252(a)(2)(B)(ii)

Section 1252(a)(2)(B)(ii) likewise does not bar review here. That provision precludes review of "any [] decision or action of the Attorney General . . . the authority for which is *specified* under this subchapter to be in the *discretion* of the Attorney General . . . ." 8 U.S.C.

19

§ 1252(a)(2)(B)(ii) (emphases added). But as the Supreme Court established in *Kucana v. Holder*, § 1252(a)(2)(B)(ii) applies only to those decisions where Congress has "set out the Attorney General's discretionary authority in the statute." 558 U.S. 233, 247 (2010). Defendants point specifically to § 1231(g) as supplying the authority to transfer and detain people at Guantánamo. Mot. 12. But § 1231(g) nowhere even mentions or authorizes "transfer," and "there is considerable uncertainty as to whether § 1231(g)(1) encompasses the authority to transfer detainees" at all. *Aguilar*, 510 F.3d at 20. And even if § 1231(g) *implicitly* authorizes transfers, it certainly does not *specify* that the power to transfer is discretionary.[6]

Regardless of whether § 1231(g) encompasses the authority to transfer or delegates the requisite discretion to transfer, § 1252(a)(2)(B)(ii) does not apply because Plaintiffs "do not seek review of the Attorney General's exercise of discretion." *Zadvydas*, 533 U.S. at 688. Plaintiffs are challenging the legal extent of the government's authority, and "the extent of that authority is not a matter of discretion," and, thus, not subject to § 1252(a)(2)(B)(ii). *Id.* (finding jurisdiction over challenge to statute explicitly providing that the Attorney General "may" detain noncitizens after a final order of removal is entered). Indeed, in *Damus v. Neilsen*, a court in this District easily rejected application of § 1252(a)(2)(B)(ii) where "petitioners were not in fact challenging [the]

---

[6] *See Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209–10 (4th Cir. 2019) (relying on *Kucana* to hold that § 1252(a)(2)(B)(ii) does not bar review of transfer decisions); *Aguilar*, 510 F.3d at 20 (reaching same conclusion pre-*Kucana*, noting "stark contrast" between § 1231(g) and other provisions of the INA that clearly specify a particular authority as discretionary). Defendants' cited cases, Mot. 12–13, do not support a contrary result because they either did not address jurisdiction, let alone § 1252(a)(2)(B)(ii), *see Gandarillas-Zambrana v. Bd. Immig. Appeals*, 44 F.3d 1251 (4th Cir. 1995); *Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006) (assuming jurisdiction); *Edison C. F. v. Decker*, No. 20-15455, 2021 WL 1997386, at *6 (D.N.J. May 19, 2021) (same), or they predate and thus conflict with *Kucana*, *see Van Dinh v. Reno*, 197 F.3d 427 (10th Cir. 1999); *Rady v. Ashcroft*, 193 F. Supp. 2d 454, 457 (D. Conn. 2002).

decisionmaking" "to detain a noncitizen" but rather raised legal challenges to the extent of that authority. 313 F. Supp. 3d at 327.

***

In sum, nothing in the INA precludes the Court's review of Plaintiffs' claims.

## III.    Plaintiffs State a Claim Under the INA Because Defendants Lack Authority to Detain Extraterritorially.

The INA is subject to the longstanding "presumption that Acts of Congress do not ordinarily apply outside our borders" but "only within United States territory." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 173 (1993). This presumption applies "across the board," *RJR Nabisco Inc. v. v. European Community*, 579 U.S. 325, 336 (2016), "in all cases," *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 261 (2010). It reflects "the commonsense notion that Congress generally legislates with domestic concerns in mind." *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993).

This presumption can only be rebutted where "Congress has affirmatively and unmistakably instructed" that a statutory provision applies extraterritorially. *RJR Nabisco*, 579 U.S. at 335. Here, Defendants cannot point to any such clear evidence of congressional intent to permit extraterritorial immigration detention. Indeed, the statutory text and structure, as well as the Supreme Court's decision in *Sale*, all confirm that the INA does not authorize extraterritorial detention. There is nothing even approaching the requisite clear command necessary for the government to rebut the strong presumption against extraterritorial application of statutes.

Defendants do not dispute that Guantánamo is outside the United States for purposes of the INA. *See* 8 U.S.C. § 1101(a)(38) (defining "the United States" for INA purposes); Mot. 21 ("acknowledg[ing]" Guantánamo's "status for the purposes of the INA"); Resp'ts' Opp. to Mot. for Stay, *Espinoza Escalona v. Noem*, No. 25-cv-604 (D.D.C. Mar. 10, 2025), ECF No. 14

21

("*Escalona* Gov Br.") at 27 (same); *see also* Off. of Legal Counsel, Status of Guantanamo Bay 1 (Oct. 27, 1981), https://perma.cc/2H5F-QPL7 (same). Nor do they claim that the INA contains an express statement that the Congress wished for the detention provisions to apply extraterritorially.

