**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

YAMIL LUNA GUTIERREZ, *et al.*,

      *Plaintiffs*,

    v.

KRISTI NOEM, *et al.*,

      *Defendants*.

Civil Action No. 25‑1766 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

    The United States Naval Station at Guantanamo Bay, Cuba is the site of one of our country's most notorious detention facilities. Over two decades ago, it was opened to hold suspected terrorists in the aftermath of the horrific terrorist attacks of September 11, 2001. Since then, Guantanamo has been synonymous with pervasive mistreatment and indefinite detention.

    In January of this year, in an unprecedented move, President Donald J. Trump directed Cabinet officials to expand operations at Guantanamo to house noncitizens in connection with civil immigration proceedings. The President explained that decision by saying "we don't want them coming back," so "we're going to send them to Guantanamo . . . it's a tough place to get out." The Secretary of Defense declared that civil immigration detention at Guantanamo "represents deterrence"; that Guantanamo is "central . . . to the message we're sending to the world – which is that our border is closed." And the Secretary of Homeland Security posted on social media that she "was just in Cuba" and noncitizens should "not come to this country or we will hunt you down, find you, and lock you up." In executing this new policy, the Defendants held approximately 500 immigrants at Guantanamo between February and June 2025 at a reported cost of about $100,000

per day per detainee—over 600 times the average cost of detention elsewhere. And immigration detention at Guantanamo is ongoing.

The Named Plaintiffs are two individuals who were detained at Guantanamo because of the new detention policy. They sued the Defendants, officials and agencies responsible for supervising the United States' immigration system, alleging that their detention at Guantanamo was unlawful three times over. They allege that the Defendants lacked statutory authority to detain them there, that the Defendants' policy of holding immigration detainees at Guantanamo is unlawfully arbitrary and capricious, and that the policy constitutes unconstitutional punishment under the Fifth Amendment. They moved to certify a class action to represent a class of people who are similarly situated. In an Order filed contemporaneously with this decision, the Court granted that request in part and certified a class of immigration detainees originally apprehended and detained in the United States who have been ordered removed, except those ordered removed pursuant to 8 U.S.C. § 1225, and who are, or will be, held at Naval Station Guantanamo Bay, Cuba.

Now, the Court considers the Defendants' motion to dismiss this case. The Defendants argue that the Court lacks jurisdiction and that the Plaintiffs' Complaint fails to state claims on which relief can be granted. The Court disagrees. The Plaintiffs have standing to pursue their claims, and under binding Supreme Court precedent, 8 U.S.C. § 1252 does not strip this Court's statutory jurisdiction. On the merits, the Plaintiffs' claims under the Administrative Procedure Act (APA) and the Fifth Amendment survive dismissal at this early stage of the proceedings. Accepting as true the allegations in the Plaintiffs' Complaint, the challenged policy of holding detainees subject to removal orders at Guantanamo is not authorized by the Immigration and Nationality Act (INA). The Complaint also sufficiently alleges that immigration detention at Guantanamo is for the purposes of retaliation and deterrence, meaning that the Defendants' policy is also

2

impermissibly punitive in violation of the Fifth Amendment's Due Process Clause. For these and other reasons explained below, the Court denies the Defendants' motion.

## BACKGROUND

### A.    Statutory Background

"The Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.*, sets out 'how persons are admitted to, and removed from, the United States.'" *Campos-Chaves v. Garland*, 602 U.S. 447, 451 (2024) (quoting *Pereida v. Wilkinson*, 592 U.S. 224, 227 (2021)). Removal of noncitizens is governed by a reticulated statutory scheme. "An alien is removable if he is either 'inadmissible' under § 1182 or 'deportable' under § 1227." *Id.* (quoting 8 U.S.C. § 1229a(e)(2)). "Removal proceedings begin when the government files a charge against an individual, and they occur before a hearing officer at the Department of Justice, someone the agency refers to as an immigration judge. If the proof warrants it, an immigration judge may order an individual removed[.]" *Pereida*, 592 U.S. at 227.

One important aspect of the INA's removal scheme is its design for detaining individuals in connection with removal proceedings. "The Secretary of Homeland Security and her delegates . . . are by statute authorized to arrest and detain an alien" under specified circumstances.[1] *N.S. v. Dixon*, 141 F.4th 279, 282 (D.C. Cir. 2025) (citing 8 U.S.C. §§ 1226(a), 1226(c), 1357(a)(2)). Such noncitizens may be "detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). And "[w]hen an alien has been found

---

[1] "The Homeland Security Act of 2002 . . . transferred the detention and removal program previously administered by the Attorney General and the Immigration and Naturalization Service (INS) to the Secretary of Homeland Security." *N.S. v. Dixon*, 141 F.4th 279, 282 n.1 (D.C. Cir. 2025) (first citing 6 U.S.C. §§ 251(2), 252(a)(3), 271(b); and then citing *Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005)). Thus, the Court treats statutory references to the Attorney General in the relevant portions of the INA as equivalent to references to the Secretary of Homeland Security.

to be unlawfully present in the United States and a final order of removal has been entered, the Government ordinarily secures the alien's removal during a subsequent 90-day statutory 'removal period,' during which time the alien normally is held in custody." *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001); *see also* 8 U.S.C. § 1231(a)(2)(A) ("During the removal period, the Attorney General shall detain the alien.").

The INA directs the Secretary of Homeland Security to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1). That detention typically culminates in removal to another country determined according to 8 U.S.C. § 1231(b). But the detention cannot last longer than the "period reasonably necessary to secure removal." *Zadvydas*, 533 U.S. at 699. Under the INA, "any alien ordered deported or removed . . . who has left the United States, shall be considered to have been deported or removed in pursuance of law." 8 U.S.C. § 1101(g). And "[t]he term 'United States', . . . when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." *Id.* § 1101(a)(38).

## B.    Factual Background

The Court draws the facts, accepted as true, from the Plaintiffs' Complaint and attachments. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). The Court also takes "judicial notice of public records from other court proceedings." *Lewis v. Drug Enf't Admin.*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011).

### 1.    United States Naval Station, Guantanamo Bay

The United States Naval Station, Guantanamo Bay "is a U.S. military base in Guantánamo Bay, Cuba. It is the site of a U.S. military prison at which the U.S. government has asserted

4

law-of-war detention authority since 2001." Compl. ¶ 22, ECF No. 1. It has two detention areas. Compl. ¶ 45. "On the Windward side of the base, there is a maximum-security prison that houses the government's military detainees and includes what is known as 'Camp 6.' On the separate Leeward side of the base is the Migrant Operations Center . . . , where migrants interdicted on the high seas have traditionally been held." *Id.*

### 2. The Guantanamo-Detention Policy

In January 2025, the President issued a memorandum directing the Secretary of Defense and the Secretary of Homeland Security to expand operations at Guantanamo to "provide additional detention space for high-priority criminal aliens unlawfully present in the United States." Compl. ¶ 24. The President sought to hold up to 30,000 noncitizens at Guantanamo. *Id.* Soon after, the government began transferring immigration detainees to Guantanamo. Compl. ¶¶ 25–26.

The Department of Homeland Security (DHS) and the Department of Defense (DOD) entered into a memorandum of understanding (MOU) to structure this new detention policy. Compl. ¶ 29. The MOU permits "the detention of immigrants at Guantánamo where the government merely 'asserts' that the immigrant is '*from a country* where the preponderance of aliens from that country enter the United States' by having 'paid a [transnational criminal organization] to be smuggled into the United States.'" *Id.* (alterations in original). Accordingly, although "[t]he government has referred to the immigrant detainees held at Guantánamo as 'the worst of the worst,' and 'high threat' criminals," the government has since "admitted that many of the immigrant detainees held at Guantánamo are 'low-risk,' with no criminal record other than an immigration violation." Compl. ¶¶ 27–28.

Compared to detention in the United States, the Guantanamo-detention policy comes with increased costs and logistical challenges. Between February and June 2025, the government held approximately 500 people in immigration detention at Guantanamo "at a reported cost of more than $40 million, or approximately $100,000 per day per detainee." Compl. ¶ 31. The same detention in a facility in the United States costs an average of $165 per day per detainee. *Id.* Immigration detainees held at Guantanamo are sometimes sent back to detention facilities in the United States before they are removed to their final destination. Compl. ¶ 32.

High-ranking government officials have made public statements about the purpose for housing immigration detainees at Guantanamo. The Secretary of Defense stated that Guantanamo "'represents deterrence,' and that the Guantánamo mission is 'central . . . to the message we're sending to the world – which is that our border is closed.'" Compl. ¶ 39. The Secretary of Homeland Security posted on social media that she "'was just in Cuba' and that noncitizens should 'not come to this country or we will hunt you down, find you, and lock you up.'" Compl. ¶ 40. The President explained the decision to house immigration detainees at Guantanamo by saying "we don't want them coming back," so "we're going to send them to Guantanamo . . . it's a tough place to get out." Compl. ¶ 41. And DHS issued a press release stating: "If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now." Compl. ¶ 42.

### 3. Conditions at Guantanamo

Immigration detainees at Guantanamo are primarily guarded by military personnel. Compl. ¶ 45. They are not told the time of day, nor are they informed about their immigration cases, what will happen to them, or where they will be taken next. Compl. ¶ 51. They are "provided no way to make medical requests." Compl. ¶ 52. They receive "insufficient food," with some losing "as many

as 10-20 pounds" in a matter of weeks. Compl. ¶ 48. Unlike other detention facilities, there is no commissary at Guantanamo. *Id.* Also unlike other detention facilities, detainees at Guantanamo are "denied activities to keep themselves occupied, and are not allowed basic possessions such as Bibles or other religious materials, or pencils or paper." Compl. ¶ 49. Detainees are not allowed to keep reading materials or legal materials. Compl. ¶ 50.

Immigration detainees at Guantanamo "are provided no cleaning materials to maintain their cells, which are infested with rodents." Compl. ¶ 48. They are not permitted to keep hygiene materials "such as toothbrushes or soap, and may access these materials only with a guard's permission." Compl. ¶ 49. Officials at Guantanamo give detainees one piece of soap each week for showering, but it must be returned to the guards after the detainees shower. *Id.*

At Camp 6, the facility previously used to detain law-of-war detainees, immigration detainees are "permitted only one hour per day of recreation in an indoor cage." Compl. ¶ 7. Guards have physically harmed detainees and withheld water from them as a form of punishment. Compl. ¶ 46. Those who "complained about conditions or mistreatment to officers have been tied to restraint chairs for hours." *Id.*

At the Migrant Operations Center, immigration detainees are housed "in small, barracks-style units, with several people held in each room." Compl. ¶ 47. They are always confined to their units, except for one hour a day "when they are released into a small recreation pen, surrounded by armed military personnel and guard dogs." *Id.* When they return from recreation, they are "invasively searched," "including a pat down of their genitals." *Id.* Guards insult and taunt the detainees and have threatened to shoot them. *Id.*

As a result of these conditions, "several detainees have attempted suicide at Guantánamo, or have suffered significant post-traumatic symptoms after release." Compl. ¶ 53.

### 4.    The Named Plaintiffs

The Named Plaintiffs are Yamil Luna Gutierrez and Rafael Angel Lopez Ocon, two Nicaraguan nationals. Compl. ¶¶ 12–13. When the Complaint was filed, both were held in immigration detention at Guantanamo. *Id.* Before being moved to Guantanamo, both were held at the Farmville Detention Center in Farmville Virginia, and at the Alexandria Staging Facility in Alexandria, Louisiana. *Id.*

### C.    Procedural Background

On June 4, 2025, the Plaintiffs sued several officials and agencies tasked with overseeing the United States' immigration system. *See generally* Compl. Their Complaint alleges that their detention at Guantanamo violated the Administrative Procedure Act, the Due Process Clause of the Fifth Amendment, and their "right to habeas corpus." Compl. ¶¶ 62–75. That same day, they filed a Motion for Class Certification and Appointment of Class Counsel. ECF No. 4. On August 4, 2025, the Defendants filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 29. On September 9, 2025, the Court ordered supplemental briefing related to both motions. *See* Min. Order (Sept. 9, 2025); Defs.' Suppl. Br., ECF No. 40; Pls.' Suppl. Br., ECF No. 41. The Court held a motions hearing on October 23, 2025.

In an Order filed contemporaneously with this Memorandum Opinion, the Court granted in part the Plaintiffs' Motion for Class Certification. ECF No. 52. In this Memorandum Opinion, the Court addresses the Defendants' Motion to Dismiss, which is fully briefed and ripe for review. *See* Opp'n, ECF No. 33; Reply, ECF No. 35.

