# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YAMIL LUNA GUTIERREZ, et al., | ) |
| | ) |
| *Plaintiffs-Petitioners,* | ) |
| | ) |
| | ) Case No. 1:25-cv-01766-SLS |
| v. | ) |
| | ) |
| KRISTI NOEM, Secretary of the U.S. | ) |
| Department of Homeland Security, et al., | ) |
| | ) |
| *Defendants-Respondents.* | ) |
| | ) |

## CERTIFICATION OF THE ADMINISTRATIVE RECORD

I, Joseph M. Humire, United States Department of Defense, based on personal knowledge and information provided to me in my official capacity, hereby certify to the best of my knowledge and belief that the attached Administrative Record, with the designation "U-DOW-CAR," is a true, correct, and complete copy of the unclassified, non-privileged documents that were directly or indirectly considered in connection with the agency's decision that is at issue in the above-captioned matter. For purposes of convenience and efficiency, the Department also provides the attached index which lists the documents contained in the Administrative Record.

I hereby certify under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*(signature page to follow)*

1

Executed this __16th__ day of January 2026.


Joseph M. Humire
Performing the Duties of the Assistant
   Secretary of Defense for Homeland
   Defense and Americas Security Affairs

2

| Subject/Document title/Date | Bates range |
|---|---|
| Feb 03 2025 Action Memo - Memorialization of Verbal Authorizations for DoD Support of DHS related to Executive Order Implementation | **U-DOW-CAR-001 - U-DOW-CAR-033** |
| Feb 13 2025 United States Senate letter to Secretary Hegseth | U-DOW-CAR-034 - U-DOW-CAR-042 |
| Nov 06 2018 Congressional Research Service - The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law | U-DOW-CAR-043 - U-DOW-CAR-115 |
| Jan 30 2025 Ex. Ord. No. 13276. Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region | U-DOW-CAR-116 - U-DOW-CAR-117 |
| Jan 29 2025 Presidential Actions - Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity | U-DOW-CAR-118 - U-DOW-CAR-126 |
| Mar 07 2025 Memorandum for Executive Secretary, Department of Homeland Security - Department of Defense Support to U.S. Immigration and Customs Enforcement Operations | U-DOW-CAR-127 - U-DOW-CAR-128 |
| Mar 07 2025 Letter to Hon. Roger Wicker from Secretary of Defense regarding Naval Station Guantanamo Bay | U-DOW-CAR-129 - U-DOW-CAR-129 |
| Mar 07 2025 Letter to Hon. Mike Rogers from Secretary of Defense regarding Naval Station Guantanamo Bay | U-DOW-CAR-130 - U-DOW-CAR-130 |
| Mar 06 2025 Action Memo - Department of Defense Support to U.S. Immigration and Customs Enforcement Operations | U-DOW-CAR-131 - U-DOW-CAR-155 |
| Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment | U-DOW-CAR-156 - U-DOW-CAR-168 |
| Feb 5 2025 Office of the Attorney General Memo to all Department Employees - Total Elimination of Cartels and Transnational Criminal Organizations | U-DOW-CAR-169 - U-DOW-CAR-173 |
| Nov 19 2002 Presidential Documents - Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region | U-DOW-CAR-174 - U-DOW-CAR-175 |
| Feb 25 FRAGO 01 to USSOUTHCOM Exord to Expand Migrant Operations at Naval Station Guantanamo Bay | U-DOW-CAR-176 - U-DOW-CAR-191 |
| Feb 25 FRAGO 02 to USSOUTHCOM Exord to Expand Migrant Operations at Naval Station Guantanamo Bay | U-DOW-CAR-192 - U-DOW-CAR-209 |
| Jan 25 Genadmin: Secretary of Defense VOCO to Expand Migrant Operations | U-DOW-CAR-210 - U-DOW-CAR-212 |
| Feb 2025 U.S. Immigration and Customs Enforcement - Legal Calls at Guantanamo | U-DOW-CAR-213 - U-DOW-CAR-213 |
| 2024 U.S. Immigration and Customs Enforcement - National Detainee Handbook | U-DOW-CAR-214 - U-DOW-CAR-288 |
| Migrant Camp Operations: The Guantanamo Experience | U-DOW-CAR-289 - U-DOW-CAR-338 |
| National Detenetion Standards - For Non-Dedicated Facilities Revised 2019 | U-DOW-CAR-339 - U-DOW-CAR-571 |
| Feb 20 2003 Medical and Public Health Law Site - Opinions of the Office of Legal Counsent - DOJ | U-DOW-CAR-572 - U-DOW-CAR-582 |
| Letter to Secretary of Defense, Hegseth | U-DOW-CAR-583 - U-DOW-CAR-584 |

| | |
|---|---|
| Jan 25 USSOUTHCOM Exord to Expand Migrant Operations at Naval Station Guantanamo Bay | U-DOW-CAR-585 - U-DOW-CAR-599 |
| Feb 04 2025 Zadvydas v. Davis - Supreme Court of the United States | U-DOW-CAR-600 - U-DOW-CAR-629 |
| Feb 20 2025 NOVO Legal Letter | U-DOW-CAR-630 - U-DOW-CAR-645 |

| Bates Start | Bates End | File name/Subject | Doc Date |
|---|---|---|---|
| U-DOW-CAR-646 | U-DOW-CAR-647 | JTF-GTMO Detection of High-Threat Illegal Aliens | Feb 02 2025 |
| U-DOW-CAR-648 | U-DOW-CAR-649 | JTF - Guantanamo Bay | Feb 01 2025 |
| U-DOW-CAR-650 | U-DOW-CAR-650 | Email Communication from USAF Lt Gen Alexus Grynkewich regarding "IA Movement Tonight" | Feb 03 2025 |
| U-DOW-CAR-651 | U-DOW-CAR-652 | Action Memo from Alexander Velez-Green (OUSD-P) regarding "Detention of High Thread Illegal Aliens in JTF - Guantanamo Facilities | Jan 31 2025 |
| U-DOW-CAR-653 | U-DOW-CAR-654 | Action Memo from General Charles Q. Brown Jr., CJCS regarding "Detention of High-Threat Illegal Aliens in JTF - Guantanamo Bay Facilities | Jan 30 2025 |
| U-DOW-CAR-655 | U-DOW-CAR-657 | USSOUTHCOM MOD 2 to USSOUTHCOM Exord | Feb 02 2025 |
| U-DOW-CAR-658 | U-DOW-CAR-662 | Special Orders Book "Forces in Support of USSOUTHCOM / Forces in Support of USNORTHCOM | Jan 31 2025 |

February 3, 2025 / 1200

## ACTION MEMO

**FOR:** PERFORMING THE DUTIES OF DEPUTY SECRETARY OF DEFENSE

**FROM:** Alexander Velez-Green, Performing the Duties of the Under Secretary of Defense for
Policy

FEB 1 2 2025

**SUBJECT:** (U) Memorialization of Verbal Authorizations for DoD Support of DHS related to
Executive Order Implementation

- ~~(CUI)~~ **Purpose**: This memorandum documents your January 21, 2025, verbal authorization, while you were Acting Secretary of Defense, to provide support to the Department of Homeland Security (DHS) by providing: light rotary-wing aviation support; an additional 1,500 military personnel (bringing the total up to 4,000 military personnel) at the southwest border (SWB) for missions including detection and monitoring support; intelligence analysis support (with up to 140 intelligence personnel); and engineering support. Additionally, you approved airlift transportation support to Immigration and Customs Enforcement for the removal from the United States of persons identified by DHS.

  - ~~(CUI)~~ You memorialized your approval of the <u>light rotary-wing aviation support</u> and <u>additional 1,170 personnel</u> in the 22 January 2025 Special SecDef Orders Book.

- ~~(CUI)~~ **Background**: On January 20, 2025, the President declared that a national emergency exists at the southern border of the United States. The President directed the Secretary of Defense to order as many units or members of the Armed Forces, including the Ready Reserve and the National Guard, as the Secretary of Defense determines to be appropriate to support the activities of the Secretary of Homeland Security in obtaining complete operational control of the southern border of the United States.

- **(U) Light Rotary-Wing Aviation Support**

  - ~~(CUI)~~ On May 22, 2024, then-Secretary Austin approved 6,100 flight hours of light rotary-wing aviation support for fiscal year (FY) 2025 on a reimbursable basis in accordance with 10 U.S.C. §§ 272, 274, and 277 (TAB B). DHS has not agreed to provide reimbursement for this aviation support, and, prior to your authorization, DoD had not provided such support to U.S. Customs and Border Protection (CBP) in FY 2025.

  - ~~(CUI)~~ On January 21, 2025, you agreed to provide the light rotary-wing aviation support on a *non-reimbursable basis* in accordance with section 1059 of the National Defense Authorization Act (NDAA) for FY 2016 ("section 1059") to support CBP activities to secure the southern land border of the United States.

  - ~~(CUI)~~ The light rotary-wing aviation personnel and equipment were deployed to operational locations and began operational missions in support of CBP on January 22, 2025, consistent with your authorization.

Prepared by: DASD(HDI&DSCA)/DSCA
Phone Number: ▮▮▮▮

Controlled By: OUSD(P) HD&HA
CUI Category: OPSEC
Distribution/Limited Dissemination Control: FEDCON
POC: DASD(HDI&DSCA)

~~Protected Material — Subject to Protective Order~~
~~CUI~~



OSD001134-25/CMD001590-25

U-DOW-CAR-001

Protected Material -- Subject to Protective Order

U-DOW-CAR-002

- **(U) Personnel for Detection and Monitoring**
  - ~~(CUI)~~ On May 22, 2024, then-Secretary Austin approved support to DHS at the SWB to perform activities including operating mobile surveillance camera (MSC) to provide detection and monitoring support to CBP in accordance with section 1059 (TAB C).

  - ~~(CUI)~~ CBP informed the Commander, U.S. Northern Command (USNORTHCOM), operating an additional 80-100 MSC and fixed-camera sites was a high priority for CBP. Commander, USNORTHCOM, identified 500 Marine Corps personnel assigned to USNORTHCOM for firefighting support in Southern California to be re-missioned to SWB support as well as 3 Battalions and associated command and control from the Rapid Response Force (RRF) that could be employed to provide this support.

  - ~~(CUI)~~ On January 21, 2025, you agreed to provide up to 1,500 addition military personnel at the SWB. These military personnel can support detection and monitoring on a *non-reimbursable basis* in accordance with section 1059. You also authorized the deployment and employment of the RRF forces to support the activities of the CBP to secure the SWB.

- **(U) Intelligence Analysis**

  - ~~(CUI)~~ On March 22, 2024, DHS requested DoD provide mission enhancing capabilities in support of CBP's Office of Intelligence (OI) SWB-related efforts as defined and outlined in the DHS request for assistance (TAB D). DoD did not agree to provide intelligence analysis support due to previous inappropriate actions by CBP towards DoD personnel discovered during an USNORTHCOM-initiated IG investigation into potential questionable intelligence activity.

    - ~~(CUI)~~ The investigation determined that questionable intelligence activities had not occurred but did determine that inappropriate actions by CBP personnel and restrictions imposed by CBP OI prevented DoD from providing appropriate oversight of DoD personnel.

    - ~~(CUI)~~ Commander, USNORTHCOM, has determined that actions by CBP to correct previous improprieties have resolved these concerns.

  - ~~(CUI)~~ On January 21, 2025, you agreed to provide up to 140 personnel to provide intelligence analysis support to CBP on a *non-reimbursable basis* in accordance with section 1059. By approving this support, you are also approving the use of intelligence personnel for non-intelligence purposes.

  - ~~(CUI)~~ Initial support may be provided immediately using intelligence personnel currently deployed to the SWB and additional sourcing solutions, which will increase intelligence units/personnel up to the approved level of 140 personnel. The 140 intelligence personnel you approved is consistent with the number of personnel previously deployed to provide intelligence analysis support to CBP.

  - ~~(CUI)~~ Commander, USNORTHCOM, will have the ability to employ intelligence personnel from various locations, including remotely, to support CBP.

U-DOW-CAR-003

- **(U) Engineering Support**

  - (CUI) On January 21, 2025, the DHS/CBP verbally requested engineering support to emplace temporary barriers, remove brush, and other light ground engineering activities to support CBP efforts to deter illegal entry into the United States. DoD received the written request on January 22, 2025 (TAB E).

  - (CUI) On January 21, 2025, you agreed to provide engineering support to emplace temporary barriers, as well as activities necessary to emplace the temporary barriers (such as land preparation and brush clearance), utilizing the 1,500 additional military personnel deployed to the SWB to CBP, in accordance with section 1059 on a *non-reimbursable basis*.

- **(U) Airlift Transportation Support**

  - (CUI) On January 21, 2025, DHS requested airlift transportation support to remove aliens from U.S. Border Patrol facilities across the Southern United States to repatriation sites in El Salvador, Guatemala, Honduras, or other locations to be determined. (TAB F).

  - (CUI) On January 21, 2025, you agreed to provide the requested airlift transportation support in accordance with 10 U.S.C. § 274 and to *waive reimbursement* in accordance with 10 U.S.C. § 277(c) through April 20, 2025.

    o (CUI) U.S. Transportation Command/Air Mobility Command assess that this mission would result in a benefit to military personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training.

  - (CUI) DHS has confirmed that they will coordinate with the State Department to obtain diplomatic clearances for the flights, ensure the host nation will receive the passengers, and provide host nation notifications prior to flight departure. Additionally, DHS or other Federal law enforcement agencies will provide appropriate personnel to maintain custody of the passengers while on-board DoD aircraft (TAB F).

- **(U) Funding**

  - (CUI) The non-reimbursable support detailed above will be funded from the accounts of the executing DoD Component. The office of the Under Secretary of Defense (Comptroller) will work with the Military Services and Combatant Commands to ensure sufficient funds are available for execution, within the limits of available appropriations. DoD remains under a Continuing Resolution, currently providing appropriations for fiscal year 2025 for obligation or expenditure only through March 14, 2025. DoD operations beyond this date are subject to the enactment of additional appropriations.

- **(U) Section 1059 Requirement**

  - (U) The provision of support under section 1059 requires that the Secretary of Defense ensure that support provided will not negatively affect military training, operations,

U-DOW-CAR-004

readiness, or other military requirements. Based on consultation with the Joint Staff, it is not expected that providing this support would have such a negative effect.

- (CUI) The Chairman of the Joint Chiefs of Staff, in collaboration with the Chiefs of the Military Services, the Commander, U.S. Northern Command, and the Chief of the National Guard Bureau, will advise the Secretary of Defense if the support provided in accordance with section 1059 could begin to negatively affect military training, operations, readiness, or other military requirements.

- **(U) Submissions to Congress**

  - (U) Section 1707 of the NDAA for FY 2020 requires the Secretary of Defense to provide to the Committee on Armed Services of the Senate (SASC) and Committee on Armed Services of the House of Representatives (HASC), not later than seven calendar days after the Secretary of Defense approves a request for assistance from DHS, a copy of the request for assistance and, immediately upon submitting the official response approving a request, a copy of the official response.

  - (U) Section 1059 requires the Secretary of Defense to transmit notice to the HASC, SASC, and the House Homeland Security Committee of approval of support under section 1059, not later than seven days after the date on which the Secretary approves a request for assistance from DHS.

  - (U) My staff will work with the Assistant Secretary of Defense for Legislative Affairs to make the necessary submissions.

(CUI) **RECOMMENDATION #1:** Approve the documentation of (A) your determination that the provision of light rotary-wing aviation support for up to a total of 6,100 flight hours for detection and monitoring support to the Department of Homeland Security (DHS)/U.S. Customs and Border Protection (CBP) for fiscal year (FY) 2025 will not negatively affect military training, operations, readiness, or other military requirements and (B) your authorization for the Commander, USNORTHCOM, to provide light rotary-wing aviation support to DHS/CBP for FY 2025 on a *non-reimbursable basis* pursuant to section 1059 of the National Defense Authorization Act for FY 2016 ("section 1059"), subject to the availability of funds.

Approve _R G7_     Disapprove _____ Other _____
FEB 1 8 2025

(CUI) **RECOMMENDATION #2:** (A) determine that the provision of additional military personnel up to approximately 4,000 total, to the DHS/CBP for FY 2025 will not negatively affect military training, operations, readiness, or other military requirements; (B) approve documentation of your authorization for the Commander, USNORTHCOM, to provide detection and monitoring support to DHS/CBP for FY 2025 on a *non-reimbursable basis pursuant to section 1059*, subject to the availability of funds; and (C) approve documentation of your authorization to deploy and employ the Rapid Response Force.

Approve _R G7_     Disapprove _____ Other _____
FEB 1 8 2025

(CUI) **RECOMMENDATION #3:** Approve the documentation of (A) your determination that the provision of up to 140 personnel for intelligence analysis support to the DHS/CBP for FY

 
 OSD001134-25/CMD001590-25

U-DOW-CAR-005

2025 will not negatively affect military training, operations, readiness, or other military requirements and (B) your authorization for the Commander, USNORTHCOM, to provide intelligence analysis support to DHS/CBP for FY 2025, including such support for non-intelligence purposes, on *a non-reimbursable basis* pursuant to section 1059, subject to the availability of funds.

Approve _RGS_____ Disapprove _____ Other _____

FEB 1 8 2025

(CUI) **RECOMMENDATION #4:** Approve the documentation of (A) your determination that the provision of <u>engineering support</u>, within the 4,000 total approved military personnel, to the DHS/CBP for FY 2025 will not negatively affect military training, operations, readiness, or other military requirements and (B) your authorization for the Commander, USNORTHCOM, to provide engineering support to emplace temporary barriers, as well as activities necessary to emplace the temporary barriers, in support of DHS/CBP for FY 2025 on a *non-reimbursable basis* pursuant to section 1059, subject to the availability of funds.

Approve _RGS_____ Disapprove _____ Other _____

FEB 1 8 2025

(CUI) **RECOMMENDATION #5:** Direct the Chairman of the Joint Chiefs of Staff, in collaboration with the Chiefs of the Military Services, the Commander, U.S. Northern Command, and the Chief of the National Guard Bureau to advise the Secretary of Defense if the support provided in accordance with section 1059 could begin to negatively affect military training, operations, readiness, or other military requirements.

Approve _RGS_____ Disapprove _____ Other _____

FEB 1 8 2025

(CUI) **RECOMMENDATION #6:** Approve the documentation of (A) your authorization for the Commander, USNORTHCOM, to <u>provide airlift transportation support</u>, in accordance with 10 U.S.C. §§ 272 and 274, to DHS for removal of aliens from the United States through April 20, 2025; (B) your determination that providing airlift transportation support would result in a benefit to military personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training; and (C) your *waiver of reimbursement*, pursuant to 10 U.S.C. § 277(c), for airlift transportation support to be provided through April 20, 2025.

Approve _RGS_____ Disapprove _____ Other _____

FEB 1 8 2025

(CUI) **RECOMMENDATION #7:** Authorize the Executive Secretary to sign the response memo to the Department of Homeland Security at TAB B.

Approve _RGS_____ Disapprove _____ Other _____

FEB 1 8 2025

Attachments:
TAB A – Reply Memo to DHS (CUI)
TAB B – FY 2025 AM and Approved Recommendations (CUI)
TAB C – Intelligence Analysis Support Duty Descriptions (U//FOUO//LES)
TAB D – Engineering Support Request (U)

Protected Material - Subject to Protective Order
CUI



OSD001134-25/CMD001590-25

TAB E – Airlift Transportation Support Request (U//~~FOUO//LES~~)
TAB F – Coordination (U)

~~Protected Material   Subject to Protective Order~~
~~CUI~~

U-DOW-CAR-007

# TAB
# A

U-DOW-CAR-008

CUI



**OFFICE OF THE SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-1000**

FEB 1 8 2025

MEMORANDUM FOR EXECUTIVE SECRETARY, DEPARTMENT OF HOMELAND
SECURITY

SUBJECT: (U) Department of Homeland Security Request for Continued Department of
Defense Support on the Southwest Border

    (U) Thank you for your January 22, 2025 request for the Department of Defense (DoD) to provide non-reimbursable airlift support to the Department of Homeland Security (DHS) to repatriate aliens to El Salvador, Guatemala, Honduras, or other locations. The Acting Secretary of Defense has approved non-reimbursable aviation support through April 20, 2025. DoD support to DHS is subject to the conditions outlined below, and subject to the availability of funds.

    (CUI) Prior to execution of missions, DHS and the State Department will obtain the requisite diplomatic clearances for the flights, and will ensure the receiving nation is notified and has agreed to accept the individuals. DHS will maintain custody of and security for the migrant detainees at all times by ensuring appropriate law enforcement presence for all DoD-provided flights.

    (CUI) In response to your March 22, 2024 request for DoD support, the Acting Secretary of Defense has approved additional support on a non-reimbursable basis to U.S. Customs and Border Protection (CBP) to increase efforts to secure the southern land border of the United States — the provision of light rotary-wing aviation support for up to a total of 6,100 flight hours for detection and monitoring support, the provision of up to 140 personnel for intelligence analysis support, and an increase to 4,200 in the total number of military personnel providing non-aviation support.

    (CUI) In response to your January 22, 2025 e-mail request for engineering support, the Acting Secretary of Defense has approved the provision of military engineering support to CBP to emplace temporary barriers, as well as related activities necessary to emplace the temporary barriers.

    (CUI) DoD military personnel performing this support will be under the command of Commander, U.S. Northern Command (USNORTHCOM).

    (U) USNORTHCOM will coordinate with DHS/CBP to obtain additional information as needed to ensure appropriate support is provided to CBP.

Kelly Bulliner Ross
Executive Secretary

cc:
CJCS
USD(P)
CDRUSNORTHCOM

Controlled by: OUSD(P)/HD&HA
CUI Category: OPSEC
Distribution/LDC: FEDCON
POC: OASD (HD&HA)

Protected Material — Subject to Protective Order

CUI

U-DOW-CAR-009

# TAB
# B

Protected Material — Subject to Protective Order

U-DOW-CAR-010

~~CUI~~

May 20. 2024/1408

## ACTION MEMO

MAY 2 2 2024

**FOR:** SECRETARY OF DEFENSE

DepSecDef Action Copy provided to DSD

**FROM:** Melissa G. Dalton. Performing the Duties of Deputy Under Secretary of Defense (Policy) MGD MAY 2 1 2024

**SUBJECT:** Department of Defense Assistance in Support of U.S. Customs and Border Protection's Southwest Border Security Mission through Fiscal Year 2025

- ~~(CUI)~~ **Purpose.** This memorandum seeks your decision on five recommendations at TAB A concerning a Department of Homeland Security (DHS) request for assistance (RFA) for support to U.S. Customs and Border Protection (CBP) through fiscal year (FY) 2025, subject to the availability of funds. DHS requests the Department of Defense (DoD) provide support on a non-reimbursable basis to the maximum extent permitted by law. Your decision is requested by May 22, 2024, to support the May 23 SecDef Orders Book.

- ~~(CUI)~~ **Background.** DoD has supported DHS's southwest border (SWB) security mission for 21 of the last 24 years with a cost to DoD of more than $4 billion. In 18 of the 21 years, DoD's support has spanned the entire fiscal year. In most cases, this support was provided on a non-reimbursable basis.

  - ~~(CUI)~~ On March 22, 2024, DHS requested DoD provide critical mission-enhancing capabilities in support of the U.S. Border Patrol (USBP) and CBP's Office of Intelligence (OI) as outlined at TAB D. DoD and DHS are moving toward a capabilities-based framework for RFA development, and this is the first iteration of that effort.

    - o ~~(CUI)~~ DoD will address this RFA in two separate packages: (1) the request for SWB support to USBP, referred to throughout as DHS RFA: and (2) a separate action to address the CBP OI request to be staffed in the near future.

    - o ~~(CUI)~~ DoD "annual" (i.e., not including "surge" or "in extremis" support) SWB support to DHS for fiscal year (FY) 2024 was for up to 2,500 personnel and 13,200 total flight hours (TAB E).

    - o ~~(CUI)~~ DoD annual support for FY 2023 to DHS for SWB support was 2,500 personnel and 12,100 total flight hours (TAB F).

  - ~~(CUI)~~ The DoD Comptroller has provided a cost estimate (TAB G) based upon the USNORTHCOM mission analysis. FY 2025 DoD support to USBP is estimated to cost $489.9M.

| | | | DSD SA | |
|---|---|---|---|---|
| SD CA | | | DSD SA | |
| SD SMA | | | DSD SMA | |
| SD MA | | | DSD MA | |
| CoS | | | DSD CA | |
| SD Action Grp | | | DSD CoS | |
| ES | | | FSB Rvw | DLM 5/22 |
| FSR | | EH 5/22 | FSD | |

**Prepared By:** ⬛ OSD (HD&HA).
**Phone Number:** ⬛

Controlled By: OUSD (P) HD&HA
CUI Category: OPSEC
Distribution/Limited Dissemination Control: FEDCON
POC: ⬛

~~CUI~~

~~Protected Material - Subject to Protective Order~~ OSD002504-24/CMC005922-24

U-DOW-CAR-011

CUI

**Standards for Providing Support:**

- (CUI) To provide support under section 1059 of the National Defense Authorization Act for FY 2016 ("section 1059"), you must, "ensure that the provision of the assistance will not negatively affect military training, operations, readiness, or other military requirements."

    - (U) All support provided under section 1059 is provided on a non-reimbursable basis.

- (CUI) Support provided under 10 U.S.C. § 272 (provision of equipment) and 10 U.S.C. § 274 (operation and maintenance of equipment) ordinarily requires reimbursement from a civilian law enforcement agency, but you may waive the requirement for reimbursement pursuant to 10 U.S.C. § 277(c) if you determine that the support would result in a benefit to the DoD element or National Guard personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training.

**Recommended Response:**

- (CUI) Policy's recommended response ensures DoD support to the DHS border security mission; reduces non-reimbursable support; and ensures DoD support does not negatively affect military training, operations, readiness, or other military requirements. We recommend approving the following DoD assistance through FY 2025, subject to the availability of funds:

    - (U) On a Non-Reimbursable Basis:

        o (CUI) DoD will provide up to 2,500 DoD personnel to perform the following requested duties in support of USBP on a non-reimbursable basis: detection and monitoring, data entry, training, transportation, vehicle maintenance, and warehousing and logistical support (TAB B1) pursuant to Section 1059 for all 12 months of fiscal year 2025. Consistent with the assessments of the Secretary of the Army, the Secretary of the Air Force, and the Chairman of the Joint Chiefs of Staff (CJCS), this support can be provided with manageable effects on military training, operations, readiness, or other military requirements.

        o (CUI) The recommended solution fulfills the request for ground support on a non-reimbursable basis.

    - (U) On a Reimbursable Basis:

        o (CUI) DoD will provide light helicopter aerial reconnaissance support for all 12 months of FY 2025 pursuant to 10 U.S.C. §§ 272 and 274 (up to 1,525 flight hours per quarter for a total of 6,100 hours).

        o (CUI) If DHS is unable or unwilling to provide reimbursement for aviation support for all 12 months of FY 2025 and requests reconsideration, DoD could evaluate whether providing support for some shorter period, or for all of FY 2025, would meet the standard for waiver of reimbursement in 10 U.S.C. § 277(c).

Protected Material -- Subject to Protective Order

U-DOW-CAR-012

- o (CUI) If Army leaders determine they need to adjust the level of aviation support based upon the results of the UH-72 Lakota accident (March 8, 2024) investigation, Policy will provide a recommendation to adjust the level of support.

- o (CUI) The recommended solution only provides 50 percent of the requested aviation support and does not meet the DHS intent that DoD provide all support on a non-reimbursable basis to the maximum extent permitted by law.

- o (CUI) Policy recommends approving only 6,100 flight hours of support due to concerns expressed by the Secretary of the Army and Chief of the National Guard Bureau (CNGB) that aviation support has reduced the programmed life cycle of the UH-72 Lakota fleet, resulting in the potential for unprogrammed funding requirements for early replacement of the UH-72 Lakota fleet, estimated at $4-6 billion.

- o (CUI) DHS is prioritizing the first quarter of FY 2025 for aviation support due to historic trends of higher migrant levels and will work with JTF-North to prioritize flight hours accordingly.

  - (CUI) Policy engaged with DHS about increasing the use of indigenous CBP capabilities out of the Air and Marine Operations (AMO) component to cover potential gaps in capability. DHS agreed to explore utilizing AMO for aviation support, but noted it may be insufficient to cover all of their requirements.

  - (CUI) Policy will continue to work with DHS to monitor helicopter utilization rates and life-cycle impacts for the UH-72 Lakota fleet.

  - (CUI) Policy has informed the White House Deputy Chief of Staff of this recommended approach, as well.

- (CUI) Policy recommends USNORTHCOM evaluate utilization rates to validate force requirements to support CBP tasks and, in coordination with CBP, identify forces that can provide duties remotely such as data entry, and forces that could be placed in a status to respond to potential in-extremis requests.

- (CUI) In accordance with the Homeland Defense Policy Guidance, the reply memorandum to DHS (TAB B) requests that DHS identify an "off ramp" plan for DoD support on the SWB, include alternative solutions to DoD support, and provide timelines for those solutions.

- (CUI) Policy's recommendation is consistent with DoD policy that RFAs for defense support of civil authorities will be evaluated based on the factors established in DoD Directive 3025.18: legality, lethality, risk, cost, appropriateness, and readiness.

**Submission to Congress:**

- (CUI) In accordance with section 1707 of the NDAA for FY 2020, the ASD(HD&HA) will make the requisite submissions to Congress through OASD(LA) upon your approval of this request.

CUI
Protected Material — Subject to Protective Order

U-DOW-CAR-013

~~CUI~~

**Resourcing Considerations**

- ~~(CUI)~~ If you approve this support, the CJCS will identify sourcing solutions for your consideration through the Global Force Management process.

  - ~~(CUI)~~ The Army intends to involuntarily mobilize Army National Guard and Army Reserve units for 365-days in accordance with 10 U.S.C. § 12302 and Executive Order 14097 in connection with the national emergency declared in Executive Order 14059 to address the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States posed by international drug trafficking.

    o ~~(CUI)~~ This national emergency was most recently continued for another year by the President on December 13, 2023. Any orders must be issued prior to the termination of the national emergency.

    o ~~(CUI)~~ The CNGB also supports one-year mobilization.

  - ~~(CUI)~~ Due to delays in receiving the request from DHS, the Army is not able to meet the customary 180-day notification to the military personnel of the mobilization. If you approve this support, the Army will provide notification to the units and personnel identified to provide support.

**Views of Others** (TAB H).

- ~~(CUI)~~ The Secretaries of the Army and Air Force and Chairman of the Joint Chiefs of Staff agree that the provision of ground support will not negatively affect military training, operations, readiness, or other military requirements (as required by section 1059), and the aviation support results in a benefit to the personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training as required by 10 U.S.C. § 277(c) if DHS is unable to provide reimbursement for the aviation support.

- ~~(CUI)~~ The CNGB non concurs on recommendations #1 and #2. The CNGB stated he believes the ground support does generate a negative effect on unit readiness and that aviation support should only be provided on a reimbursable basis and limited to 5,000 flying hours for FY 2025.

- ~~(CUI)~~ The Under Secretary of the Navy non concurs on recommendations #1 and #5. The Department of Navy (DON) expresses that sourcing Active Component Sailors and Marines will impact military training, operations, and readiness as would providing support on a non-reimbursable basis. The Joint Staff does not intend to source DON personnel through the Global Force Management process.

- ~~(CUI)~~ The Secretaries of the Military Departments, the Joint Staff, and CNGB all have commented that this support could and should be provided by contracted support. Currently, DoD could provide contracted support on a reimbursable basis but not on a non-reimbursable basis.

4

U-DOW-CAR-014

CUI

- (CUI) On April 10, 2024, DoD transmitted a Policy-initiated legislative proposal to the HASC and SASC, for consideration and possible inclusion in the National Defense Authorization Act (NDAA) for FY 2025, that would give SecDef the authority to provide contracted assistance to under section 1059.

- (CUI) If this proposal is enacted as part of NDAA for FY 2025, Policy will work with the Joint Staff, USNORTHCOM, other DoD Components as needed, and CBP to identify, and propose for SecDef consideration, DoD-funded contract solutions for SWB support to DHS for the remainder of FY 2025, and work with the Department of the Army and the National Guard Bureau on reassigning or curtailing any Reserve Component personnel ordered to active duty to provide SWB support to DHS.

**RECOMMENDATIONS:** See TAB A.

Attachments:
TAB A   – Recommendations
TAB B   – Memorandum to DHS Executive Secretary
TAB B1  – Approved DoD Duties
TAB C   – Memorandum to Commander, USNORTHCOM
TAB C1  – Approved DoD Duties
TAB D   – DHS RFA for DoD Support through Fiscal Year 2025
TAB E   – DoD SWB Support FY 2024 Extract
TAB F   – DoD SWB Support FY 2023 Extract
TAB G   – DoD Comptroller Analysis for DoD FY25 DHS USBP Support
TAB H   – Coordination Comments
TAB I   – Coordination

Protected Material — Subject to Protective Order

U-DOW-CAR-015

# TAB

# A

Protected Material -- Subject to Protective Order

U-DOW-CAR-016

~~CUI~~

## TAB A:  RECOMMENDATIONS

**SUBJECT:** (U)  Department of Defense Assistance in Support of U.S. Customs and Border Protection's Southwest Border Security Mission through Fiscal Year 2025

~~(CUI)~~ **RECOMMENDATION #1:** (A) Determine the provision of detection and monitoring, data entry, training, transportation, vehicle maintenance, and warehousing and logistical support to the Department of Homeland Security (DHS) for 12 months will not negatively affect military training, operations, readiness, or other military requirements; and (B) subject to the availability of funds, authorize Commander, USNORTHCOM, to provide detection and monitoring, data entry, training, transportation, vehicle maintenance, and warehousing and logistical support to DHS for all 12 months of fiscal year (FY) 2025 on a non-reimbursable basis pursuant to section 1059 of the National Defense Authorization Act for Fiscal Year 2016.

Approve ___ Disapprove_____ Other_____

**MAY 2 4 2024**

~~(CUI)~~ **RECOMMENDATION #2:** Authorize Commander, U.S. Northern Command (USNORTHCOM), to provide reimbursable light rotary-wing aerial reconnaissance support, subject to the availability of funds, to the DHS, for a total of 6,100 flight hours, in accordance with 10 U.S.C. §§ 272, 274, and 277 for all 12 months of FY 2025.

Approve ___ Disapprove_____ Other_____

**MAY 2 4 2024**

~~(CUI)~~ **RECOMMENDATION #3:** Direct the Chairman of the Joint Chiefs of Staff (CJCS) to develop sourcing recommendations for the activation of Reserve Component (RC) personnel pursuant to 10 U.S.C. § 12302, through the Global Force Management (GFM) process, to provide the above-recommended support, as available and where such support does not adversely affect readiness.

Approve ___ Disapprove_____ Other_____

**MAY 2 4 2024**



Controlled By:  OUSD(P)/HD&HA
CUI Category:  OPSEC
Distribution/Limited Dissemination Control:  FEDCON
POC: ███████

~~CUI~~

~~Protected Material — Subject to Protective Order~~

U-DOW-CAR-017

CUI

(CUI) **RECOMMENDATION #4:** Direct the Chief of the National Guard Bureau, in coordination with the Under Secretary of Defense for Policy and the CJCS, to notify the respective States of the National Guard units and personnel mobilized to provide the approved support.

Approve _____ Disapprove_____ Other_____

**MAY 2 4 2024**

(CUI) **RECOMMENDATION #5:** Sign the memorandum to the Commander, USNORTHCOM, at TAB C, and approve the DoD Executive Secretary response at TAB B.

Approve _____ Disapprove_____ Other_____

**MAY 2 4 2024**

2

Protected Material -- Subject to Protective Order



OSD002504-24/CMD005922-24

U-DOW-CAR-018

# TAB
# C

Protected Material – Subject to Protective Order

U-DOW-CAR-019

UNCLASSIFIED //FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

Protected Material Subject to Protective Order

U-DOW-CAR-020

## USBP SOUTHWEST BORDER RFA 2025 REQUIREMENTS

| | SDC | ELC | YUM | TCA | EPT | BBT | DRT | LRT | RGV | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| DETECTION AND MONITORING (D&M) (SITES) | 19 | 8 | 5 | 15 | 25 | 11 | 62 | 54 | 44 | 243 |
| CAMERA ROOM (WORKSTATIONS) | 12 | 4 | 5 | 36 | 8 | 8 | 8 | 7 | 21 | 99 |
| DATA ENTRY SUPPORT (WORKSTATIONS) | 13 | 0 | 0 | 41 | 0 | 6 | 0 | 18 | 0 | 78 |
| WAREHOUSE/LOGISTICAL SUPPLY CHAIN SUPPORT | 16 | 0 | 0 | 28 | 5 | 4 | 13 | 4 | 22 | 92 |
| TRAINING SUPPORT | 0 | 0 | 0 | 21 | 7 | 9 | 13 | 2 | 13 | 65 |
| VEHICLE MAINTENANCE SUPPORT | 9 | 7 | 7 | 12 | 19 | 8 | 13 | 15 | 22 | 112 |
| TRANSPORTATION SUPPORT | 17 | 7 | 7 | 9 | 6 | 4 | 10 | 4 | 11 | 75 |

Detection and Monitoring (D&M): # of field sites (24 hours per day, 7 days per week)

Camera Room: # of camera room workstations (24 hours per day, 7 days per week)

Data Entry Support: # of workstations that have separation from migrants to support data entry (24 hours per day, 7 days per week)

Warehousing/Logistical Supply Chain Support: # of personnel staffing warehousing sites (8 hours per day, 5 days per week)

Training Support: # personnel supporting training sites (8 hours per day, 5 days per week)

Vehicle Maintenance Support: # of vehicle service bays to be staffed (8 hours per day, 5 days per week)

Transportation Support: # of personnel moving assets (8 hours per day, 5 days per week)

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

## Aviation Support

With the current average of 3 hours of daily direct on-station support hours, DoD aviation support averages 151 detections per day. Of significance, those detected are historically attempting to avoid apprehension due to their criminal or immigration background.

DHS requests a minimum of 8 hours of direct on-station support aviation hours in the following 8 USBP Sectors with accompanying resources, pilots, and support personnel 7 days per week. (Minimum estimated 23,360 direct on-station aviation hours).

Light Rotary-Wing (EO/IR): San Diego, El Centro, Yuma, Tucson, El Paso, Del Rio, Laredo, and Rio Grande Valley Sectors.
Medium Lift Rotary-Wing: As available.
Fixed Wing- As available.
Light Rotary-Wing, Medium Lift Rotary-Wing, and Fixed Wing Aircraft personnel are requested to be available on a 24/7 basis in the sectors identified, as dictated by CBP operational requirements.

Caveat: Support locations identified may change based on operational necessity at time of action.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

Protected Material -- Subject to Protective Order

U-DOW-CAR-021

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

# TAB

# C

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material — Subject to Protective Order~~

U-DOW-CAR-022

UNCLASSIFIED //~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

## TAB C
### FY 2025 Duty Descriptions – Office of Intelligence Support

- All personnel performing U.S. Customs and Border Protection (CBP) intelligence support duties must meet minimum federal investigation background standards. Federal investigation background standards are Tier Level 5.

- CBP intelligence support missions require a Top Secret SCI security clearance to effectively meet mission requirements. Like Department of Defense (DoD) security clearance requirements for certain DoD support missions, CBP background investigation requirements *cannot* be waived or downgraded. Unlike the DoD security clearance process, CBP *cannot* grant interim Tier Levels.

- All military personnel must be vetted by the CBP Office of Professional Responsibility (OPR) before arriving at a CBP facility to provide mission support. CBP OPR will validate that military personnel designated for CBP mission support have the required Tier 5 Level designation and either current TS/SCI or TS clearance with ability to be read on to SCI prior to supporting the mission.

- Unless specifically indicated, DoD personnel will perform the duties detailed below with appropriate oversight by DoD and CBP personnel.

- Unless specifically indicated, DoD personnel performing the support mission duties detailed below shall *not* interact with migrants or other persons in CBP custody, or evidentiary items, or responsibility for the care, custody, and control of personal property and evidence.

- Due to on-the-job training requirements, all military personnel should be available to provide at a minimum 300 days of mission support, unless approved by CBP.

- DoD personnel performing intelligence support functions will be exercising DoD authorities and adhere to corresponding intelligence oversight policies and procedures, consistent with requirements of Executive Order 12,333. These DoD personnel will be utilizing their authorities to access Intelligence Community systems and databases to support CBP's border security mission.

- DoD will provide any required DoD training, including intelligence oversight, and ensure personnel shall be properly trained and equipped, as required by DoD, for the duties detailed below.

- CBP will provide DoD Intelligence Oversight officials access to service members, their work products, and any other requirements to ensure intelligence oversight compliance.

UNCLASSIFIED //~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material — Subject to Protective Order~~

U-DOW-CAR-023

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

- Military personnel will only access and analyze CBP information or information CBP has been given access to by other agencies. This will include UNCLASSIFIED law enforcement sensitive and CLASSIFIED networks, databases, and intelligence. CBP will be responsible for providing access to these networks and systems along with their required training.

### Office of Intelligence (OI) Support:

Location: At the Southern Border Intelligence Center, Regional Intelligence Centers, and Joint Production Exploitation Operations Center located in California, Arizona, New Mexico, and Texas. They will be located indoors in a climate-controlled environment, Law Enforcement Sensitive space and / or a Sensitive Compartmented Information Facility.

Duties: As tasked by OI, perform one or more of the following support functions. In coordination with the supporting military command and control element and approved by the SECDEF, OI may adjust the number of military personnel performing each function as required by the operational environment. All duties performed will be conducted IAW relevant DoD policy.

- All-Source Analysis: Prepare all-source intelligence products on human smuggling, illegal migration, illicit finance, narcotics, transnational organized crime, counterintelligence, counterterrorism, and other threats to national security to support CBP. Assist in establishing and maintaining systematic, cross-referenced intelligence records and files. Receive and process incoming reports and messages. Assist in determining significance and reliability of incoming information. Assist in integrating incoming information with current intelligence holdings. Assist in the analysis and evaluation of intelligence holdings to determine changes in threat actors' capabilities, vulnerabilities, and probable courses of action. Assist in the researching, drafting, and writing of finished intelligence, compliant with Intelligence Community Directive (ICD) 203 and ICD 206, by using information from multiple sources to satisfy CBP key intelligence questions. Prepare and deliver intelligence briefings to CBP leaders. Conduct analytical exchanges with other intelligence professionals across CBP and with CBP interagency partners. Draft intelligence and information reports (IIRs) and submit them for review and release to a CBP Reports Officers.

- All-Source Analysis / Full-Motion Video (FMV) Analysis: Process, exploit, and disseminate data collected by CBP (e.g., electro-optical/infrared (EO/IR), Vehicle and Dismount Exploitation Radar (VaDER), Synthetic Aperture Radar (SAR), and SeaVue) in response to priority information requirements. Execute near-real time FMV PED for Unmanned Aerial Systems (UAS) and manned data link capable aircraft along the Southwest border and its maritime domain. Provide exploitation of intelligence-led operations is support of CBP's interagency partners requiring an elevated level of situational awareness for effective Reconnaissance, Surveillance, and Target Acquisition (RSTA) operations. Support pattern of life and overwatch for ground operations on high value targets (HVT) during domestic and international operations. Utilizing UAS cueing primarily on actionable intelligence to aid in the

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

Protected Material — Subject to Protective Order

U-DOW-CAR-024

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

apprehension of and subsequent extradition of HVTs and fugitives from justice. Exploit flights that are conducted daily along the Southwest Border from California to South Texas. Analysis VaDER radar, synthetic aperture radar (SAR), and ground moving-target indicator (GMTI) data to detect, localize, and track vehicles and dismounted personnel illegally crossing the border from Mexico into the United States. Facilitate information exchanges with CBP partners for near real-time actions. Exploit imagery collected by pole cameras and other imagery provided to CBP along the SWB by interagency partners that satisfy CBP information requirements.

- **All-Source Analysis / Imagery Analysis:** Provide forensic tactical analysis by studying and analyzing imagery products from multiple sources available to CBP. Provide advanced Geospatial Intelligence (GEOINT) analysis using UNCLASSIFIED and CLASSIFIED GEOINT capabilities. Develop complex GEOINT products in support of SWB operations. Conduct imagery studies related to CBP technical collection in support of operational planning. Perform complex geospatial analyses of border activities to identify spatial and temporal changes. Analyze aerial and ground permanent record imagery developed by photographic and electronic means. Use principles and techniques of photogrammetry and employs electronic, mechanical, and optical devices to obtain information from imagery. Obtain intelligence by studying and analyzing imagery products. Determine target coordinates for accurate location of imagery analysis findings.

- **All-Source Analysis / Counter Network:** Perform network analysis to identify individuals, entities, locations, and other key nodes of illicit networks. Utilize both UNCLASSIFIED and CLASSIFIED systems to map out illicit networks, submit publication requests to interagency partners. Leverage multiple tools, datasets, and systems available to CBP to conduct complex network development and make recommendations on disruption opportunities. Analyze incoming reports, information, and intelligence to build and maintain subject matter expertise against illicit networks. Build complex network charts, draft collection requirements, collection planning, and ISR synchronization.

- **All-Source Analysis / Spanish Language Translation:** Perform translation, exploitation, and analysis of foreign communications at all echelons using intelligence community systems. Translate, transcribe, gist and/or produce summaries of foreign communication transmissions; perform analysis and ISR synchronization to support mission requirements.

**Required Military Occupational Specialty:** DoD Military Intelligence designated personnel

Caveat: Military intelligence personnel will not conduct information collection or operate information-collections systems. Military personnel will only perform analysis of CBP collected information that is resident on CBP systems and information to which CBP has been provided access that resides on other government systems. All military personnel must be trained on rules and regulations governing intelligence oversight applicable to the specific functions they will perform. The training should address, at a minimum the requirement and the process of reporting questionable intelligence activities and the name and contact information of intelligence oversight officials to whom they may direct any questions or concerns regarding

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material — Subject to Protective Order~~

U-DOW-CAR-025

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

intelligence oversight matters. Military intelligence personnel supporting CBP must be authorized to process, analyze, and disseminate imagery information. No U.S. person may be targeted for surveillance. Military personnel will not access information, including open-source information, that has not already been collected by CBP or another agency. Information incidentally collected on U.S. persons and other non-DoD persons or organizations during execution of this mission will be promptly turned over to civilian law enforcement officials.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

Protected Material — Subject to Protective Order

U-DOW-CAR-026

# TAB
# D

Protected Material – Subject to Protective Order

U-DOW-CAR-027

From: Tierney, Maryann ███████████████████
Sent: Wednesday, January 22, 2025 4:53 PM
To: Robert Salesses████████████████████
Cc: Huffman, Benjamine ██████████████████ >; VITIELLO, RONALD D.
█████████████████████████; LAW, ROB████████████████████████ Dory,
Amanda████████████      HEMENWAY, TROUP████████████████   SCOTT,
RODNEY S███████████████████████           NOVAK, JEFFREY
█████████████████

Subject: Emergent RFA for DOD Construction and Engineering Support to DHS - 22 Jan 25

Acting Secretary of Defense Salesses,

Earlier today, we transmitted the formal RFA for aviation support to your team and we appreciate how DOD has moved out on this request as well as aspects of the subsequent e-mail from Acting Secretary Huffman notifying you of the second emergent RFA which we are currently formalizing.

Separately and understanding the criticality of the situation, CBP has identified high priority locations on the SWB border where additional temporary barriers could be effective in deterring and preventing illegal aliens from entering the United States. The Presidents Executive Order, Securing our Borders states, "The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States."

To comply with this Executive Order, DHS requests DOD assist DHS with enhanced temporary barrier emplacement for approximately ███ miles in California with additional ███████████████████ ████ to be identified later by CBP. DHS requests DoD will provide support incrementally in accordance with CBP's priorities at locations to be determined by CBP and agreed upon by DOD. Additionally, DOD may be directed to perform activities necessary to █████████████████████████████████ ███████████████████████ This support will be provided on a non-reimbursable basis, to the greatest extent legally possible.

Additional language specifying CBP as the lead agency for environmental compliance and all necessary access to land will be included in the formal RFA.

Mr. Ron Vitiello (cc'd) at U.S. Customs and Border Protection will continue to be my POC to assist in coordination with your team; Director, Joint Staff; and others as you identify to provide further detail for the utilization and deployment of these resources.

I appreciate your timely consideration of this emergent request. My formal RFA will be transmitted in the coming days.

MaryAnn Tierney
Deputy Secretary (A)

████████████ (mobile)

Protected Material — Subject to Protective Order

U-DOW-CAR-028

# TAB

# E

Protected Material -- Subject to Protective Order

U-DOW-CAR-029

~~FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE~~



Office of the Executive Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

January 22, 2025

MEMORANDUM FOR: Kelly Bulliner Ross
Executive Secretary
U.S. Department of Defense

FROM:    Juliana Blackwell
Acting Executive Secretary
U.S. Department of Homeland Security

SUBJECT:    **Request for Assistance from the Department of Defense for Aviation Transportation Support to the Department of Homeland Security**

## Overview

DHS requests immediate aviation transportation assistance to remove aliens from U.S. Border Patrol facilities across Southern United States to repatriation sites in El Salvador, Guatemala, Honduras, or other locations to be determined. DHS and U.S. Customs and Border Protection (CBP) will work with the U.S. Department of State to obtain the requisite diplomatic clearances, ensure host nation notification of repatriation operations, and ensure countries where detainees will be flown have agreed to accept the detainees. Additionally, DHS will ensure CBP, or another cognizant DHS law enforcement entity will provide in-flight security for all DOD-provided flights. This Request for Assistance is made pursuant to the President's Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the United States (20 January 2025), section 2; Executive Order Declaring a National Emergency at the Southern Border of the United States (20 January 2025); and Executive Order Guaranteeing the States Protection Against Invasion (20 January 2025).

## DHS Overarching Goal

DHS seeks to expeditiously execute Presidential guidance to protect the American people against invasion and enforce immigration laws against all inadmissible and removable aliens.

## Specific Topics for Request

DHS requests aviation transportation support to remove all aliens present in the following CBP sectors, the numbers for which are current as of 22 January 2025. Future requirements to remove additional populations which may be present in the future should be expected.

Rio Grande Valley Sector - 1,357

~~FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE~~

~~Protected Material — Subject to Protective Order~~



OSD001134-25/CMD001595-25

U-DOW-CAR-030

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

Request for Assistance to the Department of Defense for Air Transportation Support to DHS
Page 2

San Diego Sector – 1,005

El Paso Sector - 959

Laredo Sector - 588

Tucson Sector - 504

Yuma Sector - 500

Del Rio Sector - 228

El Centro Sector - 31

Miami Sector - 13

Detroit Sector - 9

Swanton Sector - 7

Big Bend Sector - 4

Buffalo Sector - 1

Spokane Sector - 1

**End of Mission**

DHS requests that DoD-authorized support capabilities remain in place through completion of removal operations.

**Funding**

DHS requests DoD provide support on a non-reimbursable basis.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

Protected Material – Subject to Protective Order

U-DOW-CAR-031

# TAB
# F

Protected Material - Subject to Protective Order

U-DOW-CAR-032

## Policy Coordination Sheet

**Subject:** Memorialization of Verbal Authorizations for DoD Support for Executive Order Implementation

**Control Number:** *USP000138-25*

| Title/ Organization | Name | Coordination Requested | Coordination Received | Response |
|---|---|---|---|---|
| Joint Staff | LTG D.A. Sims | January 22, 2025 | January 23, 2025 | Concur with comment |
| OGC | Charles Lee Young III | January 22, 2025 | January 23, 2025 | Concur with comments |
| USD(C)/CFO | Anne J. McAndrew | January 22, 2025 | January 23, 2025 | Concur with comment |
| USD(A&S) | Stephen J. Morani | January 22, 2025 | January 23, 2025 | Concur |

Protected Material — Subject to Protective Order

U-DOW-CAR-033

# United States Senate

WASHINGTON, DC 20510

February 13, 2025

The Honorable Pete Hegseth
Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Dear Secretary Hegseth:

We are concerned about the Department of Defense's (DoD) immigration-related operations at the southern border and at Naval Station Guantanamo Bay — including the implications of these operations for the military's budget, readiness, and morale. DoD's support for the Department of Homeland Security (DHS) has been expensive for American taxpayers, with some DoD expenses costing over three times more than when DHS performs the same function, while also posing "an unacceptable risk" to units' readiness.[1] DoD's new immigration operations — which the Trump administration is planning at an unprecedented scale — threaten to burden the Department's resources and undermine our national security. To better understand those risks, we write to request additional information about these operations.

On his first day in office, President Trump signed an Executive Order (EO) directing the United States Northern Command (NORTHCOM) to "seal the borders" and "to provide steady-state southern border security."[2] Then on January 29, President Trump directed DoD to "expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity" of 30,000.[3]

In response, over the past four weeks, NORTHCOM has deployed roughly 2,000 active-duty troops to the southern border, drawing from numerous Army and Marine Corps units and directing the 10th Mountain Division from Fort Drum, New York to oversee the units.[4] Those

---

[1] Los Angeles Times, "Must Reads: Marine Corps commandant says deploying troops to the border poses 'unacceptable risk,'" Molly O'Toole, March 21, 2019, https://www.latimes.com/politics/la-na-pol-marine-corps-border-national-emergency-20190321-story.html; Reuters, "US military deportation flight likely cost more than first class," Phil Stewart, January 30, 2025, https://www.reuters.com/world/americas/us-military-deportation-flight-likely-cost-more-than-first-class-2025-01-30/.
[2] White House, Executive Order, Clarifying The Military's Role In Protecting The Territorial Integrity Of The United States, January 20, 2025, https://www.whitehouse.gov/presidential-actions/2025/01/clarifying-the-militarys-role-in-protecting-the-territorial-integrity-of-the-united-states/.
[3] White House, Executive Order, Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity, January 29, 2025, https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/; Reuters, "Trump to prepare facility at Guantanamo for 30,000 migrants," Jeff Mason, Idrees Ali and Ted Hesson, January 30, 2025, https://www.reuters.com/world/us/trump-says-he-will-instruct-homeland-security-pentagon-prepare-migrant-facility-2025-01-29.
[4] U.S. Army, "Fort Drum Soldiers deploy to southern border," press release, February 5, 2025, https://home.army.mil/drum/4017/3878/2079/WB_Press_Release_-_Fort_Drum_Soldiers_deploy_to_southern_boarder.pdf; CNCY Central, "Around 500 soldiers from Fort Drum to



OSD001359/25/CMD001844/25

U-DOW-CAR-034

troops supplemented the 2,500 National Guard members already stationed at the border, bringing the total under DoD's command to over 4,000.[5] DoD leaders have made clear that "there will be very likely additional missions, this is just the start."[6] In the near term, the Trump administration is reportedly considering deploying up to 10,000 troops to the southern border[7] — double the scale of DoD's border deployment in 2019 and 2020.[8] That number could grow; during President Trump's first term, Stephen Miller (now White House Deputy Chief of Staff) allegedly asserted that "[w]e need a quarter-million troops" at the southern border.[9]

Furthermore, DoD has operated over 10 deportation flights — including to Guatemala, Ecuador, India, and Guantanamo[10] — following Immigration and Customs Enforcement's (ICE) reversal of its policy against using military aircraft to deport migrants.[11] Meanwhile, DoD has supplied facilities to assist DHS immigration enforcement operations.[12] Within the United States, DoD

depart for southern border," Matthew Benninger, February 5, 2025, https://cnycentral.com/news/local/fort-drum; Military.com, "Here Are All the Units Now Deployed to the Border for Trump's Immigration Crackdown," Steve Beynon, Patricia Kime, and Thomas Novelly, January 27, 2025, https://www.military.com/daily-news/2025/01/27/here-are-all-units-now-deployed-border-trumps-immigration-crackdown.html; U.S. Department of Defense, Background Briefing on DOD Actions Responding to President Trump's Executive Order on Securing our Border, January 22, 2025, https://www.defense.gov/News/Transcripts/Transcript/Article/4038856/background-briefing-on-dod-actions-responding-to-president-trumps-executive-ord.

[5] U.S. Northern Command, "USNORTHCOM bolsters security at southern border," press release, January 23, 2025, https://www.northcom.mil/Newsroom/Press-Releases/Article/4038601/usnorthcom-bolsters-security-at-southern-border.

[6] U.S. Department of Defense, "Background Briefing on DOD Actions Responding to President Trump's Executive Order on Securing our Border," transcript, January 22, 2025, https://www.defense.gov/News/Transcripts/Transcript/Article/4038856/background-briefing-on-dod-actions-responding-to-president-trumps-executive-ord.

[7] ABC News, "DHS could request up to 10,000 troops for the border, internal memo shows," Luke Barr and Luis Martinez, January 23, 2025, https://abcnews.go.com/Politics/dhs-request-10000-troops-border-internal-memo-shows/story?id=118045892; U.S. Department of Defense, "Background Briefing on DOD Actions Responding to President Trump's Executive Order on Securing our Border," transcript, January 22, 2025, https://www.defense.gov/News/Transcripts/Transcript/Article/4038856/background-briefing-on-dod-actions-responding-to-president-trumps-executive-ord.

[8] Center for Strategic & International Studies, "Trump Sends Troops to the Southern Border: A Crisis or a Continuation of U.S. Policy," Mark F. Cancia, January 27, 2025, https://www.csis.org/analysis/trump-sends-troops-southern-border-crisis-or-continuation-us-policy.

[9] CBS News, "Esper: Stephen Miller called for a 'quarter-million troops' to respond to migrant caravan," May 5, 2022, https://www.cbsnews.com/news/mark-esper-stephen-miller-border-troops-migrant-caravan-60-minutes-2022-05-05.

[10] Air & Space Forces Magazine, "USAF Flies More Detained Migrants to Guantanamo in C-17," Chris Gordon, February 6, 2025, https://www.airandspaceforces.com/usaf-detained-migrants-guantanamo; New York Times, "What to Know About Trump's Military Deportation Flights," Annie Correal, January 31, 2025, https://www.nytimes.com/2025/01/31/world/americas/trump-military-deportation-flights.html; Air & Space Forces Magazine, "Air Force C-17s Conduct First Deportation Flights, Two Not Allowed to Land," Chris Gordon, January 26, 2025, https://www.airandspaceforces.com/air-force-c-17s-first-deportation-flights-guatemala.

[11] Air Force crew on deportation flights are reportedly removing insignia with their names and unit numbers from their uniforms. See Military.com, "Air Force Has Troops Remove Names, Unit Patches from Uniforms During Deportation Flights," Thomas Novelly, February 7, 2025, https://www.military.com/daily-news/2025/02/07/air-force-has-troops-remove-names-unit-patches-uniforms-during-deportation-flights.html; U.S. Immigration and Customs Enforcement, "ICE Air Operations Overview," August 8, 2023, https://www.ice.gov/factsheets/ice-air-operations.

[12] CBS News, "Military to provide facilities at Colorado's Buckley Space Force Base to process detained migrants," Anna Alejo, January 28, 2025, https://www.cbsnews.com/colorado/news/colorado-military-provide-facilities-

2

agreed to temporarily detain migrants at the Buckley Space Force Base in Colorado on behalf of ICE.[13] At Guantanamo, SOUTHCOM is in the process of expanding the Migrant Operations Center's (MOC) capacity to 30,000 — up from its current maximum capacity of just 120.[14] Migrants are also being held in Guantanamo's "Camp 6" prison, which previously held War-on-Terror detainees.[15] DHS has not ruled out detaining women and children at Guantanamo.[16] So far, 500 Marines have been ordered to deploy to Guantanamo,[17] with potentially more to come. DoD has been noncommittal about how long they will stay; one spokesperson noted "mass migration is unpredictable, and the extent of U.S. military support will be determined as events unfold."[18]

NORTHCOM's and SOUTHCOM's new immigration-related operations place significant — and unnecessary — burdens on DoD resources, personnel, and readiness. DoD has estimated that its southern border operations will cost almost $1 billion over just *eight months*, through the end of this fiscal year, compared to its estimate of $1 billion over three years during the first Trump administration.[19] DoD does not yet have a cost estimate for its new Guantanamo operations,[20] but a former Pentagon official warned that "[t]he total cost for this [Guantanamo operation] would quickly skyrocket into tens of millions, if not hundreds of millions, of dollars."[21]

process-detained-migrants.
[13] Reuters, "ICE to use U.S. military base in Colorado to detain migrants," Phil Stewart and Idrees Ali, January 28, 2025, https://www.reuters.com/world/us/ice-use-us-military-base-colorado-detain-migrants-2025-01-29; Wall Street Journal, "U.S. Begins Migrant Flights to Guantanamo Bay," Tarini Parti, Nancy A. Youssef, and Michelle Hackman, February 4, 2025, https://www.wsj.com/politics/policy/trump-immigration-policy-guantanamo-bay-migrant-flights-9fec8df7.
[14] Id.
[15] New York Times, "U.S. Is Holding Migrants in Cells That Once Held Al Qaeda Suspects," Hamed Aleaziz, Eric Schmitt and Carol Rosenberg, February 5, 2025, https://www.nytimes.com/2025/02/05/us/politics/migrants-trump-guantanamo-prison.html.
[16] NBC News, "Kristi Noem says 'due process will be followed' for migrants at Guantánamo Bay," Alexandra Marquez, February 2, 2025, https://www.nbcnews.com/politics/immigration/homeland-security-noem-due-process-migrants-guantanamo-bay-rcna190330.
[17] PBS News, "Pentagon sends more troops to U.S.-Mexico border, bringing total to 3,600," February 7, 2025, https://www.pbs.org/newshour/politics/pentagon-sends-more-troops-to-u-s-mexico-border-bringing-total-to-3600; U.S. Southern Command, U.S. Military Troops Arrive at Naval Station Guantanamo Bay for Illegal Alien Holding Operations, press release, February 3, 2025, https://www.southcom.mil/News/PressReleases/Article/4050872/us-military-troops-arrive-at-naval-station-guantanamo-bay-for-illegal-alien-hol.
[18] Military.com, "Marines, Soldiers Set Up Tents and Cots at Guantanamo Bay for Trump's Migrant Deportations," Drew F. Lawrence and Konstantin Toropin, February 3, 2025, https://www.military.com/daily-news/2025/02/03/over-300-service-members-now-guantanamo-bay-support-detention-of-migrants-us.html.
[19] U.S. Government Accountability Office, SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection, February 2021, p. 15, https://www.gao.gov/assets/gao-21-356.pdf.
[20] U.S. Senate Committee on Armed Services, "Open/Closed/ Hearing titleTo receive testimony on the posture of United States Northern Command and United States Southern Command in review of the Defense Authorization Request for Fiscal Year 2026 and the Future Years Defense Program," February 13, 2025, 1:40:50-1:40:53, https://www.armed-services.senate.gov/hearings/to-receive-testimony-on-the-posture-of-united-states-northern-command-and-united-states-southern-command-in-review-of-the-defense-authorization-request-for-fiscal-year-2026-and-the-future-years-defense-program.
[21] Politico, "Pentagon shocked by Trump's order to house migrants in Guantanamo Bay," Paul McLeary, Jack Detsch and Myah Ward, January 31, 2025, https://www.politico.com/news/2025/01/31/trump-guantanamo-bay-migrants-pentagon-00201715.

3

Much of this cost is avoidable. For example, DoD is deporting migrants on C-17 military aircraft, which cost far more than the commercial and chartered flights that ICE normally uses for deportations.[22] Taxpayers pay over $28,000 per flight hour for a single deportation on a military C-17 plane, compared to $8,577 per flight hour on civilian aircraft alternatives that ICE often uses.[23] Similarly, ICE pays contractors over $272,000 per detention bed to operate Guantanamo's MOC, compared to an average of around $57.00 per bed at ICE facilities within the United States.[24]

Perhaps more concerning, DoD may not have a realistic estimate of how much these new operations will cost. When DoD deployed to the border between FY2018 and FY2020 during President Trump's first term, the Department estimated that its border operations would total $1 billion in unreimbursed costs between FY2018 and FY2020.[25] The Government Accountability Office (GAO) later found that "DOD did not present reliable cost estimates . . . that would allow the Secretary to gauge how providing support could affect the department's budget."[26] DoD neglected to include entire categories of expenses in its estimates, such as the cost of DoD installations to support military personnel and National Guard member benefits.[27] The Department also failed to accurately report its costs to Congress.[28] Since then, DoD has not implemented any of GAO's recommendations for improving how it estimates the cost of assisting DHS's immigration operations.[29]

Beyond budgetary costs, DoD's growing participation in DHS immigration operations will pose serious costs for units' readiness. The Defense Secretary discontinued part of DoD's border operations between 2018 and 2020 after finding that "continued support for the mission would negatively affect military readiness and morale."[30] The Commandant of the Marine Corps had warned that the operation posed an "unacceptable risk to Marine Corps combat readiness and

---

[22] Wall Street Journal, "Analysis Reveals the High Costs of Trump's Military Deportation Flights," February 13, 2025, https://www.wsj.com/video/analysis-reveals-the-high-costs-of-trumps-military-deportation-flights/7E1D26C3-16B8-4F5F-9D10-71F8588039D0?mod=business_videos_pos2

[23] Newsweek, "Trump's Reliance on Military Planes for Deportations Is Costing Taxpayers," Jesus Mesa, January 31, 2025, https://www.newsweek.com/trumps-reliance-military-planes-deportations-costing-taxpayers-2025882; Reuters, "US military deportation flight likely cost more than first class," Phil Stewart, January 30, 2025, https://www.reuters.com/world/americas/us-military-deportation-flight-likely-cost-more-than-first-class-2025-01-30

[24] Immigration Impact, "Sending Migrants to Guantanamo Bay Is a Costly, Abusive Shift in Immigration Detention," Chris Opila, February 7, 2025, https://immigrationimpact.com/2025/02/07/sending-migrants-guantanamo-bay-costly-abusive-detention; NBC News, "Trump's stepped-up immigration arrests escalate need for more detention space," Suzanne Gamboa, Julia Ainsley, Gabe Gutierrez and Laura Strickler, January 31, 2025, https://www.nbcnews.com/news/latino/trumps-stepped-immigration-arrests-escalate-need-detention-space-rcna190217; Targeted News Service, "AKIMA INFRASTRUCTURE PROTECTION Wins $163,445,525 Federal Contract," September 8, 2024.

[25] U.S. Government Accountability Office, SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection, February 2021, p. 15, https://www.gao.gov/assets/gao-21-356.pdf.

[26] Id., p. 15.

[27] Id.

[28] Id., pp. 31-34.

[29] Id.

[30] Id., p. 25.

4

solvency."[31] For example, DoD sent Blackhawk helicopters to the border, "separate[ed] units in order to assign a portion of them to the southwest border mission," and canceled training exercises — all of which reduced the readiness of the impacted units.[32] Again, GAO found that DoD had underestimated these costs, approving border deployments with "limited information about how providing the requested capabilities would affect readiness."[33] And again, DoD has not implemented any of GAO's recommendations for improving its assessment of how border operations impact readiness. This track record casts doubt on your prediction that the current border operations will in fact "contribute[] to readiness."[34]

Likewise, we are concerned about how these operations may impact servicemembers' morale. In recent years, DoD personnel who deployed to the border have reported dangerously low morale, driven by an unclear mission, isolation, boredom, poor accommodations, and more.[35] Poor morale even contributed to a series of suicides by members of the Texas National Guard who deployed to the southern border after 2020.[36] As mentioned above, the Defense Secretary scaled back border operations in 2019 in part because of how the mission was harming troops' morale.[37]

In all, the Trump administration is militarizing the country's immigration enforcement system in an apparent attempt to signal toughness. But this political stunt will come at a high cost: it risks diverting DoD's resources away from its vital mission in ways that compromise our national security. We request answers to the following questions by February 27, 2025:

**U.S.-Mexico Border Operations**

1. Please provide a complete list of units deployed to the southern border and the estimated length of deployment for each.

2. How is NORTHCOM tracking border support activity costs and ensuring the accuracy of cost tallies?

3. Describe how DoD is assessing the impact of southern border operations on troops' readiness.

---

[31] LA Times, "Must Reads: Marine Corps commandant says deploying troops to the border poses 'unacceptable risk.'" Molly O'Toole, March 21, 2019, https://www.latimes.com/politics/la-na-pol-marine-corps-border-national-emergency-20190321-story.html

[32] U.S. Government Accountability Office, SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection, February 2021, pp. 24, 26-27, https://www.gao.gov/assets/gao-21-356.pdf.

[33] Id., p. 27.

[34] U.S. Army, "Defense Secretary says enlisted morale is high at Southern Border," Matthew Olay, February 7, 2025, https://www.army.mil/article/282912/defense_secretary_says_enlisted_morale_is_high_at_southern_border

[35] Army Times, "Death, drugs and a disbanded unit: How the Guard's Mexico border mission fell apart." Davis Winkie, December 8, 2021, https://www.armytimes.com/news/your-army/2021/12/08/death-drugs-and-a-disbanded-unit-how-the-guards-mexico-border-mission-fell-apart.

[36] Texas Standard, "At least 17 Texas National Guardsman have died patrolling the southern border, including several suicides," Gabriella Alcorta Solorio, December 9, 2024, https://www.texasstandard.org/stories/texas-national-guard-operation-lone-star-soldier-deaths-suicides.

[37] U.S. Government Accountability Office, "SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection," February 2021, p. 25, https://www.gao.gov/assets/gao-21-356.pdf.

5

U-DOW-CAR-038

a. Have any training exercises been delayed or canceled due to the recent deployments to the southern border? Please provide the date and type of any affected training exercises and explain which units were impacted.

b. Is DoD separating units when sending personnel to the border? If so, please explain the reasoning, given evidence of how doing so between 2018-2020 harmed units' readiness.

4. How, if at all, is NORTHCOM monitoring the impact of the border deployment on troops' morale?

5. Please list all National Guard forces that are currently participating in southern border operations and the authority under which they have deployed.

6. GAO previously found that "DoD has not defined what it considers to be a manageable impact on readiness."[18] How is DoD determining when an anticipated impact on readiness is "manageable"?

7. What was the total cost of DoD's border deployment between 2018-2020?

8. What does NORTHCOM project the total cost of border operations will be this calendar year?

a. Please explain the assumptions underlying that estimate.
b. Provide the total operational costs of DoD's border deployment since January 20, 2025.
c. What budgetary account will be used to pay for the operations?
d. Which expenses, if any, is DoD paying for on a non-reimbursable basis? If DoD is waiving reimbursement for any expenses under 10 U.S.C. § 277, provide the justification for doing so.

9. Are any noncitizens currently being held at the Buckley Space Force Base in Colorado?

a. If so, please describe the authority under which they are being held and the protocol for them to access legal counsel.

10. Is DoD considering using other military bases in the United States for detention operations?

11. Provide a full list of tasks to which active-duty forces will be assigned, along with a summary of functions to date and a summary of upcoming functions DoD troops will engage in.

---

[18] U.S. Government Accountability Office, SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection, February 2021, p. 26, https://www.gao.gov/assets/gao-21-356.pdf

6

U-DOW-CAR-039

12. What are the rules of engagement that govern each unit deployed to the border?

13. Are servicemembers authorized to use force at the border?

    a.  In 2020, the DoD Inspector General found that some troops did not receive Standing Rules for the Use of Force (SRUF) training.[18] What percentage of troops currently deployed to the border have completed training on when and how they can use force? Please describe the training they receive on the authorization of military force.

    b.  Are servicemembers under DoD's command authorized to use force against unarmed civilians at the border?

    c.  Under what circumstances, if any, are servicemembers under DoD's command authorized to make arrests at the border?

14. How does DoD handle encounters with citizens at the border?

**Guantanamo Operations**

1. Please describe SOUTHCOM's precise role(s) in Guantanamo's migrant detention operations.

    a.  How, if at all, are DoD personnel directly involved in the detention of any migrants at Guantanamo.

    b.  Has DoD (or any of its components) signed any memoranda of understanding or similar agreements with DHS regarding the detention of migrants at Guantanamo? Please provide a copy of any agreements if so.

2. Describe DoD's precise role at the MOC and Camp 6 and how this role is currently projected to evolve.

    a.  There are reports that DoD personnel are guarding migrants at Camp 6.[19] Please explain in detail who is currently guarding Camp 6 and whether there are plans to change the personnel stationed at Camp 6.

    b.  Are migrants at the MOC or Camp 6 free to leave or are they being formally detained? If they are detained, under what legal authority are migrants being detained at Guantanamo's Camp 6?

3. How, if at all, is SOUTHCOM monitoring the impact of the Guantanamo deployment on troops' morale?

---

[18] Department of Defense Office of Inspector General, "Evaluation of the United States Military Support of Department of Homeland Security Southern Border Security Operations Under Title 10 Authority (DODIG-2020-115)," August 14, 2020, https://www.dodig.mil/reports.html/Article/2316046/evaluation-of-the-united-states-military-support-of-department-of-homeland-secu/

[19] New York Times, "Some Migrants Sent by Trump to Guantanamo Are Being Held by Military Guards," Carol Rosenberg and Charlie Savage, February 12, 2025, https://www.nytimes.com/2025/02/12/us/gitmo-migrants-trump.html?smid=nytcore-ios-share&referringSource=articleShare.

U-DOW-CAR-040

4. Describe how DoD is assessing the impact of Guantanamo MOC operations on troops' readiness.

5. Has DHS informed DoD of whether Guantanamo's MOC will be used to hold any migrants who have not received final orders of removal?

    a. Have any migrants currently at the MOC not received final removal orders?

6. What does SOUTHCOM project the total cost of Guantanamo's MOC operations will be this fiscal year? If no single cost estimate is available, please provide a series of cost estimates based on the different scenarios for which DoD is planning.

7. GAO has found that DHS has detained U.S. citizens after mistaking them for foreign nationals.[41] What steps, if any, does DoD take to confirm the identity of an individual before taking them into custody at a military facility or on a military aircraft?

8. What is DoD's timeline for constructing permanent structures at the MOC and how long do you anticipate migrants will be held in soft-sided facilities?

9. What term is being used to describe noncitizens deported from United States to Guantanamo?

10. What is DoD's plan for migrants held at Guantanamo whose home country will not accept their repatriation?

11. What is DoD's plan for evacuating the MOC during extreme weather events?

12. Please provide a summary of the age and gender of migrants currently being held at Guantanamo's MOC.

    a. Has DoD been informed of any plan to detain women or children at Guantanamo?

13. What government entities, if any, will conduct on-site inspections of Guantanamo's MOC and Camp 6, and at what frequency? Will they publicly report on findings?

14. Has DoD received requests for access to the MOC or Camp 6 by legal service providers, humanitarian organizations, press, or other members of the public? How have requests been handled?

    a. Describe DoD's plans for facilitating migrants' access to counsel.
    b. Has DHS requested that SOUTHCOM facilitate confidential legal phone calls or legal visits?

---

[41] U.S. Government Accountability Office, Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations, July 20, 2021, https://www.gao.gov/products/gao-21-487

8

U-DOW-CAR-041

15. What steps is DoD taking to make the MOC and Camp 6 facilities habitable for the number of migrants expected to be held at Guantanamo.

    a. Any migrants currently housed in spaced with black mold, leaks, electrical fires, other issues?

16. As of the date of your response, what is the current capacity of the MOC at Guantanamo?

    a. How long does SOUTHCOM anticipate it will take DoD to complete the first phase of the MOC expansion to 2,000 migrants?[42]
    b. What is the maximum number of migrants for whom Guantanamo's MOC currently has the capacity and resources to provide sanitary facilities, medical care, food, and potable water?

17. Please explain the standards of care that DoD personnel are bound to provide at Guantanamo and provide a copy of DoD's protocol, if any, on standards of care.

Thank you for your attention to this important matter.

Sincerely,

Elizabeth Warren
United States Senator

Mazie K. Hirono
United States Senator

CC: Admiral Alvin Holsey, Commander, United States Southern Command; General Gregory M. Guillot, Commander, United States Northern Command and North American Aerospace Defense Command

---

[42] U.S. Navy, USS St. Louis (LCS-19) Supports Operation Southern Guard at Naval Station Guantanamo Bay, February 4, 2025, https://www.navy.mil/Press-Office/News-Stories/Article/4053757/uss-st-louis-lcs-19-supports-operation-southern-guard-at-naval-station-guantana.

U-DOW-CAR-042



**Congressional Research Service**
Informing the legislative debate since 1914

# The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law

Updated November 6, 2018

**Congressional Research Service**
https://crsreports.congress.gov
R42659

**CRS REPORT**
Prepared for Members and
Committees of Congress

U-DOW-CAR-043

# Summary

The Constitution permits Congress to authorize the use of the militia "to execute the Laws of the Union, suppress Insurrections and repel Invasions." And it guarantees the states protection against invasion or usurpation of their "republican form of government," and, upon the request of the state legislature, against "domestic violence." These constitutional provisions are reflected in the Insurrection Acts, which have been invoked numerous times both before and after passage of the Posse Comitatus Act, 18 U.S.C. Section 1385, in 1878. Congress has also enacted a number of statutes that authorize the use of land and naval forces to execute their objective.

The Posse Comitatus Act outlaws the willful use of any part of the Army or Air Force to execute the law unless expressly authorized by the Constitution or an act of Congress. History supplies the grist for an argument that the Constitution prohibits military involvement in civilian affairs subject to only limited alterations by Congress or the President, but the courts do not appear to have ever accepted the argument unless violation of more explicit constitutional command could also be shown. The express statutory exceptions include the legislation that allows the President to use military force to suppress insurrection or to enforce federal authority, 10 U.S.C. Sections 251-255, and laws that permit the Department of Defense to provide federal, state and local police with information, equipment, and personnel, 10 U.S.C. §§ 271-284.

Case law indicates that "execution of the law" in violation of the Posse Comitatus Act occurs (a) when the Armed Forces perform tasks assigned to an organ of civil government, or (b) when the Armed Forces perform tasks assigned to them solely for purposes of civilian government. Questions concerning the act's application arise most often in the context of assistance to civilian police. At least in this context, the courts have held that, absent a recognized exception, the Posse Comitatus Act is violated when (1) civilian law enforcement officials make "direct active use" of military investigators; or (2) the use of the military "pervades the activities" of the civilian officials; or (3) the military is used so as to subject "citizens to the exercise of military power which was regulatory, prescriptive, or compulsory in nature." The act is not violated when the Armed Forces conduct activities for a military purpose.

The language of the act mentions only the Army and the Air Force, but it is applicable to the Navy and Marines by virtue of administrative action and commands of other laws. The law enforcement functions of the Coast Guard have been expressly authorized by act of Congress and consequently cannot be said to be contrary to the act. The act has been applied to the National Guard when it is in federal service, to civilian employees of the Armed Forces, and to off-duty military personnel. The act probably only applies within the geographical confines of the United States, but supplemental provisions of 10 U.S.C. §§ 271-284 appear to apply worldwide.

Finally, the act is a criminal statute under which there has been but a handful of known prosecutions. Although violations will on rare occasions result in the exclusion of evidence, the dismissal of criminal charges, or a civil cause of action, as a practical matter compliance is ordinarily the result of military self-restraint.

This report provides an historical analysis of the use of the Armed Forces to execute domestic law and of the Posse Comitatus Act, including their apparent theoretical and constitutional underpinnings. The report then outlines the current application of the act as well as its statutory exceptions, and reviews the consequences of its violation. This report appears in abridged form as CRS Report R42669, *The Posse Comitatus Act and Related Matters: A Sketch*.

U-DOW-CAR-044

# Contents

Introduction .......................................................................................................................... 1

Background ........................................................................................................................... 2

The Use of Federal Troops Prior to 1878 .......................................................................... 5

    The Insurrection Act and Other Statutes ...................................................................... 7

        Resistance to Taxes and Duties ............................................................................. 9

        Neutrality Act Enforcement ................................................................................. 10

        Requests from States for Military Aid ................................................................. 11

        Trouble in the Western States and Territories .................................................... 15

        Slavery, the Civil War, and Reconstruction ....................................................... 16

    Use of Military Forces as a Posse Comitatus .............................................................. 17

Passage of the Posse Comitatus Act ................................................................................. 21

Constitutional Considerations .......................................................................................... 23

    Constitutional Origins ................................................................................................. 23

    Presidential vs. Congressional Powers ....................................................................... 26

    Constitutional Exceptions ........................................................................................... 28

When the Posse Comitatus Act Does Not Apply ............................................................. 30

    Statutory Exceptions ................................................................................................... 31

        Generally .............................................................................................................. 31

        The Insurrection Acts .......................................................................................... 34

        Support to Law Enforcement ............................................................................... 42

    Military Purpose .......................................................................................................... 49

Coverage of the Posse Comitatus Act .............................................................................. 55

    Willful Use ................................................................................................................... 55

    Execute the Law .......................................................................................................... 56

    Military Coverage ........................................................................................................ 59

        Navy & Marines .................................................................................................. 59

        Coast Guard ......................................................................................................... 60

        National Guard .................................................................................................... 61

        Off Duty Military, Acting as Citizens & Civilian Employees ............................ 62

    Geographical Application ............................................................................................ 64

Consequences of Violation ............................................................................................... 66

    Prosecution .................................................................................................................. 66

    Exclusion of Evidence ................................................................................................. 66

    Jurisdiction & Criminal Defenses ............................................................................... 68

    Civil Liability .............................................................................................................. 69

Compliance ........................................................................................................................ 70

# Contacts

Author Information ............................................................................................................ 70

Acknowledgments ............................................................................................................. 70

U-DOW-CAR-045

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both. 18 U.S.C. § 1385.

# Introduction

Americans have a tradition, born in England and developed in the early years of our nation, that abhors military involvement in civilian affairs, at least under ordinary circumstances. It finds its most tangible expression in the 19th century Posse Comitatus Act, 18 U.S.C. Section 1385, which forbids use of the Army and (as amended) the Air Force to execute civil law except where expressly authorized.

The exception documents a contrary component of the tradition. Congress has expressly approved the use of the Armed Forces in extraordinary circumstances or where federal manpower to enforce the law was seen as inadequate. Striking the balance between rule and exception has never been easy, but failure to do so has often proven unfortunate. If the rule is too unforgiving, a Shays's Rebellion may go unchecked. If exceptions are too generously granted, a Boston Massacre or Kent State tragedy may follow.

The terrorist attacks against the United States in September 2001 produced some calls for more generous exceptions to the rule.[1] The USA PATRIOT Act[2] broadened the permissible circumstances for the use of the military to assist law enforcement agencies in countering terrorism,[3] but Congress also reaffirmed its determination to maintain the principle of the posse comitatus law.[4] The perceived breakdown in civil law and order in Hurricane Katrina's wake evoked more calls to reevaluate the military's role in responding to disasters.[5] The possibility of using military surveillance equipment and resources, including unmanned aerial vehicles (drones), to assist civilian law enforcement has raised some objections based on the military role.[6] This report provides an historical analysis of the use of the Armed Forces to execute domestic law and of the Posse Comitatus Act, including their apparent theoretical and constitutional underpinnings. The report then outlines the current application of the Posse Comitatus Act as well as its statutory exceptions, and reviews the consequences of its violation.

---

[1] *See* Nathan Canestaro, *Homeland Defense: Another Nail in the Coffin for Posse Comitatus*, 12 WASH. U. J.L. & POL'Y 99, 100 (2003) ("Some politicians and media sources now suggest that Congress amend or even repeal the PCA to allow a degree of domestic military involvement that would have been unthinkable five years ago."). For a review of the changed role of the military, see William C. Banks, *The Normalization of Homeland Security after September 11: The Role of the Military in Counterterrorism Preparedness and Response*, 64 LA. L. REV. 745 (2004).

[2] P.L. 107-56, 115 Stat. 272 (2001).

[3] *Id.* § 104 (amending 18 U.S.C. § 2332e).

[4] Homeland Security Act of 2002, P.L. 107-296, § 886, 116 Stat. 2248 (2002), codified at 6 U.S.C. § 466 (2018).

[5] *See* Lisa Grow Sun, *Disaster Mythology and the Law*, 96 CORNELL L. REV. 1131 (2011); Jerald A. Sharum, *The Politics of Fear and Outsourcing Emergency Powers: The Death and Rebirth of the Posse Comitatus Act*, 37 LINCOLN L. REV. 111 (2009-2010);, William C. Banks, *Providing "Supplemental Security"—The Insurrection Act and the Military Role in Responding to Domestic Crises*, 3 J. NAT'L SECURITY L. & POL'Y 39 (2009) (all three articles recounting history behind the short-lived amendment to the Insurrection Act enacted in response to Hurricane Katrina).

[6] Canestaro, *supra*, note 1, at 100 (arguing that numerous exceptions for military support of civil authorities "have taken their toll on the [Posse Comitatus Act's] strength").

U-DOW-CAR-046

# Background

The Magna Carta provides the first recorded acknowledgment of the origins of the Anglo-American tradition against military involvement in civilian affairs with its declaration that "no free man shall be ... imprisoned ... or in any other way destroyed ... except by the legal judgment of his peers or by the law of the land."[7] Subsequent legislation in the reign of Edward III explained that this precluded punishment by the King except "in due Manner ... or by Process made by Writ ... [or] by Course of the Law,"[8] or as later more simply stated, except "by due Process of the Law."[9] Three hundred years after the passage of the Edwardian statutes, Lord Coke and other members of Parliament read these due process and law of the land requirements to include a broad prohibition against the use of martial law in peacetime, an interpretation they compelled King Charles I to acknowledge.[10]

King Charles I, preparing for a military expedition in France, had quartered his troops in homes along the southern English coastline.[11] Rioting resulted, and the participants, both military and civilian, were tried and punished by commissioners operating under the authority of martial law. Offended by this peacetime exercise of military judicial authority over civilians, Parliament sought and was granted the Petition of Right of 1628, which outlawed both quartering and martial law commissions.[12]

---

[7] Magna Carta, ch. 39 (1225)[ch.29 in the Charter of King John (1215)], *reprinted in* WILLIAM F. SWINDLER, MAGNA CARTA: LEGEND AND LEGACY 315-16 (1965) ("No freeman shall be taken, or imprisoned, or be disseised *of any freehold, or liberties, or free customs*, or outlawed, or banished, or in any *other* way destroyed, nor will we go or send against him, except by the lawful judgment of his peers or by the law of the land") (language added to ch.29 of the Charter of King John in the reissuance by King Henry III appears in italics). Although the Magna Carta in the modified version of King Henry III remains in effect, the language quoted above is generally cited as "chapter 29." *See, e.g.,* FAITH THOMPSON, MAGNA CARTA: ITS ROLE IN THE MAKING OF THE ENGLISH CONSTITUTION 1300-1629, at 68 (1948); SIR MATTHEW HALE, THE HISTORY OF THE COMMON LAW OF ENGLAND 49 (1716 ed.); 1 SIR EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 45 (1797 ed.); I SIR WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 400 (1765 ed.).

[8] 25 Ed. III. Stat. 5, ch. 4 (1352), *reprinted in* 1 STATUTES OF THE REALM, 1231-1377 321 (1993):

> Whereas it is contained in the Great Charter of the Franchises of England, that none shall be imprisoned nor put out of his Freehold, nor of his Franchises nor free Custom, unless it be by the Law of the Land; It is accorded assented, and established, That from henceforth none shall be taken by Petition or Suggestion made to our Lord the King, or to his Council, unless it be by Indictment or Presentment of good and lawful People of the same neighbourhood where such Deeds be done, in due Manner, or by Process made by Writ original at the Common Law; nor that none be out of his Franchises, nor of his freeholds, unless he be duly brought into answer, and forejudged of the same by the Course of the Law; and if any thing be done against the same, it shall be redressed and holden for none.

[9] 28 Ed. III. chs. 1, 3 (1354), *reprinted in* 1 STATUTES OF THE REALM, 1231-1377 at 345 (1993) ("the Great Charter ... [shall] be kept and maintained in all Points.... No Man of what[ever] Estate or Condition that he be, shall be put out of land or Tenement, nor taken, nor imprisoned, nor disinherited, nor put to Death, without being brought in Answer by due Process of the Law.").

[10] *See* THOMPSON, *supra* note 7, at 347-50; David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders,* 57 IOWA L. REV.1, 10-11 (1971). Coke's Institutes make the same point; proceedings under martial law are not proceedings under the "law of the land" (*lex terrae*). *See* I COKE, *supra* note 7, at 50 ("And so if two English men doe goe into a foreine kingdome, and fight there, and the one murder the other, *lex terrae* extendeth not hereunto, but this offense shall be heard, and determined before the constable, and marshall [i.e. at martial law], and such proceedings shall be there, by attaching of the body, and otherwise, as the law, and custom of that court have been allowed by the lawes of the realme, [13 H.IV. ch.5 (1412)]").

[11] For a more expansive examination, see Engdahl, *supra* note 10, at 22-23.

[12] Restating the relevant guarantees of the Magna Carta and subsequent statutes, Parliament declared:

U-DOW-CAR-047

When, in the following century, the British responded to colonial unrest by quartering troops in Boston, the colonists saw it as a breach of this fundamental promise of English law.[13] Their circumstances, however, were not exactly identical to those surrounding the Petition of Right. First, the question arose in the British colonies rather than England itself. England had stationed troops in the colonies to protect them against the French and Indians and had opted for military governorships in other territories.[14] Second, there was no military usurpation of judicial functions. The colonists remained subject to civil rather than military justice,[15] and soldiers who employed

---

> [N]everthess of late time divers commissions under your Majesty's great seal have issued forth, by which certain persons have been assigned and appointed commissioners with power and authority to proceed within the land, according to the justice of martial law, against such soldiers or mariners, or other dissolute persons joining with them, as should commit any murder, robbery, felony, mutiny, or other outrage or misdemeanour whatsoever, and by such summary course and order as is agreeable to martial law, and as is used in armies in time of war, to proceed to the trial and condemnation of such offenders, and them to cause to be executed and put to death according to the law martial.... They do therefore humbly pray your most excellent Majesty ... that your Majesty would be pleased to remove the said soldiers and mariners, and that your people may not be so burdened in time to come; and that the aforesaid commissions, for proceeding by martial law, may be revoked and annulled; and that hereafter no commissions of like nature may issue forth to any person or persons whatsoever to be executed as aforesaid, lest by colour of them any of your Majesty's subjects be destroyed or put to death contrary to the laws and franchise of the land.

Petition of Right, 3 Car. I, c.1. §§ 3, 4, 7, 10, *reprinted in* WILLIAM STUBBS, SELECT CHARTERS AND OTHER ILLUSTRATIONS OF ENGLISH CONSTITUTIONAL HISTORY FROM THE EARLIEST TIMES TO THE REIGN OF EDWARD THE FIRST 515-17 (8th ed. 1895); and 5 STATUTES OF THE REALM 23, 24 (1993).

The Petition of Right was understood to have established, with respect to martial law,

> *First,* That in truth and reality it is not a law, but something indulged rather than allowed as a law; the necessity of government, order and discipline in an army, is that only which can give those laws a countenance. *Secondly,* This indulged law was only to extend to members of the army, or to those of the opposite army, and never was so much indulged as intended to be (executed or) exercised upon others; for others were not listed under the army, had no colour of reason to be bound by military constitutions, applicable only to the army; whereof they were not parts, but they were to be ordered and governed according to the laws to which they were subject, though it were a time of war. *Thirdly,* That the exercise of martial law, whereby any person should lose his life or member, or liberty, may not be permitted in time of peace, when the King's courts are open for all persons to receive justice, according to the laws of the land.

HALE, *supra* note 7, at 39-40.

According to Blackstone,

> the necessity of order and discipline in an army is the only thing which can give ... countenance [to martial law]; and therefore it ought not to be permitted in time of peace, when the king's courts are open for all persons to receive justice according to the laws of the land.... And it is laid down, that if a lieutenant, or other, that hath commission of martial authority, doth in time of peace hang or otherwise execute any one by colour of martial law, this is murder; for it is against the magna carta. And the petition of right enacts, that no soldier shall be quartered on the subject without his own consent; and that no commission shall issue to proceed within this land according to martial law. And whereas, after the restoration, king Charles the second kept up about five thousand regular troops, by his own authority, for guards and garrisons; which king James the second by degrees increased to no less than thirty thousand, all paid from his own civil list; it was made one of the articles of the bill of rights, that the raising or keeping of a standing army within the kingdom in time of peace, unless it be with the consent of the parliament, is against the law.

I BLACKSTONE, *supra* note 7, at 400.

[13] Engdahl, *supra* note 10, at 22.

[14] *Id.* at 23 (explaining that Canada was governed by military rule from 1760-1763).

[15] *Id.* at 24 (noting that Parliament had rejected military commissions to try civilians for offenses).

U-DOW-CAR-048

more force than civilian law permitted were themselves subject to civilian justice as the trial of the soldiers involved in the Boston Massacre demonstrates.[16]

On the other hand, the troops involved in the Boston Massacre were stationed in Massachusetts not for protection against a marauding invader as they had been in the French and Indian Wars, nor to accomplish the transition between civil governments within a conquered territory as they had been after the French lost Canada to the British as a consequence of those conflicts, but as an independent military force quartered among a disgruntled civilian population to police it.[17] Public resentment of the use of the troops in such a manner sparked the incident, which led in turn to further heightened resentment.[18]

In any event, the experience was sufficiently vexing that the Declaration of Independence listed among our grievances against Great Britain that the King had "kept among us, in times of peace, Standing Armies without the consent of our legislatures," had "affected to render the Military independent of and superior to the civil power," and had "quarter[ed] large bodies of armed troops among us ... protecting them, by a mock trial, from punishment for any murders which they should commit on the inhabitants of these States."[19]

The Articles of Confederation for the newly established United States addressed the threat of military intrusion into civilian affairs by demanding that the Armed Forces assembled during peacetime be no more numerous than absolutely necessary for the common defense; by entrusting control to civil authorities within the states; and by a preference for the farmer in arms as a member of the militia over the standing professional army.[20]

---

[16] *Id.* at 25.

[17] HILLER B. ZOBEL, THE BOSTON MASSACRE 135 (1987) ("The soldiers, one ought always to remember, went into Boston not as an occupying army but rather as a force of uniformed peace-keepers, or policemen. Their role as even the radicals conceived it was to assist the executive and if necessary the courts to maintain order.").

[18] *See* Engdahl, *supra* note 10, at 24-25:

> The last die was cast when two regiments of troops were quartered in Boston at the end of the decade. Boston was a hotbed of colonial discontent. The assemblage of military troops for control of possible disorders aggravated the discontent, not only because it affronted the English tradition against domestic use of military troops, but also because it was without warrant in the charter of Massachusetts Bay. The unwelcome troops were frequently taunted and vilified, and the ultimate and inevitable outrage soon occurred.... A crowd of angry Bostonians ... blocked the path of a detachment of soldiers marching to their post. The soldiers made ready to force their passage, but were ordered back to the main guard.... The crowd approached the main guard with angry and opprobrious taunts. A sentinel struck one particularly bothersome boy with the butt of his musket, and quickly a crowd converged on that spot throwing snowballs and rocks at the sentinel along with verbal threats on his life. The sentinel loaded his musket and waved it at the mob, a squad of soldiers were sent to his aid. The soldiers, soon joined by a colonel, loaded their muskets as the crowd hooted and jeered and berated them and dared them to shoot. They kept the crowd back a time with bayonets, but then suddenly fired. It was never made clear – it never is – whether they had fired on their officer's order, or upon their own compulsion. In any event, five Americans lay dead and several others seriously wounded.... Members of a distrusted standing army, whose quartering was in violation of the Petition of Right, and whose preparation to militarily suppress possible civil disorder was inconsistent with the oldest of England's own traditions, had slain English civilians in a time of peace.

[19] This last charge presumably refers to the results of the murder trials of the officer and soldiers involved in the Boston Massacre. Two of the soldiers were convicted of manslaughter, branded on the hand and released; the officer and the other soldiers were acquitted. *See* ZOBEL, *supra* note 17, at 241-94.

[20] *See, e.g.*, ARTS. OF CONF. VI, VII, & IX.

> No vessels of war shall be kept up in time of peace by any State, except such number only, as shall be deemed necessary by the United States in Congress assembled, for the defence of such State, or

---

U-DOW-CAR-049

The Constitution continued these themes, albeit with greater authority vested in the federal government. It provided that a civilian (the President) should be the Commander in Chief of the Army and Navy of the United States, and civilian authorities (Congress) should be solely empowered to raise and support Armies, provide and maintain a Navy, and make rules for their government and regulation.[21] The Bill of Rights limited the quartering of troops in private homes,[22] and noted that "a well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[23] The Constitution, on the other hand, explicitly permitted Congress to provide for calling out the militia to execute the laws, suppress insurrection, and repel invasion.[24]

# The Use of Federal Troops Prior to 1878

Notwithstanding the founders' aversion to the use of a standing army to control the civilian populace, the Constitution nowhere explicitly prohibits it, and Congress lost no time in authorizing the President to call out the militia for the purposes permitted under the Constitution.[25] Despite the retention of most police powers by the several states, Congress quickly established a law enforcement capability in the federal government in order to effectuate its constitutional powers and provide a means to enforce the process of federal courts.[26] This authority was vested through the President in federal marshals, who were empowered to call upon

---

its trade; nor shall any body of forces be kept up by any State, in time of peace, except such number only, as in the judgment of the United States, in Congress assembled, shall be deemed requisite to garrison the forts necessary for the defence of such State; but every State shall always keep a well regulated and disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have ready for public use, in public stores, a due number of field pieces and tents, and a proper quantity of arms, ammunition and camp equipage.... When land-forces are raised by any State for the common defence, all officers of or under the rank of colonel, shall be appointed by the Legislature of each State respectively by whom such forces shall be raised, or in such manner as such State shall direct, and all vacancies shall be filled up by the State which first made the appointment.... The United States in Congress assembled shall never ... appoint a commander in chief of the army or navy, unless nine States assent to the same....

[21] U.S. CONST. art. II, § 2; art. I, § 8, cls. 12, 13, 14. The Constitution treats the militia similarly. The President is the Commander in Chief of the militia while it is in federal service, and Congress is empowered to approve its organization, arms and discipline, U.S. CONST. art. II, § 2; art. I, § 8, cl.16.

[22] U.S. CONST. amend. III.

[23] U.S. CONST. amend. II.

[24] U.S. CONST. art. I, § 8, cl.15. Congress is further empowered to organize, arm, and discipline the militia, and to govern any part of militia in federal service, but the power to appoint officers and train the militias remains with the states. *Id.* cl. 16.

[25] *See* Jay S. Bybee, *Insuring Domestic Tranquility: Lopez, Federalization of Crime, and the Forgotten Role of the Domestic Violence Clause*, 66 GEO. WASH. L. REV. 1, 41-42 (1997) (describing the Militia Act of 1792, 1 Stat. 264).

[26] Judiciary Act of 1789, Ch. 20, § 27, 1 Stat. 73, 87 (1789).

U-DOW-CAR-050

the posse comitatus[27] to assist them, an authority similar to that enjoyed by the sheriff at common law,[28] and which was understood to include the authority to call for military assistance.[29]

Thus, the militia under federal control (and later the Armed Forces[30]) could operate either as an arm of the government or to support the federal marshal.[31] These two roles of the military were similar in many respects, but, at least in theory, differed in one key aspect: troops serving as a posse comitatus remained subordinate to civil law enforcement authorities, while troops called up to suppress an insurrection or remove an obstruction to the execution of the laws supplanted civil authorities that had been rendered ineffective.[32] In some cases, if the marshal feared he would be unable to control a disturbance even with the aid of a posse, or if local military commanders declined to give assistance, the marshal would try to persuade the President that an insurrection was underway.[33] At other times, the President might order troops to quell what appeared to amount to an insurrection, yet limit the role of the Armed Forces to responding to the requests of the appropriate civil official, possibly dispensing with the need to issue the requisite proclamation under the Insurrection Act.[34]

In addition, Congress has from time to time enacted statutes authorizing federal troops to enforce specific proscriptions, sometimes in aid of civil authorities and sometimes (apparently) in their stead,[35] and Presidents have issued proclamations exhorting all federal officials, civilian or military, to assist in arresting a particular conspiracy or uprising.[36] It is not always easy to ascertain which statutory authority (if any) forms the basis for sending in federal troops.

---

[27] The Latin phrase literally means attendants with the capacity to act from the words *comes* and *posse* meaning companions or attendants (*comes*) and to be able or capable (*posse*). Among the Romans comitatus referred to one who accompanied the proconsul to his province. Later, comes (sometimes referred to as comites or counts) meant the king's companions or his most trusted attendants and comitatus came to refer to the districts or counties entrusted to their care. BOUVIER'S LAW DICTIONARY AND CONCISE ENCYCLOPEDIA 529, 2635 (1914).

[28] At common law, the sheriff of every county was obligated "to defend his county against any of the king's enemies when they come into the land; and for this purpose, as well as for keeping the peace and pursuing felons, he may command all the people of his county to attend him; which is call the posse comitatus, or power of the county; which summons every person above fifteen years old, and under the degree of a peer, is bound to attend upon warning, under pain of fine and imprisonment." 1 BLACKSTONE, *supra* note 7, at 332.

[29] Canestaro, *supra*, note 1, at 110 (observing that Judiciary Act of 1789 supported the Mansfield doctrine, which held that federal marshals could employ military troops as a posse comitatus).

[30] Engdahl, *supra* note 10, at 48-49 (describing how, after the Act of March 3, 1807, Ch. 39, 2 Stat. 443, permitted the use of the army wherever the militia could be employed to respond to domestic violence, "regular forces came increasingly to displace the militia as the principal instrument of arms in the nation, for marshals to employ regular military troops rather than militia as their posse comitatus").

[31] *Id.* at 47-48.

[32] *Id.* at 50 ("[C]ommon were the cases in which soldiers were called to aid civil officials in dispersing mobs or suppressing riots precipitated by hotly contested elections or other public issues, or in other ways to assist the civilian officers. It was well understood that when they were used under such circumstances the soldiers were used not in their military character, but merely as civilian assistants subject to the command of the ordinary civil officers, and no more privileged in their use of force against citizens than the civil officers were themselves.").

[33] *See infra* "The Use of Federal Troops Prior to 1878."

[34] *Id.*

[35] *See infra*, note 224 (listing examples).

[36] For example, to counter the infamous Burr conspiracy in 1806, President Jefferson issued a proclamation "enjoin[ing] and requir[ing] all officers, civil and military, of the United States, or of any of the states or territories, and especially all governors and other executive authorities, all judges, justices and other officers of the peace, all military officers of the Army or Navy of the United States, or officers of the militia, to be vigilant, each within his respective department and according to his functions, in searching out and bringing to condign punishment all persons engaged in [a military expedition against Spanish territory], in seizing and detaining ... all vessels, arms military stores ... and in

U-DOW-CAR-051

Presidents have relied upon the militia and Armed Forces with some frequency for riot control or when in extreme cases they felt it necessary to ensure the execution of federal law.[37] The following sections provide an overview of the domestic employment of military forces and the statutes that govern such use.

## The Insurrection Act and Other Statutes

Soon after Congress was first assembled under the Constitution, it authorized the President to call out the militia, initially to protect the frontier against "hostile incursions of the Indians,"[38] and subsequently in cases of invasion, insurrection, or obstruction of the laws.[39] Shortly thereafter, and echoing Article I, Section 8, cl. 15 and Article IV, Section 4 of the Constitution, Congress enacted the Calling Forth Act, authorizing the President to call out the militia in case of invasion or, at the request of a state legislature (or its governor, if the legislature could not be convened) in case of an insurrection within a state.[40] Congress also empowered the President to call forth the militia, for a period of 30 days:

---

general in preventing the carrying on such expedition or enterprise by all lawful means within their power...." FREDERICK T. WILSON, FEDERAL AID IN DOMESTIC DISTURBANCES, 1903-22, at 38, S. DOC. NO. 67-263 (1922) (hereinafter "S. DOC. NO. 67-263").

[37] Eighteenth and nineteenth century instances are collected, along with related proclamations and other documentation, in FREDERICK T. WILSON, FEDERAL AID IN DOMESTIC DISTURBANCES: 1787-1903, S. DOC. NO. 57-209 (1903); updated to include early 20th century incidents in U.S. ARMY JUDGE ADVOCATE GENERAL, FEDERAL AID IN DOMESTIC DISTURBANCES, 1903-22, S. DOC. NO. 67-263 (1922); *see also* BENNET MILTON RICH, PRESIDENTS AND CIVIL DISORDER (1941); CLAYTON D. LAURIE AND RONALD H. COLE, THE ROLE OF FEDERAL MILITARY FORCES IN DOMESTIC DISORDERS: 1877-1945 (1997); PAUL SCHEIPS, THE ROLE OF FEDERAL MILITARY FORCES IN DOMESTIC DISORDERS, 1945-1992 (2005).

[38] 1 Stat. 96 (1789); 1 Stat. 121 (1790).

[39] Calling Forth Act of 1792, ch. 28, 1 Stat. 264 (repealed 1795); the Militia Act of 1795, ch. 36, 1 Stat. 424 (repealed in part 1861 and current version at 10 U.S.C. §§ 251-255). The constitutional and statutory authority to use military force in case of insurrection seems to have been in direct response to a perceived weakness in government under the Articles of Confederation. In 1787, a group of farmers in western Massachusetts, led by a Revolutionary War veteran named Daniel Shays and feeling oppressed by tax and creditor protection policies within the Commonwealth, had harassed the state courts and constabulary, and had attempted to storm the federal arsenal at Springfield before being repulsed by the militia. Some saw the insurrection as evidence of the need for a stronger central government and implicitly, confirmation that domestic tranquility might be more readily ensured if backed by centralized military capability. *See* SAMUEL ELIOTT MORISON, ET AL., I THE GROWTH OF THE AMERICAN REPUBLIC 242 (7th ed. 1980) ("Nevertheless, Shays's Rebellion had a great influence on public opinion.... When Massachusetts appealed to the Confederation for help, [the Continental] Congress was unable to do a thing. That was the final argument to sway many Americans in favor of a stronger federal government"); CHRISTOPHER COLLIER & JAMES LINCOLN COLLIER, DECISION IN PHILADELPHIA: THE CONSTITUTIONAL CONVENTION OF 1787, at 13 (1986) ("To men like Madison and Washington, Shays's Rebellion was an imperative. It hung like a shadow over the old Congress, and gave both impetus and urgency to the Constitutional Convention. It was the final, irrefutable piece of evidence that something had gone badly wrong. For some time these men had known that the deficiencies of the American government must be remedied. Shays's Rebellion made it clear to them that it must be done now."); CATHERINE DRINKER BOWEN, MIRACLE AT PHILADELPHIA: THE STORY OF THE CONSTITUTIONAL CONVENTION MAY TO SEPTEMBER 1787, at 10 (1966) ("Shays's Rebellion had been in the public mind when Congress, after debating the Annapolis report, had voted in favor of a convention in Philadelphia.").

[40] Calling Forth Act of 1792, ch. 28, § 1, 1 Stat. 264 (repealed 1795 and current version now codified at 10 U.S.C. § 251 (2018)). It is unclear why Congress limited the ability of states to request assistance to circumstances of insurrection rather than "domestic violence" as permitted in Article IV, Section 4 of the Constitution. Perhaps "domestic violence" was interpreted to be restricted to violence of a sufficient magnitude to constitute an insurrection, or the word "insurrection" was meant to convey armed violence that did not amount to a rebellion or revolution seeking to overthrow the government in part or all of a state. *See* RICH, *supra* note 37, at 21 n. 1 (citing definition of insurrection as including resistance to government authority smaller in scope and purpose than those described by the terms "rebellion" and "revolution").The guarantee of a "republican form of government" would seem to require federal

U-DOW-CAR-052

whenever the laws of the United States shall be opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act, the same being notified to the President of the United States, by an associate justice or the district judge.[41]

In any of these events, the President was first required to issue a proclamation commanding the "insurgents" to disperse.[42] President Washington used this authority to put down the Whiskey Rebellion in western Pennsylvania.[43] Resistance to an excise tax on distilled whiskey led to violence against tax collectors; indictments of those perpetrating the violence went unanswered, and farmers eventually rose in rebellion against all efforts to enforce the federal law.[44] The governor, having declined to call out the state militia to control the violence, the federal courts were left to call on the federal government for assistance.[45] When the rioters failed to disperse on the President's proclamation, some fifteen thousand militiamen from Pennsylvania and neighboring states quickly mobilized to restore the peace.[46]

After the Calling Forth Act expired two years later, Congress reenacted virtually the same language, except that a court finding was no longer necessary, and the proclamation to disperse did not have to occur prior to calling up the militia.[47] It appears that the revised Calling Forth Act was understood to cover the use of the militia as an aid to civilian power or, in rare cases, as a means of temporarily supplanting local civilian authority.[48]

Both provisions of the Calling Forth Act were extended in 1807 to allow for the employment of the Army and Navy in domestic circumstances where the militia could be employed.[49] Even before this change, President John Adams had used regular federal troops to put down, more by intimidation rather than the actual use of force,[50] the 1799 Fries Rebellion in eastern Pennsylvania.[51] The cavalry arrested the instigator of the resistance, John Fries, along with other

---

intervention in the event of a rebellion against a state government even without its request.

[41] *Id.* § 2 (repealed 1795 and current version now at 10 U.S.C. § 252 (2018)).

[42] *Id.* § 3 (repealed 1795 and current version now at 10 U.S.C. § 254 (2018)).

[43] *See* Presidential Proclamations of Aug. 7, 1794 and Sept. 25, 1794, 1 JAMES D. RICHARDSON, A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 158-62 (1896). For more information, see generally THOMAS P. SLAUGHTER, THE WHISKEY REBELLION: FRONTIER EPILOGUE TO THE AMERICAN REVOLUTION (1986); STEVEN R. BOYD, THE WHISKEY REBELLION: PAST AND PRESENT PERSPECTIVES (1985).

[44] MARLIN S. REICHLEY, FEDERAL MILITARY INTERVENTION IN CIVIL DISTURBANCES 57 (1939).

[45] *Id.* at 58.

[46] *Id.* (noting the militia were called out from Pennsylvania, Virginia, Maryland, and New Jersey).

[47] The Militia Act of 1795, ch. 36, 1 Stat. 424 (repealed in part 1861).

[48] *See* Engdahl, *supra* note 10, at 49-50 (noting that prior to the Civil War, military troops were more commonly employed to assist civil officers in the enforcement of civilian laws rather than as soldiers privileged to use force).

[49] The Insurrection Act of 1807, ch. 39, 2 Stat. 443 provided that:

> in all cases of insurrection, or obstruction to the laws, either of the United States, or of any individual state or territory, where it is lawful for the President of the United States to call forth the militia for the purpose of suppressing such insurrection, or of causing the laws to be duly executed, it shall be lawful for him to employ, for the same purposes, such part of the land or naval force of the United States, as shall be judged necessary, having first observed all the pre-requisites of the law in that respect.

[50] *See* RICH, *supra* note 37, at 25-26 (noting lack of resistance to armed troops, whose presence terrorized local inhabitants, partly due to the inability of the commanding general to maintain strict discipline among his troops).

[51] Proclamation of March 12, 1799, *reprinted in* S. DOC. No. 67-263, *supra* note 36, at 35.

U-DOW-CAR-053

participants, and turned them over to civil authorities to be tried for treason. Those convicted were eventually pardoned.[52]

## Resistance to Taxes and Duties

As in the Whiskey and Fries Rebellions, resistance to the laws of the United States during the early years of the republic had mainly to do with citizens' objections to steadily increasing federal taxes, which were largely necessary to build up the military establishment,[53] and other laws that tended to make themselves felt in citizens' pocketbooks. In 1808, President Jefferson called out federal troops to suppress opposition to the Embargo Act[54] by groups of traders in Vermont whose livelihood depended on imports and exports with Canada.[55] Although President Jefferson followed the contemporary practice of turning to states' governors to supply militia in support of revenue collectors, the state militia troops proved reluctant to enforce the law against their neighbors, so the President sent in a detachment of regular troops to restore order.[56] Congress subsequently amended the Embargo Act specifically to authorize the use of troops to enforce the embargo.[57] Resentment at the newly enacted authority to use federal military force to enforce ordinary laws in the absence of armed resistance led to a speedy demise of the embargo statute.[58]

In 1832, resistance to revenue laws again led to the prospect of using federal troops.[59] Southerners objected to the system of protective tariffs that had been adopted in 1816 after the post-war resumption of trade threatened new domestic industries.[60] Rather than gradually reducing the tariffs, as it had indicated was its intent, Congress steadily increased the tariff until by 1832 it became a policy fixture.[61] Southerners believed that the money was raised unfairly at their expense and was expended mainly for the benefit of Northerners.[62] The legislature of South Carolina voted to nullify the tariff and declared the state ready to meet force with force in the event the federal government sought to collect the tax.[63] Congress passed a "Force Bill" to

---

[52] Proclamation of May 21, 1800, *reprinted in* S. Doc. No. 67-263, *supra* note 36, at 36.

[53] *See* Rich, *supra* note 37, at 21 (attributing need for increased revenue to pending war with France).

[54] 2 Stat. 451 (1807).

[55] S. Doc. No. 67-263, *supra* note 36, at 40-44. The federal marshal was to attempt to enforce the law with the use of the posse comitatus, and if that failed, the Secretary of War was to request the governor to issue a proclamation furnished by the President and then call on the state militia. *Id.* at 41. The President's proclamation to disperse drew ire from the local population, which drew up their own memorial protesting the characterization of the situation as an "insurrection and rebellion." Rich, *supra* note 37, at 32. When similar opposition to the embargo arose in New York, the President did not issue a proclamation, attempting instead to persuade the governor to take action, but promising to reimburse the state for its assistance in enforcing federal law. *Id.* at 33.

[56] Reichley, *supra* note 44, at 64.

[57] 2 Stat. 506, 510 (1809) (also known as the "Force Bill") (repealed).

[58] *See* Robert W. Coakley, The Role of Federal Military Forces in Domestic Disorders, 1789-1878, at 89 (1989). Congress replaced the Embargo Act with a new measure to interdict trade with Great Britain and France, 2 Stat. 528, which authorized military force to compel ships from those countries to depart U.S. ports but did not permit the use of federal or state military forces to prevent any illicit trade.

[59] *Id.* at 96 (reporting that President Jackson faced the prospect of employing military force in a state that opposed enforcement of federal law).

[60] *See* Rich, *supra* note 37, at 38-39.

[61] *Id.*

[62] *See* Coakley, *supra* note 58, at 95 (stating that Southerners, who sold cotton and other staples abroad but also imported heavily, found the measure discriminatory for protecting Northern interests, in their view amounting to an unconstitutional federal regulation of domestic industry).

[63] Rich, *supra* note 37, at 38-39; Andrew Jackson, Copies of the Proclamation and Proceedings in Relation to

---

U-DOW-CAR-054

authorize the President to use the Army and Navy to collect duties,[64] but at the same time reduced the duties.[65] South Carolina rescinded its nullification ordinance, bringing the confrontation to an end without the use of force (although, as a final defiant gesture, it issued a new ordinance to nullify the Force Bill).[66]

## Neutrality Act Enforcement

The early U.S. desire to avoid foreign entanglements of the sort that kept Europe in arms during the founders' era manifested itself in a policy of neutrality which tended, at times, to conflict with the economic interests or political views of some part of the citizenry.[67] Congress enacted a statute to prohibit the enlistment in or recruitment for foreign military service, the arming of foreign war vessels or privateers, and the dispatch of military expeditions against the territory of a state at peace with the United States.[68] The statute also empowered the President to call upon the Armed Forces to detain or take possession of illicitly armed vessels and to prevent expeditions from departing U.S. territory.[69] Even prior to its enactment, President Washington had called on state militias to deal with efforts of the French Ambassador to fit out privateers and military expeditions against British and Spanish interests.[70] President Jefferson relied on this authority to counter Aaron Burr's conspiracy in 1806[71] as well as other schemes to liberate Spain's South

---

SOUTH CAROLINA, S. DOC. NO. 22-30, at 38 (1833).

[64] Act of March 2, 1833, ch. 57 § 1, 4 Stat. 632, (authorizing the President "to employ such part of the land or naval forces, or militia of the United States, as may be deemed necessary for the purpose of preventing the removal of such vessel or cargo…"); *Id.* § 5, 4. Stat. 634 (providing that "whenever the President of the United States shall be officially informed, by the authorities of any state … that, within the limits of such state, any law or laws of the United States, or the execution thereof, or of any process from the courts of the United States, is obstructed by the employment of military force, or by any other unlawful means, too great to be overcome by the ordinary course of judicial proceeding, or by the powers vested in the marshal by existing laws, it shall be lawful for him, the President of the United States, forthwith to issue his proclamation, declaring such fact or information, and requiring all such military and other force forthwith to disperse; and if … such opposition or obstruction shall be made … the President shall be … authorized, promptly to employ such means to suppress the same, and to cause the said laws or process to be duly executed, as are authorized and provided in the cases therein mentioned by the [Calling Forth Act]").

[65] Act of July 14, 1832, ch. 227, 4 Stat. 583, amended by Act of March 2, 1833, ch. 58, 4 Stat. 636 (reducing certain tariffs).

[66] REICHLEY, *supra* note 44, at 67.

[67] *See generally* CHARLES FENWICK, THE NEUTRALITY LAWS OF THE UNITED STATES 15-18 (1913) (describing political situation accompanying President Washington's neutrality proclamation and early neutrality statutes).

[68] Act of June 5, 1794, 1 Stat. 381, renewed, 1 Stat. 497 (March 2, 1797) and 2 Stat. 54 (April 24, 1800), repealed 3 Stat. 447, 450 (1818)).

[69] *Id.* § 7, 1 Stat. 384.

[70] *See* COAKLEY, *supra* note 58, at 25-26 (describing government circulars to governors requesting militia support to suppress neutrality violations).

[71] *See supra* note 36; Thomas Jefferson, Message to Congress on the Burr Conspiracy, January 22, 1807, *available online at* The American Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=65721 ("Orders were dispatched to every interesting point on the Ohio and Mississippi from Pittsburg to New Orleans for the employment of such force either of the regulars or of the militia and of such proceedings also of the civil authorities as might enable them to seize on all the boats and stores provided for the enterprise, to arrest the persons concerned, and to suppress effectually the further progress of the enterprise."); Thomas Jefferson, Sixth Annual Message, December 2, 1806, *available online at* The American Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=29448 (suggesting additional statutory authority for prevention of such expedition might be in order). The President's desire to employ federal troops along with state militia led him to use the neutrality law rather than the Insurrection Act, although President believed the conspiracy amounted to an insurrection aimed at separating western territories from the United States. *See* COAKLEY, *supra* note 58, at 83. The Insurrection Act was thereafter amended to permit the use of regular troops as well as militia. *Id.* (citing 2 Stat. 443 (1807)), *see supra* note 49.

U-DOW-CAR-055

American colonies.[72] State militias employed for this purpose remained under the control of their respective governors.[73]

In 1836, at the time of Texas's struggle for independence from Mexico, the Armed Forces were employed in an effort to prevent armed American sympathizers from crossing the border to join the fight[74] in violation of the Neutrality Act of 1818,[75] which expressly authorized the employment of the militia and Armed Forces in its enforcement. The next year, the Army was employed in a similar vein to quiet militant activity along the Canadian border.[76] President Zachary Taylor issued a proclamation urging all officials, "civil and military," to halt a planned expedition to attack Cuba,[77] which resulted in the Navy dispatching vessels to New Orleans to prevent the expedition from departing.[78] To block American sympathizers from aiding Cuban separatists during the Ten Years' War and to halt Fenian expeditions against Canada, President Grant issued a proclamation in 1870 urging civil and military officers to take measures to prevent expeditions in violation of neutrality and to bring violators to justice.[79]

## Requests from States for Military Aid

Section 2 of the Calling Forth Act, authorizing the President to employ military force when the state made a proper application for assistance, lay dormant until the 1830s, when violence between contending groups of Irish laborers on the Chesapeake and Ohio Canal led Maryland's legislature to request federal aid in 1834.[80] President Jackson promptly endorsed the request to the Secretary of War and ordered "at least two companies of regulars" be sent to aid state civil

---

[72] FENWICK, *supra* note 67, at 32-33 (describing Francesco de Miranda's efforts to organize expeditions). Two Americans charged with violating the Neutrality Act in connection with the expedition attempted to set up a defense that their actions were undertaken on behalf of the U.S. government, but the judge refused to issue summons to various public officials, ruling that the actions were unlawful regardless whether they had been authorized by the President. *Id.* at 33 (citing United States v. Smith, 27 F. Cas. 1192, 1231 (C.C.D.N.Y. 1806)). The defendants were acquitted by a jury. *Id.*

[73] S. DOC. NO. 67-263, *supra* note 36, at 39.

[74] *Id.* at 49-50.

[75] Neutrality Act of April 20, 1818, § 8, 3 Stat. 447, 449. Prior to enactment of the 1818 statute, the general practice entailed a presidential appeal to state governors for aid in arresting violators. *See* VII JOHN BASSET MOORE, DIGEST OF INTERNATIONAL LAW § 1321 (1906). After enactment of the 1818 Act, the President called on district attorneys and U.S. marshals or on states' attorneys-general to assist in enforcement, *see id.*, sometimes with the aid of military forces.

[76] S. DOC. NO. 67-263, *supra* note 36, at 51-53.

[77] V JAMES D. RICHARDSON, A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 7-8 (1897).

[78] The first of the so-called filibuster expeditions led by Narciso Lopez was disbanded without force by the Navy and civil authorities in 1849. *See* Louis N. Feipel, *The Navy and Filibustering in the Fifties*, 44 U.S. NAVAL INST. PROC. 767, 769 (1918). A second expedition in 1851 evaded U.S. naval forces only to have two of its vessels captured by Spanish men-of-war, but the captured filibusterers were eventually released back to American forces after some diplomatic exchange. *Id.* at 1016, 1027. A third expedition managed to land in Cuba in 1851 but was not met with local enthusiasm according to plan and was defeated, ending in the trial and execution of the main instigators. *Id.* at 1027-29.

The Fenian Brotherhood was an organization of Irish-Americans some 15,000 strong by 1863 whose object it was to secure the independence of Ireland from Great Britain. After the Civil War ended, a Fenian military convention determined to invade Canada, but the U.S. military intervened to seize a vessel laden with arms and ammunition, thus frustrating the planned expedition. S. DOC. NO. 67-263, *supra* note 36, at 94.

[79] Proclamation of Oct. 12, 1870, 16 Stat. 1136; FENWICK, *supra* note 67, at 52 (stating object of proclamation).

[80] *See* COAKLEY, *supra* note 58, at 105.

---

U-DOW-CAR-056

authorities, without, however, issuing a proclamation to the laborers to disperse.[81] The presence of federal troops helped to stabilize the situation without requiring any actual use of force.[82]

A second request was occasioned in 1838, when both parties to the Pennsylvania state election claimed victory and set about to establish majority control of the state House. When public reaction turned violent, the governor called out the militia and requested aid from the local military commander, who denied the request.[83] The governor then appealed to President Van Buren for federal assistance under the Domestic Violence Clause of the Constitution.[84] Despite that clause's guarantee of protection, President Van Buren took the position that his duty was discretionary, and believing the domestic violence was not of a character that the "State authorities, civil and military ... have proved inadequate to suppress it," he declined to authorize assistance.[85] In the meantime, however, the commanding general of the U.S. arsenal at Frankford brought men and ordnance in response to the governor's request.[86] The "Buckshot War" ended without armed confrontation, but the commander was reprimanded by the War Department for acting without authorization.[87]

A more serious state of affairs was reached in Rhode Island in 1842, where dissatisfaction with the government under the state's charter, still that granted by King Charles II in 1663, led to efforts to draft a new constitution.[88] Two separate conventions were established, resulting in two separate sets of government officials claiming legitimate authority.[89] The governor under the charter declared martial law and requested the President provide federal troops to stop the feared violence, but President Tyler declared he had no power to anticipate insurrections.[90] Three subsequent similar requests were similarly denied.[91] By the time the President had decided that intervention might be necessary to prevent the opposition army (led by contending Governor Thomas Dorr) from using force, the Secretary of War had determined that Dorr's men had dispersed, and the already-prepared proclamation would not be necessary.[92]

The "Dorr Rebellion" had ended without a clash of arms.[93] It did, however, produce a seminal Supreme Court decision, *Luther v. Borden*.[94] In *Luther*, among other things, the Court established that whether a state enjoys a republican form of government guaranteed by the Constitution was a political matter for Congress to decide.[95] Moreover, the Court indicated that Congress having

---

[81] *Id.*

[82] *Id.* at 105-06.

[83] RICH, *supra* note 37, at 53.

[84] COAKLEY, *supra* note 58, at 108.

[85] RICH, *supra* note 37, at 53-54.

[86] COAKLEY, *supra* note 58, at 109.

[87] RICH, *supra* note 37, at 53; COAKLEY, *supra* note 58, at 109 (recounting that the Secretary of War laid down the general rule, that "[i]n doubtful cases where the seat of government is near the theater of the disturbance, the necessity must be very urgent and palpable to justify an officer commanding a detached post in marching his forces to repress an insurrection without authority to do so from this department").

[88] S. DOC. NO. 67-263, *supra* note 36, at 53-54.

[89] *Id.* at 54.

[90] *Id.*

[91] *Id.* at 55-56.

[92] *Id.* at 57.

[93] *Id.* (quoting President Tyler's message to Congress).

[94] Luther v. Borden, 48 U.S. 1 (1849).

[95] *Id.* at 42 ("Under [Art. IV § 4] of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily

U-DOW-CAR-057

delegated to the President its prerogative to call forth the militia in cases of domestic violence, it is up to the President to determine the exigency of responding to a call from a state for military intervention to put down a claimed insurrection.[96] In either case, the Court determined the judiciary has no role to play.[97]

After the Civil War, labor disputes led to numerous requests for federal troops to suppress violence.[98] In 1877, in response to strikes and related violence that erupted after railroads cut the pay of their workers by 10%, federal troops were requested by the governors of Pennsylvania,[99] West Virginia,[100] Maryland,[101] Illinois,[102] and Missouri, Indiana,[103] Wisconsin, California, and Kentucky,[104] with varying degrees of conformity to the requirements of the Insurrection Act, as interpreted by President Hayes.[105] Although Ohio's governor did not request federal troops to quell strike-related violence in Toledo, Cincinnati, and other places, local officials appealed for assistance from nearby military commanders.[106] No direct help was given, although supplies of arms from Rock Island Arsenal were made available to the state.[107] It has been suggested that federal authority might have been asserted on the basis of the protection of a federal function (i.e., the delivery of the mail), but either due to an understanding that federal assistance to enforce state law was constitutionally unavailable without the request of the state government, or due to the lack of available federal troops, the President made no effort to do so.[108]

---

decide what government is established in the State before it can determine whether it is republican or not.… And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal.").

[96] *Id.* at 43 ("[T]he power of deciding whether the exigency had arisen upon which the government of the United States is bound to interfere, is given to the President. He is to act upon the application of the legislature or of the executive, and consequently he must determine what body of men constitute the legislature, and who is the governor, before he can act.").

[97] *Id.* at 42-43.

[98] *See* JERRY M. COOPER, THE ARMY AND CIVIL DISORDER 1 (1980) (reporting on the rise of trade unions after the Civil War and stating that by 1877 "industrial conflict was a permanent part of the American scene").

[99] RICH, *supra* note 37, at 74-75. Pennsylvania militia sent to suppress a riot in Pittsburgh instead inflamed the situation and were forced to withdraw, leaving the city in anarchy. *Id.*

[100] The insurrection involved striking railroad workers, who seized control of the railroad in Martinsburg, WV. *See* RICH, *supra* note 37, at 73. The President sent federal troops, instructing their commanders not to act until his proclamation to disperse had been published. *See* S. DOC. NO. 67-263, *supra* note 36, at 163; 20 Stat. 803-04 (proclamation).

[101] A confrontation between militia and strike sympathizers in Baltimore, which resulted in 10 deaths, was the impetus for sending in troops. *See* RICH, *supra* note 37, at 74; 20 Stat. 804 (proclamation).

[102] The Illinois governor requested assistance in the proper form, and President Hayes promptly promised to supply it, but apparently not wanting to issue a proclamation, gave orders that troops were to be used to protect government property and enforce the orders of federal courts. *See* RICH, *supra* note 37, at 80.

[103] S. DOC. NO. 67-273, *supra* note 36, at 171-72.

[104] *See* RICH, *supra* note 37, at 80-81. The disturbance in California resulted from resentment against Chinese immigrants.

[105] *See id.* at 78 (listing the President's criteria for a formal request, which consisted of a certification that (1) disorder existed; (2) state authorities were incapable of preserving the peace; (3) the legislature was not in session; (4) the legislature could not be convened in time to meet the emergency; and (5) the appeal to the President was to protect the state against domestic violence).

[106] *See* S. DOC. NO. 67-263, *supra* note 36, at 170 (reporting that General Hancock determined that such assistance was not authorized, the governor not having requested it, unless troops were formally summoned by the sheriff as a posse comitatus).

[107] *Id.*

[108] *See* RICH, *supra* note 37, at 82-83.

U-DOW-CAR-058

Questions regarding the federal versus state control of troops arose during the 1877 riots.[109] In West Virginia and Maryland, federal troops were placed under the command of the governors to be employed alongside state troops.[110] In Indiana, where the governor's request was initially turned down for lack of compliance under the Constitution and Insurrection Act,[111] federal troops were to be furnished on the request of the federal marshal as a posse comitatus and were not turned over to the governor.[112] When disorder spread to Pennsylvania, federal troops were initially sent in to protect federal property, the governor's first request for assistance having apparently been deemed deficient.[113] After the deficiencies were corrected and a proclamation was issued, the general officer in charge of federal troops requested clarification as to the disposition of federal troops[114] and espoused the doctrine that whenever a state government asks for assistance under the Insurrection Act, federal military power should supplant local civil authority:

> When the governor of a State has declared his inability to suppress an insurrection and has called upon the President of the United States under the Constitution to do so, that from that time commences a state not of peace but of war, and that although civil local authority still exists, yet the only outcome is to resort to force through the Federal military authorities, and that can only be through a subordination of the State authorities for the time being and until lawful order is restored; otherwise there can be no complete exercise of power in a military way within the limits of the State by the Federal officers.[115]

The doctrine appears to have gained the approval of President Hayes, at least insofar as it had to do with command of state troops, although a telegram advising the commander to in effect federalize state troops arrived too late to be carried into effect.[116] The proposed equation of insurrection to war calling for the substitution of military force for ordinary methods of law enforcement seems to have found its way into later War Department manuals regarding the military role in civil disturbances.[117]

---

[109] *See* COOPER, *supra* note 98, at 62-64.

[110] *Id.* at 62.

[111] S. DOC. No. 67-273, *supra* note 36, at 171-72. Although no proclamation under the Insurrection Act was issued, President Hayes ordered that officers in charge were to command insurgents to disperse prior to taking any action. *Id.* at 172.

[112] *Id.* at 173

[113] *See* RICH, *supra* note 37, at 78.

[114] Telegram from Major-General Hancock to Adjutant-General of the Army, July 24, 1877, *reprinted in* S. DOC. No. 67-263, *supra* note 36, at 275.

[115] Telegram from Major-General Hancock to Secretary of War George W. McCrary, July 24, 1877, *reprinted in* S. DOC. No. 67-263, *supra* note 36, at 275, 276.

[116] *See* RICH, *supra* note 37, at 76-77.

[117] *See, e.g.,* War Department Document No. 882, Office of the Adjutant General, Military Protection The Use of Organized Bodies in the Protection and Defense of Property During Riots, Strikes, and Civil Disturbances 63 (1919) (stating that "federal troops can not take orders from civil authorities" and that "a degree of martial law actually exists whenever Federal troops go on duty" for the purpose of riot duty, even where martial law has not been declared); *see also A Comprehensive Study of the Use of Military Troops in Civil Disorders with Proposals for Legislative Reform*, 43 U. COLO. L. REV. 399, 410 (1972) (arguing that the use of military after the Civil War led to erosion of notion that military troops used to execute laws were ordinarily subordinate to civil authority). This phenomenon may have been more pronounced at the state level. *See* Henry Winthrop Ballantine, *Unconstitutional Claims of Military Authority*, 5 J. AM. INST. CRIM. L. & CRIMINOLOGY 718 (1915) (reporting instances of military intervention in labor disputes, mostly by state militias).

U-DOW-CAR-059

## Trouble in the Western States and Territories

U.S. troops were sent to deal with disputes in western territories and new states on several occasions. In California, the failure of the governor to request assistance under the Insurrection Act led to a denial of military assistance.[118] The California Gold Rush was marked by a heightened tendency toward lawlessness, which was for a time brought under relative control by vigilantes.[119] The self-appointed Vigilance Committee of San Francisco, which had been allowed to operate separately from federal and local law enforcement authorities, refused to surrender a prisoner to the federal court under a writ of habeas corpus.[120] The governor called out the militia to put down the insurrection, and, having received a less than enthusiastic response, requested assistance from the Army, and when that was refused, from the President.[121] The Attorney General advised the President that the situation was not sufficiently dire to require federal intervention,[122] and noted that during the month of turmoil said to require armed intervention, no effort had been made to convene the legislature.[123] When the Vigilante Committee took another prisoner, a judge of the California Supreme Court, the state governor again requested assistance from the military, this time from the commander of a ship in the harbor.[124] Again, the request was turned down. The senior naval commander in San Francisco, stressing the constitutional requirements for requesting aid from the federal government to put down domestic violence, instructed the ship's captain that there was to be no interference in the domestic troubles of the state.[125]

The territory of Utah was the site of considerable resistance to federal law after it was established in 1850, and Brigham Young, the head of the Church of Jesus Christ of Latter-day Saints, appointed its governor.[126] Most white inhabitants of Utah were also members of the Church and tended to regard laws not emanating from the governor to be invalid, eventually compelling nearly all federal officials to leave the territory for their own safety.[127] In 1857, the President appointed a new governor, and federal Armed Forces were sent in to ensure a peaceful transfer of power.[128] Governor Young responded by declaring martial law and forbidding any Armed Forces from entering the territory.[129] It was not until April 1858 that President Buchanan issued a proclamation offering amnesty to those who would obey the law and promising to prosecute those who did not.[130] The proclamation was not styled as an order to disperse, and troops were instructed to act in aid of the execution of civil power.[131]

---

[118] S. Doc. No. 67-263, *supra* note 36, at 74.

[119] *Id.* at 71.

[120] *Id.* at 74-77.

[121] *Id.* at 74.

[122] *Id.* at 72-76, 247.

[123] *Id.* at 249.

[124] S. Doc. No. 67-263, *supra* note 36, at 76.

[125] *Id.* at 77.

[126] *Id.* at 78.

[127] *Id.* at 78 (citing H.R. Ex. Doc. No. 25, 32d Cong., 2d sess.).

[128] *Id.* (federal forces were originally to act as posse comitatus to aid newly appointed civilian government).

[129] *Id.* at 79.

[130] Proclamation of April 6, 1858, 11 Stat. 796.

[131] *Id.*, 11 Stat. at 797 (reporting that the President had ordered a "detachment of the army to march for the City of Salt Lake … and to act in case of need as a *posse* for the enforcement of the laws").

---

U-DOW-CAR-060

## Slavery, the Civil War, and Reconstruction

In 1831, federal troops were sent out on several occasions to respond to reports of slave insurrections, initially in New Orleans and later in Virginia, Maryland, Delaware, and the Carolinas.[132] These actions appear to have been undertaken by the local military commandants in response to requests from local officials, and do not appear to have been justified by any statute or presidential proclamation.[133]

During troubles related to the slavery issue in Kansas in 1856, President Pierce issued a proclamation commanding persons involved in unlawful combinations to disperse.[134] In the following months, the new governor sent frequent requests to the commandants at Ft. Leavenworth and Ft. Riley for troops to disband a territorial militia that had formed in Lawrence.[135] When Kansas's pending entry into the Union in 1858 again brought tensions to a head, the governor called upon the commander of U.S. troops for troops to act "as a posse comitatus in aid of the civil authorities."[136] There does not appear to have been another proclamation under the Insurrection Act, and since only the federal marshal and his deputies were empowered to request the assistance of the military as a posse comitatus, there was no statutory basis for this action. Rather, it appears to have been an exercise of the newly emerging theory known as the Cushing Doctrine, explained below, under which members of the Armed Forces could act as a posse comitatus to enforce the law without invoking the Insurrection Act or other law that permitted the use of the Armed Forces.

At the dawn of the secessionist movement that led to the Civil War, President Buchanan declined to send troops into seceding states, apparently based on his perception that any troops dispatched to execute the laws of the Union would necessarily be subordinate to civil authorities.[137] He informed Congress that because federal law enforcement and judicial machinery in those areas had already been demolished, his duty to execute the law could not be accomplished even with the aid of military troops.[138] On coming into office, President Lincoln took a very different view, at times using federal military power without subordination to civil authority even in loyal Union states.[139] Congress also enacted a new provision to replace § 2 of the Calling Forth Act, adding "rebellions" to instances for which the use of the Armed Forces was envisioned and to change the standard from a situation in which a combination or obstruction to law enforcement was "too powerful to be suppressed by the ordinary course of judicial proceedings" to one in which the unlawful obstruction or assemblage "make[s] it impracticable to enforce the laws ... by the ordinary course of judicial proceedings."[140]

The successful suppression of the rebellion did not put an end to violence in the South. The Reconstruction period after the Civil War was characterized by constant political turbulence in the South.[141] Efforts to establish new governments in former Confederate states were particularly

---

[132] S. Doc. No. 67-263, *supra* note 36, at 45-46, related documents at 223-25.

[133] *Id.*

[134] 11 Stat. 791 (1856).

[135] S. Doc. No. 67-263, *supra* note 36, at 69-71.

[136] *Id.* at 71.

[137] *See* Engdahl, *supra* note 10, at 53.

[138] *See id.*

[139] *Id.* at 53-54. The Supreme Court declared such use of the military in loyal states to be unconstitutional. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866).

[140] Act of July 29, 1861, 12 Stat. 281. *See* Engdahl, *supra* note 10, at 55-56 (describing changes).

[141] *See* Gary Felicetti and John Luce, *The Posse Comitatus Act: Setting the Record Straight on 124 Years of Mischief*

U-DOW-CAR-061

contentious during the decade following the Civil War, and Presidents received more requests for military aid from state governors during these years than all previous decades combined, sometimes receiving simultaneous requests from two rival governors claiming legitimacy in the same state after an election.[142]

Resistance to efforts to achieve equal status for newly freed slaves led Congress to pass the Civil Rights Act of 1871 (also called the "Ku Klux Klan Act"),[143] which among other things added a new insurrection provision permitting the President to employ the land and naval forces to enforce civil rights. This authority was used immediately after enactment when President Grant issued a proclamation calling attention to the new law and declaring himself ready to invoke it if necessary.[144] This was followed several months later by a proclamation under the new act commanding conspirators in nine counties in South Carolina to disperse within five days and turn in their firearms, ammunition, and disguises to the local marshals or military officers,[145] and shortly thereafter by a proclamation suspending habeas corpus, as permitted under Section 4 of the act.[146] Hundreds of suspected Klansmen were arrested over the following months and tried in federal court.[147]

## Use of Military Forces as a Posse Comitatus

Even though Congress had since 1792 empowered the President to call out the state militia to overcome obstructions to law enforcement and it had also provided authority in a number of statutes for the President to employ the land and naval forces for certain law enforcement purposes, it appears to have been understood that federal law enforcement officials could themselves call on local military commanders for assistance without involving the President.[148] Congress had vested the federal equivalent of the sheriff, the federal marshal, with the power to call forth the posse comitatus in performance of his duties.[149] The federal marshals and their deputies were thus implicitly empowered to compel the assistance of members of the Armed Forces when force became necessary to execute the process of federal courts, but the military

---

*and Misunderstanding Before Any More Damage Is Done*, 175 MIL. L. REV. 86, 100-09 (2003) (describing "counter-reconstruction" efforts and widespread racial terrorism); S. DOC. NO. 67-263, *supra* note 36, chapters V – VIII (describing employment of military during Reconstruction period and post-Reconstruction political disturbances during the years between 1866 and 1876).

[142] *See* COAKLEY, *supra* note 58, at 341.

[143] 17 Stat. 13 (1871) (current version codified at 10 U.S.C. § 253).

[144] 17 Stat. 949 (1871). A previous proclamation under the existing authority to assist states South Carolina in putting down domestic violence on application of the governor did not bring about the desired result, 16 Stat. 1138 (March 24, 1871).

[145] 17 Stat. 950 (1871).

[146] 17 Stat. 951 (1871).

[147] S. DOC. NO. 67-263, *supra* note 36, at 103.

[148] Felicetti & Luce, *supra* note 141, at 95 ("The framers clearly were aware of the posse comitatus and the use of the military in some forms of law enforcement, yet they did not prohibit the practice.").

[149] *See, e.g.*, 1 Stat. 87 (1789) ("a marshal shall be appointed in and for each district ... whose duty it shall be ... to execute throughout the district, all lawful precepts directed to him, and issued under the authority of the United States, and he shall have the power to command all necessary assistance in the execution of his duty...."); Calling Forth Act, § 9, 1 Stat. 265 (1792) ("the marshals of the several districts and their deputies shall have the same powers in executing the laws of the United States, as sheriffs and their deputies in the several states have by law, in executing the laws of their respective states").

U-DOW-CAR-062

units serving on a posse were to remain subordinate to the marshal and could not initiate legal proceedings.[150]

In some cases when it passed a particular statute, Congress specifically authorized recourse to the posse comitatus for its enforcement. The Fugitive Slave Act[151] was such a law, and its use led to the crystallization of the government's doctrine regarding the use of the military in the role of a posse.[152] Under that act, owners whose slaves had escaped to another state were entitled to an arrest warrant for the slaves and to have the warrant executed by the federal marshals. The marshals in turn might "summon and call to their aid the bystanders, or *posse comitatus* of the proper county ... [and] all good citizens [were] commanded to aid and assist in the prompt and efficient execution of this law, whenever their services may be required, as aforesaid, for that purpose."[153] The act did not specifically authorize the use of the military or militia in its execution, but when particularly fierce opposition arose in Boston in 1851, the President issued a proclamation requiring "all officers and persons, civil and military to aid and assist by all means in their power in quelling [such] combinations...."[154] The Secretary of War sent orders to Army units to be ready to respond to the call of a marshal or deputy, or the certification of a federal judge stating that military force would likely be necessary.[155] Troops in Boston Harbor were made ready to intervene in the event of a riot, but such intervention was unnecessary.[156]

When asked by the Senate whether sufficient authority for vigorous enforcement of the Fugitive Slave Act was available, President Fillmore advanced the doctrine that his use of the Army and Navy to enforce federal law was an inherent power, suggesting that it ought not be construed as restricted by the Insurrection Act's requirements, in particular that of issuing a proclamation to disperse.[157] He also made the argument that all citizens, whether enrolled in any military service or not, may be summoned as a posse comitatus, while conceding doubt as to whether an organized military force acting under military command might be employed in such a manner.[158] The Senate Judiciary Committee declared that it saw no reason to consider military members exempt from duty to serve as a posse comitatus, whether as individuals or organized under their ordinary command structure.[159]

---

[150] *See* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 866 (1920).

[151] Act of Feb. 12, 1793, Respecting fugitives from justice, and persons escaping from the service of their masters, 1 Stat. 302, as amended by 9 Stat. 462 (1850).

[152] Laws permitting the President to use military forces to execute particular laws were apparently understood to place the forces so employed under the direction of civil authorities. *See, e.g.,* Neutrality Act of April 30, 1818, § 8-9, 3 Stat. 447, 449 (authorizing President or his designee to employ militia or land or naval forces to detain certain vessels, prevent military expeditions, and compel departure of foreign ships). In 1849, President Taylor used this authority to call upon "every officer in the military, civil or military, to use all efforts in his power to arrest for trial and punishment every such offenders of [neutrality laws, with respect to an expedition to invade Cuba]," V JAMES D. RICHARDSON, A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 7-8 (1907).

[153] 9 Stat. at 463.

[154] S. DOC. NO. 67-263, *supra* note 36, at 62; 9 Stat. 1006 (President Millard Fillmore's proclamation urging all officers, civil and military, to assist in enforcement of the Fugitive Slave Act in 1851).

[155] S. DOC. NO. 67-263, *supra* note 36, at 62.

[156] *See* COAKLEY, *supra* note 58, at 133.

[157] *Id.* at 130 (citing VI JAMES D. RICHARDSON, A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 2637-46 (1897)). He further suggested that the requirement to issue a proclamation in connection with calling forth the militia should be dispensed with in cases where such a proclamation might defeat the purpose of the law to be executed by alerting persons whose arrest was sought.

[158] *Id.*

[159] *Id.*; S. REP. NO. 31-320 (1851). The Committee suggested that statutory authority to call forth the military or the

U-DOW-CAR-063

In June of 1851, a federal marshal in Chicago arrested a fugitive slave on a warrant issued under the act.[160] He called for the assistance of members of the police force and of the state militia to prevent abolitionists from rescuing the prisoner before he could be returned to his owner.[161] The marshal subsequently filed a claim with the Department of the Treasury for reimbursement of the funds he had paid the members of the police force and the militia who responded to his call.[162] Attorney General Caleb Cushing was asked whether the United States was obligated to honor the claim.[163] While this question remained pending, another incident in Boston arose in response to the arrest of fugitive slave Anthony Burns in 1854.[164] Two batteries of artillery and a detachment of federal troops were sent into the city while the governor also called up the local militia,[165] but when additional forces were requested, military commanders considered further authorization from Washington to be necessary before complying with the requests.[166]

The Attorney General took the opportunity, ostensibly in response to the earlier request, to announce a new doctrine regarding the employment of the Armed Forces.[167] Cushing's response went well beyond the question of whether the "bystanders" contemplated by the Fugitive Slave Act might include members of a state militia when not in federal service, and announced a broader principle—members of the military by virtue of their duties as citizens were part of the posse comitatus. Apparently adopting the views expressed earlier by the Senate Judiciary Committee in reaction to the previous Administration's views on the matter, Cushing declared:

> The posse comitatus comprises every person in the district or county above the age of fifteen years, whatever may be their occupation, whether civilians or not; and including the military of all denominations, militia, soldiers, marines, all of whom are alike bound to obey the commands of the sheriff or marshal. The fact that they are organized as military bodies, under the immediate command of their own officers, does not in any wise affect their legal character. They are still the posse comitatus. (xxi Parl. Hist., p.672, 688, per Lord Mansfield).[168]

---

regular military forces to enforce due execution of the laws would be rarely used, only after civil power (with the aid of military units as a posse comitatus) were to prove inadequate. *Id.* at 1.

[160] 6 Op. Att'y Gen. 466, 466 (1854).

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] S. Doc. No. 67-263, *supra* note 36, at 63.

[165] *Id.* at 64.

[166] *Id.* at 63-65 (recounting the "Anthony Burns" riots and a similar incident that occurred in Racine, Wisconsin in 1854).

[167] *See* COAKLEY, *supra* note 58, at 133-137 (reporting that Cushing's opinion was drafted in the midst of widespread resistance in Boston to the rendition of Anthony Burns, which became the occasion for the largest military posse comitatus ever assembled, albeit not under the effective direction of the marshal).

[168] 6 Op. Att'y Gen. 466, 473 (1854). Cushing's citation to Lord Mansfield is apparently a reference to the remarks of the English Chief Justice during debate in the House of Lords concerning the validity of use troops to quell rioters in London:

> Lord Mansfield ... went on: '....[I]t appears most clearly to me, that every man may legally interfere to suppress a riot, much more to prevent acts of felony, treason, and rebellion, in his private capacity, but he is bound to do it as an act of duty; and if called upon by a magistrate, is punishable in case of refusal.... A private man, if he sees a person committing an unlawful act, ... may apprehend the offender, and ... may use force to compel him, not to submit to him, but to the law. What a private man may do, a magistrate or peace officer may clearly undertake; and according to the necessity of the case ... , any number of men assembled or called together for the purpose are justified to perform. This doctrine I take to be clear and indisputable, with all the possible

U-DOW-CAR-064

Two years later, Cushing's opinion supplied the justification for the use of federal troops at the call of civil law enforcement authorities in what some saw as partisan involvement in the conflict between pro- and anti-slavery forces in Kansas.[169] Congress reacted with a rider to an Army appropriations bill forbidding the use of any "part of the military forces of the United States to enforce territorial law in Kansas."[170] After some discussion of whether the amendment was germane, it was defeated.

---

> consequences which can flow from it, and to be the true foundation for calling in of the military power to assist in quelling the late riots.
>
> The persons who assisted in the suppression of those riots and tumults, in contemplation of law, are to be considered as mere private individuals, acting according to law, and upon any abuse of the legal power with which they are invested, are amendable to the laws of their country.
>
> ... On the whole, my lords, while I ... sincerely lament the cause which rendered it indispensably necessary to call out the military to assist in the suppression of the late disturbances, I am clearly of the opinion, that no steps have been taken which were not strictly legal, as well as fully justifiable in point of policy.... The military have been called in, ... not as soldiers, but as citizens: no matter whether their coats be red or brown, they have been called in aid of the laws, not to subvert them, or overturn the constitution, but to preserve both."

XXI HANSARD, THE PARLIAMENTARY HISTORY OF ENGLAND FROM THE EARLIEST PERIOD TO THE YEAR 1803, at 690-98 (June 19, 1780). Cushing seemed to turn Lord Mansfield's point on its head when he wrote that, "the fact that they are organized as military bodies, under the immediate command of their own officers, does not in any wise affect their legal character." English law prohibited martial law, the use of military force domestically, in peacetime England. Lord Mansfield justified an apparent breach of the martial law proscription by asserting that the soldiers had acted as individuals called, commanded, and governed exclusively by the dictates of law applicable to civilians. Civilians are not organized as military units and are not subject to the command of military officers. Lord Mansfield's justification could only hold as long as the soldiers were not organized as military bodies and were not acting under the command of their officers. The fact that they were organized as military bodies, under the immediate command of their own officers, was the critical determinant of their legal character.

[169] President Pierce told Congress:

> The Constitution requiring [the Executive] to take care that the laws of the United States be faithfully executed, if they be opposed in the Territory of Kansas he may, and should, place at the disposal of the marshal any public force of the United States which happens to be within the jurisdiction, to be used as a portion of the posse comitatus ; and if that do not suffice to maintain order, then he may call forth the militia of one or more States for that object, or employ for the same object any part of the land or naval force of the United States. So, also, if the obstruction be to the laws of the Territory, and it be duly presented to him as a case of insurrection, he may employ for its suppression the militia of any State or the land or naval force of the United States.

V JAMES D. RICHARDSON, A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 358 (1897); *see also* EDWARD CORWIN, THE PRESIDENT: OFFICE AND POWERS, 1787-1984, 155 (5th ed. 1984) (calling Cushing's opinion an ingenious means of virtually eliminating the proclamation requirement under the Insurrection Act by enabling marshals to summon both state militia and U.S. regular forces within their precincts to assist in enforcing the law, noting President Pierce's use of new doctrine to declare it his duty to place U.S. forces in Kansas at the disposal of marshal).

[170] By the proposed legislation, would Congress would have given itself final authority to select which of the contending governments to recognize:

> But Congress hereby disapproving the code of alleged laws officially communicated to them by the President, and which are represented to have been enacted by a body claiming to be the Territorial Legislature of Kansas; and also disapproving of the manner in which said alleged laws have been enforced by the authorities of said Territory, expressly declare that, until those alleged laws shall have been affirmed by the Senate and House of Representatives as having been enacted by a legal Legislature, chosen in conformity with the organic law, by the people of Kansas, no part of the military force of the United States shall be employed in aid of their enforcement, nor shall any citizen of Kansas be required, under those provisions to act as a part of the posse comitatus of any officer acting as a marshal or sheriff in said Territory.

CONG. GLOBE 34th Cong., 1st & 2d Sess. 1813 (1856).

U-DOW-CAR-065

# Passage of the Posse Comitatus Act

Following the Civil War, the use of federal troops to execute the laws, particularly in the states that had been part of the Confederacy, continued even after all other political restrictions had been lifted. By 1877, there was evidence that Republican state governments in more than one southern state owed their continued political existence to the presence of the military and that the activities of federal troops may have influenced the outcome of the Hayes-Tilden presidential election.[171]

The House of Representatives, controlled by a Democratic majority, passed an Army appropriation bill which expressly prohibited use of the Army to shore up Republican state governments in the South, or more precisely, to shore up either side of the political dispute in Louisiana or anywhere else.[172] The Senate, controlled by a Republican majority, refused to accept the provision. No compromise could be reached, and the session ended without passage of an Army appropriation bill. Money to pay the Army was subsequently appropriated in a special session,[173] without reference to restrictions on use of the Army.[174] But when the issue of Army appropriations next arose, the House included a posse comitatus section.[175] The Senate accepted the House version with minor amendments.[176]

---

[171] Members of the two political parties understandably disagreed as to whether the presence of federal troops in the South tainted or insured the integrity of the political process; compare, "[O]ur Army, degraded from its high position of the defenders of the country from foreign and domestic foes, has been used as a police; has taken possession of polls and controlled elections; has been sent with fixed bayonets into the halls of State Legislatures in time of peace and under the pretense of threatened outbreak; has been placed under the control of subordinate State officials, and, under the instructions of the Attorney General, has been notified to obey the orders of deputy United States marshals, 'general and special,' appointed in swarms to do dirty work in a presidential campaign," 5 CONG. REC. 2117 (remarks of Rep. Banning), with, "Nor do I think, sir, that the use of troops in the States recently in rebellion was uncalled for or inconsistent with the spirit of republican liberty. If they were recalled before every man, white and black, was safe – safe and truly free, with all his civil rights in their fullest extent – they were recalled too soon." 7 CONG. REC. 3616 (remarks of Rep. Philips).

[172] Section 5 of H.R. 4691, as passed by the House, provided, "That no part of the money appropriated by this act, nor any money heretofore appropriated, shall be applied to the pay, subsistence, or transportation of troops used, employed, or to be used or employed, in support of the claim[s of various individuals and bodies purporting to comprise the valid government of Louisiana]; nor in the aid of the execution of any process in the hands of the United States marshal in said State issued in aid of and for the support of any such claims. Nor shall the Army, or any portion of it, be used in support of the claims, or pretended claim or claims, of any State government, or officer thereof, in any State, until the same shall have been duly recognized by Congress. Any person offending against any of the provisions of this act shall be guilty of a misdemeanor, and, upon conviction thereof, shall be imprisoned at hard labor for not less than five years or more than ten years." 5 CONG. REC. 2119 (1877).

[173] See Presidential Proclamation of May 5, 1877, 20 Stat. 803 (1877) (calling Congress into session).

[174] The bill contained no posse comitatus provisions because the President had withdrawn federal troops from Louisiana and South Carolina and because of concern over disturbances on the Mexican border and over Indian uprisings. 6 CONG. REC. 287 (remarks of Rep. Atkins) (1877).

[175] "From and after the passage of this act it shall not be lawful to employ any part of the Army of the United States as a posse comitatus or otherwise under the pretext or for the purpose of executing the laws, except in such cases and under such circumstances as such employment of said forces may be expressly authorized by act of Congress; and no money appropriated by this act shall be used to pay any of the expenses incurred in the employment of any troops in violation of this section; and any person violating the provisions of the this section shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $10,000 or imprisonment not exceeding two years, or both such fine and imprisonment." 7 CONG. REC. 3845 (1878).

[176] The "pretext" language was stricken because it was thought to be "in the nature of a reflection upon the past administration of the Government." 7 CONG. REC. 4648 (remarks of Sen. Sargent). Instances of express Constitutional authority were added to the statutory exception, although then as now the precise effect of this change was a matter of dispute; the penalty was applicable only to willful violations, although a Senate requirement that the penalty be restricted to willful and knowing violations was not accepted. Id.

U-DOW-CAR-066

At least one contemporary military jurist viewed the new law as having less than a momentous impact on the relationship between civil and military authorities.[177] Colonel William Winthrop opined that, the occasion for its enactment having passed, the act remained "a mere impediment to the constitutional exercise of the executive power of the nation."[178] While federal marshals could no longer avail themselves of military assistance to arrest individuals charged with offenses against the United States, he stressed that wherever a combination existed to resist the enforcement of the laws, the President always could invoke the Insurrection Act.[179] He further made note of the already sizable list of exceptions to the prohibition.[180]

Others have viewed the act as having a deleterious effect on the nation's commitment to civilian law enforcement. While soldiers serving on a posse remained subordinate to civilian rules and law enforcement officers, troops called out under the Insurrection Act came to be viewed as an independent military force enforcing something like martial law, if not engaging in all-out war.[181] Today, however, the act is widely regarded as the embodiment of the American tradition of anti-militarism.[182]

Despite early efforts on the part of the executive branch to get the provision repealed or amended,[183] the Posse Comitatus Act has remained essentially unchanged since its passage.[184]

---

[177] *See* WINTHROP, *supra* note 150, at 867.

[178] *Id.*

[179] *See id.*

[180] *Id.*

[181] *See* Engdahl, *supra* note 10, at 62-64 ("By the end of the [19th] century it had become thoroughly established in the common understanding that wherever and whenever military troops were employed, it was equivalent to war.").

[182] *Cf* Felicetti & Luce, *supra* note 141, at 91 (arguing that "courts analyzing the Act [have written] about the law as if it was the only law or principle that limited the use of the armed forces in a law enforcement role. Some, therefore, have claimed to discern a broader policy or 'spirit' behind the Act that is not supported by the historical record or the statute's text. While these wider policies are sound, they are embodied in federalism, the law concerning federal arrest authority, election law, and especially fiscal law. The ... Posse Comitatus Act ... doesn't have to do all the work, a view that even the Act's original proponents appeared to recognize. Trying to force-fit all these other principles into the surviving part of the Act has only created a need to 'discover' a number of implied exceptions and has sowed a great deal of confusion."); C.J. Williams, *An Argument for Putting the Posse Comitatus Act to Rest*, 85 MISS. L.J. 99, 164-65 (2016) ("As a symbolic expression of the traditional American value of maintaining civilian control of the military, the Posse Comitatus Act fails. The Act imposes criminal sanctions on civilian authorities that use the military to enforce laws, rather than limit criminal sanctions to military authorities that usurp civilian control. As a practical tool to effectuate lofty means of maintaining a separation between the military and civilian law enforcement, it likewise fails. Its vague language has caused nothing but confusion and motivated Congress to enact so many exceptions to the Act that it has long since been swallowed.").

[183] *See* Rutherford B. Hayes, Second Annual Message to Congress, 8 CONG. REC. 5 (1878) (noting recommendation of the Secretary of War that the provision be repealed or amended); 1 Annual Report of the Secretary of War for 1878, at VI-VII (advising repeal of posse comitatus provision or expansion of exceptions to permit employment of the Army to counter lawlessness in Arizona territory); *see also* Chester A. Arthur, First Annual Message to Congress, 13 CONG. REC. 28 (1881) (advising an exception permitting the military to assist the civil Territorial authorities in enforcing the laws of the United States); Chester A. Arthur, Special Message, 13 CONG. REC. 3355 (1882) (same). Congress declined to exempt the territories at that time, apparently due to the belief that sufficient authority existed in insurrection statutes to permit military intervention to execute federal law, albeit under presidential authority rather than that of the federal marshal. *See* 13 CONG. REC. 3457-58 (1882) (statement by Senator Edmunds, reporting conclusion of the Senate Judiciary Committee). In 1900, however, Congress enacted an exemption for the District of Alaska, Act of June 6, 1900, 31 Stat. 330.

[184] For some time the act was contained in Title 10 of the United States Code and expressly exempted the territory of Alaska, 10 U.S.C. § 15 (1940 ed.). When Title 10 was recodified and the section transferred to Title 18, the Air Force, previously covered while it was part of the Army, was expressly added to the act, and the reference to Alaska, by then a state, disappeared. 70A Stat. 626 (1956).

Over the years, Congress has adjusted the impact of the Posse Comitatus Act by enlarging the number of statutes which

U-DOW-CAR-067

Congress has, however, authorized a substantial number of exceptions and has buttressed the act with an additional proscription against use of the Armed Forces to make arrests or conduct searches and seizures.[185]

# Constitutional Considerations

The Posse Comitatus Act raises at least three constitutional questions: (1) To what extent does the Posse Comitatus Act track constitutional requirements, beyond the power of the President or Congress to adjust or ignore? (2) To what extent do the powers which the Constitution vests in the President limit the power of Congress to enact the Posse Comitatus Act or any other provision restricting the President's discretion to involve the Armed Forces in civilian affairs? (3) What specifically are the military law enforcement activities "expressly authorized in the Constitution" for purposes of the act?

## Constitutional Origins

Lord Coke and his colleagues, in crafting the Petition of Right of 1628, found within that chapter of the Magna Carta and subsequent explanatory statutes that are the antecedents of our constitutional due process clauses a prohibition against martial law.[186] In times of peace, this proscription would not abide either the quartering of troops among civilians or any form of martial law, be it imposed by tribunal or more summarily dispatched by soldiers controlling or punishing civilians.

The Declaration of Independence lists the imposition of martial law upon us among those affronts to fundamental liberties that irrevocably ruptured our political ties to Great Britain.

Finally, it is possible to see the protrusions of a larger, submerged constitutional principle which bars the use of the Armed Forces to solve civilian inconveniences in the Second, Third, and Fifth Amendments, with their promises of a civilian militia, freedom from the quartering of troops among us, and the benefits of due process.

This view is not without judicial support. The courts have demonstrated a rather long-standing reluctance to recognize the authority of military tribunals over civilians.[187] And members of the

---

expressly authorize the use of the Army or Air Force to execute the law. These are sometimes referred to as "amendments" to the Posse Comitatus Act. Since they do not change language of the act itself, it seems to be more accurate to characterize them as expansions of authority under the statutory exception to the Posse Comitatus Act rather than as amendments or changes in the act itself.

[185] "The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter [10 U.S.C. §§ 271-282] does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law." 10 U.S.C. § 275.

Soon after the enactment of current § 275, the Secretary of Defense promulgated such regulations which, subject to designated exceptions, prohibited: "(i) Interdiction of a vehicle, vessel, aircraft or other similar activity. (ii) A search or seizure, (iii) An arrest, stop and frisk, or similar activity. (iv) Use of military personnel for surveillance or pursuit of individuals, or as informants, undercover agents, investigators, or interrogators." 32 C.F.R. § 213(10)(a)(3), 47 Fed. Reg. 14899, 14902 (April 7, 1982). Some years later the regulations were removed, 53 Fed. Reg. 23776 (April 28, 1993) and replaced with a new regulation combining various authorities related to domestic operations, 32 C.F.R. Part 185, 58 Fed. Reg. 52667 (Oct. 12, 1993), which in turn referred to relevant DOD Directives setting forth regulations in greater detail.

[186] *See supra* "Background."

[187] *Ex parte* Milligan, 71 U.S. (4 Wall.) 3, 123-25 (1866); Toth v. Quarles, 350 U.S. 11 (1955); Reid v. Covert, 354

U-DOW-CAR-068

Supreme Court seemed to acknowledge possible components of a larger principle in both *Youngstown Sheet and Tube Co. v. Sawyer*[188] and *Laird v. Tatum*.[189]

But if a larger anti-martial law principle lies beneath constitutional sands, visible only in these amendments and the spirit of the Posse Comitatus Act, it has remained remarkably dormant. Those regions from which it might have been expected to emerge have been characterized most by inactivity. The boundaries of the Third Amendment are virtually uncharted.[190] Until recently,

---

U.S. 1 (1957); Kinsella v. Singleton, 361 U.S. 234 (1960); Grisham v. Hagan, 361 U.S. 278 (1960); McElroy v. Guagliardo, 361 U.S. 281 (1960); O'Callahan v. Parker, 395 U.S. 258 (1969); *but see* Solorio v. United States, 483 U.S. 435 (1987) (holding that the jurisdiction of military tribunals depends upon whether the accused was a member of the Armed Forces at the time of alleged misconduct and, contrary to *O'Callahan*, not whether the crime was "service connected").

[188] 343 U.S. 579 (1952).

> Article II, Section 2 make the Chief Executive the Commander in Chief of the Army and Navy. But our history and tradition rebel at the thought that the grant of military power carries with it authority over civilian affairs.

343 U.S. at 632 (Douglas, J., concurring).

> Time out of mind, and even now in many parts of the world, a military commander can seize private housing to shelter his troops. Not so, however, in the United States, for the Third Amendment says, 'No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.' Thus, even in war time, his seizure of needed military housing must be authorized by Congress. It also was expressly left to Congress to 'provide for calling forth the Militia to execute the laws of the Union, suppress Insurrections and repel Invasions....' Such a limitation on the command power, written at a time when the militia rather than a standing army was contemplated as the military weapon of the Republic, underscores the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. Congress, fulfilling that function, has authorized the President to use the army to enforce certain civil rights. On the other hand, Congress has forbidden him to use the army for the purpose executing general laws except when *expressly* authorized by the Constitution or Act of Congress.

343 U.S. at 644-45 (Jackson, J., concurring) (emphasis in the original).

In *Youngstown*, the Court held that, when Congress had specifically refused to grant such authority by statute, the President's constitutional and statutory powers as President and Commander in Chief were not sufficient to support an executive order authorizing the Secretary of Commerce to use the resources of the federal government, including its Armed Forces, to seize and operate the country's steel mills which were then threatened by a nation-wide strike. *Id.* at 587.

[189] 408 U.S. 1 (1972).

> The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities – and indeed the claims alleged in the complaint – reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime.

*Id.* at 15-6.

In *Laird v. Tatum*, the Court refused to order the military to stop collecting information about civilians unless the civilians could show how they had been hurt by what the military was doing. *Id.* at 3. (More precisely the Court held that, in the absence of any showing of specific harm or the realistic threat of specific harm, a claim, that the data gathering activities of the military services had been conducted so as to chill the First Amendment rights of the targets of those intelligence collection efforts, was nonjusticiable.)

[190] *See* Tom W. Bell, *The Third Amendment, Forgotten But Not Gone*, 2 WM & MARY BILL RTS. J. 117 (1993); William S. Fields and David T. Hardy, *The Third Amendment and the Issue of the Maintenance of Standing Armies: A Legal History*, 35 AM. J. LEGAL HIST. 393 (1991); William Sutton Fields, *The Third Amendment: Constitutional Protection*

---

U-DOW-CAR-069

the outreaches of the militia-related Second Amendment appeared only slightly more visible.[191] Even in the inviting context of the Posse Comitatus Act, the courts have generally avoided excursions into areas of its possible constitutional underpinnings.[192]

On the other hand, the Constitution appears to recognize that military force might occasionally be called for in handling domestic affairs. It permits Congress to authorize the use of the militia "to execute the Laws of the Union, suppress Insurrections and repel Invasions."[193] And it guarantees the states protection against invasion or usurpation of their "republican form of government," and, upon the request of the state legislature, against "domestic violence."[194] While states are prohibited from keeping their own standing armies,[195] they retain some control over their militias, subject to any constraints Congress may constitutionally impose, including the authority to call forth those forces to suppress insurrections or quell civil disturbances.[196] The Constitution neither authorizes nor proscribes martial law (which is said to exist when civil authority is supplanted by

---

*From the Involuntary Quartering of Soldiers*, 124 MIL. L. REV. 195 (1989). In one of the few reported Third Amendment cases, striking state correctional officers brought a civil rights action against state authorities who had used the officers' prison facility resident quarters to house replacement national guard troops. The district court dismissed, Engblom v. Carey, 522 F. Supp. 57, 70 (S.D.N.Y. 1981), the appellate court reversed on the ground that it could not hold as a matter of law that the officers had no Third Amendment possessory interest in the resident quarters, 677 F.2d 957, 964 (2d Cir. 1982). On remand the district court dismissed based on the qualified immunity of the defendant state officials in light of the uncertainty of the right with respect to Third Amendment questions, 572 F. Supp. 44, 49 (S.D.N.Y.), *aff'd*, 724 F.2d 28 (2d Cir. 1983). The implications of the case prior to remand are discussed in *The Third Amendment's Protection Against Unwanted Military Intrusions*, 49 BROOK. L. REV. 857 (1983).

[191] The Second Amendment might be seen as evidence of the founders' preference for the Minute Men over Hessian mercenaries as a means of common defense. Story, speaking of the Second Amendment, noted the distaste in the early Republic not simply for a standing army's involvement in domestic affairs but for existence of a standing army at all:

> The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rulers. It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses, with which they are attended, and the facile means, which they afford to ambitious and unprincipled rulers, to subvert the government, or trample upon the rights of the people. The right of the citizens to keep and bear arms has justly been considered, as the palladium of the Liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful the first instance, enable the people to resist and triumph over them.

III JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1890 (1833). At one time, scholars disagreed over whether the Second Amendment's predominant theme is the right to bear arms or this perceived need for a well regulated militia. *See* William Van Alstyne, *The Second Amendment and the Personal Right to Bear Arms*, 43 DUKE L. J. 1236 (1994); Andrew D. Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. REV. 57 (1995). The Supreme Court seems to have resolved the matter in favor of the former. District of Columbia v. Heller, 554 U.S. 570 (2008).

[192] *See, e.g.*, United States v. Walden, 490 F.2d 372, 376 (4th Cir. 1974) ("[W]e do not find it necessary to interpret relatively unexplored sections of the Constitution in order to determine whether there might be constitutional objection to the use of the military to enforce civilian laws").

[193] U.S. CONST. art I, § 8, cl. 15.

[194] U.S. CONST. art IV, § 4.

[195] U.S. CONST. art. I, § 10, cl.3.

[196] *See* Luther v. Borden, 48 U.S. (7 How.) 1, 45 (1849) ("[U]nquestionably a State may use its military power to put down an armed insurrection too strong to be controlled by the civil authority.").

---

U-DOW-CAR-070

military rule due to war or similar emergency),[197] but it has been proclaimed on rare occasions.[198] Lesser forms of military involvement in law enforcement have not been commonplace, but have not been particularly rare during the history of the republic.

Without more judicial guidance, it would appear that traditional reservations about military involvement in the execution of civilian law can only clearly be said to rise to the level of constitutional imperative when they take a form that offends some more explicit constitutional prohibition or guarantee such as the right to jury trial, grand jury indictment, or freedom from unreasonable searches and seizures.[199] Consequently, beyond those specific constitutional provisions, Congress's constitutional authority to enact and adjust the provisions of the Posse Comitatus Act is largely a matter of the coordination of congressional and presidential powers.

## Presidential vs. Congressional Powers

The case of conflicting congressional and presidential powers is easily stated if not easily resolved. On one hand, the Constitution requires the President to take care to see that the laws are faithfully executed, and designates him as Chief Executive and Commander in Chief of the Armed Forces.[200] In this dual capacity, the presidency is the repository of both extensive responsibilities and broad prerogatives, not the least of which flow from Article IV, Section 4 of the Constitution, which guarantees the states a republican form of government and protection against invasion and domestic violence.[201]

---

[197] *See, e.g.*, GEORGE B. DAVIS, A TREATISE OF THE MILITARY LAW OF THE UNITED STATES 300 (3d ed. 1913) (describing "martial law" as a term applied to the "temporary government, by military authority, of a place or district in which, by reason of the existence civil disorder, or a state of war and the pendency of military operations, the civil government is, for the time being, unable to exercise its functions.")

[198] *See* Jason Collins Weida, Note, *A Republic of Emergencies: Martial Law in American Jurisprudence*, 36 CONN. L. REV. 1397 (2004); Kirk L. Davies, *The Imposition of Martial Law in the United States*, 49 A.F. L. REV. 67, 111 (2000); George M. Dennison, *Martial Law: The Development of a Theory of Emergency Powers, 1776-1861*, 18 AM. J. LEGAL HIST. 52, 56-58 (1974). Until recently, federal regulation provided for martial law in certain circumstances. *See* former 32 C.F.R. Part 501 (2007). According to former 32 C.F.R. § 501.4:

> When Federal Armed Forces are committed in the event of civil disturbances, their proper role is to support, not supplant, civil authority. Martial law depends for its justification upon public necessity. Necessity gives rise to its creation; necessity justifies its exercise; and necessity limits its duration. The extent of the military force used and the actual measures taken, consequently, will depend upon the actual threat to order and public safety which exists at the time.

The regulation went on to say that declarations of martial law are ordinarily made by the President, but that the decision could be made "by the local commander on the spot, if the circumstances demand immediate action, and time and available communications facilities do not permit obtaining prior approval from higher authority." *Id.* The regulation was withdrawn in 2008. 73 Fed. Reg. 23,350 (Apr. 30, 2008) (noting that the responsibility to prepare for civil disturbances has been transferred to Office of the Assistant Secretary of Defense for Homeland Defense). Until 1993, 32 C.F.R. Part 185, Defense Support of Civil Defense, contained a provision authorizing senior military to impose martial law where the President had not done so in the event of a complete breakdown of civil governance. The regulation further stated that military resources could not be employed for law enforcement purposes unless martial law had been proclaimed or a serious breakdown of law and order impelled civil authorities to request military assistance to prevent loss of life or wanton destruction of property. 32 C.F.R. § 185.4 (1993).

[199] *See* James P. O'Shaugnhessy, Note, *The Posse Comitatus Act: Reconstruction Politics Reconsidered*, 13 AM. CRIM. L. REV. 703, 712-13 (1976).

[200] U.S. CONST. art. II, § 1 ("[t]he executive Power shall be vested in a President of the United States of America"), § 2 ("[t]he President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into actual Service of the United States"), § 3 ("[The President] shall take Care that the Laws be faithfully executed").

[201] "The United States shall guarantee to every State in this Union, a Republican Form of Government, and shall protect

---

U-DOW-CAR-071

The Supreme Court has made it clear that the President is not dependent upon express constitutional or statutory authorization for the exercise of his powers. Thus, he may meet an emergency by appointing a marshal to protect a threatened Supreme Court Justice, although no statute expressly authorized appointment for such purposes.[202] He must resist invasion by an enemy with force though Congress has yet to declare war.[203] And when an emergency arises threatening the freedom of interstate commerce, transportation of the mails, or some other responsibility entrusted to the federal government, he may call upon "the army of the Nation, and all its militia ... to brush away the obstructions."[204]

Some commentators feel that this implied or incidental constitutional authority to use the Armed Forces not only exists in the absence of congressional direction, but is immune from congressional direction or limitation.[205]

On the other hand, Congress shares constitutional power over the laws and Armed Forces with the President. The Constitution gives Congress the power to make the laws whose faithful execution the President must take care to observe and which carry into execution Congress's own powers and those of the President.[206] It likewise vests Congress with the power to establish, maintain, and regulate the Armed Forces;[207] and with the power to describe the circumstances under which the militia may be called into federal service.[208]

The Supreme Court has shed some light on the coordination of presidential and congressional powers concerning use of the military to enforce civilian law. The Court has pointed out that the President's power under the Guarantee Clause of Article IV, Section 4, which guarantees the states protection against domestic violence, is only provisionally effective until such time as Congress acts.[209] And the President may not always use the Armed Forces to meet a domestic emergency when Congress has previously resisted an invitation to sanction their employment.[210] Finally, even when Congress has disclaimed any intent to limit the exercise of the President's constitutional powers, the President's implied and incidental powers will not always trump conflicting, constitutionally grounded claims.[211]

---

each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. CONST. art. IV, § 4.

[202] *In re* Neagle, 135 U.S. 1, 62-4 (1890).

[203] The Prize Cases, 67 U.S. (2 Black) 635, 668 (1863).

[204] *In re* Debs, 158 U.S. 364, 381 (1895).

[205] *See, e.g.*, Walter A. Lorence, *The Constitutionality of the Posse Comitatus Act*, 8 U. KAN. CITY L. REV. 164, 185-91 (1940); H.W.C. Furman, *Restrictions Upon Use of the Army Imposed by the Posse Comitatus Act*, 7 MIL. L. REV. 85, 91-2 (1960); CORWIN, *supra* note 169, at 152-61.

[206] U.S. CONST. art. I, § 8, cl.18.

[207] U.S. CONST. art. I, § 8, cls.12, 13, & 14.

[208] U.S. CONST. art. I, § 8, cls.15 & 16.

[209] *See* Texas v. White, 74 U.S. (7 Wall.) 700, 730 (1869).

[210] *See* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952). In *Youngstown*, President Truman attempted to invoke his powers as Commander in Chief and Chief Executive to seize and operate most of the Nation's steel mills during the Korean conflict when it appeared they might be shut down by a labor dispute. Congress had earlier specifically refused to grant the President such power legislatively. *Id.* at 586.

[211] *See* United States v. United States District Court, 407 U.S. 297, 303 (1972). Congress had established a warrant procedure to be used by law enforcement officials to permit wiretapping in criminal cases. In doing so, it expressly disclaimed any intent to "limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities [or] to take such measures as he deems necessary to protect the

U-DOW-CAR-072

## Constitutional Exceptions

The Posse Comitatus Act does not apply "in cases and under circumstances expressly authorized by the Constitution."[212] It has been said that the Constitution contains no provision expressly authorizing the use of the military to execute the law in such a way,[213] and that this reference to constitutional exceptions was included as part of a face-saving compromise that consequently should be ignored.[214]

When the phrase was added originally, those who opposed the Posse Comitatus Act believed that the Constitution vested implied and/or inherent powers upon the President to use the Armed Forces to execute the laws; those who urged its passage believed the President possessed no such powers.[215] As initially passed by the House, the bill contained no constitutional exception.[216] The Senate version contained an exception for instances authorized by the Constitution whether expressed or otherwise.[217] The managers of each house described the compromise reached at

United States against the overthrow of the Government by force or other unlawful means, or against any clear and present danger to the structure or existence of the Government," 18 U.S.C. § 2511(3) (1970). Even in the absence of congressionally asserted counter authority, a unanimous Court declined to accept the argument that President's inherent and incidental constitutional powers permitted a failure to comply with the Fourth Amendment's warrant requirements when gathering intelligence concerning purely domestic threats to national security. *Id.* at 332.

[212] 18 U.S.C. § 1385 (2018).

[213] H.R. REP. No. 97-71, at 6 n.3, *reprinted in* 1981 U.S.C.C.A.N. at 1789 n.3 ("The statute permits Constitutional exceptions. However, there are none"); G. NORMAN LIEBER, THE USE OF THE ARMY IN AID OF THE CIVIL POWER 17 (1898); John P. Coffey, Note, *The Navy's Role in Interdicting Narcotics Traffic: War on Drugs or Ambush of the Constitution?*, 75 GEO. L.J. 1947, 1951 (1987); John D. Gates, Note, *Don't Call Out the Marines: An Assessment of the Posse Comitatus Act*, 13 TEX. TECH. L. REV. 1467, 1486 (1982); O'Shaugnhessy, *supra* note footnote 199, at 712.

The Constitution does empower Congress "to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections and repel invasions," U.S. CONST. art. I, § 8, cl. 15; but since this express grant of authority can only be activated by an act of Congress, it adds nothing to the "act of Congress" exception also included within the Posse Comitatus Act.

[214] The act also provides that the Army and Air Force can be used on the basis of an *express constitutional* authorization. This language reflects a compromise reached in the debate over the act. It is a meaningless proviso since the Constitution does not expressly authorize such a use of troops.

In any event, if the Constitution provided the President with authority over a purely executive function, Congress could not disable the President from acting on the basis of it, whether the authorization was express or implied. But since the Constitution provides Congress with the power to control military intervention in domestic affairs, the President's actions can be limited to the express terms of a statutory authorization. *Honored in the Breech: Presidential Authority to Execute the Laws with Military Force*, 83 YALE L. J. 130, 143-44 (1973). *See also* O'Shaugnhessy, *supra* note 199, at 712-13.

[215] *Compare* 7 CONG. REC. 3582 (statement of Rep. Kimmel) *with* 7 CONG. REC. 3851-52 (statement of Mr. Gardner).

[216] 7 CONG. REC. 3877 (1878). As introduced, the measure provided:

> From and after the passage of this act it shall not be lawful to employ any part of the army of the United Sates as a *posse comitatus* or otherwise under the pretext or for the purpose of executing the laws, *except in such cases and under such circumstances as such employment of said force may be expressly authorized by act of Congress*; and no money appropriated by this act shall be used to pay any of the expenses incurred in the employment of any troops in violation of this section; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not exceeding $10,000 or imprisoned not exceeding two years, or by both such fine and imprisonment. (Emphasis added).

[217] 7 CONG. REC. 4303-304 (1878). The Senate version would have provided:

> From and after the passage of this act it shall not be lawful to employ any part of the army of the United Sates as a *posse comitatus* or otherwise for the purpose of executing the laws, *except in such cases and under such circumstances as such employment of said force may be authorized by the Constitution or by act of Congress*; and no money appropriated by this act shall be used to pay any

U-DOW-CAR-073

conference and subsequently enacted as upholding the position of their respective bodies on the issue. While the House manager believed that retention of the word "expressly" was important to prevent the use of the Army wherever implied authority could be inferred,[218] the Senate manager suggested that the term could safely be kept in without affecting the President's ability to act as required by the Constitution.[219]

Early commentaries suggest that the word "expressly" must be ignored, for otherwise in their view the Posse Comitatus Act is a constitutionally impermissible effort to limit the implied or inherent powers of the President.[220] The regulations covering the use of the Armed Forces during

---

of the expenses incurred in the employment of any troops in violation of this section. (Emphasis added).

[218] As the House manager viewed the matter:

But these [compromises on other differences in the Army appropriation bill] are all minor points and insignificant questions compared with the great principle which was incorporated by the House in the bill in reference to the use of the Army in time of peace. The Senate had already conceded what they called and what we might accept as principle; but they had stricken out the penalty and had stricken out the word 'expressly,' so that the Army might be used in all cases where implied authority might be inferred. The House committee planted themselves firmly upon the doctrine that rather than yield this fundamental principle, for which for three years this House had struggled, they would allow the bill to fail—notwithstanding the reforms which we had secured; regarding these reforms as of but little consequence alongside the great principle in all its length and breadth, including the penalty which the Senate had stricken out….We bring you back, therefore, a report with the alteration of a single word, which the lawyers assure me is proper to be made, restoring to this bill the principle for which we have contended so long, and which is so vital to secure the rights and liberties of the people.

7 CONG. REC. 4686 (1878) (remarks of Rep. Hewitt).

[219] The manager in the Senate described the compromise as follows:

With reference to the provisions of the bill inserted by the House prohibiting the use of the Army, … Senators will remember that it was amended in the senate so as to strike out ['pretext' and 'expressly,' and the penalty, and amended] so as to read 'by the Constitution or by act of congress.'… We found considerable difficulty in agreeing upon this section, but the modification which the Senate had made in it made it possible to come to an understanding…. As it now stands, the House yielded that the words 'under the pretext of' should go out, which we contended were in the nature of a reflection upon the past administration of the government, and we could not consent that anything in the nature of a reflection, and which was entirely useless for any practical purpose, should remain in the bill….

With reference to the word 'expressly,' we restored it and allowed it to go in, so that now the employment of such force must be expressly authorized by the Constitution or by act of Congress, they assenting that the words 'the Constitution or by' before the words 'act of Congress' might remain in, so that if the power arises under either the Constitution or the laws it may be exercised and the Executive would not be embarrassed by the prohibition of Congress so to act where the Constitution requires him to act; and the embarrassments would not have the effect of restraining the action of an upright and energetic Executive, but still might raise a question which he would desire to avoid if possible….

7 CONG. REC. 4648 (1878) (remarks of Sen. Sargent).

[220] *See* LIEBER, *supra* note 213, at 14-15.

The debate [on the Posse Comitatus section] was an interesting one, but too long to follow in detail. An attempt was made to strike out the word "expressly," but that failed. But, manifestly, the clause, as enacted, recognizes the Constitution as a direct source of authority for the employment of the Army. This is a very important consideration in the construction of the legislation. And another matter of great importance is also to be observed with reference to it. The enactment prescribes that it shall be unlawful to employ any part of the Army as a *posse comitatus*, or otherwise, for the purpose of executing the laws, except when it is *expressly* authorized by the Constitution or by act of Congress. Now, it is evident that the word 'expressly' can not be construed as placing a restriction on any constitutional power. If authority so to use the Army is included in a

U-DOW-CAR-074

civil disturbances do not go quite that far, but they do assert two constitutionally based exceptions—sudden emergencies and protection of federal property.[221]

The question of whether the constitutional exception contained in the Posse Comitatus Act includes instances where the President is acting under implied or inherent constitutional powers or whether it was merely a face-saving device is a question that may turn on whether Congress may constitutionally restrict the President's powers, if any, in the area—a question the courts have yet to answer.

# When the Posse Comitatus Act Does Not Apply

In addition to any express constitutional exceptions, the use of the Armed Forces to execute federal law does not violate the Posse Comitatus Act when (1) an act of Congress expressly authorizes use of part of the Army or Air Force as a posse comitatus or otherwise to execute the law; (2) the activity in question does not involve use of part of the Armed Forces covered by the proscription; or (3) the activity in question does not constitute "execution of the law."

---

constitutional power, although it be not expressly named, it can not, of course, be taken away by legislation.

Lorence, *supra* note 205, at 185-86.

But it is evident that the word *expressly* in the Posse Comitatus Act cannot be construed as placing a restriction on the constitutional Power of the President, because even though not expressly named, such constitutional power cannot be taken away by legislation.... Thus, the Posse Comitatus Act appears to be a rather singular statute to pass, saying that the Army of the United States shall not be used for the purpose of executing the laws, in view of the fact that the Constitution expressly makes the President the Commander-in-Chief of the Army and Navy, and expressly makes it his duty to take care that the laws are faithfully executed.

[221] According to 32 C.F.R. § 215.4(b),(c)(1),

(b) Aside from the constitutional limitations of the power of the Federal Government at the local level, there are additional legal limits upon the use of military forces within the United States. The most important of these from a civil disturbance standpoint is the Posse Comitatus Act (18 U.S.C. § 1385), which prohibits the use of any part of the Army or the Air Force to execute or enforce the laws, except as authorized by the Constitution or Act of Congress.

(c) The Constitution and Acts of Congress establish six exceptions generally applicable within the entire territory of the United States, to which the Posse Comitatus Act prohibition does not apply.

(1) The constitutional exceptions are two in number and are based upon the inherent legal right of the U.S. Government – a sovereign national entity under the Federal Constitution – to insure the preservation of public order and the carrying out of governmental operations within its territorial limits, by force if necessary.

(i) The emergency authority. Authori[z]es prompt and vigorous Federal action, including use of military force to prevent loss of life or wanton destruction of property and to restore governmental functioning and public order when sudden and unexpected civil disturbances, disasters, or calamities seriously endanger life and property and disrupt normal governmental functions to such an extent that duly constituted local authorities are unable to control the situation.

(ii) Protection of Federal property and functions. Authorizes Federal action, including the use of military forces, to protect Federal property and Federal governmental functions when the need for protection exists and duly constituted local authorities are unable or decline to provide adequate protection.

For a discussion of instances when the emergency, "immediate response authority" has been used, see Jim Winthrop, *The Oklahoma City Bombing: Immediate Response Authority and Other Military Assistance to Civil Authority (MACA)*, 1997-JUL ARMY LAW. 3 (1997).

U-DOW-CAR-075

## Statutory Exceptions

### Generally

The Posse Comitatus Act does not apply where Congress has expressly authorized use of the military to execute the law.[222] Congress has done so in three ways: (1) by giving a branch of the Armed Forces civilian law enforcement authority; (2) by establishing general rules for certain types of assistance; and (3) by addressing individual cases and circumstances with more narrowly crafted legislation. Thus it has vested the Coast Guard, a branch of the Armed Forces, with broad law enforcement responsibilities.[223] Second, over time it has enacted a fairly extensive array of particularized statutes, like those authorizing the President to call out the Armed Forces in times of insurrection and domestic violence.[224] Finally, it has passed general legislation permitting the

---

[222] "Whoever, *except in cases and under circumstances expressly authorized by* the Constitution or *Act of Congress,* willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385 (2018) (emphasis added).

[223] 14 U.S.C. Section 2 provides:

> The Coast Guard shall enforce or assist in the enforcement of all applicable Federal laws on, under, and over the high seas and waters subject to the jurisdiction of the United states; shall engage in maritime air surveillance or interdiction to enforce or assist in the enforcement of the laws of the United States; shall administer laws and promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States covering all matters not specifically delegated by law to some other executive department; shall develop, establish, maintain and operate with due regard to the requirements of national defense, aids to maritime navigation, icebreaking facilities, and rescue facilities for the promotion of safety on, under, and over the high seas and waters subject to the jurisdiction of the United States; shall, pursuant to international agreements, develop, establish, maintain, and operate icebreaking facilities on, under, and over the waters other than the high seas and waters subject to the jurisdiction of the United States; shall engage in oceanographic research on the high seas and in waters subject to the jurisdiction of the United States; and shall maintain a state of readiness to function as a specialized service in the Navy in time of war, including the fulfillment of Maritime Defense Zone command responsibilities.

Coast Guard personnel are also considered customs officers for purpose of customs law enforcement, 19 U.S.C. § 1401(i) (2018) ("When used in this subtitle [relating to administrative provisions concerning customs duties] or in part I of subtitle II of this chapter [relating to the miscellaneous provisions of the Tariff Act of 1930] ... (i) The terms 'officer of the customs' and 'customs officer' mean ... any commissioned, warrant, or petty officer of the Coast Guard ... "); 19 U.S.C. § 1709(b) (2018) (Coast Guard officers are customs officials for purposes of the Anti-Smuggling Act). The Coast Guard has explicit law enforcement powers under 14 U.S.C. § 89 (2018) ("The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States."); 14 U.S.C. § 91 (2018) (empowering Secretary of the respective department in which the Coast Guard is operating to provide for safety and security of U.S. naval vessels). *See generally* Greg Shelton, Note, *The United States Coast Guard's Law Enforcement Authority Under 14 U.S.C. § 89: Smugglers' Blues or Boaters' Nightmare?*, 34 Wm. & Mary L. Rev. 933 (1993); Christopher A. Abel, Note, *Not Fit for Sea Duty: The Posse Comitatus Act, the United States Navy, and Federal Law Enforcement at Sea*, 31 Wm. & Mary L. Rev. 445 (1990).

[224] Statutory exceptions to the Posse Comitatus Act include:

*5 U.S.C. App. (Inspector General Act of 1978) § 8(g)* (Department of Defense Inspector General is not limited by the Posse Comitatus Act (18 U.S.C. § 1385) in carrying out audits and investigations under the act);

*10 U.S.C. §§ 251-255* (President may use the militia and Armed Forces to suppress insurrection and enforce federal authority in the face of rebellion or other forms of domestic violence);

*10 U.S.C. § 12406* (President may call National Guard units or members into federal service to repel an invasion, suppress a rebellion, or execute federal laws when he is unable to execute them using the regular forces);

*16 U.S.C. § 23* (Secretary of the Army may detail troops to protect Yellowstone National Park upon the request of the Secretary of the Interior);

U-DOW-CAR-076

Armed Forces to share information and equipment with civilian law enforcement agencies, subject to restrictions on engaging in direct and active law enforcement.[225]

---

16 U.S.C. § 78 (Secretary of the Army may detail troops to protect Sequoia and Yosemite National Parks upon the request of the Secretary of the Interior);

16 U.S.C. § 593 (President may use the land and naval forces of the United States to prevent destruction of federal timber in Florida);

16 U.S.C. § 1861(a) (Secretary of Homeland Security (or the Secretary of the Navy in time of war) may enter into agreements for the use of personnel and resources of other federal or state agencies—including those of the Department of Defense—for the enforcement of the Magnuson Fishery Conservation and Management Act);

18 U.S.C. §§ 112, 1116 (Attorney General may request the assistance of federal or state agencies—including the Army, Navy and Air Force—to protect foreign dignitaries from assault, manslaughter and murder);

18 U.S.C. § 351 (FBI may request the assistance of any federal or state agency—including the Army, Navy and Air Force—in its investigations of the assassination, kidnapping or assault of a Member of Congress);

18 U.S.C. § 1201 (Attorney General may request assistance from any Federal, State, or local agency, including the Army, Navy, and Air Force, to enforce prohibition against kidnapping foreign officials and internationally protected persons);

18 U.S.C. § 1751 (FBI may request the assistance of any federal or state agency—including the Army, Navy and Air Force—in its investigations of the assassination, kidnapping or assault of the President);

18 U.S.C. § 3056 note (Director of the Secret Service may request assistance from the Department of Defense and other federal agencies to protect the President);

18 U.S.C. § 3192 (President may employ such portion of the land or naval forces of the United States, or of the militia thereof, as may be necessary for the safe-keeping and protection of an accused who is extradited to the United States);

22 U.S.C. § 408 (President may use the land and naval forces of the United States to enforce Title IV of the Espionage Act of 1917 (arms embargoes) (22 U.S.C. §§ 401-408));

22 U.S.C. § 461 (President may use the land and naval forces and militia of the United States to enforce parts of the Neutrality Act, 22 U.S.C. §§ 461-465 and 18 U.S.C. §§ 958-962);

22 U.S.C. § 462 (President may use the land and naval forces and militia of the United States to detain or compel departure of foreign ships under the provisions of the Neutrality Act);

25 U.S.C. § 180 (President may use military force to remove trespassers from Indian treaty lands);

42 U.S.C. § 97 ("officers of the United States shall faithfully aid in the execution of [state] quarantines and health laws, according to their respective powers and within their respective precincts, and as they shall be directed, from time to time, by the Secretary of Health and Human Services");

42 U.S.C. § 1989 (magistrates issuing arrest warrants for civil rights violations may authorize those serving the warrants to call for assistance from bystanders, the posse comitatus, or the land or naval forces or militia of the United States);

42 U.S.C. § 5170b (Governor of state in which a major disaster has occurred may request the President to direct the Secretary of Defense to permit the use of DOD personnel for emergency work necessary for the preservation of life and property, but DOD does not consider this provision to authorize law enforcement measures);

43 U.S.C. § 1065 (President may use military force to remove unlawful enclosures from the public lands);

48 U.S.C. § 1418 (President may use the land and naval forces of the United States to protect the rights of owners in guano islands);

48 U.S.C. § 1422 (Governor of Guam may request assistance of senior military or naval commander of the Armed Forces of the United States in cases of disaster, invasion, insurrection, rebellion or imminent danger thereof, or lawless violence);

48 U.S.C. § 1591 (Governor of the Virgin Islands may request assistance of senior military or naval commander of the Armed Forces of the United States in the Virgin Islands or Puerto Rico in cases of disaster, invasion, insurrection, rebellion or imminent danger thereof, or of lawless violence);

49 U.S.C. § 324 (Secretary of Transportation may provide for participation of military personnel in carrying out duties);

50 U.S.C. § 220 (President may use the Army, Navy or militia to prevent the unlawful removal of vessels or cargoes from customs areas during times of insurrection).

[225] Military assistance available to civilian law enforcement entitles includes the following provisions:

U-DOW-CAR-077

How explicit must a statutory exception be? If one believes the word "expressly" should be ignored with respect to the constitutionally based exception, consistency might suggest no more is required than that Congress authorize a thing to be done. To those so inclined, the position is further fortified when the statute authorizes executive branch action in circumstances where the President's faithful execution responsibility,[226] coupled with the Administrative Housekeeping Statute,[227] can be called into play. In this rarely espoused view, if an agency has statutory authority to perform a task, the military may be asked to help.

Others maintain that statutes which authorize assistance from federal agencies and departments generally in order to accomplish a particular task qualify as exceptions even if they do not mention the Department of Defense or any part of the military establishment by name.[228] On the one hand, such legislation has ordinarily come into being after the Posse Comitatus Act and thus would ordinarily be thought to amend any conflicting earlier law. On the other hand, the use of military force in civilian affairs is such an extraordinary thing that perhaps it ought not be presumed, but rather found only where Congress has so stated in hoc verba.

---

*10 U.S.C. § 271* (Secretary of Defense may provide federal, state, or local civilian law enforcement officials with information collected during military training operations or training);

*10 U.S.C. § 272* (Secretary of Defense may make equipment and facilities available to federal, state, and local law enforcement operations);

*10 U.S.C. § 273* (Secretary of Defense may train federal, state, and local law enforcement officials to operate and maintain equipment);

*10 U.S.C. § 274* (Secretary of Defense may provide personnel to maintain and operate equipment and facilities in support of certain federal, state and local law enforcement operations;)

*10 U.S.C. § 282* (the Secretary of Defense may provide assistance to the Department of Justice in emergency situations involving chemical or biological weapons of mass destruction);

*10 U.S.C. § 282 note (§ 1023 of the National Defense Authorization Act for Fiscal Year 2000)* (during fiscal years 2000 through 2004, the Secretary of Defense was authorized to provide assistance to federal and state law enforcement agencies to respond to terrorism or threats of terrorism);

*10 U.S.C. § 283* (Secretary of Defense may provide assistance in support of Department of Justice activities during situations involving bombings of places of public use, Government facilities, public transportation systems, and infrastructure facilities);

*10 U.S.C. § 284* (Secretary of Defense may provide support for the counterdrug activities or activities to counter transnational organized crime of any other department or agency of the Federal Government or of any State, local, tribal, or foreign law enforcement agency for certain purposes).

*18 U.S.C. § 831* (Attorney General may request assistance from the Secretary of Defense for enforcement of the proscriptions against criminal transactions in nuclear materials if an emergency is deemed to exist); 18 U.S.C. §§ 175a, 229E, and 2332e cross reference to the Attorney General's authority under 10 U.S.C. § 282 to request assistance from the Secretary in an emergency involving biological weapons, chemical weapons, and weapons of mass destruction respectively.

*42 U.S.C. § 98* (Secretary of the Navy at the request of the Public Health Service may make vessels or hulks available to quarantine authority at various U.S. ports).

[226] U.S. CONST. art. II, § 3, cl.3 ("[T]he President] shall take care that the laws be faithfully executed.").

[227] 5 U.S.C. § 301 (2018) ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property....").

[228] *E.g.*, 21 U.S.C. § 873(b) ("[w]hen requested by the Attorney General, it shall be the duty of any agency or instrumentality of the Federal Government to furnish assistance, including technical advice, to him for carrying out his functions under this subchapter; except that no such agency or instrumentality shall be required to furnish the name of, or other identifying information about, a patient or research subject whose identity it has undertaken to keep confidential").

U-DOW-CAR-078

The final and more commonly accepted proposition is that the phrase "in cases and under circumstances expressly authorized by ... Act of Congress" demands that the statutory exception specifically refer to some form of military assistance.[229]

## The Insurrection Acts

The clearest statutory exceptions to the Posse Comitatus Act are found in the Insurrection Acts, described above, in which Congress has delegated authority to the President to call forth the military during an insurrection or civil disturbance. The modern version has changed little from the original enactments,[230] and is now found in Chapter 13 of Title 10, U.S. Code.[231] The three main authorities differ according to which constitutional provision they are meant to implement, but the provisions have often been used together or without specifying which part of Chapter 13 of Title 10, U.S. Code, provided the authority.[232] In any case where the President considers it necessary to invoke the authority to use the militia or Armed Forces under these provisions, he is required by 10 U.S.C. Section 254 to issue a proclamation immediately ordering "insurgents to disperse and retire peaceably to their abodes within a limited time."

The following sections describe the modern authorities and how they have been invoked since the passage of the Posse Comitatus Act, including some instances where a separate authority may have been used for similar purposes.

### At the Request of a State

Section 251 of Title 10 (previously section 331 of Title 10) authorizes the President to use the military to suppress an insurrection at the request of a state legislature, or its governor, in the event the legislature cannot be convened.[233] It is meant to fulfill the federal government's responsibility to protect states in the event of "domestic violence"[234] (although the term

---

[229] The Department of Defense Instruction (DoDI), for example, lists only the military-aid-specific statutes in its inventory of statutory exceptions, DoDI No. 3025.21, (Encl.3) 1(b)(5) (2013).

[230] The 109th Congress changed the name of the *U.S. Code* chapter from "Insurrection Act" to "Enforcement of the Laws to Restore Public Order" and amended Section 333 to expand the circumstances in which it might be invoked, John Warner National Defense Authorization Act for Fiscal Year 2007, P.L. 109-364 § 1076, 120 Stat. 2083, 2404, (October 17, 2006)). The revised section 333 explicitly covered instances of "domestic violence" where public order is disrupted due to a "natural disaster, epidemic, or other serious public health emergency, terrorist attack or incident, or other condition." It authorized the President to employ federal troops to "restore public order and enforce the laws of the United States," without a request from the governor or legislature of the state involved, in the event he were to determine that local authorities were unable to maintain public order, where, as before, either the enjoyment of equal protection of the laws were impeded or the execution of federal law and related judicial process were obstructed. The President's recourse to "any other means" was eliminated, and the relevant state was to be deemed to have denied constitutional equal protection any time the authority was exercised outside of the newly described disaster scenario. The 110th Congress repealed these changes in the Defense Authorization Act for Fiscal Year 2008, P.L. 110-181 Section 1068, 122 Stat. 3, 325 (January 28, 2008), returning the language of section 333 to its previous state. The provision is currently codified at 10 U.S.C. § 253 (2018).

[231] The relevant DoD regulation is Defense Support of Civilian Law Enforcement Agencies, DoDI No. 3025.21, (Encl.4).

[232] These provisions were previously codified in Chapter 15, U.S. Code.

[233] 10 U.S.C. Section 251 provides:

> Whenever there is an insurrections in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection.

[234] U.S. CONST. art. IV, § 4. See *supra* note 201 for text.

U-DOW-CAR-079

"insurrection" is arguably much narrower than the phrase "domestic violence" in the Constitution). The first request by a governor for troops after enactment of the Posse Comitatus Act appears to have occurred in 1879, when the governor of Nebraska requested a company of troops to help protect a local court where the trial of a prominent outlaw was taking place, which had occasioned concern that the courthouse would be the scene of a rescue attempt by the portion of the band of outlaws still at large.[235] This request was denied, however, as it was framed as a request to use the troops as a posse comitatus, which, according to the Secretary of War, had become unlawful following enactment of the Posse Comitatus Act,[236] although if the situation were to become more dire, the governor could request aid from the President in the form of troops under military command.[237]

Another proclamation was issued under this provision in 1892 due to a miners' strike in Coeur d'Alene, ID.[238] In 1899, President McKinley deployed 500 troops to Coeur D'Alene, ID, at the governor's request, to keep a conflict between union miners and mine owners under control, but did not issue a proclamation required by statute.[239] Although by this time General Hancock's doctrine regarding the relationship between federal and state troops had gained acceptance,[240] state officials directed operations there.[241] When the governor of Colorado requested federal aid to assist state militia to cope with a coal miners' strike, Secretary of War Elihu Root informed the governor that any troops furnished pursuant to the relevant provision of the insurrection statutes would not be at the disposal of the governor, but would remain under the direction of the President.[242]

During the early part of the 20th century, Presidents generally insisted that governors comply with the requirements of the Insurrection Act and the Constitution in formulating requests for the assistance of the Army.[243] After the governor of Nevada requested troops in 1907 to put down violence by a miners' union that was forcibly removing non-union workers from the area, nine companies of infantry were sent there, but told not to act until a proclamation was issued.[244] The

---

[235] *See* S. Doc. No. 67-263, *supra* note 36, at 180-81.

[236] *Id.* at 181.

[237] *Id.*

[238] *Id.* at 192 (noting that troops were used to assist civil officers in making arrests and guarding prisoners); 27 Stat. 1030. It appears that federal troops were essentially employed as posse comitatus to assist state officials in breaking the miner's union rather than restoring order. *See* COOPER, *supra* note 98, at 168.

[239] Felicetti & Luce, *supra* note 141, at 124 (reporting that the President failed to issue the proclamation required by the statute). A proclamation was apparently prepared but withheld unless circumstances required its issue, which were deemed not to have occurred. *See* S. Doc. No. 67-263, *supra* note 36, at 215. Troops were nevertheless used to pursue the perpetrators of violence, who had fled the area, in aid of state deputies. Felicetti & Luce, *supra* note 141, at 124-25 ("the Army helped state officials arrest and detain, without legal process, over 1000 union members and sympathizers, and it placed many under Army guard for up to four months"). A congressional investigation of the legality of the Army's actions split along party lines, with the Republican majority holding that no proclamation was necessary under the insurrection laws unless the President declared martial law. *Id.* at 125; *Coeur D'Alene Labor Troubles*, H.R. REP. No. 56-1999 (1900).

[240] *See supra* note 115; RICH, *supra* note 37, at 191.

[241] *See* RICH, *supra* note 37, at 191 (attributing this state of affairs to the President's "lack of careful supervision").

[242] *Report on Labor Disturbances in the State of Colorado from 1880 to 1904, Inclusive, With Correspondence Relating Thereto*, S. Doc. No. 58-122, at 10-11.

[243] *See, e.g., id.* at 10-14 (correspondence between War Department and Colorado governor questioning existence of actual insurrection that could not be overcome using forces available to state).

[244] *See* S. Doc. No. 67-263, *supra* note 36, at 310.

U-DOW-CAR-080

mere presence of troops having quieted the unruly element, no proclamation was issued.[245] President Roosevelt chastised the governor for having requested federal troops without endeavoring to convene the legislature as required under the Constitution and Insurrection Act.[246] In 1914, a miner's strike at Ludlow, Colorado, led the governor there to request federal troops, which President Wilson granted.[247]

In 1917, after virtually the entire National Guard was called into federal service for the war in Europe,[248] the Secretary of War instituted a "Direct Access Policy" to permit local and state officials to make direct requests for the assistance of federal troops to reduce the burden on states.[249] Between 1919 and 1920, federal troops were employed to assist in putting down labor disputes and other minor disturbances 29 times, all without the issuance of a presidential proclamation.[250] Troops were deployed from the lumber mills of the Northwest to the copper mines in Arizona and New Mexico, and from the coal mines in Appalachia to the oil fields in Texas and Louisiana, justified on the need to keep up production for the war and replace absent state militia.[251] Federal troops also intervened to keep the peace in several cities afflicted by racial quarrels.[252] The policy was revoked in 1921 due to the perception that troops were being misused,[253] and President Harding issued the requisite proclamation in order to send troops to quell a dispute involving West Virginia coal miners.[254] The governor directed state police forces to act under the direction of the U.S. military commander.[255]

At the request of the Commissioners of the District of Columbia, President Hoover used federal troops in 1932 to oust the Bonus Marchers from federal property in Washington, DC, but did not issue a proclamation.[256] President Roosevelt turned down several requests during the 1930s to

---

[245] Id.

[246] Id. at 311.

[247] 38 Stat. 1994 (1914). Federal intervention was requested after the Colorado National Guard had engaged the miners in a pitched battle during which a number of persons were killed. See S. Doc. No. 67-263, supra note 36, at 312. President Wilson requested the governor to withdraw state forces once federal troops arrived, explaining that his request was compelled by the "manifest disadvantage of having two military forces under separate sources of control." Id. at 314.

[248] 40 Stat. 1681 (1917).

[249] Felicetti & Luce, supra note 141, at 126 (commenting that the policy amounted to a reestablishment of the Cushing Doctrine for nearly four and a half years, without evoking any congressional opposition); Laurie and Cole, supra note 37, at 229-31 (reporting that insurrection statutes and the Posse Comitatus Act were negated, and that soldiers were authorized to make arrests); Corwin, supra note 169, at 157-58 (calling policy a deliberate and sustained neglect of the formalities required by Article IV and the Insurrection Acts).

[250] See S. Doc. No. 67-263, supra note 36, at 317 (stating that in no case was it deemed necessary to issue a proclamation under § 5300 of the Revised Statues, the predecessor to 10 U.S.C. § 254).

[251] See Laurie and Cole, supra note 37, at 312.

[252] Rich, supra note 37, at 152. In Washington, DC, rioting was apparently sparked by the use of soldiers, sailors, and marines to conduct a manhunt for a black man suspected of having attacked a white woman. Id. at 153. The Secretary of War ordered that troops should be used to assist civilian police, and military intelligence assets were deployed in an effort to learn about planned attacks. Id. Riots also occurred in Gary, Indiana, and Omaha, Nebraska. Id. at 155-57.

[253] See Laurie and Cole, supra note 37, at 252, 325.

[254] 42 Stat. 2247 (1921). President Harding at first declined a number of requests from the governor, finding military intervention unwarranted; however, after state constabulary forces exchanged fire with a group of miners, the Army sent in several detachments of troops, who were able to restore order without resorting to force. Rich, supra note 37, at 158-67.

[255] See Rich, supra note 37, at 91.

[256] Id. at 170-71. The "Bonus Army" consisted of needy veterans from all parts of the country who descended on Washington, DC, to demand immediate payment of the soldiers' bonus Congress had promised. Id.

U-DOW-CAR-081

provide federal troops for strike duty,[257] but directed the Secretary of War in 1941 to seize and operate an aviation plant where a strike threatened wartime fighter plane production.[258] Although the Attorney General likened the situation to an insurrection, the President's order did not make reference to the insurrection statutes,[259] nor was it accompanied by a proclamation to disperse. When faced with losing their deferred status under the draft, the workers promptly returned to the plant and resumed production under military supervision.[260] Other labor disturbances were similarly addressed by having the Army or Navy seize and manage plants or railroads deemed necessary for the war effort, but these occurred under separate authorities.[261]

During the Second World War, racial strife began to contribute once again to civil disturbances,[262] although federal troops were only called in twice. At the request of the Michigan governor, President Roosevelt issued a proclamation and sent federal troops to Detroit[263] to restore order during a race riot there. Troops were also sent to Philadelphia in 1944 to seize and operate the transportation system after white workers went on strike to protest the employment of some black workers as operators.[264] This, however, was done pursuant to a 1916 statute that empowered the President, during time of war, to order the Secretary of War to take over the possession and operation of transportation systems as required for war efforts.[265]

A race riot in Detroit led the Michigan governor to request troops in 1967, which President Johnson provided.[266] Widespread violence in cities across the country following the assassination of Martin Luther King put the military establishment on alert for possible implementation of the government's plan for civil disturbances, Garden Plot.[267] In the end, only the mayor of

---

[257] *Id.* at 177. A 1941 request from the governor of Wisconsin for federal intervention in another strike went unanswered because it did not explicitly ask for troops. *See id.* at 192.

[258] Exec. Order No. 8773, 6. Fed. Reg. 2777 (June 9, 1941). President Roosevelt asserted that he was acting under the Constitution and laws of the United States, but did not mention any specific statutes. Congress later enacted the War Labor Disputes Act of 1943, Pub. L. No. 78-89, 57 Stat. 163, which provided authority for government seizure and operation of facilities deemed necessary for the war effort, § 3, 57 Stat. at 164. That authority expired under its own terms on the termination of hostilities, 57 Stat. 165. The Supreme Court later held that the omission of seizure authority from subsequent labor relations and defense production statutes precluded the President's resort to seizure of production facilities under a claim of inherent executive power. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

[259] *See* RICH, *supra* note 37, at 183-84.

[260] *Id.* at 185-86. War department seizures of manufacturing plants where war materials were under production continued during the war, which effectively precluded the need to send troops in the event of a strike. *See* SCHEIPS, *supra* note 37, at 3. There were twelve such cases between September 1945 to January 1953, *id.* at 4.

[261] *See* SCHEIPS, *supra* note 37, at 17 (describing the practice as a "legal remedy" that did not involve sending in troops); LAURIE AND COLE, *supra* note 37, ch. 17.

[262] *See* SCHEIPS, *supra* note 37, at 17 (asserting that demands for equality on the part of black Americans and the resulting backlash on the part of white Americans led to a series of racial conflicts that sometimes became violent).

[263] Proclamation No. 2588, 8 Fed. Reg. 8733 (June 25, 1943).

[264] *See* Allan M. Winkler, *The Philadelphia Transit Strike of 1944*, 59 J. AM. HIST. 73 (1972).

[265] Exec. Ord. No. 9459, 3 C.F.R. 320 (1943-1948) (citing the Act of August 29, 1916, 39 Stat. 645, among other authorities). That authority still exists and is codified at 10 U.S.C. Section 2644.

[266] Proclamation 3795, 32 Fed. Reg. 10905 (July 24, 1967) (citing governor's request as well as a need to execute federal law); Exec. Ord. No. 11364, 32 FR 10907 (July 24, 1967); *see also* SCHEIPS, *supra* note 37, at 190-91.

[267] *See* SCHEIPS, *supra* note 37, at 271-72. "Garden Plot" was the nickname for the Army's successive civil disturbance plans beginning in 1968 through 2001. The 1968 version contained an Intelligence Annex which provided guidance for commands to gather intelligence with respect to local "dissident elements" who might conspire to instigate a riot. *See id.* at 228. Army surveillance and intelligence operations targeting civil rights leaders and antiwar activists under the guise of planning for possible civil disturbances was a subject of scrutiny of the Church Committee. *See Improper Surveillance of Private Citizens by the Military, in* Supplementary Detailed Staff Reports on Intelligence Activities and

U-DOW-CAR-082

Washington, DC, and the governors of Illinois and Maryland requested assistance under the insurrection statutes. President Lyndon Johnson issued proclamations in April, 1968 ordering rioters to disperse in Washington, DC,[268] Chicago,[269] and Baltimore.[270] Each proclamation mentioned both the request for assistance and the need to enforce federal law, citing the entire chapter on insurrections in Title 10 among relevant authorities. Regular troops and federalized National Guard were deployed to these cities.[271]

In 1989, reports of widespread looting on the island of St. Croix in the wake of Hurricane Hugo led President George H. W. Bush to issue a proclamation[272] and send troops to the Virgin Islands,[273] as the territorial governor requested federal intervention.[274] The proclamation cited the need to enforce federal law and protect public property, without expressly mentioning the governor's request.[275] Eleven hundred troops (mostly military police) and 80 federal investigators were sent to St. Croix to restore order and investigate reports of looting.[276]

The most recent invocation of 10 U.S.C. § 251 (then codified at 10 U.S.C. § 331) occurred in 1992, when the acquittal of police officers on charges of beating motorist Rodney King sparked rioting in Los Angeles.[277] The California National Guard, already on the scene but unable to control the violence, was federalized, which may have hampered its efforts due to a misunderstanding that the Guard troops under federal control could no longer carry out law enforcement operations due to the Posse Comitatus Act.[278]

## To Enforce Federal Law

Section 252 of Title 10 (previously section 332 of Title 10) delegates Congress's power under the Constitution to call forth the militia[279] to the President, authorizing him to determine that "unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States make it impracticable to enforce the laws of the United States" and to use the Armed Forces as he considers necessary to enforce the law or to suppress the rebellion. Its first

---

the Rights of Americans, Book III, of the Final Report of the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, SEN. REP. NO. 94-755 (1976) (hereinafter "Church Committee Report"]. The Senate Subcommittee on Constitutional Rights rejected the contention that the authority to conduct such political surveillance flowed from the Insurrection Act. *Id.* at 794.

[268] Proclamation No. 3840, 33 Fed. Reg. 5495 (April 5, 1968).

[269] Proclamation No. 3841, 33 Fed. Reg. 5497 (April 7, 1968).

[270] Proclamation No. 3842, 33 Fed. Reg. 5499 (April 7, 1968).

[271] *See* SCHEIPS, *supra* note 37, at 338 (reporting that 23,008 regular Army troops and 15,586 Guardsmen participated in the federal response).

[272] Proclamation No. 6023, 54 Fed. Reg. 39,151 (Sep. 20, 1989).

[273] Exec. Order No. 12690, 54 Fed. Reg. 39153 (Sep. 20, 1989).

[274] *See* SCHEIPS, *supra* note 37, at 441.

[275] The President may have issued the order for troops prior to any request from the territorial governor. *See* Dennis Hevesi, *Bush Dispatches Troops to Island in Storm's Wake*, N.Y. TIMES, Sept. 21, 1989 (reporting that Governor Alexander Farrelly had told reporters he had not asked for federal troops).

[276] *See* Jeffrey Schmalz, *3 Weeks After Storm, St. Croix Still Needs Troops*, N.Y. TIMES, Oct. 9, 1989.

[277] Proclamation No. 6427, 57 Fed. Reg. 19,359 (May 1, 1992) (citing California governor's notification and request related to rioting in Los Angeles, and also determining that the "domestic violence and disorder are also obstructing the execution of the laws of the United States"); Exec. Order No. 12804, 57 Fed. Reg. 19361 (May 1, 1992).

[278] *See* SCHEIPS, *supra* note 37, at 447 (citing the findings of the Webster Commission, an advisory board set up to investigate the police and military handling of the riots).

[279] U.S. CONST. art. I, § 8, cl. 14.

U-DOW-CAR-083

application after the enactment of the Posse Comitatus Act involved an appeal by the governor of the Territory of New Mexico in 1878 for federal military assistance in putting an end to the anarchy that characterized the territory due to the operation of bands of robbers who were besieging mail coaches and terrorizing the local populace.[280] After the proclamation to disperse was issued, military forces restored relative order, after which civil authorities reportedly came to depend on U.S. troops for law enforcement to such an extent that they essentially abandoned their own efforts to enforce the law. When the governor complained about the lack of military assistance for arresting lawbreakers, the local commanding general replied that his troops could not be used to make ordinary arrests in situations that did not amount to an insurrection or reach a level of lawlessness that would extend beyond the capacity of the usual civil machinery to handle.[281] This interpretation of the new posse comitatus restriction was adopted by the War Department. The Secretary of War later blamed the Posse Comitatus Act in part for the fact that lawlessness and riots in the territory had reached such a level that military intervention was required.[282]

"Indian outrages" in Arizona led to another proclamation under the Insurrection Act, not at the request of the territorial governor but as a response to news that the governor was proposing to arm citizens to go after Apaches suspected of murder, which would oblige the military to take action to protect the reservation.[283] President Arthur initially requested legislative relief from the Posse Comitatus Act due to his view that its prohibition inhibited an effective military response.[284] Congress declined to repeal the prohibition, however, with the Senate Judiciary Committee pointing out that the Posse Comitatus Act was meant to curb the practice of local marshals and their subordinates employing the Armed Forces to assist them in enforcing the law, but not to prevent the President from himself using any part of the Army under a military chain of command.[285]

Federal troops were called to Chicago in July 1894 to quell riots accompanying the railroad strikes.[286] President Grover Cleveland did not issue a proclamation for rioters to disperse until several days after violence had begun, after learning that troops had been compelled to fire on a mob in the nearby town of Hammond, IL.[287] Another proclamation was issued the next day to remove further obstructions to the mail and execution of U.S. law occasioned by the strike as it spread westward.[288] The governors of the afflicted states did not call for federal assistance; in fact,

---

[280] *See* S. Doc. No. 67-263, *supra* note 36, at 178-180. Because New Mexico was a territory and not yet a state, the provisions of now-Section 251 were not applied, but President Rutherford B. Hayes asserted military force was necessary to overcome resistance to U.S. laws. Proclamation of October 7, 1878, 20 Stat. 806, 807.

[281] *See* S. Doc. No. 67-263, *supra* note 36, at 179.

[282] Annual Report of the Secretary of War, 1878 ("In those new regions the Army is the power chiefly relied upon by the law-abiding people for protection and chiefly feared by the lawless classes. Numerous instances might be cited, but the recent occurrences in Lincoln County, N. Mex., constitute a striking example. The inability of the officer in command of the troops at that vicinity to aid the officers of the law in making arrests was one of the principal causes which led to the most disgraceful scenes of riot and murder, amounting, in fact, to anarchy.").

[283] *See* S. Doc. No. 67-263, *supra* note 36, at 182; 22 Stat. 1035 (proclamation).

[284] Felicetti & Luce, *supra* note 141, at 119-20; *see supra* note 183.

[285] Felicetti & Luce, *supra* note 141, 120 (citing 13 Cong. Rec. 3458 (1882) (remarks of Sen. Edmunds on behalf of the Judiciary Committee)). The Senate also disagreed with the Administration's interpretation that the authority to use the Army to execute federal law did not include local territorial laws, making the suggested addition of territories to the authority to provide assistance to states when requested moot. *See supra* note 183.

[286] S. Doc. No. 67-263, *supra* note 36, at 195-96; 12 Stat. 1249 (1894).

[287] S. Doc. No. 67-263, *supra* note 36, at 197.

[288] 28 Stat. 1250 (proclaiming unlawful obstructions in North Dakota, Montana, Idaho, Washington, Wyoming,

U-DOW-CAR-084

the governor of Illinois opposed intervention.[289] Rather, the federal marshals and U.S. attorneys notified the Attorney General, who presented the requests to the President. It appears that obtaining civilian deputies to assist marshals against the strikers was made difficult due to the fact that popular sympathies were with the strikers, leading the civilian authorities to prefer shifting the responsibility to the Army.[290] Federal troops were also used to recapture trains stolen by various "industrial armies" of disaffected miners and laborers.[291]

In 1885, resistance in Utah to the "Edmunds law" for the suppression of polygamy caused the governor of that territory to seek federal assistance, which was granted. Animosity toward Chinese railroad laborers and miners led to major disturbances and to calls for federal troops in a number of western states and territories in 1885-1886.[292] Proclamations were issued for the state of Washington,[293] but federal troops sent there met with no resistance.[294] Federal troops were employed in Montana in 1897 to protect a prisoner charged with murder from a potential mob lynching, but this was done on the order of the local commander under "emergency authority," without a presidential proclamation.[295]

A proclamation was issued in 1914 to employ troops to suppress a riot in Arkansas to support the courts and protect government property.[296]

A large task force of regular troops, National Guard, federal marshals, and other police was assembled to protect the Pentagon during the 1967 anti-war demonstration known as the March on the Pentagon.[297] In connection with this effort, the Army authorized a widespread covert intelligence operation to infiltrate protest groups who were planning to march, and radio communications were also monitored.[298] Section 332 (now codified at 10 U.S.C. § 252) was considered in order to provide the legal justification, but rejected because violence was merely projected and a proclamation was thought to be too difficult to frame under such circumstances.[299] In the end, authorities decided to rely on a non-statutory basis regarded as an implicit sovereign right to protect government property, although section 332 was held in reserve in case the level of violence called for federalizing the National Guard.[300] There were a few

---

Colorado, California, and the territories of Utah and New Mexico).

[289] *See* LIEBER, *supra* note 213, at 43-44 & appendix C.

[290] *See* COOPER, *supra* note 98, at 103 (noting that correspondence between Attorney General and federal judges and marshals suggested that using the Army would save the Justice Department substantial funds).

[291] *See id.* at 106-14.

[292] *See* S. DOC. NO. 67-263, *supra* note 36, at 189-90.

[293] 24 Stat. 1027-28.

[294] *See* S. DOC. NO. 67-263, *supra* note 36, at 190.

[295] *See* LIEBER, *supra* note 213, at 46 & n. 1 (describing incident and Army regulation authorizing commanders to intervene in sudden emergencies where there was no time to await instructions from headquarters). This emergency authority was also used in Denver in 1894 after the governor of Colorado appealed directly to the local commander. *See* S. DOC. NO. 67-263, *supra* note 36, at 193. General McCook, Commander of the Department of the Colorado, sent troops into Denver and advised the governor to withdraw state militia, which the governor declined to do. Federal troops were told their mission was to protect federal property only and not assist the National Guard's efforts to retake the city hall until the governor asked for and received assistance under the insurrection statute. *Id.* at 193-94.

[296] 38 Stat. 2035 (1914).

[297] *See* SCHEIPS, *supra* note 37, at 237-53.

[298] *See* Church Committee Report, *supra* note 267, at 796. The intelligence operation targeted groups in Washington, DC, as well as groups who were planning to travel there to participate, and began weeks before the demonstration was scheduled to occur. *See id.*; SCHEIPS, *supra* note 37, at 247-48.

[299] *See* SCHEIPS, *supra* note 37, at 239.

[300] *See id.* at 239-41. It was apparently felt that the operation would comply with the Posse Comitatus Act so long as

U-DOW-CAR-085

clashes between troops and protesters, but the violence did not reach the threshold for invoking section 332.

The National Guard was called into service during a postal strike in 1970 to "execute the laws of the United States as they relate to the Post Office Department."[301] The cited authority for this action was the Economy Act of 1932,[302] which led to some criticism because that statute does not provide for the use of the Army.[303]

In 1973, the Army became involved in a federal law enforcement operation to quell a civil disturbance on the Pine Ridge Reservation in South Dakota after some 200 members of the American Indian Movement seized and occupied the village of Wounded Knee to demonstrate their grievances. The Attorney General advised President Nixon to send federal troops to the area, presumably under the authority of 10 U.S.C. § 332 (now § 252), but military advisors counseled against the idea.[304] Instead, some 350 federal officers were sent to the scene, including a paramilitary group from the U.S. Marshals Service.[305] Nevertheless, the 82d Airborne Division was tasked to provide a 1,000-man contingency force as well as some observers, and regional National Guard units provided surveillance aircraft and other equipment. The troops from the 82d Airborne were not deployed, but some questioned whether military aid supplied to civilian law enforcement was permissible under the Posse Comitatus Act,[306] leading to litigation and eventually legislation to authorize some types of military support to civil authorities. (See below "Support to Law Enforcement.")

In 1987, President Reagan issued a proclamation to order rioting prisoners in the federal penitentiary in Atlanta, Georgia, to disperse.[307] He authorized the Secretary of Defense to call up National Guard units or members to suppress the violence, specifying that the law enforcement policies determined by the Attorney General were to be followed.[308] Local authorities were able to negotiate the release of hostages the prisoners had taken and bring an end to the trouble before troops arrived.[309]

### Civil Rights Protection

Section 253 of Title 10 (previously section 333 of Title 10) permits the President to use the Armed Forces to suppress any "insurrection, domestic violence, unlawful combination, or conspiracy" if law enforcement is hindered within a state, and local law enforcement is unable to protect individuals, or if the unlawful action "obstructs the execution of the laws of the United States or impedes the course of justice under those laws." This section was enacted to implement

---

troops remained under military command and subject to presidential direction, and were not placed under the direction of civilian officials. *See id.* at 240.

[301] Proclamation 3972, Declaring a National Emergency, 35 Fed. Reg. 5001 (March 24, 1970).

[302] Pub. L. No. 97–258, Sept. 13, 1982, 96 Stat. 933, codified as amended at 31 U.S.C. § 1535 (2018).

[303] *See* SCHEIPS, *supra* note 37, at 433. It was envisioned that the troops might be required to restore order if the strike were to turn violent, but since no violence occurred, the military contribution consisted of helping to sort and move mail.

[304] *Id.* at 436-37.

[305] *Id.* at 434-35.

[306] *Id.* at 436.

[307] Proclamation No. 5748, 52 Fed. Reg. 46730 (Dec. 9, 1987).

[308] Exec. Ord. No. 12,616, 52 Fed. Reg. 46,729 (Nov. 24, 1987).

[309] *See* SCHEIPS, *supra* note 37, at 441.

U-DOW-CAR-086

the Fourteenth Amendment guarantee for equal protection. It does not require the request or even the permission of the governor of the affected state.

The provision lay dormant after the end of Reconstruction until 1957, when President Eisenhower ordered a battle group of the 101st Airborne Division into Little Rock[310] and federalized the entire Arkansas National Guard[311] in order to enforce a court order permitting nine black students to attend a previously white high school. The proclamation to disperse cited both sections 332 and 333 of Title 10, U.S. Code.[312] By federalizing the Arkansas Guard, the President effectively deprived the governor of forces that had several days previously been used to enforce the governor's view of law and order.[313]

Presidents Kennedy and Johnson followed the Little Rock precedent to deal with resistance to court-ordered desegregation in a number of Southern states. In 1962, after the governor of Mississippi attempted to prevent black student James H. Meredith from registering at the University of Mississippi at Oxford, President Kennedy sought to enforce the court order with federal marshals.[314] When marshals met with resistance from state forces and later a riotous mob, President Kennedy federalized the Mississippi National Guard and ordered active Army troops already gathered in the area to take action.[315] The President's proclamation to disperse named the governor and other state officials as forming the unlawful assemblies obstructing the enforcement of the court order, citing as authority both sections 332 and 333.[316] President Kennedy followed a similar course of action to confront state resistance to court ordered desegregation in Alabama twice in 1963.[317] President Johnson cited the same authority in 1965 to deploy troops, both regular Army and federalized National Guard, to Alabama to protect civil rights marchers as they made their way from Selma, AL, to Montgomery.[318]

## Support to Law Enforcement

In 1981, Congress enacted general law enforcement exceptions[319] to the Posse Comitatus Act prohibitions in order to resolve questions raised by the cases that grew out of the events at

---

[310] *Id.* at 40.

[311] Exec. Ord. No. 10,730, 22 Fed. Reg. 7628 (Sept. 24, 1957).

[312] Proclamation No. 3204, 22 Fed. Reg. 7628 (Sept. 24, 1957).

[313] Robert W. Coakley, *Federal Use of Militia and the National Guard in Civil Disturbances*, in BAYONETS IN THE STREETS, 17, 30 (Robin Higham, ed. 1989). The governor had ordered the National Guard to enforce segregation by preventing students from entering any high school that had previously been used exclusively for students of another race, in defiance of a federal court order. *See* SCHEIPS, *supra* note 37, at 34.

[314] *See* SCHEIPS, *supra* note 37, at 86-87.

[315] *Id.* at 87-93; Exec. Ord. No. 11053, 27 Fed. Reg. 9693 (Oct. 2, 1962).

[316] Proclamation No. 3497, 27 Fed. Reg. 9681 (Oct. 2, 1962).

[317] Proclamation 3542, 28 Fed. Reg. 5705 (June 12, 1963); Exec. Order No. 11,111, 28 Fed. Reg. 5709 (June 12, 1963); Proclamation 3554, 28 Fed. Reg. 9861 (Sept. 11, 1963); Exec. Order 11,118, 28 Fed. Reg. 9863 (Sept. 11, 1963).

[318] Proclamation No. 3645, 30 Fed. Reg. 3739 (Mar. 20, 1965); Exec. Ord. No. 11,207, 30 Fed. Reg. 3743. The governor was enjoined by court order from interfering with the march, and he refused to call out the Alabama National Guard to protect the marchers on the grounds that he did not want the state to foot the bill. *See* SCHEIPS, *supra* note 37, at 162-63.

[319] Pub. L. No. 97-86, Title IX, 95 Stat. 1115 (1981), codified as amended at 10 U.S.C. §§ 271-79 (2018).

U-DOW-CAR-087

Wounded Knee.[320] The take-over and events which occurred during the siege led to four cases[321] involving a series of federal criminal charges including obstructing a law enforcement officer in the lawful performance of his duties during the course of a civil disturbance.[322] Military assistance provided federal authorities at Wounded Knee[323] undermined the prospects of a successful prosecution for obstructing law enforcement officers by casting doubt on whether they were performing their duties lawfully, an element necessary for conviction.

The 1981 legislation contains explicit grants of authority for military assistance to the police— federal, state, and local—particularly in the form of information and equipment, along with restrictions on the use of that authority.[324] These exceptions are found in Chapter 15 of Title 10, U.S. Code, Military Support to Civilian Law Enforcement Agencies (§§271-284).

### Information: Spies, Advisers, and Undercover Agents

The Wounded Knee cases spawned uncertainty as to the extent to which military authorities might share technical advice, the results of reconnaissance flights, or any other forms of information with civilian law enforcement authorities. Section 271 (previously Section 371) specifically permits the Armed Forces to share information acquired during military operations and in fact encourages the Armed Forces to plan their activities with an eye to the production of incidental civilian benefits.[325] The section allows the use of military undercover agents and the

---

[320] H.R. REP. NO. 97-71, pt.2, 5-6, *reprinted in* 1981 U.S.C.C.A.N. 1785, 1788 ("Although the military activities challenged in each case were identical, the courts in *Banks* and *Jaramillo* found those activities to be in violation of the [Posse Comitatus] Act, while the lower court in *Red Feather* found those activities to be permissible.").

[321] United States v. Jaramillo, 380 F. Supp. 1375 (D. Neb. 1974), *app. dism'd*, 510 F.2d 808 (8th Cir. 1975); United States v. Banks, 383 F. Supp. 368 (D.S.D. 1974); United States v. Red Feather, 392 F. Supp. 916 (D.S.D. 1975); United States v. McArthur, 419 F. Supp. 186 (D.N.D.), *aff'd sub nom.* United States v. Casper, 541 F.2d 1275 (8th Cir. 1976).

[322] 18 U.S.C. § 231(a)(3) (1970 ed.) provided:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function – shall be fined not more than $10,000 or imprisoned not more than five years, or both.

[323] One court described the military assistance as follows:

> The evidence of military involvement contained in the transcripts [of the Wounded Knee trial cases], in essence, falls into the following categories: use by federal civil law enforcement officers of material and equipment furnished by the United States Army and the South Dakota National Guard; the presence of United States Army personnel who were ordered to Wounded Knee to observe and report to the President through the Department of Defense the necessity of calling in federal troops; the drafting by military personnel of contingency plans to be used by the United States Army in the event that federal military intervention was ordered by the President; aerial photographic reconnaissance service provided by the United States Air Force and the Nebraska National Guard; the advice, urging and counsel given by the United States Army personnel to Department of Justice personnel on the subjects of negotiations, logistics and rules of engagement; and the maintenance of military vehicles performed by members of the Nebraska National Guard.

*McArthur*, 419 F. Supp. at 193 n.3.

[324] Pub. L. No. 97-86, § 905, 95 Stat. 1114 (1981), currently codified as amended at 10 U.S.C. §§ 271-284 (2018).

[325] 10 U.S.C. § 271 provides:

> (a) The Secretary of Defense may in accordance with other applicable law, provide to Federal, State or local civilian law enforcement officials any information collected during the normal course of military training or operations that may be relevant to a violation of any Federal or State law within the jurisdiction of such officials.

U-DOW-CAR-088

collection of intelligence concerning civilian activities, however, only where there is a nexus to an underlying military purpose.[326] The committee report suggested that the type of intelligence operations conducted by the Army in preparation for possible civil disturbances in previous decades was not meant to be authorized.[327]

---

> (b) The needs of civilian law enforcement officials for information shall, to the maximum extent practicable, be taken into account in the planning and execution of military training or operations.
>
> (c) The Secretary of Defense shall ensure, to the extent consistent with national security, that intelligence information held by the Department of Defense and relevant to drug interdiction or other civilian law enforcement matters is provided promptly to appropriate civilian law enforcement officials.

According to its legislative history:

> The phrase 'in accordance with other applicable law' as used in section [271] is meant to continue the application of the Privacy Act to this type of intelligence sharing.... [Congress did] not intend the military to engage in the routine collection of intelligence information about United States residents ... [and] nothing in this section [was] intended to modify in any way existing law with respect to the military's authority (or lack thereof) to collect and disseminate intelligence information about American citizens and residents here and abroad. *See e.g.*, Exec. Order No. 12,036.

H.R. REP. NO. 97-71 pt.2, 8, *reprinted in* 1981 U.S.C.C.A.N. 1785, 1790-91.

[326] The House of Representatives Armed Services Committee, in reporting the Defense Authorization Act of 1982, H.R. 3519, 97th Cong. with the amendment providing for military cooperation with civilian law enforcement officials:

> adopted the view of the Department of Justice that the weight of authority on the Posse Comitatus Act 'prohibits the use of military personnel as informants, undercover agents, or non-custodial interrogators in a civilian criminal investigation that does not involve potential military defendants or is not intended to lead to any official action by the armed forces.' ... [W]hen military personnel become aware of violations of civilian laws as an incidental result of other military operations, such information may be voluntarily disclosed.
>
> Examples of this type of information sharing include situations such as investigations of military and non-military coconspirators and the observation by military personnel of illegal conduct during a routine military mission or training operation.
>
> The Committee anticipates, however, that an increased sensitivity to the needs of civilian law enforcement officials, particularly in drug enforcement, will permit more compatible mission planning and execution. For example, the scheduling of routine training missions can easily accommodate the need for improved intelligence information concerning drug trafficking in the Caribbean. The committee does not intend the military to engage in the routine collection of intelligence information about United States residents. Thus, the legislation creates no risk that the military will return to the abuses exposed in previous Congressional hearings. *See* Hearings on *Federal Data Banks, Computers and the Bill of Rights* before the Committee on Constitutional Rights, Committee on the Judiciary, United States Senate, 92d Cong., 1st sess.

H.R. REP. NO. 97-71, 8 & n.1.

[327] In connection with the hearings noted by the Armed Services Committee in recommending the language, a staff report noted that:

> the U.S. Army had for several years maintained a close and pervasive watch over most civilian protest activity throughout the United States. At its height during the late 1960's, the monitoring drew upon the part-time services of at least 1,500 plainclothes agents of the Army Intelligence Command, and an unspecified number of agents from the Continental Army Command. Their reports, which described the nonviolent political activities of thousands of individuals and organizations unaffiliated with the armed forces were amassed in scores of data centers.... The picture is that of a runaway intelligence bureaucracy unwatched by its civilian superiors, eagerly grasping for information about political dissenters of all kinds and totally oblivious to the impact its spying could have on the constitutional liberties it had sworn to defend.

Military Surveillance of Civilian Politics: A Report of the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 93d Cong., 1st Sess. 10 (1973) (Comm. Print). For a more contemporary examination of the issues associated with military surveillance of off-base political protests, see Paul M. Peterson, *Civilian*

U-DOW-CAR-089

Section 273 (previously section 373) permits military personnel to train civilian police on "the operation and maintenance of equipment" and to provide them with "expert advice."[328] The section was originally limited to equipment provided by the Armed Forces,[329] but was expanded in 1988 to include training on any equipment regardless of its origin.[330]

The explanation of what might constitute "expert advice" is limited, but Congress clearly did not use the phrase as a euphemism for active military participation in civilian police activity.[331]

---

*Demonstrations Near the Military Installation: Restraints on Military Surveillance and Other Activities*, 140 MIL. L. REV. 113 (Spring, 1993). For a review of the history of the domestic use of military personnel to collect intelligence, see Stephen Dycus, *The Role of Military Intelligence in Homeland Security*, 64 LA. L. REV. 779 (2004).

[328] 10 U.S.C. § 273 provides:

> The Secretary of Defense may, in accordance with other applicable law, make Department of Defense personnel available – (1) to train Federal, State, and local civilian law enforcement officials in the operation and maintenance of equipment, including equipment made available under section 372 of this title; and (2) to provide such law enforcement officials with expert advice relevant to the purposes of this chapter.

[329] "Nothing in this section contemplates the creation of large scale or elaborate training programs.... [This section would not authorize the routine use of a Green Beret training course for urban SWAT teams.] ... Rather this section anticipates the continuing need for the military to train civilians in the operation and maintenance of the equipment lent under proposed section 372," H.R. REP. No. 97-71, at 10, *reprinted in* 1981 U.S.C.C.A.N. 1785, 1792-793 (note 2 of the report in brackets).

[330] "Paragraph (1) clarifies current law to provide that the Secretary of Defense, in accordance with applicable law, may make Department of Defense personnel available to train Federal, State, and local civilian law enforcement officials in the operation of maintenance of equipment, including equipment made available under section 372," H.R. REP. No. 100-989, 451, *reprinted in* 1988 U.S.C.C.A.N. 2503, 2579. According to current DOD regulations,

> (1) The DoD Components may provide, subject to section 5 of this enclosure, training to Federal, State, and local civilian law enforcement officials. This does not permit large-scale or elaborate DoD training, and does not permit regular or direct involvement of DoD personnel in activities that are fundamentally civilian law enforcement operations, except as otherwise authorized in this enclosure.

> (2) Training of Federal, State, and local civilian law enforcement officials shall be provided according to this guidance:

> (a) Assistance shall be limited to situations when the use of non-DoD personnel would be unfeasible or impractical from a cost or time perspective and would not otherwise compromise military preparedness of the United States.

> (b) Assistance may not involve DoD personnel participating in a law enforcement operation, except as otherwise authorized by this Instruction.

> (c) Assistance of DoD personnel shall be provided at a location where there is not a reasonable likelihood of a confrontation between law enforcement personnel and civilians, except as otherwise authorized by law.

DoDI. No. 3025.31 (Encl.3) 1(f).

[331] "Neither does the authority to provide expert advice create a loophole to allow regular or direct involvement of military personnel in what are fundamentally civilian law enforcement operations," H.R. REP. No. 97-71, at 10, *reprinted in* 1981 U.S.C.C.A.N. 1785, 1792. "Paragraph (2) restates current law permitting advice. Such training and expert advice may extend to instruction in the operation of equipment, scientific analysis, translations, and assistance in strategic planning, but may not extend to direct, active involvement in specific law enforcement operations," H.R. REP. No. 100-989, 451, reprinted in 1988 U.S.C.C.A.N. 2503, 2579. *See also* DoDI. No. 3025.31 (Encl.3) 1(e), "DoD Components may provide, subject to section 5 of this enclosure, expert advice to Federal, State, or local law enforcement officials in accordance with section 373 of Reference (d). This does not permit direct assistance by DoD personnel in activities that are fundamentally civilian law enforcement operations, except as otherwise authorized in this enclosure."

U-DOW-CAR-090

An implementing regulation published in 2013 excludes certain intelligence activities from its purview.[332] Under the regulation, assistance to law enforcement by Defense intelligence and counterintelligence components is permitted for purposes of investigating or preventing clandestine intelligence activities by foreign powers or international terrorist or narcotics activities.[333] The provision also permits intelligence elements to cooperate with law enforcement agencies for protecting their own personnel, property, and information, and to provide specialized equipment, technical knowledge, or assistance of expert personnel when lives are endangered.[334]

## Equipment and Facilities

Abstractly it might seem that even civilian use—against Americans within the United States—of tanks, missiles, fighter planes, aircraft carriers, and other implements of war offends the Posse Comitatus Act even if use can be accomplished without the direct involvement of military personnel. The arsenal of American military weapons and equipment is "part of the Army and Air Force" even when turned over to civilian authorities before use for civilian purposes. Even if the Posse Comitatus Act were read to apply only to the use of personnel, would the use of military personnel to maintain equipment loaned to civilian authorities violate the act's proscription? The Wounded Knee cases provided conflicting answers.[335]

The 1981 provisions make it clear that the Defense Department may provide civilian police with military equipment[336] and under some circumstances, particularly in drug cases, may also supply

---

[332] 32 CFR Part 182.2(f)(3) (excepting Defense intelligence and counterintelligence activities when providing assistance in accordance with paragraph 2.6. of Executive Order 12333).

[333] E.O 12333 para. 2.6 provides:

> Elements of the Intelligence Community are authorized to:
>
> (a) Cooperate with appropriate law enforcement agencies for the purpose of protecting the employees, information, property, and facilities of any element of the Intelligence Community;
>
> (b) Unless otherwise precluded by law or this Order, participate in law enforcement activities to investigate or prevent clandestine intelligence activities by foreign powers, or international terrorist or narcotics activities;
>
> (c) Provide specialized equipment, technical knowledge, or assistance of expert personnel for use by any department or agency, or when lives are endangered, to support local law enforcement agencies. Provision of assistance by expert personnel shall be approved in each case by the general counsel of the providing element or department; and
>
> (d) Render any other assistance and cooperation to law enforcement or other civil authorities not precluded by applicable law.

Executive Order 12333, United States Intelligence Activities (As amended by Executive Orders 13284 (2003), 13355 (2004) and 13470 (2008)).

[334] *Id.*

[335] Compare *Jaramillo*, 380 F. Supp. at 1379 ("It is the use of military personnel, not materiel, which is proscribed by [the Posse Comitatus Act].") and *Red Feather*, 392 F. Supp. at 923 (loans of military equipment and materiel not proscribed) *with Banks*, 383 F. Supp. at 386 (rejecting Government's argument that loan of equipment was authorized by the Economy Act); and *McArthur*, 419 F. Supp. at 194 (finding not only that the "government policy of loaning equipment between branches of the government" was permissible, but that it "extends to the loaning of expert advisors").

[336] 10 U.S.C. § 272 (2018) provides:

> The Secretary of Defense may, in accordance with other applicable law, make available any equipment (including associated supplies or spare parts), base facility, or research facility of the Department of Defense to any Federal, State, or local civilian law enforcement official for law enforcement purposes.

*See also* 10 U.S.C. § 280 (2018) (mandating annual briefing of state law enforcement personnel to familiarize them

U-DOW-CAR-091

military personnel to maintain and, for certain limited purposes (not including searches and seizures),[337] operate such equipment.[338] The provisions also include extraordinary authority to use Navy ships to support Coast Guard drug interdiction on the high seas.[339] In 1996, Congress added authority for military assistance, including the provision of personnel and equipment, for the enforcement of laws prohibiting chemical and biological weapons of mass destruction.[340] In 2015, Congress added authority for military assistance to the Department of Justice in the case of situations involving bombings of places of public use, government facilities, public transportation systems, and infrastructure facilities, including the use of ordinance disposal units.[341] This authority does not permit the military to make arrests, directly participate in searches or seizures, or collect intelligence for law enforcement purposes.[342]

In 2016, Congress added authority for military support to counterdrug activities and activities to counter transnational organized crime.[343] Under this authority, the Secretary of Defense is permitted to provide assistance for such purposes to any agency of the federal government or any state, local, tribal, or foreign law enforcement agency upon the request of an appropriate official.[344] For assistance to domestic agencies, support is limited to maintenance and repair or

---

with the types of assistance and equipment available from the Department of Defense and means for obtaining same).

[337] 10 U.S.C. § 274(b)(2) (2018) (listing permitted functions, *see infra*); 10 U.S.C. § 275 (listing limitations); 10 U.S.C. § 282(d)(2)(a). *See* United States v. Johnson, 410 F.3d 137, 149 (4th Cir. 2005) (use of Armed Forces Institute of Pathology resources to conduct blood tests for civilian law enforcement authorities permitted so long as military personnel do not operate laboratory equipment to conduct the testing on blood extracted from a civilian suspect).

[338] 10 U.S.C. § 274 authorizes the Secretary of Defense to make military personnel available to federal, state, and local civilian law enforcement officials to maintain military equipment; to make personnel available to federal law enforcement agencies for the purposes of:

- Detection, monitoring, and communication of the movement of air and sea traffic or surface traffic outside the geographic boundary of the United States and within the United States not to exceed 25 miles of the boundary if the initial detection occurred outside the boundary.
- Aerial reconnaissance.
- Interception of vessels or aircraft detected outside the land area of the United States to direct such vessels and aircraft to go to a location designated by appropriate civilian officials.
- Operation of equipment to facilitate communications in connection with authorized law enforcement programs
- The transportation of civilian law enforcement personnel and the operation of a base of operations for them, subject to high-level approval.

Other support may be made available only if it "does not involve direct participation by such personnel in a civilian law enforcement operation unless such direct participation is otherwise authorized by law."

10 U.S.C. § 281 mandates the Secretary of Defense to establish procedures for procuring equipment for state and local agencies for counter-drug, homeland security, and emergency response activities, to be paid for by the receiving government.

[339] 10 U.S.C. § 279.

[340] *Id.* § 282 provides that the Secretary of Defense, upon the request of the Attorney General, may provide assistance in support of law enforcement activities during an emergency situation involving a biological or chemical weapon of mass destruction, if such assistance is absolutely necessary and will not adversely affect the military preparedness of the United State, and the Department of Defense is reimbursed. Assistance authorized includes the operation of equipment to monitor, contain, disable, or dispose of the weapon involved or elements of the weapon. Regulations required to implement the provision are not to authorize arrest or direct participation in conducting a search for or seizure of evidence or the collection of intelligence for law enforcement purposes.

[341] Pub. L. No. 114–92, div. A, § 1082(a), 129 Stat. 1002 (2015), codified at 10 U.S.C. § 283 (2018).

[342] *Id.*

[343] Pub. L. No. 114–328, div. A, § 1011(a)(1), 130 Stat. 2381 (2016), codified at 10 U.S.C. § 284 (2018).

[344] 10 U.S.C. § 284(a) (2018).

U-DOW-CAR-092

upgrade of equipment on loan for such purposes; transportation of personnel and supplies and equipment; establishing operation of bases of operations or training facilities; training of law enforcement personnel in counterdrug or counter-transnational crime activities; detection, monitoring, and communication of the movement of air and sea traffic within 25 miles off the U.S. coast or surface traffic within 25 miles outside the geographic boundaries of the United States if such activities were initially detected outside the boundaries; construction of roads and fences and installation of lighting to block drug smuggling at international boundaries of the United States; establishment of command and control centers and computer networks to improve integration of participating agencies and units; linguist and intelligence analysis; and aerial and ground reconnaissance.[345] With respect to support for foreign law enforcement agencies, the purposes are similar but somewhat more limited.[346] In some cases, congressional notification is required.[347]

### Limitations: Military Preparedness, Reimbursement, and Direct Use

The authority granted in sections 271-284 is subject to three general caveats. It may not be used to undermine the military capability of the United States.[348] The civilian beneficiaries of military aid must pay for the assistance.[349] And, under section 275, the Secretary of Defense must issue regulations to ensure that the authority under the chapter does not result in use of the Armed Forces to make arrests or conduct searches and seizures solely for the benefit of civilian law enforcement.[350]

For several years, the regulations called for by section 275 appeared in parallel form in the Code of Federal Regulations[351] and in a Defense Department Directive.[352] The heart of the regulations appeared in subsection 213.10(a)(3):

> Except as otherwise provided in this enclosure, the prohibition on use of military personnel 'as a posse comitatus or otherwise to execute the laws' prohibits the following forms of direct assistance:

---

[345] *Id.* § 284(b).

[346] *Id.* § 284(c).

[347] *Id.* § 284(h).

[348] 10 U.S.C. § 276 provides that no assistance to civilian law enforcement official can be provided that will adversely affect the military preparedness of the United States. Section 284 provides a waiver in the event the Secretary determines that the importance of providing such support outweighs short-term adverse effect to military preparedness. 10 U.S.C. § 284(e).

[349] 10 U.S.C. § 277 requires reimbursement under the Economy Act, 31 U.S.C. § 1531, unless waived by the Secretary of Defense, which is permissible if the assistance is provided in the normal course of military training or operations or if it provides benefits similar to what the participating personnel would obtain from operations or training.

[350] 10 U.S.C. § 275 provides:

> The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

[351] 47 Fed. Reg. 14,899 (April 7, 1982), *codified at* 32 C.F.R. pt.213, *removed by* 58 Fed. Reg. 25,776 (April 28, 1993).

[352] Department of Defense Directive No. 5525.5 (January 15, 1986), as amended December 12, 1989 (canceled and replaced in 2013 with DoDI No. 3025.21). Prior to enactment of 10 U.S.C. §§ 371 *et seq.*, the Navy had operated under a Navy Department Instruction of similar import, SECNAVINST 5400.12 (January 17, 1969), *see* United States v. Walden, 490 F.2d 372, 373-74 (4th Cir. 1974).

U-DOW-CAR-093

(i) Interdiction of a vehicle, vessel, aircraft or other similar activity.

(ii) A search or seizure.

(iii) An arrest, stop and frisk, or similar activity.

(iv) Use of military personnel for surveillance or pursuit of individuals, or as informants, undercover agents, investigators, or interrogators."[353]

Although the provisions were removed from the C.F.R., the directive remained in effect until 2013, when it was incorporated with civil disturbance authority and released as a DoD Instruction.[354] A new C.F.R. was also issued in 2013, 32 C.F.R. part 182,[355] which expanded the limitations to match those in the new Instruction, which provides that the following are prohibited:

(a) Interdiction of a vehicle, vessel, aircraft, or other similar activity.

(b) A search or seizure.

(c) An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity.

(d) Using force or physical violence, brandishing a weapon, discharging or using a weapon, or threatening to discharge or use a weapon except in self-defense, in defense of other DoD persons in the vicinity, or in defense of non-DoD persons, including civilian law enforcement personnel, in the vicinity when directly related to an assigned activity or mission.

(e) Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints.

(f) Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators.

(g) Forensic investigations or other testing of evidence obtained from a suspect for use in a civilian law enforcement investigation in the United States unless there is a DoD nexus (e.g., the victim is a member of the Military Services or the crime occurred on an installation under exclusive DoD jurisdiction) or the responsible civilian law enforcement official requesting such testing declares in writing that the evidence to be examined was obtained by consent....

## Military Purpose

The Armed Forces, when in performance of their military responsibilities, are beyond the reach of the Posse Comitatus Act and its statutory and regulatory supplements. Analysis of constitutional or statutory exceptions is unnecessary in such cases. The original debates make it clear that the act was designed to prevent use of the Armed Forces to execute *civilian* law. Congress did not intend to limit the authority of the Army to perform its military duties. The legislative history, however, does not resolve the question of whether the act prohibits the Army from performing its military duties in a manner that affords incidental benefits to civilian law enforcement officers.

---

[353] 32 C.F.R. § 213.10(a)(3) (July 1, 1992).

[354] DoDI No. 3025.21 (Encl.3).

[355] 78 Fed. Reg. 21,826 (Apr. 12 2013).

U-DOW-CAR-094

The courts and commentators believe that it does not.[356] As long as the primary purpose of an activity is to address a military purpose, the activity need not be abandoned simply because it also assists civilian law enforcement efforts.[357] Courts appear to view the location of the activity as particularly indicative of primary purpose; as one court noted, "the power to maintain order, security, and discipline on a military facility is necessary for military operations."[358]

The courts have concluded that, consistent with this legitimate military purpose to maintain order on military installations, military personnel may, without violating the Posse Comitatus Act, turn over to civilian law enforcement authorities armed felons arrested when they flee onto a military base,[359] or drunk drivers arrested on a military base,[360] or firearms stolen from a military installation,[361] as well as any stolen equipment that belongs to a military unit.[362] The courts have likewise found no violation of the act when military personnel arrest civilians on military facilities for crimes committed there,[363] or when military authorities assist a civilian police investigation conducted on a military facility.[364] The military purpose doctrine also permits military law enforcement personnel to investigate the off-base conduct of military personnel,[365]

---

[356] Logic might suggest that the military purpose doctrine is simply the largest of the statutory exceptions, that is, that the doctrine merely encompasses the military authority vested in the Armed Forces under the Code of Military Justice and the other statutes which grant them military authority. Neither the commentators nor the courts have ordinarily clearly limited their analyses in such terms, *see, e.g.,* Clarence I. Meeks, *Illegal Law Enforcement: Aiding Civil Authorities in Violation of the Posse Comitatus Act*, 70 MIL. L. REV. 83, 124-26 (1975); Paul Jackson Rice, *New Laws and Insights Encircle the Posse Comitatus Act*, 104 MIL. L. REV. 109, 128-35 (1984); Hayes v. Hawes, 921 F.2d 100, 103 (7th Cir. 1990); Taylor v. State, 640 So.2d 1127, 1136 (Fla. App. 1994); State v. Pattioay, 896 P.2d 911, 915-18 (Haw. 1995).

[357] *Cf.* N. Mariana Islands v. Gao Yue Ying Taman, No. 2009-SCC-0044-CRM, 2014 WL 4050021, at *3 (N. Mar. I. Aug. 14, 2014) (finding NCIS investigation of civilian prostitution served military purpose as permitted by DoD Instruction and therefore did not amount to a violation of the Posse Comitatus Act).

[358] Eggleston v. Dept. of Revenue, 895 P.2d 1169, 1170 (Colo. App. 1995) (citing Cafeteria & Restaurant Workers Union Local v. McElroy, 367 U.S. 886 (1961)).

[359] Harker v. State, 663 P.2d 932, 936 (Alaska 1983).

[360] Brune v. Administrative Director of Courts, 110 Hawai'i 172, 130 P.3d 1037 (Haw. 2006); Eggleston v. Dept. of Revenue, 895 P.2d 1169, 1170 (Colo. App. 1995) (military police also administered breath test and provided local law enforcement officers with the results); McNeil v. State, 787 P.2d 1036, 1037 (Alaska App. 1990); Anchorage v. King, 754 P.2d 283, 286 (Alaska App. 1988).

[361] United States v. Griley, 814 F.2d 967, 976 (4th Cir. 1987).

[362] United States v. Chon, 210 F.3d 990, 994 (9th Cir. 2000).

[363] United States v. Banks, 539 F.2d 14, 16 (9th Cir. 1976); United States v. Santana, 175 F. Supp. 2d 153 (D.P.R. 2001).

[364] United States v. Allen, 53 M.J. 402 (C.A.A.F. 2000) (Air Force investigators assisted local law enforcement to investigate military member's use of government computer for pornography); People v. Caviano, 560 N.Y.S.2d 932, 936-37 (N.Y. 1990) (Navy personnel made a sailor available for questioning at naval station facilities; the interrogation was conducted by civilian police who subsequently arrested the sailor for an out of state robbery); United States v. Hartley, 678 F.2d 961, 978 (11th Cir. 1982) (military inspectors who discovered evidence of fraudulent conduct by defense contractors "aided the civilian employee in charge of the investigation only to the extent of activities normally performed in the ordinary course of their [military] duties"); State v. Trueblood, 265 S.E.2d 662, 664 (N.C.App. 1980) (military search (with consent) of on-base quarters in connection with a civilian investigation of off-base drug dealing by military personnel); State v. Nelson, 298 N.C. 573, 260 S.E.2d 629 (1979) (military inventory of personal effects of AWOL soldier were conducted primarily for a military purpose pursuant to a regulation designed to safeguard private property and protect service against claims); Commonwealth v. Shadron, 471 Pa. 461, 465, 370 A.2d 697, 699 (1977) (military police acting within the scope their authority did not violate the Posse Comitatus Act by making a soldier available, at the Air Force base where he was stationed, to civilian investigators for interrogation by the civilian officers and by permitted the civilians to search the defendant's possessions with his consent).

[365] Davidson v. State, 249 S.W.3d 709 (Tex. App. Austin 2008) (Air Force involvement in off-base investigation of the murder of a servicemember not prohibited, even though civilian wife was eventually implicated in the crime); United

U-DOW-CAR-095

and allows them to assist in investigating the off-base conduct of civilians who are suspected of involvement in a violation of the Uniform Code of Military Justice (UCMJ).[366] The DOD Instruction evidences a comparable understanding.[367]

Cases called to apply the military purpose doctrine in cooperative police activities occurring off-base are the most difficult to reconcile. Some seem to require no more than a logical military

---

States v. Griley, 814 F.2d 967, 976 (4th Cir. 1987) (off-base military investigation of concerning property stolen on-base by military personnel); Applewhite v. United States, 995 F.2d 997, 1001 (10th Cir. 1993) (military police off-base drug sting targeting military personnel); State v. Hayes, 102 N.C. App. 777, 779-81, 404 S.E.2d 12, 13-15 (1991) (off-base purchase of drugs by a military undercover agent from an AWOL soldier); State v. Poe, 755 S.W.2d 41, 44-45 (Tenn. 1988) (military investigation of the off-base murder of a soldier by other soldiers).

[366] United States v. Hitchcock, 286 F.3d 1064, 1070 (9th Cir. 2002) ("Military participation in Hitchcock's investigation for the purpose of determining the extent to which his LSD was being used and distributed on the military base was justified [as serving a valid military purpose].").

[367] DoDI No. 3025.21 (Encl. 3) 1(b) provides:

Categories of active participation in direct law-enforcement-type activities (e.g., search, seizure, and arrest) that are not restricted by law or DoD policy are:

(1) Actions taken for the primary purpose of furthering a DoD or foreign affairs function of the United States, regardless of incidental benefits to civil authorities. This does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid the restrictions of the Posse Comitatus Act. Actions under this provision may include (depending on the nature of the DoD interest and the authority governing the specific action in question):

(a) Investigations and other actions related to enforcement of chapter 47 of Reference (d) (also known as "the Uniform Code of Military Justice").

(b) Investigations and other actions that are likely to result in administrative proceedings by the DoD, regardless of whether there is a related civil or criminal proceeding. (See DoDI 5525.07 (Reference (u)) and Memorandum of Agreement Between the AG and the Secretary of Defense (Reference (v)) with respect to matters in which the DoD and the Department of Justice both have an interest.)

(c) Investigations and other actions related to a commander's inherent authority to maintain law and order on a DoD installation or facility.

(d) Protection of classified defense information or equipment or controlled unclassified information (e.g., trade secrets and other proprietary information), the unauthorized disclosure of which is prohibited by law.

(e) Protection of DoD personnel, equipment, and official guests.

(f) Such other actions that are undertaken primarily for a military or foreign affairs purpose.

32 C.F.R. § 182.6 contains in substance the same list of permissible types of direct assistance.

U-DOW-CAR-096

nexus;[368] others demand a very clear, specific military connection before they will concede the presence of a military purpose;[369] and still others seem to seek a middle ground.[370]

Finally, it is arguable that Congress's authorization for the use of force against those responsible for the September 11 attacks[371] has mooted some of the limitations on the use of the military for

---

[368] State v. Sanders, 303 N.C. 608, 613, 281 S.E.2d 7, 10 (1981) ("military policeman Lambert's duty [during joint patrol with civilian police off-base] was not to execute civilian law but to assist the police department in returning apprehended military personnel to Fort Bragg"); State v. Short, 113 Wash.2d 35, 38-40, 775 P.2d 458, 459-60 (1989) (where civilian Naval Investigative Services (NIS) agent participated in a joint drug operation with local law enforcement agencies by working undercover at a local restaurant frequented by military personnel, the agent did not arrest the defendant, and "any personnel, equipment, and information provided to local law enforcement did not constitute direct participation," no improper military involvement in the investigation was found); People v. Wells, 175 Cal.App.3d 876 (1985) (where, in order to minimize the flow of drugs into Camp Pendleton, the N.I.S. initiated a joint investigation with the local police, in which military policemen made undercover solicitations for drugs but any detention or arrest of a suspect was conducted by a civilian police officer, the court found no "subjugation of citizens to the exercise of military power of a regulatory, prescriptive or compulsory nature" that would implicate statutory restrictions).

[369] In *United States v. Walden*, for example, where a Treasury agent was found to have used Marines as undercover agents to secure evidence against civilian firearms offenders, the court found a breach of the posse comitatus requirements without even acknowledging the government's military purpose argument. 490 F.2d 372 (4th Cir. 1974). *See* Meeks, *supra* note 356, at 115 ("[T]he Government argued [in *Walden*] that the Act had not been violated because the investigation was 'related directly to the maintenance of order and security' on the base and that such undercover assistance to civilian authorities does not constitute 'execution of the law'"); Rice, *supra* note 356, at 129 ("[i]f the court considered the government's argument that the activities of the Marines were related to the maintenance, order and security of the base, it had rejected it. However, the sale of the weapons occurred immediately off the base in the town of Quantico. If the base authorities were aware of this fact and that the illegally sold weapons were being purchased by Marines and being brought on the base, then what may they do to insure order and discipline? Clearly, they can notify local authorities. But would the purchase in question by an undercover Marine be for the primary purpose of furthering a military function? Order, discipline, and security of a base is a military function"). Other courts have expressly rejected assertions that military purpose justifies law enforcement against civilians unless a verifiable nexus exists. *See* People v. Tyler, 854 P.2d 1366, 1369 (Colo. App. 1993) ("before the military may directly participate in an undercover investigation of these civilians and their off-base activities, the state carries the burden of demonstrating that there exists a nexus between drug sales off base by civilians to military personnel and the military base at which the purchasers are stationed"), *rev'd on other grounds* 874 P.2d 1037 (Colo. App. 1994); State v. Pattioay, 78 Haw. 455, 464-65, 896 P.2d 911, 920-21 (1995) ("[w]here the target of a military investigation is a civilian and there is no verified connection to military personnel, the PCA prohibits military participation in activities designed to execute civilian laws.... In fact, the apparent justification for the military involvement in the instant case was to facilitate the enforcement of civilian laws.... Hence, the prosecution has the duty to present evidence to show that, when a military investigation was undertaken, the targeted drug transactions involved military personnel or were connected to sales conducted on a military installation.... That the military has a valid interest in ferreting out those who supply drugs to military personnel, does not automatically qualify its aid to civilian drug law enforcement as having the 'primary purpose of furthering a military ... function'") (internal citations omitted).

[370] United States v. Hitchcock, 286 F.3d 1064, 1070 (9th Cir. 2002) (where it was undisputed that the defendant had sold LSD to a Marine, who distributed the substance to other soldiers, the court stated that "the proposition that the sale of LSD to persons who might use the drug on a military base or sell it to others on the base implicates the maintenance of law and order on a military installation is unassailable"); Moon v. State, 785 P.2d 45, 48 (Alaska App. 1990) ("[I]t seems to us that the army had a valid military purpose in preventing illicit drug transactions involving active duty personnel even if the transaction took place off base. The investigation was not begun until the military was satisfied that drug dealers at the Palace Hotel had targeted military personnel as a market. It was also reasonable to infer that a substantial quantity of illicit drugs was finding its way onto the base"); State v. Maxwell, 174 W.Va. 632, 635, 328 S.E.2d 507, 509 (W.Va. 1985) ("The fact that the Navy's internal investigation happened to uncover wrongs by civilians does not bring the case within the scope of 18 U.S.C. § 1385 or render the Navy agents incompetent as witnesses."); State v. Presgraves, 174 W.Va. 683, 328 S.E.2d 699 (W.Va. 1985) (same); Hayes v. Hawes, 921 F.2d 100, 103-104 (7th Cir. 1990) (no violation where Navy undercover agent, who had "received information" that a sailor had purchased drugs at an off-base arcade, joined local police with several other military agents for surveillance of the arcade, made a drug buy in cooperation with local police who made the arrest and conducted the search of civilian).

[371] Pub. L. No. 107-40, 115 Stat. 224 (2001).

---

U-DOW-CAR-097

law enforcement purposes by recasting them as military operations. Soon after the attacks, the Office of Legal Counsel (OLC) advised the White House and Defense Department that the Posse Comitatus Act imposed no constraint on the President's use of military forces domestically for anti-terrorism operations against "international or foreign terrorists operating within the United States."[372] This conclusion rested on the determination that the act

> only applies to the domestic use of the Armed Forces for *law enforcement* purposes, rather than for the performance of military functions. The Posse Comitatus Act itself contains an exception that allows the use of the military when constitutionally or statutorily authorized, which has occurred in the present circumstances.[373]

In concluding that the prevention and deterrence of terrorism is "fundamentally military, rather than law enforcement, in character," OLC conceded that distinguishing between military and law enforcement functions when dealing with terrorism is "no easy task." Counter-terrorism operations could therefore "resemble, overlap with, and assist ordinary law enforcement activity."

> Military action might encompass making arrests, seizing documents or other property, searching persons or places or keeping them under surveillance, intercepting electronic or wireless communications, setting up roadblocks, interviewing witnesses, and searching for suspects. Moreover, the information gathered in such efforts could be of considerable use to federal prosecutors if the Government were to prosecute against captured terrorists.[374]

OLC further opined that the President's inherent power to defend the United States supplied a "constitutional exception" to the Posse Comitatus Act,[375] and that statutory exceptions could be found in both the authorization for use of military force[376] and section 333 (now section 253) of the Insurrection Act.[377]

It does not appear, however, that much of this opinion remains the official interpretation of the Justice Department. In 2008, OLC advised that "caution should be exercised before relying in any respect on the Memorandum [regarding the Authority for Use of Military Force to Combat Terrorist Activities Within the United States (Oct. 23, 2001) as a precedent of the Office of Legal Counsel," and that "certain propositions" stated therein "should not be treated as authoritative for any purpose."[378] With respect to the discussion of the Posse Comitatus Act, the superseding memorandum criticized the 2001 memo as "far too general and divorced from specific facts and circumstances to be useful as an authoritative precedent of OLC." Rather than viewing the authorization statute as a statutory exception to the act, the successor memo believed it better to state that the "reasonable and necessary use of military force taken under the authority of the AUMF would be a military action, potentially subject to the established 'military purpose'

---

[372] Office of Legal Counsel, Authority For Use Of Military Force To Combat Terrorist Activities Within The United States, October 23, 2001, *available at* 2001 WL 36190674 (O.L.C.).

[373] *Id.* (emphasis in the original).

[374] *Id.* at *15.

[375] *Id.* at *18 ("In light of [the opinion's earlier] review of the President's inherent powers, it should be clear that the PCA's constitutional exception has been triggered.").

[376] *Id.* ("This authorization does not distinguish between deployment of the military either at home or abroad, nor does it make any distinction between use of the Armed Force for law enforcement or for military purposes.").

[377] *Id.* at *19 ("We think it plain that the President could find that the present circumstances justify the invocation of § 333. Here, an unlawful terrorist group has hijacked civilian airliners and used them to kill thousands of civilians by crashing them into the World Trade Center and the Pentagon. These terrorists have engaged in 'domestic violence' within the states of New York and Virginia and have violated numerous federal laws.").

[378] Office of Legal Counsel, October 23, 2001 OLC Opinion Addressing the Domestic Use of Military Force to Combat Terrorist Activities, October 6, 2008, *available at* 2008 WL 6060107 (O.L.C.).

U-DOW-CAR-098

doctrine, rather than a law enforcement action."[379] Likewise, the revised view of the OLC emphasized that the use of the military to execute the law under the Insurrection Act "would require the presence of an actual obstruction of the execution of federal law or a breakdown in the ability of state authorities to protect federal rights."

The use of the military within the United States for counter-terrorism purposes has been negligible, despite some prodding from Congress to use military forces to apprehend, interrogate, and detain suspected members of Al Qaeda and "associated forces."[380] Consequently, there is more commentary regarding the interplay of the Posse Comitatus Act and what was previously called the "Global War on Terror"[381] than there are judicial decisions to test these theories. One U.S. citizen who was detained by the military without trial after having been designated an "enemy combatant" by the President sought habeas corpus relief, in part on the contention that his confinement by the military violated the Posse Comitatus Act. The reviewing district court judge saw things differently:

> Padilla is not being detained by the military in order to execute a civilian law or for violating a civilian law, not-withstanding that his alleged conduct may in fact violate one or more such laws. He is being detained in order to interrogate him about the unlawful organization with which he is said to be affiliated and with which the military is in active combat, and to prevent him from becoming reaffiliated with that organization.[382]

The decision, however, was reversed on the grounds that the detention violated a more specific statute, but was then vacated by the Supreme Court on procedural grounds. In subsequent proceedings, the petitioner did not rely on the Posse Comitatus Act.[383] It seems safe to say, however, that if the Constitution does not stand in the way of such a measure, the Posse Comitatus Act will not likely impose a greater hurdle.[384]

---

[379] *Id.* at *2.

[380] Congressional encouragement for a broader military role in domestic counterterrorism is most visible in the provisions of the National Defense Authorization Act for FY2012 (Pub. L. No. 112-81)) and the surrounding legislative debates.

[381] *See, e.g.,* Gregory E. Maggs *Assessing the Legality of Counterterrorism Measures Without Characterizing Them as Law Enforcement or Military Action,* 80 TEMP. L. REV. 661 (2007); Christopher J. Schmidt and David A. Klinger, *Altering the Posse Comitatus Act: Letting the Military Address Terrorist Attacks on U.S. Soil,* 39 CREIGHTON L. REV. 667 (2006); William C. Banks, *The Normalization of Homeland Security After September 11: The Role of the Military in Counterterrorism Preparedness and Response,* 64 LA. L. REV. 735 (2004); Tom A. Gizzo, Esq. and Tama S. Monoson, *A Call to Arms: The Posse Comitatus Act and the Use of the Military in the Struggle Against International Terrorism,* 15 PACE INT'L L.REV. 149 (2003); Canestaro, *supra,* note 1; Ronald J. Sievert, *War on Terrorism or Global Law Enforcement Operation?,* 78 NOTRE DAME L. REV. 307 (2003).

[382] *See* Padilla *ex rel.* Newman v. Bush, 233 F. Supp. 2d 564, 588 n.9 (S.D.N.Y. 2002), *rev'd sub nom.* Padilla v. Rumsfeld, 352 F.3d 695 (2d Cir. 2003), *rev'd,* 542 U.S. 426 (2004).

[383] Padilla v. Hanft, 389 F. Supp. 2d 678 (D.S.C. 2005), *rev'd,* 423 F.3d 386 (4th Cir.), *cert. denied,* 547 U.S. 1062 (2006). The case was ultimately made moot by the government's transfer of the petitioner into civil custody to stand trial.

[384] For more background and analysis of the constitutionality of military detention of terrorism suspects in the United States, see CRS Report R42337, *Detention of U.S. Persons as Enemy Belligerents,* by Jennifer K. Elsea.

U-DOW-CAR-099

# Coverage of the Posse Comitatus Act

## Willful Use

The act is limited to "willful" misuse of the Army or Air Force.[385] The Senate version of the original act would have limited proscription to "willful and knowing" violations;[386] the House version had no limitation.[387] The compromise that emerged from conference opted to forbid only willful violations, but neither the statements of the managers nor statements elsewhere in the debate explain what the limitation means. In other instances, Congress has used the term "willful" in a number of different contexts and the term has been construed by the courts in a variety of ways, often inconsistent and contradictory.[388] The scattered statements found in the case law under the act are somewhat conflicting and not particularly helpful,[389] although it seems unlikely that a court would convict for anything less than a deliberate disregard of the law's requirements.[390]

---

[385] Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, *willfully* uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both. 18 U.S.C. § 1385 (2018) (emphasis added).

[386] 7 CONG. REC. 4302 (1878).

[387] 7 CONG. REC. 4181 (1878).

[388] The Senate Judiciary Committee noted that:

> The courts have defined a 'willful' act as an act done voluntarily as distinguished from accidentally, an act done with specific intent to violate the law, an act done with bad purpose, an act done without justifiable excuse, an act done stubbornly, an act done without grounds for believing it is lawful, and an act done with careless disregard whether or not one has the right so to act.

S. REP. NO. 97-307, at 63-64 (1981). Supreme Court cases seem to caution against a broad interpretation of the term "willful" or any of the other state-of-mind elements in federal criminal statute, Bryan v. United States, 524 U.S. 184, 191-92 (1998) ("The word willfully is sometimes said to be a word of many meanings whose construction is often dependent on the context in which it appears.... As a general matter, when used in the criminal context, a willful act is one undertaken with a bad purpose. In other words, in order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful") (citing Ratzlaf v. United States, 510 U.S. 135, 137 (1994)).

[389] United States v. Bacon, 851 F.2d 1312, 1313 (11th Cir. 1988) ("even if the participation by military personnel [as undercover solicitors of drugs from civilians] in this drug investigation is to be considered a violation of the Posse Comitatus Act, it was not a willful violation of the spirit of the Act"); United States v. Walden, 490 F.2d 372, 376 (4th Cir. 1974) ("there is totally lacking any evidence that there was a conscious, deliberate or willful intent on the part of the Marines or the ... Special Investigator to violate the Instruction or the spirit of the Posse Comitatus Act. From all that appears, the Special Investigator acted innocently albeit ill-advisedly"); State v. Danko, 219 Kan. 490, 548 P.2d 819, 822 (1976) ("the statute is limited to deliberate use of armed force for the primary purpose of executing civilian laws") (quoting Furman, *supra* note 205, at 128; Kim v. State, 817 P.2d 467, 469 n.2 (Alaska, 1991) (Rabinowitz, J. dissenting) ("A will to violate the Act is not required, but only the wilful use of military personnel").

[390] *See, e.g.* Riley v. Newton, 94 F.3d 632, 636 (11th Cir. 1996). The court found that officers faced with civil suit for alleged violation of posse comitatus restrictions were entitled to qualified immunity because

> The law of this circuit has not been developed to make it obvious to law enforcement officers what constitutes "wilful use" of the Army "to execute the laws." Specifically, our case law does not make obvious what activities constitute "executing the law" for purposes of the Act; it does not delineate at what point or under what circumstances a joint investigation with military personnel would violate the Posse Comitatus Act. And even more importantly here, our case law does not give any guidance as to what constitutes "wilful use" in the event that the military person's actions would clearly constitute "executing the law."

In any event, it is not generally the person accused of posse comitatus violations who is facing prosecution. *See infra.*

U-DOW-CAR-100

## Execute the Law

When has the Army or Air Force been used "to execute the laws"? The language of the act by itself seems sweeping.[391] It is comparable to the instruction of the Constitution that the President "take care that the laws are faithfully executed."[392] Without more, it would seem to prohibit the use of the Army or the Air Force to implement the command or authorization of all state or federal law. It might apply with equal force to delivering the mail or making an arrest.

Existing case law and commentary indicate that "execution of the law" in violation of the Posse Comitatus Act occurs (a) when the Armed Forces perform tasks ordinarily assigned not to them but to an organ of civil government, or (b) when the Armed Forces perform tasks assigned to them solely for purposes of civilian government. (The test that applies in cases where military personnel or units are conducting activities in support of law enforcement authorities is somewhat different, and is covered below.)

While inquiries may surface in other contexts such as the use of the Armed Forces to fight forest fires or to provide assistance in the case of other natural disasters,[393] Posse Comitatus Act

---

"Consequences of Violation." Thus, even in cases where it seems obvious that military personnel were "willfully" used to "execute the law," courts have found no need to engage in lengthy analysis. *See* United States v. Wooten, 377 F.3d 1134, 1139-40 (10th Cir. 2004):

> There appears to be no dispute in this case that the United States Attorney for the Western District of Oklahoma 'willfully use[d]' ... an active duty member of the Army and Staff Judge Advocate, to assist in 'execut[ing] the laws' of the United States. In particular, [an Army captain] was appointed as an SAUSA and, in that role, participated in the investigation, grand jury proceedings, and trial of this case. The question is whether [the captain's] appointment and participation fall within the scope of the PCA's express exception.... The Court declines to answer this question, in part because it concludes that it does not have to do so in order to resolve this appeal.... Assuming [a violation of the] PCA, the question then becomes to what relief, if any, [the defendant] would be entitled. The answer is "none."

[391] "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully *uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws* shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385 (emphasis added).

[392] U.S. CONST. art. II, § 3.

[393] *See, e.g.*, John J. Copelan and Steven A. Lamb, *Disaster Law and Hurricane Andrew: Government Lawyers Leading the Way to Recovery*, 27 URB. LAW. 1 (1995); Francis A. Delzompo, *Warriors on the Fire Line: The Deployment of Service Members to Fight Fire in the United States*, 1995-APR ARMY LAW. 51 (1995); Federal Disaster Assistance: Report of the Senate Task Force on Funding Disaster Relief, S. DOC. NO. 104-4 (1995).

Congress has established provisions that at first glance might appear to be a blanket statutory exception to the prohibition of military assistance to civil authorities. For example, Pub. L. No. 102-484, § 1081(b)(1), Oct. 23, 1992, 106 Stat. 2515, required the Secretary of Defense to establish a program to be known as the 'Civil-Military Cooperative Action Program' in order to use the "skills, capabilities, and resources of the armed forces to assist civilian efforts to meet the domestic needs of the United States," 10 U.S.C. § 410(a)) (repealed by Pub. L. No. 104-106, Div. A, Title V, § 571(a)(1), Feb. 10, 1996, 110 Stat. 353). Closer examination reveals, however, that legislation sought to encourage activity that would not previously have violated the Posse Comitatus Act or its supplementary statutory and regulatory provisions:

> The programs shall have the following objectives: (1) To enhance individual and unit training and morale in the armed forces through meaningful community involvement of the armed forces. (2) To encourage cooperation between civilian and military sectors of society in addressing domestic needs. (3) To advance equal opportunity. (4) To enrich the civilian economy of the United States through education, training, and transfer of technological advances. (5) To improve the environment and economic and social conditions. (6) To provide opportunities for disadvantaged citizens of the United States.... Nothing in this section shall be construed as authorizing – (1) the use of the armed forces for civilian law enforcement purposes; or (2) the use of Department of Defense personnel or resources for any program, project, or activity that is prohibited by law.

U-DOW-CAR-101

questions arise most often when the Armed Forces assist civilian police. This is perhaps not surprising since it is the use that stimulated passage of the act. During the debate, Members complained of various ways in which the Army had been used, essentially as a police force, to break up labor disputes, to collect taxes, to execute search and arrest warrants, and to maintain order at the polls and during state legislative sessions.[394]

At least when suggested that the Armed Forces have been improperly used as a police force, the tests used by most contemporary courts to determine whether military activity in support of civilian authorities violates the Posse Comitatus Act were developed out of disturbances at Wounded Knee on the Pine Ridge Indian Reservation in South Dakota and inquiry:

1. whether civilian law enforcement officials made a "direct active use" of military investigators to "execute the law";

2. whether the use of the military "pervaded the activities" of the civilian officials; or

3. whether the military was used so as to subject "citizens to the exercise of military power which was regulatory, prescriptive, or compulsory in nature."[395]

The vast majority of cases called upon to apply these tests have found that the assistance provided civilian law enforcement did not constitute "execution of the law" in violation of Posse Comitatus Act requirements.[396] Those most likely to fail the tests seem to be those where the activities

---

Former 10 U.S.C. § 410(b),(e); S. REP. NO. 102-352, 278-82 (1992); H.R. REP. NO. 102-966, 762, reprinted in 1992 U.S.C.C.A.N. 1769, 1853. The provision that replaced it, 10 U.S.C. § 2012, likewise provides that "[n]othing in this section shall be construed as authorizing—(1) the use of the armed forces for civilian law enforcement purposes or for response to natural or manmade disasters; or (2) the use of Department of Defense personnel or resources for any program, project, or activity that is prohibited by law," subsection i. *See* W. Kent Davis, *Innovative Readiness Training under 10 U.S.C. § 2012: Understanding The Congressional Model for Civil-military Projects*, 2001-JUL ARMY LAW 21 (2001).

[394] 5 CONG. REC. 2113 (1877); 6 CONG. REC. 294-307, 322; 7 CONG. REC. 3538, 3581-582, 3850, 4245 (1878).

[395] Taylor v. State, 640 So.2d 1127, 1136 (Fla. App. 1994); *see also* United States v. Kahn, 35 F.3d 426, 431 (9th Cir. 1994); United States v. Yunis, 924 F.2d 1086, 1094 (D.C. Cir. 1991); Hayes v. Hawes, 921 F.2d 100, 104 (7th Cir. 1990); United States v. Gerena, 649 F. Supp. 1179, 1182 (D. Conn. 1986); United States v. Hartley, 678 F.2d 961, 978 n.24 (8th Cir. 1982); United States v. Jaramillo, 380 F. Supp. 1375, 1379-380 (D. Neb. 1974), *appeal dismissed*, 510 F.2d 808 (8th Cir. 1975) (whether the use of military personnel affected or materially contributed to the activities of civilian law enforcement officials); United States v. Banks, 383 F. Supp. 368, 375 (D.S.D. 1974) (whether there was active participation of military personnel in civilian law enforcement activities); United States v. Red Feather, 392 F. Supp. 916, 921 (D.S.D. 1975) (whether there was direct active use of military personnel by civilian law enforcement officers); United States v. McArthur, 419 F. Supp. 186, 194-95 (D.N.D. 1976), *aff'd sub nom.* United States v. Casper, 541 F.2d 1275, 1278 (8th Cir. 1976) (whether "Army or Air Force personnel [were] used by the civilian law enforcement officers in such manner that the military personnel subjected the citizens to the exercise of military power which was regulatory, prescriptive, or compulsory in nature, either presently or prospectively").

[396] United States v. Yunis, 924 F.2d 1086, 1094 (D.C. Cir. 1991) (Navy transportation of prisoner in the custody the FBI); Hall v. State, 557 N.E.2d 3, 4-5 (Ind. App. 1990) (Air Force personnel acting as undercover agents to assist local police in drug investigations involving a controlled buy of cocaine did not "display the unauthorized exercise of military power that is 'regulatory, prescriptive, or compulsory in nature'") (citing United States v. McArthur, 419 F. Supp. 186 (D.N.D. 1975), *aff'd*, 541 F.2d 1275 (8th Cir. 1976); United States v. Bacon, 851 F.2d 1312, 1313-14 (11th Cir. 1988) (concluding there was no 'military permeation of civilian law enforcement where "an active-duty army investigator assumed an undercover role in working jointly with the ... Sheriff's Department to ferret out a source of some of the cocaine being supplied to [the area for] both civilians and army personnel.... Army funds were used for some of the undercover drug 'buys.' ... All drugs and other evidence gathered by Army Investigator Perkins were turned over to the state and local investigators for evidence in the prosecution of [the] drug distributor.....' "); United States v. Holloway, 531 F. App'x 582, 583 (6th Cir. 2013) (Posse Comitatus regulation infraction not found "where the Navy agent turned over the information she had on [the suspect] to the civil authorities, the military was not involved in the subsequent search of his home, the seizure of evidence, or his arrest").

U-DOW-CAR-102

appear to have a colorable military purpose, but the government fails to make a convincing showing.[397]

The Office of Legal Counsel (OLC) opined in 1991 that the use of military personnel to conduct aerial infrared monitoring of private property for law enforcement purposes is "aerial reconnaissance" authorized by former 10 U.S.C. § 374(b)(2)(B), and is neither inconsistent with former 10 U.S.C. § 375 (assistance may not involve military personnel in search, seizure, or arrest) nor prohibited by the Posse Comitatus Act.[398] To reach this conclusion, OLC relied on its interpretation of the legislative history of then-sections 371-375 to find that Congress did not mean the term "search" in former section 375 to include all conduct that would constitute a search under the Fourth Amendment. Rather, OLC found,

> when Congress used the term "search" in section 375, it intended that the term encompass at most only searches involving physical contact with civilians or their property, and perhaps only searches involving physical contact that are likely to result in a direct confrontation between military personnel and civilians.[399]

---

Courts do not seem to have accepted the proposition that military undercover participation without a primary military purpose is a per se violation of the Posse Comitatus Act or at least of former DOD Dir. No. 5525.5 (Encl.4) A.3. ("except as otherwise provided in this enclosure, [e.g., when done primarily for a military purpose], the prohibition on the use of military personnel 'as a posse comitatus or otherwise to execute the laws prohibits ... d. Use of military personnel for surveillance... or as undercover agents...." United States v. Hartley, 796 F.2d 112, 115 (5ᵗʰ Cir. 1986) (Air Force assistance to a customs agent tracking an aircraft suspected of smuggling marijuana into the United States); United States v. Gerena, 649 F. Supp. 1179, 1182 (D. Conn. 1986) (military transport of prisoner in the custody of the Marshals Service); People v. Bautista, 115 Cal. App.4ᵗʰ 229 (2004) (military drug detection dog alert that led to police search of airport locker was not direct participation); Airway Heights v. Dilley, 45 Wash. App. 87, 92, 724 P.2d 407, 410 (1986) (use of Air Force technician and equipment to administer breathalyzer test).

[397] *E.g., accord,* Taylor v. State, 645 P.2d 522, 525 (Okla. Crim. App. 1982). *See also,* United States v. Walden, 490 F.2d 372 (4ᵗʰ Cir. 1974); Taylor v. State, 640 So.2d 1127, 1136 (Fla. App. 1994) ("Cases addressing [restrictions on military assistance to law enforcement under 18 U.S.C. § 1385 and 10 U.S.C. § 375] have ruled that where military involvement is limited and there is an independent military purpose, 'the coordination of military police efforts with those of civilian law enforcement officials does not violate either [section 1385 or section 375].' Hayes v. Hawes, 921 F.2d 100, 103 (7ᵗʰ Cir. 1990) (finding that Naval Investigative Service (NIS) agents' activities impermissibly "permeated the initial stages of the homicide investigation" where agents obtained authorization to arrest a sailor suspected of homicide on pretextual grounds for unauthorized absence, traveled to Virginia to interview appellant's family members and kept them under surveillance, questioned him about the homicides and took oral and written statements from him, seized his clothing and other personal effects, and then transported appellant to Jacksonville, where they returned him over to the civilian authorities).

[398] Military Use of Infrared Radars Technology to Assist Civilian Law Enforcement Agencies, 15 U.S. Op. Off. Legal Counsel 36 (1991). DOD presented the question to the Justice Department after receiving several requests for assistance from DEA to deploy Forward Looking Infrared Radar (FLIR) to identify illicit narcotics production.

[399] *Id.* at 39-40. OLC found noteworthy that the original version of 10 U.S.C. § 375 prohibited military personnel from participating in "an interdiction of a vessel or aircraft, *a search and seizure,* arrest, or other similar activity." *Id.* at 41 (citing Pub. L. No. 97-86, tit. IX, § 905(a)(1), 95 Stat. 1099, 1116 (1981) (emphasis added)). OLC reasoned that:

> The coupling of "search" and "seizure" through use of the conjunctive "and," and the reference to the two as a single event (i.e., "a search and seizure"), strongly suggests that Congress was referring to searches of persons or objects that had been seized and thus were in the custody of law enforcement officers. Searches of seized persons or objects almost always involve physical contact.

*Id.* While OLC thought the later amendment of the statute, which deleted the "and" between "search" and "seizure," was meant to clarify that it prohibited even searches that did not result in a seizure, the OLC's conclusion that the kind of searches to be prohibited encompassed only those involving physical contact remained unaffected.

U-DOW-CAR-103

The legislative history suggested to OLC that Congress had intended to codify certain court decisions interpreting the Posse Comitatus Act to have as its primary aim the prevention of any "direct confrontation between military personnel and civilians."[400]

## Military Coverage

### Navy & Marines

The Posse Comitatus Act proscribes use of the Army or the Air Force to execute the law.[401] It says nothing about the Navy, the Marine Corps, the Coast Guard, or the National Guard.[402] The amendment first offered to the Army appropriation bill in 1878 to enact the Posse Comitatus provisions would have prohibited use of "any part of the land or naval forces of the United States" to execute the law.[403] Some commentators believe that sponsors subsequently limited the posse comitatus amendment to the Army appropriation bill in order to avoid challenges on grounds of germaneness.[404] The courts have generally held that the Posse Comitatus Act by itself does not apply to the Navy or the Marine Corps.[405] They maintain, however, that those forces are

---

[400] *Id.* at 42-46 (citing H.R. REP. NO. 71, 97th Cong., 1st Sess., pt. 2 (1981) and S. REP. NO. 58, 97th Cong., 1st Sess. (1981) to conclude that Congress intended to codify the distinction articulated in United States v. Red Feather, 392 F. Supp. 916 (D.S.D. 1975) between "indirect passive" assistance and "direct active" involvement in law enforcement activity).

[401] Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses *any part of the Army or the Air Force* as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both. 18 U.S.C. § 1385 (emphasis added).

[402] For an argument as to why the Navy's use to engage in law enforcement activities at sea does not implicate civil liberties and ought not be proscribed, see generally Mark P. Nevitt, *Unintended Consequences: The Posse Comitatus Act in the Modern Era*, 36 CARDOZO L. REV. 119 (2014).

[403] *See* 7 CONG. REC. 3586 (1878).

[404] *See* Coffey, *supra* note 213, at 1955 (1987); Meeks, *supra* note 356, at 101. Under long-standing rules of the House, an amendment that deals with a subject different from those contained in the bill which it seeks to amend is nongermane and subject to challenge. If the sponsors adjusted their amendment solely for reasons of germaneness, one would expect to find a comparable amendment in the Navy appropriation bill before the Congress at the same time. No such amendment was offered to the Navy bill, 46 Stat. 48 (1878).

[405] United States v. Mendoza-Cecelia, 963 F.2d 1467, 1477 (11th Cir. 1992); United States v. Yunis, 924 F.2d 1086, 1093 (D.C. Cir. 1991); State v. Short, 113 Wash.2d 35, 38, 775 P.2d 458, 459 (1989); United States v. Ahumedo-Avendano, 872 F.2d 367, 372 n.6 (11th Cir. 1989); Schowengerdt v. General Dynamics Corp., 823 F.2d 1328, 1339-340 (9th Cir. 1987); United States v. Roberts, 779 F.2d 565, 567 (9th Cir. 1986); United States v. Walden, 490 F.2d 372, 374 (4th Cir. 1974).

U-DOW-CAR-104

covered by similarly confining administrative and legislative supplements,[406] the most currently applicable of which appear in the DOD Instruction.[407]

## Coast Guard

The Posse Comitatus Act likewise says nothing about the Coast Guard. The Coast Guard was formed by merging two civilian agencies, the Revenue Cutter Service and the Lifesaving Service. Although created and used for law enforcement purposes, the Cutter Service had already been used as part of the military forces of the United States by the time the Posse Comitatus Act was enacted.[408]

---

[406] United States v. Dreyer, 767 F.3d 826, 832 (9th Cir. 2014 ("[W]e re-affirm *Chon's* holding that NCIS agents are bound by PCA-like restrictions on direct assistance to civilian law enforcement."), *aff'd on this point on reh'g en banc*, 804 F.3d 1266 (9th Cir. 2015); United States v. Chon, 210 F.3d 990, 993 (9th Cir. 2000) ("[W]we find that the PCA-like restrictions adopted by DoD with respect to the Navy apply to the NCIS."); United States v. Kahn, 35 F.3d 426, 431 (9th Cir. 1994) ("[t]hus the Posse Comitatus Act applies to the Navy through section 375 [of title 10 of the United States Code] and 32 C.F.R. § 213.10"); Taylor v. State, 640 So.2d 1127, 1136 (Fla.App. 1994) ("[m]ilitary participation in civilian law enforcement activities is restricted by the federal Posse Comitatus Act, 18 U.S.C. § 1385, and by 10 U.S.C. § 375"); United States v. Yunis, 924 F.2d 1086, 1094 (D.C. Cir. 1991) ("[r]egulations issued under 10 U.S.C. § 375 require Navy compliance with the restrictions of the Posse Comitatus Act...."); Hayes v. Hawes, 921 F.2d 100, 102-103 (7th Cir. 1990) ("10 U.S.C. § 375 and the regulations promulgated thereunder at 32 C.F.R. §§ 213.1-213.11 make the proscriptions of [18 U.S.C.] § 1385 applicable to the Navy and serve to limit its involvement with civilian law enforcement officials"); State v. Short, 113 Wash.2d 35, 39, 775 P.2d 458, 460 (1989) ("[b]ecause the limitations on the use of the armed services contained in 10 U.S.C. § 375 correspond closely with those in the posse comitatus act, the same analysis should apply"); United States v. Ahumedo-Avendano, 872 F.2d 367, 372 n.6 (11th Cir. 1989) ("[t]he Posse Comitatus Act does not expressly regulate the use of naval forces as a posse comitatus; the courts of appeal that have considered this question, however, have concluded that the prohibition embodied in the Act applies to naval forces, either by implication or by virtue of executive act"); United States v. Roberts, 779 F.2d 565, 568 (9th Cir. 1986) (" the Posse Comitatus Act and sections 371-378 of Title 10 embody similar proscriptions against military involvement in civil law enforcement...."); United States v. Del Prado-Montero, 740 F.2d 113, 116 (1st Cir. 1984 ) ("18 U.S.C. § 1385 prohibits the use of the Army and the Air Force to enforce the laws of the United States, a proscription that has been extended by executive act to the Navy"); United States v. Chaparro-Almeida, 679 F.2d 423, 425 (5th Cir. 1982) (dicta in case involving the Coast Guard); United States v. Walden, 490 F.2d 372, 373-74 (4th Cir. 1974) ("[t]he use of Marines as undercover investigators by the Treasury Department is counter to a Navy military regulation proscribing the use of military personnel to enforce civilian laws.... Thus, though by its terms the Posse Comitatus Act does not make criminal the use of Marines to enforce federal laws, the Navy has adopted the restriction by self-imposed administrative regulation").

As an examination of the cases listed above and in the previous note demonstrate, although in basic agreement subsequent courts have sometime described their views as in conflict. In fact, one camp will cite Walden for the proposition that the Posse Comitatus Act does not apply to the Navy or Marines although its requirements have been adopted by administrative and/or legislative supplements, while the other camp will cite Walden for the assertedly contrary proposition that the Posse Comitatus Act requirements apply to the Navy and Marines by way of regulation and/or legislative supplement. A third group takes an abbreviated route to the same destination by simply citing Walden for the principle that the Posse Comitatus Act applies to Navy and the Marines, *see e.g.*, People v. Caviano, 148 Misc.2d 426, 560 N.Y.S.2d 932, 936 n.1 (1990); State v. Presgraves, 328 S.E.2d 699, 701 n.3 (W.Va. 1985); State v. Maxwell, 328 S.E.2d 506, 509 n.4 (W.Va. 1985); People v. Wells, 175 Cal.App.3d 876, 879, 221 Cal.Rprt. 273, 275 (1985); People v. Blend, 121 Cal.App.3d 215, 222, 175 Cal.Rprt. 263, 267 (1981).

[407] DoDI No. 3025.21 (2013) applies to the Office of the Secretary of Defense, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff (CJCS) and the Joint Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively as the "DoD Components").

[408] *See* 46 Stat. 316 (1878), directing the Secretary of the Treasury to issue three months extra pay to those who had engaged in the military service of the United States during the war with Mexico and listing the Cutter Service as one source of possibly qualifying service.

---

U-DOW-CAR-105

The Coast Guard is now a branch of the Armed Forces, located within the Department of Homeland Security,[409] but relocated within the Navy in time of war or upon the order of the President.[410] The act does not apply to the Coast Guard while it remains part of the Department of Homeland Security.[411] While part of the Navy, it is subject to the orders of the Secretary of the Navy,[412] and consequently to any generally applicable directives or instructions issued under the Department of Defense or the Navy.

As a practical matter, however, the Coast Guard is statutorily authorized to perform law enforcement functions.[413] Even while part of the Navy its law enforcement activities would come within the statutory exception to the posse comitatus restrictions, and the restrictions applicable to components of the Department of Defense would apply only to activities beyond those authorized.[414]

## National Guard

The act is silent as to what constitutes "part" of the Army or Air Force for purposes of proscription. There is little commentary or case law to resolve questions concerning the coverage of the National Guard, the Civil Air Patrol, civilian employees of the Armed Forces, or regular members of the Armed Forces while off duty.

Strictly speaking, the Posse Comitatus Act predates the National Guard only in name, for the Guard "is the modern Militia reserved to the States by Art. I, § 8, cls.15, 16, of the Constitution," which has become "an organized force, capable of being assimilated with ease into the regular military establishment of the United States."[415] There seems every reason to consider the National Guard part of the Army or Air Force, for purposes of the Posse Comitatus Act, when in federal service.[416] When not in federal service, historical reflection might suggest that it is likewise covered. Recall that it was the state militia, called to the aid of the marshal enforcing the Fugitive Slave Act, which triggered Attorney General Cushing's famous opinion.[417] And that the Posse Comitatus Act's reference to "posse comitatus or otherwise" is a "they-are-covered-no-matter-what-you-call-them" response to the assertion derived from Cushing's opinion that troops could be used to execute the law as long as they were acting as citizens and not soldiers.

On the other hand, the National Guard is a creature of both state and federal law, a condition which as the militia it has enjoyed since the days of the Articles of Confederation.[418] And the

---

[409] 14 U.S.C. § 1 (2018).

[410] *Id.* § 3 (2018).

[411] United States v. Chaparro-Almedia, 679 F.2d 423, 425 (5th Cir. 1982) (Posse Comitatus Act inapplicable to Coast Guard operating under the Department of Transportation); Jackson v. State, 572 P.2d 87, 93 (Alaska 1977) (same).

[412] 14 U.S.C. § 3 (2018).

[413] *Id.* § 2 (2018).

[414] *See* Panagacos v. Towery, 782 F. Supp. 2d 1183 (W.D. Wash. 2011) (Coast Guard member not covered by Posse Comitatus Act).

[415] *See* Maryland v. United States, 381 U.S. 41, 46 (1965).

[416] *See* Meeks, *supra* note 356, at 96-99; Furman, *supra* note 205, at 101.

[417] *See supra* note 167, and accompanying text.

[418] The status of the District of Columbia National Guard is somewhat different since it is a creature entirely of federal creation. This being the case it might be thought that the D.C. National Guard should be considered perpetually "in federal service" or that the Posse Comitatus Act would apply to it at all times even though the treatment of the National Guard in the various states might be different. This, however, is not the view of the Department of Justice, which has concluded the Posse Comitatus Act applies to the D.C. National Guard only when it is called into federal service as a state National Guard might be. The Department has also determined that even if this were not the case, the Posse

U-DOW-CAR-106

courts have said that members of the National Guard when not in federal service are not covered by the Posse Comitatus Act.[419] Similarly, the DOD Instruction is only applicable to members of the National Guard when they are in federal service.[420]

## Off Duty Military, Acting as Citizens & Civilian Employees

The historical perspective fares little better on the question of whether the Posse Comitatus Act extends to soldiers who assist civilian law enforcement officials in a manner which any other citizen would be permitted to provide assistance, particularly if they do so while off duty.

Congress passed the act in response to cases where members of the military had been used based on their civic obligations to respond to the call as the posse comitatus. The debate in the Senate, however, suggests that the act was not intended to strip members of the military of all civilian rights and obligations.[421]

---

Comitatus Act permits the D.C. National Guard "to support the drug law enforcement efforts" of the D.C. police because of the authority granted by Congress in D.C. Code Section 39-104 (declaring that the D.C. National Guard shall not be subject to any duty except when called into federal service or to "aid civil authorities in the execution of the laws or suppression of riots" [D.C. Code Section 39-603 authorizes D.C. officials, in times of tumult, riot, or mob violence, to request the President to call out the D.C. National Guard to aid "in suppressing such violence and enforcing the laws"]) and D.C. Code Section 39-602 (authorizing the Commanding General of the D.C. National Guard to order "such drills, inspections, parades, escort, *or other duties*, as he may deem proper") (emphasis added), *Use of the National Guard to Support Drug Interdiction Efforts in the District of Columb*ia, 13 Op. Off. Legal Counsel 110 (1989).

[419] Gilbert v. United States, 165 F.3d 470, 473 (6th Cir. 1999); United States v. Hutchings, 127 F.3d 1255, 1258 (10th Cir. 1997); United States v. Benish, 5 F.3d 20, 25-6 (3d Cir. 1993); United States v. Kyllo, 809 F. Supp. 787, 792-93 (D. Ore. 1992), *aff'd* 190 F.3d 1041 (9th Cir. 1999), *rev'd on other grounds* 533 U.S. 27 (2001); Wallace v. State, 933 P.2d 1157, 1160 (Alaska App. 1997); *accord*, Steven B. Rich, *The National Guard, Drug Interdiction and Counterdrug Activities, and the Posse Comitatus Act: The Meaning and Implications of 'In Federal Service,'* 1994-JUN ARMY LAW. 35, 42-3 (1994). However, in two of the Wounded Knee cases, in which National Guard involvement in the civilian law enforcement efforts helped doom federal prosecution, the courts made no effort to determine whether the Guard had been called into federal service, suggesting to some that the Guard was covered in any event. United States v. Banks, 383 F. Supp. 368, 376 (D.S.D. 1974); United States v. Jaramillo, 380 F. Supp. 1375, 1380-381 (D.Neb. 1974); *see also*, United States v. McArthur, 419 F. Supp. 186, 193 n.3 (D.N.D. 1976) (a third Wounded Knee case listing "use by federal civil law enforcement officers of material and equipment furnished by ... the South Dakota National Guard ... aerial photographic reconnaissance provided by ... the Nebraska National Guard ... and the maintenance of military vehicles performed by members of the Nebraska National Guard" as "evidence of military involvement"); Meeks, *supra* note 356, at 96-98.

A federal district court in *United States v. Kyllo* suggested that 32 U.S.C. § 112 (which permits the Secretary of Defense to provide funds for the drug interdiction activities conducted by various state National Guards when not in federal service) authorizes such Guards to assist in civilian law enforcement efforts, 809 F. Supp. at 793; *see also* People v. Marolda, 394 N.J. Super. 430, 927 A.2d 154 (2007) (without discussing status of members of Coast Guard and of National Guard who aided state officials in aerial search for drugs, regarding Posse Comitatus Act as inapplicable).

The legislative history of earlier efforts to involve the National Guard (while in state service) in drug interdiction indicates that the Congress believed that "[w]hen not in federal service, the National Guard is not subject to the Posse Comitatus Act," H.R. REP. NO.100-989, 455, *reprinted in* 1988 U.S.C.C.A.N. 2503, 2583.

[420] The Instruction applies to members of the National Guard only when in Federal Service," DoDI No. 3025.21, 2.d & 2.f.5. 32 C.F.R. § 182.2(d) states that the C.F.R. "applies to National Guard (NG) personnel only in title 10, U.S.C., status only."

[421] "If a soldier sees a man assaulting me with a view to take my life, he is not going to stand by and see him do it, he comes to my relief not as a soldier, but as a human being, a man with a soul in his body, and as a citizen.... The soldier standing by would have interposed if he had been a man, but not as a soldier. He could not have gone down in pursuance of an order from a colonel or a captain, but he would have done it as a man." 7 CONG. REC. 4245 (1878) (remarks of Sen. Merriman). The weight afforded remarks in the Senate should perhaps reflect the fact that the act was

U-DOW-CAR-107

The Senate debate may have influenced some reviewing courts, particularly in earlier decisions interpreting the Posse Comitatus Act, which held that a soldier who does no more than any other citizen might do to assist civilian law enforcement has not been used in violation of the Posse Comitatus Act.[422] The more recent decisions under similar facts, with the endorsement of the commentators,[423] have focused on the nature of the assistance provided and whether the assistance is incidental to action taken primarily for a military purpose.[424]

---

the work of a Democratic House, forced upon a reluctant Republican Senate.

[422] People v. Taliferro, 116 Ill.App.3d 861, 520 N.E.2d 1047, 1051 (1988) (an airman acted as an undercover agent for local drug enforcement officers; "Ferguson participated in a controlled drug purchase in exactly the same manner as any other citizen would participate in such transaction"); Burkhart v. State, 727 P.2d 971, 972 (Okla.Crim.App. 1986) (military undercover agent investigating drugs sold to military personnel purchased some from the defendant and testified against him; "the agent 'did not assume any greater authority than that of a private citizen in purchasing the marijuana'"); People v. Burden, 411 Mich. 56, 303 N.W.2d 444, 446-47 (1981) (airman agreed to serve undercover after being charged with drug sales by civilian authorities; "[i]n cooperating with and assisting the civilian police agency, Hall was not acting as a member of the military. He was acting only as a civilian. His military status was merely incidental to and not essential to his involvement with the civilian authorities. He was not in military uniform. He was not acting under military orders. He did not exercise either explicitly or implicitly any military authority. Moreover, Hall was not a regular law enforcement agent of the military, * * * nor does the record suggest that Hall's usefulness to civilian authorities was in any way enhanced by virtue of his being a military man.... [T]he assistance rendered by Hall was in no way different from the cooperation which would have been given by a private citizen offered the same opportunity to avoid criminal prosecution"); People v. Blend, 121 Cal.App.3d 215, 227, 175 Cal.Rptr. 263, 270 (1981) (a Navy Wave caught by civilian authorities in violating the drug laws, agreed to serve undercover for the civilian police; "the [posse comitatus] act does not apply to military personnel who are acting clearly on their own initiative as private citizens"); Lee v. State, 513 P.2d 125, 126 (Okla.Crim.App. 1973) (military undercover agent in cooperation with local police purchases drugs off-base from a civilian; "agent Smith did not assume any greater authority than that of a private citizen in purchasing the marijuana in the instant case"); Hildebrandt v. State, 507 P.2d 1323, 1325 (Okla.Crim.App. 1973) (military undercover investigators traced the source of drugs sold to military personnel to the defendant; the "soldier led the agents to a location outside the scope of their military jurisdiction, at which time the agents assumed no greater authority than that of a private citizen"); Hubert v. State, 504 P.2d 1245, 1246-247 (Okla.Crim.App. 1972) (same).

[423] Meeks, *supra* note 356, at 126-27 ("Military personnel are all private citizens as well as members of the federal military. The prohibitions of the Posse Comitatus Act do not apply to military personnel who are performing the normal duties of a citizen such as reporting crimes and suspicious activities, making citizens' arrests where allowed by local law and otherwise cooperating with civil police. It is not sufficient for military personnel to be 'volunteers,' they must clearly be acting on their own initiative and in a purely unofficial and individual capacity. Commanders must be careful to insure that activities which are in violation of the act are not being carried on under the labels of 'individual' or 'unofficial' assistance. Some factors which may signal a violation of the Act include aid given during duty hours, aid prompted or suggested by a military superior or aid given with the knowledge or acquiescence of a military superior. Other considerations include the manner in which the civil authorities contacted the military person, whether that person regularly performs military law enforcement functions, and whether or not the individual's usefulness to civil authorities is related to his military status"); Rice, *supra* note 356, at 128-33 (also noting that the catalyst for some of the difficulties stemmed from the holding in O'Callahan v. Parker, 395 U.S. 258 (1969) (since overturned) limiting military jurisdiction over crimes committed by military personnel to those which were service connected).

[424] Fox v. State, 908 P.2d 1053, 1057 (Alaska App. 1995) ("In civilian prosecutions stemming from joint military-civilian investigations into off-base drug sales, courts have interpreted these regulations to require the government to demonstrate a military purpose – that is a nexus between the targeted off-base sales and military personnel; this purpose must be shown to have been the primary purpose of the military's participation. In the absence of a nexus between the targeted off-base drug sales and military personnel, courts have condemned joint investigations as violations of the Posse Comitatus Act."); State v. Gunter, 902 S.W.2d 172, 175 (Tex. App. 1995) (after quoting the private citizen language in *Burkhardt, supra,* the court declared, "[A] majority of courts have also noted that where military involvement is limited and where there is an independent military purpose of preventing illicit drug transactions to support the military involvement, the coordination of military police efforts with those of civilian law enforcement does not violate the Act. Where the military participation in an investigation does not pervade the activities of civilian officials, and does not subject the citizenry to the regulatory exercise of military power, it does not violate the Act."); State v. Pattioay, 78 Haw. 455, 466, 896 P.2d 911, 922 (1995) ("Absent evidence to support the prosecution's claim of a primary military purpose, we must uphold the circuit court's conclusion that the joint civilian-military [undercover

U-DOW-CAR-108

Some have questioned whether civilian employees of the Armed Forces should come within the proscription of the act,[425] but most, frequently without comment, seem to consider them "part" of the Armed Forces for purposes of the Posse Comitatus Act.[426] The current Defense Department Instruction expressly applies "to civilian employees of the DoD Components and the activities of DoD contractors performed in support of the DoD Components." within its Posse Comitatus Act policy restrictions,[427] while the Office of Legal Counsel considers that civilian employees are not "part of" the Armed Forces and may be assigned to duties with law enforcement organizations without violating the Posse Comitatus Act.[428] The Office of Legal Counsel has also opined that military members who operate under civilian command and control are not "part of" the Armed Forces, at least so long as they are not still subject to the military chain of command.[429]

## Geographical Application

It seems unlikely that the Posse Comitatus Act, by itself, applies beyond the confines of the United States, its territories, and possessions.[430] As a general rule, acts of Congress are presumed to apply only within the United States, its territories, and possessions unless Congress has provided otherwise or unless the purpose of Congress in enacting the legislation evidences an intent that the legislation enjoy extraterritorial application.[431]

The Posse Comitatus Act contains no expression of extraterritorial application. Congress enacted it in response to problems occurring within the United States and its territories, problems associated with the American political process and military usurpation of civilian law

---

drug] investigation violated the PCA, 10 U.S.C. § 375, and relevant federal regulations"); Taylor v. State, 640 So.2d 1127, 1136 (Fla.App. 1994) ("[m]ilitary participation in civilian law enforcement activities is restricted by the federal Posse Comitatus Act and by 10 U.S.C. § 375. Cases addressing this issue have ruled that where military involvement is limited and there is an independent military purpose, 'the coordination of military police efforts with those of civilian law enforcement officials does not violate either section 1385 or section 375.' Hayes v. Hawes, 921 F.2d 100, 103 (7th Cir. 1990). The test for violation of the federal law is (1) whether civilian law enforcement officials made a direct active use of military investigators to execute the laws; (2) whether the use of the military pervaded the activities of the civilian officials; or (3) whether the military was used so as to subject citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature.

[425] State v. Short, 113 Wash.2d 35, 39-40, 775 P.2d 458, 460 (1989); State v. Morris, 522 A.2d 220, 221 (R.I. 1987); People v. Hayes, 144 Ill.App. 3d 696, 494 N.E.2d 1238, 1240 (1986); *see also,* Furman, *supra* note 205, at 101.

[426] *See e.g.,* Hayes v. Hawes, 921 F.2d 100 (7th Cir. 1990); People v. Wells, 175 Cal.App.3d 878, 221 Cal.Rprt. 273 (1988); State v. Maxwell, 328 S.E.2d 506 (W.Va. 1985); State v. Presgraves, 328 S.E.2d 699 (W.Va. 1985); United States v. Hartley, 486 F. Supp. 1348, 1356 (M.D.Fla. 1980), *aff'd,* 678 F.2d 961 (11th Cir. 1982); Meeks, *supra* note 356, at 83 ("[C]ivilian investigators operate under the immediate supervision of military officers who are prohibited by the Act from aiding local authorities. Holding that the civilian subordinates are not also prohibited allows a principal to accomplish things through his agent that he could not otherwise lawfully do himself. It is foolhardy to assume that it is only the sight of the man in military uniform aiding the sheriff that tends to offend the civilian community.").

[427] DoDI No. 3025.21, at 2.e. 32 C.F.R. 182.4(c) does not list comparable "exceptions based on status," but suggests that the restrictions apply to all DoD personnel as a matter of policy.

[428] *Effect of Posse Comitatus Act on Proposed Detail Of Civilian Employee to the National Infrastructure Protection Center,* 22 U.S. Op. Off. Legal Counsel 103 (1993).

[429] *Assignment of Army Lawyers to the Department of Justice,* 10 U.S. Op. Off. Legal Counsel 115, 121 (1986).

[430] *Extraterritorial Effect of the Posse Comitatus Act,* 13 Op. Off. Legal Counsel 387 (1989); Deanne C. Siemer & Andrew S. Effron, *Military Participation in United States Law Enforcement Activities Overseas: The Extraterritorial Effect of the Posse Comitatus Act,* 54 ST. JOHN'S L. REV. 1 (1979).

[431] RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090, 2100-101 (2016); United States v. Bowman, 260 U.S. 94, 98 (1922); Blackmer v. United States, 284 U.S. 421 (1932); United States v. Yunis, 924 F.2d 1086, 1090-91 (D.C. Cir. 1991).

U-DOW-CAR-109

enforcement responsibilities over Americans. It seems unlikely that its extraterritorial application was either anticipated or intended.

The first court to consider the question agreed, but it arose in occupied territory overseas in which an American military government had temporarily displaced civil authorities.[432] For some time subsequent decisions either declined to resolve the issue or did not address it.[433]

Congress does appear to have intended the authority and restrictions contained in 10 U.S.C. Sections 271-284 to apply both in the United States and beyond its borders. The provisions directing the placement of members of the Coast Guard on Navy ships for drug interdiction purposes[434] evidence an understanding that the Posse Comitatus Act's statutory shadow, the restrictions on arrests and similar direct law enforcement activities under 10 U.S.C. Section 275, applies at least on the high seas.[435] In some instances it initially contemplated that various provisions would only apply overseas.[436]

The regulations implementing 10 U.S.C. Section 275 address only assistance to law enforcement officials of the several states, the United States, or its territories or possessions,[437] but declares it does not apply to assistance to foreign officials.[438] In the case of assistance provided overseas to foreign law enforcement officials, the so-called Mansfield Amendment[439] creates something of an overseas version of the Posse Comitatus Act, at least for drug enforcement purposes.[440]

---

[432] Chandler v. United States, 171 F.2d 921, 936 (1st Cir. 1948).

[433] Gillars v. United States, 182 F.2d 962, 973 (D.C. Cir. 1950); D'Aquino v. United States, 192 F.2d 338, 351 (9th Cir. 1951); United States v. Cotton, 471 F.2d 744, 748-49 (9th Cir. 1973).

[434] 10 U.S.C. § 279 (2018).

[435] *Cf.,* United States v. Klimavicius-Viloria, 144 F.3d 1249, 1259 (9th Cir. 1998); United States v. Khan, 35 F.3d 426, 431-32 (9th Cir. 1994) (both determining that the particular activities of Navy personnel on the high seas in aid of law enforcement officials did not violate 10 U.S.C. § 375).

[436] "The Committee considered and narrowly rejected a suggestion that the assistance permitted by this section be made available only outside the United States," H.R. REP. NO. 97-71, pt.2, 12 n.3, *reprinted in* 1981 U.S.C.C.A.N. 1785, 1795.

[437] DoDI No. 3025.21, § 1.a.

[438] DoDI No. 3025.21, § 1.f. 32 C.F.R. Part 182 is inapplicable to assistance to law enforcement officials in foreign governments, 32 C.F.R. 182.2(f)(2), while section 182.4(c) provides that "The restrictions in Sec. 182.6(a)(1)(iii) shall apply to all actions of DoD personnel worldwide." unless an exception is granted by the Secretary or Deputy Secretary of Defense, § 182.4(d).

[439] 22 U.S.C. § 2291.

[440] *Id.* § 2291(c) prohibits U.S. officers and employees who are participating in foreign police actions from directly effecting a narcotics arrest except under exigent circumstances to protect life or safety, or from participating in or observing the interrogation of a U.S. person arrested in a foreign country for a narcotics offense unless the person consents in writing.

In the course of its opinion concerning the extraterritorial application of the Posse Comitatus Act, the Office of Legal Counsel characterized an earlier version of the Mansfield Amendment as applicable only in the case of American involvement "in the internal enforcement activities of foreign countries" and not applicable to the overseas enforcement of American law, *Extraterritorial Effect of the Posse Comitatus Act,* 13 Op. Off. Legal Counsel 387, 410-11 n.16 (1989) (citing dicta in *United States v. Green,* 671 F.2d 46, 53 n.9 (1st Cir. 1982), for the proposition that the Mansfield Amendment "was only intended to 'insure that U.S. personnel do not become involved in sensitive, internal law enforcement operations which could adversely affect U.S. relations with that country'" and inferring that U.S. enforcement of its laws within the territory of another nation for misconduct within that nation would not similarly adversely affect relations and was intended to be covered). However tenable that position may once have been, it seems to have been undermined by the inclusion of subparagraph (4) making the Amendment inapplicable in cases where the foreign country has agreed to the application of American drug laws within its territorial waters.

U-DOW-CAR-110

# Consequences of Violation

## Prosecution

The Posse Comitatus Act is a criminal statute under which there has never been an officially reported prosecution,[441] although it appears there were two prosecutions shortly after the act was passed.[442] While some courts have concluded that it does not provide a private right of action on behalf of anyone who claims to have suffered some injury due to its violation,[443] it has been invoked with varying degrees of success, as described below, to challenge the jurisdiction of the courts; as a defense in criminal prosecutions for other offenses; as a ground for the suppression of evidence; as the grounds for, or a defense against, civil liability; and as an impediment to proposed actions by the Armed Forces.

## Exclusion of Evidence

Allegations that the Posse Comitatus Act has been violated are made most often by defendants seeking to exclude related testimony or physical evidence. The case law begins with *United States v. Walden*,[444] where the U.S. Court of Appeals for the Fourth Circuit found that the Treasury Department's use of three Marines as undercover agents in an investigation of firearms offenses violated Navy regulations that made the act applicable to use of the Marines, but declined to order the exclusion of evidence obtained by the Marines.

The court found no "conscious, deliberate or willful intent on the part of the Marines or the Treasury Department's Special Investigator to violate" the regulation or the act.[445] It also noted that the regulation contained no enforcement mechanism and the Posse Comitatus Act provided only for criminal prosecution, and that case before lacked the elements which had led to the

---

[441] Matthew Gilligan, *Opening the Gate? An Analysis of Military Law Enforcement Authority Over Civilian Lawbreakers On and Off the Federal Installation*, 161 MIL. L. REV. 1, 11 (1999); State v. Pattioay, 78 Haw. 455, 467, 896 P.2d 911, 923 (1995); Moon v. State, 785 P.2d 45, 48 (Alaska App. 1990).

[442] *See* LIEBER, *supra* note 213, at 28 n. 2 (noting indictment in 1879 of two Army officers for providing troops to federal marshal to assist in arresting suspected violators of federal revenue laws). The incident involved a stand-off of sorts between federal and state law enforcement officers, in which U.S. Deputy Marshal Walter Johnson was himself arrested by state officials for having arrested, on blank warrants which he filled in at the time of arrest, citizens suspected of running illicit stills. He then secured the help of soldiers from the 10th Cavalry to arrest the original suspects again as well as the state officials who had freed them. *See Conflict of Authority in Texas*, N.Y. HERALD-TRIB., December 13, 1879, at 2; *Frontier Jurisdiction*, 26 TEX. B. J. 391 (1963) (reporting state case against the deputy marshal). Despite the notoriety of the incident, the two officers were eventually acquitted. *See Acquittal of Captain Nolan and Lieutenant Flipper*, DALLAS WKLY HERALD, December 15, 1881, at 1 (explaining that charges were dropped against the Lieutenant after the jury acquitted the Captain); *Army Officers Acquitted*, CINCINNATI COM. TRIB., December 16, 1881, at 3 (opining that "[c]harity alone prevented a rigid prosecution"). One of those officers later described a similar incident in which the same two officers were indicted for assisting the same federal deputy marshal, this time by holding prisoners overnight at Fort Elliott, two men who were suspected of stealing ammunition from the camp and selling it to local cowboys. HENRY O. FLIPPER, NEGRO FRONTIERSMAN 11-12 (1963) (autobiographical account). In that case, he reported Captain Nolan entered a guilty plea for the both of them, and each was fined one dollar. *Id.* However, that story appears to be uncorroborated by contemporary accounts, and Flipper's autobiography does not mention the first incident. It seems probable that there was only a single set of indictments. Lieutenant Flipper was already well-known as the first black cadet to have graduated from West Point.

[443] Smith v. United States, 293 F.3d 984, 988 (7th Cir. 2002); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 511 (2d Cir. 1994); Lamont v. Haig, 539 F. Supp. 552, 558–59 (D.S.D. 1982).

[444] 490 F.2d 372 (4th Cir. 1974).

[445] *Id.* at 376.

---

U-DOW-CAR-111

adoption of the Fourth Amendment exclusionary rule. Finally, the court felt the use of the Marines had been aberrational; that subsequent similar transgressions were unlikely; and that the regulation would be amended to provide an enforcement component. But the court warned, "should there be evidence of widespread or repeated violations in any future case, or ineffectiveness of enforcement by the military, we will consider ourselves free to consider whether adoption of an exclusionary rule is required as a future deterrent."[446]

Later defendants have focused upon the *Walden* court's warning; later courts have emphasized the refusal to adopt an exclusionary rule. Most cases note the absence of an exclusionary rule either to avoid deciding whether the Posse Comitatus Act was violated or to conclude that no relief is available irrespective of any violation.[447] The U.S. Court of Appeals for the Ninth Circuit (Ninth Circuit) determined in one case that a Navy investigation of child pornography involving surveillance of all computers in the state of Washington, not merely limited to those with any connection to the military, amounted to impermissible direct active involvement in civilian enforcement of a widespread nature in violation of DoD regulations.[448] A panel of the Ninth Circuit stated:

> The government's position that the military may monitor and search all computers in a state even though it has no reason to believe that the computer's owner has a military affiliation would render the PCA's restrictions entirely meaningless. To accept that position would mean that NCIS agents could, for example, routinely stop suspected drunk drivers in downtown Seattle on the off-chance that a driver is a member of the military, and then turn over all information collected about civilians to the Seattle Police Department for prosecution.[449]

---

[446] *Id.* at 377.

[447] *E.g.*, United States v. Wolffs, 594 F.2d 77, 85 (5th Cir. 1979) ("We pretermit discussion of whether there was a violation of the statute or regulation. We need not decide that complex and difficult issue because assuming without deciding that there was a violation application of an exclusionary rule is not warranted."); People v. Hayes, 144 Ill.App.3d 696, 699, 494 N.E.2d 1238, 1240 (1986) ("numerous decisions with facts similar to those presented here have found that no violation of the Act occurs if the aid is not characterized as military and the investigation merely coordinates with civilian police. More importantly, with few exceptions, the courts have uniformly held that the exclusionary rule does not apply to evidence seized in violation the Posse Comitatus Act"); other cases include, United States v. Johnson, 410 F.3d 137 (4th Cir. 2005); United States v. Mullin, 178 F.3d 334, 342-43 (5th Cir. 1999); United States v. Al-Talib, 55 F.3d 923, 930 (4th Cir. 1995); State v. Gonzales, 247 P.3d 1111, 1115, 149 N.M. 226, 230, 2011-NMCA-007, 007 (N.M.App. 2010); State v. Gunter, 902 S.W.2d 172 (Tex.App. 1995); Taylor v. State, 640 So.2d 1127 (Fla.App. 1994) (finding a violation but declining to exclude evidence); State v. Valdobinos, 122 Wash.2d 270, 858 P.2d 199 (1993); United States v. Mendoza-Cecelia, 963 F.2d 1467 (11th Cir. 1992); McPherson v. State 800 P.2d 928 (Alaska App. 1990); People v. Caviano, 148 Misc.2d 426, 560 N.Y.S.2d 932 (N.Y.S.Ct. 1990); Moon v. State, 785 P.2d 45, 46-48 (Alaska App. 1990); Badoino v. State, 785 P.2d 39, 42-43 (Alaska App. 1990); Hayes v. Hawes, 921 F.2d 100 (7th Cir. 1990); State v. Short, 113 Wash.2d 35, 40, 775 P.2d 458, 460 (1989); State v. Poe, 755 S.W.2d 41, 44-45 (Tenn. 1988); United States v. Bacon, 851 F.2d 1312 (11th Cir. 1988); United States v. Griley, 814 F.3d 967 (4th Cir. 1987); State v. Morris, 522 A.2d 220 (R.I. 1987); United States v. Hartley, 796 F.2d 112 (5th Cir. 1986); United States v. Roberts, 779 F.2d 565 (9th Cir. 1986) (found violation but declined to find application of the exclusionary rule appropriate); Burkhart v. State, 727 P.2d 971 (Okla.Crim.App. 1986); People v. Wells, 175 Cal.App.3d 876, 221 Cal.Rptr. 273 (1985); State v. Maxwell, 328 S.E.2d 506 (W.Va. 1985); Unites States v. Chaparro-Almeida, 679 F.2d 423 (5th Cir. 1982); People v. Burden, 411 Mich.56, 303 N.W.2d 444 (1981); State v. Sanders, 303 N.C. 608, 281 S.E.2d 7 (N.C. 1981); State v. Trueblood, 46 N.C.App. 541, 265 S.E.2d 662 (N.C.App. 1980); State v. Nelson, 298 N.C. 573, 260 S.E.2d 629 (1979); State v. Danko, 219 Kan. 490, 548 P.2d 819 (9176); Hubert v. State, 504 P.2d 1245 (Okla.Crim.App. 1972); United States v. Vick, 842 F.Supp.2d 891 (E.D. Va. 2012); Aviles v. Department of the Army, 666 F. Supp. 2d 224, 234 (D.P.R. 2009).

[448] United States v. Dreyer, 767 F.3d 826, 832 (9th Cir. 2014), *on reh'g en banc*, 804 F.3d 1266 (9th Cir. 2015).

[449] *Dreyer*, 767 F.3d at 834.

U-DOW-CAR-112

Accordingly, the court found that "widespread and repeated violations" required deterrence and ordered evidence suppressed.[450] However, the Ninth Circuit granted rehearing en banc and, while agreeing that the investigation violated regulations prohibiting direct military involvement in civilian law enforcement,[451] held that the suppression of evidence was unnecessary to deter future violations where the government was already taking corrective action.[452]

There being no clearly established right to the exclusion of evidence due to a violation of the Posse Comitatus Act, even if there is proof that violations are widespread, habeas petitioners have been unsuccessful in reversing their convictions based on a claimed violation.[453]

Three states' cases have required the suppression of evidence resulting from the use of military undercover agents to target civilian drug dealing without establishing any connection to activities on a military installation or sales to military personnel other than the undercover agents.[454] Where the defendant is a member of the armed services and military investigators take part in an investigation, it has been held that an attorney's failure to make an effort to exclude evidence on the basis of an alleged Posse Comitatus Act violation does not give rise to a claim for ineffective assistance of counsel.[455]

## Jurisdiction & Criminal Defenses

The first criminal defendants to seek refuge in the Posse Comitatus Act claimed unsuccessfully that use of the military to transport them back to the United States for trial violated the act and vitiated the jurisdiction of American courts to try them.[456] Ordinarily, criminal trials are not barred simply because the defendant was unlawfully seized and carried into the jurisdiction of the trial court.[457] There are indications that the same rule applies when the defendant challenges the court's jurisdiction on the grounds of Posse Comitatus Act violations. In the early posse comitatus cases, the defendants' arguments were further undermined by the fact that the countries from

---

[450] *Id.* at 836.

[451] United States v. Dreyer, 804 F.3d 1266, 1275 (9th Cir. 2015) (en banc) ("This conduct is expressly prohibited as direct assistance. See DoDD 5525.5 § E4.1.3.4 (identifying under "[r]estrictions on [d]irect [a]ssistance" the "[u]se of military personnel for surveillance or pursuit of individuals, or as undercover agents, informants, investigators, or interrogators")).

[452] Dreyer, 804 F.3d at 1280 ("NCIS must conform its investigatory practices to the law, but we are persuaded that the Government should have the opportunity to self-correct before we resort to the exclusionary rule, particularly because it has already acknowledged the need to do so."). The court also suggested that it found significance in the fact that no constitutional violation had been alleged. *Id.* at 1278.

[453] *See, e.g.,* Gonzales v. Bravo, 561 F. App'x 673, 676 (10th Cir. 2014) ("[E]ven had the petitioner shown widespread and repeated violations of the PCA, his claim would still have failed because the district court could not say that New Mexico's decision not to apply an exclusionary rule was an unreasonable application of clearly established federal law."). The habeas statute, 28 U.S.C. 2254 (2018), provides that a state conviction will not be overturned unless, among other circumstances, the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* at 2254(d)(1).

[454] State v. Pattioay, 78 Haw. 455, 896 P.2d 911 (1995); People v. Tyler, 854 P.2d 1366 (Colo.App. 1993), *rev'd on other grounds,* 874 P.2d 1037 (Colo. 1994); Taylor v. State, 645 P.2d 522 (Okla.Crim.App. 1982).

[455] United States v. Lewis, 824 F. Supp. 2d 169 (D.D.C. 2011).

[456] Chandler v. United States 171 F.2d 921 (1st Cir. 1949); Gillars v. United States, 182 F.2d 962 (D.C. Cir. 1950); D'Aquino v. United States, 192 F.2d 338 (9th Cir. 1951).

[457] Ker v. Illinois 119 U.S. 436, 444 (1886); Frisbie v. Collins, 342 U.S. 519, 522 (1952); United States v. Alvarez-Machain, 504 U.S. 655, 661-62 (1992).

U-DOW-CAR-113

which they were returned, Germany and Japan, were under American military rule at the time.[458] In later cases, some of which began beyond the territorial confines of the United States, although none in occupied territory, the courts noted that dismissal would not be an appropriate remedy for a posse comitatus violation.[459] In one case, an effort to characterize the plea for dismissal as a request to be returned to the country of abduction for formal extradition was likewise held unavailing.[460]

Defendants have found the act more helpful in prosecutions where the government must establish the lawfulness of its conduct as one of the elements of the offense charged, a rare feature of criminal prohibitions.[461] Thus, several defendants at Wounded Knee were able to persuade the court that evidence of possible Posse Comitatus Act violations precluded their convictions for obstructing law enforcement officials "lawfully engaged" in the performance of their duties.[462]

## Civil Liability

Some time ago, the U.S. Court of Appeals for the Eighth Circuit found that a violation of the act might constitute an unreasonable search and seizure for purposes of the Fourth Amendment, thereby giving rise to a *Bivens* cause of action against offending federal officers or employees.[463] A Posse Comitatus Act violation also provides the government with a defense to a claim under the Federal Tort Claims Act (FTCA) since the government is not liable under the FTCA for injuries inflicted by federal officers or employees acting outside the scope of their authority.[464] It appears

---

[458] *Chandler*, 171 F.2d at 936 ("Particularly, it would be unwarranted to assume that [the Posse Comitatus Act] was intended to be applicable to occupied enemy territory, where the military power is in control and Congress has not set up a civil regime."); *Gillars*, 182 F.2d at 972 ("The use of our Army of Occupation in Germany could not be characterized as a 'posse comitatus' since it was the law enforcement agency in Germany at the time of appellant's arrest."); *D'Aquino*, 192 F.2d at 351 (rejecting Posse Comitatus Act defense to jurisdiction based on *Chandler* and *Gillars*).

[459] United States v. Jian-Yun Dong, 731 F. App'x 180, 182 (4th Cir. 2018), cert. denied sub nom. Dong v. United States, No. 18-5766, 2018 WL 4190086 (U.S. Oct. 1, 2018) ("By its terms, the remedy for a violation of the PCA is not to dismiss the criminal charges against the offender or reverse his convictions but to hold the transgressor criminally liable."; United States v. Wooten, 377 F.3d 1134, 1140 (10th Cir. 2004); United States v. Mendoza-Cecelia, 963 F.2d 1467, 1478 n.9 (11th Cir. 1992); United States v. Yunis, 924 F.2d 1086, 1093-94 (D.C. Cir. 1991); State v. Morris, 522 A.2d 220, 221 (R.I. 1987); United States v. Roberts, 779 F.2d 565, 568 (9th Cir. 1986); United States v. Cotton, 471 F.2d 744, 749 (9th Cir. 1973); United States v. al Liby, 23 F. Supp. 3d 194, 200 (S.D.N.Y. 2014) (neither exclusion of evidence nor dismissal of indictment granted where defendant contended his "apprehension in Libya—through 'the extreme use of the Army's Delta Force to effect the Defendant's arrest, and then the subsequent Navy's participation in the Defendant's unlawful detention;—violated the [Posse Comitatus] Act").

[460] United States v. Khatallah, 160 F. Supp. 3d 144, 149–50 (D.D.C. 2016) (Where defendant, captured by the military in Libya and transported to the United States for trial, asked "only that he be restored to ... Libya with the right to contest any attempt to extradite him to face charges in the United States," the court stated "this is a distinction without a meaningful difference," despite the purported violation of the Posse Comitatus Act).

[461] *See supra* note 395 and accompanying text.

[462] United States v. Banks, 383 F. Supp. 368, 374-77 (D.S.D. 1974); United States v. Jaramillo, 380 F. Supp. 1375, 1378-381 (D. Neb. 1974).

[463] Bissonette v. Haig, 800 F.2d 812, 814-16 (8th Cir. 1986), *aff'd as if by an equally divided court for want of a quorum*, 485 U.S. 264 (1988); *see also*, Applewhite v. United States, 995 F.2d 997 (10th Cir. 1993). Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), recognized a private cause of action in tort for injuries suffered as a result of a constitutional violation. The Supreme Court, however, has been reluctant to expand *Bivens* where special factors counsel hesitancy. *See, e.g.*, Ziglar v. Abassi, 137 S. Ct. 1843, 1857 (2017).

[464] Wrynn v. United States, 200 F. Supp. 457, 464-65 (E.D.N.Y. 1961); Rice, *supra* note 356, at 115.

U-DOW-CAR-114

that plaintiffs asserting violations against state or local law enforcement officers also face an uphill battle.[465] On balance, the Posse Comitatus Act is only rarely placed in issue in civil cases.

# Compliance

The most significant impact of the Posse Comitatus Act is attributable to compliance by the Armed Forces. As administrative adoption of the act for the Navy and Marines demonstrates, the military has a long-standing practice of avoiding involvement in civilian affairs which it believes are contrary to the act.[466]

# Author Information

Jennifer K. Elsea
Legislative Attorney

# Acknowledgments

Charles Doyle, Senior Specialist, originally prepared portions of this report.

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

---

[465] *See* Panagacos v. Towery, 692 F. App'x 330, 333 (9th Cir. 2017) (Defendant police officers who used military investigators to infiltrate group of protestors entitled to qualified immunity); Riley v. Newton, 94 F.3d 632 (11th Cir. 1996) (county investigator not liable for excessive force on the part of military policeman assisting in an arrest).

[466] Furman, *supra* note 205, at 85-86; Meeks, *supra* note 356, at 83 (both citing extensively to internal instructions, directives and opinions advising members of the military to refrain from conduct understood to be contrary to the Posse Comitatus Act); Peterson, *supra* note 326, at 145 n.165 ("when the Army believes the Posse Comitatus Act actually applies, the Army interprets the prohibitions of the Act broadly"); *cf.*, Rice, *supra* note 356, at 118 & 118 n.55) ("Unexpected decisions cause ripples in the steady flow of jurisprudence. Consequently, the notoriety of the *Banks* case [one of the Wounded Knee quartet of cases] should not be surprising. It also caused hesitancy on the part of the Department of Defense.* *During the Hanafi Muslem hostage situation in Washington, D.C., the Justice Department had requested grenades in case the gunmen began to kill their hostages. There was a delay in responding to the request") (note 55 of the article is quoted following the asterisks).

U-DOW-CAR-115

## Ex. Ord. No. 13276. Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region

Ex. Ord. No. 13276, Nov. 15, 2002, 67 F.R. 69985, as amended by Ex. Ord. No. 13286, §1, Feb. 28, 2003, 68 F.R. 10619, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)), and section 301 of title 3, United States Code, and in order to delegate appropriate responsibilities to Federal agencies for responding to migration of undocumented aliens in the Caribbean region, it is hereby ordered:

Section 1. *Duties and Authorities of Agency Heads.* Consistent with applicable law,

(a)(i) The Secretary of Homeland Security may maintain custody, at any location he deems appropriate, of any undocumented aliens he has reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region. In this regard, the Secretary of Homeland Security shall provide and operate a facility, or facilities, to house and provide for the needs of any such aliens. Such a facility may be located at Guantanamo Bay Naval Base or any other appropriate location.

(ii) The Secretary of Homeland Security may conduct any screening of such aliens that he deems appropriate, including screening to determine whether such aliens should be returned to their country of origin or transit, or whether they are persons in need of protection who should not be returned without their consent. If the Secretary of Homeland Security institutes such screening, then until a determination is made, the Secretary of Homeland Security shall provide for the custody, care, safety, transportation, and other needs of the aliens. The Secretary of Homeland Security shall continue to provide for the custody, care, safety, transportation, and other needs of aliens who are determined not to be persons in need of protection until such time as they are returned to their country of origin or transit.

(b) The Secretary of State shall provide for the custody, care, safety, transportation, and other needs of undocumented aliens interdicted or intercepted in the Caribbean region whom the Secretary of Homeland Security has identified as persons in need of protection. The Secretary of State shall provide for and execute a process for resettling such persons in need of protection, as appropriate, in countries other than their country of origin, and shall also undertake such diplomatic efforts as may be necessary to address the problem of illegal migration of aliens in the Caribbean region and to facilitate the return of those aliens who are determined not to be persons in need of protection.

(c)(i) The Secretary of Defense shall make available to the Secretary of Homeland Security and the Secretary of State, for the housing and care of any undocumented aliens interdicted or intercepted in the Caribbean region and taken into their custody, any facilities at Guantanamo Bay Naval Base that are excess to current military needs and the provision of which does not interfere with the operation and security of the base. The Secretary of Defense shall be responsible for providing access to such facilities and perimeter security. The Secretary of Homeland Security and the Secretary of State, respectively, shall be responsible for reimbursement for necessary supporting utilities.

(ii) In the event of a mass migration in the Caribbean region, the Secretary of Defense shall provide support to the Secretary of Homeland Security and the Secretary of State in carrying out the duties described in paragraphs (a) and (b) of this section regarding the custody, care, safety, transportation, and other needs of the aliens, and shall assume primary responsibility for these duties on a nonreimbursable basis as necessary to contain the threat to national security posed by the migration. The Secretary of Defense shall also provide support to the Coast Guard in carrying out the duties described in Executive Order 12807 of May 24, 1992 [set out above], regarding interdiction of migrants.

U-DOW-CAR-116

Sec. 2. *Definitions*. For purposes of this order, the term "mass migration" means a migration of undocumented aliens that is of such magnitude and duration that it poses a threat to the national security of the United States, as determined by the President.

Sec. 3. *Scope.*

(a) Nothing in this order shall be construed to impair or otherwise affect the authorities and responsibilities set forth in Executive Order 12807 of May 24, 1992 [set out above].

(b) Nothing in this order shall be construed to make reviewable in any judicial or administrative proceeding, or otherwise, any action, omission, or matter that otherwise would not be reviewable.

(c) This order is intended only to improve the management of the executive branch. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity or otherwise against the United States, its departments, agencies, entities, instrumentalities, officers, employees, or any other person.

(d) Any agency assigned any duties by this order may use the provisions of the Economy Act, 31 U.S.C. 1535 and 1536, to carry out such duties, to the extent permitted by such Act.

(e) This order shall not be construed to require any procedure to determine whether a person is a refugee or otherwise in need of protection.

George W. Bush.

U-DOW-CAR-117

Case 1:25-cv-01766-SLS   Document 102-1   Filed 06/03/26   Page 124 of 152



PRESIDENTIAL ACTIONS

# EXPANDING MIGRANT OPERATIONS CENTER AT NAVAL STATION GUANTANAMO BAY TO FULL CAPACITY

January 29, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE THE SECRETARY OF HOMELAND SECURITY

U-DOW-CAR-118

Case 1:25-cv-01766-SLS Document 102-1 Filed 06/03/26 Page 125 of 152

SUBJECT:    Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity

I hereby direct the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States, and to address attendant immigration enforcement needs identified by the Department of Defense and the Department of Homeland Security.

This memorandum is issued in order to halt the border invasion, dismantle criminal cartels, and restore national sovereignty.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

News

Administration

Issues

THE WHITE HOUSE

U-DOW-CAR-119

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

U-DOW-CAR-120

MEMORANDUM OF UNDERSTANDING BETWEEN

THE U.S. DEPARTMENT OF HOMELAND SECURITY (DHS)

AND

THE U.S. DEPARTMENT OF DEFENSE (DoD)

FOR

DoD SUPPORT AT NAVAL STATION GUANTANAMO BAY (NSGB) TO U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) FOR DHS/ICE DETENTION OF ILLEGAL ALIENS SUBJECT TO FINAL ORDERS OF REMOVAL

This is a memorandum of understanding (MOU) between DHS, through ICE, and DoD. When referred to collectively, DHS and DoD are referred to as the "Parties."

1. BACKGROUND: On January 20, 2025, the President, in Executive Order (EO) 14165, "Securing Our Borders," directed the Secretary of Homeland Security to "take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States."[1] On January 29, 2025, President Trump directed the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at NSGB to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States.

2. AUTHORITIES AND REFERENCES: 8 U.S.C. § 1231(g); EO 14165, "Securing Our Borders," January 20, 2025; EO 14159, "Protecting the American People Against Invasion," January 20, 2025; Memorandum for the Secretary of Defense and the Secretary of Homeland Security, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," January 29, 2025.

3. PURPOSE: This MOU clarifies the Parties' respective roles and responsibilities related to custody and detention at NSGB of illegal aliens with final orders of removal (NSGB IAs). Consistent with DoD's authority to provide base of operations support for the purpose of facilitating counterdrug activities or activities to counter transnational organized crime of any Federal law enforcement agency within or outside the United States (10 U.S.C. § 284(b)(4)), DHS/ICE will detain at NSGB illegal aliens with a nexus to a transnational criminal organization (TCO) or criminal drug activity. This nexus can be satisfied by an alien being a member of a TCO or paying a TCO to be smuggled into the United States. Aliens subject to a final order but for whom no clear connection or nexus to TCOs or criminal drug activity exists (e.g., those who overstay their visa) will not be moved to NSGB. When the nature of an

---

[1] Additionally, Executive Order 14159 provides:

In Section 9: "[T]he Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States."

In Section 10: "Detention Facilities. The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law."

1

Protected Material — Subject to Protective Order

alien's entry into the United States is uncertain, DHS/ICE may assert a nexus where DHS/ICE reasonably believes the alien to have paid a TCO to be smuggled into the United States if the alien is from a country where the preponderance of aliens from that country enter the United States in that fashion.

4. UNDERSTANDINGS OF THE PARTIES:

**4.1. DHS/ICE——**

4.1.1. Consistent with the Immigration and Nationality Act (INA), has legal custody of NSGB IAs and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations and will fulfill these responsibilities through the direction of DHS personnel and DHS contractor personnel. This includes ensuring custody conditions for NSGB IAs are appropriate and determining which NSGB IAs are considered "high threat" for housing at Camp VI.

4.1.2. Accepts the conditions at NSGB detention sites (JTF Building VI and the Migrant Operations Center) as adequate for holding and DHS/ICE exercising legal custody and detention of NSGB IAs. (ICE representatives have assessed these sites as suitable for adults only; minors will not be moved to NSGB at any point).

4.1.3. Will provide necessary DHS/ICE guidance and training to DoD personnel at NSGB assisting DHS/ICE in fulfilling DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

4.1.4. Understands that DoD will use as standards, as an interim solution, for support to DHS/ICE detention of NSGB IAs as contained in DoD Instruction 1325.07, "Administration of Military Correctional Facilities and Clemency and Parole Programs," and Army Regulation 190-47, "The Army Corrections System," with appropriate exceptions, and adjusted by USSOUTHCOM's Joint Task Force Southern Guard (JTF-SG) based on capabilities and assets currently present. Within 15 days from the effective date of this MOU, the Parties will agree to standards for detention under DHS/ICE legal custody, to be set forth in an addendum to this MOU. The interim standards shall not apply to the following topics: (1) in person visitation; (2) mandatory work for detained aliens; (3) vocational, training, or other prisoner rehabilitate activities; and (4) public affairs, public access, media relations, requests for information and photography. ICE shall provide guidance related to these topics as needed, consistent with section 4.1.19 and other provisions of this MOU.

4.1.5. Will provide an appropriate ratio of DHS/ICE officers to NSGB IAs as mutually determined between the Parties to achieve the responsibilities indicated in this memorandum, and at a minimum, will provide at least two DHS/ICE law enforcement officers or contractors in accordance with DHS/ICE standard operating procedures at the Camp VI detention facility on a 24/7 basis and will provide an appropriate number of DHS/ICE law enforcement officers and interior security in accordance with DHS/ICE standard operating procedures at the hard-sided Migrant Operations Center facility on the leeward side on a 24/7 basis depending on the size of the NSGB IA population.

4.1.6. Will conduct any necessary searches of NSGB IAs while recognizing DoD personnel may also undertake searches and other necessary actions for the safety of DoD personnel or facility integrity.

4.1.7. Will maintain custody of NSGB IAs' funds, valuables, and other personal property.

4.1.8. Will be responsible for providing internal security of NGSB IA holding areas, including determining whether to use restraints on NSGB IAs and placing restraints on NSGB IAs, while recognizing that DoD personnel also may take actions necessary for the safety of DoD personnel, for

2

Protected Material -- Subject to Protective Order

U-DOW-CAR-122

facility integrity, or to prevent the detainee from harming self or others, or from causing serious property damage.

4.1.9.    Will be responsible for the physical custody and directing the movements of NSGB IAs, including movement between detention sites, medical facilities, and airfield/port facilities.

4.1.10.    Will be responsible for any necessary questioning of NSGB IAs related to immigration matters or offenses not committed on NSGB. Will be responsible for determining and imposing disciplinary actions.

4.1.11.    Will be responsible for translation, interpretation, and language access for NSGB IAs with limited English proficiency.

4.1.12.    Will be responsible for NSGB IA transfers, releases, and removals, as well as NSGB IA tracking and records (i.e., will provide a DHS/ICE Operations Center on the leeward side of NSGB for reception, processing, tracking of detention duration, legal status, medical status, and repatriation), and will ensure transfer from NSGB no later than 180 days from the date of final order of removal. This includes transfer for ordered court appearances related to immigration or federal court litigation.

4.1.13.    Will be responsible for inspection of and restrictions on NSGB IAs' correspondence.

4.1.14.    Understands DoD will use DoD rules for the use of force unless the Parties agree to another standard. Applicable and agreed-upon rules for the use of force will be shared between the Parties, to ensure DHS/ICE awareness of DoD operational rules.

4.1.15.    Will be responsible for any involuntary medical treatment, including in response to hunger strikes, or similar measures.

4.1.16.    Will provide a full-time liaison officer (capable of accepting and responding to ICE/Enforcement and Removal Operations (ERO) standards reporting and decision-making requirements) to JTF-SG.

4.1.17.    Will be responsible for having contingency plans, coordinated with JTF-SG, for medical evacuation and follow-on care for detainees who require a higher level of care than is available at NSGB.

4.1.18.    Will promptly provide information to DoD concerning inquiries from relevant congressional committees.

4.1.19.    Will approve and coordinate any press access subject to concurrence of the JTF-SG commander and taking into account appropriate security protocols. Due to security and legal concerns, there will be no press access to Camp VI.

4.1.20.    Will determine the appropriate level of access by NSGB IAs to legal representation, including when, to whom, and under what circumstances such access is granted, in consultation with the JTF-SG commander and taking into account NSGB physical security protocols.

4.1.21.    Will assign a DHS/ICE officer to collect and communicate grievances and requests from NSGB IAs. DHS/ICE and JTF-SG will concurrently agree upon resolution of grievances and requests, taking into account DHS/ICE policies, procedures, and JTF-SG security protocols.

3

Protected Material — Subject to Protective Order

4.1.22. Will coordinate with DoD before deployment of contractor personnel to execute any portion of this MOU.

4.1.23. Will provide JTF-SG with a daily update on the number of NSGB IAs, including the number received, the number repatriated, a 72-hour repatriation schedule as feasible, and duration information (total days in DHS/ICE custody/detention and total days since arrival at NSGB).

4.1.24. Will provide select services to NSGB IAs (e.g., recreation, religious services) in accordance with DHS/ICE policy and as practicable within the existing infrastructure at NSGB.

**4.2. DoD, through U.S. Southern Command (USSOUTHCOM)—**

4.2.1. Will provide an existing secure facility on the windward side of NSGB to DHS/ICE for holding "high threat" NSGB IAs ("Camp VI").

4.2.2. Will provide DHS/ICE with soft structures (tents) to hold other NSGB IAs. These tents do not have power, lighting, or heating/air conditioning. DoD will provide lighting in the common areas outside the tents and at appropriate locations near perimeter fencing. Climate control requirements will be developed as agreed upon by the Parties.

4.2.3. Will provide preventative health services and first aid along with additional emergency medical care, as appropriate and subject to capability and availability, for DHS and ICE personnel and NSGB IAs.

4.2.4. Will provide perimeter security and facility access/security.

4.2.5. Will be responsible for determining the maximum number of NSGB IAs who can be accommodated at all locations on NSGB, taking into account DHS/ICE legal custody requirements.

4.2.6. Will provide a sufficient number of toilets and hygiene facilities to ensure the clean, safe, and sanitary operation of camps depending on the number of NSGB IAs.

4.2.7. Will make adequate facilities and access to such facilities available, as agreed to in an addendum to this memorandum, for the transportation of DHS/ICE personnel and contractors supporting execution of this memorandum to and from NSGB, and make available lodging/berthing for DHS/ICE personnel and contractors once at NSGB.

4.2.8. Will support DHS/ICE in the provision of an appropriate level of access by NSGB IAs to legal representation as determined by DHS/ICE in coordination with DoD under 4.1.20.

5. PERSONNEL: Each Party is responsible for all personnel costs, including pay and benefits, support, and travel. Each Party is also responsible for supervising and managing its personnel, except as necessary for DHS/ICE to provide guidance to DoD personnel as part of DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

6. GENERAL PROVISIONS:

6.1. POINTS OF CONTACT (POCs). The Parties will use the following POCs to communicate matters concerning this MOU. Each Party may change its POC upon reasonable notice to the other Party.

6.1.1. For DHS/ICE—

4

Protected Material -- Subject to Protective Order

U-DOW-CAR-124

6.1.1.1  Position, office identification, phone number, and email of primary POC: Robert Paschall, Deputy Under Secretary, DHS Office of Strategy, Policy, and Plans, ███████████████

6.1.1.2.  Position, office identification, phone number, and email of alternate POC: Ihsan Gunduz, Acting Deputy Assistant Secretary for Border and Immigration Policy, DHS Office of Strategy, Policy, and Plans, ███████████████

6.1.2.  For DoD—

6.1.2.1  Position, office identification, phone number, and email of primary POC:  Rafael Leonardo, Performing the Duties of the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ███████████████

6.1.2.2.  Position, office identification, phone number, and email of alternate POC: Leigh Nolan, Acting Principal Deputy Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ███████████████

6.2.  CORRESPONDENCE.  All correspondence to be sent and notices to be given pursuant to this MOU will be addressed, if to the ICE, to—

6.2.1.  ███████████████ and, if to the DHS POLICY, to—

6.2.2. ███████████████

6.3.  FUNDS AND MANPOWER.  This MOU neither documents nor provides for the exchange of funds or manpower between the Parties, nor does it commit funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds. Reimbursable expenses will be addressed separately. No provision of this MOU shall be interpreted to require obligation or payment of funds in violation of the Anti-deficiency Act, 31 U.S.C. § 1341, or any other applicable law.  All activities contemplated by this MOU are subject to the availability of funds.

6.4.  MODIFICATION OF MOU.  This MOU may be modified at any time in response to a written request from authorized representatives of one of the Parties. Otherwise, it will be reviewed no less often than every six months of its effective date in its entirety.  For DoD, the Under Secretary of Defense for Policy may approve modifications to, addendums to, and extensions of this MOU. For DHS, the Under Secretary of Strategy, Policy, and Plan may approve modifications to, addendums to, and extensions of this MOU.

6.5.  DISPUTES.  Any disputes relating to this MOU will subject to any applicable law, Executive Order, or DoD issuances, and will be resolved by consultation between the Parties.

6.6.  TERMINATION OF UNDERSTANDING.  This MOU may be terminated in writing by mutual agreement of the Parties or with 90 days' advance written notice by either Party.

6.7.  TRANSFERABILITY.  This MOU is not transferable except with the written consent of the Parties.

6.8.  EFFECTIVE DATE.  This MOU takes effect on the day after the last Party signs.

6.9.  EXPIRATION DATE.  This MOU expires on March 15, 2026.

6.10.  NO THIRD-PARTY BENEFICIARIES.  Nothing in this MOU, express or implied, is intended to

5

Protected Material -- Subject to Protective Order

U-DOW-CAR-125

give to, or will be construed to confer upon, any person, not a party, any remedy or claim under or because of this MOU, and this MOU will be for the sole and exclusive benefit of the Parties.

7. DEFINITIONS:

7.1. "High threat" is a security category determined by DHS and is synonymous with other terms such as Maximum security, High-risk.

7.2 Detention Sites

7.2.1. "Hard Structure" detention facility on the Windward side is referred to as Camp VI.

7.2.2. The Migrant Operations Center is a DHS "Hard Structure" facility, not designed for high threat detention, on the Leeward side.

7.2.3. "Soft structure" detention facilities refer to Philips, Macalla, and Golf Course Camps and respective sub-camps.

APPROVED:

FOR DHS—

_____
Signature

FOR DoD—

_____
Signature


_____

_____

Troy D. Edgar, Deputy Secretary of Homeland Security
The U.S. Department of Homeland Security

Robert G. Salesses, Performing the Duties of
Deputy Secretary of Defense

7 March 2025 (Date)

7 March 2025 (Date)

6

Protected Material — Subject to Protective Order

U-DOW-CAR-126

**OFFICE OF THE SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-1000**

MAR 0 7 2025

MEMORANDUM FOR EXECUTIVE SECRETARY, DEPARTMENT OF HOMELAND SECURITY

SUBJECT: Department of Defense Support to U.S. Immigration and Customs Enforcement Operations

Thank you for your February 3, 2025 request for Department of Defense (DoD) support to Immigration and Customs Enforcement (ICE) operations. Supporting the President's direction in Executive Order 14167, "Clarifying the Military's Role in Protecting the Territorial Integrity of the United States," Proclamation 10886, "Declaring a National Emergency at the Southern Border of the United States," and the Presidential Memorandum, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," is a top priority of the Department, and we look forward to partnering with you to carry out this mission.

The Secretary of Defense has approved ICE use of facilities and land for expansion of temporary holding capacity on Naval Station Guantanamo Bay (NSGB) for ICE's detention of illegal aliens (IAs), including access to and use of Joint Task Force – Guantanamo Detention Facilities (Camp VI) for the temporary holding of up to 144 high-threat IAs under Department of Homeland Security (DHS) custody. DoD continues to provide aviation support under the original conditions approved on January 21, 2025 including DHS maintaining custody, control, and security of all IAs onboard, as well as responsibility for providing any required in-flight medical care. This support is being provided on a non-reimbursable basis.

The Secretary of Defense has also approved the provision of services and sustainment, such as food, emergent medical support, and laundry related to ICE detention operations at NSGB, at a cost to DoD not to exceed $30 million, which will be resourced using DoD's Drug Interdiction and Counter-drug Activities, Defense appropriation. Further, such support is contingent on ICE ensuring that the population of IA's being held by ICE are determined by ICE to be either members of transnational criminal organizations (TCOs) or human-smuggling customers of TCOs. The approved medical support comprises provision of preventative health services and first aid along with emergent life-saving medical care (life, limb, and eye-sight), as appropriate and subject to capability and availability on NSGB, for DHS and ICE personnel at NSGB, as well as IAs in DHS/ICE custody at NSGB. Medical support that exceeds the capabilities available at NSGB will need to be provided by DHS or conducted by DoD on a reimbursable basis in response to a subsequent DHS request. Given the limited medical capabilities at NSGB and the nature of the facilities and environment, DoD requests DHS not send women, children, animals, or IAs with acute medical or psychological conditions to NSGB.

To fully understand the requirements of the remaining requested capabilities, we require additional information to ensure effective and efficient provision of DoD support. DoD and

Controlled By: OUSD(P)/HD&HA
CUI Category: OPSEC
Limited Dissemination Control: FEDCON
POC: OASD (HD&HA)

Protected Material    Subject to Protective Order

U-DOW-CAR-127

DHS personnel are currently working to refine the requirements requested in the Other Operational Support to ICE category. In addition to your official request for assistance, please provide clarification on the remaining requirements. Upon receipt, DoD will review and route these requirements to the Secretary of Defense for approval as appropriate.

Kelly Bulliner Ross
Executive Secretary

cc:
Secretary of the Navy
CJCS
USD(P)
CDRUSSOUTHCOM
ASD(LA)
ASD(HD&HA)

2

Protected Material — Subject to Protective Order
CUI



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR 0 7 2025

The Honorable Roger Wicker
Chairman
Committee on Armed Services
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

Consistent with section 2815 of the National Defense Authorization Act for Fiscal Year 2017 (10 U.S.C. 2556 note), I am notifying you of the provision of Department of Defense facilities and land on Naval Station Guantanamo Bay, Cuba, for temporary use by the Department of Homeland Security to house illegal aliens identified by their Department for removal from the United States. I certify that providing this support will not negatively affect military training, operations, readiness, or other military requirements, including National Guard and Reserve readiness.

I am sending an identical letter to the Committee on Armed Services of the House of Representatives.

Sincerely,

cc:
The Honorable Jack Reed
Ranking Member

U-DOW-CAR-129



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR 0 7 2025

The Honorable Mike Rogers
Chairman
Committee on Armed Services
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

      Consistent with section 2815 of the National Defense Authorization Act for Fiscal Year 2017 (10 U.S.C. 2556 note), I am notifying you of the provision of Department of Defense facilities and land on Naval Station Guantanamo Bay, Cuba, for temporary use by the Department of Homeland Security to house illegal aliens identified by their Department for removal from the United States.  I certify that providing this support will not negatively affect military training, operations, readiness, or other military requirements, including National Guard and Reserve readiness.

      I am sending an identical letter to the Committee on Armed Services of the Senate.

Sincerely,

cc:
The Honorable Adam Smith
Ranking Member

U-DOW-CAR-130

## ACTION MEMO

**FOR:** SECRETARY OF DEFENSE                              DepSecDef Action RGS

                                                                      MAR 0 6 2025

**FROM:** Alexander Velez-Green, Performing the Duties of Under Secretary of Defense for
          Policy

**SUBJECT:** (U) Department of Defense Support to U.S. Immigration and Customs    FEB 2 8 2025
            Enforcement Operations

- (U) **Purpose**. This memorandum seeks to document your approval of the Secretary of Homeland Security's request for assistance (RFA) for the Department of Defense (DoD) to support U.S. Immigration and Customs Enforcement (ICE) operations, which cited Executive Order 14167, Clarifying the Military's Role in Protecting the Territorial Integrity of the United States, Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, and the Presidential memorandum, Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity, dated January 29, 2025.

- (CUI) **Background**. On February 3, 2025, the Secretary of Homeland Security submitted an RFA email (TAB C) for military support to augment ICE resources categorized into four broad support categories: (1) Aviation; (2) Naval Station Guantanamo Bay (NSGB) Migrant Operation Center (MOC) Expansion; (3) Use and Expansion of the Joint Task Force Guantanamo (JTF-GTMO) Detention Facility; and (4) Other Operational Support to ICE. The Department of Homeland Security (DHS) requested *all support* be provided on a *non-reimbursable basis*.

- (U) **Aviation Support:**

  - (CUI) On January 21, 2025, the then-Acting Secretary approved the requested airlift for removal operations through April 20, 2025, in accordance with 10 U.S.C. § 274, and *waived reimbursement* in accordance with 10 U.S.C. § 277(c) (TAB D).

  - (CUI) In the February 3, 2025 RFA, DHS requested that DoD provide in-flight security and medical personnel for all previously approved DoD-provided flights. Due to limitations on DoD's ability to conduct law enforcement functions and to provide in-flight medical services on a non-reimbursable basis, DoD is providing aviation support under the original conditions approved on January 21, 2025, with DHS remaining responsible for in-flight custody, control, and security of, and medical care for, all illegal aliens (IAs).

Prepared By: DASD(HDI&DSCA)/DSCA
Phone Number: ▓▓▓▓▓▓▓▓

| | | | |
|---|---|---|---|
| SD CA | | DSD SA | |
| SD SMA | | DSD SMA | |
| SD MA | | DSD MA | |
| CoS | | DSD CA | |
| SD Action Grp | | DSD CoS | |
| ES | | ESB | |
| ESR | | ESD | |

Controlled By: OUSD(P) HD&HA
CUI Category: OPSEC
Distribution/Limited Dissemination Control: FEDCON
POC: DASD(HDI&DSCA)

QSD000718-25/CMD002337-25

Protective Material – Subject to Protective Order

U-DOW-CAR-131

CUI

- (CUI) **NSGB Support:**

  - (CUI) On January 31, 2025, you approved – via the Secretary of Defense Orders Book (SDOB) – 1,090 personnel to support U.S. Southern Command (USSOUTHCOM) preparations and expansion of MOC capacity on NSGB.

    o (CUI) In the February 3, 2025 RFA, DHS requested immediate expansion of MOC capacity on the Leeward side of NSGB, including soft-sided facilities capable of housing up to 30,000 IAs. On February 6, 2025, *you approved* support involving provision, operation, and maintenance of equipment at NSGB and Commander, USSOUTHCOM, began expanding IA holding capacity.

  - (CUI) In the February 3, 2025 RFA, DHS requested immediate access to, and use of, the JTF-GTMO Detention Facility, to house approximately 300 high-threat IAs.

    o (CUI) On February 6, 2025, *you authorized* USSOUTHCOM to provide logistics and other support to DHS/ICE custody operations for the *temporary holding of up to 144 high-threat IAs* at the JTF-GTMO Detention Facility, Camp VI. This approval was subject to IAs and Law of War detainees occupying separate facilities. Law of War detainees are detained adjacent to the high-threat IAs in Camp V.

    o (CUI) DoD support was approved contingent on *DHS/ICE retaining custody* of all IAs on NSGB, including those held in the MOC, and within Camp VI. DoD personnel were *approved to support DHS/ICE operations*, and not directly participate in law enforcement activities.

  - (CUI) Between February 6-13, you approved – via the SDOB – an additional *280 personnel to provide medical, sustainment, administrative, and essential services* for DoD personnel on NSGB.

  - (CUI) You also approved DoD sustainment and medical support of ICE's operations. On a *non-reimbursable basis*, DoD is providing preventative health services and first aid along with emergent life-saving medical care (life, limb, and eye-sight), as appropriate and subject to capability and availability on NSGB, for DHS and ICE personnel and IAs. DHS is responsible for IA medical issues that exceed the capacity of what is available at NSGB.

- (CUI) **Other Operational Support to ICE:**

  - (CUI) In the February 3, 2025 RFA, DHS requested DoD provide personnel to be stationed across *all 25 ICE areas of responsibility* with specific locations to be determined by ICE. DHS requested personnel capable of executing the following functions: Security & Law Enforcement Processing; Administrative Functions; Data

2

U-DOW-CAR-132

CUI

Scientists; Unit-Level Medical Care; Transportation including high-capacity ground transportation; Multifunctional Logistics Planners; and All-source Intelligence Analysis and Computer/Data Forensics.

- (CUI) *You have not yet approved any requests under this category.* Policy and the Joint Staff requested additional information from DHS/ICE to determine the feasibility, legality, and costs of providing this support. We will separately staff recommendations for your decision.

- (U) **Authorities and Funding for Support at NSGB:**

  - (CUI) The Secretary of Defense may make equipment and facilities available to law enforcement agencies under 10 U.S.C. § 272 and may make DoD personnel available to operate and maintain equipment pursuant to 10 U.S.C. § 274. Provision of specific land and facilities to another Federal agency is recorded by permit or other agreement.

  - (CUI) On February 6, 2025, you approved support involving provision, operation, and maintenance of equipment at NSGB in accordance with 10 U.S.C. §§ 272, 274, and *waived reimbursement* of this support in accordance with § 277(c) on the basis that providing the support would result in a benefit to military personnel that is substantially equivalent to military operations and training because USSOUTHCOM is able to use the support to exercise implementation of Concept Plan 6120.

  - (CUI) OSD Comptroller estimates an incremental cost of *$1.8 billion* to support operations and maintenance for the MOC expansion, use of JTF-GTMO Detention facilities, and establishment of camps across NSGB at the current directed planning capacity of 30,000 IAs. The cost estimate may change as DHS provides additional fidelity to the anticipated future capacity requirements and standards, and Military Services continue planning Base Operations Support and Common User Logistics.

  - (CUI) The non-reimbursable support detailed above will be funded from the accounts of the executing DoD Component. The office of the Under Secretary of Defense (Comptroller) will work with the Military Services and Combatant Commands to ensure sufficient funds are available for execution, within the limits of available appropriations.

  - (CUI) DHS also has requested non-reimbursable support for provision of services, such as food, laundry, medical, and utilities. Under 10 U.S.C. § 284, the Secretary of Defense may provide support for counterdrug (CD) activities or the activities to counter transnational organized crime (CTOC) activities of any other Federal department or agency, including the establishment and operation of bases of operations for the purpose of facilitating CD or CTOC activities of any Federal law enforcement agency within or outside the United States. Such support is funded by the Drug Interdiction and Counter-drug Activities, Defense appropriation. Any support to DHS at NSGB not constituting

3

CUI

U-DOW-CAR-133

CUI

provision, operation, or maintenance of equipment (e.g., preventative medical support) is provided under 10 U.S.C. § 284, based on the population of IA's held by DHS/ICE at NSGB being determined by DHS to have a nexus to CD or CTOC activities (e.g., they are members of transnational criminal organizations (TCOs) or human-smuggling customers of TCOs). Support for IAs NOT within this population would need to be on a reimbursable basis.

- (CUI) For fiscal year (FY) 2025, $635.7 million in the Counterdrug Central Transfer Account (CTA) is budgeted for operational support. This includes programs and activities at the Combatant Commands and Defense Intelligence Agencies to help disrupt cartel activity and reduce the flow of fentanyl and other illicit drugs into the United States. Targeted cartels include those recently designated as Foreign Terrorist Organizations (FTO's). Programs and activities include intelligence analysis support to DHS and the Departments of Justice, Commerce, and Treasury, and activities under DoD's statutory responsibility to be the lead agency for detection and monitoring of aerial and maritime transit of illegal drugs into the United States in support of the CD activities of law enforcement agencies. By canceling a subset of planned counterdrug projects—those in support of foreign law enforcement partners, DoD could make available up to $30 million in CD funding to provide services in support of DHS/ICE detention operations at NSGB.

  o (U) Diversion of CD funding beyond $30 million would result in substantial mission impacts to efforts focused on designated cartel FTO's, Iran-affiliated violent extremist organizations (VEOs), Chinese money laundering organizations, and other VEOs and drug trafficking organizations' revenue-generation activities, among other things.

- (CUI) DoD remains under a Continuing Resolution, currently providing appropriations for fiscal year 2025 for obligation or expenditure only through March 14, 2025. DoD operations beyond this date are subject to the enactment of additional appropriations.

- (U) **Submissions to Congress:**

  − (U) Section 1707 of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2020 requires the Secretary to provide to the Committee on Armed Services of the Senate (SASC) and Committee on Armed Services of the House of Representatives (HASC), not later than *seven calendar* days after the Secretary of Defense approves a request for assistance from DHS, a copy of the request for assistance and, immediately upon submitting the official response approving a request, a copy of the official response.

  − (U) Section 2815 of the NDAA for FY 2016 provides that the Secretary shall not sign a memorandum of agreement with another Federal agency to provide the agency with a vacant facility for purposes of temporary housing support unless the Secretary first

4

CUI

U-DOW-CAR-134

submits to the HASC and SASC *a certification that the provision of the facility to the agency for such purpose will not negatively affect military training, operations, readiness, or other military requirements*, including National Guard and Reserve readiness. Certification letters for provision of housing support at NSGB are at TAB A.

- o (CUI) The Acting Secretary of the Navy, the Acting Chairman of the Joint Chiefs of Staff, and Commander, U.S. Southern Command *concur that provision of temporary housing support at NSGB will not negatively affect military training, operations, readiness, or other military requirements*, including National Guard and Reserve readiness because there is adequate capacity at the appropriate holding location and providing a suitable facility security force and enabling and logistical support will not negatively affect readiness.

- o (CUI) I recommend directing the Acting Secretary of the Navy, the Acting Chairman of the Joint Chiefs of Staff, Commander, U.S. Southern Command, and Chief of the National Guard Bureau to immediately notify you, via the Acting Chairman of the Joint Chiefs of Staff, if that determination changes such that *provision of temporary housing support at NSGB could negatively affect military training, operations, readiness, or other military requirements*, including the JTF-GTMO Law of War detention mission or Office of Military Commissions (OMC).

- — (U) My staff will work with the Acting Assistant Secretary of Defense for Legislative Affairs to make the necessary submissions.

(CUI) **RECOMMENDATION #1:** Document your approval of current DoD support to DHS/ICE, as described above, including your determination that operation and maintenance of equipment support at NSGB results in a benefit to military personnel that is substantially equivalent to military operations and training and *your waiver of reimbursement* for such support. Support includes expansion of IA holding capacity at NSGB, including access to and use of JTF-GTMO Camp VI facilities for the temporary holding of up to 144 high-threat illegal aliens.

Approve **PBH** Disapprove _____ Other _____
MAR - 7 2025

(CUI) **RECOMMENDATION #2:** Document your approval to provide up to $30 million in non-reimbursable support to DHS/ICE for the provision of services related to DHS/ICE illegal detention operations at NSGB, to include: food; laundry services; preventative health services and first aid along with emergent life-saving medical care (life, limb, and eye-sight), as appropriate and subject to capability and availability of resources at NSGB; utilities; and other non-maintenance sustainment as base operations support under 10 U.S.C. § 284(b)(4), using available funds in the Drug Interdiction and Counter-drug Activities, Defense appropriation.

Approve **PBH** Disapprove _____ Other _____
MAR - 7 2025

Protected Material - Subject to Protective Order


OSD000716-25/CMD002337-25

U-DOW-CAR-135

CUI

(CUI) **RECOMMENDATION #3:**  Certify that providing temporary housing support at NSGB will not negatively affect military training, operations, readiness, or other military requirements, including National Guard and Reserve readiness by signing the letters at TAB A.

(CUI) **RECOMMENDATION #4:**  Direct the Acting Secretary of the Navy, the Acting Chairman of the Joint Chiefs of Staff, Commander, U.S. Southern Command, and the Chief of the National Guard Bureau, to immediately notify you, via the Acting Chairman of the Joint Chiefs of Staff, if that determination changes such that *provision of temporary housing support at NSGB could negatively affect military training, operations, readiness, or other military requirements*, including the JTF-GTMO Law of War detention mission or OMC commissions.

Approve __**PBH**__    Disapprove _____    Other _____
MAR − 7 2025

(CUI) **RECOMMENDATION #5:**  Authorize the Executive Secretary to sign and transmit TAB B to the DHS Executive Secretary.

Approve __**PBH**__    Disapprove _____    Other _____
MAR − 7 2025

Attachments:
TAB A – Certification letters
TAB B – Response Letter to DHS
TAB C – Secretary of Homeland Security Request for Assistance, February 3, 2025
TAB D – Action Memo Regarding Aviation Support (February 18, 2025)
TAB E – Coordination

Protected Material -- Subject to Protective Order
CUI


QSD000718-25/CMD002337-25

U-DOW-CAR-136

# TAB
# A

Protected Materials Subject to Protective Order

U-DOW-CAR-137



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR 0 7 2025

The Honorable Roger Wicker
Chairman
Committee on Armed Services
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

Consistent with section 2815 of the National Defense Authorization Act for Fiscal Year 2017 (10 U.S.C. 2556 note), I am notifying you of the provision of Department of Defense facilities and land on Naval Station Guantanamo Bay, Cuba, for temporary use by the Department of Homeland Security to house illegal aliens identified by their Department for removal from the United States.  I certify that providing this support will not negatively affect military training, operations, readiness, or other military requirements, including National Guard and Reserve readiness.

I am sending an identical letter to the Committee on Armed Services of the House of Representatives.

Sincerely,

cc:
The Honorable Jack Reed
Ranking Member

Protected Material—Subject to Protective Order

U-DOW-CAR-138



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR 0 7 2025

The Honorable Mike Rogers
Chairman
Committee on Armed Services
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

Consistent with section 2815 of the National Defense Authorization Act for Fiscal Year 2017 (10 U.S.C. 2556 note), I am notifying you of the provision of Department of Defense facilities and land on Naval Station Guantanamo Bay, Cuba, for temporary use by the Department of Homeland Security to house illegal aliens identified by their Department for removal from the United States. I certify that providing this support will not negatively affect military training, operations, readiness, or other military requirements, including National Guard and Reserve readiness.

I am sending an identical letter to the Committee on Armed Services of the Senate.

Sincerely,

cc:
The Honorable Adam Smith
Ranking Member

Protected Material — Subject to Protective Order

U-DOW-CAR-139

# TAB
# B

U-DOW-CAR-140

CUI



**OFFICE OF THE SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-1000**

MAR 0 7 2025

MEMORANDUM FOR EXECUTIVE SECRETARY, DEPARTMENT OF HOMELAND SECURITY

SUBJECT:  Department of Defense Support to U.S. Immigration and Customs Enforcement Operations

 Thank you for your February 3, 2025 request for Department of Defense (DoD) support to Immigration and Customs Enforcement (ICE) operations.  Supporting the President's direction in Executive Order 14167, "Clarifying the Military's Role in Protecting the Territorial Integrity of the United States," Proclamation 10886, "Declaring a National Emergency at the Southern Border of the United States," and the Presidential Memorandum, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," is a top priority of the Department, and we look forward to partnering with you to carry out this mission.

 The Secretary of Defense has approved ICE use of facilities and land for expansion of temporary holding capacity on Naval Station Guantanamo Bay (NSGB) for ICE's detention of illegal aliens (IAs), including access to and use of Joint Task Force – Guantanamo Detention Facilities (Camp VI) for the temporary holding of up to 144 high-threat IAs under Department of Homeland Security (DHS) custody.  DoD continues to provide aviation support under the original conditions approved on January 21, 2025 including DHS maintaining custody, control, and security of all IAs onboard, as well as responsibility for providing any required in-flight medical care.  This support is being provided on a non-reimbursable basis.

 The Secretary of Defense has also approved the provision of services and sustainment, such as food, emergent medical support, and laundry related to ICE detention operations at NSGB, at a cost to DoD not to exceed $30 million, which will be resourced using DoD's Drug Interdiction and Counter-drug Activities, Defense appropriation.  Further, such support is contingent on ICE ensuring that the population of IA's being held by ICE are determined by ICE to be either members of transnational criminal organizations (TCOs) or human-smuggling customers of TCOs.  The approved medical support comprises provision of preventative health services and first aid along with emergent life-saving medical care (life, limb, and eye-sight), as appropriate and subject to capability and availability on NSGB, for DHS and ICE personnel at NSGB, as well as IAs in DHS/ICE custody at NSGB.  Medical support that exceeds the capabilities available at NSGB will need to be provided by DHS or conducted by DoD on a reimbursable basis in response to a subsequent DHS request.  Given the limited medical capabilities at NSGB and the nature of the facilities and environment, DoD requests DHS not send women, children, animals, or IAs with acute medical or psychological conditions to NSGB.

 To fully understand the requirements of the remaining requested capabilities, we require additional information to ensure effective and efficient provision of DoD support.  DoD and

Controlled By:  OUSD(P)/HD&HA
CUI Category:  OPSEC
Limited Dissemination Control:  FEDCON
POC: OASD (HD&HA) ███████

CUI

Protected Material — Subject to Protective Order

U-DOW-CAR-141

CUI

DHS personnel are currently working to refine the requirements requested in the Other Operational Support to ICE category. In addition to your official request for assistance, please provide clarification on the remaining requirements. Upon receipt, DoD will review and route these requirements to the Secretary of Defense for approval as appropriate.

Kelly Bulliner Ross
Executive Secretary

cc:
Secretary of the Navy
CJCS
USD(P)
CDRUSSOUTHCOM
ASD(LA)
ASD(HD&HA)

2

Protected Material — Subject to Protective Order

U-DOW-CAR-142

# TAB
# C

Protected Material – Subject to Protective Order

U-DOW-CAR-143

Secretary of Defense Hegseth,

Please find this email as an emergent request in advance of a formal written Request for Assistance (RFA) from DHS to DOD for military support to U.S. Immigration and Customs Enforcement (ICE) operations and the broader mission to secure the border and maintain the territorial integrity of the United States pursuant to the following Executive Orders: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the U.S. (20 Jan 2025), section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the U.S. (20 Jan 2025); (3) Executive Order Guaranteeing the States Protection Against Invasion (20 Jan 2025) and the Presidential Directive on Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity (29 Jan 2025).

DHS requests immediate assistance, to commence as soon as you receive this email, to augment existing ICE resources categorized into four broad support categories: 1-Aviation; 2-Naval Station Guantanamo Bay (NSGB) Migrant Operation Center (MOC) Expansion, 3-Use and Expansion of the Joint Task Force Guantanamo (JTF-GTMO) Detention Facility , 4-Other operational support to ICE.

For initial planning purposes, this request includes:

**Aviation**

- Immediate aviation transportation assistance to remove aliens from interior locations within the United States to repatriation sites including El Salvador, Guatemala, Honduras, or other extraterritorial locations to be determined, such as NSGB.
- Additionally, while ICE will provide at least one officer on each flight, DHS requests that DOD provides in-flight security and on-board medical personnel, for all DOD-provided flights. The required medical and security staffing will be determined by DOD in consultation with ICE.

**NSGB MOC Expansion**

- Immediate expansion of the MOC on the leeward side of GTMO, including soft-sided facilities capable of housing 30,000 illegal aliens with all appropriate logistical support capabilities, including staff and security. The initial expansion should begin at the leeward camp, with future areas for expansion to be identified by DOD. The specific requirements will be coordinated directly with ICE in accordance with DOD CONPLAN 6120 requirements. DOD should anticipate use of this facility to begin within 7-10 days.

**Use and Expansion of JTF-GTMO Detention Facility**
- Beginning 31 January 2025, immediate access, to and use of, the JTF-GTMO Detention Facility to house approximately 300 high-priority criminal aliens

2

OSD000718-25/CMD001097-25

Protected Material — Subject to Protective Order

unlawfully present in the United States. DOD should anticipate additional requirements to expand this facility and to work with ICE on specific capacity and detention requirements including security and medical capabilities.

**Other Operational Support to ICE**
- DOD personnel capable of executing the following functions to be stationed across all 25 ICE areas of responsibility with specific locations to be determined by ICE.



DHS requests this support on a non-reimbursable basis.

DHS understands the need to coordinate this request to generate a task order through the Joint Staff for execution and will reflect the same with greater detail in the formal RFA. Further, DHS understands that this RFA is expansive and will provide additional refinement in the form of required capabilities and presence in the formal submission.

Mr. Garrett Ripa (cc'd) at U.S. Immigration and Customs Enforcement will be my POC to assist in coordination with your team; Director, Joint Staff; and others as you identify to provide further detail for the utilization and deployment of these resources.

I appreciate your timely consideration of this emergent request. My formal RFA will be transmitted in the coming days.

Respectfully,
Secretary of Homeland Security Noem

3

Protected Material — Subject to Protective Order

U-DOW-CAR-145

# TAB
# D

U-DOW-CAR-146