**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| YAMIL LUNA GUTIERREZ, *et al.*,<br><br>*Plaintiffs-Petitioners*, *on behalf of themselves and all others similarly situated,*<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security, in his official capacity, *et al.*,<br><br>*Defendants-Respondents*. | Case No. 1:25-cv-01766-SLS |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS-PETITIONERS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................3

I. Legal and Statutory Background ...................................................................................3

   A.   Guantánamo is Outside the United States. .......................................................3

   B.   The INA Authorizes Detention Before—Not After—Removal. ....................................4

II. Factual Background .......................................................................................................5

   A.   Historical Use of Guantánamo. ......................................................................5

   B.   Defendants' New Detention Policy at Guantánamo. .........................................5

   C.   Transfers to and from Guantánamo. ...............................................................8

   D.   Detention at Guantánamo Compared to Detention in the United States. ......................11

III. Procedural Background .................................................................................................13

LEGAL STANDARD ...........................................................................................................14

ARGUMENT .......................................................................................................................15

I. Detention at Guantánamo is Contrary to Law. ...........................................................15

   A.   The INA Does Not Authorize Immigration Detention in Facilities Outside the United

       States. .............................................................................................................16

   B.   The Presumption Against Extraterritoriality Prohibits Detention at Guantánamo. .......23

II.  The Guantánamo Detention Policy is Arbitrary and Capricious.........................................24

    A.  Defendants Failed to Even Acknowledge the Change in Longstanding Policy. ...........25

    B.  Defendants' Justifications Are Unsupported by the Administrative Record and Are Contradicted by Publicly Available Evidence. ...............................................................26

    C.  Defendants Failed to Consider More Cost-Effective and Less Logistically Complicated Alternatives for Detention in the United States. ...........................................................29

    D.  Defendants' Implementation of the President's Memorandum is Contrary to its Text. 33

III.  The Court Should Grant Classwide Declaratory Relief and Vacatur. ................................34

CONCLUSION...................................................................................................................................36

## TABLE OF AUTHORITIES

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l Inc.*,
600 U.S. 412 (2023) .................................................................................................... 24

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000) ...................................................................................... 33

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
25 F.4th 1 (D.C. Cir. 2022) .................................................................................... 26, 27

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ................................................................ 24, 25, 26, 32

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................................... 14

*Biden v. Texas*,
597 U.S. 785 (2022) .................................................................................................... 35

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024) .................................................................................. 15

*Burlington Trick Lines, Inc. v. United States*,
371 U.S. 156 (1962) .................................................................................................... 29

*Bushireddy v. Lyons*,
No. 25-1102 (SLS), 2026 WL 759480 (D.D.C. Mar. 18, 2026) ............................... 15

*Clark v. Martinez*,
543 U.S. 371 (2005) .................................................................................................... 16

*Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
365 F. Supp. 3d 28 (D.D.C. 2019) ............................................................................. 15

*Demore v. Kim*,
538 U.S. 510 (2003) ...................................................................................................... 4

*Drs. for Am. v. Off. of Pers. Mgmt.*,
793 F. Supp. 3d 112 (D.D.C. 2025) ..................................................................... 16, 25

*Ehrman v. United States*,
429 F. Supp. 2d 61 (D.D.C. 2006) ............................................................................. 14

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989) ........................................................................... 28

*Espinoza Escalona v. Noem*,
  No. 25-cv-604 (D.D.C. Mar. 10, 2025) .............................................................. 24

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................ 26, 27, 29

*Fred Meyer Stores, Inc. v. NLRB*,
  865 F.3d 630 (D.C. Cir. 2017) ...................................................................... 30, 32

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ........................................................................................... 35

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) .................................................................... 33

*Henry v. Sec'y of Treasury*,
  266 F. Supp. 3d 80 (D.D.C. 2017) ..................................................................... 15

*Hikvision USA, Inc. v. FCC*,
  97 F.4th 938 (D.C. Cir. 2024) ............................................................................ 15

*J.G.G. v. Trump*,
  786 F. Supp. 3d 37 (D.D.C. 2025) *vacated and remanded*,
  No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025) .................................. 6

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) .............................................................................................. 4

*Las Americas Immigrant Advocacy Center v. Noem*,
  No. 1:25-cv-418 (D.D.C. Feb. 12, 2025) ........................................................ 7, 32

*Louisiana v. Salazar*,
  170 F. Supp. 3d 75 (D.D.C. 2016) ..................................................................... 15

*Make the Rd. N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ........................................................................... 34

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ........................................................................................... 23

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................. 25, 29, 32

iv

*N.S. v. Dixon*,
141 F.4th 279 (D.C. Cir. 2025) ................................................................................... 34

*Nagahi v. Immigr. & Naturalization Servs.*,
219 F.3d 1166 (10th Cir. 2000) .................................................................................. 18

*Nat'l Lifeline Ass'n v. FCC*,
921 F.3d 1102 (D.C. Cir. 2019) .................................................................................. 29

*Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*,
358 F. Supp. 3d 66 (D.D.C. 2019) .............................................................................. 26

*Nicusor-Remus v. Sessions*,
902 F.3d 895 (9th Cir. 2018) ...................................................................................... 17

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
496 F. Supp. 3d 31 (D.D.C. 2020) .............................................................................. 30

*Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*,
573 F. Supp. 3d 294 (D.D.C. 2021) ............................................................................ 28

*Physicians for Soc. Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) *abrogated*,
*Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026) .......................... 26

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................................. 13

*Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Mullin*,
174 F.4th 81 (D.C. Cir. 2026) ........................................................................ 34, 35, 36

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ................................................................................................... 35

*RJR Nabisco Inc. v. European Community*,
579 U.S. 325 (2016) .............................................................................................. 23, 24

*Sale v. Haitian Centers Council, Inc.*,
509 U.S. 155 (1993) ................................................................................................... 23

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) .............................................................................. 15

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) .................................................................................... 27

*TikTok Inc. v. Trump*,
  507 F. Supp. 3d 92 (D.D.C. 2020) .......................................................................... 33

*United States v. Sanchez*,
  604 F.3d 356 (7th Cir. 2010) ................................................................................. 17

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986) ............................................................................... 29

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ................................................................................................. 4

**Statutes**

2001 Authority for Use of Military Force ("AUMF"),
  Pub. L. No. 107-40, 115 Stat. 224 (2001) ............................................................... 5
5 U.S.C. § 706(2) ......................................................................................................... 34
5 U.S.C. § 706(2)(A) .................................................................................................... 15
5 U.S.C. § 706(2)(C) ............................................................................................... 15, 16
8 U.S.C. § 1101(a)(38) ............................................................................................. 3, 17
8 U.S.C. § 1101(g) ................................................................................................. 4, 16, 17
8 U.S.C. § 1103(a)(3) ......................................................................................... 18, 19, 23
8 U.S.C. § ch. 12 ........................................................................................................... 3
8 U.S.C. § 1226a(a) ....................................................................................................... 3
8 U.S.C. § 1229a(a)(3) ................................................................................................... 3
8 U.S.C. § 1231(a)(2) ................................................................................................... 17
8 U.S.C. § 1231(a)(6) ................................................................................................... 17
8 U.S.C. § 1231(g) ................................................................................................. passim
8 U.S.C. § 1231(g)(1) ............................................................................................... 4, 16
8 U.S.C. § 1252(f) ......................................................................................................... 34
8 U.S.C. § 1252(f)(1) ......................................................................................... 34, 35, 36
8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ................................................................................ 17
8 U.S.C. § 1231(b) ....................................................................................................... 16
8 U.S.C. § 1225(a)(1) ..................................................................................................... 3
8 U.S.C. § 1225(b)(1)(B)(iii)(I) .................................................................................... 3

**Other Authorities**

Off. of Legal Counsel,
  Status of Guantanamo Bay 1 (Oct. 27,
  1981), https://www.justice.gov/olc/page/file/1009416/dl ......................................... 24

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................... 14

**INTRODUCTION**

This class action challenges the government's unprecedented and illegal attempt to offshore our immigration detention system to the notorious military base at Guantánamo Bay, Cuba ("Guantánamo"), a place "synonymous with pervasive mistreatment and indefinite detention." ECF No. 53 ("MTD Op.") at 1. In January 2025, approximately one week into office, President Trump directed the Department of Defense ("DOD") and the Department of Homeland Security ("DHS") to expand operations at Guantánamo to house up to 30,000 noncitizens. When it began, agency heads declared that detention at Guantánamo "represents deterrence" and was "central" to the administration's message to the world that "our border is closed" and that noncitizens should "not come to this country" or they will end up at Guantánamo. *Id*.

