# EXHIBIT U

**LEAD INSPECTOR GENERAL REPORT TO THE UNITED STATES CONGRESS**

# OPERATION SOUTHERN GUARD

 

**JULY 1, 2025–DECEMBER 31, 2025**




**On the cover:** First flight of illegal aliens arrives to Guantánamo Bay in February 2025. (DHS photo)

 

We are pleased to present the first Lead Inspector General (Lead IG) report to Congress on Operation Southern Guard (OSG). This report fulfills our quarterly reporting responsibilities pursuant to the Inspector General Act of 1978, as amended.

In January 2025 President Trump issued a series of actions and executive orders declaring a national emergency at the southern U.S. border and directing the DoD and Department of Homeland Security (DHS) to expand the illegal alien holding capabilities and facilities at Naval Station Guantánamo Bay (NSGB) to full capacity. The OSG mission is for the DoD to provide support for DHS-led efforts to hold illegal aliens at NSGB.

On March 28, 2025, the DoD designated OSG as an overseas contingency operation, triggering Lead IG reporting responsibilities under 5 U.S.C. 419. The Council of the Inspectors General on Integrity and Efficiency designated the DoD IG as the Lead IG for OSG, effective July 14, 2025.

This report describes the activities of the U.S. Government in support of OSG, specifically, DoD support to the DHS in the processing, detention, housing, and all aspects of illegal alien holding operations at NSGB, during the period of July 1 through December 31, 2025. This report also discusses the planned, ongoing, and completed oversight work conducted by the DoD OIG, State OIG, the DHS OIG, and our partner oversight agencies.

**Platte B. Moring, III**
Lead Inspector General for OSG
Inspector General
U.S. Department of Defense

**Arne B. Baker**
Associate Inspector General for OSG
Senior Official Performing the Duties
of the Inspector General
U.S. Department of State

**OPERATION SOUTHERN GUARD**





A U.S. Marine stands on the flight line during an illegal alien flight arrival at Naval Station Guantánamo Bay, Cuba. (U.S. Air Force photo)

# CONTENTS

**JULY 1, 2025–DECEMBER 31, 2025**

**3  EXECUTIVE SUMMARY**

**5  MISSION UPDATE**
5   Introduction
9   Holding Operations
17  Support to Misson

**21  APPENDIXES**
21  Appendix A:
    About the Lead Inspector General
22  Appendix B:
    Methodology for Preparing this
    Lead IG Report
23  Appendix C:
    Completed Oversight Projects
23  Appendix D:
    Ongoing Oversight Projects
24  Appendix E:
    Planned Oversight Projects
25  Appendix F:
    Hotline and Investigations
26  Acronyms
27  Map
28  Endnotes





**U.S. Marines assigned to JTF-SG practice quick response force drills at NSGB. (U.S. Air Force photo)**

# EXECUTIVE SUMMARY

On March 28, 2025, the DoD designated Operation Southern Guard (OSG) as an overseas contingency operation following a series of presidential actions to secure the southern U.S. border. President Donald J. Trump directed the DoD and Department of Homeland Security (DHS) to expand illegal alien holding operations at Naval Station Guantánamo Bay (NSGB) as part of OSG. The DoD's role is to support DHS efforts to hold illegal aliens at NSGB.

**As of the end of December 2025, 708 illegal aliens had been transferred to NSGB since the start of OSG.**[1] Of these individuals, 691 had been transferred to holding facilities in the United States or repatriated. The average length of stay for illegal aliens at NSGB was 14 days.[2] Since OSG began, 28 U.S. Immigration and Customs Enforcement (ICE) charter flights arrived at NSGB and 54 charter flights departed from NSGB.[3]

**The DoD reported that it obligated $60.6 million for OSG during FY 2025.**[4] The DHS estimated that it had spent approximately $17.8 million to support its operations at NSGB through the end of October.[5] The U.S. Transportation Command (USTRANSCOM) estimated that the 31 military flights it conducted to support OSG from July to December cost about $708,020 per mission, a cost that, according to USTRANSCOM, "highlights the substantial military resources required to provide this supplemental support."[6]

**Hurricane Melissa and the U.S. Government shutdown in October and November impacted OSG operations at NSGB.** By October 20, ICE had evacuated the illegal aliens held at NSGB, after it became clear that NSGB was very likely in the hurricane's path.[7] The hurricane caused damage to the base's power supply and some facilities.[8] There were no illegal aliens at NSGB during a 50-day period between mid-October and mid-December, although Joint Task Force–Southern Guard (JTF-SG) was prepared to receive illegal aliens approximately 3 weeks after the storm.[9] The shutdown "greatly impacted" travel to and from NSGB, as there were delays in funding approvals, the DHS said.[10]

**The DoD identified some contract limitations, logistical challenges, and other issues associated with its support to OSG.** For example, NSGB base operations contracts have been leveraged to support OSG.[11] The base operations services contractor supported new, unplanned requirements for OSG, including maintenance repairs at facilities holding illegal aliens and moving tents from storage, which the DHS later determined not to be needed and taken down.[12] USTRANSCOM said that support to OSG has been "impacted by significant operational friction," including routinely cancelled flights, leading to wasted planning hours.[13]

**Several immigrant rights and legal aid organizations sued the U.S. Government to try to stop the transfer of illegal aliens from the United States to NSGB.**[14] For example, a class action lawsuit argues that since plaintiffs in the case were removed from the United States when they were sent to NSGB, the U.S. Government cannot use holding facilities on foreign soil once removal has occurred.[15] Plaintiffs reported abuse and mistreatment including invasive searches and excessive restraints.[16] The U.S. Government asked the court to dismiss the case, arguing that because the plaintiffs were removed from the United States their claims are no longer valid, and that Plaintiffs are making claims of abuses they themselves did not endure.[17]

**First flight of illegal aliens arrive to NSGB in February 2025. (DHS photo)**





**A U.S. Marine provides security at NSGB. (U.S. Air Force photo)**

# MISSION UPDATE

## INTRODUCTION

Operation Southern Guard (OSG) is the DoD operation to support Department of Homeland Security (DHS) illegal alien holding operations at Naval Station Guantánamo Bay (NSGB), Cuba. OSG began in early 2025 and is part of broader U.S. Government efforts to remove illegal aliens from the United States and protect the U.S. southern border. While the DoD IG is the Lead IG in the oversight capacity for this designated overseas contingency operation, the DHS is the lead federal agency in terms of all operations pertaining to illegal alien holding operations at NSGB.[18]

**Homeland Border Security:** On January 20, 2025, President Donald J. Trump declared a national emergency at the southern border of the United States, requiring the use of the U.S. armed forces to assist the DHS in "obtaining full operational control of the southern border."[19] That same day, the President issued Executive Order (EO) 14165, directing the DHS Secretary to take all appropriate actions to detain illegal aliens "until their successful removal from the United States."[20]

**Operation Southern Guard:** On January 29, 2025, President Trump issued a memorandum directing the DoD to expand the Migrant Operations Center (MOC) at NSGB "to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States."[21] OSG was originally modeled after a Caribbean maritime mass migration response plan, NSGB reported.[22] This approach was a bridging solution, as NSGB would support OSG using those existing capabilities until the Joint Task Force–Southern Guard (JTF-SG) was established.[23] The DoD would then utilize joint capabilities and establish contracts to execute the remainder of the buildout and support the enduring mission, NSGB stated.[24]

The scope of OSG is geographically limited to NSGB and functionally limited to the specific support roles outlined in agreements between the DoD and the DHS.[25]

According to the U.S. Southern Command (USSOUTHCOM), the desired end state for OSG is that all illegal aliens held at NSGB have been safely repatriated or safely relocated by the DHS, the lead Federal agency, and that the DoD has been relieved of its supporting mission. Until then, USSOUTHCOM said that it remains in support of the DHS and defense of the homeland.[26]

**Mission metrics:** USSOUTHCOM stated it does not have any measures of effectiveness or metrics for assessing OSG because its role is to provide support to the DHS as the supported lead Federal agency.[27] USSOUTHCOM said that assessments of the DoD's effectiveness should recognize that the ultimate success of the operation relies on the DHS's performance in accordance with its internal procedures and policies.[28]

The DHS stated that the U.S. Immigration and Customs Enforcement (ICE) measures progress of OSG by monitoring the total number of illegal aliens transferred to NSGB, the number of illegal aliens removed from NSGB, and the average length of stay at NSGB.[29] Additionally, effective coordination between the DHS and the DoD helps ensure the successful repatriation and transfer efforts of illegal aliens, the DHS said.[30]

As of the end of December 2025, 708 illegal aliens had been transferred to NSGB, and 691 had been transferred to holding facilities in the United States and repatriated, since OSG began.[31] The average length of stay for illegal aliens at NSGB was 14 days.[32] The DHS did not indicate the longest stay for an individual at NSGB. However court documents filed in a lawsuit against the DHS include a statement from an illegal alien saying they were held at NSGB for nearly 2 months.[33]

There were no illegal aliens at NSGB for a period of about 50 days between mid-October and the first 2 weeks of December during Hurricane Melissa and the U.S. Government shutdown.[34] (See pages 16-17.)

