# EXHIBIT W

John Thune, John Barrasso, Cindy Hyde-Smith, John R. Curtis, Rick Scott of Florida, Bernie Moreno, Pete Ricketts, Eric Schmitt, Jon A. Husted, Roger Marshall, Jim Justice, Tommy Tuberville, Bill Hagerty, Joni Ernst, James E. Risch, Marsha Blackburn, Tim Sheehy.

## LEGISLATIVE SESSION

Mr. THUNE. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

## EXECUTIVE SESSION

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 71.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Troy Meink, of Virginia, to be Secretary of the Air Force.

#### CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The assistant bill clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 71, Troy Meink, of Virginia, to be Secretary of the Air Force.

John Thune, Mike Crapo, Thom Tillis, Cynthia M. Lummis, Mike Rounds, Rick Scott of Florida, Roger F. Wicker, Katie Boyd Britt, Steve Daines, John Boozman, John R. Curtis, James E. Risch, John Barrasso, Cindy Hyde-Smith, Dan Sullivan, Bernie Moreno, James C. Justice.

## LEGISLATIVE SESSION

The PRESIDING OFFICER. The Senate will now resume legislative session.

#### WAIVING QUORUM CALL

Mr. THUNE. Mr. President, I ask unanimous consent that the mandatory quorum call with respect to Calendar No. 66, S. 1582, be waived.

The PRESIDING OFFICER. Without objection, it is so ordered.

The PRESIDING OFFICER. The Senator from Rhode Island is recognized.

#### BORDER SECURITY

Mr. REED. Mr. President, I rise to address President Trump's dangerous and inappropriate use of the U.S. military to carry out his immigration enforcement campaign.

Before I discuss the Trump administration's spending nearly half a billion dollars and sending tens of thousands of troops, ships, combat vehicles, and aircraft away from their real missions, I want to make clear that border security is a priority. I do not support open borders, and I believe that those who enter the United States and break our laws should be subject to deportation in accordance with the law and due process. I voted time and time again for billions of dollars of increased support for border agents, detection technology, and physical barriers where it made sense.

Mr. President, it is no secret that our borders have been under pressure for more than a decade because of a broken immigration system that congressional Republicans have consistently refused to help fix. We have considered bipartisan immigration reform bills in 2006, in 2007, in 2013, and in 2024, all of which were shut down by Republicans. The mess that we have today rests largely on their decision to put political advantage above real progress.

Now President Trump is ignoring Congress, ignoring the law, ignoring the courts, and ignoring the Constitution in order to implement an immigration policy that fails to respect due process, adversely impacts our innovation economy, and, to the point of my remarks, degrades our military.

In the name of his anti-immigrant efforts, President Trump is using the U.S. military to conduct operations on American soil that it has neither the training nor the authority to carry out. Our troops, who are already stretched thin for time and resources, are now burning time, assets, morale, and readiness for these overblown operations.

The President has declared an emergency at the border to justify using the military for civilian law enforcement—this despite border encounters currently at the lowest level since August of 2020. Over the past 12 months since President Biden's Executive actions last June, there has been a continued, significant decrease in unlawful border crossings, including a more than 60-percent decrease in encounters from May 2024 to December 2024.

In short, all along the southern border, we have seen a dramatic drop in illegal crossings and migrant encounters well before President Trump took office. A national emergency? It does not seem so.

We already have an entire Federal Agency to protect our borders and address illegal immigration: the Department of Homeland Security. DHS includes Customs and Border Protection, Immigrations and Customs Enforcement, and other law enforcement groups. I have voted consistently to give these Agencies additional resources to carry out their missions. But immigration enforcement is not and must not become a function of the Department of Defense.

Our military has long provided technical and logistical support to DHS at the border but always and exclusively in a supporting role, drawing a clear line between military law enforcement authorities. Indeed, since the Reconstruction era, U.S. Presidents have been prohibited from using the military in civilian law enforcement by a law known as the Posse Comitatus Act. This law has kept the Commander in Chief from wielding the military as a domestic political weapon, and it continues to provide an important check on the President's ability to use the military domestically against American citizens.

