**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| YAMIL LUNA GUTIERREZ, *et al.*,<br><br>*Plaintiffs-Petitioners*, *on behalf of themselves and all others similarly situated,*<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security, in his official capacity, *et al.*,<br><br>*Defendants-Respondents*. | Case No. 1:25-cv-01766-SLS |

**PLAINTIFFS-PETITIONERS' STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiffs-Petitioners ("Plaintiffs") submit the following Statement of Material Facts Not in Genuine Dispute in support of their motion for partial summary judgment. Relevant portions of the administrative record will be submitted in a joint appendix pursuant to Local Rule 7(n)(1).

## I. Historical Use of Guantánamo

1. The Guantánamo Bay Naval Station is a United States military base in Guantánamo Bay, Cuba (hereinafter referred to as "Guantánamo" or "NSGB"). Answer ¶ 22, ECF No. 62.

2. The United States government ("the government") has maintained a military prison on Guantánamo since 2002 for law-of-war detainees pursuant to the 2001 Authority for Use of Military Force. Decl. of Colonel Jennifer Venghaus, *Las Americas Immigrant Advocacy Ctr. v. Noem* ("*Las Americas*") ¶ 4, No. 1:25-cv-00418-CJN, ECF No. 14-3 (D.D.C. Feb. 20, 2025) ("Venghaus Decl."); Pub. L. No. 107-40, 115 Stat. 224 (2001); *see also* Answer ¶ 22.

1

3.      Law-of-war detainees have in practice been detained on the Windward side of the base, in a prison complex with buildings including what is known as "Camp 6" or "Camp VI." Answer ¶¶ 7, 45; Venghaus Decl. ¶ 4; *see also* U-DOW-CAR 123, 132; DHS-000120.

4.      Besides the asserted law-of-war detention authority, the government has used Guantánamo to house migrants who have been interdicted on the high seas outside of United States territorial waters. Venghaus Decl. ¶ 5; Answer ¶ 23.

5.      Interdicted migrants have historically been housed in camps, U-DOW-CAR-299–300, 317, DHS-000517–18, 535, and on the Leeward side of the base, in a facility called the "Migrant Operations Center" ("MOC"), Answer ¶ 45; Venghaus Decl. ¶ 5.

6.      The government has consistently maintained that interdicted migrants on Guantánamo—who were not brought from the United States to Guantánamo—are not being detained under, and are not subject to, the Immigration and Nationality Act ("INA"). *See, e.g.*, Venghaus Decl. ¶ 5; Ex. C to the Declaration of Sofia Gonzalez ("Gonzalez Decl.") at 1, 4.

7.      The government has maintained that these interdicted migrants "are not detained," but are merely "housed" on Guantánamo, and "are free at any time to return to their country of origin." Gonzalez Decl. Ex. B at 1; Venghaus Decl. ¶ 5; Gonzalez Decl. Ex. C at 1; *see also* U-DOW-CAR-304; DHS-000522.

8.      Until 2025, the government has never transferred noncitizens apprehended and detained in the United States on civil immigration charges to Guantánamo, or to any other facility outside the United States, for the purpose of civil immigration detention under the INA. Answer ¶¶ 4, 23.

2

## II.    The Government's New Guantánamo Detention Policy

9.    On January 21, 2025, the Acting Secretary of Defense provided verbal authorization to provide support to the Department of Homeland Security ("DHS") in the form of aviation support, military personnel, intelligence analysis support, and engineering support, and approved "airlift transportation support" to U.S. Immigration and Customs Enforcement ("ICE") for the removal of people identified by DHS. U-DOW-CAR-001.

10.    On January 29, 2025, President Donald Trump issued a Memorandum (the "President's Memorandum") directing the Secretary of Defense and Secretary of Homeland Security "to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States." U-DOW-CAR-118–119; DHS-000124.

11.    The President's Memorandum did not direct DHS or the Department of Defense ("DOD") to detain noncitizens in Camp 6. U-DOW-CAR-118–119; DHS-000124.

12.    On January 30, 2025, the Secretary of Defense directed the Commander of the U.S. Southern Command to expand migrant operations to hold "illegal aliens of varying status including those that pose a heightened security threat." U-DOW-CAR-211.

13.    In this order, the Secretary of Defense directed the Commander of the U.S. Southern Command to seek additional forces to "conduct illegal alien holding operations for up to 10,000 illegal aliens pending relocation," with a subsequent expansion of up to "30,000 illegal alien[s] pending relocation." U-DOW-CAR-211; *see also* U-DOW-CAR-586 (internal DoD order that "[Commander of the U.S. Southern Command] is directed to conduct illegal alien holding operations for up [to] 10,000 illegal aliens pending relocation with subsequent expansion to

3

accommodate a total of 30,000 illegal aliens pending relocation."); *see also* Gonzalez Decl. Ex. K at 2.

14.     On January 31, 2025, the Joint Staff J3 estimated an incremental cost to DOD of $34.5 million" in forces during fiscal year 2025 in support of Guantánamo holding operations. U-DOW-CAR-658-662.

15.     On February 2, 2025, the Joint Staff J3 issued a message within DOD transmitting the Secretary of Defense's approval to support flights of "high-threat illegal aliens" to Guantánamo "under DHS custody." U-DOW-CAR-646–47.

