**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YAMIL LUNA GUTIERREZ, *et al.*, <br><br> *Plaintiffs-Petitioners, on behalf of themselves and all others similarly situated,* <br> v. <br><br> MARKWAYNE MULLIN, Secretary of Homeland Security, in his official capacity, *et al.*, <br><br> *Defendants-Respondents*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 1:25-cv-01766-SLS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**<u>DECLARATION OF NATALIE BEHR
IN SUPPORT OF PLAINTIFFS-PETITIONERS' MOTION FOR
PARTIAL SUMMARY JUDGMENT</u>**

I, Natalie Behr, hereby declare:

1.  I am an attorney at the American Civil Liberties Union Foundation ("ACLU") Immigrants' Rights Project, and I am co-counsel for Plaintiffs-Petitioners ("Plaintiffs") in this case. I make this declaration to describe the analysis I conducted regarding discovery Defendants-Respondents ("Defendants") produced in the course of this litigation.

**Background on Data**

2.  On May 22, 2026, Defendants produced a table titled "ICE Discovery Response to Question 2," reflecting information about all noncitizens that were transferred to Guantánamo between June 4, 2025, and February 2, 2026. A true and correct copy of this table is attached to this declaration as Exhibit A, with personally identifying information redacted pursuant to the Protective Order. *See* ECF Nos. 69-1–2.[1]

3.  For each noncitizen included in this table, Defendants provided the following data:

    -   First and last name, A-number, and citizenship of the individual;
    -   The date the individual was "[b]ook[ed] in" to Guantánamo;
    -   The date they were "[b]ook[ed] out" of Guantánamo;
    -   The reason for their "release" from Guantánamo (whether they were

---

[1] The parties agree that the personally identifying information should be redacted. Plaintiffs do not rely on the redacted information so have not filed an unredacted version under seal but will provide the Court a copy of the unredacted version upon request.

"removed" to another country or "transferred" back to the United States);

- If they were "transferred" rather than "removed," the reason why they were returned to the United States and the name of the facility to which they were transferred;
- If they were transferred to another country for removal, the country to which they were ultimately transferred;
- The date they departed to that country; and,
- Whether another country had agreed to accept that individual for removal at the time of their transfer to Guantánamo.

4. On June 1, 2026, Defendants produced a separate table titled "26.5.25_Luna Gutierrez v. Mullin_Outstanding Disc. 1_Defs' Resp_Final," reflecting additional information about ten of the noncitizens included in Exhibit A that had been transferred from Guantánamo back to the United States. Specifically, for some of these ten noncitizens, the government provided new information about the country to which they were transferred from the United States, and the date they departed to that country. For some others, the government provided information about whether the individual was still in detention in the United States or whether the individual had been released from custody. A true and correct copy of this table is attached to this declaration as Exhibit B, with personally identifying information redacted pursuant to the Protective Order. *See* ECF Nos. 69-1–2.

5. During a meet and confer on June 22, 2026, Defendants notified Plaintiffs that Defendants had understood the meaning of "[w]hether another country had agreed to accept that individual for removal at the time of their transfer to Guantánamo" to mean "whether a country *other than* the country of removal identified for a particular alien had accepted the alien prior to his transfer to [Guantánamo], not whether any country, *including* the country of removal, agreed to accept him." Defs.' Am. Notice Regarding Materials Produced During Discovery ¶¶ 7, 10, ECF No. 107.

6. On June 25, 2026, Defendants produced a separate table titled "Gutierrez v. Noem - Supplemental Spreadsheet 6.25Updated," reflecting additional information about all noncitizens that were transferred to Guantánamo between June 4, 2025, and February 2, 2026. A true and correct copy of this table is attached to this declaration as Exhibit C, with personally identifying information redacted pursuant to the Protective Order. *See* ECF Nos. 69-1–2.

7. This June 25 table included some, but not all, of the data included in the May table, and added some additional information. *Compare* Ex. A *with* Ex. C. In the June 25 table, the column previously titled "[w]hether another country had agreed to accept that individual for removal at the time of their transfer to Guantánamo," Ex. A, was renamed as "[w]hether another country *other than the final destination country* had agreed to accept the individual for removal at the time of transfer to Guantanamo," Ex. C (emphasis added).

8. For each noncitizen included in this June 25 table, Defendants additionally provided the following data:

   - whether the individual had travel documents to the final destination country at the time of transfer to Guantanamo; and,
   - whether the individual had travel arrangements to the final destination country at time of transfer to Guantanamo.

