# EXHIBIT L

# Annual Report

**FISCAL YEAR**

# 2024

December 19, 2024



**U.S. Immigration and Customs Enforcement**

## Letter From Deputy Director and Senior Official Performing the Duties of the Director Patrick J. Lechleitner

I'm pleased to share U.S. Immigration and Customs Enforcement's Fiscal Year 2024 Annual Report. This report details the agency's accomplishments over the past year and highlights how each directorate and program office fulfilled its congressionally mandated mission.

As a federal law enforcement agency forged from the ashes of the worst terror attack in our nation's history, ICE's primary purposes are to safeguard the American people, preserve public safety and promote national security. The agency enforces more than 400 laws across the nation by employing fact-based, data-driven and humane policies — and it does so while remaining completely apolitical.

While the men and women of ICE are often asked to rise to new challenges and we embrace this as a part of our job, FY 2024 was one of monumental changes. Throughout the year, the agency was called on to do more without commensurate funding, working within the confines of strained resources and competing priorities while steadfastly supporting the Department of Homeland Security and its component agencies in their efforts to secure the border.

At the same time, 2024 was a year of great accomplishment, innovative resourcefulness and indomitable resiliency. ICE's remarkable workforce deserves tremendous credit for the great strides this agency has taken — not just this year, but over the past 21 years.

Throughout this fiscal year, ICE developed and solidified partnerships with federal, state, local, tribal and international law enforcement agencies across the world while continuing to support the Department of Homeland Security's Southwest Border mission. This report details the agency's primary focus areas, which include upholding immigration laws; combating terrorism, cybercrime, narcotics trafficking and weapons proliferation; and investigating a wide swath of criminal activity ranging from human trafficking and child exploitation to customs fraud, cultural property theft and transnational gang activity. It also explains how ICE's data-driven law enforcement capabilities pair with its unique law enforcement authorities to protect this great nation from evolving transnational security threats.

**Southwest Border Mission Support**

During this fiscal year, ICE's Enforcement and Removal Operations directorate deployed 10% of its workforce to support DHS in stemming irregular migration to the Southwest Border. As a result, ERO has carefully prioritized its resources, as it has in previous years — including those that were previously devoted to the directorate's interior immigration enforcement mission — and has experienced significant strain in local field offices as the number of ERO personnel has remained static for over a decade.

**Investigations, Arrests and Seizures: ICE's Core Law Enforcement Mission**

Between its two operational directorates — ERO and Homeland Security Investigations — ICE enforces more than 400 statutes and laws enacted by Congress.

During FY 2024, ERO conducted 113,431 administrative arrests, including 33,243 at-large arrests, while HSI conducted 32,608 criminal arrests and seized over 1.6 million pounds of narcotics, over $886 million in criminally derived currency and assets, and approximately $192 million in virtual currency. The directorates also identified and/or recovered 1,783 child victims of exploitation.

**ICE's Global Footprint**

ERO removed 271,484 noncitizens with final orders of removal to 192 different countries, including 88,763 who had charges or convictions for criminal activity; 3,706 known or suspected gang members; 237 known or suspected terrorists; and eight human rights violators. More than 30% of those removed during the fiscal year had criminal histories, with an average of 5.63 convictions and/or charges per individual, and many of their criminal histories were extremely serious. During the year, ERO also identified and arrested individuals who were wanted in their home countries for crimes such as terrorist activities and participation in torture.

HSI led and participated in significant efforts to combat U.S. law violations and dismantle transnational criminal organizations. It expanded its Transnational Criminal Investigative Units, which conducted 2,382 criminal arrests; seized 1,158,099 pounds of illegal narcotics and 757,478 pounds of precursor chemicals, 1,833 firearms, 100,451 rounds of ammunition and over $5.2 million in counterfeit goods; and participated in numerous activities that helped secure our nation and protect victims of crime.

**Gaining Momentum in Fighting the Opioid Epidemic**

HSI released its Strategy for Combating Illicit Opioids in FY 2023, which aligns with the National Drug Control Strategy. Throughout FY 2024, in line with this strategy, HSI has participated in and led numerous operations to help protect our communities, families, friends and neighbors from the scourge of deadly fentanyl. HSI operations have seized over 42,800 pounds of fentanyl and other opioids, and in *Operation High Capacity*, HSI seized over 350 pounds of fentanyl and para-fluorofentanyl, over 800,000 pills and 13 pill presses. In support of this anti-opioid and anti-organized crime mission, ERO continued to remove those involved in the illicit drug trade and the transnational criminal gangs that facilitate it.

**Building and Maintaining Public Trust Through Accountability and Transparency**

Transparency promotes trust. During FY 2024, building on the Office of the Chief Information Officer's Data Modernization Strategy, ICE developed and released the ERO Statistical Dashboard to share data that allows the public unprecedented access to information. ICE also strategically realigned its internal structure to include an External Affairs vertical that encompasses three existing offices — the Office of Partnership and Engagement, the Office of Public Affairs and the Office of Congressional Relations — and continues to work closely with the Office of Homeland Security Statistics to promote accurate and transparent data. The agency remains committed to earning and maintaining public trust, and to help achieve that mission, it has focused on modernizing information-sharing capabilities and streamlining processes to ensure the public can more clearly understand its mission.

**ICE's Greatest Strength: Its Responsive, Resilient and Agile Workforce**

During FY 2024, ICE's workforce remained committed to the agency's complex and continuously evolving mission. The Peer Support Program, WorkLife Program and several other initiatives provided immeasurable support to the agency's hardworking law enforcement officials, attorneys and support personnel. Through the Office of Human Capital, ICE maintained its focus on recruiting and hiring women, veterans and persons with disabilities to ensure it has the most robust and skilled talent pool among federal law enforcement agencies. ICE's High Potential Executive Leadership Development Program, which works with other initiatives to reduce attrition and support skilled, talented workers, continued to identify those with strong leadership potential for career advancement. Through the ICE Office of Diversity and Civil Rights, ICE has also formed several employee resource groups that continue to advocate for its workforce, develop initiatives to help peers, and create mentorship and learning opportunities that benefit the entire agency.

Successfully leading this agency demands a careful balance of public safety, national security and support for DHS while operating with insufficient funding. We will continue to develop and implement new strategies to support our core mission of protecting the American public by investigating, disrupting and dismantling criminal threats and enforcing our immigration laws.

This report reflects ICE's collective successes and its challenges, and it provides an overview of what's on the horizon for FY 2025. As I reflect on what the agency and its exemplary workforce has accomplished over the past year, I know that we will succeed in the face of changing demands, because it's what we've always done. It's what we'll continue to do, and I have complete faith that our workforce is ready to meet all the challenges the future holds in store for them. It's my honor to serve this agency and the American public while working alongside good people who demonstrate our commitment to safeguarding this nation every day.

Sincerely,


Patrick J. Lechleitner
Deputy Director and Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement

# Table of Contents

Letter From Deputy Director and Senior Official Performing the Duties of the Director Patrick J. Lechleitner ....................................................................................2

Executive Summary...........................................................................................8

Enforcement and Removal Operations.................................................................9

   Mission and Organization ...........................................................................9

   Balancing Resources to Support Increased Mission Demands .............................10

   ERO Recruiting, Hiring and Retention .........................................................11

   Increasing Operational Efficiency ...............................................................11

   DHS Enforcement Priorities........................................................................12

   ERO Public Safety and National Security Activities.........................................14

   Administrative Arrests ..............................................................................15

   Criminal Arrests and Prosecutions ..............................................................19

   Immigration Detainers ..............................................................................20

   Custody and Case Management....................................................................21

   Detained Docket Population........................................................................22

   Detained Noncitizen Health Care .................................................................26

   Non-Detained Docket Population..................................................................26

   Alternatives to Detention ...........................................................................28

   Removals.................................................................................................30

Homeland Security Investigations......................................................................37

   Mission and Organization ..........................................................................37

   HSI Operational Components.......................................................................37

   HSI Domestic Operations and Footprint........................................................38

   HSI International Operations and Footprint.....................................................39

   Transnational Criminal Investigative Units .....................................................41

   HSI Strategic Network Dismantlement Project.................................................41

   HSI National Academy for Advanced Training and Leadership ..........................42

   Know2Protect Campaign and Project iGuardian..............................................42

   Expansion of El Dorado Task Force..............................................................43

   HSI Branding...........................................................................................43

   Direct-Hire Authority for Recruitment ..........................................................44

   White House Office of National Drug Control Policy Awards.............................44

Significant Partnerships and Outreach....................................................................44

Joint Task Force Alpha ...........................................................................................45

Border Enforcement Security Task Forces ............................................................46

National Gangs and Violent Crimes Unit ..............................................................46

Document Benefit Fraud Task Forces ....................................................................47

HSI and the Treasury's Office of Foreign Asset Control Partnership...................47

National Special Security Events............................................................................47

FY 2024 HSI Priorities...........................................................................................48

Financial Crimes.....................................................................................................49

Cyber Crimes..........................................................................................................51

National Security ....................................................................................................52

Opioids and Precursors ..........................................................................................54

Crimes of Human Exploitation and Victimization ................................................55

Global Trade............................................................................................................58

Office of the Principal Legal Advisor .........................................................................64

Mission and Organization ......................................................................................64

Immigration Case Management..............................................................................64

Significant Immigration Case Litigation................................................................66

Specialized Juvenile Docket...................................................................................67

Federal and Administrative Litigation ...................................................................67

Special Assistant U.S. Attorney Program ..............................................................67

Complex Federal District Court Matters................................................................69

Civil and Administrative Litigation.......................................................................70

Administrative and General Law Advice and Counsel..........................................71

Training Clients and Engaging Stakeholders .........................................................72

Addressing Staffing Challenges .............................................................................73

Management and Administration.................................................................................74

Mission and Organization ......................................................................................74

Enterprise Transformation Initiative......................................................................74

Government and Retirement Benefits Platform .....................................................74

Recruitment and Hiring...........................................................................................75

The Office of Leadership and Career Development................................................75

ICE Data Modernization ........................................................................................77

Deploying Key Technology Along the Southwest Border......................................77

Artificial Intelligence ............................................................................78

Communication and Engagement with Internal and External Partners .................78

Electric Vehicle Infrastructure Planning............................................................79

Effectively Addressing ICE's Fiscal and Procurement Responsibilities ..............79

Enterprise Risk Management .............................................................................79

Office of the Chief Financial Officer ...................................................................80

Mission and Organization ..................................................................................80

Budget Execution...............................................................................................80

Cost Analysis.....................................................................................................80

Office of Professional Responsibility...................................................................81

Mission and Organization ..................................................................................81

Security Program Office......................................................................................81

Inspections Program Office.................................................................................82

Investigations Program Office.............................................................................82

Office of the Director ...........................................................................................83

Office of Diversity and Civil Rights....................................................................83

Office of External Affairs ...................................................................................84

Office of Public Affairs.......................................................................................84

Office of Congressional Relations.......................................................................85

Office of Partnership and Engagement ...............................................................86

Office of Regulatory Affairs and Policy ..............................................................87

Office of Firearms and Tactical Programs ...........................................................89

Conclusion ...........................................................................................................92

Acronyms..............................................................................................................93

Appendix...............................................................................................................97

# Executive Summary

The U.S. Immigration and Customs Enforcement Fiscal Year 2024 Annual Report provides an overview of the agency's key programs, enforcement metrics and accomplishments. It represents the agency's commitment to transparency and accountability by meeting and exceeding the requirements in the Joint Explanatory Statement accompanying the Department of Homeland Security Appropriations Act, 2024.[1] This report presents six years of immigration enforcement statistics and an analysis of agency operations, policymaking and goals for FY 2025.

The Homeland Security Act of 2002 created ICE by merging the investigative and interior enforcement elements of the former U.S. Customs Service and the Immigration and Naturalization Service. Today, ICE is a premier federal law enforcement agency with over 20,000 law enforcement and support personnel in more than 400 offices across the United States and around the world. Its mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade and immigration. ICE works to uphold hundreds of federal statutes, administer U.S. immigration laws, oversee the cases of more than 7.6 million noncitizens on the agency's national docket, prevent terrorism, and combat the illegal movement of people and goods across the U.S. border.

ICE is a key component of the DHS "layered defense" approach to protecting the nation. Its annual budget of approximately $9 billion is primarily devoted to three operational directorates: Enforcement and Removal Operations, Homeland Security Investigations, and the Office of the Principal Legal Advisor. Two additional directorates — Management & Administration (M&A) and the Office of Professional Responsibility (OPR) — support the three operational branches. M&A coordinates and implements ICE administrative and managerial functions to support and advance every aspect of the ICE mission, while OPR upholds the agency's professional standards through a multidisciplinary approach of security, inspections, and investigations to promote organization health, integrity, and accountability across the Agency. Additionally, several support programs within the ICE Office of the Director are devoted to improving the agency's operational and policymaking capabilities, enhancing stakeholder relationships, and cultivating a professionally trained and diverse workforce. In FY 2024, ICE also realigned the Office of the Chief Financial Officer (OCFO) as a separate directorate, establishing better communication between the OCFO and its internal and external partners and enhancing transparency and decision-making.

---

[1] See Joint Explanatory Statement, pg. 22.
https://docs.house.gov/billsthisweek/20240318/Division%20C%20Homeland.pdf.

FY 2024 | ICE Annual Report

# Enforcement and Removal Operations

## Mission and Organization

ICE Enforcement and Removal Operations (ERO) protects the homeland by arresting and removing noncitizens who undermine the safety of U.S. communities and the integrity of U.S. immigration laws. The directorate has a complex and wide-ranging mission, and its primary areas of focus are interior enforcement operations, management of the agency's detained and non-detained populations, and removal efforts.

At the end of FY 2024, ERO had 7,696 personnel, including 6,050 law enforcement personnel, across 25 domestic field offices and 182 sub-locations nationwide, 33 permanent overseas positions, and multiple temporary duty travel assignments supporting the broader Department of Homeland Security (DHS) enterprise along the Southwest Border. Eight headquarters divisions that oversee several programmatic areas support these positions, including Custody Management, Enforcement, Field Operations, the ICE Health Service Corps, Law Enforcement Systems and Analysis, Non-Detained Management, Operations Support, and Removal. ERO coordinates closely with its U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS) partners within DHS to enforce U.S. immigration laws and uphold the public safety and national security of the United States. In addition, ERO collaborates with several other offices and agencies, including the Department of Justice, the U.S. Department of Health and Human Services' (HHS) Office of Refugee Resettlement (ORR), and the U.S. Department of State.



Figure 1. Map of ERO Field Offices

**Balancing Resources to Support Increased Mission Demands**

Although ERO's primary mission focuses on enforcing U.S. immigration laws in the interior of the United States, over the past few fiscal years, ICE has also allocated significant ERO resources to assist with DHS efforts at the Southwest Border, including ground and air transportation support, detention bedspace, docket management and removal efforts. Despite multiple border surges over the past decade and requests to Congress for additional personnel, ERO's staffing has remained relatively static. The deployment of ERO personnel to assist with irregular migration efforts has stretched the directorate's finite resources. In FY 2024, ERO deployed more than 760 personnel to directly support these efforts, accounting for nearly 10% of its law enforcement workforce. This was a reduction from the FY 2023 deployment of more than 1,300 personnel to support these efforts.

In FY 2024, the number of encounters at the Southwest Border decreased compared to FY 2023. However, the high number of encounters drove many of ERO's resource needs, and the directorate confronted challenges on multiple interconnected fronts with limited funding and personnel. To remain solvent, ERO had to focus on prioritizing certain areas of its mission and find efficiencies wherever possible. During this time, ERO continued to conduct interior enforcement operations including focusing on identifying and apprehending noncitizens who pose the greatest threats to public safety and national security in the interior of the United States, providing high standards of care to all noncitizens in its custody, delivering excellent case management services for noncitizens on its non-detained docket, and optimizing the agency's removal capabilities to keep up with the large number of recent border crossers. However, pressure from the border limited ERO's regular operations.



Figure 2. Current Staff Onboard: ERO Deportation Officers and U.S. Border Patrol Agents

**ERO Recruiting, Hiring and Retention**

ERO is committed to attracting and retaining a capable, diverse and inclusive workforce to most effectively execute ICE's national security and public safety mission. In line with the increased demands it faced in FY 2024, ERO significantly expanded efforts to grow its workforce to successfully manage its increasing caseload and address an evolving national security landscape. To achieve this, ERO employed robust recruitment, hiring and retention efforts to attract highly qualified candidates with critical skillsets from the public and private sectors. To recruit candidates with necessary skill sets, ERO proactively participated in recruitment and hiring events that targeted college and university students, women, veterans and industry experts to further enhance its applicant pool and fill critical vacancies. ERO also worked with the ICE Office of Human Capital (OHC) to ensure it leveraged all available hiring authorities to respond to changing operational conditions and improve time-to-hire. Additionally, ERO focused on retention, offering clear career paths and mobility opportunities for law enforcement professionals by developing several programs, including the ICE Mentoring for Women program and the ICE Succession Planning program. Despite these successes, ERO must continue to grow its workforce to fulfill its critical national security and public safety mission.

**Increasing Operational Efficiency**

ERO is committed to improving the agency's operational efficiency, which includes modernizing workflows, working within budgetary constraints, and enhancing business processes, systems and reporting capabilities. ERO deployed two technological options with the aim of modernizing, streamlining, and encouraging noncitizen compliance with the immigration enforcement process. In November 2023, ERO launched the ICE Portal, a public-facing website that centralizes communications between non-detained noncitizens and the federal government. Within the online portal, noncitizens can schedule appointments, update their addresses, and check immigration court hearing information in a consolidated location. In FY 2024, ERO deployed on a small scale the ICE Check-In App to test in its Miami field office. The ICE Check-In App is a mobile app developed by ERO that allows a limited number of low-risk noncitizens on the non-detained docket to conduct their mandatory check-ins with ERO officers remotely. By using 1:1 facial verification and other verification tools including geolocation services, the app improves ICE's capacity to ensure those select noncitizens meet their immigration obligations, while allowing ICE to optimize scarce resources on in-person reporting processes.

Additionally, ERO deployed two platforms to help streamline detention operations. In February 2024, ERO launched the ERO eFile system across the country. ERO eFile is an online registration system that permits legal representatives to more easily file their Form G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative*. ERO eFile enhances the process of filing the Form G-28, enables the agency to more efficiently report on representation rates, and automates representative information within ICE's systems of record. Relatedly, ERO began developing an online scheduling tool for legal visits at ICE detention facilities through ERO eFile. By connecting to ERO eFile, the Detention Facility Appointment Scheduler will decrease the administrative burden on ERO staff and detention facility contractors of continuously vetting legal representatives and scheduling legal visits. This connection will

allow agency staff and contractors to better manage legal visitation, including through the Virtual Attorney Visitation program, which increases detained noncitizen access to counsel. In the coming year, ERO will continue building upon these technological enhancements to increase operational efficiency.

**DHS Enforcement Priorities**

As law enforcement personnel, ERO's deportation officers conduct law enforcement actions on a case-by-case basis, considering the totality of circumstances for each noncitizen and focusing limited agency resources on noncitizens who present the greatest threats to national security and public safety. These enforcement decisions — including arrests, removals, detention, detainers and other ERO officer actions — may be augmented by additional DHS, ICE or ERO guidance to ensure that law enforcement actions and operations align with current policy and mission objectives.

On September 30, 2021, DHS Secretary Alejandro Mayorkas issued *Guidelines for the Enforcement of Civil Immigration Law*. This memorandum instructs DHS immigration officers to prioritize apprehending and removing noncitizens considered to be threats to national security, public safety and border security, which include:

- National security threats include noncitizens who engaged in or are suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise pose a danger to national security.
- Public safety threats include noncitizens who pose threats to public safety, typically because of serious criminal conduct.
- Border security threats include noncitizens who pose threats to border security, including those who are apprehended at the border or port of entry while attempting to unlawfully enter the United States, or who were apprehended in the United States after unlawfully entering the country after November 1, 2020.

Since the Supreme Court's ruling in July 2023,[2] after which ICE reinstituted the application of the civil immigration enforcement priorities (CIEP) memorandum, ERO officers focus the directorate's enforcement and removal operations on noncitizens who are threats to national security, public safety and border security.

---

[2] On June 10, 2022, in *Texas v. United States*, the U.S. District Court for the Southern District of Texas vacated the September 2021 memorandum. At that time, ICE personnel ceased the implementation of the guidelines and returned to the baseline exercise of prosecutorial discretion. On June 23, 2023, in *United States v. Texas*, the U.S. Supreme Court reversed the District Court's decision in *Texas v. United States*. The Supreme Court's decision went into effect on July 25, 2023. On July 28, 2023, ICE reinstituted the application of the September 2021 memorandum.

FY 2024 | ICE Annual Report



Figure 3. FY 2024 ERO CIEP Arrests.[3]



Figure 4. FY 2024 ERO CIEP Detainers Issued.[4]

---

[3] CIEP data is current through September 30, 2024. "Other" refers to enforcement actions that do not fall into any of the three priorities based upon the criteria defined above. They may include active cases that are pending review and priority designation, or closed cases with departure dates prior to reinstatement of the September 2021 Memorandum.

[4] Ibid.

FY 2024 | ICE Annual Report



Figure 5. FY 2024 ERO CIEP Removals.[5]

**ERO Public Safety and National Security Activities**

ERO identifies noncitizens considered to be removable from the United States through a range of law enforcement and intelligence techniques. As part of these efforts, ERO's Targeting Operations centers — the National Criminal Analysis and Targeting Center, the Law Enforcement Support Center and the Pacific Enforcement Response Center — deliver real-time leads and referrals to ERO's 25 field offices to increase the operational efficiency of its targeted enforcement actions.

> **High-Profile Arrest**
>
> On May 6, 2024, ERO New York arrested a 29-year-old Salvadoran national wanted in El Salvador for terrorist activities. The noncitizen previously admitted to being an MS-13 gang member during an arrest by the Arlington Police Department in Virginia in September 2016 for three counts of grand larceny and felony possession of burglary tools. In March 2022, Salvadoran authorities notified ERO New York of its active arrest warrant. The subject was located by an ERO Fugitive Operations Team and taken into custody without incident. The noncitizen remains in ERO custody pending removal from the United States.

Once ERO identifies and locates a noncitizen who is considered a DHS enforcement priority, ERO investigates the noncitizen's case to determine removability. When ERO has probable cause, an ERO officer will arrest the target of the investigation. Two programs within ERO comprise officers who conduct arrests:

- ERO Fugitive Operations identifies, investigates, locates and arrests at-large noncitizens within the United States, including larger-scale enforcement operations, through its 129 Fugitive Operations Teams and 10 Mobile Criminal Apprehension Teams.

---

[5] Civil Immigration Enforcement Priority (CIEP) data is current through September 30, 2024. "Other" refers to enforcement actions that do not fall into any of the three priorities based upon the criteria defined above. They may include active cases that are pending review and priority designation, or closed cases with departure dates prior to reinstatement of the September 2021 Memorandum.

FY 2024 | ICE Annual Report

- The Criminal Apprehension Program (CAP) identifies, locates and arrests noncitizens in the custody of other law enforcement agencies, as well as those noncitizens released from other law enforcement agencies who were arrested for criminal activity.

**Administrative Arrests**

ERO conducts administrative arrests of noncitizens for civil violations of U.S. immigration laws. Administrative arrests occur when ERO arrests a noncitizen for a violation of the Immigration and Nationality Act. Noncitizens with or without criminal histories may be administratively arrested.

> **High-Profile Arrest**
>
> In a case that garnered Congressional attention, the New York City Police Department released from custody a 21-year-old Venezuelan national charged with assaulting NYPD officers after local ordinance prevented them from honoring a detainer lodged by ERO New York City. After the NYPD refused to cooperate, ERO New York City's Fugitive Operations Team deployed a team that prioritizes enforcement efforts on noncitizens who present heightened threat to national security, public safety, and border security. Using intelligence-driven leads, ERO's Fugitive Operations Team located and carried out an at-large arrest of the noncitizen near his residence in New York City on April 24, 2024. Through the end of the fiscal year, the noncitizen remained in ERO custody, pending removal from the United States.

After investigating noncitizens who meet DHS priorities, ERO uses its discretion to administratively arrest noncitizens who are removable from the United States through two mechanisms:

- At-large arrests, which take place within the community (i.e., outside of jails or prisons).
- Custodial arrests, which take place in the confines of a jail or prison, as CAP works with federal, state and local law enforcement partners to take custody of removable noncitizens who have already been arrested by another law enforcement agency for criminal activity.

Throughout the fiscal year, continued high levels of irregular migration at the Southwest Border and the historic growth of ERO's non-detained docket significantly impacted ERO's interior enforcement and case management operations. In addition, ERO detailed significant numbers of its personnel to support DHS efforts for managing irregular migration at the Southwest Border over the past several fiscal years, further straining ERO's finite resources. While ERO continues to invest in enhanced technology and other improvements to streamline the process, the responsibilities associated with the growing docket and the corresponding reallocation of officer time and functions resulted in fewer administrative arrests and at-large arrests in FY 2024 compared to FY 2023.

> **High-Profile Arrest**
>
> In June 2024, ERO's National Fugitive Operations Program, in coordination with HSI's Human Rights Violators and War Crimes Center and the Office of the Principal Legal Advisor, worked to identify, locate and apprehend known or suspected human rights violators. ERO officers from 14 field offices arrested 11 fugitives sought for their roles in known or suspected human rights violations during a nationwide operation that took place from June 10 through June 14.

15    FY 2024 | ICE Annual Report

In FY 2024, ERO arrested 113,431 noncitizens — a 33.5% decrease from FY 2023, when ERO conducted a total of 170,590 arrests. Although shifts in arrest numbers are driven by multiple complex factors, many of ERO's resources throughout FY 2024 were concentrated on processing and removing noncitizens at the Southwest Border, limiting interior law enforcement actions. This focus on border cases impacted routine interior enforcement operations.

