UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| YAMIL LUNA GUTIERREZ, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>MARKWAYNE MULLIN, Secretary of the<br>U.S. Department of Homeland Security, et al.,<br><br>        Defendants. | Civil Action No. 1:25-cv-01766-SLS |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' PARTIAL MOTION FOR
SUMMARY JUDGMENT AND DEFENDANTS' CROSS MOTION FOR PARTIAL
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 4

STANDARD AND SCOPE OF REVIEW ......................................................................... 4

ARGUMENT ....................................................................................................................... 6

    I.     THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS ........... 6

          A.     Section 1252(g)'s Jurisdictional Bar Forecloses Review Because Plaintiffs' Challenge an Action Arising From the Execution of Their Removal Orders ...................................................................................... 7

          B.     Section 1252(a)(2)(B)(ii)'s Jurisdictional Bar Forecloses Review Because the Secretary's Authority Pursuant to 8 U.S.C. § 1103(a)(3) Is Specified as Discretionary ............................................................................................... 9

    II.    THE DETENTION OF ALIENS AT NSGB IS NOT CONTRARY TO LAW .. 11

          A.     The Government's Detention Authority Under 8 U.S.C. § 1231 Extends Until a Removal Order is Fully Executed ................................................. 12

          B.     Section 1103(a)(3) Provides Unreviewable Detention Authority Amidst the Execution of Removal Orders ............................................................ 18

              1.     Defendants' Policy Is Unreviewable Under the APA Because Actions Taken Pursuant to 8 U.S.C. § 1103(a)(3) Are Committed to Agency Discretion by Law ............................................................................. 19

              2.     Defendants' Policy is Reasonably Related to the Execution of Removal Orders and Therefore Proper Under 8 U.S.C. § 1103(a)(3) .............. 21

          C.     The Presumption Against Extraterritoriality Does Not Apply and, In Any Event, is Plainly Rebutted ........................................................................ 26

    III.    THE DETENTION OF ALIENS AT NSGB IS NOT ARBITRARY AND CAPRICIOUS ..................................................................................................... 30

    IV.    8 U.S.C. § 1252(f)(1) DOES NOT PERMIT WHAT AMOUNTS TO A CLASS-WIDE RESTRAINT ON DETENTION OPERATIONS ................................... 38

CONCLUSION .................................................................................................................. 45

## TABLE OF AUTHORITIES

### CASES

*Alaska Dep't of Env't Conservation v. E.P.A.*,
540 U.S. 461 (2004)................................................................................................ 31, 32

*Anderson v. Liberty Lobby*, *Inc.*,
477 U.S. 242 (1986)...................................................................................................... 4

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ...................................................................................... 42

*Arizona v. United States*,
567 U.S. 387 (2012)................................................................................................ 19, 27

*Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*,
305 U.S. 315 (1938).................................................................................................... 27

*Arpaio v. Obama*,
27 F. Supp. 3d 185 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) .................................. 20

*Bates v. Donley*,
935 F. Supp. 2d 14 (D.D.C. 2013) ................................................................................ 5

*Biden v. Texas*,
597 U.S. 785 (2022)..................................................................................................... 43

*Biharie v. United States Sec. & Exch. Comm'n*,
No. 25-CV-00406 (DLF), 2025 WL 4060098 (D.D.C. Apr. 29, 2025)................................... 19

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024)..................................................................................................... 10, 11

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974)................................................................................................... 5, 31

*Brodie v. United States Dep't of Health and Hum. Servs.*,
796 F. Supp. 2d 145 (D.D.C. 2011)............................................................................... 35

*Califano v. Sanders*,
430 U.S. 99 (1977)....................................................................................................... 35

*Camp v. Pitts*,
411 U.S. 138 (1973)..................................................................................................... 35

*Catawba Cnty., N.C. v. E.P.A.*,
    571 F.3d 20 (D.C. Cir. 2009) ................................................................................................ 19

*Cayuga Nation v. Zinke*,
    302 F. Supp. 3d 362 (D.D.C. 2018) ....................................................................................... 35

*Chamber of Com. of United States v. U.S. Dep't of Homeland Sec.*,
    815 F. Supp. 3d 73 (D.D.C. 2025) ......................................................................................... 38

*Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*,
    316 F. Supp. 3d 349 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020) .............................. 17

*Cmty. for Creative Non Violence v. Kerrigan*,
    865 F.2d 382 (D.C. Cir. 1989) ............................................................................................... 24

*Coe v. McHugh*,
    968 F. Supp. 2d 237 (D.D.C. 2013) ....................................................................................... 34

*Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
    383 F. Supp. 2d 123 (D.D.C. 2005), *aff'd*, 466 F.3d 134 (D.C. Cir. 2006) ........................ 21, 22

*Conserve Sw. Utah v. United States Dep't of the Interior*,
    822 F. Supp. 3d 52 (D.D.C. 2026) ......................................................................................... 31

*Ctr. for Biological Diversity v. United States Army Corps of Eng'rs*,
    No. 20-CV-103 (RDM), 2020 WL 5642287 (D.D.C. Sept. 22, 2020) ...................................... 5

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) .......................................................................................... 7

*Dep't of Homeland Sec. v. MacLean*,
    574 U.S. 383 (2015) ............................................................................................................... 14

*Doe v. Taliban*,
    101 F.4th 1 (D.C. Cir. 2024) .................................................................................................. 27

*Doe, 1 v. Fed. Election Comm'n*,
    920 F.3d 866 (D.C. Cir. 2019) .......................................................................................... 21, 24

*Dowley v. Dewey Ballantine*, LLP,
    No. CIV.A. 05-622(EGS), 2006 WL 1102768 (D.D.C. Apr. 26, 2006) .................................... 8

*Drs. for Am. v. Off. of Pers. Mgmt.*,
    793 F. Supp. 3d 112 (D.D.C. 2025) ......................................................................................... 5

*Enriquez-Perdomo v. Newman*,
    54 F.4th 855 (6th Cir. 2022) ................................................................................ 22

*Env't Def. Fund Inc. v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) .............................................................................. 30

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ............................................................................ 12, 13, 42

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................................ 34

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................................................ 30

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
    426 U.S. 548 (1976) ............................................................................................ 11

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................................ 16

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ..................................................................................... 3, *passim*

*Garland v. Ming Dai*,
    593 U.S. 357 (2021) ............................................................................................ 42

*Gen. Elec. Co. v. S. Const. Co.*,
    383 F.2d 135 (5th Cir. 1967) ................................................................................. 8

*Gupta v. McGahey*,
    709 F.3d 1062 (11th Cir. 2013) ............................................................................. 8

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ............................................................................................ 20

*Hecht v. Ludwig*,
    82 F.3d 1085 (D.C. Cir. 1996) ............................................................................... 5

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................................ 19

*Hisp. Affs. Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) ............................................................................... 5

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) ................................................................................. 4

*I.N.S. v. Phinpathya*,
464 U.S. 183 (1984) .............................................................................................. 36

*Immigrant Advocs. Response Collaborative v. United States*,
No. 1:25-CV-2279 (TNM), 2026 WL 746923 (D.D.C. Mar. 17, 2026) ..................................... 9

*IMS, P.C. v. Alvarez*,
129 F.3d 618 (D.C. Cir. 1997) ................................................................................ 35

*In re Trump*,
172 F.4th 44 (D.C. Cir. 2026) ................................................................................ 15

*J.G.G. v. Trump*,
147 F.4th 1044 (D.C. Cir. 2025) ...................................................................... 11, 15, 18

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 n.8 (D.C. Cir. Mar. 26, 2025) .......................................... 9

*Jama v. Immigr. & Customs Enf't*,
543 U.S. 335 (2005) .............................................................................................. 13

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .............................................................................................. 39

*Johnson v. Guzman Chavez*,
594 U.S. 523 (2021) .............................................................................................. 12

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*,
896 F.3d 501 (D.C. Cir. 2018) .................................................................................. 6

*Kerry v. Din*,
576 U.S. 86 (2015) ............................................................................................... 27

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016) .............................................................................................. 13

*Kiobel v. Royal Dutch Petroleum Co.*,
569 U.S. 108 (2013) ...................................................................................... 12, 26, 27

*Kircher v. Putnam Funds Tr.*,
547 U.S. 633 (2006) .............................................................................................. 12

*Laurel Baye Healthcare of Lake Lanier, Inc. v. N.L.R.B.*,
　564 F.3d 469 (D.C. Cir. 2009) ................................................................................................. 8

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992) ................................................................................................................. 6

*Make the Rd. New York, et al. v. Mullin, et al.*,
　No. 25-5320, --- F.4th ---, 2026 WL 1792978 (D.C. Cir. June 23, 2026) ............................... 41

*Marsh v. Oregon Nat. Res. Council*,
　490 U.S. 360 (1989) ................................................................................................................. 4

*Mathews v. Diaz*,
　426 U.S. 67 (1976) ............................................................................................................ 20, 27

*Miot v. Trump*,
　818 F. Supp. 3d 126 (D.D.C. 2026) ................................................................................... 39, 40

*Morrison v. Nat'l Australia Bank Ltd.*,
　561 U.S. 247 (2010) ............................................................................................................... 28

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ................................................................................................................... 4

*Mullin v. Al Otro Lado*,
　No. 25-5, 2026 WL 1825741 (U.S. June 25, 2026) ..................................................... 29, 30, 41

*Mullin v. Doe*,
　--- U.S. ---, Nos. 25-1083 & 25-1084, 2026 WL 1825480 (U.S. June 25, 2026) .................... 39

*N.C. Fisheries Ass'n v. Gutierrez*,
　518 F. Supp. 2d 62 (D.D.C. 2007) .......................................................................................... 38

*N.S. v. Dixon*,
　141 F.4th 279 (D.C. Cir. 2025) ................................................................................... 12, 39, 43

*Narenji v. Civiletti*,
　617 F.2d 745 (D.C. Cir. 1979) ........................................................................................... 21, 22

*Nielsen v. Preap*,
　586 U.S. 392 (2019) ............................................................................................................... 41

*Nken v. Holder*,
　556 U.S. 418 (2009) ......................................................................................................... 25, 40

*Oceana, Inc. v. Ross*,
290 F. Supp. 3d 73 (D.D.C. 2018) ................................................................ 5

*Open Soc'y Inst. v. United States Citizenship & Immigr. Servs.*,
573 F. Supp. 3d 294 (D.D.C. 2021) .............................................................. 5

*People for the Ethical Treatment of Animals, Inc. v. United States Dep't of Agric.*,
7 F. Supp. 3d 1 (D.D.C. 2013) ................................................................... 10

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
374 F.3d 1251 (D.C. Cir. 2004) .......................................................... 38, 42

*Pugin v. Garland*,
599 U.S. 600 (2023) ................................................................................. 24

*Quantum Ent. Ltd. v. United States Dep't of the Interior, Bureau of Indian,*
*Affs.*, 597 F. Supp. 2d 146 (D.D.C. 2009) ................................................. 32

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976) ................................................................................. 13

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
174 F.4th 81 (D.C. Cir. 2026) ....................................................... 3, *passim*

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ....................................................................... 7, *passim*

*Riley v. Bondi*,
606 U.S. 259 (2025) ................................................................................. 16

*RJR Nabisco v. Eur. Cmty.*,
579 U.S. 325 (2016) ................................................................................. 28

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018) ................................................................................. 17

*Sadhvani v. Chertoff*,
460 F. Supp. 2d 114, 122-23 (D.D.C. 2006), *aff'd*, 279 F. App'x 9 (D.C. Cir. 2008) ............... 9

*Sale v. Haitian Centers Council, Inc.*,
509 U.S. 155 (1993) ....................................................................... 27, 28, 29

