**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| YAMIL LUNA GUTIERREZ, *et al.*,<br><br>*Plaintiffs-Petitioners*, *on behalf of themselves and all others similarly situated,*<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security, in his official capacity, *et al.*,<br><br>*Defendants-Respondents*. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:25-cv-01766-SLS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**OPPOSITION TO DEFENDANTS-RESPONDENTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS-PETITIONERS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION..............................................................................................................1

ARGUMENT.....................................................................................................................3

    I.  The Court Has Jurisdiction Over Plaintiffs' Claims...............................................3

        A.   Section 1252(g) Does Not Apply.......................................................................3

        B.   Section 1252(a)(2)(B)(ii) Does Not Preclude Review........................................4

    II. Detention at Guantánamo Is Contrary to Law and In Excess of Statutory Authority............6

        A.   Section 1231 Does Not Authorize Detention at Guantánamo...........................6

        B.   The Record Confirms That Defendants Are Not Sending Detainees to Guantánamo to Execute Their Removal Orders...........................................9

        C.   The Presumption Against Extraterritoriality Applies......................................13

    III. The Policy is Arbitrary and Capricious in Violation of the APA........................16

    IV. The Court Should Grant Classwide Declaratory Relief and Vacatur.................21

CONCLUSION ...............................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l Inc.*,
   600 U.S. 412 (2023) ............................................................................................ 15

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
   215 F.3d 61 (D.C. Cir. 2000) ............................................................................... 20

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
   779 F. Supp. 3d 584 (D. Md. 2025) ..................................................................... 17

*Bonilla Alvarez v. Noem*,
   No. 1:25-cv-03136-AHA (D.D.C. Sept. 28, 2025), ECF No. 12 ........................... 11

*Burke v. Gould*,
   286 F.3d 513 (D.C. Cir. 2002) ............................................................................... 6

*D.A.M. v. Barr*,
   474 F. Supp. 3d 45 (D.D.C. 2020) ...................................................................... 3, 4

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ............................................................................................... 3, 17

*Fred Meyer Stores, Inc. v. NLRB*,
   865 F.3d 630 (D.C. Cir. 2017) ............................................................................. 20

*Gupta v. McGahey*,
   709 F.3d 1062 (11th Cir. 2013) ............................................................................. 4

*Immigr. Advocs. Response Collaborative v. United States*,
   No. 1:25-CV-2279 (TNM), 2026 WL 746923 (D.D.C. Mar. 17, 2026) ................. 4

*J.G.G. v. Trump*,
   147 F.4th 1044 (D.C. Cir. 2025) ............................................................................ 9

*J.G.G. v. Trump*,
   No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) .................................... 4

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ............................................................................................... 5

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) .............................................................................................. 14

*Kucana v. Holder,*
    558 U.S. 233 (2010)...................................................................................................... 4, 5

*Make the Rd. New York v. Wolf,*
    962 F.3d 612 (D.C. Cir. 2020) ........................................................................................ 21

*Morrison v. Nat'l Australia Bank Ltd.,*
    561 U.S. 247 (2010)................................................................................................... 14, 15

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)........................................................................................................... 18

*Mullin v. Al Otro Lado,*
    609 U.S. ----, 2026 WL 1825741 (June 25, 2026).................................................... 15

*Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.,*
    573 F. Supp. 3d 294 (D.D.C. 2021) .................................................................... 2, 19, 20

*Pharm. Rsch. & Manufacturers of Am. v. U.S. Dep't of Health & Hum. Servs.,*
    43 F. Supp. 3d 28 (D.D.C. 2014) .................................................................................... 20

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) .................................................................................. 18

*Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Mullin,*
    174 F.4th 81 (D.C. Cir. 2026)................................................................................. 1, 21, 22

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999)....................................................................................................... 3, 4

*RJR Nabisco Inc. v. Eur. Cmny.,*
    579 U.S. 325 (2016)................................................................................................... 14, 15

*Sadhavani v. Chertoff,*
    460 F. Supp. 2d 114 (D.D.C. 2006) .................................................................................. 4

*Sale v. Haitian Centers Council, Inc.,*
    509 U.S. 155 (1993)......................................................................................................... 15

*Smith Prop. Holdings, 4411 Connecticut LLC v. United States,*
    311 F. Supp. 2d 69 (D.D.C. 2004) ..................................................................................... 6

*Smith v. United States,*
    507 U.S. 197 (1993)......................................................................................................... 14

*Spirit Airlines, Inc. v. United States Dep't of Transportation & Fed. Aviation Admin.*,
  997 F.3d 1247 (D.C. Cir. 2021) ................................................................................ 19

*TikTok Inc. v. Trump*,
  507 F. Supp. 3d 92 (D.D.C. 2020) ............................................................................ 21

*United States v. Delgado-Garcia*,
  374 F.3d 1337 (D.C. Cir. 2004) .......................................................................... 14, 15

*United Student Aid Funds, Inc. v. Devos*,
  237 F. Supp. 3d 1 (D.D.C. 2017) .............................................................................. 19

*Wash. Alliance of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
  50 F.4th 164 (D.C. Cir. 2022) ..................................................................................... 9

*Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) .......................................................................... 16, 17, 18

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986) ............................................................................. 18, 19

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ............................................................................................... 5, 8

## STATUTES

5 U.S.C. § 706 ............................................................................................................. 21

8 U.S.C. § 1101(g) .................................................................................................... 6, 8

8 U.S.C. § 1103(a)(3) ........................................................................................... *passim*

8 U.S.C. § 1231 ............................................................................................................. 8

8 U.S.C. § 1231(a)(6) .................................................................................................... 8

8 U.S.C. § 1231(b) ...................................................................................................... 16

8 U.S.C. § 1252(a)(2)(B)(ii) ................................................................................... 3, 4, 5

8 U.S.C. § 1231(d)(3) .................................................................................................... 7

8 U.S.C. § 1231(g) ................................................................................................. *passim*

8 U.S.C. § 1252 ............................................................................................................. 1

