February 3, 2025 / 1200

## ACTION MEMO

**FOR:** PERFORMING THE DUTIES OF DEPUTY SECRETARY OF DEFENSE

**FROM:** Alexander Velez-Green, Performing the Duties of the Under Secretary of Defense for Policy

**SUBJECT:** (U) Memorialization of Verbal Authorizations for DoD Support of DHS related to Executive Order Implementation

FEB 1 2 2025

- (CUI) **Purpose**: This memorandum documents your January 21, 2025, verbal authorization, while you were Acting Secretary of Defense, to provide support to the Department of Homeland Security (DHS) by providing: light rotary-wing aviation support; an additional 1,500 military personnel (bringing the total up to 4,000 military personnel) at the southwest border (SWB) for missions including detection and monitoring support; intelligence analysis support (with up to 140 intelligence personnel); and engineering support. Additionally, you approved airlift transportation support to Immigration and Customs Enforcement for the removal from the United States of persons identified by DHS.

  - (CUI) You memorialized your approval of the light rotary-wing aviation support and additional 1,170 personnel in the 22 January 2025 Special SecDef Orders Book.

- (CUI) **Background**: On January 20, 2025, the President declared that a national emergency exists at the southern border of the United States. The President directed the Secretary of Defense to order as many units or members of the Armed Forces, including the Ready Reserve and the National Guard, as the Secretary of Defense determines to be appropriate to support the activities of the Secretary of Homeland Security in obtaining complete operational control of the southern border of the United States.

- **(U) Light Rotary-Wing Aviation Support**

  - (CUI) On May 22, 2024, then-Secretary Austin approved 6,100 flight hours of light rotary-wing aviation support for fiscal year (FY) 2025 on a reimbursable basis in accordance with 10 U.S.C. §§ 272, 274, and 277 (TAB B). DHS has not agreed to provide reimbursement for this aviation support, and, prior to your authorization, DoD had not provided such support to U.S. Customs and Border Protection (CBP) in FY 2025.

  - (CUI) On January 21, 2025, you agreed to provide the light rotary-wing aviation support on a *non-reimbursable basis* in accordance with section 1059 of the National Defense Authorization Act (NDAA) for FY 2016 ("section 1059") to support CBP activities to secure the southern land border of the United States.

  - (CUI) The light rotary-wing aviation personnel and equipment were deployed to operational locations and began operational missions in support of CBP on January 22, 2025, consistent with your authorization.

Prepared by: DASD(HDI&DSCA)/DSCA
Phone Number: ▮▮▮▮▮▮

Controlled By: OUSD(P) HD&HA
CUI Category: OPSEC
Distribution/Limited Dissemination Control: FEDCON
POC: DASD(HDI&DSCA)



Protected Material — Subject to Protective Order
CUI

U-DOW-CAR-001

Protected Material -- Subject to Protective Order

U-DOW-CAR-002

- **(U) Personnel for Detection and Monitoring**
  - (CUI) On May 22, 2024, then-Secretary Austin approved support to DHS at the SWB to perform activities including operating mobile surveillance camera (MSC) to provide detection and monitoring support to CBP in accordance with section 1059 (TAB C).

  - (CUI) CBP informed the Commander, U.S. Northern Command (USNORTHCOM), operating an additional 80-100 MSC and fixed-camera sites was a high priority for CBP. Commander, USNORTHCOM, identified 500 Marine Corps personnel assigned to USNORTHCOM for firefighting support in Southern California to be re-missioned to SWB support as well as 3 Battalions and associated command and control from the Rapid Response Force (RRF) that could be employed to provide this support.

  - (CUI) On January 21, 2025, you agreed to provide up to 1,500 addition military personnel at the SWB. These military personnel can support detection and monitoring on a *non-reimbursable basis* in accordance with section 1059. You also authorized the deployment and employment of the RRF forces to support the activities of the CBP to secure the SWB.

- **(U) Intelligence Analysis**

  - (CUI) On March 22, 2024, DHS requested DoD provide mission enhancing capabilities in support of CBP's Office of Intelligence (OI) SWB-related efforts as defined and outlined in the DHS request for assistance (TAB D). DoD did not agree to provide intelligence analysis support due to previous inappropriate actions by CBP towards DoD personnel discovered during an USNORTHCOM-initiated IG investigation into potential questionable intelligence activity.

    - (CUI) The investigation determined that questionable intelligence activities had not occurred but did determine that inappropriate actions by CBP personnel and restrictions imposed by CBP OI prevented DoD from providing appropriate oversight of DoD personnel.

    - (CUI) Commander, USNORTHCOM, has determined that actions by CBP to correct previous improprieties have resolved these concerns.

  - (CUI) On January 21, 2025, you agreed to provide up to 140 personnel to provide intelligence analysis support to CBP on a *non-reimbursable basis* in accordance with section 1059. By approving this support, you are also approving the use of intelligence personnel for non-intelligence purposes.

  - (CUI) Initial support may be provided immediately using intelligence personnel currently deployed to the SWB and additional sourcing solutions, which will increase intelligence units/personnel up to the approved level of 140 personnel. The 140 intelligence personnel you approved is consistent with the number of personnel previously deployed to provide intelligence analysis support to CBP.

  - (CUI) Commander, USNORTHCOM, will have the ability to employ intelligence personnel from various locations, including remotely, to support CBP.

U-DOW-CAR-003

- **(U) Engineering Support**

  - (CUI) On January 21, 2025, the DHS/CBP verbally requested engineering support to emplace temporary barriers, remove brush, and other light ground engineering activities to support CBP efforts to deter illegal entry into the United States. DoD received the written request on January 22, 2025 (TAB E).

  - (CUI) On January 21, 2025, you agreed to provide engineering support to emplace temporary barriers, as well as activities necessary to emplace the temporary barriers (such as land preparation and brush clearance), utilizing the 1,500 additional military personnel deployed to the SWB to CBP, in accordance with section 1059 on a *non-reimbursable basis*.

- **(U) Airlift Transportation Support**

  - (CUI) On January 21, 2025, DHS requested airlift transportation support to remove aliens from U.S. Border Patrol facilities across the Southern United States to repatriation sites in El Salvador, Guatemala, Honduras, or other locations to be determined. (TAB F).

  - (CUI) On January 21, 2025, you agreed to provide the requested airlift transportation support in accordance with 10 U.S.C. § 274 and to *waive reimbursement* in accordance with 10 U.S.C. § 277(c) through April 20, 2025.

    o (CUI) U.S. Transportation Command/Air Mobility Command assess that this mission would result in a benefit to military personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training.

  - (CUI) DHS has confirmed that they will coordinate with the State Department to obtain diplomatic clearances for the flights, ensure the host nation will receive the passengers, and provide host nation notifications prior to flight departure. Additionally, DHS or other Federal law enforcement agencies will provide appropriate personnel to maintain custody of the passengers while on-board DoD aircraft (TAB F).

- **(U) Funding**

  - (CUI) The non-reimbursable support detailed above will be funded from the accounts of the executing DoD Component. The office of the Under Secretary of Defense (Comptroller) will work with the Military Services and Combatant Commands to ensure sufficient funds are available for execution, within the limits of available appropriations. DoD remains under a Continuing Resolution, currently providing appropriations for fiscal year 2025 for obligation or expenditure only through March 14, 2025. DoD operations beyond this date are subject to the enactment of additional appropriations.

- **(U) Section 1059 Requirement**

  - (U) The provision of support under section 1059 requires that the Secretary of Defense ensure that support provided will not negatively affect military training, operations,

U-DOW-CAR-004

readiness, or other military requirements. Based on consultation with the Joint Staff, it is not expected that providing this support would have such a negative effect.

- (CUI) The Chairman of the Joint Chiefs of Staff, in collaboration with the Chiefs of the Military Services, the Commander, U.S. Northern Command, and the Chief of the National Guard Bureau, will advise the Secretary of Defense if the support provided in accordance with section 1059 could begin to negatively affect military training, operations, readiness, or other military requirements.

- **(U) Submissions to Congress**

  - (U) Section 1707 of the NDAA for FY 2020 requires the Secretary of Defense to provide to the Committee on Armed Services of the Senate (SASC) and Committee on Armed Services of the House of Representatives (HASC), not later than seven calendar days after the Secretary of Defense approves a request for assistance from DHS, a copy of the request for assistance and, immediately upon submitting the official response approving a request, a copy of the official response.

  - (U) Section 1059 requires the Secretary of Defense to transmit notice to the HASC, SASC, and the House Homeland Security Committee of approval of support under section 1059, not later than seven days after the date on which the Secretary approves a request for assistance from DHS.

  - (U) My staff will work with the Assistant Secretary of Defense for Legislative Affairs to make the necessary submissions.

(CUI) **RECOMMENDATION #1:** Approve the documentation of (A) your determination that the provision of <u>light rotary-wing aviation support for up to a total of 6,100 flight hours</u> for detection and monitoring support to the Department of Homeland Security (DHS)/U.S. Customs and Border Protection (CBP) for fiscal year (FY) 2025 will not negatively affect military training, operations, readiness, or other military requirements and (B) your authorization for the Commander, USNORTHCOM, to provide light rotary-wing aviation support to DHS/CBP for FY 2025 on a <u>*non-reimbursable basis*</u> pursuant to section 1059 of the National Defense Authorization Act for FY 2016 ("section 1059"), subject to the availability of funds.

Approve _RGS_      Disapprove _____   Other _____
FEB 1 8 2025

(CUI) **RECOMMENDATION #2:** (A) determine that the provision of <u>additional military personnel up to approximately 4,000 total,</u> to the DHS/CBP for FY 2025 will not negatively affect military training, operations, readiness, or other military requirements; (B) approve documentation of your authorization for the Commander, USNORTHCOM, to provide detection and monitoring support to DHS/CBP for FY 2025 on a <u>*non-reimbursable basis pursuant to section 1059*</u>, subject to the availability of funds; and (C) approve documentation of your authorization to deploy and employ the Rapid Response Force.

Approve _RGS_      Disapprove _____   Other _____
FEB 1 8 2025

(CUI) **RECOMMENDATION #3:** Approve the documentation of (A) your determination that the provision of up to 140 personnel for <u>intelligence analysis support</u> to the DHS/CBP for FY




2025 will not negatively affect military training, operations, readiness, or other military requirements and (B) your authorization for the Commander, USNORTHCOM, to provide intelligence analysis support to DHS/CBP for FY 2025, including such support for non-intelligence purposes, on *a non-reimbursable basis* pursuant to section 1059, subject to the availability of funds.

Approve _RGS_     Disapprove _____     Other _____
FEB 18 2025

(CUI) **RECOMMENDATION #4:** Approve the documentation of (A) your determination that the provision of engineering support, within the 4,000 total approved military personnel, to the DHS/CBP for FY 2025 will not negatively affect military training, operations, readiness, or other military requirements and (B) your authorization for the Commander, USNORTHCOM, to provide engineering support to emplace temporary barriers, as well as activities necessary to emplace the temporary barriers, in support of DHS/CBP for FY 2025 on a *non-reimbursable basis* pursuant to section 1059, subject to the availability of funds.

Approve _RGS_     Disapprove _____     Other _____
FEB 18 2025

(CUI) **RECOMMENDATION #5:** Direct the Chairman of the Joint Chiefs of Staff, in collaboration with the Chiefs of the Military Services, the Commander, U.S. Northern Command, and the Chief of the National Guard Bureau to advise the Secretary of Defense if the support provided in accordance with section 1059 could begin to negatively affect military training, operations, readiness, or other military requirements.

Approve _RGS_     Disapprove _____     Other _____
FEB 18 2025

(CUI) **RECOMMENDATION #6:** Approve the documentation of (A) your authorization for the Commander, USNORTHCOM, to provide airlift transportation support, in accordance with 10 U.S.C. §§ 272 and 274, to DHS for removal of aliens from the United States through April 20, 2025; (B) your determination that providing airlift transportation support would result in a benefit to military personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training; and (C) your *waiver of reimbursement*, pursuant to 10 U.S.C. § 277(c), for airlift transportation support to be provided through April 20, 2025.

Approve _RGS_     Disapprove _____     Other _____
FEB 18 2025

(CUI) **RECOMMENDATION #7:** Authorize the Executive Secretary to sign the response memo to the Department of Homeland Security at TAB B.

Approve _RGS_     Disapprove _____     Other _____
FEB 18 2025

Attachments:
TAB A – Reply Memo to DHS (CUI)
TAB B – FY 2025 AM and Approved Recommendations (CUI)
TAB C – Intelligence Analysis Support Duty Descriptions (U//FOUO//LES)
TAB D – Engineering Support Request (U)


OSD001134-25/CMD001590-25

U-DOW-CAR-006

TAB E – Airlift Transportation Support Request (U//~~FOUO//LES~~)
TAB F – Coordination (U)

~~Protected Material – Subject to Protective Order~~
~~CUI~~

U-DOW-CAR-007

# TAB
# A

Privileged Material – Subject to Protective Order

U-DOW-CAR-008

~~CUI~~



**OFFICE OF THE SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1000

FEB 1 8 2025

MEMORANDUM FOR EXECUTIVE SECRETARY, DEPARTMENT OF HOMELAND
SECURITY

SUBJECT: (U) Department of Homeland Security Request for Continued Department of
Defense Support on the Southwest Border

(U) Thank you for your January 22, 2025 request for the Department of Defense (DoD)
to provide non-reimbursable airlift support to the Department of Homeland Security (DHS) to
repatriate aliens to El Salvador, Guatemala, Honduras, or other locations. The Acting Secretary
of Defense has approved non-reimbursable aviation support through April 20, 2025. DoD
support to DHS is subject to the conditions outlined below, and subject to the availability of
funds.

~~(CUI)~~ Prior to execution of missions, DHS and the State Department will obtain the
requisite diplomatic clearances for the flights, and will ensure the receiving nation is notified and
has agreed to accept the individuals. DHS will maintain custody of and security for the migrant
detainees at all times by ensuring appropriate law enforcement presence for all DoD-provided
flights.

~~(CUI)~~ In response to your March 22, 2024 request for DoD support, the Acting Secretary
of Defense has approved additional support on a non-reimbursable basis to U.S. Customs and
Border Protection (CBP) to increase efforts to secure the southern land border of the United
States — the provision of light rotary-wing aviation support for up to a total of 6,100 flight hours
for detection and monitoring support, the provision of up to 140 personnel for intelligence
analysis support, and an increase to 4,200 in the total number of military personnel providing
non-aviation support.

~~(CUI)~~ In response to your January 22, 2025 e-mail request for engineering support, the
Acting Secretary of Defense has approved the provision of military engineering support to CBP
to emplace temporary barriers, as well as related activities necessary to emplace the temporary
barriers.

~~(CUI)~~ DoD military personnel performing this support will be under the command of
Commander, U.S. Northern Command (USNORTHCOM).

(U) USNORTHCOM will coordinate with DHS/CBP to obtain additional information as
needed to ensure appropriate support is provided to CBP.

*Kelly Bulliner Ross*

Kelly Bulliner Ross
Executive Secretary

cc:
CJCS
USD(P)
CDRUSNORTHCOM

Controlled by: OUSD(P)/HD&HA
CUI Category: OPSEC
Distribution/LDC: FEDCON
POC: OASD (HD&HA) ██████████

~~Protected Material — Subject to Protective Order~~

~~CUI~~

# TAB B

Protected Material — Subject to Protective Order

U-DOW-CAR-010

~~CUI~~

May 20, 2024/1408

## ACTION MEMO

MAY 2 2 2024

**FOR:** SECRETARY OF DEFENSE

DepSecDef Action Copy provided to DSD

**FROM:** Melissa G. Dalton, Performing the Duties of Deputy Under Secretary of Defense (Policy) MGD MAY 2 1 2024

**SUBJECT:** Department of Defense Assistance in Support of U.S. Customs and Border Protection's Southwest Border Security Mission through Fiscal Year 2025

- ~~(CUI)~~ **Purpose.** This memorandum seeks your decision on five recommendations at TAB A concerning a Department of Homeland Security (DHS) request for assistance (RFA) for support to U.S. Customs and Border Protection (CBP) through fiscal year (FY) 2025, subject to the availability of funds. DHS requests the Department of Defense (DoD) provide support on a non-reimbursable basis to the maximum extent permitted by law. Your decision is requested by May 22, 2024, to support the May 23 SecDef Orders Book.

- ~~(CUI)~~ **Background.** DoD has supported DHS's southwest border (SWB) security mission for 21 of the last 24 years with a cost to DoD of more than $4 billion. In 18 of the 21 years, DoD's support has spanned the entire fiscal year. In most cases, this support was provided on a non-reimbursable basis.

  - ~~(CUI)~~ On March 22, 2024, DHS requested DoD provide critical mission-enhancing capabilities in support of the U.S. Border Patrol (USBP) and CBP's Office of Intelligence (OI) as outlined at TAB D. DoD and DHS are moving toward a capabilities-based framework for RFA development, and this is the first iteration of that effort.

    - ~~(CUI)~~ DoD will address this RFA in two separate packages: (1) the request for SWB support to USBP, referred to throughout as DHS RFA; and (2) a separate action to address the CBP OI request to be staffed in the near future.

    - ~~(CUI)~~ DoD "annual" (i.e., not including "surge" or "in extremis" support) SWB support to DHS for fiscal year (FY) 2024 was for up to 2,500 personnel and 13,200 total flight hours (TAB E).

    - ~~(CUI)~~ DoD annual support for FY 2023 to DHS for SWB support was 2,500 personnel and 12,100 total flight hours (TAB F).

  - ~~(CUI)~~ The DoD Comptroller has provided a cost estimate (TAB G) based upon the USNORTHCOM mission analysis. FY 2025 DoD support to USBP is estimated to cost $489.9M.

| | | | |
|---|---|---|---|
| SD CA | | DSD SA | |
| SD SMA | | DSD SMA | |
| SD MA | | DSD MA | |
| CoS | | DSD CA | |
| SD Action Grp | | DSD CoS | |
| ES | | ESR Rvw | DLM 5/22 |
| ESR | EK 5/22 | ESD | |

Prepared By: ███████ OSD (HD&HA).
Phone Number: ███████

Controlled By: OUSD (P) HD&HA
CUI Category: OPSEC
Distribution/Limited Dissemination Control: FEDCON
POC: Marcus Lindsey ███████

~~CUI~~

~~Protected Material — Subject to Protective Order~~ OSD002504-24/CMD005922-24

~~CUI~~

**Standards for Providing Support:**

- ~~(CUI)~~ To provide support under section 1059 of the National Defense Authorization Act for FY 2016 ("section 1059"), you must, "ensure that the provision of the assistance will not negatively affect military training, operations, readiness, or other military requirements."

  - (U) All support provided under section 1059 is provided on a non-reimbursable basis.

- ~~(CUI)~~ Support provided under 10 U.S.C. § 272 (provision of equipment) and 10 U.S.C. § 274 (operation and maintenance of equipment) ordinarily requires reimbursement from a civilian law enforcement agency, but you may waive the requirement for reimbursement pursuant to 10 U.S.C. § 277(c) if you determine that the support would result in a benefit to the DoD element or National Guard personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training.

**Recommended Response:**

- ~~(CUI)~~ Policy's recommended response ensures DoD support to the DHS border security mission; reduces non-reimbursable support; and ensures DoD support does not negatively affect military training, operations, readiness, or other military requirements. We recommend approving the following DoD assistance through FY 2025, subject to the availability of funds:

  - (U) On a Non-Reimbursable Basis:

    - ~~(CUI)~~ DoD will provide up to 2,500 DoD personnel to perform the following requested duties in support of USBP on a non-reimbursable basis: detection and monitoring, data entry, training, transportation, vehicle maintenance, and warehousing and logistical support (TAB B1) pursuant to Section 1059 for all 12 months of fiscal year 2025. Consistent with the assessments of the Secretary of the Army, the Secretary of the Air Force, and the Chairman of the Joint Chiefs of Staff (CJCS), this support can be provided with manageable effects on military training, operations, readiness, or other military requirements.

    - ~~(CUI)~~ The recommended solution fulfills the request for ground support on a non-reimbursable basis.

  - (U) On a Reimbursable Basis:

    - ~~(CUI)~~ DoD will provide light helicopter aerial reconnaissance support for all 12 months of FY 2025 pursuant to 10 U.S.C. §§ 272 and 274 (up to 1,525 flight hours per quarter for a total of 6,100 hours).

    - ~~(CUI)~~ If DHS is unable or unwilling to provide reimbursement for aviation support for all 12 months of FY 2025 and requests reconsideration, DoD could evaluate whether providing support for some shorter period, or for all of FY 2025, would meet the standard for waiver of reimbursement in 10 U.S.C. § 277(c).

~~Protected Material -- Subject to Protective Order~~

U-DOW-CAR-012

CUI

o (CUI) If Army leaders determine they need to adjust the level of aviation support based upon the results of the UH-72 Lakota accident (March 8, 2024) investigation, Policy will provide a recommendation to adjust the level of support.

o (CUI) The recommended solution only provides 50 percent of the requested aviation support and does not meet the DHS intent that DoD provide all support on a non-reimbursable basis to the maximum extent permitted by law.

o (CUI) Policy recommends approving only 6,100 flight hours of support due to concerns expressed by the Secretary of the Army and Chief of the National Guard Bureau (CNGB) that aviation support has reduced the programmed life cycle of the UH-72 Lakota fleet, resulting in the potential for unprogrammed funding requirements for early replacement of the UH-72 Lakota fleet, estimated at $4-6 billion.

o (CUI) DHS is prioritizing the first quarter of FY 2025 for aviation support due to historic trends of higher migrant levels and will work with JTF-North to prioritize flight hours accordingly.

■ (CUI) Policy engaged with DHS about increasing the use of indigenous CBP capabilities out of the Air and Marine Operations (AMO) component to cover potential gaps in capability. DHS agreed to explore utilizing AMO for aviation support, but noted it may be insufficient to cover all of their requirements.

■ (CUI) Policy will continue to work with DHS to monitor helicopter utilization rates and life-cycle impacts for the UH-72 Lakota fleet.

■ (CUI) Policy has informed the White House Deputy Chief of Staff of this recommended approach, as well.

• (CUI) Policy recommends USNORTHCOM evaluate utilization rates to validate force requirements to support CBP tasks and, in coordination with CBP, identify forces that can provide duties remotely such as data entry, and forces that could be placed in a status to respond to potential in-extremis requests.

• (CUI) In accordance with the Homeland Defense Policy Guidance, the reply memorandum to DHS (TAB B) requests that DHS identify an "off ramp" plan for DoD support on the SWB, include alternative solutions to DoD support, and provide timelines for those solutions.

• (CUI) Policy's recommendation is consistent with DoD policy that RFAs for defense support of civil authorities will be evaluated based on the factors established in DoD Directive 3025.18: legality, lethality, risk, cost, appropriateness, and readiness.

**Submission to Congress:**

• (CUI) In accordance with section 1707 of the NDAA for FY 2020, the ASD(HD&HA) will make the requisite submissions to Congress through OASD(LA) upon your approval of this request.

3

Protected Material — Subject to Protective Order

U-DOW-CAR-013

~~CUI~~

## Resourcing Considerations

- ~~(CUI)~~ If you approve this support, the CJCS will identify sourcing solutions for your consideration through the Global Force Management process.

  - ~~(CUI)~~ The Army intends to involuntarily mobilize Army National Guard and Army Reserve units for 365-days in accordance with 10 U.S.C. § 12302 and Executive Order 14097 in connection with the national emergency declared in Executive Order 14059 to address the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States posed by international drug trafficking.

    - o ~~(CUI)~~ This national emergency was most recently continued for another year by the President on December 13, 2023. Any orders must be issued prior to the termination of the national emergency.

    - o ~~(CUI)~~ The CNGB also supports one-year mobilization.

