JTF 160 used the staff organization, as depicted in Appendix A, in the later stages of Operation SEA SIGNAL.  The J-5 planning function has been integrated into J-3.  The J-5 politico-military planning function is more important to maintain if the JTF is located in a foreign country, where host nation (HN) issues often arise and are resolved at the JTF level.  The J-3 is the key staff member responsible for the coordination and integration of all operations, including the other staff members, subordinate JTF commands, and civilian agencies.  J-3 probably will include a Joint Operations Center (JOC), Current Operations/Plans, civil affairs, Migrant Operations and the Military Information Support Team (MIST) which incorporates psychological operations (PSYOP).  Of equal importance, the role of the J-1 staff member cannot be overlooked, especially when considering individual augmentees, critical skill requirements, and other key personnel areas.

***Joint Visitors Bureau can assist in managing visits.***

A Joint Visitors Bureau (JVB) can be a valuable asset as a special staff function.  Scheduling and hosting distinguished visitors will be a full-time responsibility.  The director should be a senior officer with a staff that has representatives from all Services and should be separate from the public affairs function. Because of the coordination required to manage visits, the JVB needs an adequate communications capability.  The JVB also will need to ensure that operational requirements are balanced with the legitimate needs of various interested NGOs such as human rights and refugee groups to visit migrant camps.

***Encourage visits by policy makers.***

Visits to the area by policy makers who have a direct impact on the mission should be encouraged as well as visits by the supported combatant commander and staff and all the agencies involved in the daily execution of the mission.  This was especially beneficial during Operation SEA SIGNAL.  The ultimate goal is to help these groups fully understand the ramifications their decisions and directions have upon the JTF and its ability to accomplish the mission.

Protected Material -- Subject to Protective Order

U-DOW-CAR-308

Migrant Camp Operations:  The Guantanamo Experience

## INTELLIGENCE OPERATIONS

*"The great thing is to get the true picture, whatever it is."*

**Winston Churchill**

***Intelligence analysis is different in migrant operations.***

Intelligence collection, analysis, and reporting in migrant camp operations will require a focus that is different from other missions. Since there may be no enemy force upon which collection efforts will be directed, intelligence personnel must analyze the situation and its dynamics. These dynamics include trends in behavior, attitudes of migrants, rumors, and overall camp morale. Information that is collected from within the migrant camps will be in response to the CJTF's priority intelligence requirements and should be reported in a daily intelligence summary that highlights significant activities in migrant camps that could affect the overall security of the camps.

## FORCE PROTECTION

***CJTF must ensure the protection of US personnel.***

CJTF must ensure the safety of US personnel from both internal and external threats. The situation will dictate when lethal and nonlethal weapons and munitions can be used to ensure protection. Concurrently, clear rules of engagement (ROE) must be developed for the applicability and use of deadly force to protect JTF personnel and to maintain order and security in the migrant camps. It is imperative that security force personnel understand the ROE and are well trained to respond to various security threats.

At Guantanamo, two company-size Quick Reaction Forces (QRF) served as the force protector for US forces involved with any migrant disturbance. The QRF was kept out of sight unless a disturbance or situation warranted its use. Camp commanders did not use the QRF indiscriminately and personally ensured that disturbances actually required its use.

Ground Defense Security Forces (GDSF) provided additional security reinforcement. During Operation SEA SIGNAL, this force employed normal infantry

Protected Material -- Subject to Protective Order

13

U-DOW-CAR-309

weapons and riot control agents and would have been used as an emergency backup for the QRF.  In a situation with an external threat, the GDSF would be the primary security force.

## FUNCTIONAL COMPONENT COMMANDS

*Special task groups for logistics and operations*

CJTF may choose to designate subordinate Joint Task Groups (JTG) consisting of selected members from more than one Service to perform specific functions. These may include a JTG to operate multiple migrant camps. Logistics support may be accomplished by designating either Logistics Support Commands, a Joint Task Force Logistics Command, or a Joint Logistics Support Center.  Functional component commanders report directly to the CJTF.

## LIAISON OFFICERS

*Use liaison officers.*

Qualified liaison personnel contribute significantly to mission success.  These include links between the JTF HQ and higher commands, adjacent units, and, between supporting or assigned forces and the JTF HQ. Knowledge of the capabilities and limitations of their parent units and Service is a prerequisite for assignment to this function.

## PUBLIC AFFAIRS AND THE MEDIA

*"In many of today's operations, media relations can prove to be more important than fire and maneuver in determining the outcome."*

**LtGen Anthony C. Zinni, USMC
CG, I Marine Expeditionary Force**

*The media can be a powerful ally.*

CJTF must be prepared to deal with the media and understand the results of media coverage, both positive and negative.  A pro-active, on-scene public affairs program should be implemented and all JTF personnel should be given guidelines for dealing with the media. Daily direct involvement with the media can contribute to mission success.  For example, at Guantanamo the CJTF met with each visiting media group at the conclusion of their visit.  In the final analysis, open

Protected Material -- Subject to Protective Order

U-DOW-CAR-310

media access with clear guidelines and access to the CJTF will prove to be beneficial.

**Use the JIB to manage media relations.**

A Joint Information Bureau (JIB) provides a means to coordinate the release of information, respond to media requests for information, manage media visits, and arrange access to the migrant camps.  JIB facilitates civilian news media representatives in their coverage of JTF activities and, if possible, provides command information on the activities of US military personnel engaged in migrant camp operations.

> "The complex nature of JTF communications requires a knowledge base that Service communicators typically do not acquire without specialized joint training."
>
> **Operation UPHOLD DEMOCRACY**
> **Joint After Action Report**

## INTEROPERABILITY

**Interoperability enhances mission effectiveness.**

The interoperability of communications equipment and computers can enhance mission effectiveness. Communications and coordination with all elements of the operation—security, operations, logistics, NGOs/PVOs/IOs—are critical for day-to-day camp operations. Hand held radios, computers and software, and telephone equipment should be compatible.

## TOUR LENGTHS

**Standardize tour lengths.**

If possible, JTF personnel should have a standard tour length.  It is difficult to implement plans and conduct operations with a high turnover of personnel.  Past operations have suffered because of different Service personnel rotation policies for joint operations.  Standardizing tours would also avoid adverse morale problems arising from the inequities of varying tour lengths.  A standard tour length of 179 days provides the most continuity and does not disrupt daily operations with constant turnover training.

Protected Material -- Subject to Protective Order

U-DOW-CAR-311

Migrant Camp Operations:  The Guantanamo Experience

# CHAPTER III
# CIVIL-MILITARY OPERATIONS

*"Civil Affairs units from the Army were indispensable in the smooth operation of the camp.  They were involved in virtually every program in the camps."*

**Brig Gen John J. Allen, USAF
Commander, JTF 160
25 February 1995 - 8 July 1995**

## GENERAL

*The effective integration of CA capabilities into migrant camp operations is an absolute requirement for success.*

The effective integration of Civil Affairs (CA) capabilities into migrant camp operations is an absolute requirement for success.  JTF forces must integrate their efforts with other US government agencies and NGO/PVO/IOs.  The method that the CJTF selects to ensure unity of effort between the JTF and other agencies organizations will depend on the location and scope of the JTF mission.

CA personnel, most of whom are from the reserves, can be utilized in the migrant camps to create a migrant social/governmental infrastructure by helping migrants elect camp leaders.  As such, this can greatly reduce tensions in the camps and lessen the threat to US forces.  This was proven to be extremely successful at Guantanamo as elected leaders played a key role in interfacing between migrants and JTF personnel.

## CIVIL-MILITARY OPERATIONS CENTER (CMOC)

*Consider establishing a Civil Military Operations Center.*

CMOC provides liaison and coordination between the military and the humanitarian assistance organizations.  The Director is normally the military representative to the senior IO or its policy making body.  The CMOC is comprised of experienced CA military personnel and should be staffed for 24-hour operations.

CMOC provides unity of effort to CA activities thereby allowing the JOC and other JTF organizations to focus on other portions of the JTF mission.  As such, the CMOC becomes the primary point of contact for IO/NGO/PVO interaction with the JTF.  The organization

Protected Material -- Subject to Protective Order

17

U-DOW-CAR-313

of the CMOC should be developed according to mission requirements and the local situation. CMOC usually operates under the cognizance of the J-3.



*Civilian-military cooperation was vital.*

*"The necessary first step in shaping effective interagency groups is making known what skills and resources one brings to the table."*

**ADM P. D. Miller, USN**
**Commander in Chief, US Atlantic Command**
**1 October 1993 - 31 October 1994**

## INTERAGENCY AND POLITICAL COORDINATION

***Integrate other government agencies into the operation.***

CJTF must understand the role of other US agencies and their potential involvement and impact on migrant camp operations.  Cooperation and coordination with these agencies is critical to mission success.  CJTF should integrate all non-DOD agencies into the JTF through the CMOC and by attendance at staff meetings and planning meetings.  The goal is to gain consensus on major policy decisions and encourage a team approach from all agencies.

Just as the military is gaining experience in conducting peace operations, other governmental and nongovernmental agencies are developing a cadre of individuals who understand and work well with the military.  They are committed and hard working, often possessing experiences exceeding many members of

Protected Material -- Subject to Protective Order

18

U-DOW-CAR-314

the JTF staff.  Evaluate the capabilities and responsibilities of the other agencies without applying any preconceived notions.

# NONGOVERNMENTAL AND PRIVATE VOLUNTARY ORGANIZATIONS

***Integrate volunteer organizations into JTF operations.***

It is likely that there will be participation of IOs/NGOs/PVOs in any migrant camp operation.  The challenge will be to integrate them into JTF operations.  Different organizational structures and different agendas will make this task difficult.  However, the CJTF should attempt to obtain agreement with them on the mission and their role while gaining respect from them through cooperation, responsiveness, and flexibility.

***IOs/NGOs/PVOs operate differently from the military.***

One significant cultural difference between the military and most of the other agencies is the approach toward organization.  The military culture emphasizes command and control, while most of the other agencies focus on coordination and cooperation.  This is an important distinction.  Sometimes perceived intransigence on the part of other agencies is based on their reluctance to subordinate their activities to DOD agencies.  On the other hand, the same issue approached in a spirit of recognition of common objectives generally can be resolved quickly.

***NGOs offer valuable expertise.***

In many cases, NGOs will have been established and operating in a country for some time before US forces become involved.  Many of the NGO/PVO's have a full-time refugee/migrant support mission.  For example, the UNCHR Handbook contains the minimum essential elements for migrant support and extensive guidance on difficult issues like employment of migrants, self-governance, camp administration, and migrant processing.  They are a potential source of information on the current situation, can generate useful contacts, and often understand the indigenous culture better than JTF personnel at the outset.  NGOs also normally will have their own agenda and not be responsible to anyone other than whoever is providing them funds.  US forces likely will support NGOs by providing physical security and logistics, particularly transportation.

Protected Material -- Subject to Protective Order

U-DOW-CAR-315

Migrant Camp Operations: The Guantanamo Experience

*Develop a team approach with relief organizations.*

For the JTF, it is important that the military personnel recognize that relief organizations are partners in the operation. Despite differing views on many aspects of the situation, the military should seek common ground and develop a team approach to work for ultimate success of the mission.



*Volunteer organizations conducted numerous educational programs in the camps.*

Protected Material - Subject to Protective Order

20

U-DOW-CAR-316

# CHAPTER IV
# CAMP ORGANIZATION AND OPERATION



*Migrants were billeted in four large camps at Guantanamo Bay, Cuba.*

***Treat migrants with dignity and respect.***

The effective operation of these camps requires a well-developed organization, detailed operating procedures, and personnel sensitized to dealing with migrants. Migrants will be provided with food, clothing, and shelter in the camps that will be their home for an indeterminate time.  CJTF should set the tone for the operation and ensure that JTF personnel understand that **migrants are human beings and not just numbers**.  As such, they must be treated with dignity and respect. Likewise, it is important to keep in mind that migrants are not military personnel; as such, they are not used to being given orders.  Random searches, for instance, only should be carried out for security purposes.



*Be sensitive to the migrants' physical and mental states upon arrival at the camps.  The above Cuban migrant art work reflects the extreme psychological and physical perils migrants may face.*

Protected Material – Subject to Protective Order

U-DOW-CAR-317

Migrant Camp Operations:  The Guantanamo Experience

# ORGANIZATION

*"We encouraged work.  I never used a soldier for a job if I could employ a migrant. This freed up a lot of our people, kept the migrants busy, left them with a sense of control over their own destiny, and improved relations with the military."*

**Col Michael Lehnert, USMC**
**Former JTG Commander, JTF 160**

***Camp organization should be tailored for the operation.***

The organization for the operation of migrant camps may be tailored as to size and the command and control structure to meet the situation.  If organized as a JTG, a functional joint staff may be used to execute the mission.  However, all will need sections for command, operations, and support.

***Involve migrants in the operation of the camps.***

Each migrant camp operation is likely to be different, but the CJTF should try to involve migrants in the operation of their camps.  Developing self-governing bodies can be a prime factor in the peaceful and efficient operation of migrant camps.  JTF personnel should identify potential migrant leadership as soon as possible and support those leaders who are willing to work toward mission accomplishment.




***Create an atmosphere where the migrants feel like they are in a village-type environment (reflected in the Cuban migrant art work above) as opposed to confined detainees (reflected in the Cuban migrant art work below).***

The migrants at Guantanamo were allowed to exercise self-government by electing their own leaders under the supervision of military personnel.  Elected migrant leaders disseminated information and policies of the JTF and camp commander and provided feedback on migrant reaction to those policies.

Migrants offer a potential source of labor for self-help construction and maintenance in the camps.  At Guantanamo, these resources were used on a voluntary basis in expediting projects, such as for camp construction and other activities under US supervision. In this way, migrants were given worthwhile projects to occupy what would otherwise have been idle time in the camps.



Protected Material -- Subject to Protective Order

U-DOW-CAR-318

Migrant Camp Operations: The Guantanamo Experience

## OPERATIONS

**Guidelines for success**

Based on experience with migrant operations at Guantanamo, USACOM personnel identified four principles that, if adhered to, can significantly contribute to mission accomplishment: accountability, control, security, and communications.

**There must be an accurate accounting of all migrants at all times.**

- **Accountability**: There must be an accurate accounting of all migrants at all times. At Guantanamo, the Deployable Mass Population Identification and Tracking System (DMPITS) was used, but the terminals were not linked together. Also, when identification bracelets had to be replaced, new numbers were assigned to the recipients of the new bracelets which led to the creation of duplicate records. In any future operations, an automated, networked system, such as DMPITS, in conjunction with an identification card with a permanent number, issued and controlled at the JTF level, is needed to ensure positive, real-time accountability for all migrants.

**Positive control of the camp population is the key to successful camp security and operations.**

- **Control**: Positive control of the camp population is the key to successful camp security and operations. The dissemination of information is an important means of population control. Use migrant leadership to disseminate information within the camps through the MIST that are a part of the PSYOP effort. It is imperative the migrants be given a message of hope for their future. If migrants develop a sense of despair for their plight, trouble and unrest in the camps likely will develop.

**Provisions for camp security and the enforcement of law, order, and discipline within the camps are essential.**

- **Security**: Provisions for camp security and the enforcement of law, order and discipline within the camps are essential. This is a delicate area since, with very few exceptions, migrants are not criminals nor are they prisoners of war and should not be treated as if they are part of either group. Nevertheless, well trained security forces with clear ROE protect both the migrants and JTF personnel.

Protected Material -- Subject to Protective Order

U-DOW-CAR-319

Migrant Camp Operations:  The Guantanamo Experience

*Effective communication can convey important messages to the migrants that helps form opinions and attitudes that contribute to good camp morale.*

- **Communications**: Effective communication can convey important messages to the migrants that helps form opinions and attitudes that contribute to good camp morale.  Migrants should be kept informed with all information that affects their status.  Communications with migrants also conveys the CJTF's interest in their well being.  Camp newspapers, radio, and face-to-face meetings by the CJTF are very effective means to dispel rumors and communicate with migrants.



*Camp newspapers were used to dispel rumors and convey important information at Guantanamo Bay, Cuba.*

# PSYCHOLOGICAL OPERATIONS

*Use PSYOP and MIST to communicate with migrants.*

PSYOP are a tool that can enhance control and security and should be integrated into daily planning and operations.  It must be flexible and capable of being delivered by various types of media. MIST is organized to implement the PSYOP plan and determine themes and produce information products such as a camp newspaper, radio programs, and leaflets.  CJTF can use these tools to reinforce policy directives and disseminate any other information to the migrant camp population.

*Rumor control will be a constant challenge.*

Many of the disturbances that occurred in Haitian and Cuban camps were caused by rumors, changes in operations, and US policy shifts that affected the status of the migrants.  Rumors need to be discovered,

24

Protected Material – Subject to Protective Order

U-DOW-CAR-320

# Migrant Camp Operations: The Guantanamo Experience

checked, and countered quickly to eliminate possible problems within the camps. Only by having a constant presence in the camps and obtaining feedback from the migrants can the CJTF counter rumors by providing the truth to migrants. This should be a coordinated action through the CMOC. However, it may be necessary for direct communication from the CJTF to counter the more serious rumors.

## MEDICAL SUPPORT

*Proper sanitation and preventive medicine early in the operation can contribute to mission success.*

**Infectious diseases pose one of the greatest threats to JTF forces and camp populations.** Proper sanitation and preventive medicine early in the operation can contribute to mission success. Food preparation, potable water, and sewage and refuse sanitation are critical to maintaining public health and preventing epidemic diseases that can bring all other medical operations to a halt until the epidemic is controlled. Medical support will be provided as an integral part of the humanitarian assistance operation with priority and standards of care set by the JTF surgeon. It will generally be limited to immediate lifesaving measures, preventive medicine, and stabilizing patients requiring extensive care for transfer to appropriate long-term facilities. Medical planning should be integrated early on to ensure the proper level of support must regard to medical supplies. Dental support must be provided to alleviate pain and suffering.



*Migrants were provided with essential medical care.*

Protected Material — Subject to Protective Order

25

U-DOW-CAR-321

Another critical medical issue is psychiatric care for migrants. During Operation SEA SIGNAL, the disposition of psychiatric patients was a difficult issue for the interagency working group to resolve. Short-term, low level care must be made available. Long-term, intensive care is a mission for which US forces are not prepared and handling of such cases will have to be referred to the interagency working group for resolution.

JTF personnel should recognize that life in migrant camps creates stress that can result in marital problems, such as spousal abuse. Special women's shelter tents were set up in Operation SEA SIGNAL for single women and married women who did not desire to remain with their spouses. Other women's issues which should be addressed by medical personnel include rape evaluation and counseling and pregnancies.

# MORALE, WELFARE, AND RECREATION

***Keep migrants informed on their status.***

Maintaining good morale among the migrant population is an essential element of the overall mission. Keeping the migrants informed of their status and US intentions toward them will go a long way toward maintaining morale and good order in the camps. In an effort to improve morale, migrants at Guantanamo were provided with postal service funded by the Department of State.

***Organized activities contribute to good morale.***

Organized recreational activities can ease boredom and restlessness. Daily camp life offers very little opportunity for productive activity. Organized programs such as physical training and sports can enhance the US relationship with migrants as well as improve their morale and quality of life. When migrants are afforded the opportunity for physical activity during their idle hours, they are more manageable and less likely to protest their conditions or cause control problems.

***Food service demands attention.***

**The quality and reliability of food service can be a major factor in maintaining tranquillity among the migrants.** An effective food services operation requires the participation of the JTF staff, medical, food services, and CA personnel. The lack of consistent food service and quality of food served can be a source of significant discontent. JTF 160 used migrants to prepare

Protected Material -- Subject to Protective Order

26

U-DOW-CAR-322

# Migrant Camp Operations: The Guantanamo Experience

food in accordance with dietary preferences. This employed migrants and reduced support requirements.

*In a migrant camp environment, meals take on an elevated importance.*

In a migrant camp environment, meals take on an elevated importance. Food service personnel at Guantanamo determined the cultural and nutritional needs of the migrant population and provided menus tailored to the specific culture of the migrants. Camp leaders were consulted to identify any food prohibitions or preferences before feeding plans were established.



*Migrants participated in food preparation and service.*

## CHAPLAIN

*Chaplains support JTF personnel and migrants.*

It is important that an adequate number of chaplains be assigned to support both the JTF military personnel and the migrants. The chaplains at Guantanamo assisted the humanitarian agencies and civil affairs personnel in the migrant camps. Also, the chaplain provided confidentiality and privileged communications in counseling the JTF personnel; this was necessary for stress management, maintaining good morale, and the early identification of personnel problems. CJTF should ensure an adequate number of chaplains and their assistants are assigned.

Protected Material - Subject to Protective Order

U-DOW-CAR-323

Migrant Camp Operations:  The Guantanamo Experience

## LINGUISTS AND INTERPRETERS

***Qualified linguists are essential.***

Linguists and interpreters are a valuable and necessary asset for the JTF. **Qualified** linguists (with a demonstrated fluency) are essential for communicating with the migrants. They can provide a link to the local population as well as to the migrants. The requirement for linguists should be established early since many are reservists and it often takes a long time to identify and deploy these individuals.

Where possible, efforts should be made to identify linguists and interpreters proficient in particular dialects or regional forms of a language, such as Haitian Creole or Cuban Spanish, to maximize the effectiveness of communications between the JTF and the migrant population.  In special cases, it may be necessary to seek contract interpreters as was the case in Operations DESERT STORM, RESTORE HOPE, and JOINT ENDEAVOR.



*Singer Gloria Estefan performed for migrants and JTF personnel at Guantanamo Bay, Cuba.*

Protected Material -- Subject to Protective Order

U-DOW-CAR-324

# CHAPTER V
# LOGISTICS SUPPORT

***Logistics planning and coordination***

Joint logistics planning and coordination are essential to successful migrant support.  The logistics structure may need to be customized into specialized centers such as a Joint Logistics Support Command (JLSC) to provide support for both JTF personnel and migrant population.  JLSC would be responsible for conserving, consolidating, synchronizing, and coordinating the logistics effort to support the JTF.

## FUNDING

***Understand funding sources.***

Funding responsibilities and sources should be determined during the planning stages.  The interagency group in Washington, D.C., will determine which non-DOD funds sources also may be available to support the operation.  Each Service is responsible for funding its own forces, except as detailed by the operations order or other agreements.  The combatant commander may provide funds to the JTF HQ for a specific purpose, but these funds usually are very limited.

If possible, the CJTF should obtain authority for the JTF to control its own budget.  Future migrant operations likely will be subject to austere funding and will not operate effectively without direct funding control and visibility.

JTF and Service components should carefully track and record costs connected with the operation.  This will allow DOD to recoup costs through later supplemental appropriations when the Secretary of Defense determines that a supplemental request is appropriate.  Additionally, a high priority should be placed on property accountability due to frequent turnover of temporary personnel.

## CAMP  CONSTRUCTION

***Camp construction and design will be a significant part of mission accomplishment.***

The design and construction of the camp will be a significant part of mission accomplishment. The camp will become the equivalent of a small town with all the infrastructure  required to support the needs of the

Protected Material -- Subject to Protective Order

U-DOW-CAR-325

# Migrant Camp Operations: The Guantanamo Experience

migrants. Early on, the CJTF should decide construction standards for migrant camps as this will dictate personnel and equipment requirements.

**Planning of the camps cannot be done in a vacuum by the engineers.**

Planning for the camps should include a site survey with representatives of all JTF staff sections. A primary consideration should be the anticipated length of the operation and the requirements to meet the initial surge of migrants If the operation continues for an extended period, it may be necessary to transition from temporary facilities to semipermanent construction.

**USACOM has developed the Land Based Contingency Kit.**

USACOM has developed the Land Based Contingency Kit (LBCK), a 2,500 person tent city that can be operational within 72 hours. This kit's list of materials includes tents, portable latrines, security lighting, and generator support.

**Navy and Air Force construction teams offer the most capability for vertical and horizontal construction.**

A large part of the JTF's construction and maintenance force will be military. The Navy's Construction Battalions and the Air Force's RED HORSE and PRIME BEEF teams offer the most capability for vertical and horizontal construction. The Army's capability focuses on expedient and temporary construction.

**Camp maintenance is critical to an efficient operation.**

Maintenance of the migrant and JTF camps is critical to a smooth running operation. Separate engineering units should be tasked with camp maintenance. It will be difficult for the primary construction units to maintain the camps since they probably will be busy constructing new camps or making quality of life improvements.

**Plan for retrograde operations.**

Another important consideration is planning for the eventual termination of the operation. Retrograde planning should be included even as camps are being constructed. A well planned and executed retrograde plan is an integral part of mission success.

Protected Material - Subject to Protective Order

30

U-DOW-CAR-326

# Migrant Camp Operations: The Guantanamo Experience



*Construction of "strongback" tents improved living conditions in the migrant camps at Guantanamo Bay, Cuba.*

## CONTRACT SUPPORT

***Sources of support***

Consideration should be given to using contractor support when the situation permits and camp operations are normalized. Use of contractors to fulfill such requirements as food service support, public works support, supply support, or linguist services may be possible early in migrant operations. Depending on the situation, it may be possible to provide other support services through contract, such as the use of cruise ships to meet troop billeting requirements as was done during part of Operation SEA SIGNAL. Though expensive, use of contracts reduces the military personnel required to complete the mission. Additionally, transportation requirements and equipment wear and tear are reduced, as was done with contract barges for bulk transport of general sustainment cargo during the Guantanamo Bay migrant operation.

Contract support should not be assumed to be available during an initial response to a migrant camp operation. Its best use would be to meet long-term requirements after any initial crisis response is executed by military personnel. In order to facilitate contracting, the CJTF should consider requesting that the combatant commander seek authority at the SECDEF level for the use of non-standard US government contracting

Protected Material -- Subject to Protective Order

U-DOW-CAR-327

authority to streamline the acquisition process by bypassing normal procedures in contracting. This will avoid potentially embarrassing and time consuming negotiations and allow the JTF to buy what is needed immediately.

## MILITARY SUPPORT

***Military support will be used in initial stages of an operation.***

Although military support is expensive, it has been the primary means of support in past migrant operations because of  responsiveness and expediency.   When migrant camp operations are established on military installations, there is a reduced requirement to transport personnel in the initial stage as the installation will attempt to manage the initial surge.  Once the decision is made to establish a JTF, additional personnel must be transported to the JOA.

## OTHER SOURCES

***Volunteer support***

Some logistics support for the migrants may come from other sources such as NGOs, PVOs, IOs, other US government organizations, and possibly from a host nation. This support may include food, transportation, construction materials, petroleum, oil, and lubricants (POL), refrigeration services, utilities, and medical supplies. An early determination must be made by the interagency working group as to whether these sources will be used and if they can last for the duration of the operation.  This support is sometimes the best suited and the most desirable from the perspective of both the migrants and the JTF.  If support is to be procured from other sources, memoranda of understanding and contracts should be completed.

## TRANSPORTATION

***Joint Movement Center can manage airlift and local transportation.***

Depending on the location of the JOA, strategic airlift or barge shipment may be the means to deploy the JTF. CJTF should monitor all strategic lift to the JOA through a Joint Movement Center (JMC).  The JMC will control the movement of both personnel and supplies into the area.  The effective allocation of transportation resources is critical to overall mission success.  In addition, the JMC will be responsible for

Protected Material -- Subject to Protective Order

32

U-DOW-CAR-328

# Migrant Camp Operations: The Guantanamo Experience

local transportation for the JTF and migrant camps. Local motor vehicle transportation is a critical element in supporting camp operations.



*During Operation SEA SIGNAL, the Joint Movement Center managed all transportation of migrants.*

Protected Material - Subject to Protective Order

33

U-DOW-CAR-329

Migrant Camp Operations: The Guantanamo Experience

# CHAPTER VI
# LEGAL RESPONSIBILITIES

**Involve the legal advisor in all aspects of the mission.**

The Staff Judge Advocate (SJA) should become a key member of the JTF Commander's "personal staff." The SJA should have a variety of experiences, especially in military justice, administrative law, and operational law. This background is important because the SJA likely will be a primary command representative who will interface with interagency and international relief agencies because of the legal considerations involved. SJA can provide valuable counsel to the CJTF in a number of critical areas, such as in CA, PSYOP, and claims and investigations. In this regard, it would be a good practice for the SJA to review all policy letters pertaining to JTF personnel and migrants.

**Establish policy on key issues.**

Early on, the CJTF should direct the SJA to draft key policy letters on the following subjects: fraternization within the task force, ROE for JTF personnel, the migrant camp commander's authority to address migrant misconduct, and military-migrant fraternization policy. Drawing on experience from Operation SEA SIGNAL, the SJA should coordinate with the Department of Justice to establish procedures for the administration of justice in the camps.

## STATUS OF UNITED STATES FORCES

**Determine the status of United States forces.**

Prior to deployment, SJA should determine if there is an existing treaty or status of forces agreement between the United States and the host nation. If no agreement exists, DOS must become involved to establish the status of US forces in the host country. Subsequently, a status of forces agreement that spells out the rights and status of US military forces may need to be drafted and signed by the United States and the host country.

## STATUS OF MIGRANTS

**Understand the legal rights of migrants.**

The rights of migrants are severely limited. The US Immigration and Naturalization Act (INA) does not have extraterritorial effect; therefore, migrants do not have the same rights in an offshore safe haven as they

Protected Material -- Subject to Protective Order

35

U-DOW-CAR-331

would in the United States.  In each safe haven situation, the Department of Justice will determine the extent to which the INA is applicable.  Even though migrants do not have the same rights as US citizens, JTF personnel must not act arbitrarily and capriciously toward them.

It may be necessary to establish a migrant disciplinary system to comply with host nation laws and administratively maintain and enforce discipline within the camps.  At a minimum, the CJTF should consider establishing a segregation facility as an internal administrative process as was done at Guantanamo with camp X-Ray.

An early determination should be sought to determine the legal status of the migrants and their ultimate disposition.  This determination will impact upon the mission's end state and ultimate conclusion of the operation.  For example, there will be questions as to where the migrants will eventually settle, whether they will be allowed to emigrate to the United States, or if some will be returned to their homes.  SJA should be a key player in coordinating with interagency representatives as policies are formulated.

## LEGAL BASIS OF OPERATION

*Know the legal basis for the operation.*

The issue of legal basis of the operation is very important, not only from a fiscal law standpoint but also from the international law perspective.  If the mission changes during the course of the operation, the SJA should review the changes to ensure that the legal basis continues to support the operation.

Protected Material -- Subject to Protective Order

U-DOW-CAR-332

# CHAPTER VII
# CONCLUSION

**Impact on readiness and operations tempo**

The success of Operation SEA SIGNAL was not without cost in terms of warfighting readiness and its impact on operations tempo.  During the Guantanamo operation the equivalent of two US Army divisions were not available for combat as a result of their commitment to migrant operations.  Two brigades were deployed to Guantanamo, two brigades were in training and preparing to deploy, and two more brigades were standing down after completing their tour of duty.  Concurrently, one Marine Division was not at full strength because of  similar commitments by one battalion to Operation SEA SIGNAL.

**Costs were substantial.**

Monetary costs were substantial:  the operation's cost was approximately one million dollars a day at its height.  The Service components paid for the share of the support they provided with the Navy paying the greatest amount.  During Operation SEA SIGNAL, USACOM estimated that it would cost over $465 million to contract for a migrant camp population of 20,000. The Military Services preferred to fund the operation out of their budgets rather than continue to send troops to Guantanamo.  However, the high estimated cost resulted in this civilianization plan being placed on hold and later cancelled following the May 1995 policy change which allowed those Cubans remaining at Guantanamo into the United States.

While DOD is permitted to participate in humanitarian operations under several authorities, the extended military support necessary for an operation such as this would require a Presidential decision.

**Use active forces only for emergency reaction.**

For future contingencies of this type, policy makers should consider only using active forces for the initial crisis response stage.  The initial forces should be followed by reserve forces or contractors. In this way, the military can respond quickly and efficiently to an emergency humanitarian assistance operation by using its rapid deployment capability, yet OPTEMPO or force readiness impacts will be minimized by hand-off to forces or an interagency organization that is better suited and chartered for migrant camp operations.

Protected Material -- Subject to Protective Order

U-DOW-CAR-333



This was the final organizational structure for JTF 160.

Protected Material – Subject to Protective Order

Appendix A:  Joint Task Force Organization

U-DOW-CAR-335

**Medical and Public Health Law Site**
**Opinions of the Office of Legal Counsent - DOJ**

## LIMITATIONS ON THE DETENTION AUTHORITY OF
## THE IMMIGRATION AND NATURALIZATION SERVICE

*The Immigration and Nationality Act by its terms grants the Attorney General a full 90 days to effect an alien's removal after the alien is ordered removed under section 241(a) of the Act, and it imposes no duty on the Attorney General to act as quickly as possible, or with any particular degree of dispatch, within the 90-day period. This reading of the Act raises no constitutional infirmity.*

*It is permissible for the Attorney General to take more than the 90-day removal period to remove an alien even when it would be within the Attorney General's power to effect the removal within 90 days. The Attorney General can take such action, however, only when the delay in removal is related to effectuating the immigration laws and the nation's immigration policies. Among other things, delays in removal that are attributable to investigating whether and to what extent an alien has terrorist connections satisfy this standard.*

February 20, 2003

### MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

Your Office has asked us to address two questions concerning the timing of removal of an alien subject to a final order of removal under section 241(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(a) (2000). First, your Office has asked us to determine whether the Attorney General is under an obligation to act with reasonable dispatch in effecting an alien's removal within the 90-day removal period established by section 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A). We conclude that the INA by its terms grants the Attorney General a full 90 days to effect an alien's removal after the alien is ordered removed and imposes no duty on the Attorney General to act as quickly as possible, or with any particular degree of dispatch, within the 90-day period. We also conclude that this reading of the Act raises no constitutional infirmity. In particular, even under the Supreme Court's recent decisions, such as *Zadvydas v. Davis*, 533 U.S. 678 (2001), the "substantive" component of the Due Process Clause does not impose a requirement that the Attorney General act with particular dispatch *within* the 90-day removal period. To the extent that the INS General Counsel's Office has issued advice to the contrary, suggesting that there is such a constitutionally based timing obligation, we disagree with that analysis. While the Attorney General's ability to delay removal of an alien within the 90-day period is not constrained by a particular timing requirement (*i.e.*, an obligation to act with dispatch), it is also not entirely unconstrained. We conclude that an express decision to postpone removal of an alien until later in the 90-day period likely must be supported by purposes related to the proper implementation of the immigration laws. We need not definitively resolve that question here because the delays in the particular case your Office inquired about were clearly supported by purposes related to proper implementation of the immigration laws.

Second, your Office has asked -- in a situation where it would be logistically possible to remove an alien within the 90-day removal period -- whether and for what purposes the Attorney General may nonetheless refrain from removing the alien within the removal period and instead detain him beyond the 90-day period with a view to removing him at a later time. We conclude, under each of two alternative readings of the statute, that it is permissible for the Attorney General to take more than the 90-day removal period to remove an alien even when it would be within the Attorney General's power to effect the removal within 90 days. The Attorney General can take such action, however, only when the delay in removal beyond the 90-day period is related to effectuating the immigration laws and the nation's immigration policies.

This memorandum confirms oral advice we have given your Office over the course of the last three months.

### Background

These issues arose in the context of the case of a particular alien who received a final order of removal on October 1, 2002, and whose 90-day removal period thus expired on December 30, 2002. This alien has significant connections to a known al Qaida operative who was seized in Afghanistan and who is now held at the naval base at Guantanamo Bay, Cuba. It was deemed a substantial possibility that the alien himself was a sleeper agent for al Qaida. Insufficient information existed at first, however, to press criminal charges or to transfer the alien to military custody as an enemy combatant. When it became apparent that it would be logistically possible to remove the alien very early within the 90-day removal period to the country that had been specified at the removal hearing (*i.e.*, travel documents were obtained), the question arose whether his removal could be delayed to permit investigations concerning his al Qaida connections to continue. Several avenues remained for developing further information about the alien, and such information would have been relevant for several purposes. For example, at first, your Office had been informed by the INS that the alien had designated a particular country of removal under section 241(b)(2)(A) of the INA, 8 U.S.C. § 1231(b)(2)(A). In that case, the Attorney General would have had statutory authority to disregard that designation if he determined that removing the alien to that country would have been "prejudicial to the United States." *Id.* § 1231(b)(2)(C)(iv). Obviously, in order for him to make that determination, it would have been important for the Attorney General to have the fullest information possible about the alien's terrorist connections, the extent of the threat he posed, and the ability (and willingness) of the law enforcement or security services of the destination country to deal appropriately with the alien. On further examination of the record, the INS later informed your Office that the alien had not, in fact, designated any country of removal. That situation raised unresolved questions of statutory interpretation concerning the Attorney General's **DISA**

U-DOW-CAR-572

under the statute to determine the country of removal -- a decision that, again, depending upon the scope, if any, of the Attorney General's discretion, could obviously benefit from the fullest information possible about the alien's terrorist connections. In addition, even apart from the question of the country to which the alien would be removed, full information about the alien's terrorist connections was critical for ensuring coordination with the law enforcement and security services in the country of removal before removing the alien. Ensuring such coordination based upon the fullest information about the threat posed by the alien would have promoted both the national security interests of the United States (by perhaps providing a basis for law enforcement officials in the destination country to detain the alien) and the foreign policy interests of the United States in maintaining good relations with the country. Other countries ordinarily would prefer not to have potential terrorists sent to their shores without adequate warning. Finally, if enough further information had been developed concerning the alien, a different course of action might have been taken with respect to him, such as criminal prosecution or detention as an enemy combatant.

These circumstances also raised the possibility that significant information might be developed concerning the alien at or near the end of the 90-day period. As a result, if it were lawful to do so, the Attorney General might have wanted to take more than 90 days to execute the removal order and thus to detain the alien beyond the 90-day removal period.

**Analysis**

**I.**

Whether the Attorney General is required to effect an alien's removal as quickly as possible within the 90-day removal period established by section 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A), is a question of statutory interpretation. In determining the meaning of a statute, we begin by examining its text. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 n.29 (1978). "[W]e begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000) (quoting *Connectictut National Bank v. Germain*, 503 U.S. 249, 254 (1992)). Section 241(a)(1)(A) of the INA states that "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')." Section 241(a)(2) provides that "[d]uring the removal period, the Attorney General shall detain the alien." The meaning of the statute is plain on its face: the Attorney General is granted a full 90 days after an alien has been ordered removed to effect the alien's removal. During that period, the Attorney General is to detain the alien. The statute does not impose a duty on the Attorney General to remove aliens as quickly as possible within the 90-day removal period, nor does it purport to prescribe the reasons for which the Attorney General might decide to act more quickly or more slowly in effectuating a particular removal within the 90-day period.

Where, as here, the language of a statute is clear, there is no need to resort to legislative history to elucidate the meaning of the text. *See, e.g., Hill*, 437 U.S. at 184 n.29. Nevertheless, we note that the legislative history here is consistent with the reading of the plain text given above -- it confirms that Congress intended to give the Attorney General a full 90 days as a reasonable period of time within which to effect an alien's removal. The predecessor provision to the current section 241(a)(1) appeared at 8 U.S.C. § 1252(c) (1994), and provided that:

> When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States . . . . Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or other release during such six-month period upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to effect such alien's departure from the Untied States within such six-month period.

When Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, it shortened the removal period from six months to 90 days and eliminated any reference from the INA to a requirement that the Attorney General proceed with "reasonable dispatch" in effecting an alien's deportation. Congress seems to have viewed its newly-established 90-day time frame as a *per se* reasonable period of time in which to effect an alien's deportation, rendering judicial inquiry into the dispatch with which the Attorney General performed the duty unnecessary. Neither the text of the statute nor its legislative history provides any reason to believe that Congress intended to impose on the Attorney General an implicit requirement that he remove aliens from the country as quickly as possible within the 90-day removal period.

It might be argued that the plain-text reading outlined above raises constitutional issues that require a narrowing construction of the statute to limit the Attorney General's authority to use the full 90-day period for effecting removal. It is settled, of course, that where there are two or more plausible constructions of a statute, a construction that raises serious constitutional concerns should be avoided. *See, e.g., Crowell v. Benson*, 285 U.S. 22, 62 (1932). There are two arguments that might be raised for a constitutional narrowing construction here.

First, in light of the Supreme Court's decision in *Zadvydas*, it might be claimed that the government is under an obligation, even within the 90-day statutory period, to act with reasonable dispatch to remove the alien as quickly as possible. The claim would be, in other words, that it would be unconstitutional for Congress to grant the Attorney General 90 days in which to effect an alien's removal without any obligation that he act quickly within those 90 days. We reject this view and conclude that the Constitution imposes no obstacle to such a grant of authority.

**DISA**

Second, also in light of the decision in *Zadvydas*, it might be argued that, if it becomes clear at a point during the removal period that an alien *can* be removed, the Constitution imposes some constraints on the *purposes* for which removal may nevertheless be delayed (and detention continued) until later in the 90-day period. The *Zadvydas* Court explained that detention under the INA must be related to the purpose for which detention is authorized -- securing the alien's removal. It thus might be argued that an express decision to delay an alien's removal until the end of the 90-day period must be based upon some purpose related to the proper execution of the immigration laws. As explained below, we conclude that the Constitution may require that the statute be read to include such a limitation. We need not definitively resolve the hypothetical question whether removal could be delayed for a reason wholly unrelated to executing the immigration laws, however, because in the instant case multiple bases existed for delaying the removal of the alien in question that were directly related to the broad considerations the Attorney General is charged with taking into account in enforcing the immigration laws. (1)

1. Reasonable dispatch. It is doubtful that the terms of section 241(a)(1)(A) could plausibly be construed to include a reasonable-dispatch requirement, particularly in light of Congress's explicit deletion of any such requirement from the statute when it enacted the IIRIRA in 1996. *Cf. Salinas v. United States*, 522 U.S. 52, 60 (1997) (principle of constitutional avoidance does not permit pressing statutory construction "to the point of disingenuous evasion"). We need not resolve that particular issue, however, because reading the statute not to include a reasonable-dispatch requirement -- which, as we have outlined above, is the best reading of the text -- does not raise any serious constitutional questions.

In *Zadvydas*, the Supreme Court held that the Constitution required reading an implicit limitation into section 241(a)(6) of the INA, 8 U.S.C. § 1231(a)(6), restricting the detention of an alien beyond the 90-day removal period "to a period reasonably necessary to bring about that alien's removal from the United States." 533 U.S. at 689. The Court read this limitation into the statute because, in its view, "[a] serious constitutional problem [would arise] out of a statute that . . . permits an indefinite, perhaps permanent, deprivation of human liberty without any [procedural] protection." *Id.* at 692. Thus, the Court ruled that if a habeas court determines that "removal is not reasonably foreseeable [during post-removal-period detention], the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699-700.

It could be argued that a constitutional limitation restricting the government's authority to detain an alien to a period "reasonably necessary to bring about that alien's removal" necessarily entails an obligation that the government proceed with reasonable dispatch in effecting removal and remove the alien as soon as reasonably practicable to do so. Even if that were a valid interpretation of the limitation imposed by *Zadvydas* on post-removal-period detention under section 241(a)(6) -- an issue that we need not definitively decide in this portion of our analysis -- that limitation is inapplicable to detention *within* the 90-day removal period established by section 241(a)(1)(A). The constitutional concerns that motivated the *Zadvydas* Court simply do not arise in the context of detention within the removal period.

In *Zadvydas*, the Court made clear that the central concern informing its constitutional analysis was that the detention it was addressing was "not limited, but potentially permanent." 533 U.S. at 691. *See also id.* at 692 (stressing the "indefinite, perhaps permanent deprivation of human liberty" at stake). The 90-day removal period, by contrast, is of a fixed and relatively short duration. Indeed, the *Zadvydas* Court expressly distinguished detention during the 90-day removal period from the detention it was addressing on precisely this ground, stating that "importantly, post-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90-day removal period, has no obvious termination point." *Id.* at 697. At least one lower court has ruled that *Zadvydas* is inapplicable to the 90-day removal period on precisely these grounds. *Shehata v. Ashcroft*, No. 02 CIV. 2490(LMM), 2002 WL 538845 at *2 (S.D.N.Y. April 11, 2002) ("Here, on the other hand, the 90 day period is quite limited in time, and serves a rational purpose, to allow INS to effect removal of a person already determined to be removable."); *see also Badio v. United States*, 172 F. Supp. 2d 1200, 1205 (D. Minn. 2001) ("*Zadvydas* does not apply to petitioner's claim because pre-removal-order proceedings do have a termination point.").

The relatively short detention period under section 241(a)(1)(A) makes a critical difference because the holding in *Zadvydas* rests upon considerations of substantive due process. Although the Court did not expressly label its decision as one based on "substantive due process," it made it clear that this was the foundation of its reasoning as it explicitly invoked the Fifth Amendment's Due Process Clause, *see Zadvydas*, 533 U.S. at 690, and at the same time disavowed any concern with procedural deficiencies:

[W]e believe that an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, *irrespective of the procedures used*, the Constitution permits detention that is indefinite and potentially permanent.

*Id.* at 696 (citation omitted) (emphasis added). The grounding of the decision in substantive due process is important because, as a general rule, government conduct violates substantive due process constraints only when it is so extreme and intrusive that it can be said to "shock the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). The prospect of "indefinite and potentially permanent" detention may shock the conscience of the courts, *Zadvydas*, 533 U.S. at 696, but detention for a limited period of 90 days clearly does not. In fact, several courts called upon to review early immigration statutes that did not specify a fixed period for the government's detention authority settled upon similar time frames in specifying the permissible length of a "reasonable" detention. *See, e.g., United States ex rel. Janavaris v. Nicolls*, 47 F. Supp. 201, 202 (D. Mass. 1942) ("The period of time which judges have found to be appropriate in peace-time varies from one month . . . to four months."); *United States ex rel. Ross v. Wallis*, 279 F. 401, 404 (2d Cir. 1922) (holding that four months is a reasonable time); *Caranica v. Nagle*, 28 F.2d 955, 957 (9th Cir. 1928) (holding that two months is a reasonable time); *Saksagansky v. Weedin*, 53 F.2d 13, 16 (9th Cir. 1931) (authorizing the detention of an alien already held for five months for an additional 30 days).

**DISA**

More important, the *Zadvydas* Court expressly held that the detention of an alien for a period of up to six months is presumptively constitutionally reasonable and does not violate substantive due process constraints. *See Zadvydas*, 533 U.S. at 701. If detention for a period of six months to effect removal is presumptively reasonable and does not violate an alien's substantive due process rights, it follows *a fortiori* that detention during the shorter 90-day removal period cannot be constitutionally problematic. *See Borrero v. Aljets*, 178 F. Supp. 2d 1034, 1039 (D. Minn. 2001) ("*Zadvydas* confirms that a legally admitted alien can always be detained during the 90-day 'removal period' contemplated by the statute. But after that, the Court held, the alien can be held for only a 'reasonable period,' which is presumed to be six months . . . ."). Where conduct that "shocks the conscience" is the ultimate touchstone for constitutional analysis, if six months' detention is reasonable, detention for 90 days is simply below the threshold for substantive due process constitutional concerns. Indeed, *Zadvydas* makes the constitutionality of detention during the 90-day removal period even clearer than this, because the six-month "presumptively reasonable" period established by that decision may very well not begin to run until *after* an alien has already been detained for the 90-day removal period.[(2)] Substantive due process constraints thus do not afford any basis for reading a "reasonable dispatch" requirement into section 241(a)(1)(A).

In addition, because this particular case involves removal of an alien with demonstrated ties to members of a terrorist organization with which the United States is currently at war, it is even plainer that detention for 90 days without any obligation on the government to act quickly cannot be a concern of constitutional dimensions under the reasoning in *Zadvydas*. In outlining the constitutional problems with potentially indefinite detention, the Supreme Court made it express that the principles it was applying might very well not apply to the government's actions dealing with aliens suspected of involvement in terrorism. The Court distinguished that context, saying that "we [do not] consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security." 533 U.S. at 696. Indeed, the Court implied that the government's interest in preventing terrorism is sufficiently great that detention measures specifically targeting "suspected terrorists" are deserving of heightened judicial deference. *See id.* at 691. Thus, the Court suggested that, in the context of an alien suspected of involvement in terrorism, detention might well be justified beyond the six-month period of detention that the Court deemed presumptively constitutionally reasonable for any case. As a result, where as here, investigation to determine whether an alien is connected to a terrorist organization is part of the justification for prolonging detention and the detention remains confined *within the 90-day removal period*, there can be no basis for concluding that substantive due process constraints are implicated.

Although we conclude, based on the reasoning of *Zadvydas*, that the Constitution does not require that a "reasonable dispatch" obligation be read into section 241(a)(1)(A), one line of lower court decisions regarding the substantive due process implications of prolonged detention should be briefly distinguished. Certain lower courts addressing pretrial detention in the criminal justice system have held that lengthy detention may violate substantive due process constraints under certain circumstances and that evaluating a claimed violation "requires assessment on a case-by-case basis, since due process does not necessarily set a bright line limit for length of pretrial confinement." *United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986). *See also United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986). It might be thought that those cases call into question our blanket conclusion that detaining aliens for a period of 90 days does not violate substantive due process guarantees, even where the Attorney General fails to act with reasonable dispatch. The purpose for the case-by-case inquiry engaged in by the courts in those cases, however, is to examine factors *other* than length of confinement that the courts deemed relevant to the substantive due process inquiry -- such as which party is primarily responsible for any delays. *See, e.g., Gonzales Claudio*, 806 F.2d at 340 ("we also consider the extent to which the prosecution bears responsibility for the delay that has ensued"). If the factor of length of confinement is viewed in isolation, applicable case law makes it crystal clear that a 90-day detention period is not constitutionally objectionable, and that no case-by-case inquiry into the length of confinement is therefore required. As we have already mentioned, *Zadvydas* explicitly states that civil detention for a period of six months in the context of deportation is presumptively constitutionally reasonable, *see* 533 U.S. at 701, and even cases examining the constitutionality of prolonged pretrial detention have typically begun their analysis by presuming that the 90-day period established by the Speedy Trial Act is a reasonable detention period. *See, e.g., Gonzales Claudio*, 806 F.2d at 340-41 (citing 18 U.S.C. § 3164(b)).

Moreover, precedents relating to preventive pretrial detention in criminal cases are not directly applicable to the context of detention incident to removal. In distinguishing its own pretrial detention precedent from the context of immigration proceedings, the Second Circuit noted that "a deportation proceeding is not a criminal proceeding . . . and the full trappings of legal protections that are accorded to criminal defendants are not necessarily constitutionally required in deportation proceedings." *Dor v. INS*, 891 F.2d 997, 1003 (2d Cir. 1989). In a later decision, the Second Circuit elaborated on this distinction:

> It is axiomatic, however, that an alien's right to be at liberty during the course of deportation proceedings is circumscribed by considerations of the national interest. Control over matters of immigration and naturalization is the "inherent and inalienable right of every sovereign and independent nation." *Fong Yue Ting v. United States*, 149 U.S. 698, 711, 13 S.Ct. 1016, 1021, 37 L.Ed. 905 (1893). . . . In exercising its broad power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 80, 96 S.Ct. at 1891. Governmental conduct that may be considered "shocking" when it serves to deprive the life, liberty or property of a citizen may not be unconstitutional when directed at an alien.

*Doherty v. Thornburgh*, 943 F.2d 204, 209 (2d Cir. 1991) (citations omitted), *cert. dismissed*, 503 U.S. 901 (1992). Thus, the Second Circuit considers the detention of an alien prior to removal to be constitutionally permissible unless the alien can show that "his continuing detention was the result of an 'invidious purpose, bad faith or arbitrariness.'" *Ncube v. INS*, No. 98 Civ. 0282 HB AJP, 1998 WL 842349, at *16 (S.D.N.Y. Dec. 2, 1998), *citing Doherty*, 943 F.2d at 212. Especially where the Supreme Court has already established that detention of an alien for a period of six months is presumptively constitutionally reasonable, detention for a period of 90 days in itself cannot possibly satisfy that exacting standard for establishing a violation. Thus, lower court decisions that hav

DISA

the substantive due process implications of pretrial detention do not call into question our conclusion that the Constitution does not require that the Attorney General act with reasonable dispatch during the 90-day removal period.

Finally, we note that in January 2002, the INS General Counsel's Office issued an opinion in which it advised that, during the 90-day removal period, the INS is constitutionally required to "proceed[] with reasonable dispatch to arrange removal." *See* Memorandum for Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations from Dea Carpenter, Deputy General Counsel, *Re: Authority to Detain During the 90-Day Removal Period* at 1 (Jan. 28, 2002) ("*INS Memorandum*"). Based on the analysis outlined above, we disagree with the INS's conclusion.

The INS derived the reasonable-dispatch requirement from language in *Zadvydas* construing section 241(a)(6) and stating that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *INS Memorandum* at 2, *citing Zadvydas*, 533 U.S. at 689. The INS reasoned that, "while the *Zadvydas* opinion is technically limited to post-removal period detention, and while the statute provides authority to detain an alien with a final order of removal for up to the 90-day removal period, the INS should not continue to detain an alien during the removal period beyond the point at which the alien could be removed except to the extent that the INS is taking necessary actions to process the alien for removal." *INS Memorandum* at 3. In our view, this conclusion was in error because it mistakenly applies the limitations on post-removal period detention under section 241(a)(6) to removal-period detention under section 241(a)(1)(A). As explained above, neither the plain language of section 241(a)(1)(A) nor its legislative history allows any inference that Congress intended to impose a reasonable-dispatch obligation on the INS during the 90-day removal period. Moreover, the constitutional concerns that impelled the Supreme Court to read such an obligation into section 241(a)(6) simply are not applicable to detention during the 90-day removal period. In *Zadvydas*, the Supreme Court reasoned that because indefinite civil detention of lawfully admitted aliens would raise serious constitutional questions, detention must be limited to a period reasonably necessary to effect removal. The *Zadvydas* court expressly distinguished the 90-day removal period, however, on the grounds that it has a defined termination point. *See* 533 U.S. at 697. Lower courts, accordingly, have held that *Zadvydas*'s constitutional reasoning is inapplicable to detention during the removal period. *See Shehata*, 2002 WL 538845, at *2. In short, we disagree with the INS's reading of *Zadvydas*, and reaffirm our conclusion that the Constitution does not impose a reasonable-dispatch obligation during the 90-day removal period. [3]

2. Purposes for which removal may be delayed. The second argument that might be raised for a constitutionally based narrowing construction of section 241(a)(1)(A) would rest on the theory that, once all of the mechanical steps that are necessary to effectuate an alien's removal have been taken, the Constitution imposes some limitations on the purposes for which it is permissible to further delay the alien's removal while keeping the alien in detention. In *Zadvydas*, the Supreme Court explained that the reasonableness of an alien's detention must be measured "primarily in terms of the statute's basic purpose," which the Court identified as securing the alien's removal. *Zadvydas*, 533 U.S. at 699. Similarly, in the wake of *Zadvydas*, the Third Circuit has stated that "[t]he requirements of substantive due process are not met unless there is a close nexus between the government's goals and the deprivation of the interest in question." *Patel v. Zemski*, 275 F.3d 299, 311 (3d Cir. 2001). Thus, the INS has taken the position, both in the *INS Memorandum* and in some instances of prior litigation, that it does not have the power to detain aliens for any purpose other than the effectuation of removal. [4] *See INS Memorandum* at 1; *United States v. Restrepo*, 59 F. Supp. 2d 133, 138 (D. Mass. 1999). [5] Even before *Zadvydas*, in fact, several district courts had expressed the view that, once it has become apparent that an alien cannot be deported, his detention can no longer be said to be for purposes of effecting his removal. *See United States ex rel. Blankenstein v. Shaughnessy*, 117 F. Supp. 699, 703-04 (S.D.N.Y. 1953) ("courts have the power to release on habeas corpus an alien held for deportation on a showing . . . that the detention cannot in truth be said to be for deportation"); *United States ex rel. Kusman v. INS*, 117 F. Supp. 541, 544-45 (S.D.N.Y. 1953); *Rodriguez v. McElroy*, 53 F. Supp. 2d 587, 591 n.6 (S.D.N.Y. 1999) ("[d]etention is intended for the sole purpose of effecting deportation"); *Fernandez v. Wilkinson*, 505 F. Supp. 787, 793 (D. Kan. 1980), *aff'd*, 654 F.2d 1382 (10th Cir. 1981); *Williams v. INS*, No. 01-043 ML, 2001 WL 1136099, at *4 (D.R.I. Aug. 7, 2001).

There is support in the cases for the general principle suggested by the INS to this extent: the detention of an alien -- perhaps even during the 90-day removal period -- likely must be related to enforcing the immigration laws and properly effecting the alien's removal in accordance with the nation's immigration laws and policies. Thus, in the abstract, it might raise difficult constitutional questions if the Attorney General were expressly to delay the removal of an alien (and thereby prolong his detention) solely for a purpose that was -- by hypothesis -- entirely unrelated to any legitimate interest in the enforcement of the immigration laws. [6] We need not definitively decide whether such a hypothetical scenario would raise constitutional infirmities, however, because in the present case there are reasons directly related to the enforcement of the immigration laws that justify any delay in the alien's removal. [7] Of course, acknowledging (as we do for purposes of analysis here) that the reason for an alien's detention must be related to legitimate interests in enforcing the immigration laws does not in itself provide much concrete guidance for determining precisely what activities meet that test. Rather, it merely frames the next step of the inquiry. Here, we cannot purport by any means to provide a comprehensive assessment of all the tasks or all the inquiries that may meet that standard in the myriad scenarios that may arise. Given the numerous broad objectives that underlie the nation's regulation of immigration -- many of which relate to protecting our citizens from harm at the hands of aliens -- there are potentially a vast array of interests legitimately related to policing immigration that may have a bearing on the Attorney General's decision (effected through the INS) concerning exactly when during the removal period an alien should be removed. [8] For present purposes, we limit our discussion to the interests relevant in this case.

At a bare minimum, of course, administrative tasks such as making transportation arrangements, securing travel documents, communicating with domestic and foreign law enforcement agencies, and making internal administrative arrangements for escorts and security are all legitimately related to removal. *Accord INS Memorandum* at 4.

In our view, moreover, there is a substantially broader range of immigration-related considerations that the Attorney General is permitted to take into account in effecting the removal of an alien, and thus deciding whether and exactly when to remove an alien. For example, as the Supreme Court acknowledged in *Zadvydas*, the immigration policy of the United States is inextricably intertwined with complex and important issues of foreign policy. *Zadvydas*, 533 U.S. at 700. *See also Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). Every removal of an alien necessarily involves an act affecting foreign policy because it requires sending the alien to another country. In some cases, the foreign policy implications of that act may be significant. As the Supreme Court has recognized, enforcement priorities in the immigration context may reflect "foreign-policy objectives" and it is even possible that the Executive might wish "to antagonize a particular foreign country by focusing on that country's nationals." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 491 (1999). *See also Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (noting that decisions relating to immigration "may implicate our relations with foreign powers"); *cf. Fong Yue Ting v. United States*, 149 U.S. 698, 705 (1893) (grounding federal control over ingress and egress of aliens in part in federal government's "entire control of international relations"). More importantly here, releasing criminal or terrorist aliens into another country without providing adequate warning to the appropriate law enforcement or other officials in the receiving country can have adverse consequences for the security of that country, which can lead to the souring of diplomatic relationships or other negative results for foreign policy. Similarly, releasing aliens from United States custody who are suspected of involvement with terrorism can have a profound impact on our own national security. National security is also a concern inherently relevant to policing the flow of persons across our borders under the immigration laws. *See generally Carlson v. Landon*, 342 U.S. 524, 534-36 (1952).

It is not only common sense that makes clear the inherent relationship between enforcing the immigration laws and considerations of both foreign policy and national security; rather, those considerations are embedded in the text of the immigration laws themselves. For example, the fact that an alien's presence in the United States could result in "adverse foreign policy consequences" is *in itself* a grounds for removal under the INA. *See* INA § 237(a)(4)(C)(i), 8 U.S.C. § 1227(a)(4)(C)(i) (2000). Similarly, in certain circumstances, the Attorney General may block the departure of an alien from the United States when it would be deemed prejudicial to national security interests to permit him to depart. *See* 8 C.F.R. § 215.3(b), (c) (2002).

More importantly here, the INA expressly gives the Attorney General authority in many instances to make discretionary decisions bearing upon the removal of an alien based on broad considerations of policy. For example, section 241(b)(2)(C)(iv), provides that "[t]he Attorney General may disregard [an alien's designation of a country to which he would like to be removed] if the Attorney General decides that removing the alien to the country is prejudicial to the United States." Similarly, section 241(b)(2)(E)(vii) provides that the Attorney General is not to remove an alien to certain countries, even if they are willing to accept the alien, if he determines that it is "impracticable" or "inadvisable." By granting the Attorney General authority to make such determinations, Congress made it clear that the broad considerations of foreign policy or national security that might underlie such decisions are directly related to -- indeed, are an integral part of -- the enforcement of the immigration laws. Where more time is needed for the Attorney General to receive further information bearing on such decisions, the investigation to generate such information is legitimately related to enforcing the immigration laws and can justify delaying the alien's departure.

Thus, at a minimum, where the Attorney General has a statutorily prescribed decision to make concerning the removal of an alien -- such as whether it would be "prejudicial to the United States" to remove him to a particular country -- developing the information needed for the Attorney General to make that determination wisely is a task that is related to proper implementation of the immigration laws. It would thus be justifiable to delay an alien's removal while an investigation to develop that information (including information about whether the alien has terrorist or criminal connections) is pursued.

In addition, even where the Attorney General does not have such an express statutory determination to make, we conclude that efforts to investigate an alien's background to determine, for example, ties to terrorist organizations are legitimately related to the process of removal. Full information on such aspects of an alien's background may be critical for a number of purposes. It permits the United States to coordinate appropriately with law enforcement officials in the receiving country to ensure that they are aware of any threats the alien might pose and might potentially benefit the national security interests of both the United States and the receiving country by providing officials in the receiving country a basis for arresting upon arrival an alien who poses a serious threat. Taking such steps to coordinate with the receiving country is part and parcel of the proper implementation of the immigration laws. Delaying departure of an alien until later in the 90-day period in order to continue pursuing such investigations into terrorist ties is thus entirely permissible.[9] It is true that, as a purely mechanical matter, the physical removal of an alien and his transportation might be arranged without thoroughly investigating his background and without taking the time to appropriately inform countries that may be willing to accept him about the results of our investigations. But there can be no question that time spent on such efforts is nevertheless reasonably related to the enforcement of the immigration laws.

## II.

Your Office has also asked us to determine whether (and under what circumstances) the Attorney General may decide to take longer than the 90-day removal period to remove an alien even where it would be logistically possible to accomplish the removal before the expiration of the 90 days. We conclude, under either of two alternative readings of the statute, that at least certain categories of removable aliens may be held by the INS beyond the 90-day removal period, at least where there are reasons for the delay that are

DISA

related to carrying out the immigration laws. We note, however, that under the Supreme Court's decision in *Zadvydas*, an obligation to act with "reasonable dispatch" will attach at some point after the expiration of the 90-day removal period.

### A.

Section 241(a) of the INA directs that the Attorney General "shall remove" aliens within 90 days of the date on which they are ordered removed. INA § 241(a)(1)(A). It also indicates, however, that section 241 elsewhere provides exceptions to that general rule. *Id.* [(10)] Section 241(a)(6) on its face provides such an exception. It states that "[a]n alien ordered removed who is inadmissible under section 212 [1182], removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) [1227] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period."

The plain text of the provision expressly states, in language indicating a grant of authority, that listed classes of aliens "may be detained beyond the removal period." By its terms it thus grants the Attorney General the power to refrain from removing an alien -- and instead to keep him in detention -- after the removal period has expired. The statute does not provide any preconditions for the exercise of this authority, other than that the alien must belong to one of the listed categories. Thus, in the *Zadvydas* litigation the United States took the position that "by using the term 'may,' Congress committed to the discretion of the Attorney General the ultimate decision whether to continue to detain such an alien and, if so, in what circumstances and for how long." Brief of the United States in *Ashcroft v. Kim Ho Ma*, 2000 WL 1784982 at *22 (Nov. 24, 2000).

Nothing in the Supreme Court's decision in *Zadvydas* casts any doubt on the validity of the plain-text reading of section 241(a)(6) as an express authorization for the Attorney General to detain -- and thus refrain from removing -- the listed classes of aliens beyond the removal period. The *Zadvydas* Court held that it would raise serious constitutional questions for Congress to authorize the *indefinite* detention of aliens falling into the listed classes. It thus read into the statute an implicit limitation on the allowable *duration* of post-removal-period detention. 533 U.S. at 689 ("the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States"). The Court also implied that detention beyond the 90-day removal period must be in furtherance of removal-related purposes, as it stated that the reasonableness of a detention should be measured "primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal." *Id.* at 699. Nothing in the Court's decision, however, calls into question the central point that section 241(a)(6) constitutes an express source of authority to detain aliens in the listed classes beyond the removal period, albeit subject to the above limitations.

This plain-text reading, moreover, does not lead to an absurd or an unconstitutional result. The statute limits the authority to prolong detention beyond the removal period to particular classes of aliens designated by Congress. The aliens listed in the statute include aliens who were never legally admitted to the country, *see* INA § 212, aliens who violate their nonimmigrant status or their conditions of entry, *see* INA § 237(a)(1)(C), criminal aliens, *see* INA § 237(a)(2), aliens who are a potential threat to national security, *see* INA § 237(a)(4), and aliens deemed by the Attorney General to constitute a flight risk or a danger to the community. *See* INA § 241(a)(6). Congress could reasonably have anticipated that in many instances additional time beyond the 90-day removal period would be required to remove these classes of aliens, perhaps because of heightened security concerns, the need to conduct especially thorough background investigations, or the difficulty that might be encountered in finding foreign countries willing to accept such aliens. *Zadvydas* confirms the constitutionality of holding such aliens beyond the 90-day removal period, and establishes that it is constitutionally permissible to hold aliens in confinement "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701. Our plain text reading of section 241(a)(6) is thus constitutionally unproblematic.

It might be argued that section 241(a)(6) does not itself constitute an exception to the 90-day rule, but rather merely empowers the Attorney General to *detain*, rather than *release*, aliens who *happen*, for some other reason, to still be in the country at the expiration of the 90-day removal period (for example, because no country would accept them or because their removal was delayed based upon some other source of authority that provides an exception to the command to remove aliens within 90 days). Under this view, section 241(a)(6) would be understood as a parallel provision to section 241(a)(3). Section 241(a)(3) gives authority to impose supervised release when it happens that an alien has not been removed within the 90-day period. Section 241(a)(6), the argument would go, should be understood as simply a parallel authority to detain the alien in the same circumstance. The difficulty with that approach to the statute is that the two sections are not drafted in parallel terms. Congress demonstrated in enacting section 241(a)(3) that it knows how to phrase language that does not grant an authority to delay removal of an alien beyond the 90-day period, but at the same time does give a power that can be exercised when it happens (for some other reason) that an alien has not been removed by the deadline. Section 241(a)(3) empowers the Attorney General to impose terms of supervised release on an alien "[i]f the alien does not leave or is not removed within the removal period." The quoted language makes it clear that section 241(a)(3) does not itself constitute authorization to delay removal beyond the removal period, but rather merely establishes an authority to impose supervised release in a certain situation -- the situation where it happens that alien has not been removed within the 90 days. The reasons *why* the alien has not been removed are not specified, and presumably could include the impossibility of removal or the exercise of some *other* authority to delay removal. The absence of similar conditional language triggering the application of section 241(a)(6) -- just three paragraphs later in the same subsection -- is a strong textual indication that section 241(a)(6) is not similarly limited. Instead, it was intended to serve as a general authorization for the Attorney General to refrain from removing the listed classes of aliens and to detain them beyond the removal period. It is well settled, after all, that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion and exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

DISA

Finally, we note that there is further textual support for the conclusion that section 241(a)(6) cannot properly be read as applying solely to a situation where it has proven impossible to remove an alien within the 90-day removal period. Here again, Congress knows how to express such a limitation when it wants to impose one, and it did so in the very next subsection of the statute. Section 241(a)(7) allows the Attorney General to authorize employment for those aliens who, although ordered removed, "cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien." That provision explicitly limits a grant of employment authorization to situations where it is impossible to remove an alien because no country is willing to accept him. The absence of similar language from section 241(a)(6) demonstrates that Congress did not intend similarly to limit the Attorney General's discretion in determining when and under what circumstances to detain aliens falling within the listed classes beyond the 90-day removal period.

## B.

Even if section 241(a)(6) did *not* authorize the Attorney General to delay removal of an alien beyond the removal period and instead provided solely authority to detain aliens who happen, for some other reasons, to still be in the country after the removal period, we would still conclude that the Attorney General has statutory authority to delay removal of at least some aliens until beyond the 90-day deadline.

We start with the observation that the text of section 241 makes it clear that Congress did not intend to obligate the Attorney General to remove aliens within the removal period in *all* instances. Despite the mandatory language directing that the Attorney General "shall remove" aliens within the removal period, numerous provisions in section 241 expressly contemplate that aliens who have been ordered removed will still be in the country after the expiration of the removal period. For example, as noted above, section 241(a)(3) establishes standards for supervised release of aliens that apply "[i]f the alien does not leave or is not removed within the removal period." Similarly, under the reading of section 241(a)(6) that we are assuming for this portion of our analysis, that provision provides authority for the Attorney General to detain an alien who has not been removed within the removal period. Both of these provisions assume a situation in which an alien has not been removed by the end of the removal period. They would make no sense if the INA imposed an ironclad legal obligation to effect the removal of all aliens before the removal period ended. Similarly, section 241(a)(7) permits the Attorney General to grant work authorizations to aliens who have been ordered removed and applies only in limited circumstances (such as where no country will accept the alien) that suggest the alien will be in the country well beyond the 90 days.

Other provisions in section 241 reinforce the conclusion that Congress understood that, in at least some instances, aliens would not be removed within the removal period. Section 241(b) establishes a detailed decision tree that the Attorney General must follow in determining to which country an alien should be removed. In some instances, the statute contemplates that the Attorney General may have to negotiate sequentially with as many as nine or more separate countries to secure permission to remove an alien, with each round of negotiations taking as many as 30 days. [11] *See* INA § 241(b)(2). It might simply be impossible to complete this entire process within the 90-day removal period, even without taking into account the time that the Attorney General and his agents must devote to such administrative tasks as securing necessary travel documents and making appropriate security arrangements. Thus, as the Supreme Court acknowledged in *Zadvydas*, "we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time." 533 U.S. at 701.

While the text of section 241 thus makes it clear that there may be instances in which an alien is not removed within the removal period, that in itself does not explain the circumstances that would make it permissible for the Attorney General to fail to accomplish removal within the allotted time. The discussion above does suggest one such circumstance -- namely, the situation where it is simply not possible to remove an alien within 90 days because a country has not yet been found that will accept him. As explained above, the detailed decision tree established in section 241(b) sets out a process for finding a country of removal that has various timing provisions built in and that may very well take more than 90 days to complete in some cases. And section 241(a)(7), in permitting the Attorney General to grant employment authorization in some circumstances, acknowledges that there may be instances in which "the alien cannot be removed due to the refusal of all countries" to accept him. It is significant, however, that the statute nowhere provides an express exception to the command to remove aliens within 90 days for such cases of impossibility. Instead, that exception must be implied based on the explicit textual references acknowledging that aliens may, in fact, be in the country past the 90-day period, the nature of the process Congress established for choosing the country of removal (a process that, on its face, may take longer than 90 days), and the assumption that Congress would not extend its command about timing to require the Attorney General to do the impossible.

The question here is whether a similar exception may also be implied under the statute that would permit the Attorney General under certain conditions to *choose* to delay removal of an alien even where it would be possible to remove him by the deadline. It could be argued that impossibility of removal -- a circumstance beyond the Attorney General's control -- is the *only* circumstance that makes it permissible for the Attorney General to fail to accomplish removal by the 90-day mark. Such a limited exception to the 90-day rule, however, would not be consistent with the nature of the decisions that are entrusted to the Attorney General under the immigration laws. Rather, a similar exception to the 90-day deadline should be understood as implicit in the statute where the time deadline would conflict with the Attorney General's ability properly to enforce the immigration laws, taking into account the full range of considerations he is charged with weighing in accomplishing removal of an alien. The Attorney General is charged by different provisions of section 241, for example, with determining whether it would be "prejudicial to the United States" to remove an alien to the country of his choosing, *see* INA § 241(b)(2)(C)(iv), and with determining whether it would be "inadvisable" to remove aliens to other countries designated by the statutory decision tree, *see* INA § 241(b)(1)(C)(iv); INA § 241(b)(2)(E)(vii); INA § 241(b)(2)(F). *Cf.* INA § 241(a)(7)(B) (noting circumstances in which Attorney General may make a finding that "removal of the alien is otherwise impracticable or cont

public interest"). As explained above, in making these and other similar determinations an essential part of the operation of the immigration laws, Congress has embedded considerations of foreign policy and national security in the decisions that the Attorney General must make in accomplishing the removal of aliens. *See Zadvydas*, 533 U.S. at 700-01. And even where a specific statutory determination is not required, in any situation involving removal of an alien with terrorist connections, weighty considerations of foreign policy and national security bear upon efforts to provide the fullest information possible to the receiving country to promote both its security and the security of the United States. At other times, the health and well-being of an alien, including human rights that are protected by the United States' treaty obligations, must be considered. *See, e.g.,* Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Apr. 18, 1988, S. Treaty Doc. No. 100-20 (1988); INA § 241(b)(3)(A).

In entrusting the Attorney General with the responsibility to make determinations that could have such serious implications, Congress surely did not intend to require him to make determinations in undue haste and without taking the necessary time to conduct thorough investigations, seriously deliberate, confer with other executive agencies, and make an informed decision. If the 90-day deadline were considered an inexorable command, however, it might require precisely such uninformed decisionmaking. For example, under the decision tree provided by section 241(b), a country willing to accept a particular alien might not be found until late in the removal period, and the Attorney General might then be faced with deciding whether it would be "inadvisable" to remove the alien to that particular country in a matter of days. Where the Attorney General has such a role to perform -- and particularly where his decision may rest upon grave concerns for national security -- there is no reason to understand the 90-day deadline as an overriding imperative in the statute that may force a premature decision based on incomplete information or lack of deliberation. Similarly, where the removal of an alien with terrorist connections is at stake and the United States is in the process of investigating information that, if passed along to a receiving country, could have a profound impact on the measures that country could take to ensure both its security and the national security of the United States, there is no reason for thinking that the 90-day deadline was meant to trump due deliberation on such proper considerations under the immigration laws.

In short, in our view, Congress did not intend a rigid time deadline to take precedence in situations where the proper administration of the immigration laws requires additional time. The statute gives no indication that Congress attributed any less importance to discretionary immigration-related determinations entrusted to the Attorney General and his designees than it did to non-discretionary functions such as securing travel documents and finding a country willing to accept an alien. Thus, in our view, the Attorney General is not rigidly bound by the 90-day requirement even in situations where it theoretically would be possible to remove an alien and a foreign country has already signaled its willingness to accept him.

Our conclusion that such an implicit exception to the 90-day deadline should be understood under the statute is also buttressed by the INS's longstanding conclusion that it has implied authority under the statute to refrain from removing aliens within the removal period essentially as a matter of prosecutorial discretion. *See* Memorandum to Regional Directors, etc., from Doris Meissner, Commissioner, Immigration and Naturalization Service, *Re: Exercising Prosecutorial Discretion* ("*INS Prosecutorial Discretion Memorandum*") at 1 (Nov. 12, 2000). The INS exercises this discretion even with respect to "executing a removal order," *id.* at 2, despite the fact that doing so will often result in non-compliance with the directive of section 241(a)(1)(A) requiring the Attorney General to remove all aliens within 90 days of the time that a removal order becomes final.

The INS typically exercises its prosecutorial discretion with respect to the execution of final orders of removal through two means. First, 8 CFR § 241.6 provides that an alien "under a final order of deportation or removal" may apply for a stay of removal by filing form I-246. The regulation further provides that "in his or her discretion and in consideration of factors listed in 8 CFR 212.5 and section 241(c) of the Act," certain INS officials "may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate." Although the statutory factors referenced by the regulation appear in provisions that apply only to aliens "applying for admission" and "arriving at a port of entry of the United States" respectively, *see* INA §§ 212(d)(5)(A), 241(c)(2), the INS appears to construe its authority to grant stays to extend more broadly to *all* aliens under a final order of deportation or removal. The instructions accompanying form I-246 state, without limitation, that "[y]ou may file this application if you have been ordered deported or removed from the United States and you wish to obtain a stay of deportation or removal under the provisions of 8 CFR 241.6." Moreover, it is clear that the regulation's cross-references to statutory provisions are intended only to borrow lists of relevant factors to be considered, not to limit the scope of the regulation to the scope of the statutory provisions. Thus, broad stay authority exercised by the INS pursuant to 8 CFR § 241.6 cannot be derived from any statutory source, but rather is derived from the INS's extra-statutory prosecutorial discretion authority. *See INS Prosecutorial Discretion Memorandum* at 6 (referring to "whether to stay an order of deportation" as one potential exercise of prosecutorial discretion).

Second, the INS may at times exercise its prosecutorial discretion authority by granting a longer-term "deferred action" with respect to the order of removal. The power to grant such deferred action has been "developed [by the INS] without express statutory authorization." 6 Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, Immigration Law and Procedure § 72.03[2][h] (rev. ed. 2002). Nevertheless, it has been acknowledged by, and appears to have received the blessing of, the courts. *See Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999) (noting that "[a]t each stage the Executive has discretion to abandon the endeavor" of immigration proceedings, at any time up to and including the execution of removal orders); *Johns v. Department of Justice*, 653 F.2d 884, 890 (5th Cir. 1981) ("The Attorney General is given discretion by express statutory provisions, in some situations, to ameliorate the rigidity of the deportation laws. In other instances, as the result of implied authority, he exercises discretion nowhere granted expressly. By express delegation, and by practice, the Attorney General has authorized the INS to exercise his discretion. . . . The Attorney General also determines whether (1) to refrain from (or, in administrative parlance, to defer in) executing an outstanding order of deportation, or (2) to stay the order of deportation. Although such a stay is usually designed to give a deportee a reasonable amount of time to make any necessary business or personal arrangements, both the length of and reason for the stay lie entirely within the discretion of the Attorney General or his delegate.").

DISA

The INS thus has long treated the apparent statutory mandate that aliens be removed within the removal period as having implied exceptions and has long exercised its prosecutorial discretion in such a manner as to refrain from removing aliens within the removal period. If that approach is correct (which we need not decide here), and if deferral and stay considerations such as the conservation of limited INS resources, humanitarian concerns, and law-enforcement needs constitute sufficient grounds to refrain from removing an alien within the removal period as directed by section 241(a)(1)(A), then it would seem to follow *a fortiori* that the considerations described above (which are directly relevant to the proper execution of the immigration laws) certainly provide a sufficient basis for a similar implicit exception from the 90-day removal deadline.

Thus, we conclude that the statute permits the Attorney General to delay the removal of an alien beyond the removal period when the failure to effect removal is directly related to the administration of the immigration laws and policies of the United States. This does not give the Attorney General *carte blanche* to delay an alien's removal excessively. The delay must be based upon reasons related to the proper implementation of the immigration laws. And as the Court established in *Zadvydas*, where the alien is detained, the Attorney General must complete the removal process within "a period reasonably *necessary* to secure removal," 533 U.S. at 699-700 (emphasis added), a period that the Court concluded presumptively runs for 180 days.[12] This reading of the statute accords the Attorney General the time that he reasonably requires to carry out his immigration-related duties thoroughly and effectively. We could not purport here to define in the abstract a comprehensive list of all the activities that are related to the enforcement of the immigration laws and the completion of which could justify delaying an alien's removal beyond the 90-day time period. At a minimum, delays in removal that are attributable to actions taken by the Attorney General for the purposes discussed at pages 12-14 above relating to delays *within* the 90-day period -- namely, investigating whether and to what extent an alien has terrorist connections -- satisfy this standard.

Whether an alien can be *detained* after the expiration of the 90-day removal period is determined by section 241(a)(6). As explained above, under the reading of section 241(a)(6) that we have assumed for purposes of this portion of our analysis, that provision authorizes the Attorney General to detain aliens who fall into the listed classes and who, despite an order of removal, are still in the country beyond the removal period. Among the classes of aliens who may be detained are aliens who pose a threat to national security or the foreign policy of the United States as set forth in section 237(a)(4) and aliens who are otherwise determined by the Attorney General to be a risk to the community or unlikely to comply with an order of removal. Again, as noted above, *Zadvydas* makes clear that if an alien is detained pending removal beyond the removal period, the Attorney General must act within a period "reasonably *necessary* to secure removal." *Zadvydas*, 533 U.S. at 699-700 (emphasis added). Presumptively, a reasonable period lasts for six months, but the Court made clear that in cases involving suspected terrorism, the same limitations would likely not apply. We cannot attempt here to provide bright-line guidance in the abstract concerning the permissible duration of detention. That may well depend on facts in a particular case.

Patrick F. Philbin
Deputy Assistant Attorney General
Office of Legal Counsel

---

1. Of course, it is also implicit in the granting of any authority to an executive officer that it may not be exercised in a manner that is expressly constitutionally proscribed. Thus, the Attorney General could not, for example, delay the removal of an alien solely as a mechanism for imposing punishment on the alien. *See, e.g., Wong Wing v. United States*, 163 U.S. 228, 238 (1896).

2. *Zadvydas* does not make it clear whether the six month "presumptively reasonable" period begins at the end of, or encompasses, the 90-day removal period. *Zadvydas*, 533 U.S. at 700-01. The lower courts appear to be split on the issue. *Compare Borrero v. Aljets*, 178 F. Supp. 2d 1034, 1040-41 (D. Minn. 2001) ("As interpreted by the Supreme Court in *Zadvydas*, § 1231(a)(6) authorizes the INS to detain aliens for six months *after the expiration* of the 90-day removal period.") (emphasis added) *with Malainak v. INS*, No. 3-01-CV-1989-P, 2002 WL 220061 at *2 (N.D. Tex. Feb. 11, 2002) ("the Court opined that a presumptively reasonable period of detention was *between* the ninety days provided for by the IIRIRA and six months") (emphasis added). In November 2001, the Department issued regulations reflecting an assumption that the presumptively reasonable six-month period from *Zadvydas* includes the 90-day removal period. *See* 8 C.F.R. § 241.13(b)(2)(ii) (2002). The choice to treat the six-month period in that fashion in the regulation, of course, is not definitive on constitutional *requirements* for measuring the six-month period.

3. The *INS Memorandum* also cites at length several decisions addressing the impact of INS detention on triggering the Speedy Trial Act where it appears that the INS has held an alien solely for the purpose of allowing a criminal investigation (into the same conduct that forms the basis for deportation) to proceed. *See INS Memorandum* at 3-4. It is unclear to what extent, if at all, the INS intends to rely on these cases for the proposition that the INS must act with reasonable dispatch. Instead, the INS relies on them primarily for the proposition that the INS can detain an alien solely for purposes of effecting removal, an issue we address below. *See infra* pp. 10-14. In any event, the Speedy Trial Act cases provide no support for any general obligation on the INS to act with dispatch. Rather, they establish solely that, when an alien is prosecuted for the same conduct that formed the basis for the immigration violation on which he was held and when the INS has delayed deportation (and prolonged detention) solely to permit the criminal investigation to proceed, the INS detention may trigger the deadlines of the Speedy Trial Act. That, in turn, may lead to a Speedy Trial Act violation that may be raised *in the criminal trial* to seek dismissal of the indictment. *See, e.g., United States v. Garcia-Martinez*, 254 F.3d 16 (1st Cir. 2001); *see also United States v. De La Pena-Juarez*, 214 F.3d 594, 598-99 (5th Cir.), *cert. denied* 531 U.S. 983 (2000) *and cert. denied*, 531 U.S. 1026 (2000). That consequence for the criminal trial does not mean by any stretch that the INS lacks *power* to detain the alien for the full 90 days prior to removal or that the INS has a general obligation to act with dispatch during that time. It is true that, in explaining how INS detention solely for purposes of criminal investigation may trigger the Speedy Trial Act, one district court stated in dicta that "[i]n essence, the INS has an obligation to act with all deliberate speed to remove from the United States a detained alien who has been finally determined to be deportable." *United States v. Restrepo*, 59 F. Supp. 2d 133, 138 (D. Mass. 1999). In context, it is clear that all the court was indicating was that, when the sole purpose of detention is providing time for criminal investigation, there may be consequences under the Speedy Trial Act for the prosecution. To the extent that this dicta might be construed to suggest anything further concerning a general obligation to act with dispatch, there is no support in the court's Speedy Trial Act analysis for such a conclusion and it is not a correct statement of the law.

4. In coming to this conclusion, the INS relies heavily on several cases holding that when aliens detained by the INS are held solely for the purpose of facilitating a criminal investigation, the detention triggers the provisions of the Speedy Trial Act. *See INS Memorandum* at 3-4. As noted above, however, those cases merely interpret the Speedy Trial Act and the guarantees it provides a defendant *in the context of his criminal case*. It might well be the case that if the INS were to hold **DISA**

for the purpose of permitting a criminal investigation to proceed there would be a Speedy Trial Act problem in the criminal prosecution. That does not mean, however, that the INS lacked legal authority to detain the alien while the criminal investigation proceeded. We therefore do not view those cases as useful for determining the scope of the INS's authority under section 241(a)(1) of the INA to delay removal of an alien during the 90-day removal period.

5. *See also INS Memorandum* at 5 ("While nothing in the language of the statute requires that the INS expedite an alien's removal during the 90-day removal period, or that the INS remove an alien at the very earliest point at which travel arrangements can be made . . . detention beyond that point must be related to removing the alien.").

6. Of course, as noted above, *see supra* n.1, it is also clear that the INS could not prolong an alien's detention for a constitutionally impermissible purpose.

7. Even if other motivations exist in addition to the need to develop information relevant to decisions in the deportation process, to our knowledge it has never been suggested that the existence of additional governmental motivations can undermine or invalidate a detention that is supported by a lawful purpose. *See, e.g., United States ex rel. Zapp v. INS*, 120 F.2d 762, 764 (2d Cir. 1941) (ongoing criminal investigations do not affect the INS's removal authority); *cf. Whren v. United States*, 517 U.S. 806, 811-13 (1996) (holding that subjective motive of officers for traffic stop is irrelevant where stop is supported by probable cause and thus rejecting "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 491 (1999) (explaining that where an alien's presence in this country is a violation of the immigration laws, he may be deported and the possible existence of additional reasons for the government's focus of enforcement efforts on him is irrelevant; indeed the "Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat").

8. For example, 8 U.S.C. § 1231(c)(2)(A)(ii) makes it express that the Attorney General may stay the removal of an alien stopped upon arriving at a port of entry (who otherwise would be removed "immediately," *id.* § 1231(c)(1)) if the "alien is needed to testify in [a criminal] prosecution." A similar need for an alien's presence in a criminal or civil trial may well be a legitimate concern justifying a delay in removal. We need not decide such questions here.

9. We note that the INS appears to agree in principle with the understanding we have outlined here concerning the factors that are legitimately considered in effecting an alien's removal. In discussing "critical aspects of the removal process," the INS has stated as follows:

It is clearly a legitimate governmental interest that the INS communicate with other law enforcement agencies, both domestic and foreign, and make sure that a particular alien is not wanted for prosecution or needed as part of an investigation, in which case the alien could be transferred into the legal custody of another law enforcement agency. In the context of the investigation into the September 11, 2001 attacks on the Pentagon and the World Trade Center, the United States and the country of removal also have a legitimate interest *in ensuring to the extent possible that a particular alien has no connection with any terrorist organization or activity.*

*INS Memorandum* at 4 (emphasis added). The full scope of the conclusions that the INS drew from this analysis is not entirely clear. As the text above explains, we conclude that if investigations into an alien's terrorist connections are ongoing during the 90-day removal period, postponing removal until later in the period in order to permit such investigations to continue is permissible. Such investigations are legitimately related to effectuating the removal properly under the immigration laws.

10. The provision reads: "Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days . . . ."

11. For example, an alien who is to be removed under section 241(b)(2) first has the opportunity to designate the country to which he would like to be removed. *See* INA § 241(b)(2)(A). Once the alien has designated a country, that country is accorded a minimum of 30 days to decide whether to accept the alien. *See* INA § 241(b)(2)(C)(ii). The Attorney General may also override the alien's designation if he determines that removing the alien to the designated country would be "prejudicial to the United States." *See* INA § 241(b)(2)(C)(iv). If the designated country declines to accept the alien, or if the Attorney General overrides the designation, the Attorney General is instructed by the statute to attempt to remove the alien to the country of his nationality or citizenship. *See* INA § 241(b)(2)(D). That country is then accorded a presumptive 30 days by the statute to decide whether to accept the alien, but here the Attorney General is further vested with discretion to alter that time period, raising the possibility that this step could take even longer. *See* INA § 241(b)(2)(D)(i). If the country of the alien's citizenship or nationality declines to accept the alien, the Attorney General is instructed to attempt to remove the alien to one of six listed countries, including the country in which the alien was born and the country from which the alien was admitted to the United States. *See* INA § 241(b)(2)(E)(i)-(vi). Each of those countries, of course, would have to be separately negotiated with by the United States, and would also have to be given an appropriate amount of time -- presumably 30 days -- to decide whether to accept or reject the alien. Finally, if none of the six listed countries is willing to accept the alien, or if the Attorney General decides that it would be "inadvisable" to send the alien to any of the listed countries that is willing to accept him, the Attorney General is instructed to remove the alien to any country of the Attorney General's choice whose government is willing to accept the alien. *See* INA § 241(b)(2)(E)(vii). Needless to say, following this decision tree through to its very last step -- which Congress must have contemplated would be necessary in at least some cases -- would take considerably longer than the 90 days allotted to the Attorney General by section 241(a)(1)(A).

12. We address here solely a decision to refrain from removing an alien by the 90-day deadline with a view to effecting removal at a later date. A decision in the exercise of prosecutorial discretion not to execute an order of removal *at all* need not be subject to the same limitations and might be subject to almost absolute discretion of the Attorney General. *See generally INS Prosecutorial Discretion Memorandum; see also Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483 (1999) ("[a]t each stage the Executive has discretion to abandon the endeavor" of pursuing removal). We express no view on that issue here.

DISA

Q Questioned
As of: February 4, 2025 9:19 PM Z

# *Zadvydas v. Davis*

Supreme Court of the United States

February 21, 2001, Argued ; June 28, 2001, Decided

Nos. 99-7791 and 00-38

## Reporter

533 U.S. 678 *; 121 S. Ct. 2491 **; 150 L. Ed. 2d 653 ***; 2001 U.S. LEXIS 4912 ****; 69 U.S.L.W. 4626; 2001 Cal. Daily Op. Service 5455; 2001 Daily Journal DAR 6671; 2001 Colo. J. C.A.R. 3494; 14 Fla. L. Weekly Fed. S 442

KESTUTIS ZADVYDAS, PETITIONER v. CHRISTINE G. DAVIS AND IMMIGRATION AND NATURALIZATION SERVICE; JOHN D. ASHCROFT, ATTORNEY GENERAL, ET AL., PETITIONERS v. KIM HO MA

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** *185 F.3d 279* and *208 F.3d 815*, vacated and remanded.

## Core Terms

alien, detention, removal, deportation, detain, cases, immigration, custody, repatriation, inadmissible, indefinite, proceedings, final order, negotiations, conditions, continued detention, courts, circumstances, supervision, parole, reasonably foreseeable, flight risk, post-removal-period, confinement, authorize, matters, terms, constitutional question, imprisonment, procedural protections

## Case Summary

### Procedural Posture

In separate writs of certiorari, petitioner alien appealed an order of the United States Court of Appeals for the Fifth Circuit authorizing his continued detention and petitioner United States Attorney General appealed an order of the United States Court of Appeals for the Ninth Circuit forbidding continued detention of an alien. Both aliens were detained pursuant to *8 U.S.C.S. § 1231(a)(6)*. The cases were consolidated for argument.

### Overview

The aliens in both cases were ordered removed after having been admitted to the United States. Immigration and Naturalization authorities could not locate a country amenable to receive the deportable aliens, so the aliens were detained indefinitely. Both aliens filed for habeas corpus relief under *28 U.S.C.S. § 2241*, which the Court held was proper for jurisdictional purposes. The issue before the Court was whether *8 U.S.C.S. § 1231(a)(6)* authorized the Attorney General, in his sole discretion, to detain a removable alien indefinitely beyond the 90-day removal period or only for a period reasonably necessary to secure the alien's removal. The Court interpreted *§ 1231(a)(6)* as containing an implicit "reasonable time" limitation of six months, the application of which was subject to federal court review. The civil confinement at issue was not limited, but potentially permanent. Also, the detention provision did not apply narrowly, but broadly to aliens ordered removed for many reasons, including tourist visa violations. Moreover, the sole procedural protections available to the alien were administrative proceedings where the alien bore the burden of proving he was not dangerous.

### Outcome

The Court vacated the decisions below and remanded both cases for further proceedings.

## LexisNexis® Headnotes

Immigration Law > Deportation & Removal > Administrative Proceedings > Bond, Custody & Detention



February 20, 2025

The Honorable Kristi Noem
Secretary of Homeland Security
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, DC 20528

The Honorable Pete Hegseth
Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301

The Honorable Marco Rubio
Secretary of State
U.S. State Department
2201 C Street, NW
Washington, DC 20520

Kimberly Gahan
Acting Principal Deputy General Counsel
U.S. Department of Defense
1600 Defense Pentagon
Washington, DC 20301

Admiral Alvin Holsey
Commander, U.S. Southern Command
9301 NW 33rd Street
Doral, FL 33172

Captain Mike Stephen
Commanding Officer, Naval Station Guantánamo Bay
PO Box 102
Jacksonville, FL 32212-0102

***Sent Via Email and USPS First Class Mail***

Dear Secretary Noem, Secretary Hegseth, Secretary Rubio, Ms. Gahan, Admiral Holsey, and Captain Stephen:

We are attorneys, who are members of the immigration and criminal defense bars and are experienced in the practice of immigration and criminal law, and we respectfully request immediate access to the noncitizens transferred to the U.S. Naval Base at Guantánamo Bay ("Guantánamo") from immigration detention inside the United States.

---

WWW.NOVO-LEGAL.COM

Kent I Local Office
19309 68th Ave S, Suite R-102, Kent, WA 98032
T: 206-212-0260  F: 206-212-0360

Denver I Headquarters
4280 Morrison Rd, Denver, CO 80219
T: 303-335-0250  F: 303-296-4586

Walla Walla I Local Office
22 E Poplar St, Suite 200, Walla Walla, WA 99362
T: 509-525-2034  F: 509-529-5482

Protected Material -- Subject to Protective Order

U-DOW-CAR-630

Since February 4, 2025, over 150 migrants have been transferred from immigration detention facilities in the United States to detention sites at Guantánamo. The US government has not provided any official information about how long these noncitizens will be detained at Guantánamo, whether they have access to communication with family, legal counsel, or anyone by phone or other methods, or what their immigration history is. While DHS asserts that the men transferred to Guantánamo have serious criminal histories and gang affiliations, recent reporting and statements by some of these men's family members raise doubts about these characterizations[1]. Secretary Noem stated that she would not rule out that migrants could stay at Guantánamo "indefinitely.[2]"

Secretary Noem has also assured the American public that "due process will be followed[3]" for the migrants detained at Guantánamo. Both the Fifth Amendment's guarantee of due process and the Immigration and Nationality Act (and its implementing regulations) provide a noncitizen's right to be represented by counsel, not at government expense, in removal proceedings and beyond. Such a right is meaningless without access to counsel.

---

[1] Department of Homeland Security, *PHOTO RELEASE: DHS Releases Images of the First Flight of Criminal Aliens to Guantanamo Bay*, February 4, 2025, available at: https://www.dhs.gov/news/2025/02/04/dhs-releases-images-first-flight-criminal-aliens-guantanamo-bay. CBS news has reported that internal DHS documents confirm that "low risk" noncitizens have also been transferred to Guantánamo. *See*, CBS, *U.S. sending nonviolent, "low-risk" migrants to Guantanamo, despite vow to detain "the worst" there*, February 12, 2025, available at: https://www.cbsnews.com/news/guantanamo-bay-migrants-trump/. Several family members of men pictured in photos released by DHS of migrants arriving at Guantánamo have spoken out, asserting that their relatives have no criminal history and, at least in one instance, entered the United States by making an appointment via the CBP One App. *See*, Migrant Insider, *Air Jordan Tattoo Prompts ICE to Send Venezuelan Migrant to Guantánamo Bay*, February 9, 2025, available at: https://migrantinsider.com/p/air-jordan-tattoo-prompts-ice-to; El Nacional, *«No pertenece al Tren de Aragua»: familia de venezolano detenido y enviado a Guantánamo dice que no tiene antecedentes ("He doesn't belong to Tren de Aragua": family of Venezuelan detained and sent to Guantanamo says he has no criminal record)*, February 11, 2025, available at: https://www.elnacional.com/mundo/habla-familia-de-venezolano-detenido-y-enviado-a-guantanamo/#google_vignette; Migrant Insider, *ICE Transfers Venezuelan Barber to Guantánamo (SCOOP)*, February 12, 2025, available at: https://migrantinsider.com/p/ice-transfers-venezuelan-barber-to; New York Times, *Family of Venezuelan Migrant sent to Guantánamo: 'My Brother Is Not a Criminal*," February 12, 2025, available at: https://www.nytimes.com/2025/02/11/world/americas/luis-castillo-venezuela-migrant-guantanamo-bay-trump.html.
[2] CNN, *State of the Union, "Not going to rule that out: Kristi Noem on migrants staying indefinitely at Guantánamo Bay,"*Feb 9, 2025, available at:
[3] NBC News, *Kristi Noem says 'due process will be followed' for migrants at Guantánamo Bay*, February 2, 2025, available at: https://www.nbcnews.com/politics/immigration/homeland-security-noem-due-process-migrants-Guantánamo-bay-rcna190330

Protected Material -- Subject to Protective Order

Moreover, ICE detention standards (both the performance-based national detention standards[4] that apply to dedicated ICE detention facilities and the national detention standards[5] that apply to shared use facilities) explicitly provide that individuals in ICE custody **shall** have meaningful access to counsel.

We respectfully request immediate access to the noncitizens detained at Guantánamo, including but not limited to free and confidential, unmonitored phone calls with each detainee, and prompt access to in-person visits with each detainee, including but not limited to the individuals listed in the pages appended to this letter as an addendum. We understand that certain noncitizens detained at Guantánamo, including those listed in the addendum, have previously been working with other attorneys and may still be represented by or planning to work with other attorneys. Several of the signatories below already have theater clearance at Guantánamo, based on their representation of law of war detainees, and should be granted initial access immediately while theater clearance for all other immigration counsel is pending.

We also request the name and immigration status of each noncitizen in immigration custody at Guantánamo who does not currently have an immigration attorney of record.

We assert that, aside from theater clearance, we do not require any further security clearance and are entitled to have access to the noncitizen detainees in immigration custody, as we would have if they were in immigration custody in the United States.

We are ready to submit Form 5512 for each of the undersigned to facilitate the theater clearance process. Please respond by Monday, February 24, 2025 as several dozen of the detainees have been held at Guantánamo since the first week of February without access to an immigration lawyer.

Please contact us at alma@novo-legal.com to advise us on next steps.

Sincerely,

Alma David, Esq.
Novo Legal Group

Bertha M. Rodriguez, Esq.
Law Office of Bertha M Rodriguez, PLLC

---

[4] U.S. Immigration and Customs Enforcement, *2011 Operations Manual ICE Performance-Based National Detention Standards*, available at: https://www.ice.gov/detain/detention-management/2011
[5] U.S. Immigration and Customs Enforcement, *2019 National Detention Standards for Non-Dedicated Facilities*, available at: https://www.ice.gov/detain/detention-management/2019

Protected Material -- Subject to Protective Order

U-DOW-CAR-632

Sarah B. Pitney, Esq.
Benach Collopy LLP

David Square
Law office of David H Square PLLC

Gwendolyn Starda
Starda Legal LLC

Marlen Romero Garcia, Esq.
Romero Immigration Law


Chelsea Mary Nowel
Dubrule & Nowel, PLLC

Kathleen M. Glynn, Senior Associate Attorney
Grob & Eirich, LLC

Afshan J Khan
Law Office of Afshan J Khan

Mac Nayeri, Esq.
Nayeri Law, Plc

Jennifer Mary Gillies, Esq.
Gillies Law, PLLC

Siana McLean, Partner
Richards and Jurusik

Sarah Owings, Partner
Owings MacNorlin LLC

Karen L. Hoffmann, Esq.
Ellenberg Law Group

Helen Parsonage
Elliot Morgan Parsonage PLLC

Protected Material — Subject to Protective Order

U-DOW-CAR-633

Sterling J. Santamaria
Law Office of Andrew L. Friedman, LLC

Cassandra Esteban Brusi
Samokhleb & Bitterman Law Group

SGT(r) Kevin Thomas O'Connor Jr.

Naomi Cruz, Esq.
Cruz and Villatoro Law

Jasmin Tohidi
Tohidi Law Office

Stephanie Marzouk, attorney
Marzouk Law LLC

Mailin Maldonado, Attorney
Maldonado-Zelaya Law Firm, PLLC

Magdalena Cuprys, Esq.
Serving Immigrants

Melissa Dominguez
Dominguez Law Firm, PLLC

Idi Melendez, Esq.
Chambers Law Firm

Sandy Restrepo
Colectiva Legal del Pueblo

Sharon Powell, Esq.
Powell Law PLLC

Andrea Chavarria
Chavarria Law Firm

Jose C. Campos, Esq.
The Campos Firm

Protected Material — Subject to Protective Order

U-DOW-CAR-634

Sherri Craig, Esq.
Sturgeon Immigration Law

Kathryn Blair Craddock
Attorney at Law (Texas Bar No. 04969850)

Stephanie Morales, Immigration Attorney
Morales Law PLLC

Jordan Calazan Manalastas, Esq.

Arianna Efstathiou, Esq.
DGO Legal

Janeita Lentz, Attorney At Law
Law Office of Janeita Lentz

Lily S. Axelrod, Attorney at Law
Axelrod Immigration Law

Corie O'Rourke, Esq.
CK Legal, PLLC

Aimee Carlsen
Carlsen Immigration PLLC

Morgan Woelke Esq.
Catterlin and Arnold Law Firm PLLC

Mayra Hernandez
Heilbrun Law Firm, PC

Natalia Vieira Santanna
Santanna Law Offices PC

Dawn A Garcia
Garcia Immigration Law PLLC

Protected Material — Subject to Protective Order

U-DOW-CAR-635

Lorilei Williams, Esq., Executive Director
Resilient Advocates Collective

Veronica Cardenas, Founder
Humanigration

Rev. Emily Kvalheim
Task Force on United Methodist Immigration Ministries of Ohio

Nicole True
Nicole True Law Firm PC

Tamber Hilton
Tamber Hilton Law, LLC

Erica B. Schommer, Clinical Professor of Law
St. Mary's University Immigration and Human Rights Clinic

Emily Leffler
Griffith Immigration Law

Hillary Walsh, Esquire
New Frontier Immigration Law

Lara NOCHOMOVITZ
LSN Legal LLC

Jennifer Scarborough - Immigration Attorney
Law Firm of Jennifer Scarborough

Jessica Wright, Esq.

Leslie Allen

Andrea Montavon-McKillip, Esq.
Montavon McKillip Law, P.A.

Barbara Zalewski-Zaragoza, Esq.
Law Office of Barbara Z. Zaragoza

Protected Material — Subject to Protective Order

U-DOW-CAR-636

Sheryl Hurst,
Hurst Immigration, PLLC

Kimberly Fasking, Esq.
Fasking Law

Alexandra Monroy

Tahmina Watson
Watson Immigration Law

Lisa Seifert
Seifert Law Offices

Robert Pauw
Gibbs Houston Pauw

Paula Arno Martinez, Attorney
Arno Martinez Law

Allison Ferber Miller, Attorney
Allison Ferber Miller

Melissa Campos
Avelar Immigration Law PLLC

Ahmad Yakzan, Immigration Attorney
American Dream Law office PLLC

Paige Gardner, Attorney
Gardner Immigration Law, P.C.

Brandon Roché
Roché Immigration

Jackie Pearce, Clinical Instructor & Supervising Attorney
CUNY School of Law, Immigrant & Non-Citizen Rights Clinic

Protected Material -- Subject to Protective Order

U-DOW-CAR-637

Daniel Cortes
Villanova CARES Clinic

Katherine Martell, Esq.
First Point Law Group, PC

Milton Toro Marquez, Attorney
Acevedo Law Firm

Nicole Nelson
NELSON SMITH LLP

Henry Rodriguez, Esq.
Passage Immigration Law

Nicolas Aguado, Esq
Aguado Immigration Firm

Briana Carlson
Calderon Seguin PLC

Ofelia Calderón, Partner
Calderón Seguin PLC

Philip Hornik
Black Helterline LLP

Laura Lindley-Gutierrez, JD, LLM
Andreeva & Gutierrez Law, LLC

McKenzie Harker, Attorney
Bennett & Harker Immigration Legal Services, LLC

Ilia C. Garrity Lopez, Esq.
Law Office of Ilia Garrity Lopez, PLLC

Blaine Bookey, Legal Director
Center for Gender & Refugee Studies

Protected Material – Subject to Protective Order

U-DOW-CAR-638

Rebecca Brunty Lee, Esq.
Immigration Legal Services

Shahzad Ahmed, Esq., B.C.S./Immigration
Brink Ahmed Immigration

Anthony Lee
LCSNW

Courtney D. Sommer

Claire R. Thomas, Assistant Professor of Law
New York Law School Legal Services, Inc.

Leticia A. Corona, Esq.
Bazzi Immigration Law, PLLC

Alexander Vernon, Assistant Professor, Director, Immigration Law Clinic
Detroit Mercy School of Law, Immigration Law Clinic

George N Miller
Dozier Miller Law Group

Julie Spahn Miller
Spahn Law Firm, PLLC

Hannah Sullivan
Hannah E Sullivan LLC

S. Hiller
Hiller Law Group

Sasha Westerman-Keuning
Rostova Westerman Law Group

Sheila Minihane, Immigration Counsel
Minihane Law P.C.

Derrick J. Hensley, Esq.
The Law Office of Derrick J. Hensley, PLLC

Protected Material - Subject to Protective Order

U-DOW-CAR-639

Derek White
Saturnia Solutions LLC

Amelia Wester, Associate Immigration Attorney
Blake Immigration Law

James C. Roberts
Catholic Charities of Oregon

Kjerstin Lewis

Nathan Bogart
Bogart, Small + Duell

Dennise Hernandez Gruber
Law office of Dennise H Gruber

Carol Anne Donohoe, Esquire

Kristen Coffey, Of Counsel
Panyard Holton Immigration, LLC

Bertha M Rodriguez, Esq
Bertha M. Rodriguez, Esq.

Candi Angeles
Immigration Attorney

Rina Gandhi
Murray Osorio PLLC

Vanessa Ann Gonzalez
The Law Office Vanessa A. Gonzalez PLLC

Matthew Engle
Donovan & Engle PLLC

Whitney Phelps, Managing Immigration Attorney
CLEAR Clinic

Protected Material — Subject to Protective Order

U-DOW-CAR-640

James G. Connell, III
Connell Law, LLC

Callie Killebrew, Attorney
Bend Immigration Group

Bernadette M. Donovan
Donovan & Engle, PLLC

Jennifer de Haro

Nicole Micheroni
Cameron Micheroni & Silvia LLC

Stephen Kirby
Kirby Law Office, PLLC

Kelsey Shamrell-Harrington, Managing Attorney
Entre Hermanos

Alycia Moss
Hawley Troxell

Jennifer Strang
Strang Immigration Law, LLC

Sarah Sherman-Stokes, Clinical Associate Professor
Boston University School of Law Immigrants' Rights and Human Trafficking Program

Jennifer Rotman
Immigrant Law Group

Rebecca O'Neill
Carolina Migrant Network

Carleigh Anable, Attorney
Law Offices of Anable and Rivera PC

Rachel T. Konrad, Esq.

Protected Material — Subject to Protective Order

U-DOW-CAR-641

Michelle Saenz-Rodriguez
Saenz-Rodriguez & Associates, P.C.

Carlos Moctezuma Garcia, Partner
Garcia & Garcia, Attorneys at Law

Yamira Acevedo
Yamira Acevedo Esq Law Office LLC

Protected Material — Subject to Protective Order

U-DOW-CAR-642

**Addendum: Names and other identifying information of detainees to whom the undersigned request access for legal visits**



Protected Material — Subject to Protective Order

U-DOW-CAR-643



Protected Material — Subject to Protective Order

U-DOW-CAR-644

UNCLASSIFIED // ~~CONTROLLED UNCLASSIFIED INFORMATION (CUI)~~
~~Protected Material – Subject to Protective Order~~

**SECRET NOFORN**

PAGE 1 OF 2

## JTF-GTMO DETENTION OF HIGH-THREAT ILLEGAL ALIENS ███████ (S)

**Originator:** JOINT STAFF J3 WASHINGTON DC

**TOR:** 02/04/2025 19:57:37

**DTG:** 041956Z Feb 25

**Prec:** Priority

**DAC:** General

**To:** CDR USSOUTHCOM MIAMI FL

**CC:** CDR USNORTHCOM PETERSON AFB CO, CMC WASHINGTON DC, CMC WASHINGTON DC, CNO WASHINGTON DC, HQDA CSA WASHINGTON DC, DHS OPERATIONS DIRECTORATE WASHINGTON DC, DHS OPERATIONS DIRECTORATE WASHINGTON DC, CJCS WASHINGTON DC, VCJCS WASHINGTON DC, CJCS DJS WASHINGTON DC, VCJCS VDJS WASHINGTON DC, JOINT STAFF DJ1 WASHINGTON DC, JOINT STAFF DJ2 WASHINGTON DC, JOINT STAFF DJ3 WASHINGTON DC, JOINT STAFF DJ5 WASHINGTON DC, JOINT STAFF DJ6 WASHINGTON DC, JOINT STAFF DJ7 WASHINGTON DC, JOINT STAFF DJ8 WASHINGTON DC, JOINT STAFF J4 WASHINGTON DC, JOINT STAFF J3 DEP-DIR ATHD WASHINGTON DC, JOINT STAFF J3 DEP-DIR GLOBAL OPS WASHINGTON DC, JOINT STAFF J3 DEP-DIR ISR WASHINGTON DC, JOINT STAFF J3 DEP-DIR REGIONAL OPS WASHINGTON DC, JOINT STAFF J3 DEP-DIR SPECIAL OPS WASHINGTON DC, JOINT STAFF J35 JFC WASHINGTON DC, JOINT STAFF J3 NMCC OPS WASHINGTON DC, JOINT STAFF J3 WASHINGTON DC

```
PAASZYUW RUEKJCS3280 0351957-SSSS--RUIPAAA.
ZNY SSSSS ZUI RUEWMCM7568 0351957
P R 041956Z FEB 25
FM JOINT STAFF J3 WASHINGTON DC
TO RUIDAAA/CDR USSOUTHCOM MIAMI FL
INFO RUIFAAA/CDR USNORTHCOM PETERSON AFB CO
RUIQAAA/CMC WASHINGTON DC
RUBWAAA/CMC WASHINGTON DC
RUOIBBB/CNO WASHINGTON DC
RUEADWD/HQDA CSA WASHINGTON DC
RUILAAA/DHS OPERATIONS DIRECTORATE WASHINGTON DC
RHEFHLC/DHS OPERATIONS DIRECTORATE WASHINGTON DC
RUEKJCS/CJCS WASHINGTON DC
RUEKJCS/VCJCS WASHINGTON DC
RUEKJCS/CJCS DJS WASHINGTON DC
RUEKJCS/VCJCS VDJS WASHINGTON DC
RUEKJCS/JOINT STAFF DJ1 WASHINGTON DC
RUEKJCS/JOINT STAFF DJ2 WASHINGTON DC
RUEKJCS/JOINT STAFF DJ3 WASHINGTON DC
RUEKJCS/JOINT STAFF DJ5 WASHINGTON DC
RUEKJCS/JOINT STAFF DJ6 WASHINGTON DC
RUEKJCS/JOINT STAFF DJ7 WASHINGTON DC
RUEKJCS/JOINT STAFF DJ8 WASHINGTON DC
RUEKJCS/JOINT STAFF J4 WASHINGTON DC
RUEKJCS/JOINT STAFF J3 DEP-DIR ATHD WASHINGTON DC
RUEKJCS/JOINT STAFF J3 DEP-DIR GLOBAL OPS WASHINGTON DC
RUIPAAA/JOINT STAFF J3 DEP-DIR ISR WASHINGTON DC
RUEKJCS/JOINT STAFF J3 DEP-DIR REGIONAL OPS WASHINGTON DC
RUEKJCS/JOINT STAFF J3 DEP-DIR SPECIAL OPS WASHINGTON DC
RUEKJCS/JOINT STAFF J35 JFC WASHINGTON DC
RUEKJCS/JOINT STAFF J3 NMCC OPS WASHINGTON DC
RUEKJCS/JOINT STAFF J3 WASHINGTON DC
BT
S E C R E T NOFORN
SUBJ/JTF-GTMO DETENTION OF HIGH-THREAT ILLEGAL ALIENS ███████
MSGID/GENADMIN/DJ-3//

REF/A/EMAIL/JS DJ3/03FEB2025//
REF/B/MEMO/CJCS/30JAN2025//
```

**SECRET NOFORN**

~~Protected Material – Subject to Protective Order~~
UNCLASSIFIED // ~~CONTROLLED UNCLASSIFIED INFORMATION (CUI)~~

UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)
Protected Material - Subject to Protective Order

**SECRET NOFORN**

PAGE 2 OF 2

REF/C/MEMO/SecDef/31JAN2025//

Reference (Ref) A is an email from the Joint Staff Director for Operations memorializing Secretary of Defense (SecDef) Verbal Orders of the Commanding Officer (VOCO) approval of a request for assistance from the Department of Homeland Security (DHS) in support of DHS and the President's Objectives as outlined in his Executive Order, "Declaring a National Emergency at the Southern Border". Ref B is a Chairman, Joint Chiefs of Staff (CJCS) memo recommending ██████████ for DHS to house high threat illegal aliens. Ref C is SecDef approval of recommendations in Ref B.//

GENTEXT/REMARKS/
1. ██████ Purpose. This message transmits SecDef approval to support flights of high-threat illegal aliens to Naval Station Guantanamo Bay under DHS custody ████████████ in accordance with Refs A-C, and in support of DHS.

2. ██████ DHS will maintain legal custody of all illegal aliens in transit to/from and at GTMO. DHS personnel in GTMO will be assisted by DOD personnel under DHS authority and supervision for all detention activities. As part of DoD's operation and control of the facility, DoD personnel will support DHS personnel, who will remain responsible for alien custody and supervision. 8 USC sec 1231(g) allows DHS to arrange appropriate places for detention. DHS assesses that GTMO is a "United States Government facility," and is therefore authorized as an appropriate place for detention of illegal aliens.

3. (U) Additional guidance will be forthcoming in a comprehensive SecDef-approved CJCS EXORD.

4. (U) The Joint Staff point of contact for this action is ████████ ██████ J-37 DDSO, ██████████████████████

Classified by: Alex Grynkewich, Lt Gen, USAF, DJ-3
Reason: 1.4 (A)
Declassify On: 042235Z Feb 50

BT
#3280

NNNN
Received from AUTODIN 041957Z Feb 25

**SECRET NOFORN**

Protected Material - Subject to Protective Order
UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)

U-DOW-CAR-647

UNCLASSIFIED // ~~CONTROLLED UNCLASSIFIED INFORMATION (CUI)~~
~~Protected Material - Subject to Protective Order~~



**CUI**

# Special Orders Book

## Forces in Support of USSOUTHCOM
(Guantanamo Bay Illegal Alien Holding Operations Center Capacity)

## Forces in Support of USNORTHCOM
(California Wildfire Support)

31 January 2025

**CUI**

Prepared by the Joint Operations Division,
GFM, J-3, The Joint Staff
Please return after use
(call ▮▮▮▮▮ for pick-up) or hold until the
next book and exchange

JS-250123-XRKH

~~Protected Material - Subject to Protective Order~~
UNCLASSIFIED // ~~CONTROLLED UNCLASSIFIED INFORMATION (CUI)~~

U-DOW-CAR-658

UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)

Protected Material - Subject to Protective Order

CUI

# 31 January 2025 Special SDOB
## Table of Contents

Summary. This Secretary of Defense (SecDef) Orders Book (SDOB) includes two force allocation tabs that require SecDef approval.

1. __Forces in Support of USSOUTHCOM (Guantanamo Bay Migrant Operations Center Capacity)__. Seek SecDef decision to deploy personnel to expand the Migrant Operations Center capacity, in support of the Department of Homeland Security (DHS), at Naval Station Guantanamo Bay, Cuba.

2. __Forces in Support of USNORTHCOM (California Wildfire Support)__. Seek SecDef approval to DoD personnel and equipment to support Federal Emergency Management Agency during the California Wildfire clean up and recovery in the USNORTHCOM AOR.

| Agency | Name | Status | Date |
|---|---|---|---|
| Deputy USD (P) | Ms. Dory | *Concur w/ Comment | 31 Jan 25 |
| USD (P&R) | Mr. Selnick | Concur | 31 Jan 25 |
| USD (I&S) | Mr. Gard-Weiss | Concur | 31 Jan 25 |
| DoD GC | Mr. Young III | No Legal Objection | 31 Jan 25 |

*USD (P): Regarding the Forces in Support of USSOUTHCOM (Guantanamo Bay Illegal Alien Holding Operations) tab, Policy highlights that INDOPACOM will be decremented 25 of 252 military personnel associated with a Naval Mobile Construction Battalion deploying to Guam in support of critical warfighting projects for the Defense of Guam. If you approve the tab, Policy recommends that USINDOPACOM provide the impacts of this reallocation and that Joint Staff identify a longer-term sourcing solution ahead of the July 31, 2025 end date. Finding skilled labor for construction projects is most acute in the INDOPACOM AOR and could have downstream impacts on our ability to build our warfighting posture.

_Great point._

JS-250123-XRKH                          A001 Page 3 of 9                          CUI

Protected Material - Subject to Protective Order

UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)

U-DOW-CAR-659

UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)
Protected Material - Subject to Protective Order

CUI

## FY 2025 GFM Allocation Plan Mod 13e

# Forces in Support of USSOUTHCOM
## (Guantanamo Bay Illegal Alien Holding Operations Center Capacity)

❑ **Problem Statement.** How does the DoD support the "Expanding Migrant Operations Center at Naval Station Guantanamo Bay (NSGB) to Full Capacity" Executive Order, directing the DoD to prepare NSGB to full capacity for illegal alien holding?

❑ **Facts Bearing on the Problem.**
    1. Background.
- On 20 January 2025, the President of the United States (POTUS) declared a national emergency on the Southwest Border and said "it is necessary for the Armed Forces to take all appropriate action to assist the Department of Homeland Security in obtaining full operational control of the southern border." Nothing in that declaration impaired or otherwise impacted the authority granted by law to an executive department or agency; and was directed to be implemented consistent with applicable law and available appropriations.
- On 29 January 2025, POTUS directed the SecDef and Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at NSGB to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States.
- On 30 January 2025, CDRUSSOUTHCOM submitted a request for forces in support of illegal alien DHS holding and removal capacity at NSGB, Cuba.
- On 31 January 2025, SecDef deployed 1x O-6 Level Headquarters, 2x Rifle Companies, and a Contracting Team in support of expanding Migrant Operations Center capacity.
- This is the second allocation set of several requested force elements to allow CDRUSOUTHCOM to prepare for illegal alien holding operations at NSGB, Cuba.
- Any use of NSGB to detain aliens currently in the United States, and attendant DoD support to such detention, will be submitted for Secretary of Defense approval separately from this action and following receipt of a request for assistance from DHS.

❑ **Plan Under Review.**

| Phase 1 | | | | | | |
|---|---|---|---|---|---|---|
| **Capability** | **Action** | **LAD** | **End Date (Duration)** | **Pax** | **Sourcing** | **Justification** |
| Brigade Support Battalion | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 100 AC | USA | Task (T): Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. Purpose (P): Provide logistical support. |
| Military Police Battalion HDD and 1x Company | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 200 AC | USA | T: Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. P: Provide force protection and general purpose labor to migrant operations center. |
| Inland Cargo Transfer Platoon | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 60 AC | USA | T: Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. P: Provide material handing equipment support. |
| 2x Quartermaster Field Feeding Teams | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 30 AC | USA | Task (T): Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. Purpose (P): Provide field feeding support at NSGB. |
| 1x Medical Company (Area Support) | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 75 AC | USA | Task (T): Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. Purpose (P): Provide ROLE 1 medical support. |
| 1x Veterinary Service Support Team | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 7 AC | USA | Task (T): Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. Purpose (P): Provide support to working animals at deployment sites. |
| 1x Preventive Medicine Detachment | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 13 AC | USA | Task (T): Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. Purpose (P): Provide environmental health surveillance. |
| 1x Naval Mobile Construction Battalion (NMCB) Advance Party | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 25 AC | USN | Task (T): Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. Purpose (P): Establish initial C2, logistics, and admin prior to NMCB arrival. |

JS-250123-XRKH

CUI

Protected Material - Subject to Protective Order
UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)

UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)

Protected Material – Subject to Protective Order

CUI

## FY 2025 GFM Allocation Plan Mod 13e

# Forces in Support of USSOUTHCOM
## (Guantanamo Bay Illegal Alien Holding Operations Center Capacity)

❏ **Plan Under Review Continued.**

| Capability | Action | LAD | End Date (Duration) | Pax | Sourcing | Justification |
|---|---|---|---|---|---|---|
| Interpreters | Deploy | EAL 1 Feb 25 | 31 Jul 25 (180 days) | 7 AC | USN | T: Deploy to NSGB, Cuba in support of SOUTHCOM and DHS. |
| | | | | 9 AC | USA | P: Provide interpreter support for personnel holding at NSGB. |
| | | | | 9 CIV | | |

❏ **Funding Summary.** The Joint Staff estimates an incremental cost of $34.5 M in support of USSOUTHCOM. The Military Departments will fund all costs of operations conducted.

❏ **Public Affairs (PA) Guidance.**
- **Messaging Guidance:** Following President Trump's Executive Order "Protecting the American People Against Invasion" and in accordance with the memorandum for the Secretary of Defense and the Secretary of Homeland Security on "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," DoD continues to fill critical capability gaps, such as logistical support, transportation, and supply chain support.
- **Deployment:** PA posture is active upon direction and in coordination with supporting CCMDs, OSD(PA), OUSD Policy, and Joint Staff PA. Initial responses to media queries will be drafted by OSD(PA) and coordinated as required, with proposed responses on further operational details led by USSOUTHCOM PA in coordination with supporting CCMDs, OSD(PA), Joint Staff PA, and OUSD Policy.

❏ **Staffing Issues and Risk.**
- USSOUTHCOM concurs to the CJCS recommendation.
- USINDOPACOM concurs to the CJCS recommendation.
  - This allocation reduces a Serviced Retained 0.5 Battalion (BN) by 25 of 252 personnel deploying to Guam from 10 March 2025 through 22 September 2025. This 0.5 BN is supporting construction projects for Defense of Guam, maintaining a preposition stock, and with detachments across the AOR.
  - USINDOPACOM retains an assigned 1.0 BN (505x personnel) in Okinawa, Japan.
- USA concurs to the CJCS recommendation.
- USN concurs to the CJCS recommendation.

❏ **CJCS Recommendation.**
- Order the deployment of the following 9x force elements (535x personnel) from 2 February 2025 through 31 July 2025 (180 days)

| | | | |
|---|---|---|---|
| Brigade Support Battalion | Military Police Battalion | Inland Cargo Transfer Platoon | 2x Quartermaster Field Feeding Teams |
| 1x Medical Company (Area Support) | 1x Veterinary Service Support Team | Interpreters | 1x Preventative Medicine Detachment |
| 1x Naval Mobile Construction Battalion (NMCB) Advance Party | | | |

- The 30 January 2025 Special SDOB allocated 2x USMC Rifle Companies. The sourcing solution, 1st Battalion 6th Marines, currently has a deploy to dwell ratio of 1:1.2 based on a recent deployment to EUCOM with 26th MEU (BATAAN ARG/MEU).
  - In accordance with the authority in Department of Defense Directive 5124.02 and the August 16, 2021, Directive-type Memorandum 21-005 "Deployment-to-Dwell, Mobilization-to-Dwell Policy Revision," active component individuals require SecDef approval to deploy with a D2D ratio of less than 1:2.
  - Deploy personnel from 1st Battalion / 6th Marines at a D2D at 1:1.2.

- Any use of NSGB to hold aliens currently in the United States, and attendant DoD support to such holding, will be submitted for Secretary of Defense approval separately from this action and following receipt of a request for assistance from DHS.

- Internal force rotations authorized.

| CJCS Reviewed | SecDef Approved _PBG_ | Date 31 JAN 25 |
|---|---|---|
| | Disapproved | |

JS-250123-XRKH

CUI

A001 Page 6 of 9

B-001 Page 8 of 11

Protected Material – Subject to Protective Order

UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)

U-DOW-CAR-661

UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)

Protected Material - Subject to Protective Order



Protected Material - Subject to Protective Order

UNCLASSIFIED // CONTROLLED UNCLASSIFIED INFORMATION (CUI)

U-DOW-CAR-662



# DoD Instruction 4515.13

# Air Transportation Eligibility

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Acquisition and Sustainment |
| **Effective:** | January 22, 2016 |
| **Change 7 Effective:** | January 11, 2024 |
| **Releasability:** | Cleared for public release. Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Reissues:** | DoD 4515.13-R, "Air Transportation Eligibility," November 1, 1994, as amended |
| **Approved by:** | Frank Kendall, Under Secretary of Defense for Acquisition, Technology, and Logistics |
| **Change 7 Approved by:** | William A. LaPlante, Under Secretary of Defense for Acquisition and Sustainment |

**Purpose:** In accordance with the authority in DoD Directive (DoDD) 5135.02, this issuance:

• Implements policies for the eligibility of passengers, cargo, and human remains for transportation on DoD aircraft.

• Provides policies and assigns responsibilities for the transportation of DoD-sponsored passengers, cargo, and human remains in accordance with DoDDs 4500.09 and 4500.56 and DoD Instruction (DoDI) 4500.57.

• Establishes and provides implementing policies for the space-available travel program.

DHS-0000001

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ................................................................ 5
    1.1. Applicability. ............................................................................................................ 5
    1.2. Scope. ...................................................................................................................... 5
    1.3. Policy. ..................................................................................................................... 6
    1.4. Summary of Change 7. ............................................................................................ 7
SECTION 2: RESPONSIBILITIES ........................................................................................ 8
    2.1. Assistant Secretary of Defense for Sustainment. ..................................................... 8
    2.2. Assistant to the Secretary of Defense for Public Affairs (ATSD(PA)). .................... 8
    2.3. Under Secretary of Defense (Comptroller)/Chief Financial Officer, Department of
        Defense. ................................................................................................................... 8
    2.4. Assistant Secretary of Defense for Strategy, Plans and Capabilities. ........................ 8
    2.5. DoD Component Heads. ........................................................................................... 9
    2.6. Secretary of the Air Force. ....................................................................................... 9
    2.7. Secretary of the Navy. ............................................................................................. 9
    2.8. Combatant Commanders (CCDRs). .......................................................................... 9
    2.9. Commander, United States Transportation Command (CDRUSTRANSCOM). .......... 9
    2.10. Executive Secretary of the Department of Defense. ................................................. 10
SECTION 3: SPACE-REQUIRED PASSENGER TRANSPORTATION .......................................... 11
    3.1. General. ................................................................................................................... 11
    3.2. Firearms and Ammunition. ....................................................................................... 11
    3.3. Baggage Allowances. .............................................................................................. 11
    3.4. Transportation of Minors. ........................................................................................ 12
    3.5. Emergency Leave Travel. ......................................................................................... 13
    3.6. Eligible Space-required Passengers. ......................................................................... 13
    3.7. Documentation Requirements. .................................................................................. 22
    3.8. Priority of Movement. .............................................................................................. 23
    3.9. Travel Entitlements for Emergencies. ....................................................................... 23
SECTION 4: SPACE-AVAILABLE PASSENGER TRANSPORTATION ........................................ 28
    4.1. General. ................................................................................................................... 28
    4.2. Baggage Allowances. .............................................................................................. 29
    4.3. Transportation of Minors. ........................................................................................ 29
    4.4. Leave or Pass Status and Wounded Warrior Travel. ................................................. 30
    4.5. Travel in Conjunction with Space-required Travel. ................................................... 30
    4.6. Travel to Restricted, All Others, and Unaccompanied Tour Areas. ............................ 30
    4.7. Registers and Sign-up Procedures. ........................................................................... 31
    4.8. Documentation Requirements and Eligibility. ........................................................... 31
    4.9. Dependent Travel. .................................................................................................... 35
    4.10. Unfunded EML Travel. ........................................................................................... 37
    4.11. Eligible Space-available Travelers, Priorities, and Approved Geographical Travel
         Segments. ............................................................................................................... 37
SECTION 5: PATIENT MOVEMENT (PM) .......................................................................... 46
    5.1. General. ................................................................................................................... 46
    5.2. PM Eligibility. ......................................................................................................... 46

DHS-0000002

5.3.  Nonmedical Attendants...........................................................................................46
5.4.  Other Government-sponsored Patients. ...................................................................47
5.5.  Patients of Other USG Agencies.............................................................................47
SECTION 6:  CARGO TRANSPORTATION ELIGIBILITY ................................................................48
6.1.  General....................................................................................................................48
6.2.  Cargo Preparation Requirements.............................................................................48
6.3.  Reimbursable Transportation..................................................................................48
SECTION 7:  TRANSPORTATION OF HUMAN REMAINS...............................................................49
7.1.  Eligibility. ..............................................................................................................49
7.2.  Escorts and Honor Guards. .....................................................................................49
SECTION 8:  ORIENTATION FLIGHTS AND PUBLIC AFFAIRS TRANSPORTATION ......................50
8.1.  Orientation Flights. .................................................................................................50
8.2.  Public Affairs Transportation. ................................................................................51
SECTION 9:  SUPPORT TO FOREIGN GOVERNMENTS AND INTERNATIONAL ORGANIZATIONS ..........53
9.1.  General....................................................................................................................53
9.2.  Eligibility. ..............................................................................................................53
9.3.  Transportation in Support of Exercises...................................................................54
9.4.  Transportation Authorization Documentation. .......................................................54
SECTION 10:  SERVICE ANIMALS, PETS, AND OTHER ANIMALS..............................................56
10.1.  Service Animals. ...................................................................................................56
10.2.  Pets........................................................................................................................60
10.3.  Other Animals. ......................................................................................................60
SECTION 11:  REIMBURSEMENT AND BILLING.........................................................................61
11.1.  General..................................................................................................................61
11.2.  Categories of Traffic.............................................................................................61
11.3.  Reimbursement.....................................................................................................62
11.4.  Tariffs...................................................................................................................63
SECTION 12:  APPROVAL AUTHORITIES..................................................................................65
12.1.  General..................................................................................................................65
12.2.  Approving Authority Actions. ..............................................................................65
12.3.  Approval Authorities. ...........................................................................................66
GLOSSARY ..............................................................................................................................71
G.1.  Acronyms. .............................................................................................................71
G.2.  Definitions.............................................................................................................72
REFERENCES ...........................................................................................................................76


TABLES

Table 1.  Travel Entitlement for Emergencies Codes ..................................................................23
Table 2.  Travel Entitlements for Emergencies ..........................................................................24
Table 3.  Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel
Segments ...................................................................................................................................38
Table 4.  Approval Authorities ..................................................................................................66

DHS-0000003

FIGURE

Figure 1.  Example Statement of Assurance.................................................................................. 59

TABLE OF CONTENTS                                                                                     4

DHS-0000004

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## SECTION 1: GENERAL ISSUANCE INFORMATION

**1.1. APPLICABILITY.** This issuance:

a. Applies to:

(1) OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff (CJCS) and the Joint Staff , the Combatant Commands (CCMDs), the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this issuance as the "DoD Components").

(2) The Commissioned Corps of the Public Health Service, under agreement with the Department of Health and Human Services and the Commissioned Corps of the National Oceanic and Atmospheric Administration, under agreement with the Department of Commerce.

b. Does **not** apply to:

(1) The eligibility of passengers, cargo, and human remains for transportation on aircraft while in use by or in support of the President or Vice President. The approval authority for airlift on rotary-wing and tilt rotary-wing aircraft is the Military Service or DoD Component that owns the asset, funds the mission, and provides the aircrew. Such requests for transportation on Military Service-owned rotary-wing or tilt rotary-wing aircraft do not require OSD approval.

(2) DoD personnel traveling on foreign military aircraft. Refer to DoDD 5030.61.

c. If this issuance conflicts with the Joint Travel Regulations (JTR), the JTR, as applicable, takes precedence.

**1.2. SCOPE.** Specific policies for operational support airlift (OSA) are located in DoDI 4500.43. Policies on the use of government aircraft and air travel are located in DoDD 4500.56. Policies on administrative use of motor vehicles are located in DoDI 4500.36. Policies on air passenger management and safety and quality control of civil air carriers are located in DoDI 4500.53. In addition, the issuance concerns:

a. All civil aircraft chartered by or on behalf of the DoD to provide passenger transportation, when the DoD is responsible for manifesting passengers.

b. DoD aircraft operated in a common-user airlift service, to include U.S. Air Force Air Mobility Command (AMC) organic aircraft; OSA; theater-assigned organic aircraft; and other Service-owned aircraft when operated under a common-user role.

c. Any DoD aircraft when one or more passengers are civilians (including DoD and non-DoD civilian employees, couriers, travelers on public affairs events, dependents, defense contractor personnel, and retirees) who are not part of the crew or on board the aircraft for operational support purposes.

DHS-0000005

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

1.3. POLICY.

a. DoD transportation resources will be used only to accomplish DoD and approved interagency missions. In accordance with DoDD 4500.09, commercial transportation resources will be used to the maximum extent practicable, provided requirements for security, communications, and schedules can be satisfied.

b. Transportation of passengers, cargo, and human remains on DoD aircraft will comply with applicable laws and regulations.

c. Passengers traveling on DoD-owned and contracted aircraft will be screened before boarding the aircraft in compliance with U.S. entry and exit requirements specified in Defense Transportation Regulation (DTR) 4500.9-R. Individuals not cleared to travel will not board the aircraft.

d. In accordance with the policies in DoDD 4500.09 and Section 41113 of Title 49, United States Code (U.S.C.), passenger manifesting systems and procedures must collect certain identifying information, including the emergency contact information called for in Part 243 of Title 14, Code of Federal Regulations (CFR). DTR 4500.9-R contains specific passenger manifesting systems information and data collection requirements.

e. All personnel must ensure that the policies and procedures in this issuance are implemented to protect the privacy of individuals in the collection, use, maintenance, and dissemination of personally identifiable information. All records containing personally identifiable information gathered from individuals using the Defense Transportation System will be maintained by manifesting systems and storage programs, and will be accounted for in a Privacy Act system of records, pursuant to Section 552a of Title 5, U.S.C. and DoDI 5400.11.

f. Passengers on DoD or DoD-contracted aircraft may be denied boarding or transportation if they are unruly; under the influence of alcohol or narcotics or other drugs that may create a hazard to the safety of the aircraft or passengers; or a disruptive influence.

g. DoD aircrew and passenger terminal personnel will make every effort to assist passengers with disabilities.

h. Aircraft not designed or normally configured for passenger (non-aircrew personnel) transportation will not be used for passenger travel. Exceptions to this policy are passengers who originate and terminate in the same airfield for the purpose of an orientation flight prescribed in Section 8 of this issuance and non-aircrew personnel assigned to perform duties on a particular aircraft.

i. DoD-funded air transportation will not be used for the movement of goods donated to the DoD. Exceptions include cargo moved in accordance with Sections 401, 402, 404, and 2561 of Title 10, U.S.C. and as otherwise noted in Section 12 of this issuance.

j. Transportation and reimbursement requests for transportation provided to other executive agencies of the U.S. Government (USG) will be provided in accordance with Section 1535 of Title 31, U.S.C. and DoD 7000.14-R.

DHS-0000006

k.  Space-available passenger transportation will be extended to:

(1)  Uniformed services members and their dependents as an avenue of relief from the demands of duty and prolonged service.

(2)  Retired uniformed services members and their families in recognition of their career of duty and eligibility for recall to active duty.

(3)  Other designated individuals, on a limited basis, for their direct service to uniformed services members and their families.

l.  Before travel aboard aircraft operated by an activity not financed through the Transportation Working Capital Fund (TWCF), DD Form 1381, "Air Transportation Agreement," will be executed by non-DoD personnel traveling pursuant to the guidelines contained in this issuance when their flight originates in a foreign country.  Sponsors will execute DD Form 1381 for minor dependents or individuals incapable of signing for themselves. North Atlantic Treaty Organization personnel traveling in performance of official duties are exempt from this requirement.  An electronic version of the form is available on the DoD Forms Management Program website at https://www.esd.whs.mil/DD/.

m.  Congressional and public affairs transportation may be provided in accordance with DoDD 4515.12 and DoDI 5122.08.

## 1.4.  SUMMARY OF CHANGE 7.  This change:

a.  Deletes responsibilities to align with the updated charter directive for the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict and establishes responsibilities for the Assistant Secretary of Defense for Strategy, Plans, and Capabilities regarding the transportation of foreign disaster relief cargo.

b.  Updates procedures for transportation of foreign disaster relief cargo and non-government-owned cargo consistent with Defense Security Cooperation Agency (DSCA) Manual 5105.38-M.

c.  Updates references and makes other administrative changes for currency and accuracy.

DHS-0000007

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## SECTION 2: RESPONSIBILITIES

**2.1. ASSISTANT SECRETARY OF DEFENSE FOR SUSTAINMENT.** Under the authority, direction, and control of the Under Secretary of Defense for Acquisition and Sustainment and in accordance with DoDD 5134.12, the Assistant Secretary of Defense for Sustainment:

a. Develops policies and prescribes guidance for the transportation of passengers, cargo, and human remains on DoD aircraft.

b. Communicates with other USG agencies and industry officials on processes and procedures for the use of DoD aircraft.

**2.2. ASSISTANT TO THE SECRETARY OF DEFENSE FOR PUBLIC AFFAIRS (ATSD(PA)).** The ATSD(PA):

a. In accordance with DoDI 5122.08, approves transportation for public affairs purposes aboard DoD aircraft arranged by any DoD Component or at the request of another Federal department, agency, or foreign government.

b. Reviews and authorizes requests for non-local public affairs travel.

**2.3. UNDER SECRETARY OF DEFENSE (COMPTROLLER)/CHIEF FINANCIAL OFFICER, DEPARTMENT OF DEFENSE.** The Under Secretary of Defense (Comptroller)/Chief Financial Officer, Department of Defense develops and maintains financial management procedures for billing and reimbursement for transportation services.

**2.4. ASSISTANT SECRETARY OF DEFENSE FOR STRATEGY, PLANS AND CAPABILITIES.**

Under the authority, direction, and control of the Under Secretary of Defense for Policy, the Assistant Secretary of Defense for Strategy, Plans and Capabilities coordinates with the CJCS on transportation requirements for foreign disaster relief and humanitarian assistance.

DHS-0000008

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

**2.5. DOD COMPONENT HEADS.** The DoD Component heads:

a. Ensure DoD Component publications, memoranda, and concept plans are in full compliance with this issuance and with the procedures in DTR 4500.9-R, DoDD 4500.09, DoDD 4500.56, and DoDI 4500.57.

b. Establish procedures for the transportation of passengers, cargo, and human remains on DoD aircraft under their control, which are consistent with this issuance and the procedures in DTR 4500.9-R, DoDD 4500.56, and DoDI 4500.57.

c. Ensure their Component commanders and personnel at all levels prevent the misuse of DoD airlift assets as well as the perception of their misuse.

**2.6. SECRETARY OF THE AIR FORCE.** In addition to the responsibilities in Paragraph 2.5., the Secretary of the Air Force is responsible for all matters pertaining to special airlift mission aircraft assigned to the 89th Airlift Wing.

**2.7. SECRETARY OF THE NAVY.** In addition to the responsibilities in Paragraph 2.5., the Secretary of the Navy sponsors transportation requirements of the United States Coast Guard (USCG) when USCG units are assigned to the Department of the Navy.

**2.8. COMBATANT COMMANDERS (CCDRS).** In addition to the responsibilities in Paragraph 2.5., within their areas of responsibility (AORs), the CCDRs:

a. Establish procedures and approve transportation of non-DoD personnel on DoD aircraft under their control and when the CCDRs determine travel is in the best interests of their commands and the DoD.

b. Approve use of DoD aircraft under their control by individuals other than news media representatives for non-local travel for public affairs purposes. This authority may be further delegated, in writing, not below the two-star or civilian-equivalent level within their commands.

c. Approve requests for transportation in support of counterdrug operations for law enforcement agency personnel, in accordance with CJCS Instruction 3710.01.

d. Publish guidance, in accordance with DoDI 1327.06, regarding the availability and authorization to use space-available and environmental morale leave (EML). Guidance must be consistent with this issuance.

**2.9. COMMANDER, UNITED STATES TRANSPORTATION COMMAND (CDRUSTRANSCOM).** In addition to the responsibilities in Paragraphs 2.5. and 2.8. and in accordance with DoDI 5158.06, the CDRUSTRANSCOM:

a. Accepts passengers, cargo, and human remains for transportation as authorized in this issuance and DoDD 4500.54E.

SECTION 2: RESPONSIBILITIES                                                            9

DHS-0000009

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

b. Updates and maintains DTR 4500.9-R to include guidance and instructions to support policies and procedures in this issuance for the transportation of passengers, cargo, and human remains.

c. Provides users of the Defense Transportation System with rates for the transportation of passengers, cargo, and human remains covered by this issuance.

d. Annually, in March, collects and provides the Deputy Assistant Secretary of Defense for Logistics space-available movement data, including the number of passengers, moved from AMC passenger terminals.

2.10. **EXECUTIVE SECRETARY OF THE DEPARTMENT OF DEFENSE.** The Executive Secretary of the Department of Defense approves transportation of:

a. Foreign officials invited by officials of the OSD, the Defense Agencies, or the DoD Field Activities.

b. Official travel for individuals of the OSD organizations.

c. Official and unofficial travel for individuals and family members of the OSD organizations administratively supported by OSD.

d. All other requests as delegated by the Secretary of Defense.

DHS-0000010

## SECTION 3: SPACE-REQUIRED PASSENGER TRANSPORTATION

**3.1. GENERAL.** The passengers listed in this section are eligible for space-required transportation on DoD aircraft under the conditions cited. Passenger service personnel will deny transportation when an order or authorization for movement is neither authorized by this issuance nor approved according to the policies in this issuance. The requirement to wear uniforms by uniformed services members on active duty and members of the Reserve Components (RC) not on active duty is governed by the regulations of the Military Department concerned and DoDD 4500.54E. When civilian clothing is worn, it should be accepted attire in the overseas country of departure, transit, or destination.

a. **Pregnant Passengers.** Pregnant women may be transported through 34 weeks of gestation unless medically inadvisable. Women fewer than 6 weeks postpartum and infants under 6 weeks old may be accepted for transportation if considered medically sound and so certified in writing by a responsible medical officer or civilian physician. In an evacuation authorizing space-required travel (e.g., the ordered or authorized departure of noncombatants), pregnant women beyond the 34th week of gestation may be accepted for air transportation if considered medically sound and certified in writing by a responsible medical officer or civilian physician.

b. **Disabled Passengers.** Every effort will be made to transport passengers with disabilities who are otherwise eligible to travel. Passenger service personnel and aircraft crewmembers will provide assistance in boarding, seating, and deplaning a disabled passenger. The chief of the passenger travel section or the aircraft commander may disapprove transportation if there is an unacceptable risk to the safety or health of the disabled passenger, other passengers, or crew, or if operational necessity, equipment, or manpower limitations preclude accepting a disabled passenger, service animal, or mobility assistance device. The aircraft commander is the final approval authority on all matters relating to flight safety.

**3.2. FIREARMS AND AMMUNITION.** DTR 4500.9-R contains procedures for transporting firearms and small arms ammunition on DoD aircraft.

**3.3. BAGGAGE ALLOWANCES.**

a. **Checked Baggage Allowance.** Passengers are authorized two pieces of checked baggage. Each passenger also may hand-carry one article (e.g., small luggage, garment bags, backpack) and one personal item (e.g., cosmetic case, purse, small boxes, packages) for storage in the passenger cabin area. Checked baggage may not exceed 62 linear inches (length plus width plus height) or 70 pounds for each piece. Carry-on baggage must fit under the seat and may not exceed 45 linear inches. Any duffel bag, sea bag, B-4 bag, flyers kit bag, or diver's traveling bag that exceeds 62 linear inches but does not exceed 100 pounds may be substituted for one of the checked baggage items.

DHS-0000011

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

b. **Authorized Excess Baggage Allowance.** When authorized by Military Service regulations, an individual's orders may include an excess baggage allowance, stated by number of pieces and not by weight. To determine the number of pieces necessary, use an estimate of 70 pounds for each piece of baggage and round to the next highest whole piece to determine the number of pieces necessary. For example, if 100-pounds excess is needed, then two pieces of excess baggage are authorized.

c. **Unauthorized Excess Baggage.** Baggage that exceeds the normal allowance without proper authorization may be accepted for shipment at the discretion of a passenger service representative, subject to the capacity of the mission to support excess baggage. When baggage in excess of that capacity is refused for transportation, the owner is responsible for disposition of unauthorized baggage not accepted for shipment.

d. **Excess Baggage Fees.** Excess baggage fees will not be charged for space-required passengers traveling on DoD organic airlift when authorized by contingency, exercise, or deployment orders. Unauthorized excess baggage will not displace space-required passengers or cargo. Excess baggage fees may be levied if the traveler connects with commercial aircraft.

e. **Baggage Allowance Restriction.** To maximize seat availability, terminal personnel may further restrict passenger baggage allowances.

**3.4. TRANSPORTATION OF MINORS.** Except as noted in this issuance, minors must be accompanied by a parent or legal guardian at all times when traveling on DoD aircraft. A power of attorney or other non-judicial document which has not been issued or approved by a court will not be accepted as proof of legal guardianship or responsibility for a minor, except as noted in Paragraph 3.4.a.

a. A document signed by a court or a notarized power of attorney that is signed by one or both of the child's parents that designate an individual as having responsibility for the minor is acceptable during the ordered departure of noncombatants from a foreign area.

b. Minors between the ages of 10 and 18 years old as of the date of travel will be accepted for unaccompanied space-required travel on AMC Patriot Express missions performed by DoD chartered aircraft, if they meet the criteria in Volume 2 of Air Force Instruction 24-605. The minor must be accompanied to the AMC terminal or gateway by a parent, legal guardian, or responsible adult who will remain with the child until departure and provide evidence that the child will be met at the airport of arrival by a parent, legal guardian, or responsible adult. Minors under the age of 10 are not permitted to travel unaccompanied.

(1) The air carrier contractor is responsible for the care of unaccompanied minors during the flight, including any technical stops and any delay which occurs after boarding.

(2) The air carrier contractor will accept unaccompanied minors only for travel on non-stop or direct flights (i.e., a flight that makes a stop without a plane change). No unaccompanied minors will be permitted to travel on flights scheduled to remain overnight at any en-route location.

DHS-0000012

**3.5. EMERGENCY LEAVE TRAVEL.** Emergency leave travelers may receive options depending on their entitlements or privileges contained in the JTR or this issuance, including:

a. Government-funded transportation on DoD aircraft.

b. Government-funded commercial transportation when DoD aircraft are not reasonably available.

c. Member-funded (space-required) transportation on DoD aircraft or commercial aircraft when there is no entitlement for government-funded travel in the JTR.

d. Space-available unfunded travel aboard DoD aircraft.

**3.6. ELIGIBLE SPACE-REQUIRED PASSENGERS.** The following individuals are eligible for space required transportation on DoD aircraft in accordance with this issuance and the JTR. Unless otherwise stated, transportation on aircraft funded by the TWCF is chargeable to the DoD Component concerned at the USG DoD rate tariff.

a. **Uniformed Services Members.**

(1) Service members on active duty traveling under official permanent change of station (PCS), temporary duty (TDY), or temporary additional duty (TAD) orders.

(2) Uniformed services members on funded emergency leave pursuant to DoDI 1327.06 and the leave regulations of their respective Departments. In these instances, government-funded round-trip travel is permitted in accordance with Table 2.

(3) RC Service members, when traveling to perform inactive duty for training or active duty for training, with or without pay.

(4) Uniformed services members traveling with leave taken between consecutive assignments outside the continental United States (OCONUS), in accordance with the JTR.

(5) Active duty uniformed services members on rest and recuperation or liberty pass, in accordance with DoDI 1327.06.

(6) Uniformed services members and their dependents on funded environmental morale leave (FEML).

(7) Cadets and midshipmen of the U.S. military academies traveling on TDY or TAD orders.

(8) U.S. Public Health Service commissioned officers and National Oceanic and Atmospheric Administration Commissioned Officer Corps officers traveling on TDY or TAD orders.

DHS-0000013

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

b.  **Civilian Employees of DoD Components.**

(1)  Civilian employees traveling under official PCS, TDY, or TAD orders or on rest and recuperation or FEML travel.

(2)  U.S. citizen civilian employees traveling under a family emergency, as determined by the respective Military Service and the JTR.  Round-trip travel is permitted in accordance with Table 1 of this issuance.  When funded transportation is not authorized, individuals may travel space-required at personal expense on DoD aircraft or space-available in accordance with Table 2 of this issuance.

(3)  Civilian employees who have defaulted on their transportation agreement and command-sponsored dependents, but only when commercial transportation is unavailable. Travel orders will require the employee to pay the transportation costs before travel at the USG non-DoD rate tariff.  Such costs may be reimbursed in cash.

c.  **Command-Sponsored Dependents of Uniformed Services Members and DoD Civilian Employees.**

(1)  Dependents, as defined in the JTR, traveling under official PCS orders.

(2)  Dependents issued official travel orders under conditions for which the sponsor could receive emergency leave.  Round-trip travel, accompanied or unaccompanied, is permitted in accordance with Table 2.  Transportation costs for travel on aircraft operated by an activity financed through the TWCF are normally chargeable to appropriated funds from the sponsor's unit.  When funded transportation is not authorized, the sponsor may have their dependents travel space-required at personal expense.  In accordance with Table 3, space available travel may also be used.

(3)  Dependents accompanying their sponsors on approved circuitous travel.  All costs in excess of the authorized government-furnished transportation will be paid by the sponsor.  Travel on aircraft provided by an activity financed through the TWCF is chargeable to the sponsor.

(4)  Dependents acquired after the effective date of PCS orders, which at the time of PCS were not entitled to transportation at government expense.  Dependents are authorized to join their sponsors at their OCONUS permanent duty station (PDS) via space-required transportation at personal expense, accompanied or unaccompanied, when no commercial transportation is available.  Transportation is limited to travel from the aerial port of embarkation (APOE) in the continental United States (CONUS), Alaska, or Hawaii to the aerial port of debarkation (APOD) serving the sponsor's OCONUS PDS.  The OCONUS CCDR must approve entrance of these dependents before travel.  Travel on aircraft provided by an activity financed through the TWCF is chargeable to the sponsor.  In accordance with Table 3, space available travel may also be used.

(5)  Dependents stationed OCONUS.  This includes unmarried dependents who are under 23 years old and full-time students attending a school in the United States to obtain a secondary, undergraduate, graduate (pursued on a full-time basis at an accredited institution), or vocational

DHS-0000014

education (pursued on a full-time basis at a post-secondary vocational institution). The JTR contain details on restrictions that apply to this travel.

    (6) Accompanied or unaccompanied dependents of uniformed services members or DoD civilian employees traveling under FEML orders in accordance with the JTR.

    (7) Dependents of uniformed services members or DoD civilian employees traveling in connection with leave taken between consecutive OCONUS assignments, in accordance with the JTR.

    (8) Dependents of uniformed services members and DoD civilians authorized to be evacuated by a competent authority in accordance with the JTR.

    (9) Dependents of uniformed services members and DoD civilian employees stationed OCONUS participating in inter-scholastic activities when payment for transportation is authorized in accordance with DoDD 1342.20.

    d. **Non-command-sponsored Dependents.** The traveler will reimburse transportation costs. A space-available travel option for the following individuals is authorized in accordance with Table 3 of this issuance.

    (1) Dependents of uniformed services members, when issued official travel orders under conditions for which the sponsor could obtain emergency leave. The individual may elect to travel space-required at personal expense on DoD aircraft. One-way travel, accompanied or unaccompanied, is permitted in accordance with Table 2.

    (2) Dependents of uniformed services members acquired during the course of a member's current tour of duty who are otherwise not entitled to transportation at government expense and are in an OCONUS area, in accordance with the JTR. If the sponsor complies with Military Service or CCMD regulations relating to the dependent's acquisition and meets all requirements of the U.S. Immigration and Customs Enforcement for the dependent's entry into the United States, the dependent is eligible for space-required transportation at personal expense from the OCONUS APOE to an APOD in the CONUS, Alaska, or Hawaii, in conjunction with the member's PCS from the OCONUS area.

    (3) Dependents who are permanent members of the household of uniformed services members or DoD civilian employees may be provided space required transportation between CONUS and OCONUS areas or between OCONUS areas at the expense of the sponsor or dependent, if travel is within 30 days of the sponsor's PCS travel.

    e. **Dependents Accompanying DoD Personnel on Official Business.** A dependent spouse normally is not permitted to accompany a DoD sponsor traveling on official business. However, flag officers and those commanders specified in Section 12 of this issuance may approve a dependent spouse's travel on a case-by-case basis, in accordance with DoDD 4500.56. Travel is allowed on a non-interference basis only and must be supported with an invitational travel authorization (ITA). Blanket ITAs for this type of travel are prohibited.

DHS-0000015

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

**f. Employees and Dependents of Nonappropriated Fund (NAF) Activities.** Space-required transportation is chargeable at the USG non-DoD rate tariff for the following NAF activities, officials, or employees:

(1) NAF officials or employees traveling on official orders.

(2) NAF officials or employees and their sponsored dependents, when issued official travel orders under conditions for which emergency leave could be granted to a uniformed services member. If NAF-funded travel is not authorized, the NAF employee and dependent(s) may elect to travel space-required at personal expense or space-available in accordance with Table 3 of this issuance.

(3) Non-U.S. citizen employees of NAF activities, when transportation is in the OCONUS area and is the responsibility of the USG in accordance with the terms of the employment contract.

(4) NAF officials, employees, and dependents stationed OCONUS and individuals authorized space-required transportation, when a competent authority has authorized evacuation of NAF officials, employees, or dependents.

**g. Employees and Dependents of Other USG Agencies.** Space-required transportation is chargeable:

(1) To the sponsoring DoD Component at the USG DoD rate tariff for employees of other USG agencies when traveling for or in the interests of the DoD and when approved in accordance with Section 12 of this issuance.

(2) To the concerned USG agency at the USG non-DoD rate tariff for:

(a) U.S. citizens that are USG employees assigned to a post or country that has been designated a hostile area for family visitation. Travel must be authorized by the chief of the diplomatic mission to which the employee is attached. If not attached to a diplomatic mission, the employee must receive travel authorization from the head of the OCONUS office of the USG agency or office to which the employee is attached or other competent agency authority. Posts designated for family visitation travel will be notified by a Department of State (DOS) message. Round-trip travel is authorized from the employee's PDS to the family's residence.

(b) U.S. citizens who are USG employees and their dependents stationed OCONUS when traveling for emergency visitation in instances of serious illness or death of a member of an employee's or dependent's immediate family. The chief of the diplomatic mission to which the employee is attached must authorize the round-trip travel from the employee's residence to the emergency destination. If the employee is not attached to a diplomatic mission, the head of the OCONUS office of the USG agency or office to which the employee is attached or other agency authority must authorize the travel.

(c) Dependents of U.S. citizen DOS or Peace Corps employees located OCONUS, either at post or away from post, traveling for emergency visitation in instances of serious illness or death of a member of an employee's or dependent's immediate family. The chief of the

DHS-0000016

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

diplomatic mission or head of an OCONUS U.S. Agency for International Development (USAID) establishment or their designees, or the Director of Personnel, Peace Corps (for Peace Corps staff personnel) must authorize the travel. Round-trip travel, accompanied or unaccompanied, is authorized from the dependent's residence to the emergency destination.

　　　　(d)  U.S. DOS-identified diplomatic passport couriers, when carrying DOS courier letters.

　　**h.  Nonprofit Service Organizations.**  Transportation services for nonprofit service organizations are limited to personnel of the American Red Cross (ARC), United Service Organizations (USO), the United Seamen's Service (USS), recognized scouting organizations, and as indicated in Paragraphs 3.6.h.(1) through (7) of this issuance.  Transportation is reimbursable at the USG non-DoD rate tariff.  Transportation in circumstances other than those specified in Paragraphs 3.6.h.(1) through (7) may be authorized in accordance with a memorandum of understanding (MOU) or memorandum of agreement (MOA) between the DoD and the service organization.  The MOU or MOA should be referenced to determine when transportation is authorized and the appropriate rate tariff, if reimbursement is required.  This does not include travel in CONUS.

　　　　(1)  ARC full-time paid employees who are U.S. citizens traveling under official PCS, TDY, or TAD orders and assigned to support Military Services overseas.

　　　　(2)  ARC full-time paid employees who are U.S. citizens and their dependents accompanying Service personnel overseas, when issued official travel orders under conditions similar to the circumstances for which emergency leave could be granted a Service member. Round-trip travel is permitted in accordance with Table 2.

　　　　(3)  The USO National Executive Director, other USO national headquarters staff personnel, USO facility directors, and executive directors and assistant executive directors of OCONUS USO facilities (must be full-time paid personnel who are U.S. citizens assigned to duty on a DoD installation overseas), when the travel provides a direct service to the Military Services and is at the invitation of the OCONUS CCDR.

　　　　(4)  Employees of the USS, when travel provides a direct service to the Military Service concerned.

　　　　(5)  Professional scout leaders (full time staff and executives) stationed overseas with the approval of the DoD and the executives of the national headquarters of the scouting organizations, when the travel provides direct scouting support to DoD personnel and their dependents stationed overseas.

　　　　(6)  Scouting organization officials, employees, and dependents stationed overseas, when evacuation has been authorized.

　　　　(7)  Dependents of full-time paid employees of the ARC who are U.S. citizens assigned to Military Services overseas, when evacuation of dependents has been authorized.

DHS-0000017

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

i. **Invited Travelers.** The concerned DoD Component head must approve any traveler not meeting the criteria permitting the issuance of ITAs and not otherwise eligible for transportation.

j. **Foreign Government and International Organization Travelers.** Section 9 of this issuance addresses the eligibility of passengers from foreign governments and international organizations.

k. **Defense Contractor Personnel.** Defense contractor personnel may be provided DoD-funded transportation when there is a contractual requirement for the DoD to provide transportation services.

(1) Defense contractor personnel providing services under a contract with the DoD will receive a letter of authorization (LOA) for DoD-funded transportation from their contracting officer or their representative, pursuant to DoDI 3020.41. ITAs may not be issued for defense contractor employees. A sample LOA is contained in the Defense Federal Acquisition Regulations Supplement Procedures, Guidance, and Information. The LOA must contain a statement that commercial transportation is not available, obtainable, or capable of meeting the transportation requirement.

(a) The LOA will include the prime contract number, sub-contract number, emergency contact phone number, and DoD appropriation or DoD customer identification code (CIC) to be charged for services when travel is chargeable to the DoD. Transportation is chargeable at the USG DoD rate tariff.

(b) When the defense contractor will reimburse the travel, the LOA will include the defense contractor's complete billing address and point of contact (POC). Defense contractors may obtain accounts for passenger travel and cargo movements at defense contractor expense by contacting Headquarters, AMC, Financial Management and Comptroller by e-mail at AMC.FMFA.TWCF@us.af.mil. Transportation is reimbursable at the USG non-DoD rate tariff.

(2) Specified employees of U.S. educational institutions under contract to the DoD who provide direct educational services for military personnel stationed OCONUS are authorized transportation when the DoD Component concerned provides funding and the required LOA. The dependents of such employees may be included in the LOA if the contract provides for such travel. Eligibility is limited to travel to, from, and between the OCONUS areas.

(3) Defense contractor personnel stationed OCONUS whose travel from the CONUS, Alaska, or Hawaii to the OCONUS duty assignment, when issued an LOA for which emergency leave could be granted to a Service member. Space-required, round-trip travel aboard DoD aircraft is authorized in accordance with Table 2, except for personal services contracts. Transportation is chargeable to the defense contractor or traveler at the non-USG rate tariff.

l. **Educators not Affiliated with the DoD Education Activity Prescribed in DoDD 1342.20 and not on a Personal Services Contract as Described in the Defense Federal Acquisition Regulations Supplement Procedures, Guidance, and Information.** These travelers will reimburse transportation costs at the non-USG rate tariff:

DHS-0000018

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

(1)  Educators traveling OCONUS under a DoD contract, provided travel is from the CONUS, Alaska, or Hawaii, and travel orders are issued under conditions for which emergency leave could be granted a Service member.  Traveler-funded, space-required, round-trip travel aboard DoD aircraft is authorized in accordance with Table 2.

(2)  Educators provided an ITA by the appropriate DoD Component.  A complete and correct billing address and POC must be included in the ITA.

(3)  Personnel employed by schools in Puerto Rico, Guam, American Samoa, and the Northern Marianas and their dependents, when traveling between the CONUS, Alaska, or Hawaii and OCONUS on orders authorized by the OCONUS commanders.

(4)  Personnel connected with national accrediting associations for secondary schools and colleges, when traveling on orders authorized by a DoD Component.

m.  Athletes and Entertainers.  Traveling Service member athletes, coaches, and officials must be issued travel orders by the appropriate DoD Component.  Invited athletes and entertainers will travel on ITAs issued by the appropriate DoD Component.  ITAs must include a complete billing address and POC for the following individuals:

(1)  Service member coaches, officials, and athletes participating in sports clinics, intramural games, or contests sponsored by a DoD Component.

(2)  Service member athletes and athletic teams (including coaches) traveling to train for or participate in international competitions in amateur sports and qualifying events, preparatory competition for those games, or any other international competition in amateur sports when the Secretary of State, in accordance with Section 717 of Title 10, U.S.C., determines that participation in international sports will serve the interests of the United States.

(3)  Service member entertainers participating in shows, contests, or events organized and sponsored by a DoD Component.

(4)  Entertainers traveling OCONUS on ITAs issued by the Department of the Air Force, Armed Forces Entertainment Office, or under the sponsorship of a contract with a morale, welfare, and recreation organization.  Commercial transportation must be unavailable or unsuitable.

(5)  Entertainers contracted locally in OCONUS areas traveling for DoD personnel entertainment on ITAs issued by the OCONUS commander or delegated coordinators of the entertainment program.

n.  Civil Air Patrol (CAP).  Transportation costs are reimbursable by the sponsoring DoD Component for:

(1)  Senior and cadet members of the CAP on aircraft when performing official CAP duties or when supporting a CAP operational mission authorized by or at the request of the U.S. Air Force.  Travel is authorized in the CONUS, Alaska, Hawaii, and Puerto Rico.

DHS-0000019

(2) Participants in a U.S. Air Force and CAP-approved Aerospace Education Workshop field trip scheduled as part of the approved curriculum.

o.  **Reserve Officer Training Corps (ROTC).**

(1) ROTC students of the Army, Navy, and Air Force at field training or the Naval ROTC summer training programs and competitions, on approval of the field training commander.

(2) ROTC students of the Army, Navy, and Air Force during the school year.  Travel must have the prior approval of the appropriate authority of the Military Department concerned. Students must be enrolled and actively participating in formal ROTC and academic training during the school term in which travel occurs, and the flight must be in connection with this training.  Students must travel in uniform.

(3) Civilian officials of an educational institution that offers ROTC.  Travel is to visit military installations for orientation in connection with ROTC activities.  Prior approval of the Military Department is required.

p.  **Junior Reserve Officer Training Corps (JROTC).**  Pursuant to Section 2031 of Title 10, U.S.C., and to the extent considered appropriate by the Secretary of the Military Department concerned, transportation may be provided to support JROTC programs.  Students must be enrolled and participating in the JROTC program during the school term in which travel occurs, and the flight must be in connection with the training.  Students must travel in uniform.

q.  **International ROTC Programs.**  Travel requests for international ROTC programs must be approved by the DoD Component concerned.

r.  **Naval Sea Cadets.**  As approved by the Secretary of the Navy, transportation may be provided to support the United States Naval Sea Cadets Corps (USNSCC).  Travel is authorized in the CONUS, Alaska, Hawaii, and Puerto Rico.  Participants in the USNSCC are authorized travel for the purpose of Sea Cadet orientation training and return.  Students will have adult chaperones and be enrolled and participating in the Sea Cadets program during the school term in which travel occurs and the flight must be in connection with the training.  Students must travel in uniform.

s.  **National Guard Youth Challenge Program Participants.**  In accordance with Section 509 of Title 32, U.S.C., participants in congressionally sanctioned, DoD-approved National Guard Youth Challenge Programs may be provided transportation on DoD aircraft for travel to and from a program site and to a program activity.

t.  **Persons Transported Under the Authority of the Military Extraterritorial Jurisdiction Act.**  Personnel accompanying DoD forces OCONUS—including civilian personnel, dependents of military and civilian personnel, and defense contractor personnel and their dependents—may be transported, along with authorized escorts, under the authority of Chapter 212 of Title 18, U.S.C., as implemented by DoDI 5525.11.  Depending on the category of personnel being transported, official orders, ITAs, or LOAs may be used as the transportation authorization.

DHS-0000020

**u. Other Individuals Not Affiliated With the DoD.** Individuals who are not otherwise eligible for transportation in accordance with this section may be authorized space-required transportation in the following circumstances:

(1) Designated Individuals of Seriously Ill or Injured Uniformed Services Members. These individuals are issued travel orders in accordance with the JTR. Not more than three designated individuals (without regard to relationship or command sponsorship) of a uniformed services member who is seriously ill or seriously injured and hospitalized either in the CONUS or OCONUS may be authorized to travel. Round-trip, government-funded transportation is authorized between the residence of the designated individuals and the location of the medical facility in which the member is hospitalized. The attending physician or surgeon and the commander or head of the military medical facility exercising control over the member's care must determine, in writing, that the presence of an individual(s) is necessary for the member's health and welfare.

(2) Family Members of Seriously Ill or Injured DoD Civilian Employees. In accordance with the JTR, two family members (without regard to command sponsorship) of a DoD civilian employee who is seriously ill or seriously injured and hospitalized either in the CONUS or OCONUS may be authorized to travel. Individuals traveling to or from an OCONUS location may travel on any CONUS leg segment (i.e., on a flight with en-route stops) when no change of aircraft or mission number is required.

(3) Designated Individuals and Non-medical Attendants of Seriously Wounded, Ill, or Injured Uniformed Services Members. Individuals are issued travel orders by the sponsoring organization in accordance with the JTR.

(4) Relatives, Family Members, Attendants, and Escorts Attending a Funeral of a Deceased Service Member. Individuals are issued orders in accordance with the JTR.

(5) Individuals Authorized to Attend a Yellow Ribbon Reintegration Program. Individuals are issued orders in accordance with the JTR.

(6) Media Representatives Sponsored or Approved by the DoD. See Section 8 of this issuance for additional information.

(7) Members of the Clergy or Ministry Attending Meetings Dealing with Religious Matters that are Sponsored or Approved by a DoD Component. Transportation is chargeable at the USG non-DoD rate tariff.

(8) Individuals in Support of the U.S. Antarctic and Arctic Ice Cap Programs. When sponsored by a DoD Component or the National Science Foundation and directly related to the programs, transportation costs are reimbursable at the USG DoD rate tariff in Antarctica, and at the USG non-DoD rate tariff in the Arctic.

(9) Individuals Residing OCONUS to Travel to the CONUS, Alaska, or Hawaii for Induction into the Military Services. Transportation is chargeable at the USG DoD rate tariff and includes returning OCONUS if found unqualified for induction on arriving in the CONUS, Alaska, or Hawaii.

DHS-0000021

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

(10)  State National Guard Officials.  When travel is for official duty connected with National Guard activities, travel may be in and between the CONUS, Puerto Rico, Guam, the Virgin Islands, or the States of Alaska and Hawaii only.  Officials may include the State governors, lieutenant governors, adjutants general, and assistant adjutants general for such travel.

(11)  Certain State, County, Municipal, or Private Company Employees Who Perform a Service in Direct Support of the National Guard Mission in the States and Territories.  Travel must be for an official purpose and authorized in advance by the Chief, National Guard Bureau (NGB) or other authorized official.  Travel may be in and between the CONUS, Puerto Rico, Guam, the Virgin Islands, or the States of Alaska and Hawaii only.

(12)  Spouses of a State Governor, Lieutenant Governor, or Adjutant General When Travel is for Official Duty Connected with National Guard Activities.  Travel may be in and between the CONUS, Puerto Rico, the Virgin Islands, or the States of Alaska and Hawaii.  The traveler must be accompanied by the official, and there must be an official function in which the spouse is actually to participate in an official capacity or the travel must be deemed in the interest of the National Guard.  State governors or lieutenant governors will sign the approvals personally on a case-by-case basis.

## 3.7.  DOCUMENTATION REQUIREMENTS.

a.  All passengers must have in their possession a travel order or similar authorization issued by an appropriate authority and a valid form of identification issued by a DoD Component, Federal, State, or local government authority.  Additionally, overseas travelers must carry documents required by this issuance, Volume 2 of Air Force Instruction 24-605, and the JTR, such as passports, immunization records, and visas.  With the exception of emergency transportation or medical evacuation, passengers lacking proper identification and other documents may be denied transportation.

b.  For billing purposes, travel authorizations will include either the appropriation chargeable and the CIC, or the name and address of a specific organization or individual responsible for payment.  One copy must be provided to the passenger service personnel.

c.  Passengers who are employees of other Federal Government agencies must have the identification and other documents required in Paragraphs 3.7.a. and 3.7.b. and documentation that their travel aboard DoD aircraft has been approved, unless specifically authorized otherwise by this issuance.

d.  Passengers traveling on ITAs as authorized by the JTR will have the ITA in their possession.  Unless specifically authorized in this issuance, an ITA does not negate approval requirements for transportation on DoD aircraft in accordance with Section 12 of this issuance.

e.  All other travelers will have the identification and other documents required in Paragraphs 3.7.a. and 3.7.b. and documentation showing their travel on DoD aircraft has been approved.

DHS-0000022

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

**3.8. PRIORITY OF MOVEMENT.** Priority of movement for space-required passengers on channel missions is prescribed by Joint Publication 4-01.

a. **Priority 1.** Personnel with an acute emergency that requires they be moved before everyone else and not delayed for any reason; medical evacuees; or individuals returning to the United States or its possessions on emergency leave.

b. **Priority 2.** Personnel who have an urgent deadline to accomplish an essential mission at the destination; are destined for units or activities required to be in place to meet an emergency and whose travel is more urgent than travel under Priorities 3 and 4; on TDY; or on PCS orders to a mobile or moving final duty assignment.

c. **Priority 3.** Personnel who are traveling to accomplish an important mission; returning to duty station from emergency leave; traveling as inductees from military entrance processing stations to reception stations and training centers; on PCS orders to fixed or stationary final duty assignment of duty station; or returning to duty from routine TDY or TAD.

d. **Priority 4.** Personnel who are not otherwise eligible for movement in Priorities 1-3; dependents; personnel of non-DoD activities; or recruits traveling from home to military entrance processing stations.

**3.9. TRAVEL ENTITLEMENTS FOR EMERGENCIES.** Tables 1 and 2 provide the guidance for emergency leave travel. Table 1 provides the alpha numeric codes used to indicate travel entitlements in Table 2. Table 2 provides a reference for choosing emergency leave travel options. The "Entitlement or Privilege" column in Table 2 indicates which alpha numeric entitlement code to use. Entitlements are round-trip unless otherwise specified. Consult the JTR for further details regarding transportation entitlements.

**Table 1. Travel Entitlement for Emergencies Codes**

| Alpha | Entitlement |
|---|---|
| a | Government-funded travel on DoD aircraft. |
| b | Government-funded commercial travel. |
| c | Traveler-funded (space-required) travel on DoD aircraft. |
| d | Space-available travel aboard DoD aircraft. |
| **Numeric** | |
| 1 | Stationed means serving on permanent duty or assigned to a ship. |
| 2 | Travel in or transit of the CONUS to reach an emergency destination located OCONUS. |
| 3 | Travel in the CONUS to reach a CONUS destination. |
| 4 | Member's home of record, place from which called (or ordered) to active duty, place of first entitlement, or place of permanent legal residence. |

DHS-0000023

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 1. Travel Entitlement for Emergencies Codes, Continued

| Numeric | |
|---|---|
| 5 | Individuals traveling to or from an OCONUS location may travel on any CONUS leg segment (i.e., on a flight with en-route stops) when no change of aircraft or mission is involved. Otherwise, CONUS travel is not authorized. |
| 6 | Government-funded, round-trip travel between CONUS locations if a member is TDY or TAD from the PDS or assigned to a ship that is away from its CONUS homeport when the emergency situation occurs. |

Table 2. Travel Entitlements for Emergencies

| Item | The Traveler | Circumstance | Entitlement or Privilege | Remarks |
|---|---|---|---|---|
| 1 | A uniformed services member. | The uniformed services member is stationed OCONUS and the emergency destination is OCONUS or in the CONUS. | a2, b2 | Government-funded transportation from the international airport nearest the member's location when notified or the member's PDS. |
| 2 | A uniformed services member. | The uniformed services member is stationed (1) in the CONUS, their domicile (4) is OCONUS, and the emergency destination is OCONUS. | a2, b2 | Government-funded transportation from the international airport nearest member's location when notified or the member's PDS. |
| 3 | A uniformed services member. | The uniformed services member is stationed in the CONUS and the emergency destination is in the CONUS. | b6 | |
| 4 | A uniformed services member. | The uniformed services member is seriously ill or seriously injured and hospitalized either in the CONUS or OCONUS. | a2,3 b2,3 | Transportation is authorized for only three family members between the residence of the family members and the location of the medical facility in which the member is hospitalized. Certification by the primary care provider or other competent medical authority that the presence of the family members is necessary for the health and welfare of the member is required. |
| 5 | A uniformed services member's command-sponsored dependent. | The dependent resides OCONUS and the emergency destination is OCONUS or the CONUS. | a2 b2 | Government-funded transportation from the international airport nearest member's or dependent's location when notified, member's PDS, or dependent's other OCONUS residence when member is entitled to a station allowance on dependent's behalf. |

SECTION 3: SPACE-REQUIRED PASSENGER TRANSPORTATION                    24

DHS-0000024

**Table 2.  Travel Entitlements for Emergencies, Continued**

| Item | The Traveler | Circumstance | Entitlement or Privilege | Remarks |
|---|---|---|---|---|
| 6 | A uniformed services member's dependent. | The dependent resides in the CONUS, the member's domicile is OCONUS, and the emergency destination is OCONUS. | a2<br>b2 | Government-funded transportation from the international airport nearest member's or dependent's location when notified or member's PDS. |
| 7 | A uniformed services member's dependent. | The dependent resides in the CONUS, the member's domicile is not OCONUS, and the emergency destination is OCONUS. | c2<br>d5 | |
| 8 | A uniformed services member's non command-sponsored dependent. | The dependent resides OCONUS with the sponsor, and the emergency destination is OCONUS or CONUS. | c | Transportation is authorized one way to the emergency destination. Government-funded return travel on DoD aircraft is not authorized. |
| 9 | A U.S. citizen civilian DoD employee. | The employee is stationed OCONUS and the emergency destination is OCONUS or in the CONUS. | a5<br>b5 | |
| 10 | A U.S. citizen civilian DoD employee's command-sponsored dependent. | The dependent resides with the employee who is stationed OCONUS and the emergency destination is OCONUS or in the CONUS. | a5<br>b5 | |
| 11 | A U.S. citizen civilian DoD employee's family (without regard to command sponsorship). | The U.S. citizen DoD employee is seriously ill or seriously injured and hospitalized either in the CONUS or OCONUS. | a5<br>b5 | Transportation is authorized for no more than two family members between the residence of the family members and the location of the medical facility in which the member is hospitalized. Certification that the presence of the family members is necessary for the health and welfare of the employee is required.  Commercial options must be unavailable. |

DHS-0000025

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 2. Travel Entitlements for Emergencies, Continued

| Item | The Traveler | Circumstance | Entitlement or Privilege | Remarks |
|---|---|---|---|---|
| 12 | An ARC full-time paid employee who is a U.S. citizen assigned to a DoD installation overseas. | The individual is serving with a DoD Component overseas and the emergency destination is OCONUS or in the CONUS. | c<br>d5 | |
| 13 | A command-sponsored dependent of an eligible ARC full-time paid employee who is a U.S. citizen assigned to a DoD installation overseas. | The sponsor is serving with a DoD Component overseas and the emergency destination is OCONUS or in the CONUS. | c<br>d5 | |
| 14 | A U.S. citizen civilian NAF activity employee. | The individual is stationed OCONUS and their travel to the PDS was incident to a PCS at NAF expense, and the emergency destination is OCONUS or in the CONUS. | c<br>d5 | |
| 15 | A U.S. citizen NAF-activity employee's command-sponsored dependent. | The individual resides OCONUS with the sponsor, whose travel to the PDS was incident to a PCS at NAF expense, and the emergency destination is OCONUS or in the CONUS. | c<br>d5 | |

DHS-0000026

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 2. Travel Entitlements for Emergencies, Continued

| Item | The Traveler | Circumstance | Entitlement or Privilege | Remarks |
|---|---|---|---|---|
| 16 | Defense contractor personnel who are civilian employees of commercial concerns under contract to the DoD. | The individual is stationed OCONUS and their travel from the CONUS, Alaska, or Hawaii to the duty assignment was at DoD expense, and the emergency destination is OCONUS or in the CONUS. | c5 | Commercial options must be unavailable. |
| 17 | An educator or national educational accrediting association employee. | The individual is stationed or traveling OCONUS, their travel from the CONUS, Alaska, or Hawaii was at DoD expense, and the emergency destination is OCONUS or in the CONUS. | c5 | Commercial options must be unavailable. |
| 18 | A U.S. citizen, foreign service employee (except contract employees) of the DOS, USAID, and Peace Corps. | The individual is stationed OCONUS and the emergency destination is OCONUS or in the CONUS. | a2,3 b2,3, c5 | Authorization by specified officials in each Federal agency is required. |
| 19 | Dependents of U.S. citizen, foreign service employees (except contract employees) of the DOS, USAID, and Peace Corps. | The individual is located OCONUS either at post or away from post, and the emergency destination is OCONUS or in the CONUS. | a2,3, b2,3 | Authorization by specified officials in each Federal agency is required. Transportation may be accompanied or unaccompanied. |

DHS-0000027

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## SECTION 4: SPACE-AVAILABLE PASSENGER TRANSPORTATION

**4.1. GENERAL.** The passengers listed in this section are eligible for space-available transportation on DoD aircraft under the conditions cited. Space-available passenger transportation, using surplus aircraft capacity, is permitted, provided all space-required passengers and cargo have been accommodated. Space-available transportation is allowed on a non-interference basis only. DoD aircraft, including training missions, will not be scheduled or sized to accommodate the movement of passengers on a space-available basis. Space-available transportation will not be used for personal gain or for a business enterprise. No additional funds may be used or flight hours performed to provide transportation under the space-available travel program. The following guidance applies to all space-available passengers traveling on DoD aircraft:

a. **Reservations.** There is no guarantee of transportation and reservations will not be accepted or made for any space-available traveler. The DoD is not obligated to continue an individual's travel or return the individual to the point of origin or any other point. Travelers should have sufficient personal funds to pay for commercial transportation, lodging, and other expenses if space-available transportation is not available. All associated expenses are the responsibility of the traveler.

b. **Impartiality.** Transportation opportunities will be provided on an equitable basis without regard to rank or grade, military or civilian, or branch of uniformed service. No distinction is made between members retired from the RC and members retired from active duty. Space-available seats may not be reserved or blocked for use at en-route stops along mission routes. Individuals traveling to or from an OCONUS location may travel on any CONUS leg segment (i.e., on a flight with en-route stops) only when there is no change of aircraft or mission number.

c. **Uniforms.** The requirement to wear uniforms by uniformed services members on active duty and members of the RC not on active duty is governed by the regulations of the Military Department concerned and DoDD 4500.54E. When civilian clothing is worn, it should not conflict with accepted attire in the overseas country of departure, transit, or destination.

d. **Joint Spouse Service.** A joint spouse Service member (active or retired) parent or step-parent, with the documentation cited in this section, may accompany their dependent children, regardless of which parent is designated as the sponsor in the Defense Enrollment Eligibility Reporting System.

e. **Categories.** Eligible space-available travelers are placed in one of six categories (Category I – Category VI) based on the traveler's status and circumstance, as specified in Table 3. Once accepted for movement, a space-available passenger will not be bumped by another space-available passenger, regardless of category.

f. **Priority of Movement.** On a case-by-case basis, the local installation commander may change the priority of movement of any space-available traveler for emergency or humanitarian reasons when the circumstances fully support such an exception. When a movement priority is changed, the passenger will be moved no higher than the bottom of the Category I space-

DHS-0000028

available list.  The installation commander may delegate the authority to make such changes to no lower than the chief of the passenger terminal or equivalent.  Where AMC units are tenants, the senior AMC authority will advise the installation commander of this authority and offer technical assistance.  The upgrade will be effective from the passenger's originating and transit locations to the emergency location.  This upgrade may not be used for the passenger's return travel.

g. **Pregnant Passengers.**  Pregnant women up to the 34th week of gestation may be transported unless medically inadvisable.  Women less than 6 weeks postpartum and infants under 6 weeks old may be accepted for transportation if considered medically sound and so certified in writing by a responsible medical officer or civilian physician.  In an evacuation authorizing space-required travel (e.g., the ordered or authorized departure of noncombatants), pregnant women beyond the 34th week of gestation may be accepted for air transportation if considered medically sound and certified in writing by a responsible medical officer or civilian physician.

h. **Disabled Passengers.**  Passenger service personnel and aircraft crewmembers will provide assistance in boarding, seating, and deplaning a disabled passenger.  Transportation may be disapproved by the chief of the passenger travel section or the aircraft commander if there is an unacceptable risk to the safety or health of the disabled passenger or other passengers or crew, or if operational necessity, equipment, or manpower limitations preclude accepting a disabled passenger, service animal, or mobility assistance device.  The aircraft commander is the final approval authority on all matters relating to flight safety.

i. **Forms.**  Members of the RC traveling space-available must have a completed DD Form 1853, "Verification of Reserve Status for Travel Eligibility."  An electronic version of the form is available on the DoD Forms Management Program website at https://www.esd.whs.mil/Directives/forms/.

## 4.2.  BAGGAGE ALLOWANCES.

a. **Checked Baggage Allowance.**  Passengers are authorized two pieces of checked baggage.  Each passenger also is permitted to hand-carry one article (e.g., small luggage, garment bag, backpack) and one personal item (e.g., cosmetic case, purse, small box, package) for storage in the passenger cabin area.  Checked baggage may not exceed 62 linear inches (length plus width plus height) or 70 pounds for each piece.  Carry-on baggage must fit under the seat and may not exceed 45 linear inches (length plus width plus height).

b. **Baggage Allowance Restriction.**  To maximize seat availability, terminal personnel may further restrict passenger baggage allowances.  Excess baggage is not authorized for space-available passengers.

## 4.3.  TRANSPORTATION OF MINORS.
Minors must be accompanied by a parent or legal guardian at all times when traveling in a space-available status on DoD aircraft.  A power of attorney or other non-judicial document that has not been issued or approved by a court transferring legal responsibility for the minor will not be accepted to satisfy this requirement,

DHS-0000029

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

except as noted in Section 3 of this issuance or for the ordered departure of noncombatants from a foreign area.

## 4.4. LEAVE OR PASS STATUS AND WOUNDED WARRIOR TRAVEL.

a. Uniformed services members must be in a valid leave, pass, or non-duty status pursuant to DoDI 1327.06 to register for travel and remain in such status for the entire period of travel. Service members may travel using their military identification card and verbal verification when on pass status. If passengers subsequently present leave orders, they must re-sign up with a new effective date and time consistent with their leave forms. Service members in appellate leave status are not granted space-available travel privileges.

b. DoD civilian employees, when given any of the space-available privileges listed in Table 3, must be in a leave or non-duty (i.e., weekend or holiday) status to register for space-available travel. If in non-duty status, leave must be approved for the first normal working day following the non-duty period. Employees will be on leave status while awaiting travel and for the entire period of travel.

c. Service members on active duty who have been injured in a combat zone and are receiving treatment at a medical treatment facility or in a wounded warrior program may be offered excess seats on any DoD OSA aircraft supporting DoD senior officials' travel. Senior officials are encouraged to make seats available; however, mission impact, the need for classified communications, and privacy concerns may be considered in determining whether to make excess seats available. Wounded warriors must be ambulatory and require no in-flight medical treatment. Allocation of seats is at the discretion of the senior traveler.

## 4.5. TRAVEL IN CONJUNCTION WITH SPACE-REQUIRED TRAVEL.
Transportation from a PDS to a TDY location must be on a space-required basis. Space-available transportation may be used from the TDY location as long as space-available transportation does not substitute for any transportation authorization when travelers have a space-required entitlement. Dependents may not use space-available transportation to accompany their sponsors on space-required transportation unless traveling space-available pursuant to established unaccompanied programs. Sponsors accompanying their dependents must be traveling in the same status (either space-required or space-available) as the dependents.

## 4.6. TRAVEL TO RESTRICTED, ALL OTHERS, AND UNACCOMPANIED TOUR AREAS.

a. Non-command sponsored dependents of active duty uniformed services members serving unaccompanied PCS OCONUS may use space-available transportation to and from the member's approved overseas tour location, as approved by the installation commander concerned (or as delegated, no lower than unit commander). Dependents may not use space-available transportation to accompany their sponsors on space-required transportation or to travel to or from a sponsor's restricted or all other (unaccompanied) tour location unless traveling in accordance with non-command sponsored programs. The uniformed services member must

DHS-0000030

obtain prior written approval for non-command sponsored dependent travel from the installation or unit commander concerned. This documentation will be presented to passenger terminal personnel, stay in the dependent's possession during travel, and remain valid for one round-trip to the sponsor's PCS duty location.

b. Approval letters will include, at a minimum: the sponsor's name and rank, approved unaccompanied PCS location, sponsor's contact information (on and off-duty), dependent names and current residence information, timeframe for which the letter is valid, and length of stay authorized. An example approval letter may be found at: https://www.amc.af.mil/Home/AMC-Travel-Site/.

## 4.7. REGISTERS AND SIGN-UP PROCEDURES.

a. Each installation from which space-available transportation is offered will establish a single space-available register. All passengers accepted for airlift from that location must have been selected from the register's roll. Maintenance of the register is the responsibility of the AMC passenger activity, where established. The register will be automated, if the capability exists. Where no AMC passenger activity is established, it will be the responsibility of the installation commander to designate the organization responsible for maintaining the space-available register.

b. To compete for space-available travel, eligible personnel must present all required documentation and sign up on the space-available roster either in person or remotely, where such capability exists. The United States Transportation Command (USTRANSCOM) and other DoD Components will provide procedures for using remote sign up services.

c. The original date and time of sign-up will be documented and remain with the traveler until movement to their declared final destination is complete, their leave terminates, or a maximum of 60 days has passed, whichever occurs first. The CCDR may further restrict this time limit for assigned personnel. Those registered are not required to accept any seat offered and failure to accept an offered seat will not jeopardize a passenger's position on the space-available register. Passengers dropped from the register may sign up again in their respective categories and will be provided a new date and time of sign-up.

d. Instances of unacceptable passenger conduct or behavior that warrant consideration for removal of space-available privileges will be processed in accordance with Volume 2 of Air Force Instruction 24-605.

## 4.8. DOCUMENTATION REQUIREMENTS AND ELIGIBILITY. 
All travelers must possess a valid form of USG identification during travel. Valid forms of USG identification must be from a Federal, State, local, or tribal government authority. The DoD identification card descriptions and their corresponding eligible population categories are defined in Volume 1 of DoD Manual 1000.13. Overseas travelers must have in their possession documents required by Section 4 of this issuance, DoDI 1327.06, and DoDD 4500.54E (e.g., passports, immunization records, and visas). Specific required documentation must be presented to the passenger terminal personnel or other appropriate authority when requested, and includes the following:

DHS-0000031

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

a.  Uniformed services members on active duty (including National Guard and RC on active duty in excess of 30 days or active Guard Reserve), U.S. Public Health Service commissioned officers, National Oceanic and Atmospheric Administration Commissioned Officer Corps officers, and cadets and midshipmen of the U.S. Military Academies must have:

(1)  A common access card (CAC).

(2)  A valid leave authorization or other documentation required by the Military Service.

(3)  A U.S. uniformed services identification (USID) dependent identification and privilege card for any dependents accompanying the member.  Uniformed services member dependents under the age of 14 must travel with the sponsor or eligible parent and must possess a Federal-, State-, local-, or tribal government-issued identification.

b.  RC members on active duty for 30 days or fewer (includes National Guard and RC members) must have:

(1)  A CAC or Armed Forces of the United States - Geneva Conventions identification card for Guard or Reserve.

(2)  Orders placing the Reservist on active duty.

(3)  A U.S. USID dependent identification and privilege card with "Guard" or "Reserve" in the sponsor affiliation block, for any dependents accompanying the member.  Uniformed services member dependents under the age of 14 must travel with the sponsor or eligible parent and possess a Federal-, State-, local-, or tribal government-issued identification.

c.  Retired uniformed services members must have:

(1)  A U.S. USID sponsor identification and privilege card with "Retired" in the sponsor affiliation block.

(2)  A U.S. USID dependent identification and privilege card for any dependents accompanying the sponsor, with "Retired" in the sponsor affiliation block.

d.  Authorized RC members (including the remainder of the Ready Reserve not accounted for in Paragraphs 4.8.a. and 4.8.b. of this issuance, as well as the Standby Reserve standby active status list) must have:

(1)  A CAC.

(2)  A DD Form 1853.

(3)  A U.S. USID dependent identification and privilege card with "Guard" or "Reserve" in the sponsor affiliation block for any dependents accompanying the member.  Uniformed services member dependents under the age of 14 must travel with the sponsor or eligible parent and possess a Federal-, State-, local-, or tribal government-issued identification.

DHS-0000032

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

e.  Retired Reservists under the age of 60, but entitled to retired pay at age 60 ("gray area retirees") must have:

(1)  A U.S. USID sponsor identification and privilege card with "Reserve Retired" in the affiliation block.  A notice of retirement eligibility is not required.

(2)  A U.S. USID dependent identification and privilege card with "Guard" or "Reserve" in the sponsor affiliation block for any dependents accompanying the member.  Uniformed services member dependents under the age of 14 must travel with the sponsor or eligible parent and possess a Federal-, State-, local-, or tribal government-issued identification.

f.  Dual-uniformed services members with dependent children, when the non-sponsor military parent or step-parent accompanies their dependent minor children on DoD aircraft, must have:

(1)  A CAC.

(2)  A valid U.S. USID dependent identification and privilege card.

(3)  Written approval from the dependent children's sponsor, as identified in the Defense Enrollment Eligibility Reporting System.

(a)  Only original signed and notarized approval letters will be accepted.  This documentation will be presented to air terminal personnel and will be in the non-sponsor parent or step-parent's possession during all segments of space-available travel.  This documentation is valid for 180 days from date of signature.

(b)  Approval letters will include, at a minimum: sponsor's name, rank, contact address and phone number; non-sponsor parent or step-parent's name and rank; and dependent children's names and relationship to non-sponsor parent or step parent.  An example approval letter may be found at: https://www.amc.af.mil/Home/AMC-Travel-Site/.

g.  ROTC members, nuclear power officer candidates (NUPOCs), and Civil Engineer Corps (CEC) members must have a DD Form 1853.

h.  Foreign exchange personnel, as defined in DoDD 5230.20, must have:

(1)  A CAC.

(2)  A valid leave authorization.

i.  Dependents of foreign exchange service officers must have a U.S. DoD or USID dependent identification and privilege card.

j.  Dependents under the age of 14 and traveling without a U.S. USID dependent identification and privilege card must travel with the sponsor or eligible parent.  Dependents of uniformed services members who are under the age of 14 must travel with the sponsor or eligible parent and must possess a Federal, State, local, or tribal government issued identification.

DHS-0000033

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

k. EML travelers must have:

(1) A CAC or U.S. USID sponsor identification and privilege card for uniformed services members.

(2) A valid EML authorization.

(3) A U.S. USID dependent identification and privilege card for any dependents accompanying the uniformed services member.

l. American Samoan veterans are authorized space-available travel between American Samoa and Hawaii, in accordance with Section 2641a of Title 10, U.S.C., when transportation is required for hospital care. The veteran must reside in American Samoa, and an official of the Department of Veterans Affairs (VA) must determine the need for hospital care from VA facilities in Hawaii. The veteran must possess a letter from the VA indicating they reside in American Samoa and must travel to Hawaii to receive hospital care, along with the dates the care will be provided. Dependent travel is not authorized.

m. Retirees residing in or located in a Commonwealth or U.S. possession and referred by a military or civilian primary care provider located in that Commonwealth or possession to a specialty care provider for services to be provided outside of that Commonwealth or possession will be provided space-available travel for health care services. The member may be accompanied by a dependent, as determined by the primary care provider and stated in the referral for medical services. Transportation is authorized between the Commonwealth or possession and the specialty care provider. The priority status will be the same category as that of an unaccompanied dependent over the age of 18 traveling on environmental and morale leave. In the event of the death of the Service member, the dependent who accompanied the member to obtain the health care is authorized Category VI space-available travel in accordance with Table 3 to return to their point of origin.

n. Medal of Honor (MOH) recipients and dependents of MOH recipients, when accompanied by their sponsor, must have a U.S. USID identification and privilege card with "MOH" in the affiliation block for sponsors and the sponsor affiliation block for dependents.

o. Personnel assigned to Diego Garcia must be in one of these two categories:

(1) Third-country national (TCN) direct hire employees. Round-trip, space-available transportation is authorized to and from Diego Garcia and the nearest intermediate destination served by commercial aircraft. TCN employees must present a CAC and valid leave documents to support the transportation request.

(2) Military personnel and civilian employees of the Ministry of Defence of the United Kingdom (UK) permanently assigned to Diego Garcia. Space-available transportation is authorized to and from Diego Garcia. Passengers must present proof that they are assigned to Diego Garcia permanently, are in a leave, pass, or liberty status, and are authorized to travel space-available. Documentation must include POC information for the passenger unit of assignment. Passengers also must present photo identification consisting of a UK Ministry of Defense identification card or valid UK passport.

DHS-0000034

p. Guantanamo Bay, Cuba special category residents and other approved travelers must have government-issued identification and travel approval documentation. This transportation will not be used in lieu of authorized space-required travel.

(1) Special category residents, as designated under the provisions of Public Law 109-163, are permitted round-trip space available travel on DoD aircraft between Guantanamo Bay and the nearest intermediate destination serviced by scheduled commercial airlines.

(2) When scheduled commercial transportation is not reasonably available to meet the traveler's needs and travel is approved by the Commander, Naval Base, Guantanamo Bay, round-trip space-available travel is permitted between Guantanamo Bay and the nearest intermediate destination. Leave or travel approval documentation will include a statement that scheduled commercial transportation was not reasonably available. Eligible travelers include:

(a) DoD civilians (including NAF) and their dependents (other than EML).

(b) USG agency employees and their dependents.

(c) U.S. citizen defense contractor personnel and their dependents.

(d) TCN direct hire employees.

(e) U.S citizens, when the visit has been approved by the Commander, Naval Base, Guantanamo Bay.

q. Veterans with a permanent service-connected disability rated as total, must have a:

(1) U.S. USID sponsor identification and privilege card for disabled American veterans with "100% DAV" in the affiliation block.

(2) U.S. USID dependent identification and privilege card for any dependents accompanying the member with "100% DAV" in the affiliation block.

r. Surviving spouses of Service members who died while on active duty, inactive duty training, or annual training status as well as retired military members, and their accompanying dependents, must have a DoD USID and privilege card. Dependents who are under the age of 14 must possess a Federal-, State-, local-, or tribal government-issued identification.

s. Individuals not included in the preceding categories may be eligible for space-available transportation pursuant to an international agreement, acquisition and cross-servicing agreement (ACSA), cooperative military airlift agreement (CMAA), or MOU or MOA between the DoD and another entity or certain employees of the ARC, USO, and USS when they provide direct support to the DoD in overseas areas. In these cases, eligibility limitations and documentation requirements must be specified in the agreement or arrangement.

**4.9. DEPENDENT TRAVEL.** Except where specifically noted in Section 3 of this issuance, dependents may travel space-available only when accompanied by their sponsors.

DHS-0000035

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

a. **Command-sponsored Dependent Travel.**

(1) Travel is authorized pursuant to Table 3. Travelers are responsible for obtaining all country, theater, and border clearance documentation and having the necessary funds when traveling between theaters.

(2) A sponsor must obtain verification of command sponsorship in the form of a verification letter signed and dated by their current section or unit commander. Each letter is valid for one round trip from the sponsor's OCONUS PDS. The letter must state the sponsor's name, rank, and unit of assignment, unit contact phone number, and dependent name(s). A verification letter example may be found at: https://www.amc.af.mil/Home/AMC-Travel-Site/.

(3) Travelers must present a copy of the verification letter to the servicing air passenger terminal for movement and maintain a copy of the letter during travel.

(4) Travelers may sign up for space-available travel on or after the date the verification letter is signed by the unit commander; however, travelers will be removed from the space-available roster upon expiration of travel authorization or after 60 days, whichever occurs first.

(5) Passenger service agents will accept only verification letters signed by commanders or acting commanders, or orders signed by "By Direction" authority in the case of the Navy and Marine Corps. Squadron section commanders assigned to headquarters may sign verification letters for those sponsors assigned to headquarters billets.

b. **Dependents of Deployed Active Duty Uniformed Services Members.**

(1) Dependents 18 years of age or older of deployed active duty uniformed services members are eligible to travel unaccompanied when the deployment orders indicate the deployment is for 30 consecutive days or more. Dependents are authorized to travel for the duration of the sponsor's deployment. There is no limit on the number of trips. Dependents may sign up for travel no earlier than 10 days before the sponsor's deployment and are eligible to commence travel effective on the first day of the sponsor's deployment.

(2) Eligible dependents must present to air terminal personnel a verification letter signed by the member's commander verifying the member's length of deployment. The verification letter must remain in the dependent's possession during travel. A sample verification letter may be found at: https://www.amc.af.mil/Home/AMC-Travel-Site/.

c. **Unfunded Emergency Travel of Dependents Stationed in the CONUS.** When funded emergency travel is not authorized for unaccompanied dependents stationed in the CONUS traveling OCONUS, travel may be authorized pursuant to Table 3. The sponsor must obtain verification in the form of a letter signed by the commander or acting commander, or orders signed by "By Direction" authority in the case of the Navy and Marine Corps. Squadron commanders assigned to headquarters may sign verification letters for those sponsors assigned to headquarters billets.

DHS-0000036

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## 4.10. UNFUNDED EML TRAVEL.

a. The CCDR or designee may designate authorized EML duty locations and destinations in their AOR. Dependents under 18 years of age traveling under EML orders must be accompanied by an EML-eligible parent or legal guardian who is traveling in an EML status. Dependents 18 years of age or older may travel unaccompanied.

b. Unfunded EML travelers may travel in Category II status to only one EML destination for each set of EML orders. This does not preclude several approved destinations being included in a single set of EML orders, as long as procedures are in effect to ensure that the individual is provided Category II status only for travel to and from the first authorized EML destination actually reached. Subsequent space-available travel (e.g., from the EML destination to a third location and return, or from the third location to another EML location) may be provided only in Category III status.

## 4.11. ELIGIBLE SPACE-AVAILABLE TRAVELERS, PRIORITIES, AND APPROVED GEOGRAPHICAL TRAVEL SEGMENTS.

The following traveler categories and geographical travel segments are used in Table 3.

a. **Item.** A sequential numbering system for reference purposes only; has no impact on priority of travel within that category.

b. **Category.** The category of travel as specified in Paragraph 4.1.e. of this issuance.

c. **Traveler's Status and Situation.** Lists specific travelers and the conditions under which space-available travel may be authorized.

d. **Approved Geographical Travel Segments.** Lists the origin and destination combinations.

    (1)  C-C is CONUS to CONUS.

    (2)  O-O is OCONUS to OCONUS.

    (3)  C-O is CONUS to OCONUS.

    (4)  O-C is OCONUS to CONUS.

e. **Example.** A "yes" in the column headed by one of these abbreviations indicates that travel is authorized in that particular geographical travel segment for the particular type of traveler cited in that item number, and subject to any limitations cited. Lack of a "yes" indicates travel is not authorized in that particular geographical travel segment. "Uniformed services" and "uniformed services members," as used in the chart, refer to active duty uniformed services members (Category VI), unless otherwise specified.

DHS-0000037

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 3.  Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel Segments

| Category I - Emergency Leave Unfunded Travel.  Transportation by the most expeditious routing only for bona fide immediate family emergencies, as determined by DoDI 1327.06 and Military Service regulations.  This travel privilege will not be used in lieu of funded travel entitlements | | | |
|---|---|---|---|
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 1 | Wounded Warriors traveling on leave will be offered seats on OSA aircraft on a space-available basis before any other potential space-available passenger. | yes | yes | yes |
| 2 | Immediate family members of Wounded Warriors who possess a valid DoD identification card when accompanying Wounded Warriors to their destination on OSA aircraft. | yes | yes | yes |
| 3 | Uniformed services members with emergency status indicated in leave orders and their accompanying dependents. | yes | | |
| 4 | Unaccompanied dependents of members of the uniformed services who are assigned and domiciled in the CONUS. | | | yes |
| 5 | Non-command-sponsored dependents of members of the uniformed services, residing OCONUS with the sponsor; one-way only to emergency destination. | | yes | C-O: no O-C: yes |
| 6 | (1) Command-sponsored dependents of members of the uniformed Services; (2) DoD civilians and their command-sponsored dependents; (3) ARC full-time, paid U.S. citizen personnel serving with a DoD Component overseas; (4) NAF personnel whose travel from the CONUS, Alaska, or Hawaii was incident to a PCS assignment at NAF expense. | | yes | yes |
| 7 | Dependents of retired uniformed services members who die OCONUS are authorized travel from OCONUS to the CONUS, and OCONUS to OCONUS to accompany the remains of the deceased member.  Return travel is authorized if accomplished within 1 year of arrival.  The dependent will present to air terminal personnel documentation certified by DoD mortuary affairs offices. The documentation must be in the dependent's possession during travel. | | yes | yes |

DHS-0000038

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

**Table 3. Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel Segments, Continued**

| Category II - Accompanied EML | | | | |
|---|---|---|---|---|
| **Item** | **Traveler's Status and Circumstance** | **C-C** | **O-O** | **C-O / O-C** |
| 8 | Sponsors in an EML status and their dependents traveling with them, also in an EML status.  Sponsors include: (1) uniformed services members; (2) U.S. citizen civilian employees of the Military Services who are eligible for government-funded transportation to the United States at tour completion (including NAF employees); (3) ARC full-time, paid U. S. citizen personnel on duty with a DoD Component overseas; (4) USO full-time, paid U.S. citizens personnel assigned to a DoD installation overseas; (5) DoD Education Activity teachers during the school year and during employer-approved training during recess periods. | | yes | yes |

| Category III - Ordinary Leave, Relatives, House Hunting Permissive TDY, MOH Holders, and Foreign Military | | | | |
|---|---|---|---|---|
| **Item** | **Traveler's Status and Circumstance** | **C-C** | **O-O** | **C-O / O-C** |
| 9 | Uniformed services members in ordinary leave or pass status. | yes | yes | yes |
| 10 | Uniformed services members traveling under permissive TDY orders for house hunting incident to a pending PCS. | yes | yes | yes |
| 11 | Relatives who are permanent members of the household and dependent upon a Military Service member, a DoD civilian employee, or an ARC full-time employee serving with a DoD Component overseas, when the sponsor is authorized transportation of dependents at government expense.  Travel must be in accordance with the sponsor or sponsor's dependents' PCS move. | | yes | C-O only |
| 12 | Dependent spouses of military personnel officially reported in a missing status.  Dependents and accompanying dependent children and parents, when traveling for humanitarian reasons and on approval on a case-by-case basis by the Chief of the Military Department or designated representative.  Travelers will present approval document from the Service concerned. | yes | yes | yes |
| 13 | Dependents of a uniformed services member when accompanied by their sponsor in ordinary leave or pass status. | yes | yes | yes |
| 14 | Dependents when accompanying a uniformed services member traveling under permissive TDY orders for house hunting incident to a pending PCS. | yes | yes | yes |

DHS-0000039

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 3.  Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel Segments, Continued

| Category III - Ordinary Leave, Relatives, House Hunting Permissive TDY, MOH Holders, and Foreign Military, Continued | | | | |
|---|---|---|---|---|
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 15 | MOH recipients and their accompanying dependents. Except for active duty, traveler will present a copy of the MOH (MH or MOH) award certificate or DoD USID and privilege card with designation "MH" or "MOH." | yes | yes | yes |
| 16 | Command-sponsored dependents of uniformed services members accompanying their sponsors on approved circuitous travel.  Commanders authorized to publish circuitous travel orders for members under current policy of their uniformed service, where extenuating circumstances prevail, may approve requests for travel of their dependents within and between OCONUS areas and the CONUS incident to approved circuitous travel of the member. | | yes | yes |
| 17 | Civilian U.S. Military Service patients who have recovered after treatment in medical facilities and their accompanying nonmedical attendants.  Travel is permitted by the most expeditious routing to return the recovered patient and nonmedical attendant to their OCONUS post of assignment. (During the death or extended hospitalization of the patient, the nonmedical attendant retains the space-available travel authority to return to the patient's OCONUS post of assignment). | | yes | C-O:  yes O-C:  no |
| 18 | Foreign cadets and midshipmen attending U.S. Service academies in a leave status.  Foreign cadets' and midshipmen's native countries must be identified in the leave authorization. | | | yes |
| 19 | Foreign exchange service members on permanent duty with the DoD, when in a leave status. | yes | yes | yes |
| 20 | Dependents of foreign exchange service members on permanent duty with the DoD, when accompanying their sponsors. | yes | yes | yes |
| 21 | Unaccompanied dependents of deployed active duty uniformed services members when the deployment exceeds 365 consecutive days (passenger will be at the bottom of Category III). | yes | yes | yes |
| 22 | Military personnel and civilian employees of the Ministry of Defence of the UK permanently assigned to Diego Garcia. | | yes | |

DHS-0000040

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

**Table 3.  Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel Segments, Continued**

| Category IV - Unaccompanied EML | | | | |
|---|---|---|---|---|
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 23 | Unaccompanied dependents traveling under the EML Program. | | yes | yes |
| 24 | DoD Education Activity teachers and their dependents (accompanied or unaccompanied) traveling during the summer under the EML Program. | | yes | yes |
| 25 | Unaccompanied dependents of deployed active duty uniformed services members when the deployment is for at least 30 consecutive days. | yes | yes | yes |
| 26 | Uniformed services member retirees residing in commonwealths and U.S. possessions traveling to obtain certain health care services (medical or dental) and one dependent of the individual, if needed to accompany the individual. | | yes | yes |
| 27 | Diego Garcia TCN direct hire employees.  Transportation is to and from the nearest intermediate destination serviced by commercial aircraft. | | yes | |
| **Category V - Permissive TDY (Non-House Hunting), Students, Dependents, Post Deployment/Mobilization Respite Absence, and Others** | | | | |
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 28 | Military personnel traveling on permissive TDY orders other than for house hunting. | yes | yes | yes |
| 29 | Authorized dependents who are in-residence college students attending an OCONUS branch of an American (i.e., U.S.) university located in the same OCONUS area in which they reside, command-sponsored, stationed OCONUS with their sponsor, who is:  (1) a member of the uniformed services; (2) a U.S. citizen civilian employee of the DoD (paid from either appropriated funds or NAF); or (3) an ARC full-time, paid employee serving with the DoD. Unaccompanied travel is permitted from the overseas military passenger terminal nearest the sponsor's PDS to the overseas military passenger terminal nearest the university during school breaks.  Return travel is authorized.  Students must present written authorization from the sponsor's approving authority.  Only one round trip each year is authorized and unused trips may not be accumulated from school year to school year. | | yes | |

SECTION 4:  SPACE-AVAILABLE PASSENGER TRANSPORTATION                    41

DHS-0000041

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

**Table 3.  Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel Segments, Continued**

| Category V – Permissive TDY (Non-House Hunting), Students, Dependents, Post Deployment/Mobilization Respite Absence, and Others, Continued | | | | |
|---|---|---|---|---|
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 30 | Dependents, command-sponsored, stationed OCONUS with their sponsor, who is:  (1) a uniformed services member; (2) a U.S. citizen civilian employee of the DoD (paid from either appropriated funds or NAF); or (3) an ARC full-time, paid employee serving with the DoD.  Unaccompanied travel is permitted to and from the nearest overseas military academy testing site to take scheduled entrance examinations for entry into any of the U.S. Military Service Academies. | | yes | |
| 31 | Dependents of active duty U.S. military personnel stationed OCONUS who, at the time of PCS, were not entitled to transportation at government expense.  Travel is to accompany or join their sponsor at their duty station.  Travel may be unaccompanied and is limited to travel from the APOE in the CONUS, Alaska, or Hawaii to the OCONUS APOD serving the sponsor's duty station. | | | C-O: yes O-C: no |
| 32 | Non-command sponsored dependents, acquired in an OCONUS area during a military member's current tour of assigned duty, not otherwise entitled to transportation at government expense.  Command regulations pertaining to the acquisition of dependents must be followed.  Travel must be with the member's PCS, may be unaccompanied, and is limited to travel from the OCONUS APOE to the APOD in the CONUS, Alaska, or Hawaii.  Member's PCS orders are required for travel. | | | C-O: no O-C: yes |
| 33 | Unaccompanied spouses of uniformed services members stationed in OCONUS areas in response to written requests from school officials or when deemed essential, authorized, and directed in writing by the sponsor's commander for personal consultation on matters about the needs of dependent members attending school at an OCONUS location away from the uniformed services member's PDS. | | yes | |

DHS-0000042

Table 3.  Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel Segments, Continued

| Category V - Permissive TDY (Non-House Hunting), Students, Dependents, Post Deployment/Mobilization Respite Absence, and Others, Continued | | | | |
|---|---|---|---|---|
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 34 | Command-sponsored dependents of uniformed services members, unaccompanied, who are stationed OCONUS. Travel restrictions may apply to certain OCONUS destinations as determined by the CCDR.  Documentation signed by the sponsor's commander verifying command sponsorship will be presented to air terminal personnel, and be in the dependent's possession during travel.  Dependents under 18 years of age must be accompanied by an eligible parent or legal guardian. | | yes | yes |
| 35 | Non-command sponsored dependents of Active Duty personnel on a remote PCS tour.  Approval must be granted in advance by the member's commander.  A copy of the written approval must be presented to the air terminal personnel. | | yes | yes |
| 36 | Service members and their dependents traveling on post deployment/mobilization respite absence. | yes | yes | yes |
| Category VI - Retired, Dependents, Reserve, ROTC, NUPOC, CEC, Veterans with a Permanent Service-connected Disability Rated as Total, and Surviving Spouses of Service Members who Died in Active Duty, Inactive Duty Training, or Annual Training Status and Retired Military Members | | | | |
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 37 | Retired uniformed services members and their dependents (when accompanied by their sponsor). | yes | yes | yes |
| 38 | Dependents, command-sponsored, stationed OCONUS with their sponsor, who is:  (1) a uniformed services member; (2) a U.S. citizen civilian employee of the DoD (paid from either appropriated funds or NAF); or (3) an ARC full-time, paid employee serving with the DoD.  Unaccompanied travel is permitted to the United States for enlisting in one of the Military Services when local enlistment in the overseas area is not authorized.  If an applicant for military service is rejected, return travel to the overseas area may be provided under this eligibility. | | yes | yes |

DHS-0000043

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 3.  Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel Segments, Continued

| Category VI - Retired, Dependents, Reserve, ROTC, NUPOC, CEC, Veterans with a Permanent Service-connected Disability Rated as Total, and Surviving Spouses of Service Members who Died in Active Duty, Inactive Duty Training, or Annual Training Status and Retired Military Members, Continued | | | | |
|---|---|---|---|---|
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 39 | Authorized RC members and authorized RC members entitled to retired pay at age 60 (i.e., "gray area retirees") and their dependents (when accompanied by their sponsor) when traveling in the CONUS or directly between the CONUS and Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam, and American Samoa (Guam and American Samoa travelers may transit Hawaii or Alaska); or traveling within Alaska, Hawaii, Puerto Rico or the U.S. Virgin Islands. | yes | | |
| 40 | NUPOC, CEC, and ROTC students of the Army, Navy, or Air Force receiving financial assistance or enrolled in advanced training, in uniform, during authorized absences from the school.  Travel is authorized within and between the CONUS, Alaska, Hawaii, and the U.S. territories. | yes | | |
| 41 | Newly commissioned ROTC officers who are awaiting the call to extended active duty.  Travel is authorized within and between the CONUS, Alaska, Hawaii, and the U.S. territories. | yes | | |
| 42 | American Samoa veterans residing in America Samoa traveling to and from Hawaii for hospital care from the VA facility in Hawaii. | | To and from Hawaii only | |
| 43 | Dependent who accompanied a Service member while the Service member obtained health care services and subsequently died. | | yes | yes |
| 44 | Full-time, paid, U.S. citizen employees of the ARC or USO assigned to duty with the Military Services on a DoD installation overseas, and USS employees when providing direct support to the U.S. Military Services. | | | yes |
| 45 | Special Category Residents (Cuban exiles) | | To and from Cuba only | |
| 46 | Individuals at Guantanamo Bay, Cuba, as identified in Paragraph 4.8.p. of this issuance.  Such passengers will be at the bottom of the Category VI sign-up register. | | To and from and Cuba only | |

DHS-0000044

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 3.  Eligible Space-Available Travelers, Priorities, and Approved Geographical Travel Segments, Continued

| Category VI - Retired, Dependents, Reserve, ROTC, NUPOC, CEC, Veterans with a Permanent Service-connected Disability Rated as Total, and Surviving Spouses of Service Members who Died in Active Duty, Inactive Duty Training, or Annual Training Status and Retired Military Members, Continued | | | | |
|---|---|---|---|---|
| Item | Traveler's Status and Circumstance | C-C | O-O | C-O / O-C |
| 47 | Authorized veterans with a permanent service-connected disability rated as total and their dependents (when accompanied by their sponsor) traveling in the CONUS or directly between the CONUS and Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam, and American Samoa (Guam and American Samoa travelers may transit Hawaii or Alaska); or traveling within Alaska, Hawaii, Puerto Rico, or the U.S. Virgin Islands. | yes | | |
| 48 | Surviving spouses of Service members who died on active duty and their dependents (when accompanied by the surviving spouse). | yes | | |
| 49 | Surviving spouses of retired military members and their dependents (when accompanied by the surviving spouse). | yes | | |
| 50 | Surviving spouses of Service members who died in an inactive duty training status and their dependents (when accompanied by the surviving spouse). | yes | | |
| 51 | Surviving spouses of Service members who died in an annual training status and their dependents (when accompanied by the surviving spouse.) | yes | | |

DHS-0000045

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## Section 5:  Patient Movement (PM)

**5.1.  GENERAL.** DoDI 6000.11 identifies categories of patients eligible for PM and define the conditions necessary to provide PM.  DoDI 6000.11 also identifies conditions under which costs for PM services provided to DoD healthcare beneficiaries, other USG agencies, private individuals or organizations, foreign countries, or foreign nationals by the USTRANSCOM are reimbursable to the DoD.  USTRANSCOM will establish the procedures and approval authorities for regulated PM as part of its responsibilities for global patient regulating.

**5.2.  PM ELIGIBILITY.**

a.  **PM.** As defined in DoDI 6000.11, patients may be provided PM within the CONUS, to the CONUS from an OCONUS area, and between or in OCONUS areas for inpatient or outpatient treatment for which PM to obtain further medical treatment is required by a competent medical authority.  Specific authorizations for movement in PM status are based on those specified for each category of DoD health beneficiary listed in DoDI 6000.11.  PM transportation charges will conform to DoD reimbursement policies and third-party billing procedures.

b.  **Recovered Patients.** Recovered patients and their dependents may be authorized PM within the CONUS, from the CONUS to an OCONUS area, and in OCONUS areas for return travel to their duty stations when certified by a competent medical authority.  Specific authorizations for areas of travel authorized in PM recovered patient status are based on those specified for each category of DoD health beneficiary.

**5.3.  NONMEDICAL ATTENDANTS.**

a.  When a competent medical authority determines that a family member's presence is necessary to a patient's health and welfare, one adult member of the immediate family of a patient provided PM also may be provided PM as a nonmedical attendant authorized to accompany the patient.  If an immediate family member is not available, another adult may accompany the patient in nonmedical attendant status when the competent medical authority determines a need.

b.  Nonmedical attendants are issued travel orders authorizing the same category of movement as the patient.  Payment due the government for PM that may apply to the patient also will be applied to the nonmedical attendant.  The orders should clearly provide all known reimbursable items, costs, and corresponding accounting data to facilitate processing by the responsible finance activity.

c.  A nonmedical attendant whose status is lost due to the death, extended medical care of the patient, or other circumstances certified by a competent medical authority may be provided space-required movement on DoD aircraft to the destination nearest to their home.

DHS-0000046

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## 5.4. OTHER GOVERNMENT-SPONSORED PATIENTS.

a. A government employee classified by competent medical authority as a patient and requiring PM is authorized government transportation entitlements, in accordance with the JTR. PM may be provided from OCONUS to a CONUS hospital or between medical facilities OCONUS or in the CONUS. Transportation is chargeable to the employee's agency at the USG non-DoD rate tariff.

b. DoD civilian employees who become ill or injured while deployed in support of U.S. military forces engaged in hostilities are eligible for medical evacuation at no cost to the civilian employee and at the same level and scope provided to military personnel. The same system used to track active duty patients through the Military Health System will be used to track DoD civilian employees injured in theater while deployed in support of a contingency, in accordance with Directive-type Memorandum 17-004.

c. Defense contractor personnel who support the Military Services in contingency operations or other military operations may be provided with PM in emergencies where loss of life, limb, or eyesight could occur. The contract and medical authorities must specifically authorize medical or dental care beyond this standard. All costs associated with treatment and transportation of defense contractor personnel to a selected civilian facility are reimbursable to the Federal Government and are the responsibility of the defense contractor personnel, their employer, or their health insurance provider. DoDI 3020.41 provides further guidance on the transportation of defense contractor personnel.

## 5.5. PATIENTS OF OTHER USG AGENCIES.

Individuals sponsored by a USG agency, when classified as PM patients by a medical authority, may be provided PM. Specific authorizations for PM patients who are beneficiaries of other USG agencies are based on those specified for each category of DoD health employees listed in DoDI 1300.18. The sponsoring agency will reimburse the DoD at the USG non-DoD rate.

DHS-0000047

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## SECTION 6: CARGO TRANSPORTATION ELIGIBILITY

6.1. **GENERAL.** The following categories of cargo are eligible for transportation on DoD aircraft under the conditions cited in this issuance, DTR 4500.9-R, and DoDI 4500.57:

    a. DoD-owned or sponsored cargo.

    b. U.S. military mail and mail sent from or addressed to any Military Service post office.

    c. Defense courier cargo.

    d. Cargo of other USG agencies approved for transportation under the provisions contained in this issuance, in accordance with Section 2642 of Title 10, U.S.C.

    e. Cargo of DoD NAF activities such as religious and morale, welfare, and recreation agencies. Transportation costs are funded by the shipping or sponsoring organization.

    f. Cargo of the ARC, USO, or USS, in accordance with DTR 4500.9-R and DoDD 1000.26E, and under the terms of agreements between the DoD and these organizations.

    g. Cargo of foreign governments and international organizations transported pursuant to Section 9 or approved pursuant to Section 12 of this issuance.

    h. Humanitarian cargo transported pursuant to Sections 402 and 2561 of Title 10, U.S.C., and related authorities (e.g. Section 2557 of Title 10, U.S.C.).

    i. Foreign disaster assistance cargo transported pursuant to Section 404 of Title 10, U.S.C.

    j. Cargo of DoD support contracts when such transportation is specified in the contract.

    k. All other cargo when authorized by the Secretary of Defense, or designee, or other approval authority identified in Section 12 of this issuance or DoDI 4500.57.

6.2. **CARGO PREPARATION REQUIREMENTS.** All cargo offered for air transportation must meet the packing, marking, labeling, and documentation requirements outlined in DTR 4500.9-R.

6.3. **REIMBURSABLE TRANSPORTATION.** Documentation must provide for payment by citing the applicable transportation account code (TAC) or indicating the name and address of the entity or individual responsible for payment. In accordance with Section 1535 of Title 31, U.S.C., USG agencies requesting reimbursable transportation must certify that funds are available for payment of the services.

DHS-0000048

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## SECTION 7: TRANSPORTATION OF HUMAN REMAINS

**7.1. ELIGIBILITY.** Transportation on DoD aircraft of human remains of the individuals listed in this section is authorized in accordance with DoDD 1300.22, subject to the conditions and limitations described in DTR 4500.9-R and Sections 1481 through 1490 of Title 10, U.S.C.:

    a.  Service members.

    b.  RC members.

    c.  DoD civilian employees serving with the Military Departments.

    d.  Dependents of DoD Component members.

    e.  Retired Service members and dependents.

    f.  Other U.S. citizen, USG employees, to include defense contractor employees and their dependents, when authorized in accordance with Section 1486 of Title 10, U.S.C. or DoDI 3020.41.

    g.  Prisoners of war and interned enemy detainees.

    h.  Foreign nationals in accordance with Section 9 of this issuance.

**7.2. ESCORTS AND HONOR GUARDS.** Escorts and honor guards traveling with the remains are considered space-required passengers. DoDI 1300.18 provides additional information on the transportation of human remains and escorts.

DHS-0000049

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

# SECTION 8:  ORIENTATION FLIGHTS AND PUBLIC AFFAIRS TRANSPORTATION

## 8.1.  ORIENTATION FLIGHTS.

a.  In accordance with DoDI 5122.08 and Volume 2 of DoDI 5410.19, orientation flights further the understanding of particular programs concerning the DoD's roles and missions.  The approval authority for orientation flights is at the discretion of the Military Departments, but may be no lower than the installation commander, except as outlined in Paragraph 8.2. of this issuance.  Passengers under 18 years of age must have written parental approval before the scheduled flights.

b.  Orientation flights will be local area flights that begin and return to the point of origin or a point nearby, and will not be conducted to provide transportation.  Conducting an orientation flight on which a record attempt will be made, or which is the first flight of an aircraft just accepted into the inventory, or on any other flight of a similar or special nature where the safety of the aircraft, persons on board the aircraft, or persons on the ground may be endangered for any reason, are prohibited.

c.  Orientation flights may be provided to support:

(1)  Military Service members and civilian employees of the DoD Components.

(2)  ROTC program members, cadets, designated applicants to the ROTC programs, and civilian officials of educational institutions offering ROTC.  JROTC students who are members of an organized JROTC activity and key civilian officials directly involved in the JROTC programs.

(3)  CAP cadets and individuals when authorized by the CAP, National commander.

(4)  Air Force and Navy Aerospace Education Workshop participants.

(5)  USNSCC cadets in connection with USNSCC activities approved by the Chief of Naval Personnel.

(6)  Boy Scouts of America members and accompanying adult leaders when participating in DoD-approved activities.  Minors must possess a completed parent or guardian consent form.

(7)  Federal Aviation Administration (FAA) personnel when:

(a)  Engaged in flight-checking local military air traffic control procedures and facilities, navigational aids, communications, approach, and similar DoD procedures.

(b)  Examining rated aircrew personnel of the Military Departments for civil pilot, navigator, or engineer certificates or ratings.

DHS-0000050

(c)  Participating in approved military familiarization flights under existing arrangements between the Military Department concerned and the FAA, if seating position permits direct monitoring of aircrew duties.

(d)  Participating with students in the FAA Aviation Career Education Camp Program.

(8)  U.S. ambassadors or their senior deputies within overseas theaters, when invited by the CCDR or Military Department component commander to take an orientation flight and when the CCDR determines that the orientation flight is primarily in support of the DoD mission.

(9)  Federal Government officials, foreign officials, and members of Congress and their staffs.

(10)  Youth in congressionally sanctioned, DoD-approved youth programs.  Program participants may take part in no more than one orientation flight.  Parental or guardian permission is required.

(11)  State and local government and local community leaders.


**8.2.  PUBLIC AFFAIRS TRANSPORTATION.**  Public affairs transportation may be performed in accordance with DoDIs 5122.08 and 5410.16, Volume 2 of DoDI 5410.19, and DoDD 5100.46.

a.  While many orientation flights described in Paragraph 8.1. are for public affairs purposes, other types of public affairs transportation exist.

b.  The ATSD(PA), or their delegated representative in accordance with DoDI 5122.08, is the approval authority for the following public affairs travel:

(1)  Transportation in accordance with Paragraph 2.2. of this issuance.

(2)  Guests of the Secretary of Defense participating in the Joint Civilian Orientation Conference, in accordance with Volume 2 of DoDI 5410.19.

(3)  Non-local public affairs travel, except that, pursuant to DoDI 5122.08, the CJCS and the Secretaries of the Military Departments also have such authority; in addition, CCDRS have such authority for non-local public affairs travel pertinent to their command responsibility to and from their AORs.

(4)  Transportation of entertainment media personnel during production of a project that has DoD support, as outlined in a signed production assistance agreement pursuant to DoDI 5410.16.

(5)  All inter-theater public affairs travel, except that, pursuant to DoDI 5122.08, CCDRs may also authorize inter-theater travel from the nation where their headquarters is located to their AOR if the headquarters is located outside the AOR.

DHS-0000051

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

c.  Unless ATSD(PA) approval is required per DoDI 5122.08, the Offices of Public Affairs for each Military Department and the Office of Information, Department of the Navy, are authorized to monitor, control, and approve public affairs transportation by their respective units for the following:

(1)  State and local government and local community leaders participating in community relations programs, media tours of military installations, or conferences in which a DoD Component is either a sponsor or a participant.

(2)  Representatives of information media individually or in groups in connection with assignments to cover military events, press tours, visits to military installations, military exercises, or military operations.

DHS-0000052

# SECTION 9: SUPPORT TO FOREIGN GOVERNMENTS AND INTERNATIONAL ORGANIZATIONS

**9.1. GENERAL.** Transportation provided to foreign governments and international organizations must be authorized in advance of movement. It is the responsibility of the organization sponsoring the passenger, cargo, or human remains to provide evidence that transportation on DoD aircraft is authorized and meets the conditions outlined in this issuance. CCDRs or their designated authorities are limited to approvals within their AOR, unless otherwise stated in this issuance, DoDD 4500.56, or DoDI 4500.57.

**9.2. ELIGIBILITY.** Eligible categories of passengers, cargo, and human remains include:

   a. Those with transportation authorized pursuant to the terms of an international agreement or arrangement may be approved by the CCDR, including:

      (1) ACSAs concluded pursuant to DoDD 2010.09. Traffic sponsored by a department or ministry of defense of a foreign government or international organization with which the DoD has an ACSA are eligible for space-required or opportune transportation on aircraft in accordance with the terms of those agreements. Travel is reimbursable to the DoD at the USG DoD rate tariff unless another rate is specified in the travel authorization, and will be for the official business of the department or ministry of defense of the foreign government or international organization.

      (2) CMAAs concluded in accordance with Section 2350c of Title 10, U.S.C. Transportation is reimbursable at the USG DoD rate tariff unless otherwise specified in the travel authorization.

      (3) Other duly concluded international agreements or arrangements. Such agreements and arrangements are often temporary, limited in scope, and governed by the terms of the specific agreement or arrangement.

   b. Transportation authorized under a foreign military sales case, as described in Section 2751 of Title 22, U.S.C. Transportation is normally reimbursable by the foreign government or international organization at the non-USG DoD rate tariff.

   c. Transportation authorized in accordance with Section 2151 of Title 22, U.S.C. and Section 2321h(b)(2)(A) of Title 22, U.S.C., as amended by Public Law 113-296, when transportation is for official purposes and is the responsibility of the DoD under the Foreign Military Financing Program or the Military Assistance Program (i.e., Grant Aid). When transportation is provided on TWCF-funded aircraft, transportation is reimbursable at the USG non-DoD rate tariff and chargeable to the fund cite in the documents authorizing transportation. If the supported foreign government elects to defray the cost of transportation in lieu of funding by the USG, the foreign government will be charged the USG non-DoD rate tariff with billing on a direct basis.

DHS-0000053

d.  Foreign exchange personnel when transportation is directed by the DoD Component to which the individual is assigned.  Transportation is reimbursable at the USG DoD rate tariff.

e.  Foreign students participating in DoD professional military education programs, when travel on DoD aircraft is part of or required by the program curriculum.  Transportation is reimbursable at the USG DoD rate tariff.

f.  Canadian Forces personnel assigned to the North American Aerospace Defense Command when performing North American Aerospace Defense Command duties.  Transportation in accordance with this paragraph is on a noninterference basis on already-scheduled DoD aircraft.  When travel is on non-TWCF-funded aircraft, transportation is non-reimbursable.  When travel is on TWCF-funded aircraft, transportation will be authorized and reimbursed in accordance with procedures specified in the U.S.-Canada ACSA and related arrangements.

g.  Foreign national personnel assigned to the North Atlantic Treaty Organization, including its subordinate units, when performing North Atlantic Treaty Organization duties.  Transportation under this paragraph is on a noninterference basis on already-scheduled DoD aircraft.  When travel is on non-TWCF aircraft, transportation is non-reimbursable.  When travel is on TWCF-funded aircraft, transportation will be authorized and reimbursed in accordance with procedures specified in the appropriate ACSA and related arrangements.

h.  Other foreign passengers, cargo, and human remains, when authorized in accordance with Section 12 of this issuance.

**9.3.  TRANSPORTATION IN SUPPORT OF EXERCISES.**  Transportation is authorized for passengers and cargo of the armed forces of a foreign government or international organization participating in exercises that include combined operations and are sponsored or directed by the CJCS, CCDR, Military Service component commanders of the CCDR, or Military Department.  Transportation within the exercise area is authorized on a non-reimbursable basis.  Transportation to or from the exercise area or on logistics support flights within the exercise area is not authorized unless approved in accordance with Paragraph 9.2. of this issuance.

**9.4.  TRANSPORTATION AUTHORIZATION DOCUMENTATION.**

a.  Documents authorizing transportation on DoD aircraft pursuant to this section will be published or endorsed by a DoD Component, refer to the specific agreement, arrangement, program, or other authority under which transportation is authorized, and state whether transportation is reimbursable or non-reimbursable.

b.  When transportation is reimbursable by a foreign government, international organization, or DoD Component, the documents authorizing transportation will include the major accounting classification code (also referred to as "expenditure account chargeable"), complete billing address, or, in the case of transportation authorized under an ACSA that is to be accomplished in whole or in part on TWCF-funded aircraft, the USTRANSCOM-assigned CIC or TAC.  Requests for non-reimbursable transportation must be approved in accordance with Section 12 of this issuance.

DHS-0000054

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

    c. Where no DoD Component head is available to issue or endorse transportation authorizations, the senior U.S. military officer may approve the issuance of such authorizations, provided they comply with the policies and procedures in this section.

DHS-0000055

## SECTION 10: SERVICE ANIMALS, PETS, AND OTHER ANIMALS

**10.1. SERVICE ANIMALS.** A service animal, as defined in the Glossary, is permitted to accompany a passenger with a disability within the cabin on DoD aircraft. Commercial aircraft chartered by the DoD, or on behalf of the DoD, may be subject to the provisions of Part 382 of Title 14, CFR, relating to service animals. Other DoD aircraft may accommodate service animals subject to reasonable limitations required by the configuration of the aircraft or operational necessity.

a. Transportation of a service animal in the cabin or cargo hold is authorized without charge when accompanying a passenger who is otherwise authorized transportation under this issuance. DoD personnel will make every effort to ensure individuals with disabilities are not separated from their service animals. An animal's weight and size, as well as USG and foreign country restrictions, may limit the transport of a service animal within the cabin or cargo hold.

b. A service animal handler:

(1) Pursuant to Part 382 of Title 14, CFR, must comply with all requirements in this issuance to travel with a service animal on:

(a) DoD aircrafts; or

(b) Commercial aircrafts chartered by the DoD or on behalf of the DoD.

(2) Is subject to the requirements of Section 1001 of Title 18, U.S.C. that make it a Federal crime for making materially false, fictitious, or fraudulent statements, entries, or mispresentations knowingly on required paperwork to secure disability accommodations, while traveling with a service animal on:

(a) DoD aircrafts; or

(b) Commercial aircraft chartered by the DoD or on behalf of the DoD.

(3) May:

(a) Travel with no more than two properly trained service animals that must be able to fit on the service animal handler's lap or in the service animal handler's foot space on the:

1. DoD aircraft; or

2. Commercial aircrafts chartered by the DoD or on behalf of the DoD.

(b) Be required to pay a pet fee and transport service animals in a pet carrier or pay for damage from service animals that do not meet all of the requirements specified in Paragraphs 10.1.b.(1) to 10.1.b.(5) of this issuance.

(4) Must:

DHS-0000056

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

(a)  Harness, leash, or otherwise tether service animals at all times in an air terminal or on an aircraft.

(b)  Keep service animals under control at all times.  Care for and supervise service animals, to include toileting and feeding the service animals.

(c)  Maintain control of service animals in an air terminal or on an aircraft, to include:

1.  Restraining service animals from relieving themselves while in the air terminal or on the aircraft; or

2.  Ensuring service animals relieve themselves without posing a health or sanitation issue (e.g., by using a dog diaper).

(5)  Provides the departing DoD passenger terminal service with the:

(a)  Service animal handler's:

1.  Name.

2.  E-mail address.

3.  Phone number.

(b)  Service animal user's name and phone number (if different from the service animal handler's name and contact information).

(c)  Service animal's name and description, to include the animal's appearance, height, and weight.

(d)  Current service animal information, to include:

1.  Rabies vaccination date and the date the vaccination expires.

2.  Other health issues, diseases, or conditions (e.g., fleas, ticks, or disease that could potentially endanger people or other animals).

3.  Veterinarian's name and phone number.

4.  Name and contact information of the service animal's trainer or the training organization that trained the service animal to do work or perform tasks for the service animal user.

c.  Transportation of service animals is subject to country quarantine procedures.  When it is necessary to detain a service animal pending a determination of admissibility, the traveler will provide detention facilities that are satisfactory to the quarantine officer.  The passenger will bear the expense of such detention, including necessary examinations, vaccinations, and other expenses incurred due to the service animal accompanying the traveler.

DHS-0000057

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

d.  A service animal may be removed from the premises if the handler cannot control the animal or the animal poses a threat to the health or safety of passenger service personnel, the aircraft crew, or other travelers.

e.  No later than 48 hours before the date and time of departure, the service animal handler must provide the departing DoD passenger terminal service a signed statement of assurance to comply with:

(1)  The requirements specified in Paragraphs 10.1.b.(1) to 10.1.b.(5).

(2)  A signed statement with the information in Paragraph 10.1.b.(5).  An example of the signed statement is provided in Figure 1.

DHS-0000058

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Figure 1.  Example Statement of Assurance

**Statement of Assurance**

☐ [Service animal handler's first and last name, e-mail address, and phone number.]

☐ [Service animal user's first and last name and phone number (if different from the service animal handler's name and contact information).]

☐ My service animal's name is Kaiser.  Kaiser is a male Drahthaar, brown and grey wire coat, weighs 85 pounds, and is 28 inches tall.

☐ [Rabies vaccination date and the date the vaccination expires.]

☐ Kaiser does not have any health issues, diseases, or conditions (e.g., fleas, ticks, or a disease that could potentially endanger people or other animals).

☐ [Service animal's veterinarian's name and phone number.]

☐ Kaiser is trained to do work or perform tasks to assist with my disability and to behave well in a public setting.

☐ Kaiser completed obedience training and training to perform service animal tasks from [name and contact information of the service animal's trainer or training organization that trained the service animal].

☐ Kaiser is a properly trained dog who remains under the control of his handler in an air terminal or aircraft.  He does not act aggressively by biting, barking, jumping, lunging, or injuring people or other animals.  He does not urinate or defecate inside buildings or vehicles.

☐ I understand that if Kaiser does not behave well in public and acts aggressively by biting, barking, jumping, lunging, or injuring people or other animals, the airline may treat Kaiser as a pet, charge me a pet fee, charge me for damage from Kaiser, and require that Kaiser be transported in a pet carrier.

☐ To the best of my knowledge, Kaiser has not behaved aggressively or caused serious injury to another person or animal.

☐ I will care for, supervise, and keep Kaiser harnessed, leashed, or tethered, at all times, in the air terminal and on the aircraft.

☐ Kaiser will not need to relieve himself on the aircraft.  I will put a dog diaper on Kaiser if and when needed to ensure that he does not relieve himself on the air terminal or aircraft and pose a health or sanitation issue.

☐ I understand that I am subject to the requirements of Section 1001 of Title 18, United States Code, that makes it a Federal crime to knowingly and willfully make materially false, fictitious, or fraudulent statements, entries, or misrepresentations on required paperwork to secure disability accommodations while traveling with a service animal on DoD aircraft or commercial aircraft chartered by the DoD or on behalf of the DoD.

_____

Service animal handler's signature and date

DHS-0000059

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

10.2. PETS. Pets are dogs and cats only. Other animals, such as horses, fish, birds, rodents, ferrets, spiders, and reptiles, are excluded as pets under this authority because of their size, exotic nature, shipping restrictions, host-nation restrictions, or special handling difficulties that pose unavoidable safety or public health concerns.

a. Passengers traveling under PCS orders may be allowed to ship their pets at their own expense, and are limited to a maximum of two pets for each family. Pet movement aboard DoD organic aircraft is authorized for PCS moves only when such aircraft provide the only service to a location. Passengers traveling in a space-available status are not permitted to ship pets.

b. In the event of an evacuation or ordered or authorized departure of noncombatants from a PDS located in a foreign area in accordance with DoDD 3025.14, a uniformed services member or authorized DoD civilian employee is permitted transportation for up to two household pets to and from the safe haven location to a designated place. The member must have owned the pets at the evacuated foreign PDS. For an evacuation or authorized departure from a PDS located in Alaska or Hawaii, the uniformed services member is authorized transportation for up to two household pets that the member owned at the PDS.

c. The owner of the pet is responsible for the preparation and care of the animal and for all documentation, immunization, and border clearance requirements, including quarantine. The owner will provide a pet shipment container of sufficient size to allow the animal to stand up, turn around, and lie down with normal posture and body movements.

d. See Chapter 103 of Part I of DTR 4500.9-R for additional procedures for transporting pets on DoD aircraft.

10.3. OTHER ANIMALS. Other animals owned by the DoD, such as military working dogs, will be moved aboard DoD aircraft as cargo. Their movement is not restricted by this issuance, provided that such transportation does not pose safety or health risks to the aircraft, crew, or passengers. Animals will be housed, caged, and shipped in a humane fashion consistent with law and accepted commercial industry standards.

DHS-0000060

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## SECTION 11: REIMBURSEMENT AND BILLING

### 11.1. GENERAL.

a. The Secretary of Defense, the Secretaries of the Military Departments; the Chief, NGB; and the CCDRs may authorize and fund the transportation of DoD passengers, cargo, and human remains on missions financed through the TWCF.

b. The sponsoring organization will issue travel orders, ITAs, and other travel authorizations or approval documentation and include either the appropriation chargeable and the CIC or the name and address of a specific organization or individual responsible for payment. Reimbursement is required for transportation on aircraft operated by an activity financed through the TWCF. Airlift provided by an activity through TWCF will be reimbursed by the sponsoring DoD Component or agency. Reimbursement may be required for other transportation aboard DoD aircraft in accordance with DoDI 4500.57. For billing purposes, passengers must provide one copy of the travel authorization to the passenger services personnel.

c. The DoD Component sponsoring the movement is responsible for preparing all documentation necessary to effect transportation, which includes providing the TAC, CIC, billing address, and other information necessary for reimbursement purposes. Airlift rates are located at https://www.ustranscom.mil/dbw/index.cfm.

d. The CDRUSTRANSCOM is authorized to approve transportation on missions financed through TWCF for eligible cargo and personnel necessary to support airlift operations.

### 11.2. CATEGORIES OF TRAFFIC.

a. **DoD Traffic.** Traffic belonging to or sponsored by the DoD Components, as authorized by the Secretary of Defense or designee, the Secretaries of the Military Departments or designees, or the CCDRs or designees, as being primarily for official business or of official concern to the DoD.

(1) Where transportation is provided by USTRANSCOM, airlift users or their Military Services will pay for the services rendered. The sole exception is an order from the CJCS to USTRANSCOM requiring transportation when no Military Service is a participant (e.g., unreimbursed efforts in support of the North Atlantic Treaty Organization).

(2) Special reimbursement rules apply to any contingency operation designated by the Secretary of Defense as a "National Contingency Operation" pursuant to Section 127a of Title 10, U.S.C. These rules are issued separately in conjunction with any designation by the Secretary of Defense in accordance with the provisions of that section.

b. **Non-DoD USG Traffic.** Non-DoD USG traffic consists of passengers, cargo, or human remains belonging to or sponsored by other USG Executive Departments or agencies when authorized pursuant to this issuance. This type of traffic is paid for by the Executive Department

DHS-0000061

or agency involved. The Executive Department or agency requesting transportation must provide complete billing information, including a fund citation for direct billing purposes.

c. **Non-USG Traffic.** Non-USG traffic consists of passengers, cargo, and human remains belonging to or sponsored by a non-USG entity that has been authorized transportation pursuant to this issuance. When the authorization to transport non-USG traffic indicates that transportation is to be provided on a reimbursable basis, the individual or organization receiving the transportation must provide complete billing information, if such information is not provided in the authorization. This includes the name, address, and contact information of an individual responsible for the passenger or cargo, as well as a billing address.

## 11.3. REIMBURSEMENT.

a. As a general rule, the transportation of passengers, cargo, or human remains on missions financed through the TWCF is reimbursable. DTR 4500.9-R and DoD 7000.14-R prescribe rate tariff and billing procedures in such circumstances. When transportation is on a mission financed by the TWCF, approval actions and travel orders must specify the organization, entity, or individual responsible for paying for transportation.

(1) When transportation is on a mission financed by the TWCF and provided at no cost or on a non-reimbursable basis to a non-DoD customer pursuant to a statute, international agreement, or exception to policy granted under this issuance, approval actions and orders must specify the sponsoring DoD Component responsible for reimbursement to the TWCF.

(2) When transportation of DoD passengers and cargo on a mission is financed by the TWCF in support of operations designated by the Secretary of Defense pursuant to Section 127a of Title 10, U.S.C., special rules for billing and reimbursement will be provided separately, in conjunction with the designation.

(3) Non-reimbursable transportation of DoD traffic on TWCF-funded missions engaged in aircraft positioning or depositioning activities, as defined in Volume 2 of Air Force Instruction 24-605, must be approved by CDRUSTRANSCOM.

(4) Unless approved by CDRUSTRANSCOM, USTRANSCOM-assigned aircraft and USTRANSCOM-gained Air Reserve Component aircraft, whether or not mobilized, flying missions not financed by TWCF may not be used to transport DoD cargo or passengers on a non-reimbursable basis outside the CONUS.

b. The transportation of DoD passengers and cargo on missions not financed by the TWCF generally are not reimbursable by the DoD requestor. The transportation of non-DoD passengers and cargo on such missions may or may not be reimbursable, depending on the terms of the governing statute or international agreement. Consult DoDI 4500.57 and the relevant statute or international agreement to determine whether reimbursement is required, which rate tariff to charge, and any other restrictions or limitations that may apply.

DHS-0000062

(1)  When aircraft are departing or returning to the CONUS, missions not financed by the TWCF should offer their unused aircraft capacity to USTRANSCOM for mission requirements financed by the TWCF.

(2)  When engaged in positioning, depositioning, or training missions within the CONUS, DoD aircraft may be used for the transportation of DoD passengers and cargo to the extent authorized by DoDD 4500.56 and DoDI 4500.57.

## 11.4. TARIFFS.

a.  The USG DoD rate tariff will apply to:

(1)  Traffic authorized by Paragraph 11.2.a. of this issuance.

(2)  Traffic authorized by an ACSA, CMAA, or similar international agreement, unless otherwise specified in the authorizing documents.

(3)  USCG traffic, when in support of USCG units attached to the DoD Components and sponsored by the Department of the Navy.

(4)  Defense contractor personnel, cargo, and human remains when a responsible authority specifies that transportation will be furnished at DoD expense and the authorizing documents include a DoD CIC, TAC, or line of accounting chargeable for the transportation.

(5)  Traffic authorized under Section 2649 of Title 10, U.S.C. when on TWCF aircraft.

(6)  Non-DoD traffic when authorized at the DoD rate tariff in accordance with Section 2642 of Title 10, U.S.C.

b.  The USG non-DoD rate tariff will apply to:

(1)  Traffic authorized by Paragraph 11.2.b. of this issuance and transportation provided pursuant to Section 1535 of Title 31, U.S.C.

(2)  Activities and agencies in the USG that will make payments from appropriations, including foreign military financing furnished in accordance with Section 2221 of Title 22, U.S.C.

(3)  Trainees and students of eligible foreign countries who elect to reimburse a portion of the costs incurred which are otherwise chargeable to military appropriations made in implementation of Title 22, U.S.C.

(4)  Treaties or other international agreements or arrangements which specifically provide for such transportation at the USG non-DoD rate tariff.

(5)  Traffic of activities under the jurisdiction of a DoD Component funded with NAF.

c.  Non-USG rate tariff will be charged for the following traffic:

DHS-0000063

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

(1)  Traffic authorized by Paragraph 11.2.c. of this issuance.

(2)  Traffic of activities and agencies in the Federal Government (including any personnel of the DoD) when provided unauthorized air transportation.

(3)  Any agency or person outside the Federal Government, such as foreign military sales transactions pursuant to Title 22, U.S.C. and State and local government agencies, private parties, and any others not covered in this section.

(4)  Defense contractor personnel, when a responsible DoD authority either specifies that transportation will be furnished at the defense contractor's expense or fails to provide a DoD TAC, CIC, or line of accounting chargeable for the transportation.

(5)  Traffic authorized under Section 2649(a) of Title 10, U.S.C.  The actual rate for this traffic may be adjusted to comply with the statutory requirement that the customer be charged no less than the rate charged by commercial entities for the same kinds of service.  In the case of an emergency, disaster response, or the provision of humanitarian assistance, the customer should be charged no more than the cost of providing the transportation.

DHS-0000064

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## SECTION 12: APPROVAL AUTHORITIES

**12.1. GENERAL.** Table 4 provides a consolidated list of transportation approval authorities and the types of transportation each may approve. In addition, this section describes approval process for passengers, cargo, and human remains movements not included in DoDDs 4500.09 and 4500.56, DoDI 4500.43, or otherwise contained in this issuance.

a. Approval authorities cited in this section cannot be delegated unless specified by "or designee" in Table 4. Delegations of authority must be made in writing and specify the period of the delegation and the specific areas to which the delegation applies. Unless otherwise stated, delegations of authority may not be delegated below the two-star or equivalent civilian level.

b. CCDRs may delegate approval authority to authorize sub-unified and theater special operations commanders to approve transportation of foreign nationals in the grades of O-6 and below, and civilian equivalents, on DoD-owned or -controlled aircraft. This authority is valid when such commanders are in a CCDR's AOR, and when the commander has determined that such travel is in the primary interest of the DoD. Reimbursement is required for transportation on aircraft operated by an activity financed through the TWCF.

c. No commitment for airlift transportation will be made before obtaining approval.

d. When approval for non-interference movement of passengers or cargo is granted, such transportation will not displace space-required passengers or cargo.

e. The DoD Component approving the transportation of senior foreign government officials, such as a head of state, prime minister, or ministerial personnel, must notify the Executive Secretary of the Department of Defense at least 72 hours before the scheduled travel.

**12.2. APPROVING AUTHORITY ACTIONS.** Organizations requesting transportation under this section must request transportation from the approval authority at Table 4. Non-DoD Federal agency heads must endorse transportation requests. The approval authorities must consider all aspects of the transportation request. All requests must include:

a. Purpose for the transportation being requested.

b. Justification explaining why the transportation is in the best interest of the DoD or of the DoD Component concerned. Non-DoD Federal agencies requesting DoD transportation must provide a justification explaining why DoD airlift is required and in the best interest of the USG.

c. The cost of commercial airlift and a statement explaining why commercial transportation resources are not available or, if available, cannot meet the mission requirement. Cost alone is insufficient justification for not using commercial transportation service.

d. The estimated cost of DoD airlift by aircraft type.

DHS-0000065

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

e. A statement that the requested transportation is on a space-required or a non-interference basis and whether it will be provided on a reimbursable or non-reimbursable basis to the organization or individual receiving the transportation.

(1) When transportation is reimbursable by the organization or individual receiving the transportation, the request must include the appropriation, account chargeable, or name and address of the organization or individual responsible for payment.

(2) If the transportation is to be provided on a non-reimbursable basis to the organization or individual, the request must include a justification explaining why the transportation will not be reimbursed.

12.3. **APPROVAL AUTHORITIES.** Table 4 outlines transportation approval authorities and the types of transportation each may approve. The sequential numbering in the item column of Table 4 is for reference purposes only; it has no impact on priority of travel within that category.

Table 4. Approval Authorities

| Item | Approval Authorities |
|---|---|
| **Secretary of Defense, Deputy Secretary of Defense or** **Executive Secretary of the Department of Defense** | |
| 1 | Passenger, cargo, and human remains airlift requirements necessary to execute the responsibilities in Title 10, U.S.C. White House Support Missions, transportation of foreign nationals, and support to other Federal executive, judicial, or legislative departments or agencies and non-governmental directed missions. Transportation to support the counter-drug activities of law enforcement agencies funded using DoD counter-drug appropriations; transportation in support of foreign and U.S. disaster relief activities; transportation to support responses to civil emergencies; hostage repatriation; and support to civilian law enforcement agencies.<br><br>The DoD Executive Secretary may approve DoD air transportation support for USAID-sponsored urban search and rescue teams and equipment on a reimbursable basis, in accordance with the September 14, 2012 MOA between USAID and DoD. |
| **Executive Secretary of the Department of Defense** | |
| 2 | Foreign officials invited by OSD, the Defense Agencies, or the DoD Field Activities, as authorized by DoDI 7250.13. |
| 3 | Official travel for individuals of the OSD organizations; the Deputy Secretary of Defense; the Under Secretaries of Defense; the Director of Administration and Management; the General Counsel of the Department of Defense; the Assistant Secretaries of Defense; the Assistants to the Secretary of Defense; the OSD Directors, and equivalents, who report directly to the Secretary or the Deputy Secretary of Defense; the IG DoD; and other staff offices within OSD established by law or the Secretary of Defense to assist in carrying out assigned responsibilities. |
| 4 | Official and unofficial travel for individuals and family members of the OSD organizations administratively supported by OSD. |
| 5 | All other requests as delegated by the Secretary of Defense. |

DHS-0000066

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 4.  Approval Authorities, Continued

| | Under Secretary of Defense for Policy |
|---|---|
| 6 | USG and foreign national passengers, cargo, and human remains, to include other Federal executive, judicial, or legislative departments or agencies when the transportation is primarily in the interest of DoD.  Travel may be approved on a reimbursable basis in accordance with Section 1535 of Title 31, U.S.C. or other appropriate statutory authority.  Unless otherwise authorized by law, non-reimbursable travel may be approved only on a non-interference basis on already-scheduled DoD aircraft.  Such approvals are limited to a case-by-case basis only and will not be on a recurring basis. |
| | **ATSD(PA)** |
| 7 | Public affairs travel for news media, entertainment media personnel, and other public activities in accordance with DoDIs 5122.08 and 5410.16 and Volume 2 of DoDI 5410.19, respectively. |
| | **Deputy Assistant Secretary of Defense for Logistics** |
| 8 | Cargo and cargo couriers for non-DoD entities, Federal Government departments or agencies, and State government agencies when transportation is reimbursable or pursuant to Section 1535 of Title 31, U.S.C. |
| | **Secretaries of the Military Departments, Chairman and Vice Chairman of the Joint Chiefs of Staff, the Chiefs of Staff of the Army and Air Force, the Chief of Naval Operations, and the Commandant of the Marine Corps, Chief of Space Operations, Chief, NGB, or Designee** |
| 9 | Passengers, cargo, and human remains requirements necessary to execute the responsibilities of the approving DoD Component and in the interest of the DoD, including transportation on rotary wing and rotary tilt assets.  This includes foreign nationals, and other Federal departments or agencies and non-governmental directed missions.  Travel may be approved on a reimbursable basis in accordance with Section 1535 of Title 31, U.S.C., or other appropriate statutory authority.  Unless otherwise authorized by law, non-reimbursable travel may be approved only on a non-interference basis on already-scheduled DoD aircraft.  Such approvals are limited to a case-by-case basis only and will not be on a recurring basis. |
| 10 | Family members of personnel assigned to the Military Department, Joint Staff, and NGB, in accordance with DoDD 4500.56. |
| 11 | Foreign officials invited by the Military Department, CJCS, and, NGB, as authorized by DoDI 7250.13. |
| 12 | Invited members of Congress, dependents of members of Congress, and employees of Congress when traveling in the 50 States and U.S. territories. |
| 13 | Secretarial designee health care beneficiaries, including authorized attendants and escorts, in accordance with DoDI 6000.11. |
| 14 | Donated property, including gift items intended for distribution to DoD personnel, which are accepted by the Military Department or Joint Staff and transported at the expense of the Military Department, Joint Staff, or NGB. |

DHS-0000067

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

**Table 4.  Approval Authorities, Continued**

| Item | Approval Authorities |
|---|---|
| | **Secretary of the Air Force or Designee** |
| 15 | Non-DoD passengers conducting familiarization or hurricane analysis missions in support of the National Hurricane Operations Plan.  Transportation may be provided on a non-interference basis on previously scheduled missions.  Authority may be delegated to a level not lower than the commander of a U.S. Air Force major command. |
| | **CJCS or Designee** |
| 16 | Students attending Defense colleges sponsored by the CJCS, including the National Defense and Inter-American Defense Colleges. |
| 17 | Foreign nationals, non-DoD Federal agency personnel and cargo in support of Joint Chiefs of Staff-sponsored exercises. |
| | **CCDRs[1, 2, 3, 4] or Designee** |
| 18 | Passengers, cargo, and human remains airlift requirements necessary to execute the responsibilities of the CCDR concerned and in the interest of the DoD, in accordance with Title 10, U.S.C., including transportation on rotary wing, tilt rotary wing assets. Passengers include foreign nationals and other Federal Government departments or agencies and non-governmental-directed missions not otherwise addressed in DoDD 4500.56, DoDI 4500.57, or this issuance.  Travel may be approved on a reimbursable basis in accordance with Section 1535 of Title 31, U.S.C., or other appropriate statutory authority.  Unless otherwise authorized by law, non-reimbursable travel may be approved only on a non-interference basis on previously scheduled DoD aircraft.  Such approvals are limited to a case-by-case basis only and will not be on a recurring basis.  The Commanders, U.S. Northern Command and U.S. Indo-Pacific Command, may approve DoD air transportation support on reimbursable basis as delegated by the Secretary of Defense in the Defense Support of Civil Authorities Execute Order. |
| 19 | Transportation is authorized for passengers and cargo of the armed forces of a foreign government or international organization participating in exercises that include combined operations and are sponsored or directed by the CJCS, CCDR, Military Service component commanders of the CCDR, or Military Department.  Transportation within the exercise area is authorized on a non-reimbursable basis.  Transportation to or from the exercise area or on logistics support flights within the exercise area is not authorized unless approved under Paragraph 9.2. of this issuance. |
| 20 | U.S. ambassadors and support staff invited by the CCDR when travel is primarily in the official interest of the CCDR and in furtherance of the DoD mission.  Travel may be approved on a non-reimbursable basis. |
| 21 | Foreign officials on approved DoD-sponsored visits in accordance with DoDI 7250.13. |
| 22 | Passengers and cargo of the USO, ARC, and USS, including gifts intended for distribution to members of the Military Departments, subject to the conditions and limitations described in DTR 4500.9-R and any applicable MOU or MOA. |
| 23 | Foreign government officials, when requested by the U.S. ambassador or Chief of U.S. mission, following a determination by the Secretary of State that such transportation is warranted for security or medical reasons.  Reimbursement in accordance with Section 1535 of Title 31, U.S.C., is required unless the Secretary of Defense directs otherwise. |

DHS-0000068

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

**Table 4.  Approval Authorities, Continued**

| Item | Approval Authorities |
|------|----------------------|
| 24 | Donated property, including items intended for distribution to DoD personnel, accepted by a CCMD and transported at the expense of the CCMD. |
| 25 | Space-available transportation of DSCA-approved non-government-owned humanitarian supplies furnished by a nongovernmental source, pursuant to Section 402 of Title 10, U.S.C., and approved in accordance with Chapter 12 of the Security Assistance Management Manual (DSCA Manual 5105.38-M), that are transported on a prescheduled, non-TWCF aircraft assigned or allocated to the CCMD. |
| 26 | Family member travel on a mission non-interference basis and supported with ITAs. |
| 27 | Space-available transportation of non-command sponsored dependents. |
| **CDRUSTRANSCOM or Designee** | |
| 28 | USG passengers and cargo, when commercial transportation is nonexistent or severely constrained, such as during national emergencies, strikes, and disruptions of public transportation capabilities.  Approvals must be within the scope of authority of DoDI 5158.06. |
| 29 | DoD passengers and cargo that are primarily in the interest of the USTRANSCOM mission. |
| 30 | Foreign officials on an approved DoD-sponsored visit, in accordance with DoDI 7250.13, when travel is on a TWCF-funded mission and not otherwise authorized. |
| 31 | Space-available transportation of DSCA-approved humanitarian supplies furnished by a nongovernmental source, pursuant to Section 402 of Title 10, U.S.C., and approved in accordance with Chapter 12 of the Security Assistance Management Manual (DSCA Manual 5105.38-M), that are transported on a prescheduled aircraft assigned or allocated to USTRANSCOM. Transportation of such supplies requires advance coordination with the receiving geographic CCDR.  Shipments will be processed in accordance with the procedures detailed in DTR 4500.9-R. |
| 32 | Transportation provided under the authority of Section 2649 of Title 10, U.S.C., on aircraft assigned or allocated to USTRANSCOM or TWCF-funded missions. |
| 33 | Passengers and cargo supporting DoD-related investigations conducted by the National Transportation Safety Board. |
| 34 | Non-reimbursable, non-interference transportation of DoD passengers and cargo which are engaged in positioning or depositioning activities. |
| **Defense Attachés (DATTs) and Chiefs of Military Missions[4][5]** | |
| 35 | U.S. ambassadors (or in their absence, the Deputy Chief of Mission or *charge d'affaires*) and members of their staffs designated by the ambassador, Deputy Chief of Mission, or charge conducting official USG business. |
| 36 | Foreign nationals, when transportation is in support of official DoD mission requirements. |
| 37 | Spouses of personnel assigned to the DATT, military mission, and U.S. diplomatic mission or foreign nationals.  Spouse travel must be approved on a case-by-case basis only.  The spouse must accompany the sponsor traveling on official business and the spouse's presence must be required for accomplishment of official business. Travel is on a non-interference basis. |

DHS-0000069

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Table 4.  Approval Authorities, Continued

| Item | Approval Authorities |
|------|---------------------|
| | **Base and Installation Commanders** |
| 38 | Individuals who are in immediate danger of loss of life, limb, or sight.  Approval is limited to aircraft assigned to the base or installation. |
| 39 | Individuals and equipment (including search dogs) engaged in search and rescue operations.  Approval is limited to aircraft assigned to the base or installation. |
| 40 | Orientation flights continuous with the local flying area and terminating at the point of origin.  Approval is limited to aircraft assigned to the installation and approval authority must be no lower than the installation commander. |

[1] This authority may be delegated, in writing, though not below the two-star or civilian equivalent level.

[2] Transportation across CCMD OCONUS geographic boundaries requires advance approval with the transiting CCDR(s) with geographic areas of responsibility or designee(s).  For public affairs purposes, reference DoDI 5122.08.

[3] Exercise of authority under items 18 through 22 is limited to: (1) aircraft assigned or allocated to the CCMD; and/or (2) aircraft tasked to support the CCMD by the Joint OSA Center, Executive Aircraft Scheduling Activity, or other CCMD, after advance agreement with that center, activity, or CCMD through normal request processes.

[4] Cargo includes cargo in support of approved DoD humanitarian assistance pursuant to Section 2561 of Title 10, U.S.C., or approved DoD foreign disaster relief pursuant to Section 404 of Title 10, U.S.C. and funded by Overseas Humanitarian, Disaster, and Civic Aid appropriations, and humanitarian supplies from nongovernmental sources pursuant to Section 402 of Title 10, U.S.C. that have been approved by DSCA in accordance with Chapter 12 of DSCA Manual 5105.38-M.

[5] DATTs and Chiefs of Military Missions' approval authorities are limited to transportation on aircraft assigned to the DATT or military mission when the primary purpose of the transportation is for the official business of the DATT.

DHS-0000070

# GLOSSARY

## G.1. ACRONYMS.

| | |
|---|---|
| ACSA | acquisition and cross-servicing agreement |
| AMC | Air Mobility Command |
| AOR | area of responsibility |
| APOD | aerial port of debarkation |
| APOE | aerial port of embarkation |
| ARC | American Red Cross |
| ATSD(PA) | Assistant to the Secretary of Defense for Public Affairs |
| | |
| CAC | common access card |
| CAP | Civil Air Patrol |
| CCDR | Combatant Commander |
| CCMD | Combatant Command |
| CDRUSTRANSCOM | Commander, United States Transportation Command |
| CEC | Civil Engineer Corps |
| CFR | Code of Federal Regulations |
| CIC | customer identification code |
| CJCS | Chairman of the Joint Chiefs of Staff |
| CMAA | cooperative military airlift agreement |
| CONUS | continental United States |
| | |
| DATT | defense attaché |
| DAV | disabled American veterans |
| DD | Department of Defense (form) |
| DoDD | DoD directive |
| DoDI | DoD instruction |
| DOS | Department of State |
| DSCA | Defense Security Cooperation Agency |
| DTR | Defense Transportation Regulation |
| | |
| e-mail | electronic mail |
| EML | environmental morale leave |
| | |
| FAA | Federal Aviation Administration |
| FEML | funded environmental morale leave |
| | |
| ITA | invitational travel authorization |
| | |
| JROTC | Junior Reserve Officer Training Corps |
| JTR | Joint Travel Regulations |
| | |
| LOA | letter of authorization |

GLOSSARY                                                                 71

DHS-0000071

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

| MOA | memorandum of agreement |
| MOH | Medal of Honor |
| MOU | memorandum of understanding |
| | |
| NAF | nonappropriated fund |
| NGB | National Guard Bureau |
| NUPOC | nuclear power officer candidate |
| | |
| OCONUS | outside the continental United States |
| OSA | operational support airlift |
| | |
| PCS | permanent change of station |
| PDS | permanent duty station |
| PM | patient movement |
| POC | point of contact |
| | |
| RC | Reserve Components |
| ROTC | Reserve Officer Training Corps |
| | |
| TAC | transportation account code |
| TAD | temporary additional duty |
| TCN | third-country national |
| TDY | temporary duty |
| TWCF | Transportation Working Capital Fund |
| | |
| UK | United Kingdom |
| USAID | U.S. Agency for International Development |
| U.S.C. | United States Code |
| USCG | United States Coast Guard |
| USG | U.S. Government |
| USID | uniformed services identification |
| USNSCC | United States Naval Sea Cadet Corps |
| USO | United Service Organizations |
| USS | United Seamen's Service |
| USTRANSCOM | United States Transportation Command |
| | |
| VA | Department of Veterans Affairs |

**G.2. DEFINITIONS.** Unless otherwise noted, these terms and their definitions are for the purpose of this issuance.

**channel mission**. Airlift mission that operates on an established schedule and route.

**circuitous travel**. Travel by a route other than the one that ordinarily would be prescribed by a transportation officer between the places involved.

GLOSSARY

DHS-0000072

**defense contractor**.  Any individual, firm, corporation, partnership, association, or other legal non-Federal entity that enters into a contract directly with the DoD to furnish services, supplies, or construction.

**defense contractor personnel**.  Any individual employed by a firm, corporation, partnership, or association under contract with the DoD to furnish services, supplies, or construction.  Defense contractor personnel may include U.S. citizens and host nation and TCN direct hire employees.

**dependent**.  Defined in Appendix A of the JTR.

**DoD aircraft**.  For the purposes of determining air transportation eligibility in accordance with this issuance and DoDDs 4500.09 and 4500.56, any aircraft owned, controlled, leased, chartered, rented, or hired as part of a contract by any DoD Component.  These aircraft include, but are not limited to, common user aircraft, executive aircraft, OSA aircraft, special air mission aircraft, and aircraft assigned to the National Guard.  It also includes aircraft belonging to or controlled by a foreign military or international organization when the DoD has purchased, or otherwise arranged for, capacity on the aircraft for DoD use.  Eligible passengers, cargo, and human remains transported on DoD aircraft include:

DoD personnel and other individuals specified in this issuance.

DoD property, including articles owned, leased, rented, or otherwise controlled by or consigned to the care of a DoD Component.

Defense contractor support employees and property when there is a contractual requirement for the DoD to provide transportation services.

Human remains, as specified in this issuance.

Other USG and non-USG personnel and cargo when the request for transportation is approved in accordance with this issuance or DoDI 4500.57.

**FEML**.  A program offered to all active duty military personnel, all DoD civilians with travel agreements, command sponsored dependents, and those categories of personnel who are designated by the CCDRs.  This benefit allows travelers to travel in a duty status and utilize either scheduled commercial or military aircraft to a designated or authorized EML destination.

**individual**.  Under the Privacy Act, an individual is defined as a U.S. citizen or an alien lawfully admitted for permanent residence

**invited travelers**.  Non-USG individuals who qualify for DoD-funded transportation and are issued ITAs in accordance with the JTR.

**local area flight**.  A continuous flight performed in the local flying area that terminates at the point of origin.

DHS-0000073

**local travel**.  Defined in DoDI 5122.08.

**National Guard Youth Challenge Programs**.  Programs established by the Secretary of Defense using the National Guard to conduct civilian youth opportunities normally consisting of at least a 22-week residential program and a 12-month post-residential mentoring period.

**non-interference**.  The transportation of passengers or cargo on DoD aircraft that does not displace official DoD cargo or passengers or otherwise act to restrict or impede in any way the performance of a DoD mission.

**non-local travel**.  Defined in DoDI 5122.08.

**overseas humanitarian, disaster, and civic aid**.  Appropriation that funds DoD activities under Sections 401, 402, 404, 407, 2557, and 2561 of Title 10, U.S.C., including humanitarian assistance activities (e.g., activities that build the capacity of a partner nation government to provide essential humanitarian services to the civilian population and that support partner nation efforts to reduce the risk of, prepare for, and respond to humanitarian disasters, thereby reducing reliance on international disaster relief assistance as well as foreign disaster assistance activities and humanitarian demining assistance activities.

**personally identifiable information**.  Defined in DoDI 5400.11.

**properly trained service animal**.  A dog that does not urinate, defecate, or act aggressively by biting, barking, jumping, lunging, or injuring people or other animals while on the aircraft or in the air terminal gate area.

**public affairs orientation flights**.  Continuous flights in DoD aircraft performed within the local flying area and terminating at the point of origin or within proximity to the point of origin.

**public affairs transportation**.  Transportation of individuals, groups, or materiel undertaken as a result of a request to or an invitation from, and authorized by, an approving authority in the interest of adding to the public understanding of DoD activities.  It includes transportation involving individuals or cargo, military or civilian, government or non-government, U.S., and foreign requests.  Transportation may be local or nonlocal, point-to-point, or public affairs orientation flights that are performed in a local flying area and terminate at the point of origin or in proximity to the point of origin.

**scouting organizations**.  The Boy Scouts of America, the Girl Scouts of America as described in Part 621 of Title 32, CFR.

**service animal**.  A dog, regardless of breed or type, that is individually trained to do work or perform tasks for the benefit of a qualified individual with a disability, to include a physical, sensory, psychiatric, intellectual, or other mental disability.  Animal species other than dogs, emotional support animals, comfort animals, companionship animals, and service animals in training are not service animals for the purposes of Part 382.3 of Title 14, CFR, and this issuance.

DHS-0000074

**service animal handler**.  Pursuant to Part 382.3 of Title 14, CFR, a passenger in air transportation who is a qualified individual with a disability who receives assistance from service animals that do work or perform tasks that are directly related to the individual's disability, or a third party who accompanies the individual with a disability traveling with a service animal (e.g., a parent of a minor child or a caretaker).  The service animal handler is responsible for keeping the animal under control at all times and caring for and supervising the service animal, to include toileting and feeding.

**Service component command**.  Defined in the DoD Dictionary of Military and Associated Terms.

**space-available transportation**.  Authority granted to the Secretary of Defense to allow space on DoD assets to be used for the transportation of personnel after space-required passengers and cargo have been accommodated.

**space-required travel**.  Funded, mission-essential transportation authorized for a passenger on DoD aircraft.

**standby active status list**.  A listing for members in the Standby Reserve who have a remaining Military Service obligation, a temporary hardship, a key employee designation, or another cogent reason that prevents participation in training on a regular basis.

**TCN**.  A person who is not a citizen of the U.S. or the host country where the person is employed.

**uniformed services members**.  Members of the "uniformed services" as defined in Section 101 of Title 10, U.S.C.

**USID.**  Identification cards issued to retired and reserve members, dependent family members of Uniformed Services members, and other eligible individuals in accordance with DoD policy to facilitate access to benefits, privileges, and DoD bases.  DoD is transitioning from the Teslin family of USID cards to a more secure, next generation USID card.  The next generation USID card incorporates an updated design and security features to deter counterfeiting and fraud, and is printed on a plastic cardstock.

DHS-0000075

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

## REFERENCES

Air Force Instruction 24-605, Volume 2, "Air Transportation Operations," July 2, 2020

Chairman of the Joint Chiefs of Staff Instruction 3710.01, "DoD Counterdrug Support," current edition

Code of Federal Regulations, Title 14

Code of Federal Regulations, Title 32, Part 621

Defense Federal Acquisition Regulation Supplement Procedures, Guidance, and Information, current edition

Defense Security Cooperation Agency Manual 5105.38-M, "Security Assistance Management Manual," current edition

Defense Support of Civil Authorities Execute Order[1]

Defense Transportation Regulation 4500.9-R, current edition

Directive-type Memorandum 17-004, "Department of Defense Expeditionary Civilian Workforce," January 25, 2017, as amended

DoD 7000.14-R, "Department of Defense Financial Management Regulation (DoD FMR)," date varies by volume

DoD Directive 1000.26E, "Support for Non-Federal Entities Authorized to Operate on DoD Installations," February 2, 2007, as amended

DoD Directive 1300.22, "Mortuary Affairs Policy," October 30, 2015, as amended

DoD Directive 1342.20, "Department of Defense Education Activity (DoDEA)," July 7, 2020

DoD Directive 2010.09, "Acquisition and Cross-Servicing Agreements," April 28, 2003, as amended

DoD Directive 3025.14, "Evacuation of U.S. Citizens and Designated Aliens from Threatened Areas Abroad," February 26, 2013, as amended

DoD Directive 4500.09, "Transportation and Traffic Management," December 27, 2019, as amended

DoD Directive 4500.54E, "DoD Foreign Clearance Program," May 31, 2022

DoD Directive 4500.56, "DoD Policy on the Use of Government Aircraft and Air Travel," April 14, 2009, as amended

DoD Directive 4515.12, "DoD Support for Travel of Members and Employees of Congress," January 15, 2010

DoD Directive 5030.61, "DoD Airworthiness Policy," May 24, 2013, as amended

DoD Directive 5100.46, "Foreign Disaster Relief (FDR)," July 6, 2012, as amended

DoD Directive 5134.12, "Assistant Secretary of Defense for Logistics and Materiel Readiness (ASD(L&MR))," May 25, 2000, as amended

DoD Directive 5135.02, "Under Secretary of Defense for Acquisition and Sustainment (USD(A&S))," July 15, 2020

---

[1] Found with limited access at the office of the Humanitarion and Response Operations, Deputy Assistant Secretary of Defense for Global Partnerships, Under Secretary of Defense for Policy, email address osd.pentagon.ousd-policy.list.hadr@mail.mil

DHS-0000076

DoD Directive 5230.20, "Visits and Assignments of Foreign Nationals," June 22, 2005

DoD Instruction 1300.18, "DoD Personnel Casualty Matters, Policies, and Procedures," January 8, 2008, as amended

DoD Instruction 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

DoD Instruction 3020.41, "Operational Contract Support (OCS)," December 20, 2011, as amended

DoD Instruction 4500.36, "Acquisition, Management, and Use of Non-Tactical Vehicles," February 1, 2023

DoD Instruction 4500.43, "Operational Support Airlift," July 30, 2021

DoD Instruction 4500.53, "DoD Commercial Air Transportation Quality and Safety Review Program," May 7, 2021

DoD Instruction 4500.57, "Transportation and Traffic Management," March 7, 2017, as amended

DoD Instruction 5122.08, "Use of DoD Transportation Assets for Public Affairs Purposes," December 17, 2014, as amended

DoD Instruction 5158.06, "Joint Deployment and Distribution Enterprise (JDDE) Planning and Operations," April 7, 2020

DoD Instruction 5400.11, "DoD Privacy and Civil Liberties Programs," January 29, 2019, as amended

DoD Instruction 5410.16, "DoD Assistance to Non-Government, Entertainment-Oriented Media Productions," July 31, 2015

DoD Instruction 5410.19, Volume 2, "Community Outreach Activities: OSD Outreach Programs, Speaking Engagements, and Support to Non-DoD Organizations," September 29, 2021

DoD Instruction 5525.11, "Criminal Jurisdiction Over Civilians Employed By or Accompanying the Armed Forces Outside the United States, Certain Service Members, and Former Service Members," March 3, 2005

DoD Instruction 6000.11, "Patient Movement (PM)," June 22, 2018

DoD Instruction 7250.13, "Use of Appropriated Funds for Official Representation Purposes," May 22, 2023

DoD Manual 1000.13, Volume 1, "DoD Identification (ID) Cards:  ID Card Life-Cycle," January 23, 2014, as amended

Joint Publication 4-01, "The Defense Transportation System," July 18, 2017

Joint Travel Regulations, current edition

Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

Public Law 109-163, Section 377, "National Defense Authorization Act for Fiscal Year 2006," January 6, 2006

Public Law 113-296, "United States-Israel Strategic Partnership Act of 2014," December 19, 2014

DHS-0000077

*DoDI 4515.13, January 22, 2016*
*Change 7, January 11, 2024*

Memorandum of Agreement between U.S. Agency for International Development and DoD, September 14, 2012[2]

United States Code, Title 5, Section 552a

United States Code, Title 10

United States Code, Title 18

United States Code, Title 22

United States Code, Title 31, Section 1535

United States Code, Title 32, Section 509

United States Code, Title 49, Section 41113

---

[2] Found with limited access at the office of the Humanitarion and Response Operations, Deputy Assistant Secretary of Defense for Global Partnerships, Under Secretary of Defense for Policy, email address osd.pentagon.ousd-policy.list.hadr@mail.mil

REFERENCES                                                          78

# Presidential Documents

Executive Order 14167 of January 20, 2025

## Clarifying the Military's Role in Protecting the Territorial Integrity of the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* (a) As Chief Executive and as Commander in Chief of the Armed Forces of the United States, I have no more solemn responsibility than protecting the sovereignty and territorial integrity of the United States along our national borders. The protection of a nation's territorial integrity and national boundaries is paramount for its security.

(b) The Armed Forces of the United States have played a long and well-established role in securing our borders against threats of invasion, against unlawful forays by foreign nationals into the United States, and against other transnational criminal activities that violate our laws and threaten the peace, harmony, and tranquility of the Nation. These threats have taken a variety of forms over our Nation's history, but the Armed Forces have consistently played an integral role in protecting the sovereignty of the United States.

(c) Threats against our Nation's sovereignty continue today, and it is essential that the Armed Forces staunchly continue to participate in the defense of our territorial integrity and sovereignty. A National Emergency currently exists along the southern border of the United States. Unchecked unlawful mass migration and the unimpeded flow of opiates across our borders continue to endanger the safety and security of the American people and encourage further lawlessness. Accordingly, through this order, I am acting in accordance with my solemn duty to protect and defend the sovereignty and territorial integrity of the United States along our national borders.

**Sec. 2**. *Policy.* It is the policy of the United States to ensure that the Armed Forces of the United States prioritize the protection of the sovereignty and territorial integrity of the United States along our national borders.

**Sec. 3**. *Implementation.* The Secretary of Defense shall:

(a) No later than 10 days from the effective date of this order, deliver to the President a revision to the Unified Command Plan that assigns United States Northern Command (USNORTHCOM) the mission to seal the borders and maintain the sovereignty, territorial integrity, and security of the United States by repelling forms of invasion including unlawful mass migration, narcotics trafficking, human smuggling and trafficking, and other criminal activities.

(b) On the effective date of this order, add the following requirements to the Contingency Planning Guidance and Guidance for the Employment of the Force:

(i) A Level 3 planning requirement for USNORTHCOM to seal the borders and maintain the sovereignty, territorial integrity, and security of the United States by repelling forms of invasion, including unlawful mass migration, narcotics trafficking, human smuggling and trafficking, and other criminal activities, with a commander's estimate due to the Secretary of Defense within 30 days of the effective date of this order.

(ii) A campaign planning requirement for USNORTHCOM to provide steady-state southern border security, seal the border, and maintain the

DHS-000079

sovereignty, territorial integrity, and security of the United States by repelling forms of invasion, including unlawful mass migration, narcotics trafficking, human smuggling and trafficking, and other criminal activities.

(iii) Continuous assessments of all available options to protect the sovereign territory of the United States from mass unlawful entry and impingement on our national sovereignty and security by foreign nations and transnational criminal organizations.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02089
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

DHS-000080

8327

**Federal Register**

Vol. 90, No. 18

Wednesday, January 29, 2025

# Presidential Documents

Title 3—

The President

**Proclamation 10886 of January 20, 2025**

## Declaring a National Emergency at the Southern Border of the United States

**By the President of the United States of America**

**A Proclamation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby proclaim:

America's sovereignty is under attack. Our southern border is overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans, including America.

This invasion has caused widespread chaos and suffering in our country over the last 4 years. It has led to the horrific and inexcusable murders of many innocent American citizens, including women and children, at the hands of illegal aliens. Foreign criminal gangs and cartels have begun seizing control of parts of cities, attacking our most vulnerable citizens, and terrorizing Americans beyond the control of local law enforcement. Cartels control vast territories just south of our southern border, effectively controlling who can and cannot travel to the United States from Mexico. Hundreds of thousands of Americans have tragically died from drug overdoses because of the illicit narcotics that have flowed across the southern border.

This assault on the American people and the integrity of America's sovereign borders represents a grave threat to our Nation.

Because of the gravity and emergency of this present danger and imminent threat, it is necessary for the Armed Forces to take all appropriate action to assist the Department of Homeland Security in obtaining full operational control of the southern border.

To protect the security and safety of United States citizens, to protect each of the States against invasion, and to uphold my duty to take care that the laws be faithfully executed, it is my responsibility as President to ensure that the illegal entry of aliens into the United States via the southern border be immediately and entirely stopped.

As Commander in Chief, I have no more solemn duty than to protect the American people.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that a national emergency exists at the southern border of the United States, and that section 12302 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretaries of the military departments concerned, subject to the direction of the Secretary of Defense. To provide additional authority to the Department of Defense to support the Federal Government's response to the emergency at the southern border, I hereby declare that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631), that the construction authority provided in section 2808 of

DHS-000081

title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments. I hereby direct as follows:

**Section 1**. *Deployment of Personnel and Resources.* The Secretary of Defense, or the Secretary of each relevant military department, as appropriate and consistent with applicable law, shall order as many units or members of the Armed Forces, including the Ready Reserve and the National Guard, as the Secretary of Defense determines to be appropriate to support the activities of the Secretary of Homeland Security in obtaining complete operational control of the southern border of the United States. The Secretary of Defense shall further take all appropriate action to facilitate the operational needs of the Secretary of Homeland Security along the southern border, including through the provision of appropriate detention space, transportation (including aircraft), and other logistics services in support of civilian-controlled law enforcement operations.

**Sec. 2**. *Additional Physical Barriers.* The Secretaries of Defense and Homeland Security shall immediately take all appropriate action, consistent with law, including 10 U.S.C. 2214, to construct additional physical barriers along the southern border. To the extent possible, the Secretaries of Defense and Homeland Security shall coordinate with any Governor of a State that is willing to assist with the deployment of any physical infrastructure to improve operational security at the southern border.

**Sec. 3**. *Unmanned Aerial Systems.* The Secretary of Transportation and the Federal Communications Commission shall, consistent with applicable law, consider waiving all applicable Federal Aviation Administration and Federal Communications Commission regulations or policies, respectively, that restrict the Department of Homeland Security's ability to counter unmanned aerial systems within 5 miles of the southern border.

**Sec. 4**. *Revision of Policies and Strategies.* The Secretary of Defense and the Secretary of Homeland Security, in consultation with the Attorney General, shall take all appropriate action, consistent with law, to prioritize the impedance and denial of the unauthorized physical entry of aliens across the southern border of the United States, and to ensure that use of force policies prioritize the safety and security of Department of Homeland Security personnel and of members of the Armed Forces.

**Sec. 5**. *Revocation.* Proclamation 10142 of January 20, 2021 (Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction), is hereby revoked.

**Sec. 6**. *Reporting Requirement.* (a) Within 30 days of the date of this proclamation, the Secretary of Defense shall submit to the President, through the Homeland Security Advisor, a report outlining all actions taken to fulfill the requirements and objectives of this proclamation; and

(b) Within 90 days of the date of this proclamation, the Secretary of Defense and the Secretary of Homeland Security shall submit a joint report to the President about the conditions at the southern border of the United States and any recommendations regarding additional actions that may be necessary to obtain complete operational control of the southern border, including whether to invoke the Insurrection Act of 1807.

**Sec. 7**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

DHS-000082

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–01948
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

DHS-000083

# Presidential Documents

**Proclamation 10888 of January 20, 2025**

## Guaranteeing the States Protection Against Invasion

**By the President of the United States of America**

**A Proclamation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby proclaim:

An essential feature of any sovereign nation is the existence of territorial boundaries and the inherent authority to decide who and what may cross those boundaries. The Supreme Court of the United States has described this power as a "fundamental act of sovereignty," which "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *U.S. ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950). The Supreme Court has recognized the inherent right and duty of the Executive Branch to defend our national sovereignty, stating that "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power." *Id.*

The Congress has, in establishing "an uniform Rule of Naturalization," created a complex and comprehensive Federal scheme in the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* to control the entry and exit of people and goods across the borders of the United States. In routine circumstances, this complex and comprehensive scheme can protect the national sovereignty of the United States by facilitating the admission of individuals whose presence serves the national interest and preventing the admission of those who do not, such as those aliens who pose threats to public health, section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1); safety, section 212(a)(2) (8 U.S.C. 1182(a)(2)); and national security, section 212(a)(3) (8 U.S.C. 1182(a)(3)). Prospective immigrants who use the visa system are screened for such health, safety, and security concerns while outside of the United States, and are not permitted to enter the United States until they establish that they are eligible to be admitted as a matter of law and should be admitted as a matter of discretion.

But screening under those provisions of the INA can be wholly ineffective in the border environment, where access to necessary information is limited for aliens who have traveled from countries around the world to enter the United States illegally, or when the system is overwhelmed, leading to the unauthorized entry of innumerable illegal aliens into the United States.

Due to significant information gaps—particularly in the border environment—and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by section 212(a)(2)–(3) of the INA, 8 U.S.C. 1182(a)(2)–(3). Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials.

The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other transnational criminal organizations on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. And the risks

DHS-000084

associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that prevent actual operational control of the border.

The same is true for public health, where the Federal Government currently lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1). Effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as a lawful immigrant would. As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States.

Over the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States. The sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those previously described that are intended to prevent aliens posing threats to public health, safety, and national security from entering the United States. As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide.

This ongoing influx of illegal aliens across the southern border of the United States has placed significant costs and constraints upon the States, which have collectively spent billions of dollars in providing medical care and related human services, and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries.

In joining the Union, the States agreed to surrender much of their sovereignty and join the Union in exchange for the Federal Government's promise in Article IV, Section 4 of the U.S. Constitution, to ''protect each of [the States] against Invasion.'' I have determined that the current state of the southern border reveals that the Federal Government has failed in fulfilling this obligation to the States and hereby declare that an invasion is ongoing at the southern border, which requires the Federal Government to take measures to fulfill its obligation to the States.

The INA provides the President with certain emergency tools. For example, it states that ''[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.'' 8 U.S.C. 1182(f). This statute ''exudes deference to the President in every clause.'' *Trump* v. *Hawaii,* 585 U.S. 667, 684 (2018). Further, the INA renders it unlawful for ''any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.'' 8 U.S.C. 1185(a)(1).

Historically, Presidents have used these statutory authorities to deny entry of designated classes and categories of aliens into the United States through ports of entry. But if the President has the power to deny entry of any alien into the United States, and to impose any restrictions as he may deem appropriate, this authority necessarily includes the right to deny the physical entry of aliens into the United States and impose restrictions on access to portions of the immigration system, particularly when the number of aliens illegally crossing the southern border prevents the Federal Government from obtaining operational control of the border.

The INA does not, however, occupy the Federal Government's field of authority to protect the sovereignty of the United States, particularly in times

DHS-000085

of emergency when entire provisions of the INA are rendered ineffective by operational constraints, such as when there is an ongoing invasion into the States. The President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry of aliens involved in an invasion into the United States, and to rapidly repatriate them to an alternative location. Only through such measures can the President guarantee the right of each State to be protected against invasion.

By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States. Accordingly, I am issuing this Proclamation based on my express and inherent powers in Article II of the Constitution of the United States, and in faithful execution of the immigration laws passed by the Congress, and suspending the physical entry of aliens involved in an invasion into the United States across the southern border until I determine that the invasion has concluded.

NOW, THEREFORE, I, Donald J. Trump, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby direct as follows:

**Section 1**. *Suspension of Entry.* I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States on or after the date of this order of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended until I issue a finding that the invasion at the southern border has ceased.

**Sec. 2**. *Imposition of Restrictions on Entry for Aliens Invading the United States.* I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that aliens engaged in the invasion across the southern border of the United States on or after the date of this proclamation are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 3**. *Suspension of and Restriction on Entry for Aliens Posing Public Health, Safety, or National Security Risks.* I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States, on or after the date of this order, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA, 8 U.S.C. 1182(a)(1)–(3), is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended and restrict their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158.

**Sec. 4**. *Constitutional Suspension of Physical Entry.* Under the authorities provided to me under Article II of the Constitution of the United States, including my control over foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4, I hereby suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and direct the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take appropriate actions as may be necessary to achieve the

objectives of this proclamation, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 5**. *Operational Actions to Repel the Invasion.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after the date of this order, whether as an exercise of the suspension power in section 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), or as an exercise of my delegated authority under the Constitution of the United States, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 6**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–01951
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

DHS-000087

Protected Material

| | |
|---|---|
| **From:** | Blackwell, Juliana |
| **To:** | ████████████████████ |
| **Cc:** | ████████████████████ |
| **Subject:** | ICE Support RFA #1: Emergent Request for Assistance (RFA) for DOD support to ICE Missions |
| **Date:** | Monday, February 3, 2025 12:24:00 PM |

Hi Kelly,

Below please see a note from Secretary Noem to Secretary Hegseth.

We will be passing the official RFA for the below request later this week. Let me know if you have any questions.

Best,

JJ

---

Secretary of Defense Hegseth,

Please find this email as an emergent request in advance of a formal written Request for Assistance (RFA) from DHS to DOD for military support to U.S. Immigration and Customs Enforcement (ICE) operations and the broader mission to secure the border and maintain the territorial integrity of the United States pursuant to the following Executive Orders: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the U.S. (20 Jan 2025), section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the U.S. (20 Jan 2025); (3) Executive Order Guaranteeing the States Protection Against Invasion (20 Jan 2025) and the Presidential Directive on Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity (29 Jan 2025).

DHS requests immediate assistance, to commence as soon as you receive this email, to augment existing ICE resources categorized into four broad support categories: 1-Aviation; 2-Naval Station Guantanamo Bay (NSGB) Migrant Operation Center (MOC) Expansion, 3-Use and Expansion of the Joint Task Force Guantanamo (JTF-GTMO) Detention Facility , 4-Other operational support to ICE.

For initial planning purposes, this request includes:

**Aviation**

- Immediate aviation transportation assistance to remove aliens from interior locations within the United States to repatriation sites including El Salvador, Guatemala, Honduras, or other extraterritorial locations to be determined, such as NSGB.
- Additionally, while ICE will provide at least one officer on each flight, DHS requests that DOD provides in-flight security and on-board medical personnel, for all DOD-provided flights. The required medical and security staffing will be determined by DOD in consultation with ICE.

**NSGB MOC Expansion**

- Immediate expansion of the MOC on the leeward side of GTMO, including soft-sided facilities capable of housing 30,000 illegal aliens

DHS-000088

Protected Material

with all appropriate logistical support capabilities, including staff and security. The initial expansion should begin at the leeward camp, with future areas for expansion to be identified by DOD. The specific requirements will be coordinated directly with ICE in accordance with DOD CONPLAN 6120 requirements. DOD should anticipate use of this facility to begin within 7-10 days.

### Use and Expansion of JTF-GTMO Detention Facility

- Beginning 31 January 2025, immediate access, to and use of, the JTF-GTMO Detention Facility to house approximately 300 high-priority criminal aliens unlawfully present in the United States. DOD should anticipate additional requirements to expand this facility and to work with ICE on specific capacity and detention requirements including security and medical capabilities.

### Other Operational Support to ICE

- DOD personnel capable of executing the following functions to be stationed across all 25 ICE areas of responsibility with specific locations to be determined by ICE.



DHS requests this support on a non-reimbursable basis.

DHS understands the need to coordinate this request to generate a task order through the Joint Staff for execution and will reflect the same with greater detail in the formal RFA. Further, DHS understands that this RFA is expansive and will provide additional refinement in the form of required capabilities and presence in the formal submission.

Mr. Garrett Ripa (cc'd) at U.S. Immigration and Customs Enforcement will be my POC to assist in coordination with your team; Director, Joint Staff; and others as you identify to provide further detail for the utilization and deployment of these resources.

I appreciate your timely consideration of this emergent request. My formal

RFA will be transmitted in the coming days.
Respectfully,
Secretary of Homeland Security Noem

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR DISSEMINATION Protected Material

# GTMO Bound Flight Coordination Process

This Concept of Operations includes a general overview of the daily interagency coordination requirements for conducting the movement of illegal aliens from the Continental United States (CONUS) to Naval Station Guantanamo Bay (NSGB/GTMO).

**Table 1. Coordination Process for GTMO Bound Flights**

| # | Primary Entity | Actions |
|---|---|---|
| 1. | ICE | ▪ Develops manifest of illegal aliens (to include quantity, high/medium/low custody level, and demographic information) and shares with SOUTHCOM/JTF-SG, HSTF-SE, MCC, DHS ICC Medical Branch, USCIS, and DOS<br>○ Manifest developed based on camp capacity relayed by SOUTHCOM daily<br>○ SOUTHCOM/JTF-SG receives for camp planning; MCC receives for flight planning; DHS ICC Medical Branch receives for Electronic Medical Record coordination; DOS receives for visibility |
| 2. | JTF-SG | ▪ Provides SOUTHCOM J3 and HSTF-SE confirmation of camp capacity and ability to receive manifested illegal aliens |
| 3. | SOUTHCOM J3 | ▪ Provides final approval to receive flights based upon JTF-SG (and JTF-GTMO if high-threat) recommended ability to receive illegal aliens |
| 4. | MCC | ▪ Determines flight sourcing (ICE, DOD)<br>○ If ICE Air, go to 4a<br>○ If DOD, go to 4b |
| 4a. | MCC/ICE | ▪ ICE LNO in MCC schedules flight for arrival at NSGB within 48-72 hours<br>▪ ICE Air coordinates permission to land charter flight at NSGB with TRANSCOM |
| 4b. | MCC/NORTHCOM | ▪ MCC submits flight request for arrival at NSGB within 48-72 hours to NORTHCOM with confirmation from SOUTHCOM to receive the manifested illegal aliens<br>▪ NORTHCOM reviews request and, if approved, coordinates with TRANSCOM for flight planning<br>▪ MCC coordinates flight security element and medical element |
| 5. | MCC | ▪ MCC provides finalized flight plan and manifest to HSTF-SE, SOUTHCOM and JTF-SG |
| 6. | ICE/DOD | ▪ Conducts flight movement to Naval Station Guantanamo Bay |

This document is for internal U.S. Government coordination and may not be disseminated or released without the consent of the Department of Homeland Security and other U.S. Government entities referenced herein.

Protected Material

The following are critical terms and definitions related to the movement of illegal aliens to Naval Station Guantanamo Bay.

- **Movement Coordination Cell (MCC):** An element of the DHS Incident Command Center comprised of personnel from CBP, ICE, and DOD. The MCC initiates and coordinates domestic/international flight missions for illegal alien decompression and removal.
- **High Custody / Medium-High Custody:** May include detainees with a history of violent or assault charges, convictions, institutional misconduct, or those with a gang affiliation.
- **Medium-Low Custody / Low Custody:** May include detainees with criminal histories and non-violent felony charges and convictions. Detainees are those with no history of violent or assault charges or convictions, no institutional misconduct, and no gang affiliation.
- **Holding Capacity:** GTMO's ability to receive and ensure wrap-around services for the incoming detainees, including quantity of beds available for high/medium-high and medium-low/low custody level.

## Points of Contact

- Department of Homeland Security (DHS) Incident Command Center (ICC):
    - ICE POCs for manifests: ███████████████████
    - MCC Transportation POCs (include all on correspondence): ███████████████
    ███████████████████████████
    ███████████████████████
    - ███████████████ – DHS ICC Operations
    - ███████████████ – DHS ICC Section Chiefs
- Homeland Security Task Force – Southeast (HSTF-SE):
    - ███████████████████████████
    ███████████
- U.S. Southern Command (SOUTHCOM)/Joint Task Force (JTF) – Southern Guard:
    - ███████████████████ – SOUTHCOM CAT ████████ focus on IA mission)
    - ███████████████████████ – 24 hour across all SOUTHCOM AOR activities)
    - ███████████████████ – DDOC
    - ███████████ (ARSOUTH LNO); █████████
    ████████████████████████████
- U.S. Northern Command (NORTHCOM):
    - ███████████████████ – NORTHCOM Crisis Management Cell – Southern Border (CMC-SB) Deportation Flight Distro List
    - ███████████████ – NC J30 Joint Operation Planning and Execution System (JOPES)
    - ███████████████ – Deployment Distribution Operations Center (DDOC)
    - ███████████ – Army North (ARNORTH) LNO/NORTHCOM Coordination Element (NCE) Member
- U.S. Citizenship and Immigration Services (USCIS):
    - ███████████
- DHS ICC Operations Medical Branch:
    - ███████████ – DHS Office of Health Security (OHS)
    - ███████████ – DHS OHS
    - ███████████ – ICE Health Service Corps (HSC)
- Department of State (DOS)
    - ███████████ – Bureau of Western Hemisphere Affairs (WHA)
    - ███████████ – Bureau of Counterterrorism/Field Operations (CT/FO)
    - ███████████ – Bureau of Population, Refugees, and Migration (PRM)

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR DISSEMINATION OR RELEASE

Protected Material

# Critical Considerations (as of 02/09/2025)

The following critical considerations are vital data points, such as circumstances or conditions, that must be considered due to their operational significance:

- Initial planned population for GTMO transfers includes:
  - Single adult males (no family units)
  - Spanish-speaking individuals
- No medically fragile individuals (those with health concerns placing them at higher risk)
  - No Cuban or Mexican nationals to GTMO, per Department of State
- Flight operations to GTMO will include illegal aliens with final orders of removal that are "hard to remove but have no legal impediment to removal," per ICE
- Preference to receive illegal aliens at GTMO is 0700-1600 for processing (not limiting factor)
- ICE Air operations to be leveraged for large passenger flights (greater than 50 passengers, up to 135) for cost effectiveness for ICE. ICE ERO field offices have capability to provide meals and water for aliens.
- ICE provides each manifest with a unique identifier GTMO/Transfer #X. MCC provides each GTMO flight request with a unique identifier (e.g. flight request XR 01, 02, etc.)
- Fear screenings take place before illegal aliens depart from CONUS.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR DISSEMINATION OR RELEASE

DHS-000093

# Guantanamo Bay Clinical Operating Standards

Version 1
For Official Use Only





DHS-000094

<u>**U.S. DEPARTMENT OF HOMELAND SECURITY**</u>

**GUANTANAMO BAY
CLINICAL OPERATING STANDARDS**

**Background:**  This document is intended to provide guidance for health care personnel delivering services on Naval Station Guantanamo Bay (NSGB) as part of immigration enforcement activities. However, and to the extent feasible, the 2019 U.S. Immigration and Customs Enforcement (ICE) National Detention Standards (NDS) for Non-Dedicated Facilities should be applied and used as a reference for best practices at NSGB. The following Clinical Operating Standards has been adapted from the NDS, specifically Part 4.3 on Medical Care, to account for the unique operational environment at NSGB.

All detainees shall have access to appropriate medical, dental, and mental health care, including emergency services, as operationally feasible and within the constraints established and required by leadership.

1.  **Facilities**
    1.1. Adequate space and equipment will be furnished so that all detainees are provided basic health examination, treatment, and communication in a private setting to the extent it is operationally feasible. Medical records will be kept separately from detainee records and stored in a securely locked area. All pharmaceuticals will be stored in a secure and temperature-controlled area to ensure no alteration in potency.

2.  **Translation, Interpretation, and Language Access for Detainees with Limited English Proficiency (LEP)**
    2.1. Appropriate interpretation and language services will be provided for LEP detainees related to medical and mental health care, including professional interpretation services if staff interpretation is not available. Detainees shall not be used for interpretation services during any medical or mental health service. Interpretation and translation services by other detainees shall only be used in an emergency medical situation.

3.  **Health Care Personnel**
    3.1. A health care program that includes administrative and clinical leadership will be provided.
    3.2. Sufficient medical personnel to perform basic assessments and treatments for all detainees will be available.
    3.3. Health care personnel shall have a valid professional licensure, registration, and/or certification and will perform duties within the scope of their clinical license, registration, and/or certification.

    The following terms apply to health care staff referred to throughout this standard:

    - Health Care Practitioner: Defined as an individual who is licensed, certified, credentialed by a state or territory (e.g., MD/DO, PA, NP, RN, PharmD), or registered or trained by other

2
**FOR OFFICIAL USE ONLY**

DHS-000096

entity (e.g., EMT, medic, corpsmen, etc.) to provide health care services within the scope and skills of the respective health care profession.

- Mental Health Clinician: Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse/nurse practitioner/physician assistant, clinical social worker, or any other mental health professional who, by virtue of their education, credentials, and experience, are permitted by law to evaluate and care for the mental health needs of patients.

4. **Medical Screening (New Arrivals)**
   4.1. All detainees will be provided a Medical Intake Screening to include review of the transfer summary and determination of medical needs to include:
   - Identification of acute or chronic care conditions
   - Reconciliation of medications
   4.2. This Medical Intake Screening should occur as soon as operationally practical, ideally within 12 hours after arrival, but no later than 24 hours.
   4.3. The Medical Intake Screening should be performed by health care personnel, a specially trained detention officer, or other trained staff.
   4.4. The Medical Intake Screening will include collection of information regarding any known acute, emergent, or pertinent past or chronic medical, dental, and mental health conditions, including history of mental illness, particularly prior suicide attempts or current suicidal/homicidal ideation or intent, and any disabilities or impairments affecting major life activities.
   4.5. Any detainee responding in the affirmative shall have an evaluation facilitated to a qualified, licensed health care practitioner as quickly as possible, but no later than 48 hours.
   4.6. A health care practitioner will also review any transfer or health summary provided by any prior detention or hospital stay to ensure continuity of care. Detainees who appear upon arrival to raise urgent medical or mental health concerns shall receive priority in the intake medical screening process.
   4.7. The detention area shall have policies and procedures to ensure the Medical Intake Screening is documented.
   4.8. Any individual arriving from ICE custody without a tuberculosis (TB) screening within the past year shall receive a TB screening in accordance with the most current Centers for Disease Control and Prevention (CDC) guidelines, including, but not limited to, CDC Guidelines for Correctional Facilities, prior to being housed.

5. **Infectious and Communicable Diseases**
   5.1. Written plans will be provided to address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, treatment, and education.

6. **Comprehensive Health Assessment**
   6.1. Health care practitioners will conduct and document a comprehensive health assessment, including a physical examination, dental, and mental health screening, on each detainee within 14 days of the detainee's arrival at the facility, or as soon as operationally feasible.

**FOR OFFICIAL USE ONLY**

DHS-000097

6.2. Detainees with preexisting medical, dental, or mental health conditions identified during Intake Screening should have a comprehensive health assessment (physical exam) no later than 72 hours after their Medical Intake Screening was conducted.

6.3. The comprehensive health assessments shall be performed by a physician, physician assistant, or nurse practitioner. A registered nurse (RN) or other health care practitioner can also perform this function with documented initial and annual training provided by a physician and a dentist. When a physical examination is not conducted by a provider (MD/DO, PA, or NP), it must be reviewed by a provider.

6.4. If there is documented evidence of a comprehensive health assessment within the previous 90 days during which time the detainee has been in continuous custody, the health care practitioner may determine that a new assessment is not required.

**7. Dental Treatment:**

7.1. Detainees shall be afforded only authorized dental treatment, defined as follows:
- Emergency dental treatment shall be provided for immediate relief of pain, trauma, and acute oral infection.

**8. Sick Call**

8.1. All detainees will have access to sick call.

8.2. There will be regularly scheduled times when medical personnel are available to see detainees who have requested medical services, commonly known as sick call.

8.3. There will be a mechanism that allows detainees the opportunity to privately request health care services (including mental health and dental services) provided by a physician or other health care practitioner in a clinical setting.

8.4. A health care practitioner will review the sick call request within 24 hours and determine when the detainee will be seen based on the acuity of the problem.

8.5. Detainees requesting a sick call should be seen within 72 hours of their request.

**9. First Aid, Medical, and Mental Health Emergencies**

9.1. There will be a written plan for the delivery of 24-hour emergency medical and mental health care when immediate medical attention is required.

9.2. A physician will determine the availability, placement, and contents of first aid kits.

9.3. Detention staff and health care staff will be trained to initiate response to health-related emergencies within 4 minutes once the emergency is called (length of time it takes for the brain to be impacted when there is lack of oxygen). This training will be provided by a responsible medical authority in cooperation with the facility and will include the following:
- The recognition of signs of potential health emergencies and the required response;
- The administration of first aid and cardiopulmonary resuscitation (CPR);
- The recognition and response to decompensated mental illness; and
- An established plan and procedures for providing emergency medical care including the safe and secure transfer of detainees for appropriate medical care.

9.4. If a detainee requires emergency medical care, the first responding staff will immediately take steps to contact a health care practitioner through established procedures.

4

**FOR OFFICIAL USE ONLY**

DHS-000098

## 10. Medication

10.1. Provision of over the counter and prescription medications, as required.

10.2. Medication will be distributed by health care staff according to the established instructions and procedures. Health care staff shall keep written records of all medication given to or refused by detainees.

## 11. Special Needs

11.1. Notifications will be made of any detainee who requires close medical supervision, including chronic and convalescent care. There shall be a written treatment plan, including access to health care and other treatment, and coordination with non-medical personnel as necessary.

## 12. Bloodborne Pathogens

12.1. Information regarding infectious diseases shall be communicated on a regular basis to non-medical and health care staff, as well as detainees from a public service perspective. Detainees exposed to potentially infectious bodily fluids (e.g., through needle sticks, bites, or other means) shall be afforded timely medical assistance, and the incident shall be reported as soon as possible to the physician or designee and documented in the detainee's medical file. All detainees shall be assumed to be infectious for bloodborne pathogens, and standard precautions are to be used at all times when caring for all detainees.

12.2. There shall be a written plan to address exposure to bloodborne pathogens and post-exposure intervention, including testing and prophylactic administration of medication.

12.3. A detainee may request hepatitis testing, of any type, at any time.

12.4. A detainee may request human immunodeficiency virus (HIV) testing at any time. There shall be a written plan to ensure the highest degree of confidentiality regarding HIV status. Staff training shall emphasize the need for confidentiality, and procedures shall be established to limit access to health records to only authorized individuals and only when necessary.

12.5. The accurate diagnosis and medical management of HIV infection among detainees is important. An HIV diagnosis may be made only by a qualified health care practitioner, based on a medical history, current clinical evaluation of signs and symptoms, and laboratory studies.

## 13. Clinical Evaluation and Management of HIV

13.1. Medical personnel shall provide all detainees diagnosed with HIV or acquired immunodeficiency syndrome (AIDS) appropriate medical care consistent with national recommendations and guidelines disseminated through the U.S. Department of Health and Human Services agencies, including the CDC, and the Infectious Diseases Society of America. Medical and pharmacy personnel shall ensure that all Food and Drug Administration (FDA)-approved medications currently approved for the treatment of HIV/AIDS are accessible. Medical and pharmacy personnel shall develop and implement distribution procedures to ensure timely and confidential access to medications.

13.2. Any detainee with confirmed or suspected TB disease shall also be evaluated for possible HIV infection, and any detainee with HIV shall be evaluated for TB disease.

**FOR OFFICIAL USE ONLY**

DHS-000099

13.3. Medical and pharmacy personnel shall ensure access to adequate supplies of FDA-approved medications for the treatment of HIV/AIDS to ensure that newly admitted detainees are able to continue with their treatment without interruption. Upon removal, detainees currently receiving medications shall receive up to a 30-day supply of their medications as medically appropriate.

14. **Informed Consent**

14.1. Health care personnel will obtain specific signed and dated consent forms from all detainees at intake as a general consent for evaluation and treatment, and before any invasive procedure, except in emergency circumstances. Consent forms must be explained in the language the detainee understands.

14.2. As a rule, medical treatment shall not be administered against the detainee's will. If a detainee refuses treatment, DHS will be consulted in determining whether forced treatment will be administered, unless the situation is an emergency. In emergency situations or those that place other detainees or staff at risk of exposure to infectious agents, health care practitioners shall take appropriate emergency measures and notify DHS as soon as possible.

14.3. If the detainee refuses to consent to treatment, health care staff will explain the medical risks to the detainee of declining treatment and make reasonable efforts to convince the detainee to voluntarily accept treatment in a language or manner that the detainee understands. Health care staff will document their treatment efforts and the refusal of treatment in the detainee's medical record. Health care staff will document that the detainee was advised of the medical risks of refusal to consent to treatment in the language he or she understands. A detainee refusing examination or treatment may be segregated from the general population when recommended by the health care staff.

15. **Confidentiality and Release of Medical Records**

15.1. All health care personnel, and in particular those who have access to medical records, shall protect the privacy of detainees' medical information to the maximum extent possible while permitting the exchange of health information required to fulfill program responsibilities and to provide for the well-being of detainees.

15.2. There shall be a policy describing how detainees and their representatives can request and receive medical records, which shall be communicated to the detainee. Detainees and their representatives may also request medical records through the detainee's designated ICE Officer or the ICE Freedom of Information Act (FOIA) process.

15.3. Detainees who indicate that they wish to obtain copies of their medical records shall be provided with any appropriate forms. The facility will provide the detainee with assistance in making the written request (if needed) and will assist in transmitting the request to the appropriate office or person.

15.4. Following the release of health information, the written authorization shall be retained in the health record, and a copy placed in the detainee's detention file or maintained in a retrievable electronic format.

16. **Removal of Detainees**

**FOR OFFICIAL USE ONLY**

DHS-000100

16.1. Medical/Psychiatric Alert: When a health care practitioner determines that a detainee's medical or psychiatric condition requires either clearance by the health care staff prior to removal, or requires medical escort during removal, the facility shall notify DHS in writing.

16.2. Notification of Removals: Health care personnel will be given at least 72 hours advance notice prior to the removal of a detainee, so that they may provide for any medical needs associated with the removal.

16.3. Transfer of Medical Information: When a detainee is removed, a medical transfer summary shall accompany the detainee.

16.4. Prior to removal, the detainee shall be provided medication (in quantities specified below), in addition to the medical transfer summary. This summary should include medication instructions that the detainee can understand and health history that would be meaningful to future health clinicians. The summary shall include, at a minimum, the following items:
- Patient identification;
- TB screening results (including results date) and current TB status if TB disease is suspected or confirmed;
- Current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;
- Current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;
- Any past hospitalizations or major surgical procedures;
- Recent test results, as appropriate;
- Known allergies;
- Any pending medical or mental health evaluations, tests, procedures, or treatments for a serious medical condition that was scheduled and still pending for the detainee.
- Copies of any relevant documents as appropriate;
- Printed instructions on how to obtain the complete medical record; and
- The name and contact information of the transferring medical official.

16.5. Upon removal, the detainee shall receive up to a 30-day supply of medication as ordered by the prescribing authority and a medical care summary. If a detainee is on prescribed narcotics, the clinical health authority shall make a determination regarding continuation, based on assessment of the detainee.

## 17. Medical Experimentation and Research

17.1. Detainees shall not be used in any medical, pharmaceutical, or cosmetic experiments or research.

17.2. This will not preclude an individual detainee from receiving a medical treatment or procedure not generally available but determined medically necessary by the physician such as medications and clinical trials. The administration of such investigational therapies shall follow relevant FDA or other national protocols and will be administered only with written consent from the detainee, which should be retained in the detainee's medical record. DHS must be notified of all such situations.

FOR OFFICIAL USE ONLY

DHS-000101

## 18. Mental Health Program

18.1. There shall be a mental health program, approved by the appropriate medical authority, that provides:

- Assistance with intake screening for mental health concerns;
- Referral, in the form of in-person consultation or through telehealth, as needed for evaluation, diagnosis, treatment and monitoring of mental illness by a qualified mental health clinicians;
- Sufficient capacity to provide crisis intervention and management of acute mental health episodes, in-person or through telehealth, as determined by the health care practitioner;
- Professional consultation for and assistance with the suicide prevention program; and
- Mechanism to report to DHS when a detainee exceeds available mental health resources.

## 19. Referrals for Sexual Abuse Victims or Abusers

19.1. If any security or medical intake screening or classification assessment indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified health care practitioner and/or mental health clinician for a medical and/or mental health evaluation and follow-up as appropriate.

## 20. Women's Medical Care

20.1. Female detainees shall receive age appropriate gynecological and obstetrical health care, consistent with recognized community and clinical guidelines for women's health services.

20.2. All initial health assessments of female detainees shall be conducted by a qualified health care practitioner. In addition to the criteria listed on the health assessment form, the evaluation shall inquire about and perform the following:

- If pregnancy test was not done while CONUS for detainees aged 18-56 immediately before arriving, then perform a pregnancy test, inform detainee of the result, and document the result;
- If the detainee is currently nursing (breastfeeding);
- Use of contraception;
- Reproductive history (number of pregnancies, number of live births, number of spontaneous/elective abortions, pregnancy complications, etc.);
- Menstrual cycle;
- History of breast and gynecological problems;
- Family history of breast and gynecological problems; and
- Any history of physical or sexual victimization and when the incident occurred. A pelvic and breast examination, pap test, baseline mammography and sexually transmitted disease (STD) testing shall be offered and provided as deemed appropriate or necessary by a health care practitioner and as operationally feasible.

## 21. Pregnancy

8

DHS-000102

21.1. Upon confirmation by the health care practitioner that a detainee is pregnant, the detainee shall be provided close medical supervision. Pregnant detainees shall have access to prenatal and specialized care (as operationally feasible), and comprehensive counseling on topics including, but not limited to, nutrition, exercise, complications of pregnancy, prenatal vitamins, labor and delivery, postpartum care, lactation, family planning, and parenting skills.

21.2. The facility administrator shall ensure that DHS is notified as soon as practicable of any pregnant detainee, but no later than 72 hours after such determination.

21.3. A health care practitioner will identify any special needs (e.g., diet, housing, and other accommodations such as the provision of additional pillows) and inform all necessary security staff and facility authorities.

21.4. All chemically dependent pregnant detainees (e.g., detainees dependent on substances including alcohol, sedatives/hypnotics, anxiolytics, and opioids) are considered high risk and referred to qualified physician capable of addressing their needs in a timely fashion.

## 22. Substance Dependence and Detoxification

22.1. During the Medical Intake Screening, all detainees shall be evaluated for their use of or dependence on mood and mind-altering substances including alcohol, opiates, hypnotics, and sedatives.

22.2. Detainees reporting the use of such substances shall be evaluated for their degree of reliance and potential for withdrawal. The physician shall establish guidelines for evaluation and treatment of new arrivals who require detoxification. As appropriate, guidelines will specifically address the treatment of pregnant women who are chemically dependent. Treatment and supportive measures shall be provided to permit withdrawal with minimal discomfort.

**FOR OFFICIAL USE ONLY**

DHS-000103

**FOR OFFICIAL USE ONLY**



*Office of Health Security*
**U.S. Department of Homeland Security**

**Homeland Security**

February 12, 2025

MEMORANDUM

TO:             Todd Lyons
                        Executive Associate Director (Acting)
                        Enforcement and Removal Operations
                        U.S. Immigration and Customs Enforcement

THROUGH:      Incident Commander
                        DHS Incident Command Center (ICC)
                        U.S. Department of Homeland Security

FROM:         Dr. Herbert O. Wolfe, MHS-PA     HERBERT O WOLFE   Digitally signed by HERBERT O WOLFE Date: 2025.02.12 23:13:17 -05'00'
                        Chief Medical Officer and Director (Acting)

SUBJECT:      **Interim Guidance: Elevated In-Custody Medical Risk Definition**

---

**Purpose:** Provide Medical Unified Group[1] (MUG) developed interim guidance for the definition of illegal aliens who are at an elevated in-custody medical risk (see Attachment).

**Background:** Illegal aliens with certain medical history may have a higher risk of decompensation and may require additional monitoring or care during transportation and time in custody. These illegal aliens may be at increased risk for medical complications on flights to Naval Station Guantanamo Bay (NSGB) and may exceed the medical capacity at NSGB. This definition standardizes the medical history or other factors that would increase an illegal alien in-custody medical risk.

**Direction:** The definition of Elevated in-Custody Medical Risk (ECMR) should be incorporated into NSGB standard operating procedures for immigration enforcement activities, including the screening, transportation, and care of illegal aliens. Operationally, illegal aliens should be screened using the ECMR definition:
- Prior to manifesting for transport to a 'collection point' (e.g., El Paso Detention Facility)
- Prior to manifesting for transport to NSGB
- Prior to boarding flight to NSGB

---

[1] MUG membership consists of the U.S. Department of Homeland Security, U.S. Department of Defense, U.S. Department of Health and Human Services, and U.S. Department of Veterans Affairs.

OHS-M-25-034

**FOR OFFICIAL USE ONLY**              DHS-000104

FOR OFFICIAL USE ONLY

**Interim Guidance: Elevated In-Custody Medical Risk Definition**
Page 2

If illegal aliens meet the criteria outlined in the ECMR definition, the medical recommendation is that they should not be transported to NSGB nor transported to a collection point intended for transfer to NSGB.

**Attachment:**  EMCR Definition

**CC:**  Assistant Director, ICE Health Service Corps

FOR OFFICIAL USE ONLY

DHS-000105

FOR OFFICIAL USE ONLY



*Office of Health Security*
**U.S. Department of Homeland Security**

**Attachment**

## Elevated In-Custody Medical Risk (ECMR) Definition

### General Considerations
- Need for medication(s), medical equipment and/or interventions which exceed NSGB Illegal Alien Detention Facility's medical support capability, including:
    - specialized or intra-venous (IV)/intra-muscular (IM) injection medication
    - feeding tubes
    - ostomy care
    - specialized diets
    - recurrent seizures
    - risk for injury to self/others due to behavior
    - ongoing complex wound care
    - any medical device implant
    - severe allergic reaction (e.g., food, insect bites)
- Requires regular or frequent specialty care/consultation especially which cannot be provided via telehealth
- Condition limiting communication and/or mobility; requires assistance with activities of daily living (ADL)
- General medical distress with any abnormal vital signs, including tachycardia, tachypnea, hypotension/hypertension, and/or hypoxia
- Surgery with complications within the past three years

### Specific Clinical Conditions
**Cardiovascular:**
- Cardiac dysfunction, including but not limited to congenital heart disease, cardiomyopathy, congestive heart failure, prior myocardial infarction with active symptoms (e.g., chest pain, dyspnea, palpitations, syncope), exertional or at-rest chest discomfort/dyspnea, aortic disease, valvular disease, dysrhythmia
- Blood pressure SBP > 180 mm Hg and/or DBP > 120 mm Hg
- Signs or symptoms suggestive of possible end organ dysfunction, including but not limited to, chest pain, syncope, severe headache, acute vision change, dyspnea, decreased urination/hematuria/dark urine
- Evidence of peripheral vascular disease including but not limited to, extremity pain, pallor, abnormal/absent peripheral pulses, non-healing wounds
- Current pacemaker or implantable cardiac defibrillator

### HEENT (Head, Eyes, Ears, Nose, Throat):
- Acute change in visual acuity, visual field deficit, monocular/binocular vision loss, flashes/floaters, blurred vision

OHS-M-25-034

FOR OFFICIAL USE ONLY

DHS-000106

FOR OFFICIAL USE ONLY

**Interim Guidance: Elevated In-Custody Medical Risk Definition**
Page 2

- Eye pain with extra-ocular motion
- Periorbital swelling and/or erythema
- Advanced periodontal disease with active infection (abscess, bleeding, severe inflammation), especially when associated with difficulty swallowing
- Neck swelling, difficulty swallowing
- Pharyngitis associated with difficulty swallowing or breathing

**Dermatology:**
- Skin condition placing individual or population at risk, cutaneous abscess, cellulitis/erysipelas, denuded skin (including mucus membrane lesions), untreated burn
- Acute rash plus fever or other symptoms of acute, systemic infection

**Endocrine:**
- Non-insulin dependent diabetes with fasting blood glucose >400 mg/dl
- Type 1 diabetes
- Endocrine condition (e.g., diabetes mellitus, thyroid disorder) with abnormal vital signs or acute symptoms (e.g., mental status change, nausea/vomiting, abdominal pain)

**Environmental:**
- Hypothermia (temperature <95 degrees Fahrenheit)
- Fever (temperature >100.3 degrees Fahrenheit)
- Heat stroke symptoms (temperature >101.5 Fahrenheit, combined with hot/red/dry skin, nausea, weakness/passing out, confusion, or altered mental status)

**Gastrointestinal:**
- Recent upper or lower GI bleed (<30 days)
- Intractable nausea, vomiting, abdominal pain, and/or diarrhea
- Advanced liver disease/cirrhosis

**Immunologic:**
- Conditions impacting immune function (e.g., cystic fibrosis, sickle cell disease, active cancer diagnoses)
- Regular and/or daily use of immunosuppressive medications or immunomodulatory medications requiring IV/IM injection

**Hematologic:**
- Chronic anemias associated with acute symptoms or requiring treatment within the last 30 days
- Acute anemia associated with chest pain, shortness of breath, persistent dizziness
- Congenital conditions including but not limited to sickle cell disease, thalassemia, blood dyscrasias (e.g., Von Willebrand disease, hemophilia), especially when associated with acute symptoms

OHS-M-25-034

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

**Interim Guidance: Elevated In-Custody Medical Risk Definition**
Page 3

**Infectious Disease:**
- Communicable diseases of public health/congregate setting significance (e.g., measles, polio, active tuberculosis, mumps, pneumonic plague, SARS, viral hemorrhagic fevers)
- Any concern for meningitis (constellation of two or more of the following symptoms: headache, fevers, stiff neck, nausea, vomiting, change in mental status)
- Any concern for sepsis including, but not limited to, hyperthermia or hypothermia in the context of any combination of elevated heart rate (>100 beats/min), elevated respiratory rate (>20 breaths/min), and low blood pressure (systolic BP <100 mm Hg) plus clinical concern for an infectious source.

**Behavioral Health and Substance Abuse:**
- Illegal aliens having ANY behavioral health condition which may place the individual or population at risk (e.g., delusional behavior, dementia, chronic psychosis/schizophrenia, anorexia/bulimia, etc.)
- History of active substance abuse of any kind with:
    - last use <14 days
    - risk for acute withdrawal (especially alcohol and benzodiazepines) or prior withdrawal syndrome episodes (e.g., seizure, delirium tremens, hospitalization requirement)

**Pulmonary:**
- Emphysema, asthma, COPD/chronic bronchitis, or other structural lung conditions with active symptoms (e.g., shortness of breath, cough, wheezing, chest pain)
- Medically dependent upon supplemental oxygen, mechanical ventilator, or continuous positive airway pressure (CPAP)

**Neurologic:**
- Seizure disorder without daily medication, seizure within the last year, or recent missed or underdosed seizure medications
- Stroke or stroke-like event (e.g., transient ischemic event) within last 3 years
- Baseline cognitive deficit that precludes performance of activities of daily living
- Movement disorder with impaired mobility or fall risk (e.g., Parkinson's disease, Alzheimer's dementia)
- Impaired communication ability (e.g., hearing, vision, or speech impaired)
- Acute neurologic symptoms, including sudden/maximal onset headache, focal motor weakness, generalized weakness/gait instability, monocular/binocular vision loss, visual field deficit, flashes/floaters, decreased visual acuity from baseline with corrective lenses (where applicable)

**Renal:**
- Acute renal failure or chronic kidney disease, including requirement for hemodialysis or peritoneal dialysis

OHS-M-25-034

FOR OFFICIAL USE ONLY

DHS-000108

**FOR OFFICIAL USE ONLY**

**Interim Guidance: Elevated In-Custody Medical Risk Definition**
Page 4

- Flank pain suggestive of acute and symptomatic renal stone or pyelonephritis (e.g., urinary tract infection symptoms associated with fever, nausea, vomiting)

**Trauma:**
- Acute or chronic traumatic injury requiring on-going treatment, including wound/burn care, splints/casts, assistive devices (e.g., brace, crutches, wheelchair)
- Evidence of wound infection or non-healing wounds
- Any injury requiring frequent follow-up care (e.g., surgery, physical therapy, occupational therapy, wound care)

**Urologic:**
- Urological conditions requiring medical intervention beyond oral medication (e.g., catheter, stent)

**Women's Health**
- Pregnant female
- Post-partum mothers (12 months post-delivery) with the following complications/symptoms:
  - abdominal/pelvic pain
  - vaginal bleeding, discharge, or leak of fluid
  - fever/other symptoms of infection
  - intractable vomiting that has not responded to anti-emetic therapy with difficulty hydrating/nourishing
  - new onset headache or other neurological symptoms
- Vaginal bleeding/discharge beyond routine menses, and/or moderate to severe pelvic/abdominal pain

OHS-M-25-034

**FOR OFFICIAL USE ONLY**



# HEALTH AND MEDICAL CONSIDERATIONS FOR DHS PERSONNEL DEPLOYING TO NAVAL STATION GUANTANAMO BAY

*This bulletin outlines key health and medical considerations for DHS personnel deploying to Naval Station Guantanamo Bay*

## General Conditions at NSGB

Naval Station Guantanamo Bay (NSGB) has limited on-base resources and the environmental conditions may present risk for personnel with certain medical history, conditions, and needs. There is no access to the rest of Cuba, and transportation on/off base is extremely limited. The only mobile phone carrier that works at NSGB is T-Mobile and reliable access to Wi-Fi may be difficult.

The conditions on NSGB include potential prolonged exposure to sun, high temperatures, humidity, tropical diseases, and elements including dust. Mosquitos, midges, and other insects are present and may present a significant nuisance. DHS personnel may be exposed to infectious diseases including dengue, Zika, Oropouche virus disease, and tuberculosis during deployment to this location. Personal protective equipment may be required to protect against environmental, occupational, and medical exposures.

The temporary living quarters and working conditions may also present challenges for those with certain medical histories. DHS personnel lodging may include congregate settings for sleeping with minimal personal privacy. Dietary requests due to allergies, religious needs, or personal preference may be difficult to be accommodate given the limited resources on the island.

## Health Care Resources Available at NSGB

While there is an on-base hospital for emergency care, routine medical care will not be regularly available on the island. Given the limited resources, potential for extreme conditions and minimal transportation available while at NSGB, traveling to NSGB with certain health conditions poses an increased risk.

If a DHS personnel member possesses a condition on the *Medical* or *Behavioral and Mental Health* list below, an informed decision must be made on whether to deploy. Discussion with a personal physician, supervisor, and/or Component occupational health program may assist in this decision.

*Emergency Care* – The U.S. Naval Hospital Guantanamo Bay Emergency Department provides Level 3 Emergency Care, Emergency Ambulance Services and Urgent Care. Emergency care is available 24 hours a day, 7 days a week. Urgent/emergent patients requiring medical care beyond the capabilities of the hospital are transferred by air medical evacuation to the mainland for further evaluation and treatment.

There is limited emergency medical care available at NSGB, and many injuries and illnesses would require medevac by private contractor to the mainland at a cost. Personnel on temporary duty (TDY) are covered by the Federal Employees Compensation Act for all activities reasonably incidental to the travel (e.g., ambulating, eating, grooming, etc.). Injuries and illnesses while on TDY are usually considered work-related unless it is a substantial deviation for personal activities (e.g., sightseeing). To facilitate timely processing of payments or reimbursements for transport and/or treatment, deployed employees should promptly file a claim after an incident. To potentially avoid being billed directly, ensure the Employees' Compensation Operations & Management Portal (ECOMP) claim number is available to the medevac company and medical providers. If billed, the employee can either forward the invoice to the Department of Labor (DOL), or pay personally and seek reimbursement by filing the receipt with the DOL.

*OB/GYN* – Routine pregnancy care will not be available. Pregnant employees should be aware of the unique risks of the Zika virus, which is present on the island and can be transmitted to the fetus. Zika virus carries a risk of birth defects.



OFFICE OF HEALTH SECURITY

DHS-000110



*Dental* – Emergent/temporizing dental care may be able to be provided. Complex orthodontic treatment is not available.

*Medical Conditions That Pose an Increased Risk at NSGB* – The Department of Defense (DOD), which operates NSGB, publishes a list of conditions that may disqualify DOD personnel from moving to NSGB. The list is shared here as a resource for DHS employees to help them determine if they can safely deploy to NSGB. The list not definitive, and health concerns may be directed to the employee's Component Occupational Health program or Reasonable Accommodations Program point of contact.  Some disabilities may not be able to be effectively accommodated and may result in the DHS personnel being unable to deploy.

*Medical*

- Tracheostomies and/or home ventilators or any home oxygen needs;
- G-tube/feeding tube needs;
- Ventriculoperitoneal shunts for treatment/management of hydrocephalus;
- Dialysis or stage 4 or 5 chronic kidney disease;
- Undergoing cancer treatment or diagnosed with a cancer;
- Transplant patients of any organ system;
- Aplastic anemia or being considered for bone marrow transplant;
- Chronic conditions requiring maintenance therapy with biologic agents, daily steroids, or immune modulators such as TNF alpha inhibitors (e.g., Humira or similar medications);
- Medical conditions which have a high probability of resulting in ICU admissions;
- History of stroke within 3-5 years;
- Thoracic or abdominal aortic aneurysm (or any other potentially surgical vascular issue);
- Pacemaker or automatic implantable cardio-defibrillator;
- Any coagulation disorder, such as thrombophilia or lupus anticoagulant;
- Asthma with two or more admissions in the past 2 years;
- Diabetes mellitus type I or brittle/labile insulin-dependent diabetes;
- Any seizure disorder;
- Gastric bypass for morbid obesity or any related subsequent complications due to the surgery or the related morbid obesity within the past 3 years;
- Laparoscopic gastric band for weight loss (regardless of time from insertion);
- Gastroparesis with ongoing weight loss;
- History of poorly managed eosinophilic esophagitis or achalasia;
- Uncontrolled glaucoma;
- Cerebral palsy;
- Spinal deformity or surgical spine surgery within 12 months (longer for continued surgical management);
- Total joint arthroplasty infections active or within 12 months from a definitive revision or with anticipated need for joint replacement surgery;
- Spinal issues or chronic pain conditions managed with Schedule II controlled substances or requiring a pain management specialist;
- Any history of hemoptysis from cavitary disease of any sort to include bronchiectasis;
- Active tuberculosis

*Behavioral and Mental Health*

- Psychiatric conditions where there is a history of admission or recommendation for inpatient hospitalizations, including "day hospitalization" or "partial hospitalization," and/or residential treatment in the past 10 years;
- Mental health conditions that require family therapy;





- Aggressive, destructive, and/or illegal behaviors;
- Active or substantiated family advocacy case within the past 2 years;
- Psychiatric conditions where the patient is on antipsychotic medications;
- DSM diagnosis and/or requiring significant psychotropic medication management or psychotherapy who are not stable for at least one year;
- Substance abuse/dependence over the past 10 years;
- Schizophrenia/schizoaffective disorder or dissociative disorder;
- Bipolar disorder;
- Suicide attempt/gesture within the past 3 years;
- Sexual addiction;
- Eating disorder;
- All borderline personality disorders not stabilized by treatment;
- Major depressive episode not stabilized by treatment;
- Panic disorder, obsessive compulsive disorder, or any anxiety disorder with panic attacks not stabilized by treatment;
- Dementia

## Deployment Preparation

Prior to deployment, obtain a 60+ day supply of medications and medical supplies (including all prescription and personal supply of over-the-counter medicines and remedies), complete all necessary medical, optical, and dental screening, and obtain adequate supply of any prescription optical (glasses and contact lenses). It is recommended that personnel deploying to NSGB are up to date on the CDC recommended routine vaccinations for Cuba, including varicella (chicken pox), Tdap (tetanus, diphtheria, and pertussis), influenza, MMR (measles, mumps, and rubella), polio, and shingles. CDC also recommends most travelers be up to date on COVID-19, hepatitis A, hepatitis B and typhoid vaccines. Full CDC recommendations are available on the CDC's Travelers' Health - Cuba site.

### Packing and Luggage Considerations
- Consider packing items in luggage inside zip-type or dry-sack bags.
- Consider packing items such as location and weather-appropriate clothing, jacket, sturdy field footwear, "shower shoes," rain gear, phone chargers, headlamp/flashlight with extra batteries, temp-stable snacks, water bottle, eye/ear protection, protective gloves, padlock, sun-protective hat, sunblock, insect repellent, mosquito netting, sun glasses, PT gear including reflective vest, swim clothing (for communal showers), sleep clothing, sanitation/wet wipes, alcohol hand gel, bandana, travel towel, first aid kit (bandages, analgesics, lip balm, moleskin, etc.), paper and writing implements, small sewing kit and tools (tweezer, nail clippers, scissors, etc.), carabiners, cash, and multi-plug power strip extension cord.
- Possible need for sleeping bag, pillow, blankets, air mattress, and other bedding items.
- Consider copies of necessary medical/dental records and up-to-date immunization.

### Personal Effects and Dependent Considerations
- Consider preparing a "Letter of Instruction," which provides trusted friends and family instructions or a list of things to do in the employee's absence, including emergency repair points of contact (e.g., plumber, HVAC service provider, etc.) and providing keys or access control to critical assets (e.g., homes, storage).
- Consider arranging for the care of dependent(s) and pets, including instructions to access dental, medical, and vision care with applicable location and contact numbers.
- Consider providing necessary contacts and documents to trusted relative/friends (e.g., itineraries, custody arrangements, powers of attorney).

3



# HEALTH AND MEDICAL CONSIDERATIONS FOR DHS PERSONNEL DEPLOYING TO NAVAL STATION GUANTANAMO BAY



- Consider arranging for automatic payment of recurring bills (e.g., utility, student loans, etc.).
- Consider notification to credit card companies and bank accounts to authorize use overseas so accounts are not frozen.
- Consider executing one or more power of attorney documents naming a trusted person to handle any legal or official affairs during the employee's absence.
- Consider executing estate documents (e.g., will, trust) and a living will (e.g., medical power of attorney).
- Consider ensuring life insurance policies and beneficiary designations are paid, accurate and up to date.

## Supporting Mental Health During Deployment

Time on NSGB may include exposure to psychological stimuli and triggers. Below are resources available to support employees pre/post deployment:

- Component Employee Assistance Programs (EAP) are a confidential service offering support for life's challenges. It includes access to licensed mental health professionals, legal and financial consultations, Work-Life services, childcare, and much more.
- The 988 Suicide and Crisis Lifeline offers 24/7 judgment-free support for mental health, substance use, and more.
- The SAMHSA National Helpline, 1-800-662-HELP (4357), delivers 24/7 free and confidential treatment referral and information service for individuals and families facing mental and substance use disorders.
- The Federal Employees Health Benefits (FEHB) Program presents health plans with a variety of mental health services that can help the employee and their family.
- DHS Components with Peer Support programs have trained peer volunteers to provide support for colleagues with exposure to psychological stimuli and triggers that are disturbing.
- Veterans Affairs National Center for PTSD website provides PTSD information and treatment options for veterans.
- The U.S. Department of Veterans Affairs (VA) provides several mobile apps designed to support veterans' mental health. These apps feature tools for managing insomnia, practicing stress reduction, improving physical fitness, quitting smoking, addressing post-traumatic stress disorder, and more. To explore these resources and download these applications, visit My HealtheVet.
- The DHS-Columbia Protocol app supports suicide risk screening through a series of simple, plain-language questions that anyone can ask.

For additional resources, visit the Employee Resources site on DHS.gov. For more information, contact the employee's Component Work-Life Program Manager or send an email to worklife@hq.dhs.gov.



DHS-000113

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

Protected Material



*Executive Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

February 28, 2025

| | |
|---|---|
| **MEMORANDUM FOR:** | Kelly Bulliner Ross<br>Executive Secretary<br>U.S. Department of Defense |
| **FROM:** | Juliana Blackwell<br>Acting Executive Secretary<br>U.S. Department of Homeland Security |
| **SUBJECT:** | **Request for Assistance from the Department of Defense for Transportation Support to the Department of Homeland Security** |

## Overview

DHS requests immediate assistance, to commence as soon as you receive this request, for transportation support to the Department of Homeland Security (DHS), on a non-interference basis, for supplies, equipment and personnel mobilizing to support alien removal operations. This request supports the execution of the 3 Feb 2025 request from DHS to DOD to expand the Naval Station Guantanamo Bay (NGSB), Cuba Migrant Operations Center (MOC) and utilize the Joint Task Force Guantanamo (JTF-GTMO) detention facility and the 12 Feb 2025 Request for Assistance in Support of U.S. Immigration and Customs Enforcement Removal Operations.

This Request for Assistance (RFA) is made pursuant to the following Executive Orders and Proclamations: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the United States (20 Jan 2025), Section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the United States (20 Jan 2025); (3) Presidential Proclamation Guaranteeing the States Protection Against Invasion (20 Jan 2025); and (4) Executive Order Securing Our Borders (20 Jan 2025); and the Presidential Memorandum on Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity (29 Jan 2025).

## DHS Overarching Goal

DHS seeks to expeditiously execute Presidential guidance to protect the American people against invasion, foreign terrorists and other national security and public safety threats.

www.dhs.gov

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE DHS-000114

Protected Material

Request for Assistance from the Department of Defense for Transportation Support to the
Department of Homeland Security
Page 2

## Specific Topics for Request

Transportation capabilities for supplies, equipment, and personnel directly supporting alien
detention and removal operations both CONUS and OCONUS specifically for the purpose of
providing support to operations at NSGB.

General support should include viable airframes, aircrew, material handling equipment, ground
support equipment and qualified personnel to build and manifest cargo as requested by the
Department of Homeland Security. DHS requests DOD determine the best type of support,
which may include either airlift or barge, to conduct the movement requested by DHS. Also,
DHS will consolidate requirements to maximize transportation efficiency and will use
preexisting air missions to the maximum extent possible.

## End of Mission

DHS requests that DOD-authorized support capabilities remain in place until POTUS issues a
finding that the invasion along the borders and approaches to the United States has ceased.

## Funding

DHS requests DoD provide support on a non-reimbursable basis.

Protected Material

OFFICE OF THE SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1000

MAR 0 7 2025

MEMORANDUM FOR EXECUTIVE SECRETARY, DEPARTMENT OF HOMELAND
SECURITY

SUBJECT: Department of Defense Support to U.S. Immigration and Customs Enforcement
Operations

Thank you for your February 3, 2025 request for Department of Defense (DoD) support
to Immigration and Customs Enforcement (ICE) operations. Supporting the President's direction
in Executive Order 14167, "Clarifying the Military's Role in Protecting the Territorial Integrity
of the United States," Proclamation 10886, "Declaring a National Emergency at the Southern
Border of the United States," and the Presidential Memorandum, "Expanding Migrant
Operations Center at Naval Station Guantanamo Bay to Full Capacity," is a top priority of the
Department, and we look forward to partnering with you to carry out this mission.

The Secretary of Defense has approved ICE use of facilities and land for expansion of
temporary holding capacity on Naval Station Guantanamo Bay (NSGB) for ICE's detention of
illegal aliens (IAs), including access to and use of Joint Task Force – Guantanamo Detention
Facilities (Camp VI) for the temporary holding of up to 144 high-threat IAs under Department of
Homeland Security (DHS) custody. DoD continues to provide aviation support under the
original conditions approved on January 21, 2025 including DHS maintaining custody, control,
and security of all IAs onboard, as well as responsibility for providing any required in-flight
medical care. This support is being provided on a non-reimbursable basis.

The Secretary of Defense has also approved the provision of services and sustainment,
such as food, emergent medical support, and laundry related to ICE detention operations at
NSGB, at a cost to DoD not to exceed $30 million, which will be resourced using DoD's Drug
Interdiction and Counter-drug Activities, Defense appropriation. Further, such support is
contingent on ICE ensuring that the population of IA's being held by ICE are determined by ICE
to be either members of transnational criminal organizations (TCOs) or human-smuggling
customers of TCOs. The approved medical support comprises provision of preventative health
services and first aid along with emergent life-saving medical care (life, limb, and eye-sight), as
appropriate and subject to capability and availability on NSGB, for DHS and ICE personnel at
NSGB, as well as IAs in DHS/ICE custody at NSGB. Medical support that exceeds the
capabilities available at NSGB will need to be provided by DHS or conducted by DoD on a
reimbursable basis in response to a subsequent DHS request. Given the limited medical
capabilities at NSGB and the nature of the facilities and environment, DoD requests DHS not
send women, children, animals, or IAs with acute medical or psychological conditions to NSGB.

To fully understand the requirements of the remaining requested capabilities, we require
additional information to ensure effective and efficient provision of DoD support. DoD and

Controlled By: OUSD(P)/HD&HA
CUI Category: OPSEC
Limited Dissemination Control: FEDCON
POC: OASD (HD&HA) █████████

CUI

DHS-000116

Protected Material

CUI

DHS personnel are currently working to refine the requirements requested in the Other Operational Support to ICE category. In addition to your official request for assistance, please provide clarification on the remaining requirements. Upon receipt, DoD will review and route these requirements to the Secretary of Defense for approval as appropriate.

Kelly Bulliner Ross
Executive Secretary

cc:
Secretary of the Navy
CJCS
USD(P)
CDRUSSOUTHCOM
ASD(LA)
ASD(HD&HA)

2

CUI

DHS-000117

Protected Material

Memorandum of Understanding Between

the U.S. Department of Homeland Security (DHS)

And

The U.S. Department of Defense (DoD)

For

DoD Support at Naval Station Guantanamo Bay (NSGB) to U.S. Immigration and Customs Enforcement (ICE) for DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal

This is a memorandum of understanding (MOU) between DHS, through ICE, and DoD. When referred to collectively, DHS and DoD are referred to as the "Parties."

1. BACKGROUND: On January 20, 2025, the President, in Executive Order (EO) 14165, "Securing Our Borders," directed the Secretary of Homeland Security to "take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States."[1] On January 29, 2025, President Trump directed the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at NSGB to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States.

2. AUTHORITIES AND REFERENCES: 8 U.S.C. § 1231(g); EO 14165, "Securing Our Borders," January 20, 2025; EO 14159, "Protecting the American People Against Invasion," January 20, 2025; Memorandum for the Secretary of Defense and the Secretary of Homeland Security, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," January 29, 2025.

3. PURPOSE: This MOU clarifies the Parties' respective roles and responsibilities related to custody and detention at NSGB of illegal aliens with final orders of removal (NSGB IAs). Consistent with DoD's authority to provide base of operations support for the purpose of facilitating counterdrug activities or activities to counter transnational organized crime of any Federal law enforcement agency within or outside the United States (10 U.S.C. § 284(b)(4)), DHS/ICE will detain at NSGB illegal aliens with a nexus to a transnational criminal organization (TCO) or criminal drug activity. This nexus can be satisfied by an alien being a member of a TCO or paying a TCO to be smuggled into the United States. Aliens subject to a final order but for whom no clear connection or nexus to TCOs or criminal drug activity exists (e.g., those who overstay their visa) will not be moved to NSGB. When the nature of an

---

[1] Additionally, Executive Order 14159 provides:
In Section 9: "[T]he Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States."
In Section 10: "Detention Facilities. The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law."

1

DHS-000118

Protected Material

alien's entry into the United States is uncertain, DHS/ICE may assert a nexus where DHS/ICE reasonably believes the alien to have paid a TCO to be smuggled into the United States if the alien is from a country where the preponderance of aliens from that country enter the United States in that fashion.

4. UNDERSTANDINGS OF THE PARTIES:

**4.1. DHS/ICE——**

4.1.1. Consistent with the Immigration and Nationality Act (INA), has legal custody of NSGB IAs and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations and will fulfill these responsibilities through the direction of DHS personnel and DHS contractor personnel. This includes ensuring custody conditions for NSGB IAs are appropriate and determining which NSGB IAs are considered "high threat" for housing at Camp VI.

4.1.2. Accepts the conditions at NSGB detention sites (JTF Building VI and the Migrant Operations Center) as adequate for holding and DHS/ICE exercising legal custody and detention of NSGB IAs. (ICE representatives have assessed these sites as suitable for adults only; minors will not be moved to NSGB at any point).

4.1.3. Will provide necessary DHS/ICE guidance and training to DoD personnel at NSGB assisting DHS/ICE in fulfilling DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

4.1.4. Understands that DoD will use as standards, as an interim solution, for support to DHS/ICE detention of NSGB IAs as contained in DoD Instruction 1325.07, "Administration of Military Correctional Facilities and Clemency and Parole Programs," and Army Regulation 190-47, "The Army Corrections System," with appropriate exceptions, and adjusted by USSOUTHCOM's Joint Task Force Southern Guard (JTF-SG) based on capabilities and assets currently present. Within 15 days from the effective date of this MOU, the Parties will agree to standards for detention under DHS/ICE legal custody, to be set forth in an addendum to this MOU. The interim standards shall not apply to the following topics: (1) in person visitation; (2) mandatory work for detained aliens; (3) vocational, training, or other prisoner rehabilitate activities; and (4) public affairs, public access, media relations, requests for information and photography. ICE shall provide guidance related to these topics as needed, consistent with section 4.1.19 and other provisions of this MOU.

4.1.5. Will provide an appropriate ratio of DHS/ICE officers to NSGB IAs as mutually determined between the Parties to achieve the responsibilities indicated in this memorandum, and at a minimum, will provide at least two DHS/ICE law enforcement officers or contractors in accordance with DHS/ICE standard operating procedures at the Camp VI detention facility on a 24/7 basis and will provide an appropriate number of DHS/ICE law enforcement officers and interior security in accordance with DHS/ICE standard operating procedures at the hard-sided Migrant Operations Center facility on the leeward side on a 24/7 basis depending on the size of the NSGB IA population.

4.1.6. Will conduct any necessary searches of NSGB IAs while recognizing DoD personnel may also undertake searches and other necessary actions for the safety of DoD personnel or facility integrity.

4.1.7. Will maintain custody of NSGB IAs' funds, valuables, and other personal property.

4.1.8. Will be responsible for providing internal security of NGSB IA holding areas, including determining whether to use restraints on NSGB IAs and placing restraints on NSGB IAs, while recognizing that DoD personnel also may take actions necessary for the safety of DoD personnel, for

2

DHS-000119

Protected Material

facility integrity, or to prevent the detainee from harming self or others, or from causing serious property damage.

4.1.9.    Will be responsible for the physical custody and directing the movements of NSGB IAs, including movement between detention sites, medical facilities, and airfield/port facilities.

4.1.10.  Will be responsible for any necessary questioning of NSGB IAs related to immigration matters or offenses not committed on NSGB.  Will be responsible for determining and imposing disciplinary actions.

4.1.11.  Will be responsible for translation, interpretation, and language access for NSGB IAs with limited English proficiency.

4.1.12.  Will be responsible for NSGB IA transfers, releases, and removals, as well as NSGB IA tracking and records (i.e., will provide a DHS/ICE Operations Center on the leeward side of NSGB for reception, processing, tracking of detention duration, legal status, medical status, and repatriation), and will ensure transfer from NSGB no later than 180 days from the date of final order of removal. This includes transfer for ordered court appearances related to immigration or federal court litigation.

4.1.13.  Will be responsible for inspection of and restrictions on NSGB IAs' correspondence.

4.1.14.  Understands DoD will use DoD rules for the use of force unless the Parties agree to another standard.  Applicable and agreed-upon rules for the use of force will be shared between the Parties, to ensure DHS/ICE awareness of DoD operational rules.

4.1.15.  Will be responsible for any involuntary medical treatment, including in response to hunger strikes, or similar measures.

4.1.16.  Will provide a full-time liaison officer (capable of accepting and responding to ICE/Enforcement and Removal Operations (ERO) standards reporting and decision-making requirements) to JTF-SG.

4.1.17.  Will be responsible for having contingency plans, coordinated with JTF-SG, for medical evacuation and follow-on care for detainees who require a higher level of care than is available at NSGB.

4.1.18.  Will promptly provide information to DoD concerning inquiries from relevant congressional committees.

4.1.19.  Will approve and coordinate any press access subject to concurrence of the JTF-SG commander and taking into account appropriate security protocols. Due to security and legal concerns, there will be no press access to Camp VI.

4.1.20.  Will determine the appropriate level of access by NSGB IAs to legal representation, including when, to whom, and under what circumstances such access is granted, in consultation with the JTF-SG commander and taking into account NSGB physical security protocols.

4.1.21.  Will assign a DHS/ICE officer to collect and communicate grievances and requests from NSGB IAs. DHS/ICE and JTF-SG will concurrently agree upon resolution of grievances and requests, taking into account DHS/ICE policies, procedures, and JTF-SG security protocols.

3

DHS-000120

Protected Material

4.1.22.  Will coordinate with DoD before deployment of contractor personnel to execute any portion of this MOU.

4.1.23.  Will provide JTF-SG with a daily update on the number of NSGB IAs, including the number received, the number repatriated, a 72-hour repatriation schedule as feasible, and duration information (total days in DHS/ICE custody/detention and total days since arrival at NSGB).

4.1.24.  Will provide select services to NSGB IAs (e.g., recreation, religious services) in accordance with DHS/ICE policy and as practicable within the existing infrastructure at NSGB.

**4.2. DoD, through U.S. Southern Command (USSOUTHCOM)—**

4.2.1. Will provide an existing secure facility on the windward side of NSGB to DHS/ICE for holding "high threat" NSGB IAs ("Camp VI").

4.2.2. Will provide DHS/ICE with soft structures (tents) to hold other NSGB IAs. These tents do not have power, lighting, or heating/air conditioning. DoD will provide lighting in the common areas outside the tents and at appropriate locations near perimeter fencing. Climate control requirements will be developed as agreed upon by the Parties.

4.2.3.  Will provide preventative health services and first aid along with additional emergency medical care, as appropriate and subject to capability and availability, for DHS and ICE personnel and NSGB IAs.

4.2.4. Will provide perimeter security and facility access/security.

4.2.5. Will be responsible for determining the maximum number of NSGB IAs who can be accommodated at all locations on NSGB, taking into account DHS/ICE legal custody requirements.

4.2.6. Will provide a sufficient number of toilets and hygiene facilities to ensure the clean, safe, and sanitary operation of camps depending on the number of NSGB IAs.

4.2.7. Will make adequate facilities and access to such facilities available, as agreed to in an addendum to this memorandum, for the transportation of DHS/ICE personnel and contractors supporting execution of this memorandum to and from NSGB, and make available lodging/berthing for DHS/ICE personnel and contractors once at NSGB.

4.2.8. Will support DHS/ICE in the provision of an appropriate level of access by NSGB IAs to legal representation as determined by DHS/ICE in coordination with DoD under 4.1.20.

5. PERSONNEL: Each Party is responsible for all personnel costs, including pay and benefits, support, and travel. Each Party is also responsible for supervising and managing its personnel, except as necessary for DHS/ICE to provide guidance to DoD personnel as part of DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

6. GENERAL PROVISIONS:

6.1.  POINTS OF CONTACT (POCs).  The Parties will use the following POCs to communicate matters concerning this MOU.  Each Party may change its POC upon reasonable notice to the other Party.

6.1.1.  For DHS/ICE—

4

Protected Material

6.1.1.1  Position, office identification, phone number, and email of primary POC: Robert Paschall, Deputy Under Secretary, DHS Office of Strategy, Policy, and Plans, ██ ████████ ████████████████████

6.1.1.2.  Position, office identification, phone number, and email of alternate POC: Ihsan Gunduz, Acting Deputy Assistant Secretary for Border and Immigration Policy, DHS Office of Strategy, Policy, and Plans, ██████████████████████████

6.1.2.  For DoD—

6.1.2.1  Position, office identification, phone number, and email of primary POC:  Rafael Leonardo, Performing the Duties of the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ████████████████████████████

6.1.2.2.  Position, office identification, phone number, and email of alternate POC: Leigh Nolan, Acting Principal Deputy Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ██████████████████████

6.2.  CORRESPONDENCE.  All correspondence to be sent and notices to be given pursuant to this MOU will be addressed, if to the ICE, to—

6.2.1.  ██████████████████  and, if to the DHS POLICY, to—

6.2.2. ████████████████

6.3.  FUNDS AND MANPOWER.  This MOU neither documents nor provides for the exchange of funds or manpower between the Parties, nor does it commit funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds. Reimbursable expenses will be addressed separately. No provision of this MOU shall be interpreted to require obligation or payment of funds in violation of the Anti-deficiency Act, 31 U.S.C. § 1341, or any other applicable law.  All activities contemplated by this MOU are subject to the availability of funds.

6.4.  MODIFICATION OF MOU.  This MOU may be modified at any time in response to a written request from authorized representatives of one of the Parties. Otherwise, it will be reviewed no less often than every six months of its effective date in its entirety.  For DoD, the Under Secretary of Defense for Policy may approve modifications to, addendums to, and extensions of this MOU. For DHS, the Under Secretary of Strategy, Policy, and Plan may approve modifications to, addendums to, and extensions of this MOU.

6.5.  DISPUTES.  Any disputes relating to this MOU will subject to any applicable law, Executive Order, or DoD issuances, and will be resolved by consultation between the Parties.

6.6.  TERMINATION OF UNDERSTANDING.  This MOU may be terminated in writing by mutual agreement of the Parties or with 90 days' advance written notice by either Party.

6.7.  TRANSFERABILITY.  This MOU is not transferable except with the written consent of the Parties.

6.8.  EFFECTIVE DATE.  This MOU takes effect on the day after the last Party signs.

6.9.  EXPIRATION DATE.  This MOU expires on March 15, 2026.

6.10.  NO THIRD-PARTY BENEFICIARIES.  Nothing in this MOU, express or implied, is intended to

5

Protected Material

give to, or will be construed to confer upon, any person, not a party, any remedy or claim under or because of this MOU, and this MOU will be for the sole and exclusive benefit of the Parties.

## 7. DEFINITIONS:

7.1. "High threat" is a security category determined by DHS and is synonymous with other terms such as Maximum security, High-risk.

7.2 Detention Sites

7.2.1. "Hard Structure" detention facility on the Windward side is referred to as Camp VI.

7.2.2. The Migrant Operations Center is a DHS "Hard Structure" facility, not designed for high threat detention, on the Leeward side.

7.2.3. "Soft structure" detention facilities refer to Philips, Macalla, and Golf Course Camps and respective sub-camps.

APPROVED:

FOR DHS—

Signature

FOR DoD—

Signature

Troy D. Edgar, Deputy Secretary of Homeland Security The U.S. Department of Homeland Security

Robert G. Salesses, Performing the Duties of Deputy Secretary of Defense

7 March 2025 (Date)

7 March 2025 (Date)

DHS-000123

Case 1:25-cv-01766-SLS    Document 102-6    Filed 08/23/26    Page 183 of 215

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity

The White House

January 29, 2025

## MEMORANDUM FOR THE SECRETARY OF DEFENSE THE SECRETARY OF HOMELAND SECURITY

SUBJECT:     Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity

I hereby direct the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States, and to address attendant immigration enforcement needs identified by the Department of Defense and the Department of Homeland Security.

This memorandum is issued in order to halt the border invasion, dismantle criminal cartels, and restore national sovereignty.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DHS-000124




**GET THE FACTS →**



Subscribe to The White House newsletter

Your email

**SIGN UP**

Text POTUS to 45470 to receive updates

DHS-000125

Case 1:25-cv-01766-SLS   Document 102-3   Filed 08/23/26   Page 184 of 215

ADMINISTRATION

CONTACT

VISIT

INTERNSHIPS

STAY INFORMED

NEWS

GALLERY

VIDEO LIBRARY

MEDIA OFFENDERS

WHITE HOUSE WIRE

FREEDOM 250

INVESTMENTS

WORKING FAMILIES TAX CUTS

AI.GOV

DOGE

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



DHS-000126

DHS-000127







U.S. Immigration
and Customs
Enforcement



# ICE

# ENFORCEMENT AND REMOVAL OPERATIONS

## POST ORDER CUSTODY REVIEW UNIT (POCRU)

## POST ORDER CUSTODY REVIEW PROCESS



U.S. Immigration and Customs Enforcement

DHS-000128



# COMPLIANT CASES TIMELINE

DHS-000156

# ICE

## DAY 1

➤ When the alien enters into ICE custody – Do a **NEW** I-213 to document the detention period.

➤ Serve final order alien with a <u>I-229(a) and Instruction Sheet</u>. Instruction sheet must be specific on what the alien <u>needs to do</u> to assist in obtaining a Travel Document and Update EARM and eTD.

**MUST be served no later than 30 days post final order and in custody**



U.S. Immigration
and Customs
Enforcement

DHS-000157

Case 1:25-cv-01766-SLS   Document 102-36   Filed 06/03/26   Page 188 of 215

Protected Material

# ICE   DAY 1

➢ Review TD website below for specific country requirements. Ensure you obtain and/or complete all relevant identity documents/applications, that are needed to obtain a TD:

➢ ▮▮▮▮▮▮▮▮▮▮▮

➢ Complete a new Form I-217 (Information for Travel Document or Passport). Form I-217 must be complete and accurate. This form is **crucial** with many countries to issue a Travel Document.



U.S. Immigration
and Customs
Enforcement

DHS-000158

Case 1:25-cv-01766-SLS   Document 102-36   Filed 06/03/26   Page 189 of 215

Case 1:25-cv-01766-SLS   Document 102-36   Filed 06/03/26   Page 190 of 215

# No later than DAY 7

- ➤ From information collected: submit TD package to Embassy/Consulate and document tracking number in A-File. Ensure you make copies of **ALL** documents submitted. Call Embassy every **15** days to track TD issuance.

- ➤ Prior to submitting package to Consulate, upload ALL documents in eTD.

- ➤ If additional documentation is acquired, scan the documents into eTD under the **EXISTING** case.

- ➤ Update EARM.



U.S. Immigration
and Customs
Enforcement

DHS-000159

# No later than DAY 50

- ➤ Serve alien with **NOTICE OF CUSTODY REVIEW/INTERVIEW**.
  - ➤ Allow alien 30 Days to provide documentation.
- ➤ Update EARM.


U.S. Immigration and Customs Enforcement

DHS-000160

Protected Material

# ICE

# DAY 75

**If TD has <u>NOT</u> been received, please request assistance from HQ TDU and update EARM and eTD.**

To obtain the Officers Area of Responsibility (AOR):

➢ ██████████████████████████

➢ Take every effort to personally contact, via email, the HQ TDU officer assigned to the respective country.

  ➢ Do NOT rely solely on the eTD request for HQ assistance.

➢ Update EARM.



U.S. Immigration and Customs Enforcement

DHS-000161

# ICE

# DAY 80

- ➢ Complete 90-Day POCR and submit for FOD review and signature through SDDO.
  - ➢ The FOD and DFOD only have the authority to sign a decision letter.
- ➢ Update EARM.



U.S. Immigration
and Customs
Enforcement

DHS-000162

# ICE

# DAY 90

➢ Serve 90-Day POCR decision to the alien.
➢ Update EARM.



U.S. Immigration
and Customs
Enforcement

DHS-000163

# ICE

# DAY 91-180

➤ If a TD has been denied, past day 90, or removal is not imminent, the FOD has the authority to make a custody determination *or* transfer the case to HQ POCRU for custody determination.

➤ If the TD is still pending, it is important to continue efforts to acquire a TD.



U.S. Immigration
and Customs
Enforcement

DHS-000164

Protected Material

# ICE

## DAY 180

➢ Send scanned copies of the 90-POCR Worksheet, the Continued Detention Letter, Proof of Service, and the HQ POCRU transfer checklist to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

➢ Update EARM.



U.S. Immigration and Customs Enforcement

DHS-000165

Protected Material

# ICE

## DAY 180

- Upon receipt of the 180-day POCR by HQ POCRU an automatic reply will generate:
  - Your Case Transfer Documents (90-day POCR Worksheet/HQ POCRU Transfer Checklist/90-day field office decision letter) have been received in HQ POCRU. If the transfer package is accepted as complete and correct, <u>please allow 10 business days for HQ POCRU processing</u>
  - If after 10 business days, you have not received a custody determination notification, please contact your designated HQ POCRU Point-of-Contact (POC).
  - POC contact information can be found at



U.S. Immigration and Customs Enforcement

DHS-000166

Case 1:25-cv-01766-SLS    Document 102-6    Filed 06/03/26    Page 197 of 215

Protected Material

# POCRU Officers Area of Responsibility

# ICE

U.S. Immigration
and Customs
Enforcement

# ICE

# DAY 180

➤ If the transfer package to HQ POCRU is incomplete or incorrect, it will be returned to you for correction and resubmission.

> ➤ Upon receipt of the corrected submission in HQ POCRU a custody determination notification will be forwarded to your designated Field Office POCs <u>within 10 business days of receipt of the corrected transfer documents</u>



U.S. Immigration
and Customs
Enforcement

DHS-000168

# **Future follow-up**

- Send HQ POCR checklist to HQ POCRU mailbox
  - every 90 days,
  - upon filing of a habeas,
  - a TD is received, or
  - until subject is removed or released from ICE custody.

  - The field should notify HQ POCRU of any circumstances that affect SLRRFF.

- Update EARM.


U.S. Immigration
and Customs
Enforcement

DHS-000169



# FTC Timeline

DHS-000203

# ICE

# FTC during the 90 day Removal Period

## No later than day 7

➢ Review TD web-site below for specific country requirements. Ensure you obtain and/or complete all relevant identity documents that are needed to secure a TD.

➢

➢ Complete a new Form I-217 (Information for Travel Document or Passport) in EABM. Form I-217 must be complete and accurate. This form is **critical** for most countries when issuing a Travel Document.

➢ If the alien is a FTC, the case officer is responsible for pursuing a TD independently.



**U.S. Immigration and Customs Enforcement**

DHS-000204

Case 1:25-cv-01766-SLS   Document 102-8   Filed 08/03/26   Page 202 of 215

# ICE

# FTC during the 90 day Removal Period

## No later than day 7

➢ From information collected: submit TD package to Embassy/Consulate and document tracking number in A-File. Ensure you make copies of **ALL** documents submitted. Call Embassy every **15** days to track TD issuance.

➢ Prior to submitting package to Consulate, upload ALL documents in eTD.

➢ Update EARM.

➢ If additional documentation is acquired then scan the documents into eTD under the **EXISTING** case.



U.S. Immigration and Customs Enforcement

DHS-000205

# ICE

## FTC during the 90 day Removal Period
### No later than day 30

➢ Serve alien with <u>I-229(a) and Instruction Sheet.</u> Instruction sheet must be specific on what alien <u>needs to do</u> to assist in obtaining a Travel Document. Update EARM and eTD.

  ➢ The I-229(a) must be served every 30 days thereafter until alien becomes compliant.

  ➢ You are not required to wait the 30 days after serving the I-229(a) if the alien overtly hinders efforts to obtain a TD or impedes removal.

➢ <u>(Initial I-229(a) and Instruction Sheet must be served no later than 30th Day)</u>



U.S. Immigration and Customs Enforcement

DHS-000206

# FTC during the 90 day Removal Period

➢ If alien is still **NOT** compliant, document and update EARM.

  ➢ Document alien's failure to cooperate/comply on I-166C (Memorandum of Investigation). Memo must specifically articulate how the alien failed to comply.

➢ Serve FTC Notice: the POCR clock is suspended.

  ➢ Serve the FTC Notice every 30 days until alien is compliant.

➢ Serve the alien with a notice of custody review no later than day 50.



U.S. Immigration and Customs Enforcement

DHS-000207



# ICE

# FTC during the 90 day Removal Period

## DAY 75

- ➢ **If TD has <u>NOT</u> been received, please request assistance from HQ TDU and update EARM and eTD.**
- ➢ To obtain the Officers Area of Responsibility:
- ➢ [redacted]



**U.S. Immigration and Customs Enforcement**

DHS-000208

Case 1:25-cv-01766-SLS   Document 102-8   Filed 08/02/26   Page 206 of 215

# FTC during the 90 day Removal Period

➤ Conduct POCR on the actual day 80-this is still required even if the alien is non-compliant and the POCR clock has been suspended.

➤ The POCR should be served on the alien by actual day 90

   ➤ A continue detention letter should be completed with a notice that the alien is a FTC in the letter. It is another notice/warning to the alien. The field should also continue to send the FTC Notice in the normal schedule.

   ➤ Throughout FTC status the jurisdiction of the case remains with the field office.



U.S. Immigration and Customs Enforcement

DHS-000209

# FTC future follow-up

- Once the alien demonstrates compliance, document and initiate the TD request with the alien's participation.
- The POCR clock resumes from the original suspension date (i.e. the date the initial FTC Notice is served).
- Upon compliance, the POCR clock resumes. At day 90 of the POCR clock, conduct the second post order custody review.
  - The field office continues to retain custody jurisdiction for an additional 90 days.



U.S. Immigration
and Customs
Enforcement

DHS-000210



# ICE

# FTC after the initial 90 day Removal Period

- ➤ If the alien becomes non-compliant after the initial 90 day removal period, serve the initial FTC Notice and the POCR clock is suspended.
- ➤ The field must serve the I-229(a) and FTC Notice every 30 days until compliant.
- ➤ When the alien becomes compliant the POCR clock resumes. The next POCR due would be forwarded to HQ POCRU.

U.S. Immigration and Customs Enforcement

DHS-000211

# FTC timing is everything

➢ At the moment that the alien appears to or actually fails to comply or assist in acquiring his TD: START the FTC process immediately.

➢ Generally, FTC is something you should pursue early in the removal period.

➢ The longer the wait, the harder it will be to litigate if case goes to court.

➢ Remember: An alien can start off compliant and later in the process, fail to comply.



**U.S. Immigration and Customs Enforcement**

DHS-000212





# National Detention Standards
## For Non-Dedicated Facilities
### Revised 2019





U.S. Immigration
and Customs
Enforcement

DHS-000274

An official website of the United States Government Here's how you know



Home  >   ...   >  Designation of International Cartels

# Designation of International Cartels

**FACT SHEET**

**OFFICE OF THE SPOKESPERSON**

FEBRUARY 20, 2025

The United States remains committed to protecting our nation, the American people, and our hemisphere by stopping the campaigns of violence and terror committed by international cartels and transnational organizations.

Today, the Department of State announces the designation of Tren de Aragua (TdA), Mara Salvatrucha (MS-13), Cártel de Sinaloa, Cártel de Jalisco Nueva Generación (CJNG), Cártel del Noreste (CDN), La Nueva Familia Michoacana (LNFM), Cártel de Golfo (CDG), and Cárteles Unidos (CU) as Foreign Terrorist Organizations (FTOs) and Specially Designated Global Terrorists (SDGTs).

> TdA is a transnational organization that originated in Venezuela with cells in Colombia, Peru, and Chile, with further reports of sporadic presence in Ecuador, Bolivia, and Brazil. This brutal criminal group has conducted kidnappings, extorted businesses, bribed public officials, authorized its members to attack and kill U.S. law enforcement, and assassinated a Venezuelan opposition figure.
>
> MS-13 is a transnational organization that originated in Los Angeles but shifted to Central America as individuals were deported there from the United States. MS-13 actively recruits, organizes, and spreads violence in several countries, primarily in Central America and North America, including El Salvador, Honduras, Guatemala, Mexico, and the United States. MS-13 has conducted numerous violent attacks, including assassination and the use of IEDs and

DHS-000557

drones, against El Salvador government officials and facilities. Additionally, MS-13 uses public displays of violence to intimidate civilian populations to obtain and control territory and manipulate the electoral process in El Salvador.

Cártel de Sinaloa is a transnational organization based in Sinaloa, Mexico. It is one of the world's most powerful drug cartels and is one of the largest producers and traffickers of fentanyl and other illicit drugs to the United States. Cártel de Sinaloa has used violence to murder, kidnap, and intimidate civilians, government officials, and journalists.

CJNG is a transnational organization with a presence in nearly every part of Mexico. In addition to trafficking fentanyl, the group engages in extortion, migrant smuggling, oil and mineral theft, as well as weapons trade. The group has contacts across the Americas, as well as in Australia, China, and Southeast Asia. CJNG has conducted intimidating acts of violence, including attacks on Mexican military and police with military grade weaponry, the use of drones to drop explosives on Mexican law enforcement, and assassinations or attempted assassinations of Mexican officials.

CDN, formerly known as Los Zetas, is a transnational organization based in northeastern Mexico involved in drug trafficking, kidnapping, extortion, human smuggling, and other illicit activities. CDN uses violence to exert its criminal control, including attacks against government officials in Mexico.

LNFM is the successor of the La Familia Michoacana, a violent transnational organization based in the Pacific coast state of Michoacan with operations in the Mexican states Guerrero, Morelos, and Mexico. In addition to drug trafficking, kidnapping, and extortion, LNFM attacks government officials and uses violence, including drone attacks and explosives, to exert its criminal control and terrorize communities.

CDG is a violent transnational organization based in northeast Mexico involved in drug trafficking, kidnapping, extortion, human smuggling, and other illicit activities. CDG employs violence, including assassinations of civilians and government officials to intimidate the public and control territory.

CU is a violent transnational organization that formed from an alliance of multiple cartels and other groups in Michoacán, Mexico. Since its formation, CU has engaged in violent activities which have resulted in numerous civilian, military, and law enforcement casualties.

Terrorist designations expose and isolate entities and individuals, denying them access to the U.S. financial system and the resources they need to carry out attacks. As a result of actions taken

DHS-000558

today, all property and interests in property of those designated today that are in the United States or that are in possession or control of a U.S. person are blocked, and U.S. persons are generally prohibited from engaging in transactions with them. Moreover, designations can assist law enforcement actions of other U.S. agencies and governments.

*Today's actions are taken pursuant to section 219 of the Immigration and Nationality Act, as amended, and Executive Order 13224, as amended.  FTO designations go into effect upon publication in the Federal Register.*

*Petitioners requesting removal of those designated today from the Specially Designated Nationals and Blocked Persons List should refer to the Department of State's **Delisting Guidance** page.*

---

TAGS

**Bureau of Counterterrorism**     **Bureau of Western Hemisphere Affairs**     **Counterterrorism**

**Crime**     **Division for Counter Threat Finance and Sanctions**     **Office of the Spokesperson**

**Organized Crime and Gangs**     **The Secretary of State**     **Terrorist Designation**

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Freedom 250

---

DHS-000559

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

DHS-000560