While Defendants are correct that an express statement is not always required, Mot. 19, they have not and cannot produce any evidence that would make this one of the "rare" situations where a court will find such a clear instruction without an "express statement of extraterritoriality." *RJR Nabisco*, 579 U.S. at 340; *see e.g.*, *id.* at 338 (statute contained provisions that "plainly" "applie[d] *only* to conduct occurring" abroad). Defendants bear a heavy burden to establish that Congress has—through context, purpose, legislative history, or statutory structure—"affirmatively and *unmistakably* instructed that the provision at issue should apply to foreign conduct." *Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412, 417–18 (2023) (citation modified and emphasis added). As the Supreme Court has made clear, this is a high bar. *See, e.g.*, *Morrison*, 561 U.S. at 262–63 (provision defining "commerce" as including "trade . . . between any foreign country and any State" did not "defeat the presumption against extraterritoriality") (quotation marks and citation omitted); *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 250–51 (1991) (same for broad terms like "employer," "commerce," and "industry affecting commerce") (collecting cases); *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 118 (2013) (statute that applied to "any civil action" by a noncitizen for violations of the law of nations did not "evince a clear indication of extraterritoriality") (quotation marks and citation omitted); *see United States v. Al-Imam*, 373 F. Supp. 3d 247, 257 (D.D.C. 2019) ("[C]ontext, purpose, legislative history, and statutory structure are unavailing unless they amount to a 'clear indication' of intended extraterritoriality." (quoting *Kiobel*, 569 U.S. at 115)). Indeed, the government has previously acknowledged this exceedingly high bar, arguing in the Supreme Court, in a case also involving the INA, that the presumption was

22

not rebutted "unless there is a 'clearly expressed,' 'affirmative intention' by Congress to the contrary." *See* Br. for Pets., 1992 WL 541276, at \*27, 32–36 & n.20, *Sale*, 509 U.S. 155 ("*Sale* Gov. Br.") (arguing that language in former INA § 1253(h), which indicated that the provision applied to "'any alien,'" did "not constitute the sort of specific expression of congressional intent . . . necessary to overcome the presumption"); *see also* Pet. for Cert. at 19–20, No. 25-5 (U.S. 2025), *Noem v. Al Otro Lado*, 138 F.4th 1102 (9th Cir. 2025) (same as to INA provisions for asylum and inspection of applicants for admission).

Defendants' claim that the presumption is overcome is based almost entirely on their argument that removal itself is inherently extraterritorial. Mot. 18–23. But this argument wrongly conflates the government's authority to *detain* individuals with removal orders in detention facilities meant for that purpose and its authority to *execute* those removal orders. Detention and removal are distinct processes authorized by different statutory provisions, carried out by different divisions of ICE.[7] Defendants get no mileage out of certain of the INA's *removal* provisions applying abroad because they must rebut the presumption as to the specific provision authorizing *detention*. *See Morrison*, 561 U.S. at 265 ("[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms."); *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455–56 (2007) (when a statute "cover[s] certain activity abroad," the presumption "remains instructive in determining the *extent* of the statutory exception"); Restatement (Fourth) of the Foreign Relations Law of the United States

---

[7] As explained on ICE's website, the agency organizes itself into several divisions with distinct responsibilities. *See* ICE, *Enforcement and Removal Operations* (last updated Apr. 28, 2025), https://perma.cc/HG34-VPJJ. The "Custody Management Division" is in charge of ICE's detention operations, including "the acquisition of detention facilities," while a separate "Removal Division" "coordinates, manages and facilitates efforts to remove [noncitizens] from the United States," including "collaborating . . . with . . . foreign embassies and consulates, and international partners." *Id.*

§ 404 reporters' note 9 (Am. L. Inst. 2018) ("[A] court applying the presumption against extraterritoriality must do so provision by provision.").

Confronted by this dearth of evidence, Defendants attempt to recast the detention statutes as a subspecies of removal statutes, arguing that "'removal'" under the INA is a "multi-step process that often involves detention, transfer, and travel." Mot. 22. In particular, Defendants assert that "Sections 1231(a)(2) and (6) and 1225(b)(1)(B)(iii)(IV) [the post-final-order detention statues] afford the Secretary extraterritorial authority to manage international removal operations," Mot. 19, and that by "transporting the detainee to their country of removal . . . ICE routinely exercises its §§ 1231 and 1225 detention authority outside of the United States," Mot. 21. But that is not what the detention statutes say. As explained in Defendants' own brief, the provisions authorizing detention of individuals with expedited removal orders under 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) and those with final removal orders under 8 U.S.C. § 1231(a)(2) and (a)(6) only provide for detention "until they are removed from the United States" or "while the government works to execute the removal order." Mot. 3. These detention provisions say nothing about the removal process itself such that they would require extraterritorial application in the form of authorization for the construction and use of detention facilities abroad. Nor do these detention statutes say anything about where such individuals can be detained while they are awaiting removal, and certainly nothing that suggests they can be detained for long periods in either permanent or ad hoc detention facilities outside the United States.

Defendants also cannot rebut the presumption by relying on 8 U.S.C. § 1103(a)(3), which only authorizes the Secretary of DHS to take actions "deem[ed] necessary for carrying out his authority under" the INA. That is not a clear grant of free-floating, unlimited authority to take any actions abroad, and Defendants have not identified any specific statutory authority to run a

24

detention facility abroad. *See, e.g.*, *Arabian Am. Oil Co.*, 499 U.S. at 251 ("[S]tatutes that contain . . . broad jurisdictional language" do not rebut the presumption where they "contain[] no words which definitely disclose an intention to give [them] extraterritorial effect[.]") (citation modified) (collecting cases); *see also Nagahi v. Immigr. & Naturalization Servs.*, 219 F.3d 1166, 1170 (10th Cir. 2000) (holding that Attorney General could not rely on § 1103(a)(3) to issue regulation limiting time that applicant could seek judicial review because "the obvious scope of th[e] grant [of authority under § 1103(a)(3)] is limited to acts which allow the Attorney General to carry out her [delegated] authority"). That general language certainly is not sufficient to overcome the presumption against extraterritoriality.[8]

In fact, as Defendants appear to recognize, the only detention provision that addresses *where* individuals can be detained pending removal is 8 U.S.C. § 1231(g). But this provision says nothing to indicate that such facilities can be outside the United States, and certainly nothing that would constitute the kind of "affirmativ[e] and unmistakabl[e]" evidence of intent that is required to rebut the presumption against extraterritoriality. *See Abitron Austria GmbH*, 600 U.S. at 417–18.