### LEGAL STANDARD

"When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must demonstrate that the court indeed has subject-matter jurisdiction to hear his claims." *Hill v. U.S. Dep't of the Interior*, 699 F. Supp. 3d 1, 12 (D.D.C. 2023) (first citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

561 (1992); and then citing *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000)). In reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), courts "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).

Under Rule 12(b)(6), a court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotations omitted). But courts need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## DISCUSSION

The Court first addresses the justiciability of the Plaintiffs' claims, and then discusses the Plaintiffs' APA claims and Fifth Amendment claim.

### A.     Justiciability

Under Federal Rule of Civil Procedure 12(b)(1), the Defendants contend that this Court lacks jurisdiction for two reasons: (1) the Plaintiffs lack standing, and (2) this Court's statutory jurisdiction has been stripped.[2] The Court disagrees.

---

[2] The Motion to Dismiss also argues that this case is moot. Mot. Dismiss. at 7. But for the reasons stated in this Court's contemporaneously filed Memorandum Opinion addressing the Motion for Class Certification, the Court concludes that this case is not moot. ECF No. 51, at 5–10.

## 1.    Standing

"To maintain an action in federal court," a plaintiff must establish standing—that "they have suffered an 'injury in fact,' 'fairly traceable to the challenged action of the defendant,' and it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision.'" *Johnson v. Becerra*, 111 F.4th 1237, 1243 (D.C. Cir. 2024) (alteration in original) (quoting *Lujan*, 504 U.S. at 560–61). The Defendants argue that the Plaintiffs claim injuries "they themselves have not experienced, and given their removal, will not experience in the future." Mot. Dismiss at 9. But to maintain a class action such as this one, all that is required is that "individual named plaintiffs representing a class . . . have standing to pursue their own individual claims at the time the suit was filed." *Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 65 (D.D.C. 2018). Here, the Named Plaintiffs were suffering the allegedly unlawful detention challenged in the Complaint when they filed this suit, Compl. ¶¶ 12–13, which is sufficient to confer standing.[3]

The Defendants' other standing arguments rely on undisputed factual assertions from materials outside the Complaint, including a declaration from a DHS official.[4] That declaration

---

[3] In their Opposition to the Plaintiffs' Motion for Class Certification, the Defendants make similar arguments contesting standing. Focusing on the alleged injury suffered by absent class members, they characterize that injury as the risk of harm caused by a "hypothetical future transfer to" Guantanamo. Opp'n Mot. Class Certification at 12–13, ECF No. 28. But that misapprehends both standing doctrine and the class definition. As stated above, in a class action such as this one, standing depends on the *named plaintiffs'* standing at the time the suit was filed. *Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 65 (D.D.C. 2018). And under the class definition adopted by this Court, Order at 1, ECF No. 52, the class consists of immigration detainees who are or will be held at Guantanamo. All such individuals currently held at Guantanamo are in that class, and future individuals only enter the class once they are held at Guantanamo. There is nothing hypothetical about that.

[4] The Defendants do not articulate why the Court should consider these materials at the motion-to-dismiss stage. But as the D.C. Circuit recently reiterated, "[i]t is well-settled that a court may consider materials outside the pleadings to determine its jurisdiction." *Jibril v. Mayorkas*, 101

states that when the Named Plaintiffs were detained at Guantanamo, they were housed at Camp 6.

Decl. Francisco Madrigal ¶¶ 11, 17, ECF No. 28-3. Because the Named Plaintiffs were not housed

at the Migrant Operations Center, the Defendants contend that they lack standing to challenge

detention at that latter facility. Mot. Dismiss at 9. But this argument confuses the nature of the

Named Plaintiffs' injury. The Plaintiffs allege that the Defendants' policy of holding immigration

detainees at Guantanamo is unlawful, regardless of whether the Defendants use Camp 6 or the

Migrant Operations Center. Compl. ¶¶ 62–75. Their injury inheres in their allegedly unlawful

detention at Guantanamo, especially given that—even setting aside conditions present at only one

of the two facilities—the conditions they experienced there were materially worse than conditions

they suffered at domestic immigration detention facilities, as discussed below. *See Est. of Boyland

v. USDA*, 913 F.3d 117, 123 (D.C. Cir. 2019) ("For purposes of analyzing plaintiffs' standing,"

courts assume that the plaintiff "would prevail on the merits of their claim."). The Court thus

concludes that when the Named Plaintiffs filed their Complaint, they had standing.

### 2.    Statutory Bars on Judicial Review

Next, the Defendants argue that several provisions in 8 U.S.C. § 1252 strip this Court's

statutory jurisdiction over the Plaintiffs' claims. But the Supreme Court's explanations of the reach

of each of these provisions make clear that they do not preclude judicial review.

### a.  8 U.S.C. § 1252(g)

First, the Defendants point to 8 U.S.C. § 1252(g), which states:

---

F.4th 857, 866 (D.C. Cir. 2024) (alterations adopted) (quoting *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021)). The Circuit's use of permissive language—"*may* consider," *id.* (emphasis added)—suggests that it is within a district court's discretion to consider such materials. *See also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). Here, the Court will consider the Defendants' materials given that the underlying factual assertions are undisputed and the Plaintiffs do not object to the Court considering them. *See* Opp'n at 14–15.

> [N]otwithstanding any other provision of law . . . , including . . . any . . . habeas corpus provisions, . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). The Defendants argue that "[t]he discretionary determination to transfer a detainee to an appropriate place of detention as part of a removal effort" is "an unreviewable 'action' taken to execute a final removal order." Mot. Dismiss at 11. The Court disagrees.

The Supreme Court has explained that Section 1252(g) is "narrow." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020). It does not "cover[] 'all claims arising from deportation proceedings' or impose[] 'a general jurisdictional limitation.'" *Id.* (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (*AAADC*)). Instead, by its terms, it "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AAADC*, 525 U.S. at 482. These actions "represent the initiation or prosecution of various stages in the deportation process." *Id.* at 483. Other than these "three discrete events along the road to deportation," Section 1252(g) has nothing to say about "other decisions or actions that may be part of the deportation process." *Id.* at 482.

*AAADC* is dispositive here. The Defendants make no effort to explain how interpreting Section 1252(g) to bar the Plaintiffs' claims would be consistent with the Supreme Court's construction. Although the decision to detain individuals "pending removal" at Guantanamo rather than another facility, 8 U.S.C. § 1231(g)(1), is an action that is "part of the deportation process," it is not one of the "discrete actions" covered by Section 1252(g), *see AAADC*, 525 U.S. at 482. The Plaintiffs do not challenge the Secretary of Homeland Security's decision to "*execute*" their "removal orders." *Id.* Their challenge, as the Defendants themselves recognize, is to the decision "to transfer a detainee to an appropriate place of detention as part of a removal effort." Mot.

Dismiss at 11. They contest "the physical manner of their deportation"—their detention at Guantanamo pending departure to their destination country—which "does not implicate the agency's discretionary decision to execute their removal orders." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 60 (D.D.C. 2020). Again, to trigger Section 1252(g), it is insufficient that a decision is "part of the deportation process"; the decision must instead be to "initiat[e] or prosecut[e]" the relevant "stage[] of the deportation process," *AAADC*, 525 U.S. at 482–83, which is not the decision challenged here. The Court thus concludes that the Plaintiffs' claims do not fall within Section 1252(g)'s "narrow" scope. *Regents of the Univ. of Cal.*, 591 U.S. at 19.

### b.  8 U.S.C. § 1252(a)(2)(B)(ii)

Next, the Defendants raise 8 U.S.C. § 1252(a)(2)(B)(ii) as a bar to judicial review. Mot. Dismiss at 12. Section 1252(a)(2)(B)(ii) strips courts' jurisdiction to review "any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security," except for specified relief not relevant here. 8 U.S.C. § 1252(a)(2)(B)(ii).

The Supreme Court has explained that Section 1252(a)(2)(B)(ii) "bar[s] court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." *Kucana v. Holder*, 558 U.S. 233, 247 (2010). The Court further clarified that Section 1252(a)(2)(B)(ii) "speaks of authority 'specified'—not merely assumed or contemplated—to be in the Attorney General's discretion." *Id.* at 243 n.10. And "'[s]pecified' is not synonymous with 'implied' or 'anticipated.'" *Id.*; *accord Geneme v. Holder*, 935 F. Supp. 2d 184, 192 (D.D.C. 2013) (noting that the language of Section 1252(a)(2)(B)(ii) "refers not to

'discretionary decisions,' . . . but to acts the *authority* for which is *specified* under the INA to be discretionary" (quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003))).[5]

The Defendants identify 8 U.S.C. § 1231(g)(1) as the provision that specifies discretionary authority to trigger the bar in Section 1252(a)(2)(B)(ii). Mot. Dismiss at 12–13. Although the Defendants do not identify the specific text in Section 1231(g)(1) that they believe confers discretionary authority, ostensibly they have in mind the directive that "[t]he Attorney General shall arrange for *appropriate* places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1) (emphasis added). That directive no doubt grants the Attorney General flexibility to consider a variety of factors when arranging for places of detention. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("'[A]ppropriate' is 'the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors.'" (quoting *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part and dissenting in part))). And it may be enough for the Court to conclude that discretionary authority to decide where to detain individuals can be "assumed," "contemplated," "implied," or "anticipated" by Section 1231(g)(1). *See Kucana*, 558 U.S. at 243 n.10. But it is not enough to conclude that such authority is "*specified*" by Section 1231(g)(1). *See id.* (emphasis added); *see also Aguilar v. ICE*, 510 F.3d 1, 20 (1st Cir. 2007) ("[S]ection 1231(g)

---

[5] The Court notes that there is some tension in the D.C. Circuit's post-*Kucana* caselaw regarding the finer points of the breadth of Section 1252(a)(2)(B)(ii). *Compare Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 630 (D.C. Cir. 2020) (Section 1252(a)(2)(B)(ii) is "focuse[d] . . . on individualized forms of discretionary relief from removal or exclusion."), *with iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 66 (D.C. Cir. 2021) (Section 1252(a)(2)(B)(ii) "preclude[s] judicial review of those decisions 'specified under this subchapter to be in the discretion of the Attorney General or the Secretary,' whether or not those decisions grant or deny an immigrant relief from removal."). But any tension in the Circuit's cases is ultimately beside the relevant point: Section 1252(a)(2)(B)(ii) applies only when "Congress itself set out the Attorney General's discretionary authority in the statute." *Kucana v. Holder*, 558 U.S. 233, 247 (2010).

fails to 'specify' that individual transfer decisions are in the Attorney General's discretion."); *Ozturk v. Hyde*, 136 F.4th 382, 396 (2d Cir. 2025) ("[*E*]*ven if* the discretionary authority to transfer a detainee between facilities is contemplated under § 1231(g), such authority is merely implied."); *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019) ("[T]he language of § 1231(g) does not . . . explicitly grant the Attorney General or the Secretary of Homeland Security discretion with respect to transfers.").

That conclusion becomes clearer in light of the kinds of decisions the D.C. Circuit has held triggers the Section 1252(a)(2)(B)(ii) bar. In *Zhu v. Gonzalez*, for example, the Circuit concluded that waiver decisions pursuant to 8 U.S.C. § 1153(b)(2)(B)(i) are not subject to judicial review given Section 1252(a)(2)(B)(ii). 411 F.3d 292, 295 (D.C. Cir. 2005). That provision states that the Attorney General "may" waive a requirement to petition for a type of work visa "when the Attorney General deems it to be in the national interest." 8 U.S.C. § 1153(b)(2)(B)(i). The Circuit identified two features of the provision reflecting that it specifies discretionary authority. *Zhu*, 411 F.3d at 295. "First, the Attorney General in any particular case may 'deem' a waiver of the requirement to be in the 'national interest,' which determination calls upon his expertise and judgment unfettered by any statutory standard whatsoever." *Id.* "Second, even if the Attorney General deems a waiver to be in the national interest, the statute provided that he 'may'—not that he must—then grant it." *Id.* Together, these features sufficiently specified that the Attorney General is not "constrained when deciding whether a waiver should be granted." *Id.* at 296.

Similarly, in *iTech U.S., Inc. v. Renaud*, the Circuit held that Section 1252(a)(2)(B)(ii) bars judicial review of revocation decisions made pursuant to 8 U.S.C. § 1155. 5 F.4th 59, 68 (D.C. Cir. 2021). Section 1155 says that the Secretary of Homeland Security "may, at any time, for what he deems to be good and sufficient cause, revoke the approval" of certain visa petitions. 8 U.S.C.