In litigation, the government has transparently attempted to obscure that original narrative and has defended its policy very differently. It now insists that detention at Guantánamo is merely part of the government's ordinary process of facilitating the removal of individuals with final orders of removal, with Guantánamo serving as a "staging" area for such removals. ECF No. 29 ("Defs.' Mot. to Dismiss") at 22. But this is simply not the case. The record shows that the government has flown detainees to Guantánamo without any removal plan in place and then allowed them to languish there for weeks or even months—and, indeed, many of them are flown *back* to the United States from Guantánamo before removal. In the end, the record makes clear that the government is not using Guantánamo as part of the ordinary removal process. Indeed, a recent Inspector General report reflected that neither DOD nor DHS "provide[d] *any* specific national security, cost, or other benefit gained from housing illegal aliens at [Guantánamo] rather than other . . . facilities in the continental United States." Statement of Uncontested Material Facts ("SUF") ¶ 100 (emphasis added).

The government's Guantánamo detention policy is unlawful for at least two reasons.

*First*, the policy is not authorized by statute. As this Court already concluded, the Immigration and Nationality Act ("INA") authorizes immigration detention pending removal proceedings or pending removal itself, *i.e.*, before an individual has been removed. It does not authorize detention *after* an individual has been removed outside the United States, which Guantánamo indisputably is. MTD Op. at 43. The record developed since this Court's decision confirms that detention at Guantánamo is not serving as "a [way]station [en] route to final destination" as the government claims. Disc. Hr'g Tr. 11:1–3, 12:13–14, 18–20 (Mar. 19, 2026) ("Disc. Hr'g Tr."), ECF No. 83. Over the past year, the government has transferred hundreds of noncitizens to Guantánamo despite having had no country agree to accept them for removal at the time of their transfer. These detainees were then held at Guantánamo for weeks on end—many were held over 40 days, and several were held for over 100 days. In fact, many were then transferred back to the United States from Guantánamo because it was not (and apparently never had been) operationally feasible for them to be transferred from Guantánamo to their final destinations. The record thus makes clear what was obvious from the start: Guantánamo is not being used as a "staging area" for removal, and detention at Guantánamo is no mere pitstop or "way station en route to final destination." Disc. Hr'g Tr. 11:1–3, 12:13–14, 18–20 (cleaned up). It is therefore contrary to law under the INA and Administrative Procedure Act ("APA").

*Second*, the government's Guantánamo policy also arbitrarily breaks from the decades-long unbroken practice of confining immigration detention to U.S. territory, through a wasteful and illogical operation that serves only to impermissibly terrorize noncitizens. Detention at Guantánamo is thus arbitrary and capricious under the APA. In leaping into this new policy, the agencies failed to explain the need for detention at Guantánamo, given existing detention and

removal capacity inside the United States, or to consider the exorbitant costs and added logistical hurdles of detaining people at a remote U.S. military base. Reports indicate that the government has spent tens of millions of taxpayer dollars to transfer and detain a miniscule fraction of the total detention population on an offshore base that lacks the infrastructure to accommodate these individuals. Moreover, the agencies have ignored the limits of the President's own directive to focus on "high-priority criminal aliens" and have regularly transferred "low priority" noncitizens with no criminal records and detained them at facilities previously used for suspected terrorists and those interdicted on the high seas.

The Court should grant Plaintiffs' motion for partial summary judgment.

## BACKGROUND

### I.    Legal and Statutory Background

#### A.  Guantánamo is Outside the United States.

Guantánamo is outside the United States for purposes of the INA—a fact the government does not dispute. In the INA, Congress enacted a comprehensive system governing the admission, presence, detention, and removal of noncitizens in the United States. *See* 8 U.S.C. ch. 12. The INA defines the term "United States," "when used in a geographical sense," as "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." 8 U.S.C. § 1101(a)(38). As Defendants acknowledge, Defs.' Mot. to Dismiss at 21, and this Court found, MTD Op. at 43–44, this does not include U.S. military bases on foreign territory, like the Guantánamo Bay Naval Station in Cuba. *See* 8 U.S.C. § 1101(a)(38). The INA's definition thus clarifies when a noncitizen is "present in the United States," *id.* § 1225(a)(1), "arrives in the United States," *id.*, and is "removed from the United States," *id.* §§ 1225(b)(1)(B)(iii)(I), 1226a(a), 1229a(a)(3).

**B.  The INA Authorizes Detention Before—Not After—Removal.**

The INA defines when removal occurs. Specifically, 8 U.S.C. § 1101(g) provides that one has been "deported or removed" once they have "left the United States." MTD Op. at 43. Consistent with that provision, Defendant U.S. Immigration and Customs Enforcement ("ICE") itself defines removal as "the compulsory and confirmed movement of an inadmissible or deportable noncitizen out of the United States." SUF ¶ 48.

The INA further provides for "appropriate places of detention," which in turn are defined as "[d]etention facilities" such as a "prison, jail, detention center, or other comparable facility suitable for such use" to detain noncitizens "pending removal or a decision on removal." 8 U.S.C. § 1231(g). In other words, the INA authorizes detention pending the outcome of removal proceedings. *See Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018); *see also* ECF No. 33 ("Opp'n to MTD") at 4 (summarizing statutes). And individuals may be detained after receiving a removal order "pending" their removal from the United States. *See* Opp'n to MTD at 4. The purpose of detention in those circumstances is to ensure that the noncitizen is present "at the moment of removal." *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001); *see also Demore v. Kim*, 538 U.S. 510, 528 (2003) (detention pending removal proceedings "serves the purpose of preventing [flight] . . . , thus increasing the chance that, if ordered removed, the [noncitizens] will be successfully removed").

In short, the INA does not authorize the use of detention facilities once removal has occurred, but only "pending removal," *see* 8 U.S.C. § 1231(g)(1)—which in turn occurs when the individual has "left the United States," *id*. § 1101(g). *See also* MTD Op. at 44–45. And no provision of the INA includes any language indicating that noncitizens may be held at permanent facilities outside the United States for the purpose of detention under the statute.

II.     **Factual Background**

A.  **Historical Use of Guantánamo.**

Prior to 2025, the government had never used detention facilities outside the United States to detain noncitizens pursuant to the INA. SUF ¶ 8. Its prior use of Guantánamo was generally limited to two contexts.

First, in the wake of the September 11 terrorist attacks, the United States established a military prison at Guantánamo to hold law-of-war detainees pursuant to the 2001 Authority for Use of Military Force ("AUMF"). *See* Pub. L. No. 107-40, 115 Stat. 224 (2001); SUF ¶ 2. The military has held these law-of-war detainees at Guantánamo in a maximum-security prison complex with several buildings, including what is now referred to as "Camp 6" (or "Camp VI"), on the Windward side of the base. SUF ¶ 3. Those military facilities became synonymous with pervasive mistreatment, torture, and indefinite detention. MTD Op. at 1.

Second, the government has used Guantánamo to house migrants interdicted on the high seas who—unlike Plaintiffs and the certified class—were not transferred from the United States to Guantánamo. SUF ¶ 4. The government has historically held these interdicted migrants at various camps on the base, most recently at the Migrant Operations Center ("MOC"), on the Leeward side of the base. SUF ¶ 5. The government has consistently maintained that these migrants are not "detained," but are merely "housed" at Guantánamo and are free to return to their country of origin at any time. SUF ¶¶ 6–7.

B.  **Defendants' New Detention Policy at Guantánamo.**

On January 29, 2025, President Donald Trump issued a memorandum (the "President's Memorandum") directing the Secretary of Defense and Secretary of Homeland Security "to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay

5

to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States." SUF ¶ 10. The President sought to hold up to 30,000 noncitizens at Guantánamo. SUF ¶¶ 13–14.

Less than a week later, DHS announced that it had begun transfers of immigration detainees from inside the United States to Guantánamo, starting with ten individuals transferred from Fort Bliss, Texas. SUF ¶ 22. On February 4, 2025, U.S. Customs and Border Patrol ("CBP") posted on social media videos of the transfer of these ten individuals, shackled and in chains, on a military plane, stating that "[f]lights to Guantanamo Bay have begun." SUF ¶ 23. The government publicly alleged that these ten individuals were members of Tren de Aragua, a Venezuelan gang, but did not provide proof they were in fact gang members,[1] their identities, their immigration status, the nature of the legal proceedings against them, the legal authority under which they were held, or how long they would be held at Guantánamo. SUF ¶ 24.