**Holding operations in the continental United States:** Illegal alien holding operations at NSGB under OSG are very small compared to holding operations elsewhere in the United States. DHS statistics show that there were 68,990 illegal aliens detained in facilities across the United States from October 1, 2025, through January 7, 2026.[35] Of those individuals, 17,729 were characterized as "convicted criminals," 17,881 had "pending criminal charges," and 33,380 were "other immigration violator."[36] They were held at facilities ranging from large ICE processing centers to small jails at the municipal and county level.[37]

The Office of the Under Secretary of Defense for Policy (OUSD(P)) stated that during the reporting period, the only DoD facility other than NSGB that was being used to hold illegal aliens in the United States was Fort Bliss, Texas.[38] Fort Bliss could hold 2,736 illegal aliens as of December 31, and 2,690 illegal aliens were there at that time, according to the OUSD(P).[39] Though located on a DoD installation, the Fort Bliss illegal alien holding facility is operated entirely by the DHS.[40]

Neither the DoD nor the DHS provided any specific national security justification, cost, or other benefit explaining why illegal aliens are being sent to NSGB rather than other DHS or DoD facilities in the continental United States.

**As of the end of December 2025, 708 illegal aliens had been transferred to NSGB, and 691 had been transferred to holding facilities in the United States and repatriated, since January 2025.**

# FUNDING

**USSOUTHCOM estimated that costs specifically related to housing illegal aliens at NSGB totaled $8.6 million in FY 2025, and $3.47 million in the first 3 months of FY 2026.**

**DoD funding:** The DoD Office of the Under Secretary of Defense (Comptroller)/Chief Financial Officer (OUSD(C)) reported that, as of September 30, the DoD had obligated about $60.6 million for OSG during FY 2025, which is a part of wider "Homeland Border Security Initiatives" estimated at a cost of nearly $1.8 billion.[41] (See Table 1.)

USSOUTHCOM estimated that costs specifically related to housing illegal aliens at NSGB totaled $8.6 million in FY 2025, and $3.47 million in the first 3 months of FY 2026.[42] These costs include dining and laundry services, as well as air traffic control and air terminal ground handling.[43]

According to OUSD(C), in FY 2025, DoD support to DHS holding operations associated with OSG was provided on a non-reimbursable basis. In FY 2026, DoD support will be provided on a reimbursable basis.[44] (See Table 1.)

**DHS funding:** The DHS estimated that it had spent approximately $17.8 million to support its operations at NSGB through the end of October.[45] (See Table 2.)

Table 1.

## DoD Funding for OSG, as of September 30, 2025

| Component | Obligations | Disbursements |
|---|---|---|
| Army | **$29,365,000** | **7,944,000** |
| Navy | **$8,810,000** | **$6,303 ,000** |
| Air Force | **22,466,000** | **$20,997,000** |
| Other DoD | **$5,000** | **$5,000** |
| **OSG TOTAL** | **$60,646,000** | **$35,249,000** |

**Source:** OUSD(C), response to DoD OIG request for information, 26.1 OSG 028, 1/20/2026.

Table 2.

## DHS Funding for Operations at NSGB, as of December 12, 2025

| | |
|---|---|
| Utilities | **$127,929.57** |
| Base Operating Services | **$57,308.87** |
| Performance Assessment Representative Fee | **$5,678.14** |
| ICE Gitmo Management Operations Center Contract | **$17,658,947.12** |
| **TOTAL** | **$17,849,863.70** |

**Note:** Cost estimates are based on the full contract.

**Source:** DHS, response to DoD OIG request for information, 26.1 OSG 010, 1/12/2026.

# AN INTERAGENCY MISSION

Multiple Federal agencies support illegal alien holding operations at NSGB. A March 7 memorandum of understanding between the DoD and the DHS outlined the roles and responsibilities for the two departments.[46]

**DHS:** As the lead Federal agency for OSG, the DHS is responsible for processing, controlling, and safeguarding illegal aliens at NSGB, from arrival to departure, and at all times in between.[47] The DHS maintains custody of illegal aliens' personal property, including money and any valuables on their person. The agency is responsible for translation services, determining the appropriate level of access to legal representation, detainee tracking and records, and involuntary medical treatment.[48]

**DoD:** DoD support focuses on facility support, logistical assistance, transportation, and security, enabling DHS to manage the illegal alien population.[49] (See Table 3.) The DoD provides perimeter security, preventative health services, and emergency medical care.[50]

USSOUTHCOM established JTF-SG to support illegal alien holding operations at NSGB.[51] U.S. Army South assumed responsibility as the lead of JTF-SG tasked with managing facilities supporting DHS-led operations, though JTF-SG includes supporting forces from other Military Service branches.[52]

**State:** Since 2002, State has managed the Migrant Operations Center (MOC) at NSGB in coordination with DHS.[53] State has the lead, in coordination with other Federal agencies, on negotiating arrangements with other countries that allow third-country national removals. State also facilitates clearances for overflight permissions of countries the U.S. Government transits through and obtaining landing clearances in destination countries for the illegal aliens.[54]

Table 3.

**DoD Lines of Effort**

**Facility Support:** The DoD provides secure housing for ilegal aliens.

**Logistical and Medical Augmentation:** The DoD provides food, water, sanitation, and medical personnel and resources for care for illegal aliens.

**Transportation Support:** The DoD provides ground and cross-bay transportation to DHS facilitating the movement of illegal aliens within NSGB as directed by the DHS.

**Security Support:** The DoD covers external security at facilities where ICE is holding illegal aliens.

**Source:** USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019 and 25.4 OSG 029, 10/8/2025.



**A U.S. Soldier inspects newly installed double bunk beds at a facility being used by the DHS for illegal alien holding operations. (U.S. Air Force photo)**

# HOLDING OPERATIONS

## FACILITIES

To stand up OSG, USSOUTHCOM established a phased approach to increase NSGB capacity to hold 30,000 illegal aliens.[55] However, the total capacity for illegal alien holding operations under OSG and total number of illegal aliens being held there at the end of the reporting period was not available for public release, USSOUTHCOM said.[56]

One of the first steps was to build tent camps in anticipation of an initial holding capacity of 5,000 bunks, USSOUTHCOM stated.[57] The DHS later determined the tent facilities did not meet DHS detention standards, so the tents were taken down and stored for future use.[58] Setting up tents cost about $2.85 million, which included placing them and installing additional fencing, according to NSGB.[59] USSOUTHCOM said the tents were drawn from prepositioned stocks on NSGB that could be used for mass migration operations, and that U.S. military personnel set up the tents as opposed to contractors.[60]

NSGB is split between the west and east side of Guantánamo Bay, referred to as the Leeward and Windward sides, respectively.[61] The DHS said that a recurring challenge for OSG has been moving illegal aliens across Guantánamo Bay to different parts of NSGB. For this, the DHS relies on coordination with DoD boats to transport vehicles, security forces, guard personnel, and illegal aliens across a roughly 2.5-mile stretch of water.[62]

**Reception Operations Center (ROC):** The ROC is the initial processing center for all illegal aliens upon arrival at NSGB. DHS personnel, with logistical support from JTF-SG, conduct initial processing steps before illegal aliens are moved to their designated holding facilities.[63]

**Migrant Operations Center (MOC):** The MOC is a DHS facility and was designed to hold displaced migrants. Currently, the MOC is used to house low-threat illegal aliens under DHS custody, with JTF-SG providing external security support.[64]

**Camp VI:** Previously used by JTF-GTMO to house Law of War detainees—the official term for prisoners apprehended during the Global War on Terror—Camp VI has been repurposed to house high-threat illegal aliens in DHS custody.[65] USSOUTHCOM stated that any remaining Law of War detainees at NSGB are in a different facility, separate from Camp VI, that is managed by a separate task force according to entirely different legal and operational protocols.[66] JTF-SG maintains control of this facility's physical space and external security, ensuring it meets DHS standards for safety and security, USSOUTHCOM said.[67] In May the DoD began contracting to increase Camp VI's capacity to hold additional high threat illegal aliens, USSOUTHCOM said.[68]

# Other Migrant Operations at NSGB

The United States and Cuba entered into agreements in 1903 that led to the United States leasing 45 square miles of land and water at Guantánamo Bay for use as coaling and naval stations to help sustain the growing U.S. Navy fleet.[69] Among its roles during its long history, NSGB has been used for fleet training, ship repair, refueling and resupply, migrant operations, regional humanitarian relief and disaster assistance, and search and rescue support.[70]