I understand American citizens asking if it matters which Department enforces immigration as long as the job gets done. Well, there are plenty of reasons to be concerned by the President's current approach even if one agrees with him politically.

Most alarmingly, President Trump is taking real steps to militarize immigration enforcement. Once he uses the military for this reason, it will be easier for him to use it for other purposes. And given the tenor of his public statements, it is a reasonable fear that he may someday order the use of the Armed Forces in American cities and against American citizens.

Indeed, the Brennan Center—a law and public policy institution—recently analyzed President Trump's military actions at the border and concluded:

Using the military for border enforcement is a slippery slope. If soldiers are allowed to take on domestic policing roles at the border, it may become easier to justify uses of the military in the U.S. interior in the future. Our nation's founders warned against the dangers of an army turned inward, which can all too easily be turned into an instrument of tyranny.

Beyond these concerns, there are real, immediate consequences for our troops, which we are seeing right now.

One of the military's top priorities is readiness. America faces real, growing threats from China, Russia, Iran, and other adversaries, and the Department of Defense needs to be laser-focused on preparing troops to defend our interests abroad. It is difficult to explain the border missions as anything but a distraction from readiness.

We should acknowledge the jobs that our troops are actually doing there. In the past, up to 2,000 National Guard and Reserve troops would rotate to the border each year to assist DHS and Customs and Border Patrol with basic monitoring, logistics, and warehousing activities—non-law enforcement activities. These missions were designed to be "behind the scenes" to free up Border Patrol agents from administrative duties and return them back to the field to conduct their core mission of immigration enforcement.

Today, however, President Trump has surged more than 12,000 Active-Duty troops to the border to carry out a variety of expanded missions that do not look anything like "behind the scenes." For example, one Marine battalion has been stringing miles and

miles of barbed wire across the California mountains. Multiple Army infantry companies are patrolling the Rio Grande riverbank on foot with loaded rifles. Navy aircrews are flying P–8 Poseidons—the most advanced submarine-hunting planes in the world, and they are flying them over the desert. Two Navy destroyers are loitering off our east and west coasts, looking for migrant boats in the water. At least one Army transportation unit is changing the oil and tires on Border Patrol trucks all day and every day.

In addition, the administration has wasted massive amounts of defense dollars by flying migrants out of the country using military aircraft. Often, they have had to return them to the U.S. mainland just a few days later. According to U.S. Transportation Command, it costs at least $20,000 per flight hour to use a C–130 and $28,500 per hour to use a C–17. In comparison, contracted ICE flights that regularly transport migrants inside of the United States cost only $8,500 per flight hour.

President Trump's decision to use military aircraft instead of ICE aircraft to shuttle migrants across the globe to as far away as India is a gross misuse of taxpayers' dollars and servicemembers' time.

Just yesterday, we learned that the White House wanted to fly migrants on military aircraft to Libya, which is one of the most dangerous, hostile locations on Earth. Human rights groups have called the conditions in Libya's network of migrant detention centers ''horrific'' and ''deplorable.'' The plan has been canceled for now, but it is unconscionable for the Trump administration to consider sending migrants to Libya and endangering our troops in the process.

Further, the Department of Defense has informed Congress that the current surge in border missions, including troop deployment and military flights, could cost as much as $2 billion by the end of this fiscal year.

Secretary Hegseth has claimed that the border mission is so overwhelming that we will have to withdraw massive numbers of troops from Europe in order to meet the demand. Incredibly, he has also claimed that the border mission will have ''no impact'' on our military readiness.

However, we know that these border missions are harming military readiness. Last month, when the NORTHCOM commander testified before the Armed Services Committee, I asked how his forces on the border mission are maintaining their required military readiness and required training. He testified that his troops are spending 5 days a week supporting Customs and Border Patrol and other Agencies and only 1 day a week training. In other words, 20 percent—at most—of our servicemembers' time is being spent training on their critical military tasks.

In my personal engagements with commanders at all levels, they have made clear that readying their formations requires extensive time and training as well as stability for families. Border missions will not build these warfighting requirements. Border missions will distract from training, drain resources, and undermine readiness.