16.     The message stated that DHS personnel "will remain responsible for alien custody and supervision" and that "8 USC sec 1231(g) allows DHS to arrange appropriate places for detention. DHS assesses that GTMO is a 'United States Government facility,' and is therefore authorized as an appropriate place for detention of illegal aliens." U-DOW-CAR-647.

17.     This message did not cite or otherwise discuss 8 U.S.C. § 1103(a)(3). U-DOW-CAR-646–47.

18.     On February 3, 2025, DHS submitted a formal request to the DOD, memorializing the verbal authorizations for DOD support of ICE operations and carrying out the President's Memorandum. U-DOW-CAR-001–006.

19.     Specifically, on February 3, 2025, the Secretary of Homeland Security submitted an email requesting military support to augment ICE resources in four categories: aviation; Guantánamo MOC expansion; use of the Joint Task Force Guantánamo detention facility ("JTF-GTMO"), and other operational support to ICE. U-DOW-CAR-131, 144–45; DHS-000088–90.

20.     The aviation assistance requested was "immediate aviation transportation assistance to remove aliens from interior locations within the United States to repatriation sites

including El Salvador, Guatemala, Honduras, or other extraterritorial locations to be determined, such as NSGB." U-DOW-CAR-144; DHS-000088.

21.     With respect to the JTF-GTMO facility, the Secretary requested "immediate access to and use of the JTF-GTMO Detention Facility to house approximately 300 high-priority" noncitizens, and "immediate expansion" of MOC so that "use of [the] facility [can] begin within 7-10 days"). U-DOW-CAR-144–145; DHS-000088–89.

22.     On February 4, 2025, DHS announced that it had transferred ten immigrant detainees from Fort Bliss, Texas, to Guantánamo. Answer ¶ 25; *see also* Gonzalez Decl. Ex. D.

23.     U.S. Customs and Border Patrol ("CBP") posted on social media videos of the transfer of these ten individuals, shackled and in chains, onto a military plane, stating that "[f]lights to Guantanamo Bay have begun." Gonzalez Decl. Ex. E at 1; Answer ¶ 25.

24.     The government publicly alleged that these ten individuals were members of Tren de Aragua, a Venezuelan gang, but did not provide the identities of these individuals, proof that they were gang members, their immigration status, the nature of the legal proceedings against them, the legal authority under which they were held, or how long they would be held at Guantánamo. *See* Gonzalez Decl. Ex. F.

25.     After a visit to Guantánamo, DHS Secretary Kristi Noem posted a message social media that she "was just in Cuba" watching immigrants "being unloaded off a flight at GITMO," and that noncitizens should "not come to this country or we will hunt you down, find you, and lock you up." Gonzalez Decl. Ex. G at 1.

26.     The "GTMO Bound Flight Coordination Process" is an eight-part process involving daily interagency coordination between multiple agencies: ICE; DOD; Joint Task Force – Southern Guard; U.S. Southern Command; U.S. Northern Command; DHS Incident Command Center

("ICC"); Homeland Security Task Force – Southeast; U.S. Citizenship and Immigration Services; DHS ICC Operations Medical Branch; and the Department of State. DHS-000091–92.

27.     DHS defines custody classifications for noncitizen detainees transferred to Guantánamo to include both "High Custody / Medium – High Custody" which "[m]ay include detainees with a history of violent or assault charges, convictions, institutional misconduct, or those with a gang affiliation," and "Medium-Low Custody / Low Custody" which only includes "detainees . . . with no history of violent or assault charges or convictions, no institutional misconduct, and no gang affiliation" but "[m]ay include detainees with criminal histories and non-violent felony charges and convictions." DHS-000091–92.

28.     As of February 9, 2025, critical considerations for initial transfers to Guantánamo "due to their operational significance" has included: limiting the initial planned population to single adult males and Spanish-speaking individuals; no "medically fragile individuals (those with health concerns placing them at higher risk)"; no Cuban or Mexican nationals, per Department of State; and, noncitizens transferred to Guantánamo must have "final orders of removal that are 'hard to remove but have no legal impediment to removal,' per ICE." DHS-000093.

29.     On February 13, 2025, Senators Elizabeth Warren and Mazie K. Hirono submitted a letter to the Secretary of Defense expressing concerns about DOD's immigration-related operations at the southern border and Guantánamo, including the costs to American taxpayers because of "some DOD expenses costing over three times more than when DHS performs the same function." U-DOW-CAR-034–42.

30.     Senators Warren and Hirono's letter referred to a statement by a former Pentagon official that "[t]he total cost for this [Guantánamo operation] would quickly skyrocket into tens of millions, if not hundreds of millions, of dollars." U-DOW-CAR-036.

31.     The Senators' letter stated that much of this cost is "avoidable," that "DoD is deporting migrants on C-17 military aircraft, which cost far more than commercial and chartered flights that ICE normally uses" (specifically "$28,000 per flight hour for a single deportation on a military C-17 plane, compared to $8,577 per flight hour on civil aircraft alternatives that ICE often uses"), and that "ICE pays contractors over $272,000 [annually] per detention bed at Guantanamo's MOC, compared to an average of around $57,000 [annually] per bed at ICE facilities in the United States." U-DOW-CAR-037.