9. On June 26, 2026, Defendants produced a declaration by John A. Schultz, Acting Assistant Director of the Removal Division of U.S. Immigration and Customs Enforcement, dated June 26, 2026, which provided additional information about the contents of the June 25 table. A true and correct copy of this declaration is attached to this declaration as Exhibit D.

10. Subsequently, Plaintiffs asked Defendants to clarify their definition of "travel arrangements" as used in the June 25 table, and Defendants responded that "the phrase refers to whether there was a flight scheduled to the individual's final destination country at the time the individual was transferred to Guantanamo."

11. I converted the table in Exhibit A (the May table) into an Excel spreadsheet and counted 227 noncitizens in this table. I then inputted the additional information from Exhibit B (the June 1 table) and Exhibit C (the June 25 table) discussed above into this Excel spreadsheet. *See supra* ¶¶ 4, 8. I identified a number of discrepancies between the data in the May and June 25 tables,[2] but those differences generally did not materially impact the analysis I conducted.[3] The discussion below is based on the data in the May table because they were corroborated by other data points, and I relied on the June 25 table's data only for additional data about travel documents and travel arrangements not reflected in the May table.[4]

---

[2] Specifically: (1) for 11 noncitizens, the May table includes both a final destination country in the column "Departed to Country" and the date that the noncitizen departed to that country in the column "Departed Date," while the June table does not provide either a final destination country or a departed date; (2) for one noncitizen, the May table includes a final destination country but the June 25 table does not; (3) for two noncitizens, the final destination country is different between the May and June 25 tables; (4) for one noncitizen, the "Release reason" is "Transferred" in the May table, but "Removed" in the June 25 table; and (5) for one noncitizen, the "Departed Date" was different between the two tables.

[3] The most significant disparities between the tables were differences in the "Departed Date" column. *See supra* note 2. For most of the calculations discussed below, I did not use the "Departed Date," and thus any disparities between the data in the tables did not result in material changes to the calculations I conducted. The only calculations that used the "Departed Date" are those that analyze the length of time noncitizens were held in custody in the United States after their detention at Guantánamo. *See infra* ¶¶ 15–17.

[4] I compared these data points against the detailed explanation on why an individual was

**Length of Detention at Guantánamo**

12. Using this data, I calculated the following:[5]

- The median number of days that these 227 noncitizens included in the chart spent detained at Guantánamo was 23 days;[6]
- The mean number of days they spent detained at Guantánamo was 30.8 days;
- 205 noncitizens, or 90.3% of these 227 noncitizens, spent over three days detained at Guantánamo;
- 105 noncitizens, or 46.3% of these 227 noncitizens, spent over 30 days detained at Guantánamo;
- 75 noncitizens, or 33% of these 227 noncitizens, spent over 40 days detained at Guantánamo; and,
- Three noncitizens spent over 100 days detained at Guantánamo.

**Noncitizens Transferred back to the United States from Guantánamo**

13. I also used this data to calculate that 90 noncitizens (or 39.6% of all 227 noncitizens) were transferred from Guantánamo to a detention facility within the United States, rather than being "removed" directly from Guantánamo.

14. For this group transferred from Guantánamo back to the United States, the mean average length of their detention at Guantánamo was 48.6 days.

15. I calculated that 7.8% of that group (or seven noncitizens) were transferred to the country designated for their removal within three days of their return to the United States.

16. I calculated that 82 of the 90 noncitizens who were transferred back to the United States, or 91.1%, spent seven or more days in detention in the United States after

---

returned to the United States where applicable as provided in the May table, and several of these explanations matched the data provided in the May table rather than the June 25 table. For example, for one person who had a "departed date" of April 8, 2026, in the May table and no date listed in the June 25 table, the detailed explanation stated that "[s]ubject was transferred back to AEX on 3/8/26 for staging and subsequently removed from there on 4/9/26."

[5] For purposes of all calculations in this declaration, when calculating length of detention, I did not count the last day (e.g., for length of detention at Guantánamo, I did not include the date noncitizens were "booked out" of Guantánamo).

[6] For one of these individuals, the government did not list a date that the individual was booked out of Guantánamo in the "NSGB Book Out Date" column, but in the detailed explanation of why the individual was transferred back to the United States, the government stated that "[s]ubject was transferred back to AEX on 3/8/26." Ex. A at 7.

leaving Guantánamo. 75 of those 82 noncitizens were ultimately transferred to their final destination country of removal, with five noncitizens waiting 60 or more days in the United States before being transferred to their final destination country.