Despite the limits on available ERO personnel and resources, ERO continued to conduct targeted enforcement actions in the interior of the country, focusing on identifying, locating and arresting noncitizens who posed the greatest threats to public safety and national security in line with DHS priorities. As a result, while overall arrests fell, the composition of ERO's arrests shifted toward noncitizens with serious criminal histories. In FY 2024, 81,312, or 71.7%, of the 113,431 noncitizens ERO arrested were convicted criminals or had pending criminal charges at the time of arrest. In contrast, 73,822, or 43%, of the 170,590 ERO arrested in FY 2023 had criminal histories, representing a significant jump in the percentage of criminals arrested.

During FY 2024, the 81,312 criminal noncitizens ERO arrested had 516,050 charges and convictions, for an average of 6.3 charges or convictions per person. These charges or convictions included serious and violent offenses, including 57,081 assaults; 18,579 sexual assault and sex offenses; 12,895 weapons offenses; 11,822 burglaries; 5,462 robberies; 2,894 homicides; and 2,766 kidnappings, demonstrating ERO's strong focus on public safety arrests and its role keeping communities safe nationwide.

**High-Profile Arrest**

On March 20, 2024, members of ERO New York City's Fugitive Operations Team, the U.S. Marshals Service's New Jersey-New York Regional Fugitive Task Force and the Eastchester Town Police Department worked together to arrest a Colombian national and suspected member of a South American theft group after a federal arrest warrant was issued. As of September 30, 2024, this noncitizen is in Bureau of Prisons custody for violating 8 U.S.C. §1326, Re-Entry of Removed Aliens. ERO lodged a detainer on March 20, 2024, and will seek to remove this individual upon release.

In FY 2024, of the 113,431 ERO arrests, 33,242, or 29.3%, were conducted at-large. This is a decrease of 63.7% compared to FY 2023, when ERO conducted 91,497 at-large arrests. This was largely driven by the same factors as the overall decreases in administrative arrests and ERO's limited resources being focused on border security.

FY 2024 | ICE Annual Report



Figure 6. FY 2019 – FY 2024 ERO Administrative Arrests by Criminality with USBP Encounters[6]



Figure 7. FY 2019 – FY 2024 ERO Initial Book-Ins by Month and Arresting Agency[7]

---

[6] FY 2024 Arrest Data are current through September 30, 2024. FY 2019 – FY 2023 data are locked and remain static. ERO Administrative Arrests include all ERO Programs. USBP encounter data are current through September 30, 2024 (https://www.cbp.gov/newsroom/stats/nationwide-encounters).

[7] FY 2024 Arrest Data are current through September 30, 2024. FY 2019 – FY 2023 data are locked and remain static. ICE Detention data exclude ORR transfers/facilities, as well as U.S. Marshals Service prisoners. The "ICE" Arresting Agency includes ERO, HSI and other programs. The "CBP" Arresting Agency includes the following programs: Border Patrol, Inspections, Inspections-Air, Inspections-Land and Inspections-Sea.



Figure 8. FY 2019 – FY 2024 ERO At-Large Administrative Arrests by Criminality.[8]

| Criminal Charge Code | Relevant Charge | Relevant Conviction | Total |
|---|---|---|---|
| Traffic Offenses | 80,105 | 48,175 | 128,280 |
| Dangerous Drugs | 41,094 | 27,522 | 68,616 |
| Immigration | 34,074 | 30,206 | 64,280 |
| Assault | 38,186 | 18,895 | 57,081 |
| Obstructing Judiciary, Congress, Legislature, Etc. | 13,713 | 6,193 | 19,906 |
| Larceny | 11,646 | 6,875 | 18,521 |
| General Crimes | 11,285 | 5,850 | 17,135 |
| Obstructing the Police | 11,124 | 5,956 | 17,080 |
| Weapon Offenses | 8,311 | 4,584 | 12,895 |
| Burglary | 7,047 | 4,775 | 11,822 |
| Invasion of Privacy | 6,885 | 4,378 | 11,263 |
| Fraudulent Activities | 6,685 | 4,238 | 10,923 |
| Sex Offenses[9] | 6,106 | 4,486 | 10,592 |
| Public Peace | 5,934 | 3,304 | 9,238 |

[8] FY 2024 data are current through September 30, 2024. ERO Administrative Arrests include all ERO programs. Starting in FY2018, ICE defines immigration violators' criminality in the following manner: Convicted Criminal: An immigration violator with a criminal conviction entered into ICE systems of record at the time of the enforcement action; Pending Criminal Charges: Immigration violators with pending criminal charges entered into ICE system of record at the time of the enforcement action; and Other Immigration Violators: Immigration violators without any known criminal convictions or pending charges entered into ICE system of record at the time of the enforcement action.

[9] Not involving Assault or Commercialized Sex.

| | | | |
|---|---|---|---|
| Sexual Assault | 4,716 | 3,271 | 7,987 |
| Family Offenses | 3,908 | 2,041 | 5,949 |
| Stolen Vehicle | 3,392 | 2,135 | 5,527 |
| Robbery | 3,192 | 2,270 | 5,462 |
| Damage Property | 3,320 | 1,681 | 5,001 |
| Stolen Property | 2,586 | 1,369 | 3,955 |
| Forgery | 2,312 | 1,483 | 3,795 |
| Flight/Escape | 2,381 | 1,376 | 3,757 |
| Liquor | 2,630 | 1,045 | 3,675 |
| Homicide | 1,619 | 1,275 | 2,894 |
| Kidnapping | 1,816 | 950 | 2,766 |
| Threat | 1,250 | 582 | 1,832 |
| Commercialized Sexual Offenses | 754 | 462 | 1,216 |

Figure 9. FY 2024 ERO Administrative Arrests by Charges and Convictions.[10]

**Criminal Arrests and Prosecutions**

ERO conducts criminal arrests and initiates prosecution cases for violations of the U.S. Code, primarily under Title 8. ERO Criminal Prosecution teams within its 25 field offices work with Offices of the U.S. Attorneys to pursue criminal violations of the U.S. Code. When criminal noncitizens complete their sentences, ICE assumes custody and places them in the appropriate removal proceedings.

During FY 2024, ERO's prosecutions resulted in 3,032 criminal arrests; 3,012 criminal indictments; and 3,014 criminal convictions. Frequent charges and convictions included violations of 8 U.S.C. § 1253, Penalties Related to Removal; 8 U.S.C § 1325, Improper Entry by Alien; 8 U.S.C § 1326, Re-Entry of Removed Aliens; 18 U.S.C. § 1361, Government Property or Contracts;

> **High-Profile Prosecution**
>
> On October 27, 2023, a U.S. District Court judge sentenced a 33-year-old Jamaican national to 21 months in federal prison for illegally reentering the United States in violation of 8 U.S.C. § 1326, Re-Entry of Removed Aliens. ERO had removed the noncitizen to Jamaica on March 3, 2022, after he served a prison sentence for conspiracy to commit mail fraud, a case that involved a scheme to defraud elderly and vulnerable victims of their money through a fake lottery. ERO became aware that the noncitizen was again present in the United States following a fingerprint match after he was arrested during a mail fraud investigation while using a fake name. ERO lodged a detainer and will seek to remove him upon release.

18 U.S.C § 1546, Fraud and Misuse of Visas, Permits and Other Documents; 18 U.S.C § 111, Assaulting, Resisting, or Impeding Certain Officers or Employees; and 18 U.S.C § 922(g), Felon in Possession of a Firearm.

---

[10] FY 2024 Arrest Data is current through September 30, 2024. Criminal charge categories are based on criminal history as it appears in ICE's system of record at the time of arrest. A noncitizen may have multiple charges and/or convictions.

FY 2024 | ICE Annual Report



Figure 10. FY 2019 – FY 2024 ERO Criminal Arrests and Prosecution Actions.[11]

## Immigration Detainers

When noncitizens who fall within ERO's enforcement priorities are arrested for criminal activity and taken into custody by state or local law enforcement agencies, ERO may lodge immigration detainers against them. Detainers request that federal, state, local or tribal law enforcement agencies maintain custody of a noncitizen for a period not to exceed 48 hours beyond the time they would otherwise be released.[12] This allows ERO to arrest noncitizens in safe, custodial settings.

Detainers are critical public safety tools because they increase the safety of all parties involved — ERO personnel, law enforcement officials, removable noncitizens and the public. In addition, detainers are an effective force multiplier for ERO and help reduce a significant operational burden within the jurisdictions where they are issued. Detainers help conserve scarce government resources by allowing ERO to take criminal noncitizens into custody immediately upon release from jail or prison, rather than expending resources locating and arresting them in the community.

---

[11] Arrests, indictments and convictions reflected in the data occurred during the given fiscal year. In some instances, an arrest may occur in one fiscal year and a corresponding indictment or conviction in a subsequent one.
[12] Immigration Detainers. https://www.ice.gov/immigration-detainers

FY 2024 | ICE Annual Report



Figure 11. FY 2019 – FY 2024 ERO Detainers Issued[13]

In FY 2024, ERO issued 149,764 detainers for noncitizens with criminal histories, an increase of 19.5% from FY 2023, when ERO issued 125,358 detainers. During FY 2024, ERO issued detainers to noncitizens with convictions and charges for numerous serious criminal activities, including 80,854 assaults; 21,379 sexual assault and sex offenses; 19,409 weapons offenses; 19,248 burglaries; 7,904 robberies; 4,541 kidnappings; and 4,085 homicides.

**Custody and Case Management**

ERO manages the detained and non-detained dockets from initial book-in to final case disposition (and removal, if applicable). Although ERO's detained population is limited due to congressional funding for ERO's detention beds, the non-detained population has grown significantly, driven primarily by increased migration at the Southwest Border. At the end of FY 2024, ICE managed more than 7.6 million noncitizens in removal proceedings or subject to final orders of removal on the agency's non-detained docket. In addition, in FY 2024, ERO provided for the safety, security and care for nearly 278,000 noncitizens who entered into ERO custody over the course of the fiscal year. Additionally, ERO transports noncitizens between detention facilities, to and from medical appointments, to relieve overcrowding along the Southwest Border, and to stage those who have received final orders of removal.

---

[13] FY 2024 Detainer Data is current through September 30, 2024. FY 2019 – FY 2023 data are locked and remain static. ERO Detainers include all ERO programs.



Figure 12. FY 2019 – FY 2024 ERO Detained and Non-Detained Dockets End-of-Year Snapshot (as of September 30, 2024).[14]

## Detained Docket Population

ERO oversees the civil immigration detention of one of the most diverse and rapidly changing detained populations in the world. The ERO Headquarters Custody Management and ICE Health Service Corps (IHSC) divisions assist ERO field officers with managing the detained population, overseeing the safety and health — including dental and mental health care — of noncitizens in custody, and ensuring compliance with ERO's detention standards.

During FY 2024, noncitizens from dozens of countries passed through ERO's 129 detention facilities, staying in custody for an average of 46.9 days.[15] These noncitizens speak dozens of languages, including rare indigenous dialects, and present with a wide range of physical and mental health care requirements.

ERO detention is not punitive, and the agency detains noncitizens only when required by law or based on the unique circumstances of the case. Generally, noncitizens in ICE detention fall into one of three categories:

- Noncitizens ERO may not release because doing so would violate the Immigration and Nationality Act.
- Noncitizens ERO has determined must be detained to secure their presence for immigration proceedings or removal from the United States.
- Noncitizens who pose risks to public safety or national security or may be considered flight risks.

---

[14] FY 2024 data is current through September 30, 2024. FY 2019 – FY 2023 data are locked and remain static. ICE Detention data exclude ORR transfers/facilities, as well as U.S. Marshals Service Prisoners. ICE National Docket data are a snapshot of September 3, 2024.
[15] ICE detention facilities exclude hold rooms, hospital, and juvenile facilities.

FY 2024 | ICE Annual Report

ERO's limited detention capacity and relatively static appropriated bedspace forces the agency to carefully prioritize whom it detains. Similar to FY 2023, ERO's limited detention capacity was primarily used to house two populations in FY 2024: Noncitizens CBP arrested at the Southwest Border and were subsequently transferred to ERO custody, and noncitizens with criminal histories ERO arrested in the U.S. interior. Between FY 2023 and FY 2024, the number of noncitizens in ERO custody increased from 36,845 at the end of FY 2023 to 37,684 at the end of FY 2024.[16] Maintaining a steady trend seen over the past several years, 67.4% of book-ins resulted from CBP arrests in FY 2024, compared to 68.6% in FY 2023.



Figure 13. FY 2019 – FY 2024 ERO Initial Book-Ins by Final Order and Fiscal Year.[17]



Figure 14. FY 2024 ERO Currently Detained by Final Order Status

| Country of Citizenship | Detained |
|---|---|
| Mexico | 5,089 |
| Honduras | 2,957 |
| Guatemala | 2,713 |

---

[16] FY 2024 National Docket data are a snapshot of September 30, 2024.

[17] FY 2024 Book-In Data are current through September 30, 2024. FY 2019 – FY 2023 data are locked and remain static.

| India | 2,647 |
|---|---|
| El Salvador | 1,958 |
| Colombia | 1,834 |
| Dominican Republic | 1,629 |
| Venezuela | 1,470 |
| Ecuador | 1,432 |
| Russia | 1,319 |

Figure 15. FY 2024 ERO Currently Detained by Top 10 Countries of Citizenship



Figure 16. FY 2019 – FY 2024 ERO Currently Detained by Arresting Agency.[18]

---

[18] FY 2019 – FY 2023 data are locked and remain static and are as of the end of the fiscal years.

FY 2024 | ICE Annual Report



Figure 17. FY 2019 – FY 2024 ERO Average Daily Population by Arresting Agency.[19]



Figure 18. FY 2019 – FY 2024 ERO Average Daily Population
by Arresting Agency and Month.[20]

---

[19] FY 2024 data are current through September 30, 2024. FY 2019 – FY 2023 data are locked and remain static.
[20] ICE Detention data exclude ORR transfers/facilities, as well as U.S. Marshals Service Prisoners.

FY 2024 | ICE Annual Report



Figure 19. FY 2019 – FY 2024 ERO Average Length of Stay by Arresting Agency.[21]

**Detained Noncitizen Health Care**

ERO is committed to safely delivering high-quality health care to noncitizens in its custody. IHSC administers the health care system and manages a diverse workforce comprising approximately 1,750 authorized positions, including highly qualified federal civil servants, U.S. Public Health Service officers and contract health professionals. ERO provides direct health care at IHSC-staffed facilities, oversees the compliance with health-related detention standards in contract facilities, reimburses providers for off-site health care services noncitizens receive while in ERO and CBP custody, and supports special operation missions.[22] All noncitizens in ERO custody receive health care screenings within 12 hours of arrival and complete medical assessments within 14 days of admission.

During FY 2024, IHSC's operating budget approached $421.5 million, and IHSC provided direct care — including medical, mental, and dental health services — to over 138,000 noncitizens housed at 18 IHSC-staffed facilities throughout the United States over the course of more than 1.3 million visits. In addition, IHSC oversaw compliance with health-related detention standards for 186,900 noncitizens housed in 129 non-IHSC-staffed facilities, totaling over 45,500 beds.

**Non-Detained Docket Population**

ERO detains noncitizens only when necessary. As a result, most noncitizens on ERO's national docket remain on its non-detained docket. Noncitizens on the non-detained docket — including those released from agency custody with final orders of removal, those who are pending removal proceedings, and unaccompanied children who have aged out of the custody of HHS ORR —

---

[21] ICE Detention data exclude ORR transfers/facilities, as well as U.S. Marshals Service prisoners.

[22] IHSC Special Operations Unit officers support maritime operations in partnership with the U.S. Coast Guard; care for noncitizens with high-risk conditions or special medical needs during air transport to their country of origin; and undergo extensive training to respond appropriately to in-flight medical emergencies.

FY 2024 | ICE Annual Report

are monitored outside detention settings through a variety of mechanisms.[23] At the end of FY 2024, the non-detained docket increased by approximately 24.6%, from more than 6.1 million noncitizens at the end of FY 2023 to more than 7.6 million noncitizens at the end of FY 2024. CBP apprehensions of noncitizens at the Southwest Border and the transfer of those cases to ERO were the main drivers of this increase.



Figure 20. FY 2024 ERO Currently Non-Detained by Final Order Status.[24]



Figure 21. FY 2019 – FY 2024 ERO Non-Detained Docket End-of-Year Snapshots.[25]

---

[23] When an immigration judge issues an order of removal against a noncitizen, the noncitizen may appeal the immigration judge's decision to the Board of Immigration Appeals (BIA). If the BIA dismisses the appeal and affirms the immigration judge's order of removal, the order of removal becomes administratively final.
[24] FY 2024 National Docket data are a snapshot of September 30, 2024.
[25] FY 2024 National Docket data are a snapshot of September 30, 2024. FY 2019 – FY 2023 data is locked and remains static and are as of the last day of the fiscal year.

FY 2024 | ICE Annual Report

| Country of Citizenship | Non-Detained Total |
|---|---|
| Mexico | 1,135,743 |
| Guatemala | 982,669 |
| Honduras | 951,188 |
| Venezuela | 701,678 |
| El Salvador | 569,090 |
| Cuba | 539,400 |
| Colombia | 384,734 |
| Nicaragua | 355,122 |
| Ecuador | 310,977 |
| Haiti | 292,178 |

Figure 22. FY 2024 ERO Currently Non-Detained by Top 10 Countries of Citizenship.[26]

**Alternatives to Detention**

While ERO's detention resources are finite, and the agency detains only a small subset of noncitizens on its docket — approximately 37,700 of more than 7.6 million noncitizens were in detention on an average day in FY 2024 — the Alternatives to Detention (ATD) program offers an intermediate level of supervision for a subset of non-detained cases. The ATD program uses technology, case management and other tools to manage compliance with release conditions while noncitizens are on ERO's non-detained docket. This provides increased supervision of noncitizens for whom detention may not be necessary or possible, but who may benefit from additional oversight. ERO uses ATD to manage a range of non-detained cases, including those in which noncitizens may be at a higher risk of absconding, have very minor criminal histories but are not considered public safety threats, or have serious medical conditions.

*ATD-Intensive Supervision Appearance Program*

ERO uses three types of technology to monitor noncitizens on the ATD-Intensive Supervision Appearance Program (ISAP), including telephonic reporting, GPS monitoring and biometric facial comparison. ERO continues to improve the program by adding new technology options to the ATD-ISAP suite. In April 2023, ERO initiated limited deployments of a wrist-worn device in the Denver and Los Angeles field offices. The wrist-worn device augments existing ATD-ISAP technologies and leverages technology like a consumer smartwatch. The wrist-worn device cannot be used for any functions beyond GPS monitoring, facial comparison check-in, and messaging with ERO and ATD-ISAP contract staff through a pre-installed application. In February 2024, a contract modification approved the use of the wrist-worn device across ERO. As a result, ERO deployed wrist-worn devices for use throughout its 25 field offices.

---

[26] FY 2024 data are a snapshot of September 30, 2024.

ATD-ISAP allows ERO to supervise participants through a combination of contractor case management support services, including orientation and enrollment, home visits, office visits, access to Know Your Rights presentations, alert management, EOIR court tracking and individualized service plans for targeted case management support by the contractor. Beyond traditional case management services, ERO offers extended case management services, such as orientation and education on legal rights and responsibilities and reminders for ERO check-ins, court date appearances and compliance with final decisions.[27]

As ERO's non-detained docket continues to grow, the ATD-ISAP program serves as an important case management and accountability tool, allowing ICE to provide increased supervision for an eligible subset of the non-detained docket. Adults 18 and older who are released from DHS custody and who are generally in removal proceedings or subject to final orders of removal may be eligible for ATD-ISAP. Officers review several factors when making enrollment determinations, including criminal, immigration and supervision history; family and community ties; proximity to case management sites; status as a caregiver or provider; and humanitarian and medical considerations. Overall, the program provides an additional layer of supervision for noncitizens released from detention with conditions, such as release on an order of recognizance, release on an order of supervision, a grant of parole or a posted immigration bond.

At the end of FY 2024, there were more than 179,000 active participants on ATD-ISAP, fewer than the 194,000 participants on the program at the end of FY 2023. Several factors contributed to the lower ATD-ISAP population in FY 2024. The two main factors were a decrease in ATD enrollments at the Southwest Border between March and July 2024 and an increase in program terminations along the Southwest Border. However, a lack of necessary funding also led to a smaller number of program enrollments during the fiscal year.

In FY 2024, 37,812 participants on ATD-ISAP absconded from the program. An ATD absconder is defined as a noncitizen who, while enrolled in ATD-ISAP, flees from their current address without any notification or forwarding information to ERO. As a result, the case specialist or ATD officer is unable to contact or locate the noncitizen, leading ERO to classify them as an absconder. An ATD absconder differs from an absconder from ICE's non-detained docket and a fugitive. An absconder from the non-detained docket is defined as a noncitizen who fails to comply with their reporting requirements after release from ICE custody. ERO, however, does not track the absconder rate for non-ATD absconders as it does for those enrolled in ATD. Additionally, ERO does not officially use the word "abscond" in this context. ERO defines a fugitive as a noncitizen who fails to depart the United States upon receiving a final order of removal, deportation or exclusion, or who fails to report to ICE after receiving notice to do so.

---

[27] Beginning in FY 2021, ATD – ISAP began offering Wraparound Stabilization Services (WSS), targeted services that provide psychosocial and behavioral health support for vulnerable participants and their families who would benefit from additional stabilization services. As of June 2024, ICE discontinued the use of the Wraparound Stabilization Services available within ATD – ISAP as part of reprogramming efforts to help ERO remain solvent through the end of the fiscal year.

*Young Adult Case Management Program*

In FY 2024, ERO continued to operate the Young Adult Case Management Program (YACMP) to help participants 18 to 19 years of age navigate the immigration process. YACMP is a non-detained program that replaces ERO field office reporting requirements with case management services and does not include GPS or other monitoring technology. During FY 2024, ERO enrolled 5,111 participants in YACMP, made more than 9,135 referrals for participants to various social service organizations, and conducted 4,593 human trafficking screenings. Additionally, ERO referred 29 cases with indicators for possible human trafficking to HSI for additional investigation. During FY 2024, ERO faced resourcing constraints that required some cost saving measures across its broader operations. As a result, due to fiscal limitations and the fact that ERO reviewed the program and determined YACMP did not align with ERO's missions or priorities, the directorate decided not to exercise the third year of the contact, effectively ending the contract on August 17, 2024.

## Removals

Title 8 of the U.S. Code authorizes ERO officers to remove noncitizens with final orders of removal, including final orders issued by an immigration judge or other lawful means. An ICE removal is defined as the compulsory and confirmed movement of an inadmissible or deportable noncitizen out of the United States. ERO removes noncitizens it arrests within the U.S. interior and noncitizens apprehended by CBP along the Southwest and Northern Borders who are subsequently transferred to ERO custody. Removal management is a complex process that requires careful planning and coordination with a wide range of domestic and foreign partners. After a noncitizen receives a final order of removal, ERO coordinates with necessary partners to obtain proper travel documents and effectuates the noncitizen's removal via a chartered flight, a commercial flight, or land transport for removals to contiguous countries.

> **High-Profile Removal**
>
> On June 26, 2024, ERO Harlingen, with assistance from the ERO Assistant Attache for Removal in Honduras, removed a 40-year-old citizen and national of Honduras. Honduran authorities wanted the foreign fugitive for aggravated human trafficking in the form of commercial sexual exploitation. The noncitizen was removed from the U.S. only four months after being arrested by U.S. Border Patrol and transferred to ERO custody.

ERO removed significantly more noncitizens in FY 2024 than in both FY 2023 and FY 2022. In FY 2024, ERO removed 271,484 noncitizens — an increase of 90.4% compared to FY 2023 and an increase of 276.1% compared to FY 2022 — to 192 countries.

Several factors drove the increase of ERO removals in FY 2024, including prior FY 2023 successful in-country negotiations that resulted in approvals for an increased number of removal flights, reduced manifest notification requirements stemming from FY 2023 Electronic Nationality Verification (ENV) program[28] expansion, and air charter flight manifesting

---

[28] Since July 2019, ICE ERO has partnered with the governments of El Salvador, Guatemala and Honduras to expedite repatriation of their nationals with final orders of removal from the United States via the ENV program. Through ENV, noncitizens subject to final orders of removal who affirm their countries of citizenship under oath are

over the weekends. DHS and ERO's successful negotiations with foreign governments on ICE charter flight restrictions and requirements to countries with high-volume populations encountered at the Southwest Border led to several high-volume countries in the Western Hemisphere agreeing to expand weekly flight cadences, lower advance mission notification time requirements, receive weekend manifests and expand ENV program participation. These actions enhanced ERO's ability to scale up removal operations and laid the groundwork for the

**High-Profile Removal**

On April 1, 2024, ERO Boston removed a 38-year-old Colombian national and convicted drug trafficker from the United States. In October 2018, CBP arrested the noncitizen while aboard a sea vessel subject to U.S. inspection and transferred the noncitizen to U.S. Marshals Service custody to face federal drug trafficking charges. In July 2019, the U.S. District Court for the Eastern District of Texas convicted the noncitizen of conspiracy to possess with intent to distribute cocaine while aboard a vessel subject to the jurisdiction of the United States and issued a sentence of 11 years and three months in federal prison.

increase of removals in FY 2024. Additionally, intensive diplomatic efforts by DHS and ERO resulted in an increased number of charter flights in FY 2024 to countries in the Eastern Hemisphere. These included the first large charter removal flight to the People's Republic of China since FY2018 as well as large charter flights stopping in Albania, Angola, Egypt, Georgia, Ghana, Guinea, India, Mauritania, Romania, Senegal, Tajikistan and Uzbekistan.

Of the 271,484 removals, 88,763 — or 32.7% — had criminal histories, with an average of 5.63 convictions and/or charges per individual. These included many serious charges or convictions for offenses, including 47,885 assaults; 16,552 sexual assaults and sex offenses; 10,862 weapons offenses; 9,453 burglaries; 4,906 robberies; 2,699 homicides; and 2,423 kidnappings.



Figure 23. FY 2019 – FY 2024 Overall ERO Removals by Fiscal Year.[29]

---

authorized for repatriation to their native country. Participating governments and ERO jointly determine eligibility parameters and eliminate the traditional travel document request/issuance through a consular officer.