*Savignac v. Day*,
754 F. Supp. 3d 135 (D.D.C. 2024) .............................................................. 4

*Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*,
404 F.2d 824 (D.C. Cir. 1968) .................................................................................. 8

*Sec'y of Labor v. Twentymile Coal Co.*,
456 F.3d 151 (D.C. Cir. 2006) ................................................................................ 18

*Sierra Club v. Jackson*,
648 F.3d 848 (D.C. Cir. 2011) ................................................................................ 18

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................................... 4

*Slyper v. Att'y Gen.*,
827 F.2d 821 (D.C. Cir. 1987) ................................................................................ 19

*State of Texas v. United States*,
106 F.3d 661 (5th Cir. 1997) ........................................................................... 20, 40

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ................................................................................... 40

*Thorpe v. Hous. Auth. of City of Durham*,
393 U.S. 268 (1969) ................................................................................................ 24

*United States v. Delgado-Garcia*,
374 F.3d 1337 (D.C. Cir. 2004) ............................................................................. 28

*United States v. Sanchez*,
604 F.3d 356 (7th Cir. 2010) ........................................................................... 16, 25

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ................................................................................................ 43

*United States v. Texas*,
599 U.S. 670 (2023) .................................................................................... 20, 40, 42

*Visinscaia v. Beers*,
4 F. Supp. 3d 126 (D.D.C. 2013) ........................................................................ 4, 5

*Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*,
50 F.4th 164 (D.C. Cir. 2022) ........................................................................... 19, 21

*Webster v. Doe*,
486 U.S. 592 (1988) ................................................................................ 10, 11, 19, 25

*Zadvydas v. Davis*,
   533 U.S. 678 (2001).................................................................................2, *passim*

*Zhu v. Gonzales*,
   411 F.3d 292 (D.C. Cir. 2005) ............................................................................. 10

## STATUTES

5 U.S.C. § 701(a)(2)....................................................................................... 18, 20

5 U.S.C. § 706(2) .................................................................................................. 40

5 U.S.C. § 706(2)(A)......................................................................................... 4, 30

6 U.S.C. § 202(5) .................................................................................................. 20

8 U.S.C. § 1101(g) ................................................................................................ 16

8 U.S.C. § 1103(a)(3)...................................................................................2, *passim*

8 U.S.C. § 1158(a)(1)............................................................................................ 29

8 U.S.C. § 1182(f) ................................................................................................. 28

8 U.S.C. § 1225(b)(1) ........................................................................................... 41

8 U.S.C. § 1231 ........................................................................................... 6, 12, 30

8 U.S.C. § 1231(a) .................................................................................. 2, 11, 16, 23

8 U.S.C. § 1231(a)(2)(A) ...................................................................................... 12

8 U.S.C. § 1231(a)(6)................................................................................... 14, 16, 42

8 U.S.C. § 1231(b) .................................................................................. 2, 11, 16, 23

8 U.S.C. § 1231(b)(1) ........................................................................................... 13

8 U.S.C. § 1231(b)(2) ........................................................................................... 13

8 U.S.C. § 1231(b)(2)(C) ................................................................................ 29, 43

8 U.S.C. § 1231(d)(3) ..................................................................................... 13, 14

8 U.S.C. § 1231(f)(1) ............................................................................................ 14

8 U.S.C. § 1231(g) .................................................................................................. 6

- ix -

8 U.S.C. § 1231(g)(1) ........................................................................................... 17

8 U.S.C. § 1252(b)(9) ............................................................................................. 6

8 U.S.C. § 1252(f)(1) ....................................................................................... 38, 39

8 U.S.C. § 1252(g) ......................................................................................... 7, 8, 9

## RULES

Fed. R. Civ. P. 23(b)(2)........................................................................................ 39

Fed. R. Civ. P. 56(a) ............................................................................................... 4

## REGULATIONS

8 C.F.R. § 1.2........................................................................................................ 13

8 C.F.R. § 214.15(c).............................................................................................. 23

8 C.F.R. § 241.15(b) ............................................................................................. 23

8 C.F.R. § 287.8(d)(2)........................................................................................... 13

8 C.F.R. § 1208.16(c)(4)........................................................................................ 16

**INTRODUCTION**

On January 29, 2025, the President issued a Memorandum ordering the Department of Homeland Security ("DHS") and the Department of War ("DOW") to take all necessary steps "to expand the Migrant Operations Center ["MOC"] at Naval Station Guantanamo Bay ["NSGB"] to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States." U-DOW-CAR-119 & DHS-000124. The Presidential Memorandum further directed the agencies "to address" any "attendant immigration enforcement needs" they "identified." *Id*. As the President explained, the purpose of his directive to expand the use of NSGB was "to halt the border invasion, dismantle criminal cartels, and restore national sovereignty." *Id*. Following the Presidential Memorandum's issuance, and in light of multiple related Executive Orders, DOW and DHS engaged in a joint planning process that culminated in a Memorandum of Understanding ("MOU") governing the detention of removable aliens at NSGB. U-DOW-CAR-121-26 & DHS-000118-23. Since then, Defendants have used NSGB to detain certain aliens as a step in the government's lawful execution of their final removal orders.

Plaintiffs now challenge the Guantanamo detention policy on the grounds that it is unauthorized by statute and an arbitrary departure from what they claim was established agency practice. But, at bottom, all of Plaintiffs' arguments dispute the government's action to execute their removal orders and thus fall squarely within the scope of § 1252(g)'s jurisdictional bar. This action should therefore be dismissed.

If the Court concludes otherwise, Plaintiffs provide no basis to disturb the Guantanamo detention policy because the detention of aliens at NSGB during the execution of their removal orders is not contrary to law. *First*, the government's custodial authority under § 1231 does not end until the execution of a final order of removal is complete, which occurs only when an alien reaches and is accepted into his final destination country. This reading of the statute is compelled

by its plain language, which commands the Secretary not only to remove aliens with final orders from the United States, but specifically directs that they are removed *to* particular countries and permits him to transport those aliens to a specified destination. *See* 8 U.S.C. § 1231(b), (d)(3). This reading of the statute is additionally compelled by the Supreme Court's decision in *Zadvydas v. Davis*, where the Court conceptualized the execution of a removal order as not simply a physical departure but as a process ending with the alien in a country that would agree to accept him. 533 U.S. 678 (2001). *Second*, the government has unreviewable authority under 8 U.S.C. § 1103(a)(3) to perform "acts as he deems necessary for carrying out his authority" under the Immigration and Nationality Act ("INA"), including detaining aliens amidst the execution of their removal orders. Even if the Court finds this authority reviewable, acts performed pursuant to § 1103(a)(3) must only be "reasonably related" to the statute, not, as Plaintiffs suggest, narrowly tailored. *Third*, as this Court previously signaled, *see* ECF No. 53, Memorandum Opinion ("Mem. Op.") at 38 n.15, the presumption of extraterritoriality does not apply to these grants of authority to the Executive relating to removal because it would undermine the very purpose of applying the presumption in the first place.

Defendants' detention of aliens at NSGB is also not arbitrary and capricious. Instead, a review of the administrative record confirms that the Guantanamo detention policy is both reasonable and reasonably explained. Following the issuance of the Presidential Memorandum, DOW and DHS coordinated to effectuate the President's directive and use NSGB to provide additional detention space for high-priority criminal aliens as part of the Administration's larger effort to increase immigration enforcement and protect the territorial integrity of the United States. In building up the mission, DOW and DHS drew upon an existing migrant detention facility, resources from prior joint missions, existing detention standards and procedures, and specialized

knowledge of NSGB to determine which aliens could be detained there, where they would be housed, and what infrastructure was needed to accommodate them. And, although the Court's review under the Administrative Procedure Act ("APA") is necessarily record-based, Plaintiffs largely fail to engage with that evidence and instead rely heavily on extra-record materials to advocate for the policy choice that they would prefer. In doing so, they only halfheartedly attempt to establish that the Court cannot resolve this claim on the administrative record alone. *See* ECF Nos. 75, 97 (authorizing limited discovery only for Plaintiffs' contrary-to-law claim). What is most clear from Plaintiffs' arguments is that they simply disagree with Defendants' decisionmaking, which is not sufficient to establish that the challenged detention policy is arbitrary and capricious.

Because the Guantanamo detention policy is neither contrary to law nor arbitrary and capricious, the Court should grant Defendants' motion for partial summary judgment and deny Plaintiffs' motion for the same. But even if the Court grants Plaintiffs' motion, it cannot issue the class-wide vacatur that they seek. Unlike in *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 104 (D.C. Cir. 2026) ("*RAICES*"), issuing vacatur in this case would have far-reaching consequences across the statutory scheme governing the execution of removal orders. That is, for this Court to set aside Defendants' policy would either effectively enjoin Defendants' authority under multiple overlapping provisions of § 1231 or would require fashioning a judge-made carve-out to the statute that is untethered from any authority. Because Defendants' position is that § 1231 authorizes detention until the execution of a final order of removal is complete, the Court may not use its own interpretation of the statute to enjoin such actions on a class-wide basis. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 548-50 (2022). Accordingly, the Court should deny Plaintiffs' request for relief.

**STATEMENT OF FACTS**

Defendants respectfully submit the attached Response to Plaintiffs' Statement of Material Facts Not in Genuine Dispute, *see* ECF No. 108-3.

**STANDARD AND SCOPE OF REVIEW**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is one with potential to change the litigation's substantive outcome, and a dispute is genuine if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). In an APA case like this one, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). When parties file cross-motions for summary judgment, a court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Savignac v. Day*, 754 F. Supp. 3d 135, 163 (D.D.C. 2024) (citations omitted).

Under the APA, courts will "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "narrow" standard, "which appropriately encourages courts to defer to the agency's expertise." *Visinscaia v. Beers*, 4 F. Supp. 3d 126, 130 (D.D.C. 2013) (citing *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) ("[I]f the Court finds support for the agency action, it must step back and refrain from assessing the wisdom of the decision unless there has been 'a clear error of judgment.'")

(quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)). And even a decision "that is not fully explained . . . may be upheld 'if the agency's path may reasonably be discerned.'" *Visinscaia*, 4 F. Supp. 3d at 130 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

APA cases are generally decided only on the basis of the administrative record. *See, e.g., Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 131 (D.D.C. 2025) ("The question is whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.") (cleaned up); *Bates v. Donley*, 935 F. Supp. 2d 14, 22 (D.D.C. 2013). In this case, however, the Court permitted limited discovery as to Plaintiffs' contrary-to-law claim in order to "ascertain the contours of the precise policy at issue," and those materials are properly before the Court. ECF No. 75 at 2 (quoting *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018)). In support of their summary judgment motion, however, Plaintiffs submitted additional exhibits numbering in the hundreds of pages; only one of these exhibits is comprised of the discovery materials properly before the Court. *See* ECF No. 108; *see* Behr Decl. (discussing information produced in discovery). This Court should be "leery of [the] request[] to consider" evidence beyond the record and limited discovery. *Ctr. for Biological Diversity v. United States Army Corps of Eng'rs*, No. 20-CV-103 (RDM), 2020 WL 5642287, at *8 (D.D.C. Sept. 22, 2020). Indeed, before the Court does so, Plaintiffs must "demonstrate unusual circumstances justifying a departure from the general rule," *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018) (citation omitted), by showing that (1) "the agency deliberately or negligently excluded documents that may have been adverse to its decision;" (2) "the district court need[s] to supplement the record with background information in order to determine whether the agency considered all of the relevant factors;" or (3) "the agency failed to explain administrative action so as to frustrate

effective judicial review," *Open Soc'y Inst. v. United States Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294, 307 (D.D.C. 2021) (citing *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)).