8 U.S.C. § 1252(f)(1) ............................................................................................... 1, 21

8 U.S.C. § 1252(g) ................................................................................................................. 3, 4

**OTHER AUTHORITIES**

Charles R. Davis, *Exclusive: ICE Eyes 1,000-Bed Detention Facilities in Foreign Countries*, The
Redoubt (July 13, 2026)........................................................................................................ 7

U.S. Government Accountability Office, *Southern Border Security: DOD Used Multiple
Strategies to Fund Operations* (July 2026)............................................................................ 20

**RULES**

Federal Rule of Civil Procedure 56(c) .............................................................................................. 6

Local Rule 7(h)(1).............................................................................................................................. 6

v

**INTRODUCTION**

In early 2025, Defendants took the extraordinary step of transferring civil immigration detainees from the United States to the military base at Guantánamo Bay, Cuba ("Guantánamo")—an unprecedented action designed to send a message of terror and deterrence to immigrants throughout the country and world. Since then, hundreds of noncitizens have been unlawfully detained at Guantánamo for weeks or months in service of an operation that has wasted tens of millions of taxpayer dollars. Defendants do not even dispute what the record and public reporting reflect as to official statements about detention at Guantánamo and its costs. As Plaintiffs explained, Defendants' Guantánamo detention policy plainly violates the Immigration and Nationality Act ("INA") and the Administrative Procedure Act ("APA"). *See generally* ECF No. 108-2 ("SJ Mot.").

Defendants' opposition largely recycles legal arguments that this Court has already rejected with respect to jurisdiction, remedy, and Plaintiffs' statutory claim. *First*, no provision of 8 U.S.C. § 1252 precludes judicial review of Plaintiffs' claims. ECF No. 53 ("MTD Op.") at 11. *Second*, on remedy, the government grudgingly acknowledges that the D.C. Circuit has now squarely held that vacatur of an agency policy—including one implementing a presidential directive—is not barred by 8 U.S.C. § 1252(f)(1). *See Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Mullin* ("*RAICES*"), 174 F.4th 81, 119 (D.C. Cir. 2026). Defendants offer only tortured arguments that fail to distinguish *RAICES*.

*Third*, on the merits of the statutory claim, Defendants renew their basic arguments but, as this Court previously found, neither 8 U.S.C. § 1231(g) nor § 1103(a)(3) authorizes "detention" at Guantánamo, leaving open only a narrow window for Defendants to show that, as a factual matter, they were simply using Guantánamo "en route to a final destination," and that Guantánamo was thus simply a logistical stop (or perhaps a short-term staging area). MTD Op. 45. But the facts

1

show that Guantánamo is not serving this narrow function. Just the opposite. They show that detainees are detained for long periods of time at the notorious military facility; that detainees are transferred to Guantánamo without travel arrangements to their final destination; and that many are even flown back to the United States. That the government does not need formal acceptance from certain countries hardly shows that Guantánamo is being used as a staging area or refueling pit stop; indeed, Defendants nowhere claim that they transferred detainees to their final destination from Guantánamo the next day, or even within the 72 hours that detainees typically spend in staging areas in the United States. The record thus confirms that Plaintiffs "are being detained at Guantanamo in the same manner as at any other detention facility where individuals are pending removal"—not "in the midst of the execution of their removal orders." MTD Op. 45.

*Finally*, Defendants' response on Plaintiffs' arbitrary and capricious claim ignores basic tenets of APA caselaw. They acknowledge that they have never before flown immigration detainees from the United States to Guantánamo, ECF No. 110-2 ("Opp.") at 35, yet nowhere point to anything in the administrative record that squarely acknowledges that drastic change in policy, let alone anything that attempts to justify it. That alone is dispositive. Defendants' main argument appears to be that Plaintiffs rely on extra-record evidence, but Plaintiffs introduced that material to show that there was evidence that was readily available to Defendants, which they failed to acknowledge or explain. The use of extra-record evidence to show that Defendants failed to consider relevant and important factors is routine and established in this context. *See* Opp. 5 (citing *Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294, 307 (D.D.C. 2021) (courts can consider extra-record evidence "in order to determine whether the agency considered all of the relevant factors")).

The Court should grant Plaintiffs' motion for partial summary judgement, classwide declaratory relief and vacatur, and deny the government's motion.

## ARGUMENT

## I.    The Court Has Jurisdiction Over Plaintiffs' Claims.

Defendants acknowledge "this Court previously rejected [their] argument that challenges to the location of detention 'pending removal' under 8 U.S.C. § 1231(g) fall under the INA's jurisdictional bars." Opp. 6 (citing MTD Op. 11–13). They renew those arguments regarding 8 U.S.C. § 1252(g) and § 1252(a)(2)(B)(ii) but cite no intervening caselaw or reason to revisit this Court's conclusion that these provisions "do not preclude judicial review." MTD Op. 11.

### A.  Section 1252(g) Does Not Apply.

As this Court has already explained, "Section 1252(g) is 'narrow.'" MTD Op. 12 (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020)). "[B]y its terms, it 'applies only to three discrete actions that the Attorney General may take: her decision or action to *commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999)) (internal quotation marks omitted). Here, Plaintiffs challenge only the authority to detain them at a particular location as part of the asserted deportation process, "which 'does not implicate the agency's discretionary decision to execute their removal orders.'" *Id.* at 12–13 (quoting *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 60 (D.D.C. 2020)). Thus, § 1252(g) does not apply. *Id.*

Defendants again argue that Plaintiffs' challenge "arises out of" the decision or action to execute removal orders, Opp. 9, ignoring this Court's explanation of how "Section 1252(g) has *nothing to say* about 'other decisions or actions that may be part of the deportation process,'" MTD Op. 12 (quoting *AADC*, 525 U.S. at 482) (emphasis added). Defendants resist the Court's reliance

3

on *D.A.M.*, essentially arguing that case was wrongly decided, Opp. 7–8, but they overlook the core of the Court's holding: that the Supreme Court's decision in *AADC* "is di[s]positive here." MTD Op. 12. And Defendants' cited cases merely underscore this Court's conclusion: § 1252(g) applies only to discretionary decisions "to initiate or prosecute the relevant stage of the deportation process, which is not the decision challenged here." *Id*. at 13 (citation modified).[1] Indeed, as this Court correctly noted, Plaintiffs do not challenge their removal. *Id*. at 12. Nor do Plaintiffs claim that they cannot be detained in the United States or suggest that the government lacks appropriate discretion to choose which facility in the United States to detain them.