  - ~~(CUI)~~ Due to delays in receiving the request from DHS, the Army is not able to meet the customary 180-day notification to the military personnel of the mobilization. If you approve this support, the Army will provide notification to the units and personnel identified to provide support.

## Views of Others (TAB H).

- ~~(CUI)~~ The Secretaries of the Army and Air Force and Chairman of the Joint Chiefs of Staff agree that the provision of ground support will not negatively affect military training, operations, readiness, or other military requirements (as required by section 1059), and the aviation support results in a benefit to the personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training as required by 10 U.S.C. § 277(c) if DHS is unable to provide reimbursement for the aviation support.

- ~~(CUI)~~ The CNGB non concurs on recommendations #1 and #2. The CNGB stated he believes the ground support does generate a negative effect on unit readiness and that aviation support should only be provided on a reimbursable basis and limited to 5,000 flying hours for FY 2025.

- ~~(CUI)~~ The Under Secretary of the Navy non concurs on recommendations #1 and #5. The Department of Navy (DON) expresses that sourcing Active Component Sailors and Marines will impact military training, operations, and readiness as would providing support on a non-reimbursable basis. The Joint Staff does not intend to source DON personnel through the Global Force Management process.

- ~~(CUI)~~ The Secretaries of the Military Departments, the Joint Staff, and CNGB all have commented that this support could and should be provided by contracted support. Currently, DoD could provide contracted support on a reimbursable basis but not on a non-reimbursable basis.

~~Protected Material -- Subject to Protective Order~~

U-DOW-CAR-014

~~CUI~~

- ~~(CUI)~~ On April 10, 2024, DoD transmitted a Policy-initiated legislative proposal to the HASC and SASC, for consideration and possible inclusion in the National Defense Authorization Act (NDAA) for FY 2025, that would give SecDef the authority to provide contracted assistance to under section 1059.

- ~~(CUI)~~ If this proposal is enacted as part of NDAA for FY 2025, Policy will work with the Joint Staff, USNORTHCOM, other DoD Components as needed, and CBP to identify, and propose for SecDef consideration, DoD-funded contract solutions for SWB support to DHS for the remainder of FY 2025, and work with the Department of the Army and the National Guard Bureau on reassigning or curtailing any Reserve Component personnel ordered to active duty to provide SWB support to DHS.

**RECOMMENDATIONS:** See TAB A.

Attachments:
TAB A  – Recommendations
TAB B  – Memorandum to DHS Executive Secretary
TAB B1 – Approved DoD Duties
TAB C  – Memorandum to Commander, USNORTHCOM
TAB C1 – Approved DoD Duties
TAB D  – DHS RFA for DoD Support through Fiscal Year 2025
TAB E  – DoD SWB Support FY 2024 Extract
TAB F  – DoD SWB Support FY 2023 Extract
TAB G  – DoD Comptroller Analysis for DoD FY25 DHS USBP Support
TAB H  – Coordination Comments
TAB I  – Coordination

~~Protected Material -- Subject to Protective Order~~

U-DOW-CAR-015

# TAB

# A

Protected Material -- Subject to Protective Order

U-DOW-CAR-016

CUI

## TAB A: RECOMMENDATIONS

**SUBJECT:** (U) Department of Defense Assistance in Support of U.S. Customs and Border Protection's Southwest Border Security Mission through Fiscal Year 2025

(CUI) **RECOMMENDATION #1:** (A) Determine the provision of detection and monitoring, data entry, training, transportation, vehicle maintenance, and warehousing and logistical support to the Department of Homeland Security (DHS) for 12 months will not negatively affect military training, operations, readiness, or other military requirements; and (B) subject to the availability of funds, authorize Commander, USNORTHCOM, to provide detection and monitoring, data entry, training, transportation, vehicle maintenance, and warehousing and logistical support to DHS for all 12 months of fiscal year (FY) 2025 on a non-reimbursable basis pursuant to section 1059 of the National Defense Authorization Act for Fiscal Year 2016.

Approve___*LMH*___   Disapprove_____   Other_____

**MAY 2 4 2024**

(CUI) **RECOMMENDATION #2:** Authorize Commander, U.S. Northern Command (USNORTHCOM), to provide reimbursable light rotary-wing aerial reconnaissance support, subject to the availability of funds, to the DHS, for a total of 6,100 flight hours, in accordance with 10 U.S.C. §§ 272, 274, and 277 for all 12 months of FY 2025.

Approve___*LMH*___   Disapprove_____   Other_____

**MAY 2 4 2024**

(CUI) **RECOMMENDATION #3:** Direct the Chairman of the Joint Chiefs of Staff (CJCS) to develop sourcing recommendations for the activation of Reserve Component (RC) personnel pursuant to 10 U.S.C. § 12302, through the Global Force Management (GFM) process, to provide the above-recommended support, as available and where such support does not adversely affect readiness.

Approve___*LMH*___   Disapprove_____   Other_____

**MAY 2 4 2024**

Controlled By:  OUSD(P)/HD&HA
CUI Category:  OPSEC
Distribution/Limited Dissemination Control:  FEDCON
POC:  ██████████

CUI

Protected Material — Subject to Protective Order



OSD002504-24/CMD005922-24

U-DOW-CAR-017

~~CUI~~

~~(CUI)~~ **RECOMMENDATION #4:** Direct the Chief of the National Guard Bureau, in coordination with the Under Secretary of Defense for Policy and the CJCS, to notify the respective States of the National Guard units and personnel mobilized to provide the approved support.


Approve_____ Disapprove_____ Other_____

**MAY 2 4 2024**

~~(CUI)~~ **RECOMMENDATION #5:** Sign the memorandum to the Commander, USNORTHCOM, at TAB C, and approve the DoD Executive Secretary response at TAB B.


Approve_____ Disapprove_____ Other_____

**MAY 2 4 2024**

~~Protected Material -- Subject to Protective Order~~



OSD002504-24/CMD005922-24

U-DOW-CAR-018

# TAB
# C

Protected Material -- Subject to Protective Order

U-DOW-CAR-019

UNCLASSIFIED //FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

## USBP SOUTHWEST BORDER RFA 2025 REQUIREMENTS

| | SDC | LLC | YUM | TCA | EPT | BBT | DRT | LRT | RGV | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| DETECTION AND MONITORING (D&M) (SITES) | 19 | 8 | 5 | 15 | 25 | 11 | 62 | 54 | 44 | 243 |
| CAMERA ROOM (WORKSTATIONS) | 12 | 4 | 5 | 26 | 8 | 8 | 8 | 7 | 21 | 99 |
| DATA ENTRY SUPPORT (WORKSTATIONS) | 13 | 0 | 0 | 41 | 0 | 6 | 0 | 18 | 0 | 78 |
| WAREHOUSE/LOGISTICAL SUPPLY CHAIN SUPPORT | 16 | 0 | 0 | 28 | 5 | 4 | 13 | 4 | 22 | 92 |
| TRAINING SUPPORT | 0 | 0 | 0 | 21 | 7 | 9 | 13 | 2 | 13 | 65 |
| VEHICLE MAINTENANCE SUPPORT | 9 | 7 | 7 | 12 | 19 | 8 | 13 | 15 | 22 | 112 |
| TRANSPORTATION SUPPORT | 17 | 7 | 7 | 9 | 6 | 4 | 10 | 4 | 11 | 75 |

Detection and Monitoring (D&M): # of field sites (24 hours per day, 7 days per week)
Camera Room: # of camera room workstations (24 hours per day, 7 days per week)
Data Entry Support: # of workstations that have separation from migrants to support data entry (24 hours per day, 7 days per week)
Warehousing/Logistical Supply Chain Support: # of personnel staffing warehousing sites (8 hours per day, 5 days per week)
Training Support: # personnel supporting training sites (8 hours per day, 5 days per week)
Vehicle Maintenance Support: # of vehicle service bays to be staffed (8 hours per day, 5 days per week)
Transportation Support: # of personnel moving assets (8 hours per day, 5 days per week)

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

Protected Material - Subject to Protective Order

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

### Aviation Support

With the current average of 3 hours of daily direct on-station support hours. DoD aviation support averages 151 detections per day. Of significance, those detected are historically attempting to avoid apprehension due to their criminal or immigration background.

DHS requests a minimum of 8 hours of direct on-station support aviation hours in the following 8 USBP Sectors with accompanying resources, pilots, and support personnel 7 days per week. (Minimum estimated 23,360 direct on-station aviation hours).

Light Rotary-Wing (EO/IR): San Diego, El Centro, Yuma, Tucson, El Paso, Del Rio, Laredo, and Rio Grande Valley Sectors.
Medium Lift Rotary-Wing: As available.
Fixed Wing- As available.
Light Rotary-Wing, Medium Lift Rotary-Wing, and Fixed Wing Aircraft personnel are requested to be available on a 24/7 basis in the sectors identified, as dictated by CBP operational requirements.

Caveat: Support locations identified may change based on operational necessity at time of action.

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material -- Subject to Protective Order~~

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

# TAB

# C

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material — Subject to Protective Order~~

U-DOW-CAR-022

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

## TAB C
### FY 2025 Duty Descriptions – Office of Intelligence Support

- All personnel performing U.S. Customs and Border Protection (CBP) intelligence support duties must meet minimum federal investigation background standards. Federal investigation background standards are Tier Level 5.

- CBP intelligence support missions require a Top Secret SCI security clearance to effectively meet mission requirements. Like Department of Defense (DoD) security clearance requirements for certain DoD support missions, CBP background investigation requirements *cannot* be waived or downgraded. Unlike the DoD security clearance process, CBP *cannot* grant interim Tier Levels.

- All military personnel must be vetted by the CBP Office of Professional Responsibility (OPR) before arriving at a CBP facility to provide mission support. CBP OPR will validate that military personnel designated for CBP mission support have the required Tier 5 Level designation and either current TS/SCI or TS clearance with ability to be read on to SCI prior to supporting the mission.

- Unless specifically indicated, DoD personnel will perform the duties detailed below with appropriate oversight by DoD and CBP personnel.

- Unless specifically indicated, DoD personnel performing the support mission duties detailed below shall *not* interact with migrants or other persons in CBP custody, or evidentiary items, or responsibility for the care, custody, and control of personal property and evidence.

- Due to on-the-job training requirements, all military personnel should be available to provide at a minimum 300 days of mission support, unless approved by CBP.

- DoD personnel performing intelligence support functions will be exercising DoD authorities and adhere to corresponding intelligence oversight policies and procedures, consistent with requirements of Executive Order 12,333. These DoD personnel will be utilizing their authorities to access Intelligence Community systems and databases to support CBP's border security mission.

- DoD will provide any required DoD training, including intelligence oversight, and ensure personnel shall be properly trained and equipped, as required by DoD, for the duties detailed below.

- CBP will provide DoD Intelligence Oversight officials access to service members, their work products, and any other requirements to ensure intelligence oversight compliance.

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material — Subject to Protective Order~~

U-DOW-CAR-023

UNCLASSIFIED //~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

- Military personnel will only access and analyze CBP information or information CBP has been given access to by other agencies. This will include UNCLASSIFIED law enforcement sensitive and CLASSIFIED networks, databases, and intelligence. CBP will be responsible for providing access to these networks and systems along with their required training.

### Office of Intelligence (OI) Support:

Location: At the Southern Border Intelligence Center, Regional Intelligence Centers, and Joint Production Exploitation Operations Center located in California, Arizona, New Mexico, and Texas. They will be located indoors in a climate-controlled environment, Law Enforcement Sensitive space and / or a Sensitive Compartmented Information Facility.

Duties: As tasked by OI, perform one or more of the following support functions. In coordination with the supporting military command and control element and approved by the SECDEF, OI may adjust the number of military personnel performing each function as required by the operational environment. All duties performed will be conducted IAW relevant DoD policy.

- **All-Source Analysis:** Prepare all-source intelligence products on human smuggling, illegal migration, illicit finance, narcotics, transnational organized crime, counterintelligence, counterterrorism, and other threats to national security to support CBP. Assist in establishing and maintaining systematic, cross-referenced intelligence records and files. Receive and process incoming reports and messages. Assist in determining significance and reliability of incoming information. Assist in integrating incoming information with current intelligence holdings. Assist in the analysis and evaluation of intelligence holdings to determine changes in threat actors' capabilities, vulnerabilities, and probable courses of action. Assist in the researching, drafting, and writing of finished intelligence, compliant with Intelligence Community Directive (ICD) 203 and ICD 206, by using information from multiple sources to satisfy CBP key intelligence questions. Prepare and deliver intelligence briefings to CBP leaders. Conduct analytical exchanges with other intelligence professionals across CBP and with CBP interagency partners. Draft intelligence and information reports (IIRs) and submit them for review and release to a CBP Reports Officers.

- **All-Source Analysis / Full-Motion Video (FMV) Analysis:** Process, exploit, and disseminate data collected by CBP (e.g., electro-optical/infrared (EO/IR), Vehicle and Dismount Exploitation Radar (VaDER), Synthetic Aperture Radar (SAR), and SeaVue) in response to priority information requirements. Execute near-real time FMV PED for Unmanned Aerial Systems (UAS) and manned data link capable aircraft along the Southwest border and its maritime domain. Provide exploitation of intelligence-led operations is support of CBP's interagency partners requiring an elevated level of situational awareness for effective Reconnaissance, Surveillance, and Target Acquisition (RSTA) operations. Support pattern of life and overwatch for ground operations on high value targets (HVT) during domestic and international operations. Utilizing UAS cueing primarily on actionable intelligence to aid in the

UNCLASSIFIED //~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material -- Subject to Protective Order~~

U-DOW-CAR-024

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

apprehension of and subsequent extradition of HVTs and fugitives from justice. Exploit flights that are conducted daily along the Southwest Border from California to South Texas. Analysis VaDER radar, synthetic aperture radar (SAR), and ground moving-target indicator (GMTI) data to detect, localize, and track vehicles and dismounted personnel illegally crossing the border from Mexico into the United States. Facilitate information exchanges with CBP partners for near real-time actions. Exploit imagery collected by pole cameras and other imagery provided to CBP along the SWB by interagency partners that satisfy CBP information requirements.

- **All-Source Analysis / Imagery Analysis:** Provide forensic tactical analysis by studying and analyzing imagery products from multiple sources available to CBP. Provide advanced Geospatial Intelligence (GEOINT) analysis using UNCLASSIFIED and CLASSIFIED GEOINT capabilities. Develop complex GEOINT products in support of SWB operations. Conduct imagery studies related to CBP technical collection in support of operational planning. Perform complex geospatial analyses of border activities to identify spatial and temporal changes. Analyze aerial and ground permanent record imagery developed by photographic and electronic means. Use principles and techniques of photogrammetry and employs electronic, mechanical, and optical devices to obtain information from imagery. Obtain intelligence by studying and analyzing imagery products. Determine target coordinates for accurate location of imagery analysis findings.

- **All-Source Analysis / Counter Network:** Perform network analysis to identify individuals, entities, locations, and other key nodes of illicit networks. Utilize both UNCLASSIFIED and CLASSIFIED systems to map out illicit networks, submit publication requests to interagency partners. Leverage multiple tools, datasets, and systems available to CBP to conduct complex network development and make recommendations on disruption opportunities. Analyze incoming reports, information, and intelligence to build and maintain subject matter expertise against illicit networks. Build complex network charts, draft collection requirements, collection planning, and ISR synchronization.

- **All-Source Analysis / Spanish Language Translation:** Perform translation, exploitation, and analysis of foreign communications at all echelons using intelligence community systems. Translate, transcribe, gist and/or produce summaries of foreign communication transmissions; perform analysis and ISR synchronization to support mission requirements.

**Required Military Occupational Specialty:** DoD Military Intelligence designated personnel

Caveat: Military intelligence personnel will not conduct information collection or operate information-collections systems. Military personnel will only perform analysis of CBP collected information that is resident on CBP systems and information to which CBP has been provided access that resides on other government systems. All military personnel must be trained on rules and regulations governing intelligence oversight applicable to the specific functions they will perform. The training should address, at a minimum, the requirement and the process of reporting questionable intelligence activities and the name and contact information of intelligence oversight officials to whom they may direct any questions or concerns regarding

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material — Subject to Protective Order~~

U-DOW-CAR-025

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

intelligence oversight matters. Military intelligence personnel supporting CBP must be authorized to process, analyze, and disseminate imagery information. No U.S. person may be targeted for surveillance. Military personnel will not access information, including open-source information, that has not already been collected by CBP or another agency. Information incidentally collected on U.S. persons and other non-DoD persons or organizations during execution of this mission will be promptly turned over to civilian law enforcement officials.

UNCLASSIFIED // ~~FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE~~

~~Protected Material -- Subject to Protective Order~~

U-DOW-CAR-026

# TAB D

Protected Material – Subject to Protective Order

U-DOW-CAR-027

From: Tierney, Maryann ███████████████████
Sent: Wednesday, January 22, 2025 4:53 PM
To: Robert Salesses ███████████████████████████
Cc: Huffman, Benjamine ██████████████████████ >; VITIELLO, RONALD D.
████████████████████████ ; LAW, ROB█
████████████████████ HEMENWAY, TROUP ██████████████████████████ , SCOTT,
RODNEY S ███████████████████████            ██████ NOVAK, JEFFREY
████████████████████

Subject: Emergent RFA for DOD Construction and Engineering Support to DHS - 22 Jan 25

Acting Secretary of Defense Salesses,

Earlier today, we transmitted the formal RFA for aviation support to your team and we appreciate how
DOD has moved out on this request as well as aspects of the subsequent e-mail from Acting Secretary
Huffman notifying you of the second emergent RFA which we are currently formalizing.

Separately and understanding the criticality of the situation, CBP has identified high priority locations on
the SWB border where additional temporary barriers could be effective in deterring and preventing
illegal aliens from entering the United States. The Presidents Executive Order, Securing our Borders
states, "The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate
action to deploy and construct temporary and permanent physical barriers to ensure complete
operational control of the southern border of the United States."

███████████████████████████████████████████████████████████████████
███████████████████████████████████████ DHS requests DoD will provide support incrementally in accordance
with CBP's priorities at locations to be determined by CBP and agreed upon by DOD. ██████████████
███████████████████████████ This support will be provided on a non-reimbursable basis, to the
greatest extent legally possible.

Additional language specifying CBP as the lead agency for environmental compliance and all necessary
access to land will be included in the formal RFA.

Mr. Ron Vitiello (cc'd) at U.S. Customs and Border Protection will continue to be my POC to assist in
coordination with your team; Director, Joint Staff; and others as you identify to provide further detail for
the utilization and deployment of these resources.

I appreciate your timely consideration of this emergent request. My formal RFA will be transmitted in the
coming days.

MaryAnn Tierney
Deputy Secretary (A)

████████████ (mobile)

Protected Material -- Subject to Protective Order

U-DOW-CAR-028

# TAB E

Protected Material -- Subject to Protective Order

U-DOW-CAR-029

~~FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE~~



Office of the Executive Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

January 22, 2025

MEMORANDUM FOR: Kelly Bulliner Ross
Executive Secretary
U.S. Department of Defense

FROM: Juliana Blackwell
Acting Executive Secretary
U.S. Department of Homeland Security

SUBJECT: **Request for Assistance from the Department of Defense for Aviation Transportation Support to the Department of Homeland Security**

### Overview

DHS requests immediate aviation transportation assistance to remove aliens from U.S. Border Patrol facilities across Southern United States to repatriation sites in El Salvador, Guatemala, Honduras, or other locations to be determined. DHS and U.S. Customs and Border Protection (CBP) will work with the U.S. Department of State to obtain the requisite diplomatic clearances, ensure host nation notification of repatriation operations, and ensure countries where detainees will be flown have agreed to accept the detainees. Additionally, DHS will ensure CBP, or another cognizant DHS law enforcement entity will provide in-flight security for all DOD-provided flights. This Request for Assistance is made pursuant to the President's Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the United States (20 January 2025), section 2; Executive Order Declaring a National Emergency at the Southern Border of the United States (20 January 2025); and Executive Order Guaranteeing the States Protection Against Invasion (20 January 2025).

### DHS Overarching Goal

DHS seeks to expeditiously execute Presidential guidance to protect the American people against invasion and enforce immigration laws against all inadmissible and removable aliens.

### Specific Topics for Request

DHS requests aviation transportation support to remove all aliens present in the following CBP sectors, the numbers for which are current as of 22 January 2025. Future requirements to remove additional populations which may be present in the future should be expected.

Rio Grande Valley Sector - 1,357

~~FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE~~

~~Protected Material — Subject to Protective Order~~



OSD001134-25/CMD001595-25

U-DOW-CAR-030

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

Request for Assistance to the Department of Defense for Air Transportation Support to DHS
Page 2

San Diego Sector – 1,005

El Paso Sector - 959

Laredo Sector - 588

Tucson Sector - 504

Yuma Sector - 500

Del Rio Sector - 228

El Centro Sector - 31

Miami Sector - 13

Detroit Sector - 9

Swanton Sector - 7

Big Bend Sector - 4

Buffalo Sector - 1

Spokane Sector - 1

### End of Mission

DHS requests that DoD-authorized support capabilities remain in place through completion of removal operations.

### Funding

DHS requests DoD provide support on a non-reimbursable basis.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

Protected Material - Subject to Protective Order

U-DOW-CAR-031

TAB
F

Protected Material – Subject to Protective Order

U-DOW-CAR-032

## Policy Coordination Sheet

**Subject:** Memorialization of Verbal Authorizations for DoD Support for Executive Order Implementation

**Control Number:** *USP000138-25*

| Title/ Organization | Name | Coordination Requested | Coordination Received | Response |
|---|---|---|---|---|
| Joint Staff | LTG D.A. Sims | January 22, 2025 | January 23, 2025 | Concur with comment |
| OGC | Charles Lee Young III | January 22, 2025 | January 23, 2025 | Concur with comments |
| USD(C)/CFO | Anne J. McAndrew | January 22, 2025 | January 23, 2025 | Concur with comment |
| USD(A&S) | Stephen J. Morani | January 22, 2025 | January 23, 2025 | Concur |

Protected Material -- Subject to Protective Order

U-DOW-CAR-033

# United States Senate

WASHINGTON, DC 20510

February 13, 2025

The Honorable Pete Hegseth
Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Dear Secretary Hegseth:

We are concerned about the Department of Defense's (DoD) immigration-related operations at the southern border and at Naval Station Guantanamo Bay — including the implications of these operations for the military's budget, readiness, and morale. DoD's support for the Department of Homeland Security (DHS) has been expensive for American taxpayers, with some DoD expenses costing over three times more than when DHS performs the same function, while also posing "an unacceptable risk" to units' readiness.[1] DoD's new immigration operations — which the Trump administration is planning at an unprecedented scale — threaten to burden the Department's resources and undermine our national security. To better understand those risks, we write to request additional information about these operations.