Contrary to Defendants' suggestion, Mot. 19, § 1231(g)'s mention of the general term, "United States Government facilities," does not overcome the presumption because nothing in the provision affirmatively indicates facilities abroad. *See Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 122 (D.C. Cir. 2022) (the presumption against extraterritorial application of statutes "is rebutted

---

[8] Defendants misread *Sale* as "assuming" that § 1103(a)(3) applies extraterritorially. Mot. 20. But the Supreme Court in *Sale* made no such assumption. *See* 509 U.S. at 171. While *Sale* briefly discussed § 1103(a)(3), it did so only to note that the *lower court*'s citation to § 1103(a)(3) did not support its conclusion that the term "Attorney General" in an INA provision included other executive officials, because § 1103(a)(3) draws an explicit distinction between the authorities of the Attorney General and those of other executive officials. *Id.*

only when the statute's text, history, or purposes evince a clear indication of extraterritorial reach" (quoting *Kiobel*, 569 U.S. at 109) (quotation marks and alterations omitted)). As the Supreme Court has repeatedly made clear, general terms in a statute cannot be interpreted to apply extraterritorially absent specific evidence of such intent. *See Morrison*, 561 U.S. at 262–63; *Arabian Am. Oil Co.,* 499 U.S. at 251. In the case Defendants cite for support, a district court found "many obvious extraterritorial applications" of a criminal statute that is (also obviously) not at issue here. *Al-Imam*, 373 F. Supp. 3d at 261–62; *see* Mot. 20. But that court did so only after reluctantly applying a unique "century-old chestnut of extraterritoriality doctrine" applicable only to "certain kinds of federal criminal statutes" that it acknowledged "sits uneasily with" the Supreme Court's modern presumption against extraterritoriality cases. *Al-Imam*, 373 F. Supp. 3d at 257 (discussing *United States v. Bowman*, 260 U.S. 94 (1922)); *see id.* ("Because *Bowman* remains binding on the lower courts, this Court must assume that satisfying *Bowman* is one way of 'clear[ly] indicati[ng]' a federal statute's extraterritorial reach—even if *Bowman* itself requires no 'affirmative' evidence of a deliberate congressional decision to permit overseas applications." (quoting *Morrison*, 561 U.S. at 255, and *Kiobel*, 569 U.S. at 115)). Even if that doctrine can survive the Supreme Court's modern presumption cases—and is not at all clear that it can[9]—it has no application here.

    Indeed, the best reading of Section 1231(g) is that it authorizes the use of detention facilities to detain individuals while they are waiting for removal to begin. Specifically, § 1231(g) authorizes

---

[9] As the district court in *Al-Imam* acknowledged, "the Supreme Court has not yet attempted to reconcile the stability-serving values undergirding recent civil decisions like *Morrison* and *Kiobel* with the reality that *Bowman* is 'not easy to administer.'" *Al-Imam*, 373 F. Supp. 3d at 257 (quoting *Morrison*, 561 U.S. at 258). Indeed, the only time any Supreme Court opinion has even cited *Bowman* since 1958 came in a dissenting opinion written by Justice Scalia. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 814 (1993) (Scalia, J., dissenting).

the Secretary to arrange for places of detention for individuals detained "pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). The term "pending" could, in isolation, mean "while awaiting" (i.e., "until") or "during."[10] But as used in § 1231(g), it can only mean "while awaiting" or "until." In the statute, the word applies to *both* "removal" and "a decision on removal." And as applied to the latter, "pending" could not mean "during"—because, by its very nature, a "decision on removal" is issued at one single moment in time. Thus, the only way to make sense of the phrase "pending removal or a decision on removal" is for it to mean "while awaiting" (or "until") removal or a decision on a removal. *See Clark v. Martinez*, 543 U.S. 371, 378 (2005) (when one statutory term "applies without differentiation" to multiple categories of noncitizens, "[t]o give these same words a different meaning for each category would be to invent a statute rather than interpret one").

This reading is reinforced by other parts of the statute. For instance, 8 U.S.C. § 1231(a)(3), which provides that an individual who cannot be removed during the 90-day removal period shall "*pending removal*, . . . be subject to supervision." *Id*. (emphasis added). Individuals released from detention subject to supervision are thus similarly "awaiting removal," not released "during removal."

Because § 1231(g) only authorizes detention while individuals are awaiting removal, it does not authorize detention outside the country. As the INA provides in § 1101(g), "any [noncitizen] ordered deported or removed . . . *who has left the United States*, shall be considered to have been deported or removed. . . ." *Id*. (emphasis added). An individual transported by the

---

[10] Webster's defines "pending" to mean "during"—"through the period of continuance or indeterminacy of," or to mean "while awaiting"—"until the occurrence . . . of." *See* "Pending," *Webster's Third International Dictionary of the English Language* (1993); *see also* "Pending," *Black's Law Dictionary* (12th ed. 2024) (defining "pending" either as "[t]hroughout the continuance of; during" or "[w]hile awaiting; until").

government outside the country to Guantanamo has thus "left the United States" (§ 1101(g)) and is accordingly no longer "pending removal" (§ 1231(g)).