§ 1155. The Circuit explained that "*Zhu* makes clear that the combination of 'may' and 'deems' is sufficient to render a statutory grant of authority like the one in section 1155 discretionary." *iTech*, 5 F.4th at 67.

Unlike these provisions, Section 1231(g)(1) uses the nondiscretionary word "shall." 8 U.S.C. § 1231(g)(1) ("The Attorney General shall arrange for appropriate places of detention[.]"); *see also Ozturk*, 136 F.4th at 395 ("Far from specifying discretion, § 1231(g) uses the obligatory 'shall' rather than a permissive 'may.'"). And although, as mentioned, the term "appropriate" may confer flexibility on the Attorney General's decisionmaking, Section 1231(g)(1) does not authorize the Attorney General to "deem" places appropriate for detention. In other words, Section 1231(g)(1) lacks language specifying that the Secretary of Homeland Security's location-of-detention and transfer decisions are discretionary. This Court thus joins others in holding that Section 1252(a)(2)(B)(ii) does not strip jurisdiction to hear challenges to such decisions.[6]

### c. 8 U.S.C. § 1252(b)(9)

Finally, the Defendants contend that 8 U.S.C. § 1252(b)(9) precludes judicial review. Mot Dismiss at 13. Section 1252(b)(9) states:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction . . . to review such an order or such questions of law or fact.

---

[6] *See, e.g.*, *Aguilar v. ICE*, 510 F.3d 1, 20 (1st Cir. 2007); *Ozturk v. Hyde*, 136 F.4th 382, 395–96 (2d Cir. 2025); *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209–10 (4th Cir. 2019). Although the Court is aware that the Tenth Circuit has suggested otherwise in *Van Dinh v. Reno*, that decision was issued before *Kucana*, and the Tenth Circuit has not cited *Van Dinh* since *Kucana*. *See* 197 F.3d 427, 433–34 (10th Cir. 1999).

8 U.S.C. § 1252(b)(9).

"The Supreme Court has characterized § 1252([b])(9) as a 'zipper clause,' which consolidates judicial review of immigration proceedings into one action in the court of appeals." *O.A. v. Trump*, 404 F. Supp. 3d 109, 130 (D.D.C. 2019) (cleaned up). Although the Court has not yet provided a "comprehensive interpretation" of Section 1252(b)(9), *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (plurality opinion), it has explained that this provision "'does not present a jurisdictional bar' where those bringing suit 'are not asking for review of an order of removal,' 'the decision . . . to seek removal,' or 'the process by which . . . removability will be determined.'" *Regents of the Univ. of Cal.*, 591 U.S. at 19 (first quoting *Jennings*, 583 U.S. at 294 (plurality opinion); and then citing *id.* at 355 (Breyer, J., dissenting)). Because the Plaintiffs' challenges do not fit one of these categories, Section 1252(b)(9) does not bar judicial review.

The Defendants barely acknowledge this precedent and instead direct the Court to the text of Section 1252(b)(9) alone. *See* Mot. Dismiss at 13; Reply at 9. The only thing the Defendants have to say about the Supreme Court's interpretation is that the Court "rejected an overly-expansive [sic] reading of § 1252(b)(9)" that the "Defendants have [n]either advocated for [n]or subscribed to." Reply at 9. But again, the Supreme Court has said more: Section 1252(b)(9) does not present a jurisdictional bar unless the plaintiff is seeking "review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Regents of the Univ. of Cal.*, 591 U.S. at 19 (cleaned up). Because the Plaintiffs are not, the Court concludes that Section 1252(b)(9) poses no obstacle to their claims.

## B.    APA Claims

Turning to the merits of the Plaintiffs' claims, the Complaint alleges that the Defendants' policy of holding immigration detainees at Guantanamo violates the APA. Compl. ¶¶ 62–69. The

Court begins by addressing whether the Plaintiffs may bring a claim under the APA. Then the Court discusses whether the Complaint states a claim that the Defendants' decision was contrary to law or arbitrary and capricious.

### 1.    Availability of APA Claims

The Defendants argue that an APA claim is unavailable (1) because the Plaintiffs' claims do not challenge a final agency action, and (2) because transfer decisions are committed to agency discretion by law.[7] The Court is not convinced. The Complaint sufficiently alleges that the Defendants' designation of Guantanamo as a detention location for immigration detainees is a final agency action subject to judicial review.

### a.    Final Agency Action

The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. For agency action to be final, it must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Sierra Club v. EPA*, 955 F.3d 56, 61 (D.C. Cir. 2020) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The Plaintiffs articulate the relevant agency action here as the Defendants' recent "policy of placing immigrants at Guantánamo"

---

[7] The Defendants also briefly argue that APA claims are unavailable because the Plaintiffs' claims sound in habeas. Mot. Dismiss at 14. But "they have not provided a compelling reason why this is so. APA and habeas review may coexist." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 185 (D.D.C. 2015). And more fundamentally, the Plaintiffs are not seeking release from detention. Compl. ¶ 3 (the Plaintiffs "do not challenge the government's authority to detain them on U.S. soil or to directly remove them to their home country or to another statutorily authorized country"). Their APA claims challenge only the Defendants' recent decision to use Guantanamo as an immigration detention facility. *Cf. Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005) ("Because neither prisoner's claim would necessarily spell speedier release, neither lies at 'the core of habeas corpus.'" (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973))).

(which the Court will refer to as the "Guantanamo-detention policy"). Opp'n at 34; *see also* Compl. ¶ 3 ("What [the Plaintiffs] challenge is the government's unprecedented and unlawful decision to hold them in a detention facility at Guantánamo[.]").

To be sure, the Complaint does not allege that the Guantanamo-detention policy is written in full anywhere. But that does not foreclose APA review. "Agency action generally need not be committed to writing to be final and judicially reviewable." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (applying APA principles to 28 U.S.C. § 2342(7)); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 77–78 (D.D.C. 2025); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015). "A contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.' . . . Denying review of agency action that is essentially conceded but ostensibly unwritten would fly in the face of the Supreme Court's instruction that finality be interpreted 'pragmatic[ally].'" *R.I.L-R*, 80 F. Supp. 3d at 184–85 (first quoting *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003); and then quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980)).

Still, both the Supreme Court and the D.C. Circuit have recognized that challenged agency conduct must be sufficiently discrete to qualify as agency action under the APA. The leading case on the subject is the Supreme Court's decision in *Lujan v. National Wildlife Federation* (*NWF*). The Circuit's recent decision in *National Treasury Employees Union v. Vought* (*NTEU*) is also instructive.

*NWF* concerned a challenge to actions taken by the Bureau of Land Management (BLM) under the Federal Land Policy and Management Act of 1976 (FLPMA). 497 U.S. 871, 879 (1990). The FLPMA tasked the BLM with various tasks related to classifying and disposing of public land,

including land use planning, preparing and maintaining an inventory of all public lands, reviewing

classifications of public land, and more. *Id.* at 877. The plaintiff, an environmental organization,

"averred generally that the reclassification of some withdrawn lands and the return of others to the

public domain would open the lands up to mining activities, thereby destroying their natural

beauty." *Id.* at 879. The organization's APA claims sought review of "[t]he activities undertaken

by the BLM to comply with [the FLPMA's] various provisions," which the organization's

complaint styled as "the BLM's 'land withdrawal review program.'" *Id.* at 877.

The Court held that the "land withdrawal review program" was not an agency action within

the meaning of the APA. *Id.* at 890. The Court explained:

> The term 'land withdrawal review program' (which . . . is not derived from any
> authoritative text) does not refer to a single BLM order or regulation, or even to a
> completed universe of particular BLM orders and regulations. It is simply the name
> by which [the organization] ha[s] occasionally referred to the continuing (and thus
> constantly changing) operations of the BLM in reviewing withdrawal revocation
> applications and the classifications of public lands and developing land use plans
> as required by the FLPMA.

*Id.* The "land withdrawal review program," the Court elaborated, "is no more an identifiable

'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a

'drug interdiction program' of the Drug Enforcement Administration." *Id.*

The Court was not moved by the organization's allegation that "violation of the law" was

"rampant" in the so-called "land withdrawal review program." *Id.* at 891. It concluded that "the

flaws in the entire 'program'—consisting principally of the many individual actions referenced in

the complaint, and presumably, actions yet to be taken as well—cannot be laid before the courts

for wholesale correction under the APA." *Id.* at 893. That is because litigants "cannot seek

*wholesale* improvement of this program by court decree, rather than in the offices of the

Department or the halls of Congress, where programmatic improvements are normally made.

Under the terms of the APA, [a litigant] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Id.* at 891.

In *NTEU*, the D.C. Circuit reviewed a challenge to actions taken by the Consumer Financial Protection Bureau (CFPB) "to substantially downsize the agency." 149 F.4th 762, 770 (D.C. Cir. 2025). "These actions included terminating employees, cancelling contracts, declining additional funding, moving to smaller headquarters, and requiring advance approval for agency work." *Id.* Several plaintiffs "sued to stop what they describe[d] as a decision to 'shut down' the Bureau." *Id.* The Circuit held that the plaintiffs did not challenge an agency action within the meaning of the APA. *Id.* at 783. It began by noting that "[t]he plaintiffs point to no regulation, order, document, email, or other statement, written or oral, purporting to shut down the CFPB. Instead, they infer[red] such an overarching decision from various discrete 'actions' taken by agency leadership to downsize the Bureau[.]" *Id.* at 782. The Circuit also acknowledged the government's litigation position that it did not undertake to shut down the CFPB. *Id.*

Among other defects, the Circuit explained that "the posited shutdown decision [was] insufficiently discrete to qualify as 'agency action.'" *Id.* at 784. "To begin with," it said, "no statute or regulation authorizes the CFPB to shut itself down, so the posited decision is not 'derived from any authoritative text' that might help structure judicial review." *Id.* (quoting *NWF*, 497 U.S. at 890). Further, like the so-called policy challenged in *NWF*, what the plaintiffs referred to as the "shutdown decision" was the plaintiffs' way of "referring to a constellation of then-ongoing actions," including an email from agency leadership, firing employees, cancelling contracts, declining additional funding, and terminating the lease for the CFPB's headquarters. *Id.* The Circuit said that "[r]ather than seeking to challenge any of these discrete decisions that may have caused them harm, the plaintiffs seek to dress up these 'many individual actions' as a single

decision in order to challenge all of them at once, which is exactly what [*NWF*] prevents." *Id.* (quoting *NWF*, 497 U.S. at 893).

The Defendants liken the Plaintiffs' challenge here to those in *NWF* and *NTEU*, arguing that it similarly does not identify "a discrete, identifiable 'agency action.'" Mot. Dismiss at 14. The Court disagrees. The Guantanamo-detention policy—which again, refers to the Defendants' recent designation of Guantanamo as a location to house immigration detainees in connection with their immigration proceedings—is sufficiently "circumscribed" and "discrete" to qualify as a cognizable agency action. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

The Court begins with the most glaring distinction between this case and the two discussed above: the presence of written and oral statements regarding the challenged policy. According to the Complaint, the President issued a written memorandum directing the DHS and DOD Secretaries to expand operations at Guantanamo to hold immigration detainees. Compl. ¶ 24.[8] Then, in response to the President's instruction, DHS and DOD entered into a memorandum of understanding structuring the agencies' handling of immigration detention at Guantanamo. *See* Compl. ¶ 29. Admittedly, the import of the MOU has been underdeveloped in the Parties' briefing. The Plaintiffs have not articulated whether they believe that the MOU itself constitutes the Guantanamo-detention policy, or whether it is just a clarificatory overlay. And similarly, the Defendants have not represented whether the Defendants would continue holding immigration detainees at Guantanamo if the Court were to set aside that MOU. But suffice it to say, the

---

[8] In the Defendants' Reply, they suggest for the first time that the Plaintiffs challenge presidential action either directly or by agencies acting solely on his behalf. Reply 11–12. Yet "courts in our circuit will not consider arguments raised for the first time in a reply. For that reason, the court declines to address the [Defendants'] theory." *Bancoult v. McNamara*, 214 F.R.D. 5, 12 n.7 (D.D.C. 2003) (citation omitted). The Court notes, however, that even if the President's written memorandum cannot itself form a part of the Guantanamo-detention policy, it nevertheless provides important context for the MOU and the agencies' accompanying conduct.

existence of the MOU goes a long way to show that the Guantanamo-detention policy is not a mere "abstract decision" or "constellation of then-ongoing actions." *See NTEU*, 149 F.4th 783–84. And on top of that, the Complaint alleges statements by agencies and high-ranking officials addressing immigration-detainee detention at Guantanamo. *See* Compl. ¶¶ 39–42. At this early stage, the Plaintiffs' allegations are sufficiently detailed.