In the rush to begin transfers to Guantánamo, DHS requested multiple kinds of assistance from DOD, including aviation transportation assistance and expansion of the MOC. SUF ¶¶ 19–20. Initial transfers to Guantánamo carried multiple restrictions, including prohibiting transfers of "medically fragile individuals" and certain nationals, and limited the initial population to single adult males and Spanish-speaking individuals. SUF ¶ 27. Guantánamo-bound flights required coordination among multiple agencies across DHS, DOD, and the State Department. SUF ¶ 26.

Shortly after transfers of immigrant detainees to Guantánamo began, lawmakers expressed concerns about the cost of the detention operation at Guantánamo, costs that were "avoidable"

---

[1] In separate litigation involving the Alien Enemies Act, Judge Boasberg found that "significant evidence has come to light" indicating that noncitizens accused of membership in Tren de Aragua "have no connection to the gang" and were targeted based on "flimsy, even frivolous, accusations." *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 46 (D.D.C. 2025), *vacated and remanded on other grounds*, No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025).

considering the aircraft and detention space alternatives in the United States. SUF ¶ 30. For instance, the cost of a single deportation on a military C-17 plane cost $28,000 per flight hour compared to $8,577 per flight hour on a civil aircraft; additionally, ICE was projected to pay contractors $272,000 annually per detention bed at the MOC compared to an average of $57,000 annually per bed at an ICE facility in the United States. SUF ¶ 30.

Beyond the financial considerations, multiple legal service organizations as well as immigration and military attorneys expressed immediate concerns about the detention of noncitizens at Guantánamo, including the lack of any ability to communicate with those individuals. SUF ¶ 32. On February 12, 2025, several organizations and family members of detainees filed a lawsuit against the government for thwarting access to counsel for those immigrant detainees who had effectively disappeared into a black box at Guantánamo. *See Las Americas Immigrant Advocacy Center v. Noem ("Las Americas")*, No. 1:25-cv-418 (D.D.C. Feb. 12, 2025), ECF No. 1. The government did not develop any semblance of attorney-client access protocols until after that litigation began, SUF ¶ 106, and the government still does not allow noncitizens detainees to meet in-person with counsel, due to "operational and logistical reasons, and consistent with direction from DHS." SUF ¶ 107.

Over a month after transfers to Guantánamo began, DHS and DOD entered into a memorandum of understanding, dated March 7, 2025, for "DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal" ("MOU"). SUF ¶ 41. The MOU confirms that DHS has legal custody over noncitizens with final orders of removal at Guantánamo. SUF ¶¶ 41–42. On the same day, DOD confirmed its approval for ICE to use its facilities and land for expansion for temporary holding capacity at Guantánamo, including access to and use of the Joint Task Force Guantánamo detention facility (referring to Camp 6) for up to 144 "high threat [illegal aliens]," aviation support,

7

and services such as food and medical support for an initial amount "not to exceed $30 million" of DOD appropriation. SUF ¶ 35. DOD's comptroller estimated a cost of $1.8 billion to support operations and maintenance for the MOC expansion, use of Camp 6, and establishment of camps at Guantánamo for expansion to a capacity of 30,000. SUF ¶ 39.

DOD made its support of the Guantánamo operation "contingent on ICE ensuring that the population of [illegal aliens] being held by ICE are determined by ICE to be either members of transnational criminal organizations (TCOs) or human-smuggling customers of TCOs." SUF ¶ 38. However, the MOU specifies that DHS/ICE need only assert a "nexus" to a TCO or criminal drug activity, which can be established if the noncitizen is from a country from which the preponderance of noncitizens enter the United States through smuggling by a TCO. SUF ¶ 43. DOD also requested that DHS not send any women, children, or noncitizens with "acute medical or psychological conditions" to Guantánamo "[g]iven the limited medical capabilities at [Guantánamo] and the nature of the facilities and environment." SUF ¶ 37.

### C. Transfers to and from Guantánamo.

Since January 2025, the government has transferred at least 797 noncitizens from the United States and detained them at Guantánamo, with no indication that these transfers will stop. SUF ¶¶ 47, 49. Noncitizens transferred from the United States and detained at Guantánamo are held in either the Camp 6 prison or the MOC. SUF ¶¶ 44, 50. The government has publicly referred to the immigration detainees held at Guantánamo as "the worst of the worst," and "high-threat" criminals who crossed the border to bring "violence and mayhem to our communities." SUF ¶ 51. But despite these statements, Defendants acknowledge they have detained numerous people at Guantánamo who are "low-risk," with no record of encounters with law enforcement other than

with immigration officials. SUF ¶¶ 52–53 (referring to 176 noncitizens who "did not have criminal convictions or pending charges beyond immigration violations").

The costs of detention at Guantánamo have been massive. In 2025 alone, DHS spent $12 million to fly 480 noncitizens to Guantánamo from the United States and to fly 670 noncitizens off Guantánamo (some on to another country and others back to the United States). SUF ¶ 96. And this does not include the money DOD or DHS spent on detention (*see infra* at 11), nor the additional transportation costs borne by DOD. Given that during just the second half of 2025, DOD spent approximately $21.9 million to fly 31 military flights to transport immigrants to and from Guantánamo, SUF ¶ 95, the total 2025 expenditure by DOD and DHS for just the transportation aspect of Guantánamo detention was well over $34 million (and perhaps approaching $60 million), SUF ¶¶ 95–96.

Statistics derived from government records likewise confirm that detention at Guantánamo is no mere "waystation" during removal. For the period in which Plaintiffs received discovery— from June 4, 2025, to February 2, 2026—Defendants transferred 227 noncitizen detainees to Guantánamo, SUF ¶ 56:

- At the time of their transfer to Guantánamo, **none** (zero) of these 227 noncitizens had been accepted for removal by another country, SUF ¶ 79;

- The median length of their detention at Guantánamo was 23 days while the mean length was about 31 days, SUF ¶ 57, far in excess of the typical three-day staging time in the United States for removals, SUF ¶ 55;

  - About 46% of the group (105 noncitizens) spent over 30 days at Guantánamo, SUF ¶ 59;

  - 33% of the group (75 noncitizens) spent over 40 days at Guantánamo, SUF ¶ 60;

  - Three people spent over 100 days at Guantánamo, SUF ¶ 61;

- About 40% of the group (90 noncitizens) were transferred from Guantánamo back to the United States, SUF ¶ 62;

- o For this group, the mean average length of their detention at Guantánamo was about 49 days, SUF ¶ 63;

- o Only about 8% of this group (7 out of 90 noncitizens) were transferred to the country designated for their removal within three days, SUF ¶ 64;

- o About 91% of this group (82 out of 90 noncitizens) spent more than seven days in detention after arriving back in the United States, SUF ¶ 65, and 75 of those 82 noncitizens were later transferred to their final destination country, with five of those 75 waiting 60 or more days before their transfer, SUF ¶¶ 66–67.

- o About 8% of this group (7 out of 90 noncitizens) were either released from detention after returning to the United States or remained in custody as of Defendants' discovery production on June 1, 2026, SUF ¶ 68.

Noncitizen detainees at Guantánamo have been transferred back to the United States for several different reasons. Due to lack of commercial flight options available from Guantánamo, some detainees had to be returned to the United States to effectuate their removal via commercial flights. SUF ¶ 70. Other detainees classified for "Special High-Risk Charters" ("SHRCs")—either because they were going to countries that are difficult for removal, they previously failed to comply with removal orders, or they possessed significant criminal histories—had to be transferred back to the United States from Guantánamo because "[s]taging SHRCs from NSGB [Naval Station Guantánamo Bay] is operationally inefficient due to numerous restrictions and logistical challenges associated with the facility." SUF ¶ 71. Moreover, non-Mexicans who the government nonetheless intended to remove to Mexico (*i.e.*, as a "third country") were transferred back to the United States from Guantánamo because "[t]hird country removals to Mexico are only conducted via the land border." SUF ¶ 72.

**D.  Detention at Guantánamo Compared to Detention in the United States.**

Defendants have continued to transfer immigration detainees to Guantánamo even though it has complicated rather than facilitated the removal process and has cost an exorbitant amount of money, especially when compared to what it would cost to detain them in the United States.