Migrant operations at NSGB began in the early 1990s, during U.S. maritime interdiction efforts of Haitian and Cuban migrants attempting to enter the U.S. illegally.[71] NSGB would soon become widely known as a detention center for enemy combatants captured during the wars that followed the September 11, 2001 terrorist attacks on the United States.[72]

The DHS reported that authorities under EO 13276, signed in 2002 by then-President George W. Bush, remain available for use with certain migrants interdicted in the Caribbean region and may operate independently of or concurrently with OSG.[73] EO 13276 designates NSGB as a potential location to temporarily house interdicted migrants with protection needs and authorizes the U.S. Government to determine whether they should be returned to their country of origin, nationality, or departure, or, if in need of protection, not returned without their consent.[74]

The DHS reported that migrants consenting to transfer to NSGB under EO 13276 authority would typically be housed at the MOC, which is now being used for the illegal alien holding operations under OSG.[75] However, according to the DHS, since the inception of OSG, no migrants interdicted at sea have been transferred to NSGB on the basis of protection screenings at sea.[76] The DHS noted that one interdicted migrant who was identified as potentially requiring protection declined transfer to NSGB.[77] The DHS stated that facilities associated with the MOC remain available should protected migrants under EO 13276 require temporary housing at NSGB in the future, subject to operational and security considerations.[78]

## CRITERIA FOR TRANSFER TO NSGB

According to the March 7 memorandum of understanding (MoU) between the DoD and the DHS, the DHS must ensure that all illegal aliens transported to NSGB meet certain criteria, to include having a court-mandated final order of removal from the United States and a connection to specific drug trafficking or other criminal activity.[79]

**Final Order for Removal:** The DHS stated that ICE confirms the existence and validity of the final order through official case management systems used for enforcement and removal operations.[80] The DHS said that final orders of removal can be issued by either the DHS or the Department of Justice, depending on the legal status of the case, and under which section of the Immigration and Nationality Act the illegal alien is being charged.[81] According to the DHS, ICE verifies and records the final orders for removal.[82] Illegal aliens subject to an administrative final order of removal are considered detained under U.S. immigration law.[83]

**Criminal Nexus:** The March MOU states that the DHS will hold illegal aliens at NSGB only if they have a "nexus to a transnational criminal organization (TCO) or criminal drug activity."[84] The requirement for a connection to a TCO or criminal drug activity derives from DoD counter-drug activity support authority under Section 284 of title 10, United States Code (10 U.S.C. 284).[85] The law allows the DoD to provide specified support to U.S. and

**A U.S. Marine assigned to JTF-SG cleans his rifle. (U.S. Air Force photo)**



foreign law enforcement agencies for counternarcotics activities and operations against TCOs, USSOUTHCOM said. The DHS is required to screen all illegal aliens for TCO nexus to ensure DoD funding is consistent with 10 U.S.C. 284 authority.[86]

The March MOU states that criteria for establishing a connection to a TCO may include cases where "DHS/ICE reasonably believes the alien to have paid a TCO to be smuggled into the United States if the alien is from a country where the preponderance of aliens from that country enter the United States in that fashion."[87] According to the DHS, a "preponderance of aliens" means the majority of illegal aliens from a particular country—more than half— are reasonably believed, based on ICE data or intelligence, to have entered the United States illegally by paying a smuggler or TCO.[88] ICE said that it investigates ties to TCOs, criminality, and affiliations to other criminal organizations through interviews with the illegal aliens, and reviews of financial records, previous law enforcement encounters, and other investigative means.[89] The DHS Homeland Security Investigations component manages this and other information in a case management database.[90]

Where an individual is held at NSGB depends on whether they are considered a low-threat illegal alien or high-threat illegal alien.[91]

**First flight of illegal aliens arrives to NSGB in February 2025.
(DHS photo)**



**According to the DHS, four illegal aliens transported to NSGB initially met the detention criteria but were later determined to no longer qualify as of September 30.**

**High-threat illegal aliens:** The DHS said that it defines high-threat illegal aliens as non-citizens unlawfully present in the United States with violent criminal convictions or deemed to pose a serious public or national security risk.[92] The DHS said that ICE utilizes the most reliable and objective information available to classify all arriving individuals as either high-threat or low-threat illegal aliens in addition to information obtained during the initial screening.[93]

According to the DHS, objective information refers to documented or observable details, including recent or past criminal offenses, escape history, institutional disciplinary records, violent incidents, sex, risk of victimization or abusiveness as outlined under U.S. law, mental health or medical conditions, and age.[94] In general, high-threat and low-threat classifications follow the same processes used for determining appropriate housing at a facility state-side, the DHS said.[95] Classifications can change during the detention period, especially if a low-threat illegal alien commits a safety or security violation, therefore requiring enhanced levels of detention.[96]

All incoming cases are screened by the ICE Office of the Principal Legal Advisor to ensure they meet legal requirements and by the ICE Health Service Corps to ensure medical clearance. Additionally, a DoD attorney will review and document their concurrence, the DHS said.[97]

**Ineligible transfers:** According to the DHS, four illegal aliens transported to NSGB initially met the detention criteria but were later determined to no longer qualify as of September 30: two due to court filings and two due to developing a need for a higher level of medical care.[98] Two were later determined to be part of an ongoing class action lawsuit against the DHS and subject to a court order requiring a new screening for asylum exception requests based on a fear of persecution or torture if they return to their country.[99] Both screenings resulted in "negative fear determinations," meaning that a U.S. Citizenship and Immigration Services asylum officer determined that the alien has not established a credible fear of persecution based on race, religion, nationality, political opinion, or has not established a fear of torture, if returned to the respective country.[100] As of January 28, both were still detained, pending removal to their home country.[101]

In October 2025, there were an additional three cases that were inadvertently added to a previously reviewed list due to a clerical error, the DHS said.[102] The three cases were later determined to have more complex medical requirements. Those individuals were returned to the continental United States on the same day on the ICE charter plane they arrived on.[103]

To prevent future errors, ICE legal and medical staff revised their review process, the DHS said.[104] The DHS said that suitability for travel to and management at NSGB now requires a review of acute and chronic conditions, medications, mental health, and infectious conditions not able to be effectively managed at NSGB.[105]

According to media reports, the DHS did not specify whether women and children would be held at NSGB under OSG.[106]

Table 4.

**Reception and Processing**

**Arrival:**
- Illegal aliens arriving at NSGB are immediately taken to the Reception Operations Center (ROC).
- Illegal aliens receive orientation on expectations, rules, daily routines, hygiene, medical and mental health providers, and religious practices.
- They receive a handbook detailing conduct standards and procedures. Property is inventoried, and they are screened for special vulnerabilities before undergoing medical intake with U.S. Public Health Service staff and DoD medical staff.

**Transfer to the MOC or Camp VI:**
- Illegal aliens receive housing assignments, showers, clothing and hygiene kits, food, and ability to make family or legal calls.
- At Camp VI, additional security measures, such as searches and X-ray screenings, are conducted.
- ICE staff coordinate with ICE headquarters to arrange removal dates for deportation.

**Source:** DHS, response to DoD OIG request for information, 25.4 OSG 003, 9/30/2025.

# DETENTION CONDITIONS

The DHS said that it recently formalized temporary detention standards with the DoD to manage an increased number of illegal aliens effectively and humanely at NSGB. These standards help ICE and the DoD maintain order and safety within the facility while addressing the specific needs of high-threat illegal aliens.[107] The standards are based on DoD standards related to military corrections systems and facilities.[108]

The DHS said that a draft for finalized illegal alien holding operations standards is pending.[109] The pending final standards are derived from various regulations, standards, policies, and community best practices, but adjusted to accommodate NSGB's geographical, logistical and jurisdictional situation, the DHS said.[110] The DHS said that the temporary draft standards share similarities with ICE National Detention Standards for Non-Dedicated Facilities, adapted to the DoD capabilities to support the OSG mission in the austere NSGB environment.[111]

**Physical conditions**: USSOUTHCOM said that DoD facilities used for DHS-led illegal alien holding operations under OSG need to meet established standards for safety, security, and humane conditions as defined by DHS.[112] Media reported that in late August there was a water main failure affecting the water supply to the MOC, where ICE holds low-threat illegal aliens.[113] At the time, the three illegal aliens being held there were transferred to another part of NSGB where high-threat illegal aliens are housed, according to media reporting.[114] According to USSOUTHCOM, the DoD took measures to transfer water to affected areas after a pipe ruptured, and there was "minimal to no impact" to supporting the DHS mission.[115]

**Medical Incidents:** Of the illegal aliens that had been sent to NSGB since January 29, 2025, no detainees have required involuntary medical treatment or medical evacuation, the DHS said.[116] There have been no hunger strikes (defined as nine consecutively missed meals in a 72-hour period), nor have there been any illegal alien deaths in custody at NSGB, according to DHS.[117]