The Government Accountability Office, or GAO, has assessed previous support missions to DHS and found them to be detrimental to unit readiness. Specifically, in its 2021 report, GAO found that ''separating units in order to assign a portion of them to the southwest border mission was a consistent trend in degrading readiness ratings.''

In February, President Trump issued an unprecedented order to the Defense Department to begin transporting and detaining migrants at Guantanamo Bay, Cuba. For decades, the U.S. Naval Station at Guantanamo Bay has housed a facility called the Migrant Operations Center that is used to temporarily house migrants who are saved at sea while traveling in unsafe vessels from Cuba, Haiti, or other nearby nations. The facility is typically unoccupied and is kept in a low-level operational readiness until needed—that is, until February.

The intended use of the center was never to house migrants flown from the United States to Guantanamo Bay. Nevertheless, President Trump ordered the military to expand the Migrant Operations Center to accommodate up to 30,000 migrants who would be brought there from the United States.

Within weeks, approximately 1,000 Active-Duty troops were sent to Guantanamo to build tents for this massive number of migrants. However, once built, the tents were found not to meet ICE standards, and to date, they have never been used and are now being dismantled. The hundreds of troops sent down for the mission have had very little to do in the meantime.

Since February, around 500 individuals identified by the administration as illegal migrants have been flown to Guantanamo Bay, and most have been detained for no more than 2 weeks. Rather than being taken to the Migrant Operations Center, about half of these migrants have been held on the other side of the island at the detention facility that was built and used for law of war detainees, such as 9/11 terrorist Khalid Shaikh Mohammed.

There are currently 15 law of war detainees remaining on Guantanamo Bay. The facilities housing these detainees have deteriorated significantly in the 20 years since they were built. The military personnel who guard these individuals also endure the same tough conditions in these dilapidated facilities. Needless to say, these servicemembers have been stretched thin.

Last fall, it was a significant morale boost for them when the remaining law of war detainees were moved to a ''newer'' facility. Naturally, it was a blow, then, to their morale when, just 1 month later, they were ordered back to the older, more decrepit facility to make way for migrants at the newer facility.

While it is crystal clear the military is in charge of the law of war detention center at Guantanamo Bay, it is not clear who is legally responsible for the migrants being held there. Longstanding law dictates that U.S. Immigration and Customs Enforcement maintain ''custody and control'' of migrants, but in the detention center, the military maintains control.

This leads to questions about who is in charge and who is accountable. When I have asked those questions, the answers have often been contradictory, and that is disturbing.

To investigate these issues, I traveled to Guantanamo Bay in March with several colleagues, including Senators SHAHEEN, PETERS, KING, and PADILLA. We conducted a firsthand examination of the missions underway there and met with military servicemembers, ICE officers, and DHS officials to fully understand the costs and military readiness impacts of these missions. The trip raised many new questions and concerns.

I have grave doubts about the legality of removing migrants from the United States to Cuba, a foreign nation, and detaining them there. There are at least a dozen open cases and court orders impacting the Guantanamo mission. The detention center has only been used for law of war detainees, and it is reckless to equate migrants with international war criminals. I was also outraged by the scale of wastefulness we found there.

It is obvious Guantanamo Bay is an illogical location to detain migrants. The staggering financial cost to fly these migrants out of the United States and detain them at Guantanamo Bay—a mission costing tens of millions of dollars a month—is an insult to American taxpayers. President Trump could implement his immigration policies for a fraction of the cost by using existing ICE facilities in the United States, but he is obsessed with the image of using Guantanamo no matter the cost.

I am also frustrated that my Senate colleagues and I had to fly to Cuba to get answers to the questions that Secretary Hegseth and Homeland Security Secretary Noem have been ducking for months. By avoiding questions, they are putting servicemembers and officers on the ground in the position of trying to make sense of contradictory and political orders without any guidance or support from the Pentagon or DHS headquarters.

Since coming into office, the Trump administration has expanded the role of the military in immigration enforcement in other troubling ways. The movement of migrants from the U.S. to Guantanamo Bay is unprecedented, and the buildup of 12,000 Active-Duty troops at the southern border, including the Army's 10th Mountain Division

and 100 armored Stryker combat vehicles, has a huge impact on our military posture. This is a larger force than we deployed to Afghanistan in 2002 and 2003. This administration has purposely placed many of our military forces into the immigration debate in this country, and I fear it will also place them in legal and ethical risk.