32.     The Senators' letter stated that "[p]erhaps more concerning" was the lack of "a realistic estimate" of the operation costs for DOD, U-DOW-CAR-037, and submitted a number of questions regarding Guantánamo operations including a request for projection of total cost, timeline for constructing permanent structures and how long migrants will be held in soft-sided facilities, DOD's plans for migrants held at Guantánamo whose home country will not accept their repatriation, plans for access to Guantánamo by legal service providers, plans for facilitating access to counsel, and plans for ensuring that the MOC and Camp 6 facilities are habitable for the number of migrants expected to be held there. U-DOW-CAR-040–42.

33.     Several groups of attorneys and nonprofits organizations submitted letters of concern regarding the transfer of noncitizens from the United States to Guantánamo, including the lack of any ability to communicate with those noncitizens. U-DOW-CAR-630–45; *see also* Gonzalez Decl. Ex. H.

34.     On February 18, 2025, DOD submitted a memorandum to DHS stating that the Acting Secretary of Defense had approved non-reimbursable aviation support for DHS repatriation of noncitizens to El Salvador, Guatemala, Honduras, or other locations through April 20, 2025. U-DOW-CAR-009.

35.     In a memorandum to the Executive Secretary for DHS dated March 7, 2025, the Executive Secretary for DOD confirmed that the Secretary of DOD had approved ICE use of facilities and land for expansion of temporary holding capacity at Guantánamo. U-DOW-CAR-127–28; DHS-000116–17.

36.     DOD agreed to provide the following support to DHS's operation at Guantánamo: access to and use of Joint Task Force-Guantánamo facilities for detention of up to 144 "high threat [illegal aliens]" at Camp 6; aviation support on a non-reimbursable basis under the original conditions approved on January 21, 2025; and, services and sustainment such as food, emergent medical support, and laundry related to ICE detention operations at Guantánamo "at a cost to DoD not to exceed $30 million," using DOD's appropriation. U-DOW-CAR-127; DHS-000116.

37.     DOD agreed to provide the aviation support under the original conditions approved on January 21, 2025, including the condition that DHS "coordinate with the State Department to obtain diplomatic clearances for the flights, ensure the host nation will receive the passengers, and provide host nation notifications prior to flight departure." U-DOW-CAR-004, 127; DHS-000116.

38.     DOD requested DHS not to send any women, children, or noncitizens with "acute medical or psychological conditions" to Guantánamo "[g]iven the limited medical capabilities at [Guantánamo] and the nature of the facilities and environment." U-DOW-CAR-127; DHS-000116.

39.     DOD made its support "contingent on ICE ensuring that the population of [illegal aliens] being held by ICE are determined by ICE to be either members of transnational criminal organizations (TCOs) or human-smuggling customers of TCOs." U-DOW-CAR-127; DHS-000116.

40.     In an Action Memo approved on March 7, 2025, DOD stated that the Under Secretary of Defense Comptroller "estimates an incremental cost of **_$1.8 billion_** to support

operations and maintenance" for the MOC expansion, use of JTF-GTMO Camp 6 detention facilities, and establishment of camps across Guantánamo at the directed planning capacity of 30,000 noncitizens. U-DOW-CAR-133 (emphasis added).

41.     The Action Memo stated that DOD could make available up to $30 million in funding available to support "DHS/ICE detention operations" at Guantánamo by "canceling . . . planned counterdrug projects" though diversion of more funding would "result in substantial mission impacts to efforts focused on designated cartel [foreign terrorist organizations], Iran-affiliated violent extremist organizations (VEOs), Chinese money laundering organizations, and other VEOs and drug trafficking organizations' revenue-generation activities, among other things." U-DOW-CAR-134.

42.     A Memorandum of Understanding ("MOU") between DHS and DOD for "DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal," dated March 7, 2025, describes DHS's and DOD's respective roles and responsibilities related to the custody and detention of noncitizens with final orders of removal at Guantánamo. *See* U-DOW-CAR-121–27; DHS-000118–23.

43.     The MOU provides that DHS has legal custody of detained noncitizens at Guantánamo. U-DOW-CAR-122; DHS-000119.

44.     The MOU provides that DHS/ICE will detain at Guantánamo any noncitizen "with a nexus to a transnational criminal organization (TCO) or criminal drug activity," although where the nature of a noncitizen's entry into the United States is "uncertain," the MOU provides that "DHS/ICE may assert a nexus where DHS/ICE reasonably believes the alien to have paid a TCO to be smuggled into the United States if the alien is from a country where the preponderance of

aliens from that country enter the United States in that fashion." U-DOW-CAR-121–22; DHS-000118–19.

45.    The MOU states that DOD "[w]ill provide an existing secure facility on the windward side of [Guantánamo] to DHS/ICE"—Camp 6—"for holding 'high threat' . . . [illegal aliens]." U-DOW-CAR-124; DHS-000121.

46.    The MOU states that DHS will "provide necessary guidance and training to DoD personnel at [Guantánamo] assisting DHS/ICE in fulfilling DHS/ICE's responsibility to exercise legal custody and detention of" noncitizens detained at Guantánamo. U-DOW-CAR-122; DHS-000119.