17. I calculated that seven out of the 90 noncitizens who were transferred back to the United States, or 7.8%, were either released from custody in the United States or, as of Defendants' discovery production on June 1, 2026, remained in detention in the United States.

**Travel Arrangements at the Time of Transfer to Guantánamo**

18. I used this data to calculate that 150 noncitizens, or 66.1% of these 227 noncitizens, did not have travel arrangements to their final destination country at the time that they were transferred to Guantánamo.

19. I calculated that for the 77 noncitizens who Defendants listed as having travel arrangements at the time they were transferred to Guantánamo:

- The mean number of days these 77 noncitizens spent detained at Guantánamo was 33.8 days;
- Zero noncitizens (0%) spent less than three days detained at Guantánamo;
- One noncitizen (1.3%) spent less than four days detained at Guantánamo;
- Two noncitizens (2.6%) spent less than seven days detained at Guantánamo;
- 73 noncitizens (94.8%) spent over 20 days detained at Guantánamo;
- 51 noncitizens (66.2%) spent over 30 days detained at Guantánamo;
- 23 noncitizens (29.9%) spent over 40 days detained at Guantánamo; and,
- 66 noncitizens (85.7%) were transferred back to the United States from Guantánamo before removal to their final destination country.

20. Only 11 of the 77 noncitizens whom Defendants listed as having travel arrangements to their final destination country at the time they were transferred to Guantánamo (14.3%) were transferred directly from Guantánamo to their final destination country.
- Only one of those 11 were transferred to their final destination country within three days of their arrival at Guantánamo.
- The other ten of these 11 noncitizens were detained at Guantánamo for between six and 48 days before being removed to their final destination.

21. I counted that 53 of the 77 noncitizens who the government stated had travel arrangements at the time of their transfer to Guantánamo were transferred to

Guantánamo "for staging" on a January 27, 2026 "mission" to their final destination country:

- These 53 noncitizens were transferred to Guantánamo on either December 14, 2025, January 2, 2026, or January 10, 2026—meaning that they arrived at Guantánamo between 17 and 44 days before the scheduled January 27, 2026 "mission."[7]
- For these 53 noncitizens, the government stated that a weather delay resulted in the "mission" being cancelled, and each of these noncitizens were transferred back to the United States on February 2, 2026, before being transferred to their destination country.
- I calculated that these 53 noncitizens spent an average of 35.3 days detained at Guantánamo.

**Travel Documents at the Time of Transfer to Guantánamo**

22. I calculated that for the 227 noncitizens transferred to Guantánamo:

- For 193 noncitizens (85%), the government indicated that the designated country for removal did not require a travel document, whether because they participated in the Electronic Nationality Verification ("ENV") program, or otherwise. I counted that there were a total of 14 countries that were designated countries of removal for this group of 193 citizens that did not require a traditional travel document.
- 24 noncitizens (10.6%) did not have travel documents at the time of their transfer to Guantánamo, and the government did not indicate that the designated country participated in the ENV program or otherwise did not require a travel document;
- Ten noncitizens (4.4%) did have travel documents at the time of their transfer to Guantánamo. I calculated that these ten noncitizens spent between 14 and 66 days detained at Guantánamo, and the mean length of their detention at Guantánamo was 48.4 days.

23. For the 203 noncitizens who either had travel documents at the time of their transfer or did not need travel documents, I calculated the following data:

---

[7] For each of these 53 noncitizens, the May 22 table states that the individual "was transferred to GITMO on 12/14/25 for staging on the 1/27/26 mission to [final destination country]." *See* Ex. A ("Detailed Explanation on why individual was returned to CONUS" column). While 20 of these individuals have December 14, 2025, listed as their "NSGB Book In Date," 14 of these individuals have January 2, 2026, listed as their "NSGB Book In Date," and 19 individuals have January 10, 2026 listed as their "NSGB Book In Date."

- 126 noncitizens (62%) did not have travel arrangements in place at the time of their transfer to Guantánamo;
- The mean number of days they spent detained at Guantánamo was 25 days;
- Zero noncitizens (0%) spent less than three days detained at Guantánamo;
- 108 noncitizens (53.2%) spent over 20 days detained at Guantánamo;
- 81 noncitizens (39.9%) spent over 30 days detained at Guantánamo;
- 52 noncitizens (25.6%) spent over 40 days detained at Guantánamo; and
- 73 noncitizens (35.96%) were transferred back to the United States before being removed to their final destination country.

I declare under penalty of perjury under the laws of the United States and New York that the foregoing is true and correct.

Executed in Brooklyn, New York on the 2nd of July, 2026.

_/s/ Natalie Behr_
Natalie Behr