[29] FY 2024 Removals data are current through September 30, 2024. FY 2019 – FY 2023 data are locked and remain static. ICE Removals include Returns. Returns include Voluntary Returns, Voluntary Departure, and Withdrawals Under Docket control. ICE Removals include noncitizens processed for Expedited Removal (ER) or Voluntary Return (VR) that were turned over to ERO for detention. Noncitizens processed for ER and not detained by ERO or VR after June 13, 2013, are primarily processed by U.S. Border Patrol.



Figure 24. FY 2019 – FY 2024 ERO Removals by Criminality.[30]



Figure 25. FY 2019 – FY 2024 ERO Interior Removals by Criminality.[31]

---

[30] FY 2024 Removals data are current through September 30, 2024. FY 2019 – FY 2023 data are locked and remain static.
[31] Ibid.

FY 2024 | ICE Annual Report



Figure 26. FY 2019 – FY 2024 ERO Removals by Arresting Agency.[32]



Figure 27. FY 2019 – FY 2024 ERO Removals by Arresting Agency and Month

*Removals of U.S. Border Patrol-Apprehended Unaccompanied Children and Family Units*

ERO is responsible for repatriating unaccompanied children[33] and family units[34] who have received final orders of removal from an immigration judge, as well as unaccompanied children who have been granted voluntary departure. Although ERO removes many more single adults than unaccompanied children or members of family units, these unique and vulnerable populations require dedicated resources and individual agreements with foreign governments to ensure a safe and efficient removal process.

---

[32] This chart represents removals performed by ICE and does not capture total removals or returns by DHS.

[33] Unaccompanied children (UCs) are defined as children who have no lawful immigration status in the United States; have not attained 18 years of age; and with respect to whom there is no parent or legal guardian in the United States, or no parent or legal guardian in the United States available to provide care and physical custody.

[34] Family units contain an adult noncitizen parent or legal guardian accompanied by their own juvenile noncitizen child(ren).

In FY 2024, ERO removed 411 unaccompanied children to their countries of origin, a 93.3% increase from FY 2023.



Figure 28. FY 2019 – FY 2024 ERO Removals of Unaccompanied Children

In FY 2024, ERO removed 49,435 members of family units to their countries of origin, an increase of 175.5% compared to FY 2023. The vast increase in the number of family unit removals in FY 2024 over FY 2023 is a result of ERO's family-focused programs, such as the Family Expedited Removal Management (FERM) program, which aim to more swiftly and efficiently remove noncitizens without legal basis to remain in the United States.



Figure 29. FY 2019 – FY 2024 ERO Removals of USBP-Identified Family Unit Members

*Family Expedited Removal Management*

During FY 2024, ERO continued to operate family-focused programs geared toward the fair, humane, and expedited processing and removal of family units that do not establish eligibility to remain in the United States. The Family Expedited Removal Management (FERM) program, which ERO launched in May 2023, continues to assist DHS efforts in more expediently

processing and removing family units with credible fear claims that are undergoing expedited removal proceedings. Through FERM, certain heads of household are placed on ATD-ISAP technology and, as a condition of their parole, are closely supervised while they and their family members await the findings of their credible fear interviews.

In FY 2024, ERO enrolled 31,330 family units, including 12,364 heads of household and 18,966 riders, into the program. Riders are noncitizens whose status is dependent on the principal enrollee and their status. The FERM program is designed for the efficient adjudication of credible fear claims, which also resulted in having large number of disenrollments upon the completion of the credible fear process. Of the 31,330 family members, ERO disenrolled 29,994 FERM participants for various reasons, the most common of which was USCIS making a positive credible fear determination and the family subsequently receiving a Notice to Appear, demonstrating the program's effectiveness. Other disenrollment reasons included removal from the United States and non-compliance issues. Further proving the program's efficacy, in FY 2024, ERO removed 4,151 family units — including 1,661 heads of household and 2,490 riders — from the United States.

*High-Priority Removals: Known or Suspected Terrorists, Gang Members, and Human Rights Violators*

As part of its critical mission, ERO removes noncitizens who threaten national security. These high-priority removals include noncitizens who are known or suspected terrorists, known or suspected gang members, and noncitizens who committed egregious human rights violations or war crimes prior to arriving in the United States.

> **High-Profile Removal**
>
> In June 2024, ERO officers arrested several noncitizens from Tajikistan suspected of having ties to ISIS, pursuant to immigration authorities. The arrests were closely coordinated with the FBI's Joint Terrorism Task Forces. Of the eight Tajik nationals, ERO removed three in FY 2024 while the additional five cases remained in immigration proceedings.

In FY 2024, ERO removed 237 known or suspected terrorists, a 70.5% increase compared to FY 2023.



Figure 30. FY 2019 – FY 2024 ERO Removals of Known or Suspected Terrorists.[35]

---

[35] A known terrorist is defined as an individual who has been arrested, charged by information, indicted for, or convicted of a crime related to terrorism and/or terrorist activities by U.S. government or foreign government authorities or identified as a terrorist or a member of a terrorist organization pursuant to statute, executive order or international legal obligation pursuant to a United Nations Security Council Resolution. A suspected terrorist is defined as an individual who is reasonably suspected to be engaging in, has engaged in, or intends to engage in conduct constituting, in preparation for, in aid of, or related to terrorism and/or terrorist activities.

In FY 2024, ERO removed 3,706 known or suspected gang members, an increase of 8.8% compared to FY 2023. ERO efforts to enhance its screening and vetting processes through innovative, intelligence-driven technology in FY 2024 contributed to the increase in removals of known or suspected terrorists and known or suspected gang members. These efforts allowed ERO to more effectively combat emerging public safety and national security threats — including gang members who employ new strategies to conceal their gang affiliations, like those associated with Tren de Aragua, a Venezuelan transnational criminal organization.



Figure 31. FY 2019 – FY 2024 ERO Removals of Known or Suspected Gang Members.[36]

In FY 2024, ERO removed eight human rights violators, an increase of 33.3% compared to FY 2023.



Figure 32. FY 2019 – FY 2024 ERO Removals of Human Rights Violators.[37]

---

[36] A gang member is defined as anyone who admits gang affiliation, convicted of violations associated with 18 U.S.C. § 521 or any other federal or state law punishing or imposing civil consequences for gang-related activity or association, or falls under two or more of the following criteria, one of which occurred in the previous five years: subject has tattoos identifying a specific gang; subject frequents an area notorious for gangs and or associates with known gang members; subject has been seen displaying gang hand signs/symbols; subject has been identified as a gang member by a reliable source or by an informant (tested or untested); subject has been arrested on two or more occasions with known gang members (if the most recent arrest occurred in the past five years, the "previous five years" requirement is deemed to have been met); subject has been identified as a gang member by a jail, prison, or other law enforcement agency; subject has been identified as a gang member through seized written or electronic correspondence; subject has been seen wearing gang apparel or been found possessing gang paraphernalia; and subject has been identified as a gang member through documented reasonable suspicion.

[37] Human rights violators are defined as individuals who have committed human rights violations and war crimes, including acts of torture, genocide, extrajudicial killings, gender-based violence, and the use or recruitment of child soldiers.

FY 2024 | ICE Annual Report

# Homeland Security Investigations

## Mission and Organization

ICE Homeland Security Investigations (HSI) investigates, disrupts and dismantles terrorist, transnational and other criminal organizations that threaten or seek to exploit U.S. customs and immigration laws. HSI's workforce comprises approximately 8,800 employees, including special agents, criminal analysts and mission support personnel. With its focus on transnational criminal activity, HSI has an extensive global footprint, with offices in 237 cities across the United States and its territories and in 56 countries.

HSI has broad legal authority to conduct federal criminal investigations of the illegal movement of people, goods, money, technology and other contraband into, out of, and throughout the United States. HSI uses these authorities to investigate a wide array of transnational crime and violations of U.S. customs and immigration laws, including:

- Terrorism and national security threats.
- Money laundering.
- Financial fraud and illicit schemes.
- Cybercrime.
- Intellectual property theft and trade fraud.
- Stolen goods and organized retail crime.
- Narcotics smuggling.
- Transnational gang activity.
- Child exploitation.
- Human smuggling.
- Labor exploitation of workers and children.
- Human trafficking.
- Illegal exports of sensitive and controlled technologies, including weapons and munitions.
- Identity and benefit fraud.
- Human rights violations and war crimes.

During FY 2024, HSI conducted 32,608 criminal arrests, seized over 1.6 million pounds of narcotics, identified and/or assisted 1,783 victims of child exploitation, and assisted 818 victims of human trafficking.

## HSI Operational Components

In FY 2024, HSI played a crucial role in several significant, high-profile investigations that enhanced national security and public safety, including:

- *The arrests of two Sinaloa Cartel leaders:* In July 2024, U.S. authorities arrested Ismael "El Mayo" Zambada Garcia and Joaquin "Kikin" Guzman Lopez in the Western District of Texas following a joint investigation between HSI and other law enforcement partners into the Sinaloa Cartel that spanned more than a decade. HSI's role in the apprehension of

Zambada was to help execute the arrest on U.S. soil near El Paso, Texas, on July 25. In December 2022, HSI secured indictments against several members of the Sinaloa Cartel, including Guzman Lopez, the son of Joaquin "El Chapo" Guzman Loera.

- *Operation High Capacity:* In October 2023, in conjunction with its law enforcement partners, HSI conducted one of the largest-ever fentanyl seizures in New York City, which resulted in the charging of three subjects for operating a fentanyl mill in the Bronx. In total, the operation has resulted in the arrests of 18 co-conspirators and the seizure of 255 pounds of para-fluorofentanyl, 100 pounds of fentanyl, 215 pounds of methamphetamine, over 800,000 counterfeit pills and 13 pill presses.
- *Operation Total Silence:* In May 2024, HSI, along with other law enforcement agencies, arrested 58 suspected gang members linked to a violent criminal organization for multiple narcotics and firearms violations. This HSI-led, multiagency investigation targeted the criminal activities of a drug trafficking organization operating in Ponce, Puerto Rico.
- *Operation Saphirus Fission:* HSI, in conjunction with its law enforcement partners, led an investigation resulting in nine individuals' indictments, three companies' indictments, and two guilty pleas. One of the guilty pleas came from a Ukrainian citizen who admitted to a money laundering charge that stemmed from a scheme to violate U.S. export laws and regulations by attempting to smuggle a dual-use export-controlled item valued at over $1.5 million to Russia. In May 2024, an Estonian citizen was sentenced to 15 months of imprisonment for his role in the scheme. In April 2024, three additional individuals were indicted for conspiracy to export and money laundering violations, bringing the total number of indictments to nine individuals and three companies.
- *Operation Shattered Glass:* In July 2024, HSI led a large scale, multiagency enforcement operation in Moraine, Ohio, and surrounding areas, as part of an investigation into a suspected Chinese money laundering organization. HSI investigated allegations of financial crimes, labor exploitation, money laundering and possible human smuggling.
- *Operation Icarus:* In August 2024, HSI seized an aircraft belonging to the government of Venezuela that was used to transport Venezuelan president Nicolas Maduro. The government of the Dominican Republic seized the aircraft and turned it over to HSI in response to a U.S. warrant based on evidence that the aircraft had been purchased by a shell company, a violation of U.S. sanctions.

**HSI Domestic Operations and Footprint**

Domestic Operations is responsible for managing, directing, coordinating and supporting all investigative activities within HSI's domestic offices. Domestic Operations also deconflicts field operations and apprises HSI leadership of ongoing field investigations. HSI's domestic footprint comprises 237 field offices, including 30 HSI Special Agent in Charge (SAC) offices, more than 6,950 HSI special agents, and over 1,800 additional personnel, including criminal analysts and mission support personnel.



Figure 33. HSI Domestic Operational Areas of Responsibility

## HSI International Operations and Footprint

HSI's International Operations administers and oversees international activity conducted by HSI attaché offices. This component is devoted to disrupting and dismantling transnational criminal organizations (TCOs) and terrorist groups. International Operations also represents HSI in collaborative efforts with international law enforcement organizations and foreign governments, facilitating the investigation of a wide range of immigration and customs violations. With 94 offices in 56 countries worldwide, HSI has one of the largest international footprints in U.S. law enforcement. Additionally, International Operations has more than 700 Transnational Criminal Investigative Unit (TCIU) personnel in 17 countries who are assigned to 14 TCIUs and three international task forces. These groups include foreign law enforcement officials, customs officers, immigration officers and prosecutors who each undergo a strict vetting process and HSI training.

During FY 2024, in collaboration with strategic partners in the United States and abroad, HSI special agents gathered evidence to identify and build criminal cases against TCOs, terrorist networks and facilitators, and other criminal elements that threaten the homeland. HSI worked with prosecutors to indict and arrest violators, execute search warrants, seize criminally derived money and assets, and take other actions to disrupt and dismantle criminal networks.



Figure 34. HSI International Operational Areas of Responsibility

**Transnational Criminal Investigative Units**

Transnational Criminal Investigative Units (TCIUs) further HSI's global mission by working with foreign partners to investigate and prosecute people involved in transnational criminal activities that threaten the United States or regional stability. TCIUs identify targets, collect evidence, share intelligence, and facilitate prosecutions in the United States and foreign countries. Additionally, these units play a critical role in HSI's efforts to prevent transnational criminal activity before it affects communities in the United States.

**Success Story**

In July 2024, HSI Panama City reported the identification of four victims of child exploitation and the arrest of a Panamanian citizen for violations concerning child sexual exploitation. These efforts are part of an HSI Panama City, HSI Panama TCIU, and Fiscalia Provincia de Chiriqui (FPC) investigation into the subject, who abused the minor victims and exploited them for monetary gain. HSI Panama TCIU and FPC conducted a search warrant at the subject's residence in San Vicente, Panama, identified and assisted the minor victims, and arrested the subject.

In FY 2024, TCIU teams conducted 2,382 criminal arrests and seized:

- Over 1,158,099 pounds of illegal narcotics, including 757,478 pounds of precursor chemicals.
- 1,833 firearms.
- 100,451 rounds of ammunition.
- $16,040,456 in U.S. currency.
- $5,228,473 in counterfeit goods.
- $8,762,247 in seized general merchandise.
- $2,957,461 in seized real estate.
- $451,720 in seized virtual currency and assets.

**HSI Strategic Network Dismantlement Project**

In FY 2024, HSI established the HSI Strategic Network Dismantlement Project (HSNDP) as the agency's response to combat transnational criminal networks (TCNs) that pose the greatest threats to the security of the United States. HSNDP comprises HSI field offices and HSI Headquarters components working in partnership with CBP's National Targeting Center, the U.S. Department of the Treasury's Office of Foreign Asset Control and Treasury Executive Office for Asset Forfeiture, DHS's Science and Technology Directorate, the U.S. Department of Defense, the U.S. Postal Inspection Service, and private industry partners and contractors.

HSI weighs cases against its missions and priorities to highlight the most significant investigations. Task Group 1 (TG-1) supports the HSNDP effort by serving as the HSI Innovation Lab's primary operations center, coordinating and supporting major TCN investigations and initiatives. TG-1 brings special agent and criminal analyst subject matter experts together with data scientists to solve complex data-centric challenges. The development team at the Innovation Lab works to enhance tools powered by HSI's in-house data analytics platform, the Repository for Analytics in a Virtualized Environment (RAVEN), while TG-1 provides direct support to HSNDP-designated investigations and initiatives. TG-1's unique composition and co-location at the Innovation Lab enables rapid iteration and the ability to fuse massive quantities of information from strategic data sets and investigative holdings to enhance

41

disruptive operational outcomes against TCNs.

**HSI National Academy for Advanced Training and Leadership**

In FY 2024, HSI established the HSI National Academy for Advanced Training and Leadership (NAATL) in Huntsville, Alabama, as a centralized hub dedicated to advanced programmatic training and leadership development opportunities for all HSI employees. NAATL is HSI's commitment to nurturing talent within the organization and its sustained investment in professional leadership and development. NAATL empowers the HSI workforce with the knowledge and skills needed to excel in their careers through training in cutting-edge technology, innovative business practices and sophisticated criminal analysis. These training opportunities are also available to HSI's federal, state, local, international and nongovernmental partners and are tailored to meet the needs of different individuals and divisions and ultimately help to advance a proficient, agile and innovative workforce.

In September 2024, HSI hosted a training and collaboration event at NAATL, bringing together a regional group of HSI leaders from multiple offices and representatives from their corresponding U.S. attorneys' offices. The event featured training sessions on HSI's capabilities, operations, initiatives and authorities, as well as the sharing of best practices. Participants included various members of HSI leadership, criminal chiefs assigned to U.S. attorneys' offices, OPLA attorneys, case agents and prosecuting assistant U.S. attorneys. Building on the success of this event, HSI plans to expand future trainings to include all HSI field offices and U.S. attorneys' offices, enhancing both individual and organizational performance. In FY 2024, NAATL conducted 19 advanced training and leadership courses to 739 participants, and it projects offering 50 courses to approximately 1,500 attendees in FY 2025.

**Know2Protect Campaign and Project iGuardian**

HSI plays a pivotal role in DHS's national public awareness campaign, Know2Protect®: Together We Can Stop Online Child Exploitation™, which was launched in April 2024 to prevent and combat online child sexual exploitation and abuse (CSEA). Through the HSI-led DHS Cyber Crimes Center (DHS C3) and the HSI-led outreach initiative, Project iGuardian®, HSI drives K2P's mission to educate and empower children, teens, parents, trusted adults and policymakers to prevent and combat online CSEA; explain how to report online enticement and victimization; and offer a response and support resources for victims and survivors of online CSEA. To amplify the campaign's reach, K2P partners with several sports leagues, including Major League Baseball Together, Major League Soccer, the National Football League, the National Hockey League, NASCAR, and the U.S. Olympic and Paralympic Committees. K2P also partners with tech companies, including Google LLC, Meta, Roblox Corporation and Snap Inc.

Since its inception, K2P has made substantial progress in raising awareness and equipping adults and children with vital tools to safeguard against online dangers. Within its first six months, K2P garnered over 250 million impressions across various media channels, driving critical awareness and action in response to the alarming rise in online child exploitation. The National Center for Missing and Exploited Children's CyberTipline reports increased by 360% over the past decade.

The campaign's digital strategy has also shown remarkable results. Through the release of seven new videos and targeted digital advertising, HSI has enhanced the campaign's online presence, with a 78.6% boost in engagement due to donated Meta advertising and over 78 million impressions garnered from donated advertising by campaign partners. This multimedia outreach includes the widely viewed "Sexting and Sextortion" video, which has amassed nearly a million views on YouTube and 4.8 million impressions through television ads.

HSI's Project iGuardian, which relaunched in October 2023 as the official in-person educational arm of the K2P campaign, exemplifies HSI's direct engagement with communities. Leveraging HSI's investigative expertise, case studies, and insights from victim assistance and forensic interview specialists, Project iGuardian provides in-person presentations that educate children, teens, parents and community groups about online CSEA threats and prevention strategies. HSI special agents and subject matter experts have conducted over 1,000 Project iGuardian presentations since its relaunch, reaching nearly 100,000 individuals and generating more than 70 investigative leads and 50 victim disclosures.

**Expansion of El Dorado Task Force**

The HSI El Dorado Task Force (EDTF) National Initiative's mission is to disrupt and dismantle transnational money laundering organizations operating in the United States by conducting aggressive and proactive investigations, actively engaging private sector partners, and leveraging federal and state laws and regulations.

Building on the successes and tradition of the original HSI New York EDTF, the EDTF National Initiative brings together the collective anti-money laundering (AML) expertise of its stakeholders and employs highly qualified personnel. As a result, the AML community can easily adapt to emerging money laundering trends and threats to the nation's financial infrastructure. The EDTF National Initiative also promotes the use of asset forfeiture authorities to deprive criminal organizations of criminally linked proceeds and property used to substantially facilitate criminal activity. Since launching the EDTF National Initiative in FY 2024, 28 of HSI's 30 Special Agent in Charge field offices have established operational EDTFs to conduct high-impact money laundering investigations. HSI plans to establish additional EDTFs in FY 2025.

**HSI Branding**

In FY 2024, HSI implemented a standalone branding initiative to increase awareness of its mission to protect the United States by investigating global crimes that impact local communities. HSI protects the homeland from global crime and threats by conducting significant and complex criminal investigations into individuals and international criminal networks that violate U.S. laws. HSI focuses its efforts on combating the transnational criminal networks that pose the greatest threats to the security of the United States.

HSI's branding efforts include the creation of the www.HSI.gov internet domain; HSI email addresses for personnel; branding on internal and external facing materials; visual, digital and social media platforms; recruiting, outreach and awareness/educational campaign materials; office and facility signage; office decorations; award devices; business cards; stationery; wall

seals; and other items the ICE Director identifies as necessary for the optimal execution of the ICE and HSI missions. This branding initiative allows HSI to educate external stakeholders — including the public, private sector partners, nongovernmental organizations, other law enforcement agencies, state and local officials, and Congress — about HSI's unique mission.

**Direct-Hire Authority for Recruitment**

In FY 2024, the Office of Personnel Management granted HSI Direct-Hire Authority (DHA) to address critical hiring needs in response to increasingly complex geopolitical and global events. The implementation of the DHA reaches applicants who otherwise may not have considered a law enforcement career. These applicants bring expertise and new technological approaches, which complement traditional recruitment and preference eligible populations in the pipeline, further supporting HSI in its efforts to address growing threats. With the authority in place, HSI facilitated its first national DHA recruiting and hiring event to seek qualified applicants with expertise in intelligence, finance, cyber and foreign languages. HSI advertised, recruited, interviewed, and extended tentative job offers to hundreds of qualified applicants using this authority at a DHS hiring event in Virginia and through recruiting efforts led by local HSI offices.

**White House Office of National Drug Control Policy Awards**

During FY 2024, HSI's partners, including the Office of National Drug Control Policy (ONDCP), recognized the component for its narcotics interdiction efforts. HSI received awards in three of nine ONDCP award categories, including:

- *Highway Interdictions:* An HSI Albuquerque/High Intensity Drug Trafficking Areas (HIDTA) Group Task Force officer from the New Mexico State Police conducted a traffic stop that resulted in the interdiction of narcotics and the arrest of a suspect that was implicated in the shooting and murder of an 11-year-old child.
- *Illicit Finance:* HSI Chicago's Operation Banco Sucio and its financial investigations group targeted TCOs using Mexico-based employees and their relationships with correspondent banks to launder narcotics proceeds through the respondent banks and shell businesses.
- *Land Interdiction:* HSI Hartford's Northeast Corridor Border Enforcement Security Task Force Group leveraged robust data analysis to identify smuggling trends and implement proactive operations at sort facilities and other parcel hubs in the greater Hartford metropolitan area. The initiative focused on identifying, interdicting and seizing narcotics and bulk cash along the tristate corridor.

**Significant Partnerships and Outreach**

*HSI Congressional Engagement*

HSI has expanded its Congressional Engagement program to accommodate increased visibility and interest in HSI's mission.

HSI's Congressional Engagement program follows three lines of effort:

- Works with HSI leadership and stakeholders to develop legislative strategy to support HSI legislative priorities.
- Ensures consistent messaging to Congress by supporting HSI subject matter experts in preparing, reviewing and providing briefings to members of Congress and their staffs, and by reviewing of all congressional inquiries sent to HSI.
- Supports HSI, ICE and DHS leadership in preparation for hearings and testimony before Congress.

In FY 2024, HSI Congressional Engagement's efforts led to the introduction of several bills, including legislation which would:

- Bolster HSI's ability to conduct cross-border narcotics investigations and provide additional avenues to forfeit seized chemicals intended to be used in the illicit manufacturing of synthetic opioids.
- Codify the Export Enforcement Coordination Center and provide HSI with a seizure fund to support investigations into sanctioned Iranian proxies.
- Provide HSI with statutory authority to intercept Unmanned Aerial Systems used in criminal activity or that pose threats to law enforcement or the public.
- Ensure body armor issued to DHS law enforcement personnel meets established safety criteria and is effective for women and the entire DHS law enforcement workforce.
- Establish a specific trade crimes unit within the Department of Justice to support the prosecution of HSI global trade and export investigations.
- Increase the use and reduce the administrative burden of applying for Continued Presence for human trafficking victims.
- Codify and support HSI's Cross Border Financial Crime Center.
- Bolster HSI's Victim Assistance Program and assist HSI special agents and analysts who conduct human trafficking investigations.

In addition, HSI Congressional Engagement has secured funding for the continued development of the RAVEN analytical tools suite, the Center for Countering Human Trafficking's Blue Campaign, and the HSI National Academy for Advanced Training and Leadership.

**Joint Task Force Alpha**

In June 2021, the U.S. Attorney General announced the creation of the Joint Task Force Alpha (JTFA), a joint law enforcement effort capitalizing on the investigative and prosecutorial resources of the Department of Justice and DHS. Its mission is to disrupt and dismantle human smuggling networks that exploit and endanger migrants traveling to the United States from Mexico and the Northern Triangle countries of El Salvador, Guatemala and Honduras.

In June 2024, JTFA expanded to combat human smuggling in Colombia and Panama, both of which border the region known as the Darién Gap. JTFA partner agencies leverage and synchronize their respective intelligence, interdiction, investigative and prosecutorial capabilities to counter TCOs involved in human smuggling.

45

HSI is the lead agency in nearly all ongoing JTFA-supported investigations. Through JTFA, the Human Smuggling Unit focuses on targeting TCOs' finances by tracing criminal proceeds, identifying third-party money launderers and forfeiting illicit assets domestically and abroad. Since inception, JTFA has produced approximately 545 criminal arrests and 102 convictions, and has seized approximately $5 million in currency and assets. In FY 2024, JTFA produced approximately 68 criminal arrests and 25 convictions, and it seized $1.3 million in currency and assets.

In July 2024, Mexican authorities arrested a key leader of a TCO involved in human smuggling in Tijuana, Mexico, under an active provisional arrest warrant issued by HSI. This TCO has been implicated in over 400 human smuggling incidents facilitating the entry of undocumented noncitizens from special interest countries, including some with ties to terrorism. As part of the investigation, HSI collaborated closely with the Department of Treasury's Office of Foreign Assets Control to impose sanctions on four members of the TCO. The arrested leader of the TCO is currently awaiting extradition to the United States to face charges related to human smuggling.