## ARGUMENT

### I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS[1]

Although this Court previously rejected Defendants' argument that challenges to the location of detention "pending removal" under 8 U.S.C. § 1231(g) fall under the INA's jurisdictional bars, Mem. Op. at 11-13, it has not yet considered this argument in the context of detention under 8 U.S.C. §§ 1231 as a whole or under 1103(a)(3), which both fall squarely within the scope of § 1252(a)(2)(B)(ii) and (g). And given that the Court construed removal to mean any departure from the territory of the United States, *see* Mem. Op. at 43, it must necessarily revisit these jurisdictional bars in that context to ensure it has jurisdiction to review the Government's decisions and actions arising from the execution of aliens' removal orders. *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018) (explaining that a court must "assure itself of its subject matter jurisdiction").

---

[1] Defendants respectfully preserve for appeal the additional grounds for dismissal raised in Defendants' Motion to Dismiss. *See* ECF No. 29. First, 8 U.S.C. § 1252(b)(9) precludes judicial review of Plaintiffs' claims because it provides that "judicial review of all questions of law . . . including interpretation and application of statutory provisions . . . arising from *any action taken . . . to remove an alien* from the United States" is only proper before the appropriate court of appeals via a petition for review. 8 U.S.C. § 1252(b)(9). *See* ECF No. 29 at 13. Second, there has been no final agency action because Plaintiffs are seeking "wholesale improvement" of "the entirety" of the Executive's execution of removal orders. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590-91 (1992); *see* ECF No. 29 at 15. Moreover, although the Court concluded that "legal consequences" flow from Defendants NSGB policy by analogizing that that "a blonde person's detention in Alaska" would be the direct result of a policy calling for all blonde-haired people to be detained in that state, the Court did not identify any *legal* consequences of being detained in one location over another. Mem. Op. at 24-25. Third, Plaintiffs' challenge to the legality of their detention sound in habeas and should not be reviewable under the APA. Mem. Op. at 18 n.7; *see* ECF No. 29 at 14.

### A.    Section 1252(g)'s Jurisdictional Bar Forecloses Review Because Plaintiffs' Challenge an Action Arising From the Execution of Their Removal Orders

Because detention at NSGB occurs in the midst of executing final orders of removal, it falls outside of this Court's jurisdiction pursuant to 8 U.S.C. § 1252(g), which bars claims arising from three discrete actions, including, as relevant here, the decision or action to "execute removal orders." 8 U.S.C. § 1252(g). In enacting § 1252(g), Congress spoke clearly, providing that "no court" has jurisdiction over "any cause or claim" arising from the covered actions "notwithstanding any other provision of law," whether "statutory or nonstatutory," including the APA. *Id.* While § 1252(g) is "narrow," it is not nonexistent; by its plain language, the statute applies to "commencing proceedings, adjudicating cases, and *executing* removal orders." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 & 487 (1999) ("*AADC*") (emphasis added) (citing 8 U.S.C. § 1252(g) and explaining that "[a]t each stage the Executive has discretion to abandon the endeavor").

This Court previously relied on *D.A.M. v. Barr* to find that aliens' "challenge[s] to the physical manner" of removal do not fall within the scope of this provision because they "do[] not implicate the discretionary decision to execute their removal orders." 474 F. Supp. 3d 45, 60 (D.D.C. 2020); *see* Mem. Op. at 13. Under this Court's construction of the statute as influenced by *D.A.M.*, the only issue shielded from judicial review is the decision to remove an alien. The Court's insistence that judicial scrutiny is available for any "physical" activity flowing from that decision leaves open the very real possibility that aliens will see an invitation to file lawsuits attacking every physical juncture of the removal process whether it be establishing contact with a foreign government, transfer from one detention facility to another, movement to a staging area, or placement on a particular aircraft. This cannot possibly be the outcome Congress sought by enacting § 1252(g). To avoid incongruities like this, courts must give meaning to the whole

statutory language. *See Laurel Baye Healthcare of Lake Lanier, Inc. v. N.L.R.B.*, 564 F.3d 469, 472 (D.C. Cir. 2009) (finding agency's interpretation of statute violated "cardinal principle" of statutory interpretation by "eschewing various portions of the statutory language"); *see also Dowley v. Dewey Ballantine*, LLP, No. CIV.A. 05-622(EGS), 2006 WL 1102768, at \*9 (D.D.C. Apr. 26, 2006) (interpreting "arising out of" to include all claims that are germane to the subject matter"). And *D.A.M.* read out a critical word from the statute: § 1252(g) applies to "any cause or claim . . . *arising* from the decision or action" to execute a removal order. 8 U.S.C. § 1252(g) (emphasis added). Thus, by its plain language, § 1252(g) does not simply apply to the discretionary decision *to execute* a removal order but instead applies more broadly. *See Dowley v. Dewey Ballantine*, *LLP*, No. CIV.A. 05-622(EGS), 2006 WL 1102768, at \*9 (D.D.C. Apr. 26, 2006) (interpreting "arising out of" to include "all claims that are germane to the subject matter").

To illustrate the reach of this jurisdictional bar, the Supreme Court itself treated a denial of a stay of removal as one of "various decisions . . . leading up to or consequent upon final orders of deportation" and thus within the scope of § 1252(g). *AADC*, 525 U.S. at 485; *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) ("Securing an alien while awaiting a removal determination constitutes an action taken to commence proceedings"). The Court may not parse and prioritize certain statutory language over others as a means of paving a jurisdictional path forward. *See Gen. Elec. Co. v. S. Const. Co.*, 383 F.2d 135, 138 (5th Cir. 1967) ("The court must give effect to the plain and obvious meaning of the statute without reading in or reading out."); *see also Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*, 404 F.2d 824, 828 (D.C. Cir. 1968) ("[W]here the language of a statute is clear and unambiguous on its face, the thrust of that language should not be controverted by seeking to show an inconsistent legislative intent.").

- 8 -

Congress's use of "arising" in the statute makes clear that "challenges to the manner in which [the government] executed a removal order" are "subject to the unambiguous jurisdiction stripping language of 8 U.S.C. § 1252(g)." *Sadhvani v. Chertoff*, 460 F. Supp. 2d 114, 122-23 (D.D.C. 2006), *aff'd*, 279 F. App'x 9 (D.C. Cir. 2008); *cf. Immigrant Advocs. Response Collaborative v. United States*, No. 1:25-CV-2279 (TNM), 2026 WL 746923, at *4 (D.D.C. Mar. 17, 2026) (finding that "challenges to the way the Government resolves removal proceedings fall comfortably within" the scope of § 1252(g)). And, here, Plaintiffs challenge exactly that: the government's decision to "initiate" the execution of their removal orders by transferring them to NSGB for detention prior to transfer to their final destination countries. *AADC*, 525 U.S. at 483; *see* Mem. Op. at 43; ECF No. 108-2, Memorandum of Law in Support of Plaintiffs-Petitioners' Motion for Partial Summary Judgment ("SJ Mot") at 17, 20-21. That is, the subject of this lawsuit is the "single act" of bringing aliens to NSGB, which is a "decision or action" that arises out of the execution of their removal orders. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *28 n.8 (D.C. Cir. Mar. 26, 2025) (Millett, J., concurring) (distinguishing a "single act," which falls under the scope of § 1252(g), from "a group of decisions or a practice or procedure employed in making decisions" which does not). Just as a litigant's challenge to "the process by which removal cases are settled" cannot be reviewed because it is a decision arising from the adjudication of cases, *Immigrant Advocs. Response Collaborative*, 2026 WL 746923, at *4, Plaintiffs' challenge to the process by which they are transported to their final destination countries arises from the execution of their removal order and is likewise barred under § 1252(g).

**B.      Section 1252(a)(2)(B)(ii)'s Jurisdictional Bar Forecloses Review Because the Secretary's Authority Pursuant to 8 U.S.C. § 1103(a)(3) Is Specified as Discretionary**

Additionally, because Defendants' authority to "maintain custody over an individual while the government is in the midst of executing their removal order" is rooted in 8 U.S.C. § 1103(a)(3),

*see* Mem. Op. at 45, section 1252(a)(2)(B)(ii) also precludes judicial review.  This provision strips this Court's jurisdiction over "any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security," except for specified relief not relevant here.  8 U.S.C. § 1252(a)(2)(B)(ii).  Critically, "a decision may be 'specified to be in the discretion of the Attorney General' even if the grant of authority to make that decision does not use the word 'discretion.'"  *Zhu v. Gonzales*, 411 F.3d 292, 294-95 (D.C. Cir. 2005) (quoting 8 U.S.C. § 1252(a)(2)(B)(ii)).

Here, section 1103(a)(3) of Title 8 provides that the Secretary of Homeland Security shall "establish such regulations," "issue such instructions," and "perform such other acts as he deems necessary for carrying out his authority under the provisions" of the INA.  "The key phrase, of course, is '*as he deems necessary*.'"  *People for the Ethical Treatment of Animals, Inc. v. United States Dep't of Agric*., 7 F. Supp. 3d 1, 11 (D.D.C. 2013) (emphasis added).  According to the Supreme Court, "[t]his standard fairly exudes deference."  *Webster v. Doe*, 486 U.S. 592, 600 (1988) (analyzing statutory phrase that permits termination "whenever he shall deem such termination necessary or advisable").  As this Court has previously recognized, Mem. Op. at 15, this Circuit has already held that statutory language permitting action when the operative authority "deems" it to be prudent triggers § 1252(a)(2)(B)(ii)'s jurisdictional bar.  For example, in *Zhu*, the court recognized that similar statutory language—stating that "the Attorney General may, when the Attorney General deems it to be in the national interest, waive" certain requirements, 8 U.S.C. § 1153(b)(2)(B)(i)—"comes within the reach of § 1241(a)(2)(B)(ii) even under the more demanding standard used by the Ninth Circuit."  411 F.3d at 295; *see also Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) (finding that "authority to revoke an approved visa petition 'at any time, for

- 10 -

what he deems to be good and sufficient cause' falls under § 1252(a)(2)(B)(ii)'s jurisdictional bar). In the same way, the operative statutory language here states that the Secretary will, among other things, perform acts that he *deems* necessary, not only acts that *are* necessary. *See Webster*, 486 U.S. at 600; *see Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976) (finding "deems necessary" to "clearly grant [delegee] a measure of discretion"). That § 1103(a)(3) uses the word "shall" rather than "may" does not change the analysis because "Congress has in no way prescribed how" the Secretary should exercise this discretion. *Bouarfa*, 604 U.S. at 14. Instead, the statute ends in a catchall grant of authority to "perform such other acts," highlighting the broad discretion by which the Secretary is permitted to, as relevant here, execute final orders of removal. Defendants' actions are therefore unreviewable and Plaintiffs' claims should be dismissed. *See* 8 U.S.C. § 1252(a)(2)(B)(ii)

## II.  THE DETENTION OF ALIENS AT NSGB IS NOT CONTRARY TO LAW

First, detention authority for aliens with final orders of removal under § 1231 extends until the government has fully executed their final order of removal, which is not complete until they have reached their final destination country. *See* 8 U.S.C. § 1231(a)-(b), (d). The text and structure of the overlapping provisions of the statute read alongside the Supreme Court's decision in *Zadvydas*—which permits detention during the removal period—compel this result. 533 U.S. at 699-702. Second, if the Court reaches the issue, continued custodial control of aliens through the full execution of a removal is also provided by § 1103(a)(3), which grants unreviewable authority to the Secretary to carry out the provisions of the INA. *See J.G.G. v. Trump*, 147 F.4th 1044, 1053 n.4 (D.C. Cir. 2025) (Katsas, J., concurring) Third, the presumption against extraterritoriality—the purpose of which is to ensure proper deference to the Executive in the realm of foreign affairs—has no place in this analysis when the statute itself is

written to further the same goal. *See Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); Mem. Op. at 38 n.15.