### B.  Section 1252(a)(2)(B)(ii) Does Not Preclude Review.

Defendants' attempt to relitigate the applicability of § 1252(a)(2)(B)(ii) likewise fails. That provision "bar[s] court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute," and the authority must be "'specified'— not merely assumed or contemplated—to be in the Attorney General's discretion." MTD Op. 13 (quoting *Kucana v. Holder*, 558 U.S. 233, 247, 243 n.10 (2010)). As this Court explained, § 1231(g) lacks the language specifying discretionary authority that is necessary to trigger the bar to review. *Id*. at 14–16. Defendants now rely instead on § 1103(a)(3) as the trigger for § 1252(a)(2)(B)(ii)'s bar, arguing that it provides the Secretary with unreviewable discretion over

---

[1] Defendants' cases all involve challenges to the three types of discretionary decisions discussed in *AADC*. *See Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) (decision to commence proceeding against a specific individual); *Sadhavani v. Chertoff*, 460 F. Supp. 2d 114, 122–23 (D.D.C. 2006) (decision to execute a petitioner's removal order); *Immigr. Advocs. Response Collaborative v. United States*, No. 1:25-CV-2279 (TNM), 2026 WL 746923, at *2 (D.D.C. Mar. 17, 2026) (challenge "ask[ed] courts to interfere with the Executive's continued *adjudications*" (emphasis added)). And Judge Millett's concurrence in *J.G.G. v. Trump*, supports Plaintiffs by underscoring that § 1252(g) does not bar "challenge[s] to the procedures . . . by which removals are being effectuated." No. 25-5067, 2025 WL 914682, at *28 n.8 (D.C. Cir. Mar. 26, 2025) (Millet, J., concurring).

4

the government's choice to maintain custody of an individual while in the midst of executing a removal order. Opp. 9–11. But this argument also fails, for four reasons.

*First*, as discussed below, Defendants' actions are not authorized by § 1103(a)(3) because they are not detaining Plaintiffs at Guantánamo "in the midst of executing a removal order." *See infra* Section II.B. Thus, § 1103(a)(3) is beside the point. *Second*, § 1103(a)(3) nowhere authorizes or even mentions detention of any kind, but § 1252(a)(2)(B)(ii)'s bar applies only where the authority is both expressly specified in the statute and expressly designated as within the discretion of the Secretary. *See Kucana*, 558 U.S. at 247. *Third*, regardless of whether § 1103(a)(3) applies (and it does not), § 1252(a)(2)(B)(ii) does not apply because Plaintiffs do not seek to challenge any exercise of discretion. *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). Defendants still identify no case applying § 1252(a)(2)(B)(ii) to bar a challenge like the one here—not to the individualized decisions to transfer noncitizens to one detention facility over another, but rather to the government's legal authority to maintain an immigration detention facility abroad.

*Finally*, the government's argument is limitless: that, although § 1103(a)(3) does not mention detention, much less detention abroad, the jurisdictional bar in § 1252(a)(2)(B)(ii) is triggered because § 1103(a)(3) provides the Secretary with the *general* authority to enact regulations and take other actions to carry out his duties. But if that were sufficient, then *every* single action would fall under the discretionary bar, because the government could always claim that behind every action is § 1103(a)(3). But that cannot be what *Kucana* meant and it would mean the Supreme Court has erred in case after case in which it has resolved the merits of statutory questions in the immigration area. *See, e.g.*, *Zadvydas*, 533 U.S. at 688 (jusrisdiction over statutory detention claim); *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (same).

In short, nothing in the INA bars review of Plaintiffs' claims.

**II.     Detention at Guantánamo Is Contrary to Law and In Excess of Statutory Authority.**

The government has not provided any answer to why summary judgment should not be granted as to Count I. As to their own motion, as a threshold matter, while Defendants filed both an opposition and a cross motion for summary judgment, they did not file a statement of material facts in support of *their* cross-motion, ECF No. 110-3 ("Defs.' Resp. to Pls.' SUF"). That statement is required under Federal Rule of Civil Procedure 56(c) and Local Rule 7(h)(1) since the Court recognized this case is not a typical APA case that is confined to the administrative record on Count I. *See* ECF No. 97 at 14. The D.C. Circuit "has long upheld strict compliance with the district court's local rules on summary judgment." *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002); *see also, e.g.*, *Smith Prop. Holdings, 4411 Connecticut LLC v. United States*, 311 F. Supp. 2d 69, 78 (D.D.C. 2004) (denying government's cross-motion for summary judgment for "complete failure to submit a proper statement of material facts").

### A.  Section 1231 Does Not Authorize Detention at Guantánamo.

As Plaintiffs have explained and this Court has already concluded, § 1231(g) authorizes the Secretary to arrange for detention facilities only for individuals who are *awaiting* removal and therefore does not authorize detention facilities for individuals who have departed from the United States. *See* SJ Mot. 16–18; MTD Op. 33–34. Defendants repeat arguments that this Court has already rejected. For instance, Defendants contend that the "context [of the statute] requires that" removal cannot take place "until [an] alien reaches his final destination country." Opp. 12. But as the Court already pointed out, § 1101(g) "eliminates any ambiguity" and "unmistakably shows Congress's understanding that the consequential moment for removal is the individual's departure from the United States." MTD Op. 35 (citations omitted). This Court has also already concluded that the government has the necessary residual authority in § 1103(a)(3) to "cover the

Government's concern about an overnight refueling stop" or other circumstances requiring restraint of a noncitizen while en route to a final destination. MTD Op. 41. But the custody allowed pursuant to § 1103(a)(3) is entirely different than the authority needed to run a detention facility outside the country. *See* SJ Mot. 18–24; *infra* Section II.B.