On his first day in office, President Trump signed an Executive Order (EO) directing the United States Northern Command (NORTHCOM) to "seal the borders" and "to provide steady-state southern border security."[2] Then on January 29, President Trump directed DoD to "expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity" of 30,000.[3]

In response, over the past four weeks, NORTHCOM has deployed roughly 2,000 active-duty troops to the southern border, drawing from numerous Army and Marine Corps units and directing the 10th Mountain Division from Fort Drum, New York to oversee the units.[4] Those

[1] Los Angeles Times, "Must Reads: Marine Corps commandant says deploying troops to the border poses 'unacceptable risk,'" Molly O'Toole, March 21, 2019, https://www.latimes.com/politics/la-na-pol-marine-corps-border-national-emergency-20190321-story.html; Reuters, "US military deportation flight likely cost more than first class," Phil Stewart, January 30, 2025, https://www.reuters.com/world/americas/us-military-deportation-flight-likely-cost-more-than-first-class-2025-01-30/.
[2] White House, Executive Order, Clarifying The Military's Role In Protecting The Territorial Integrity Of The United States, January 20, 2025, https://www.whitehouse.gov/presidential-actions/2025/01/clarifying-the-militarys-role-in-protecting-the-territorial-integrity-of-the-united-states.
[3] White House, Executive Order, Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity, January 29, 2025, https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity; Reuters, "Trump to prepare facility at Guantanamo for 30,000 migrants," Jeff Mason, Idrees Ali and Ted Hesson, January 30, 2025, https://www.reuters.com/world/us/trump-says-he-will-instruct-homeland-security-pentagon-prepare-migrant-facility-2025-01-29.
[4] U.S. Army, "Fort Drum Soldiers deploy to southern border," press release, February 5, 2025. https://home.army.mil/drum/4017/3878/2079/WB_Press_Release_-_Fort_Drum_Soldiers_deploy_to_southern_boarder.pdf; CNC Y Central, "Around 500 soldiers from Fort Drum to



OSD001359/25/CMD001844-25

U-DOW-CAR-034

troops supplemented the 2,500 National Guard members already stationed at the border, bringing the total under DoD's command to over 4,000.[5] DoD leaders have made clear that "there will be very likely additional missions, this is just the start."[6] In the near term, the Trump administration is reportedly considering deploying up to 10,000 troops to the southern border[7] — double the scale of DoD's border deployment in 2019 and 2020.[8] That number could grow; during President Trump's first term, Stephen Miller (now White House Deputy Chief of Staff) allegedly asserted that "[w]e need a quarter-million troops" at the southern border.[9]

Furthermore, DoD has operated over 10 deportation flights — including to Guatemala, Ecuador, India, and Guantanamo[10] — following Immigration and Customs Enforcement's (ICE) reversal of its policy against using military aircraft to deport migrants.[11] Meanwhile, DoD has supplied facilities to assist DHS immigration enforcement operations.[12] Within the United States, DoD

depart for southern border," Matthew Benninger, February 5, 2025, https://cnycentral.com/news/local/fort-drum/ Military.com, "Here Are All the Units Now Deployed to the Border for Trump's Immigration Crackdown," Steve Beynon, Patricia Kime, and Thomas Novelly, January 27, 2025, https://www.military.com/daily-news/2025/01/27/here-are-all-units-now-deployed-border-trumps-immigration-crackdown.html; U.S. Department of Defense, Background Briefing on DOD Actions Responding to President Trump's Executive Order on Securing our Border, January 22, 2025, https://www.defense.gov/News/Transcripts/Transcript/Article/4038856/background-briefing-on-dod-actions-responding-to-president-trumps-executive-ord.

[5] U.S. Northern Command, "USNORTHCOM bolsters security at southern border," press release, January 23, 2025, https://www.northcom.mil/Newsroom/Press-Releases/Article/4038601/usnorthcom-bolsters-security-at-southern-border.

[6] U.S. Department of Defense, "Background Briefing on DOD Actions Responding to President Trump's Executive Order on Securing our Border," transcript, January 22, 2025, https://www.defense.gov/News/Transcripts/Transcript/Article/4038856/background-briefing-on-dod-actions-responding-to-president-trumps-executive-ord.

[7] ABC News, "DHS could request up to 10,000 troops for the border, internal memo shows," Luke Barr and Luis Martinez, January 23, 2025, https://abcnews.go.com/Politics/dhs-request-10000-troops-border-internal-memo-shows/story?id=118045892; U.S. Department of Defense, "Background Briefing on DOD Actions Responding to President Trump's Executive Order on Securing our Border," transcript, January 22, 2025, https://www.defense.gov/News/Transcripts/Transcript/Article/4038856/background-briefing-on-dod-actions-responding-to-president-trumps-executive-ord.

[8] Center for Strategic & International Studies, "Trump Sends Troops to the Southern Border: A Crisis or a Continuation of U.S. Policy," Mark F. Cancia, January 27, 2025, https://www.csis.org/analysis/trump-sends-troops-southern-border-crisis-or-continuation-us-policy.

[9] CBS News, "Esper: Stephen Miller called for a 'quarter-million troops' to respond to migrant caravan," May 5, 2022, https://www.cbsnews.com/news/mark-esper-stephen-miller-border-troops-migrant-caravan-60-minutes-2022-05-05.

[10] Air & Space Forces Magazine, "USAF Flies More Detained Migrants to Guantanamo in C-17," Chris Gordon, February 6, 2025, https://www.airandspaceforces.com/usaf-detained-migrants-guantanamo; New York Times, "What to Know About Trump's Military Deportation Flights," Annie Correal, January 31, 2025, https://www.nytimes.com/2025/01/31/world/americas/trump-military-deportation-flights.html; Air & Space Forces Magazine, "Air Force C-17s Conduct First Deportation Flights, Two Not Allowed to Land," Chris Gordon, January 26, 2025, https://www.airandspaceforces.com/air-force-c-17s-first-deportation-flights-guatemala.

[11] Air Force crew on deportation flights are reportedly removing insignia with their names and unit numbers from their uniforms. See Military.com, "Air Force Has Troops Remove Names, Unit Patches from Uniforms During Deportation Flights," Thomas Novelly, February 7, 2025, https://www.military.com/daily-news/2025/02/07/air-force-has-troops-remove-names-unit-patches-uniforms-during-deportation-flights.html; U.S. Immigration and Customs Enforcement, "ICE Air Operations Overview," August 8, 2023, https://www.ice.gov/factsheets/ice-air-operations.

[12] CBS News, "Military to provide facilities at Colorado's Buckley Space Force Base to process detained migrants," Anna Alejo, January 28, 2025, https://www.cbsnews.com/colorado/news/colorado-military-provide-facilities-

U-DOW-CAR-035

agreed to temporarily detain migrants at the Buckley Space Force Base in Colorado on behalf of ICE.[13] At Guantanamo, SOUTHCOM is in the process of expanding the Migrant Operations Center's (MOC) capacity to 30,000 — up from its current maximum capacity of just 120.[14] Migrants are also being held in Guantanamo's "Camp 6" prison, which previously held War-on-Terror detainees.[15] DHS has not ruled out detaining women and children at Guantanamo.[16] So far, 500 Marines have been ordered to deploy to Guantanamo,[17] with potentially more to come. DoD has been noncommittal about how long they will stay; one spokesperson noted "mass migration is unpredictable, and the extent of U.S. military support will be determined as events unfold."[18]

NORTHCOM's and SOUTHCOM's new immigration-related operations place significant — and unnecessary — burdens on DoD resources, personnel, and readiness. DoD has estimated that its southern border operations will cost almost $1 billion over just *eight months*, through the end of this fiscal year, compared to its estimate of $1 billion over three years during the first Trump administration.[19] DoD does not yet have a cost estimate for its new Guantanamo operations,[20] but a former Pentagon official warned that "[t]he total cost for this [Guantanamo operation] would quickly skyrocket into tens of millions, if not hundreds of millions, of dollars."[21]

process-detained-migrants.

[13] Reuters, "ICE to use U.S. military base in Colorado to detain migrants," Phil Stewart and Idrees Ali, January 28, 2025, https://www.reuters.com/world/us/ice-use-us-military-base-colorado-detain-migrants-2025-01-29; Wall Street Journal, "U.S. Begins Migrant Flights to Guantanamo Bay," Tarini Parti, Nancy A. Youssef, and Michelle Hackman, February 4, 2025, https://www.wsj.com/politics/policy/trump-immigration-policy-guantanamo-bay-migrant-flights-9fec8df7.

[14] *Id.*

[15] New York Times, "U.S. Is Holding Migrants in Cells That Once Held Al Qaeda Suspects," Hamed Aleaziz, Eric Schmitt and Carol Rosenberg, February 5, 2025, https://www.nytimes.com/2025/02/05/us/politics/migrants-trump-guantanamo-prison.html

[16] NBC News, "Kristi Noem says 'due process will be followed' for migrants at Guantánamo Bay," Alexandra Marquez, February 2, 2025, https://www.nbcnews.com/politics/immigration/homeland-security-noem-due-process-migrants-guantanamo-bay-rcna190330.

[17] PBS News, "Pentagon sends more troops to U.S.-Mexico border, bringing total to 3,600," February 7, 2025, https://www.pbs.org/newshour/politics/pentagon-sends-more-troops-to-u-s-mexico-border-bringing-total-to-3600; U.S. Southern Command, U.S. Military Troops Arrive at Naval Station Guantanamo Bay for Illegal Alien Holding Operations, press release, February 3, 2025, https://www.southcom.mil/News/PressReleases/Article/4050872/us-military-troops-arrive-at-naval-station-guantanamo-bay-for-illegal-alien-hol.

[18] Military.com, "Marines, Soldiers Set Up Tents and Cots at Guantanamo Bay for Trump's Migrant Deportations," Drew F. Lawrence and Konstantin Toropin, February 3, 2025, https://www.military.com/daily-news/2025/02/03/over-300-service-members-now-guantanamo-bay-support-detention-of-migrants-us.html.

[19] U.S. Government Accountability Office, SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection, February 2021, p. 15, https://www.gao.gov/assets/gao-21-356.pdf.

[20] U.S. Senate Committee on Armed Services, "Open/Closed/ Hearing titleTo receive testimony on the posture of United States Northern Command and United States Southern Command in review of the Defense Authorization Request for Fiscal Year 2026 and the Future Years Defense Program," February 13, 2025, 1:40:50-1:40:53, https://www.armed-services.senate.gov/hearings/to-receive-testimony-on-the-posture-of-united-states-northern-command-and-united-states-southern-command-in-review-of-the-defense-authorization-request-for-fiscal-year-2026-and-the-future-years-defense-program.

[21] Politico, "Pentagon shocked by Trump's order to house migrants in Guantanamo Bay," Paul McLeary, Jack Detsch and Myah Ward, January 31, 2025, https://www.politico.com/news/2025/01/31/trump-guantanamo-bay-migrants-pentagon-00201715.

3

U-DOW-CAR-036

Much of this cost is avoidable. For example, DoD is deporting migrants on C-17 military aircraft, which cost far more than the commercial and chartered flights that ICE normally uses for deportations.[22] Taxpayers pay over $28,000 per flight hour for a single deportation on a military C-17 plane, compared to $8,577 per flight hour on civilian aircraft alternatives that ICE often uses.[23] Similarly, ICE pays contractors over $272,000 per detention bed to operate Guantanamo's MOC, compared to an average of around $57.00 per bed at ICE facilities within the United States.[24]

Perhaps more concerning, DoD may not have a realistic estimate of how much these new operations will cost. When DoD deployed to the border between FY2018 and FY2020 during President Trump's first term, the Department estimated that its border operations would total $1 billion in unreimbursed costs between FY2018 and FY2020.[25] The Government Accountability Office (GAO) later found that "DOD did not present reliable cost estimates . . . that would allow the Secretary to gauge how providing support could affect the department's budget."[26] DoD neglected to include entire categories of expenses in its estimates, such as the cost of DoD installations to support military personnel and National Guard member benefits.[27] The Department also failed to accurately report its costs to Congress.[28] Since then, DoD has not implemented any of GAO's recommendations for improving how it estimates the cost of assisting DHS's immigration operations.[29]

Beyond budgetary costs, DoD's growing participation in DHS immigration operations will pose serious costs for units' readiness. The Defense Secretary discontinued part of DoD's border operations between 2018 and 2020 after finding that "continued support for the mission would negatively affect military readiness and morale."[30] The Commandant of the Marine Corps had warned that the operation posed an "unacceptable risk to Marine Corps combat readiness and

[22] Wall Street Journal, "Analysis Reveals the High Costs of Trump's Military Deportation Flights," February 13, 2025, https://www.wsj.com/video/analysis-reveals-the-high-costs-of-trumps-military-deportation-flights/7E1D26C3-16B8-4F5F-9D10-71F8588039D0?mod=business_videos_pos2

[23] Newsweek, "Trump's Reliance on Military Planes for Deportations Is Costing Taxpayers," Jesus Mesa, January 31, 2025, https://www.newsweek.com/trumps-reliance-military-planes-deportations-costing-taxpayers-2025882; Reuters, "US military deportation flight likely cost more than first class," Phil Stewart, January 30, 2025, https://www.reuters.com/world/americas/us-military-deportation-flight-likely-cost-more-than-first-class-2025-01-30

[24] Immigration Impact, "Sending Migrants to Guantánamo Bay Is a Costly, Abusive Shift in Immigration Detention," Chris Opila, February 7, 2025, https://immigrationimpact.com/2025/02/07/sending-migrants-guantanamo-bay-costly-abusive-detention; NBC News, "Trump's stepped-up immigration arrests escalate need for more detention space," Suzanne Gamboa, Julia Ainsley, Gabe Gutierrez and Laura Strickler, January 31, 2025, https://www.nbcnews.com/news/latino/trumps-stepped-immigration-arrests-escalate-need-detention-space-rcna190217; Targeted News Service, "AKIMA INFRASTRUCTURE PROTECTION Wins $163,445,525 Federal Contract," September 8, 2024.

[25] U.S. Government Accountability Office, SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection, February 2021, p. 15, https://www.gao.gov/assets/gao-21-356.pdf

[26] Id., p. 15.

[27] Id.

[28] Id., pp. 31-34.

[29] Id.

[30] Id., p. 25.

4

U-DOW-CAR-037

solvency."[31] For example, DoD sent Blackhawk helicopters to the border, "separate[ed] units in order to assign a portion of them to the southwest border mission," and canceled training exercises — all of which reduced the readiness of the impacted units.[32] Again, GAO found that DoD had underestimated these costs, approving border deployments with "limited information about how providing the requested capabilities would affect readiness."[33] And again, DoD has not implemented any of GAO's recommendations for improving its assessment of how border operations impact readiness. This track record casts doubt on your prediction that the current border operations will in fact "contribute[] to readiness."[34]

Likewise, we are concerned about how these operations may impact servicemembers' morale. In recent years, DoD personnel who deployed to the border have reported dangerously low morale, driven by an unclear mission, isolation, boredom, poor accommodations, and more.[35] Poor morale even contributed to a series of suicides by members of the Texas National Guard who deployed to the southern border after 2020.[36] As mentioned above, the Defense Secretary scaled back border operations in 2019 in part because of how the mission was harming troops' morale.[37]

In all, the Trump administration is militarizing the country's immigration enforcement system in an apparent attempt to signal toughness. But this political stunt will come at a high cost: it risks diverting DoD's resources away from its vital mission in ways that compromise our national security. We request answers to the following questions by February 27, 2025:

**U.S.-Mexico Border Operations**

1. Please provide a complete list of units deployed to the southern border and the estimated length of deployment for each.

2. How is NORTHCOM tracking border support activity costs and ensuring the accuracy of cost tallies?

3. Describe how DoD is assessing the impact of southern border operations on troops' readiness.

---

[31] LA Times, "Must Reads: Marine Corps commandant says deploying troops to the border poses 'unacceptable risk.'" Molly O'Toole, March 21, 2019, https://www.latimes.com/politics/la-na-pol-marine-corps-border-national-emergency-20190321-story.html

[32] U.S. Government Accountability Office, SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection, February 2021, pp. 24, 26-27, https://www.gao.gov/assets/gao-21-356.pdf.

[33] Id., p. 27.

[34] U.S. Army, "Defense Secretary says enlisted morale is high at Southern Border," Matthew Olay, February 7, 2025, https://www.army.mil/article/282912/defense_secretary_says_enlisted_morale_is_high_at_southern_border.

[35] Army Times, "Death, drugs and a disbanded unit: How the Guard's Mexico border mission fell apart," Davis Winkie, December 8, 2021, https://www.armytimes.com/news/your-army/2021/12/08/death-drugs-and-a-disbanded-unit-how-the-guards-mexico-border-mission-fell-apart.

[36] Texas Standard, "At least 17 Texas National Guardsman have died patrolling the southern border, including several suicides," Gabriella Alcorta Solorio, December 9, 2024, https://www.texasstandard.org/stories/texas-national-guard-operation-lone-star-soldier-deaths-suicides.

[37] U.S. Government Accountability Office, "SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection," February 2021, p. 25, https://www.gao.gov/assets/gao-21-356.pdf.

5

U-DOW-CAR-038

a. Have any training exercises been delayed or canceled due to the recent deployments to the southern border? Please provide the date and type of any affected training exercises and explain which units were impacted.

b. Is DoD separating units when sending personnel to the border? If so, please explain the reasoning, given evidence of how doing so between 2018-2020 harmed units' readiness.

4. How, if at all, is NORTHCOM monitoring the impact of the border deployment on troops' morale?

5. Please list all National Guard forces that are currently participating in southern border operations and the authority under which they have deployed.

6. GAO previously found that "DoD has not defined what it considers to be a manageable impact on readiness."[19] How is DoD determining when an anticipated impact on readiness is "manageable"?

7. What was the total cost of DoD's border deployment between 2018-2020?

8. What does NORTHCOM project the total cost of border operations will be this calendar year?

   a. Please explain the assumptions underlying that estimate.
   b. Provide the total operational costs of DoD's border deployment since January 20, 2025.
   c. What budgetary account will be used to pay for the operations?
   d. Which expenses, if any, is DoD paying for on a non-reimbursable basis? If DoD is waiving reimbursement for any expenses under 10 U.S.C. § 277, provide the justification for doing so.

9. Are any noncitizens currently being held at the Buckley Space Force Base in Colorado?

   a. If so, please describe the authority under which they are being held and the protocol for them to access legal counsel.

10. Is DoD considering using other military bases in the United States for detention operations?

11. Provide a full list of tasks to which active-duty forces will be assigned, along with a summary of functions to date and a summary of upcoming functions DoD troops will engage in.

---

[19] U.S. Government Accountability Office, SOUTHWEST BORDER SECURITY Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection, February 2021, p. 26, https://www.gao.gov/assets/gao-21-356.pdf

6

U-DOW-CAR-039

12. What are the rules of engagement that govern each unit deployed to the border?

13. Are servicemembers authorized to use force at the border?

    a.  In 2020, the DoD Inspector General found that some troops did not receive Standing Rules for the Use of Force (SRUF) training.[37] What percentage of troops currently deployed to the border have completed training on when and how they can use force? Please describe the training they receive on the authorization of military force.

    b.  Are servicemembers under DoD's command authorized to use force against unarmed civilians at the border?

    c.  Under what circumstances, if any, are servicemembers under DoD's command authorized to make arrests at the border?

14. How does DoD handle encounters with citizens at the border?

**Guantanamo Operations**

1.  Please describe SOUTHCOM's precise role(s) in Guantanamo's migrant detention operations.

    a.  How, if at all, are DoD personnel directly involved in the detention of any migrants at Guantanamo.

    b.  Has DoD (or any of its components) signed any memoranda of understanding or similar agreements with DHS regarding the detention of migrants at Guantanamo? Please provide a copy of any agreements if so.

2.  Describe DoD's precise role at the MOC and Camp 6 and how this role is currently projected to evolve.

    a.  There are reports that DoD personnel are guarding migrants at Camp 6.[38] Please explain in detail who is currently guarding Camp 6 and whether there are plans to change the personnel stationed at Camp 6.

    b.  Are migrants at the MOC or Camp 6 free to leave or are they being formally detained? If they are detained, under what legal authority are migrants being detained at Guantanamo's Camp 6?

3.  How, if at all, is SOUTHCOM monitoring the impact of the Guantanamo deployment on troops' morale?

---

[37] Department of Defense Office of Inspector General, "Evaluation of the United States Military Support of Department of Homeland Security Southern Border Security Operations Under Title 10 Authority (DODIG-2020-115)," August 14, 2020, https://www.dodig.mil/reports.html/Article/2316046/evaluation-of-the-united-states-military-support-of-department-of-homeland-secu/

[38] New York Times, "Some Migrants Sent by Trump to Guantanamo Are Being Held by Military Guards," Carol Rosenberg and Charlie Savage, February 12, 2025, https://www.nytimes.com/2025/02/12/us/gitmo-migrants-trump.html?smid=nytcore-ios-share&referringSource=articleShare

U-DOW-CAR-040

4. Describe how DoD is assessing the impact of Guantanamo MOC operations on troops' readiness.

5. Has DHS informed DoD of whether Guantanamo's MOC will be used to hold any migrants who have not received final orders of removal?

    a. Have any migrants currently at the MOC not received final removal orders?

6. What does SOUTHCOM project the total cost of Guantanamo's MOC operations will be this fiscal year? If no single cost estimate is available, please provide a series of cost estimates based on the different scenarios for which DoD is planning.

7. GAO has found that DHS has detained U.S. citizens after mistaking them for foreign nationals.[41] What steps, if any, does DoD take to confirm the identity of an individual before taking them into custody at a military facility or on a military aircraft?

8. What is DoD's timeline for constructing permanent structures at the MOC and how long do you anticipate migrants will be held in soft-sided facilities?

9. What term is being used to describe noncitizens deported from United States to Guantanamo?

10. What is DoD's plan for migrants held at Guantanamo whose home country will not accept their repatriation?

11. What is DoD's plan for evacuating the MOC during extreme weather events?

12. Please provide a summary of the age and gender of migrants currently being held at Guantanamo's MOC.

    a. Has DoD been informed of any plan to detain women or children at Guantanamo?

13. What government entities, if any, will conduct on-site inspections of Guantanamo's MOC and Camp 6, and at what frequency? Will they publicly report on findings?

14. Has DoD received requests for access to the MOC or Camp 6 by legal service providers, humanitarian organizations, press, or other members of the public? How have requests been handled?

    a. Describe DoD's plans for facilitating migrants' access to counsel.
    b. Has DHS requested that SOUTHCOM facilitate confidential legal phone calls or legal visits?

---

[41] U.S. Government Accountability Office, Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations, July 20, 2021, https://www.gao.gov/products/gao-21-487.

U-DOW-CAR-041

U-DOW-CAR-042

15. What steps is DoD taking to make the MOC and Camp 6 facilities habitable for the number of migrants expected to be held at Guantanamo.

    a.  Any migrants currently housed in spaced with black mold, leaks, electrical fires, other issues?

16. As of the date of your response, what is the current capacity of the MOC at Guantanamo?

    a.  How long does SOUTHCOM anticipate it will take DoD to complete the first phase of the MOC expansion to 2,000 migrants?[6]
    b.  What is the maximum number of migrants for whom Guantanamo's MOC currently has the capacity and resources to provide sanitary facilities, medical care, food, and potable water?

17. Please explain the standards of care that DoD personnel are bound to provide at Guantanamo and provide a copy of DoD's protocol, if any, on standards of care.

Thank you for your attention to this important matter.

Sincerely,

Elizabeth Warren
United States Senator

Mazie K. Hirono
United States Senator

CC: Admiral Alvin Holsey, Commander, United States Southern Command; General Gregory M. Guillot, Commander, United States Northern Command and North American Aerospace Defense Command

---

[6] U.S. Navy, USS St. Louis (LCS-19) Supports Operation Southern Guard at Naval Station Guantanamo Bay, February 4, 2025, https://www.navy.mil/Press-Office/News-Stories/Article/4053757/uss-st-louis-lcs-19-supports-operation-southern-guard-at-naval-station-guantana.



**Congressional
Research Service**
Informing the legislative debate since 1914

# The Posse Comitatus Act and Related Matters:
# The Use of the Military to Execute
# Civilian Law

Updated November 6, 2018

**Congressional Research Service**

https://crsreports.congress.gov

R42659

**CRS REPORT**
Prepared for Members and
Committees of Congress

U-DOW-CAR-043

# Summary

The Constitution permits Congress to authorize the use of the militia "to execute the Laws of the Union, suppress Insurrections and repel Invasions." And it guarantees the states protection against invasion or usurpation of their "republican form of government," and, upon the request of the state legislature, against "domestic violence." These constitutional provisions are reflected in the Insurrection Acts, which have been invoked numerous times both before and after passage of the Posse Comitatus Act, 18 U.S.C. Section 1385, in 1878. Congress has also enacted a number of statutes that authorize the use of land and naval forces to execute their objective.