Notably, Defendants never address § 1101(g) head-on, though they put forth several theories for why detainees who have been transported outside the United States to Guantánamo are not "removed." Mot. 21–23 (arguing that United States has control over the naval station and has not relinquished custody of detainees at Guantánamo). But § 1101(g) does not condition the fact of removal on the government relinquishing custody. As multiple cases have held, a person is considered removed under the INA once they leave the United States, regardless of intent or whether they remain in U.S. custody. *See, e.g.*, *Nicusor-Remus v. Sessions*, 902 F.3d 895, 897, 899–900 (9th Cir. 2018) (holding that removal order was executed where noncitizen was escorted by ICE agents across the border into Mexico and then escorted back into the United States to testify at trial, and hence was in U.S. custody at all times); *Aguilera-Ruiz v. Ashcroft*, 348 F.3d 835, 836 (9th Cir. 2003) (brief departure to Tijuana executed removal order, even though noncitizen had no intention to do so). And the fact that the government exercises control over the base does not change the fact "Guantánamo is not within, nor is it subject to, the territorial jurisdiction of the United States for purposes of the INA." Brief for Appellants, *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412 (11th Cir. 1995), 1994 WL 16506602, at *26–27 (government citing 8 U.S.C. § 1101(a)(38) and arguing that refugee provisions of the INA do not apply to Guantánamo). In fact, as recently as a few months ago, the government itself took this very position and argued that removal occurs when a flight leaves the United States. *See, e.g.*, *Melgar-Salmeron v. Bondi*, No. 23-7792 (2d Cir. May 28, 2025), Dkt. No. 38-1 at 10, *available at* https://static01.nyt.com/newsgraphics/documenttools/a1487cf7641993de/0c230f5d-full.pdf [https://perma.cc/RRZ5-MPTL] (government stating that petitioner's removal occurred "at

approximately 10:20 a.m. EDT" when "Petitioner's flight departed Alexandria, Louisiana" to argue that it had not failed to comply with a judicial stay order that was entered while the petitioner's removal flight was still at the airport in Louisiana).

The government nonetheless argues that it must have the power to construct and utilize extraterritorial detention facilities because otherwise it would lack statutory authority to maintain custody and restrain individuals while on a removal plane or during a refueling stopover in a third country. But that is an enormous logical leap. The government can, of course, restrain individuals while transporting them in the process of executing a removal. *See* 8 U.S.C. § 1231(d)(3) (authority to compel carriers to "take on board, guard safely, and transport to the destination specified any [noncitizen] ordered to be removed"). That the INA might contemplate allowing DHS to restrain noncitizens on "a removal flight [e]n route to Romania" if that plane "were to make an overnight refueling stop in Germany," Mot. 22, is not remotely comparable to the kind of full-scale detention operation, in a large facility meant for detention of noncitizens for significant periods of time, that Defendants are mounting at Guantánamo. The provision on which Defendants rely, § 1231(g), only authorizes detention in "facilities" such as a "prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(2). It defies common sense to infer, in the face of the heavy presumption to the contrary, that Congress intended to authorize the building of detention facilities abroad to incarcerate people for days, weeks, or even months "en route" (sincerely or pretextually) to their final destination. While the government may continue to hold individuals in its custody during a flight or in transit between flights, that is not "detention" in a facility like a jail or prison, as § 1231(g) describes. *Cf. Smith*, 507 U.S. at 204–5 ("norms of statutory construction" leads to same conclusion as presumption against extraterritorial application). Nor can Congress have plausibly intended to authorize such

29

detention facilities abroad only to permit the executive to later transfer people detained there *back to* the United States, as has been documented at Guantánamo. Compl. ¶ 32.

Congress could not have contemplated using detention "facilities" outside the United States to detain individuals with final removal orders "pending removal" since the act of transporting them abroad already renders them removed. That is also consistent with how the Supreme Court has interpreted Defendants' authority under the INA. In *Sale*, the Court considered whether the INA provision barring the return of individuals to persecution, 8 U.S.C. § 1253(h) (1993), applied extraterritorially to prevent the Coast Guard from returning Haitians interdicted at sea to their home country. 509 U.S. at 158–59. Based on the plain text and structure of the statute—and before even considering the presumption against extraterritoriality—the Court held that it did not. *Id.* at 173. In reaching this conclusion, the Court relied heavily on the provision's location in Part V of the INA, which the Court stated was "limited to strictly domestic procedures." *Id.* Notably, one of the provisions in Part V of the 1993 INA was 8 U.S.C. § 1252(c), the predecessor of what is now § 1231(g), the provision on which Defendants are relying here. Like the current § 1231(g), former § 1252(c) authorized the Attorney General to "arrange for appropriate places of detention" of noncitizens. But the Supreme Court found that Title V contained "*no reference* to a possible extraterritorial application." *Sale*, 509 U.S. at 173 (emphasis added).

Notably, in 1996, just three years after *Sale*, Congress passed the Illegal Immigration Reform and Responsibility Act, 110 Stat. 3009-546 (1996), and recodified 8 U.S.C. § 1252(c) into what is now 8 U.S.C. § 1231(g). In so doing, Congress explained that the new provision merely

"restates" the authority of the Attorney General under former Section 1252(c). H.R. Rep. No. 104-828, at 218 (1996) (Conf. Rep.).[11]

Finally, the government's practice of detaining Named Plaintiffs and the putative Plaintiff class at Guantánamo represent a distinct break from the decades-long unbroken practice of confining immigration detention to U.S. territory. Before this year, the government has never asserted authority to run a detention facility abroad. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (when an agency claims to discover "an unheralded power" in "a long-extant statute," courts "greet its announcement with a measure of skepticism"); *cf. Small v. United States*, 544 U.S. 385, 388–89 (2005) (reiterating the "commonsense notion that Congress generally legislates with domestic concerns in mind" (internal citation omitted)). And Defendants' broad claim that the detention statutes silently authorize detention throughout the removal process, including in facilities abroad, is contrary to how these statutes have been understood and carried out in practice. *See Zadvydas*, 533 U.S. at 699 ("basic purpose" of the post-final-order detention statute, 8 U.S.C. § 1231(a), is "assuring the [noncitizen]'s presence at the *moment* of removal." (emphasis added)); *Ly v. Hansen*, 351 F.3d 263, 265 (6th Cir. 2003) (describing § 1231(a) detention as detention while "*awaiting removal from* the United States" (emphasis added)); *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 45 (D.D.C. 2002) (same); *see also ICE Annual Report 2024*, *supra*, at 30 (ICE describing removal as "the compulsory and confirmed movement . . . out of the United States"). Against the backdrop "notion that Congress generally