There are more distinctions between this case and *NWF*/*NTEU*. First, as discussed below, federal law authorizes immigration detention, meaning that the "posited decision is . . . 'derived from . . . authoritative text' that might help structure judicial review." *NTEU*, 149 F.4th at 784 (quoting *NWF*, 497 U.S. at 890). Second, even if the MOU does not itself constitute the Guantanamo-detention policy, the Plaintiffs' challenge is to "a completed universe of particular . . . orders and regulations": the orders, agreements, and memoranda—written or unwritten—that are leading to immigration detention at Guantanamo for the first time. *See NWF*, 497 U.S. at 890. Third, the Plaintiffs' detention at Guantanamo reflects that "the scope of the controversy has been reduced to . . . manageable proportions, and its factual components fleshed out, by some concrete action applying the [policy] to the claimant's situation in a fashion that harms . . . him." *Id.* at 891. And fourth, the Defendants affirmatively contend that they have the power to hold immigration detainees at Guantanamo, and they do not dispute that they are exercising that claimed power. *See NTEU*, 149 F.4th at 782 (noting that "the government does not claim the power to 'shut down' the CFPB" and that "the government disputes that it undertook to shut down the CFPB").

Accordingly, the Court is convinced that the Plaintiffs' challenge is not an attempt to dress up a collection of individual agency actions as a single decision. Indeed, if one were to try to break the Guantanamo-detention policy into component parts, what would they be? The MOU might be

one, but what else? The agencies' selection of individuals to be detained at Guantanamo? The allocation of funds to pay for detention there? Those are all incident to the one discrete thing that the Plaintiffs challenge: "the government's unprecedented and unlawful decision to hold them in a detention facility at Guantánamo." Compl. ¶ 3. That is not the same thing as a challenge to "the government's removal decisions at-large." *Contra* Reply at 12. The Court is satisfied that the Complaint alleges facts plausibly reflecting that the Guantanamo-detention policy is an agency action. *See Iqbal*, 556 U.S. at 678.

Further, the Court is convinced that the Guantanamo-detention policy is *final* agency action within the meaning of the APA. Based on the allegations in the Complaint, the Guantanamo-detention policy is not "of a merely tentative or interlocutory nature." *See Bennett*, 520 U.S. at 178. Instead, the Defendants have been executing that policy by holding immigration detainees at Guantanamo. *See Sw. Airlines Co. v. DOT*, 832 F.3d 270, 275 (D.C. Cir. 2016) ("In assessing whether a particular agency action qualifies as final for purposes of judicial review, [the D.C. Circuit] and the Supreme Court have looked to the way in which the agency subsequently treats the challenged action.").

The second prong, that the agency action is "one by which rights or obligations have been determined, or from which legal consequences will flow," is also easily met. *Sierra Club*, 955 F.3d at 61 (quoting *Bennett*, 520 U.S. at 178). As explored below in connection with the Fifth Amendment claim, the Defendants' "placement decisions had immediate and significant legal consequences for Plaintiffs, who must bear detention in more restrictive settings" than they would have absent the Guantanamo-detention policy. *Ramirez v. ICE*, 338 F. Supp. 3d 1, 23 (D.D.C. 2018). Puzzlingly, the Defendants broadly contend that no legal consequences flow from "operational determinations relating to post-removal[-order] detention and transfer" because such

24

consequences "are the direct outcome of the removal order itself." Reply at 14. But that is simply not true. Imagine that the Secretary of Homeland Security promulgates a policy stating that all brown-haired people with removal orders will be detained close to any family, but all those with blonde hair will be detained in Alaska. Then, a blonde person's detention in Alaska obviously would not be a "direct outcome of the removal order itself," *contra* Reply at 14; it would be the result of the Secretary's new policy. So too here—the Plaintiffs allege that they are held at Guantanamo rather than another detention facility because of the Guantanamo-detention policy. The Court sees no reason why that agency action is not final within the meaning of the APA.

### b.  Committed to Agency Discretion by Law

Next, the Defendants raise 5 U.S.C. § 701(a)(2), which renders the APA's judicial review provisions inapplicable when "agency action is committed to agency discretion by law." Mot. Dismiss at 16. Generally, "[t]here is a strong presumption of reviewability under the [APA]." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (quoting *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003)). Section 701(a)(2) is a "quite narrow[]" exception to that general rule, "confin[ed] . . . to those rare 'administrative decisions traditionally left to agency discretion.'" *Regents of the Univ. of Cal.*, 591 U.S. at 17 (alteration adopted) (first quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018); and then quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). The presumption of judicial review, "like all presumptions used in interpreting statutes, may be overcome by, *inter alia*, specific language or specific legislative history that is a reliable indicator of congressional intent, or a specific congressional intent to preclude judicial review that is fairly discernible in the detail of the legislative scheme." *Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 670 (1986) (cleaned up). Courts consider "both the nature of the administrative action at issue and the language and structure of

the statute that supplies the applicable legal standards for reviewing that action." *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006) (quoting *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)). The question is whether "the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Physicians for Soc. Resp.*, 956 F.3d at 643 (cleaned up). And it is the "heavy burden" of the party invoking Section 701(a)(2) to prove by "clear and convincing evidence" that a challenge falls within that provision's narrow exception. *Bowen*, 476 U.S. at 671–72 (first quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975); and then quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967)).

The Defendants contend that Section 701(a)(2) excludes the Plaintiffs' APA claims from judicial review because "the execution of removal orders is a process over which the Executive Branch enjoys largely unfettered discretionary control." Mot. Dismiss at 16. The Court disagrees. If Executive control over the removal process were sufficient to trigger Section 701(a)(2), then all APA claims touching on that process would fail at the threshold. The existence of successful APA challenges in this context is good evidence that courts should not determine the applicability of Section 701(a)(2) at the abstract level of Executive power. *See, e.g.*, *Regents of the Univ. of Cal.*, 591 U.S. at 17–19, *Ramirez*, 338 F. Supp. 3d at 37–38. Yet that is the only Section 701(a)(2) argument the Defendants make in their Motion to Dismiss.[9]

In their Reply, the Defendants additionally argue for the first time that the INA's grant of authority to the Executive in 8 U.S.C. § 1231(g) to make location-of-detention decisions also

---

[9] The Defendants also argue that the jurisdiction-stripping provisions discussed above are relevant here because 5 U.S.C. § 701(a)(1) does not permit APA review where another statute forbids it. Mot. Dismiss at 17–18. But for the reasons stated above, those provisions do not foreclose judicial review.

triggers Section 701(a)(2). Reply at 15–17. Although the Court would typically decline to address an argument raised for the first time in a reply brief, *see Bancoult v. McNamara*, 214 F.R.D. 5, 12 n.7 (D.D.C. 2003), the Court does so here to focus the Parties' arguments as this case progresses.

Section 1231(g)(1) directs the Secretary of Homeland Security to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). The Defendants say nothing about how "the nature of the administrative action at issue" (*i.e.*, the Guantanamo-detention policy) or "the language and structure of" Section 1231(g)(1) demonstrate that there are no legal norms to apply to the Plaintiffs' APA claims. *See Twentymile Coal Co.*, 456 F.3d at 156. Instead, the Defendants invoke the "backdrop" of courts interpreting Section 1231(g)(1) as granting the Secretary of Homeland Security discretion to choose locations for immigration detention. Reply at 15–16. But identifying a grant of authority—even one that provides broad decisionmaking discretion—is not sufficient to show that an APA challenge is of the "rare" sort that falls within the "narrow[]" category of claims rendered unreviewable by Section 701(a)(2). *See Regents of the Univ. of Cal.*, 591 U.S. at 17 (quoting *Weyerhaeuser Co.*, 586 U.S. at 23). The D.C. Circuit "has found meaningful standards to apply" in the context of statutes using highly "permissive and indeterminate language"—for example, a statute requiring "nothing more than 'high quality and cost-effective care'" and another stating that an agency "may excuse a failure to file if it finds it to be in the interest of justice." *Physicians for Soc. Resp.*, 956 F.3d at 643 (cleaned up).

Here, Section 1231(g)(1)'s grant of location-of-detention authority is limited to "aliens detained pending removal or a decision on removal," which is the limitation at issue in the Plaintiffs' contrary-to-law claim. 8 U.S.C. § 1231(g)(1). And the Defendants have made no effort to show that Section 1231(g)(1) is "drawn so that it furnishes no meaningful standard by which to

judge" the Plaintiffs' arbitrary-and-capricious claim. *See Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). Further, the Court notes that other courts have "entertained . . . challenges" to decisions made pursuant to Section 1231(g)(1). *See id.*; *see, e.g.*, *Aguilar*, 510 F.3d at 21–24; *Reyna*, 921 F.3d at 210–11; *Ortiz v. Orange Cnty.*, No. 23-cv-2802, 2024 WL 113705, at *8–*9 (S.D.N.Y. Jan. 10, 2024). In sum, even if evaluation of the Plaintiffs' APA claims requires the Court to heed the Executive's discretion in this area, the Defendants have not clearly and convincingly shown that judicial review would be entirely standardless. That means that they have failed to satisfy their burden to demonstrate that this case is excepted from the APA's strong presumption of review.

### 2.    Contrary to Law

Turning to the substance of the Plaintiffs' APA claims, the Complaint states that the Guantanamo-detention policy is contrary to law because the Defendants lack authority to hold immigration detainees at Guantanamo while they await removal.[10] Compl. ¶¶ 62–64. In their Motion to Dismiss, the Defendants do not identify the precise statutory text authorizing the Guantanamo-detention policy. Instead, they contend that 8 U.S.C. §§ 1103(a)(3), 1225(b)(1)(B)(iii)(IV), 1231(a)(2) and (6), and 1231(g) together "confer broad extraterritorial authority for ICE to carry out Congress's removal mandate." Mot. Dismiss at 20. The Court cannot

---

[10] The Complaint and the Parties' briefing do not precisely state the APA theory behind this claim. The Complaint refers to this claim as one averring that the Guantanamo-detention policy is "contrary to law" under the APA, citing 5 U.S.C. § 706(2)(A). Compl. ¶ 64. It seems that the Plaintiffs have combined Section 706(2)(A)'s phrase "not in accordance with law" with Section 706(2)(B)'s phrase "contrary to constitutional right, power, privilege, or immunity." But given the nature of the authority granted by the statutory provisions discussed here, it strikes the Court that the more natural characterization of the Plaintiffs' challenge is one alleging that the Guantanamo-detention policy is "in excess of statutory . . . authority[] or limitations." 5 U.S.C. § 706(2)(C). Still, under the APA the proper response to unlawfulness is the same regardless of the theory—to "hold unlawful and set aside" the relevant agency action. *Id.* § 706(2). Thus, for simplicity's sake, the Court will use the Complaint's "contrary to law" framing.

assess the Defendants' statutory authority at this high level of generality. The question is whether any of the Defendants' cited provisions permit the Guantanamo-detention policy.

### a.  The Defendants' Cited Provisions

Most of the provisions cited by the Defendants—although relevant to defining the general contours of the Secretary of Homeland Security's detention responsibilities—do not shed light on whether the decision to detain class members at Guantanamo is authorized by statute. Section 1225(b)(1)(B)(iii)(IV) directs that individuals subject to the expedited removal process "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Similarly, 8 U.S.C. § 1231(a)(2) instructs that the Secretary "shall detain" an individual subject to a final order of removal for a certain period, and Section 1231(a)(6) says that some of those individuals "may be detained" for a longer period. These provisions address several aspects of immigration detention, including who should be detained and for how long. But they say nothing about *where* individuals may be held.

The Defendants' two remaining provisions are more on point. First, 8 U.S.C. § 1231(g)(1) states:

> The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend . . . amounts necessary to acquire land and to acquire, built, remodel, repair, and operate facilities . . . necessary for detention.