Since the government's policy started, lawmakers have continued to document the waste and comparative disadvantages of detention at Guantánamo. For instance, after a congressional delegation visit to Guantánamo in May 2025, Senator Jack Reed criticized the use of Guantánamo for immigration detention, stating, "[i]t is obvious Guantanamo Bay is an illogical location to detain migrants. The staggering financial cost to fly these migrants out of the United States and detain them at Guantánamo Bay—a mission costing tens of millions of dollars a month—is an insult to American taxpayers." SUF ¶ 86. Around the same time, Senators Gary C. Peters and Alex Padilla noted that just one month into the operation, the government had spent approximately $40 million to transfer and detain immigration detainees at Guantánamo—at a reported $100,000 per day for each detainee, *600 times the cost of detention in the United States*. SUF ¶ 85. From March 28, 2025, through March 31, 2026, DOD obligated approximately $66.4 million to support DHS detention at Guantánamo. SUF ¶ 93. These DOD costs—which are on top of the costs borne by DHS—would have been totally unnecessary were the detainees held in the United States.[2] Meanwhile, the detention numbers at Guantánamo are a tiny fraction of the total numbers in the United States: as of January 12, 2026, the MOC had the capacity to hold only 50 people and Camp 6 had the capacity to hold up to 245 people. SUF ¶ 99. Comparatively, ICE's average daily population reached a record of over 70,000 in January 2026. SUF ¶ 109. And DHS's own records

---

[2] Reports on costs of the operation at Guantánamo have varied depending on the time period involved and agency reporting.

indicate that there is no shortage of capacity at immigration detention centers in the United States; an analysis of DHS data shows that in April 2025, a few months after the government started flying noncitizens to Guantánamo, ICE's detention capacity in the United States was nearly 63,000 beds, but only 48,056 beds were occupied. SUF ¶ 108.

In their initial report, the Inspectors General of DOD and the State Department ("Inspectors General" or "IGs") expressed similar concerns with operations at Guantánamo. The 2025 joint report by these IGs ("2025 IG Report") documented DOD's "contract limitations, logistical challenges, and other issues associated with its support" for the detention operations at Guantánamo, including the need for maintenance repairs, tents that were later determined not to be needed, and "significant operational friction" from "routinely cancelled flights, leading to wasted planning hours." SUF ¶ 88. The IGs recognized that the detention capacity at Guantánamo is "very small compared to holding operations elsewhere in the United States"—then, just over 700 noncitizens compared to the 68,990 noncitizens detained in facilities across the United States from October 1, 2025, through January 7, 2026. SUF ¶¶ 90–91. And in their second report, the IGs observed that "[t]he average detention duration at NSGB has increased over time" due to the limits on repatriation flights for nationals held there. SUF ¶ 80 ("2026 IG Report"); *see also* SUF ¶ 81 (noting how average length of detention increased "due to repatriation issues"). Notably, "[n]either the DoD nor the DHS provided [the Inspectors General] any specific national security justification, cost, or other benefit explaining why illegal aliens are being sent to NSGB rather than other DHS or DoD facilities in the continental United States." SUF ¶ 100.

In public, however, government officials have continued to hold out detention at Guantánamo for the impermissible purpose of deterring migrants from coming to or remaining in the United States, warning that noncitizens should "not come to this country or we will hunt you

down, find you, and lock you up" in Guantánamo. SUF ¶ 25; *see also* SUF ¶ 47 (DHS spokesperson stating: "If you come to our country illegally and break our laws, you could end up in Guantanamo Bay, CECOT, or a third country. Our message is clear: criminal illegal aliens are not welcome in the U.S."); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 189–90 (D.D.C. 2015) (detention policy based on deterring immigration is likely unlawful).

### III.     Procedural Background

Plaintiffs and Class Representatives Yamil Luna Gutierrez and Rafael Angel Lopez Ocon are noncitizens with final orders of removal who were apprehended in the United States and previously held in immigration detention facilities in the United States before being transferred to and detained at Guantánamo. SUF ¶¶ 112–14, 116–18. On June 4, 2025, Plaintiffs filed a challenge to the government's use of Guantánamo for their detention. *See* ECF No. 1 (Compl.). Plaintiffs also sought certification of a class of "[a]ll immigration detainees originally apprehended and detained in the United States, and who are, or will be held at Naval Station Guantánamo Bay, Cuba." ECF No. 4 (Pls.' Mot. for Class Cert.). Plaintiff Luna Gutierrez spent 38 days detained at Guantánamo and Plaintiff Lopez Ocon spent over two weeks detained at Guantánamo before they were both finally transferred to their destination country of removal. SUF ¶¶ 115, 119.

After briefing and argument, the Court denied Defendants' motion to dismiss and granted in part Plaintiffs' motion for class certification. ECF Nos. 52 ("Order Certifying Class"), 54 ("Order Denying MTD"). The Court certified the following class and ordered that the class may pursue the APA and Fifth Amendment claims under Counts I, II, and III of the Complaint against Defendants:

> All immigration detainees originally apprehended and detained in the United States who have been ordered removed, except those ordered removed pursuant to 8 U.S.C. § 1225, and who are, or will be, held at Naval Station Guantanamo Bay, Cuba.

13

Order Certifying Class at 1.[3]

After Defendants produced the Certified Administrative Record ("CAR"),[4] the parties engaged in limited discovery on Count I (the statutory claim), and the Court eventually ordered further discovery on Count I to ascertain the contours of the Guantánamo detention policy. *See* ECF Nos. 75, 97. The parties agreed to proceed with partial summary judgment on Counts I and II (the APA claims), while holding in abeyance Count III (the substantive due process claim) because a ruling on Counts I and II may obviate the need for further discovery. *See* Jt. Not., ECF No. 57 at 1, 3.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Only those facts "that might affect the outcome of the suit under the governing law" are material. *Id.* at 248. When "both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006) (citations omitted).

---

[3] The Court exempted those with expedited removal orders, finding that Plaintiffs had not identified anyone at the time who had such an order. ECF No. 51 at 21–22.

[4] Defendants originally excerpted certain classified materials from the CAR but after agency review, determined that the remaining material could be declassified and produced in partly unredacted form to Plaintiffs. *See* ECF Nos. 77, 86. The redacted CAR is available on the public docket at ECF No. 102-2–7, while the unredacted CAR is available with the parties and the Court.

14

"When a plaintiff challenges an agency's final action under the [APA], summary judgment 'is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.'" *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 47 (D.D.C. 2019) (quoting *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016)). "'Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Bushireddy v. Lyons*, No. 25-1102 (SLS), 2026 WL 759480, at *5 (D.D.C. Mar. 18, 2026) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). "The APA requires courts to 'hold unlawful and set aside an agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id*. at *10 (quoting *Henry v. Sec'y of Treasury*, 266 F. Supp. 3d 80, 86 (D.D.C. 2017)).

## ARGUMENT

### I.    Detention at Guantánamo is Contrary to Law.

There is no statutory authority for Defendants' use of Guantánamo to detain noncitizens who are awaiting removal to their final destination country. Accordingly, this policy is contrary to law, and this Court should set it aside. 5 U.S.C. § 706(2)(A), (C); *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (vacatur of unlawful agency action "is the normal remedy" for APA violations); *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 944 (D.C. Cir. 2024) ("In the absence of statutory authorization for its act, an agency's action is plainly contrary to law and cannot stand" under 5 U.S.C. § 706(2)(A) (citation and quotation marks omitted)); *Drs. for Am. v.*

15

*Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 142–43 (D.D.C. 2025) ("[I]f an agency acts without statutory authority, then a court must set that action aside." (citing 5 U.S.C. § 706(2)(C))).

### A. The INA Does Not Authorize Immigration Detention in Facilities Outside the United States.

As the Court previously concluded, the INA does not authorize immigration detention outside of the United States, unless the government is "tak[ing] steps amid executing a removal order reasonably related to delivering an individual to the country designated by 8 U.S.C. §1231(b)." MTD Op. at 41.

### i.    Section 1231(g) Does Not Authorize Detention at Guantánamo.

For those with final orders, like Plaintiffs and the certified class, the INA authorizes the Attorney General to detain them in detention centers "pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). The plain meaning of "pending removal" as used in § 1231(g) is "while awaiting a decision on removal," and not "during" the removal itself. MTD Op. at 32–33. While "pending" can generally mean either "during" or "while awaiting," the second phrase of § 1231(g)(1), "[p]ending . . . a decision on removal," can only mean "*while awaiting* a decision on removal," given that a decision on removal is issued at a discrete point in time. *Id.* at 32 (collecting dictionary definitions from around 1996, when § 1231(g) was enacted). Because "pending" is used without differentiation with *both* "removal" *and* with "decision on removal," it must have the same meaning—"while awaiting"—in relation to each phrase. *Id.* (citing *Clark v. Martinez*, 543 U.S. 371, 378 (2005)).