**Disciplinary incidents:** Examples of actions or behaviors that have required disciplinary measures against detainees include disruptive conduct (such as fighting), aggressive behavior, insolence toward staff, property damage, and possession of prohibited items, the DHS said.[118] These actions led to illegal aliens being placed in "segregation housing," the DHS said.[119]

**Use of force:** The DHS reported that ICE may use force against detainees only when no reasonably effective, safe, and feasible alternative appears to exist.[120] ICE personnel do not carry firearms or intermediate force weapons within the NSGB illegal alien holding, DHS said.[121] The DHS reported no use of force incidents involving ICE personnel occurred at NSGB between January 29 and December 31, 2025, nor were there any major behavior or security incidents during that time.[122] Chokeholds and carotid restraints, used to restrain an individual or as a compliance technique, are prohibited except when the use of deadly force is authorized.[123] Chokeholds and carotid restraints must not be used to control non-compliant subjects, the DHS said.[124] As of December 9, 2025, there had been no use of deadly force on illegal aliens at NSGB, the DHS said.[125] ICE Defensive Tactics instructors delivered training to DoD staff, offering an overview of ICE's Use of Force Policy.[126]

**U.S. Marines stand guard outside the MOC at NSGB. (U.S. Air Force photo)**

DoD personnel in support of DHS illegal alien holding operations at NSGB conduct their operations in accordance with standing DoD rules for the use of force.[127] Deadly force is to be used only when all lesser means have failed or cannot be reasonably employed.[128] Restraints may only be employed by personnel trained in their use, according to USSOUTHCOM.[129]





## CONTINGENCY PLANNING

**Government shutdown:** The DHS and USSOUTHCOM said that the 43-day lapse in appropriations ("shutdown") in October and November "greatly impacted" travel to and from NSGB, as there were delays in funding approvals.[130] However, the DHS said that there were no impacts to illegal alien holding operations because there were no illegal aliens in custody at NSGB during that time.[131]

USSOUTHCOM stated that financial support to OSG remained largely unaffected by the lapse in appropriations. All major contractual obligations were satisfied prior to the funding interruption, allowing essential services and resources to continue. In anticipation of a possible shutdown and to ensure continuity of operations, USSOUTHCOM prioritized acquiring essential equipment and stockpiling critical supplies, such as fencing material and construction equipment.[132] However, the funding lapse did delay the disbursement of funding for OSG-related logistical needs. Despite these delays, the DoD continued uninterrupted support to the DHS, USSOUTHCOM stated.[133] No Army civilians working on OSG were furloughed, USSOUTHCOM said.[134]

**Extreme weather:** USSOUTHCOM stated that it coordinates with NSGB and the DHS to plan and respond to extreme or destructive weather events that will impact illegal alien holding operations.[135] The DHS has and will maintain custody and control of illegal aliens throughout any weather event, USSOUTHCOM stated.[136] In the event of an evacuation, the DHS would plan and coordinate the evacuation of illegal aliens with DoD providing necessary support to ensure a safe and efficient process, USSOUTHCOM stated.[137]

The planning was put into action in the days before Hurricane Melissa moved across the Caribbean toward NSGB in late October.[138] By October 20, ICE had evacuated the illegal aliens held at NSGB, after it was determined that NSGB was very likely in the hurricane's path, the DHS said.[139]

Personnel from NSGB arrive at Naval Air Station Pensacola on Oct. 25 and 26, ahead of Hurricane Melissa. (U.S. Navy photo)

**During the initial phase of operations in January 2025, JTF-SG reached its peak force disposition, with approximately 1,000 DoD personnel.**

The DHS said that it began to prepare on October 22 for the evacuation of DHS personnel and other potential DoD nonessential persons.[140] By October 24, a total of 128 people, including 93 DHS staff and contractors, 25 DoD families, and others were safely evacuated via a special charter flight, the DHS said.[141] USSOUTHCOM said that no illegal aliens were present at NSGB during the preparation for and impact of Hurricane Melissa.[142]

The storm caused damage to infrastructure on NSGB, USSOUTHCOM said.[143] On October 31, an advance team from the DHS's Enforcement and Removal Operations Miami office deployed to NSGB, consisting of a DHS senior official, Enforcement Removal Operations officers, DHS information technology personnel, and contractors. The team focused on restoring mission-critical operations, stabilizing infrastructure, debris removal, and ensuring the safety and continuity of essential services.[144]

USSOUTHCOM stated that OSG did not receive any new illegal aliens for 7 weeks after the storm's passage, even though JTF-SG was prepared to receive illegal aliens approximately 3 weeks after the storm.[145] ICE did not bring any illegal aliens to NSGB until a post-hurricane damage assessment and the appropriate repairs were completed, DHS said.[146] According to USSOUTHCOM, repairs included restoring power, repairing any damage to housing facilities, ensuring adequate sanitation, and medical resources. Additionally, the DHS needed to confirm they could safely and humanely house and care for any illegal alien arriving at NSGB.[147]

## SUPPORT TO MISSION

In 2025, OSG focused on establishing and maintaining the infrastructure and processes necessary to support the DHS's illegal alien holding operation mission.[148] This included deploying DoD personnel to provide logistical, medical, and security support to the DHS, and training with DHS personnel to ensure effective coordination and interoperability.[149] USSOUTHCOM also established transportation routes and protocols for moving illegal aliens between locations as directed by the DHS.[150]

### PERSONNEL

**DHS:** As of September 30, ICE had 28 staff members and 78 contract security personnel assigned to OSG, the DHS said.[151] After evacuations due to Hurricane Melissa in October, ICE reduced total staff to 15 staff members and 52 contractors as of December 9, the DHS said.[152] According to the DHS, the post-hurricane staff levels are based on the current operational tempo, but the DHS can surge staff as needed.[153]

**DoD:** During the initial phase of operations in January 2025, JTF-SG reached its peak force disposition, with approximately 1,000 DoD personnel. Force levels have since been adjusted to align with operational requirements, USSOUTHCOM said.[154]

U.S. Army South initially deployed as the command element in January. This initial deployment included a Task Force consisting of a military police battalion, infantry companies, a medical battalion, and a special troops battalion under the command of a two-star general officer.[155]

In May 2025, the Marine Corps replaced the Army command element by sourcing an O-6 headquarters out of Camp Lejeune, North Carolina, USSOUTHCOM stated.[156] The DoD determined that the lower grade of O-6 was appropriate for the mission after initial estimates of holding thousands of illegal aliens at NSGB did not materialize, USSOUTHCOM said.[157] Further personnel reductions included downsizing the Inland Cargo Transfer Company and the JTF's security element.[158] USSOUTHCOM said that the JTF continues to "right-size the force to continue supporting DHS while minimizing the DoD footprint."[159]

As of the end of the reporting period, there were fewer than 400 military personnel assigned to JTF-SG. Total numbers may fluctuate based on operational requirements and rotations, USSOUTHCOM said.[160] JTF-SG was composed of personnel drawn from various military branches and units, to include personnel from a combat logistics regiment, a movement control element, an inland cargo transfer company, an artillery battery, and a military police company, USSOUTHCOM said.[161]

# TRANSPORTATION

The first flight transporting 10 high-threat illegal aliens arrived at NSGB on February 4, 2025.[162] According to the DHS, the 10 illegal aliens were members of the Venezuelan gang "Tren de Aragua," which the Trump Administration previously designated as a foreign terrorist organization.[163] According to media reporting, the first flight on a military C-17 aircraft cost about $22,213 per illegal alien.[164]

**DHS transportation:** ICE Air Operations has managed all DHS-facilitated flights to and from NSGB, the DHS said.[165] As of December 21, 2025, ICE Air Operations completed a total 28 charter flights arriving at NSGB and 54 charter flights departing from NSGB since OSG began, the DHS said.[166] A large portion of those departures occurred between July 1 and December 21, with 30 charter flights departing from NSGB, and only 5 charter flights arriving to NSGB, the DHS said.[167]

In the same period, ICE Air Operations transported 481 aliens to NSGB from Arizona, Florida, Louisiana, and Texas, DHS said.[168] During the same period, ICE Air Operations transported 670 individuals from NSGB to 26 countries and locations in the United States, DHS said.[169] (See Table 5.)

The estimated overall cost of operating these flights since the operation began is nearly $12 million, the DHS said.[170] This total includes quarterly expenditures in 2025 of

Table 5.

**Destination of Outgoing DHS-Chartered IA Flights**

| United States | Central and South America | Other Countries |
| --- | --- | --- |
| Arizona | Brazil | Egypt |
| Florida | Colombia | England |
| Louisiana | Dominican Republic | India |
| Texas | Ecuador | Kenya (2) |
| | El Salvador | Liberia |
| | Guatemala | Marshall Islands |
| | Haiti (2) | Nigeria |
| | Honduras (2) | Romania |
| | Jamaica | Sierra Leone |
| | Nicaragua | Vietnam |
| | Peru | |
| | Saint Kitts and Nevis | |
| | Venezuela | |

Sources: DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.