For example, on March 30—shown in the photograph here—a military flight traveled from Guantanamo Bay to El Salvador with foreign nationals on board, including seven Venezuelans. To my understanding, not a single DHS official or civilian was on the flight, meaning that military personnel maintained both custody and control of the migrants, contrary to longstanding DOD policy and practice.

Here, as I said, is an image of that plane unloading in El Salvador. As you can see, the crew does not appear to include any DHS officials or civilian law enforcement personnel—only uniformed troops, who are physically handing migrants to the Salvadoran police.

This flight would clearly have been in violation of various immigration laws and policies, recent judicial orders, and the Posse Comitatus Act, as the military carried out a core law enforcement function of deportation without any DHS official present. After the fact, the administration tried to explain itself by saying it used ''counterterrorism'' authorities rather than law enforcement authorities. I am not aware of any counterterrorism authorities that would authorize such a flight.

Accordingly, last month, I sent a letter to the Department of Defense Office of Inspector General, asking that office to conduct an inquiry into the incident and any laws or Defense Department policies that may have been violated. I expect the IG to exercise his independence in carrying out this inquiry, and I am disturbed that the administration continues to put servicemembers in legal and physical jeopardy through these reckless orders.

Mr. President, I ask unanimous consent that this letter be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. SENATE,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, April 23, 2025.*

DEAR MR. STEBBINS: Recent public reporting raises issues about the propriety and legality of a March 30th military flight from Guantanamo Bay to El Salvador transporting 17 foreign nationals, including seven Venezuelan nationals to El Salvador. In particular, the transport of the Venezuelan nationals raises enforcement concerns under various immigration laws and policy, including the Immigration and Nationality Act (INA), 8 U.S.C. §1101 et seq., the regulations implementing the INA, Federal law and policy concerning the transport of migrants to third countries under the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), and compliance with recent judicial orders concerning deportations under that Act. Most concerningly, however, from the perspective of the Department of Defense (DOD) and the proper use of DOD personnel, we understand that there were no personnel from the Department of Homeland Security on this flight, meaning that military personnel maintained both custody and control of the migrants, contrary to longstanding DOD policy and practice.

According to government information, the Administration relied on ''counter-terrorism'' authorities rather than law enforcement authorities to conduct this deportation. We are unaware of which counter-terrorism authorities, if any, would authorize these flights.

Accordingly, we ask that you conduct an inquiry into, and provide us an assessment of, the following:

1. The facts and circumstances surrounding the above referenced flight(s), including:

a. The approval authority for this flight, and any subsequent approvals through the military chain of command authorizing the flight(s), including, but not limited to, members of the Office of the Secretary of Defense (OSD), and the Commanders and staff of U.S. Northern Command, U.S. Southern Command, U.S. Transportation Command, Joint Task Force Southern Guard, Joint Task Force Guantanamo Bay.

b. A copy of the legal review conducted by any party identified in section 1.a. opining on the legal authority to execute the flight(s), including, but not limited to. the OSD Office of General Counsel, and the Staff Judge Advocates of U.S. Northern Command, U.S. Southern Command, U.S. Transportation Command, Joint Task Force Southern Guard, Joint Task Force Guantanamo Bay.

c. Identification of the legal authorities under which the flight(s) were executed.

d. Identification of which parties identified in sections 1.a. and 1.b. had knowledge of the flight(s) prior to them transpiring.

e. Identification of which DOD elements, aircraft, and personnel participated in those flights.

2. Whether this flight complied with Federal law and policy, including but not limited to, the Immigration and Nationality Act (INA), 8 U.S.C. §1101 et seq., the regulations implementing the INA, and Federal law and policy concerning the transport of migrants to third countries under the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).