47.    In a letter to the Chairman of the Senate Committee on Armed Services on March 7, 2025, the Secretary of Defense described the operation as the "provision of [DOD] facilities and land on [Guantánamo] for temporary use by the [DHS] to house illegal aliens identified by their Department for removal from the United States." U-DOW-CAR-129–30.

48.    The government has publicly stated that it plans to continue transferring noncitizens from the United States to be detained at Guantánamo. *See, e.g.*, Gonzalez Decl. Ex. I at 8 ("If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now."); Gonzalez Decl. Ex. J at 1 ("Whether it is CECOT, Alligator Alcatraz, Guantanamo Bay or another detention facility . . . President Trump and Secretary Noem are using every tool available to get criminal illegal aliens off our streets and out of our country."); Gonzalez Decl. Ex. K at 3 (DHS spokesperson stated: "If you come to our country illegally and break our laws, you could end up in Guantanamo Bay, CECOT, or a third country. Our message is clear: criminal illegal aliens are not welcome in the U.S.").

**III.    Transfers to and From, and Detention at Guantánamo**

49.    ICE defines removal as "the compulsory and confirmed movement of an inadmissible or deportable noncitizen out of the United States." Gonzalez Decl. Ex. L at 30.

50.    Noncitizens transferred from the United States and detained at Guantánamo are held in the Camp 6 prison and the MOC. U-DOW-CAR-122; DHS-000119; Answer ¶ 45; Decl. of Francisco Madrigal ¶ 3 ("Madrigal Decl."), ECF No. 28-3.

51.    The government has publicly referred to the immigration detainees held at Guantánamo as "the worst of the worst," and "high-threat" criminals who crossed the border to bring "violence and mayhem to our communities." Gonzalez Decl. Ex. O; *see also* Gonzalez Decl. Ex. N.

52.    The government has also acknowledged it has detained people at Guantánamo who are classified as "low-risk" and have no record of encounters with law enforcement other than with immigration officials. *See, e.g.*, Venghaus Decl. ¶ 11; Gonzalez Decl. Ex. P at 3 (quoting DHS spokesperson who stated "[i]n addition to holding violent gang members and other high-threat illegal aliens, Guantanamo Bay is also holding other illegal aliens with final deportation orders.").

53.    Inspectors General of DOD and the State Department ("Inspectors General" or "IGs") reported to Congress that between January 21, 2025 and March 31, 2026, the government transferred 797 noncitizens from the United States to Guantánamo. Gonzalez Decl. Ex. M at 1, 4 (hereinafter referred to as "2026 IG Report"). Of the 797 noncitizens transferred to Guantánamo through March 31, 2026, it was reported that "176 did not have criminal convictions or pending charges beyond immigration violations." 2026 IG Report at 5.

54.    For removals by air from the United States, noncitizens in detention are generally transferred to a staging facility, like Alexandria Staging Facility in Louisiana or Florence Staging Facility in Arizona, before they are removed. *See* Gonzalez Decl. Ex. Q at 1.

55.    The average length of stay ("ALOS") at staging facilities in the United States is three days or under. *See* Gonzalez Decl. Ex. R (three day ALOS for Alexandria Staging Facility, Florence Staging Facility and San Juan Staging, and one day ALOS for Miami Staging Facility); *see also* Gonzalez Decl. Ex. S at 4 n.1 ("This facility [Alexandria Staging Facility] holds male detainees . . . for periods less than 72 hours.").

56.    From June 4, 2025, to February 2, 2026, the period of time for which Plaintiffs received data in discovery, 227 noncitizens were transferred from immigration custody in the United States to be detained at Guantánamo. Decl. of Natalie Behr ("Behr Decl.") ¶¶ 2, 4, 6, 11 & Ex. A (May 22, 2026 ICE Discovery Response), Ex. B (June 1, 2026 ICE Discovery Response), & Ex. C (June 25, 2026 ICE Discovery Response).

57.    The median length of detention at Guantánamo for the 227 noncitizens transferred there was 23 days. Behr Decl. ¶ 12 & Ex. A.

58.    In the same period, the mean length of detention at Guantánamo was about 31 days. Behr Decl. ¶ 12 & Ex. A.

59.    In the same period, 105 noncitizens (about 46% of the group) spent over 30 days detained at Guantánamo. Behr Decl. ¶ 12 & Ex. A.

60.    In the same period, 75 noncitizens (33% of the group) spent over 40 days detained at Guantánamo. Behr Decl. ¶ 12 & Ex. A.

61.    In the same period, three noncitizens spent over 100 days detained at Guantánamo. Behr Decl. ¶ 12 & Ex. A.

62.    In the same period, 205 noncitizens, or about 90% of these 227 noncitizens, spent over three days detained at Guantánamo. Behr Decl. ¶ 12 & Ex. A.

63.    In the same period, 90 noncitizens (about 40% of the group) were transferred from Guantánamo back to the United States. Behr Decl. ¶ 13 & Exs. A, B.

64.    For this group transferred from Guantánamo back to the United States, the mean length of their detention at Guantánamo was about 49 days. Behr Decl. ¶ 14 & Exs. A, B.

65.    Of that group of people transferred back to the United States from Guantánamo, only seven people (7.8% of the group) were transferred to the country designated for their removal within three days of returning to the United States. Behr Decl. ¶ 15 & Exs. A, B.