**Border Enforcement Security Task Forces**

HSI Border Enforcement Security Task Forces (BESTs) continue to serve as important tools in combating TCOs engaged in drug trafficking, human smuggling, weapons trafficking and money laundering. In FY 2024, BESTs expanded to HSI Flagstaff, Arizona; HSI Corpus Christi, Texas; HSI Helena, Montana; HSI Atlantic City, New Jersey; HSI El Paso, Texas; and HSI Durango, Colorado. There are 98 BESTs throughout the United States and its territories, including Puerto Rico and the U.S. Virgin Islands.

An HSI New England BEST investigation regarding multiple packages being shipped by a suspected fentanyl pill supplier led to the identification of the Vitaran-Especial TCO. The Vitaran-Especial TCO accepts and processes online orders for counterfeit and authentic pharmaceutical pills using multiple websites in India and routes the orders to a Dominican Republic-based operation. The Dominican Republic operation allocates the online orders among different pill mills operating within the United States. Large quantities of pills are shipped to secondary distributors for further distribution. This investigation has led to the identification of approximately 50 linked websites; pill mills in seven states; the seizure of more than 220 pounds of fentanyl and 220 pounds of Schedule II pills, 220 pounds of Schedule IV pills, cocaine, heroin, xylazine, and numerous firearms; and nine arrests.

In FY 2024, HSI BEST-related investigations resulted in 8,090 criminal arrests; 3,832 indictments; 2,310 convictions; and the seizure of over $292 million in currency and assets.

**National Gangs and Violent Crimes Unit**

In FY 2024, the National Gangs and Violent Crimes Unit (NGVCU) expanded the Violent Gang Task Force (VGTF) initiative from seven to 18 offices — an increase of 157%. HSI efforts to counter transnational gang crime have resulted in the arrests of gang members and associates in violent gang investigations who were charged with offenses including distribution of fentanyl and other narcotics, firearms trafficking and possession, violent crimes, terroristic acts, human

smuggling, human trafficking and money laundering.

In FY 2024, HSI transnational gang investigations resulted in 4,523 criminal arrests (334 of which were VGTF-related), 2,189 indictments and 1,106 convictions.

**Document Benefit Fraud Task Forces**

Document, identity and benefit fraud schemes pose significant national security and public safety threats that may create or exploit vulnerabilities in the nation's immigration system, enabling terrorists, TCOs and noncitizens with malicious intent to gain unlawful entry into the United States. HSI operates Document and Benefit Fraud Task Forces (DBFTFs) across the country that collaboratively deter, disrupt and dismantle TCOs involved in identity and benefit fraud. The DBFTFs investigate evolving fraud schemes, including aspects of traditional immigration-related fraud (e.g., H-1B visa fraud) in conjunction with COVID-19 relief fraud (Paycheck Protection Program).

HSI has determined that these fraud schemes further undermine both immigration and financial laws. HSI collaborates with USCIS and other federal agency partners to investigate document, identity and benefit fraud schemes. The National Lead Development Center supports the DBFTFs' mission by serving as the central repository for receiving document and benefit fraud intelligence and developing and distributing actionable leads to the field. In FY 2024, HSI made over 800 arrests for identity and benefit fraud; more than 380 were noncitizens and over 430 were citizens. Identity and benefit fraud investigations also resulted in 528 indictments and 315 convictions.

**HSI and the Department of Treasury's Office of Foreign Asset Control Partnership**

Pursuant to the 2023 White House Strategy to Combat Transnational Organized Crime, HSI has partnered with the Office of Foreign Asset Control (OFAC) to better incorporate HSI investigative findings into OFAC sanctions determinations. HSI and OFAC have agreed to formalize the case referral process, develop training and coordinate public sanctions announcements.

> **Success Story**
>
> In 2024, an HSI El Paso-led investigation, with assistance from other law enforcement partners, resulted in two arrests and the indictments of eight members of the Lopez Human Smuggling Organization, a TCO operating in Guatemala, Mexico and the United States. The organization allegedly generated between $104 million and $416 million in illicit proceeds from its human smuggling activities. OFAC announced sanctions against the TCO and took action to freeze its assets and limit its financial transactions. If convicted, the defendants face up to 20 years in prison and the remaining six face up to ten years.

**National Special Security Events**

In FY 2024, HSI supported the U.S. Secret Service with multiple national special security events (NSSE), including the Asian Pacific Economic Cooperation in San Francisco, California; the North Atlantic Treaty Organization in Washington, D.C.; the Republican National Convention in Milwaukee, Wisconsin; the Democratic National Convention in Chicago, Illinois; and the 79th United Nations General Assembly in New York, New York. In total during this time period, HSI provided 2,120 special agents for NSSE support and deployed over 4,100 special agents for various assignments related

to the presidential campaign.

In February 2024, Super Bowl 58 took place in Las Vegas, Nevada. In addition to providing federal coordination and security elements, HSI Las Vegas worked with state, local and federal partners and the NFL, with support from the National Intellectual Property Rights Coordination Center, to seize 7,000 counterfeit items with estimated manufacturer's suggested retail prices totaling $1,260,220. Additionally, HSI, working alongside law enforcement officers from state, local and federal agencies, and with support from the DHS Center to Combat Human Trafficking, made 47 felony arrests and identified and assisted nine victims of human trafficking. The HSI Victim Assistance Program supported HSI Las Vegas with a human trafficking operation during the Super Bowl 58 week by assessing victims' needs, informing victims of their rights, and conducting forensic interviews.



Figure 35. Counterfeit NFL and MLB rings seized by HSI at a local vendor prior to Super Bowl 58.

**FY 2024 HSI Priorities**

In FY 2024, HSI designated six operational priorities based on law enforcement trends, ways the workforce must evolve to face emerging threats, and congressional mandates:

- *Financial crimes:* Integrate financial investigations and asset forfeiture capabilities into all HSI cases to dismantle TCOs and eliminate the financial incentives to engage in criminal activities.
- *Cybercrimes:* Use innovative investigative techniques and cutting-edge technology to protect critical infrastructure from intrusion; counter cybersecurity threats, illicit marketplaces and cryptocurrency-based crime.
- *National security:* Target the people, money and materials that support terrorist activities

48

and global atrocities; support efforts to counter foreign intelligence and non-traditional collection threats.

- *Opioids and precursors:* Illuminate, investigate, disrupt and dismantle TCOs that introduce fentanyl, heroin and other dangerous opioids into the United States; deny precursor chemicals from entering the illicit supply chain.
- *Crimes of human exploitation and victimization:* Leverage resources across HSI to enhance investigative strategies through intelligence-driven enforcement, outreach programs, and public-private partnerships to dismantle transnational human smuggling organizations; combat the labor exploitation of workers and children, human trafficking and the online exploitation of children involving child sexual abuse material using a victim-centered approach.
- *Global trade:* Combat illegal export and proliferation of sensitive technology, equipment and weapons; protect public health and safety, and the U.S. economy; investigate illegal trade practices; and target TCOs that engage in environmental crime, specifically wildlife trafficking.

**Financial Crimes**

*Cross-Border Financial Crime Center*

HSI's Cross-Border Financial Crime Center (CBFCC) strengthens the United States' anti-money laundering framework. The CBFCC is a public-private partnership aimed at convening federal law enforcement agencies, partner nations, financial institutions and financial technology (FinTech) companies to collaborate to fight cross-border financial crime. The CBFCC supports the prosecution, disruption and dismantlement of TCOs; strengthens the financial and FinTech industries against illicit activity; and enhances communication between government and private sector partners. HSI leads the DHS Cyber Crimes Center and leverages this critical asset along with the Trade Transparency Unit, the National Lead Development Center, and the Bulk Cash Smuggling Center to form the foundation for CBFCC's efforts. By spearheading these initiatives, HSI enhances its capabilities to more effectively prevent TCOs, kleptocrats and oligarchs, professional money laundering organizations, and other criminal actors from accessing the elaborate international systems used to launder money and hide and protect criminally derived wealth.

*Third-Party Money Laundering*

HSI provides programmatic, operational and training support to field offices to enhance their ability to conduct high-impact financial investigations while protecting U.S. financial systems from TCOs. HSI pursues financial crime aspects to identify and seize illicit proceeds and to target financial networks and third-party facilitators that launder illegal financial gains.

HSI achieves this through its Third-Party Money Laundering (3PML) program, which targets those responsible for laundering criminal proceeds for TCOs all over the world. These professional money launderers include accountants, attorneys, notaries, bankers, real estate agents and others who are not typically involved in the underlying criminal conduct; however, they use their professional influence and expertise to transfer funds on behalf of third parties,

knowing that the funds are proceeds of, or are otherwise involved in, illicit activity. Because professional money launderers often cater to multiple TCOs, prioritizing 3PML investigations increases HSI's impact in disrupting and dismantling TCOs. In FY 2024, 3PML investigations yielded 152 arrests, 121 indictments, 17 convictions, and 314 seizures totaling $102,997,681.

*Asset Forfeiture*

HSI uses asset forfeitures to disrupt and dismantle TCOs. HSI's Asset Forfeiture Unit (AFU) oversees and coordinates all field Asset Identification and Removal Groups and the Seized Property program. The AFU is the primary liaison to the Department of the Treasury's Executive Office for Asset Forfeiture and the Treasury Forfeiture Fund.

In FY 2024, the AFU oversaw the distribution of over $164 million from the Treasury Forfeiture Fund. The money was used to support investigations involving darknet marketplaces, weapons smuggling, human rights violations and war crimes, business email compromise and network intrusion, narcotics trafficking, money laundering, cryptocurrency, international organized crime and TCOs. The funds also furthered data analytics and financial auditor contracts, investigative efforts for the Center for Countering Human Trafficking, the National Targeting Center Investigations (NTC-I), Special Operations Unit and Narcotics Task Forces, equitable sharing and seized property activities, undercover investigations, cybercrimes investigations, child exploitation investigations, and victim identification and assistance.

*Financial Fraud*

HSI will continue to leverage its unique investigative authorities to investigate financial fraud schemes, which include wire fraud, identity theft, bank fraud, conspiracy to commit money laundering and other violations of federal law. In FY 2024, HSI conducted 61 romance fraud cases that resulted in 13 criminal arrests, 12 indictments, four convictions, and $852,874 in seized currency. HSI also conducted 258 elder fraud cases that resulted in 137 criminal arrests, 121 indictments, 52 convictions, and $12.6 million seized.

*National Aviation Trafficking Initiative*

The National Air Trafficking Initiative (NATI) is an HSI-led, multiagency initiative focusing on the financial, export and regulatory violations associated with the procurement of U.S. aircraft that TCOs use to traffic large quantities of cocaine and drug proceeds. In FY 2024, NATI seized 6,314 pounds of cocaine and four aircraft. Since its inception in 2019, NATI has seized 93,310 pounds of cocaine and 86 aircraft; it has also made 94 criminal arrests.

*Operation Aquila*

The Bulk Cash Smuggling Center (BCSC) oversees Operation Aquila, a joint financial crimes partnership with USPIS to target money laundering activity and provide advanced analytical support to HSI and USPIS field offices. Through Operation Aquila, the BCSC and USPIS proactively identify illicit proceeds in parcel shipments and money laundering activity in postal money order transactions.

In FY 2024, Operation Aquila identified $2.2 million in suspected illicit proceeds, responded to 13 requests for assistance from special agents and postal inspectors, and referred one investigative case to HSI and USPIS field offices. Since inception, Operation Aquila has identified more than $46.3 million in suspected illicit proceeds, referred 23 investigative cases, and responded to more than 390 requests for assistance.

*Operation Boiling Point*

HSI developed and implemented Operation Boiling Point to respond to organized retail theft, cargo theft and similar crimes. Operation Boiling Point leverages HSI's strong partnerships with private industries, retailers, financial institutions and others that play critical roles in combating criminal groups that seek to disrupt interstate and foreign commerce. During FY 2024, Operation Boiling Point officials made approximately 500 arrests, seized over $100,000 million in currency and monetary instruments, and seized equipment and merchandise valued at over $800,000. Since its inception in 2022, officials have arrested over 1,000 people and seized equipment and merchandise valued at over $1.1 million in conjunction with this operation.

## Cyber Crimes

*DHS Cyber Crimes Center*

In March 2024, the HSI Cyber Crimes Center was redesignated as the DHS Cyber Crimes Center (C3). The redesignation of C3 did not modify its organizational or leadership structure. Instead, the redesignation aimed to enhance coordination and cooperation across DHS. Consistent with its existing role in operating C3, HSI leads efforts to combat CSEA and cyber-enabled and cyber-facilitated crimes through a Child Exploitation Investigations Unit, a Computer Forensics Unit, a Cyber Crimes Unit and a Cyber Intelligence Unit. HSI ensures that the redesignated center's efforts reflect a coordinated, DHS-wide approach to these important issues. In FY 2024, C3 supported 6,939 new child exploitation investigations; 4,959 criminal arrests; 2,816 indictments; and 1,910 convictions, and it identified and assisted 1,783 child victims of online CSEA.

*Operation Renewed Hope II*

In FY 2024, C3's Child Exploitation Investigations Unit's Victim Identification Lab hosted a two-week operation called Operation Renewed Hope II. The operation focused on reviewing CSEA case materials depicting unidentified victims from around the world. Victim identification specialists from over 20 countries, along with local partners and HSI personnel, reviewed thousands of videos and images during the operation, resulting in over 400 leads that have so far led to the identification and assistance of over 140 victims.

*Operation Cyber Centurion*

Operation Cyber Centurion (OCC) disrupts hundreds of cyber intrusion and ransomware attacks that target critical infrastructure, such as major utilities, healthcare, public education, financial systems, emergency services and local government operations. OCC prevents billions of dollars

in economic losses and directly improves public safety. In FY 2024, OCC disrupted 195 intrusions and attacks. Since its inception, OCC has disseminated over 500 leads to field offices for notification and mitigation.

*HSI Innovation Lab*

The HSI Innovation Lab in the Cyber and Operational Technology Division is a centralized hub for developing advanced investigative analytics and tools for HSI special agents, criminal analysts and task force officers. The RAVEN platform provides the central data storage and technical infrastructure that powers the tools. In FY 2024, the HSI Innovation Lab released continuous enhancements to the RAVEN platform, and the platform's flagship analytics tool has progressed from testing phases to field-wide availability.

Previously mentioned in this report, TG-1 supports the HSNDP effort as the HSI Innovation Lab's primary operations center, coordinating and supporting major TCN investigations and initiatives. In FY 2024, TG-1 had a significant impact across the fentanyl supply chain, supporting over 330 HSI investigations that led to 215 criminal arrests and 497 seizures, including $3,723,502 in illicit proceeds.

## National Security

*Human Rights Violators and War Crimes Center*

The Human Rights Violators and War Crimes Center (HRVWCC) identifies, prosecutes and removes individuals who committed human rights violations and war crimes prior to entering the United States. The HRVWCC takes a whole-of-government approach that comprises multiple agencies and components, including DHS and the Departments of Justice, State and Defense. In FY 2024, the HRVWCC supported more than 180 investigations related to suspected war criminals. The HRVWCC's Human Rights Target Tracking Team created over 400 lookout records on known and suspected human rights violators, helping prevent their entry into the United States. In support of Operation Limelight USA, an ongoing ICE program designed to deter and increase public awareness of female genital mutilation (FGM), the HRVWCC also trained special agents and attorneys on preventing perpetrators of FGM from traveling.

*National Security Unit*

The National Security Unit (NSU) oversees 184 HSI field offices and manages and supports counterterrorism investigations within HSI. The NSU develops, facilitates and implements policies in support of the counterterrorism mission and has programmatic oversight of HSI's engagement on the Joint Terrorism Task Force (JTTF). In FY 2024, HSI initiated approximately 455 counterterrorism investigations. HSI personnel assigned to the JTTF obtained 70 criminal indictments, effected more than 125 criminal arrests and 169 administrative arrests that resulted in 107 convictions, executed 48 search warrants, and made 36 seizures related to individuals associated to counterterrorism investigations. Although HSI makes up less than three percent of the total JTTF workforce, in FY 2024, HSI's significant participation led to 93% of terrorism-related disruptions. Of those disruptions, 77% were led by HSI using its unique and

often exclusive authorities, signifying the prominent role that HSI plays in countering terrorism every day.

*Special Interest Investigations*

The Special Interest Investigations Unit (SIIU) identifies and combats national security threats by aggregating, analyzing, and delivering intelligence and counterintelligence support to internal and external stakeholders. During FY 2024, the SIIU supported 33 field Counterintelligence Task Forces (CITFs) and coordinated on more than 91 investigations. Fifty-six HSI personnel from across the country are assigned to CITFs.

*Counter Threat Lead Development*

The Counter Threat Lead Development Unit (CTLD) identifies and disrupts state and non-state actors and dismantles transnational criminal enterprises and organizations that threaten the security of the United States through the exploitation of the nation's immigration system. The CTLD uses intelligence, cyber investigative techniques, and strong partnerships with its interagency counterparts to support HSI's counterterrorism and counterintelligence functions. The CTLD is also responsible for maintaining the integrity of the student visa program and tracking and dismantling fraudulent educational institutions that facilitate the entry of terrorists and individuals who pose threats to national security. During FY 2024, the CTLD processed and reviewed 1.5 million individuals for national security threats.

*Operation Citadel*

Operation Citadel focuses HSI authorities and subject matter expertise on priority TCOs involved in human smuggling, human trafficking, firearms trafficking, bulk cash smuggling, narcotics smuggling and other criminal activities in Latin America. In FY 2024, HSI deployed 26 temporary duty special agents and 15 criminal analysts to 17 countries for 60- to 90-day increments. In support of Operation Citadel, HSI deployed personnel to Mexico, the Caribbean, Central America and South America. Operation Citadel resulted in the seizure of 52 firearms and 27,813 pounds of narcotics, 695 arrests, 148 search warrants, the identification and assistance of 98 minors, biometric enrollment of 7,317 individuals, and the training of 582 foreign officers.

*Student and Exchange Visitor Program*

HSI's Student and Exchange Visitor Program (SEVP) increases the integrity of the U.S. immigration system by collecting, maintaining and analyzing information so only legitimate nonimmigrant students or exchange visitors can enter the United States on F or M visas. SEVP ensures institutions accepting nonimmigrant students are certified and follow applicable federal rules and regulations. In addition, SEVP manages the Student and Exchange Visitor Information System (SEVIS) and coordinates with law enforcement partners across DHS to provide data used for enforcement actions. In FY 2024, SEVP received over 105,625 phone calls and more than 26,860 emails, and it conducted approximately 13,110 visits to more than 7,000 SEVP certified schools nationwide. SEVP withdrew 268 school certifications due to anomalies encountered during its review process and denied certification to eight schools. Additionally, SEVIS

maintained records of more than 1.2 million nonimmigrant students in active status.

*Visa Security Program*

The Visa Security Program (VSP) is an HSI-led counterterrorism program that assigns HSI special agents to diplomatic posts worldwide to conduct law enforcement visa-security activities and train the Department of State's Bureau of Consular Affairs on threats, trends and other topics affecting visa adjudication. The VSP is a key tool HSI deployed internationally to prevent terrorists and other national security threats from obtaining visas and traveling to the United States. In FY 2024, VSP efforts prevented 10,097 individuals with links to terrorism from traveling to the United States. This number represents a 20% increase from FY 2023, which totaled 8,412 individuals.

## Opioids and Precursors

*Strategy for Combating Illicit Opioids and Operation ORION*

HSI's Strategy for Combating Illicit Opioids leverages HSI's experience and unique investigative authorities for combating TCOs to focus on four core goals, all of which align with the National Drug Control Strategy, to reduce the international supply of illicit opioids; reduce the domestic supply of illicit opioids; attack the enablers of illicit finance, cybercrime and weapons smuggling; and conduct outreach with private industry. Through this strategy, HSI aims to make important strides in reducing the harm illicit opioids have on U.S. communities.

Operation ORION aligns with the goals and strategies set forth in the *Strategy for Combating Illicit Opioids,* allowing HSI to leverage its vast administrative, civil and criminal law enforcement authorities to counter fentanyl and fentanyl-related substance distribution. In FY 2024, under this operation, HSI increased the number of BESTs to a total of 98 from 92 in FY 2023; Fentanyl Abatement and Suppression Teams (FASTs) to a total of 47 from two in FY 2023; and Fentanyl Overdose Resolution Teams (FORTs) to a total of 13 from one in FY 2023, placing them in strategic locations to support HSI's nationwide fentanyl and fentanyl-related substance supply reduction strategy. FASTs are investigative groups within BESTs that focus on disrupting that focuses on disrupting the smuggling and distribution of fentanyl, contributing to the reduction of opioid overdose rates across the United States.

> **Success Story**
>
> In September 2024, the subject of an HSI-led investigation was sentenced to 17 years in federal prison for distributing fentanyl that caused a fatal overdose. The subject knowingly sold counterfeit oxycodone pills containing fentanyl and continued selling them even after the victim's death. The investigation resulted in the seizure of 72 fentanyl pills marked as "oxycodone," two firearms, several high-capacity magazines and ammunition.

In FY 2024, HSI seized over 42,800 pounds of illicit opioids, 33,542 more than 33,500 of which were fentanyl.

*Operation Chain Breaker*

Operation Chain Breaker (OCB) is an initiative targeting illicit Chinese pill press manufacturers and Mexican TCOs using this pill press equipment to mass produce fentanyl pills being smuggled into the United States. OCB is one of three nationally branded HSI National Opioid Strategy Initiatives and focuses on Chinese pill press supply chains, Mexican pill press brokers, Mexican TCOs using pill press equipment to mass produce fentanyl and fentanyl-related substances, domestic pill press equipment recipients engaged in fentanyl and fentanyl-related substance production, and money launderers facilitating the movement of fentanyl proceeds. During FY 2024, OCB sent over 145 collateral case requests and/or investigative referrals to HSI offices. Since its inception in 2021, OCB leads have resulted in the dismantlement of 37 domestic fentanyl labs, the seizures of over 550 pounds of fentanyl and fentanyl-related substances, over 2,000 pounds of fentanyl precursors, and over 2,500 pieces of pill press equipment.

*Operation Pelican Bones*

Operation Pelican Bones made significant progress toward the goals of disrupting and dismantling an extremely violent and powerful TCO through the interdiction of illicit narcotics, the disruption of precursor supply chains, and the forfeiture of financial tools used by the organization for profit and reinvestment. Since its inception in 2020, Operation Pelican Bones has resulted in the seizure of $234,637; more than 66,400 pounds of methamphetamine; over one million pounds of fentanyl, fentanyl- related substances, and methamphetamine precursor chemicals; and the indictments of high-level Mexican cartel members, including two regional priority organization targets and one consolidated priority organization target.

*Operation Hydra*

HSI's Operation Hydra targets the supply chains responsible for foreign shipments of precursor chemicals used to produce fentanyl, fentanyl-related substances, and methamphetamine destined for the United States. Operation Hydra targets and seizes precursor chemicals before criminals convert them into the synthetic drugs that fuel overdose deaths. In FY 2024, through Operation Hydra, HSI interdicted more than 2.4 million pounds of precursor chemicals, increasing the total weight of the chemical interdictions to over 4.8 million pounds since the operation's inception in late 2019.

## Crimes of Human Exploitation and Victimization

*Center for Countering Human Trafficking*

The Center for Countering Human Trafficking (CCHT) is an HSI-led effort comprising 16 supporting offices and components from DHS. The CCHT's mission is to advance counter human trafficking law enforcement operations, protect victims and enhance prevention efforts by aligning DHS's capabilities and expertise. The CCHT is the first unified, intercomponent coordination center for countering human trafficking and the importation of goods produced with forced labor.

Throughout FY 2024, the CCHT took significant steps to advance HSI's counter trafficking efforts, driving and supporting criminal investigations of forced labor and sex trafficking through coordinated intelligence and evidence-based strategies. CCHT personnel supported multiple large-scale operations across the country by providing funding and subject matter expertise while coordinating with other agencies. In FY 2024, the CCHT assisted HSI offices on various human trafficking operations in conjunction with events, such as the Kentucky Derby and the NFL draft. These operations resulted in the identification and assistance of numerous victims and arrests of multiple individuals.

Additionally, the CCHT supported an HSI Miami investigation involving a Latin Kings gang member convicted of sex trafficking. The defendant coerced several adult and underage victims to engage in commercial sex through violence, false imprisonment and the use of drugs. With CCHT support, the defendant was found guilty at a jury trial and sentenced to 380 months of imprisonment.

The CCHT increased HSI's counter human trafficking efforts through training, outreach and the awareness of victim protections by providing over 2 million pieces of outreach materials, quarterly Continued Presence webinars for law enforcement, and biannual Continued Presence webinars in English and Spanish for the public. In FY 2024, the CCHT delivered and/or facilitated 207 training and outreach events to approximately 20,004 participants, including hosting the third DHS-wide Virtual Human Trafficking Seminar and an in-person, four-day Human Trafficking Investigator Course for HSI investigators and supervisors. Additionally, the CCHT formally integrated the DHS Blue Campaign, delivering 170 human trafficking awareness presentations to over 23,600 federal government, non-governmental organizations, law enforcement personnel, congressional representatives and staff, and members of the public. The Blue Campaign also acquired 51 new partners in areas including aviation, colleges and universities, youth serving organizations, and campus and school resource offices. The Blue Campaign's human trafficking training initiatives have significantly enhanced awareness among participants about the nature and scope of human trafficking, its indicators, and the importance of timely reporting. As a result, individuals are now better equipped to identify potential trafficking situations and take appropriate actions to support victims and prevent exploitation.

*Victim Assistance Program*

HSI's Victim Assistance Program (VAP), within the Countering Transnational Organized Crime Division, is a central piece of HSI's victim-based approach to investigations into crimes of victimization and exploitation. The VAP ensures victims of federal crimes, such as human trafficking, exploitation, financial scams and human rights abuse, are informed of their rights and receive necessary assistance in compliance with federal statutes and the U.S. Attorney General's Guidelines for Victim and Witness Assistance. Using a victim-centered, trauma-informed and culturally sensitive approach, the VAP provides victim services and conducts forensic interviews of victims in support of HSI criminal investigations.