A. **The Government's Detention Authority Under 8 U.S.C. § 1231 Extends Until a Removal Order is Fully Executed**

The INA provides that an alien "shall" be detained during the "removal period," 8 U.S.C. § 1231(a)(2)(A) and may continue to be detained for "a period reasonably necessary" to execute the removal order.[2] *Zadvydas*, 533 U.S. at 699. The start of this period is statutorily defined as the "latest of three dates: (1) the date the order of removal becomes 'administratively final,' (2) the date of the final order of any court that entered a stay of removal, or (3) the date on which the alien is released from non-immigration detention or confinement." *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021) (citing 8 U.S.C. § 1231(a)(1)(B)). The statute is silent as to the precise end of that period, however, and context requires that it extend until the alien reaches his final destination country.

Pursuant to "the cannon against reading conflicts into statutes," the government's detention authority over the removal of aliens cannot refer to the mere fact of taking them outside of the territorial boundaries of the United States. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018). Focusing narrowly on the physical act of departure fails to account for the entire statutory scheme governing removals that are carried out by the government. *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 643 (2006) ("[T]hat suggestion would be persuasive only if we stopped reading right there, and we do not stop there; we do not read statutes in little bites."); *see also Radzanower v.*

---

[2] Although the statute and regulations refer to the "Attorney General," these references should be read as references to the Secretary of Homeland Security. *See N.S. v. Dixon*, 141 F.4th 279, 282 (D.C. Cir. 2025) (explaining that the Homeland Security Act of 2002 "transferred the detention and removal program previously administered by the Attorney General and the Immigration and Naturalization Service (INS) to the Secretary of Homeland Security.")

*Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("[A] specific statute will not be controlled or nullified by a general one.").  The government's detention authority must encompass the process of executing a final order of removal in accordance with the full statutory provision that requires removing an alien *to* a particular location.  8 U.S.C. § 1231(b)(2); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 338 (2005); *see* Oxford English Dictionary, EXECUTE ("To follow out into effect," and "[t]o complete and give validity to (the instrument by which such act is effected) by performing what the law requires to be done") (rev. 1989); 8 C.F.R. § 1.2 (defining "executed" as "fully completed"); *see also Epic Sys. Corp.*, 584 U.S. at 521 ("Because we can easily read Congress's statutes to work in harmony, that is where our duty lies").  Section 1231(b)(2) sets out a consecutive array of countries to which an alien may be removed and commands that the Secretary "shall" remove the alien to those countries, making clear that the government's authority to detain must extend until the alien reaches that final destination.  *See, e.g.*, 8 U.S.C. § 1231(b)(1), (b)(2)(A)(ii), (b)(2)(D); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").

Indeed, the statute expressly says so.  In a section entitled "removal upon order," Congress provided the Secretary with the authority to require any "owner, agent, master, commanding officer, person in charge, purser, or consignee" in charge of providing transportation services to "guard safely[] and transport *to the destination specified* any alien ordered to be removed." 8 U.S.C. § 1231(d)(3) (emphasis added); *see* 8 C.F.R. § 287.8(d)(2) (providing guidelines for "[e]scorting officers" present on airline transportation).  The Secretary could not require these actions of others unless he himself still had custodial authority over those aliens during this period, making clear that Congress was legislating against a backdrop of detention authority extending

- 13 -

through the full execution of the removal order.  *See* 8 U.S.C. § 1231(d)(3).  And given that this provision does not limit "destination specified" only to the final destination country, it contemplates the possibility of continued detention at other destinations.  *Compare* 8 U.S.C. § 1231(d)(3) (permitting custody during transport "to the destination specified"), *with* 8 U.S.C. § 1231(f)(1) (providing that certain aliens with mental or physical conditions be provided a personal caretaker "until the alien arrives at the final destination"); *see Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.").  And the provision requiring aliens with mental or physical conditions to be provided a traveling companion who "shall accompany and care for the alien until the alien arrives at the final destination," exemplifies one of the various extraterritorial applications of the government's detention authority as a means of effectuating a removal order.  8 U.S.C. § 1231(f)(1).

The Supreme Court's decision in *Zadvydas* also confirms that the mere act of physical removal is not determinative of detention authority because it recognized that ensuring that an alien will reach and be accepted by a final destination country is part and parcel of removal. 533 U.S. at 699.  After issuance of his final order of deportation in 1994, Zadvydas remained in detention for multiple years while the government sought to find a country willing to accept him. *Id.* at 684 (documenting INS's unsuccessful efforts to deport Zadvydas to Germany, Lithuania, and the Dominican Republic).  To resolve the question of whether his continued detention was authorized by statute, *see* 8 U.S.C. § 1231(a)(6) (providing that certain aliens "may be detained beyond the removal period"), the Supreme Court recognized a presumptive six-month period of continued detention following the 90-day statutory period and ultimately held that detention is permissible "until it has been determined that there is no significant likelihood of removal in the

reasonably foreseeable future." *Id.* at 702. As relevant here, the government's authority to detain Zadvydas was not contingent only on his ability to be taken out of the country, as he had a final, enforceable removal order throughout his detention and could have been physically removed at any point. *Id.* at 684. Rather, when an alien's removal is no longer significantly likely in the reasonably foreseeable future, it is not because the government lacks the capability to physically remove him, but rather because, for one reason or another, no final destination country is willing to accept him. *Id.* at 684, 699-702. The Supreme Court's conception of "removal" therefore includes not simply the alien's physical departure from the United States, but also his arrival and acceptance elsewhere, making clear that the government's authority under § 1231 does not end at the United States border. *See id.* at 699 ("Whether a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal is determinative of whether the detention is, or is not, pursuant to statutory authority.").

This Court previously held that "removal occurs when an individual subject to a removal order departs from the United States," and used the definition of removal to conclude that the government's authority to detain aliens "pending removal" under § 1231(g) ends upon the alien's physical departure from this country.[3] *See* Mem. Op. at 43. But this case is about detention authority, and the precise moment of an alien's removal "do[es] not clearly connote anything about custody" itself or the government's authority to detain. *J.G.G. v. Trump*, 147 F.4th 1044, 1052 (D.C. Cir. 2025) (Katsas, J., concurring); *see also In re Trump*, 172 F.4th 44, 57 (D.C. Cir. 2026) ("[T]he ordinary meaning of 'remove' refers to a change in territorial location, not custody."). And the words of § 1231(g) "must be read in their context and with a view to their place in the

---

[3] As discussed above and below, the Court's prior construction of § 1231(g) is not inconsistent with Defendants' argument here, however Defendants nonetheless respectfully reserve this issue for appeal. *See* Mem. Op. at 30-43.

overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). While a "removal" occurs if an alien with an outstanding final order exits the territory of the United States for any destination absent ever being in the custody of the government, 8 U.S.C. § 1101(g), when an alien with a final removal order does not depart on his own volition but is instead detained and then removed by the government, the government lawfully executes his final order of removal by removing him to a specified country pursuant to 8 U.S.C. § 1231(b). *See supra*. These two distinct means of exiting the country—departing on one's own volition and being escorted out by the government—both result in a "removal" as a matter of law. *See* 8 U.S.C. § 1101(g). But it does not necessarily follow that Congress contemplated the latter process concluding at the exact moment of physical departure from the bounds of this country. To be sure, the INA requires more from the government than simply "sailing [an alien] out to the boundary of the territorial waters of the United States and tossing her overboard," although that would qualify as a "removal." *United States v. Sanchez*, 604 F.3d 356, 359 (7th Cir. 2010) (holding that this alien would technically be "removed").[4]

Critically, while a statute "cannot be read to grant the [Executive branch] authority . . . in conflict with the INA's express removal provisions," *RAICES*, 174 F.4th at 105, the directive to the Secretary to arrange for "appropriate places for aliens detained pending removal or a decision

---

[4] To further illustrate that 8 U.S.C. § 1101(g) does not map perfectly onto the government's authority and obligations in escorted removals, take an alien with a final order who has CAT protection from Mexico. 8 C.F.R. §§ 1208.16(c)(4), (f), 1208.17(a), (b)(2); *see Riley v. Bondi*, 606 U.S. 259, 269 (2025) ("An order denying [protection] under the CAT is not a final order of removal and does not affect the validity of a previously issued order of removal."). If he leaves the United States he "shall be considered to have been deported or removed in pursuance of law, irrespective of . . . the place to which he departed," even if that place is Mexico. 8 U.S.C. § 1101(g). Thus, if this alien voluntarily walks across the border to Mexico, he was "removed" to Mexico, even though the government could not have lawfully executed his removal order by removing him to Mexico. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a); 8 U.S.C. § 1101(g).

on removal," 8 U.S.C. § 1231(g)(1), *see* Mem. Op. at 32, does not contradict the government's argument here. Once the moment of removal has passed, it is axiomatic that detention would not continue "pending" that moment. Insofar as Plaintiffs have latched onto a line in DOW's message traffic—which is used to simply issue orders and direct command activity—to assert that statutory authority derives from § 1231(g) alone, *see* SJ Mot. at 20 (citing U-DOW-CAR-647), that is not so. The Court provided Plaintiffs the opportunity to concede as much and they declined to do so. ECF No. 93 at 3. Consequently, Plaintiffs cannot now claim that this document establishes the full statutory basis for the Guantanamo detention policy. Moreover, to expect a brief order in message traffic to lay out the full array of statutory justifications for its intended action is neither required nor reasonable.

In short, the execution of a removal order by the government is a multi-step process wherein the alien physically leaves the United States, arrives to the final destination country, and that country's government assumes responsibility for him. The government has not fully executed a final order of removal until all of these events have transpired, regardless of the precise moment of departure from the physical territory of this country. *See Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 316 F. Supp. 3d 349, 391 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020) (explaining that statutory provisions "must be read together, in accordance with 'one of the most basic interpretive canons'—that a 'statute should be construed so that effect is given to all its provisions'") (quoting *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018)). And consistent with Supreme Court precedent, all of these steps must occur within the removal period, the six months thereafter, or until there is no significant likelihood of executing the removal order in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 702.

Because context compels that § 1231 detention authority extends until the removal order has been fully executed, Defendants' policy of detaining aliens at NSGB is not contrary to law.

> **B.**    **Section 1103(a)(3) Provides Unreviewable Detention Authority Amidst the Execution of Removal Orders**

Even assuming the Court disagrees that the detention authority for Defendants' policy arises from § 1231 alone, the government may lawfully maintain custody over aliens amidst the execution of their removal orders pursuant to 8 U.S.C. § 1103(a)(3).  Section 1103(a)(3) provides that the Secretary of Homeland Security shall "establish such regulations," "issue such instructions," and "perform such other acts as he deems necessary for carrying out his authority under the provisions" of the INA.  As discussed above, the INA requires aliens to be removed to specified countries.  *See supra*.  As Judge Katsas and this Court have reasoned, authority under this provision "includes moving aliens to specific countries selected under 1231(b)."  *J.G.G.*, 147 F.4th at 1053 n.4 (Katsas, J., concurring); *see* Mem. Op. at 45 (stating that 8 U.S.C. § 1103(a)(3) provides statutory authority for DHS to "maintain custody over an individual while the government is in the midst of executing their removal order").