Defendants try three new tacks, none of which work.

First, they cite 8 U.S.C. § 1231(d)(3), which authorizes the government to require persons providing transportation to removal destinations to "guard [noncitizens with final orders] safely[] and transport [them] to the destination specified," arguing that this must provide the government "custodial authority" over the noncitizens "during this period." Opp. 13. But the "custodial authority" to escort a removed noncitizen on the way to their destination country is wholly different than the authority to construct and maintain a detention facility and to detain individuals inside it. That Congress allowed for the former in § 1231(d)(3) (and § 1103(a)(3), *see* SJ Mot. 18–19) does not in any way mean it allowed for the latter. *See* MTD Op. 44 ("Section 1231(g) is the *only* provision expressly governing where immigration detainees can be held.") (emphasis added); ECF No. 41 at 11. Defendants argue that because § 1231(d)(3) "does not limit 'destination specified' only to the destination country, it contemplates the possibility of continued detention at other destinations." Opp. 14. But that is a major stretch, especially when the statute does not even use the word "detention." If Defendants were correct, a statute that at most implies a limited authority to engage in custodial escorts during the execution of removal orders would silently but radically grant the government the power to fly noncitizens around the globe for long-term detention in overseas camps.[2]

---

[2] *See* Charles R. Davis, *Exclusive: ICE Eyes 1,000-Bed Detention Facilities in Foreign Countries*, The Redoubt (July 13, 2026), https://perma.cc/Q9T8-SBX3.

Second, Defendants cherry-pick language from *Zadvydas*, to suggest that while that decision focuses on detention prior to "the moment of removal," 533 U.S. at 699, it recognized that removal can only take place once a noncitizen is relinquished into the custody of a final destination country. Opp. 15. But *Zadvydas* focused on limiting the time that a noncitizen could be detained inside the country where removal was not reasonably foreseeable, not the time it might take for a removal order to be effectuated once an individual was physically removed from the country and en route to their final destination. *See* 533 U.S. at 683–86. The Court nowhere suggested that § 1231(a)(6) permits the government to detain someone outside the United States simply because another country would not accept the individual. If anything, *Zadvydas* is consistent with Plaintiffs' reading of the statutes by describing the "basic purpose" of § 1231 as "assuring the alien's presence *at the moment* of removal," *id.* at 699 (emphasis added), suggesting that authority for § 1231 detention ends once removal *begins*. That matches Plaintiffs' theory, which allows for authority to detain pending removal inside the United States, § 1231(g), and a different authority for custodial authority *during* the execution of a removal order outside of it, § 1103(a)(3).[3]

Third, Defendants argue that § 1101(g)'s definition of removal applies only to noncitizens with removal orders who "exit[] the territory of the United States for any destination absent ever being in the custody of the government." Opp. 16. But this distinction is nowhere to be found in

---

[3] That the Court in *Zadvydas* tied foreseeability of removal to acceptance by another country also made sense in a context where the whole issue in the case was finding a willing country and where it was never suggested that the government would transfer and detain the noncitizen outside of the United States until they would reach their final destination. *See* 533 U.S. at 683–86.

the statute's text, and the government cites no case to suggest that distinction should or could be read into the text.[4]

### B. The Record Confirms That Defendants Are Not Sending Detainees to Guantánamo to Execute Their Removal Orders.

Defendants' arguments under § 1103(a)(3) likewise fail. As noted above, the Court has already foreclosed Defendants' arguments that § 1103(a)(3), alone or in conjunction with other statutes, could authorize running a detention facility at Guantánamo. *Compare* Opp. 21, *with* MTD Op. 29–30; *see supra* Section II.A. And as explained in Plaintiffs' motion for partial summary judgment, the record in this case confirms that Defendants' use of Guantánamo bears no reasonable relationship to the execution of removal orders, but is merely for the purpose of creating fear and for *detention* of noncitizens who are awaiting removal—exactly how Defendants use detention facilities inside the United States. *See* SJ Mot. 21–23.[5]

---

[4] The government cites language in concurrence in a non-precedential per curiam order in *J.G.G.* Opp. 15. That case did not involve the question here about extraterritorial detention under the INA, but rather the lawfulness of using the Alien Enemies Act. *J.G.G. v. Trump*, 147 F.4th 1044, 1044 (D.C. Cir. 2025). In any event, the government fails to note that its own position in that case was that "removal" occurred once those flights left U.S. airspace, inconsistent with the position it takes before this Court. *See id.* at 1051 (Katsas, J., concurring); *see also* ECF No. 33 at 28–29 (pointing to government's contrary position in *Melgar-Salmeron v. Bondi*, No. 23-7792 (2d Cir. May 28, 2025), ECF No. 38-1 at 10).

[5] Defendants argue that as long as the Guantánamo *detention* policy is "reasonably related" to its power to "execut[e] removal orders," it is statutorily authorized by the general authority in § 1103(a)(3). Opp. 18–19, 21–22 (citing cases). But none of Defendants' cases even involved the execution of removal orders, let alone detention. And with respect to detention, there are specific statutes setting forth the authority, and constraints, on that power. In any event, the record in those cases, unlike here, demonstrated that there was a reasonable relationship between the challenged policies and the Secretary's duties under the INA. *See, e.g.*, *Wash. Alliance of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 168–69, 179 (D.C. Cir. 2022) (the record showed that the rule permitting practical training for F-1 student visa holders was "reasonably relate[d]" to the terms for those visas). By contrast, Defendants do not offer any rationale or evidence for how detaining noncitizens at Guantánamo reasonably relates to executing their removal orders, and the record here does not support such a conclusion, given that Guantánamo is plainly not being used to detain en route to the final destination, as is the case with a short logistical stop.