The Posse Comitatus Act outlaws the willful use of any part of the Army or Air Force to execute the law unless expressly authorized by the Constitution or an act of Congress. History supplies the grist for an argument that the Constitution prohibits military involvement in civilian affairs subject to only limited alterations by Congress or the President, but the courts do not appear to have ever accepted the argument unless violation of more explicit constitutional command could also be shown. The express statutory exceptions include the legislation that allows the President to use military force to suppress insurrection or to enforce federal authority, 10 U.S.C. Sections 251-255, and laws that permit the Department of Defense to provide federal, state and local police with information, equipment, and personnel, 10 U.S.C. §§ 271-284.

Case law indicates that "execution of the law" in violation of the Posse Comitatus Act occurs (a) when the Armed Forces perform tasks assigned to an organ of civil government, or (b) when the Armed Forces perform tasks assigned to them solely for purposes of civilian government. Questions concerning the act's application arise most often in the context of assistance to civilian police. At least in this context, the courts have held that, absent a recognized exception, the Posse Comitatus Act is violated when (1) civilian law enforcement officials make "direct active use" of military investigators; or (2) the use of the military "pervades the activities" of the civilian officials; or (3) the military is used so as to subject "citizens to the exercise of military power which was regulatory, prescriptive, or compulsory in nature." The act is not violated when the Armed Forces conduct activities for a military purpose.

The language of the act mentions only the Army and the Air Force, but it is applicable to the Navy and Marines by virtue of administrative action and commands of other laws. The law enforcement functions of the Coast Guard have been expressly authorized by act of Congress and consequently cannot be said to be contrary to the act. The act has been applied to the National Guard when it is in federal service, to civilian employees of the Armed Forces, and to off-duty military personnel. The act probably only applies within the geographical confines of the United States, but supplemental provisions of 10 U.S.C. §§ 271-284 appear to apply worldwide.

Finally, the act is a criminal statute under which there has been but a handful of known prosecutions. Although violations will on rare occasions result in the exclusion of evidence, the dismissal of criminal charges, or a civil cause of action, as a practical matter compliance is ordinarily the result of military self-restraint.

This report provides an historical analysis of the use of the Armed Forces to execute domestic law and of the Posse Comitatus Act, including their apparent theoretical and constitutional underpinnings. The report then outlines the current application of the act as well as its statutory exceptions, and reviews the consequences of its violation. This report appears in abridged form as CRS Report R42669, *The Posse Comitatus Act and Related Matters: A Sketch*.

U-DOW-CAR-044

# Contents

Introduction ............................................................................................................. 1

Background ............................................................................................................... 2

The Use of Federal Troops Prior to 1878 .............................................................. 5

    The Insurrection Act and Other Statutes ........................................................... 7

        Resistance to Taxes and Duties ...................................................................... 9

        Neutrality Act Enforcement .......................................................................... 10

        Requests from States for Military Aid ........................................................... 11

        Trouble in the Western States and Territories ............................................... 15

        Slavery, the Civil War, and Reconstruction ................................................. 16

    Use of Military Forces as a Posse Comitatus ................................................... 17

Passage of the Posse Comitatus Act ..................................................................... 21

Constitutional Considerations ............................................................................... 23

    Constitutional Origins ....................................................................................... 23

    Presidential vs. Congressional Powers .............................................................. 26

    Constitutional Exceptions .................................................................................. 28

When the Posse Comitatus Act Does Not Apply .................................................. 30

    Statutory Exceptions ......................................................................................... 31

        Generally ........................................................................................................ 31

        The Insurrection Acts ..................................................................................... 34

        Support to Law Enforcement ......................................................................... 42

    Military Purpose ................................................................................................ 49

Coverage of the Posse Comitatus Act ................................................................... 55

    Willful Use ......................................................................................................... 55

    Execute the Law ................................................................................................ 56

    Military Coverage .............................................................................................. 59

        Navy & Marines ............................................................................................. 59

        Coast Guard ................................................................................................... 60

        National Guard ............................................................................................... 61

        Off Duty Military, Acting as Citizens & Civilian Employees ...................... 62

    Geographical Application ................................................................................... 64

Consequences of Violation .................................................................................... 66

    Prosecution ........................................................................................................ 66

    Exclusion of Evidence ....................................................................................... 66

    Jurisdiction & Criminal Defenses ..................................................................... 68

    Civil Liability .................................................................................................... 69

Compliance ............................................................................................................ 70

# Contacts

Author Information ................................................................................................. 70

Acknowledgments .................................................................................................. 70

U-DOW-CAR-045

## Ex. Ord. No. 13276. Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region

Ex. Ord. No. 13276, Nov. 15, 2002, 67 F.R. 69985, as amended by Ex. Ord. No. 13286, §1, Feb. 28, 2003, 68 F.R. 10619, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)), and section 301 of title 3, United States Code, and in order to delegate appropriate responsibilities to Federal agencies for responding to migration of undocumented aliens in the Caribbean region, it is hereby ordered:

Section 1. *Duties and Authorities of Agency Heads.* Consistent with applicable law,

(a)(i) The Secretary of Homeland Security may maintain custody, at any location he deems appropriate, of any undocumented aliens he has reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region. In this regard, the Secretary of Homeland Security shall provide and operate a facility, or facilities, to house and provide for the needs of any such aliens. Such a facility may be located at Guantanamo Bay Naval Base or any other appropriate location.

(ii) The Secretary of Homeland Security may conduct any screening of such aliens that he deems appropriate, including screening to determine whether such aliens should be returned to their country of origin or transit, or whether they are persons in need of protection who should not be returned without their consent. If the Secretary of Homeland Security institutes such screening, then until a determination is made, the Secretary of Homeland Security shall provide for the custody, care, safety, transportation, and other needs of the aliens. The Secretary of Homeland Security shall continue to provide for the custody, care, safety, transportation, and other needs of aliens who are determined not to be persons in need of protection until such time as they are returned to their country of origin or transit.

(b) The Secretary of State shall provide for the custody, care, safety, transportation, and other needs of undocumented aliens interdicted or intercepted in the Caribbean region whom the Secretary of Homeland Security has identified as persons in need of protection. The Secretary of State shall provide for and execute a process for resettling such persons in need of protection, as appropriate, in countries other than their country of origin, and shall also undertake such diplomatic efforts as may be necessary to address the problem of illegal migration of aliens in the Caribbean region and to facilitate the return of those aliens who are determined not to be persons in need of protection.

(c)(i) The Secretary of Defense shall make available to the Secretary of Homeland Security and the Secretary of State, for the housing and care of any undocumented aliens interdicted or intercepted in the Caribbean region and taken into their custody, any facilities at Guantanamo Bay Naval Base that are excess to current military needs and the provision of which does not interfere with the operation and security of the base. The Secretary of Defense shall be responsible for providing access to such facilities and perimeter security. The Secretary of Homeland Security and the Secretary of State, respectively, shall be responsible for reimbursement for necessary supporting utilities.

(ii) In the event of a mass migration in the Caribbean region, the Secretary of Defense shall provide support to the Secretary of Homeland Security and the Secretary of State in carrying out the duties described in paragraphs (a) and (b) of this section regarding the custody, care, safety, transportation, and other needs of the aliens, and shall assume primary responsibility for these duties on a nonreimbursable basis as necessary to contain the threat to national security posed by the migration. The Secretary of Defense shall also provide support to the Coast Guard in carrying out the duties described in Executive Order 12807 of May 24, 1992 [set out above], regarding interdiction of migrants.

U-DOW-CAR-116

Sec. 2. *Definitions*. For purposes of this order, the term "mass migration" means a migration of undocumented aliens that is of such magnitude and duration that it poses a threat to the national security of the United States, as determined by the President.

Sec. 3. *Scope.*

(a) Nothing in this order shall be construed to impair or otherwise affect the authorities and responsibilities set forth in Executive Order 12807 of May 24, 1992 [set out above].

(b) Nothing in this order shall be construed to make reviewable in any judicial or administrative proceeding, or otherwise, any action, omission, or matter that otherwise would not be reviewable.

(c) This order is intended only to improve the management of the executive branch. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity or otherwise against the United States, its departments, agencies, entities, instrumentalities, officers, employees, or any other person.

(d) Any agency assigned any duties by this order may use the provisions of the Economy Act, 31 U.S.C. 1535 and 1536, to carry out such duties, to the extent permitted by such Act.

(e) This order shall not be construed to require any procedure to determine whether a person is a refugee or otherwise in need of protection.

George W. Bush.

U-DOW-CAR-117

Case 1:25-cv-01766-SES Document 102-1 Filed 06/03/26 Page 48 of 85



PRESIDENTIAL ACTIONS

# EXPANDING MIGRANT OPERATIONS CENTER AT NAVAL STATION GUANTANAMO BAY TO FULL CAPACITY

January 29, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE THE SECRETARY OF HOMELAND SECURITY

U-DOW-CAR-118

Case 1:25-cv-00766-ESS    Document 102-1    Filed 06/03/26    Page 25 of 852

SUBJECT:    Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity

I hereby direct the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States, and to address attendant immigration enforcement needs identified by the Department of Defense and the Department of Homeland Security.

This memorandum is issued in order to halt the border invasion, dismantle criminal cartels, and restore national sovereignty.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

News

Administration

Issues

THE WHITE HOUSE

U-DOW-CAR-119

1600 Pennsylvania Ave NW
Washington, DC 20500

# THE WHITE HOUSE

WH.GOV

Copyright

Privacy

U-DOW-CAR-120

MEMORANDUM OF UNDERSTANDING BETWEEN

THE U.S. DEPARTMENT OF HOMELAND SECURITY (DHS)

AND

THE U.S. DEPARTMENT OF DEFENSE (DoD)

FOR

DoD SUPPORT AT NAVAL STATION GUANTANAMO BAY (NSGB) TO U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) FOR DHS/ICE DETENTION OF ILLEGAL ALIENS SUBJECT TO FINAL ORDERS OF REMOVAL

This is a memorandum of understanding (MOU) between DHS, through ICE, and DoD. When referred to collectively, DHS and DoD are referred to as the "Parties."

1. BACKGROUND: On January 20, 2025, the President, in Executive Order (EO) 14165, "Securing Our Borders," directed the Secretary of Homeland Security to "take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States."[1] On January 29, 2025, President Trump directed the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at NSGB to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States.

2. AUTHORITIES AND REFERENCES: 8 U.S.C. § 1231(g); EO 14165, "Securing Our Borders," January 20, 2025; EO 14159, "Protecting the American People Against Invasion," January 20, 2025; Memorandum for the Secretary of Defense and the Secretary of Homeland Security, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," January 29, 2025.

3. PURPOSE: This MOU clarifies the Parties' respective roles and responsibilities related to custody and detention at NSGB of illegal aliens with final orders of removal (NSGB IAs). Consistent with DoD's authority to provide base of operations support for the purpose of facilitating counterdrug activities or activities to counter transnational organized crime of any Federal law enforcement agency within or outside the United States (10 U.S.C. § 284(b)(4)), DHS/ICE will detain at NSGB illegal aliens with a nexus to a transnational criminal organization (TCO) or criminal drug activity. This nexus can be satisfied by an alien being a member of a TCO or paying a TCO to be smuggled into the United States. Aliens subject to a final order but for whom no clear connection or nexus to TCOs or criminal drug activity exists (e.g., those who overstay their visa) will not be moved to NSGB. When the nature of an

---

[1] Additionally, Executive Order 14159 provides:
In Section 9: "[T]he Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States."
In Section 10: "Detention Facilities. The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law."

1

Protected Material — Subject to Protective Order

U-DOW-CAR-121

alien's entry into the United States is uncertain, DHS/ICE may assert a nexus where DHS/ICE reasonably believes the alien to have paid a TCO to be smuggled into the United States if the alien is from a country where the preponderance of aliens from that country enter the United States in that fashion.

## 4. UNDERSTANDINGS OF THE PARTIES:

### 4.1. DHS/ICE——

4.1.1. Consistent with the Immigration and Nationality Act (INA), has legal custody of NSGB IAs and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations and will fulfill these responsibilities through the direction of DHS personnel and DHS contractor personnel. This includes ensuring custody conditions for NSGB IAs are appropriate and determining which NSGB IAs are considered "high threat" for housing at Camp VI.

4.1.2. Accepts the conditions at NSGB detention sites (JTF Building VI and the Migrant Operations Center) as adequate for holding and DHS/ICE exercising legal custody and detention of NSGB IAs. (ICE representatives have assessed these sites as suitable for adults only; minors will not be moved to NSGB at any point).

4.1.3. Will provide necessary DHS/ICE guidance and training to DoD personnel at NSGB assisting DHS/ICE in fulfilling DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

4.1.4. Understands that DoD will use as standards, as an interim solution, for support to DHS/ICE detention of NSGB IAs as contained in DoD Instruction 1325.07, "Administration of Military Correctional Facilities and Clemency and Parole Programs," and Army Regulation 190-47, "The Army Corrections System," with appropriate exceptions, and adjusted by USSOUTHCOM's Joint Task Force Southern Guard (JTF-SG) based on capabilities and assets currently present. Within 15 days from the effective date of this MOU, the Parties will agree to standards for detention under DHS/ICE legal custody, to be set forth in an addendum to this MOU. The interim standards shall not apply to the following topics: (1) in person visitation; (2) mandatory work for detained aliens; (3) vocational, training, or other prisoner rehabilitate activities; and (4) public affairs, public access, media relations, requests for information and photography. ICE shall provide guidance related to these topics as needed, consistent with section 4.1.19 and other provisions of this MOU.

4.1.5. Will provide an appropriate ratio of DHS/ICE officers to NSGB IAs as mutually determined between the Parties to achieve the responsibilities indicated in this memorandum, and at a minimum, will provide at least two DHS/ICE law enforcement officers or contractors in accordance with DHS/ICE standard operating procedures at the Camp VI detention facility on a 24/7 basis and will provide an appropriate number of DHS/ICE law enforcement officers and interior security in accordance with DHS/ICE standard operating procedures at the hard-sided Migrant Operations Center facility on the leeward side on a 24/7 basis depending on the size of the NSGB IA population.

4.1.6. Will conduct any necessary searches of NSGB IAs while recognizing DoD personnel may also undertake searches and other necessary actions for the safety of DoD personnel or facility integrity.

4.1.7. Will maintain custody of NSGB IAs' funds, valuables, and other personal property.

4.1.8. Will be responsible for providing internal security of NGSB IA holding areas, including determining whether to use restraints on NSGB IAs and placing restraints on NSGB IAs, while recognizing that DoD personnel also may take actions necessary for the safety of DoD personnel, for

2

Protected Material -- Subject to Protective Order

facility integrity, or to prevent the detainee from harming self or others, or from causing serious property damage.

4.1.9.    Will be responsible for the physical custody and directing the movements of NSGB IAs, including movement between detention sites, medical facilities, and airfield/port facilities.

4.1.10.  Will be responsible for any necessary questioning of NSGB IAs related to immigration matters or offenses not committed on NSGB.  Will be responsible for determining and imposing disciplinary actions.

4.1.11.  Will be responsible for translation, interpretation, and language access for NSGB IAs with limited English proficiency.

4.1.12.  Will be responsible for NSGB IA transfers, releases, and removals, as well as NSGB IA tracking and records (i.e., will provide a DHS/ICE Operations Center on the leeward side of NSGB for reception, processing, tracking of detention duration, legal status, medical status, and repatriation), and will ensure transfer from NSGB no later than 180 days from the date of final order of removal. This includes transfer for ordered court appearances related to immigration or federal court litigation.

4.1.13.  Will be responsible for inspection of and restrictions on NSGB IAs' correspondence.

4.1.14.  Understands DoD will use DoD rules for the use of force unless the Parties agree to another standard.  Applicable and agreed-upon rules for the use of force will be shared between the Parties, to ensure DHS/ICE awareness of DoD operational rules.

4.1.15.  Will be responsible for any involuntary medical treatment, including in response to hunger strikes, or similar measures.

4.1.16.  Will provide a full-time liaison officer (capable of accepting and responding to ICE/Enforcement and Removal Operations (ERO) standards reporting and decision-making requirements) to JTF-SG.

4.1.17.  Will be responsible for having contingency plans, coordinated with JTF-SG, for medical evacuation and follow-on care for detainees who require a higher level of care than is available at NSGB.

4.1.18.  Will promptly provide information to DoD concerning inquiries from relevant congressional committees.

4.1.19.  Will approve and coordinate any press access subject to concurrence of the JTF-SG commander and taking into account appropriate security protocols. Due to security and legal concerns, there will be no press access to Camp VI.

4.1.20.  Will determine the appropriate level of access by NSGB IAs to legal representation, including when, to whom, and under what circumstances such access is granted, in consultation with the JTF-SG commander and taking into account NSGB physical security protocols.

4.1.21.  Will assign a DHS/ICE officer to collect and communicate grievances and requests from NSGB IAs. DHS/ICE and JTF-SG will concurrently agree upon resolution of grievances and requests, taking into account DHS/ICE policies, procedures, and JTF-SG security protocols.

3

Protected Material — Subject to Protective Order

U-DOW-CAR-123

4.1.22. Will coordinate with DoD before deployment of contractor personnel to execute any portion of this MOU.

4.1.23. Will provide JTF-SG with a daily update on the number of NSGB IAs, including the number received, the number repatriated, a 72-hour repatriation schedule as feasible, and duration information (total days in DHS/ICE custody/detention and total days since arrival at NSGB).

4.1.24. Will provide select services to NSGB IAs (e.g., recreation, religious services) in accordance with DHS/ICE policy and as practicable within the existing infrastructure at NSGB.

**4.2. DoD, through U.S. Southern Command (USSOUTHCOM)—**

4.2.1. Will provide an existing secure facility on the windward side of NSGB to DHS/ICE for holding "high threat" NSGB IAs ("Camp VI").

4.2.2. Will provide DHS/ICE with soft structures (tents) to hold other NSGB IAs. These tents do not have power, lighting, or heating/air conditioning. DoD will provide lighting in the common areas outside the tents and at appropriate locations near perimeter fencing. Climate control requirements will be developed as agreed upon by the Parties.

4.2.3. Will provide preventative health services and first aid along with additional emergency medical care, as appropriate and subject to capability and availability, for DHS and ICE personnel and NSGB IAs.

4.2.4. Will provide perimeter security and facility access/security.

4.2.5. Will be responsible for determining the maximum number of NSGB IAs who can be accommodated at all locations on NSGB, taking into account DHS/ICE legal custody requirements.

4.2.6. Will provide a sufficient number of toilets and hygiene facilities to ensure the clean, safe, and sanitary operation of camps depending on the number of NSGB IAs.

4.2.7. Will make adequate facilities and access to such facilities available, as agreed to in an addendum to this memorandum, for the transportation of DHS/ICE personnel and contractors supporting execution of this memorandum to and from NSGB, and make available lodging/berthing for DHS/ICE personnel and contractors once at NSGB.

4.2.8. Will support DHS/ICE in the provision of an appropriate level of access by NSGB IAs to legal representation as determined by DHS/ICE in coordination with DoD under 4.1.20.

5. PERSONNEL: Each Party is responsible for all personnel costs, including pay and benefits, support, and travel. Each Party is also responsible for supervising and managing its personnel, except as necessary for DHS/ICE to provide guidance to DoD personnel as part of DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

6. GENERAL PROVISIONS:

6.1. POINTS OF CONTACT (POCs). The Parties will use the following POCs to communicate matters concerning this MOU. Each Party may change its POC upon reasonable notice to the other Party.

6.1.1. For DHS/ICE—

4

Protected Material -- Subject to Protective Order

U-DOW-CAR-124

6.1.1.1 Position, office identification, phone number, and email of primary POC: Robert Paschall, Deputy Under Secretary, DHS Office of Strategy, Policy, and Plans, ▮▮▮▮▮

6.1.1.2. Position, office identification, phone number, and email of alternate POC: Ihsan Gunduz, Acting Deputy Assistant Secretary for Border and Immigration Policy, DHS Office of Strategy, Policy, and Plans, ▮▮▮▮▮

6.1.2. For DoD—

6.1.2.1 Position, office identification, phone number, and email of primary POC: Rafael Leonardo, Performing the Duties of the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ▮▮▮▮▮

6.1.2.2. Position, office identification, phone number, and email of alternate POC: Leigh Nolan, Acting Principal Deputy Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ▮▮▮▮▮

6.2. CORRESPONDENCE. All correspondence to be sent and notices to be given pursuant to this MOU will be addressed, if to the ICE, to—

6.2.1. ▮▮▮▮▮ and, if to the DHS POLICY, to—

6.2.2. ▮▮▮▮▮

6.3. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds or manpower between the Parties, nor does it commit funds or resources. No provision in this MOU will be interpreted to require obligation or payment of funds. Reimbursable expenses will be addressed separately. No provision of this MOU shall be interpreted to require obligation or payment of funds in violation of the Anti-deficiency Act, 31 U.S.C. § 1341, or any other applicable law. All activities contemplated by this MOU are subject to the availability of funds.

6.4. MODIFICATION OF MOU. This MOU may be modified at any time in response to a written request from authorized representatives of one of the Parties. Otherwise, it will be reviewed no less often than every six months of its effective date in its entirety. For DoD, the Under Secretary of Defense for Policy may approve modifications to, addendums to, and extensions of this MOU. For DHS, the Under Secretary of Strategy, Policy, and Plan may approve modifications to, addendums to, and extensions of this MOU.

6.5. DISPUTES. Any disputes relating to this MOU will subject to any applicable law, Executive Order, or DoD issuances, and will be resolved by consultation between the Parties.

6.6. TERMINATION OF UNDERSTANDING. This MOU may be terminated in writing by mutual agreement of the Parties or with 90 days' advance written notice by either Party.

6.7. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

6.8. EFFECTIVE DATE. This MOU takes effect on the day after the last Party signs.

6.9. EXPIRATION DATE. This MOU expires on March 15, 2026.

6.10. NO THIRD-PARTY BENEFICIARIES. Nothing in this MOU, express or implied, is intended to

5

Protected Material -- Subject to Protective Order

give to, or will be construed to confer upon, any person, not a party, any remedy or claim under or because of this MOU, and this MOU will be for the sole and exclusive benefit of the Parties.

## 7. DEFINITIONS:

7.1. "High threat" is a security category determined by DHS and is synonymous with other terms such as Maximum security, High-risk.

7.2 Detention Sites

7.2.1. "Hard Structure" detention facility on the Windward side is referred to as Camp VI.

7.2.2. The Migrant Operations Center is a DHS "Hard Structure" facility, not designed for high threat detention, on the Leeward side.

7.2.3. "Soft structure" detention facilities refer to Philips, Macalla, and Golf Course Camps and respective sub-camps.

APPROVED:

FOR DHS—

_____
Signature

FOR DoD—

_____
Signature

_____

_____

Troy D. Edgar, Deputy Secretary of Homeland Security
The U.S. Department of Homeland Security

Robert G. Salesses, Performing the Duties of
Deputy Secretary of Defense

7 March 2025 (Date)

7 March 2025 (Date)

6

Protected Material — Subject to Protective Order

U-DOW-CAR-126

**OFFICE OF THE SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-1000**

MAR 0 7 2025

MEMORANDUM FOR EXECUTIVE SECRETARY, DEPARTMENT OF HOMELAND
SECURITY

SUBJECT:  Department of Defense Support to U.S. Immigration and Customs Enforcement
Operations

Thank you for your February 3, 2025 request for Department of Defense (DoD) support
to Immigration and Customs Enforcement (ICE) operations.  Supporting the President's direction
in Executive Order 14167, "Clarifying the Military's Role in Protecting the Territorial Integrity
of the United States," Proclamation 10886, "Declaring a National Emergency at the Southern
Border of the United States," and the Presidential Memorandum, "Expanding Migrant
Operations Center at Naval Station Guantanamo Bay to Full Capacity," is a top priority of the
Department, and we look forward to partnering with you to carry out this mission.