---

[11] Although the Conference Report also states that it "amends" that authority, it specifies that "[t]he amendment" it refers to is the addition of 8 U.S.C. § 1231(g)(2), a separate provision requiring the INS to consider the availability of existing facilities before constructing new ones. The use of the singular "the amendment" instead of plural "the amendments" makes clear that this was the *only* amendment Congress intended to make to the Attorney General's authority under former 8 U.S.C. 1252(c) and that, as the Conference Report states, modern 8 U.S.C. § 1231(g)(1) "restates" prior 1252(c) H.R. Rep. No. 104-828, at 218 (1996) (Conf. Rep.).

legislates with domestic concerns in mind," *Smith*, 507 U.S. at 204 n.5, the Court should reject the government's attempt to invoke domestic immigration detention authority in a manner that "does not remotely resemble how it has been used on prior occasions," *Biden v. Nebraska*, 600 U.S. 477, 497 (2023).

## IV.    Plaintiffs State a Claim Under the APA.

The government's policy of detaining noncitizens at Guantánamo constitutes final agency action and is not committed to agency discretion. Defendants barely address the merits of Plaintiffs' APA claims, but to the extent they justify their actions as "utilizing unused detention capacity," Mot. 24, that argument is not properly before the Court at the motion to dismiss stage; indeed, Defendants have not even produced the AR. *See also* LCvR 7(n) (requiring, "[i]n cases involving the judicial review of administrative agency actions," that "unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint or simultaneously with the filing of a dispositive motion, whichever occurs first"). Courts regularly deny motions to dismiss an APA claim where "[w]ithout the administrative record, the court is unable" "to evaluate the agency's rationale at the time of decision." *Swedish Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 88 (D.D.C. 2010); *see also Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[O]f course, it is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." (internal quotation marks and citation omitted)); *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 580 (D.C. Cir. 2001) (reversing denial of preliminary injunction on APA claim where lower court addressed the claim before the administrative record was filed); *Stone v. U.S. Dep't of State*, No. CV 21-3244 (RC), 2022 WL 4534732, at *6 (D.D.C. Sept. 28, 2022) ("courts must

review the administrative record when the plaintiff is challenging not only the administrative decision, but also the process that led to that decision" (internal quotation marks and citation omitted)).[12]

Further, Defendants allege that APA review is unavailable here because Plaintiffs' claims sound in habeas. Mot. 4. But "APA and habeas review may coexist." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 185–86 (D.D.C. 2015) (collecting cases). "The Supreme Court has long construed the 'adequate remedy' limitation on APA review narrowly," *id.*, so as to not "defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts,* 487 U.S. 879, 903 (1988). Congress has "never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA," and courts regularly review similar policies under the APA as long as success on those claims does not result in immediate release. *R.I.L-R*, 80 F. Supp. at 185; *see also* ECF 30 at 22 (collecting cases). Thus, Plaintiffs may proceed under the APA.[13]

### A.    The Government's Policy of Using Guantánamo for Immigration Detention Constitutes Final Agency Action.

Defendants next argue that Plaintiffs seek "wholesale improvement of an agency's operations" and that this is "not a discrete, identifiable agency action subject to challenge." Mot. 14, 15 (cleaned up). But this "confuse[s] aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack." *Ramirez v. U.S. Immigr. & Customs Enf't,* 310 F. Supp. 3d 7, 21

---

[12] Defendants also argue that they were not required to produce the administrative record because there has been no final agency action. Mot. 15–16. This is incorrect. *See infra* IV.A (discussing final agency action).

[13] It is true that in the Alien Enemies Act context, judicial review is generally limited to habeas, *see Trump v. J. G. G.*, 145 S. Ct. 1003, 1005 (2025), but that context has no application here.

(D.D.C. 2018) (policy of placing youth in adult detention facilities without considering statutorily mandated factors was subject to APA review). Plaintiffs do not lodge a "generalized attack" on all aspects of ICE's removal and detention operations, nor do they seek a "wholesale change" to these operations or request that this Court "inject itself into the day-to-day agency management." *Id.* at 20; *contra* Mot. 15. Instead, they "attack *particularized* agency action"—namely, detention at *Guantánamo*—and have shown that this "action is 'one . . . from which legal consequences flow.'" *R.I.L-R*, 80 F. Supp. 3d at 184 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (unwritten ICE policy of "considering certain factors in individualized custody determinations" subject to APA review) . Defendants' "placement decisions"—namely, their policy of placing immigrants at Guantánamo—"had immediate and significant legal consequences for Plaintiffs" because as a direct result of those policies, Plaintiffs "must bear detention" at Guantánamo. *Ramirez*, 310 F. Supp. 3d at 23. Far from seeking "programmatic improvements," Mot. 15, Plaintiffs allege that this *particular* detention policy is unlawful. *See* Compl. ¶ 3 ("What they challenge is the government's unprecedented and unlawful decision to hold them in a detention facility at Guantánamo[.]").

Nor are Defendants' actions immune from APA review just because they may implicate foreign relations and political considerations. Mot. 15. Courts routinely review immigration policies that implicate removal. *See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 18–19 (2020) (reviewing rescission of deferred action program); *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 35–36 (D.D.C. 2020) (reviewing expedited removal and related detention policy under the APA); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *27–29 (D.D.C. July 2, 2025) (reviewing presidential proclamation limiting access to asylum and withholding of removal at the

34

border), *stay denied* No. 25-5243 (D.C. Cir. Aug. 1, 2025) (per curiam). For these reasons, Defendants' claim that LCvR 7(n) does not apply due to lack of final agency action is also incorrect.