Although this provision is directed "mo[st] centrally to the government's brick and mortar obligations for obtaining facilities in which to detain aliens," *Reyna*, 921 F.3d at 209; *see also Aguilar*, 510 F.3d at 20 (similar), several courts have also interpreted it to grant the Secretary authority to make location-of-detention decisions, *see, e.g.*, *Sinclair v. Att'y Gen.*, 198 F. App'x

218, 222 n.3 (3d Cir. 2006) (citing Section 1231(g) for the proposition that "the place of detention is left to the discretion of the Attorney General"); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (en banc) ("Section 1231(g)(1) gives both 'responsibility' and 'broad discretion' to the Secretary 'to choose the place of detention for deportable aliens.'" (quoting *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir.), *amended by* 807 F.2d 769 (9th Cir. 1986))). The Plaintiffs do not dispute that Section 1231(g) provides such authority, so the Court presumes that those courts are correct.

Second, 8 U.S.C. § 1103(a)(3) states that the Secretary of Homeland Security "shall . . . perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." The D.C. Circuit has understood this provision (in combination with 8 U.S.C. § 1184(a)(1)) to mean that "the INA need not specifically authorize each and every action taken by DHS, so long as its action is reasonably related to the duties imposed upon it." *Save Jobs USA v. DHS*, 111 F.4th 76, 79 (D.C. Cir. 2024) (quoting *Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 179 (D.C. Cir. 2022)).

Because Section 1103(a)(3) appears to grant only interstitial authority to the Secretary, Section 1231(g)(1) seems to be the Defendants' core statutory basis for the Guantanamo-detention policy. Few courts, however, have interpreted that provision. And the Defendants do not proffer their own analysis of its language. Accordingly, the Court must answer what appears to be a question of first impression: Does Section 1231(g)(1) contain any detention-location limitations that prevent individuals subject to removal orders from being detained at Guantanamo?

**b. Interpreting 8 U.S.C. § 1231(g)(1)**

"In addressing a question of statutory interpretation, [the Court] begin[s] with the text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (quoting *City of Clarkesville v.*

*FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018)). Although, as mentioned, the directive to arrange for

"appropriate" places of detention grants considerable decisionmaking flexibility to the Secretary,

*see Michigan*, 576 U.S. at 752, Section 1231(g)(1) is not limitless. Recall that the INA authorizes

detention in two circumstances: (1) when an individual is "pending a decision on whether [he] is

to be removed from the United States," 8 U.S.C. § 1226(a); and (2) when an individual has been

ordered removed, 8 U.S.C. § 1231(a)(2). *See also* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (similar for

expedited removal). Section 1231(g)(1) directly corresponds to those two authorizations, directing

the Secretary to arrange for detention locations for "aliens detained pending removal or a decision

on removal." 8 U.S.C. § 1231(g)(1). Neither Section 1231(g)(1) nor any other provision of the

INA contemplates detention locations for individuals who are not "pending removal or a decision

on removal." Accordingly, the Court must determine what it means for an individual to be

"pending removal or a decision on removal."[11]

---

[11] The Parties structure much of their arguments regarding Section 1231(g) around the presumption against extraterritoriality. "It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007)). "This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* In the Plaintiffs' view, that presumption should inform the Court's interpretation of Section 1231(g); there must be a clear statement that Section 1231(g) authorizes extraterritorial detention. Opp'n at 21. The Court is not convinced. Courts "typically apply the presumption to discern whether an Act of Congress regulating conduct applies abroad." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). True, the presumption has been applied in other contexts. *See id.* (applying the presumption to a statute that "allows federal courts to recognize certain causes of action"); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) (applying the presumption to conclude that refugee protections did not apply extraterritorially). But the Court is unaware of any case that has applied the presumption to discern the scope of a grant of authority to the Executive. And at the motions hearing, counsel for the Plaintiffs admitted that they were not aware of such a case. Mots. Hr'g Tr. 48:8–22, ECF No. 50. Ultimately, however, the Court need not answer whether the presumption applies here because it concludes that the best reading of Section 1231(g) is consistent with the presumption.

Around 1996, when Congress promulgated this language,[12] dictionaries identified two senses of "pending" when used, as here, as a preposition: (1) "Throughout the continuance of; during," and (2) "While awaiting; until." *Pending*, Black's Law Dictionary (7th ed. 1999); *see also Pending*, Merriam Webster's Collegiate Dictionary (10th ed. 1996) ("During" or "while awaiting"); *Pending*, Webster's II New Riverside Dictionary (1994) ("While in the process of: During" and "While awaiting: Until"); *Pending*, Webster's Third New International Dictionary (1993) ("through the period of continuance or indeterminacy of: During" or "until the occurrence or completion of: while awaiting"). Reading the whole phrase in Section 1231(g)(1) together, it is clear that Congress used "pending" in its "while awaiting" sense. Individuals who are "detained pending . . . a decision on removal" are those who have been "arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a); *see also Nielsen v. Preap*, 586 U.S. 392, 397 (2019) (Section 1226(a) "sets out the general rule regarding [removable noncitizens'] arrest and detention pending a decision on removal"); *Arizona v. United States*, 567 U.S. 387, 457 (2012) (Alito, J., concurring in part and dissenting in part) ("Congress has given the Executive discretion under § 1226(a) over whether to arrest and detain them pending a decision on removal."). And a decision on whether an individual will be removed is something that happens at a discrete point in time. Thus, detention "pending" that decision is read naturally as "while awaiting" that decision—not "throughout the continuance of" that decision.

Because the word "pending" "applies without differentiation" to both "removal" and "a decision on removal," it must have the same meaning in relation to each phrase. *See Clark v.*

---

[12] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104–208, § 305, 110 Stat. 3009–546, 3009–606 (1996).

*Martinez*, 543 U.S. 371, 378 (2005) ("The operative language . . . applies without differentiation to all three categories of aliens that are its subject. To give these same words a different meaning for each category would be to invent a statute rather than interpret one."); *cf. Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."). Said differently, because "pending . . . a decision on removal" means "while awaiting" that decision, so too must "pending removal" mean "while awaiting" removal. Therefore, Section 1231(g)(1) authorizes the Secretary to arrange for appropriate places of detention for (1) individuals who are awaiting removal or (2) individuals who are awaiting a decision on removal.

The class at issue here consists of individuals who have been ordered removed, and they are therefore not awaiting a decision on removal. Thus, the question is whether individuals moved to Guantanamo under the Guantanamo-detention policy are individuals who are awaiting removal. The Plaintiffs contend that the answer is no. They argue that under the INA, when individuals subject to removal orders are moved to Guantanamo, they have been removed—and are therefore no longer awaiting removal. Opp'n at 27–28. Evaluating this argument requires determining when, precisely, removal occurs.

### c.  Determining the Moment of Removal

One might expect there to be black-letter law defining "removal" given its significance in our immigration system, particularly because certain immigration and criminal consequences attach upon removal. *See, e.g.*, 8 U.S.C. §§ 1182(a)(9)(A), 1326; Richard D. Steel, Steel on Immigration Law § 14:47 (2025-2026 ed.). Surprisingly, that appears not to be the case.

Start with the nature of the term "removal." Is it given its plain meaning, or does it have a specialized meaning in the immigration context? The Defendants argue that "'removal' as contemplated by the INA is a legal term of art." Mot. Dismiss at 22. But they do not cite any decision so holding (much less providing any such specialized meaning),[13] and courts seem to disagree. *See, e.g.*, *United States v. Sanchez*, 604 F.3d 356, 359 (7th Cir. 2010) ("In both legal and lay parlance, removal simply means '[t]he transfer or moving of a person or thing from one location, position, or residence to another.'" (quoting *Removal*, Black's Law Dictionary (9th ed. 2009))); *J.G.G. v. Trump*, 147 F.4th 1044, 1052 (D.C. Cir. 2025) (per curiam) (Katsas, J., concurring) (same). Other courts have looked to 8 U.S.C. § 1101(g) to define removal; it states that "any alien ordered deported or removed . . . who has left the United States, shall be considered to have been deported or removed in pursuance of law, irrespective of . . . the place to which he departed." *See, e.g.*, *Romero v. DHS*, 20 F.4th 1374, 1380 (11th Cir. 2021) ("The governing statutory provision, which defines when an alien is considered 'deported or removed' under the INA, is 8 U.S.C. § 1101(g)."); *Nicusor-Remus v. Sessions*, 902 F.3d 895, 899 (9th Cir. 2018) ("A removal order is executed once an alien 'has left the United States.'" (quoting 8 U.S.C. § 1101(g))).

The Court is convinced that under the INA, removal occurs when an individual subject to a removal order leaves the United States, regardless of whether that departure is by their own design or carried out by the Government. That understanding is grounded in the term's plain meaning as well as Section 1101(g).

---

[13] The Defendants cite two cases: (1) a case from the Board of Immigration Appeals holding that a removal order is not the same thing as a deportation order, *In re G-N-C*, 22 I. & N. Dec. 281, 296–97 (BIA 1998); and (2) a Ninth Circuit case expounding the specialized meaning of the statutory term "enter," *United States v. Argueta-Rosales*, 819 F.3d 1149, 1155–56 (9th Cir. 2016). Mot. Dismiss at 22.

The Court begins with the term's plain meaning. Removal is "the transfer of a person or thing from one place to another." *Removal*, Black's Law Dictionary (4th rev. ed. 1968); *see also Removal*, Black's Law Dictionary (7th ed. 1999) ("The transfer or moving of a person or thing from one location, position, or residence to another."). And if the unadorned word "removal" is all there were, it might be ambiguous whether Congress understood removal to occur when the individual goes "from one place" (*i.e.*, leaves the United States) or instead when he goes "to another" (*i.e.*, arrives at the destination country). But Section 1101(g) eliminates any ambiguity. It says: "any alien ordered deported or removed . . . who has *left the United States*, shall be considered to have been deported or removed in pursuance of law, *irrespective of . . . the place to which he departed*." 8 U.S.C. § 1101(g) (emphases added). This provision unmistakably shows Congress's understanding that the consequential moment for removal is the individual's departure from the United States. Indeed, the best reading of Section 1101(g) is that it defines removal as occurring at that moment. *See, e.g.*, *Romero*, 20 F.4th at 1380; *Nicusor-Remus*, 902 F.2d at 899. Further support comes from the many provisions in which Congress paired "removed" with "from the United States," emphasizing that it is the departure from U.S. territory that occasions removal. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(A)(i), 1225(b)(1)(B)(iii)(I), 1226(a), 1229a(a)(3), 1282(b), 1326(b)(3)–(4), 1366(4), 1534(a)(1), 1537(b)(2)(D).

Courts have applied this interpretation of removal in a variety of immigration law contexts. Here are a few examples:

- *Nicusor-Remus v. Sessions*, 902 F.3d 895 (9th Cir. 2018). An individual entered the United States under the Visa Waiver Program, 8 U.S.C. § 1187. *Id.* at 897. The individual was ordered removed in 2002, but he then became an FBI informant. *Id.* In 2004, federal agents "drove [the individual] to the United States-Mexico Border. The agents escorted [him]

across the border into Tijuana and then back into the United States."[14] *Id.* In 2012, DHS took the individual into custody pursuant to the 2002 removal order. *Id.* On a petition for review, the Ninth Circuit faced the question whether "the 2002 removal order was executed when [the individual] left the country in 2004" because if so, his 2012 detention was not pursuant to a removal order over which the court had jurisdiction. *Id.* at 899. The Ninth Circuit held that it lacked jurisdiction because the individual's "2002 removal order was executed when he left the United States." *Id.* The government argued that the 2004 "'physical departure' did not constitute a 'legal departure.'" *Id.* The court rejected that argument, citing Section 1101(g). *Id.* It explained that "[t]he statute makes no distinction between 'physical' and 'legal' departures. The plain statutory text clearly envisions that any departure is sufficient to execute a removal order, regardless of how long the alien remains outside the United States or to where the alien departs." *Id.* (citation omitted). "All the statute requires to execute the removal order is for the alien to 'le[ave] the United States.'" *Id.* (quoting 8 U.S.C. § 1011(g)).

- *United States v. Sanchez*, 604 F.3d 356 (7th Cir. 2010). 8 U.S.C. § 1326 generally makes it a crime for a noncitizen who was removed to enter the United States. An individual was ordered removed to El Salvador but was mistakenly escorted across the border to Mexico. *Sanchez*, 604 F.3d at 357, 359–60. In an appeal from a later Section 1326 conviction, he contended that the district court erroneously forbade him from arguing that he was "never properly removed from the United States because he was sent to the wrong country." *Id.* at 358. The Seventh Circuit disagreed, holding that the individual "was 'removed' from the

---

[14] Apparently, the agents wanted to take him out of the country "and bring him back legally so that he could testify . . . at trial." *Nicusor-Remus v. Sessions*, 902 F.3d 895, 897 (9th Cir. 2018).