Because § 1231(g) authorizes detention only while individuals are awaiting removal, it does not authorize detention once an individual has departed from the United States. As the INA provides in § 1101(g), "any [noncitizen] ordered deported or removed . . . *who has left the United States*, shall be considered to have been deported or removed in pursuance of law, *irrespective*

16

*of . . . the place to which he departed*." 8 U.S.C. § 1101(g) (emphasis added). Thus, "a removal occurs when an individual subject to a removal order leaves the United States, regardless of whether that departure is by their own design or carried out by the Government," and regardless of when the United States relinquishes custody of the individual. MTD Op. 34, 43; *see also Nicusor-Remus v. Sessions*, 902 F.3d 895, 899–900 (9th Cir. 2018) (holding that noncitizen was removed when escorted by ICE agents across the border into Mexico, even though he was then escorted back into the United States to testify at trial and remained in United States custody at all times); *United States v. Sanchez*, 604 F.3d 356, 358–59 (7th Cir. 2010) (finding that a removal occurred when authorities mistakenly escorted individual with final removal order across the border). When the government transports an individual with a removal order outside the country— "including by departing to Guantánamo, which the INA excludes from its definition of United States"—that individual has "left the United States," effecting their removal. MTD Op. at 43–44; 8 U.S.C. § 1101(a)(38), (g). At that point, they are no longer "pending removal," and thus cannot be detained under § 1231(g). MTD Op. at 43–44.

### ii. Sections 1225(b)(1)(B)(iii)(IV), 1231(a)(2), and 1231(a)(6) Do Not Authorize Detention Outside the United States.

Defendants have previously asserted the authority to detain noncitizens outside of the United States pursuant to several other provisions of the INA that either require or provide the Secretary with discretion to detain noncitizens in certain circumstances. *See* Defs.' Mot. to Dismiss at 19–20; *see also* 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV) (directing that individuals subject to expedited removal "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"), 1231(a)(2) (providing that the Secretary "shall detain" an individual subject to removal order for a certain period of time), 1231(a)(6) (providing that some individuals subject to a removal order "may be detained" for a longer period).

17

But as this Court has held, none of these provisions address the location of detention at all, let alone provide authority to establish detention facilities abroad. MTD Op. at 29. Nor do they authorize detention *after* an individual has been removed.

### iii.    Section 1101(a)(3) Does Not Grant Defendants Authority to Maintain Their Detention Policy at Guantánamo.

As this Court has also explained, 8 U.S.C. § 1103(a)(3) grants the Secretary of DHS the authority to take actions "deem[ed] necessary for carrying out his authority under" the INA. MTD Op. at 41. That includes providing "some additional authority to maintain custody over an individual while the government is *in the midst* of executing their removal order." *Id*. at 45 (emphasis added). Accordingly, this authority would permit the government, during a removal flight, to restrain noncitizens during the flight, or maintain custody during a necessary layover, for instance, to refuel the plane or to land in an emergency. *See id*. at 41.

That provision is not, however, a grant of free-floating, unlimited authority to set up and run a detention facility abroad absent some separate and specific statutory authority authorizing overseas detention. *See* MTD Op. at 45 (detention alleged at Guantánamo, where some detainees are held for as long as six weeks and are transferred back to the United States for removal from there, is not consistent with § 1103(a)(3)); *see also Nagahi v. Immigr. & Naturalization Servs.*, 219 F.3d 1166, 1170 (10th Cir. 2000) (holding that Attorney General could not rely on § 1103(a)(3) to issue regulation limiting judicial review over the Attorney General's own acts because "the obvious scope of th[e] grant [of authority under § 1103(a)(3)] is limited to acts which allow the Attorney General to carry out her [delegated] authority").

Defendants have asserted that the government is only detaining noncitizens at Guantánamo during the execution of their removal orders, suggesting that the Guantánamo-detention policy is

18

thus within Defendants' authority under § 1103(a)(3).[5] In the Court's prior opinion, it accepted Plaintiffs' allegations but left open to Defendants "the opportunity to challenge" those "factual allegations" and, perhaps, demonstrate that "detention at Guantánamo constitutes a 'staging point' amid execution of a removal order." MTD Op. at 45–46 (quoting Defs.' Mot. to Dismiss at 20 and ECF No. 35 at 17 ("Defs.' Reply ISO MTD")). With discovery complete, Defendants' assertions have been exposed as entirely bare.

The administrative record in this case refutes the idea that the detention of noncitizens at Guantánamo is part of the execution of individuals' removal orders. To the contrary, in an internal DOD message on February 2, 2025, the government indicated that it understood the Guantánamo-detention policy to be treating Guantánamo as a detention facility overseas where noncitizens would be detained in the same manner as in a domestic detention facility, and under the same authority, § 1231(g)(1). SUF ¶ 16. The message, which transmitted the Secretary of Defense's approval to support flights of noncitizens in DHS custody to Guantánamo, explained the legal basis for DHS maintaining custody over noncitizens at Guantánamo: "8 USC sec 1231(g) allows DHS to arrange appropriate places for detention. DHS assesses that GTMO is a 'United States Government facility,' and is therefore authorized as an appropriate place for detention of illegal aliens." SUF ¶ 16. This message said nothing about § 1103(a)(3) and did not otherwise indicate that this detention was merely part of the process to *execute* noncitizens' removal orders. SUF ¶ 17.

---

[5] *See* Defs.' Mot. to Dismiss at 20 (characterizing their detention policy as "part of the government's effort to facilitate [noncitizens'] removals"); Defs.' Reply ISO MTD 17, ECF No. 35 (describing detention at Guantanamo as a "'staging point' amid execution of a removal order"); Disc. Hr'g Tr. 11:1–3, 12:13–14, 18–20 (Defendants' counsel explaining that they were "not sure" that they could "concede" that Guantanamo is being treated the same way as a domestic detention facility, given that "the goal was that this was a [way]station [en] route to final destination.").

19

Other internal DOD documents in the administrative record describe the mission in terms that reflect that noncitizens are being held in detention while *awaiting* the execution of their removal orders—not *during* that execution. For example, DOD executive orders issued on February 25, 2026, described the operation as "conduct[ing] illegal alien holding operations for up [to] 10,000 illegal aliens *pending relocation* with subsequent expansion to accommodate a total of 30,000 *illegal aliens pending relocation.*" SUF ¶ 13 (emphasis added). Similarly, in a March 7, 2025 letter to the Chairman of the Senate Committee on Armed Services, the Secretary of Defense describes the operation as the "provision of [DOD] facilities and land on [Guantánamo] for temporary use by the [DHS] *to house* illegal aliens identified by their Department for removal from the United States." SUF ¶ 46 (emphasis added).

The actions Defendants have taken in implementing their policy further confirm that the detention is not merely custody incident to executing a removal order. For example, the government has been transporting noncitizens to Guantánamo before any country has even agreed to accept them, indicating that the government is not actually in the process of executing a removal order. Indeed, *not one* of the 227 noncitizens transferred to Guantánamo between June 4, 2025, and February 2, 2026 (the period covered by discovery in this case) had already been accepted for removal by another country at the time of their transfer to Guantánamo. SUF ¶ 79. This is at odds with the government's standard process for removing noncitizens, in which it requests in advance that a foreign government agree to accept the noncitizen. SUF ¶¶ 75–76. Thus, the fact that the government has not been obtaining such assurances before transferring noncitizens to Guantánamo indicates that the government is either not yet able or, at a minimum, unprepared to imminently transport them to the country designated for removal. *See* Op. & Order Granting Discovery at 6–7, ECF No. 97 (recognizing that "whether another country has agreed to accept the individual for

20

removal at the time of transfer" is "probably the best indicator of whether the government is actually in the process of removing someone when they are brought to Guantánamo" (citation omitted)). These facts squarely refute the government's claim that Guantánamo is comparable to a mere pitstop for refueling or other logistics during the removal process.

The length of detentions at Guantánamo further confirms that the government is not in the process of executing removal orders when it transfers people to Guantánamo. For noncitizens held at staging facilities in the United States, like the Alexandria Staging Facility in Louisiana, the average length of stay to date in Fiscal Year 2026 has been three days or fewer. SUF ¶ 55. Conversely, the 227 noncitizens transferred to Guantánamo between June 4, 2025, and February 6, 2026, spent an average of 31 days on the base, with a median length of detention of 23 days. SUF ¶¶ 56–58. 105 of these noncitizens, or about 46%, spent over 30 days detained there. SUF ¶ 59. 75 of these noncitizens, or about 33% of the whole group, spent over 40 days detained there. SUF ¶ 60. These have not been brief "pit-stops" like refueling layovers or even the short, three-days-or-under stays at staging facilities in the United States. SUF ¶¶ 54–55.