**The U.S. Transportation Command said that it conducted 31 flights in support of OSG from July 1 to December 31, 2025.**

roughly: $1.6 million from January to March; $3.8 million from April to June; $5.8 million from July to September; and $771,000 from October to December.[171]

The aircraft utilized for these operations included commercial and charter models such as the Airbus A320-214, A321-211, and A321-231; Boeing B737-800, B767-200ER, B767-300, B767-300ER, and B777-200ER; and military and executive aircraft including the C-17 and Gulfstream V, the DHS said.[172]

**DoD transportation:** The U.S. Transportation Command (USTRANSCOM) said that it conducted 31 flights in support of OSG from July 1 to December 31, 2025.[173] The flights consisted of 29 detainee removal flights and 2 detainee transfer flights, at a cost of $21.9 million, or about $708,020 per mission. According to USTRANSCOM, the "significant cost per mission highlights the substantial military resources required to provide this supplemental support."[174]

According to USTRANSCOM, its support to OSG has been "impacted by significant operational friction."[175] High costs are compounded by "chronic inefficiency." USTRANSCOM described periods where the DHS has canceled up to 60 percent of requested flights, leading to wasted planning hours and underutilized readiness. USTRANSCOM said that it engaged DHS leadership to standardize mission sets and reinforce established lead times to impose stability and reduce the strain on critical military resources.[176]

## IMPACTS TO OTHER MISSIONS

The DoD uses existing contracts for base operations, logistics, and support for OSG.[177] NSGB identified some limitations with this approach. For example, continued use of these contracts will impact steady-state operations with increased baseline costs and service level delays across NSGB.[178] Due to the limited number of contractor personnel on the island, NSGB experienced delays in other routine maintenance and support, NSGB stated.[179] The base operations services contractor has been supporting unplanned, new requirements from the OSG workload, including groundskeeping and maintenance repairs at the MOC, NSGB stated.[180] As a result of increased usage, NSGB had to shift its priorities to repairing roads, utilities and other infrastructure.[181] Existing NSGB base operations contracts were leveraged to support OSG, according to NSGB.[182]

Using existing contracts means some aspects of base operations require Navy funding for the duration of OSG.[183] According to NSGB, the most pressing aspect is an OSG requirement to establish logistics for around the clock aerial port debarkation, supporting a minimum of two flights per day with 72-hour notice from the DHS and ICE.[184] As of September 30, NSGB airfield operations totaled 18 hours per day, which was sufficient for all NSGB tenants, NSGB said. A 6-hour-per-day service gap for OSG (to achieve the 24-hours-per-day service needed by DHS) would require an estimated annual additional contract cost of about $1 million, NSGB stated.[185] This DHS-requested support is specific to OSG and not part of typical NSGB operations.[186]

USSOUTHCOM said that the DoD awarded no new contracts during the reporting period that were specifically for illegal alien holding operations support. The DoD has also modified existing contracts to support OSG, mainly for food service, air operations, and base operations.[187]

# Legal Challenges to Using NSGB to Hold Illegal Aliens

Since March, several immigrant rights and legal aid organizations have sued the U.S. Government to try to stop the transfer of illegal aliens from the United States to NSGB.[188]

Cases included a lawsuit filed on June 4 by two individuals held at NSGB, challenging the U.S. Government's holding of civil immigration detainees at the facility.[189] The two men were illegal aliens with final orders of removal who were apprehended in the United States and previously held in immigration detention facilities in the United States before being transferred to NSGB. The lawsuit argues that detention may only occur "pending removal or a decision on removal."[190] Since the two were removed from the United States when they were sent to NSGB, they argue that the law does not authorize holding them in facilities on foreign soil once removal has occurred.[191]

Illegal aliens at NSGB have reported significant abuse and mistreatment including invasive searches, excessive restraints, denial of basic necessities, and other harsh treatment resulting from restrictive conditions at NSGB, the lawsuit claims.[192] In late August the plaintiffs asked the court for approval to proceed as a class action to represent "all immigration detainees originally apprehended and detained in the United States, and who are, or will be held at Naval Station Guantánamo Bay, Cuba."[193]

Plaintiffs in the class action claim that illegal aliens at the MOC are housed in small spaces with several people held in each room. They claim they are frequently confined to their units, surrounded by armed military personnel and guard dogs, undergo invasive searches, and that "guards" insult, taunt, and have threatened to shoot them. As a result of these conditions, "several detainees have attempted suicide at Guantánamo or have suffered significant post-traumatic symptoms after release," according to a recent filing.[194]

The U.S. Government asked the court to dismiss the case, arguing that because the Plaintiffs were removed from the United States their claims are no longer valid. Additionally, the Plaintiffs lack standing to challenge alleged violations caused by policies and practices they themselves did not endure. Attorneys for the U.S. Government say that the conditions of confinement are changing over time as the NSGB base is built up, as are efforts to establish policies and practices to ensure proper detention at NSGB.[195]

Other lawsuits similarly claim that there is no valid reason to send migrants to NSGB, and that there is ample detention capacity within the United States. They argue that the detentions are an attempt to "instill fear in the immigrant population," and that many low-threat illegal aliens are being held at NSGB rather than the "the worst criminal illegal aliens" as claimed by the U.S. Government.[196]

# APPENDIXES

## APPENDIX A
## About the Lead Inspector General

The Inspector General Act of 1978, as amended (codified at 5 U.S.C. Sections 401-424), established in section 419 the Lead Inspector General (Lead IG) framework for oversight of overseas contingency operations. The Lead IG agencies are the Offices of Inspector General (OIG) of the Department of Defense (DoD), the Department of State (State), and the U.S. Agency for International Development (USAID). For Operation Southern Guard, USAID OIG did not have any programs or activities to oversee and, therefore, is not a signatory of this report.

Section 419 requires the Council of the Inspectors General on Integrity and Efficiency to appoint a Lead IG from among the Inspectors General of the Lead IG agencies upon the commencement or designation of a military operation that exceeds 60 days as an overseas contingency operation or receipt of notification thereof.

Lead IG oversight of the operation "sunsets" at the end of the first fiscal year after commencement or designation in which the total amount appropriated for the operation is less than $100,000,000.

The Lead IG agencies collectively carry out the Lead IG statutory responsibilities to:

- Submit to Congress on a quarterly basis a report on the contingency operation and to make that report available to the public.
- Develop a joint strategic plan to conduct comprehensive oversight of the operation.
- Ensure independent and effective oversight of programs and operations of the U.S. Government in support of the operation through either joint or individual audits, inspections, investigations, and evaluations.

The Overseas Contingency Operations Joint Planning Group serves as a primary venue to coordinate audits, inspections, and evaluations of U.S. Government-funded activities supporting overseas contingency operations.

The Lead IG agencies use dedicated, rotational, and temporary employees, as well as contractors, to conduct oversight projects, investigate fraud and corruption, and provide consolidated planning and reporting on the status of overseas contingency operations.

 

# APPENDIX B
# Methodology for Preparing this Lead IG Report

This report complies with section 419 of the Inspector General Act of 1978, as amended (codified at 5 U.S.C. sections 401-424), which requires that the designated Lead IG provide a quarterly report, available to the public, on each overseas contingency operation, and is consistent with the requirement that a biannual report be published by the Lead IG on the activities of the Inspectors General with respect to that overseas contingency operation. The Chair of the Council of the Inspectors General for Integrity and Efficiency designated the DoD IG as the Lead IG for Operation Southern Guard (OSG).

This report covers the period from July 1 to December 31, 2025. The DoD OIG, State OIG, and DHS OIG contributed the content of this report.

## INFORMATION COLLECTION FROM AGENCIES AND OPEN SOURCES

To fulfill the congressional mandate to report on OSG, the Lead IG agencies gather data and information from Federal agencies and open sources. The sources of information contained in this report are listed in endnotes or notes to tables and figures. Except in the case of audits, inspections, investigations, and evaluations referenced in this report, the Lead IG agencies have not verified or audited the information collected through open-source research or from Federal agencies, and the information provided represents the view of the source cited in each instance.

This report also draws on current, publicly available information from reputable sources. Sources used in this report may include the following:

- U.S. Government statements, press conferences, and reports
- Reports issued by international organizations, nongovernmental organizations, and think tanks
- Media reports

The Lead IG agencies use open-source information to assess information obtained through their agency information collection process and provide additional detail about the operation.

## REPORT PRODUCTION

The DoD IG, as the Lead IG for this operation, is responsible for assembling and producing this report. The DoD OIG and State OIG drafted the sections of the report related to the activities of their agencies and then participate in editing the entire report. Once assembled, each OIG coordinates a two-phase review process of the report within its own agency. During the first review, the Lead IG agencies ask relevant offices within their agencies to comment, correct inaccuracies, and provide additional documentation. The Lead IG agencies incorporate agency comments, where appropriate, and send the report back to the agencies for a second review prior to publication. The final report reflects the editorial view of the DoD OIG State OIG, and DHS OIG as independent oversight agencies.