3. DOD's adherence to law and policies concerning DOD support to civil authorities and conduct of law enforcement activities, including, but not limited to:

a. Section 1385 of Title 18, U.S. Code (Posse Comitatus Act)

b. Section 275 of Title 10, U.S. Code (Restriction on direct participation by military personnel)

c. DOD Directive 3025.18 (defense support of civil authorities)

d. DOD Instruction 3025.21 (defense support of civilian law enforcement agencies)

4. DOD's reliance on ''counter-terrorism'' authorities to unilaterally conduct this flight, an enumeration of those policies, and an assessment of whether DOD's reliance on those authorities is appropriate and consistent with law and policy.

5. Any other matter you determine in the course of your review to be relevant to the proper application of law and policy to these circumstances.

Sincerely.

JACK REED,
*Ranking Member.*

Mr. REED. I am also concerned about the Trump administration's dubious creation of ''National Defense Areas'' along the southern border in the last several weeks. These National Defense Areas, first designated in New Mexico and later expanded into Texas, were created when the Department of the Interior transferred land, including the Roosevelt Reservation—a 60-foot-wide strip along the border—to the Department of Defense. So now, large swaths of the border are considered military installations.

The administration has created these zones so that, when a migrant crosses the border in those areas, prosecutors can charge them with both entering the United States illegally and trespassing on a military installation. In effect, the National Defense Zones evade the longstanding protections of the Posse Comitatus Act by allowing military forces to act as de facto border police, detaining migrants until they can be transferred to Customs and Border Protection. In the administration's telling, this approach permits military involvement in immigration control without invoking the Insurrection Act of 1807.

This is both unprecedented and, indeed, a legal fiction. Again, as the Brennan Center report found:

No matter how the Trump administration frames these activities . . . they are civilian law enforcement functions. He cannot turn them into military operations by misusing the language of war. These civilian law enforcement activities are not ''incidental''— they are the reason for creating the installation.

The administration is also considering using military bases to detain thousands of migrants inside the United States. Unlike in past emergencies, when military bases near the border were used to hold migrants during large surges, this administration is seeking to use installations deep within the country, including in New Jersey, Indiana, Delaware, California, and Virginia. One could be forgiven for extrapolating that these bases are being selected to hold round-ups of migrants in major cities.

The President is not taking these military actions out of necessity; he is testing the boundaries of our legal system and, in my view, violating them. If left unchecked and unchallenged, he will go much, much further in to employing the Armed Forces in to enforce domestic immigration laws, traditionally a civilian law enforcement function.

For years, Mr. Trump has publicly expressed his desire to use U.S. military personnel for domestic law enforcement. During the last campaign, he repeatedly claimed that, if elected, he would order the National Guard and Active-Duty military to carry out mass deportations of undocumented migrants. He even said that he would deploy the military to conduct local law enforcement in cities and that troops could shoot shoplifters leaving the scene of a crime.

The President's defenders often say that he is joking or exaggerating when he makes such claims, but we know these are not idle threats. In his first 100 days in office, he has declared multiple national emergencies and has invoked the Alien Enemies Act of 1798 to

deport migrants without due process. Indeed, he has even unapologetically deported U.S. citizens in violation of the Constitution. We have all seen the chilling videos of masked and hooded ICE agents arresting civilians on the street—scenes we are accustomed to seeing on the nightly news, not here but in countries run by dictators.

The administration is expanding its operation one step at a time, and President Trump's deployment of forces to the border, the military deportation flights, and the establishment of National Defense Areas can be interpreted as setting the stage to invoke the Insurrection Act and order the military to carry out domestic law enforcement inside the country.

In fact, we have seen the situation before. In June of 2020, then-President Trump, infuriated by protesters in front of the White House and across the country, ordered his staff to prepare to invoke the Insurrection Act to allow him to deploy Active-Duty military forces to patrol the streets of DC and other cities. Then-Defense Secretary Mark Esper and Chairman of the Joint Chiefs of Staff Mark Milley talked him out of it, but the President clearly views this as a serious option.

Beyond the immorality of Trump's desire to deploy military domestically, to do so would simply be illegal. As I mentioned, the doctrine of posse comitatus is sacred in our Nation to separate the military from direct law enforcement responsibilities.

The use of National Guard or Active-Duty troops should be reserved only to those rare circumstances where civilian law enforcement has collapsed and State leaders have specifically asked for Presidential assistance. Their deployment should never be at the sole discretion of a President, as President Trump has demonstrated that such power begs abuse.