66.    Of that group of people transferred back to the United States from Guantánamo, 82 noncitizens (about 91% of that group) spent seven or more days detained in the United States after leaving Guantánamo. Behr Decl. ¶ 16 & Exs. A, B.

67.    75 of those 82 noncitizens have since been removed to another country. Behr Decl. ¶ 16 & Exs. A, B.

68.    Five of those 82 noncitizens spent more than 60 days detained in the United States before they were removed to another country. Behr Decl. ¶ 16 & Exs. A, B.

69.    Seven of the 90 noncitizens that were transferred back to the United States (about 7.8% of that group) have either since been released from detention in the United States or remained in custody as of June 1, 2026. Behr Decl. ¶ 17 & Exs. A, B.

70.    Many of these noncitizens were transferred to Guantánamo "for staging" on a January 27, 2026, "mission" to their destination country, but that "mission" was cancelled due to a weather delay, and the noncitizens were then transferred back to the United States on February

2, 2026, before they were eventually transferred from the United States to their destination country on February 9, 2026. Behr Decl. ¶ 21 & Ex. A; *see also infra* ¶¶ 86–89.

71.    Some of the noncitizens transferred back to the United States from Guantánamo were transferred back due to the fact that there are no commercial flight options available from Guantánamo, so noncitizens had to be returned to the United States in order to effectuate their removal via commercial flights. Behr Decl. Ex. A.

72.    Noncitizens classified for "Special High-Risk Charters" ("SHRCs")—because they are going to countries that are difficult for removal, have failed to comply with removal orders, or possess significant criminal histories, Gonzalez Decl. Ex. Q at 1—are transferred back to the United States from Guantánamo because "[s]taging SHRCs from NSGB is operationally inefficient due to numerous restrictions and logistical challenges associated with the facility" so "SHRCs are typically staged from [continental United States] locations." Behr Decl. Ex. A.

73.    Six non-Mexicans who the government intended to remove to Mexico were transferred back to the United States from Guantánamo because "[t]hird country removals to Mexico are only conducted via the land border." Behr Decl. Ex. A at 4–5.

74.    Two of the noncitizens that were transferred back to the United States to be removed to Mexico via the land border had received protection from removal to their country of origin under the Convention Against Torture before they were transferred to Guantánamo. Behr Decl. Ex. A at 5.

75.    One noncitizen was returned to the United States because he did not have a final order of removal. Behr Decl. Ex. A at 5.

76.     150 of all 227 noncitizens transferred to Guantánamo during this period (about 66% of the group) did not have travel arrangements to their final destination country at the time of their transfer to Guantánamo, Behr Decl. ¶ 18 & Ex. C.

77.     The government's reference to "travel arrangements" in its data regarding the 227 transferred to Guantánamo during this period means that "there was a flight scheduled to the individual's final destination country at the time the individual was transferred Guantánamo." Behr Decl. ¶ 10.

78.     77 of all 227 transferred to Guantánamo during this period were reported as having travel arrangements to their final destination country at the time of their transfer. Behr Decl. ¶ 19 & Exs. A, C.

79.     Of this group of 77 noncitizens, the mean length of detention at Guantánamo was about 34 days. Behr Decl. ¶ 19 & Exs. A, C.

80.     Of this group of 77 noncitizens, no (zero) noncitizens spent less than three days detained at Guantánamo, and only one noncitizen (1.3%) spent less than four days detained at Guantánamo. Behr Decl. ¶ 19 & Exs. A, C.

81.     Of this group of 77 noncitizens, 73 noncitizens (about 95%) spent over 20 days detained at Guantánamo, 51 noncitizens (about 66% of the group) spent over 30 days detained at Guantánamo, and 23 noncitizens (about 30% of the group) spent over 40 days detained at Guantánamo. Behr Decl. ¶ 19 & Exs. A, C.

82.     Of this group of 77 noncitizens, 66 noncitizens (about 86% of this group) were transferred back to the United States before being transferred to their final destination country. Behr Decl. ¶ 19 & Exs. A, C.

83.     Of this group of 77 noncitizens, 11 noncitizens (about 14% of this group) were transferred directly from Guantánamo to their final destination country. Behr Decl. ¶ 20 & Exs. A, C.

84.     Of these 11 noncitizens, only one was transferred to their final destination country within three days of their arrival at Guantánamo. Behr Decl. ¶ 20 & Exs. A, C.

85.     The other ten noncitizens that had travel arrangements at the time of their transfer to Guantánamo and were transferred directly from Guantánamo to their final destination country spent between six to 48 days detained at Guantánamo. Behr Decl. ¶ 20 & Exs. A, C.

86.     Of the 77 noncitizens who had a scheduled flight to their final removal country at the time of their transfer to Guantánamo, the government stated that 53 noncitizens were transferred to Guantánamo for staging on a January 27, 2026 "mission" to their final destination country. Behr Decl. ¶ 21 & Exs. A, C; *see also supra* ¶ 70.

87.     The government does not explain what this "mission" was or whether it is the same or different from its definition of "travel arrangements." *See* Behr Decl. ¶ 10 & Ex. C.

88.     These 53 noncitizens were transferred to Guantánamo on December 14, 2025, January 2, 2026, and January 10, 2026—between 17 and 44 days before the scheduled January 27, 2026 mission. Behr Decl. ¶ 21 & Exs. A, C.