From FY 2020 to FY 2023, the VAP received congressional enhancement funds to increase victim support during HSI investigations in the United States and abroad. The funds allowed the program to create 76 new full-time positions, with 61 in HSI field offices where staff can

directly serve and support victims. VAP personnel assisted 3,715 identified victims, including 2,044 minors. Of these individuals, 818 were further identified as human trafficking victims and 1,783 were identified as victims of child exploitation. Forensic interview specialists assigned to SAC offices throughout the United States conducted 2,033 interviews. In addition, in FY 2024 VAP delivered approximately 700 presentations worldwide on various topics, including labor trafficking, trauma, victim centered approach, and the best ways to conduct interviews of victims.



Figure 36. FY 2024 Victim Assistance Program Data

*Document Benefit and Labor Exploitation*

HSI's Document Benefit & Labor Exploitation Unit (DBLEU) plays a critical role in maintaining the integrity of the employment and labor standards in the United States. HSI uses its civil and criminal authorities to identify and disrupt labor exploitation, providing security and stabilization for victims, and educating U.S. companies on best employment practices to prevent future violations. HSI serves the business community through the IMAGE program, which is a voluntary partner initiative between the federal government and private sector employers. Businesses that enroll in IMAGE receive training and guidance in topics such as anti-discrimination, fraudulent documents, E-Verify, forced labor and an overview on child labor. HSI conducts Form I-9 inspections to identify victims and egregious employers who are exploiting workers and children. HSI uses all civil and criminal remedies against persons, companies and/or organizations that exploit workers or pose threats to national security and public safety. HSI seeks suspension and debarment remedies against any person or business involved in the exploitation of vulnerable persons while preventing the government from working with them.

HSI uses a victim-centered approach to dismantle the infrastructure that exploits vulnerable populations, such as fraudulent document mills and smuggling and money laundering organizations. In addition, HSI focuses on the identification and seizure of illicit proceeds from

57

those who exploit workers and helps victims seek restitution. In FY 2024, HSI made over 280 criminal arrests and obtained approximately 15 management indictments and 10 management convictions relating to labor exploitation. DBLEU initiated 830 labor exploitation investigations, over 264 Form I-9 inspections, and debarred 166 businesses and 78 individuals. HSI referred 222 entities to the ICE Suspension and Debarment Division — including 31 with a nexus to forced labor, human trafficking and document servitude — for debarment. HSI also referred 38 entities for debarment to CBP, 73 to FEMA and 60 to USCIS. In total, 171 entities were referred outside of HSI. HSI conducted 231 IMAGE presentations to 1,860 businesses and acquired 13 new members. Lastly, as part of the I-9 process, HSI issued companies with Notices of Intent to Fine that resulted in 169 final orders to pay, totaling more than $17 million, of which $4.5 million has been collected.

**Global Trade**

*Global Trade Investigations*

HSI's Global Trade Division oversees and supports investigations of U.S. import and export laws related to trade fraud and counter-proliferation, including operation of the National Intellectual Property Rights Coordination Center, the Export Enforcement Coordination Center and the Counterproliferation Mission Center.

*National Intellectual Property Rights Coordination Center*

For more than two decades, the National Intellectual Property Rights Coordination Center (IPR Center), working collaboratively with its public and private sector partners, has led the government's response to combating global intellectual property theft and enforcing intellectual property rights violations. The IPR Center plays a significant role in policing the sale and distribution of counterfeit goods on websites, social media, and the dark web. As part of its digital piracy initiative, the IPR Center, in conjunction with the National Cyber-Forensics Training Alliance, created HSI's first Digital Piracy Training Course. During FY 2024, HSI offered two sessions of the course, training a total of 38 special agents.

In FY 2024, the IPR Center continued to coordinate enforcement actions at multiple high-profile sporting events under Operation Team Player. During pre-Super Bowl week, the IPR Center supported HSI Las Vegas in preparing for enforcement operations that resulted in the seizure of approximately 4,600 counterfeit items. During that week, the IPR Center also hosted an international delegation of European law enforcement officials, demonstrating HSI's plans for large scale enforcement operations targeting counterfeit goods at sporting events. The IPR Center also provided its experience and best practices to the delegation in preparing for the 2024 Paris Olympics.

Operation Apothecary is a cornerstone program at the IPR Center that focuses on addressing the threat of counterfeit pharmaceuticals. In FY 2024, the IPR Center expanded collaboration with pharmaceutical brand holders to target and disrupt transnational shipping routes that use free trade ports to move illicit pharmaceuticals. Based on data-driven intelligence, the IPR Center conducted two advanced pharmaceutical workshops for countries in sub-Saharan Africa and

western Asia to identify and disrupt high-level TCOs engaged in the illicit pharmaceutical trade.

By training and engaging foreign partners through these workshops, the IPR Center anticipates curbing the use of these foreign TCO shipping routes and ultimately preventing illicit pharmaceuticals from entering the United States.

*Headquarters Trade Enforcement Coordination Center*

In FY 2024, the GT Commercial Fraud Unit, in conjunction with CBP, launched the Headquarters Trade Enforcement Coordination Center (TECC) at the IPR Center to support HSI field office TECCs around the country. TECCs integrate HSI and CBP personnel and resources to identify instances of international trade fraud and enhance trade enforcement by promoting interagency collaboration, information sharing and efficient communication. While TECCs in domestic field offices focus on proactive identification, interdiction and investigation of inbound cargo that violates U.S. customs laws and related regulations, the HQ TECC focuses on effective lead and case development to support field offices and provides an enhanced agency response to ongoing trade violations that threaten the U.S. economy.
In FY 2024, the HQ TECC supported 38 criminal investigations and disseminated leads associated with thousands of commercial entries, totaling a domestic value of over $1.2 billion.

*Government Supply Chain Investigations Unit*

In FY 2023, HSI established the Government Supply Chain Investigations Unit (GSCIU) in response to growing concerns over the infiltration of counterfeit and substandard goods into the U.S. government supply chain. The GSCIU focuses on three critical missions: Protecting national security, ensuring military readiness, and assuring veteran and warfighter safety. The GSCIU brings together key public and private partners, with each entity holding specific expertise and authority. In building this contemporary solution, the GSCIU has modernized existing infrastructure and processes to identify vulnerabilities and target criminal networks who otherwise seek to reduce U.S. operational effectiveness. The GSCIU operates in a task force environment, which allows for the integration and analysis of interagency information and enhances the collective ability to identify and combat threats to the U.S. government supply chain.

GSCIU operations include:

- *Operation Gung Ho:* Identifies and interdicts counterfeit and noncompliant weapon components from entering the U.S. supply chain, ensuring U.S. military personnel and first responders are equipped with reliable equipment.
- *Operation Genuine Valor:* Safeguards the health and safety of U.S. veterans by ensuring pharmaceuticals, medical devices and surgical supplies purchased through federal contracts are genuine and perform as expected, through strategic enforcement operations, interdiction efforts and complex investigations.
- *Operation Roll Back:* Leverages data received from e-commerce platforms to identify third-party vendors who have engaged in counterfeiting and other intellectual property rights violations before those entities can harm the U.S. government's

procurement efforts.

- *Operation Chain Reaction:* Proactively targets counterfeit goods, such as microelectronics, entering Department of Defense and other U.S. government agency supply chains.

*Counter-Proliferation Investigations*

HSI's Counter-Proliferation Investigations (CPI) program is the agency's lead for export enforcement. CPI's primary mission is to prevent illicit procurement networks, terrorist groups and hostile nations from illegally obtaining U.S. military products, sensitive dual-use technology and weapons of mass destruction. Additionally, CPI provides investigative and analytical support to HSI special agents who conduct counter-proliferation investigations.

In FY 2024, HSI counter-proliferation investigations resulted in 823 criminal arrests, 487 indictments and 273 convictions.

> **Success Story**
>
> The investigation of Onur Aksoy and the PRO NETWORK companies was one of the largest counterfeit-trafficking operations ever prosecuted. Aksoy was sentenced to 78 months in prison for running an enormous operation over many years to traffic in fraudulent and counterfeit Cisco networking equipment. This HSI-led investigation, with support from OEMs such as Cisco, disrupted the flow of counterfeit technology, including equipment that could have compromised sensitive U.S. military applications. The case serves as a model for future efforts and is now part of training and outreach programs for government and industry stakeholders.

*Operation Cold Steel*

Initiated in 2022, Operation Cold Steel is an international operation targeting the illicit movement of weapons into Canada over the U.S. Northern Border. The largest weapons seizure under Operation Cold Steel occurred in FY 2024 by HSI Miami. The case was initiated after the Buffalo BEST worked with Canadian counterparts to produce information regarding a straw purchasing organization in Florida. The Buffalo BEST, along with the Bureau of Alcohol, Tobacco, Firearms and Explosives and HSI Miami, introduced an undercover agent to the operation; that led to the seizure of 110 firearms, 182 magazines, and 1,804 rounds of ammunition for violations of federal firearms trafficking laws. In FY 2024, Operation Cold Steel resulted in the seizure of 331 firearms, 297 magazines and 2,917 rounds of ammunition.

In FY 2024, the multiagency, multijurisdictional Project Saxom/Operation Dual Approach targeted the illicit movement of firearms across the U.S.-Canada border, resulting in the seizure of 106 firearms, 118 prohibited devices, 1,700 rounds of ammunition, 51 pounds of methamphetamine, 2 pounds of fentanyl, 688 suspected fentanyl pills, 3 pounds of cocaine, 197 grams of heroin, 877 opioid pills, 280 grams of psilocybin, $63,332 in Canadian currency and $4,689 in U.S. currency.

*Targeting of Illicit Iranian Origin Petroleum Products*

In 2020, OFAC stated that Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and fund its malign activities throughout the Middle East. OFAC also stated that Iran's petrochemical and petroleum sectors are primary sources of funding for

Iran's global terrorist activities and weapons of mass destruction program, and they enable its persistent use of violence against its own people.

Since 2019, HSI has been targeting the illicit sale and shipment of petroleum products that originated in Iran in violation of U.S. sanctions for the benefit of the Iranian Islamic Revolutionary Guard Corps-Quds Force (IRGC). HSI is uniquely positioned to target these shipments due to its longstanding authority and expertise in conducting criminal investigations involving violations and attempted violations of U.S. sanctions. To date, HSI and its investigative partners have disrupted a total of 12 tankers engaged in the movement of crude and fuel oil that originated in Iran or are owned by the IRGC-QF, resulting in a combined total forfeiture amount of nearly $374 million.

> **Success Story**
>
> In FY 2024, a civil forfeiture complaint was unsealed in the District of Columbia. The complaint alleged that more than 500,000 barrels of Iranian fuel oil valued at over $25 million, which was previously aboard the Oil Tanker "Abyss," was forfeitable under the terrorism financing statutes as property of the IRGC, a designated foreign terrorist organization.

*Export Enforcement Coordination Center*

The Export Enforcement Coordination Center (E2C2) is the primary forum within the federal government where executive departments and agencies coordinate and enhance export enforcement efforts. E2C2 has collaborative partnerships with 25 federal agencies across DHS, the Office of the Director of National Intelligence, and the Departments of Justice, Commerce, State, Energy, Treasury and Defense. Since becoming operational in 2012, E2C2 partners have processed approximately 17,000 deconfliction requests. In FY 2024, through its intelligence working group and interagency campaigns, the E2C2 developed and distributed approximately 49 investigative leads to the field. These efforts helped prevent the illicit procurement of sensitive U.S. technology by our adversaries.

*Counterproliferation Mission Center*

The Counterproliferation Mission Center (CPMC) in Huntsville, Alabama, serves as HSI's focal point for enhancing counterproliferation investigations for HSI domestic and international offices. As part of its analytical support, CPMC uses innovative analytical tools to increase the speed and efficiency through which investigators can analyze large amounts of data for pertinent evidence. In FY 2024, CPMC supported 194 HSI investigations, processed over 1.5 terabytes of data and developed 29 investigative leads.

*Operation Without a Trace*

Led by HSI at the National Targeting Center-Investigations (NTC-I), Operation Without a Trace (WaT) is a unified DHS strategy aimed at combatting the illicit flow of firearms, firearms components and ammunition from the United States into Mexico. Operation WaT is a federal partnership between HSI, CBP and the Bureau of Alcohol, Tobacco, Firearms and Explosives, in collaboration with the government of Mexico. In FY 2024, HSI field offices initiated 312 new Operation WaT investigations, made 356 criminal arrests, and seized 2,918 firearms; 8,118 ammunition magazines; and 829,826 rounds of ammunition.

*Weapons Seizures*

HSI weapons seizures increased significantly in FY 2024 compared to FY 2023. In FY 2024, HSI seized 41,351 weapons, a 99% increase from FY 2023. In FY 2024, CPI personnel hosted a training event for a delegation representing seven nations from the Caribbean Community National Gun Intelligence Unit. The full-day sessions included topics such as international firearms investigations, international controlled deliveries, and intelligence analysis capabilities and sharing. The training also included discussions on the current state and trends of firearms smuggling in the Caribbean region, with participants agreeing to strengthen ongoing collaboration in addressing this issue.

*Cultural Property, Arts and Antiquities Program*

In FY 2024, HSI repatriated approximately 1,850 artifacts and pieces of cultural property to Argentina, Cambodia, China, Ecuador, Egypt, Germany, Greece, Guatemala, India, Italy, Mexico, Morocco, Nepal, Pakistan, Peru, Spain, Ukraine and Türkiye. Repatriated items included scores of pre-Columbian artifacts from Mesoamerica, dinosaur fossils, ancient coins, a Roman Mosaic of a horse, a Greek bronze helmet, manuscripts, one of the first books ever printed about arithmetic, a 500-pound Buddhist statue and a textile woven more than 2,000 years ago.

The Cultural Property, Arts and Antiquities (CPAA) program led cultural property workshops with foreign partners in India, Morocco, Peru and the United Arab Emirates. In April 2024, CPAA presenters participated in the first cultural property training program at the International Law Enforcement Academy (ILEA) in El Salvador, which is now part of the ILEA catalog. Finally, CPAA collaborated with domestic partners to deliver two all-day webinars on Cultural Property of Native American and Indigenous People and Paleontological Resources and Fossils. Each webinar was attended by more than 180 members of law enforcement and academia.



Figure 37. HSI FY 2024 Statistics Snapshot

# Office of the Principal Legal Advisor

## Mission and Organization

The ICE Office of the Principal Legal Advisor (OPLA) protects the homeland by diligently litigating cases and adhering to the highest standards of professional conduct; providing essential, timely and accurate legal advice and counsel to agency leadership and personnel on cutting-edge matters; and optimizing resources to advance the DHS and ICE missions. With more than 1,700 attorneys and 260 support personnel across ICE Headquarters and 95 locations around the country, OPLA is the largest legal component within DHS. OPLA attorneys play an active role in the mission by working closely with ICE officers and agents each day, and alongside ERO and HSI, OPLA is recognized as ICE's third operational component.

As a large legal program with a complex federal law enforcement mission, OPLA handles a wide range of issues, from helping ensure responsible procurement practices to prosecuting high-profile national security cases and litigating groundbreaking immigration matters. On a given day, OPLA attorneys provide legal advice, counsel and training to ICE officers and agents, Management and Administration, and policymakers on myriad issues spanning ICE's mission, including immigration law, customs law, criminal law, administrative law, employment law and fiscal law. Additionally, OPLA attorneys serve as agency counsel supporting the U.S. Department of Justice (DOJ) in federal court litigation with ICE equities, and 12 OPLA attorneys are detailed to the Special Assistant U.S. Attorney (SAUSA) program, where they help prosecute federal criminal cases presented by ICE and other DHS components. A range of offices and agencies within DHS and ICE also regularly seek OPLA's legal expertise and assistance, and OPLA attorneys also serve on special assignment to the DHS Office of General Counsel and the White House Domestic Policy Council.

## Immigration Case Management

Among the broad range of legal issues OPLA handles, immigration cases are among the most critical. OPLA attorneys are the exclusive DHS representatives in administrative immigration removal proceedings before the DOJ's Executive Office for Immigration Review (EOIR), including immigration courts and the Board of Immigration Appeals (BIA). At the end of FY 2024, EOIR had over 3.5 million pending cases, and it is OPLA's responsibility to represent DHS in each of these proceedings.

During FY 2024, growth in immigration cases without commensurate resourcing continued to be the single greatest challenge affecting ICE, with all three operational components stretching their limited resources to keep up with an evolving operational picture and an expanding mission. In OPLA's case, the fiscal year was marked by challenges in staffing numbers and funding, which necessarily impacted its ability to respond to the full range of issues it regularly handles.



Figure 38. FY 2018 – FY 2024 EOIR Pending Cases at the End of Each Fiscal Year

However, despite severe ongoing resource challenges, during FY 2024, OPLA continued to carry out this fundamental piece of its mission by addressing the nationwide immigration caseload. In FY 2024, OPLA:[38]

- Represented DHS in nearly 1,813,000 removal hearings before EOIR.
- Supported the completion of over 582,860 cases pending before EOIR, including more than 50,200 orders of relief or protection, nearly 287,000 removal orders, and over 126,000 dismissals in the exercise of prosecutorial discretion.
- Managed more than 1,900 human rights violator cases and more than 5,100 national security cases nationwide.
- Implemented and executed the process outlined in the DHS memorandum, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings*, which facilitates the use of classified information in immigration proceedings, reversing the preexisting 2004 policy of using classified information as a "last resort."
- Engaged in appellate advocacy efforts that were instrumental in securing 14 important BIA precedent decisions involving issues such as detention authority, a noncitizen's credibility in immigration court, and whether certain crimes render noncitizens

---

[38] The case specific statistics reported here are from OPLA's internal case management system used by ICE OPLA attorneys nationally to capture work performed during and in preparation for litigation before EOIR; it is not intended to be a statistical tool. This data is subject to changes/updates at any time, as OPLA attorneys enter new information. Data stored in OPLA's case management system are input manually and they are not verified against EOIR databases, which are the record of proceedings for administrative immigration cases.

removable from the United States.

As EOIR's immigration court docket has continued to grow,[39] OPLA attorneys have exercised prosecutorial discretion on a case-by-case basis throughout removal proceedings in compliance with applicable guidance. Prosecutorial discretion is frequently used in law enforcement to prioritize important cases in a resource-constrained environment, and under current operational conditions, it is an important tool for effective immigration case management. By carefully reviewing cases being considered for prosecutorial discretion, OPLA attorneys prioritize scarce resources while ensuring public safety and national security are not compromised, and that enforcement is conducted in line with existing laws and policies. In FY 2024, OPLA attorneys:

- Reviewed 368,338 cases for dismissal or administrative closure of removal proceedings.
- Agreed to the dismissal or administrative closure in the exercise of prosecutorial discretion in over 141,124 cases.

By the end of FY 2024, immigration judges ordered 131,756 of those cases dismissed or administratively closed.

## Significant Immigration Case Litigation

A core part of ICE's mission involves countering national security and public safety threats. In some instances, this involves identifying noncitizens who have committed serious crimes before entering the country. OPLA works hand in hand with HSI agents and ERO officers to ensure that individuals who represent such threats are identified and prosecuted or removed from the country, as appropriate.

In addition, in immigration proceedings before EOIR, OPLA filed notices of intent to use classified information to secure removal orders in several top-priority national security cases. OPLA also helps obtain justice for victims of war crimes and other human rights violations around the world by identifying perpetrators who are now within the United States and taking action against them. From noncitizens who have committed egregious crimes in their home countries and then entered the United States illegally to war criminals who have become naturalized U.S. citizens under fraudulent pretenses, OPLA attorneys work tirelessly to prosecute these serious cases.

**High-Profile Removals**

In FY 2024, OPLA secured several removal orders in high-profile national security, human rights violator and criminal cases, including:

- A convicted conspirator of planned terrorist attacks against significant infrastructure in the United States.
- A convicted drug trafficker who admitted responsibility for kidnappings, murders and massacres during his time as a high-ranking commander in the United Self-Defense Forces of Colombia.
- A fugitive wanted in El Salvador for death-squad killings committed during the Salvadoran civil war.
- A human rights violator from Chile wanted for torture and extrajudicial killing.

---

[39] This graph is based on EOIR's Adjudication Statistics on Pending Cases, New Cases and Total Completions, https://www.justice.gov/eoir/media/1344791/dl?inline.

**Specialized Juvenile Docket**

In FY 2024, OPLA, in coordination with EOIR, implemented nationwide guidance for handling juvenile.[40] matters to ensure due process in immigration proceedings and maximize opportunities for juveniles appearing in immigration courts to access outside legal advice and counsel. This cross-agency initiative supports DHS's commitment to the compassionate handling of such cases and helps combat human trafficking, child labor and exploitation.

Guidance for the specialized juvenile docket mandates that each OPLA field location has dedicated "Juvenile Points of Contact" (POCs) to manage cases and help maintain a child-centered approach in the courtroom, ensure a more child-friendly environment, and provide continuity and consistency in handling these sensitive matters. To enhance subject matter expertise, OPLA hosted an in-person, nationwide training for almost 100 Juvenile POCs from June 10 to June 14, 2024, featuring subject matter expertise from OPLA's Human Rights Violator Law Division and the Enforcement and Removal Operations Law Division, ERO's Juvenile and Family Management Division, the DHS CCHT , USCIS's Refugee and Asylum Law Division, HHS's Office of Refugee Resettlement, Kids in Need of Defense (KIND), and the Massachusetts General Hospital Center for Law, Brain and Behavior. Throughout the fiscal year, OPLA continued to upskill its workforce to ensure fair and effective handling of this important set of cases, and by the end of the fiscal year, 159 OPLA attorneys were serving as Juvenile POCs nationwide.

**Federal and Administrative Litigation**

In FY 2024, OPLA attorneys managed an unprecedented uptick in federal litigation, providing legal representation and guidance to the agency and assisting DOJ before federal courts in matters ranging from immigration law, customs law, criminal law, administrative law, tort law, employment law and fiscal law. During this time, OPLA handled significant discovery demands associated with federal litigation, and supported ICE in the production of documents associated with requests under the Freedom of Information Act (FOIA). OPLA also represented the agency before the Merit Systems Protection Board (MSPB), the Equal Employment Opportunity Commission (EEOC), the Civilian Board of Contract Appeals (CBCA) and the Government Accountability Office (GAO), ensuring ICE's interests were effectively represented in these external forums.

**Special Assistant U.S. Attorney Program**

Despite overall staffing shortages throughout the fiscal year, OPLA expanded number of full-time SAUSA participants on detail to the DOJ, where its attorneys prosecute criminal immigration and customs violations in federal courts. At the end of FY 2024, OPLA had 12 full-time SAUSA participants, four of whom OPLA assigned to the Southwest Border.

---

[40] "Juvenile" in this context refers to the legal terms "child", "juvenile", "minor", and "unaccompanied [noncitizen] child", as defined by statute and regulation in INA § 101(b)(1), INA § 101(c)(1), 8 C.F.R. § 1236.3, 8 C.F.R. § 1236.2, and 6 U.S.C. § 279(g), respectively. Juveniles who are part of family units in removal proceedings are not included in juvenile dockets.

Notwithstanding the relatively small number, this group of attorneys processed more than 6,600 U.S. attorney's offices case receipts for potential prosecution, many involving complex ICE-led cases related to drug trafficking, human smuggling and other HSI priorities. Of the 6,600 case receipts, the DOJ accepted 6,023 cases for prosecution. In addition, despite having only four SAUSA participants detailed to the Southwest Border, this group secured more than 4,500 criminal convictions in federal district courts and assisted with the prosecution of numerous immigration-related crimes. SAUSA participants also secured several high-profile convictions during the fiscal year, including the following:

- In January 2024, a SAUSA participant and Assistant U.S. Attorney (AUSA) trial partners secured convictions against three defendants on one count of conspiracy to conceal, harbor, and shield from detection two children; one count of concealment of an undocumented immigrant; and one count of forcing labor through threats of serious harm to a victim or another person. One of the defendants coached the victims to lie to U.S. immigration authorities about their family relationships so they could obtain tourist visas, subsequently accompanying them into the United States. Once in the United States, the three defendants harbored the victims in residences and forced them to provide labor and services for the defendants' financial gain. The defendants used violence against the victims to force them to work both inside the residences and at a hair salon.

- In May 2024, another SAUSA participant secured a victory in a two-day jury trial where the defendant was found guilty of violating 19 U.S.C. § 1459(a)(e)(1) & (g), Misdemeanor Reporting Requirements for Individuals. The defendant had entered the United States at the Southwest Border along with 25 other noncitizens, later arguing in court that because he turned himself into the U.S. Border Patrol, he was seeking asylum rather than evading federal law enforcement; however, the jury found him guilty. This was the first trial in the District of Arizona charging a violation of 19 U.S.C. § 1459 in at least a decade, and the decision may help facilitate future prosecutions, not only under this provision of law, but also under 8 U.S.C. § 1325 (Illegal Entry) and 8 U.S.C. § 1326 (Illegal Reentry).

- In September 2024, a SAUSA participant and another AUSA secured a trial victory after a federal jury found the defendant — a convicted child molester — guilty of naturalization fraud in violation of 18 U.S.C. § 1425(a) and using a fraudulently obtained naturalization certificate as proof of United States citizenship to apply for a passport from the U.S. Department of State in violation of 18 U.S.C. § 1423. The defendant applied for naturalization in 2017, and subsequently became a U.S. citizen in 2018. In the naturalization application and during his naturalization interview, the noncitizen falsely denied ever forcing or trying to force someone to engage in sexual conduct or relations, and committing, assisting in committing, or attempting to commit an offense for which he was not arrested. However, after naturalizing, the defendant was arrested for child abuse that occurred in 2014, and in October 2019, he was convicted of two counts of child abuse against a minor victim under 12 years old and sentenced to 14 months

in prison. ERO subsequently identified the defendant in prison and worked with OPLA to present him to the U.S. attorney's office for prosecution.

While these cases are by no means exhaustive, they illustrate some of the important — and in some cases, precedent-setting — work that OPLA's attorneys perform as SAUSA participants and beyond.