First, because the statutory language and context of 8 U.S.C. § 1103(a)(3) make clear that agency action taken pursuant to that provision is committed to agency discretion by law, Defendants' policy is unreviewable.  5 U.S.C. § 701(a)(2) (precluding review when "agency action is committed to agency discretion by law"); *see Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) ("To determine whether a matter has been committed to agency discretion, we 'consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action.'") (quoting *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)).  Second, assuming the Court concludes the policy is reviewable, Defendants' detention policy is "reasonably related to the

purposes" of the INA and therefore proper under 8 U.S.C. § 1103(a)(3). *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 50 F.4th 164, 178-79 (D.C. Cir. 2022).

> **1.  Defendants' Policy Is Unreviewable Under the APA Because Actions Taken Pursuant to 8 U.S.C. § 1103(a)(3) Are Committed to Agency Discretion by Law**

Implementation of a statute is committed to agency discretion when it is "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821 (1985); *see Slyper v. Att'y Gen.*, 827 F.2d 821, 824 (D.C. Cir. 1987) (declining to review when "the governing statute is devoid of guidance"). As discussed above, *see supra* I.B, § 1103(a)(3) provides that the Secretary of Homeland Security shall "establish such regulations," "issue such instructions," and "perform such other acts as he deems necessary for carrying out his authority under the provisions" of the INA. The phrase *deems necessary* "foreclose[s] the application of any meaningful judicial standard of review." *Webster*, 486 U.S. at 600. Again, this is so because the statutory language permits the Secretary to, among other things, perform acts that he *deems* necessary, not only acts that *are* necessary. *See Webster*, 486 U.S. at 600; *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 35 (D.C. Cir. 2009) (finding "deems necessary" language committed to agency discretion because the statute "says nothing of what precisely will render a modification necessary"); *see also Biharie v. United States Sec. & Exch. Comm'n*, No. 25-CV-00406 (DLF), 2025 WL 4060098, at *2 (D.D.C. Apr. 29, 2025) (no standard by which to review "deems necessary" language).

The statutory purpose and context only reinforce this conclusion. To be sure, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012); *see also AADC*, 525 U.S. at 486 ("Of course, *many* provisions of [the 1996 amendments to the INA] are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation")

- 19 -

(emphasis in original).  The Supreme Court has explained that "[f]or reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976).  Indeed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952); *see Arpaio v. Obama*, 27 F. Supp. 3d 185, 209 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) (noting the "longstanding practice of enforcement discretion regarding the Nation's immigration laws" and providing that "[s]uch discretion is conferred by statute").  And Congress specifically provided that the Secretary "establish[] national immigration enforcement priorities," which necessarily will affect and determine the actions that he "deems necessary" at any given time to carry out the provisions of the INA, including executing final orders of removal.  6 U.S.C. § 202(5); *cf. United States v. Texas*, 599 U.S. 670, 680 (2023) ("In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies.  That complicated balancing process in turn leaves courts without meaningful standards for assessing those policies.").  In short, because "section 1103 places no substantive limits on the Attorney General and commits enforcement of the INA to h[is] discretion," and detention at NSGB as a part of the execution of removal orders falls under that authority, review under the APA is precluded. *State of Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997); *see* 5 U.S.C. § 701(a)(2).

**2.      Defendants' Policy is Reasonably Related to the Execution of Removal Orders and Therefore Proper Under 8 U.S.C. § 1103(a)(3)**

Assuming the Court reaches the issue, because 8 U.S.C. § 1103(a)(3) directs the Secretary to "perform such other acts as he deems necessary for carrying out his authority under" the statute, Defendants' policy of detention at NSGB, considered in the context of the statutory scheme described above, and amidst the execution of a removal order, is not contrary to law. "Where Congress has delegated general authority to carry out an enabling statute, an agency's exercise of that authority ordinarily must be "reasonably related to the purposes of the legislation."" *Washington All. of Tech. Workers*, 50 F.4th at 178 (quoting *Doe, 1 v. Fed. Election Comm'n*, 920 F.3d 866, 871 (D.C. Cir. 2019)). While simply pursing a statute's "general purposes" is not permissible "if the resulting interpretation is at odds with the statute's clear language, structure, and legislative history," an agency's exercise of authority is permissible so long as it is consistent with the "means [Congress] has deemed appropriate, and prescribed, for the pursuit of those purposes." *Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 383 F. Supp. 2d 123, 144 (D.D.C. 2005), *aff'd*, 466 F.3d 134 (D.C. Cir. 2006). And "so long as [the Secretary's] action is reasonably related to the duties imposed upon him" by statute, then the statute "need not specifically authorize each and every action." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979).

Here, the statute unambiguously provides DHS with detention authority over aliens with final orders of removal before and during their transport to any destination specified by the Secretary as a part of the removal process. 8 U.S.C. §§ 1103(a)(3), 1231(a), (d)(3). The statute does not otherwise dictate or limit the agency's discretion as to how it executes final orders of removal. *Colorado River Indian Tribes*, 383 F. Supp. 2d at 144 (asking whether agency is action is "at odds" with the statute); *cf. RAICES*, 174 F.4th at 105 (finding that the Executive may not

- 21 -

take actions that are "in conflict with the INA's express removal provisions").  And the record supports that the use of NSGB as a detention facility is reasonably related to the statutory mandates requiring execution of final orders of removal to final destination countries. *Narenji*, 617 F.2d at 747.  The MOU between DHS and DOW stipulates that only aliens with executable final orders of removal may be detained at NSGB, which differentiates it from other detention facilities that house aliens still in removal proceedings and evinces an intent to use the facility only amidst the execution of removal orders.  U-DOW-CAR-119 & DHS-000118-23; *see Enriquez-Perdomo v. Newman*, 54 F.4th 855, 863 (6th Cir. 2022) (interpreting plain language of "execute removal orders" to require a "existing and enforceable removal order[]").  And given that the Court already concluded that aliens at NSGB have been removed as a matter of law, *see* Mem. Op. at 43, Defendants are *necessarily* in the process of fully executing those aliens' removal orders to their final destination country.  Communications that describe NSGB as a facility for aliens "pending relocation," U-DOW-CAR-211; U-DOW-CAR-586, are not inconsistent with that, as these aliens are, in fact, pending relocation to their final destination. *Contra* SJ Mot. at 20.  Indeed, 137 of the 227 aliens at NSGB between June 4, 2025, and February 2, 2026, were transported directly from NSGB to their final destination countries.  Behr Decl. Exh. A ("May 22, 2026 NSGB  Chart").  In approximately 60 of those cases, transport to the final destination country occurred within ten days of arrival at NSGB.  *Id.*

Additionally, the overwhelming majority of aliens for whom data exists—89%, or 203 out of 227—were either accepted by their country of removal prior to their transfer to NSGB or did not need to be accepted prior to being removed to that country, which is very strong evidence that Defendants transfer aliens to NSGB amidst execution of their removal orders.  *See* Transcript of March 19, 2026 Discovery Conference, at 20 (Court stating that "[W]hether another country has

agreed to accept the individual for removal at the time of transfer to Guantanamo is probably the best indicator of whether the government is actually in the process of removing someone"). Specifically, DHS had travel documents for ten aliens, *see* Behr Decl. Exh. C ("June 25, 2026 NSGB Chart"), and DHS's receipt of a travel document for an alien "indicates that the country has accepted the alien." Behr Decl. Exh. D ("Schultz Decl") ¶ 5; *see* 8 C.F.R. § 241.15(b) ("For the purposes of [8 U.S.C. § 1231(b)], the Secretary retains discretion to determine the effect, if any, of acceptance or lack thereof, when an acceptance by a country is required, and *what constitutes sufficient acceptance*.") (emphasis added).

Moreover, 193 aliens reflected in the Discovery Responses are citizens of countries that participate in the Electronic Nationality Verification ("ENV") program and were being removed to their country of citizenship, which obviates the need for a travel document or any other form of advance acceptance by that country's government. Schultz Decl. ¶ 6; *see* 8 C.F.R. § 241.15(b); *see also* 8 C.F.R. § 214.15(c) ("The absence or lack of response from a de jure or functioning government . . . does not preclude the removal of an alien to a receiving country"). For those aliens, DHS provides "advanced notifications to the country through the ERO attaché, and citizenship is verified upon the alien's arrival." Schultz. Dec. ¶ 6. The fact that 85% of aliens brought to NSGB were being removed to ENV countries such that no advanced acceptance was required further highlights that the facility is primarily used for aliens with no impediments to the execution of their removal order. *See Zadvydas*, 533 U.S. at 699 (explaining that trouble "secur[ing] removal" to a particular country may extend an alien's detention). Despite emphasizing the importance of this information throughout litigation, *see e.g.*, ECF No. 93,

- 23 -

Plaintiffs' Summary Judgment Motion does not acknowledge that 89% of aliens were either accepted or did not need advanced acceptance at the time of their transfer to NSGB.[5] *See* SJ Mot.

Rather, Plaintiffs suggest that that the agency's authority under 8 U.S.C. § 1103(a)(3) in the removal context might be limited to instances of absolute necessity and no more than a matter of hours or days.   SJ Mot. at 21 ("[P]it-stops like refueling layovers or even the short, three-days-or-under stays at staging facilities in the United States"); *see also* Mem. Op. at 41.  But Plaintiffs so assume without meaningfully engaging with the applicable legal framework, which does not require narrow tailoring, but simply a "reasonable relationship." *Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 281 (1969).   This standard is not a straitjacket. *See Pugin v. Garland*, 599 U.S. 600, 607 (2023) (calling "relating to" a "broad phrase"); *see, e.g.*, *Doe*, *1,* 920 F.3d at 871 (acknowledging the fact that a regulation "requires more disclosure than the governing statute . . . is no reason for rejecting it"); *Cmty. for Creative Non Violence v. Kerrigan*, 865 F.2d 382, 387 (D.C. Cir. 1989) (upholding regulation that places 24-hour time limit on permits authorizing demonstrations because it "serves the Board's interest in maintaining day-to-day control over the Capitol Grounds, an interest that is reasonably related to the Board's statutory authority to regulate traffic").  And, as discussed, the Secretary is permitted to perform

---

[5] Plaintiffs are incorrect that Defendants "did not produce information about whether the final destination country had agreed to 'accept' noncitizens for removal at the time of their transfer" to NSGB.  SJ Mot. at 23 n.10.  Defendants' June 25, 2026 Chart reflects whether DHS possessed a "travel document" at the time of an alien's transfer or whether a travel document was not necessary because the alien was a citizen of and was being removed to an ENV country.  June 25, 2026 NSGB Chart.  Defendants also provided Plaintiffs with the Schultz Declaration, which explains how this information answers the question at issue.  Schultz. Decl. ¶ 5-6 (providing that "[t]he receipt of a travel document indicates that the country has accepted the alien" and no travel documents or advanced acceptances are required for ENV countries).  The fact that Plaintiffs chose to omit this information from their Statement of Material Facts Not in Genuine Dispute does not render Defendants' production unresponsive.  *Compare* Plaintiffs' Statement of Material Facts Not in Genuine Dispute ¶¶ 94-95, *with* Defendants' Response to Plaintiffs' Statement of Material Facts Not in Genuine Dispute ¶¶ 94-95.

any acts he "*deems* necessary," not simply those that are, by any objective measure, necessary. 8 U.S.C. § 1103(a)(3) (emphasis added); *see Webster*, 486 U.S. at 600. Therefore, Plaintiffs' arguments that some aliens did not have a pre-scheduled flight to their final destination country and spent more time at NSGB than the average stay at another staging facility are simply beside the point. *See* SJ Mot. at 21-23.