First, Defendants do not dispute that the vast majority of the noncitizens for whom data was provided were transferred to Guantánamo without any travel arrangements in place to their final destination country. SUF ¶ 76 (66%, or 150 out of 227 noncitizens); *see* Opp. 21–26. Nor do Defendants dispute that these noncitizens spent weeks detained at Guantánamo, with a third of the group for whom data was provided spending more than 40 days at Guantánamo and several spending more than 100 days. SUF ¶¶ 58, 60–61. Defendants' only response is to claim that the lack of travel arrangements and the long periods of detention there are "simply beside the point." Opp. 25. But this data is hardly beside the point when Defendants' position is that Guantánamo is merely a way-station. Nor do Defendants address that detention at Guantánamo is *far* longer than the 72-hour period that facilities in the United States hold noncitizens when staging them for transport to their final destination country. SUF ¶¶ 55, 62.[6]

These facts show that Defendants were not bringing noncitizens to Guantánamo as merely a stop amid executing their removal orders, but rather to hold them in detention while Defendants were still in the process of making the arrangements necessary to execute those orders. *See* MTD Op. 45 (finding that the allegation that "'some detainees have been held at Guantánamo for as long as six weeks' . . . support[s] that class members detained at Guantanamo are not in the midst of the execution of their removal orders") (citation omitted); *see also* Tr. of March 19, 2026 Status

---

[6] Instead, Defendants note that of the 137 cases where a noncitizen was transferred from Guantánamo to their final destination country, about 60 noncitizens were transported directly from Guantánamo to their final destination country within ten days. Opp. 22. But this figure only undercuts Defendants' argument, because the fact they spent up to ten days there before being transported to their destination country—far longer than the 72-hour stays at staging facilities— and that the remaining 77 noncitizens spent even longer demonstrates that these noncitizens were not being held for a mere "pitstop" en route to their final destination. *See* Tr. of March 19, 2026 Status Conference 12:18–20.

Conference 12:18–20 (government attorney stating "[i]t's my understanding that the goal was that this is a weigh [sic] station on [sic] route to final destination.").

Defendants point to the Memorandum of Understanding between the U.S. Department of Homeland Security ("DHS") and the U.S. Department of Defense ("DOD") ("MOU"), noting that it "stipulates that only aliens with executable final orders of removal may be detained at NSGB," which according to Defendants "evinces an intent to use the facility only amidst the execution of removal orders." Opp. 22. But the evidence plainly shows the opposite, i.e., that Defendants were not taking the basic steps one would expect were they executing a removal order, such as having travel arrangements in place to the detainee's final destination. Indeed, Defendants even transferred some detainees to Guantánamo without the travel documents that were necessary for them to be accepted by the country to which they were being removed. *See* SJ Mot. 10 n.2; SUF ¶¶ 98. Notably, the MOU also states that DHS "will ensure transfer from NSGB no later than *180 days* from the date of final order of removal." U-DOW-CAR-123 (emphasis added). Indeed, several of the noncitizens for whom Defendants provided data were held for over 100 days (or over three months), SUF ¶ 61; *see also Bonilla Alvarez v. Noem*, No. 1:25-cv-03136-AHA (D.D.C. Sept. 28, 2025), ECF No. 12 at 3 (describing Salvadoran national who had CAT withholding of removal and was detained at Guantánamo from June 2025 through September 21, 2025).

Defendants additionally place significant reliance on the fact that the majority of the Guantánamo detainees for whom data was provided supposedly did not need travel documents (because they were from countries that participate in the Electronic Nationality Verification ("ENV") program, SUF ¶ 96). Opp. 22–23. But Defendants skirt over the fact that even these noncitizens spent weeks on end at Guantánamo, and that the majority of them *did not have travel arrangements* at the time they were transferred there. SUF ¶¶ 99–104; *see also* Defs.' Resp. to

11

Pls.' SUF ¶¶ 99–104.[7] And for those who were from non-ENV countries and thus *did* need travel documents, Defendants acknowledge that less than one third of them (ten of 34) had them. Opp. 23; *see also* SUF ¶ 96.[8]

Defendants also have no persuasive explanation for transferring noncitizens to Guantánamo and then *back* to the United States. Opp. 36. For the nine individuals transferred back to the United States to be removed on commercial flights, Defendants assert that "removal operations do not only take place on commercial flights," and suggested that there "may have been military transport planned that had to be diverted for any number of reasons, leaving a commercial flight as the best option." Opp. 26. But this contradicts the record, which shows that none of these nine individuals had travel arrangements—whether military or commercial—at the time they were removed to Guantánamo. *See* Behr Decl. Ex. A at 4 (lines 23, 33, 39, 48, 56, 60), 5 (lines 10, 14,

---

[7] *See also* SUF ¶¶ 99 (the ten noncitizens with travel documents at the time of their transfer still spent between 14 and 66 days at Guantánamo, or an average of about 49 days); 100 (the mean length of detention for those who had or did not need a travel document was 25 days); 101 (62% of those who had or did not need travel documents did not have travel arrangements at the time of transfer).

[8] Defendants assert that they produced information about whether the final destination country had agreed to accept a noncitizen for removal at the time of their transfer because they disclosed whether each noncitizen had or did not need a travel document at the time of their transfer to Guantánamo, and provided a declaration explaining that "[t]he receipt of a travel document indicates that the country has accepted the alien." Opp. 24 n.5. But the lack of a barrier to removal (i.e., the travel document), is not the same thing as affirmative acceptance by another country. Tellingly, Defendants did not provide any evidence as to whether the fact that a country *does not require a travel document* means that that country necessarily *accepted* an individual; and indeed, one example in the record demonstrates that that is not the case. There, even though a travel document was not necessary for the individual's country of origin and travel arrangements had been made at the time of his transfer to Guantánamo, his country of origin did *not* accept him for removal. Behr Decl. Ex. A at 5 ("For this [noncitizen], [the country of origin] refused to accept the individual for removal. Consequently this person was also removed to Mexico as a third country."); Behr Decl. Ex. D (stating that no travel document was necessary for the same noncitizen); *see also* SUF ¶ 73. Thus, for the 193 individuals where Defendants stated that a travel document was not required, SUF ¶ 96, Defendants did not explain whether the final destination country had agreed to accept them for removal at the time of their transfer to Guantánamo.