The Secretary of Defense has approved ICE use of facilities and land for expansion of
temporary holding capacity on Naval Station Guantanamo Bay (NSGB) for ICE's detention of
illegal aliens (IAs), including access to and use of Joint Task Force – Guantanamo Detention
Facilities (Camp VI) for the temporary holding of up to 144 high-threat IAs under Department of
Homeland Security (DHS) custody.  DoD continues to provide aviation support under the
original conditions approved on January 21, 2025 including DHS maintaining custody, control,
and security of all IAs onboard, as well as responsibility for providing any required in-flight
medical care.  This support is being provided on a non-reimbursable basis.

The Secretary of Defense has also approved the provision of services and sustainment,
such as food, emergent medical support, and laundry related to ICE detention operations at
NSGB, at a cost to DoD not to exceed $30 million, which will be resourced using DoD's Drug
Interdiction and Counter-drug Activities, Defense appropriation.  Further, such support is
contingent on ICE ensuring that the population of IA's being held by ICE are determined by ICE
to be either members of transnational criminal organizations (TCOs) or human-smuggling
customers of TCOs.  The approved medical support comprises provision of preventative health
services and first aid along with emergent life-saving medical care (life, limb, and eye-sight), as
appropriate and subject to capability and availability on NSGB, for DHS and ICE personnel at
NSGB, as well as IAs in DHS/ICE custody at NSGB.  Medical support that exceeds the
capabilities available at NSGB will need to be provided by DHS or conducted by DoD on a
reimbursable basis in response to a subsequent DHS request.  Given the limited medical
capabilities at NSGB and the nature of the facilities and environment, DoD requests DHS not
send women, children, animals, or IAs with acute medical or psychological conditions to NSGB.

To fully understand the requirements of the remaining requested capabilities, we require
additional information to ensure effective and efficient provision of DoD support.  DoD and

Controlled By:  OUSD(P)/HD&HA
CUI Category:  OPSEC
Limited Dissemination Control:  FEDCON
POC:  OASD (HD&HA) ████████

Protected Material – Subject to Protective Order

DHS personnel are currently working to refine the requirements requested in the Other Operational Support to ICE category. In addition to your official request for assistance, please provide clarification on the remaining requirements. Upon receipt, DoD will review and route these requirements to the Secretary of Defense for approval as appropriate.

Kelly Bulliner Ross
Executive Secretary

cc:
Secretary of the Navy
CJCS
USD(P)
CDRUSSOUTHCOM
ASD(LA)
ASD(HD&HA)

2

Protected Material – Subject to Protective Order
CUI

U-DOW-CAR-128



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

MAR 0 7 2025

The Honorable Roger Wicker
Chairman
Committee on Armed Services
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

Consistent with section 2815 of the National Defense Authorization Act for Fiscal Year 2017 (10 U.S.C. 2556 note), I am notifying you of the provision of Department of Defense facilities and land on Naval Station Guantanamo Bay, Cuba, for temporary use by the Department of Homeland Security to house illegal aliens identified by their Department for removal from the United States.  I certify that providing this support will not negatively affect military training, operations, readiness, or other military requirements, including National Guard and Reserve readiness.

I am sending an identical letter to the Committee on Armed Services of the House of Representatives.

Sincerely,

cc:
The Honorable Jack Reed
Ranking Member

U-DOW-CAR-129



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR 0 7 2025

The Honorable Mike Rogers
Chairman
Committee on Armed Services
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

Consistent with section 2815 of the National Defense Authorization Act for Fiscal Year 2017 (10 U.S.C. 2556 note), I am notifying you of the provision of Department of Defense facilities and land on Naval Station Guantanamo Bay, Cuba, for temporary use by the Department of Homeland Security to house illegal aliens identified by their Department for removal from the United States.  I certify that providing this support will not negatively affect military training, operations, readiness, or other military requirements, including National Guard and Reserve readiness.

I am sending an identical letter to the Committee on Armed Services of the Senate.

Sincerely,

cc:
The Honorable Adam Smith
Ranking Member

U-DOW-CAR-130

**ACTION MEMO**

**FOR:** SECRETARY OF DEFENSE

DepSecDef Action RGS

MAR 06 2025

**FROM:** Alexander Velez-Green, Performing the Duties of Under Secretary of Defense for Policy

FEB 2 8 2025

**SUBJECT:** (U) Department of Defense Support to U.S. Immigration and Customs Enforcement Operations

- (U) **Purpose.** This memorandum seeks to document your approval of the Secretary of Homeland Security's request for assistance (RFA) for the Department of Defense (DoD) to support U.S. Immigration and Customs Enforcement (ICE) operations, which cited Executive Order 14167, Clarifying the Military's Role in Protecting the Territorial Integrity of the United States, Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, and the Presidential memorandum, Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity, dated January 29, 2025.

- (CUI) **Background.** On February 3, 2025, the Secretary of Homeland Security submitted an RFA email (TAB C) for military support to augment ICE resources categorized into four broad support categories: (1) Aviation; (2) Naval Station Guantanamo Bay (NSGB) Migrant Operation Center (MOC) Expansion; (3) Use and Expansion of the Joint Task Force Guantanamo (JTF-GTMO) Detention Facility; and (4) Other Operational Support to ICE. The Department of Homeland Security (DHS) requested *all support* be provided on a *non-reimbursable basis*.

- (U) **Aviation Support:**

  - (CUI) On January 21, 2025, the then-Acting Secretary approved the requested airlift for removal operations through April 20, 2025, in accordance with 10 U.S.C. § 274, and *waived reimbursement* in accordance with 10 U.S.C. § 277(c) (TAB D).

  - (CUI) In the February 3, 2025 RFA, DHS requested that DoD provide in-flight security and medical personnel for all previously approved DoD-provided flights. Due to limitations on DoD's ability to conduct law enforcement functions and to provide in-flight medical services on a non-reimbursable basis, DoD is providing aviation support under the original conditions approved on January 21, 2025, with DHS remaining responsible for in-flight custody, control, and security of, and medical care for, all illegal aliens (IAs).

Prepared By: DASD(HDI&DSCA)/DSCA
Phone Number: ███████████

Controlled By: OUSD(P) HD&HA
CUI Category: OPSEC
Distribution/Limited Dissemination Control: FEDCON
POC: DASD(HDI&DSCA)

| | | | |
|---|---|---|---|
| SD CA | | DSD SA | |
| SD SMA | | DSD SMA | |
| SD MA | | DSD MA | |
| CoS | | DSD CA | |
| SD Action Grp | | DSD CoS | |
| ES | | ESB | |
| ESR | | ESD | |

Protected Material – Subject to Protective Order



QSD000718-25/CMD002337-25

U-DOW-CAR-131

CUI

- **(CUI) NSGB Support:**

  - (CUI) On January 31, 2025, you approved – via the Secretary of Defense Orders Book (SDOB) – 1,090 personnel to support U.S. Southern Command (USSOUTHCOM) preparations and expansion of MOC capacity on NSGB.

    o (CUI) In the February 3, 2025 RFA, DHS requested immediate expansion of MOC capacity on the Leeward side of NSGB, including soft-sided facilities capable of housing up to 30,000 IAs. On February 6, 2025, *you approved* support involving provision, operation, and maintenance of equipment at NSGB and Commander, USSOUTHCOM, began expanding IA holding capacity.

  - (CUI) In the February 3, 2025 RFA, DHS requested immediate access to, and use of, the JTF-GTMO Detention Facility, to house approximately 300 high-threat IAs.

    o (CUI) On February 6, 2025, *you authorized* USSOUTHCOM to provide logistics and other support to DHS/ICE custody operations for the *temporary holding of up to 144 high-threat IAs* at the JTF-GTMO Detention Facility, Camp VI. This approval was subject to IAs and Law of War detainees occupying separate facilities. Law of War detainees are detained adjacent to the high-threat IAs in Camp V.

    o (CUI) DoD support was approved contingent on *DHS/ICE retaining custody* of all IAs on NSGB, including those held in the MOC, and within Camp VI. DoD personnel were *approved to support DHS/ICE operations*, and not directly participate in law enforcement activities.

  - (CUI) Between February 6-13, you approved – via the SDOB – an additional *280 personnel to provide medical, sustainment, administrative, and essential services* for DoD personnel on NSGB.

  - (CUI) You also approved DoD sustainment and medical support of ICE's operations. On a *non-reimbursable basis*, DoD is providing preventative health services and first aid along with emergent life-saving medical care (life, limb, and eye-sight), as appropriate and subject to capability and availability on NSGB, for DHS and ICE personnel and IAs. DHS is responsible for IA medical issues that exceed the capacity of what is available at NSGB.

- **(CUI) Other Operational Support to ICE:**

  - (CUI) In the February 3, 2025 RFA, DHS requested DoD provide personnel to be stationed across *all 25 ICE areas of responsibility* with specific locations to be determined by ICE. DHS requested personnel capable of executing the following functions: Security & Law Enforcement Processing; Administrative Functions; Data

Protected Material – Subject to Protective Order
CUI

U-DOW-CAR-132

CUI

Scientists; Unit-Level Medical Care; Transportation including high-capacity ground transportation; Multifunctional Logistics Planners; and All-source Intelligence Analysis and Computer/Data Forensics.

- (CUI) *You have not yet approved any requests under this category.* Policy and the Joint Staff requested additional information from DHS/ICE to determine the feasibility, legality, and costs of providing this support. We will separately staff recommendations for your decision.

- (U) **Authorities and Funding for Support at NSGB:**

  - (CUI) The Secretary of Defense may make equipment and facilities available to law enforcement agencies under 10 U.S.C. § 272 and may make DoD personnel available to operate and maintain equipment pursuant to 10 U.S.C. § 274. Provision of specific land and facilities to another Federal agency is recorded by permit or other agreement.

  - (CUI) On February 6, 2025, you approved support involving provision, operation, and maintenance of equipment at NSGB in accordance with 10 U.S.C. §§ 272, 274, and *waived reimbursement* of this support in accordance with § 277(c) on the basis that providing the support would result in a benefit to military personnel that is substantially equivalent to military operations and training because USSOUTHCOM is able to use the support to exercise implementation of Concept Plan 6120.

  - (CUI) OSD Comptroller estimates an incremental cost of **$1.8 billion** to support operations and maintenance for the MOC expansion, use of JTF-GTMO Detention facilities, and establishment of camps across NSGB at the current directed planning capacity of 30,000 IAs. The cost estimate may change as DHS provides additional fidelity to the anticipated future capacity requirements and standards, and Military Services continue planning Base Operations Support and Common User Logistics.

  - (CUI) The non-reimbursable support detailed above will be funded from the accounts of the executing DoD Component. The office of the Under Secretary of Defense (Comptroller) will work with the Military Services and Combatant Commands to ensure sufficient funds are available for execution, within the limits of available appropriations.

  - (CUI) DHS also has requested non-reimbursable support for provision of services, such as food, laundry, medical, and utilities. Under 10 U.S.C. § 284, the Secretary of Defense may provide support for counterdrug (CD) activities or the activities to counter transnational organized crime (CTOC) activities of any other Federal department or agency, including the establishment and operation of bases of operations for the purpose of facilitating CD or CTOC activities of any Federal law enforcement agency within or outside the United States. Such support is funded by the Drug Interdiction and Counter-drug Activities, Defense appropriation. Any support to DHS at NSGB not constituting

Protected Material -- Subject to Protective Order

U-DOW-CAR-133

CUI

provision, operation, or maintenance of equipment (e.g., preventative medical support) is provided under 10 U.S.C. § 284, based on the population of IA's held by DHS/ICE at NSGB being determined by DHS to have a nexus to CD or CTOC activities (e.g., they are members of transnational criminal organizations (TCOs) or human-smuggling customers of TCOs). Support for IAs NOT within this population would need to be on a reimbursable basis.

- (CUI) For fiscal year (FY) 2025, $635.7 million in the Counterdrug Central Transfer Account (CTA) is budgeted for operational support. This includes programs and activities at the Combatant Commands and Defense Intelligence Agencies to help disrupt cartel activity and reduce the flow of fentanyl and other illicit drugs into the United States. Targeted cartels include those recently designated as Foreign Terrorist Organizations (FTO's). Programs and activities include intelligence analysis support to DHS and the Departments of Justice, Commerce, and Treasury, and activities under DoD's statutory responsibility to be the lead agency for detection and monitoring of aerial and maritime transit of illegal drugs into the United States in support of the CD activities of law enforcement agencies. By canceling a subset of planned counterdrug projects—those in support of foreign law enforcement partners, DoD could make available up to $30 million in CD funding to provide services in support of DHS/ICE detention operations at NSGB.

  o (U) Diversion of CD funding beyond $30 million would result in substantial mission impacts to efforts focused on designated cartel FTO's, Iran-affiliated violent extremist organizations (VEOs), Chinese money laundering organizations, and other VEOs and drug trafficking organizations' revenue-generation activities, among other things.

- (CUI) DoD remains under a Continuing Resolution, currently providing appropriations for fiscal year 2025 for obligation or expenditure only through March 14, 2025. DoD operations beyond this date are subject to the enactment of additional appropriations.

- (U) **Submissions to Congress:**

  – (U) Section 1707 of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2020 requires the Secretary to provide to the Committee on Armed Services of the Senate (SASC) and Committee on Armed Services of the House of Representatives (HASC), not later than *seven calendar* days after the Secretary of Defense approves a request for assistance from DHS, a copy of the request for assistance and, immediately upon submitting the official response approving a request, a copy of the official response.

  – (U) Section 2815 of the NDAA for FY 2016 provides that the Secretary shall not sign a memorandum of agreement with another Federal agency to provide the agency with a vacant facility for purposes of temporary housing support unless the Secretary first


Protected Material — Subject to Protective Order
CUI

U-DOW-CAR-134

submits to the HASC and SASC *a certification that the provision of the facility to the agency for such purpose will not negatively affect military training, operations, readiness, or other military requirements*, including National Guard and Reserve readiness. Certification letters for provision of housing support at NSGB are at TAB A.

o ~~(CUI)~~ The Acting Secretary of the Navy, the Acting Chairman of the Joint Chiefs of Staff, and Commander, U.S. Southern Command *concur that provision of temporary housing support at NSGB will not negatively affect military training, operations, readiness, or other military requirements*, including National Guard and Reserve readiness because there is adequate capacity at the appropriate holding location and providing a suitable facility security force and enabling and logistical support will not negatively affect readiness.

o ~~(CUI)~~ I recommend directing the Acting Secretary of the Navy, the Acting Chairman of the Joint Chiefs of Staff, Commander, U.S. Southern Command, and Chief of the National Guard Bureau to immediately notify you, via the Acting Chairman of the Joint Chiefs of Staff, if that determination changes such that *provision of temporary housing support at NSGB could negatively affect military training, operations, readiness, or other military requirements*, including the JTF-GTMO Law of War detention mission or Office of Military Commissions (OMC).

— (U) My staff will work with the Acting Assistant Secretary of Defense for Legislative Affairs to make the necessary submissions.

~~(CUI)~~ **RECOMMENDATION #1:** Document your approval of current DoD support to DHS/ICE, as described above, including your determination that operation and maintenance of equipment support at NSGB results in a benefit to military personnel that is substantially equivalent to military operations and training and *your waiver of reimbursement* for such support. Support includes expansion of IA holding capacity at NSGB, including access to and use of JTF-GTMO Camp VI facilities for the temporary holding of up to 144 high-threat illegal aliens.

Approve **PBH** _____  Disapprove _____  Other _____
MAR – 7 2025

~~(CUI)~~ **RECOMMENDATION #2:** Document your approval to provide up to $30 million in non-reimbursable support to DHS/ICE for the provision of services related to DHS/ICE illegal detention operations at NSGB, to include: food; laundry services; preventative health services and first aid along with emergent life-saving medical care (life, limb, and eye-sight), as appropriate and subject to capability and availability of resources at NSGB; utilities; and other non-maintenance sustainment as base operations support under 10 U.S.C. § 284(b)(4), using available funds in the Drug Interdiction and Counter-drug Activities, Defense appropriation.

Approve **PBH** _____  Disapprove _____  Other _____
MAR – 7 2025



OSD000718-25/CMD002337-25

U-DOW-CAR-135

(CUI)

(CUI) **RECOMMENDATION #3:** Certify that providing temporary housing support at NSGB will not negatively affect military training, operations, readiness, or other military requirements, including National Guard and Reserve readiness by signing the letters at TAB A.

(CUI) **RECOMMENDATION #4:** Direct the Acting Secretary of the Navy, the Acting Chairman of the Joint Chiefs of Staff, Commander, U.S. Southern Command, and the Chief of the National Guard Bureau, to immediately notify you, via the Acting Chairman of the Joint Chiefs of Staff, if that determination changes such that *provision of temporary housing support at NSGB could negatively affect military training, operations, readiness, or other military requirements*, including the JTF-GTMO Law of War detention mission or OMC commissions.

Approve **PBH**　Disapprove _____　Other _____
MAR – 7 2025

(CUI) **RECOMMENDATION #5:** Authorize the Executive Secretary to sign and transmit TAB B to the DHS Executive Secretary.

Approve **PBH**　Disapprove _____　Other _____
MAR – 7 2025

Attachments:
TAB A – Certification letters
TAB B – Response Letter to DHS
TAB C – Secretary of Homeland Security Request for Assistance, February 3, 2025
TAB D – Action Memo Regarding Aviation Support (February 18, 2025)
TAB E – Coordination

Protected Material – Subject to Protective Order
CUI


OSD000718-25/CMD002337-25

U-DOW-CAR-136

# TAB
# C

Protected Material — Subject to Protective Order

U-DOW-CAR-143

Secretary of Defense Hegseth,

Please find this email as an emergent request in advance of a formal written Request for Assistance (RFA) from DHS to DOD for military support to U.S. Immigration and Customs Enforcement (ICE) operations and the broader mission to secure the border and maintain the territorial integrity of the United States pursuant to the following Executive Orders: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the U.S. (20 Jan 2025), section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the U.S. (20 Jan 2025); (3) Executive Order Guaranteeing the States Protection Against Invasion (20 Jan 2025) and the Presidential Directive on Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity (29 Jan 2025).

DHS requests immediate assistance, to commence as soon as you receive this email, to augment existing ICE resources categorized into four broad support categories: 1-Aviation; 2-Naval Station Guantanamo Bay (NSGB) Migrant Operation Center (MOC) Expansion, 3-Use and Expansion of the Joint Task Force Guantanamo (JTF-GTMO) Detention Facility , 4-Other operational support to ICE.

For initial planning purposes, this request includes:

**Aviation**

- Immediate aviation transportation assistance to remove aliens from interior locations within the United States to repatriation sites including El Salvador, Guatemala, Honduras, or other extraterritorial locations to be determined, such as NSGB.
- Additionally, while ICE will provide at least one officer on each flight, DHS requests that DOD provides in-flight security and on-board medical personnel, for all DOD-provided flights. The required medical and security staffing will be determined by DOD in consultation with ICE.

**NSGB MOC Expansion**

- Immediate expansion of the MOC on the leeward side of GTMO, including soft-sided facilities capable of housing 30,000 illegal aliens with all appropriate logistical support capabilities, including staff and security. The initial expansion should begin at the leeward camp, with future areas for expansion to be identified by DOD. The specific requirements will be coordinated directly with ICE in accordance with DOD CONPLAN 6120 requirements. DOD should anticipate use of this facility to begin within 7-10 days.

**Use and Expansion of JTF-GTMO Detention Facility**

- Beginning 31 January 2025, immediate access, to and use of, the JTF-GTMO Detention Facility to house approximately 300 high-priority criminal aliens

2

OSD000718-25/CMD001097-25

Protected Material — Subject to Protective Order

unlawfully present in the United States. DOD should anticipate additional requirements to expand this facility and to work with ICE on specific capacity and detention requirements including security and medical capabilities.

### Other Operational Support to ICE

- DOD personnel capable of executing the following functions to be stationed across all 25 ICE areas of responsibility with specific locations to be determined by ICE.



DHS requests this support on a non-reimbursable basis.

DHS understands the need to coordinate this request to generate a task order through the Joint Staff for execution and will reflect the same with greater detail in the formal RFA. Further, DHS understands that this RFA is expansive and will provide additional refinement in the form of required capabilities and presence in the formal submission.

Mr. Garrett Ripa (cc'd) at U.S. Immigration and Customs Enforcement will be my POC to assist in coordination with your team; Director, Joint Staff; and others as you identify to provide further detail for the utilization and deployment of these resources.

I appreciate your timely consideration of this emergent request. My formal RFA will be transmitted in the coming days.

Respectfully,
Secretary of Homeland Security Noem

3

Protected Material — Subject to Protective Order

UNCLAS ~~FOUO~~

# FRAGO 01 TO USSOUTHCOM EXORD TO EXPAND MIGRANT OPERATIONS AT NAVAL STATION GUANTANAMO BAY

**Originator:** CDR USSOUTHCOM MIAMI FL//SCJ35

  **Office:** SCJ35

    **DTG:** 041253Z Feb 25

      **Prec:** Routine

        **To:** CDR USARSO FT SAM HOUSTON TX, AFSOUTH 12AF A2 DAVIS MONTHAN AFB AZ, AFSOUTH CAOC DAVIS MONTHAN AFB AZ, AFSOUTH WATCHCTR DAVIS MONTHAN AFB AZ, COMUSNAVSOUTH, COMMARFORSOUTH, COMSOCSOUTH, CDR JTF-BRAVO, JTF GTMO, HQ USSOUTHCOM J1 MIAMI FL, HQ USSOUTHCOM J2 MIAMI FL, HQ USSOUTHCOM J3 MIAMI FL, HQ USSOUTHCOM J4 MIAMI FL, HQ USSOUTHCOM J5 MIAMI FL, HQ USSOUTHCOM J6 MIAMI FL, HQ USSOUTHCOM J7 MIAMI FL, HQ USSOUTHCOM J8 MIAMI FL, HQ USSOUTHCOM J9 MIAMI FL, HQ USSOUTHCOM MIAMI FL, CCGDSEVEN MIAMI FL, HOMELAND SECURITY TASK FORCE SE MIAMI FL, NAVSTA GUANTANAMO BAY CU, NAVFAC SOUTHEAST JACKSONVILLE FL, JOINT STAFF J3 WASHINGTON DC, JOINT STAFF J5 WASHINGTON DC, USCIS WASHINGTON DC, HQ ICE ERO WASHINGTON DC

        **CC:** DIRJIATF SOUTH, CDR USTRANSCOM SCOTT AFB IL, CDR USSOCOM MACDILL AFB FL, CDR USNORTHCOM PETERSON AFB CO, JOINT STAFF J3 DEP-DIR REGIONAL OPS WASHINGTON DC, DLA FT BELVOIR VA

```
TIMEZONE/Z//

MSGID/GENADMIN/DJ-3//
REF/A/DOC/PRES MEMO/YMD:20250129//
REF/B/VOCO/SECDEF/YMD:20250130//
REF/C/EMAIL/JS DJ3/YMD: 20250130//
REF/D/DOC/JCS/YMD: 20250130//
REF/E/EXORD/USSOUTHCOM/312353Z JAN25//
REF/F/APPENDIX/USSOUTHCOM J3/20250130//

AMPN/
REF A IS THE PRESIDENTIAL MEMORANDUM FOR THE SECRETARY OF DEFENSE AND

THE SECRETARY OF HOMELAND SECURITY, EXPANDING MIGRANT OPERATIONS
CENTER AT NAVAL STATION GUANTANAMO BAY TO FULL CAPACITY.//
REF B IS THE SECRETARY OF DEFENSE (SECDEF) VERBAL ORDER OF THE
COMMANDING OFFICER (VOCO) FOR CDRUSSOUTHCOM TO EXPAND MIGRANT
OPERATIONS AT NAVAL STATION GUANTANAMO BAY.//
REF C IS EMAIL FROM JOINT STAFF DIRECTOR OF OPERATIONS (DJ3)
MEMORIALIZING REF B.//
REF D GENADMIN: SECRETARY OF DEFENSE VOCO TO EXPAND MIGRANT
OPERATIONS
AT NAVAL STATION GUANTANAMO BAY.//
REF E IS USSOUTHCOM EXORD TO EXPAND MIGRANT OPERATIONS AT NSGB.//
REF F IS GUANTANAMO BAY JTF-MIGOPS ILLEGAL ALIEN HOLDING OPERATIONS
USE OF FORCE APPENDIX//

MSGID/ORDER/CDRUSSOUTHCOM//

NARR (CUI) THIS IS A USSOUTHCOM EXECUTION ORDER DIRECTING CDR JTF TO
EXPAND MIGRANT OPERATIONS AT NAVAL STATION GUANTANAMO BAY (NSGB) IN
SUPPORT OF REF A TO INCLUDE THE HOUSING OF UP TO 30,000 ILLEGAL
ALIENS
OF VARYING STATUS INCLUDING THOSE THAT POSE A HEIGHTENED SECURITY
THREAT AS EARLY AS 30 JAN 2025. AS OF 03 FEB 2025, THIS MISSION HAS
BEEN NAMED "OPERATION SOUTHERN GUARD" AND JTF-MIGOPS WILL NOW BE
NAMED
JTF-SOUTHERN GUARD.

1. (U) SITUATION.
```

UNCLAS ~~FOUO~~

~~Protected Material -- Subject to Protective Order~~

## UNCLAS ~~FOUO~~

1.A. (U) ON 29JAN25, POTUS SIGNED AN EXECUTIVE ORDER DIRECTING THE SECRETARY OF DEFENSE AND THE SECRETARY OF HOMELAND SECURITY TO TAKE ALL APPROPRIATE ACTIONS TO EXPAND THE MIGRANT OPERATIONS CENTER AT NAVAL STATION GUANTANAMO BAY TO FULL CAPACITY TO PROVIDE ADDITIONAL HOLDING SPACE FOR HIGH-PRIORITY CRIMINAL ALIENS UNLAWFULLY PRESENT IN

THE UNITED STATES, AND TO ADDRESS ATTENDANT IMMIGRATION ENFORCEMENT NEEDS IDENTIFIED BY THE DEPARTMENT OF DEFENSE AND THE DEPARTMENT OF HOMELAND SECURITY.