**B.    Extraterritorial Detention at Guantánamo is Not Committed to Agency Discretion.**

Defendants argue that the decision to house immigrant detainees at Guantánamo is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and that the INA divests the Court of jurisdiction to review Plaintiffs' claims, *id.* § 701(a)(1). Mot. 16–18. They are wrong on both counts.

"The APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action," and "the exception in § 701(a)(2) [is therefore read] quite narrowly." *Regents*, 140 S. Ct. at 1905 (cleaned up). The § 701(a)(2) exception to judicial review applies only in the "rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (citation modified). The burden on the government to rebut the presumption of reviewability is "heavy," *Ramirez*, 338 F. Supp. 3d at 37, and it can only do so when there is "no law to apply" because "courts have no legal norms pursuant to which to evaluate the challenged action, *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d. 634, 642–43 (D.C. Cir. 2020) (citation modified). But here, there are plainly "judicially manageable standards" to determine: (1) whether the INA permits extraterritorial detention under basic principles of statutory construction, (2) whether the detention violates the Constitution, and (3) whether the agency action is arbitrary and capricious. *See id.* at 643 ("judicially manageable standards" to review agency action "may be found" in a wide range of sources: "formal and informal policy statements and regulations as well as statutes" (citation modified)). Moreover,

even the President's Memorandum and Defendants' statements about its detention policy at Guantánamo provide a set of judicially manageable standards. *See Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) ("[T]he agency itself can often provide a basis for judicial review through the promulgation of regulations or announcement of policies.").

Finally, as discussed above, *supra* II, no INA provision bars review of Plaintiffs' claims.

At bottom, Defendants' generalized invocation of the Executive's purported "unfettered discretionary control" over the removal process, Mot. 16, is insufficient to overcome the "strong presumption of reviewability" of agency action. *Robbins*, 780 F.2d at 45. Indeed, courts regularly subject immigration decisions to APA review. *See, e.g., Regents*, 591 U.S. at 1906 (recission of DACA); *Judulang v. Holder*, 565 U.S. 42, 52–53 (2011) (Board of Immigration Appeals policy regarding discretionary relief); *Grace v. Barr*, 965 F.3d 883, 893–94 (D.C. Cir. 2020) (standards in asylum proceedings).

### C.    Defendants' Implementation of President Trump's Memorandum is Arbitrary and Capricious.

Defendants notably do not contest that, by detaining individuals at Guantanamo who are not "high-risk criminal detainees" and holding them at Camp 6 (rather than solely at the MOC), their actions are inconsistent with the text of the Memorandum. Mot. 23. Nor do they contest that they (1) failed to give a reason for their new policy of detaining noncitizens at Guantánamo and departure from their own longstanding practice to the contrary; (2) considered factors Congress did not intend to be considered; and (3) entirely failed to consider important aspects of the problem. *Id*.; Compl. ¶ 66. Instead, Defendants claim that they have independent statutory authority for such detention and are not required to provide any justification. Mot. 23. But that is incorrect for the reasons explained above. And for the purpose of Plaintiffs' APA claim, the relevant point is that the agencies have failed to justify their actions by reference to the President's Memorandum.

The only explanation Defendants can muster is that detention at Guantánamo is required to "maximize available detention resources." Mot. 24. As a threshold matter, the Court cannot consider this explanation at this stage because Defendants have not produced the AR, which Plaintiffs must review to rebut Defendants' claim of limited detention capacity. *See also Gomez v. Trump,* No. 20-CV-01419 (APM), 2020 WL 12919371, at *1 (D.D.C. Aug. 13, 2020) (compelling expedited production of administrative record where plaintiffs challenged "policies, procedures, and practices implementing Presidential Proclamations" suspending processing and issuance of diversity visas); *id.* (explaining that production of the administrative record was necessary to assess the likelihood of plaintiffs' success on the merits of their APA claims, where defendants alleged lack of final agency action).

Underscoring the extraordinary nature of Defendants' request in this procedural posture, Defendants' discussion of Plaintiffs' arbitrary and capricious claim cites no opinion reaching the merits of this type of claim on the pleadings without an AR. Mot. 23–24. And even if the Court could consider this purported justification, it does not pass muster in light of Plaintiffs' well-pled allegations regarding the waste and inefficiency of Defendants' actions. *See* Compl. ¶¶ 34–36 (alleging that there are numerous less expensive and logistically complicated ways to expand detention capacity); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) ("The agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" (citation omitted)); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 83 (D.D.C. 2025) (agency action implementing Executive Order was arbitrary and capricious where it failed to offer a "rational connection between the facts found and the choice made"), *rev'd on other grounds sub nom. Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *11 (D.C. Cir. Aug. 13,

37

2025). In short, the government is acting arbitrarily and failing to justify its actions, in violation of the APA.

## V.    Plaintiffs State a Substantive Due Process Claim of Punitive Detention.

### A.    Plaintiffs Have a Liberty Interest Against Punitive Detention.

Defendants do not dispute that Plaintiffs have a liberty interest in avoiding punitive detention while in civil immigration detention. *See Block v. Rutherford*, 468 U.S. 576, 583 (1984) (holding that detainees who have not been convicted of a crime have a due process right not to be subjected to any "condition, practice, or policy [that] constitutes punishment."); *see also D.A.M. v. Barr*, 474 F. Supp. 3d 45, 63 (D.D.C. 2020) ("Because civil immigration detainees, like pretrial criminal detainees, have not been convicted of any present crime, they 'may not be subjected to punishment of any description.'" (internal citation omitted)); Mot. 28 (acknowledging a "liberty" interest against conditions that "constitute[] punishment" (citing *Block*, 468 U.S. at 583)). Nor do Defendants dispute that civil detention "amount[s] to punishment," where the detention is "imposed for the purpose of punishment," is not "rationally related to a legitimate nonpunitive governmental purpose," or "appears excessive in relation to that purpose." *Bell v. Wolfish*, 441 U.S. 520, 538, 561 (1979); *see also Kingslev v. Hendrickson*, 576 U.S. 389, 398–99 (2015); *O.M.G. v. Wolf*, 474 F. Supp. 3d 274, 286 (D.D.C. 2020).