United States when he was physically taken to Mexico." *Id.* at 359. It explained that an individual is "considered removed when he is escorted out by the authorities pursuant to . . . a valid deportation order." *Id.* The court further offered a morbid hypothetical: an individual would be removed (although unlawfully) "if the government decided to remove an illegal alien by sailing her out to the boundary of the territorial waters of the United States and tossing her overboard." *Id.*

- *Mansour v. Gonzales*, 470 F.3d 1194 (6th Cir. 2006). The Immigration and Naturalization Service "failed to execute the order of deportation" for a person ordered deported; then, while "attending his engagement party, [the person] 'became drunk[,] . . . accidentally travelled to Mexico,'" and re-entered the United States. *Id.* at 1196. Years later, the person moved to reopen his deportation proceedings. *Id.* at 1197. The Sixth Circuit held that by traveling to Mexico, the person "effectively executed his outstanding deportation order, thus leaving no deportation proceedings to reopen." *Id.* at 1200; *see id.* at 1199 (the person's "departure executed his order of deportation").

The Court is aware of one outlier case to the contrary. In *Handa v. Clark*, the Ninth Circuit held that an individual was not removed when he presented himself at the Canadian border, was denied entry, and then "circl[ed] the Canadian flag pole, recross[ed] the border, and present[ed] himself to the United States officials." 401 F.3d 1129, 1132 (9th Cir. 2005). But that circuit has since rejected that *Handa* stands for the "proposition that a physical departure does not execute a removal order." *Nicusor-Remus*, 902 F.3d at 899–900. It explained that the facts of *Handa* were "unique," and analogized it to a situation where a person "has not left the outdoors" even if they "step[] onto the doorstep but find[] that the front door is locked." *Id.*; *see also J.G.G.*, 147 F.4th at 1053 (Katsas, J., concurring) (interpreting Ninth Circuit caselaw to treat *Handa* as a *de minimis*

exception to the general physical departure rule). The lesson from all these cases is that throughout immigration law, individuals subject to removal orders are considered removed when they have departed the United States.[15]

The Defendants evidently disagree with this understanding of "removal," but their alternative interpretation is hard to pin down. The Defendants say that "[t]o effectuate a departure or removal from the United States, the immigration detainee must lawfully enter another country." Mot. Dismiss at 22. But their briefing at points seems to suggest that removal instead hinges on the United States relinquishing custody of the individual. *Id.* at 23 (suggesting that class members have not been removed because "the U.S. government has not relinquished control of immigration detainees at [Guantanamo]"); Reply at 18 ("The Secretary's authority under these provisions begins upon entry of the removal order and necessarily extends until she relinquishes custody of the alien detainee.").[16]

---

[15] Two significant cases that predate the INA held that under some circumstances, a person's return to the United States after having physically departed does not fit the statutory meaning of entry in the immigration laws. *See Delgadillo v. Carmichael*, 332 U.S. 388, 389–91 (1947) (noncitizen's ship sailing from Los Angeles to New York was torpedoed, and noncitizen was rescued and taken to Cuba; his return to the United States was not an entry); *Di Pasquale v. Karnuth*, 158 F.2d 878, 878–79 (2d Cir. 1947) (noncitizen rode a train from Buffalo to Detroit, which he did not realize passed through Canada; his arrival in Detroit did not constitute an entry). After the enactment of the INA, the Supreme Court relied on these cases to hold that, under the INA, an individual's return to the United States after visiting Mexico for "a couple hours" did not constitute entry. *Rosenberg v. Fleuti*, 374 U.S. 449, 460 (1963). But whatever the vitality of these cases given intervening statutory amendments, *see, e.g.*, *Heredia v. Sessions*, 865 F.3d 60, 64–65 (2d Cir. 2017), they do not illuminate the meaning of removal because the individuals in those cases were not subject to removal orders (or to be historically accurate, deportation orders) when they left the United States, *see Mansour v. Gonzales*, 470 F.3d 1194, 1199 (6th Cir. 2006) (distinguishing *Fleuti* on this basis); *Aguilera-Ruiz v. Ashcroft*, 348 F.3d 835, 837–38 (9th Cir. 2003) (same); *see also United Ass'n of Journeymen, Loc. Union No. 412 v. Barr*, 981 F.2d 1269, 1271 n.1 (D.C. Cir. 1992) ("'Entry' is a term of art in the immigration laws.").

[16] At the motions hearing, the Court asked counsel for the Defendants when they believe removal occurs. Mots. Hr'g Tr. 65:8. Seemingly blending their lawful-foreign-entry and relinquishment-of-custody theories, counsel first stated: "Removal would occur upon the final sort

The Defendants' doctrinal basis for these positions is meager. They make no argument based on the plain meaning—or even a purportedly specialized meaning—of the term "removal." The only cited statutory support in their briefs are 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV) and 1231(a)(2) & (6), which are discussed above and state only that certain individuals shall be detained until removed. Reply at 18.[17] At the motions hearing, counsel for the Defendants broadly gestured toward 8 U.S.C. § 1231(b), which prescribes countries to which an individual can be removed, and stated that the statutory scheme is about "[g]etting them to the destination." Mots. Hr'g Tr. 66:13–25, ECF No. 50; *see also id.* 69:6–7 ("I don't think I have anything more specific than the statutes I have quoted."). And the only case the Defendants cite relevant to this question is *Handa*. Mot. Dismiss at 22–23. This handful of authorities hardly makes a forceful case that either of the Defendants' proffered interpretations of "removal" are correct.

For the Defendants, Section 1101(g) in particular is like garlic to a vampire. Despite that provision occupying a significant role in the Plaintiffs' argument, *see* Opp'n at 3, 5, 27–28, the Defendants do not cite it *once* in their briefs. The Court asked counsel for the Defendants at the motions hearing about the provision, resulting in this exchange:

> THE COURT: Okay. So what is wrong with the plaintiffs' interpretation of 1101(g)? I mean, you have heard me press [them] on . . . the implications of that [interpretation]. Looking at that statute, what is wrong with how they interpret it?
>
> [COUNSEL]: Well, again, 1101(g) would imply that DHS's authority ends at the border and they have to immediately release them from custody.

---

of repatriation in the country of the removal. It might not be a repatriation, but the delivery in the country where the removal order points to." *Id.* 65:9–12. Counsel then stated that removal occurs "[w]hen the individual leaves the custody [of the United States] in accordance with 1231." *Id.* 65:15–16.

[17] *See* 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV) ("Any alien subject to [expedited removal] shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."), 1231(a)(2)(A) ("During the removal period, the Attorney General shall detain the alien."), 1231(a)(6) (identifying persons who "may be detained beyond the removal period").

> THE COURT: But again, looking at the words of the statute, why are they wrong in how they interpret it?
>
> . . .
>
> Is the argument, then, it can't possibly mean what it says because that would lead to the absurd conclusion that DHS's jurisdiction ends at the border?
>
> [COUNSEL]: That's not the only reason. But I would say that 1101(g) is really -- Congress is really addressing the situation when the individual leaves on their own or just taken on a private transport out of the United States because it speaks, quote, "who has left the United States."
>
> THE COURT: So you think 1101(g) only applies when someone is leaving voluntarily?
>
> [COUNSEL]: I am not prepared to say that because I don't want to cause any problems. But I do think it has to be read with 1231, which clearly envisions DHS custody beyond the border of the United States.

Mots. Hr'g Tr. 69:8–70:11.

True, legislative history suggests that what is now Section 1101(g) was principally aimed at ensuring individuals subject to deportation orders who left the United States voluntarily were considered deported. *See Mrvica v. Esperdy*, 376 U.S. 560, 563–64 (1964). But even the Defendants are unwilling to say that it is limited to that scenario—a wise move, considering that such an interpretation would (1) as indicated by the cases discussed above, have a blast radius that reaches far beyond this case; and (2) require the Defendants to argue, without any basis in the INA, that individuals subject to removal orders are removed at different points depending on whether they depart voluntarily or depart under government supervision.

The Defendants' arguments only start to bite when they leave the world of legal authorities and enter the world of policy. They argue that "[i]f this Court accepts Plaintiffs' rigid theory of detention authority, absurd results would follow, such as the government's broad powers under the INA being held to instantly terminate upon the detainee's flight leaving U.S. airspace but before ICE relinquishes control." Reply at 17–18. They offer a hypothetical: "if a removal flight in route to Romania were to make an overnight refueling stop in Germany, DHS would be acting

without lawful basis once the plane left the United States or landed in Germany." Mot. Dismiss at 22.

The Court is convinced, however, that the Defendants' policy concerns are misplaced. "The government's litigating position . . . seems to reflect a concern that, if a removal is complete upon physical departure, the government might lack authority to continue detaining aliens while they remain *en route* to their ultimate destination. But the government may take acts it 'deems necessary for carrying out [its] authority' under the INA, 8 U.S.C. § 1103(a)(3), which includes moving aliens to specific countries selected under section 1231(b)." *J.G.G.*, 147 F.4th at 1053 n.4 (Katsas, J., concurring) (citation omitted). Section 1103(a)(3) also seems to cover the Government's concern about an overnight refueling stop—the Court does not doubt that maintaining custody in that situation is "necessary for carrying out [its] authority" to remove an individual to a specified country. 8 U.S.C. § 1103(a)(3). Same result if, for example, inclement weather required a plane to land abroad while in the midst of a removal flight. In all these situations, although removal occurred when the individual departed the United States, the government retains residual authority to take steps amid executing a removal order reasonably related to delivering an individual to the country designated by 8 U.S.C. § 1231(b)—*e.g.*, restraining individuals, making refueling stops, flying a route with layovers, or landing in an emergency. *See Save Jobs USA*, 111 F.4th at 79 (explaining that Section 1103(a)(3) and 8 U.S.C. § 1184(a)(1) mean that "the INA need not specifically authorize each and every action taken by DHS, so long as its action is reasonably related to the duties imposed upon it" (quoting *Wash. All. of Tech. Workers*, 50 F.4th at 179)).

The trickier policy question arises from a situation not raised by the Defendants in this litigation. What happens if a noncitizen is apprehended in Hawaii or Alaska (or Puerto Rico, or Guam, etc.), ordered removed, and then flown to the continental United States for detention

pending removal? Her flight path would surely involve exiting U.S. territory and flying over foreign territory (*e.g.*, Canada) or international waters. If her removal order is executed when the plane crosses over that border, then upon arrival she would lack an executable final order of removal pursuant to which the government could remove her to her final destination. And it seems odd that the government would have to obtain a new removal order or reinstate the executed order. *See* 8 C.F.R. § 241.8. The answer to this quandary might be that individuals who travel via vessels that (1) depart from and enter the United States without stopping abroad, and (2) have a U.S. nationality mark (such as a ship flying an ensign), are not considered to have departed the United States. *See Delgadillo v. Carmichael*, 332 U.S. 388, 389–90 (1947) (suggesting that an individual aboard a U.S. mercantile ship sailing from Los Angeles to New York would not have departed the United States had he not been diverted to Cuba); *see also United States v. Sanford Ltd.*, 880 F. Supp. 2d 9, 16 (D.D.C. 2012) (describing the "law of the flag" doctrine, "which states generally that 'a merchant ship is part of the territory of the country whose flag she flies'" (quoting *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 123 (1923))). This issue, of course, is not implicated in this case and thus there is no reason for the Court to conclusively resolve it.

And ultimately, "'even the most formidable' policy arguments cannot 'overcome'" the best reading of the statutory text. *B.P. P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230, 245 (2021) (quoting *Kloeckner v. Solis*, 568 U.S. 41, 56 n.4 (2012)). "It is not [the Court's] place to question whether Congress adopted the wisest or most workable policy, only to discern and apply the policy it did adopt." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 706 (2022). If the Defendants think "good governance requires a different set of rules, its appeals are better directed to those who make the laws than those charged with following them." *Id.*

Thus, the Court is left facing the inexorable conclusion that the "focus of removal under the INA" is "territorial." *J.G.G.*, 147 F.4th at 1053 (Katsas, J., concurring). "The [INA] . . . supports an understanding of *removal* to mean the physical expulsion of an alien from the United States" and does not "hinge on admission or assumption of custody by the receiving country." *Id.* at 1052–53; *see also L.G.M.L. v. Noem*, No. 25-cv-2942, 2025 WL 2671690, at *13 (D.D.C. Sept. 18, 2025) ("[R]emoval focuses on the act of expulsion[.]") Therefore, when an individual subject to a removal order departs from the United States, they are removed—and are no longer pending removal.