Moreover, a significant portion of detainees have been transferred *back* from Guantánamo to the United States before they were repatriated—further demonstrating that they were not brought to Guantánamo as part of a removal flight plan. Within the group of 227 transferred between June 4, 2025 and February 2, 2026, about 40% were transferred back to the United States and of those, only a small fraction (7.8%) were transferred to the country designated for their removal within three days of being returned to the United States. SUF ¶ 64. The majority of those returned to the United States waited more than a week, with some waiting more than 60 days before being transferred to another country. SUF ¶¶ 65–67. Still others had not been removed at all as of June 1, 2026, when discovery closed. SUF ¶ 68.

The specific reasons noncitizens were transferred back to the United States further shows that detention at Guantánamo was not a part of the process of executing their removal orders. For some, transfer back to the United States was necessary because no commercial flight options were available on Guantánamo to fly them to their designated countries of removal—something the government would have known at the time it transferred them to Guantánamo. SUF ¶ 70. Others who, prior to their transfer to Guantánamo, had received protection from removal to their country of origin, were transferred back to the United States to be removed to Mexico via the land border because "[t]hird country removals to Mexico are only conducted via the land border." SUF ¶¶ 72–73. This shows that, at the time of their transfer to Guantánamo, the government knew either that it was going remove these individuals to Mexico (and thus the flights to and from Guantánamo were not a part of that removal process) or that it did not yet know to which country it was going to remove them. In either case, their transfers to and detention at Guantánamo were not part of the process of executing their removal orders.

Lastly, noncitizens classified for "Special High-Risk Charters" ("SHRCs") are transferred back to the United States from Guantánamo because "[s]taging SHRCs from NSGB is operationally inefficient due to numerous restrictions and logistical challenges associated with the facility" so "SHRCs are typically staged from [continental United States] locations." SUF ¶ 71. Individuals are classified as requiring SHRCs either because they are going to countries that are difficult for removal, they previously failed to comply with removal orders, or they possess significant criminal histories. SUF ¶ 71. Again, this is something the government would have known when it transferred these noncitizens to Guantánamo, meaning Guantánamo was not even a *potential* pitstop during the execution of their removal orders.

22

In short, the record confirms beyond any doubt that Defendants are not transporting noncitizens to Guantánamo during the process of executing their removal orders, and that the Guantánamo-detention policy is therefore not authorized under § 1103(a)(3) as an action "deem[ed] necessary for carrying out" the government's removal authority under the INA. MTD Op. at 45. Instead, the government is transporting noncitizens to Guantánamo to detain them while awaiting removal to their final destination country—the kind of detention contemplated under § 1231(g), and the kind of detention that is unlawful because Guantánamo is not part of the United States. MTD Op. at 45. The Guantánamo detention policy is thus contrary to, and in excess of, statutory authority, under the APA.

**B. The Presumption Against Extraterritoriality Prohibits Detention at Guantánamo.**

While the plain meaning of the detention statutes is clear, the presumption against extraterritoriality further confirms that the Guantánamo detention policy is not authorized within the INA.[6] The INA is subject to the longstanding "presumption that Acts of Congress do not ordinarily apply outside our borders" but "only within United States territory." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 173 (1993). This presumption applies "in all cases," *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 261 (2010), and can be rebutted only where "Congress has affirmatively and unmistakably instructed" that a statutory provision applies extraterritorially. *RJR Nabisco Inc. v. European Community*, 579 U.S. 325, 335 (2016). Defendants cannot point to

---

[6] In its decision on Defendants' Motion to Dismiss, the Court held that it was "not convinced" that the presumption against extraterritoriality applies to authority-granting statutes like those at issue in this case. MTD Op. 31 n.11. This Court did not "need" to reach the question of whether the presumption applies to § 1231(g), however, "because it conclude[d] that the best reading of" the statute "is consistent with the presumption." *Id.* Plaintiffs respectfully maintain and preserve for appeal that the presumption applies in this case and that Defendants cannot rebut the presumption, as further set forth in Plaintiffs' Opposition to Defendants' Motion to Dismiss at 21–32, ECF No. 33.

23

any such clear evidence of congressional intent to permit extraterritorial immigration detention, and the government cannot rely on any broad or general text to overcome the presumption.[7]

This Court observed that the Supreme Court has not had the occasion to consider whether the presumption applies to discern the scope of a grant of authority to the Executive, MTD Op. at 31 n.11, but the Supreme Court has instructed that the presumption applies "across the board," *RJR Nabisco Inc.*, 579 U.S. at 336. In short, the best reading of the statute is that Congress did not authorize detention outside the United States; the government certainly cannot therefore meet its burden of showing any "affirmative[] and unmistakabl[e]" evidence that Congress intended to authorize the use of detention facilities outside the United States to detain individuals who are awaiting removal. *Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412, 417 (2023) (citation omitted).

## II.     The Guantánamo Detention Policy is Arbitrary and Capricious.

The policy of detaining noncitizens at Guantánamo also violates the APA because it is arbitrary and capricious. When an agency action marks a departure from past practice, "the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017); *see also id*. at 927 (agency's "failure even to acknowledge its past practice" of categorizing territory as protected land, "let alone explain its reversal of course . . . was arbitrary and capricious"). Here, Defendants failed to acknowledge, let alone explain, their departure from decades-long practice of detaining noncitizens under the INA in detention facilities exclusively inside of the United States. As

---

[7] *See also* Defs.' Mot. to Dismiss at 21 ("acknowledg[ing]" Guantánamo's "status for purposes of the INA"); Resp'ts' Opp'n to Mot. for Stay, *Espinoza Escalona v. Noem*, No. 25-cv-604 (D.D.C. Mar. 10, 2025), ECF No. 14 ("*Escalona* Gov Br.") at 27 (same); *see also* Off. of Legal Counsel, Status of Guantanamo Bay 1 (Oct. 27, 1981), https://www.justice.gov/olc/page/file/1009416/dl [https://perma.cc/2H5F-QPL7] (same).

discussed above, even the government's own IGs have concluded that the government has failed (even after all this time) to provide any "national security justification, cost, or other benefit" from immigration detention at Guantánamo. SUF ¶ 100; *see also supra* at 1–2. That is enough to render the policy arbitrary and capricious.

A policy is also arbitrary and capricious when the agencies "relied on factors which Congress has not intended [them] to consider, entirely failed to consider [] important aspect[s] of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Drs. for Am.*, 793 F. Supp. 3d at 145 (agency action implementing executive order was arbitrary and capricious where "defendants [did] not explain[] their decisionmaking, and from the sparse administrative record it [could not be] 'reasonably [] discerned'" (quoting *State Farm*, 463 U.S. at 43)).

Defendants failed in all of these respects. The barebones explanations offered in support of the new policy are illogical and find *no* support in the administrative record—or are flat out contradicted by it. Furthermore, Defendants failed to consider the existence of more cost-effective and less logistically complicated alternatives in the United States. Defendants also implemented the policy in a manner that deviates from the actual text of the President's Memorandum by not limiting detention at Guantánamo to "high risk" detainees and to the MOC.

**A.  Defendants Failed to Even Acknowledge the Change in Longstanding Policy.**

"A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923.

This principle applies not only to formal policies, but also to longstanding agency practice. *See id*. at 924 (unacknowledged departure from "two decades of agency practice" was arbitrary and capricious); *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (obligation to articulate coherent reasons for change in position attaches when an agency "depart[s] from precedents or *practices*" (emphasis added)), *abrogated on other grounds*, *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237 (D.C. Cir. 2026).

Agencies "must 'provide a reasoned explanation for [a] change" in policy. *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F. Supp. 3d 66, 89 (D.D.C. 2019) (citation omitted). They must show that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better" than the previous policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.* ("*AFL-CIO*"), 25 F.4th 1, 5 (D.C. Cir. 2022) ("decision to abandon [the agency's] longstanding precedents . . . was not sufficiently reasoned"). Here, Defendants do not even *acknowledge* their unprecedented departure from the longstanding practice of not detaining noncitizens who are apprehended in the United States at Guantánamo or at any detention facility outside the United States. This is dispositive and renders their actions arbitrary and capricious. *See Fox Television*, 556 U.S. at 515 (at minimum, an agency must "display awareness that it *is* changing position").

## B. Defendants' Justifications Are Unsupported by the Administrative Record and Are Contradicted by Publicly Available Evidence.