# APPENDIX C
# Completed Oversight Projects

From July 1 to December 31, 2025, there were no completed oversight reports related to Operation Southern Guard (OSG).

# APPENDIX D
# Ongoing Oversight Projects

Table 6 lists the titles and objectives for Lead IG and partner agencies' ongoing oversight projects related to OSG.

Table 6.

**Ongoing Oversight Projects Related to OSG by Partner Agencies as of December 31, 2025**

| GOVERNMENT ACCOUNTABILITY OFFICE |
|---|
| ***Cost of DoD Support to Southern Border Operations (Project no. 108437)*** <br> To determine the extent to which DoD is 1) tracking its costs, including reimbursements, transfers, and reprogrammings, for southern border operations since FY 2025 and 2) following statutory reporting requirements for southern border operations since FY 2025. These costs will include those for the Guantánamo Bay detention facilities. |
| ***Immigration Detention Costs and Funding (Project no. 108665)*** <br> To determine how ICE has funded detention operations, how it plans to fund the expansion of immigration detention capacity, how costs and funding sources differ by type of detention facility (e.g., whether the facility is owned, operated, or managed by ICE, the U.S. Marshals Service, the Federal Bureau of Prisons, state and local governments, private companies, or the U.S. military); and how ICE manages and oversees costs for immigration detention, including those for the Guantanamo Bay detention facilities. |
| ***Immigration Detention Expansion and Operations (Project no. 108663)*** <br> To determine what ICE data indicate about the number and characteristics of individuals in its custody; what facilities ICE is using to detain individuals in its custody, and how has this changed over time; the extent to which DHS or ICE evaluated needs for detention space, and how they are acquiring new detention space; how ICE makes detention facility placement decisions; and to what extent the agency considers facility cost and capacity data when placing individuals at detention facilities. This review will include ICE's use of DoD facilities, including the Guantanamo Bay detention facilities. |

 

# APPENDIX E
# Planned Oversight Projects

Table 7 lists the titles and objectives for Lead IG and partner agencies' planned oversight projects related to OSG.

Table 7.

**Planned Oversight Projects Related to OSG by the DoD and State, and USAID OIGs as of December 31, 2025**

| DEPARTMENT OF DEFENSE OFFICE OF INSPECTOR GENERAL |
| --- |

***Audit of the DoD's Air Transportation of Illegal Aliens***
To determine the extent to which the DoD processed and executed Department of Homeland Security requests for air transportation of illegal aliens in accordance with Federal and DoD policies.

***Audit of the DoD's Support for Illegal Alien Holding Operations at Naval Station Guantanamo Bay***
To assess the Joint Task Force–Southern Guard's (JTF-SG) execution of security, medical, and logistical support for illegal aliens held at Naval Station Guantanamo Bay and the DoD's efforts to sustain JTF-SG personnel deployed to Naval Station Guantanamo Bay.

| DEPARTMENT OF STATE OFFICE OF INSPECTOR GENERAL |
| --- |

***Inspection of Embassy Havana, Cuba***
To evaluate the programs and operations of the U.S. Embassy in Havana, Cuba.

***Classified Inspection of Embassy Havana, Cuba***
To evaluate the programs and operations of the U.S. Embassy in Havana, Cuba.




# APPENDIX F
# Hotline and Investigations

## HOTLINE ACTIVITY

Each Lead IG agency maintains its own hotline to receive complaints specific to its agency. The hotlines provide a confidential, reliable means for individuals to report violations of law, rule, or regulation; mismanagement; gross waste of funds; or abuse of authority.

The Lead IG hotlines received no allegations related to OSG.

## INVESTIGATIONS

The Lead IG agencies and their partners coordinate investigative activities, deconflict potential or common targets, and interact for logistical and legal support. The investigative partner agencies consist of representatives from the DoD OIG's criminal investigative component, the Defense Criminal Investigative Service, Department of Homeland Security OIG, State OIG, USAID OIG, U.S. Army Criminal Investigation Division, Naval Criminal Investigative Service, Air Force Office of Special Investigations, and Federal Bureau of Investigation.

During the two quarters, investigative branches of the Lead IG agencies and their partner agencies had 1 open investigation and closed 1 investigation. They made no referrals to the Department of Justice during the period.




# ACRONYMS

| Acronym | |
|---|---|
| DHS | Department of Homeland Security |
| DoD | Department of Defense |
| EO | Executive Order |
| FY | fiscal year |
| ICE | U.S. Immigration and Customs Enforcement |
| JTF-SG | Joint Task Force—Southern Guard |
| Lead IG | Lead Inspector General |
| Lead IG agencies | DoD, State, and USAID OIGs |
| MOC | Migrant Operations Center |
| MOU | memorandum of understanding |
| NSGB | Naval Station Guantánamo Bay |

| Acronym | |
|---|---|
| OIG | Office of Inspector General |
| OUSD(C) | Under Secretary of Defense (Comptroller)/ Chief Financial Officer |
| OUSD(P) | Office of the Under Secretary of Defense for Policy |
| ROC | Reception Operations Center |
| State | Department of State |
| TCO | transnational criminal organization |
| U.S. | United States |
| USAID | U.S. Agency for International Development |
| USSOUTHCOM | The U.S. Southern Command |
| USTRANSCOM | The U.S. Transportation Command |




**Aerial Image of Guantánamo Bay, Cuba**



**Source:** National Geospatial-Intelligence Agency.

# ENDNOTES

1. DHS, response to DoD OIG request for information, 26.1 OSG 001, 1/12/2026.
2. DHS, response to DoD OIG request for information, 26.1 OSG 001, 1/12/2026; DHS, response to DoD OIG request for information, 25.4 OSG 001, 9/30/2025.
3. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
4. OSD(C), response to DoD OIG request for information, 26.1 OSG 028, 1/20/2026.
5. DHS, response to DoD OIG request for information, 26.1 OSG 010, 1/12/2026.
6. USTRANSCOM, response to DoD OIG request for information, 26.1 OSG 039, 1/8/2026.
7. DHS, response to DoD OIG request for information, 26.1 OSG CLAR 020, 1/28/2026.
8. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG FOL 040, 1/7/2026.
9. DHS, response to DoD OIG request for information, 26.1 OSG 019, 1/12/2026; DHS, response to DoD OIG request for information, 26.1 OSG 020, 1/12/2026; USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG FOL 040, 1/7/2026.
10. DHS, response to DoD OIG request for information, 26.1 OSG 019, 1/12/2026 and 26.1 OSG CLAR 020, 1/28/2026.
11. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
12. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025; USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025; USSOUTHCOM, vetting comment, 2/10/2026.
13. USTRANSCOM, response to DoD OIG request for information, 26.1 OSG 039, 1/8/2026.
14. Sacha Pfeiffer, "ACLU and Other Advocates Sue to Block Migrants from Being Sent to Guantánamo Bay," NPR, 3/1/2025.
15. U.S. District Court for the District of Columbia, Plaintiffs-Petitioners' Opposition to Motion to Dismiss, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 8/27/2025.
16. U.S. District Court for the District of Columbia, Plaintiffs-Petitioners' Opposition to Motion to Dismiss, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 8/27/2025.
17. U.S. District Court for the District of Columbia, Reply in Support of Defendants' Motion To Dismiss, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 9/8/2025.
18. DoD, DHS, "Memorandum of Understanding Between the U.S. Department of Homeland Security (DHS) and the U.S. Department of Defense (DoD) for DoD Support at Naval Station Guantanamo Bay (NSGB) To U.S. Immigration and Customs Enforcement (ICE) For DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," 3/7/2025; White House, "Memorandum on Expanding Migrant Operations Center at Naval Station Guantamo Bay to Full Capacity," 1/29/2025
19. White House, "Declaring A National Emergency at the Southern Border of the United States," 1/20/2025.
20. White House, "Executive Order 14165—Securing Our Borders," 1/20/2025.
21. White House, "Memorandum on Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," 1/29/2025.
22. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
23. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
24. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
25. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.
26. USSOUTHCOM, vetting comment, 2/10/2026.
27. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 020, 10/8/2025.
28. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 020, 10/8/2025.
29. DHS, response to DoD OIG request for information, 25.4 OSG 001, 9/30/2025.
30. DHS, response to DoD OIG request for information, 25.4 OSG 001, 9/30/2025.
31. DHS, response to DoD OIG request for information, 26.1 OSG 001, 1/12/2026.
32. DHS, response to DoD OIG request for information, 26.1 OSG 001, 1/12/2026; DHS, response to DoD OIG request for information, 25.4 OSG 001, 9/30/2025.
33. U.S. District Court for the District of Columbia, Declaration of Yamil Luna Gutierrez, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766-SLS, 8/08/2025.
34. DHS, response to DoD OIG request for information, 26.1 OSG 019, 1/12/2026; DHS, response to DoD OIG request for information, 26.1 OSG 020, 1/12/2026; USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG FOL 040, 1/7/2026.
35. DHS, website, Detention Management, "FY 2025 ICE Statistics," data updated 1/7/2026.
36. DHS, website, Detention Management, "FY 2025 ICE Statistics," data updated 1/7/2026.
37. DHS, website, Detention Management, "FY 2025 ICE Statistics," data updated 1/7/2026.
38. OUSD(P), response to DoD OIG request for information, 25.4 OSG 024, 10/1/2025; OUSD(P), response to DoD OIG request for information, 26.1 OSG 027, 1/8/2026.
39. OUSD(P), response to DoD OIG request for information, 25.4 OSG 024, 10/1/2025; OUSD(P), response to DoD OIG request for information, 26.1 OSG 027, 1/8/2026.
40. OUSD(P), response to DoD OIG request for information, 26.1 OSG 027, 1/8/2026.
41. OSD(C), response to DoD OIG request for information, 26.1 OSG 028, 1/20/2026.
42. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 023, 10/8/2025 and 26.1 OSG 026, 1/7/2026.
43. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 023, 10/8/2025.
44. OUSD(C), vetting comment, 2/20/2026.