Ultimately, U.S. military members are trained to engage the enemies of the United States abroad with deadly force, not to arrest migrants on the southern border or to deport them from U.S. cities. The military has a sacred role in our country, but the public's trust is easily lost, and a pillar of our society is cracked when the Commander in Chief uses the military recklessly.

Our constitutional system is fundamentally designed to separate military and civilian roles, reserving police powers for law enforcement agencies and endowing the military with the superior weaponry and firepower necessary to fight and win the Nation's wars. When we allow the military to be used in the routine exercise of the police power, the Nation teeters on the brink of autocracy and military rule. One need not be a student of history to see how easily this backsliding can occur. It is all around us in the world today.

Trump's clear intent to use the military in potentially illegal and certainly inappropriate ways for his own political benefit is antithetical to the spirit of our American democracy. Such power is the hallmark of authoritarians around the world.

President Trump and Secretary Hegseth must use common sense, follow the law, and immediately cease the military border deployments and deportation flights.

And, my colleagues, particularly my colleagues in the majority, should demand the same and hold the administration accountable for its actions.

I yield the floor.

The PRESIDING OFFICER (Mr. MORENO). The Senator from Wyoming.

Ms. LUMMIS. Mr. President, I ask unanimous consent to complete my remarks and ask that Senator HAGERTY have 7 minutes to complete his remarks before the vote.

The PRESIDING OFFICER. Without objection, it is so ordered.

S. 1582

Ms. LUMMIS. Mr. President, I rise today because the United States is behind when it comes to digital assets.

American digital asset innovation has faced a challenging environment, with talent, investment, and development often relocating to more welcoming international jurisdictions like Singapore, Switzerland, and the UAE. These countries have created clear frameworks, specifically designed to attract blockchain ventures while the United States has generally maintained a less defined regulatory landscape that has inadvertently encouraged this exodus of opportunity and expertise.

This week, we have the opportunity to start to change that, and we must grab the reins and ensure that all Americans are able to take charge of their financial futures.

The last White House blocked us, but now we have a President who not only sees the immeasurable value digital assets have but is willing to firmly secure America's leadership in this space.

Before he even took office, President Trump announced he had tapped David Sacks to serve as the White House AI and Crypto Czar, ensuring we maintain America's competitive edge, and issued a blitz of Executive actions targeting heavy-handed SEC tactics slowing down progress.

Under President Trump, we have seen a significant shift in the executive branch's attitude toward digital assets. It is night and day what we experienced under the Biden administration. President Trump's promise to make America the digital asset capital of the world wasn't just lip service; it was a strategic vision—recognizing that dollar-backed stablecoins represent a critical opportunity to extend American financial influence in an increasingly digital world—and a call to action. Decades from now, students will read about the foresight of the President and the 119th Congress in moving this issue to the forefront.

I want to make clear that this is not a partisan issue. I have spent years— years—working with Senator GILLI-BRAND of New York to ensure that we have crafted a bipartisan proposal that can get across the finish line—a lot of late nights, early morning phone calls, thousands of hours of our staffs going back and forth on policy.

I want to thank Senator GILLIBRAND and her team for all their hard work, for working with my team in good faith, and for always pushing to make this legislation stronger.

We have incorporated feedback from both Democrats and Republicans— many, many, many, many Democrat amendments. We have been working for days—recently, days—to bring this bill to the floor and to satisfy our colleagues across the aisle. I truly appreciate everyone who has engaged on this issue. We have the opportunity now to be in the driver's seat and install commonsense regulations that are tailor-made for American-based digital asset companies. The digital future is something to embrace. We are witnessing the dawn of a modern 21st century economy that can benefit all Americans through technical innovation.

This Congress, I joined with Senator BILL HAGERTY of Tennessee to cosponsor his Guiding and Establishing National Innovation for U.S. Stablecoins Act, or the GENIUS Act—legislation which provides robust consumer protections without sacrificing innovation. And now, thanks to Leader THUNE's leadership, the hard work of Senator HAGERTY, Chairman SCOTT, Senator GILLIBRAND, and our shared commitment to maintaining U.S. leadership in this space, we can begin the bipartisan proposal and move it one step closer to becoming law.