89.     For each these 53 noncitizens, the government stated that "[d]ue to weather delay, the mission was cancelled." Behr Decl. Ex. A at 5–7; *see also* Behr Decl. ¶ 20 & Ex. C.

90.     On February 2, 2026, each of these 53 noncitizens were transferred back to the United States. Behr Decl. ¶ 21 & Exs. A, C.

91.     The mean length of detention at Guantánamo for these 53 noncitizens was about 35 days. Behr Decl. ¶ 21 & Exs. A, C.

92. For the remaining 24 noncitizens that had travel arrangements at the time of their transfer to Guantánamo but were not scheduled for the January 27, 2026 "mission," *see supra* ¶¶ 86–89, the government does not state when the scheduled flights to each of their final destination countries were scheduled to depart from Guantánamo. *See* Behr. Decl. Ex. A.

93. ICE takes specific steps to carry out removals, including obtaining any necessary travel documents, DHS-000204, 206, communicating with the embassy/consulate of the country of removal, DHS-000205, and obtaining consent from the country of removal, U-DOW-CAR-030; *see also* Gonzalez Decl. Ex. T at 1–2.

94. The Acting Assistant Director of the ICE Removal Division, John Schultz, stated in a declaration signed on June 26, 2026 (the "Schultz Declaration"), that "ICE typically needs a valid travel document to effectual an alien's removal from the United States." Behr Decl. Ex. D (Schultz Decl. ¶ 5).

95. The Schultz Declaration further states that where a valid passport does not exist for the noncitizen, "ICE routinely requests that foreign embassies and consulates verify an alien's nationality and issue a travel document for the alien's removal prior to effectuating the alien's removal." Schultz Decl. ¶ 5.

96. For 193 of the 227 noncitizens transferred to Guantánamo between June 4, 2025 and February 2, 2026 (about 85% of the group), the countries designated for these noncitizens' removals did not require a traditional travel document in order to accept a removed noncitizen, whether because the country participates in the Electronic Nationality Verification ("ENV") program, or it otherwise does not require a travel document. Behr Decl. ¶ 22 & Ex. C.

97. Of these 193 noncitizens, there was a total of 14 designated countries for removal that did not require a traditional travel document. Behr Decl. ¶ 22 & Exs. A, C.

98.     For 24 of the 227 noncitizens transferred to Guantánamo during that same period (about 11%), the government did not have a travel document at the time of their transfer to Guantánamo and did not indicate that the country designated for removal participated in the ENV program or otherwise did not require a travel document. Behr Decl. ¶ 22 & Ex. C.

99.     For ten of the 227 noncitizens transferred to Guantánamo during that same period (about 4% of the group), the government had a travel document at the time of their transfer to Guantánamo. Behr Decl. ¶ 22 & Exs. A, C. These ten noncitizens were detained at Guantánamo for between 14 and 66 days, and their mean length of detention was about 49 days. Behr Decl. ¶ 22 & Exs. A, C.

100.     For the 203 noncitizens who either had a travel document (ten noncitizens) or did not need a travel document (193 noncitizens), the mean length of detention Guantánamo was 25 days. Behr Decl. ¶¶ 22–23 & Ex. C.

101.     Of this group of 203 noncitizens, 126 noncitizens (about 62% of the group), did not have travel arrangements in place at the time of their transfer to Guantánamo. Behr Decl. ¶ 23 & Ex. C.

102.     Of this group of 203 noncitizens, no (zero) noncitizens spent less than three days detained at Guantánamo. Behr Decl. ¶ 23 & Ex. C.

103.     Of this group of 203 noncitizens, 81 noncitizens (about 40%) spent over 30 days detained at Guantánamo. Behr Decl. ¶ 23 & Ex. C.

104.     Of this group of 203 noncitizens, 73 noncitizens, (about 36%), were transferred back to the United States before being removed to their final destination country. Behr Decl. ¶ 23 & Ex. C.

105.    For two noncitizens transferred to Guantánamo during this same period, the government stated that the country of origin did not require a travel document, and that they had travel arrangements in place at the time of their transfer to Guantánamo; however, the country of origin refused to accept them for removal and they were ultimately transferred back to the United States to be removed to Mexico, as a third-country removal, via the United States-Mexico land border. Behr Decl. Ex. A at 5 & Ex. C at 2.

106.    The 2026 IG Report stated that "[t]he average detention duration at NSGB has increased over time" due to the limits on repatriation flights for nationals held there. 2026 IG Report at 4.

107.    The 2026 IG Report acknowledged that detention length at Guantánamo increased for the first quarter of 2026 "due to repatriation issues," primarily due to the nationality of the individuals held there; Haitians were only accepted on one repatriation flight per month. 2026 IG Report at 1, 4.

## IV.    Detention in the United States Compared to Detention at Guantánamo

108.    DOD provides support to DHS's detention of noncitizens at Guantánamo through what is referred to as Operation Southern Guard ("OSG"). Gonzalez Decl. Ex. U at iii (hereinafter referred to as "2025 IG Report"); 2026 IG Report at 3.

109.    DOD designated OSG as an overseas contingency operation on March 28, 2025, triggering reporting obligations for DOD and State Department Legal Inspectors General to Congress under 5 U.S.C. § 419. 2025 IG Report at iii.