### Complex Federal District Court Matters

In FY 2024, OPLA's work contributed to multiple successful outcomes in federal civil actions. OPLA supported the defense of 291 federal court lawsuits, collaborating with the DOJ in litigation, as well as filing amicus curiae briefs in matters impacting ICE's mission. OPLA also managed significant discovery demands associated with these federal actions, with its attorneys collecting and reviewing 191,038 documents in ICE's eDiscovery system.

**OPLA Represents ICE in Federal Court Matters**

In FY 2024, OPLA assisted the DOJ in numerous ICE-related matters, including 277 individual petitions for writ of habeas corpus and 291 complex federal district court lawsuits, 82 of which were class actions or putative class actions. OPLA also adjudicated 482 administrative claims under the Federal Court Claims Act and processed 25 requests for DOJ representation on behalf of ICE employees sued in their individual capacity.

OPLA was involved in many complex and high-profile cases throughout FY 2024, including the following:

- One particularly intricate litigation involved several years of discovery, including the review of hundreds of thousands of documents and extensive motion practice. Due to OPLA's efforts and collaboration, the government received a favorable ruling January 4, 2024, from the U.S. District Court for the Western District of Washington. The court granted the government's motion for summary judgment dismissing *NWDC Resistance v. U.S. Immigration and Customs Enforcement*, No. 18-5860 (W.D. Wash. filed Oct. 23, 2018). This lawsuit — filed by two organizations, Northwest Detention Center Resistance and the Coalition of Anti-Racist Whites — alleged that ICE implemented a pattern or practice that selectively targeted noncitizens who exercised their rights to speak out and organize against U.S. immigration policy. Plaintiffs identified approximately two dozen individuals across the country who were alleged victims of "selective enforcement." However, OPLA was able to successfully represent ICE's position that any enforcement actions taken were appropriate and lawful.

- OPLA successfully supported the DOJ in legal challenges to state-enacted immigration laws, including *United States v. Texas*, 719 F. Supp. 3d. 640, (W.D. Tex. 2024)  (Texas SB 4); *United States v. Iowa*, --- F. Supp. 3d ---, 2024 WL 3035430 (S.D. Iowa June 17, 2024) (Iowa SF 2340); and *United States v. Oklahoma*, --- F. Supp. 3d ---, 2024 WL 3449197 (W.D. Okla. June 28, 2024) (Oklahoma HB 4156). The federal government was successful at obtaining preliminary injunctions against these state-enacted immigration laws prior to their implementation, as these laws violate longstanding principles of the Supremacy Clause of the U.S. Constitution. Left unchallenged, these cases would have

generated significant adverse impacts to the nation's immigration system and foreign affairs.

- OPLA worked closely with the Department of Justice to settle two long-standing class action lawsuits: *Ms. L. v. ICE*, No. 18-428 (S.D. Cal. filed Feb. 26, 2018) (class action challenge to the separation of noncitizen parents and children at the U.S.-Mexico Border) and *Hamama v. Adducci*, No. 17-11910 (E.D. Mich. filed June 15, 2017) (class action challenge to removal of certain Iraqi nationals). Resolution of these cases came at the end of multiyear negotiation efforts and prevents further expenditure of limited ICE resources.

- OPLA successfully advocated for the DOJ to file amicus curiae briefs in matters challenging state laws that would effectively eliminate ICE detention operations in certain regions. *See GEO Grp. Inc. v. Inslee*, No. 23-5626 (W.D. Wash. filed July 13, 2023) (challenge to Washington House Bill 1470); and *CoreCivic v. New Jersey*, No. 23-2598 (3d. Cir. filed Jan. 4, 2024) (appeal of the U.S. District Court for the District of New Jersey's decision in *CoreCivic v. Murphy*, 690 F.Supp.3d 467 (D.N.J. Aug. 23, 2023) where the district court agreed with the persuasive brief filed by the DOJ, which was supported by OPLA and ERO, and issued a favorable ruling that struck down New Jersey Assembly Bill 5207 which effectively eliminated ICE detention operations in the entire state).

| OPLA Federal Court Litigation during FY 2024 | |
| --- | --- |
| **Habeas Litigation** | **Class Action Litigation** |
| 277 | Number of class action and putative class action suits: 82 |
| **FOIA Litigation** | **Document Review** |
| 179 | Total number of documents reviewed in ICE system: 191,038 |
| **Total Current Cases Pending** | Responsive documents released: 18,315.[41] |
| 291 | |

**Civil and Administrative Litigation**

OPLA also represents the agency and supports litigation efforts by the DOJ in federal matters before various administrative tribunals. In FY 2024, OPLA represented ICE in 36 appeals to the MSPB and 119 cases before the EEOC. OPLA also provided support in over 180 active FOIA litigation matters, closing out 37 of them in FY 2024. In addition, OPLA represented ICE in bid protests before GAO and against claims before the CBCA. For example, during ICE's procurement of translation and interpretation services, OPLA successfully defended against a pre-award bid protest where the protester challenged its exclusion because their GSA contract had minimum quantities, which was prohibited by the solicitation. OPLA also defended ICE in contract disputes before the CBCA related to medical staffing and ICE Air contracts, resulting in favorable negotiated settlements, and assisted the DOJ with trial preparation of contract and administrative claims before the U.S. Court of Federal Claims and the U.S. District Court. By

---

[41] This figure is an approximation due to how documents are released in separate litigation.

representing ICE in these forums, OPLA helps ensure efficient and effective operations for the agency, as well as optimal use of resources in a challenging fiscal environment.

| OPLA Administrative Adjudications and Litigation during FY 2024 | |
|---|---|
| **FTCA Claims** | **Labor and Employment** |
| Claims received: 299 | MSPB: 36 |
| Claims adjudicated: 482 | Arbitrations: 1 |
| Claims pending: 518 | EEOC cases: 119 |
| **Employment-Related Litigation** | |
| 25 | |
| **FOIA** | |
| Appeals received: 201 | Appeals adjudicated: 181 |

**Administrative and General Law Advice and Counsel**

In addition to supporting ICE's enforcement mission, OPLA also plays a critical role in ensuring the agency adheres to the highest ethical standards, advising ICE and its workforce on professional conduct, as well as fiscal, contractual and employment matters. In FY 2024, OPLA assisted ICE employees by addressing more than 3,590 requests for ethics advice on important topics including outside employment, gifts, political activities, fundraising, misuse of position and working with contractors; and helped employees avoid any financial conflicts between official duties and personal

> **Protecting Children Online**
>
> OPLA is an advisor to DHS's Know2Protect national public awareness campaign to combat online child exploitation, providing guidance on issues such as relations with non-federal entities, fiscal law, contractual matters, gifts to the agency and a variety of endorsement concerns. This support was crucial to the timely and successful launch of this important campaign in April 2024, and OPLA attorneys continue to support these efforts by processing gift offers, advising on donations, and executing written agreements with organizations supporting anti-child sexual exploitation and abuse efforts across for-profit and nonprofit corporations and associations.

interests by reviewing more than 4,100 financial disclosures. OPLA also assists the agency with ensuring effective and efficient procurement activities as well as sound fiscal management. In FY 2024, its attorneys supported ICE's ability to obtain quality support from the private sector by reviewing more than 900 contract formation-related actions and addressing 128 contract administration-related actions.

Additionally, OPLA also helped safeguard the integrity and quality of the procurement process by seeking suspensions and debarments for entities engaged in criminal or other improper conduct, barring those entities from doing business with the government, and recouping lost funds. In FY 2024, OPLA had 201 suspensions and debarments issued and collected more than $8.7 million in delinquent debt, including $7.4 million for breached surety immigration bonds. Finally, several other areas of OPLA support also fall under administrative and general legal advice. As advisors to ICE and multiple other DHS programs, OPLA attorneys help department personnel navigate complex laws, regulations and policies so programs can accomplish their goals effectively and lawfully. While some legal support focuses on avoiding negative outcomes or mitigating existing issues, OPLA's attorneys also proudly support innovative and

collaborative initiatives across the agency and DHS, including programs that foster collaboration between the public and private sectors.

**Training Clients and Engaging Stakeholders**

One of the most important ways OPLA helps uphold ICE's mission and supports the workforce is through its robust training program.

Throughout FY 2024, OPLA attorneys provided over 3,100 hours of classroom

> **Eliminating Waste, Fraud, and Abuse**
>
> In FY 2024, OPLA recovered a $300,000 debt from a large furnishings company. To determine why the invoice was delinquent, OPLA researched the Secretary of State's website and determined the company had not closed but had multiple locations, and the invoice had been sent to a factory instead of corporate headquarters. OPLA contacted the company's attorney, who directed them to new management at the company. Management promptly paid the invoice, avoiding a lengthy process where ICE's finance center would have referred the delinquent debt to the U.S. Treasury, resulting in delayed or diminished payment to ICE and legal problems for the company.

legal instruction to approximately 1,500 ERO officers and HSI agents at the Federal Law Enforcement Training Center (FLETC) facilities in Glynco, Georgia, and Charleston, South Carolina, with offerings ranging from basic to advanced and specialized courses, and provided over 45,690 hours of client training to over 25,460 ERO, HSI, M&A, and federal, state and local stakeholders. OPLA also invested heavily in continuing education for its own workforce, training 261 new attorneys, as well as offering advanced training to 87 experienced attorneys and 42 managers. To sharpen the workforce's litigation skills and stay abreast of emerging legal issues, OPLA also hosted trial advocacy trainings for 94 attorneys and conducted 30 nationwide virtual trainings for over 2,600 attendees on a variety of substantive legal topics, including labor exploitation, preventing and responding to female genital mutilation, human trafficking, professional conduct, expert witnesses, credible fear adjudications, reporting attorney misconduct, litigating fraud cases in immigration court, and the Hatch Act.

Finally, OPLA also offers trainings to law enforcement beyond FLETC, and provides offerings for ICE personnel as well as federal, state and local law enforcement officers. While OPLA seeks to offer the most relevant trainings to each audience, trainings include topics such as Fourth Amendment issues, individual officer liability, body-worn cameras, border search authorities, counter-proliferation issues, financial crimes, IPR and trade enforcement, intelligence law, task force officer training, human rights law,

> **OPLA Trains LEOs to Lawfully Carry Out Their Duties**
>
> OPLA has dedicated FLETC attorneys to provide law enforcement officers training on Fourth and Fifth Amendment issues, use of force, fugitive operations, human trafficking, child exploitation, maritime law, narcotics crimes, human smuggling, border search, electronic surveillance, money laundering, financial crimes, identity and benefit fraud, civil forfeiture, criminal forfeiture and commercial fraud.

human trafficking, immigration law custody and enforcement authorities, juveniles, mental competency, information sharing, national security issues, U.S. citizenship, and VAWA, T and U visas and protections. Not only do these trainings help ensure law enforcement officers have the most current skills and are operating at the highest standards of professionalism, but they also provide an avenue for ICE to build and strengthen relationships with partners while educating on the complexities of its mission.

**Addressing Staffing Challenges**

As a relatively small agency with a complex mission and growing workload, ICE's greatest challenge is finite resources. Like the agency's other operational components, ERO and HSI, OPLA has felt the ongoing effects of staffing shortages alongside a caseload that continues to expand. Since 2018, the growth of OPLA's workforce has lagged compared to EOIR's rapidly expanding immigration court system, and this widening gap has contributed to case backlogs, staff burnout and resources drained from other initiatives.

In response to staffing constraints, OPLA has sought out and implemented innovative initiatives that have helped close some — but not all — of the gap in staffing. For example, to help address onboarding delays, OPLA diverted staffing resources to fund four additional dedicated staff within ICE's Human Resources Unit. During FY 2024, these additional OPLA-funded personnel allowed the Human Resources Unit to begin reducing their significant hiring backlog, and OPLA was able to onboard 379 new attorneys and 42 new support staff. Nevertheless, this falls short of the number of attorneys and support staff OPLA needs to meet current immigration court demands.

To address operational challenges caused by its staffing constraints, OPLA has also implemented procedures that increase efficiency for existing staff, and a number of OPLA field locations have implemented nonappearance procedures where attorneys allocate their limited time to certain priority cases instead of appearing in court for non-priority cases. Although OPLA is currently selective about cases where it declines to appear, its need to utilize nonappearance to manage the increasing number of immigration judges and pending immigration court cases will increase. OPLA has also dedicated headquarters attorney resources to assist field locations with handling their caseloads and court appearances, which impacts its ability to proactively address litigation risks posed by agency policies and operations. While OPLA will continue to mitigate its staffing challenges as much as possible, shortfalls in staffing its workforce will continue to impact its ability to carry out its mission.

# Management and Administration

## Mission and Organization

ICE's Management and Administration (M&A) directorate's mission is to empower ICE through a diverse workforce dedicated to a culture of customer service and exemplary management operations. M&A's vision is to deliver innovative enterprise solutions. M&A, through its workforce of more than 1,400 employees, oversees many of ICE's processes, including:

- Acquisition management processes and procurements.
- Human resources, workforce recruitment and hiring.
- Information technology systems and tactical communications support.
- Management, sharing, disclosure and protection of ICE data and information.
- Real property and asset management.
- ICE leadership and career development training.

## Enterprise Transformation Initiative

Under the leadership of the Office of the Deputy Director and M&A, in FY 2024, ICE began the Enterprise Transformation Initiative (ETI). ETI is an agencywide, strategic effort to modernize and enhance ICE's enterprise service capabilities — the administrative support capabilities, such as hiring, facilities management, career and leadership development, and budget planning and execution, — that ensure ICE can meet its mission of protecting public safety and national security. The primary goal of ETI is to be more efficient and effective with the agency's enterprise services and be better stewards of taxpayer dollars by streamlining processes, improving technology and optimizing resources.

This multiyear effort began with leveraging one of DHS's Federal Funded Research and Development Centers (FFRDC), the Homeland Security Operational Analysis Center, to conduct the study and help ICE build an action plan to drive efficiency, effectiveness and innovation in the areas of human resources and position management. In FY 2024, ICE established an ETI program management office, established a governance framework including an Executive Steering Committee and advisory board; partnered on the FFRDC's review of ICE's hiring resources, processes, policies and technology that is informing a final ICE action plan by early FY 2025 to improve ICE's hiring process and hiring timelines; made substantial technology improvements through the human resources information technology (HRIT) effort; and acquired contract support for implementation of the ETI action plan to improve hiring and position management, which will begin in early FY 2025.

## Government and Retirement Benefits Platform

The ICE Office of Human Capital (OHC) activated the Government and Retirement Benefits (GRB) Platform for all ICE employees, replacing the functions previously utilized in FedHR Navigator. The new online platform offers improvements to both the human resources and customer experiences by providing an intuitive and innovative interface for employees to submit certain retirement and benefit-related requests.

ICE employees may use the GRB Platform for several requests, including:

- Annuity estimates prepared by a retirement specialist.
- Military service deposit computations and requests to make a deposit.
- Civilian service deposit and redeposit estimates and requests to make deposits and redeposits.
- Applications for retirement.
- Changes to health and life insurance due to qualifying life events.

The GRB Platform guides employees on how to initiate a request, prefills forms with current employee data, and allows electronic signatures and submissions to the Human Resources Operations Center (HROC), making retirement and benefit changes and requests more accessible to ICE's workforce. In addition, the GRB Platform provides employees with tools and information at their fingertips. For example, employees may instantly run their own annuity estimate computations, calculate Federal Employees' Group Life Insurance (FEGLI) premiums before submitting changes, and review their total compensation statements with a comprehensive, up-to-date picture of the full value of their compensation and benefits.

**Recruitment and Hiring**

*DHS EXPO Hiring Event*

On June 27 and 28, 2024, ICE participated in the DHS Hiring Expo Event at the Dulles Expo Center in Northern Virginia, greeting more than 8,800 job seekers in two days. The ICE Office of Human Capital (OHC) led the cadre of hiring managers, program office recruiters and volunteers in support of the hiring event. The leadership, collaboration and commitment demonstrated during the event yielded unprecedented results for ICE; hiring managers met with applicants, partnered with OHC to review resumes, conducted interviews, and made on-the-spot selection decisions. These efforts resulted in ICE extending a total of 185 accepted tentative job offers, which contributed to a notable increase in ICE's hiring efforts in FY 2024.

*Direct-Hire Authority Delegation*

In April 2024, OHC received direct hire authority (DHA) from the Office of Personnel Management for several mission critical occupations in support of geopolitical and evolving global economic events critical to ensuring national security and public safety in accordance with presidential executive orders. OHC partnered with program offices — including ERO and HSI — to use DHA as part of its overall strategic workforce planning and to support a recruiting strategy that reaches all segments of society. Since July 2024, ICE has extended 172 tentative job offers and an additional 366 selections made pending tentative offers through DHA, further supporting ICE's FY 2024 hiring goals.

**The Office of Leadership and Career Development**

In FY 2024, the ICE Office of Leadership and Career Development (OLCD) provided instructor-led development training to nearly 6,600 participants, accumulating more than 2,400 training

hours across the DHS Leader Development Framework. This training encompassed customized instruction for each of the five tiers of the DHS framework, including the non-supervisory Foundation and Milestone programs and the supervisory and executive-level Cornerstone, Keystone and Capstone programs. Advanced Supervisory Leadership Training (ASLT), the Keystone Leadership Program (KLP), Investiture, Team Member Leadership Development (TMLD) and Fundamentals of Mission Support (FMST) are among the courses that are Federal Law Enforcement Training Accreditation (FLETA) Board-accredited.

Additionally, throughout the fiscal year, OLCD provided instructor-led development training to more than 1,800 participants, totaling over 1,900 training hours across the DHS Leader Development Framework, which included tailored training for all five tiers of the DHS framework. Courses include the FLETA-accredited Supervisory Leadership Training and Instructor Development Course courses, Advanced Supervisory Leadership Training, Keystone Leadership Program, Team Member Leadership Development, Museum of Tolerance, Coaching, and the Gettysburg leadership training program designed to facilitate discussion and debate about the leadership principles, decisions, and actions that occurred during the Battle of Gettysburg. The training guides participants through tactical and operational problems by using the terrain and historical context of an actual battle. The training also provides an opportunity for participants to sharpen analytical and decision-making skills, refine ability to interpret information, and gain insight into the combat leadership challenges of senior and mid-level officers that fought in the Battle of Gettysburg. In support of new employee orientation and the DHS Secretary Public Service Ethos (PSE) initiative, throughout the fiscal year, 1,388 new employees received an OLCD briefing at their New Employee Orientation and 927 new employees received PSE training. Additionally, 308 new supervisors attended the L/M90X webinar, totaling 10 training hours.

The ICE OLCD Mentoring Program delivered 21 training hours to more than 1,000 participants across the ICE Mentoring for Women (IM4W) and IHSC mentoring programs. The programs are designed to help employees develop skills and competencies needed to succeed in today's challenging work environment, enabling ICE employees to share their experiences and talents to motivate, teach and build relationships that will ensure organizational growth and success. The formal mentoring programs address specific developmental competencies tied to executive core qualifications, which include leading change, leading people, driving results, building business acumen and building coalitions. For the last three years, more than 96% of mentees reported that they enhanced their interpersonal communications, technical competencies and leadership skills.

In FY 2024, OLCD partnered with 20 field and headquarters offices to deliver customized leadership development programs for supervisory and non-supervisory employees for more than 1,100 participants, totaling 351.5 training hours. These customized leadership development programs build upon previous training and address specific issues within programs. Trainings offered include Leading at the Speed of Trust, Resume Writing and Interview Skills, DiSC, Strength Finders, Conflict, Myers Briggs Type Indicator, the Leadership Challenge Workshop and Individual Development Plans.

Moreover, in FY 2024, the OLCD Coaching Program delivered 102 hours of training to ICE coaches, including 60 hours of professional coach certification training and 42 hours of training as part of the coaches continuing education series. ICE coaches represent all offices across ICE,

76

and the program enables any ICE employee to work with a certified professional coach to attain their professional and personal goals. Professional coaching positively influences employee retention, morale and productivity as it helps influence an organizational culture of support, curiosity and psychological safety.

### ICE Data Modernization

With the understanding that ICE still faces challenges such as historical surges at the border, increased strains on interior enforcement, and expanded complexities in enterprise services with data maintenance and utilization, ICE continues to take proactive steps to advance, adapt and evolve data operations to meet mission challenges. ICE's Data Modernization Strategy provides ongoing guidelines to encourage data that is secure, connected, accessible and reliable. ICE made significant progress on prioritized IT data modernization opportunities during FY 2024, including the development of a data analytics platform for non-investigative data and development of a centralized data catalog to launch ICE's data exchange and sharing activities; human resource IT (HRIT) modernization has worked to streamline HR data and replaced many manual processes helping to reducing error rates.

For the FY 2024 end-of-year awards, the inclusion of National Finance Center (NFC) data enabled ICE to process performance ratings and awards with appropriate unique identifiers and auto-populate amounts, saving HRIT personnel 72 hours in manual processing time. The automatic ingest of award ratings will provide one minute of savings per person per rating, saving approximately 358 hours across approximately 21,500 ICE employees. The automation of over 35 data fields eliminated more than 90% of data entry errors and saves ICE an estimated 19 minutes of manual data entry per hire for criminal investigators and deportation officers. Other streamlined processes include the Data Empowerment Program, which advanced the ability to use data for policy and budget-driven decisions.

### Deploying Key Technology Along the Southwest Border

As part of its role in leading technological efforts and responding to the surge at the Southwest Border, OCIO delivered capabilities that directly impacted information sharing, automated manual processes, reduced the time to perform job functions and increased the ability to provide transparent data to agency partners throughout FY 2024. ICE offered tangible improvements and benefits to Southwest Border operations within immigration processing, transportation and detention facility management with significant impact from the following applications:

- EOIR Court Scheduler.
- ICE Portal.
- Electronic A-Files.
- ICE Air Operations Commercial.
- The Bedspace Request System.

Through close collaboration, OCIO, ERO and contractor support streamlined the court date scheduling process and removed the need to manually enter information on Notices to Appear. These efforts positively impacted noncitizens by eliminating conflicting court dates. In FY 2024,

ICE successfully launched the ICE Portal, a public-facing website developed to simplify and centralize resources and communications between noncitizens and the agency. Online services are accessible to noncitizens in nine languages, including the ability to change addresses, schedule field office appointments and obtain real-time EOIR court hearing information. The ICE Portal logged over 1 million total user sessions in FY 2024, including 16,000 noncitizens successfully retrieving court date details.

In FY 2024, ICE continued to ensure delivery of upcoming interim milestones aligned with DHS-wide goals for electronic A-Files. Additionally, ICE worked on the Warrant of Arrest/Notice to Appear processing disposition during FY 2024. Progress on this endeavor supports alignment to the reformatting of the Notice to Appear-Own Recognizance form. Additionally, ICE implemented a digitized method of verifying and validating the accuracy of addresses associated with noncitizens in the immigration process. Enhanced features to meet virtual check-in requirements include the ability to use mobile phones and the use of facial verification and geolocation for noncitizens ERO case officers deem as low risk.

### Artificial Intelligence

ICE recognizes the transformative potential of artificial intelligence (AI) to the mission space. As a result, in FY 2024, the agency continued to establish the foundation for the safe, secure and ethical development and use of AI technology. Throughout the fiscal year, ICE embraced generative AI in accordance with DHS policy, providing training and guidance to over 600 employees and enabling two proofs of concept to evaluate potential uses of the technology for investigations and policy analyst support. Additionally, ICE cultivated new opportunities for AI across the agency's mission space throughout the fiscal year by identifying potential use cases and securing partial future funding for programs to combat cybercrimes and child exploitation as well as provide mobile language translation. ICE OCIO, along with the DHS Artificial Intelligence Policy Working Group, led efforts to define the assessment, compliance and extension process for use cases that may impact civil rights or safety.

### Communication and Engagement with Internal and External Partners

In FY 2024, ICE's Freedom of Information Act (FOIA) unit within M&A successfully increased its production efforts to counter the exponentially higher volume of public FOIA requests. Higher efficiency and rates of production, increased staff and greater streamlined coordination with USCIS allowed ICE to successfully address the growing backlog of FOIA requests and complete a record number of case closures per month. ICE's FOIA production rates in FY 2024 included:

- 69,294 FOIA requests completed, a 116% increase from FY 2023.
- 157,187 A-Files reviewed, a 66% increase from FY 2023.
- Reduction in the number of backlogged requests by 39% from FY 2023.
- Reduction the number of appeals by 39% from FY 2023.

During FY 2024, ICE's Privacy Unit continued to support the agency's mission and objectives by conducting privacy analyses of investigatory tools and systems. These comprehensive

analyses and assessments were conducted to ensure the rights of both citizens and noncitizens are protected in accordance with the Privacy Act and E-Government Act.

**Electric Vehicle Infrastructure Planning**

During FY 2024, ICE's Fleet Management Program completed the upfitting, evaluation and delivery of two electric vehicles (EVs).[42] ICE's Fleet Program worked with the DHS Office of the Chief Readiness Support Officer in FY 2024 to acquire an EV for upfitting and law enforcement testing in FY 2025. In FY 2024, the ICE Office of Asset and Facilities Management continued collaborating with ICE programs to test additional vehicles from different manufacturers in various law enforcement operational settings, testing which will continue throughout FY 2025. Additionally, ICE worked with CBP to avoid duplicating tests on EVs, with a strategy to share evaluation results between the components.

**Effectively Addressing ICE's Fiscal and Procurement Responsibilities**

The ICE Office of Acquisition Management (OAQ) continued to support ICE's Vendor Engagement Events Program with three separate ICE program-focused events. In FY 2024, OAQ participated in nearly 800 vendor engagements through various modes of communication, including the DHS Vendor Outreach Sessions held every month. ICE received its 15th A+ rating on the DHS Small Business Scorecard Award from the U.S. Small Business Administration for its small business program. Further, ICE exceeded the 38.5% DHS goal for the overall Small Business Prime goal by awarding 41.34% of its contracts to small businesses while maintaining a 98% accuracy and timeliness rate for required Federal Procurement Data System entries.