Nor does the fact that some individuals were transferred from NSGB to a different detention facility prior to ultimately reaching their final destination country mean that the government was not in the process of executing their final orders of removal. *Contra* SJ Mot. at 21. As a threshold matter, contrary to the Court's previous suggestion, *see* Mem. Op. at 42, these transfers back to the United States do not require the government to reinstate the final order or restart removal proceedings. Because it was the government that was unable to complete the execution of these aliens' final orders for one reason or another, their transfer back into detention facilities located within the continental United States simply results in "the restoration of the immigration status [they] had upon removal." *Nken v. Holder*, 556 U.S. 418, 435 (2009) (discussing outcome of alien's success on a petition for review after he had been lawfully removed). That is, they remain aliens with final, executable removal orders. *See Sanchez*, 604 F.3d at 359 (acknowledging removal occurs upon departure but explaining, "this is not to say . . . that there exists no set of facts under which an alien could legitimately reenter the United States after being escorted out").

For many of the aliens detained at NSGB during the execution of their removal orders, events outside of Defendants' control precipitated the transfers back to the United States. For example, in over 50 cases, inclement weather caused flight cancellations. *See* NSGB Chart. In four cases, transfer was due to medical events or developments in litigation that affected the

- 25 -

validity of the aliens' final orders. NSGB Chart; *see, e.g.*, *Vasilevskii v. Noem* (D.D.C.), No. 25-2173, ECF No. 26 at 4, 19 n.11; *see also id.*, ECF No. 46 (Order, Feb. 18, 2026) at 2-3 (noting that alien was issued expedited removal order before being transferred to NSGB). Plaintiffs do not meaningfully engage with these reasonable explanations for an alien's return to the United States except to continue to argue that the timing of these incidents was more than a mere "pit stop." SJ Mot. at 23 n.9. As discussed above, however, no such narrow tailoring is required. And critically, ensuring the flight safety of removal operations, the medical stability of aliens in custody, and complying with judicial orders are all reasonably related to the agency's obligations to detain aliens and enforce immigration laws. 8 U.S.C. § 1103(a)(3); *see also* DHS-000392-406. Finally, transfers of nine individuals due to the unavailability of commercial flights does not suggest that their removal order was not being executed, as removal operations do not only take place on commercial flights. U-DOW-CAR-131 (DOW approving military aviation support for removal operations). There may have been military transport planned that had to be diverted for any number of reasons, leaving a commercial flight as the best option to effectuate the removal. *Contra* SJ Mot. at 22. In short, Plaintiffs' disagreement with Defendants' response to operational realities that are part and parcel of the process of executing a final order of removal are insufficient to show that Defendants' actions were not reasonably related to their statutory authority and obligations.

### C.    The Presumption Against Extraterritoriality Does Not Apply and, In Any Event, is Plainly Rebutted

Courts apply the presumption against extraterritoriality "to discern whether an Act of Congress regulating conduct applies abroad" and to ascertain "what courts may do" to provide relief relating to such conduct. *Kiobel*, 569 U.S. at 116. The rationale for applying the presumption is to "guard[] against our courts triggering such serious foreign policy consequences, and instead

- 26 -

defers such decisions, quite appropriately, to the political branches." *Id.* at 124; *id*. at 116 ("The presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches."); *see also Doe v. Taliban*, 101 F.4th 1, 12 (D.C. Cir. 2024) (noting that "conducting foreign relations and making the sensitive diplomatic and national-security judgments" is a task for the political branches of government). It would therefore be counterintuitive and contravene the purpose of the presumption for it to be applied to a congressional grant of authority to the Executive. *See* Mem. Op. at 38 n.15. And §§ 1103(a)(3), 1231 are just that: an unambiguous grant of authority to the Secretary to detain removable aliens and execute their final orders of removal to specific countries. *See Arizona*, 567 U.S. at 396; *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (removal decisions "are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary"); *see also Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring in judgment) (recognizing the President's "broad power over the creation and administration of the immigration system").

While Plaintiffs generally assert that the presumption governs in all cases, they do so without acknowledging the purpose of the presumption or explaining how applying it here would further that purpose. SJ Mot at 23-24. To be sure, applying the presumption against extraterritoriality to a conferral of authority to the Executive in the name of deference toward the Executive would be to undo the deference that Congress baked into the statute itself. *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function."). *Sale v. Haitian Centers Council, Inc*. does not counsel otherwise. 509 U.S. 155 (1993). *Contra* SJ Mot. at 24. There, the presumption worked in concert with—not against—the conferral of authority to the

Executive Branch, as the Supreme Court upheld an Executive Order that construed the scope of statutory and treaty rights to have domestic application because that interpretation was consistent with the broad power that the statute provides to the Executive branch. 509 U.S. at 171-73 ("The 1981 and 1992 Executive Orders expressly relied on statutory provisions that confer authority on the President to suspend the entry of 'any class of aliens' or to 'impose on the entry of aliens any restrictions he may deem to be appropriate.'") (quoting 8 U.S.C. § 1182(f)). Unlike in *Sale*, applying the presumption here would undermine the purpose of the statute.

Even if the presumption against extraterritoriality may be applied in this context, it is plainly rebutted. The presumption is rooted in the general principle that "federal laws will be construed to have only domestic application" absent "clearly expressed congressional intent to the contrary." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016). But this is not a "clear statement rule." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010) (rejecting that contention). Rather, it is an invitation to use statutory language alongside context to reach "the most faithful reading of the text." *Id.*; *United States v. Delgado-Garcia*, 374 F.3d 1337, 1344 (D.C. Cir. 2004) ("Contextual reasons . . . supply the 'affirmative evidence' the Supreme Court requires to overcome the presumption."). Section 1231 is—by its express terms and its context— "international in focus" and "has many extraterritorial applications," given that it directs aliens who entered or remained in the United States in violation of law to be removed to specific countries; contemplates interactions, agreements, and communications between the Secretary and those countries' foreign governments; and requires transportation custodians to physically take aliens to those countries. *Delgado-Garcia*, 374 F.3d at 1345 & 1347-48; *id.* at 1345 ("It is natural to expect that a statute that protects the borders of the United States, unlike ordinary domestic statutes, would reach those outside the borders."); *see* 8 U.S.C. § 1231(b)(2)(C)-(D), (d)(3), (f)(1).

Unlike in *Sale* where the statute in question governed deportation proceedings—which the INA "obviously contemplate[s]" as domestic, *Sale*, 509 U.S. at 173—here, the Secretary is expressly granted authority to communicate with foreign countries' governments and then execute aliens' final orders of removal to those countries by physically transporting them there.   8 U.S.C. § 1231(b)(2)(C)-(D), (d)(3), (f)(1); *see also Las Americas v. Noem*, No. 1:25-cv-418 (CJN) (D.D.C. Mar. 14, 2025), ECF No. 28-4, Transcript of March 14, 2025 TRO Hrg., at 24 (Plaintiffs conceding "[o]bviously the removal statutes apply extraterritorially.  That's inherent.").

The Supreme Court's explanation for finding the presumption unrebutted in the context of §§ 1158(a)(1), 1225(a)(1), and (a)(3) of the INA only underscores that it is rebutted here. *Mullin v. Al Otro Lado*, --- U.S. ---, No. 25-5, 2026 WL 1825741, at *9-10 (U.S. June 25, 2026). There, the Court used the presumption to determine whether "the phrase 'arrives in the United States' gives extraterritorial reach to the provisions in which that phrase appears.'" *Id.* at *9.  In finding that it did not, the Court explained that "[n]othing in the text of § 1158(a)(1) or §§ 1225(a)(1) and (a)(3) manifests an unmistakable congressional intent to require that aliens be inspected and allowed to apply for asylum while they are still outside the United States." *Id.* at *10.  This conclusion is unsurprising given that the statutory language is neither international in focus nor has any clear foreign applications but instead merely "link[s] inspection and the asylum process to what occurs on the U.S. side of the border." *Id.*; *see* 8 U.S.C. §§ 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum in accordance with this section."), 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."), 1225(a)(3) ("All aliens (including alien crewmen) who are applicants for admission or otherwise seeking

admission or readmission to or transit through the United States shall be inspected by immigration officers."). The Court additionally emphasized that the application of the presumption only reinforced the same conclusion about the statute reached under both the textual and contextual canons of construction. *Id.* at *3. By contrast, the text and context of § 1231(b) make clear that when the government executes a final order of removal, the process ends only once the Secretary removes the alien "to" his particular final destination country, which shows "an unmistakable congressional intent" to permit detention of aliens to continue until that process is complete. *Al Otro Lado*, 2026 WL 1825741, at *9-10. In sum, because the best reading of 8 U.S.C. §§ 1231 and 1103(a)(3) extends the Secretary's detention authority until final orders of removal have been executed such that aliens have reached their final destination countries and the presumption against extraterritoriality does not apply to these statutes, Defendants' detention policy at NSGB is not contrary to law.

## III.   THE DETENTION OF ALIENS AT NSGB IS NOT ARBITRARY AND CAPRICIOUS

The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Review under this standard is "deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*; *Env't Def. Fund Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (describing the arbitrary-and-capricious standard as "highly deferential" and one that "presumes the agency's action to be valid"). Instead, a reviewing court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus*

*Radio Project*, 592 U.S. at 423; *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

The detention policy Plaintiffs challenge here is both reasonable and reasonably explained as part of the Administration's larger effort to increase immigration enforcement and protect the territorial integrity of the United States. U-DOW-CAR-001-33, U-DOW-CAR-119, U-DOW-CAR-121, U-DOW-CAR-127, U-DOW-CAR-585, U-DOW-CAR-658-61, DHS-000079-88, DHS-000114, DHS-000116, DHS-000118, DHS-000124; *see Conserve Sw. Utah v. United States Dep't of the Interior*, 822 F. Supp. 3d 52, 69 (D.D.C. 2026) ("An agency is not required to explain its conclusions with crystalline clarity; rather, the APA requires only that the reviewing court be able "reasonably [to] discern[]" the "agency's path.") (quoting *Alaska Dep't of Env't Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004)). Specifically, a January 2025 Presidential Memorandum directs the agencies to utilize NSGB so as to: (1) "provide additional detention space for high-priority criminal aliens unlawfully present in the United States"; (2) "address attendant immigration enforcement needs identified by the Department of [War] and the Department of Homeland Security"; and (3) "halt the border invasions, dismantle criminal cartels, and restore national sovereignty." U-DOW-CAR-119; DHS-000124. In the days and weeks immediately following the Presidential Memorandum, and consistent with its purpose and directives, DOW issued a series of internal communications setting out extensive initial plans for the expansion of NSGB's capacity to hold illegal aliens. *See* U-DOW-CAR-176-212, U-DOW-CAR-585-99, U-DOW-CAR-646-61. And, in a February 28, 2025 Request for Assistance, DHS sought from DOW "[t]ransportation capabilities for supplies, equipment, and personnel directly supporting alien detention and removal

operations . . . specifically for the purpose of providing support to operations at NSGB." DHS-000114. DHS explained its "[o]verarching [g]oal" as "seek[ing] to expeditiously execute Presidential guidance to protect the American people against invasion, foreign terrorists and other national security and public safety threats." *Id*.; *see Quantum Ent. Ltd. v. United States Dep't of the Interior, Bureau of Indian Affs.*, 597 F. Supp. 2d 146, 152 (D.D.C. 2009) ("Nothing more than a 'brief statement' is necessary [under the APA], as long as the agency explains 'why it chose to do what it did.'").