34); Behr Decl. Ex. C at 2 (lines 23, 33, 39, 48, 57, 61), 3 (lines 2, 6, 28). Indeed, these individuals did not even have travel documents at the time of transfer, further demonstrating that they were not in the process of being removed to their final destination country. *See* Behr Decl. Exs. A, C. Further, even under Defendants' logic, the fact that no commercial flights are available at Guantánamo, and thus a diversion of a military transport requires transportation *back* to the United States, further underscores that detention at Guantánamo was not intended to be, and is not in practice, "a 'staging point' amid execution of a removal order." MTD Op. 45. Defendants also entirely fail to address other detainees who Defendants likely knew would have to be transferred to their final destination country from the United States for operational reasons, and yet were brought to Guantánamo anyway. Those include the detainees on "Special High-Risk Charters" ("SHRCs"), which are "typically staged" in the United States, and the detainees who Defendants had to be removed to Mexico via the United States-Mexico border, because they were protected from being removed to their country of origin. *See* SJ Mot. 22.[9]

In short, the facts do not support that Defendants are detaining the noncitizens at Guantánamo "in the midst of the execution of their removal orders." MTD Op. 45.

### C. The Presumption Against Extraterritoriality Applies.

As Plaintiffs already noted, if the Court agrees that the statute is clear, the Court need not reach the question of whether the presumption against extraterritoriality applies here. *See* SJ Mot. 24 n.11. If, however, the Court does reach the issue, the government's new arguments for not applying the presumption should be rejected.

---

[9] Defendants state that many of those transfers back to the United States were due to inclement weather requiring cancellation of their flights. Opp. 25. But Defendants failed to explain why those individuals were transferred to and detained at Guantánamo for multiple weeks before the cancelled flight was initially planned to depart. *See* SJ Mot. 23 n.9.

First, Defendants attempt to rely on "the purpose of the presumption" in arguing that it does not apply. Opp. 26. But courts apply the presumption "in all cases," *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 261 (2010), and "across the board," *RJR Nabisco Inc. v. Eur. Cmny.*, 579 U.S. 325, 336 (2016). Defendants' argument flips the presumption on its head. While the presumption is justified in part by deference to the foreign-policy assessments of *both* "political branches," Opp. at 27 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013)), the government effectively converts that justification into a blank check for the Executive branch only. *See id.* (arguing that "applying the presumption . . . to a conferral of authority to the Executive in the name of *deference toward the Executive* would be to undo the deference that Congress baked into the statute itself" (emphasis added)). Under Defendants' view, unless Congress clearly *limits* a grant of executive authority to domestic application, the Executive can apply it extraterritorially—the very opposite of the way the presumption works. *See RJR Nabisco*, 579 U.S. at 335.

Second, "applying the presumption here would [*not*] undermine the purpose of the statute." Opp. 28. Defendants argue the courts should bless an interpretation of a statute that would permit the Executive, for the first time ever, to operate permanent immigration detention centers around the world. *Id.* at 30. That change would undoubtedly carry with it significant foreign-policy consequences that Congress, in § 1231(g), clearly did not embrace—and, for sure, did not embrace clearly enough to overcome the presumption. *See United States v. Delgado-Garcia*, 374 F.3d 1337, 1344 (D.C. Cir. 2004) ("[T]he presumption . . . in part makes sense because we assume that Congress desires to avoid conflict with other nations."). It is therefore Defendants' interpretation, not Plaintiffs', that would show insufficient deference to Congress, which "generally legislates with [only] domestic concerns in mind." *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993).

14

Third, Defendants are wrong in claiming that the presumption is rebutted here. As the Court previously found, the statute is clear, and Defendants certainly have not produced any evidence that would make this one of the "rare" situations where a court will find such a clear instruction without an "express statement of extraterritoriality." *RJR Nabisco*, 579 U.S. at 340; *see, e.g.*, *id.* at 338 (statute contained provisions that "plainly" "applie[d] *only* to conduct occurring" abroad). Defendants bear a heavy burden to establish that Congress has—through context, purpose, legislative history, or statutory structure—"affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct." *Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412, 417–18 (2023) (citation modified and emphasis added). As the Supreme Court has made clear, this is a high bar. *See, e.g.*, *Morrison*, 561 U.S. at 262–63 (provision defining "interstate commerce" as including "trade . . . between any foreign country and any State" did not "defeat the presumption against extraterritoriality") (quotation marks and citation omitted); *see also* ECF No. 33 at 22–23.

Finally, Defendants' cited cases do not help them. The plentiful textual and contextual evidence indicating extraterritorial application of the specific statute in *Delgado-Garcia* stands in stark contrast to § 1231(g). *See* 374 F.3d at 1344–46 (discussing statute that criminally prohibited attempts to "bring" unauthorized noncitizens into the United States). Indeed, the D.C. Circuit there distinguished the statute at issue in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 170–71 (1993), as "govern[ing] deportation proceedings," which were "fundamentally domestic in focus," *Delgado-Garcia*, 374 F.3d at 1348—just like the detention pending removal at issue here, *see* ECF No. 33 at 30. And *Mullin v. Al Otro Lado*, likewise supports Plaintiffs. 609 U.S. ----, 2026 WL 1825741, at *10 (June 25, 2026) (requiring, and failing to find, an "unmistakable congressional intent" that a statute regulating "arriv[al] in the United States" has extraterritorial reach).

15

Defendants' bare assertion that "text and context" around § 1231(b) "make clear" that Congress meant to authorize detention pending removal *anywhere in the world* so long as the removal "process is [not yet] complete," Opp. 30, is wrong. *See supra* Section II.A.

**III.    The Policy is Arbitrary and Capricious in Violation of the APA.**

Defendants' Guantánamo detention policy is also arbitrary and capricious for multiple reasons that Plaintiffs explained and Defendants fail to rebut.