1.B. ~~(CUI)~~ IAW REF B, CDRUSSOUTHCOM IS DIRECTED TO CONDUCT ILLEGAL ALIEN HOLDING OPERATIONS FOR UP 10,000 ILLEGAL ALIENS PENDING RELOCATION WITH SUBSEQUENT EXPANSION TO ACCOMMODATE A TOTAL OF 30,000

ILLEGAL ALIENS PENDING RELOCATION.

1.C. (CUI) IAW REF B, CDRUSSOUTHCOM IS AUTHORIZED TO TAKE ACTIONS NECESSARY TO EFFECTUATE REF B, INCLUDING MOVEMENT OF PERSONNEL, EQUIPMENT, AND THE EXPENDITURE OF FUNDS FOR REF A MISSION AS ORDERED IN REF B.

1.D. ~~(CUI)~~ C-DAY IS 30 JAN 2025 AND D-DAY IS 31 JAN 2025.

2. ~~(CUI)~~ MISSION. USSOUTHCOM CONDUCTS ILLEGAL ALIEN HOLDING OPERATIONS (IAHO) IN SUPPORT OF THE DEPARTMENT OF HOMELAND SECURITY (LEAD FEDERAL AGENCY) TO PROVIDE FOR THE CARE, SAFETY, AND TRANSPORTATION OF ILLEGAL ALIENS AT NAVAL STATION GUANTANAMO BAY NLT 31 JAN 2025.

3. (U) EXECUTION.

3.A. (U) COMMANDER'S INTENT.

3.A.1. ~~(CUI)~~ PURPOSE. MY INTENT IS TO DEPLOY FORCES TO NAVAL STATION

GUANTANAMO BAY TO EXPAND MIGRANT OPERATIONS TO FULL CAPACITY AND TO PROVIDE ADDITIONAL HOLDING SPACE FOR HIGH-THREAT ILLEGAL ALIENS.

3.A.2. ~~(CUI)~~ METHOD. THIS OPERATION WILL RAPIDLY PROJECT FORCES TO ACHIEVE NECESSARY REQUIREMENTS FOR CAMP OPERATIONS. ██████████

████████████, CONTRACT SOLUTIONS WILL REPLACE DOD CAPABILITIES WHERE FEASIBLE IN ORDER TO MINIMIZE THE DOD FOOTPRINT OVER TIME.

3.A.3. ~~(CUI)~~ ENDSTATE. ALL ILLEGAL ALIENS HELD AT GUANTANAMO BAY ARE

SAFELY REMOVED AS DIRECTED BY LEAD FEDERAL AGENCY AND BASE OPERATIONS

RETURN TO NORMAL.

3.B. (U) CONCEPT OF THE OPERATION.

3.B.1. (U) THIS OPERATION WILL BE CONDUCTED IN FOUR PHASES: PHASE I -

MIGRANT OPERATIONS CENTER (MOC)EXPANSION; PHASE II - LEEWARD INTIAL OPERATIONAL CAPACITY (IOC); PHASE III - LEEWARD FULL OPERATIONAL CAPACITY (FOC); AND PHASE IV - WINDWARD EXPANSION. USSOUTHCOM WILL DESIGNATE JTF-SOUTHERN GUARD AS THE JOINT FORCE COMMANDER (JFC) WITH RESPONSIBILITY AND AUTHORITY TO LEAD THE OPERATIONAL EFFORT FOR IAHO IN SUPPORT OF DHS.

3.B.2. - ADD: (U) TERMS OF REFERENCE FOR ILLEGAL ALIENS, HIGH THREAT ILLEGAL ALIENS, HOLDING OPERATIONS, ETC WILL BE PROVIDED IN SUBSEQUENT FRAGMENTARY ORDER IN COORDINATION WITH DHS/ICE.

3.C. (U) TASKS.

3.C.1. (U) CDR JTF-SOUTHERN GUARD.

## UNCLAS ~~FOUO~~

~~Protected Material -- Subject to Protective Order~~

U-DOW-CAR-177

## UNCLAS ~~FOUO~~

PAGE 3 OF 16

3.C.1.A. (U) ASSUME OPCON OF INBOUND FORCES.
3.C.1.A.1. (U) COMMENCE CRISIS ACTION PLANNING INCLUDING REQUIRED
PERSONNEL AND EQUIPMENT AUGMENTATION TO DEVELOP SUPPORTING PLAN FOR
NSGB IAHO.
3.C.1.B. (U) CONDUCT IAHO AT NSGB TO PROVIDE CARE, SAFETY, AND
TRANSPORTATION AS REQUIRED.
3.C.1.C. (U) COORDINATE WITH USNAVSOUTH FOR BOS SUPPORT AT NSGB.
3.C.1.D. (U) EXECUTE CONSTRUCTION AND EXPANSION OF CAMPS FOR DEPLOYED

FORCES AND ILLEGAL ALIENS.
3.C.1.E. (U) ESTABLISH LEEWARD CAMP L1 WITH THE ABILITY TO SECURE,
HOUSE AND FEED APPROXIMATELY 1000 ILLEGAL ALIENS NLT D+10.
3.C.1.F. (U) ESTABLISH LEEWARD CAMPS L2-L6 WITH THE ABILITY TO
SECURE,
HOUSE AND FEED UP TO A TOTAL OF APPROXIMATELY 10,000 ILLEGAL ALIENS
NLT D+21.
3.C.1.G. (U) ON ORDER, ESTABLISH WINDWARD CAMPS (PHILLIPS, MCCALLA
AND
NSGB GOLF COURSE) WITH THE ABILITY TO SECURE, HOUSE, AND FEED UP TO A

TOTAL OF APPROXIMATELY 30,000 ILLEGAL ALIENS ON NSGB.
3.C.1.H. (U) DEVELOP A DISTINCT PLAN WITH SUPPORTING LOGISTICAL
REQUIREMENTS FOR HOUSING OF HIGH THREAT ILLEGAL ALIENS (HTIA).
3.C.1.I. (U) COORDINATE WITH CDRUSSOUTHCOM, NSGB, AND OTHER
USSOUTHCOM
STAFF (AS REQUIRED) TO FACILITATE WINDWARD CAMP EXPANSION.
3.C.1.J. (U) CONDUCT JOINT RECEPTION, STAGING, ONWARD MOVEMENT, AND
INTEGRATION (JRSOI) OF ALL ELEMENTS DEPLOYED IN SUPPORT OF THIS
OPERATION.
3.C.1.K. (U) BPT ESTABLISH A JOINT INTELLIGENCE SUPPORT ELEMENT
(JISE)
AS NECESSARY.
3.C.1.L. (U) BPT ESTABLISH A HUMINT AND/OR CI COORDINATION CELL (J2X)

WITH A HUMINT OPERATIONS CELL (HOC) AND TASK FORCE
COUNTERINTELLIGENCE
COORDINATING AUTHORITY (TFCICA) TO EXECUTE COORDINATION AND
DECONFLICTION OF HUMINT AND COUNTERINTELLIGENCE ACTIVITIES WITH NAVAL

FORCES OPERATING IN THE MARITIME AREA OF OPERATION. KEEP USG
CIVILIAN
AGENCIES INFORMED.
3.C.1.M (U) ESTABLISH METOC CELL WITH A DESIGNATED JOINT METOC
OFFICER
(JMO), RESPONSIBLE FOR SUPPORT OF JOINT OPERATIONS AND PLANNING.
3.C.1.N. (U) COORDINATE WITH USSOUTHCOM J6 AND PARTICIPATING FORCES
TO
ESTABLISH A COMMUNICATIONS ARCHITECTURE THAT MAXIMIZES C2,
INTEROPERABILITY, FUNCTIONALITY, AND SECURITY FOR ALL JTF NETWORKS
AND
SERVICES IAW ANNEX K GUIDANCE.
3.C.1.O. (U) PROVIDE OPERATIONAL ASSESSMENT UPDATES ON PROGRESS
TOWARDS DIRECTED OBJECTIVES AND EFFECTS TO CDRUSSOUTHCOM.
3.C.1.P. (U) DESIGNATE FORCES FOR THE ACCOMPLISHMENT OF EQUIPMENT
RETROGRADE AND BASE RESTORATION MISSIONS AT THE HOLDING CAMP.
3.C.1.Q. (U) ICW COMMANDER, NAVY REGION SOUTHEAST (CNRSE) AND NSGB
CONDUCT ACTIONS TO RETURN FACILITIES AND GROUNDS TO AN ACCEPTABLE
STATE UPON COMPLETION OF OPERATIONS.
3.C.1.R. - MODIFY: (U) ESTABLISH OPERATIONAL CONTRACT SUPPORT
INTEGRATION CELL (OCSIC) AND PERFORM OCSIC FUNCTIONS IN SUPPORT OF
JTF
OEPRATIONS (E.G., CONDUCT JOINT REQUIREMENTS REVIEW BOARD, INTEGRATE

## UNCLAS ~~FOUO~~

~~Protected Material — Subject to Protective Order~~

UNCLAS ~~FOUO~~

PAGE 4 OF 16

AND SYNCHRONIZE COMMERCIAL SUPPORT TO JTF CUOPS/FUOPS). COORDINATE
WITH NAVSOUTH (AS LEAD SERVICE FOR CONTRACTING (LSC)) AND ITS
DESIGNATED SENIOR CONTRACTING OFFICIAL (SCO) REGARDING PROCEDURES TO
SUBMIT APPROVED REQUIREMENTS FOR CONTRACTING ACTIONS. SUPPORT
USSOUTHCOM OCS WORKING GROUP AS REQUIRED.
3.C.1.S. (U) COORDINATE WITH DOJ AND DHS FOR CAMP DISPOSITION NEEDS
FOR ILLEGAL ALIENS OF INTEREST OR PERSONS UNDER CRIMINAL
INVESTIGATION.
3.C.1.T. (U) ESTABLISH COMMON ACCOUNTABILITY AND ACCESS PROCEDURES
FOR
ILLEGAL ALIEN POSSESSIONS, ESPECIALLY MOBILE PHONES.
3.C.1.U. (U) PROVIDE SUSTAINMENT FOR ILLEGAL ALIENS AND JTF MEMBERS.
3.C.1.V. (U) ASSUME TACON OF JTF-GTMO GUARD FORCES IN DIRECT SUPPORT
OF DHS/ICE FOR CONTROL OF HTIA. DHS/ICE WILL MAINTAIN CUSTODY OF
HTIA. NOTHING IN THIS ORDER SHALL DETRACT FROM JTF-GTMO PRIMARY
RESPONSIBILITY TO PROVIDE CUSTODY AND CONTROL OF LAW OF WAR
DETAINEES.
3.C.1.W. - ADD: (U) PROVIDE COMMON USER LOGISTICS (CUL) TO UNITS AND
PERSONNEL ASSIGNED/OPCON/TACON TO THE JTF.
3.C.1.X. - ADD: (U) COORDINATE FORCE PROTECTION PLANS WITH NAVAL
STATION GUANTANAMO BAY.

3.C.2. (U) COMMANDER, U.S. ARMY SOUTH (CDRUSARSOUTH).
3.C.2.A. (U) IMMEDIATELY DEPLOY SSAT AND ADVANCE PARTY TO NSGB TO
COORDINATE WITH NSGB AND INTERAGENCY PERSONNEL.
3.C.2.B. (U) ESTABLISH JTF-SOUTHERN GUARD AND SERVE AS THE INITIAL
JOINT FORCE COMMANDER (JFC) AT NSGB NLT 01 FEB 2025.
3.C.2.C. (U) ICW USNAVSOUTH, CNRSE AND USSOUTHCOM J4 (ENGINEERS),
REVIEW ILLEGAL ALIEN CAMP CONSTRUCTION PLAN.
3.C.2.D. (U) ESTABLISH A JOINT NETWORK CONTROL CENTER TO MONITOR AND
REPORT ALL JTF COMMUNICATION ITEMS OF INTEREST TO USSOUTHCOM'S JOINT
DEFENSE OPERATIONS CENTER.
3.C.2.E. - MODIFY: (U) MAINTAIN A DETAILED CONCEPT OF LOGISTICS
SUPPORT INCLUDING DECISION POINTS AND TIMELINES FOR INITIATING
TRANSITION OF REQUIREMENTS TO CONTRACT SOLUTIONS.
3.C.2.F. - MODIFY: (U) COORDINATE REQUIREMENTS WITH THE JTF AND WITH
NAVY (AS LEAD SERVICE FOR CONTRACTING (LSC)) FOR CONTRACTING ACTIONS.
3.C.2.G. (U) CONDUCT COORDINATION WITH USNAVSOUTH TO INTEGRATE
ILLEGAL
ALIEN CAMP REQUIREMENTS INTO THE BOS-I FOR NSGB.
3.C.2.H. (U) BPT SERVE AS THE FINANCIAL MANAGEMENT ISO JTF-SOUTHERN
GUARD.
3.C.2.I. (U) ASSESS REQUIREMENT FOR A CIVIL AFFAIRS TEAM (CAT) TO
MONITOR MEASURES OF EFFECTIVENESS FOR HUMANITARIAN ASSISTANCE AND
INFORMATION OPERATIONS KEY INDICATORS FOR PROVISION OF WATER,
SANITATION, FOOD, HEALTH, SHELTER AND NON-FOOD ITEMS, AND DRIVERS
CONTRIBUTING TO INCREASE ILLEGAL ALIEN FLOW, AND BPT PLACE A CIVIL
MILITARY OPERATIONS CENTER (CMOC) AT SOURCE COUNTRY OF MIGRATION OR,
IF DIRECTED, AT NSGB.
3.C.2.J. (U) COORDINATE WITH ARMY MATERIAL COMMAND TO DRAW AND
RECEIVE
OPERATIONAL PROJECT STOCKS REQUIRED ISO HOLDING CAMP OPERATIONS.

3.C.3. (U) COMMANDER, U.S. NAVAL FORCES SOUTH (COMUSNAVSOUTH).
3.C.3.A. (U) PROVIDE A DEPUTY COMMANDER (PROPOSED RANK O6) TO JTF-
SOUTHERN GUARD, WHEN FORMED.
3.C.3.B. - MODIFY: (U)ACCEPT ADCON OF DEPLOYING U.S. NAVAL FORCES
UPON
ARRIVAL AT NSGB.
3.C.3.C. (U) SUPPORT ARSOUTH IN REVIEWING OPERATIONAL REQUIREMENTS
INCLUDING FACILITY, EQUIPMENT, AND SUPPLY REQUIREMENTS ON NSGB.
3.C.3.D. - MODIFY: (U) DESIGNATED AS LEAD SERVICE FOR CONTRACTING

UNCLAS ~~FOUO~~

~~Protected Material - Subject to Protective Order~~

U-DOW-CAR-179

UNCLAS F̶ ̶O̶ ̶U̶ ̶O̶

PAGE 5 OF 16

(LSC). COORDINATE WITH CNRSE FOR BOS FUNCTION SUPPORT AT NSGB.
3.C.3.E. - MODIFY: (U) DEVELOP CONTRACTS TO SUPPORT HOLDING CAMP
OPERATIONS TO INCLUDE LIFE SUPPORT SUPPLIES AND SERVICES OF ILLEGAL
ALIENS AND CAMP MANAGEMENT AT NSGB WITH ASSOCIATED TIMELINES AND
COST.
CONTRACT SOLUTIONS FOR TASK PERFORMED BY MILITARY FORCES TO REDUCE
FORCE REQUIREMENTS AS SOON AS FEASBLE BUT NLT D+180.
3.C.3.F. - MODIFY: (U) COORDINATE FOR THE NAVY TO SERVE AS LSC.
ESTABLISH OCS INTEGRATION CELL (OCSIC). DESIGNATE SENIOR CONTRACTING
OFFICIAL (SCO) TO CHAIR JOINT CONTRACTING SUPPORT BOARD (JCSB).
PUBLISH PROCEDURES FOR RECEIPT OF ACQUISITION-READY REQUIREMENTS.
3.C.3.G. (U) REMOVED.
3.C.3.H. (U) REMOVED.
3.C.3.I. (U) IDENTIFY INFRASTRUCTURE IMPROVEMENTS REQUIRED TO SUSTAIN

U.S. OPERATIONS ON NAVAL STATION WINDWARD SIDE.
3.C.3.J - ADD: (U) SERVE AS EXECUTIVE AGENT AND EXERCISE FORCE
PROTECTTION TACON ON BEHALF OF CDR, USSOUTHCOM FOR NAVAL STATION
GUANTANAMO BAY.

3.C.4. (U) COMMANDER, U.S. MARINE CORPS FORCES, SOUTH
(COMUSMARFORSOUTH).
3.C.4.A. (U) SUPPORT ARSOUTH/CDR JTF-SOUTHERN GUARD, IN PLANNING FOR
INITIAL HOLDING CAMP SURGE OPERATIONS.
3.C.4.B. - MODIFY: (U) BPT PROVIDE LIAISONS TO ARSOUTH/JTF-SOUTHERN
GUARD AND USNAVSOUTHIN ORDER TO FACILITATE COMMUNICATIONS AND SUPPORT

TO PLANNING OPERATIONS.
3.C.4.C. - MODIFY: (U)ACCEPT ADCON OF DEPLOYING MARINE FORCES UPON
ARRIVAL AT NSGB.
3.C.4.D. (U) BPT SUPPORT JTF-SOUTHERN GUARD WITH CIVIL AFFAIRS
ASSETS.

3.C.5. (U) COMMANDER, U.S. AIR FORCES SOUTH (COMUSAFSOUTH)
3.C.5.A. (U) DESIGNATED AS THEATER JOINT FORCE AIR COMPONENT
COMMANDER
(JFACC).
3.C.5.B. (U) SUPPORT ARSOUTH/JTF-SOUTHERN GUARD.
3.C.5.C. (U) BPT EXECUTE INTRA-THEATER AIR MOBILITY OPERATIONS AS
DIRECTED TO INCLUDE INTEGRATING ADDITIONAL ALLOCATED AIR ASSETS.

3.C.6. (U) COMMANDER, U.S. SPECIAL OPERATIONS SOUTH (COMSOCSOUTH).
3.C.6.A. (U) BPT PROVIDE PLANNING PERSONNEL AND SUPPORT TO CDR JTF-
SOUTHERN GUARD.
3.C.6.B. (U) BPT PROVIDE SOF RECOMMENDATIONS NECESSARY TO SUPPORT
THIS
PLAN. SPECIFICALLY, RECOMMENDATIONS FOR THE COMMAND AND CONTROL OF
SOF PERSONNEL.
3.C.6.C. (U) BPT SUPPORT WITH SELECT IN-THEATER CIVIL AFFAIRS AND/OR
MISO ASSETS TO JTF-SOUTHERN GUARD.

3.C.6.D. (U) DIRECTOR, JOINT INTERAGENCY TASK FORCE SOUTH (JIATF-S).

BE PREPARED TO RELINQUISH TACON OF U.S. DOD AIR AND MARITIME ASSETS
TO
SUPPORT JTF-SOUTHERN GUARD UNTIL FURTHER NOTICE.

3.C.7. (U) COMMANDER, JOINT TASK FORCE GUANTANAMO.
3.C.7.A. (U) BPT PROVIDE PLANNING PERSONNEL AND SUPPORT TO CDR JTF-
SOUTHERN GUARD.
3.C.7.B. (U) PROVIDE ENGINEERING ASSESSMENT OF INFRASTRUCTURE
IMPROVEMENTS REQUIRED TO HOLD HIGH THREAT ILLEGAL ALIENS (HTIA) IN

UNCLAS F̶ ̶O̶ ̶U̶ ̶O̶

Protected Material -- Subject to Protective Order

PAGE 6 OF 16

JTF-GUANTANAMO FACILITIES.
3.C.7.C. (U) DIRLAUTH AUTHORIZED TO COORDINATE AND CONDUCT INTERAGENCY
HOLDING OPERATIONS TRAINING WITH IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) PERSONNEL AT NSGB.
3.C.7.D. (U) COMPLETE.
3.C.7.E. PROVIDE JTF-GTMO GUARD FORCES TACON TO JTF-SOUTHERN GUARD IN

DIRECT SUPPORT OF DHS/ICE FOR CONTROL OF HTIA. DHS/ICE WILL MAINTAIN

CUSTODY OF HTIA. NOTHING IN THIS ORDER SHALL DETRACT FROM JTF-GTMO PRIMARY RESPONSIBILITY TO PROVIDE CUSTODY AND CONTROL OF LAW OF WAR DETAINEES.

3.C.8. (U) USSOUTHCOM STAFF.
3.C.8.A. (U) USSOUTHCOM J1 (SCJ1).
3.C.8.A.1. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.A.2. (U) COORDINATE PERSONNEL SUPPORT IN SUPPORT OF THE JTF.
3.C.8.A.3. (U) DEVELOP, MAINTAIN, AND COORDINATE FILLS FOR THE JTF-SOUTHERN GUARD JOINT MANNING DOCUMENT (JMD) POSITIONS.
3.C.8.A.4 (U) IMPLEMENT A DESIGNATED ATAAPS CODE TO TRACK AND ACCOUNT
FOR ALL OVERTIME HOURS WORKED BY SC HQ PERSONNEL IN DIRECT SUPPORT OF

OPERATION.