Defendants argue instead that Plaintiffs cannot assert a due process claim because the government has discretion under the INA to determine detention locations, and thus Plaintiffs have no liberty interest in the location of their detention. Mot. 24 ("detention locations are not punitive"). But that is not Plaintiffs' claim. The extraterritorial location of Guantánamo is the basis for Plaintiffs' statutory claim, but as explained below, the basis of their constitutional claim is not

the location of the facility at which Plaintiffs are detained but the conditions at the facility, regardless of where it is located.

### B.    Plaintiffs Have Alleged Sufficient Facts to Show Punitive Detention.

Defendants also challenge the adequacy of Plaintiffs' factual allegations involving punitive detention. Plaintiffs readily clear the low bar that Rule 12(b)(6) sets for a fact-based challenge. Their complaint more than adequately alleges that the government's policy of detaining immigrants for expressly punitive purposes, and under excessive conditions of confinement constitutes impermissible punishment in violation of the Due Process Clause.

Immigration detention is "undisputedly civil— i.e., non-punitive in nature." *R.I.L-R.*, 80 F. Supp. 3d at 187. As a result, immigration detention must be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690. Plaintiffs may plead that the putative class's detention "amount[s] to punishment" by alleging facts showing (1) this detention is "imposed for the purpose of punishment," (2) the conditions of detention are not "rationally related to a legitimate nonpunitive governmental purpose," or (3) they "appear[] excessive in relation to that purpose." *Bell*, 441 U.S. at 538, 561; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 398–99 (2015).[14] Plaintiffs' complaint readily clears the bar to survive a Rule 12(b)(6) motion.

First, Plaintiffs clearly allege that Defendants detain putative class members at Guantánamo "for the purpose of punishment." *Bell*, 441 U.S. at 538. Defendants do not dispute—

---

[14] Defendants discuss a burden-shifting framework, where "the burden shifts to the government to show legitimate justification only if plaintiffs show they face worse conditions than other civil detainees." Opp. 28–29 (citing *Ams. for Immigrant Just. v. U.S. Dep't Homeland Sec.*, No. 22-3118, 2023 WL 1438376, at *12 (D.D.C. Feb. 1, 2023)). Defendants are correct that a burden-shifting framework may be available to plaintiffs challenging conditions of civil detention, particularly regarding access to counsel. *Ams. for Immigrant Just.*, 2023 WL 1438376, at *12. But here, Plaintiffs allege unconstitutional conditions of confinement in ways that do not involve a comparison to prison conditions, and so this burden-shifting framework does not come into play.

or even address—this impermissible purpose of deterrence in their motion. Mot. 27–30. They cannot: Defendants have themselves trumpeted their punitive purpose in detaining immigrants at Guantánamo, calling it a "tool" in their toolkit like detention at "Alligator Alcatraz" and the notorious CECOT prison in El Salvador. Press Release, U.S. Dep't of Homeland Sec., *DHS Releases Names of Worst of the Worst Convicted Criminal Illegal Aliens Detained at Guantanamo Bay* (Jul. 8, 2025), https://perma.cc/YL55-5RD6. As made clear in Defendants' own statements, the government is explicitly drawing on the history of Guantánamo choosing to detain people at there to deter migrants from staying in the United States and to deter future migrants from coming the United States. Compl. ¶¶ 38–43, 71. These statements include:

- Guantánamo "represents deterrence," and the Guantánamo mission is "central . . . to the message we're sending to the world—which is that our border is closed." *Id*. ¶ 39 (quoting Secretary of Defense during visit to Guantánamo).

- Noncitizens should "not come to this country or we will hunt you down, find you, and lock you up." *Id*. ¶ 6 (quoting Secretary of DHS's X post referencing Guantánamo).
- "If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now.'" *Id*. ¶ 42 (quoting DHS Press Release).

*See also Escalona* Gov. Br. 35 ("The government does not dispute that the mass removal efforts are intended in part to deter illegal migration . . . .").

Thus, under this policy, detention at Guantánamo is punitive because general deterrence is not a legitimate purpose in the civil context. *Bell*, 441 U.S. at 539 n.20 ("Retribution and deterrence are not legitimate nonpunitive governmental objectives."); *R.I.L-R.*, 80 F. Supp. 3d at 188–89 (finding immigration detention "for the sake of sending a message of deterrence" is "out of line" with Supreme Court precedent); *see also Kansas v. Crane*, 534 U.S. 407, 412 (2002) (explaining that civil detention cannot be a "'mechanism for retribution or general deterrence'—functions properly those of criminal law"); *Jacinto-Castanon de Nolasco v. U.S. Immigration and Customs Enf't*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018) (policy of detaining parents away from their

children in order to "deter[] immigration" of other migrant families serves no "compelling or legitimate government objective").