### d. The INA's Definition of "United States"

Having concluded that removal occurs when an individual subject to a removal order departs from the United States, the last issue to resolve is what constitutes the "United States" for purposes of the INA. The Plaintiffs point to 8 U.S.C. § 1101(a)(38) to answer this question. That provision states that "[t]he term 'United States,' except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." 8 U.S.C. § 1101(a)(38). Accordingly, "Guantanamo is not part of the United States under the [INA]." *Ali v. Trump*, 959 F.3d 364, 374 n.3 (D.C. Cir. 2020) (Randolph, J., concurring in the judgment); *see also* Detainee Treatment Act of 2005, Pub. L. No. 109–148, § 1005, 119 Stat. 2680, 2743 (2005) (codified at 10 U.S.C. § 801 note) ("For purposes of this section, the term 'United States,' when used in a geographic sense, is as defined in section 101(a)(38) of the Immigration and Nationality Act and, in particular, does not include the United States Naval Station, Guantanamo Bay, Cuba.").

The Defendants "acknowledge [Guantanamo]'s status for purposes of the INA." Mot. Dismiss at 21; Reply at 18. But they also appear to resist Section 1101(a)(38) by reference to *Boumediene v. Bush*, 553 U.S. 723 (2008). Mot. Dismiss at 21–22; Reply at 18. In *Boumediene*, the Supreme Court held that "Art. I, § 9, cl. 2, of the Constitution has full effect at Guantanamo Bay." 553 U.S. at 771. Among the factors contributing to that conclusion, the Court noted that "[i]n every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States." *Id.* at 769; *see also id.* at 755 ("[W]e take notice of the obvious and uncontested fact that the United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over this territory."). The Defendants posit that (but do not explain why) *Boumediene* "undercuts [the Plaintiffs'] foundational claim that Defendants are unable to detain aliens at [Guantanamo]." Reply at 18.

Of course, *Boumediene*'s constitutional holding says nothing about the statutory interpretation question at issue here. The term "United States" is defined by the INA. The Defendants do not suggest that, as a constitutional matter, the INA's definition of U.S. territory must include Guantanamo. The plain text of Section 1101(a)(38) therefore governs this case. Individuals who enter Guantanamo have "left the United States." 8 U.S.C. § 1101(g).

### e.  Sufficiency of the Complaint

Here is where we are. Section 1231(g)(1) is the only provision expressly governing where immigration detainees can be held. But that provision contemplates only (as relevant here) detention pending—*i.e.*, while awaiting—removal. And removal occurs when an individual departs from the United States, including by departing to Guantanamo, which the INA excludes from its definition of United States. Because Section 1231(g)(1) does not permit detention of removed individuals, it does not permit the Secretary to arrange for individuals subject to removal

Case 1:25-cv-01766-SLS    Document 53    Filed 12/05/25    Page 45 of 57

orders to be detained at Guantanamo. Still, 8 U.S.C. § 1103(a)(3) provides some additional authority to maintain custody over an individual while the government is in the midst of executing their removal order.

The Complaint alleges that the Guantanamo-detention policy carries out Section 1231(g)-style—rather than Section 1103(a)(3)-style—detention. It alleges that the President "issued a Memorandum directing the Secretary of Defense and Secretary of Homeland Security 'to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity and to provide additional detention space for high-priority criminal aliens unlawfully present in the United States,' and declared his intention to hold as many as 30,000 immigrants at Guantánamo." Compl. ¶ 24. It further alleges that "the government has transferred immigrants held at Guantánamo *back to* immigration detention facilities in the United States so they could be removed from there." Compl. ¶ 32. Further, "although the government has claimed that immigrants are detained [at] Guantánamo on a 'temporary' basis en route to a final destination, some detainees have been held at Guantánamo for as long as six weeks." Compl. ¶ 44. These allegations, construed in the light most favorable to the Plaintiffs, support that class members detained at Guantanamo are not in the midst of the execution of their removal orders. They are being detained at Guantanamo in the same manner as at any other detention facility where individuals are pending removal.

The Defendants appear to dispute these allegations. They characterize the Guantanamo-detention policy as "part of the government's efforts to facilitate [immigration detainees'] removals," Mot. Dismiss at 20, and they suggest that detention at Guantanamo constitutes a "staging point" amid execution of a removal order, Reply at 17. But at the motion-to-dismiss stage, the Court must "accept as true the well-pleaded factual allegations of the

complaint." *Davis v. Billington*, 681 F.3d 377, 379 (D.C. Cir. 2012). And here, the Complaint sufficiently alleges that the Guantanamo-detention policy exceeds statutory authorization by arranging for a detention facility for removed individuals. As the case progresses, the Defendants will have the opportunity to challenge these factual allegations and have any disputes resolved by a factfinder. But at this early stage, the Court concludes that the Complaint states a claim.

*     *     *

Taking a step back, the discussion of the statutory scheme above accords with the commonsense intuition that Congress did not authorize the government to arrange for detention locations for individuals who have been removed. After all, the underlying purpose of the removal process is to ensure the lawful departure of individuals from the United States. *See Zadvydas*, 533 U.S. at 699 (the "basic purpose" of the INA's detention provisions is to "assur[e] the alien's presence at the moment of removal"). What does our immigration system get out of housing removed individuals abroad?

And all of this is consistent with the Executive's longstanding approach to immigration-detention locations. As counsel for the Defendants acknowledged at the motions hearing, before the Guantanamo-detention policy at issue here, the United States had never run a detention facility outside of the United States for individuals subject to removal orders. Mots. Hr'g Tr. 73:22–74:1; *see also* Compl. ¶ 4 ("Never before this Administration has the federal government moved noncitizens apprehended and detained in the United States on civil immigration charges to Guantánamo, or to any other facility outside the United States, for the purpose of civil immigration detention."). Yet now, the Defendants assert that the INA grants the Executive essentially boundless authority to arrange for detention facilities anywhere outside the United States. *See* Mots. Hr'g Tr. 73:15–21 (claiming authority to hold immigration detainees at U.S. military bases

all around the world). The unprecedented nature of this claim of authority is another clue that the Defendants' reading of the statutory scheme is wrong. *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy"—or to make another "decision[] of vast economic and political significance"—"we typically greet its announcement with a measure of skepticism" (cleaned up)).[18]

Although, for the reasons stated above, the Plaintiffs will have a factual burden to carry to prevail in this case, the Court is convinced that their reading of the statutory scheme is correct. The Complaint's contrary-to-law claim survives the Defendants' motion to dismiss.[19]

### 3. Arbitrary and Capricious

Next, the Defendants argue that the Complaint fails to state an arbitrary-and-capricious claim. Mot. Dismiss at 23. The problem, however, is that the Court currently lacks the administrative record that was before the Defendants when they instituted the

---

[18] The Court notes that Guantanamo has been used to house noncitizens who have been interdicted on the high seas and therefore never entered the United States. *See* Sonia R. Farber, Comment, *Forgotten at Guantánamo*, 98 Calif. L. Rev. 989, 993–97 (2010). But that history is inapposite to immigration detention under the INA, as the Supreme Court has long held that individuals who never entered the United States are not covered by the INA. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Sale*, 509 U.S. at 175.

[19] The Defendants seek to get a lot of mileage out of 8 U.S.C. § 1231(g)(1)'s second sentence: "When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention." According to the Defendants, this sentence permits the government to use any "United States Government facilit[y]" for immigration detention. *See* Mot. Dismiss at 19; Reply at 18. But that severely overreads a sentence that is most naturally understood as expressing "Congress's preference to use existing facilities" before the government acquires new ones. *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 752 (9th Cir. 2022) (en banc); *see also McHenry Cnty. v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) (similar). And even if that sentence had some bearing on permissible detention locations under Section 1231(g)(1), it would still fail to authorize detention at locations that necessarily could only house removed individuals.

Guantanamo-detention policy. And this Court's review of the arbitrary-and-capricious claim "must 'be based on the full administrative record that was before the [Defendants] at the time [they] made [their] decision.'" *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). In their Motion to Dismiss, the Defendants state that they are using Guantanamo "to maximize available detention resources given ongoing and increasing enforcement efforts." Mot. Dismiss at 20. But the Court cannot rely "on the parties' written or oral representations to discern the basis on which the [Defendants] acted." *Am. Bioscience*, 243 F.3d at 582. And when pressed at the motions hearing about whether the Court could address this claim without reviewing the administrative record, counsel for the Defendants acknowledged that they were "primarily resting on the[ir] threshold arguments." Mots. Hr'g Tr. 77:23–24.[20] Further, the Complaint alleges that "[d]etention at Guantánamo is not necessary to meet ICE's detention capacity needs," especially given that "ICE has numerous less expensive and more straightforward avenues for increasing detention capacity" as evidenced by the government "recently enter[ing] into several contracts for even more bed space within the United States." Compl. ¶ 34–35. The Court cannot say that the Plaintiffs' arbitrary-and-capricious claim is so facially implausible that it can be dismissed without review of the administrative record.

---

[20] Counsel for the Defendants also referred to the MOU, which states that the Guantanamo-detention policy would "provide additional detention space." Opp'n Mot. Class Certification at 1; Mots. Hr'g Tr. 77:25–78:4. But counsel tellingly did not represent that the MOU was the entire administrative record—and indeed, the MOU appears to be *instituting* the Guantanamo-detention policy, not a part of the record on which the Defendants relied when they instituted that policy. Thus, assuming that the Court can consider the MOU because it was referenced in the Complaint, *see Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011), the Court is not convinced that it can dismiss this portion of the Complaint without reviewing the full administrative record.

C.    **Fifth Amendment**

Finally, the Defendants contend that the Complaint fails to state a violation of the Fifth Amendment. The Due Process Clause of the Fifth Amendment states, in relevant part, that "[n]o person shall be . . . deprived of . . . liberty . . . without due process of law." U.S. Const. amend. V. The Supreme Court has held that "government detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas*, 533 U.S. at 690 (citations omitted) (first quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); and then quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)).

Immigration proceedings "are civil, not criminal." *Id.* The Supreme Court has nevertheless accepted that detention in connection with such proceedings is permissible in some circumstances. *See, e.g.*, *id.*; *Carlson v. Landon*, 342 U.S. 524, 544 (1952); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896). Here, the Plaintiffs do not dispute that the government may detain them while they await execution of their removal orders. Compl. ¶ 3. They instead claim that the Defendants' policy of detaining class members at Guantanamo is impermissibly punitive in violation of the Due Process Clause. Compl. ¶¶ 70–73.

In *Bell v. Wolfish*, the Supreme Court explained that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." 441 U.S. 520, 535 (1979). Although the Court's decision in *Bell* focused on the due process rights of pretrial detainees, lower courts have consistently applied *Bell* in the context of immigration detention. *See, e.g.*, *Amanullah v. Nelson*, 811 F.2d 1, 15 (1st Cir. 1987) (citing *Bell* and comparing pretrial detainees to immigration detainees); *Hope v. Warden York Cnty. Prison*,

972 F.3d 310, 325 (3d Cir. 2020) ("As immigration detainees, Petitioners are entitled to the same

due process protections as pretrial detainees."); *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir.

2000) ("We consider a person detained for deportation to be the equivalent of a pretrial

detainee[.]"); *Banyee v. Garland*, 115 F.4th 928, 934 (8th Cir. 2024) (citing *Bell* and noting that

the length and conditions of immigration detention can constitute "unconstitutional punishment");

*Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017) (holding that the district court properly applied

*Bell* to the immigration detention context); *Dixit v. Fairnot*, No. 23-11436, 2025 WL 1733887,

at *5 (11th Cir. June 23, 2025) (per curiam) (applying *Bell* to detention of an immigration

detainee); *D.A.M.*, 474 F. Supp. 3d at 63 ("Because civil immigration detainees, like pretrial

criminal detainees, have not been convicted of any present crime, they 'may not be subjected to

punishment of any description.'" (quoting *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 210 (D.D.C.

2020))).

Accordingly, "the dispositive inquiry is whether the challenged condition, practice, or

policy constitutes punishment." *Block v. Rutherford*, 468 U.S. 576, 583 (1984). "[S]uch

'punishment' can consist of actions taken with an 'expressed intent to punish.'" *Kingsley v.