Without acknowledging that their Guantánamo detention policy departs from past practice, Defendants attempt to justify the new policy by asserting that they are expanding detention capacity and using Guantánamo as a staging ground for removals. Not only are these scant explanations inadequate and illogical, but there is "no evidence" in the administrative record to

26

support them. *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707–10 (D.C. Cir. 2014) (new rule was arbitrary and capricious where nothing in the record supported agency's reasoning).

First, Defendants' claim that detention at Guantánamo is necessary to "maximize available detention resources," Defs.' Mot. to Dismiss at 24, is devoid of *any* support in the administrative record. Indeed, the record contains no indication that Defendants even considered available options in the United States before they started detaining individuals at Guantánamo. Their decision to forego available detention space in the United States is thus unexplained, not to mention illogical given that detention at Guantánamo is far more costly and logistically challenging than detention in the United States. *See infra*, Section II.C. Defendants' second claim—that they must use Guantánamo as a "staging" area for removal flights, Defs.' Mot. to Dismiss at 22—similarly does not pass muster. Defendants have provided no coherent rationale for why some detainees with final orders are removed directly to their home countries, while others are being flown to Guantánamo. And, again, the record contains no evidence supporting the supposed benefits of using Guantánamo as a staging ground. The agencies "must at least explain why and how [they] concluded" that detention at Guantánamo is "'better' than" the longstanding unbroken practice of detaining exclusively in the United States that they were "relinquishing." *AFL-CIO*, 25 F.4th at 10 (quoting *Fox Television*, 556 U.S. at 515). Here, they have "failed to do so," and that is enough to render their decision arbitrary and capricious. *Id.*

Not only are Defendants' justifications wholly unreasoned, but they are contradicted by readily available public evidence. The Court may review extra-record evidence where "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision; (2) the district court need[s] to supplement the record with background information in order to determine whether the agency considered all of the relevant factors; or (3) the agency failed to

27

explain administrative action so as to frustrate effective judicial review." *Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294, 307 (D.D.C. 2021) (quotation marks and citation omitted); *see also Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (similar). Here, publicly available government documents underscore that the agencies failed to consider a significant relevant factor: available detention capacity in the United States.

DHS's own records indicate that there is no shortage of capacity at immigration detention centers in the United States, and that as of April 2025, a few months after the government began its Guantánamo detention policy, ICE's detention capacity in the United States was nearly 63,000 beds, but only 48,056 beds were occupied. SUF ¶ 108. This conclusion is supported by the 2025 IG Report, which highlights the logistical complexities and attendant costs of setting up the offshore detention facility. SUF ¶ 88. According to that report, "[n]either the DoD nor the DHS provided any specific national security justification, cost, or other benefit explaining why illegal aliens are being sent to NSGB rather than other DHS or DoD facilities in the continental United States." SUF ¶ 100. It notes that from February 2025 to December 2025, 708 noncitizens had been detained at Guantánamo, and that this is "very small compared to holding operations elsewhere in the United States," which detained 68,990 noncitizens at non-DOD facilities from October 1, 2025, through January 7, 2026. SUF ¶¶ 90–91. The total numbers detained at Guantánamo for the period January 2025 through March 2026 are not much higher: Guantánamo held only 797 individuals during this period. SUF ¶ 49. This is far short of the 30,000 figure that the agencies initially touted and hardly supports any appreciable "maximiz[ation]," Defs.' Mot. to Dismiss at 24, of detention resources.

Further, the "staging ground" rationale is undercut by Defendants' own actions. The Guantánamo detention scheme requires additional flights that would be entirely unnecessary if the

28

government staged and removed noncitizens directly from the United States. Indeed, on February 10, 2025, the same day that Defendants transferred 15 Venezuelans with final orders of removal to Guantánamo, they removed another 190 directly from Texas to Venezuela. SUF ¶ 110. Further, as discussed above, a large percentage of those detained at Guantánamo—40% of those detained there between June 4, 2025, and February 2, 2026—have been transferred back to the United States for further detention. *See supra* at 10, 21; SUF ¶ 62.

Defendants have embarked on this new detention policy but have failed to provide "a reasoned explanation" "for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television*, 556 U.S. at 516. This is not reasoned decision-making. *See e.g., Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1114 (D.C. Cir. 2019) (departure from prior policy "without reasoned explanation and failing to consider key aspects" of new policy was arbitrary and capricious).

### C. Defendants Failed to Consider More Cost-Effective and Less Logistically Complicated Alternatives for Detention in the United States.

To engage in "reasoned decisionmaking," agencies must "look at the costs as well as the benefits" of their actions. *State Farm*, 463 U.S. at 52, 54. Moreover, "[t]he agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" *Id*. at 52 (quoting *Burlington Trick Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "The failure of an agency to consider obvious alternatives has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986). Here, Defendants' choice to detain noncitizens at Guantánamo "runs counter to the evidence before the agency," *id*. at 745 (quoting *State Farm*, 463 U.S. at 43), because the little information that can be gleaned from the administrative record shows that detention at Guantánamo is *more* costly, *more* logistically complicated, and *less* sustainable than detention at facilities in the United States.

29

Detention at Guantánamo is exponentially more costly than detention in the United States. The Department of Defense Comptroller "estimates an incremental cost of $1.8 billion" to support the expansion of Guantánamo to support detention of 30,000 noncitizens. SUF ¶ 39; *see also* SUF ¶ 29 (citing former Pentagon official stating that total cost could "quickly skyrocket to tens of millions, if not hundreds of millions, of dollars"). Transportation of detainees to Guantánamo on military C-17 planes costs $28,000 per flight hour, compared to $8,577 per flight hour on civilian aircrafts that ICE typically uses. SUF ¶ 30. And, annually, ICE pays contractors "over $272,000 per detention bed to operate Guantánamo's MOC, compared to an average of about $57,000 per bed at ICE facilities in the United States." SUF ¶ 30. To foot this enormous cost, DOD will need to divert resources from other projects. For example, to support DHS's mission, DOD determined it would need to cancel "planned counterdrug projects" amounting up to $30 million. SUF ¶ 40; *see also* SUF ¶ 35; SUF ¶ 14 (estimating incremental cost to DOD of $34.5 million in fiscal year 2025 to support Guantánamo detention mission). This "complete failure to reasonably reflect upon the information contained in the record and grapple with contrary evidence" renders Defendants' decision arbitrary and capricious. *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017); *see also Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 75 (D.D.C. 2020) (explaining that agencies "must provide reasons for disregarding the evidence, especially when the contrary evidence is substantial," and finding that failure to "grapple with" evidence that new policy was considerably more costly ran afoul of reasoned decision-making).

Evidence from the public record further underscores the prohibitive cost of detention at Guantánamo. In a statement after a Congressional delegation visit to Guantánamo, Senator Jack Reed noted the "staggering financial cost"—"tens of millions of dollars a month"—of "fly[ing]

30

these migrants out of the United States and detain[ing] them at Guantánamo." SUF ¶ 86. Similarly, during a congressional hearing with former DHS Secretary Kristi Noem, Senator Richard Blumenthal stated that the government spent "$21 million between January and April [2025] transporting around 400 migrants to Guantánamo Bay," and that "about half of them were flown back to the United States." SUF ¶ 87.

Moreover, detention at Guantánamo is also more logistically complicated than detention in ICE facilities in the United States, further contributing to its cost. Because the military base is located on an island, everything from food to medical supplies to basic equipment must be flown in. The remote location also requires more personnel support than would be required at a typical ICE detention facility in the United States, further driving up the cost. *See also* SUF ¶¶ 88–89 (DHS and State Department IGs identifying "logistical challenges" such as delays for routine maintenance due to lack of contractor personnel, and "[h]igh costs [] compounded by 'chronic inefficiency'" due to routine cancellation of flights by DHS). And DHS personnel have also needed to train DOD personnel to provide support services. *See* SUF ¶ 45; *see also* SUF ¶ 28 (Senators Elizabeth Warren and Mazie K. Hirono noting that "some DOD expenses cost[] over three times more than when DHS performs the same function"). Facilities in the United States do not require such training, and can be operational much more quickly. *See, e.g.*, SUF ¶ 111 (private contractor made 2,560-bed facility operational in under five months). Defendants entirely neglected to account for this complexity in their decision-making. *Cf.* SUF ¶ 26 (listing eight-part "GTMO Bound Flight Coordination Process" involving daily interagency coordination between multiple components within DHS, DoD, and the State Department).