45. DHS, response to DoD OIG request for information, 26.1 OSG 010, 1/12/2026.
46. DoD and DHS, "Memorandum of Understanding Between the U.S. Department of Homeland Security (DHS) and the U.S. Department of Defense (DoD) for DoD Support at Naval Station Guantanamo Bay (NSGB) To U.S. Immigration and Customs Enforcement (ICE) For DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," 3/7/2025.
47. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.
48. DoD and DHS, "Memorandum of Understanding Between the U.S. Department of Homeland Security (DHS) and the U.S. Department of Defense (DoD) for DoD Support at Naval Station Guantanamo Bay (NSGB) To U.S. Immigration and Customs Enforcement (ICE) For DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," 3/7/2025.
49. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.
50. DoD and DHS, "Memorandum of Understanding Between the U.S. Department of Homeland Security (DHS) and the U.S. Department of Defense (DoD) for DoD Support at Naval Station Guantanamo Bay (NSGB) To U.S. Immigration and Customs Enforcement (ICE) For DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," 3/7/2025.
51. USSOUTHCOM, website, "Operation Southern Guard–Joint Task Force Southern Guard," undated.
52. USSOUTHCOM, website, "Operation Southern Guard–Joint Task Force Southern Guard," undated.
53. State, response to State OIG request for information, 12/29/2025.
54. State, response to State OIG request for information, 12/29/2025; State, vetting comment, 2/10/2026.
55. SASC, hearing "United States Northern Command and United States Southern Command," 2/13/2025; USSOUTHCOM, News Release, "90 days in—Joint Task Force Southern Guard," 5/6/2025.
56. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG CLAR 031,  10/8/2025; USSOUTHCOM, vetting comment, 2/10/2026.
57. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.
58. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.
59. NSGB, vetting comment, 2/10/2026.
60. USSOUTHCOM, vetting comment, 2/11/2026.
61. Humanities Action Lab, website, "Guantanamo Public Memory Project," undated.
62. DHS, response to DoD OIG request for information, 26.1 OSG FOL 001, 1/12/2026.
63. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 028, 10/8/2025.
64. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 028, 10/8/2025.
65. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 028, 10/8/2025.
66. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 028, 10/8/2025.
67. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 028, 10/8/2025
68. USSOUTHCOM, vetting comment, 2/10/2026.
69. CRS, "Naval Station Guantanamo Bay: History and Legal Issues Regarding Its Lease Agreements," 8/1/2022; Commander, U.S. Navy Region South, Naval Station Guantanamo Bay, website, "Installation Information," undated.
70. CRS, "Naval Station Guantanamo Bay: History and Legal Issues Regarding Its Lease Agreements," 8/1/2022; Commander, U.S. Navy Region South, Naval Station Guantanamo Bay, website, "Installation Information," undated.
71. USSOUTHCOM, vetting comment, 2/11/2026.
72. Antonio Maria Delgado, "U.S. Navy Base in Guantanamo, Cuba, has History of Detaining Migrants, Terror Suspects," Miami Herald, 1/29/2025.
73. DHS, response to DoD OIG request for information, 26.1 OSG 018, 1/12/2026; DHS, vetting comment, 2/10/2026.
74. DHS, response to DoD OIG request for information, 26.1 OSG 018, 1/12/2026; White House, "Executive Order 13276—Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region," 11/15/2002; DHS; vetting comment, 2/10/2026.
75. DHS, response to DoD OIG request for information, 26.1 OSG 018, 1/12/2026; DHS, vetting comment, 2/10/2026.
76. DHS, response to DoD OIG request for information, 26.1 OSG 018, 1/12/2026; DHS, vetting comment, 2/10/2026.
77. DHS, response to DoD OIG request for information, 26.1 OSG 018, 1/12/2026; DHS, vetting comment, 2/10/2026.
78. DHS, response to DoD OIG request for information, 26.1 OSG 018, 1/12/2026; DHS, vetting comment, 2/10/2026.
79. DoD and DHS, "Memorandum of Understanding Between the U.S. Department of Homeland Security (DHS) and the U.S. Department of Defense (DoD) for DoD Support at Naval Station Guantanamo Bay (NSGB) To U.S. Immigration and Customs Enforcement (ICE) For DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," 3/7/2025.
80. DHS, response to DoD OIG request for information, 25.4 OSG 005, 9/30/2025.
81. DHS, vetting comment, 2/10/2026.
82. DHS, response to DoD OIG request for information, 25.4 OSG 005, 9/30/2025.
83. DHS, response to DoD OIG request for information, 26.1 OSG SUPP 001B, 1/28/2026.
84. DoD and DHS, "Memorandum of Understanding Between the U.S. Department of Homeland Security (DHS) and the U.S. Department of Defense (DoD) for DoD Support at Naval Station Guantanamo Bay (NSGB) To U.S. Immigration and Customs Enforcement (ICE) For DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," 3/7/2025.
85. USSOUTHCOM, vetting comment, 2/10/2026.
86. USSOUTHCOM, vetting comment, 2/10/2026.
87. DoD and DHS, "Memorandum of Understanding Between the U.S. Department of Homeland Security (DHS) and the U.S. Department of Defense (DoD) for DoD Support at Naval Station Guantanamo Bay (NSGB) To U.S. Immigration and Customs Enforcement (ICE) For DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," 3/7/2025.
88. DHS, response to DoD OIG request for information, 25.4 OSG 008, 9/30/2025.
89. DHS, response to DoD OIG request for information, 26.1 OSG FOL 004, 1/30/2026.

90. DHS, response to DoD OIG request for information, 26.1 OSG FOL 004, 1/30/2026.
91. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 028, 10/8/2025
92. DoD, "Memorandum for Executive Secretary, Department of Homeland Security; Subject: Department of Defense Support to U.S. Immigration and Customs Enforcement Operations," 3/7/2025.
93. DHS, response to DoD OIG request for information, 26.1 OSG FOL 011, 1/12/2026; DHS, response to DoD OIG request for information, 25.4 OSG 011, 9/30/2025.
94. DHS, response to DoD OIG request for information, 26.1 OSG FOL 011, 1/12/2026; DHS response to DoD OIG request for information, 25.4 OSG 011, 9/30/2025.
95. DHS, response to DoD OIG request for information, 26.1 OSG FOL 011, 1/12/2026.
96. DHS, response to DoD OIG request for information, 26.1 OSG FOL 011, 1/12/2026.
97. DHS, response to DoD OIG request for information, 25.4 OSG 007, 9/30/2025.
98. DHS, response to DoD OIG request for information, 25.4 OSG 006, 9/30/2025.
99. DHS, response to DoD OIG request for information, 26.1 OSG FOL 006, 1/12/2026; USCIS, website, "Credible Fear Screenings," last updated 1/24/2025.
100. DHS, vetting comment, 2/10/2026.
101. DHS, response to DoD OIG request for information, 26.1 OSG CLAR FOL 006, 1/27/2026
102. DHS, response to DoD OIG request for information, 26.1 OSG 007, 1/12/2026.
103. DHS, response to DoD OIG request for information, 26.1 OSG 007, 1/12/2026.
104. DHS, response to DoD OIG request for information, 26.1 OSG 007, 1/12/2026.
105. DHS, response to DoD OIG request for information, 26.1 OSG FOL 007, 1/12/2026.
106. Alexandra Marquez, "Kristi Noem Says 'Due Process Will be Followed' for Migrants at Guantánamo Bay," NBC News, 2/2/2025.
107. DHS, response to DoD OIG request for information, 25.4 OSG 017, 9/30/2025.
108. DHS, response to DoD OIG request for information, 26.1 OSG FOL 016, 1/12/2026; DoD and DHS, "Memorandum of Understanding Between the U.S. Department of Homeland Security (DHS) and the U.S. Department of Defense (DoD) for DoD Support at Naval Station Guantanamo Bay (NSGB) to U.S. Immigration and Customs Enforcement (ICE) For DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," 3/7/2025.
109. DHS, response to DoD OIG request for information, 26.1 OSG FOL 016, 1/12/2026.
110. DHS, response to DoD OIG request for information, 26.1 OSG FOL 016, 1/12/2026.
111. DHS, response to DoD OIG request for information, 26.1 OSG FOL 016, 1/12/2026; DHS, response to DoD OIG request for information, 26.1 OSG SUPP 017, 1/28/2026.
112. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.