At its core, the GENIUS Act protects consumers through mandatory 100-percent reserve backing with U.S. dollars and short-term Treasurys, the monthly public disclosure of reserve composition, and strict prohibitions against misleading marketing.

Put simply, this isn't just another bill. It is a comprehensive framework, ensuring America leads the next generation of financial technology in stablecoins.

Just minutes ago, an American was elected Pope. His name will be Leo XIV—an American leading one of the strongest religious organizations in the world. We should also be leading in financial innovation.

I yield the floor.

The PRESIDING OFFICER. The Senator from Tennessee.

Mr. HAGERTY. Mr. President, I want to compliment my colleague from Wyoming for the wonderful introduction that she gave. That means that I don't need to give the many, many pages of speech that I had planned. But I would like to come to one final point, and that is for the benefit of my colleagues today.

I want to take a broader view of what we are actually voting on. What we are voting on is ''cloture.'' That is a term

Case 1:25-cv-01766-SLS Document 103-27 Filed 06/10/26 Page 6 of 6

that is used to get on the bill, to actually have the debate that we are supposed to conduct here in the U.S. Senate. It is the beginning of debate for a bill that fundamentally supports crypto technology and innovation here in America at the most basic level.

My Democratic colleagues supported this, coming through a committee on a bipartisan basis. In fact, we had a vote of 18 to 6, a very strong movement out of committee.

Since that time, we have made a number of changes at their request. They have come back again with more requests. We are considering those changes as well. But for us to even begin to implement these changes, we are going to have to get on this bill in order to debate it and in order to incorporate the changes that have been negotiated.

I look forward to working with my colleagues should they choose to move forward on this bill. And if they don't, I want the American public and I want everybody watching today to understand that this is a vote to kill the crypto industry here in America, and it is a shame.

This is our first opportunity to deliver groundbreaking legislation to America that puts America squarely in the most competitive place we possibly could be, to lead in the area of innovation where we need to be leading. Otherwise, this would be a vote to push all of that offshore. It is a vote for our strength.

I want to thank the Senators who have helped so much: Senator SCOTT and Senator LUMMIS from our side. And I want to thank Senators GILLIBRAND and ALSOBROOKS from the Democrat side. I want to thank everybody who has worked so hard on this. And I hope that we will be able to move forward, actually get on this bill, and complete our work.

I yield the floor.

CLOTURE MOTION

The PRESIDING OFFICER. Pursuant to rule XXII, the Chair lays before the Senate the pending cloture motion, which the clerk will state.

The legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the motion to proceed to Calendar No. 66, S. 1582, a bill to provide for the regulation of payment stablecoins, and for other purposes.

John Thune, Ted Budd, Katie Boyd Britt, John Cornyn, Deb Fischer, Roger Marshall, Jim Justice, Tim Scott of South Carolina, Mike Crapo, Tommy Tuberville, Bill Hagerty, Cindy Hyde-Smith, Markwayne Mullin, Mike Rounds, Steve Daines, Cynthia M. Lummis, Rick Scott of Florida.

The PRESIDING OFFICER. The Senator from Arizona.

Mr. GALLEGO. Mr. President, I ask unanimous consent to speak for up to 2 minutes.

The PRESIDING OFFICER. Is there objection?

Mr. KENNEDY. I object.

The PRESIDING OFFICER. Objection is heard.

Mr. KENNEDY. I withdraw my objection.

The PRESIDING OFFICER. The Senator is recognized for 2 minutes.

UNANIMOUS CONSENT REQUEST—S. 1582

Mr. GALLEGO. Mr. President, we made some great progress this past week. I greatly—greatly—appreciate the work that we have done in a bipartisan manner.

I want to thank my fellow colleagues across the aisle: Senator WARNER, Senators LUMMIS, HAGERTY, Chairman SCOTT, Senators ALSOBROOKS and LISA BLUNT ROCHESTER. They really have been working hard to get a good product, and it was done in good faith. And I really want to thank my Republican colleagues for doing this.

The reason you are hearing some hesitancy is the legislation of this scope and importance really just cannot be rushed, and we need time both to educate our colleagues and people.