110.    Lawmakers have continued to speak out against detention at Guantánamo. *See, e.g.*, Gonzalez Decl. Exs. V–X.

111. Senators Gary C. Peters and Alex Padilla noted that just one month into the operation, the government had spent approximately $40 million to transfer and detain immigration detainees at Guantánamo—at a reported $100,000 per day for each detainee, *600 times the cost of detention in the United States*. Gonzalez Decl. Ex. V at 1–2.

112. After a Congressional delegation visit to Guantánamo in May 2025, Senator Jack Reed stated, "[i]t is obvious Guantanamo Bay is an illogical location to detain migrants. The staggering financial cost to fly these migrants out of the United States and detain them at Guantanamo Bay—a mission costing tens of millions of dollars a month—is an insult to American taxpayers." Gonzalez Decl. Ex. W at 2.

113. Senator Richard Blumental stated during a congressional hearing with then-DHS Secretary Kristi Noem, that the government spent "$21 million between January and April [2025] transporting around 400 migrants to Guantánamo Bay," and that "about half of them were flown back to the United States." Gonzalez Decl. Ex. X at 1.

114. The 2025 IG Report stated that DOD "identified some contract limitations, logistical challenges, and other issues associated with its support to OSG," including the need for maintenance repairs, tents that were later determined not to be needed, and "significant operational friction" from "routinely cancelled flights, leading to wasted planning hours." 2025 IG Report at 4, 19.

115. The 2025 IG Report stated that "[d]ue to the limited number of contractor personnel, NSGB experienced delays in other routine maintenance and support," and that "[h]igh costs are compounded by 'chronic inefficiency.'" 2025 IG Report at 19.

116. The 2025 IG Report stated that by the end of December 2025, 708 noncitizens had been transferred to Guantánamo as part of Operation Southern Guard. 2025 IG Report at 6.

117.    The 2025 IG Report stated that "[i]llegal holding operations at NSGB under OSG are very small compared to holding operations elsewhere in the United States," noting that according to DHS, 68,990 noncitizens were detained in facilities across the United States from October 1, 2025, through January 7, 2026. 2025 IG Report at 6.

118.    The 2026 IG Report made a similar observation after the first quarter of 2026, noting that compared to the 797 noncitizens who had been detained at Guantánamo through March 31, 2026, those numbers were "small compared to holding operations elsewhere in the United States," which "DHS statistics show . . . [to be] 60,311 . . . [noncitizens] detained in facilities across the United States as of April 4." 2026 IG Report at 4.

119.    From March 28, 2025 through March 31, 2026, DOD obligated approximately $66.4 million on its operation to support DHS's detention of illegal aliens at Guantánamo. 2026 IG Report at 7.

120.    In addition, DHS estimated that it had spent nearly $16.5 million to support its operations at Guantánamo through its MOC support contract. 2026 IG Report at 8.

121.    Between July 1 and December 31, 2025, DOD conducted 31 military flights to transport immigrants to and from Guantánamo, at a cost of $21.9 million, or about $708,020 per mission. 2025 IG Report at 3, 19.

122.    In addition to DOD's flights, as of December 21, 2025, DHS had spent approximately $12 million on transportation alone to fly 82 charter flights, which transported approximately 480 immigrants to Guantánamo and 670 immigrants from Guantánamo, including those who were transported back to the United States. 2025 IG Report at 16.

123.    DHS spent an additional nearly $6.6 million on flights in the first quarter of 2026. 2026 IG Report at 9.

124.    The costs for detaining noncitizens at Guantánamo, including dining, laundry services, air traffic control, and air terminal ground handling, were estimated to total $8.6 million in Fiscal Year 2025 and $3.94 million in the first three months of Fiscal Year 2026. 2026 IG Report at 7.

125.    As of January 12, 2026, the MOC had the capacity to hold 50 people and Camp 6 had the capacity to hold up to 245 people. Answer ¶ 56.

126.    Both the 2025 IG Report and the 2026 IG Report stated that "[n]either the DoD nor the DHS provided any specific national security justification, cost, or other benefit explaining why illegal aliens are being sent to NSGB rather than other DHS or DoD facilities in the continental United States." 2025 IG Report at 6; *see also* 2026 IG Report at 4.

127.    As of May 14, 2026, government employees at Guantánamo outnumbered detainees roughly 100 to 1. Gonzalez Decl. Ex. K at 2.

128.    ICE was informed on February 12, 2025, that noncitizens who meet the definition of being at "an elevated in-custody medical risk," which is defined as including a wide range of different medical conditions, should not be transported to Guantánamo because they "may be at increased risk for medical complications on flights to [Guantánamo] and may exceed the medical capacity at NSGB." DHS-000104–109.

129.    People who are at "an elevated in-custody medical risk" include anyone who requires regular or frequent specialty care/consultation; anyone with "ANY behavioral health conditions which may place the individual or population at risk"; anyone with an impaired communication ability (e.g., hearing, vision, or speech impaired); and generally anyone with a "need for medication(s), medical equipment and/or interventions which exceed NSGB Illegal

Alien Detention Facility's medical support capability" including specialized diets, any medical device implant, and severe allergic reaction. DHS-000106–09.