**Enterprise Risk Management**

Throughout the fiscal year, ICE continued to build off its FY 2023 accomplishments to mature its Enterprise Risk Management (ERM) program as required by OMB Circular No. A-123. Working closely with agency leadership and an ERM working group comprising representatives from all agency directorates, ICE conducted a comprehensive risk identification and analysis process to develop initial risk statements and enhanced this data into detailed profiles, resulting in the first time the agency completed and submitted an enterprise Operational Risk Register to the DHS Program Analysis and Evaluation Office ahead of the annual deadline.

---

[42] Eight administrative and law enforcement EVs will be delivered to ICE El Paso's Collocation Facility by the first quarter of FY 2025.

# Office of the Chief Financial Officer

## Mission and Organization

ICE formally realigned the ICE Office of the Chief Financial Officer (OCFO), with its 370 personnel, as its own directorate on November 5, 2023, and established the ICE CFO position as equivalent to an Executive Associate Director. This movement established a direct line of communication between OCFO and the ICE director, enhancing transparency and decision-making. This movement garnered great support from Congress and established better communication between the OCFO and its internal and external partners. The realignment also successfully addressed concerns with ICE's ability to best manage its financial resources.

## Budget Execution

OCFO effectively executed the largest budget in ICE's history, obligating 99.88% of ICE's FY 2024 funding with a 0.12% lapse, a 0.05% reduction from the previous year. To further enhance ICE's budget operations, OCFO's Office of Data Analytics (ODA) developed an enhanced Southwest Border Rapid Cost Model (SWB-RCM) for detention bed cost projections. The model utilizes operations and financial data to forecast needs based on encounters projections and conducts "what-if" drills to see how different factors impact allocated funds.

## Cost Analysis

In FY 2024, to improve ICE cost analysis, ODA continued to develop an enhanced Detention Bed Model and conducted preliminary analyses on transportation, ATD, and medical models to forecast budgetary needs based on various factors, such as inflation and bed utilization rate. Version 1.4 of the Detention Bed Model completed the verification, validation and accreditation process with DHS Program Analysis and Evaluation in early FY 2024. To further address ICE Office of Budget Performance and Planning leadership's need, ODA revised the Detention Bed Model. The current version, Version 1.5, allows OCFO users to generate budget proposals and forecast future detention costs based on several input variables, including estimated medical cost, funding sources, inflation rate and bed utilization rates. Version 1.5 completed power user training in September 2024.

# Office of Professional Responsibility

## Mission and Organization

The ICE Office of Professional Responsibility (OPR) upholds the agency's professional standards through a multidisciplinary approach of security, inspections and investigations to promote organizational health, integrity and accountability. OPR promotes organizational integrity by vigilantly managing ICE's security programs, conducting independent reviews of ICE programs and operations, and impartially investigating allegations of employee and contractor misconduct. OPR achieves its mission through three dynamic program offices: The Security Program Office, the Inspections Program Office and the Investigations Program Office.

In FY 2024, OPR's approximately 600 employees cleared over 25,000 employees and contractors for hire, reviewed almost 100,000 continuous evaluation alerts, conducted 194 inspections of ICE detention facilities, and reviewed over 16,000 allegations of potential misconduct.

## Security Program Office

The Security Program Office (SEC) safeguards people, information and facilities through comprehensive and integrated programs that encompass threat management, as well as personnel, physical, information and administrative security.

During FY 2024, polygraph professionals and senior personnel security management participated in a DHS-wide polygraph working group to help standardize common polygraph procedures while continuing to maintain the highest standards. The working group coordinated with officials from the National Center for Credibility Assessment to gain understanding of the different types of polygraph examinations and key terms used in the industry. As a result of the working group's recommendations, ICE significantly improved its communications to prospective applicants about the polygraph process by creating a frequently asked questions area on ICE's public facing website to alleviate misconceptions about polygraph examinations and help applicants understand examination procedures.

The OPR Personnel Security Division (PSD) collaborated with Enterprise Transformation Initiative (ETI) executives to provide a comprehensive Entry-on-Duty Daily Report dashboard that may be accessed by any ICE hiring manager or their designees. Since launching this foundational step toward achieving a streamlined and transparent hiring process, PSD provided access to approximately 400 hiring managers, providing them with greater transparency and administrative oversight of their hiring selections on July 31, 2024.

In FY 2024, the OPR Security Infrastructure Section developed and implemented a process to conduct facility security assessments similar to those conducted by DHS's Federal Protective Service on ICE-owned or direct leased facilities. The team successfully conducted six facility assessments in FY 2024, resulting in an in-depth analysis to assist designated officials and responsible officers in the risk management process by identifying threats and vulnerabilities at their facility. These efforts assisted in determining recommendations for effective technical

countermeasures to address and strengthen the overall safety and protection of ICE personnel, information and facilities.

**Inspections Program Office**

The Inspections Program Office (ISP) inspects, audits and reviews ICE directorates, programs and detention standards to assess compliance with federal laws and applicable policies and procedures. This internal oversight provides ICE leadership with an independent and objective review of the performance and organizational health of ICE offices and programs

In FY 2024, ISP conducted 194 detention facility compliance inspections, 43 of which were unannounced. During these inspections, 93% of the detention facilities received ratings of acceptable or higher. ISP facilitated the completion of 21 Prison Rape Elimination Act (PREA) audits at various short- and long-term ICE detention facilities. Additionally, ISP conducted 21 financial audits of investigative programs to assess the state of performance of ICE's Certified Undercover Operations program and conducted 23 inspections of 287(g) programs to ensure compliance with the requirements of each memorandum of agreement. Furthermore, ISP conducted 105 field office inspections, a 20% increase from the previous fiscal year, and administered biennial self-inspections to 393 HSI, OPLA and OPR offices.

**Investigations Program Office**

The Investigations Program Office (INV) manages and investigates allegations of employee misconduct and oversees a variety of other integrity programs. This oversight protects public trust and preserves the highest standards of integrity and accountability across the agency. In FY 2024, INV maintained 13 field offices to conduct investigations into allegations of criminal and serious administrative misconduct involving ICE employees and contractors. INV processed and documented over 16,000 pieces of information, an increase of approximately 8% from FY 2023. From the resulting information, INV identified and evaluated more than 3,000 allegations of misconduct, provided oversight and guidance for 1,418 management inquiries, and completed 409 investigations.

Additionally, during the fiscal year, INV made significant changes to the Giglio/Henthorne and other integrity programs, leading to increased efficiency and transparency for ICE employees. INV presented three investigations involving critical incidents to the Firearms and Use of Force Incident Review Committee, provided PREA training to 465 students, and delivered integrity awareness training to over 4,456 employees. INV also participated in working groups related to the use of body worn cameras and developed new standard operating procedures for many processes related to its implementation. Lastly, in FY 2024, INV improved coordination with internal and external partners, including DHS organizations with integrity oversight, by developing new technological advancements in investigative databases as well as intelligence and forensic processing.

# Office of the Director

**Office of Diversity and Civil Rights**

*Mission and Organization*

The ICE Office of Diversity and Civil Rights (ODCR) is responsible for directing and integrating the application of the Civil Rights Act of 1964, as amended, as well as other applicable non-discrimination complaint systems and affirmative employment programs. The mission of ODCR is to ensure that the rights of employees and applicants are protected, and that the agency promotes a proactive equal employment opportunity program to achieve an ethnically diverse workplace.

*Civil Liberties Division*

The Civil Liberties Division (CLD) continued its work to promote equitable access to ICE's programs, services and activities across its main mission areas of compliance, language access and disability access. CLD continued managing and developing ICE's overall language access program, including providing technical assistance materials to the workforce to increase their knowledge of the processes and responsibilities to provide interpretive assistance and translations. CLD met its mission responsibilities in FY 2024 by partnering with DHS and ICE program offices and directorates to participate in community engagement and listening sessions, developing a better understanding of community issues with immigration enforcement. CLD continued managing and developing ICE's program to enhance disability access by developing and posting the technical assistance materials for the workforce and community, including the Disability Access webpage, providing key information to external stakeholders with disabilities. CLD managed and developed its compliance mission by partnering with ICE program offices in assessing and addressing civil liberties issues and initiatives.

*Diversity Management Division*

The Diversity Management Division (DMD) is responsible for providing applicants, employees and management with the necessary tools and available resources to address the needs of a diverse workforce. In addition to planning, implementing and monitoring structured diversity plans, DMD maintains information and undertakes initiatives in furtherance of the Equal Employment Opportunity Commission's Management Directive 715, reasonable accommodations, special emphasis programs, special hiring authorities, and certain other annual Equal Employment Opportunity (EEO) Commission reporting requirements.

*Complaints and Resolution Division*

In FY 2024, the Complaints and Resolution Division (CRD) was challenged by the departure of several key staff members, including its deputy division chief. Despite these challenges, CRD reduced the time it expends to issue claim acceptance notices by 19% compared to FY 2023, while issuing 5% more of these notices in FY 2024. CRD also reviewed and updated all its position descriptions, some of which dated to the U.S. Customs Service. In February 2024, CRD

83

ended the use of its investigative services contractor due to several performance deficiencies. CRD quickly pivoted and implemented an interagency agreement with the U.S. Postal Service to ensure continuity in ICE's capacity to investigate EEO complaints. CRD is working to implement additional contracts and another interagency agreement to minimize risk associated with any one vendor's capacity limitations.

## Office of External Affairs

*Mission and Organization*

ICE established the ICE Office of External Affairs (OEA) in January 2024 to streamline public communications and ensure more transparent, factual communication and information sharing that represents the agency's core values. The creation of OEA is just one of many ways that ICE is demonstrating its commitment to one of its most important responsibilities: Providing information to the public. As part of OEA's creation, the Office of Public Affairs, the Office of Partnership and Engagement, and the Office of Congressional Relations were integrated under OEA. As part of the streamlined external communications OEA structure, there were several key accomplishments for OPA, OPE and OCR in FY 2024.

## Office of Public Affairs

The Office of Public Affairs (OPA) builds public understanding and support for the agency's mission by engaging with the news media; federal, state and local agencies; and nongovernmental organizations and working closely with internal stakeholders to inform and engage ICE employees. The Media Engagement Division houses the agency's primary spokespeople and is responsible for responding to local, national and international media inquiries, planning press events, crafting agency messaging and developing media campaigns. ICE field public affairs officers, located throughout the country, are responsible for regional media relations in designated geographic areas. Public affairs officers cover 30 HSI Special Agent in Charge offices and 24 Enforcement and ERO Field Office Director offices, in addition to OPLA field offices, across the United States.

Within OPA, the Media Engagement Division comprises one regional director and six staff based at ICE Headquarters, with five additional regional directors (Northwest, Southwest, Midwest, Northeast and Southeast) and 30 field public affairs officers assigned to operational offices in their geographic areas of responsibility. The Digital Engagement (DE) Division, which comprises the Digital Marketing and Outreach Unit (DMO) and the Visual Communication Unit (VISCOM), develops marketing strategies for the agency and its programs using the talents of a 24-member staff that includes contractors. Through a wide range of communication channels, the content and campaign development team within DE highlights ICE's mission and role in the safety and security of the nation. The Mission Support Division handles all budget, staffing, time and attendance, and administrative duties, including travel and inventory.

**Office of Congressional Relations**

The Office of Congressional Relations (OCR) is the primary point of contact for the U.S. Congress and represents ICE on Capitol Hill through a variety of federal congressional liaison activities. OCR helps ICE leadership effectively engage with members of Congress and staff, evaluates potential legislative impacts to ICE, anticipates questions and responds to congressional decisionmakers about the agency's mission and operations.

In FY 2024, OCR continued its focus on expanding training and outreach opportunities for ICE's district, state and Washington, D.C.-based congressional stakeholders. In January 2024, OCR hosted a two-day ICE virtual conference for congressional staff, which was attended by over 180 individuals, followed by targeted outreach in February and March to staff of new members to the 118th Congress. OCR's proactive outreached efforts continued throughout the year with bimonthly virtual speaker series events focused on different aspects of ICE operations, participation in numerous in-person caseworker conferences hosted by the U.S. House of Representatives' Office of the Chief Administrative Officer, and OCR-hosted regional *Constituent Casework: How to Work with ICE* training events for congressional district staff. These training and outreach events enabled OCR to improve communication and relationships with congressional members and committee staff, while reducing response time for congressional inquiries.

In FY 2024, OCR provided on-site support to the ERO field offices to conduct proactive and reactive outreach to local congressional delegations; respond to incoming inquiries; prepare and research talking points and other background materials; assist with congressional visits and tours; and accurately track congressional interactions and activities. OCR deployed Headquarters-assigned congressional liaison specialists to the ERO Denver, Seattle, Chicago and Harlingen field offices.

OCR conducted over 200 congressional briefings in FY 2024. Congressional liaisons responded to more than 1,500 congressional inquiries and 100 "get-back" inquiries in support of ICE's mission. Additionally, OCR directly contributed to eight hearings in FY 2024, including developing and producing extensive background materials and communications documents as well as preparing senior ICE and DHS officials for testimony.

| Category | Total |
|---|---|
| Congressional Hearings | 8 |
| Congressional Delegations/Staff Delegations | 53 |
| Congressional Notifications | 19 |
| Congressional Briefings/Meetings/Tours/Events | 200 |
| Congressional Training Events | 1 |
| Congressional Inquiries | 1,552 |

**Office of Partnership and Engagement**

The ICE Office of Partnership and Engagement (OPE) coordinates outreach efforts with the public, key stakeholders and leadership from HSI, ERO and OPLA to increase local and national awareness of ICE's mission while building relationships and fostering trust in U.S. communities. OPE has a cadre of 26 community relations officers (CROs) in field offices across the United States who serve as liaisons to the public, key stakeholders, and ICE local leadership. OPE comprises two components: Community Relations and the Victims Engagement and Services Line (VESL).

In FY 2024, OPE continued to significantly increase ICE's ability to inform and educate the American public on the agency's work, mission and law enforcement priorities. OPE's national engagements focused on increasing awareness, accessibility and understanding of new ERO processes, policies and programs. OPE also focused on gaining, maintaining and strengthening partnerships to advance HSI's FY 2024 mission priorities. OPE's local engagements are based on CROs' individual annual engagement plans, which are designed in collaboration with local ERO, HSI and OPLA leadership. Despite having six of the 25 positions vacant in FY 2024, the 19 CROs handled 7,230 engagements and 2,897 inquiries from various groups and individuals. During FY 2024, most stakeholder inquiries and requests for engagement involved ERO policies and practices. Through CROs and victim liaisons, OPE's VESL handled 332 requests for victim assistance and support, responding to the needs of victims impacted by crime. The charts below outline the type and number of inquiries and engagements OPE addressed in FY 2024.

**OPE FY 2024 Field Inquiries**

| Category | Total |
|---|---|
| ERO inquiries | 3,731 |
| HSI inquiries | 1,299 |
| OPLA inquiries | 747 |
| VESL inquiries | 230 |
| General inquiries | 1,223 |

**OPE FY 24 Field and HQ Engagements**

| Category | Total |
|---|---|
| ERO engagements | 750 |
| HSI engagements | 865 |
| General engagements | 625 |
| OPLA engagements | 287 |
| VESL engagements | 77 |
| HQ engagements | 293 |

**FY 2024 VESL Information and Assistance**

| Category | Total |
|---|---|
| VESL calls referred to OPE VESL Division | 332 |
| OPE VESL victim services | 93 |
| VESL status/information services | 209 |

OPE continues to proactively and strategically facilitate the expansion and strengthening of partnerships among key stakeholders, including law enforcement, intergovernmental associations, elected state and local officials, the private sector, the business and retail sectors, academia, faith-based groups, nongovernmental organizations, legal service providers, other federal agencies and national organizations. Each year, OPE CROs develop their stakeholder lists to ensure they align with ICE national and local priorities and serve the goals of their annual engagement plans.

OPE hosted engagements on several ERO policy priorities such as language access, legal access, E-file, detention facility closure, detained noncitizen segregation, Cash Electronic Bonds (CeBonds), ATD, and detention facility policies and practices. OPE partnered with HSI to reach out to trade associations, individual companies, other DHS components and federal agencies to promote HSI's operational success in six priority areas: Cybercrime, national security, human trafficking, child exploitation, financial crimes, global trade and terrorism. OPE also assisted HSI in working with partners to combat money laundering groups and organized retail crime based in the People's Republic of China. OPE continued to diversify its outreach to reflect the direct engagement and partnership needs of field office directorates and, to increase transparency, OPE hosted educational engagements on new processes, policies and technologies.

OPE also expanded its proactive engagement with stakeholders, increasing its attendance at conferences, returning to in-person meetings with stakeholders at ICE Headquarters after the COVID-19 pandemic, and increasing the participation of senior leadership in OPE engagements. These proactive engagements allowed OPE to increase ICE, ERO and HSI's visibility and ensured the agency's goals, priorities and messages reached a wider audience.

**Office of Regulatory Affairs and Policy**

The ICE Office of Regulatory Affairs and Policy (ORAP) is responsible for establishing policies and regulations that impact ICE by coordinating with departmental and interagency partners. ORAP coordinates and collaborates with internal and external stakeholders to:

- Identify, develop and effectively communicate ICE's strategic and organizational policies.
- Maintain responsibility for developing ICE regulations and manage the agency's regulatory process.
- Oversee ICE's strategic planning functions.

ORAP provides guidance to support ICE's mission through policies and regulations that address

current agency challenges in a manner that is responsive to the agency's constantly evolving landscape. To develop policies and regulations, ORAP balances differing perspectives within ICE and factors in its operations and functions by participating in interagency policy forums and engaging with DHS and its components and other executive branch agencies.

*Policy*

In FY 2024, ORAP issued, revised and advanced the development of several policies:

- *Chaplain Program*: On October 17, 2023, ICE issued ICE Directive 1058.2, *Chaplain Program*, which enhances the effectiveness of the existing ICE Chaplain Program by expanding the pool of personnel who may be designated as Chaplain Program coordinators.

- *Disciplinary and Adverse Action*: On October 18, 2023, ICE issued ICE Directive 30012.3, *Disciplinary and Adverse Action*. This updated directive sets forth procedural guidance for administering disciplinary and adverse action.

- *Body Worn Cameras:* On November 17, 2023, ICE issued ICE Directive 19010.2, *Body Worn Camera (BWC)*, which implements an enterprise-wide BWC program in accordance with the requirements of Executive Order 14074, *Advancing Effective, Accountable Policing and Criminal Justice Practices to Enhance Public Trust and Public Safety*, and the DHS *Department Policy on Body Worn Cameras (BWC)*. This directive establishes when ICE law enforcement officers capture footage of enforcement activities, exceptions for certain enforcement activities, prohibitions on recording protected activities, and procedures for the redaction and release of captured footage. ICE completed the initial BWC implementation in Baltimore, Buffalo, Detroit, Philadelphia and Washington, D.C., with additional areas of responsibility to be added upon pending funding and equipment.

- *Criminal Investigator Careers:* On April 14, 2024, ICE issued ICE Directive 1002.3, *Criminal Investigator Career Progression*, ICE Directive 1062.1, *Criminal Investigator Career Board*, and ICE Directive 1063.1, *Voluntary Change to Lower Grade Level for GS-14 and GS-15 Criminal Investigators*. These directives govern ICE policies and procedures for criminal investigator career progression at ICE and are applicable to all GS-1811 criminal investigators within HSI, OPR and the Office of Firearms and Tactical Programs.

- *Investigatory Authorities*: On May 3, 2024, ICE rescinded the following documents: ICE Directive 10086.1: *Oversight of ICE Personnel Serving on Federal Investigative Task Forces* (Mar. 25, 2016); *Memorandum from the ICE Deputy Director, Delegation of General Arrest Authority Under Title 19 to Enforcement and Removal Officers and Participation in Investigative Task Forces* (Apr. 4, 2016); and *Memorandum from the Director of the Office of Investigations and the Director of the Office of Detention and Removal*, 10057.1: DRO/OI Protocols (Aug. 20, 2007) and Attachment. ICE rescinded these documents on an expedited timetable. The recission allowed ERO to issue an ERO-

wide directive on the same matters, tailored to the needs of ERO and its workforce while continuing field and headquarters level coordination between ERO and HSI.

- *Victims and Witnesses of Exploitative Labor Practices:* On August 13, 2024, ICE issued ICE Policy 10094.3, *Prosecutorial Discretion Victims and Witnesses of Exploitative Labor Practices.* The former policy established ICE policy to better support law enforcement partners by exercising prosecutorial discretion for participants and potential participants in labor investigations, specifically establishing that ICE should generally grant eligible noncitizens deferred action or a stay of removal with an order of supervision for a period of two years. Subsequently, DHS agreed, at the urging of labor agencies, to generally extend the initial period of deferred action to up to four years. ICE Policy 10094.3 implements this change.

*Regulations*

Beyond issuing and revising ICE policies, ORAP coordinates and oversees the development, review and clearance of ICE regulations and other Federal Register publications. During FY 2024, ORAP produced the following:

- *Employment Authorization for F-1 Nonimmigrant Students Experiencing Severe Economic Hardship*: This action grants relief of certain regulatory requirements to F-1 nonimmigrant students experiencing economic hardship due to emergent circumstances. The F-1 student notices notify qualifying students from certain countries of the ability to increase work hours and reduce course loads while maintaining F-1 status. ICE published nine notices during FY 2024 for Burma (Myanmar), Cameroon, Ethiopia, Haiti, the Palestinian Territories, Somalia, Syria, Venezuela and Yemen. Due to these efforts, more than 14,400 nonimmigrant students may be eligible for relief.

- *Update to the DHS STEM Designated Degree Program List:* This Federal Register Notice amended the DHS Science, Technology, Engineering and Mathematics (STEM) Designated Degree Program List by adding one qualifying field of study and a corresponding Department of Education Classification of Instructional Programs code.

- *Removal of Obsolete Procedures and Requirements Related to F, J, and M Nonimmigrants:* This Final Rule amended regulations to update information that is no longer accurate following the creation of the Student and Exchange Visitor Information System.

**Office of Firearms and Tactical Programs**

*Mission and Organization*

The ICE Office of Firearms and Tactical Programs (OFTP) is responsible for all use of force policy, training and equipment. OFTP provides specialized firearms and tactical training and certification; all equipment, support and guidance necessary to promote officer and public safety; and effective execution of ICE's law enforcement mission.

*Body Worn Camera Program*

In FY 2024, OFTP worked diligently to identify best practices and streamline common processes across the organization. In November 2023, the Use of Force Analysis Unit (UFAU) successfully coordinated the completion of the ICE Directive 19010.2: *Body Worn Camera*. As one of OFTP's biggest accomplishments in FY 2024, the UFAU completed the first phase of ICE-wide implementation of the Body Worn Camera (BWC) Program. OFTP executed more than $10.8 million BWC funds, resulting in the procurement of more than 6,100 systems and licenses, exceeding FY 2023 projections by more than 15%. OFTP also developed and delivered BWC training to 700 ICE personnel. In August 2024, OFTP facilitated a tabletop exercise to develop procedures to guide the expedited public release of BWC recordings resulting from critical incidents.

Additionally, the UFAU continued to develop processes and procedures as the Use of Force Review Committee examined data from 83 use of force incidents to identify trends that will enhance tactics, training and policy development. In August 2024, the UFAU coordinated with HSI, ERO, OPR and OPLA to convene the Board of Survey (BoS) and Firearms and Use of Force Review Committee (FUFIRC). The BoS reviewed 93 events involving 182 serialized lost, stolen and damaged items. The FUFIRC reviewed three use of force incidents that involved the intentional discharge of a firearm by an ICE authorized officer.

*Body Armor Acquisition*

In FY 2024, OFTP developed an acquisition strategy to establish a long-term contract to meet ICE leadership's four-year goal to transition the armed workforce to body armor with enhanced protection from recently identified ricochet hazards most associated with female body shapes. In FY 2024, OFTP awarded a multiyear contract for this enhanced protection body armor, spending more than $18.5 million so far. During FY 2024, OFTP issued 5,087 sets of body armor to the workforce; 6,873 employees still need to convert to the new armor. The new armor has been issued to 42% of the workforce, including 90% of female agents and officers.

*Ammunition Contract Awards*

In FY 2024, OFTP conducted two multimillion-dollar strategic solicitations for duty and training ammunition contracts, along with successfully awarding other high-dollar sole-source specialty ammunition contracts for duty and training purposes, which will benefit ICE and other DHS agencies. OFTP launched a working group comprising law enforcement personnel, firearms trainers, use of force policy professionals, and contracting officer representatives who specialize in the acquisition of weapons and ammunition. The working group helped establish new methodology to more efficiently utilize limited ICE funds to maximize ammunition acquisitions to meet current and future needs, draft process maps to identify areas of opportunity for OFTP and help create new standard operating procedures for OFTP employees to effectively manage OFTP ammunition contracts.

*Use of Force and Tactics Training*

In FY 2024, OFTP trained and certified 432 HSI personnel and 1,115 ERO personnel, for a combined total of 107 weeks' worth of use of force and tactics training. Additionally, OFTP delivered the inaugural ERO Rapid Response Program course.

*Facility Acquisition*

OFTP continued to build and improve upon facilities, buildings and land acquired from the U.S. Army on Fort Moore in Georgia. The projects included developing 66 acres of space for the newly designed Advanced Training and Operations Center and several facilities supporting armory storage and the ICE BWC program.

During FY 2024, OFTP completed most actions needed to co-locate the ICE Altoona and Fort Moore armories, including the transfer of 95% of the equipment, and funding and scheduling all personnel relocations to Fort Moore. Some of the benefits of co-locating the Altoona and Fort Moore armories include a safer and more secure operating environment for armory functions located on an expansive military base, more efficient and effective organizational communication and collaboration within OFTP, compliance with federal mandates by reducing the environmental footprint, the elimination of duplicate costs, and reduced operating costs. Undertaking this critical consolidation effort helped OFTP achieve one of ICE's key strategic goals of operating an efficient and effective agency. OFTP is on schedule to complete the co-location effort in early FY 2025.

*ICE Tactical Programs Oversight*

During FY 2024, OFTP maintained programmatic oversight of all ICE's tactical programs, including the Crisis Negotiation Program (CNP), Tactical Emergency Medical Services (TEMS), Rapid Response Program (RRP), Special Response Team (SRT), and their sub-competencies. OFTP managed continuous oversight of the SRT Desk Officers for East, Central and West regions; drafted manuals for CNP, TEMS, RRP, SRT and SRT Sniper programs; and provided operational oversight on more than 507 ERO SRT operations and 821 HSI SRT operations.