Given the Presidential Memorandum, and in light of additional relevant Executive Orders relating to the need to secure the country's borders and the military's role in that effort, *see* DHS-000079-88, as well as the designation of multiple international criminal cartels as foreign terrorist organizations, *see* DHS-000557-59, Defendants engaged in a joint planning process related to the detention of aliens with final removal orders at NSGB. The record demonstrates that, throughout the planning process, Defendants considered, among other things, the types of aliens who should be detained at NSGB,[6] how to transport them to NSGB,[7] and how to provide

---

[6] *See* DHS-000092 (February 9, 2025 document establishing "GTMO Bound Flight Coordination Process," describing the custody levels of aliens who would be moved to NSGB, to include both "high custody/medium-high custody" including "detainees with a history of violent or assault charges, convictions, institutional misconduct, or those with a gang affiliation," as well as "medium-low/low custody" including "detainees with criminal histories and non-violent felony charges and convictions"); DHS-000093 (same, describing "Critical Considerations (as of 02/09/2025) . . . that must be considered due to their operational significance"), DHS-000104-05 (February 12, 2025 DHS memorandum, considering the needs of certain aliens who "may be at increased risk for medical complications on flights to [NSGB] and may exceed the medical capacity at NSGB" such that "they should not be transported to NSGB nor transported to a collection point intended for transfer to NSGB").

[7] *See* DHS-000091 (February 9, 2025 document establishing "GTMO Bound Flight Coordination Process").

needed services to detainees throughout their stay at NSGB.[8]  The record further confirms that this planning process drew on, among other things, past lessons learned from prior joint missions involving NSGB, *see* U-DOW-CAR-289-338, DHS-000508-56; guidance regarding the military's role in civilian law enforcement, *see* U-DOW-CAR-043-115; existing agency resources, *see* U-DOW-CAR 127, DHS-000088; existing ICE detention authority for aliens with final orders of removal, *see* U-DOW-CAR-572-82, U-DOW-CAR-600-29; existing standards and services for immigration detainees, *see* U-DOW-CAR-214-88, U-DOW-CAR-339-571; existing ICE detention and custody review standards, *see* DHS-000127-506; existing military support to immigration enforcement at the southern border of the United States, *see* U-DOW-CAR-001-33, U-DOW-CAR-034-37; and existing policies for passengers traveling on DOW aircraft, *see* DHS-000001-78.  Following the initial planning process, on March 7, 2025, DHS and DOW entered into an MOU, which confirms the basis for the Guantanamo detention policy, provides additional context showing Defendants' consideration of relevant factors and coordinated efforts to execute the President's initial directive, and underscores the overall reasonableness of the challenged detention policy.  *See* U-DOW-CAR-121-26; DHS-00118-23.

Plaintiffs' arguments to the contrary are unconvincing and largely untethered to the administrative record.  To begin, Plaintiffs insist that Defendants failed to acknowledge their

---

[8]  *See* DHS-000088-89 (February 3, 2025 e-mail from DHS to DOW requesting assistance "to augment existing ICE resources categorized into four broad categories" and discussing the need to expand existing facilities at NSGB, including the MOC and Camp-VI); DHS-000092 (considering NSGB's "ability to receive and ensure wrap-around services for the incoming detainees, including quantity of beds available for high/medium-high and medium-low/low custody level" and establishing agency points of contact); DHS-000096 (February 2025 document establishing "Guantanamo Bay Clinical Operating Standards" and recognizing the need to adapt existing detention standards for detainees' medical care "to account for the unique operational environment at NSGB"); U-DOW-CAR-127-28 & DHS-00016-17 (March 7, 2025 memorandum from DOW to DHS); U-DOW-CAR-630-45 (February 20, 2025 letter from counsel seeking access to immigration detainees at Guantanamo).

allegedly "unprecedented departure from the longstanding practice of not detaining noncitizens who are apprehended in the United States at Guantanamo or at any detention facility outside the United States." SJ Mot. at 27. Certainly, because agencies must explain their actions, they may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, however, Plaintiffs point to no evidence that the agencies departed from any established policy or disregarded any existing rule. SJ Mot. at 26-27.

In fact, despite that review of an arbitrary-and-capricious claim must be based on the administrative record, Plaintiffs do not engage with the evidence in the record or support this portion of their argument with any evidentiary citation at all. *Id.*; *see Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013) (observing that the court must decide, as a matter of law, "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review"). And the record here confirms the Secretary of Homeland Security's longstanding authority to "maintain custody" of certain aliens "at any location he deems appropriate," including "Guantanamo Bay Naval Base or any other appropriate location." U-DOW-CAR-116 (Executive Order No. 13276); *see* 8 U.S.C. §§ 1103(a)(3) (conferring authority to lawfully maintain custody over aliens amidst the execution of their removal orders). The decision to utilize NSGB for an immigration-related purpose initially included "undocumented aliens" who the Secretary "ha[d] reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region." U-DOW-CAR-116; *see* U-DOW-CAR-289-338 & DHS-00511-17 (describing Operation Sea Signal in the mid-1990's). Rather than markedly departing from that initial policy, Defendants' use of NSGB shifted in degree to include certain final-order aliens in DHS custody. Specifically, the President

- 34 -

instructed the agencies to "*expand* the Migrant Operations Center at Naval Station Guantanamo Bay . . . to provide *additional* detention space for high-priority criminal aliens unlawfully present in the United States[.]"    U-DOW-CAR-119 & DHS-000124 (emphasis added); *see* U-DOW-CAR-121 ¶¶ 1-2 & DHS-000118 ¶¶ 1-2.  Thus, although it is not entirely incorrect to view the inclusion of NSGB in the available detention facilities used for aliens with final orders of removal as a change in agency practice, Plaintiffs overreach by characterizing it as an unacknowledged course reversal by Defendants.  SJ Mot. at 26-27.

With their broad disagreement about the need for detention space at NSGB, along with their complaints about the costs and logistics of detention at NSGB, Plaintiffs simply seek to substitute their policy preferences for the agency's detention decisionmaking.  SJ Mot. at 27-33. This is not the function of deferential APA review, however.  *See Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 370 (D.D.C. 2018) ("[D]isagreement is not a sufficient basis for this Court to overturn an agency decision under the APA.").  Plaintiffs center their arguments on a variety of extra-record materials, which they claim the Court can review because "the agencies failed to consider a significant relevant factor:  available detention capacity in the United States."  SJ Mot. at 29; *see id*. at 30-33.  But it is well settled that "[t]he Court should focus its review on the administrative record," *Brodie v. United States Dep't of Health and Hum. Servs.*, 796 F. Supp. 2d 145, 150 (D.D.C. 2011), and consider only "the materials that were before the agency at the time its decision was made," *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997); *see, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ( "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  And Plaintiffs offer no principled basis for going outside the administrative record in this

- 35 -

case. SJ Mot. at 28-33 (relying, starting on p. 32, on what Plaintiffs describe as "[e]vidence from the public record"). Indeed, it is not clear how the available detention capacity in the United States is an especially relevant factor to the agencies' decisionmaking here given the President's relatively straightforward instruction simply "to provide *additional* detention space for high-priority criminal aliens." U-DOW-CAR-119 & DHS-000124 (emphasis added).

Plaintiffs go on to articulate Defendants' alleged justifications for the Guantanamo detention policy solely based on the arguments in Defendants' Motion to Dismiss, which was filed prior to the production of the administrative record. SJ Mot. at 28; Defs' Mot. to Dismiss, ECF No. 29 (Aug. 4, 2025); *see I.N.S. v. Phinpathya*, 464 U.S. 183, 188-89 n.6 (1984) (statements of counsel in a brief are not evidence). Having set up their strawman, Plaintiffs proceed to knock him down by asserting that "the record contains no indication that Defendants even considered available options in the United States before they started detaining individuals at Guantanamo" and that there is "no evidence supporting the supposed benefits of using Guantanamo as a staging ground." SJ Mot. at 28. But the record does contain evidence, as described above, reflecting the President's directive to expand the use of NSGB as part of the Administration's larger effort to increase civil immigration enforcement and protect the territorial integrity of the United States. *See* U-DOW-CAR-001-33, U-DOW-CAR-119, U-DOW-CAR-121, U-DOW-CAR-127, U-DOW-CAR-176, U-DOW-CAR-192-93, U-DOW-CAR-585, U-DOW-CAR-647, DHS-000079-88, DHS-000114, DHS-000116, DHS-000118, DHS-000124. *Contra* SJ Mot. at 28. The record also makes clear that the agencies—which were by no means writing on a completely blank slate—sufficiently accounted for the costs and logistics associated with the Guantanamo detention policy, *contra* SJ Mot. at 29-33, understood the complexities inherent in executing the President's initial directive, and

considered how to leverage existing processes and assets to try to maximize efficiencies over time, especially in light of NSGB's unique location. *See* DHS-000093 (listing "critical considerations . . . that must be considered due to their operational significance"), DHS-000115 (DHS Request for Assistance explaining that it "will consolidate requirements to maximize transportation efficiency and will use preexisting air missions to the maximum extent possible"); *see also* U-DOW-CAR-001-37, U-DOW-CAR-127, U-DOW-CAR-659-61, DHS-000001-78, DHS-000088, DHS-000096-103.

Finally, the Guantanamo detention policy is not contrary to the text of the Presidential Memorandum as Plaintiffs suggest. SJ Mot. at 34. First, Plaintiffs state, incorrectly, that the Presidential Memorandum instructed Defendants to "limit[] detention at Guantanamo to 'high threat' individuals." SJ Mot. at 34; *compare* U-DOW-CAR-119 & DHS-000124. In this regard, Plaintiffs appear to assume that the "high-priority criminal aliens" who *were* mentioned in the Presidential Memorandum as eligible for detention at NSGB meant to preclude aliens who, by virtue of the non-violent nature of their criminal histories, their good behavior while detained, and their lack of gang affiliation, are eligible for lower-level custody restrictions. SJ Mot. at 34; *compare* DHS-000092. Second, Plaintiffs wrongly assume that Defendants' authority to hold immigration detainees at NSGB derives exclusively from the President's Memorandum and that the Memorandum somehow limits the Secretary's detention authority only to the MOC itself. SJ Mot. at 34. Instead, as discussed above, the Secretary's detention authority is statutory, and the Presidential Memorandum does not purport to cabin that authority in any way; it merely directs the use of NSGB to detain criminal aliens who are unlawfully present in the United States along with the expansion of the MOC. *See* U-DOW-CAR-119, DHS-000124. Indeed, the Memorandum broadly allows for "the Secretary of Defense and the Secretary of Homeland Security . . . to address

attendant immigration enforcement needs identified by the Department of [War] and the Department of Homeland Security."  U-DOW-CAR-119, DHS-000124.  And it is precisely because the agency action here consisted of "independent decisionmaking that fleshed out a presidential directive" that it is reviewable at all.  *Chamber of Com. of United States v. U.S. Dep't of Homeland Sec.*, 815 F. Supp. 3d 73, 109 (D.D.C. 2025) (cleaned up).  Third, and in any event, the Presidential Memorandum itself makes clear that it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."  U-DOW-CAR-119, DHS-000124.

On the whole, Plaintiffs' challenges to the Guantanamo detention policy reflect their obvious disagreement with that policy.  But their arguments, largely based on materials outside the administrative record, do not support the conclusion that the challenged detention policy is arbitrary and capricious.  *See, e.g.*, *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) ("While [an agency's] conclusion may be debatable as a policy matter, mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful.") (citing *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004)).

## IV.    8 U.S.C. § 1252(f)(1) DOES NOT PERMIT WHAT AMOUNTS TO A CLASS-WIDE RESTRAINT ON DETENTION OPERATIONS

Plaintiffs ask the Court to impose a sweeping remedy and "**VACATE**[] Defendants' policy of transferring noncitizens from the United States and detaining them at Guantanamo" Bay, Cuba.  Plaintiffs' [Proposed] Order Granting Plaintiffs-Petitioners' Motion for Partial Summary Judgment, ECF 108-1 (emphasis in original); *see* Compl. ¶ 76-80.  Plaintiffs seek to apply this relief to a class of aliens that this Court certified under Rule 23(b)(2), Compl. ¶ 61;

- 38 -

ECF Nos. 51-52, which is appropriate only when Defendants' actions "apply generally" such that the Court can impose "final injunctive relief . . . respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Worse yet, Plaintiffs request what amounts to injunctive relief in the face of 8 U.S.C. § 1252(f)(1), which states that "no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provision of part IV of this subchapter . . ." (emphasis added).