*First*, Defendants failed to acknowledge and justify a radical change in policy. They acknowledge, in their briefs, that detention of "aliens with final orders of removal" at Guantánamo is "a change in agency practice," Opp. 35, but the administrative record contains no acknowledgement of this change in longstanding practice, let alone any reasonable explanation for it. Contrary to Defendants' suggestion, this principle applies not only to "established policy" or "existing rule[s]," Opp. 34, but to longstanding "past *practices*" as well. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923–24 (D.C. Cir. 2017) (requiring "reasoned explanation" for departure from "two decades of agency practice") (emphasis added); *see also id*. at 927–28 (collecting cases addressing agency practice). Defendants fault Plaintiffs for failing to offer any record citation for this argument, Opp. 34, but that is only because the record is devoid of any explanation for the abrupt change in the decades-long practice of not detaining noncitizens apprehended in the United States at Guantánamo—or anywhere else abroad.

Defendants point to the DHS Secretary's *general* authority to detain noncitizens and an entirely *different* policy of holding noncitizens intercepted on the high seas at the Migrant Operations Center, to argue that the challenged Guantánamo detention policy is merely a "shift[] in degree." Opp. 34; *compare* Decl. of Sofia Gonzalez Ex. B at 1, ECF No. 108-11 (State Department Fact Sheet noting that migrants apprehended at sea are "neither detained nor

imprisoned"), *with* SUF ¶ 42 (MOU discussing parties' responsibilities as to "custody and detention" at Guantánamo). But this is hardly a "reasoned explanation" for implementing an unprecedented policy that relies on completely different legal authorities and factual circumstances. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923 (agency action that failed to acknowledge or explain change was arbitrary and capricious); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 617 (D. Md. 2025) (same). Under no circumstances does flying detainees from the United States to Guantánamo constitute merely a difference in "degree." *Contra* Opp. 34.

*Second*, while Defendants do not contest that immigration detention at Guantánamo is more costly and more logistically complicated than detention in the United States, or that there is available detention capacity at facilities in the country, they attempt to sidestep these facts by offering a new explanation for the policy: that it is necessary "to increase immigration enforcement and protect the territorial integrity of the United States." Opp. 31. But agencies cannot rely on shifting rationales to retroactively justify their actions. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20–21 (2020). It is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." *Id*. at 20 (cleaned up) (review of decision to rescind DACA was "limited to the agency's original reasons" despite *post hoc* explanations). Here, the MOU and the Presidential Memorandum it is implementing make clear that the Guantánamo detention policy is being undertaken to "provide additional detention space for high-priority criminal aliens." SUF ¶ 10 (President's Memorandum); *see also* SUF ¶ 44 (MOU).

In any event, that new justification does not address the agencies' failure to "consider [the] obvious alternative[]" of detention in U.S. facilities, *Yakima Valley Cablevision, Inc. v. FCC*, 794

17

F.2d 737, 746 n.36 (D.C. Cir. 1986), or the logistical and practical difficulties of safely housing immigration detainees at Guantánamo, which is an "important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And the explanation "run[s] counter to the evidence" in the record, which shows that detention at Guantánamo is costly and logistically complicated. *Id*. The administrative record contains no evidence that detention at Guantánamo helps increase immigration enforcement or protects the territorial integrity of the country. Indeed, the evidence that Defendants cite only underscores that detention at Guantánamo requires complex logistical coordination, diverts military resources to DHS, exposes detainees to inadequate medical facilities, and deprives them of adequate access to counsel. Opp. 32–33 nn. 6–8. Yet, Defendants "brushed aside" these "critical facts," *Am. Wild Horse Pres. Campaign*, 873 F.3d at 932, and their conclusion is entirely untethered from evidence found in the record.[10]

Defendants do not contest that detention at Guantánamo is more costly than detention in the United States—nor could they, as the administrative record is clear on this point. SJ Mot. 30–31. Instead, they claim that they "sufficiently accounted for the costs and logistics associated with the Guantánamo detention policy." Opp. 36–37. But asserting something does not make it so. Undertaking a course of action that the administrative record clearly demonstrates is more costly and complicated than an obvious alternative—detention in the United States—is not "reasoned decisionmaking" and "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43, 52.

---

[10] To the extent that Defendants are suggesting that detention at Guantánamo furthers these goals by sending a message of deterrence, through fear, such a purpose would, of course, be unlawful. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 189–90 (D.D.C. 2015) (detention policy based on deterring immigration is likely unlawful).

Nor do Defendants contest that there is available detention capacity in the United States or that such detention is an obvious alternative. Instead, they argue that this is not "an especially relevant factor" because the Presidential Memorandum simply instructed agencies to provide "additional" detention space without specifying where. Opp. 36. But it is a cardinal rule of arbitrary-and-capricious review that agencies must consider "obvious alternatives." *Yakima Valley*, 794 F.2d at 746 n.36 (failure to do so "has uniformly led to reversal"); *id*. (collecting cases). "An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. United States Dep't of Transportation & Fed. Aviation Admin.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (quotation and citation omitted) (vacating agency action where it failed to consider less "drastic" measures). Indeed, the failure to consider adding detention capacity in the United States is even more glaring given the record evidence establishing the prohibitive costs, logistical, and safety challenges with detaining noncitizens at Guantánamo. SJ Mot. 27–30.