3.C.8.B. (U) USSOUTHCOM J2 (SCJ2).
3.C.8.B.1. - MODIFY: (U) PROVIDE THREAT ASSESSMENT TO THE JOINT PLANNING GROUP (JPG), JTF, AND DEPLOYING FORCES.
3.C.8.B.2. (U) BPT PROVIDE ███████████████ TO HSTF-SE INTELLIGENCE SECTION OF THIS OPERATION UNTIL NO LONGER REQUIRED.
3.C.8.B.3. (U) PROVIDE INDICATIONS AND WARNING OF IMPENDING CARIBBEAN

MARITIME MASS MIGRATION ICW USCG MIFC-LANT.
3.C.8.B.4. (U) ICW DHS, BPT ESTABLISH AN INTELLIGENCE FUSION CELL (IFC) AND STAND UP AN INTELLIGENCE COMMUNITY OF INTEREST (COI) TO FUNCTION AS FOCAL POINT AND LEAD FOR COORDINATION, COLLABORATION, AND

FACILITATION OF INTELLIGENCE SUPPORTING THIS MISSION ICW WITH ALL MEMBERS OF THE INTELLIGENCE COMMUNITY (IC) AND ANY OTHER STAKEHOLDERS

INVOLVED IN SUPPORTING THE CRISIS EVENT(S).
3.C.8.B.5. (U) COORDINATE THEATER AND REQUEST NATIONAL INTELLIGENCE COLLECTION AND OTHER SUPPORT AS REQUIRED SUPPORTING MARITIME SUPPORT AND HOLDING CAMP OPERATIONS.
3.C.8.B.6. (U) COORDINATE WITH HSTF-SE/DHS TO DEVELOP A COLLECTION STRATEGY AND REFINE ISR CONOP FOR P1+ OPERATIONS; IDENTIFY REQUIREMENTS FOR ADDITIONAL THEATER ISR ASSETS (RFF) AND PED SUPPORT (RFS).
3.C.8.B.7. (U) BPT REDIRECT AND REQUEST AVAILABLE TRADITIONAL AND NON-
STANDARD INTELLIGENCE, SURVEILLANCE, AND RECONNAISSANCE (ISR) ASSETS AS REQUIRED TO ACTION THE COLLECTION STRATEGY AND ADDRESS INTELLIGENCE GAPS.
3.C.8.B.8. (U) HQ USSOUTHCOM J2 INTELLIGENCE FOREIGN DISCLOSURE OFFICE
(FDO) WILL BE RESPONSIBLE FOR THE REVIEW AND APPROVAL/DISAPPROVAL OF USSOUTHCOM ORIGINATED CLASSIFIED MILITARY INFORMATION (CMI) AND CONTROLLED UNCLASSIFIED INFORMATION (CUI) PRODUCTS. ALL FOREIGN DISCLOSURE REQUESTS FOR MILITARY INTELLIGENCE INFORMATION WILL BE

Protected Material -- Subject to Protective Order

U-DOW-CAR-181

UNCLAS~~FOUO~~

COORDINATED VIA SCJ2 INTEL FDO FOR REVIEW AND APPROVAL/DISAPPROVAL
PRIOR TO FOREIGN RELEASE. IF YOU HAVE QUESTIONS ABOUT INTELLIGENCE
FOREIGN DISCLOSURE, PLEASE CONTACT THE SCJ2 INTEL FDO AT ███████

INTEL FDO GROUP ██████

███████████████████████████████████

3.C.8.B.9. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN
SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.B.10. (U) DEVELOP AND REFINE PRIORITY INTELLIGENCE REQUIREMENTS

(PIRS) AND ESSENTIAL ELEMENTS OF INFORMATION (EEIS) IN SUPPORT OF THE

COMMANDER'S CRITICAL INFORMATION REQUIREMENTS (CCIRS) AND DECISION
POINTS (DPS).
3.C.8.B.11. - MODIFY: (U) COORDINATE WITH DIA, DHS, AND USG
STAKEHOLDERS TO UTILIZE ENHANCED DOMAIN AWARENESS (EDA) TO INCREASE
INFORMATION SHARING, AS WELL AS PROVIDE A COMMON INTELLIGENCE PICTURE

(CIP) / COMMON OPERATING PICTURE (COP) THAT FOCUSES ON LAND AND
MARITIME MIGRATION.
3.C.8.B.12. - ADD: (U) BPT TO CREATE EDA SOLUTIONS TO SHARE WITH
ALLIES AND PARTNER NATIONS.
3.C.8.B.13. (U) BPT REFINE AND COORDINATE HUMAN INTELLIGENCE (HUMINT)

AND COUNTERINTELLIGENCE (CI) STRATEGIES TO OPTIMIZE THE EMPLOYMENT OF

DOD, SERVICE FORCE PROTECTION AND CI COLLECTION ASSETS.
3.C.8.B.14. (U) BPT SUPPORT ENHANCED VETTING OF ILLEGAL ALIENS TO
ASSIST THE LEAD FEDERAL AGENCY IN IDENTIFYING AND CHARACTERIZING THE
THREAT.
3.C.8.B.15. - ADD: (U) BPT PROVIDE ███ SECURITY SUPPORT PERSONNEL IN
DIRECT SUPPORT OF JTF-SOUTHERN GUARD AT NSGB FOR ACCESS CONTROL, INFO

SECURITY, AND PHYSICAL SECURITY.

3.C.8.C. (U) USSOUTHCOM J3 (SCJ3).
3.C.8.C.1. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN
SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.C.2. (U) ACTIVATE THE USSOUTHCOM CRISIS ACTION TEAM (CAT) AND
THE FUTURE OPERATIONS (FUOPS) OPT.
3.C.8.C.3. (U) TASK COMPONENT COMMANDS AS REQUIRED TO SUPPORT HOLDING

OPERATIONS.
3.C.8.C.4. (U) VALIDATE JTF-SOUTHERN GUARD JMD REQUIREMENTS.
3.C.8.C.5. (U) BPT SUBMIT PTDO/RFF (INCLUDING ENGINEER SUPPORT FOR
THE
CONSTRUCTION OF HOLDING CAMPS) TO THE JOINT STAFF.
3.C.8.C.6. (U) COORDINATE WITH SCJ2 FOR ISR COVERAGE AND COLLECTIONS
REQUIREMENTS.
3.C.8.C.7. (U) BPT REQUEST JECC MISSION-TAILORED PACKAGE TO AUGMENT
USSOUTHCOM AND JTF-SOUTHERN GUARD.
3.C.8.C.8. (U) REQUEST AIRLIFT AS REQUIRED.
3.C.8.C.9. (U) ISSUE PLANS AND ORDERS AS REQUIRED.
3.C.8.C.10. (U) PROVIDE SPECIFIC AUGMENTATION TO JTF-SOUTHERN GUARD,
AS REQUIRED.
3.C.8.C.11. (U) DEVELOP, VALIDATE, AND GAIN APPROVAL OF TPFDD.
3.C.8.C.12. (U) THROUGH THE SENIOR METOC OFFICER SERVES AS THE FOCAL

UNCLAS~~FOUO~~

~~Protected Material — Subject to Protective Order~~

## UNCLAS ~~FOUO~~

PAGE 8 OF 16

POINT FOR JOINT FORCE METOC SUPPORT. ENSURES ALL METOC CAPABILITY
REQUIREMENTS ARE VALIDATED.
3.C.8.C.13. (U) SUPPORT NSGB FOR ANY EVACUATION OF NON-ESSENTIAL
PERSONNEL AND FAMILY MEMBERS, IF REQUIRED FOR SAFETY/SECURITY REASONS

AS CAMPS EXPAND.
3.C.8.C.14. (U) PRODUCE AND TRANSMIT APPLICABLE ORDERS NECESSARY TO
SUPPORT THE OPERATION. ALERT SUBORDINATE COMMAND HEADQUARTERS OF AN
IMPENDING REQUIREMENT TO PROVIDE PERSONNEL AND SUPPORT FOR THE
EXECUTION OF HOLDING OPERATIONS.
3.C.8.C.15. (U) RECEIVE A COMPREHENSIVE AFTER-ACTION REVIEW FROM THE
JTF, FOR USE WITH USSOUTHCOM AND FOR DISSEMINATION TO OTHER COMBATANT

COMMANDS.
3.C.8.C.16. (U) COLLECT AND PRESERVE ALL RECORDS ASSOCIATED WITH THE
OPERATION.
3.C.8.C.17. (U) ASSIST JTF-SOUTHERN GUARD IN EXECUTING FORCE
PROTECTION (FP) RESPONSIBILITIES. RECOMMEND FP POLICIES, INCLUDING
WEAPONS POLICY, AND ROE/RUF TO CDRUSSOUTHCOM IN COORDINATION WITH
SCJ2
AND SCSJA.
3.C.8.C.18. ~~(U)~~ SET PRIORITY OF MISSION AND PRIORITY OF SUPPORT FOR

OPERATIONS IN EXECUTION AT NSGB.
3.C.8.C.19. ~~(U)~~ DETERMINE DEPLOYMENT CRITERIA FOR DEPLOYING FORCES
TO NSGB.
3.C.8.C.20. (U) COORDINATE PREPARATION OF NSGB FOR HOLDING CAMP
OPERATIONS (USSOUTHCOM STAFF, USARSOUTH AND USNAVSOUTH).
3.C.8.C.21. (U) GENERATE AND MAINTAINS A ROSTER FOR A 50 PAX SUPPORT
ELEMENT TO AUGMENT NSGB PREPARATION TO ASSIST JTF-SOUTHERN GUARD
PRIOR
TO IOC.
3.C.8.C.22. ASSIGN LNO SUPPORT FROM SOUTHCOM TO IMMIGRATION AND
CUSTOMS ENFORCEMENT (ICE) IN WASHINGTON DC.
3.C.8.C.23. - ADD: (U) CONDUCT ASSESSMENT OF FP REQUIREMENTS AT NSGB.

3.C.8.D. (U) USSOUTHCOM J4 (SCJ4).
3.C.8.D.1. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN
SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.D.2. (U) SUPPORT PLANNING AND EXECUTION OF LOGISTICS SERVICES,
MAINTENANCE, SUPPLY, DEPLOYMENT AND DISTRIBUTION, ENGINEERING, AND
OPERATIONAL CONTRACT SUPPORT.
3.C.8.D.3. (U) ICW USARSOUTH, JTF-GTMO, AND USNAVSOUTH, IDENTIFY
EMERGENT REQUIREMENTS TO DEVELOP LEEWARD AND WINDWARD INFRASTRUCTURE
TO INCLUDING FACILITY, EQUIPMENT, AND SUPPLY REQUIREMENTS ON NSGB.
3.C.8.D.4. (U) SYNCHRONIZE ACTIONS OF ALL LOGISTICS ENABLERS INVOLVED

IN THIS OPERATION VIA THE JOINT LOGISTICS COORDINATION BOARD, TO
INCLUDE ADJACENT CCMDS, FUNCTIONAL CMDS, SERVICE COMPONENTS, COMBAT
SUPPORT AGENCIES, AND INTERAGENCY (DHS, ICE).
3.C.8.D.5. (U) COORDINATE WITH DLA AS REQUIRED TO MAINTAIN SUPPORT TO

HOLDING CAMP OPERATIONS AT NSGB.
3.C.8.D.6. (U) COORDINATE STRATEGIC MOVEMENTS IN SUPPORT OF
DEPLOYMENT
OPERATIONS.
3.C.8.D.7. (U) BE PREPARED TO COORDINATE AND SYNCHRONIZE ENGINEERING
RESOURCES AS REQUIRED.
3.C.8.D.8. (U) BE PREPARED TO FACILITATE ENGINEER REACH BACK SUPPORT
FOR TECHNICAL EXPERTISE AS REQUIRED.
3.C.8.D.9. ~~(U)~~ SET PRIORITY OF MOVEMENT FOR LOGISTICS SUPPORTING

## UNCLAS ~~FOUO~~

~~Protected Material – Subject to Protective Order~~

UNCLAS ~~FOUO~~

OPERATIONS AT NSGB.

3.C.8.D.10 (U) ICW NSGB PROVIDE AN ASSESSMENT OF HARDENED FACILITIES ON NSGB, TO INCLUDE CAPACITY AND CAPABILITIES TO SUPPORT JTF-SOUTHERN

GUARD AND ILLEGAL ALIENS DURING SEVERE WEATHER.

3.C.8.D.11. (U) IN COORDINATION WITH NAVSOUTH, CREATE A POAM TO TRANSITION HOLDING CAMP LOGISTICAL FUNCTIONS FROM MILITARY TO CONTRACTED SOLUTIONS AS EARLY AS D+180.

3.C.8.D.12. (U) ESTABLISH THE USSOUTHCOM OCS INTEGRATION CELL (OCSIC).

3.C.8.E. (U) USSOUTHCOM J5(SCJ5).

3.C.8.E.1. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN SUPPORT OF USSOUTHCOM'S B2C2WG.

3.C.8.E.2. U) AS REQUIRED, CONDUCT SEQUEL PLANNING VIA THE FUTURE PLANS JOINT PLANNING GROUP (FUPLANS JPG).

3.C.8.E.3. (U) AS REQUIRED, UPDATE THE USSOUTHCOM CAMPAIGN PLAN (SCP).

3.C.8.F. (U) USSOUTHCOM J6 (SCJ6).

3.C.8.F.1. (U) PARTICIPATE IN ASSIGNED B2C2WGS, AS REQUIRED.

3.C.8.F.2. (U) HOST COMMUNICATION WORKING GROUP, INCLUSIVE OF ALL INTERNAL AND EXTERNAL STAKEHOLDERS AND IAW GUIDANCE PROVIDED IN CONPLAN 6120, TO PLAN AND COORDINATE MISSION COMMUNICATION REQUIREMENTS ISO OPERATIONS.

3.C.8.F.3. (U) ASSIST LEAD COMPONENT WITH PLANNING AND EXECUTING A ROBUST COMMUNICATIONS INFRASTRUCTURE THAT ENSURES INTEROPERABILITY BETWEEN ALL MISSION PARTNERS FOR JTF AND SSAT EQUITIES.

3.C.8.F.4. (U) ENSURE NETWORKS, SERVICES, AND APPLICATIONS MEET OPERATIONAL REQUIREMENTS FOR SECURE AND NON-SECURE VOICE, VIDEO, AND DATA COMMUNICATIONS, TO INCLUDE ACCESS TO NIPRNET/ SIPRNET/ INTERNET ENCLAVES AND DHS' INTERNET-BASED HOMELAND SECURITY INFORMATION NETWORK

(HSIN), AS REQUIRED.

3.C.8.F.5. (U) ASSIST JTF AND/OR LEAD COMPONENT WITH VETTING/PROCESSING ALL COMMUNICATION RFF/RFS REQUIREMENTS THROUGH SCJ35 GFM.

3.C.8.F.6. (U) ENSURE LEAD COMPONENT INCLUDES PACE PLANNING FOR ALL NETWORKS, SERVICES, AND TRANSPORTS, AS AVAILABLE.

3.C.8.F.7. (U) ENSURE THE JTF J6 STANDS UP A JOINT NETWORK COORDINATION CENTER (JNCC) TO MONITOR, TRACK AND REPORT COMMUNICATION

STATUS, FOR ALL MISSION FORCES, TO THE SCJ6 JOINT DODIN OPERATIONS CENTER (JDOC).

3.C.8.F.8. (U) ENSURE JNCC PROVIDES DAILY COMMUNICATION STATUS (COMSTAT) AND SITUATIONAL UPDATES TO THE JDOC IAW WRITTEN OR VERBAL GUIDANCE PROVIDED BY THE SCJ6 AND JDOC.

3.C.8.F.9. (U) BPT ASSIST LEAD COMPONENT /JTF WITH SOURCING COMMERCIAL

SATELLITE (COMSAT) SOLUTIONS (I.E. ███████, AS REQUIRED.

3.C.8.F.10. (U) BPT PLAN AND EXECUTE SURGE COMMUNICATION REQUIREMENTS

FOR WINDWARD BUILD-OUT, AS REQUIRED.

3.C.8.F.11. (U) ASSIST LEAD COMPONENT WITH PROCESSING SPECTRUM AND COMMUNICATION SECURITY (COMSEC) REQUESTS FOR DOD FORCES, AS REQUIRED.

3.C.8.F.12. (U) ENSURE LEAD COMPONENT IS PREPARED TO PROVIDE COMMUNICATIONS SUPPORT TO INTERAGENCY AND NGO MISSION PARTNERS, AS REQUIRED.

3.C.8.F.13. (U) COORDINATE PHONES AND FIBER TRANSPORT CONNECTIVITY REQUIREMENTS WITH NSGB BASE COMMUNICATIONS OFFICE (BCO) AND/OR COMMERCIAL VENDORS.

3.C.8.F.14. (U) COORDINATE JTF-GTMO J6 COMMUNICATIONS SUPPORT TO

UNCLAS ~~FOUO~~

~~Protected Material -- Subject to Protective Order~~

**UNCLAS ~~FOUO~~**

PAGE 10 OF 16

ASSIGNED JTF.

3.C.8.G. (U) USSOUTHCOM J7/9 (SCJ7/9).
3.C.8.G.1. (U) IDENTIFY AND MAINTAIN CONTINUAL COORDINATION LINKS
WITH
ALL USG AGENCIES, INTERGOVERNMENTAL ORGANIZATIONS (SUCH AS THE UN,
UNHCR, IOM, OAS, AND THE PAN AMERICAN HEALTH ORGANIZATION (PAHO)),
AND
NGOS, AS PERMISSIBLE.
3.C.8.G.2. (U) REQUEST SUPPORT (INCLUDING PLANNING, INFORMATION
SHARING AND EXECUTION) FROM ALL RELEVANT USG AGENCIES.
3.C.8.G.3. (U) TRANSITION JOIN INTERAGENCY COORDINATION GROUP (JIACG)

TO CRISIS BATTLE RHYTHM TO MAINTAIN COORDINATION LINKS WITH THE
INTERAGENCY. IT SHOULD INCLUDE BUT IS NOT LIMITED TO THE FOLLOWING
AGENCIES: NATIONAL SECURITY COUNCIL (NSC), DOS, DOD, DHS, DEPARTMENT

OF TRANSPORTATION (DOT), CIA, DOJ, NSA, DIA, DLA, DEPARTMENT OF
TREASURY (TREAS), JCS, UN, AND OAS, AS WELL AS REPRESENTATION FROM
IOS
AND NGOS WHEN APPROPRIATE. EMPHASIZE WITH THE INTERAGENCY THAT
PRODUCTS CLASSIFIED AND RELEASABLE TO THE LOWEST LEVEL WOULD BE MOST
USEFUL IN THIS ANTICIPATED SCENARIO.
3.C.8.G.4. (U) BPT SUPPORT JTF SOUTHERN GUARD WITH CIVIL AFFAIRS
PLANNING CAPABILITY AND/OR INITIAL CAPABILITY OF DEPLOYABLE CMOC
ORGANIZATION.

3.C.8.H. (U) USSOUTHCOM J8 (SCJ8).
3.C.8.H.1. (U) AS REQUIRED, PROVIDE ADVOCACY TO COMPONENTS WHILE THEY

WORK WITH THEIR SERVICE HEADQUARTERS TO SECURE FUNDING AND
AUTHORITIES
TO PREPARE NSGB FOR HOLDING CAMP OPERATIONS.
3.C.8.H.2. (U) PROVIDE FINANCIAL GUIDANCE AND, WHEN NECESSARY,
COORDINATE WITH THE JOINT STAFF AND THE SECDEF FOR THE DESIGNATION OF

A MILITARY DEPARTMENT EXECUTIVE AGENT (EA). COORDINATE WITH THE
JOINT
STAFF, SUPPORTING COMMANDER'S COMPTROLLER AND SUPPORTING USG AGENCIES

TO ENSURE TIMELY RECEIPT OF FM INSTRUCTIONS AND AUTHORITIES.
3.C.8.H.3. (U) LEAD AN OPERATION ASSESSMENT WORKING GROUP, AS
REQUIRED.
3.C.8.H.4 (U) IN COORDINATION WITH THE SCJ55, REVIEW CHANGES OR
MODIFICATIONS NEEDED TO THE SCP.
3.C.8.H.5. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL TO THE
USSOUTHCOM B2C2WGS AS REQUIRED.
3.C.8.H.6. (U) REMOVED.
3.C.8.H.7 (U) DETAIL THE PROCESS FOR FUNDING ONCE SECDEF APPROVES A
REQUEST FOR ASSISTANCE (RFA).
3.C.8.H.8. (U) DEVELOP AND MAINTAIN DECISION SUPPORT MODELS TO ENABLE

DECISION MAKING AND IDENTIFICATION OF OPERATIONAL RISKS.

3.C.8.I. (U) STAFF JUDGE ADVOCATE (SCSJA), USSOUTHCOM.
3.C.8.I.1. (U) MONITOR OPERATIONS AND ADVISE CDRUSSOUTHCOM AND
USSOUTHCOM STAFF AND COORDINATE WITH THE DESIGNATED LEGAL ADVISOR FOR

ANY JTF AND/OR OTHER U.S. COMMANDER, ON ANY LEGAL, REGULATORY, AND
POLICY IMPLICATIONS ON CURRENT AND PLANNED ACTIVITIES, POLICIES, AND
PROCEDURES THROUGH ALL OPERATIONAL PHASES.
3.C.8.I.2. (U) PROVIDE GUIDANCE TO SUBORDINATE LEGAL ADVISORS ON THE

**UNCLAS ~~FOUO~~**

~~Protected Material -- Subject to Protective Order~~

PROVISION OF LEGAL GUIDANCE TO COMPONENT COMMANDS, JTF-SOUTHERN GUARD

COMMANDER, AND NAVAL FORCES COMMANDER ON HANDLING OF ILLEGAL ALIENS, MODIFICATION TO SROE/RUF, TREATMENT OF CIVILIAN CASUALTIES AND ANY ADDITIONAL REQUESTED ITEMS THROUGH ALL OPERATIONAL PHASES.
3.C.8.I.3. (U) ADVISE USSOUTHCOM STAFF ON REQUIREMENTS FOR DIPLOMATIC

CLEARANCES, OVER FLIGHT, BASING RIGHTS, ACCESS AGREEMENTS AND FACILITY/EQUIPMENT USAGE AUTHORIZATIONS AS APPLICABLE.
3.C.8.I.4. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL TO THE USSOUTHCOM B2C2WGS AS REQUIRED.

3.C.8.J. (U) USSOUTHCOM COMMAND SURGEON (SCSG).
3.C.8.J.1. (U) SUPPORT USARSOUTH'S PLANNING AND EXECUTION OF FORCE HEALTH READINESS FUNCTIONS.
3.C.8.J.2. (U) DETERMINE MEDICAL RULES OF ELIGIBILITY AND POLICY GOVERNING MEDICAL TREATMENT AND EVACUATION OF ILLEGAL ALIENS AND JTF PERSONNEL.
3.C.8.J.3. (U) VALIDATE MEDICAL CAPABILITIES AND COORDINATE ASSETS AS

REQUIRED.
3.C.8.J.4. (U) MONITOR MEDICAL SUPPORT REQUIREMENTS SUPPORTING THE JTF.
3.C.8.J.5. (U) COORDINATE WITH DHS POLICIES FOR MEDICAL EVACUATION OF

ILLEGAL ALIENS REQUIRING MEDICAL CARE BEYOND THE LEVEL OF CARE ESTABLISHED AT NSGB.
3.C.8.J.6. (U) COORDINATE (ICW USNAVSOUTH) AND INTEGRATE MEDICAL CAPABILITIES FROM SUPPORTING SERVICE COMPONENTS, AGENCIES, AND OTHER MEDICAL PROVIDERS, TO INCLUDE NAVHOSP, NSGB.
3.C.8.J.7. (U) COORDINATE JTF-SOUTHERN GUARD MEDICAL ASSETS AS REQUIRED.
3.C.8.J.8. (U) MONITOR MEDICAL SUPPORT REQUIREMENTS AT DESIGNATED NSGB
HOLDING CAMPS.
3.C.8.J.9 (U) MONITOR MEDICAL HEALTH STATUS WITHIN HOLDING CAMPS FOR VULNERABLE POPULATIONS, INCLUDING PRE-EXISTING CHRONIC DISEASES, WITH

AN EMPHASIS ON PROTECTING PREGNANT WOMEN AND PREVENTING INFECTIOUS DISEASES.
3.C.8.J.10. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL TO THE USSOUTHCOM B2C2WGS AS REQUIRED.