Second, Plaintiffs clearly allege that their detention at Guantánamo is not "rationally related to a legitimate nonpunitive governmental purpose." *Bell*, 441 U.S. at 561. The government has paid approximately $100,000 per day per detainee held at Guantánamo, in contrast to an average of $165 per day to hold someone in the United States. Compl. ¶ 31. Detention at Guantánamo has not "streamlined the removal process"; to the contrary, the government has "transferred immigrants held at Guantánamo *back to* immigration detention facilities in the United States so they could be removed from there." *Id*. ¶ 32. "[T]he government has admitted that many of the immigrant detainees held at Guantánamo are 'low-risk,' with no criminal record," and that some people are held at Guantánamo "based solely on their nationality." *Id*. ¶¶ 28, 29. "Detention at Guantánamo is not necessary to meet ICE's detention capacity needs." *Id*. ¶ 34. "ICE has numerous less expensive and more straightforward avenues for increasing detention capacity" and, for example, has signed "several contracts for even more bed space within the United States." *Id*. ¶ 35.

Defendants' only response is to point to evidence outside the proper record on a Rule 12(b)(6) motion to claim "'security concerns,'" Mot. 30 (quoting MOU at 4.1.20, ECF No. 28-1), and to argue that Plaintiffs have yet to present "'substantial evidence in the record to indicate that [Defendants] have exaggerated their response'" to these security concerns, Mot. 30 (quoting *Block*, 468 U.S. at 584). But on a Rule 12(b)(6) motion, Defendants can neither introduce their own evidence nor demand that Plaintiffs support their allegations with evidence. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).

Third, Defendants argue that the Court should consider only the conditions experienced by Named Plaintiffs and not by others in the putative Plaintiff class at Guantánamo. Mot. 27 n.3. But a detained plaintiff may prove "an unsafe . . . condition in their [detention facility]" even if "nothing yet had happened to them" personally. *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Plaintiffs' allegations of conditions others faced at Guantánamo demonstrate "sufficiently imminent dangers" that they would face those same conditions—and, as to the Named Plaintiffs, that they likewise would have faced such dangers had Defendants not removed from already. *Id.* at 34; *see Brown v. Plata*, 563 U.S. 493, 532 (2011) (recognizing that people detained in a facility with systemically inadequate medical care are "in no sense are they remote bystanders" to these deficiencies, but rather "that system's next potential victims").

Fourth, Plaintiffs clearly allege conditions of detention that "appear[] excessive in relation to that purpose." *Bell*, 441 U.S. at 561. Defendants cherry-pick a single allegation—that "conditions are far worse than [what putative class members] experienced in ICE detention or other carceral facilities"—and argue that this allegation alone is insufficient. Mot. 29 (quoting Compl. ¶ 44). But, Defendants ignore Plaintiffs' other disturbing allegations of punitive conditions. "[D]etainees who have complained about conditions or mistreatment to officers have been tied to restraint chairs for hours," "[g]uards have reportedly withheld water from detainees as a form of punishment," and "[o]ne officer slammed a radio against a detainee's hand, fracturing his hand." Compl. ¶ 46. A detainee "was beaten up so badly that he tried to harm himself twice in two weeks," and "several detainees have attempted suicide." *Id.* ¶¶ 46, 53. Detainees are provided "insufficient food," no access to commissary to purchase supplemental food, and only one change of clothes per week. *Id.* ¶ 48. They are not allowed "Bibles or other religious materials, or pencils or paper," and they may access "hygiene materials such as toothbrushes or soap . . . only with a

guard's permission." *Id.* ¶ 49. Even when individual factual allegations may not rise to the level of constitutional violations on their own, the Court may rely on the "totality of the[] circumstances" to find Plaintiffs have adequately pled unconstitutional punishment. *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 18-760 (CKK), 2020 WL 3265533, at *24 (D.D.C. June 17, 2020). Defendants cannot divide and conquer a complaint by grabbing randomly at isolated portions out of context. Rather, complaints are to be read "as a whole," granting the plaintiffs the benefit of all reasonable inferences. *Menoken v. Dhillon*, 975 F.3d 1, 11 (D.C. Cir. 2020).

These allegations readily state a Fifth Amendment violation. *E.g.*, *Kingsley*, 576 U.S. 389 (objectively unreasonable use of force is unconstitutional punishment); *Von Colln v. Cnty. of Ventura*, 189 F.R.D. 583, 599 (C.D. Cal. 1999) (enjoining use of a restraint chair); *cf. Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 512 (6th Cir. 2001) ("Plaintiff's deprivation of drinking water allegation states a viable Eighth Amendment claim.").[15] Defendants attempt to brush aside Plaintiffs' allegations of hunger by painting commissary—through which detainees might supplement the insufficient food provided—as an "amenit[y]" that need not be provided at Guantánamo. This callous attempt to ignore their denial of adequate food fails. *See Green v. Johnson*, 977 F.2d 1383, 1391 (10th Cir. 1992) ("The deprivation of essential food can state a constitutional claim.").

Plaintiffs allege punitive intent, conditions of detention untethered to any nonpunitive purpose, and harsh conditions. Plaintiffs thus readily clear the bar set by Rule 12(b)(6). They are

---

[15] Conditions of confinement that violate the Eighth Amendment violate due process a fortiori. *See Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions.").

entitled to proceed past the complaint stage and obtain discovery into Defendants' purpose for detention at Guantánamo and the conditions at the facility.

## CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety and order that, within seven days of an order denying the motion, Defendants produce the AR.


Dated: August 27, 2025

Eunice H. Cho (D.C. Bar No. 1708073)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(202) 546-6616
echo@aclu.org

My Khanh Ngo (D.D.C. Bar No. CA00219)
Kyle Virgien*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No.
NY0224)
Judy Rabinovitz
Noor Zafar
Omar C. Jadwat
Natalie Behr*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org
IRP_NBehr@aclu.org

Kimberly Grano (D.D.C. Bar No. NY0512)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 946-7453
kgrano@refugeerights.org

Attorneys for Plaintiffs-Petitioners

*Pro bono representation certificates
forthcoming