Hendrickson*, 576 U.S. 389, 398 (2015) (quoting *Bell*, 441 U.S. at 538). Or "in the absence of an

expressed intent to punish," an immigration detainee can nevertheless demonstrate that the

challenged actions constitute punishment "by showing that the actions are not 'rationally related

to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation

to that purpose.'" *Id.* (quoting *Bell*, 441 U.S. at 561); *accord Florence Immigrant & Refugee Rts.

Project v. DHS*, No. 22-cv-3118, 2025 WL 2844538, at *5 (D.D.C. Oct. 6, 2025).

The Complaint sufficiently alleges that the Guantanamo-detention policy constitutes

impermissible punishment. It includes several statements from government decisionmakers

reflecting that the "expressed intent" behind detaining the class at Guantanamo is punishment. *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 538). According to the Complaint, the Secretary of Defense—one official responsible for overseeing detention of the class at Guantanamo—stated that Guantanamo "represents deterrence" and that detention is for the purpose of sending a "message." Compl. ¶¶ 18, 39. The Secretary of Homeland Security—another such official—visited Guantanamo and posted on social media that noncitizens should "not come to this country or we will hunt you down, find you, and lock you up." Compl. ¶¶ 14, 40. The President similarly explained the decision to detain the class at Guantanamo by stating "we don't want them coming back" and referring to Guantanamo as "a tough place to get out [of]." Compl. ¶ 41. DHS also issued a press release saying: "If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now." Compl. ¶ 42. Interpreting these alleged statements in the light most favorable to the Plaintiffs, as the Court must at this stage in the litigation, the Court sees unusually strong direct evidence that the Defendants chose to detain some noncitizens at Guantanamo for the express purpose of retaliating against them and deterring others' conduct. But as the Supreme Court stated in *Bell* itself, "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." 441 U.S. at 539 n.20; *see also Kansas v. Crane*, 534 U.S. 407, 412 (2002) (warning that civil detention may not "become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law" (quoting *Hendricks*, 521 U.S. at 372–73 (Kennedy, J., concurring))). Because the Complaint plausibly alleges that

detention of the class at Guantanamo is principally aimed at those objectives, it states a due process claim.[21]

Curiously, the Defendants entirely fail to address the significance of these alleged statements to perceiving the expressed intent behind the Guantanamo-detention policy. They instead skip over that question and argue that the Complaint fails to plead facts showing that conditions at Guantanamo are excessive in relation to the government's legitimate nonpunitive purpose. Mot. Dismiss at 27–30; Reply at 24–25. But this ignores that under *Bell*, "[g]overnment restrictions taken with an 'expressed intent to punish' clearly constitute punishment." *United States v. Moore*, No. 18-cr-198, 2019 WL 2569659, at *2 (D.D.C. June 21, 2019) (quoting *Bell*, 441 U.S. at 538). The Complaint states a violation of the Fifth Amendment by pleading facts sufficient to plausibly allege that the Defendants chose to detain class members at Guantanamo rather than other facilities for punitive purposes.

---

[21] The Defendants articulate no reason, and the Court sees none, to give less than full effect to the *Bell* Court's statement that "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979). "It is certainly possible that this bar on employing general deterrence does not apply in the civil *immigration* context— *i.e.*, that some sort of immigration carve-out exists. The Court, however is not persuaded why this should be so as a matter of logic. Its doubt is animated, in part, by *Zadvydas*, which grounds its analysis of immigration detention in principles derived from the wider civil-commitment context." *R.I.L-R*, 80 F. Supp. 3d at 189.

In the context of the Double Jeopardy Clause, the Supreme Court has explained that the presence of a deterrent purpose cannot serve as the line between criminal and civil sanctions because "all civil penalties have some deterrent effect." *Hudson v. United States*, 522 U.S. 93, 102 (1997); *see also Bennis v. Michigan*, 516 U.S. 442, 452 (1996) ("[F]orfeiture also serves a deterrent purpose distinct from any punitive purpose."). But the Court has never applied its Double Jeopardy Clause precedents in the context of due process protections for detainees who have not been convicted of a crime. Those Double Jeopardy Clause precedents are concerned with distinguishing between kinds of penalties. *See Hudson*, 522 U.S. at 99. Yet the Court could not be clearer that detention may not be used as any form of penalty for individuals who have not been convicted of a crime. *Zadvydas*, 533 U.S. at 690.

To be clear, the Court need not go so far as to hold that a decisionmaker's subjective desire to punish an immigration detainee is *always* sufficient to violate due process.[22] After all, the "inquiry is whether the challenged condition, practice, or policy *constitutes* punishment." *Block*, 468 U.S. at 583 (emphasis added). An immigration detainee who is subject to nothing more than longstanding and commonplace removal-process detention policies would be hard pressed to show that those policies constitute punishment merely because a decisionmaker subjectively believed it to be so. But in any event, that hypothetical is far afield from the allegations here. The Complaint alleges that "[n]ever before . . . has the federal government moved noncitizens apprehended and detained in the United States on civil immigration charges to Guantánamo . . . for the purpose of civil immigration detention." Compl. ¶ 4. After recounting the statements by government officials detailed above, the Complaint further alleges that "the government is perversely utilizing Guantánamo's well-known history as a site of abuse and mistreatment, including as the location of two former CIA 'black sites,' to frighten immigrants." Compl. ¶ 43. In addition, the Complaint details other features of detention at Guantanamo that are not present at detention facilities in the United States. *E.g.*, Compl. ¶¶ 45 (military personnel as guards), 46 (use of restraint chair), 47 (recreation period supervised by military personnel and guard dogs), 48 (no commissary), 49 (prohibition on religious materials). Thus, to the extent that a violation of due process requires more than proof that a detaining official subjectively desired to punish an immigration detainee, the Complaint here goes well beyond that subjective desire. It adequately pleads that the

---

[22] "There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Bell*, 441 U.S. at 539 n.21 (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)). Thus, the Court assumes that, at minimum, a *de minimis* imposition on an immigration detainee is consistent with due process even if it is imposed because of a subjective desire to punish.

Defendants' Guantanamo-detention policy contemplates consequences different—and indeed, materially more severe—than what is typical of lawful confinement in connection with removal.

The Court need not go further at this stage. But even if it were to evaluate whether the Guantanamo-detention policy is "rationally related to a legitimate nonpunitive governmental purpose" or whether that policy instead "appear[s] excessive in relation to that purpose," the Complaint would still state a claim. *See Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 538). Beginning with the government's purpose, the Defendants puzzlingly assert that "any due process claim must be rooted in the conditions of the facility in which Plaintiffs are actually housed, not the mere fact of their transfer." Mot. Dismiss at 30. And they assert "legitimate security purposes and operational limitations" to explain the conditions at Guantanamo. *Id.* But the Defendants' premise is far from obvious. They cite nothing to support the proposition that a punitive transfer to another facility cannot violate due process. The most they have to say—again without any supporting authority—is that "the mere fact of being held at [Guantanamo] . . . cannot violate due process because detention locations are not punitive." *Id.* at 24. Yet the Court sees nothing inherently impermissible about a due process claim alleging a "practice[] or policy" of punitive transfers, even if the transferee facility does not impose "condition[s]" that are themselves excessive in relation to a legitimate purpose. *See Block*, 468 U.S. at 583.[23]

_____

[23] The Defendants assert that "in the immigration context, it is well-settled that discretionary determinations do not give rise to any liberty interest protected by the Due Process Clause." Mot. Dismiss at 26. And they suggest that their detention-location decision is such a discretionary determination, meaning that the Plaintiffs must base their due process claim on some other liberty interest. *Id.* at 26–27. Even assuming the Defendants have discretionary authority to make detention-location decisions, the Defendants cite nothing supporting the proposition that a decisionmaker complies with due process when she uses otherwise legitimate discretionary authority to punish immigration detainees. And at the motions hearing, the Defendants conceded that an immigration detainee need assert no liberty interest other than that he has been subject to a detention policy, practice, or condition that constitutes punishment. Mots. Hr'g Tr. 64:4 ("[Y]es,

To understand why, consider an analogy. Imagine that a state policymaker decides to transfer all pretrial detainees from local jails to the state's maximum-security prison. It may well be that the conditions at the prison are "rationally related to a legitimate nonpunitive governmental purpose" and not "excessive in relation to that purpose." *See Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 538). After all, the security concerns inherent in operating a maximum-security prison often justify highly restrictive conditions. But that does not mean that the *transfer policy* is nonpunitive. It may well be that the transfer policy constitutes punishment because it is excessive in relation to the state's objective.

Accordingly, returning to the Guantanamo-detention policy at issue here, the Court finds notable that the Defendants have not yet proffered in this litigation any justification for that policy. The Complaint alleges that the government has previously stated that immigration detainees sent to Guantanamo are "the worst of the worst" and "'high-threat' criminals." Compl. ¶ 27. But the

---

we agree; no punishment for civil detainees."). Especially off-base is the Defendants' reliance on *Sandin v. Conner*, in which the Supreme Court held that due process may protect liberty interests asserted by convicted prisoners when a prison practice "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995); Mot. Dismiss at 26–27. *Sandin* itself distinguished *Bell v. Wolfish* on the grounds that "*Bell* dealt with the interests of pretrial detainees and not convicted prisoners." 515 U.S. at 484. That is why the *Sandin* Court rejected the proposition that "any state action taken for a punitive reason encroaches upon a liberty interest." *Id.* But this case, of course, involves immigration detainees, not convicted prisoners. And immigration detainees—like pretrial detainees—have a liberty interest against punishment whatever its form. *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 63 (D.D.C. 2020).

Somewhat confusingly, the Plaintiffs respond to the Defendants' arguments on this front by stating that "the basis of their constitutional claim is not the location of the facility at which Plaintiffs are detained[,] but the conditions at the facility[] regardless of where it is located." Opp'n at 38–39. The Defendants seize on this statement to claim that the Plaintiffs conceded that "the mere fact of being detained in a particular location" "is wholly unrelated to their due process challenge." Reply at 21. But at the motions hearing, counsel for the Plaintiffs clarified they are claiming the Guantanamo-detention policy has an impermissible punitive purpose; it is their alternative theory of punitive conditions that is not based on the selection of Guantanamo as a detention location. *See* Mots. Hr'g Tr. 60:8–11 ("[W]e're relying on [Guantanamo's] history and reputation for the first prong, the purpose prong, but not for the conditions prong. We recognize that for the conditions it has to be the current conditions.").

Complaint further alleges that this explanation has been belied by the reality that detainees held there are in fact "'low-risk,' with no criminal record other than an immigration violation." Compl. ¶ 28. And the alleged statements discussed above, when interpreted in the Plaintiffs' favor, indicate that a claimed purpose based on detainees' prior criminal convictions is pretextual. Thus, even grasping for a "legitimate nonpunitive governmental purpose" that has not yet been articulated by the Defendants in this litigation, at this point it appears that purpose is insubstantial. *See Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 538).

It should therefore go without saying that the Guantanamo-detention policy "appear[s] excessive." *See id.* (quoting *Bell*, 441 U.S. at 538). The Court sees no security-based reason why low-risk immigration detainees would need to be held in facilities "previously used by the military to hold law-of-war detainees." *See* Compl. ¶ 7. The incongruity between any security- or operations-based justification and the Guantanamo-detention policy is especially pronounced given the Complaint's allegation that "[d]etention at Guantánamo is not necessary to meet ICE's detention capacity needs" and is much more costly and logistically difficult than running detention facilities elsewhere. Compl. ¶¶ 34–36. Thus, the Court concludes that the Complaint states a due process violation even if the Court must look beyond the punitive purpose discussed above.

The Court declines to go yet further and consider the Plaintiffs' alternate theory that the alleged conditions suffered by the Plaintiffs at Guantanamo constitute punishment separate and apart from the Guantanamo-detention policy. "[U]nder the Federal Rules of Civil Procedure, a complaint need not pin [a] plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer*,

562 U.S. 521, 530 (2011). Given the Court's holdings above, the Complaint's due process claim survives the Defendants' Motion to Dismiss regardless of the plausibility of this alternate theory.[24]

**CONCLUSION**

For the foregoing reasons, the Court DENIES the Defendants' Motion to Dismiss, ECF No. 29.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   December 5, 2025

---

[24] For this reason, the Court need not yet weigh in on the Parties' dispute about the applicability of a burden-shifting framework in this context. *Compare* Opp'n at 39 n.14, *with* Reply at 23.