Related to Defendants' failure to consider the complications involved in detaining noncitizens at Guantánamo, they also "entirely fail[ed] to consider [another] important aspect of

the problem"—namely, the harms to noncitizens due to the lack of adequate medical facilities and access to counsel on a remote military base. *Fred Meyer Stores*, 865 F.3d at 638 (quoting *State Farm*, 463 U.S. at 43). Noncitizens with a wide range of medical conditions "may be at increased risk for medical complications on flights to [Guantánamo] and may exceed the medical capacity" at the naval station. SUF ¶ 102. DHS personnel are also warned that "routine medical care" would not be "regularly available" at Guantánamo and that, "[g]iven the limited resources, potential for extreme conditions and minimal transportation available while at [Guantánamo]," traveling there with certain health conditions "poses an increased risk." SUF ¶ 104. Emergency medical care "would require medevac by private contractor to the mainland at a cost." SUF ¶ 105.

The decision to start transferring immigrants to Guantánamo within days of the President's directive is likewise arbitrary and capricious because Defendants failed to consider how they could safely transport and house hundreds, if not thousands, of detainees without first setting up the requisite infrastructure. SUF ¶ 20 (DHS seeking "immediate aviation transportation assistance" from DOD to transport noncitizens to Guantánamo, "immediate access to and use of the JTF-GTMO Detention Facility to house approximately 300 high-priority" noncitizens, and "immediate expansion" of MOC so that "use of [the] facility [can] begin within 7-10 days"); *see also* Defs.' Opp'n to Mot. for Temp. Restraining Order at 15, *Las Americas*, ECF No. 14 (describing transfers to Guantánamo as "developing operation").

In short, the agencies failed to grapple with critical facts that undermine their reasoning. *See State Farm*, 463 U.S. at 43; *Am. Wild Horse Pres. Campaign*, 873 F.3d at 932 (agencies may not "brush[] aside critical facts" and must "adequately analyze the [] consequences" of their policies). Their "failure to 'consider significant alternatives'"—including detention in the United States—"is a telltale sign that [their] decisionmaking process cannot 'be regarded as rational.'"

*TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 111 (D.D.C. 2020) (quoting *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000)); *id.* at 110, 112 (reviewing agency action "effectuat[ing] an executive order" and concluding that failure to consider any alternatives and violated the APA).

### D. Defendants' Implementation of the President's Memorandum is Contrary to its Text.

Finally, in implementing the President's Memorandum, Defendants have arbitrarily departed from its plain text. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) (finding agency policy arbitrary and capricious where it was not "compelled by the [presidential] Proclamations"). The President's Memorandum specifically directs DOD and DHS to "expand the Migrant Operations Center at [Guantánamo]" to "provide additional detention space for high-priority criminal aliens." SUF ¶ 10. But Defendants have not limited detention at Guantánamo to "high threat" individuals, as instructed in the President's Memorandum. Medium and low custody detainees, including those "with no history of violent assault charges or convictions, no institutional misconduct, and no gang affiliation" are held there as well. SUF ¶ 27. And Defendants are detaining individuals not just at the MOC, but also at the Camp 6 military prison, in contradiction to the plain text of the President's Memorandum. SUF ¶ 50; *see Gomez*, 485 F. Supp. 3d at 194–95 (finding agency implementation of presidential proclamations arbitrary and capricious where "[t]he Administrative Record reveals no justification for [agencies' policy] except the incorrect assumption that it is compelled by the Proclamations").

33

**III.    The Court Should Grant Classwide Declaratory Relief and Vacatur.**

The Court has the power to enter all of the relief Plaintiffs request in this case. Defendants are wrong that 8 U.S.C. § 1252(f)(1) strips this Court of jurisdiction and leaves it without power to remedy the violations Plaintiffs have shown.

Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

Nothing this in this provision strips this Court of jurisdiction to enter the declaratory or vacatur relief sought by Plaintiffs in this case.

First, as this Court already recognized, Defendants' argument regarding the unavailability of declaratory relief "is foreclosed by D.C. Circuit precedent." ECF No. 51 ("Class Cert. Op.") at 27. The D.C. Circuit has been clear that "[§] 1252(f) prohibits only injunctions against 'the operation of the provisions of part IV of this subchapter' as amended by IIRIRA. It does not proscribe issuance of a declaratory judgment . . . ." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020) (quoting 8 U.S.C. § 1252(f)); *accord N.S. v. Dixon*, 141 F.4th 279, 290 n.7 (D.C. Cir. 2025). There is no question, therefore, that declaratory relief remains available as a remedy in this case.

Second, vacatur is not foreclosed by § 1252(f)(1). On their APA claim, Plaintiffs ask this Court to "set aside" or vacate unlawful agency action. 5 U.S.C. § 706(2). And as the D.C. Circuit just confirmed in in *Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Mullin* ("*RAICES*"), 174 F.4th 81 (D.C. Cir. 2026), § 1252(f)(1) leaves intact district courts' power to enter vacatur relief on a class-wide basis. To start, "Section 1252(f)(1) addresses only" injunctive relief. *Id.* at 119.

The text of that provision applies only to orders that "enjoin" or "restrain" certain statutes—*i.e.*, injunctions and temporary restraining orders. 8 U.S.C. § 1252(f)(1). The title of § 1252(f)(1)— "Limit on injunctive relief"—similarly emphasizes the "narrowness of its scope." *Biden v. Texas*, 597 U.S. 785, 798 (2022); *see Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). And, importantly, "vacatur under the APA is distinct from injunctive relief." *RAICES*, 174 F.4th at 119. As the D.C. Circuit explained, while "an injunction is a means by which a court tells someone what to do or not to do, and such an order is enforceable by contempt," vacatur relief "simply holds unlawful and sets aside the action" without enjoining or retraining anyone. *Id.* (citation modified). And because "Section 1252(f)(1) addresses only [injunctive relief], … Section 1252(f)(1) [is] inapplicable to the vacatur." *RAICES*, 174 F.4th at 119; *see also id.* at *54 n. 241 (Walker, J., concurring in part) ("I too would 'hold Section 1252(f)(1) inapplicable to the vacatur.'"). Accordingly, under D.C. Circuit precedent, vacatur is available.

Plaintiffs are not requesting classwide injunctive or habeas relief at this time but maintain that both forms of relief are available. The Court declined to certify the class for their habeas claim only because Plaintiffs have not filed a separate motion. Class Cert. Op. at 34. And the Court previously noted that Plaintiffs' argument that injunctive relief remains available in this case "appears to be in tension with [*Garland v.*] *Aleman Gonzalez*, [596 U.S. 543 (2022)]." *Id.* at 27 n.13. However, the D.C. Circuit recently explained that where an injunction "merely prohibits the Executive from doing what it cannot do"—here, detain individuals outside of the United States— "Section 1252(f)(1) does not bar such relief." *RAICES*, 174 F.4th at 119 (cleaned up). Thus, unlike the case in *Aleman Gonzalez*, where petitioners' claim turned on the proper application of a statute, 596 U.S. at 546, 552, Plaintiffs' argument is about the lack of statutory authority at all, *see supra*. "[J]ust because the [Court] discuss[es] provisions in Part IV [of the INA] does not mean that the

35

[Court] enjoin[s] provisions in Part IV." *RAICES*, 174 F.4th at 118. However, because binding D.C. Circuit precedent confirms the availability of both classwide declaratory and vacatur relief, Plaintiffs are not seeking either classwide injunctive or habeas relief at this time. In sum, nothing in § 1252(f)(1) poses an obstacle to the declaratory judgment or vacatur relief that Plaintiffs seek in this case.

**CONCLUSION**

For these reasons, the Court should grant the Plaintiffs' motion for partial summary judgment.

Dated: June 10, 2026

My Khanh Ngo (D.D.C. Bar No. CA00219)
Kyle Virgien
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org

Derek Poteet ±*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(703) 217-8374
dpoteet@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No. NY0224)
Judy Rabinovitz
Noor Zafar
Natalie Behr
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
IRP_NBehr@aclu.org
ojadwat@aclu.org

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon
CENTER FOR CONSTITUTIONAL
RIGHTS

(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Kimberly Grano (D.D.C. Bar No. NY0512)
Pedro Sepulveda (D.D.C. Bar No. NY0637)
Ghita Schwarz (D.D.C. Bar No. NY0663)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 946-7453
kgrano@refugeerights.org
psepulveda@refugeerights.org
gschwarz@refugeerights.org

Megan Hauptman (D.C. Bar No. 1780749)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

666 Broadway, Floor 7
New York, NY 10012
(212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

*Attorneys for Plaintiffs-Petitioners*

*\*Pro bono representation certificates
forthcoming
± Not admitted in D.C.; practice limited to
federal courts*

37