113. Sacha Pfeiffer, "Water Failure at Guantánamo Bay Affects U.S. Migrant Operations There," NPR, 9/12/2025.
114. Sacha Pfeiffer, "Water Failure at Guantánamo Bay Affects U.S. Migrant Operations There," NPR, 9/12/2025.
115. DHS, vetting comment, 2/11/2026.
116. DHS, response to DoD OIG request for information, 26.1 OSG 012, 1/12/2026; DHS, response to DoD OIG request for information, 25.4 OSG 012, 9/30/2025.
117. DHS, response to DoD OIG request for information, 26.1 OSG 012, 1/12/2026; DHS, response to DoD OIG request for information, 25.4 OSG 012, 9/30/2025.
118. DHS, response to DoD OIG request for information, 25.4 OSG 013, 9/30/2025.
119. DHS, response to DoD OIG request for information, 26.1 OSG 013, 1/12/2026; DHS, response to DoD OIG request for information, 25.4 OSG 013, 9/30/2025.
120. DHS, response to DoD OIG request for information, 25.4 OSG 016, 9/30/2025.
121. DHS, response to DoD OIG request for information, 25.4 OSG 016, 9/30/2025.
122. DHS, response to DoD OIG request for information, 26.1 OSG 013, 1/12/2026; DHS, response to DoD OIG request for information, 25.4 OSG 013, 9/30/2025; DHS, response to DoD OIG request for information, 26.1 OSG CLAR 013, 1/28/2026.
123. DHS, response to DoD OIG request for information, 25.4 OSG 016, 9/30/2025.
124. DHS, response to DoD OIG request for information, 25.4 OSG 016, 9/30/2025.
125. DHS, response to DoD OIG request for information, 26.1 OSG FOL 016, 1/12/2026.
126. DHS, response to DoD OIG request for information, 25.4 OSG 014, 9/30/2025.
127. USSOUTHCOM, vetting comment, 2/10/2026.
128. USSOUTHCOM, vetting comment, 2/10/2026.
129. USSOUTHCOM, vetting comment, 2/10/2026.
130. DHS, response to DoD OIG request for information, 26.1 OSG 019, 1/12/2026.
131. DHS, response to DoD OIG request for information, 26.1 OSG 019, 1/12/2026; USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG 022, 1/7/2026; DHS, response to DoD OIG request for information, 2 6.1 OSG CLAR 020, 1/27/2026.
132. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG 022, 1/7/2026; USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG CLAR 022, 1/28/2026.
133. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG 022, 1/7/2026.
134. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG CLAR 022, 1/28/2026.
135. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 040, 10/8/2025; USSOUTHCOM, vetting comment, 2/10/2026.
136. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 040, 10/8/2025.
137. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 040, 10/8/2025.

138. Jake Thomas, "U.S. Evacuates Guantanamo Bay as Hurricane Melissa Slams Caribbean," UPI, 10/28/2025; "Melissa Causes Extensive Damage to Cuba's Southeastern Provinces," The Caribbean Council, 11/3/2025.
139. DHS, response to DoD OIG request for information, 26.1 OSG CLAR 020, 1/28/2026.
140. DHS, response to DoD OIG request for information, 26.1 OSG 020, 1/12/2026.
141. DHS, response to DoD OIG request for information, 26.1 OSG 020, 1/12/2026.
142. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG FOL 040, 1/7/2026.
143. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG 023, 1/7/2026.
144. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG 023, 1/7/2026; DHS, response to DoD OIG request for information, 26.1 OSG 020, 1/12/2026.
145. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG FOL 040, 1/7/2026.
146. DHS, response to DoD OIG request for information, 26.1 OSG CLAR 020, 1/28/2026.
147. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG FOL 040, 1/7/2026.
148. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.
149. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.
150. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 019, 10/8/2025.
151. DHS, response to DoD OIG request for information, 25.4 OSG 002, 9/30/2025.
152. DHS, response to DoD OIG request for information, 26.1 OSG 004, 1/12/2026.
153. DHS, response to DoD OIG request for information, 26.1 OSG 004, 1/12/2026.
154. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 029, 10/8/2025.
155. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 029, 10/8/2025; USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 030, 10/8/2025.
156. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 029, 10/8/2025.
157. USSOUTHCOM, vetting comment, 2/10/2026.
158. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 029, 10/8/2025.
159. USSOUTHCOM, response to DoD OIG request for information, 25.4 OSG 030, 10/8/2025.
160. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG 032, 1/7/2026; USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG CLAR 031, 1/28/2026.
161. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG 032, 1/7/2026.
162. DoD, press release, "Department of Defense Announces Arrival of High-Threat Illegal Aliens at Guantanamo Bay Detention Facility," 2/5/2025.
163. DoD News, "First Flight of Illegal Aliens Arrives at Guantanamo," 2/5/2025.
164. Silvia Foster-Frau, Alex Horton, and Laris Karklis, "Trump Wants Guantánamo to Hold 30,000 Migrants. So Far it Has Held About 300," Washington Post, 3/14/2025.
165. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
166. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
167. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
168. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
169. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
170. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
171. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
172. DHS, response to DoD OIG request for information, 26.1 OSG 015, 1/12/2026.
173. USTRANSCOM, response to DoD OIG request for information, 26.1 OSG 039, 1/8/2026.
174. USTRANSCOM, response to DoD OIG request for information, 26.1 OSG 039, 1/8/2026.
175. USTRANSCOM, response to DoD OIG request for information, 26.1 OSG 039, 1/8/2026.
176. USTRANSCOM, response to DoD OIG request for information, 26.1 OSG 039, 1/8/2026.
177. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
178. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
179. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
180. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
181. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
182. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
183. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
184. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
185. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
186. NSGB, response to DoD OIG request for information, 25.4 OSG 027, 10/8/2025.
187. USSOUTHCOM, response to DoD OIG request for information, 26.1 OSG 026, 1/7/2026.
188. Sacha Pfeiffer, "ACLU and Other Advocates Sue to Block Migrants from Being Sent to Guantánamo Bay," NPR, 3/1/2025.
189. U.S. District Court for the District of Columbia, class action complaint for Declaratory and Injunctive Relief and Petition for Writ of Habeas Corpus, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 6/4/2025.
190. U.S. District Court for the District of Columbia, Plaintiffs-Petitioners' Opposition to Motion to Dismiss, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 8/27/2025.

191. U.S. District Court for the District of Columbia, Plaintiffs-Petitioners' Opposition to Motion to Dismiss, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 8/27/2025.

192. U.S. District Court for the District of Columbia, Plaintiffs-Petitioners' Opposition to Motion to Dismiss, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 8/27/2025.

193. U.S. District Court for the District of Columbia, Plaintiffs-Petitioners' Opposition to Motion to Dismiss, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 8/27/2025.

194. U.S. District Court for the District of Columbia, Memorandum Opinion, "Yanil Luna Gutierrez et al., vs. Kristi Noem et al.," 1:25-cv-1766, 12/5/2025.

195. U.S. District Court for the District of Columbia, Reply in Support of Defendants' Motion To Dismiss, "Yanil Luna Gutierrez and Rafael Angel Lopez Ocon vs. Kristi Noem et al.," 1:25-cv-1766, 9/8/2025.

196. PBS, "Lawyers Sue to Stop Trump Administration from Sending 10 Migrants to Guantanamo Bay," 3/1/2025; Chloe Atkins, Benjamin Deeter, Alexandra Marquez, and Emma Dion, "ACLU sues Trump Administration to Halt Immigrant Transfers to Guantanamo," NBC News, 3/1/2025.



TO REPORT FRAUD, WASTE, OR ABUSE RELATED TO
OVERSEAS CONTINGENCY OPERATIONS
AND PROGRAMS, CONTACT:



## DEPARTMENT OF DEFENSE HOTLINE

www.dodig.mil/hotline

**1-800-424-9098**



## DEPARTMENT OF STATE HOTLINE

www.stateoig.gov/hotline

**1-800-409-9926 or 202-647-3320**