We are not shutting down. We don't want to shut this down to the point where we are ending all this work that we have put into it. We want to bring this economy and this innovation to the United States, and I am asking for that time.

I want to be clear that you do have enough Members across the aisle who want to see this passed in a good manner. So what I am going to be asking for is that we collapse today's vote and Monday's vote into a single vote on Monday.

I believe there is a pathway for us to actually get this done, get good language, and have a bipartisan win for this country.

All this agreement is asking for is simply to combine today's and Monday's vote. It would not add or reduce any floor time compared to just taking this vote today. So I ask for unanimous consent to do that.

The PRESIDING OFFICER. Is there objection?

Mr. KENNEDY. Objection.

The PRESIDING OFFICER. Objection is heard.

By unanimous consent, the mandatory quorum call has been waived.

The question is, Is it the sense of the Senate that debate on the motion to proceed to S. 1582, a bill to provide for the regulation of payment stablecoins, and for other purposes, shall be brought to a close?

The yeas and nays are mandatory under the rule.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Kansas (Mr. MORAN) and the Senator from Mississippi (Mr. WICKER).

Mr. DURBIN. I announce that the Senator from Minnesota (Ms. SMITH) is necessarily absent.

The yeas and nays resulted—yeas 48, nays 49, as follows:

[Rollcall Vote No. 240 Leg.]

YEAS—48

| | | |
|---|---|---|
| Banks | Ernst | McCormick |
| Barrasso | Fischer | Moody |
| Blackburn | Graham | Moreno |
| Boozman | Grassley | Mullin |
| Britt | Hagerty | Murkowski |
| Budd | Hoeven | Ricketts |
| Capito | Husted | Risch |
| Cassidy | Hyde-Smith | Rounds |
| Collins | Johnson | Schmitt |
| Cornyn | Justice | Scott (FL) |
| Cotton | Kennedy | Scott (SC) |
| Cramer | Lankford | Sheehy |
| Crapo | Lee | Sullivan |
| Cruz | Lummis | Tillis |
| Curtis | Marshall | Tuberville |
| Daines | McConnell | Young |

NAYS—49

| | | |
|---|---|---|
| Alsobrooks | Hickenlooper | Rosen |
| Baldwin | Hirono | Sanders |
| Bennet | Kaine | Schatz |
| Blumenthal | Kelly | Schiff |
| Blunt Rochester | Kim | Schumer |
| Booker | King | Shaheen |
| Cantwell | Klobuchar | Slotkin |
| Coons | Luján | Thune |
| Cortez Masto | Markey | Van Hollen |
| Duckworth | Merkley | Warner |
| Durbin | Murphy | Warnock |
| Fetterman | Murray | Warren |
| Gallego | Ossoff | Welch |
| Gillibrand | Padilla | Whitehouse |
| Hassan | Paul | Wyden |
| Hawley | Peters | |
| Heinrich | Reed | |

NOT VOTING—3

| | | |
|---|---|---|
| Moran | Smith | Wicker |

The PRESIDING OFFICER. The majority leader.

Mr. THUNE. Mr. President, I change my vote to no.

The PRESIDING OFFICER. On the motion, the yeas are 48, the nays are 49.

On this vote, three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is not agreed to.

The motion was rejected.

The majority leader.

MOTION TO RECONSIDER

Mr. THUNE. Mr. President, I enter a motion to reconsider the vote.

The PRESIDING OFFICER. The motion is entered.

MORNING BUSINESS

Mr. THUNE. Mr. President, I ask unanimous consent that the Senate be in a period of morning business, with Senators permitted to speak therein for up to 10 minutes each.

The PRESIDING OFFICER. Without objection, it is so ordered.

GENIUS ACT

Mr. THUNE. Mr. President, let me just say that the Democrats have just used the filibuster for the fourth time this year. Why? Well, in this case, no one really knows.

This is a bipartisan issue. It is a bipartisan bill, and it had a bipartisan process from the very beginning. And if Democrats were interested in further changes, as they claim, they would have had the chance to make those changes on the floor. All they had to do was vote for cloture.

Not every bill that comes to the floor is a final bill. Now, that may be how it