130.    DHS has issued guidance regarding health and medical considerations for personnel deploying to Guantánamo because of its "limited on-base resources and the environmental conditions" that "may present risk for personnel with certain medical history, conditions, and needs," including the lack of regularly available routine medical care, limited transportation, and the potential for extreme conditions. DHS-000110–113; *see also* DHS-000110 ("Given the limited resources, potential for extreme conditions and minimal transportation available while at [Guantánamo], traveling to [Guantánamo] with certain health conditions poses an increased risk.").

131.    In this guidance, DHS stated that emergency medical care "would require medevac by private contractor to the mainland at a cost." DHS-000110.

132.    Four legal service organizations and several noncitizens filed a lawsuit challenging the lack of access to the outside world, including attorneys, at Guantánamo. *See* Compl., *Las Americas*, ECF No. 1; Venghaus Decl. ¶¶ 21–29. After the lawsuit was filed, DHS set up a legal hotline with the American Bar Association and adopted access-to-counsel protocols that are still subject to litigation. U-DOW-CAR-213.

133.    The government still does not permit noncitizen detainees at Guantánamo to meet with counsel in-person, "[f]or operational and logistical reasons, and consistent with direction from DHS." Decl. of Colonel Tommy Sieker ¶ 19, ECF No. 28-2.

134.    According to an analysis of DHS's data by TRAC, a nonprofit data research project, as of April 14, 2025, ICE's contractual detention capacity in the United States was 62,913, but only 48,056 beds were occupied. Gonzalez Decl. Ex. Z at 1.

23

135.     ICE's average daily population was over 70,000 in January 2026. *See* Gonzalez Decl. Ex. AA at 3 (showing an average daily population of 71,929 during January 2026 for immigration detainees arrested by either ICE or CBP).

136.     On February 10, 2025, the government transferred 15 Venezuelans with final orders of removal to Guantánamo, and that same day, the government removed another 190 directly from Texas to Venezuela. Decl. of Juan Agudelo ¶¶ 8, 11, *Las Americas*, ECF No. 14-1

137.     A private contractor, CoreCivic, Inc. entered into a contract with ICE to detain noncitizens in a 2,560-bed facility in the United States on April 1, 2025, and by August 27, 2025, the contractor began receiving detainees. Gonzalez Decl. Ex. Y at 1.

## V.     Plaintiffs' Detention at Guantánamo

138.     Plaintiff Yamil Luna Gutierrez is a Nicaraguan national who was transferred from the United States to Guantánamo on or around May 20, 2025. *See* Decl. of Yamil Luna Gutierrez, ¶ 13 ("Luna Gutierrez Decl."), ECF No. 4-1; Madrigal Decl. ¶ 11.

139.     Plaintiff Luna Gutierrez received a removal order in late April or early May 2025, before he was transferred to Guantánamo. Luna Gutierrez Decl. ¶ 2.

140.     Prior to his detention at Guantánamo, Plaintiff Luna Gutierrez was held at the Farmville Detention Center in Farmville, Virginia, and the Alexandria Staging Facility in Alexandria, Louisiana. Luna Gutierrez Decl. ¶ 4.

141.     Plaintiff Luna Gutierrez was transferred from Guantánamo to Nicaragua on June 26, 2025, after spending 38 days at Guantánamo. Madrigal Decl. ¶ 13.

142.     Plaintiff Rafael Angel Lopez Ocon is a Nicaraguan national who was transferred from the United States to Guantánamo on or around May 22, 2025. *See* ECF No. 4-2 (Lopez Ocon Decl.) ¶ 3.

143.    Plaintiff Lopez Ocon received a removal order on May 8, 2025, before he was transferred to Guantánamo. Lopez Ocon Decl. ¶ 2.

144.    Prior to his detention at Guantánamo, Plaintiff Lopez Ocon was held at the Farmville Detention Center in Farmville, Virginia, and the Alexandria Staging Facility in Alexandria, Louisiana. Lopez Ocon Decl. ¶ 5.

145.    Plaintiff Lopez Ocon was transferred from Guantánamo to Nicaragua on June 5, 2025, after spending over two weeks at Guantánamo. Madrigal Decl. ¶ 19.

Dated: July 2, 2026

My Khanh Ngo (D.D.C. Bar No. CA00219)
Kyle Virgien
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org

Derek Poteet ±*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(703) 217-8374
dpoteet@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Kimberly Grano (D.D.C. Bar No. NY0512)
Pedro Sepulveda (D.D.C. Bar No. NY0637)
Ghita Schwarz (D.D.C. Bar No. NY0663)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 946-7453
kgrano@refugeerights.org
psepulveda@refugeerights.org
gschwarz@refugeerights.org

Megan Hauptman (D.C. Bar No. 1780749)
INTERNATIONAL REFUGEE

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No.
NY0224)
Judy Rabinovitz
Noor Zafar
Omar C. Jadwat
Natalie Behr
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org
IRP_NBehr@aclu.org

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No.
454248)
J. Wells Dixon
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, Floor 7
New York, NY 10012
T: (212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

*Attorneys for Plaintiffs-Petitioners*

*Pro bono representation certificates
forthcoming
± Not admitted in D.C.; practice limited to
federal courts*

26

ASSISTANCE PROJECT
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org