## Conclusion

In FY 2024, ICE remained committed to protecting the United States through criminal investigations and enforcing immigration laws to preserve national security and public safety. By strengthening partnerships with federal, state, local and international partners, ICE worked to address threats posed by transnational criminal organizations, human trafficking, and the illegal movement of drugs, weapons and other contraband. In FY 2024, ICE seized more than 1.6 million pounds of narcotics and assisted more than 800 victims of human trafficking. ICE also protected the homeland by arresting and removing noncitizens who undermined public safety, national security, and the integrity of U.S. immigration laws. In FY 2024, ICE nearly doubled the number of removals it conducted compared to FY 2023. Additionally, throughout the fiscal year, ICE maintained a focus on transparency and efficiency with its stakeholders, striving to enhance its operations through innovative technology such as the new ICE Statistical Dashboard, and by strategically realigning its external communications programs to respond to evolving domestic and international challenges. Looking into FY 2025, ICE remains dedicated to protecting the United States by ensuring compliance with immigration laws and supporting America's national security objectives in alignment with the agency's mission.

## Acronyms

| | |
|---|---|
| 3PML | Third Party Money Laundering |
| AI | artificial intelligence |
| AML | anti-money laundering |
| ASLT | Advanced Supervisory Leadership Training |
| ATD | Alternatives to Detention |
| BCSC | Bulk Cash Smuggling Center |
| BEST | Border Enforcement Security Task Forces |
| BIA | Board of Immigration Appeals |
| BWC | Body Worn Camera |
| C3 | Cyber Crimes Center |
| CAP | Criminal Apprehension Program |
| CBFCC | Cross-Border Financial Crime Center |
| CBP | Customs and Border Protection |
| CCHT | Center to Combat Human Trafficking |
| CESA | Child Sexual Exploitation and Abuse |
| CIEP | Civil Immigration Enforcement Priorities |
| CITF | Counterintelligence Task Forces |
| CLD | Civil Liberties Division |
| CNP | Crisis Negotiation Program |
| CPAA | Cultural Property, Arts, and Antiquities |
| CPI | Counter-Proliferation Investigations |
| CPMC | Counterproliferation Mission Center |
| CRO | Community Relations Officer |
| CTLD | Counter Threat Lead Development Unit |
| DBFTF | Document and Benefit Fraud Task Forces |
| DBLEU | Document Benefit and Labor Exploitation Unit |
| DHA | direct hire authority |
| DHS | Department of Homeland Security |
| E2C2 | Export Enforcement Coordination Center |
| EDTF | El Dorado Task Force |
| ENV | Electronic Nationality Verification |
| EOIR | Executive Office for Immigration Review |
| ER | Expedited Removal |
| ERM | Enterprise Risk Management |
| ERO | Enforcement and Removal Operations |
| EV | electric vehicles |
| FAMU | Family Units |

| | |
|---|---|
| FEGLI | Federal Employees' Group Life Insurance |
| FERM | Family Expedited Removal Program |
| FLETA | Federal Law Enforcement Training Accreditation |
| FLETC | Federal Law Enforcement Training Center |
| FMST | Fundamentals of Mission Support |
| FOIA | Freedom of Information Act |
| FY | fiscal year |
| GRB | Government and Retirement Benefits |
| GSCIU | Government Supply Chain Investigations Unit |
| HHS | U.S. Department of Health and Human Services |
| HIDTA | High Intensity Drug Trafficking Areas |
| HRIT | human resource IT |
| HROC | Human Resources Operations Center |
| HRVWCC | Human Rights Violators and War Crimes Center |
| HSI | Homeland Security Investigations |
| HSNDP | HSI Strategic Network Dismantlement Project |
| ICE | U.S. Immigration and Customs Enforcement |
| IFGC | Islamic Revolutionary Guard Corps |
| IHSC | ICE Health Service Corps |
| IM4W | ICE Mentoring for Women |
| IPR Center | Intellectual Property Rights Center |
| ISAP | Intensive Supervision Appearance Program |
| ISP | Individualized Service Plan |
| JTFA | Joint Task Force Alpha |
| JTFF | Joint Terrorism Task Force |
| K2P | Know2Protect |
| KLP | Keystone Leadership Program |
| M&A | Management and Administration |
| NATI | National Air Trafficking Initiative |
| NEO | New employee orientation |
| NGVCU | National Gangs and Violent Crimes Unit |
| NLDC | National Lead Development Center |
| NOIT | Notices of Intent to Take Case off Court's Calendar |
| NSU | National Security Unit |
| NTA | Notice to Appear |
| NTC | National Targeting Center |
| NTC-I | National Targeting Center Investigations |
| OAQ | Office of Acquisition Management |
| OCB | Operation Chain Breaker |

94

| | |
|---|---|
| OCC | Operation Cyber Centurion |
| OCFO | Office of the Chief Financial Officer |
| OCIO | Office of the Chief Information Officer |
| OCR | Office of Congressional Relations |
| OD | Office of the Director |
| ODCR | Office of Diversity and Civil Rights |
| OEA | Office of External Affairs |
| OFAC | Office of Foreign Asset Control |
| OFTP | Office of Firearms and Tactical Programs |
| OHC | Office of Human Capital |
| OLCD | Office of Leadership and Career Development |
| ONDCP | Office of National Drug Control Policy |
| OPA | Office of Public Affairs |
| OPE | Office of Partnership and Engagement |
| OPLA | Office of the Principal Legal Advisor |
| ORAP | Office of Regulatory Affairs and Policy |
| ORH II | Operation Renewed Hope II |
| ORR | Office of Refugee Resettlement |
| PSE | Public Service Ethos |
| RAVEN | Repository for Analytics in a Virtualized Environment |
| RRP | Rapid Response Program |
| S&T | Science and Technology |
| SAC | Special Agent in Charge |
| SAUSA | Special Assistant U.S. Attorney |
| SEVIS | Student and Exchange Visitor Information System |
| SEVP | Student and Exchange Visitor Program |
| SIIU | Special Interest Investigations Unit |
| SRT | Special Response Team |
| STEM | Science, Technology, Engineering and Mathematics |
| SWB-RCM | Southwest Border Rapid Cost Model |
| TCIU | Transnational Criminal Investigative Units |
| TCN | Transnational Criminal Network |
| TCO | Transnational Criminal Investigative Units |
| TECC | Trade Enforcement Coordination Center |
| TEMS | Tactical Emergency Medical Services |
| TEOAF | Treasury Executive Office for Asset Forfeiture |
| TG-1 | Task Group 1 |
| TMLD | Team Member Leadership Development |
| UC | unaccompanied child(ren) |

| UFAU | Use of Force Analysis Unit |
|------|---------------------------|
| USCIS | U.S. Citizenship and Immigration Services |
| USIP | U.S. Postal Inspection Service |
| VAP | Victim Assistance Program |
| VESL | Victims Engagement and Services Line |
| VGTF | Violent Gang Task Force |
| VR | Voluntary Return |
| VSP | Visa Security Program |
| WaT | Operation Without a Trace |
| WSS | Wraparound Stabilization Services |
| YACMP | Young Adult Case Management Program |

# Appendix

**FY 2019 – FY 2024 YTD ICE Removals by Country of Citizenship [43]**

| Country of Citizenship | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|
| Total | 267,258 | 185,884 | 59,011 | 72,177 | 142,580 | 271,484 |
| Afghanistan | 36 | 25 | 14 | 12 | 44 | 132 |
| Albania | 80 | 53 | 10 | 19 | 16 | 40 |
| Algeria | 20 | 5 | 6 | 7 | 4 | 14 |
| Andorra | 0 | 1 | 0 | 0 | 0 | 0 |
| Angola | 40 | 43 | 8 | 13 | 70 | 119 |
| Anguilla | 2 | 0 | 0 | 0 | 0 | 0 |
| Antigua-Barbuda | 12 | 6 | 3 | 4 | 4 | 7 |
| Argentina | 130 | 87 | 80 | 60 | 85 | 63 |
| Armenia | 48 | 31 | 25 | 16 | 15 | 27 |
| Aruba | 1 | 0 | 2 | 0 | 1 | 0 |
| Australia | 40 | 39 | 12 | 15 | 29 | 22 |
| Austria | 8 | 6 | 2 | 1 | 6 | 6 |
| Azerbaijan | 10 | 9 | 3 | 5 | 7 | 13 |
| Bahamas | 109 | 76 | 94 | 55 | 86 | 92 |
| Bahrain | 2 | 0 | 1 | 0 | 0 | 1 |
| Bangladesh | 159 | 305 | 29 | 67 | 51 | 244 |
| Barbados | 29 | 6 | 7 | 8 | 7 | 7 |
| Belarus | 18 | 11 | 4 | 3 | 8 | 8 |
| Belgium | 7 | 10 | 5 | 6 | 8 | 18 |
| Belize | 90 | 78 | 42 | 65 | 184 | 139 |
| Benin | 9 | 5 | 5 | 2 | 4 | 9 |
| Bermuda | 2 | 1 | 3 | 2 | 0 | 1 |
| Bhutan | 1 | 0 | 0 | 0 | 0 | 0 |
| Bolivia | 64 | 49 | 42 | 46 | 132 | 302 |
| Bosnia-Herzegovina | 36 | 27 | 26 | 14 | 10 | 8 |
| Botswana | 3 | 2 | 0 | 1 | 1 | 1 |
| Brazil | 1,770 | 1,902 | 1,935 | 1,767 | 1,607 | 1,859 |
| British Virgin Islands | 4 | 5 | 3 | 0 | 2 | 4 |
| Brunei | 0 | 0 | 0 | 0 | 0 | 0 |

[43] Country of Citizenship is derived from the ICE system of record as it is input by the officer at the time of processing. An "Unknown" Country indicates the non-citizen failed or refused to identify a country of citizenship or the officer lacked documentation to do so; these noncitizens can include those that were born in Palestine, West Bank or the Gaza strip and considered Stateless. In addition, the ICE system of record contains several historical entities that may have changed their names or no longer exist; these often result from instances where a noncitizen was initially encountered many years ago or has older documents. While Country of Birth or Citizenship can be updated by an Officer at any point, it is reported exactly as it appears at the close of the fiscal year.

| | | | | | | |
|---|---|---|---|---|---|---|
| Bulgaria | 21 | 21 | 4 | 10 | 4 | 2 |
| Burkina Faso | 20 | 4 | 9 | 12 | 12 | 20 |
| Burma | 29 | 26 | 6 | 0 | 1 | 1 |
| Burundi | 5 | 10 | 4 | 1 | 3 | 5 |
| Cambodia | 80 | 32 | 1 | 5 | 6 | 20 |
| Cameroon | 76 | 54 | 84 | 28 | 22 | 24 |
| Canada | 318 | 320 | 136 | 137 | 161 | 157 |
| Cape Verde | 50 | 15 | 29 | 4 | 9 | 12 |
| Cayman Islands | 3 | 1 | 2 | 2 | 0 | 0 |
| Central African Republic | 7 | 1 | 1 | 1 | 1 | 3 |
| Chad | 3 | 1 | 0 | 1 | 3 | 19 |
| Chile | 253 | 351 | 252 | 553 | 544 | 342 |
| China, Peoples Republic of | 637 | 337 | 138 | 127 | 288 | 517 |
| Christmas Island | 0 | 0 | 0 | 0 | 0 | 0 |
| Cocos Islands | 0 | 0 | 0 | 0 | 0 | 0 |
| Colombia | 1,158 | 931 | 748 | 3,753 | 9,866 | 14,268 |
| Comoros | 0 | 0 | 0 | 0 | 0 | 0 |
| Congo | 15 | 12 | 6 | 7 | 14 | 25 |
| Costa Rica | 176 | 130 | 91 | 113 | 183 | 332 |
| Croatia | 9 | 4 | 5 | 4 | 12 | 5 |
| Cuba | 1,179 | 1,583 | 95 | 48 | 371 | 657 |
| Curacao | 0 | 0 | 0 | 0 | 2 | 0 |
| Cyprus | 1 | 2 | 0 | 1 | 0 | 0 |
| Czech Republic | 56 | 22 | 14 | 5 | 12 | 6 |
| Czechoslovakia | 2 | 1 | 2 | 0 | 0 | 0 |
| Dem Rep of the Congo | 81 | 96 | 56 | 33 | 33 | 96 |
| Denmark | 5 | 12 | 3 | 3 | 7 | 5 |
| Djibouti | 3 | 0 | 0 | 0 | 0 | 0 |
| Dominica | 16 | 13 | 9 | 5 | 6 | 8 |
| Dominican Republic | 2,186 | 1,835 | 1,289 | 1,497 | 4,104 | 2,993 |
| East Timor | 0 | 0 | 0 | 0 | 0 | 0 |
| Ecuador | 2,253 | 2,951 | 1,471 | 1,600 | 5,651 | 12,921 |
| Egypt | 57 | 78 | 40 | 19 | 39 | 234 |
| El Salvador | 18,981 | 12,590 | 2,872 | 7,231 | 8,310 | 15,284 |
| Equatorial Guinea | 5 | 7 | 1 | 2 | 5 | 6 |
| Eritrea | 49 | 37 | 6 | 20 | 17 | 34 |
| Estonia | 9 | 6 | 4 | 2 | 3 | 4 |
| Eswatini | 1 | 0 | 0 | 0 | 0 | 2 |
| Ethiopia | 32 | 43 | 23 | 5 | 11 | 27 |

| | | | | | |
|---|---|---|---|---|---|
| Fiji | 11 | 9 | 2 | 5 | 7 | 4 |
| Finland | 3 | 4 | 1 | 5 | 1 | 5 |
| France | 78 | 83 | 23 | 44 | 38 | 48 |
| French Guiana | 2 | 0 | 0 | 0 | 0 | 1 |
| French Polynesia | 2 | 0 | 0 | 0 | 0 | 0 |
| Gabon | 8 | 4 | 3 | 0 | 2 | 4 |
| Gambia | 124 | 45 | 18 | 7 | 9 | 20 |
| Georgia | 38 | 44 | 12 | 10 | 24 | 162 |
| Germany | 77 | 63 | 30 | 50 | 54 | 42 |
| Ghana | 203 | 121 | 56 | 46 | 62 | 94 |
| Greece | 32 | 17 | 7 | 16 | 19 | 29 |
| Grenada | 13 | 6 | 3 | 5 | 8 | 5 |
| Guadeloupe | 1 | 1 | 1 | 0 | 2 | 6 |
| Guatemala | 54,919 | 29,790 | 7,778 | 6,612 | 20,179 | 66,435 |
| Guinea | 102 | 44 | 25 | 11 | 27 | 85 |
| Guinea-Bissau | 4 | 0 | 0 | 2 | 2 | 4 |
| Guyana | 125 | 84 | 79 | 62 | 51 | 48 |
| Haiti | 690 | 895 | 353 | 1,532 | 717 | 792 |
| Honduras | 41,800 | 21,139 | 4,904 | 6,309 | 22,274 | 45,923 |
| Hong Kong | 7 | 3 | 3 | 4 | 4 | 2 |
| Hungary | 71 | 44 | 23 | 18 | 29 | 19 |
| Iceland | 0 | 1 | 2 | 1 | 2 | 1 |
| India | 1,616 | 2,312 | 292 | 276 | 370 | 1,529 |
| Indonesia | 77 | 62 | 23 | 8 | 25 | 15 |
| Iran | 21 | 16 | 10 | 13 | 18 | 27 |
| Iraq | 84 | 32 | 32 | 13 | 24 | 36 |
| Ireland | 33 | 19 | 10 | 17 | 37 | 60 |
| Israel | 89 | 52 | 22 | 18 | 18 | 30 |
| Italy | 140 | 139 | 65 | 102 | 140 | 99 |
| Ivory Coast | 39 | 41 | 12 | 9 | 13 | 9 |
| Jamaica | 751 | 523 | 406 | 342 | 407 | 446 |
| Japan | 21 | 27 | 6 | 10 | 9 | 10 |
| Jordan | 106 | 70 | 61 | 30 | 38 | 90 |
| Kazakhstan | 26 | 25 | 16 | 10 | 14 | 23 |
| Kenya | 122 | 85 | 33 | 24 | 23 | 48 |
| Kiribati | 0 | 0 | 0 | 0 | 1 | 0 |
| Korea | 59 | 23 | 21 | 5 | 7 | 10 |
| Kosovo | 15 | 13 | 13 | 5 | 4 | 14 |
| Kuwait | 21 | 14 | 1 | 3 | 0 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| Kyrgyzstan | 19 | 3 | 8 | 1 | 14 | 69 |
| Laos | 5 | 11 | 0 | 5 | 1 | 0 |
| Latvia | 15 | 19 | 12 | 8 | 8 | 15 |
| Lebanon | 48 | 41 | 10 | 9 | 17 | 27 |
| Lesotho | 0 | 0 | 0 | 0 | 0 | 0 |
| Liberia | 108 | 112 | 44 | 42 | 36 | 37 |
| Libya | 6 | 4 | 2 | 3 | 5 | 7 |
| Liechtenstein | 0 | 0 | 0 | 0 | 0 | 0 |
| Lithuania | 37 | 22 | 9 | 10 | 16 | 17 |
| Luxembourg | 0 | 1 | 0 | 0 | 0 | 0 |
| Macau | 2 | 1 | 1 | 0 | 2 | 0 |
| Macedonia | 0 | 0 | 0 | 0 | 0 | 0 |
| Madagascar | 0 | 0 | 0 | 0 | 0 | 0 |
| Malawi | 1 | 2 | 2 | 1 | 1 | 1 |
| Malaysia | 9 | 11 | 3 | 3 | 1 | 6 |
| Maldives | 0 | 0 | 0 | 0 | 0 | 0 |
| Mali | 52 | 15 | 10 | 7 | 6 | 19 |
| Malta | 1 | 1 | 0 | 0 | 0 | 0 |
| Marshall Islands | 32 | 16 | 0 | 0 | 28 | 67 |
| Martinique | 0 | 0 | 0 | 1 | 0 | 0 |
| Mauritania | 41 | 25 | 7 | 7 | 58 | 353 |
| Mauritius | 1 | 0 | 0 | 0 | 0 | 0 |
| Mexico | 127,492 | 100,388 | 31,761 | 33,832 | 54,056 | 87,298 |
| Micronesia, Federated States of | 91 | 24 | 0 | 7 | 91 | 91 |
| Moldova | 28 | 17 | 7 | 7 | 13 | 14 |
| Monaco | 0 | 0 | 0 | 0 | 0 | 0 |
| Mongolia | 19 | 19 | 5 | 3 | 2 | 8 |
| Montenegro | 23 | 7 | 5 | 1 | 2 | 8 |
| Montenegro - Raps | 0 | 0 | 0 | 0 | 0 | 0 |
| Montserrat | 1 | 0 | 0 | 0 | 0 | 0 |
| Morocco | 33 | 27 | 20 | 14 | 18 | 49 |
| Mozambique | 3 | 2 | 0 | 1 | 1 | 3 |
| Namibia | 0 | 0 | 0 | 1 | 3 | 1 |
| Nauru | 0 | 1 | 0 | 0 | 0 | 0 |
| Nepal | 162 | 97 | 23 | 28 | 22 | 57 |
| Netherlands | 40 | 31 | 9 | 23 | 26 | 26 |
| Netherlands Antilles | 6 | 4 | 0 | 0 | 0 | 1 |
| New Caledonia | 0 | 0 | 0 | 0 | 0 | 0 |
| New Zealand | 22 | 13 | 4 | 5 | 16 | 9 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Nicaragua | 2,240 | 1,416 | 964 | 2,538 | 2,320 | 3,872 |
| Niger | 13 | 5 | 6 | 2 | 3 | 8 |
| Nigeria | 286 | 199 | 78 | 49 | 152 | 138 |
| North Korea | 0 | 0 | 1 | 0 | 2 | 0 |
| North Macedonia | 15 | 10 | 4 | 3 | 3 | 7 |
| Norway | 9 | 11 | 2 | 4 | 6 | 3 |
| Oman | 0 | 2 | 0 | 1 | 1 | 0 |
| Pakistan | 202 | 207 | 68 | 68 | 89 | 132 |
| Palau | 10 | 4 | 5 | 3 | 8 | 12 |
| Palestine | 0 | 0 | 0 | 0 | 0 | 0 |
| Panama | 55 | 36 | 34 | 42 | 101 | 112 |
| Papua New Guinea | 2 | 1 | 0 | 0 | 1 | 1 |
| Paraguay | 7 | 9 | 8 | 4 | 15 | 33 |
| Peru | 571 | 353 | 287 | 980 | 5,062 | 4,301 |
| Philippines | 176 | 120 | 81 | 75 | 79 | 91 |
| Pitcairn Islands | 0 | 0 | 0 | 0 | 0 | 0 |
| Poland | 135 | 102 | 44 | 35 | 42 | 67 |
| Portugal | 101 | 47 | 28 | 33 | 60 | 69 |
| Qatar | 3 | 1 | 2 | 0 | 0 | 1 |
| Reunion | 0 | 0 | 0 | 0 | 0 | 0 |
| Romania | 400 | 263 | 209 | 184 | 366 | 611 |
| Russia | 153 | 108 | 80 | 68 | 229 | 464 |
| Rwanda | 12 | 8 | 4 | 5 | 1 | 6 |
| Samoa | 17 | 4 | 6 | 0 | 0 | 8 |
| San Marino | 0 | 0 | 0 | 0 | 0 | 0 |
| Sao Tome and Principe | 0 | 0 | 0 | 0 | 0 | 0 |
| Saudi Arabia | 79 | 60 | 29 | 11 | 19 | 14 |
| Senegal | 55 | 52 | 17 | 25 | 202 | 410 |
| Serbia | 31 | 16 | 10 | 10 | 6 | 5 |
| Serbia and Montenegro | 2 | 1 | 0 | 0 | 1 | 0 |
| Seychelles | 1 | 1 | 0 | 0 | 0 | 0 |
| Sierra Leone | 86 | 23 | 28 | 9 | 8 | 11 |
| Singapore | 3 | 5 | 2 | 6 | 3 | 3 |
| Sint Maarten (Dutch) | 0 | 0 | 0 | 0 | 0 | 1 |
| Slovakia | 22 | 12 | 9 | 2 | 4 | 11 |
| Slovenia | 1 | 2 | 2 | 0 | 4 | 3 |
| Solomon Islands | 0 | 0 | 0 | 0 | 0 | 0 |
| Somalia | 151 | 112 | 47 | 10 | 22 | 64 |
| South Africa | 39 | 31 | 25 | 7 | 17 | 14 |

| | | | | | |
|---|---|---|---|---|---|
| South Korea | 127 | 129 | 50 | 22 | 54 | 46 |
| South Sudan | 65 | 41 | 22 | 2 | 4 | 0 |
| Spain | 259 | 235 | 128 | 165 | 244 | 183 |
| Sri Lanka | 112 | 119 | 75 | 45 | 70 | 117 |
| St. Helena | 0 | 0 | 0 | 0 | 0 | 0 |
| St. Kitts-Nevis | 11 | 3 | 2 | 4 | 4 | 5 |
| St. Lucia | 22 | 10 | 16 | 4 | 3 | 7 |
| St. Pierre and Miquelon | 0 | 0 | 0 | 0 | 0 | 0 |
| St. Vincent-Grenadines | 19 | 8 | 11 | 10 | 4 | 6 |
| Stateless | 0 | 0 | 0 | 0 | 12 | 0 |
| Sudan | 18 | 17 | 4 | 5 | 9 | 5 |
| Suriname | 12 | 1 | 6 | 0 | 5 | 3 |
| Swaziland | 0 | 0 | 0 | 0 | 0 | 0 |
| Sweden | 21 | 9 | 14 | 8 | 16 | 18 |
| Switzerland | 6 | 10 | 2 | 4 | 7 | 7 |
| Syria | 9 | 2 | 0 | 2 | 6 | 10 |
| Taiwan | 51 | 42 | 9 | 24 | 26 | 26 |
| Tajikistan | 4 | 4 | 3 | 4 | 4 | 77 |
| Tanzania | 25 | 13 | 10 | 4 | 7 | 5 |
| Thailand | 46 | 25 | 25 | 9 | 17 | 14 |
| Togo | 16 | 14 | 10 | 5 | 6 | 8 |
| Tonga | 10 | 10 | 0 | 0 | 12 | 8 |
| Trinidad and Tobago | 106 | 73 | 48 | 38 | 46 | 61 |
| Tunisia | 20 | 6 | 6 | 0 | 3 | 11 |
| Türkiye | 113 | 77 | 35 | 166 | 787 | 649 |
| Turkmenistan | 4 | 0 | 0 | 1 | 3 | 5 |
| Turks and Caicos Islands | 3 | 3 | 1 | 1 | 3 | 1 |
| Tuvalu | 0 | 0 | 0 | 0 | 0 | 0 |
| Uganda | 22 | 21 | 7 | 2 | 3 | 7 |
| Ukraine | 125 | 106 | 44 | 24 | 32 | 53 |
| United Arab Emirates | 3 | 3 | 1 | 2 | 1 | 1 |
| United Kingdom | 198 | 173 | 73 | 102 | 181 | 212 |
| Unknown | 46 | 30 | 13 | 8 | 2 | 6 |
| Uruguay | 51 | 28 | 21 | 14 | 19 | 25 |
| USSR | 0 | 0 | 0 | 0 | 1 | 0 |
| Uzbekistan | 45 | 49 | 21 | 55 | 88 | 572 |
| Vanuatu | 0 | 0 | 0 | 0 | 0 | 0 |
| Venezuela | 327 | 193 | 176 | 176 | 834 | 3,256 |
| Vietnam | 80 | 93 | 33 | 15 | 39 | 58 |

| Yemen | 46 | 14 | 6 | 15 | 7 | 11 |
|---|---|---|---|---|---|---|
| Yugoslavia | 3 | 6 | 1 | 2 | 2 | 0 |
| Zambia | 7 | 8 | 7 | 2 | 7 | 4 |
| Zimbabwe | 16 | 16 | 1 | 3 | 3 | 11 |