In an apparent effort to avoid the limitations imposed by § 1252(f)(1) on providing injunctive relief to more than one individual alien, Plaintiffs seek declaratory relief followed by vacatur. *See* SJ Mot. at 35-37. Indeed, the Supreme Court has confirmed that the statute strips the district courts of jurisdiction to impose "injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 548-50. The only exception to the general prohibition against class-wide injunctive or restraint-style relief comes straight from the statute itself and allows for such remedies only with respect to "individual alien[s]." *Id.* at 550-51 (citing *AADC*, 525 U.S. at 481–82; *Jennings v. Rodriguez*, 583 U.S. 281, 312-13 (2018) (remaining citation omitted)). In *Dixon*, the D.C. Circuit adhered to the interpretation set forth in *Aleman Gonzalez* and explained how that decision abrogated its prior caselaw narrowly interpreting § 1252(f)(1). 141 F.4th at 289. Specifically, the *Dixon* court rejected an injunction that "prevent[ed] the Marshals from arresting and detaining any criminal defendant in the D.C. Superior Court for a suspected civil immigration violation" as falling within § 1252(f)(1) because detention is an activity authorized under the covered portion of the INA. 141 F.4th at 289.

In a recent shift, however, both the D.C. Circuit and this Court have embraced restraining, if not outright enjoining, the actions of the Executive as relief in class action lawsuits under the

- 39 -

guise of vacatur.  In *Miot v. Trump*, 818 F. Supp. 3d 126 (D.D.C. 2026), *reversed on other grounds*, *Mullin v. Doe*, --- U.S. ---, Nos. 25-1083 & 25-1084, 2026 WL 1825480, at *13 (U.S. June 25, 2026), this Court encountered an action by five aliens challenging the termination of Temporary Protective Status ("TPS").  The Court distinguished *Dixon* on the ground that the relief did not target the TPS statute's "operation" and the plaintiffs were not asking the Court to "impose limitations that the . . . statute itself does not contain."  *Miot*, 818 F. Supp. 3d at 155 (citing *Aleman Gonzalez*, 596 U.S. at 551).  Going further, *Miot* held that APA vacatur, apparently regardless of its actual impact, stands apart from the injunctive and restraint relief rejected in *Aleman Gonzalez*.  *Id*. (citing *Aleman Gonzalez*, 596 U.S. at 571 (Sotomayor, J., concurring and dissenting in part)).  Supporting this proposition, the *Miot* court looked to the Fifth Circuit's decision in *Texas v. United States*, which in turn relied on what the Fifth Circuit viewed as narrowing language from the Supreme Court in *Aleman Gonzalez* and cast vacatur as doing "nothing but re-establishing the status quo" and "neither compel[ing] nor restrain[ing] further agency decision making."  *Miot*, 818 F. Supp. 3d at 155 (citing *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022), *rev'd*, *United States v. Texas*, 599 U.S. 670 (2023)).

Along similar lines, the D.C. Circuit also sees vacatur as equating to neither an injunction nor a restraint running afoul of § 1252(f)(1).  In *RAICES*, 174 F.4th 81 (D.C. Cir. 2026), the court concluded that the lower court had the authority to vacate what the *RAICES* court determined was an unlawful Proclamation and Guidance issued by the President.  The *RAICES* court explained that an injunction "'directs the conduct of a party, and does so with the backing of its full coercive powers.'"  *Id*. at 119 (quoting *Nken*, 556 U.S. at 428).  But vacatur, according to *RAICES*, "simply 'h[olds] unlawful and set[s] aside' the action."  *Id*. (quoting 5 U.S.C. § 706(2)).

- 40 -

Quite recently, the D.C. Circuit addressed a case where an immigrant services organization, on behalf of its membership, and two individuals challenged the DHS Secretary's expansion of aliens eligible for expedited removal under 8 U.S.C. § 1225(b)(1). *Make the Rd. New York, et al. v. Mullin, et al.*, No. 25-5320, --- F.4th ---, 2026 WL 1792978 *1 (D.C. Cir. June 23, 2026). Although ultimately finding that the Secretary acted in conformity with the law, the *Make the Road* court nevertheless determined that this Court properly exercised its authority under the § 705(b) of the APA when it issued a stay of the Secretary's pronouncement. Once again looking to *Aleman Gonzalez*, the *Make the Road* court drew a line between stays, which do not entail "a judicial command that coerces a party's behavior," and injunctions, which are backed by the Court's coercive powers. *Id*. at *11. The D.C. Circuit also leaned heavily on holdings that § 1252(f)(1) does not stand as a bar to declaratory relief, *see Nielsen v. Preap*, 586 U.S. 392, 402 (2019), and reasoned that the statute does not "bar remedies that might restrict government action in a functional sense; it restricts court from issuing only those remedies that are formally coercive." *Make the Rd. New York*, 2026 WL 1792978, at *11.

This case stands apart from the situations encountered in *Miot*, *RAICES*, and *Make the Road* because the vacatur sought by Plaintiffs is not confined to a discrete action the Court would need to find unlawful when measured against a given statutory authority. Instead, Plaintiffs seek to restrain a host of Defendants' actions across a Presidential Memorandum, a group of Executive Orders and a series of statutory provisions that govern the larger, overarching removal process. As explained in greater detail above, *see supra* II.A, there is no doubt that Plaintiffs and all class members are subject to final and fully executable removal orders. Nor is there any dispute that the removals at issue are to be carried out by the government. *See RAICES*, 174 F.4th at 104. This necessitates Defendants taking affirmative steps to effectuate aliens' removals, which entails

- 41 -

maintaining custody over them pursuant to statutory obligations and authorizations exceeding the overly narrow question as framed by Plaintiffs' complaint.

Particularly, Defendants must effectuate removals in accordance with 8 U.S.C. §§ 1103(a)(3), 1231(b)(1), (b)(2), (b)(3), (d)(3), (g), (f)(1), all of which—by their plain language and when read in concert—confirm that detention authority extends past the moment of removal until the order is fully executed. *See supra* II.A. In light of the requirement that statutes are to be read to "work in harmony," *see Epic Sys. Corp.*, 584 U.S. at 521, this Court cannot myopically focus on § 1231(g) and issue a vacatur order that amounts to a restraint on Defendants' operations across the larger statutory scheme. *See Aleman Gonzalez*, 596 U.S. at 551; *see also* Black's Law Dictionary 529 (6th ed. 1990) ("[e]njoin" means to "require," "command," or "positively direct" (emphasis omitted)); *id*. at 1314 ("[r]estrain" means to "limit" or "put compulsion upon" (emphasis omitted)). Indeed, for this Court to set aside Defendants' NSGB detention policy, it would have to derive some principled limit for the exercise of custodial authority abroad that is not found in the INA or its regulations—or else order the "wholesale vacatur" of the government's execution of final orders of removal. *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring); *cf. Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) ("[I]t is long since settled that a reviewing court is generally not free to impose additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel.") (citation omitted). As Justice Gorsuch noted, had Congress intended the APA to "'overthrow the practice of case-by-case judgments with respect to the parties in each case' and vest courts with a 'new and far-reaching' remedial power, it surely chose an obscure way to do it." *Id*. (quoting *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C. J., concurring)).

Critically, § 1252(f)'s remedial bar is not limited to the covered provisions "as properly interpreted."    *Aleman Gonzalez*, 596 U.S. at 550.    In *Aleman Gonzalez*, the Supreme Court explained that injunctions requiring the government to provide bond hearings for aliens detained under 8 U.S.C. § 1231(a)(6) "'enjoin or restrain the operation' of § 1231(a)(6) because they require officials to take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by § 1231(a)(6)." *Id*. at 551.    Because "[t]hose injunctions . . . interfere[d] with the Government's efforts to operate §1231(a)(6)" in its chosen manner, the Court concluded that the restrictions were barred by § 1252(f)(1).    *Id*.    Just so here.    Defendants interpret the provisions of §§ 1103(a)(3) and 1231 to authorize detention until a removal order is fully executed.    Even if this Court were to ultimately find this interpretation to be erroneous, § 1252(f)(1) bars the Court from enjoining Defendants' operation of the statute on a class wide basis.    *Dixon*, 141 F.4th at 289 (noting that because § 1252(f)(1) is not "contingent upon the merits of the claim . . . [it] has the same force even when the National Government allegedly enforces the relevant statutes unlawfully").    And contrary to Plaintiffs' contention, *see* SJ Mot. at 35-36, it is precisely the proper application of §§ 1103(a)(3), 1231, which is at issue here.    *See supra* II.A-B.

Plaintiffs have insisted on bringing a class action lawsuit, consistently focused on § 1231(g), and then sought a far-reaching remedy prohibited by statute.    *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").    As the Supreme Court noted in *Biden v. Texas*, § 1252(f)(1) has limited reach in that it "withdraws a district court's 'jurisdiction or authority' to grant a particular form of relief.    597 U.S. 785, 798 (2022).    In charting their course, Plaintiffs have painted themselves into a corner and

impermissibly insist that the Court issue class-wide relief without weighing the real-world consequences of the vacatur sought, because do so would uncover the serious restraints imposed on Defendants' effort to bring about lawful removals consistent with their statutory authority. As in *Aleman Gonzalez*, Plaintiffs in this case intreat the Court to issue an order wading directly into § 1252(f)(1)'s sphere of prohibition, and thus, vacatur of the Guantanamo Bay detention policy is forbidden by statute.

**CONCLUSION**

Because Defendants' policy of detaining aliens at NSGB during the execution of their removal orders is unreviewable, the Court should dismiss this action. In the alternative, the Court should grant Defendants' Motion for Partial Summary Judgment and deny Plaintiffs' Motion for Partial Summary Judgment because Defendants' policy is neither contrary to law nor arbitrary and capricious.

Dated: July 7, 2026                        Respectfully submitted,


BRETT A. SHUMATE                           LESLIE McKAY
*Assistant Attorney General*               *Assistant Director*

DREW C. ENSIGN                             RUSSEL J.E. VERBY
*Deputy Assistant Attorney General*        *Senior Litigation Counsel*

ANTHONY NICASTRO                           ALEXA PERLMUTTER
*Director*                                 JASON K. ZUBATA
                                           *Trial Attorneys*

AUGUST E. FLENTJE
*Deputy Director*

                                   By: /s/ *Ian S. Lam*
                                     IAN S. LAM
                                     *Trial Attorney*
                                     U.S. Department of Justice, Civil Division
                                     Office of Immigration Litigation
                                     P.O. Box 878, Ben Franklin Station
                                     Washington, DC 20044
                                     Tel: (202) 307-6329
                                     Email: ian.s.lam@usdoj.gov

                                     *Counsel for Defendants*

- 45 -

**CERTIFICATE OF SERVICE**

I certify that on July 7, 2026, I electronically filed the foregoing Motion for Defendants with the Clerk of Court for the United States District Court of the District of Columbia using the CM/ECF system. I also certify that Plaintiffs will be served through their counsel, who are registered CM/ECF users, via the CM/ECF system.

By: /s/ *Ian S. Lam*
IAN S. LAM
*Trial Attorney*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-6329
Email: ian.s.lam@usdoj.gov