Defendants fault Plaintiffs for relying on publicly available evidence to further support their arguments, Opp. 35, but even if the Court were to limit its review to the administrative record, it could set aside the policy as arbitrary and capricious because it is an unexplained change from longstanding agency practice, disregards critical facts about increased costs and logistical challenges, and fails to consider the obvious alternative of U.S.-based detention. Moreover, review of publicly available evidence is appropriate here, to allow the Court to "determine whether the agency considered all of the relevant factors"—namely, whether detention in the United States is a less costly, logistically easier, obvious alternative. *Open Soc'y Inst.*, 573 F. Supp. 3d at 307; *see also United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 5 (D.D.C. 2017) (permitting extra-record evidence where it was necessary to assess agency's failure to consider "central"

19

factual issues). Defendants' own public records confirm that detention in the country is a far more logical alternative *if* the goal was genuinely to increase detention space: there is available capacity at U.S. facilities, and it is less costly and logistically complicated to make these facilities operational. *See, e.g.*, SUF ¶ 134 (thousands of U.S. detention beds available in the months after government started transferring people to Guantánamo); SUF ¶ 113 ($21 million spent over four months to transport detainees to Guantánamo); SUF ¶ 137 (2,560-bed U.S. detention facility made operational in under five months); SUF ¶¶ 114–15 (DHS and State Department Inspectors General identifying logistical challenges at Guantánamo); *see also* U.S. Government Accountability Office, *Southern Border Security: DOD Used Multiple Strategies to Fund Operations* 21 (July 2026)[11] (DOD officials noting that it was "cost-prohibitive to build facilities" for 30,000 people "that met ICE detention standards"). This additional evidence facilitates "effective judicial review" by permitting the Court to more thoroughly assess Defendants' failure to consider alternatives. *Open Soc'y Inst*, 573 F. Supp. 3d at 307. Far from "substitut[ing] their policy preferences for the agency's detention decisionmaking," Opp. 35, Plaintiffs demonstrate that the agencies failed to "grapple with contrary evidence" showing that detention at Guantánamo is more costly and complicated, *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017), and failed to "consider significant alternatives." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000). These are hallmarks of arbitrary and capricious decisionmaking.

*Finally*, the agencies' implementation of the Presidential Memorandum is inconsistent with its text, which expressly states that Guantánamo was intended for "high-priority criminal aliens." SUF ¶ 10. Defendants' claim that the President's directive mentioned "high-priority criminal

---

[11] *Available at* https://perma.cc/XV64-4VX6. The Court may take "judicial notice of information posted on official public websites of government agencies." *Pharm. Rsch. & Manufacturers of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (collecting cases).

aliens" but that he did not intend to limit detention at Guantánamo to that group. Opp. 37. But the text of the directive cannot bear that interpretation. Defendants also argue that they have *statutory* authority to detain at Guantánamo in addition to the President's directive, Opp. 18, but the record makes clear that the new policy is based on the President's directive. *See TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 109 (D.D.C. 2020) (reviewing implementation of presidential memorandum even where International Emergency Economic Powers Act and National Emergencies Act provided statutory authority for Treasury Secretary's action). Nor does a boilerplate disclaimer about creating a private right of action jettison the availability of APA review of Defendants' actions.

## IV.     The Court Should Grant Classwide Declaratory Relief and Vacatur.

As an initial matter, Defendants do not appear to dispute that § 1252(f)(1) does not bar classwide *declaratory* relief. Declaratory relief is mentioned only twice in its brief, Opp. 39, 41, and neither time do Defendants attempt to explain why the D.C. Circuit or this Court were incorrect in concluding that § 1252(f)(1) does not bar that form of relief. They have therefore conceded that classwide declaratory relief remains available in this case. *See Make the Rd. New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020) (holding that "Section 1252(f) … does not proscribe issuance of a declaratory judgment").

On *vacatur*, the D.C. Circuit has now squarely held that "Section 1252(f)(1)'s prohibition is limited to enjoining the operation of certain statutory provisions[,] ... leav[ing] intact the courts' power under the APA to hold unlawful or set aside agency action that violates its terms." *RAICES*, 174 F.4th at 120 (citation modified). That is because "[v]acatur under [5 U.S.C.] 706 functions quite differently from an injunction" in that while an injunction "tells someone what to do or not to do" and "is enforceable by contempt," vacatur merely "holds unlawful and sets aside the action."

*Id.* at 119. Defendants' attempt to distinguish *RAICES* is contrived. Defendants argue that "the vacatur sought by Plaintiffs is not confined to a discrete action the Court would need to find unlawful when measured against a given statutory authority" but rather seeks "to restrain a host of Defendants' actions . . . that govern the larger, overarching removal process." Opp. 41. According to Defendants, to grant relief to Plaintiffs, the Court would need to "order the 'wholesale vacatur' of the government's execution of final orders of removal." *Id.* at 42 (citation omitted). That is incorrect. Defendants acknowledge that Plaintiffs ask this Court to vacate and declare unlawful only "'Defendants' policy of transferring noncitizens from the United States and detaining them at Guantánamo.'" Opp. 38 (quoting Plaintiffs' [Proposed] Order, ECF No. 108-1). Nowhere do Plaintiffs ask this Court to question, let alone restrain, the government's authority to effectuate removals or to detain noncitizens pending execution of a removal order. An order from this Court finding unlawful and vacating the policy of transferring and detaining noncitizens *outside* of the United States at Guantánamo would leave intact the full extent of the authority granted by the INA to detain noncitizens pending execution of removal orders *inside* the United States or to remove someone who is removable. Like *RAICES*, this case challenges a specific policy and vacatur is permissible.

## CONCLUSION

The Court should grant the Plaintiffs' motion for partial summary judgment and deny Defendants' motion for partial summary judgment.

Dated: July 21, 2026

My Khanh Ngo (D.D.C. Bar No. CA00219)
Kyle Virgien
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org

Derek Poteet ±*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(703) 217-8374
dpoteet@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Kimberly Grano (D.D.C. Bar No. NY0512)
Pedro Sepulveda (D.D.C. Bar No. NY0637)
Ghita Schwarz (D.D.C. Bar No. NY0663)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 946-7453
kgrano@refugeerights.org
psepulveda@refugeerights.org
gschwarz@refugeerights.org

Megan Hauptman (D.C. Bar No. 1780749)
INTERNATIONAL REFUGEE

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No.
NY0224)
Judy Rabinovitz
Noor Zafar
Natalie Behr
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
IRP_NBehr@aclu.org
ojadwat@aclu.org

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, Floor 7
New York, NY 10012
(212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

*Attorneys for Plaintiffs-Petitioners*

*\*Pro bono representation certificates
forthcoming*
*± Not admitted in D.C.; practice limited to
federal courts*

23

ASSISTANCE PROJECT
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org

24