3.C.8.K. (U) USSOUTHCOM PUBLIC AFFAIRS (SCPA).
3.C.8.K.1. (U) THE DEPARTMENT OF HOMELAND SECURITY IS THE LEAD FEDERAL
AGENCY FOR PUBLIC AFFAIRS GUIDANCE. DEVELOP PUBLIC AFFAIRS GUIDANCE IN COORDINATION WITH DHS, DOS AND OTHER USG AGENCIES TO COMMUNICATE USG INTENT FOR ILLEGAL ALIEN HOLDING OPERATIONS AT GUANTANAMO BAY, CUBA.
3.C.8.K.2.(U) PROVIDE PUBLIC AFFAIRS GUIDANCE AND OVERSIGHT TO USSOUTHCOM ENTERPRISE, ESTABLISHED TASK FORCES, AND SUPPORTING INSTALLATIONS/UNITS ON ILLEGAL ALIEN HOLDING OPERATIONS.
3.C.8.K.3.(U) MAINTAIN PUBLIC AFFAIRS AND STRATEGIC COMMUNICATION COORDINATION WITH OSD PA, STATE DEPARTMENT, INTERAGENCY PARTNERS AND THE USSOUTHCOM ENTERPRISE ON ILLEGAL ALIEN HOLDING OPERATIONS AND ACTIVITIES.
3.C.8.K.4. (U) SYNCHRONIZE PUBLIC AFFAIRS CAPABILITIES, OPERATIONS, ACTIVITIES, AND INVESTMENTS SUPPORTING ILLEGAL ALIEN HOLDING OPERATIONS.
3.C.8.K.5.(U) BPT TO SERVE AS CDRUSSOUTHCOM SPOKESPERSON ON PUBLIC ANNOUNCEMENTS CONCERNING ILLEGAL ALIEN HOLDING OPERATIONS.

~~Protected Material -- Subject to Protective Order~~

U-DOW-CAR-186

PAGE 12 OF 16

3.C.8.K.6. (U) BPT SUPPORT ESTABLISHMENT OF A JOINT TASK FORCE INTERAGENCY-JOINT INFORMATION CENTER (JIC) OR PUBLIC INFORMATION CENTER (PIC) AT GUANTANAMO BAY, CUBA.

3.C.8.L. (U) USSOUTHCOM FOREIGN DISCLOSURE (SCFD).
3.C.8.L.1. (U) PROVIDE POLICY AND GUIDANCE FOR THE SHARING OF CLASSIFIED MILITARY INFORMATION (CMI) AND CONTROLLED UNCLASSIFIED INFORMATION (CUI) TO FOREIGN GOVERNMENTS AND INTERGOVERNMENTAL ORGANIZATIONS.
3.C.8.L.2. (U) AS REQUIRED, COORDINATE WITH JOINT STAFF DIRECTORATE OF
MANAGEMENT (DOM), OFFICE OF THE UNDERSECRETARY OF DEFENSE FOR POLICY (OSD (P)), AND CHAIRMAN OF THE NATIONAL DISCLOSURE POLICY COMMITTEE FOR EXCEPTIONS NATIONAL DISCLOSURE POLICY (ENDP).
3.C.8.L.3. (U) PROVIDE FOREIGN DISCLOSURE SUPPORT TO USSOUTHCOM JOINT

OPERATIONS CENTER (JOC), JPG, AND JTF-SOUTHERN GUARD. USARSOUTH WILL PROVIDE AN FDO USING ORGANIC ASSETS WITH DEPLOYING JTG-SOUTHERN GUARD

IF REQUIRED.

3.C.8.M. (U) USSOUTHCOM COMMAND CHAPLAIN (SCCH).
3.C.8.M.1. (U) COORDINATE RELIGIOUS SUPPORT ASSETS AS REQUIRED.
3.C.8.M.2. (U) MONITOR RELIGIOUS SUPPORT REQUIREMENTS AT DESIGNATED HOLDING CAMP LOCATION(S).
3.C.8.M.3. (U) BE PREPARED FOR MIXED FAITH ILLEGAL ALIEN POPULATIONS.
3.C.8.M.4. (U) COORDINATE CONTRACTED RELIGIOUS SUPPORT FOR ILLEGAL ALIEN POPULATIONS BASED ON DISTRIBUTION OF DOCUMENTED FAITH GROUPS.

3.D. (U) COORDINATING INSTRUCTIONS.
3.D.1. (U) DIRECT LIAISON AUTHORITY (DIRLAUTH) WITH ALL SUPPORTING COMPONENTS, MILITARY DEPARTMENTS AND AGENCIES IS APPROVED. KEEP USSOUTHCOM INFORMED.
3.D.2. (U) EMAIL IS PREFERRED DELIVERY METHOD; USE POINTS OF CONTACT IN PARAGRAPH 5.D.
3.D.3. (U) ALL COMPONENTS AND USSOUTHCOM DIRECTORATES, PROVIDE PLANNING SUPPORT IN THE EVENT A PLANNING TEAM IS STOOD UP.
3.D.4. (U) ENHANCED DOMAIN AWARENESS (EDA) AS PRIMARY MEANS FOR COMMON
TACTICAL PICTURE AS WELL AS FOR SHARING INFORMATION AND UNCLASSIFIED INTELLIGENCE.

3.D.5. (U) PUBLIC AFFAIRS (PA) GUIDANCE. THE PA POSTURE FOR THIS PLANNING EFFORT IS RESPOND-TO QUERY ONLY. MEDIA QUERIES WILL BE REFERRED TO USSOUTHCOM PA OR ATSD(PA) WITHOUT COMMENT.

3.D.6. (U) REPORTING INSTRUCTIONS.
3.D.6.A. (U) SUBMIT ALL REPORTING VIA THE UNCLASSIFIED NETWORK (NIPR)

DIRECTLY TO USSOUTHCOM JOINT OPERATIONS CENTER (JOC), ███████████

EMAIL: ████████████████████████████████████████████ NO LATER THAN
(NLT) 1700 HOURS, DAILY.
3.D.6.B. (U) ALTHOUGH NOT ALL INCLUSIVE, REPORTING REQUIREMENTS, AT A

MINIMUM, WILL INCLUDE: LAST 24/ RECENT ACTIONS; NEXT 24/ UPCOMING ACTIONS; REQUESTS FOR ASSISTANCE; OPPORTUNITIES; CHALLENGES AND/OR FRICTION POINTS; AND ASSESSMENTS/IMPACTS OF ACTIONS/OAIS.
3.D.6.C. (U) USE SC DIRECTED LSSS TRACKING REPORT FORMAT (ENCL 1) AS PART OF DAILY REPORTING (NLT 1200HRS EST) TO THE JOC AND SEND A COPY TO DIRECTLY TO SC JOINT LOGISTICS OPERATIONS CENTER (JLOC) EMAIL:

Protected Material -- Subject to Protective Order

3.D.7. (U) ANTITERRORISM/FORCE PROTECTION (AT/FP) GUIDANCE.
3.D.7.A. - MODIFY: (U) CDRUSSOUTHCOM EXERCISES FORCE PROTECTION TACON

OF ALL DOD FORCES IN THEATER, EXCEPT THOSE UNDER THE SECURITY
RESPONSIBILITY OF CHIEFS OF MISSION (COM) AS SPECIFICALLY IDENTIFIED
IN COUNTRY-SPECIFIC SECURITY MOAS BETWEEN CDRUSSOUTHCOM AND COMS.
3.D.7.B. - ADD: (U) THE BASELINE FPCON IS BRAVO. CDRS ARE AUTHORIZED
TO IMPLEMENT ADDITIONAL FPCON MEASURES TO SUPPORT MISSION
REQUIREMENTS, IAW SC REG 34-2. ANY INCREASE IN FPCON MEASURES WILL BE

ROUTED THROUGH SCJ34.
3.D.7.C. - ADD: (U) ALL FORCE PROTECTION MEASURES ON NAVAL STATION
GUANTANAMO BAY WILL BE COORDINATED THROUGH THE CDR, NAVAL STATION
GUANTANAMO BAY.
3.D.7.D. - ADD: (U) ALL SERVICES AND JTF-SOUTHERN GUARD WILL
PARTICIPATE IN THE SC FORCE PROECTION WORKING GROUP.
3.D.8. (U) HUMAN RIGHTS. SUPPORTING COMMANDS WILL CERTIFY THAT THEIR
PERSONNEL HAVE RECEIVED ANNUAL HUMAN RIGHTS TRAINING.
3.D.8.1. - ADD: (U) ALL IAHO WILL BE CONDUCTED IN A MANNER THAT
ENSURES SAFE AND HUMANE TREATMENT IN ACCORDANCE WITH DOMESTIC AND
INTERNATIONAL LEGAL OBLIGATIONS AT ALL TIMES.

3.D.9. (U) PERSONNEL RECOVERY TRAINING.
3.D.9.A. (U) ALL DEPLOYING PERSONNEL ARE REQUIRED TO COMPLETE SERE
100.2 LEVEL A, OR ARMY PR 101 A, B, AND C, WITHIN 36 MONTHS OF
DEPLOYING INTO THE USSOUTHCOM AOR WITH THE EXCEPTION OF PERSONNEL WHO

MAINTAIN SERE TRAINING CURRENCY IAW AFI 16-1301. ALL PERSONNEL MUST
HAVE AN ISOLATED PERSONNEL REPORT (ISOPREP) ELECTRONICALLY SUBMITTED
INTO THE PERSONNEL RECOVERY MISSION SOFTWARE (PRMS) WEBSITE AND THE
ISOPREP MUST BE REVIEWED BY THE MEMBER WITHIN 6 MONTHS OF DEPLOYMENT.
3.D.9.B. (U) ALL DEPLOYING PERSONNEL WILL CONDUCT NECESSARY
COORDINATION WITH HOST NATION COUNTERPART AND THE SECURITY
COOPERATION
OFFICE IN SUPPORT OF A PR PLAN.
3.D.9.C. (U) THEATER ENTRY REQUIREMENTS. ALL PERSONNEL MUST COMPLY
WITH THEATER ENTRY REQUIREMENTS TO INCLUDE REQUIREMENTS OUTLINED IN
THE FOREIGN CLEARANCE GUIDE FOR NAVAL STAION GUANTANAMO BAY. EFFORTS
SHOULD BE MADE FOR DOD PERSONNEL TO OBTAIN AND TRAVEL ON THEIR
OFFICIAL PASSPORTS.

3.D.10. - MODIFY: (U) RULES FOR THE USE OF FORCE (RUF).
3.D.10.A. (U) THE STANDING RULES OF ENGAGEMENT (SROE)/ STANDING RULES

FOR THE USE OF FORCE (SRUF) ARE IN EFFECT IAW CJCS 3121.01B. UNIT
COMMANDERS RETAIN THE INHERENT RIGHT AND OBLIGATION TO EXERCISE UNIT
SELF-DEFENSE, INCLUDING DEFENSE OF OTHER U.S. FORCES IN THE VICINITY,

IN RESPONSE TO A HOSTILE ACT OR DEMONSTRATED HOSTILE INTENT. PROVIDE
ADDITIONAL REQUESTS FOR SUPPLEMENTAL ROE AS NEEDED THROUGH
USSOUTHCOM.
3.D.10.A.1. (U) NOTHING IN THIS EXORD LIMITS A COMMANDER'S INHERENT
RIGHT AND OBLIGATION TO EXERCISE UNIT SELF-DEFENSE, INCLUDING DEFENSE

OF OTHER U.S. FORCES IN THE VICINITY, IN RESPONSE TO A HOSTILE ACT OR

DEMONSTRATED HOSTILE INTENT.
3.D.10.A.2. (U) UNIT COMMANDERS ARE AUTHORIZED TO DEFEND U.S.
NATIONALS AND THEIR PROPERTY FROM A HOSTILE ACT OR DEMONSTRATION OF
HOSTILE INTENT.

Protected Material — Subject to Protective Order

PAGE 14 OF 16

3.D.10.A.3. (U) USSOUTHCOM WILL SUBMIT ADDITIONAL REQUESTS FOR SUPPLEMENTAL ROE/RUF, AS NEEDED OR REQUESTED BY JTF-SOUTHERN GUARD OR

COMPONENT COMMANDERS THROUGH THE JOINT STAFF.
3.D.10.A.4. - ADD: (U) USSOUTHCOM HAS PUBLISHED A GUANTANAMO BAY JTF-SOUTHERN GUARD ILLEGAL ALIEN HOLDING OPERATIONS USE OF FORCE APPENDIX

ON SIPR DETAILING GUIDANCE ON THE RUF POLICY. REQUESTS FOR MODIFICATIONS TO THE RUF POLICY WILL BE ROUTED THROUGH THE SCJ34.

3.D.11. (U) CLASSIFICATION GUIDANCE. OPERATIONS IN SUPPORT OF THIS MISSION SHOULD BE CARRIED OUT IN AN UNCLASSIFIED MANNER TO THE MAXIMUM
EXTENT POSSIBLE TO ALLOW FOR PARTNER NATION COORDINATION, COMMUNICATION, AND COOPERATION.
3.D.12. (U) ALL IAHO WILL BE CONDUCTED IN A MANNER THAT ENSURES SAFE AND HUMANE TREATMENT IN ACCORDANCE WITH DOMESTIC AND INTERNATIONAL LEGAL OBLIGATIONS AT ALL TIMES.
3.D.13. - ADD: ~~(U)~~ OPSEC GUIDANCE. ████████████████

████████████████████████████████████████

3.D.14. - ADD: (U) NSGBINST 5530.2A APPLIES TO ALL PERSONNEL ONBOARD NSGB. PHOTOGRAPHY SHALL NOT BE TAKEN OF CLASSIFIED FACILITIES, EQUIPMENT OR MATERIAL, DETENTION FACILITIES, RESTRICTED AREAS, OR OF ANY ILLEGAL ALIENS WITHOUT PRIOR AUTHORIZATION.

4.(U) ADMINISTRATION AND LOGISTICS.
4.A. (U) LOGISTICS. USE FRAMEWORK ESTABLISHED IAW ANNEX D AND W TO CONPLAN 6120.
4.A.1. (U) THE CONCEPT IS THAT JTF-SOUTHERN GUARD FORCES AND THE INTERAGENCY PARTNERS OPERATING ON NSGB ARE TENANTS ON THE INSTALLATION. JTF-SOUTHERN GUARD AND AGENCIES WILL COORDINATE LIFE SUPPORT ITEMS AND SERVICES WITH NAVSOUTH AS THE BOS-I FOR SERVICE OR AGENCY MEMBERS. JTF-SOUTHERN GUARD IS RESPONSIBLE FOR PROVIDING OR COORDINATING ALL SUSTAINMENT OF ILLEGAL ALIENS IN CAMPS ESTABLISHED BY
THE JTF. THE CCDR USSOUTHCOM DESIGNATES THE NAVY AS LEAD SERVICE FOR CONTRACTING (LSC) UNDER DIRECTIVE AUTHORITY FOR LOGISTICS (DAFL) RELATED CONTRACTING SUPPORT. LSC IS RESPONSIBLE FOR COORDINATING AND MANAGING ALL CONTRACTING RELATED ACTIONS AND PUBLISHES PROCEDURES FOR

COMPONENTS. DIRECT LIAISON AUTHORITY FOR LOGISTICS IS GRANTED.
4.B. (U) JOPES IS DIRECTED FOR DEPLOYMENT OF ALL FORCES TO INCLUDE CONTRACTORS. COORDINATED STRATEGIC LIFT REQUIREMENTS WITH SOUTHCOM DDOC. ████████████████ HAVE BEEN ESTABLISHED TO SUPPORT THIS OPERATION. ALL REQUIREMENTS WILL BE PLACED IN FORCE MODULE DEP25 FOR VALIDATION. GCCS NEWSGROUP ████████████ (ALL LOWER CASE), ACCESSIBLE THROUGH THE USSOUTHCOM NEWS SERVER, ████████████████ , WILL BE USED

FOR TIME-PHASED FORCE DEPLOYMENT DATA (TPFDD) PLANNING AND COORDINATION.

4.B. (U) FUNDING. USSOUTHCOM WILL NOT PROVIDE FUNDING. COMPONENT COMMANDS AND PARTICIPATING DEFENSE AGENCIES WILL SEEK RESOURCES FROM THEIR SERVICE AND CAPTURE AND REPORT COSTS TO THEIR AGENCY HEADQUARTERS AND THROUGH THEIR RESPECTIVE MILITARY DEPARTMENT

~~Protected Material -- Subject to Protective Order~~

UNCLAS ~~FOUO~~

COMPTROLLER TO THE DEFENSE FINANCE AND ACCOUNTING SERVICES (DFAS) IN ACCORDANCE WITH DOM FMR VOL 12, CHAPTER 23 AND AS DIRECTED BY OUSD COMPTROLLER. KEEP USSOUTHCOM J8 INFORMED.

4.C. (U) TRANSPORTATION.
4.C.1. (U) COORDINATE TRANSPORTATION REQUIREMENTS WITH THE SC J4 SDDOC.

4.D. (U) U.S. MEDICAL.
4.D.1. (U) FORCE HEALTH PROTECTION. COMMANDS AND DOD CONTRACTORS WILL

ENSURE COMPLIANCE WITH ALL APPLICABLE FORCE HEALTH PROTECTION (FHP) REQUIREMENTS (PRE-, DURING-, AND POST- DEPLOYMENT) IAW THE "FHP GUIDANCE FOR DEPLOYMENT TO USSOUTHCOM AOR", DTG 2916133Z MAY 13 AND USSOUTHCOM REGULATION 40-501 "MEDICAL SUITABILITY SCREENING". SERVICE

COMPONENTS ARE RESPONSIBLE FOR SCREENING DOD CIVILIANS FOR MINIMUM MEDICAL SUITABILITY STANDARDS PRIOR TO DEPLOYMENT. USSOUTHCOM SURGEON'S OFFICE POC FOR DEPLOYMENT FHP ISSUES IS AT COMM: ███

4.D.2. (U) PATIENT MOVEMENT. THE THEATER PATIENT MOVEMENT REQUIREMENTS
CENTER - AMERICA (TPMRC-A) PROVIDES PATIENT MOVEMENT FOR DOD MILITARY,
CIVILIANS AND CONTRACTORS DEPLOYED ISO THIS OPERATION SUBMIT ALL PATIENT MOVEMENT REQUEST TO TPMRC-A. PATIENT MOVEMENT IN THE USSOUTHCOM AOR WILL BE IAW
USSOUTHCOM REGULATION 40-401 - USSOUTHCOM PATIENT MOVEMENT REGULATION

- WHICH OUTLINES RESPONSIBILITIES, POLICY, AND PROCEDURES FOR PATIENT

MOVEMENT OF U.S. FORCES, DOD CIVILIANS, AND DOD CONTRACTORS WHILE DEPLOYED IN USSOUTHCOM AOR.
4.D.3. - ADD: (U) MEDICAL SUPPORT FOR ILLEGAL ALIENS. DEPLOYABLE HEALTH SERVICES SUPPORT PROVIDING HOSPITAL CARE THAT INCLUDES GENERAL

MEDICAL CARE AND SURGICAL SUPPORT SERVICES EQUIVALENT TO ROLE 3 HEALTHCARE FOR ILLEGAL ALIENS.
4.D.4. - ADD: (U) PATIENT MOVEMENT FOR ILLEGAL ALIENS. ROLE 3 OR HIGHEST ECHELON OF CARE AT NAVAL STATION GUANTANAMO BAY COORDINATES WITH DHS FOR MOVEMENT OF PATIENT OFF ISLAND. ROLE 3 OR HIGHEST ECHELON
OF CARE RESPONSIBLE FOR TRANSPORTING PATIENT FROM FACILITY TO AIRFIELD
AND FOR TRANSFERRING CARE TO DHS. DHS IS RESPONSABLE FOR FINAL TRANSFER OF ILLEGAL ALIEN OFF ISLAND.
4.D.5. - ADD: (U) MEDICAL SUPPORT FOR INTERAGENCY PARTNERS. INTERAGENCY PARTNERS REQUIRED TO COORDINATE WITH JTF-SOUTHERN GUARD AND NAVAL STATION GUANTANAMO BAY FOR MEDICAL SUPPORT. INTERAGENCY WILL ENSURE COMPLIANCE WITH ALL APPLICABLE FORCE HEALTH PROTECTION (FHP) REQUIREMENTS (PRE-, DURING-, AND POST-DEPLOYMENT) IAW THE "FHP GUIDANCE FOR DEPLOYMENT TO USSOUTHCOM AOR", DTG 2916133Z MAY 13 AND USSOUTHCOM REGULATION 40-501 "MEDICAL SUITABILITY SCREENING." SERVICE

COMPONENTS ARE RESPONSIBLE FOR SCREENING DOD CIVILIANS FOR MINIMUM MEDICAL SUITABILITY STANDARDS PRIOR TO DEPLOYMENT.

5.(U) COMMAND AND CONTROL.
5.A. (U) COMMAND RELATIONSHIPS. CDRUSSOUTHCOM MAINTAINS COCOM OF ARSOUTH, AFSOUTH, NAVSOUTH, MARFORSOUTH, JTF-B AND JTF-GUANTANAMO. CDRUSSOUTHCOM HAS OPCON OF SOCSOUTH. WITH THIS EXORD, USSOUTHCOM ESTABLISHES JTF-SOUTHERN GUARD UNDER COCOM AUTHORITY.

UNCLAS ~~FOUO~~

~~Protected Material -- Subject to Protective Order~~

UNCLAS ~~FOUO~~

5.A.1. (U) JTF-GUANTANAMO IS TACON TO JTF-SOUTHERN GUARD FOR CONTROL
OF HTIA IN WINDWARD LOCATION.
5.B. (U) USSOUTHCOM WILL ISSUE SUBSEQUENT ORDERS OR MODIFICATIONS AS
REQUIRED.
5.C. (U) (U) DIRECT LIAISON AUTHORITY (DIRLAUTH) WITH ALL SUPPORTING
COMPONENTS, MILITARY DEPARTMENTS AND AGENCIES, AS WELL AS COM AND
DOS,
IS APPROVED, AND KEEP USSOUTHCOM UPDATED AND INFORMED ON
COORDINATION.
5.D. (U) POINTS OF CONTACT.



6.A. (U) THIS MESSAGE IS APPROVED FOR RELEASE BY BRENDAN MCPHERSON,
RADM, USCG, DIRECTOR OF OPERATIONS, SCJ-3.
6.B. (U) THIS MESSAGE WAS CLASSIFIED BY BRENDAN MCPHERSON, RADM,
USCG,
DIRECTOR OF OPERATIONS, SCJ-3.
6.B.1. (U) REASON: 1.4(A).
6.B.2. (U) DECLASSIFY ON: 20500202.//

UNCLAS ~~FOUO~~

~~Protected Material – Subject to Protective Order~~

U-DOW-CAR-191