# ¿Está usted detenido y separado de su(s) hijo(s)?

***Aún cuando se encuentre detenido por inmigración, usted puede comunicarse con su(s) hijo(s) y tomar decisiones sobre su cuidado.***

Usted puede pedir ayuda para localizar y/o ponerse en contacto con su(s) hijo(s) al realizar las siguientes llamadas sin costo alguno desde el teléfono de la unidad ubicada en su habitación. Solicite las instrucciones del personal de las instalaciones sobre cómo realizar llamadas por teléfono utilizando la plataforma gratuita.

- Si usted necesita asistencia para localizar a su(s) hijo(s) o para establecer comunicación continua con éstos, llame a la Línea de Información y Denuncias de los Centros de Detención (Marque 9116# desde la plataforma gratuita).
- Si usted sabe que su(s) hijo(s) está(n) bajo la custodia del gobierno de los Estados Unidos, llame a la línea telefónica para padres de la Oficina de Reasentamientos de Refugiados (ORR, por sus siglas en inglés) marcando el número gratuito 699# desde cualquiera de los teléfonos de su centro de detención.

Además de llamar, usted puede llenar un formulario de solicitud del detenido. Para solicitar asistencia en localizar y/o comunicarse con su hijo(s), pida ayuda a un oficial del Servicio de Inmigración y Control de Aduanas de los Estados Unidos (ICE, por sus siglas en inglés).



El Servicio de Inmigración y Control de Aduanas de los Estados Unidos (ICE, por sus siglas en inglés) y la Oficina de Reasentamiento de Refugiados (ORR, por sus siglas en inglés) trabajan en conjunto para localizar niño(s), corroborar la relación familiar entre padres e hijos, establecer comunicaciones continuas entre éstos, y coordinar la expulsión conjunta de padres e hijos de ser necesaria.

Para obtener más información sobre sus derechos paternales, lea el material de autoayuda de la Comisión de Mujeres Refugiadas *Detained or Deported: What About My Children?* (*Detenidas y Deportadas: ¿Qué les pasará a mis hijos?*), disponible en las computadoras de las bibliotecas legales.

U.S. Immigration and Customs Enforcement

U-DOW-CAR-280


WHEN YOU ARE FORCED TO WORK AGAINST YOUR WILL
If you are made to work against your will for little or no pay, you may be a victim of human trafficking.
To report suspected human trafficking, call the U.S. Department of Homeland Security (DHS) tip line:
1-866-DHS-2-ICE (347-2423)
If you are a victim and need help, call the National Human Trafficking Hotline:
1-888-373-7888
BLUE CAMPAIGN


CUANDO TE
FUERZAN
A TRABAJAR
EN CONTRA DE
TU VOLUNTAD
Si te obligan a trabajar por poco o ningún pago,
puedes ser una víctima de la trata de personas.
Para reportar la sospecha de la trata de personas, llame a la línea para informantes del Departamento de Seguridad Nacional (DHS, por sus siglas en ingles) de Estados Unidos:
1-866-DHS-2-ICE (347-2423)
Si eres una víctima y se necesita asistencia, llame a la Línea Directa Nacional de la Trata de Personas:
1-888-373-7888
BLUE CAMPAIGN
One Voice. One Mission. End Human Trafficking.




# ICE Detention Reporting and Information Line

## Dial: 9116# or

Detention Pro Bono Access Code

or 1-888-351-4024

Call to:

- Obtain **basic immigration case information.** For information on your next court date please call 1-800-898-7180.
- Report an incident of **sexual or physical assault or abuse.**
- Report **serious or unresolved problems in detention.**
- Report that you are a **victim of human trafficking or other crimes.**
- Obtain assistance in **locating and contacting a separated child** in the custody of U.S. Health and Human Services Office of Refugee Resettlement.
- Report that you have a **serious mental disorder or condition.** If you believe the disorder or condition impacts your ability to represent yourself or participate in an immigration court case, you should also notify the immigration judge.

ICE does not discriminate based on **disability**. Under federal law and through ICE policy, you have the right to make verbal or written disability-related accommodation requests to facility staff and/or ICE personnel, and to receive disability-related accommodations to access the facility's programs and activities. You may address your disability accommodation matters through the facility grievance process, by contacting ICE, and/or the Office of Inspector General.

**If you need urgent assistance, including a medical emergency please contact your facility staff immediately!**

Language assistance, including Spanish-speaking operators, is available.

ICE

ICE Enforcement and Removal Operations
Committed to transparency, collaboration, and resolving concerns



U-DOW-CAR-283




# Línea de Información y Comunicación para los Detenidos de ICE

## Marque 9116# o ____________

Código de acceso Pro Bono del centro de detención

**O llame al 1-888-351-4024**

Llame para:

- **Obtener información básica de casos de inmigración.** Para obtener información sobre su próxima cita ante el tribunal, reportar un incidente de favor llame al 1-800-898-7180.
- **Reportar un incidente de agresión o abuso físico o sexual.**
- **Reportar problemas graves o no resueltos en la detención.**
- **Informar que usted es una víctima de tráfico de personas u otros crímenes.**
- **Obtener ayuda para localizar y contactar a un menor separado** bajo la custodia con la Oficina de Reasentamiento de Refugiados, del Departamento de Servicios para la Salud y los Humanos de los Estados Unidos.
- **Informar que usted tiene un trastorno o condición mental grave.** Si usted cree que el trastorno o condición afecta su capacidad para representarse a sí mismo o participar en un caso judicial de inmigración, también debe notificar al juez de inmigración.

**ICE no discrimina basado en la discapacidad.** Bajo la ley federal y por medio de las reglas de ICE, usted tiene el derecho de hacer solicitudes verbales o escritas de acomodación relacionadas con la discapacidad al personal de la institución y / o personal de ICE y recibir acomodaciones relacionadas con la discapacidad para acceder los programas y actividades de la institución. Usted puede dirigir sus asuntos de la adaptación de discapacidad a través del proceso de queja de la institución, entrando en contacto con ICE, y / o con la Oficina del Inspector General.

**Si necesita asistencia urgente, incluyendo una emergencia médica, ¡comuníquese con el personal de su centro inmediatamente!**

Se ofrece asistencia lingüística, incluyendo operadores de habla español.

ICE

Oficina de Detención y Deportación de ICE
Comprometidos a la transparencia, colaboración y resolución de asuntos




**Kote Pou Rele Pou Enfòmasyon nan Sant Detansyon ICE (imigrasyon) lan**

**Rele nan: 9116# oswa** ______

Kòd Aksè an gratis nan Detansyon an

**oswa 1-888-351-4024**

Rele pou:

- Jwenn enfòmasyon debaz pou pwosesis imigrasyon. Pou plis enfòmasyon pou pwochen dat nan tribinal ou tanpri rele 1-800-898-7180.
- Fè konnen si gen ensidan si ou sibi agresyon seksyèl si yo bat ou oswa abize ou.
- Fè konnen si ou gen yon pwoblèm grav ki paka rezoud nan detansyon an.
- Fè konnen ke ou se yon viktim kote yo fè trafik ak moun oswa lòt krim sou ou.
- Fè sant detansyon imigrasyon konnen si yo separe ou ak timoun ou genyen ki anbazaj ou oswa lòt moun ki depann de ou, oswa si gen bagay ki konsène ou kòm yon paran.
- Fè konnen ke ou gen yon maladi mantal oswa lòt kondisyon. Si ou kwè maladi oswa kondisyon ka anpeche ou reprezante tèt ou nan pwosesis ou ye nan tribinal imigrasyon an, ou ta dwe fè yon jij imigrasyon konnen.

ICE pa fè diskriminasyon ki baze sou andikap. Daprè lwa federal epi selon règleman ICE yo, ou gen dwa pou fè demann vèbal oswa alekri ki gen rapò ak akomode andikape bay pèsonèl etablisman an oswa pèsonèl ICE la, epi pou resevwa akomodasyon ki gen rapò ak andikap pou w ka gen dwa aksè nan pwogram ak aktivite etablisman an. Ou kapab prezante pwoblèm ki gen rapò ak akomadasyon andikap yo atravè pwosesis pote plent etablisman an, lè ou ta kontakte ICE ak/oswa Biwo Enspektè Jeneral la.

Si ou bezwen asistans touswit, ki gen pou ouè ak ijans medikal, tanpri kontakte anplwaye yo imedyatman!
Gen moun ki pale lang ou, gen nan operatè yo ki pale panyòl, ki disponib.

**ICE**

ICE (imigrasyon) Ranfòsman ak operasyon pou depòte moun
Angajman sou transparans ak kolaborasyon, pou rezoud enkyetid ou

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 7 of 157



ਆਪਣੀਆਂ ਚਿੰਤਾਵਾਂ ਬਾਰੇ ਦੱਸੋ
يرجى الإبلاغ عن مخاوفك
报告您的顾虑
Signalez vos préoccupations
Rapòte enkyetid ou
Apresente suas denúncias
Báo cáo quan ngại của quý vị
Exprese sus inquietudes

# ਆਈਸ ਨਜ਼ਰਬੰਦੀ ਰਿਪੋਰਟਿੰਗ ਅਤੇ ਇਨਫਰਮੇਸ਼ਨ ਲਾਈਨ

## ਡਾਇਲ: ੯੧੧੬#(9116#) ਜਾਂ ਨਜ਼ਰਬੰਦੀ ਪ੍ਰੋ ਬੋਨੋ ਐਕਸੈਸ ਕੋਡ

ਕਾਲ ਕਰੋ:

- ਇਮੀਗ੍ਰੇਸ਼ਨ ਮਾਮਲੇ ਸਬੰਧੀ ਬੁਨਿਆਦੀ ਜਾਣਕਾਰੀ ਪ੍ਰਾਪਤ ਕਰੋ. ਆਪਣੀ ਅਗਲੀ ਅਦਾਲਤ ਦੀ ਮਿਤੀ ਦੀ ਜਾਣਕਾਰੀ ਲਈ ਕਿਰਪਾ ਕਰਕੇ ਇੱਥੇ ਫੋਨ ਕਰੋ 1-800-898-7180.
- ਜਿਨਸੀ ਜਾਂ ਸਰੀਰਕ ਹਮਲੇ ਜਾਂ ਦੁਰਵਿਵਹਾਰ ਦੀ ਘਟਨਾ ਦੀ ਰਿਪੋਰਟ ਕਰੋ.
- ਨਜ਼ਰਬੰਦੀ ਵਿੱਚ ਗੰਭੀਰ ਜਾਂ ਅਸਮਰੱਥੀਆਂ ਸਮੱਸਿਆਵਾਂ ਦੀ ਰਿਪੋਰਟ ਕਰੋ

ਜਾਂ 1-888-351-4024

- ਰਿਪੋਰਟ ਕਰੋ ਕਿ ਤੁਸੀਂ ਮਨੁੱਖੀ ਤਸਕਰੀ ਜਾਂ ਹੋਰ ਜੁਰਮਾਂ ਦੇ ਸ਼ਿਕਾਰ ਹੋ.
- ਯੂਐਸ ਹੈਲਥ ਐਂਡ ਹਿਊਮਨ ਸਰਵਿਸਿਜ਼ ਰਫਿਊਜੀ ਰੀਸੈਟਲਮੈਂਟ ਦਫਤਰ ਦੀ ਹਿਰਾਸਤ ਵਿਚ ਆਪਣੇ ਵੱਖਰੇ ਬੱਚੇ ਨੂੰ ਲੱਭਣ ਅਤੇ ਸੰਪਰਕ ਕਰਨ ਵਿਚ ਸਹਾਇਤਾ ਪ੍ਰਾਪਤ ਕਰੋ. ਰਿਪੋਰਟ ਕਰੋ ਕਿ ਤੁਹਾਨੂੰ ਗੰਭੀਰ ਮਾਨਸਿਕ ਵਿਗਾੜ ਜਾਂ ਮਾਨਸਿਕ ਬਿਮਾਰੀ ਹੈ.
- ਜੇ ਤੁਹਾਨੂੰ ਲੱਗਦਾ ਹੈ ਕੇ ਤੁਹਾਡੀ ਮਾਨਸਿਕ ਹਾਲਾਤ ਤੁਹਾਡੀ ਪ੍ਰਤਿਨਿਧਤਾ ਕਰਨ ਜਾਂ ਇਮੀਗ੍ਰੇਸ਼ਨ ਦੇ ਅਦਾਲਤੀ ਕੇਸ ਵਿਚ ਹਿੱਸਾ ਲੈਣ ਦੀ ਤੁਹਾਡੀ ਸਮਰੱਥਾ 'ਤੇ ਪ੍ਰਭਾਵ ਪਾਉਂਦੀ ਹੈ, ਤਾਂ ਤੁਹਾਨੂੰ ਇਮੀਗ੍ਰੇਸ਼ਨ ਜੱਜ ਨੂੰ ਵੀ ਸੂਚਿਤ ਕਰਨਾ ਚਾਹੀਦਾ ਹੈ

ਆਈਸ ਅਪਾਹਜਤਾ ਦੇ ਆਧਾਰ ਤੇ ਵਿਤਕਰਾ ਨਹੀਂ ਕਰਦੀ. ਫੈਡਰਲ ਕਾਨੂੰਨ ਅਤੇ ਆਈਸੀਈ ਨੀਤੀ ਦੇ ਮਾਧਿਅਮ ਤੋਂ, ਤੁਹਾਨੂੰ ਸਟਾਫ ਅਤੇ / ਜਾਂ ਆਈਸੀਈ ਕਰਮਚਾਰੀਆਂ ਨੂੰ ਮੌਖਿਕ ਜਾਂ ਲਿਖਤੀ ਅਪਾਹਜਤਾ ਸੰਬੰਧੀ ਰਿਹਾਇਸ਼ ਦੀਆਂ ਬੇਨਤੀਆਂ ਕਰਨ ਦਾ ਹੱਕ ਹੈ ਅਤੇ ਸਹੂਲਤ ਦੇ ਪ੍ਰੋਗਰਾਮਾਂ ਅਤੇ ਗਤੀਵਿਧੀਆਂ ਤਕ ਪਹੁੰਚ ਕਰਨ ਲਈ ਅਪੰਗਤਾ ਨਾਲ ਸੰਬੰਧਿਤ ਰਿਹਾਇਸ਼ਾਂ ਪ੍ਰਾਪਤ ਕਰਨ ਦਾ ਹੱਕ ਹੈ. ਤੁਸੀਂ ਆਪਣੇ ਅਪਾਹਜਤਾ ਦੇ ਮਾਮਲਿਆਂ ਨੂੰ ਸੰਬੋਧਿਤ ਕਰ ਸਕਦੇ ਹੋ ਸਹੂਲਤ ਸ਼ਿਕਾਇਤ ਪ੍ਰਕਿਰਿਆ ਦੁਆਰਾ, ਆਈਸ, ਅਤੇ / ਜਾਂ ਦਫ਼ਤਰ ਆਫ਼ ਇੰਸਪੈਕਟਰ ਜਨਰਲ ਨਾਲ ਸੰਪਰਕ ਕਰਕੇ.

ਜੇ ਤੁਹਾਨੂੰ ਜੇ ਤੁਹਾਨੂੰ ਡਾਕਟਰੀ ਐਮਰਜੈਂਸੀ ਦੀ ਸਹਾਇਤਾ ਦੀ ਤੁਰੰਤ ਜ਼ਰੂਰਤ ਹੈ ਤਾਂ ਤੁਰੰਤ ਆਪਣੇ ਸਹੂਲਤ ਕਰਮਚਾਰੀਆਂ ਨਾਲ ਸੰਪਰਕ ਕਰੋ!

ICE

ਪਾਰਦਰਸ਼ਿਤਾ, ਸਹਿਯੋਗ ਅਤੇ ਚਿੰਤਾਵਾਂ ਨੂੰ ਹੱਲ ਕਰਨ ਲਈ ਸਮਰਥਤ



U-DOW-CAR-286

# DEPARTMENT OF HOMELAND SECURITY
# OFFICE OF INSPECTOR GENERAL

The DHS OIG works with DHS employees, contractors and the public to protect the integrity, effectiveness and efficiency of DHS programs. Report suspected criminal violations, misconduct, wasteful activities, and allegations of civil rights and civil liberties to the DHS OIG Hotline.

La Oficina del Inspector General (OIG) del Departamento de Seguridad Nacional (DHS), colabora con los empleados y contratistas del Departamento y el público para protejer la integridad, eficacia y eficiencia de los programas de DHS. Reporte cualquier sospecha de violación criminal, mala conducta, actividad de despilfarro , ó alegación de abuso de derechos civiles ó libertad civil a la linea directa de DHS OIG.

Website/Sitio Web: WWW.OIG.DHS.GOV
Call/Llame: 1-800-323-8603 Toll Free/Gratis
TTY: 1-844-889-4357 Toll Free/Gratis
Fax: 202-254-4297
U.S. Mail/Correo Postal:
DHS Office of Inspector General/MAIL STOP 0305
Attn: Office of Investigations - Hotline
245 Murray Lane SW
Washington, DC 20528-0305

Complaints may be made anonymously and confidentially.
Puede comunicarse de forma anonima y confidencial.

U.S. Immigration
and Customs
Enforcement

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 10 of 157

# Migrant Camp Operations:

## *The Guantanamo Experience*



## LETTER FROM CINCUSACOM

The United States armed forces are becoming increasingly involved in humanitarian assistance operations around the world. Operations such as those involving Cuban and Haitian migrants, Kurdish and Rwandan refugees, and internal disaster relief are likely to continue as a result of other wars, natural disasters, and political or economic turmoil. We have adapted well to these challenges by forming joint task forces (JTFs) and using our command and control systems, logistics, and rapid deployment capabilities in innovative ways. We must build from these experiences as we prepare for future challenges.

Future operations will vary according to political, geographical, and environmental factors, as well as likelihood of armed threats. Future JTFs must be ready to deal with and coordinate the activities of numerous U.S. Government agencies, private voluntary organizations, international organizations, nongovernmental organizations and national and international media representatives. The JTF commander's task will be to integrate these organizations and agencies so that they all work together to accomplish the objectives of the operation. Used properly, these organizations and agencies can be potent force multipliers.

This multimedia package provides guidelines to consider as humanitarian assistance JTFs are organized and deployed. The package has three elements. The first element is this pamphlet. The second is a video tape that chronicles many of the macro level experiences of personnel involved in Operation SEA SIGNAL—the recent Cuban migrant operation at Guantanamo Bay, Cuba. The last element is a CD-ROM that provides a comprehensive, interactive data base utilizing lessons learned from Operation SEA SIGNAL as a foundation to assist in future humanitarian assistance operations.

J. J. SHEEHAN
General, U.S. Marine Corps

~~Protected Material – Subject to Protective Order~~

# TABLE OF CONTENTS


| CHAPTER | | PAGE |
|---|---|---|
| | EXECUTIVE SUMMARY | iii |
| | INTRODUCTION | 1 |
| I | MISSION | 3 |
| | General | 3 |
| | Policy Directives | 4 |
| | Legal Authority | 5 |
| | Mission Analysis | 6 |
| | End State | 8 |
| | Additional Considerations | 9 |
| II | JOINT TASK FORCE ORGANIZATION | 11 |
| | Staff Organization | 11 |
| | Staff Requirement Considerations | 11 |
| | Intelligence Operations | 13 |
| | Force Protection | 13 |
| | Functional Component Commands | 14 |
| | Liaison Officers | 14 |
| | Public Affairs and the Media | 14 |
| | Interoperability | 15 |
| | Tour Lengths | 15 |
| III | CIVIL-MILITARY OPERATIONS | 17 |
| | General | 17 |
| | Civil-Military Operations Center | 17 |
| | Interagency and Political Coordination | 18 |
| | Nongovernmental and Private Voluntary Organizations | 19 |
| IV | CAMP ORGANIZATION AND OPERATION | 21 |
| | Organization | 22 |
| | Operations | 23 |
| | Psychological Operations | 24 |
| | Medical Support | 25 |
| | Morale, Welfare, and Recreation | 26 |
| | Chaplain | 27 |
| | Linguists and Interpreters | 28 |
| V | LOGISTICS SUPPORT | 29 |
| | Funding | 29 |
| | Camp Construction | 29 |
| | Contract Support | 31 |
| | Military Support | 32 |

# Table of Contents


| CHAPTER | | PAGE |
|---|---|---|
| | Other Sources | 32 |
| | Transportation | 32 |
| VI | LEGAL RESPONSIBILITIES | 35 |
| | Status of United States Forces | 35 |
| | Status of Migrants | 35 |
| | Legal Basis of Operation | 36 |
| VII | CONCLUSION | 37 |
| | APPENDIX A (JTF Organization) | A-1 |


*Printed in May 1996*



~~Protected Material -- Subject to Protective Order~~

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 14 of 157



# EXECUTIVE SUMMARY

- **Operation SEA SIGNAL, conducted in USACOM's area of responsibility, resulted in an unprecedented opportunity for a single combatant commander using almost exclusively his own assigned forces to plan, execute, and sustain a major operation. Unity of command was a significant advantage for USACOM during Operation SEA SIGNAL and greatly reduced the elapsed time from the CINC's decisions to execution.**

- **Although the military is not specifically trained or organized to conduct migrant camp operations, its inherent flexibility resulted in rapid adaptation to the situation and enhanced mission accomplishment.**

- **International organizations/nongovernmental organizations/private voluntary organizations are "force multipliers" in migrant operations.**

- **The end state for migrant operations is the resettlement of the migrants; however, the duration of the operation and the morale of the migrants is largely dependent upon the timeliness of policy decisions that determine the ultimate disposition of the migrants.**

- **Timely and coherent policy decisions by the Interagency Working Group are critical for operational execution and mission success.**

- **People are at the center of migrant operations; therefore, basic human rights, needs, and dignity must be provided.**

- **Functional military components are key to joint task force success in migrant operations.**

- **Migrant operations vary according to the culture of the migrants.**

- **Operation SEA SIGNAL had an adverse impact on force readiness and operation tempo. In the future, consideration should be given to using contractors or reserve forces following the crisis response stage once the situation has stabilized.**

~~Protected Material -- Subject to Protective Order~~

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 15 of 157



U-DOW-CAR-294




Protected Material – Subject to Protective Order

U-DOW-CAR-295




~~Protected Material -- Subject to Protective Order~~

Intentionally Blank



~~Protected Material - Subject to Protective Order~~

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 18 of 157


# INTRODUCTION

***The military quickly adapted its unique capabilities to operate migrant camps.***

This pamphlet summarizes the lessons learned by USACOM in Operation SEA SIGNAL and provides guidance for future JTF commanders. This successful operation demonstrated that while the military is not specifically organized, trained, and equipped to conduct migrant operations, its inherent flexibility assisted in the rapid adaptation from a crisis situation to a stable environment which finally led to mission success. Ultimately, the quality of the people proved to be the key. The ability to put the right people in the right place was essential. Likewise, the humanitarian treatment of the migrants, and the understanding that their perception of the operation and definition of success (as reflected in the Cuban migrant art work in the executive summary and throughout the pamphlet) may differ from that of the JTF's, created conditions for success.

***The relationship that developed between JTF 160, USACOM, and the interagency working group should be a model for future JTFs.***

Organizing and commanding a JTF that is tasked with a humanitarian assistance operation will be unlike any other mission that a senior officer will have. The lessons learned by USACOM at Guantanamo and the subsequent identification of enduring principles for future JTF commanders provide a blueprint for any future migrant camp operation. The unique skills that US military forces possess were of immense value in this operation. The cooperation with international organizations, private voluntary organizations, and nongovernmental organizations was an essential element of success. Similarly, **the relationship and cooperation that developed between JTF 160, USACOM, and the interagency working group should be a model for future JTFs**.

***SEA SIGNAL's success demonstrated the value of having only one combatant commander responsible for an operation.***

Operation SEA SIGNAL's success was in no small part due to the unique position and capabilities of USACOM and its status as a combatant command. The majority of the forces that were employed came from its own Service components. The advantage of one combatant commander being responsible for the entire operation was clear as forces were deployed quickly within USACOM's area of responsibility. The normal delays that would have occurred if another command had been

~~Protected Material -- Subject to Protective Order~~

providing a large number of forces or if a Service component had been responsible for the operation were not evident.


~~Protected Material -- Subject to Protective Order~~

# CHAPTER I
# MISSION

*"This event [Operation SEA SIGNAL] closes a difficult, yet successful, operation that has helped many thousands of people begin a new life in the United States."*

**Bill Clinton**
**President of the United States**
**31 January 1996**



*JTF 160 processed more than 47,000 Haitian and Cuban Migrants.*

*"Successful completion of this humanitarian endeavor was truly a feat of Herculean effort and a remarkable testament to the skill, determination, and ingenuity of the US military. The operation [SEA SIGNAL] established a standard by which all future migrant operations will be measured. The lessons learned will be invaluable."*

**GEN John M. Shalikashvili**
**Chairman of the Joint Chiefs of Staff**

## GENERAL

***Humanitarian assistance operations vary according to the events which caused them.***

Humanitarian assistance operations vary according to the events which caused them. The nature and complexity of each operation require the commander, joint task force (CJTF) to understand thoroughly the mission, the political situation, specific military and civilian chains of command, the roles of other agencies involved and how to coordinate and interface with these agencies.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 21 of 157

US participation may involve a variety of tasks that range from holding migrants in camps to processing and arranging for their ultimate resettlement. At Guantanamo, Jamaica, and other third-country processing sites, these included feeding, housing, security, medical care, and overall administration of migrants until political decisions were made that determined their final destination. These tasks present unique challenges for the CJTF which require innovative solutions.

***Establish operational objectives.***

The combatant commander should establish the operational objectives needed to transform national-level policy and guidance into effective operational-level (JTF) actions. The combatant commander provides authoritative direction, initiates actions, sequences events, and applies resources to initiate and sustain the military contribution to migrant camp operations. CJTF, in turn, requires a clear and achievable mission so that tasking for the participating units can be efficiently executed.

## POLICY DIRECTIVES

***Policy dictates the mission.***

The combatant commander develops the mission statement and concept of operations based on direction from the National Command Authorities (NCA). The policy is implemented by other US government agencies, and influenced by factors such as location of the contingency, weather conditions, and local threat, which may change as events unfold. In most cases, a deliberative interagency process will determine what role is appropriate for the Department of Defense from a legal and policy standpoint.

The combatant commander's policy, mission, and commander's intent must be translated into mission objectives and operating parameters for the JTF. During Operation SEA SIGNAL, close links between the combatant and JTF commanders and their staffs helped to anticipate and react to inevitable policy changes. Specifically, the 2 May 1995 announcement on parole by the Attorney General was well coordinated between JTF 160 and USACOM.

~~Protected Material – Subject to Protective Order~~



U-DOW-CAR-300

## LEGAL AUTHORITY

***Legal authority provides the basis for the mission.***

CJTF must understand the scope of the legal authority for the operation: Is it governed by US statutes, Presidential Directives and Executive Orders, treaty obligations, or other international agreements? Existing international agreements may constrain US forces; agreements negotiated during the course of the operation could provide additional flexibility for expanded operations in neighboring countries. Likewise, agreements also may define the legal rights and responsibilities of US forces in dealing with migrants, as well as host country officials.

The statutory authority for the operation may dictate the source of funds and the manner in which they can be spent. For example, during Operation SEA SIGNAL the mission changed from an emergency reaction to one of extended care and processing for the migrants. In such a case, it is necessary to ensure that there is still a legal basis to spend a particular department's appropriations. Therefore, the CJTF needs to have a clear understanding on funding and its constraints early in the operation.

> *"The mission analysis and command estimate processes are as critical in planning for MOOTW as they are in planning for war."*
>
> **Joint Pub 3-07,**
> **"Joint Doctrine for Military Operations Other Than War"**




***JTF personnel arriving at Guantanamo Bay, Cuba***

## MISSION ANALYSIS

***Detailed and iterative mission analysis is crucial to the ultimate success of the operation.***

Detailed and iterative mission analysis is crucial to the ultimate success of the operation. CJTF may wish to use the staff planning procedure that analyzes mission, enemy, terrain and weather, troops and support, time and space available. This procedure was especially helpful at Guantanamo Bay in providing a structure that facilitated a quick reaction to the influx of migrants.

***Understand the mission and its scope.***

It is essential that the CJTF and the JTF staff thoroughly understand the mission and its scope at the outset. During Operation SEA SIGNAL, the mission and scope changed from an emergency reaction to one of extended care and processing for the migrants. Before the mission analysis begins, the CJTF should clarify any policy directives that are unclear. As these directives will set the parameters for the operation, "gray areas" should be explored with the combatant command to obtain clear guidance as to the meaning and intent of directives. Clear mission guidance will allow the CJTF the freedom of action to determine the objectives and fully recognize the end state.

***Mission analysis should be a continual process.***

Continual mission analysis is vital to achieving the mission. For example, at Guantanamo, the mission ranged from emergency care to transporting migrants to a third country, constructing living quarters, providing medical care, and processing migrants for eventual entry into the United States. CJTF and staff should frequently examine the mission to ensure that mission, procedures, processes, and measures of effectiveness are still valid.

***Mission changes will dictate force structure changes.***

Over time, the nature of the mission likely will change. For example, in the early stages of the operation the emphasis will be on emergency measures to house, feed, and provide necessary medical care for the migrants. As this phase is completed, the JTF may initiate efforts to improve the quality of life for the migrants and prepare for the end of the operation. This was the case at Guantanamo as the flood of migrants ended and eventual movement to the United States began. Continuing mission analysis should identify



~~Protected Material -- Subject to Protective Order~~

these transitions in the operation and the requisite change in force structure for the JTF.

***Understanding the culture of the migrants is a crucial part of the mission analysis process.***

**Understanding the culture of the migrants is a crucial part of the mission analysis process.** An intelligence analysis of the region and people should be reviewed prior to deployment in order to understand the operational environment. This should include information on customs and habits: foods, taboos, religious requirements, as well as information on the migrants' country, the site of the mission, and data on any previous related operations. Cultural awareness provides a framework for rendering assistance to, as well as resolving problems with, the migrants.

***An assessment team report can be a critical planning tool.***

As a part of the mission analysis process, an assessment team composed of a broad spectrum of personnel with functional area expertise should survey the joint operations area (JOA) before deployment. This site survey can validate the mission analysis process, reduce potential duplication of effort, identify requirements and shortfalls, and provide for a rational division of labor. **It is important that the assessment team members be a part of the JTF that will participate in the actual operation.** They should have the capability to provide real-time information and analysis directly to the CJTF and staff.

***Key Questions***

As a product of the analysis process, the CJTF should be able to answer the following questions:

- What is the mission going to achieve and how will the JTF achieve it?
- Can the JTF accomplish its mission in the allotted time?
- What are the requirements for interagency and voluntary organization activity?
- Where will resources and funding come from?
- What is the desired end state?
- What are measurable events to gauge progress?

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 25 of 157

- What are indicators of success?
- What are the requirements for transition?

A thorough and continuing mission analysis in the context of a definitive mission statement should help prevent losing control of the situation. Different agendas of participating organizations can cause the combatant commander or the CJTF to expand military activities into areas beyond the initial scope defined by the mission. **The combatant commander and the CJTF will have to coordinate with other US government agencies in order to prevent "mission creep."**

*"The formulation of a clear and precise mission statement which defines measurable and attainable objectives is paramount."*

**Gen Joseph P. Hoar, USMC**
**Commander in Chief, US Central Command**

## END STATE



***It is critical to have a desired end state– understanding the migrants' goal is liberation and freedom as depicted in this Cuban migrant painting.***

Identify the desired end state during the mission analysis process. Coordination with other US government agencies is necessary to obtain agreement on an end state. This will ensure all parties are working toward the same objective.

A clearly defined mission statement from the CJTF which includes the end state allows component commanders and other organizations and agencies to develop or define their implementing and supporting tasks. The desired end state should be reviewed periodically, especially if the nature of the mission changes due to policy changes during the operation. During migrant camp operations at Guantanamo Bay, Cuba, there were two major mission changes that were directly related to policy shifts. In October 1994, the mission shifted from "housing" the migrants to "housing and limited processing" after a policy decision permitted limited entry into the U.S. under four "parole protocols." Subsequently, the mission changed on 2 May 1995, to intensive processing as a result of a policy decision which allowed Cubans not previously paroled entry into the U.S. on a case-by-case basis.


~~Protected Material -- Subject to Protective Order~~

***Define mission success.***

CJTFs should develop criteria to define mission success. A precise mission statement can be used to develop the criteria necessary to evaluate operations and ultimately define success. For example, at Guantanamo, these criteria were the orderly operation of migrant camps, the transition to closure of the camps, and the resettlement of the migrants.

***Measures of success provide the yardstick for determining mission accomplishment.***

Measures of success provide the yardstick for determining mission accomplishment. They serve as indicators that determine the difference between success and failure. Selecting measures of success can be difficult in any military operation. In migrant operations, it is easy to mistake the symptom for the problem. Measures of success, to be useful, should be objective and quantifiable.

## ADDITIONAL CONSIDERATIONS



*CJCS GEN Shalikashvili visited migrant camps at Guantanamo Bay, Cuba, on several occasions.*

*"A Task Force Commander who creates a close knit interagency working relationship can focus on getting the mission accomplished without the distractions created by outside agencies or attempts to fulfill special agendas that might be disruptive to the operation."*

**RADM Michael D. Haskins**
**Commander, JTF 160**
**8 July 1995 - 3 November 1995**

***Interagency working group will decide policy issues.***

Basic policy issues affecting the JTF may be addressed by an interagency working group in Washington that is organized for the specific operation. This group will probably consist of representatives from the National Security Council Staff, the Joint Staff, Office of the Secretary of Defense, the Department of State (DOS), the Coast Guard, and the Community Relations Service and the Immigration and Naturalization Service of the Department of Justice. Policy issues may include immigration policy, migrant housing, food, medical services, mail, donations of goods and services, camp programs, and transportation of migrants to the United States.

CJTF should maintain close links with the combatant command and both government and nongovernmental agencies through frequent communication. At a minimum, the JTF should request liaison officers from the Department of State, Immigration and Naturalization Service, United Nations High Commissioner for Refugees (UNHCR), and appropriate international organizations, private volunteer organizations and nongovernmental organizations (IOs/PVOs/NGOs). The objective is to establish a relationship to gain support and consensus for actions.



*JTF 160 personnel and civilian representatives met daily.*



~~Protected Material – Subject to Protective Order~~

# CHAPTER II
# JOINT TASK FORCE ORGANIZATION

## STAFF ORGANIZATION

***JTF Organization***

The purpose of the JTF headquarters (HQ) is command, control, and administration of the JTF; it provides the basis for a unified effort, centralized planning, and decentralized execution. The unique aspects of this mission mean that the JTF HQ must be flexible, responsive, and aware of the capabilities and limitations of the JTF forces as well as those of the various relief organizations. The unique mission of the JTF means that it probably will be necessary for the CJTF to design an organizational structure for the JTF to accomplish the specialized tasks. This may mean creating task groups for logistics and/or security, for example. During Operation SEA SIGNAL, JTF 160 was comprised of security, support, and logistics task groups.

***Selecting key staff members who have your confidence will ultimately pay dividends.***

Selecting key staff members will ultimately pay dividends. The "personal staff group" comprised of the chief of staff, the public affairs officer, surgeon, chaplain, and staff judge advocate becomes the focus of operations more than in conventional combat operations. They must have direct access to the CJTF and must not work in isolation.

***Recognize Service cultures.***

CJTF should recognize the different Service "cultures" staff members bring with them that are reflected in their approach to staff work and operations. Therefore, the CJTF may find it prudent to spend more time initially to ensure directives and guidance are conveyed clearly.

## STAFF REQUIREMENT CONSIDERATIONS

***Mission considerations will determine organization.***

A JTF formed specifically to conduct migrant camp operations on a US military facility such as JTF 160 at Guantanamo will likely be organized differently from a JTF in a foreign country with a broad mission, only part of which is the establishment and operation of migrant camps.

JTF 160 used the staff organization, as depicted in Appendix A, in the later stages of Operation SEA SIGNAL. The J-5 planning function has been integrated into J-3. The J-5 politico-military planning function is more important to maintain if the JTF is located in a foreign country, where host nation (HN) issues often arise and are resolved at the JTF level. The J-3 is the key staff member responsible for the coordination and integration of all operations, including the other staff members, subordinate JTF commands, and civilian agencies. J-3 probably will include a Joint Operations Center (JOC), Current Operations/Plans, civil affairs, Migrant Operations and the Military Information Support Team (MIST) which incorporates psychological operations (PSYOP). Of equal importance, the role of the J-1 staff member cannot be overlooked, especially when considering individual augmentees, critical skill requirements, and other key personnel areas.

***Joint Visitors Bureau can assist in managing visits.***

A Joint Visitors Bureau (JVB) can be a valuable asset as a special staff function. Scheduling and hosting distinguished visitors will be a full-time responsibility. The director should be a senior officer with a staff that has representatives from all Services and should be separate from the public affairs function. Because of the coordination required to manage visits, the JVB needs an adequate communications capability. The JVB also will need to ensure that operational requirements are balanced with the legitimate needs of various interested NGOs such as human rights and refugee groups to visit migrant camps.

***Encourage visits by policy makers.***

Visits to the area by policy makers who have a direct impact on the mission should be encouraged as well as visits by the supported combatant commander and staff and all the agencies involved in the daily execution of the mission. This was especially beneficial during Operation SEA SIGNAL. The ultimate goal is to help these groups fully understand the ramifications their decisions and directions have upon the JTF and its ability to accomplish the mission.


~~Protected Material -- Subject to Protective Order~~

## INTELLIGENCE OPERATIONS

*"The great thing is to get the true picture, whatever it is."*

**Winston Churchill**

***Intelligence analysis is different in migrant operations.***

Intelligence collection, analysis, and reporting in migrant camp operations will require a focus that is different from other missions. Since there may be no enemy force upon which collection efforts will be directed, intelligence personnel must analyze the situation and its dynamics. These dynamics include trends in behavior, attitudes of migrants, rumors, and overall camp morale. Information that is collected from within the migrant camps will be in response to the CJTF's priority intelligence requirements and should be reported in a daily intelligence summary that highlights significant activities in migrant camps that could affect the overall security of the camps.

## FORCE PROTECTION

***CJTF must ensure the protection of US personnel.***

CJTF must ensure the safety of US personnel from both internal and external threats. The situation will dictate when lethal and nonlethal weapons and munitions can be used to ensure protection. Concurrently, clear rules of engagement (ROE) must be developed for the applicability and use of deadly force to protect JTF personnel and to maintain order and security in the migrant camps. It is imperative that security force personnel understand the ROE and are well trained to respond to various security threats.

At Guantanamo, two company-size Quick Reaction Forces (QRF) served as the force protector for US forces involved with any migrant disturbance. The QRF was kept out of sight unless a disturbance or situation warranted its use. Camp commanders did not use the QRF indiscriminately and personally ensured that disturbances actually required its use.

Ground Defense Security Forces (GDSF) provided additional security reinforcement. During Operation SEA SIGNAL, this force employed normal infantry

~~Protected Material -- Subject to Protective Order~~

weapons and riot control agents and would have been used as an emergency backup for the QRF. In a situation with an external threat, the GDSF would be the primary security force.

## FUNCTIONAL COMPONENT COMMANDS

***Special task groups for logistics and operations***

CJTF may choose to designate subordinate Joint Task Groups (JTG) consisting of selected members from more than one Service to perform specific functions. These may include a JTG to operate multiple migrant camps. Logistics support may be accomplished by designating either Logistics Support Commands, a Joint Task Force Logistics Command, or a Joint Logistics Support Center. Functional component commanders report directly to the CJTF.

## LIAISON OFFICERS

***Use liaison officers.***

Qualified liaison personnel contribute significantly to mission success. These include links between the JTF HQ and higher commands, adjacent units, and, between supporting or assigned forces and the JTF HQ. Knowledge of the capabilities and limitations of their parent units and Service is a prerequisite for assignment to this function.

## PUBLIC AFFAIRS AND THE MEDIA

*"In many of today's operations, media relations can prove to be more important than fire and maneuver in determining the outcome."*

**LtGen Anthony C. Zinni, USMC**
**CG, I Marine Expeditionary Force**

***The media can be a powerful ally.***

CJTF must be prepared to deal with the media and understand the results of media coverage, both positive and negative. A pro-active, on-scene public affairs program should be implemented and all JTF personnel should be given guidelines for dealing with the media. Daily direct involvement with the media can contribute to mission success. For example, at Guantanamo the CJTF met with each visiting media group at the conclusion of their visit. In the final analysis, open



~~Protected Material -- Subject to Protective Order~~

media access with clear guidelines and access to the CJTF will prove to be beneficial.

***Use the JIB to manage media relations.***

A Joint Information Bureau (JIB) provides a means to coordinate the release of information, respond to media requests for information, manage media visits, and arrange access to the migrant camps. JIB facilitates civilian news media representatives in their coverage of JTF activities and, if possible, provides command information on the activities of US military personnel engaged in migrant camp operations.

> *"The complex nature of JTF communications requires a knowledge base that Service communicators typically do not acquire without specialized joint training."*
>
> **Operation UPHOLD DEMOCRACY**
> **Joint After Action Report**

## INTEROPERABILITY

***Interoperability enhances mission effectiveness.***

The interoperability of communications equipment and computers can enhance mission effectiveness. Communications and coordination with all elements of the operation—security, operations, logistics, NGOs/PVOs/IOs—are critical for day-to-day camp operations. Hand held radios, computers and software, and telephone equipment should be compatible.

## TOUR LENGTHS

***Standardize tour lengths.***

If possible, JTF personnel should have a standard tour length. It is difficult to implement plans and conduct operations with a high turnover of personnel. Past operations have suffered because of different Service personnel rotation policies for joint operations. Standardizing tours would also avoid adverse morale problems arising from the inequities of varying tour lengths. A standard tour length of 179 days provides the most continuity and does not disrupt daily operations with constant turnover training.

~~Protected Material -- Subject to Protective Order~~

Intentionally Blank



~~Protected Material – Subject to Protective Order~~

# CHAPTER III
# CIVIL-MILITARY OPERATIONS

*"Civil Affairs units from the Army were indispensable in the smooth operation of the camp. They were involved in virtually every program in the camps."*

**Brig Gen John J. Allen, USAF**
**Commander, JTF 160**
**25 February 1995 - 8 July 1995**

## GENERAL

***The effective integration of CA capabilities into migrant camp operations is an absolute requirement for success.***

The effective integration of Civil Affairs (CA) capabilities into migrant camp operations is an absolute requirement for success. JTF forces must integrate their efforts with other US government agencies and NGO/PVO/IOs. The method that the CJTF selects to ensure unity of effort between the JTF and other agencies organizations will depend on the location and scope of the JTF mission.

CA personnel, most of whom are from the reserves, can be utilized in the migrant camps to create a migrant social/governmental infrastructure by helping migrants elect camp leaders. As such, this can greatly reduce tensions in the camps and lessen the threat to US forces. This was proven to be extremely successful at Guantanamo as elected leaders played a key role in interfacing between migrants and JTF personnel.

## CIVIL-MILITARY OPERATIONS CENTER (CMOC)

***Consider establishing a Civil Military Operations Center.***

CMOC provides liaison and coordination between the military and the humanitarian assistance organizations. The Director is normally the military representative to the senior IO or its policy making body. The CMOC is comprised of experienced CA military personnel and should be staffed for 24-hour operations.

CMOC provides unity of effort to CA activities thereby allowing the JOC and other JTF organizations to focus on other portions of the JTF mission. As such, the CMOC becomes the primary point of contact for IO/NGO/PVO interaction with the JTF. The organization

of the CMOC should be developed according to mission requirements and the local situation. CMOC usually operates under the cognizance of the J-3.



*Civilian-military cooperation was vital.*

*"The necessary first step in shaping effective interagency groups is making known what skills and resources one brings to the table."*

**ADM P. D. Miller, USN**
**Commander in Chief, US Atlantic Command**
**1 October 1993 - 31 October 1994**

## INTERAGENCY AND POLITICAL COORDINATION

***Integrate other government agencies into the operation.***

CJTF must understand the role of other US agencies and their potential involvement and impact on migrant camp operations. Cooperation and coordination with these agencies is critical to mission success. CJTF should integrate all non-DOD agencies into the JTF through the CMOC and by attendance at staff meetings and planning meetings. The goal is to gain consensus on major policy decisions and encourage a team approach from all agencies.

Just as the military is gaining experience in conducting peace operations, other governmental and nongovernmental agencies are developing a cadre of individuals who understand and work well with the military. They are committed and hard working, often possessing experiences exceeding many members of



~~Protected Material – Subject to Protective Order~~

the JTF staff. Evaluate the capabilities and responsibilities of the other agencies without applying any preconceived notions.

## NONGOVERNMENTAL AND PRIVATE VOLUNTARY ORGANIZATIONS

***Integrate volunteer organizations into JTF operations.***

It is likely that there will be participation of IOs/NGOs/PVOs in any migrant camp operation. The challenge will be to integrate them into JTF operations. Different organizational structures and different agendas will make this task difficult. However, the CJTF should attempt to obtain agreement with them on the mission and their role while gaining respect from them through cooperation, responsiveness, and flexibility.

***IOs/NGOs/PVOs operate differently from the military.***

One significant cultural difference between the military and most of the other agencies is the approach toward organization. The military culture emphasizes command and control, while most of the other agencies focus on coordination and cooperation. This is an important distinction. Sometimes perceived intransigence on the part of other agencies is based on their reluctance to subordinate their activities to DOD agencies. On the other hand, the same issue approached in a spirit of recognition of common objectives generally can be resolved quickly.

***NGOs offer valuable expertise.***

In many cases, NGOs will have been established and operating in a country for some time before US forces become involved. Many of the NGO/PVO's have a full-time refugee/migrant support mission. For example, the UNCHR Handbook contains the minimum essential elements for migrant support and extensive guidance on difficult issues like employment of migrants, self-governance, camp administration, and migrant processing. They are a potential source of information on the current situation, can generate useful contacts, and often understand the indigenous culture better than JTF personnel at the outset. NGOs also normally will have their own agenda and not be responsible to anyone other than whoever is providing them funds. US forces likely will support NGOs by providing physical security and logistics, particularly transportation.

***Develop a team approach with relief organizations.***

For the JTF, it is important that the military personnel recognize that relief organizations are partners in the operation. Despite differing views on many aspects of the situation, the military should seek common ground and develop a team approach to work for ultimate success of the mission.



*Volunteer organizations conducted numerous educational programs in the camps.*



~~Protected Material – Subject to Protective Order~~

# CHAPTER IV
# CAMP ORGANIZATION AND OPERATION



*Migrants were billeted in four large camps at Guantanamo Bay, Cuba.*

***Treat migrants with dignity and respect.***

The effective operation of these camps requires a well-developed organization, detailed operating procedures, and personnel sensitized to dealing with migrants. Migrants will be provided with food, clothing, and shelter in the camps that will be their home for an indeterminate time. CJTF should set the tone for the operation and ensure that JTF personnel understand that **migrants are human beings and not just numbers**. As such, they must be treated with dignity and respect. Likewise, it is important to keep in mind that migrants are not military personnel; as such, they are not used to being given orders. Random searches, for instance, only should be carried out for security purposes.



*Be sensitive to the migrants' physical and mental states upon arrival at the camps. The above Cuban migrant art work reflects the extreme psychological and physical perils migrants may face.*

## ORGANIZATION

*"We encouraged work. I never used a soldier for a job if I could employ a migrant. This freed up a lot of our people, kept the migrants busy, left them with a sense of control over their own destiny, and improved relations with the military."*

**Col Michael Lehnert, USMC**
**Former JTG Commander, JTF 160**

***Camp organization should be tailored for the operation.***

The organization for the operation of migrant camps may be tailored as to size and the command and control structure to meet the situation. If organized as a JTG, a functional joint staff may be used to execute the mission. However, all will need sections for command, operations, and support.

***Involve migrants in the operation of the camps.***

Each migrant camp operation is likely to be different, but the CJTF should try to involve migrants in the operation of their camps. Developing self-governing bodies can be a prime factor in the peaceful and efficient operation of migrant camps. JTF personnel should identify potential migrant leadership as soon as possible and support those leaders who are willing to work toward mission accomplishment.



***Create an atmosphere where the migrants feel like they are in a village-type environment (reflected in the Cuban migrant art work above) as opposed to confined detainees (reflected in the Cuban migrant art work below).***



The migrants at Guantanamo were allowed to exercise self-government by electing their own leaders under the supervision of military personnel. Elected migrant leaders disseminated information and policies of the JTF and camp commander and provided feedback on migrant reaction to those policies.

Migrants offer a potential source of labor for self-help construction and maintenance in the camps. At Guantanamo, these resources were used on a voluntary basis in expediting projects, such as for camp construction and other activities under US supervision. In this way, migrants were given worthwhile projects to occupy what would otherwise have been idle time in the camps.



~~Protected Material – Subject to Protective Order~~

# OPERATIONS

***Guidelines for success***

Based on experience with migrant operations at Guantanamo, USACOM personnel identified four principles that, if adhered to, can significantly contribute to mission accomplishment: accountability, control, security, and communications.

***There must be an accurate accounting of all migrants at all times.***

- **Accountability**: There must be an accurate accounting of all migrants at all times. At Guantanamo, the Deployable Mass Population Identification and Tracking System (DMPITS) was used, but the terminals were not linked together. Also, when identification bracelets had to be replaced, new numbers were assigned to the recipients of the new bracelets which led to the creation of duplicate records. In any future operations, an automated, networked system, such as DMPITS, in conjunction with an identification card with a permanent number, issued and controlled at the JTF level, is needed to ensure positive, real-time accountability for all migrants.

***Positive control of the camp population is the key to successful camp security and operations.***

- **Control**: Positive control of the camp population is the key to successful camp security and operations. The dissemination of information is an important means of population control. Use migrant leadership to disseminate information within the camps through the MIST that are a part of the PSYOP effort. It is imperative the migrants be given a message of hope for their future. If migrants develop a sense of despair for their plight, trouble and unrest in the camps likely will develop.

***Provisions for camp security and the enforcement of law, order, and discipline within the camps are essential.***

- **Security**: Provisions for camp security and the enforcement of law, order and discipline within the camps are essential. This is a delicate area since, with very few exceptions, migrants are not criminals nor are they prisoners of war and should not be treated as if they are part of either group. Nevertheless, well trained security forces with clear ROE protect both the migrants and JTF personnel.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 41 of 157

***Effective communication can convey important messages to the migrants that helps form opinions and attitudes that contribute to good camp morale.***

- **Communications**: Effective communication can convey important messages to the migrants that helps form opinions and attitudes that contribute to good camp morale. Migrants should be kept informed with all information that affects their status. Communications with migrants also conveys the CJTF's interest in their well being. Camp newspapers, radio, and face-to-face meetings by the CJTF are very effective means to dispel rumors and communicate with migrants.




*Camp newspapers were used to dispel rumors and convey important information at Guantanamo Bay, Cuba.*

## PSYCHOLOGICAL OPERATIONS

***Use PSYOP and MIST to communicate with migrants.***

PSYOP are a tool that can enhance control and security and should be integrated into daily planning and operations. It must be flexible and capable of being delivered by various types of media. MIST is organized to implement the PSYOP plan and determine themes and produce information products such as a camp newspaper, radio programs, and leaflets. CJTF can use these tools to reinforce policy directives and disseminate any other information to the migrant camp population.

***Rumor control will be a constant challenge.***

Many of the disturbances that occurred in Haitian and Cuban camps were caused by rumors, changes in operations, and US policy shifts that affected the status of the migrants. Rumors need to be discovered,



~~Protected Material – Subject to Protective Order~~

checked, and countered quickly to eliminate possible problems within the camps. Only by having a constant presence in the camps and obtaining feedback from the migrants can the CJTF counter rumors by providing the truth to migrants. This should be a coordinated action through the CMOC. However, it may be necessary for direct communication from the CJTF to counter the more serious rumors.

## MEDICAL SUPPORT

***Proper sanitation and preventive medicine early in the operation can contribute to mission success.***

**Infectious diseases pose one of the greatest threats to JTF forces and camp populations.** Proper sanitation and preventive medicine early in the operation can contribute to mission success. Food preparation, potable water, and sewage and refuse sanitation are critical to maintaining public health and preventing epidemic diseases that can bring all other medical operations to a halt until the epidemic is controlled. Medical support will be provided as an integral part of the humanitarian assistance operation with priority and standards of care set by the JTF surgeon. It will generally be limited to immediate lifesaving measures, preventive medicine, and stabilizing patients requiring extensive care for transfer to appropriate long-term facilities. Medical planning should be integrated early on to ensure the proper level of support must regard to medical supplies. Dental support must be provided to alleviate pain and suffering.



*Migrants were provided with essential medical care.*

Another critical medical issue is psychiatric care for migrants. During Operation SEA SIGNAL, the disposition of psychiatric patients was a difficult issue for the interagency working group to resolve. Short-term, low level care must be made available. Long-term, intensive care is a mission for which US forces are not prepared and handling of such cases will have to be referred to the interagency working group for resolution.

JTF personnel should recognize that life in migrant camps creates stress that can result in marital problems, such as spousal abuse. Special women's shelter tents were set up in Operation SEA SIGNAL for single women and married women who did not desire to remain with their spouses. Other women's issues which should be addressed by medical personnel include rape evaluation and counseling and pregnancies.

## MORALE, WELFARE, AND RECREATION

***Keep migrants informed on their status.***

Maintaining good morale among the migrant population is an essential element of the overall mission. Keeping the migrants informed of their status and US intentions toward them will go a long way toward maintaining morale and good order in the camps. In an effort to improve morale, migrants at Guantanamo were provided with postal service funded by the Department of State.

***Organized activities contribute to good morale.***

Organized recreational activities can ease boredom and restlessness. Daily camp life offers very little opportunity for productive activity. Organized programs such as physical training and sports can enhance the US relationship with migrants as well as improve their morale and quality of life. When migrants are afforded the opportunity for physical activity during their idle hours, they are more manageable and less likely to protest their conditions or cause control problems.

***Food service demands attention.***

**The quality and reliability of food service can be a major factor in maintaining tranquillity among the migrants**. An effective food services operation requires the participation of the JTF staff, medical, food services, and CA personnel. The lack of consistent food service and quality of food served can be a source of significant discontent. JTF 160 used migrants to prepare



~~Protected Material – Subject to Protective Order~~

food in accordance with dietary preferences. This employed migrants and reduced support requirements.

***In a migrant camp environment, meals take on an elevated importance.***

In a migrant camp environment, meals take on an elevated importance. Food service personnel at Guantanamo determined the cultural and nutritional needs of the migrant population and provided menus tailored to the specific culture of the migrants. Camp leaders were consulted to identify any food prohibitions or preferences before feeding plans were established.



*Migrants participated in food preparation and service.*

## CHAPLAIN

***Chaplains support JTF personnel and migrants.***

It is important that an adequate number of chaplains be assigned to support both the JTF military personnel and the migrants. The chaplains at Guantanamo assisted the humanitarian agencies and civil affairs personnel in the migrant camps. Also, the chaplain provided confidentiality and privileged communications in counseling the JTF personnel; this was necessary for stress management, maintaining good morale, and the early identification of personnel problems. CJTF should ensure an adequate number of chaplains and their assistants are assigned.

## LINGUISTS AND INTERPRETERS

***Qualified linguists are essential.***

Linguists and interpreters are a valuable and necessary asset for the JTF. **Qualified** linguists (with a demonstrated fluency) are essential for communicating with the migrants. They can provide a link to the local population as well as to the migrants. The requirement for linguists should be established early since many are reservists and it often takes a long time to identify and deploy these individuals.

Where possible, efforts should be made to identify linguists and interpreters proficient in particular dialects or regional forms of a language, such as Haitian Creole or Cuban Spanish, to maximize the effectiveness of communications between the JTF and the migrant population. In special cases, it may be necessary to seek contract interpreters as was the case in Operations DESERT STORM, RESTORE HOPE, and JOINT ENDEAVOR.



*Singer Gloria Estefan performed for migrants and JTF personnel at Guantanamo Bay, Cuba.*



~~Protected Material -- Subject to Protective Order~~

# CHAPTER V
# LOGISTICS SUPPORT

***Logistics planning and coordination***

Joint logistics planning and coordination are essential to successful migrant support. The logistics structure may need to be customized into specialized centers such as a Joint Logistics Support Command (JLSC) to provide support for both JTF personnel and migrant population. JLSC would be responsible for conserving, consolidating, synchronizing, and coordinating the logistics effort to support the JTF.

## FUNDING

***Understand funding sources.***

Funding responsibilities and sources should be determined during the planning stages. The interagency group in Washington, D.C., will determine which non-DOD funds sources also may be available to support the operation. Each Service is responsible for funding its own forces, except as detailed by the operations order or other agreements. The combatant commander may provide funds to the JTF HQ for a specific purpose, but these funds usually are very limited.

If possible, the CJTF should obtain authority for the JTF to control its own budget. Future migrant operations likely will be subject to austere funding and will not operate effectively without direct funding control and visibility.

JTF and Service components should carefully track and record costs connected with the operation. This will allow DOD to recoup costs through later supplemental appropriations when the Secretary of Defense determines that a supplemental request is appropriate. Additionally, a high priority should be placed on property accountability due to frequent turnover of temporary personnel.

## CAMP CONSTRUCTION

***Camp construction and design will be a significant part of mission accomplishment.***

The design and construction of the camp will be a significant part of mission accomplishment. The camp will become the equivalent of a small town with all the infrastructure required to support the needs of the

migrants. Early on, the CJTF should decide construction standards for migrant camps as this will dictate personnel and equipment requirements.

***Planning of the camps cannot be done in a vacuum by the engineers.***

Planning for the camps should include a site survey with representatives of all JTF staff sections. A primary consideration should be the anticipated length of the operation and the requirements to meet the initial surge of migrants If the operation continues for an extended period, it may be necessary to transition from temporary facilities to semipermanent construction.

***USACOM has developed the Land Based Contingency Kit.***

USACOM has developed the Land Based Contingency Kit (LBCK), a 2,500 person tent city that can be operational within 72 hours. This kit's list of materials includes tents, portable latrines, security lighting, and generator support.

***Navy and Air Force construction teams offer the most capability for vertical and horizontal construction.***

A large part of the JTF's construction and maintenance force will be military. The Navy's Construction Battalions and the Air Force's RED HORSE and PRIME BEEF teams offer the most capability for vertical and horizontal construction. The Army's capability focuses on expedient and temporary construction.

***Camp maintenance is critical to an efficient operation.***

Maintenance of the migrant and JTF camps is critical to a smooth running operation. Separate engineering units should be tasked with camp maintenance. It will be difficult for the primary construction units to maintain the camps since they probably will be busy constructing new camps or making quality of life improvements.

***Plan for retrograde operations.***

Another important consideration is planning for the eventual termination of the operation. Retrograde planning should be included even as camps are being constructed. A well planned and executed retrograde plan is an integral part of mission success.



~~Protected Material – Subject to Protective Order~~



*Construction of "strongback" tents improved living conditions in the migrant camps at Guantanamo Bay, Cuba.*

## CONTRACT SUPPORT

***Sources of support***

Consideration should be given to using contractor support when the situation permits and camp operations are normalized. Use of contractors to fulfill such requirements as food service support, public works support, supply support, or linguist services may be possible early in migrant operations. Depending on the situation, it may be possible to provide other support services through contract, such as the use of cruise ships to meet troop billeting requirements as was done during part of Operation SEA SIGNAL. Though expensive, use of contracts reduces the military personnel required to complete the mission. Additionally, transportation requirements and equipment wear and tear are reduced, as was done with contract barges for bulk transport of general sustainment cargo during the Guantanamo Bay migrant operation.

Contract support should not be assumed to be available during an initial response to a migrant camp operation. Its best use would be to meet long-term requirements after any initial crisis response is executed by military personnel. In order to facilitate contracting, the CJTF should consider requesting that the combatant commander seek authority at the SECDEF level for the use of non-standard US government contracting

authority to streamline the acquisition process by bypassing normal procedures in contracting. This will avoid potentially embarrassing and time consuming negotiations and allow the JTF to buy what is needed immediately.

## MILITARY SUPPORT

***Military support will be used in initial stages of an operation.***

Although military support is expensive, it has been the primary means of support in past migrant operations because of responsiveness and expediency. When migrant camp operations are established on military installations, there is a reduced requirement to transport personnel in the initial stage as the installation will attempt to manage the initial surge. Once the decision is made to establish a JTF, additional personnel must be transported to the JOA.

## OTHER SOURCES

***Volunteer support***

Some logistics support for the migrants may come from other sources such as NGOs, PVOs, IOs, other US government organizations, and possibly from a host nation. This support may include food, transportation, construction materials, petroleum, oil, and lubricants (POL), refrigeration services, utilities, and medical supplies. An early determination must be made by the interagency working group as to whether these sources will be used and if they can last for the duration of the operation. This support is sometimes the best suited and the most desirable from the perspective of both the migrants and the JTF. If support is to be procured from other sources, memoranda of understanding and contracts should be completed.

## TRANSPORTATION

***Joint Movement Center can manage airlift and local transportation.***

Depending on the location of the JOA, strategic airlift or barge shipment may be the means to deploy the JTF. CJTF should monitor all strategic lift to the JOA through a Joint Movement Center (JMC). The JMC will control the movement of both personnel and supplies into the area. The effective allocation of transportation resources is critical to overall mission success. In addition, the JMC will be responsible for



~~Protected Material -- Subject to Protective Order~~

U-DOW-CAR-328

local transportation for the JTF and migrant camps. Local motor vehicle transportation is a critical element in supporting camp operations.




*During Operation SEA SIGNAL, the Joint Movement Center managed all transportation of migrants.*

Intentionally Blank



Protected Material -- Subject to Protective Order

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 52 of 157


# CHAPTER VI
# LEGAL RESPONSIBILITIES

***Involve the legal advisor in all aspects of the mission.***

The Staff Judge Advocate (SJA) should become a key member of the JTF Commander's "personal staff." The SJA should have a variety of experiences, especially in military justice, administrative law, and operational law. This background is important because the SJA likely will be a primary command representative who will interface with interagency and international relief agencies because of the legal considerations involved. SJA can provide valuable counsel to the CJTF in a number of critical areas, such as in CA, PSYOP, and claims and investigations. In this regard, it would be a good practice for the SJA to review all policy letters pertaining to JTF personnel and migrants.

***Establish policy on key issues.***

Early on, the CJTF should direct the SJA to draft key policy letters on the following subjects: fraternization within the task force, ROE for JTF personnel, the migrant camp commander's authority to address migrant misconduct, and military-migrant fraternization policy. Drawing on experience from Operation SEA SIGNAL, the SJA should coordinate with the Department of Justice to establish procedures for the administration of justice in the camps.

## STATUS OF UNITED STATES FORCES

***Determine the status of United States forces.***

Prior to deployment, SJA should determine if there is an existing treaty or status of forces agreement between the United States and the host nation. If no agreement exists, DOS must become involved to establish the status of US forces in the host country. Subsequently, a status of forces agreement that spells out the rights and status of US military forces may need to be drafted and signed by the United States and the host country.

## STATUS OF MIGRANTS

***Understand the legal rights of migrants.***

The rights of migrants are severely limited. The US Immigration and Naturalization Act (INA) does not have extraterritorial effect; therefore, migrants do not have the same rights in an offshore safe haven as they

~~Protected Material -- Subject to Protective Order~~

would in the United States. In each safe haven situation, the Department of Justice will determine the extent to which the INA is applicable. Even though migrants do not have the same rights as US citizens, JTF personnel must not act arbitrarily and capriciously toward them.

It may be necessary to establish a migrant disciplinary system to comply with host nation laws and administratively maintain and enforce discipline within the camps. At a minimum, the CJTF should consider establishing a segregation facility as an internal administrative process as was done at Guantanamo with camp X-Ray.

An early determination should be sought to determine the legal status of the migrants and their ultimate disposition. This determination will impact upon the mission's end state and ultimate conclusion of the operation. For example, there will be questions as to where the migrants will eventually settle, whether they will be allowed to emigrate to the United States, or if some will be returned to their homes. SJA should be a key player in coordinating with interagency representatives as policies are formulated.

## LEGAL BASIS OF OPERATION

***Know the legal basis for the operation.***

The issue of legal basis of the operation is very important, not only from a fiscal law standpoint but also from the international law perspective. If the mission changes during the course of the operation, the SJA should review the changes to ensure that the legal basis continues to support the operation.



~~Protected Material – Subject to Protective Order~~

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 54 of 157


# CHAPTER VII
# CONCLUSION

***Impact on readiness and operations tempo***

The success of Operation SEA SIGNAL was not without cost in terms of warfighting readiness and its impact on operations tempo. During the Guantanamo operation the equivalent of two US Army divisions were not available for combat as a result of their commitment to migrant operations. Two brigades were deployed to Guantanamo, two brigades were in training and preparing to deploy, and two more brigades were standing down after completing their tour of duty. Concurrently, one Marine Division was not at full strength because of similar commitments by one battalion to Operation SEA SIGNAL.

***Costs were substantial.***

Monetary costs were substantial: the operation's cost was approximately one million dollars a day at its height. The Service components paid for the share of the support they provided with the Navy paying the greatest amount. During Operation SEA SIGNAL, USACOM estimated that it would cost over $465 million to contract for a migrant camp population of 20,000. The Military Services preferred to fund the operation out of their budgets rather than continue to send troops to Guantanamo. However, the high estimated cost resulted in this civilianization plan being placed on hold and later cancelled following the May 1995 policy change which allowed those Cubans remaining at Guantanamo into the United States.

While DOD is permitted to participate in humanitarian operations under several authorities, the extended military support necessary for an operation such as this would require a Presidential decision.

***Use active forces only for emergency reaction.***

For future contingencies of this type, policy makers should consider only using active forces for the initial crisis response stage. The initial forces should be followed by reserve forces or contractors. In this way, the military can respond quickly and efficiently to an emergency humanitarian assistance operation by using its rapid deployment capability, yet OPTEMPO or force readiness impacts will be minimized by hand-off to forces or an interagency organization that is better suited and chartered for migrant camp operations.

Intentionally Blank




**This was the final organizational structure for JTF 160.**

~~Protected Material – Subject to Protective Order~~

U-DOW-CAR-335

Intentionally Blank



~~Protected Material -- Subject to Protective Order~~

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 58 of 157

## ACKNOWLEDGEMENT

The photographs in this publication were provided by the Department of Defense Joint Combat Camera Center, Washington, D. C.

~~Protected Material – Subject to Protective Order~~

Developed by OC, Incorporated
for
Commander in Chief, US Atlantic Command
and
Assistant Secretary of Defense, Special Operations and Low-Intensity Conflict



# National Detention Standards

## For Non-Dedicated Facilities

Revised 2019

NDS

U.S. Immigration and Customs Enforcement

U-DOW-CAR-339

# *Foreword*

## INTRODUCTION

U.S. Immigration and Customs Enforcement (ICE) is a federal agency charged with enforcing the nation's immigration laws in a fair and effective manner. ICE identifies, apprehends, detains, and removes individuals who are amenable to removal from the United States. ICE uses its immigration detention authority to effectuate this mission by securing individuals in custody while they await the outcome of their immigration proceedings and/or removal from the United States. ICE has important obligations under the U.S. Constitution and other federal and state law when it decides to keep an individual in custody. ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled.

This revision of ICE's National Detention Standards (NDS) reflects the agency's ongoing commitment to working with its state and local partners to enforce immigration laws and improve public safety and national security. These standards have been updated to better reflect the strong relationship ICE has with its law enforcement partners, including where detention facilities successfully manage their own populations and are willing to assist ICE with housing immigration detainees.

## BACKGROUND

The original NDS were issued in 2000 by the U.S. Department of Justice (DOJ) Immigration and Naturalization Service (INS), ICE's predecessor agency. The NDS established consistent conditions of confinement, program operations, and management expectations within the agency's detention system. Over the past 17 years, much has changed in immigration enforcement, including the growth of a network of dedicated immigration detention facilities, which are now largely covered by a separate set of standards – the Performance Based National Detention Standards (PBNDS). However, due to the scope of immigration enforcement and the importance of collaboration with local law enforcement agencies, ICE must continue to rely on state and local facilities to house its detainees. This updated version of the NDS, designed for non-dedicated facilities, streamlines many of the original requirements and provides additional requirements to account for important changes in relevant law, policy, and practice similar to the PBNDS.

### Specific Areas of Change

ICE is confident in the ability of its state and local partners to lawfully, safely, and humanely manage detainees in a correctional setting. This is reflected in the updates to this version of the NDS. The revised NDS eliminate or greatly reduce a number of prior standards based on ICE's experience with local law enforcement partners and the understanding that local practice appropriately covers these requirements. Eliminated or condensed standards include: Emergency Plans; Marriage Requests; Non-Medical Emergency Escorted Trips; Contraband; Population Counts; Key and Lock Control; and Tool Control. Many standards have also been streamlined, including: Food Service; Environmental Health and Safety; Security Inspections; and Voluntary Work Program. Two prior NDS standards regarding Administrative and Disciplinary Special

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 62 of 157

Management Units were condensed into one standard. Descriptions of ICE's responsibilities and commitments to its detainees have been removed throughout.

These updated, streamlined NDS focus on ICE's essential requirements, encourage greater communication between facilities and their local ICE Enforcement and Removal Operations (ERO) Field Offices, and provide a comprehensive list of circumstances in which such communication is required. Three new standards have been added: Searches of Detainees; Sexual Abuse and Assault Prevention and Intervention; and Disability Identification, Assessment, and Accommodation. Three appendices have also been included: Appendix A: List of Required Staff Training; Appendix B: ICE Reporting Requirements; and Appendix C: Contents of the Local Supplement; Appendix D: Definitions. Additional details on specific areas of change are described below.

*Sexual Abuse and Assault Prevention and Intervention*

Pursuant to DHS Final Rule, 6 CFR Part 115, *Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities* (Mar. 7, 2014), also known as the DHS Prison Rape Elimination Act (PREA) Standards, ICE detention facilities must adhere to a zero-tolerance policy for all forms of sexual abuse and assault. The additions to the NDS in this area cover policies and procedures to appropriately prevent, detect, and respond to, as well as to report and investigate, allegations of sexual abuse or assault.

*Disability Identification, Assessment, and Accommodation*

Pursuant to Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act of 1990, their implementing federal regulations, and other applicable federal and state law, facilities are obligated to provide detainees with disabilities with accommodations, auxiliary aids, and modifications to policies, practices, and/or procedures to allow them an equal opportunity to access, participate in, or benefit from detention programs, services, and activities. Federal and state law also require that facilities provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, sign language interpreters, videophones, telephones compatible with hearing aids, telecommunications devices (TTYs), and note-takers, as needed. As laid out in the new detention Standard 4.7, "Disability Identification, Assessment, and Accommodation," facilities must consider and respond to detainees' formal and informal requests for disability-related aids, modifications, and accommodations. ICE can assist facilities in procuring disability-related services, aids, and accommodations.

*Language Access*

Pursuant to Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency" (Aug. 2000), and Title VI of the Civil Rights Act of 1964, facilities are required to identify detainees with limited English proficiency (LEP) (i.e., detainees who do not speak English as their primary language and who have limited ability to read, speak, write, or understand English) and provide LEP detainees with meaningful access to their programs and activities through language interpretation and translation services. The facilities' obligation to provide meaningful access to LEP detainees extends to all aspects of detention, including but not

limited to intake, disciplinary proceedings, placement in segregation, sexual abuse and assault prevention and intervention, staff-detainee communication, mental health, and medical care. Meaningful access may be accomplished through professional in-person or telephonic interpretation and translation services or bilingual personnel. Except in emergencies, other detainees should not be used as interpreters or translators.

Generally, all written materials provided to detainees must be translated into Spanish and other frequently encountered languages. Oral interpretation or other language assistance must be provided to any detainee who speaks a language in which written material has not been translated or who is illiterate.

Areas where language access is particularly important have been included with specific provisions throughout the updated NDS. ICE can assist the facilities with language services (by providing contact and other necessary information) so that the facility can secure interpretation and translation services at no additional cost. ICE will also supply the facility with Spanish translations of frequently used ICE forms. Where necessary, ICE can assist the facility in obtaining translations of pertinent materials and forms in other languages.

# Table of Contents


**1. SAFETY**

STANDARD 1.1
**Environmental Health and Safety......................1**
STANDARD 1.2
**Transportation by Land ....................................9**

**2. SECURITY**

STANDARD 2.1
**Admission and Release......................................18**
STANDARD 2.2
**Custody Classification System..........................21**
STANDARD 2.3
**Facility Security and Control ...........................24**
STANDARD 2.4
**Funds and Personal Property...........................28**
STANDARD 2.5
**Hold Rooms in Detention Facilities..................31**
STANDARD 2.6
**Post Orders ........................................................34**
STANDARD 2.7
**Searches of Detainees ........................................36**
STANDARD 2.8
**Use of Force and Restraints..............................44**
STANDARD 2.9
**Special Management Units ...............................53**
STANDARD 2.10
**Staff-Detainee Communication ........................66**
STANDARD 2.11
**Sexual Abuse and Assault Prevention and Intervention ................................................69**

**3. ORDER**

STANDARD 3.1
**Disciplinary System..........................................91**

**4. CARE**

STANDARD 4.1
**Food Service........................................................97**
STANDARD 4.2
**Hunger Strikes................................................108**
STANDARD 4.3
**Medical Care...................................................112**
STANDARD 4.4
**Personal Hygiene............................................127**
STANDARD 4.5
**Significant Self-Harm and Suicide Prevention and Intervention .......................................130**
STANDARD 4.6
**Terminal Illness and Death ...........................135**
STANDARD 4.7
**Disability Identification, Assessment, and Accommodation........................................137**

**5. ACTIVITIES**

STANDARD 5.1
**Correspondence and Other Mail ..................147**
STANDARD 5.2
**Recreation .......................................................152**
STANDARD 5.3
**Religious Practices..........................................155**
STANDARD 5.4
**Telephone Access............................................158**
STANDARD 5.5
**Visitation .........................................................163**
STANDARD 5.6
**Voluntary Work Program .............................176**

**6. JUSTICE**

STANDARD 6.1
**Detainee Handbook ........................................180**
STANDARD 6.2
**Grievance System ..........................................182**
STANDARD 6.3
**Law Libraries and Legal materials...............185**
STANDARD 6.4
**Legal Rights Group Presentations................191**

**7. ADMINISTRATION AND MANAGEMENT**

STANDARD 7.1
**Detention Files ...............................................195**
STANDARD 7.2
**Detainee Transfers .........................................198**

**APPENDICES**

APPENDIX A
**List of Required Staff Training......................203**
APPENDIX B
**ICE Reporting Requirements........................206**
APPENDIX C
**Contents of the Local Supplement ................212**
APPENDIX D
**Definitions .....................................................214**




U-DOW-CAR-343

## Acronyms and Abbreviations

AFOD: Assistant Field Office Director

BIA: Board of Immigration Appeals, Executive Office for Immigration Review, U.S. Department of Justice

CBP: U.S. Customs and Border Protection

CDC: Centers for Disease Control and Prevention, U.S. Department of Health and Human Services

CMA: Clinical Medical Authority

COR: Contracting Officer's Representative

CRCL: Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security

DHS: U.S. Department of Homeland Security

DOJ: U.S. Department of Justice

DRIL: ICE ERO Detention Reporting and Information Line

DSCU: ICE ERO Detention Standards Compliance Unit

EOIR: DOJ Executive Office for Immigration Review

E/R: Expedited Removal

ERO: ICE Enforcement and Removal Operations

FOD: Field Office Director

FSA: Food Service Administrator

HSA: Health Services Administrator

IAO: ICE Air Operations

IDP: Institution Disciplinary Panel

IGSA: Intergovernmental Service Agreement

IHSC: ICE Health Service Corps

JIC: DHS Joint Intake Center

LEP: Limited English Proficiency (or Proficient)

LOP: Legal Orientation Program

LPR: Lawful Permanent Resident

MOU: Memorandum of Understanding

NCCHC: National Commission on Correctional Health Care

NCIC: National Crime Information Center, Federal Bureau of Investigation

NFPA: National Fire Protection Association

NTA: Notice to Appear

OIG: DHS Office of the Inspector General

OPLA: ICE Office of the Principal Legal Advisor

OPR: ICE Office of Professional Responsibility

ORR: Office of Refugee Resettlement, U.S. Department of Health and Human Services

OSHA: Occupational Safety and Health Administration, U.S. Department of Labor

PBNDS: Performance-Based National Detention Standards

PII: Personally Identifiable Information

PREA: Prison Rape Elimination Act of 2003, Pub. L. 108-79 (Sept. 4, 2003), codified at 42 U.S.C. § 15601 *et seq*.

RSC: Religious Services Coordinator

SAFE: Sexual Assault Forensic Examiner

SANE: Sexual Assault Nurse Examiner

SART: Sexual Assault Response Team

SDS: Safety Data Sheet

SIR: Significant Incident Report

SMI: Serious Mental Illness

SMU: Special Management Unit

SRT: Special Response Team

# Section 1: SAFETY

# STANDARD 1.1

## ENVIRONMENTAL HEALTH AND SAFETY

## I. POLICY

This detention standard protects detainees, staff, volunteers, and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices, and control of hazardous substances and equipment. The facility will operate in accordance with all applicable regulations and codes, such as those of the Occupational Safety and Health Administration (OSHA), the National Fire Protection Association (NFPA), the Food and Drug Administration (FDA), the Centers for Disease Control and Prevention (CDC), and the Environmental Protection Agency (EPA).

## II. STANDARDS AND PROCEDURES

### A. Hazardous Substances

In accordance with OSHA 29 CFR 1910.1200, *Hazard Communication,* each facility utilizing hazardous chemicals shall create a written hazardous communication program that outlines proper chemical labeling, providing Safety Data Sheets (SDS), and training for employees.

The facility will establish a system for storing, issuing, and maintaining inventories of, and accountability for, hazardous materials.

Every area will have a perpetual inventory of the hazardous (flammable, toxic, or caustic) substances used and stored in that area. Inventory records will be maintained for each substance.

#### 1. Safety Data Sheets (SDSs); Files

In accordance with OSHA requirements, every area using hazardous substances will maintain a file of the corresponding Safety Data Sheets (SDSs). The SDSs provide vital information on individual hazardous substances, including instructions on safe handling, storage, and disposal, prohibited interactions, etc. Staff and detainees will have ready and continuous access to SDSs for the substances with which they are working while in the work area.

Staff must review SDS files and the Maintenance Supervisor will review the records as necessary.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 68 of 157

**2. Master Index**

The Maintenance Supervisor or facility designee will compile a master index of all hazardous substances in the facility, including their locations, along with a master file of SDSs. Documentation of reviews will be maintained in the SDS master file.

The master index will also include a comprehensive, up-to-date list of emergency phone numbers (fire department, poison control center, etc.).

**3. Personal Responsibility**

Every individual using a hazardous substance in the facility must be familiar with and follow all prescribed precautions, wear personal protective equipment (PPE) when necessary, and report hazards or spills to the designated authority.

Staff supervising detainees must be familiar with and follow all prescribed precautions, ensuring detainees are provided with and are properly utilizing PPE. Supervisors will promptly report hazards and incidents to the designated authority.

**4. General Guidelines**

a. Flammable, caustic, and toxic substances (hazardous substances) will be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

b. Hazardous substances will be issued in the amount needed as deemed necessary by the facility administrator.

c. Inventory records for a hazardous substance must be kept current before, during, and after each use.

d. Any liquid or aerosol labeled "Flammable" or "Combustible" must be stored and used as prescribed on the label, in accordance with the Federal Hazardous Substances Labeling Act, to protect both life and property.

e. The SDS will govern use of a particular flammable or combustible liquid. Staff will follow SDS directions in disposing of excess flammable or combustible liquids and chemical spills.

**5. Toxic and Caustic Substances**

a. All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

b. Only authorized staff will draw/dispense these substances, in accordance with the applicable SDS(s).

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 69 of 157

**6. Labeling of Chemicals, Solvents, and Other Hazardous Materials**

a. The facility will require use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer the material.

b. Staff and detainees who work with hazardous materials will have appropriate training, including the classification code and safe handling procedures for each material.

## B. Emergency Response

The facility will develop written plans and procedures for handling emergency situations reasonably likely to occur. Plans will include procedures for detainees with disabilities to ensure their safety and security during the facility response. All staff will be trained in the emergency plans, which will be reviewed and updated as appropriate on an annual basis.

## C. Significant Event Notification Requirements

1. The facility shall immediately notify ICE/ERO of any and all of the following incidents or circumstances:

   a. Disturbances: Activation of disturbance control team(s); Disturbances (including gang activities, group demonstrations, food boycotts, work strikes, workplace violence, civil disturbances/protests); Escape or escape attempts; Weapons discharge; Full or partial lock down of the detention facility; Bomb threats; Detention facility evacuations;

   b. Acts of God: Fires; Significant environmental problems that impact the detention facility operations; Adverse weather (e.g., hurricanes, floods, ice/snow storms, heat waves, tornadoes);

   c. Adverse Findings: Citations or denied licensures related to federal, state and local health, life, safety, and fire codes; Adverse incidents that attract unusual interest or significant publicity;

   d. Noncompliance: The facility is required to provide a notice per the Public Notification Rule (40 CFR Part 141). This requires a facility to notify its water consumers its water supply violates a national primary drinking water regulation or has a situation that may pose a risk to public health. These consumer notices are required to be provided to persons served (not just billing customers), including detainees.

      1. If potable water is provided by a public water utility, the facility must immediately notify detainees and ICE/ERO if the facility receives a public notification from its water supplier in accordance with the Public Notification Rule.

2. If the facility is its own public water system, it must notify its customers, including detainees and ICE/ERO, when its water violates federal or state drinking water regulations (including monitoring requirements), or when they provide drinking water that may pose a risk to consumer's health.

e. Accidents/Facility Operation Issues: Transportation (e.g., airlift, bus) accidents resulting in ICE detainee injuries, death, or detention facility property damage; fence damage; power outages; interruption in water service; HVAC system failure impacting detainee living areas; sewage backup; roof leaks in detainee living areas;

f. Assaults or Misconduct:

i. Detainee-on-Detainee Assault (Any serious physical assault on an ICE detainee by another detainee or inmate);

ii. Staff-on-Detainee Assaults (Any incident or allegation of a physical assault on an ICE detainee perpetrated by staff, including the facility investigation); and

iii. Staff Misconduct (Any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE).

## D. Fire Prevention and Control

The facility will comply with standards and regulations issued by the National Fire Protection Association (NFPA), Environmental Protection Agency (EPA) and OSHA, national, state, and local fire safety codes, and the applicable standards of the American Society for Testing and Materials, American National Standards Institute, and Underwriters' Laboratories or Factory Mutual Engineering Corporation. Such topics will include, but are not limited to, fire safety codes; regular fire and safety inspections; a fire prevention, control and evacuation plan and fire drills.

New construction, alterations, and renovations will comply with the latest revision or update of the National Building Code of the Building Officials and Code Administrators International; the Uniform Building Code; or the Standard Building Code, in accordance with 40 USC 619 and local law.

In addition, the construction will comply with the latest edition of the National Fire Protection Association (NFPA) *NFPA 101, Life Safety Code*, and *NFPA 1, Fire Code*.

## E. Pests and Vermin

Pests and vermin will be controlled and eliminated. Conditions which provide food, shelter, a medium for breeding, or harborage will be controlled and eliminated. The facility shall immediately notify ICE/ERO in the event of insect or rodent infestation.

**F. Certification of Facility Water Supply**

Potable water shall be available throughout the facility. If the facility is not on a certified community water source, a state laboratory will test samples of drinking and wastewater to ensure compliance with applicable standards. The facility shall immediately notify ICE/ERO in the event a report or notification is received showing the water supply violates health-based standards that may lead to water-related illnesses.

**G. Emergency Electrical Power Generator**

Power generators will be tested according to the manufacturer's instructions. Other emergency equipment and systems will undergo quarterly testing, with follow-up repairs or replacement as necessary. Testing documentation will be retained for review.

**H. Guidelines for Specific Areas of the Facility:**

**1. Barber Operations**

Sanitation of barber operations is of the utmost concern due to the possible transfer of diseases through direct contact or by the tools, implements, and supplies including the towels, combs, and clippers. Towels must not be reused after use on one person.

a. The operation will be located in an easily cleanable area with sufficient lighting of at least 50-foot candles.

b. At least one lavatory/sink with hot and cold running water, or waterless hand sanitizer, will be available.

c. Barber operations will be provided with all equipment and facilities necessary for maintaining sanitary procedures of hair care, including containers for waste, disinfectants, disposable headrest covers, laundered towels, and haircloths.

d. All hair care tools which come in contact with detainees will be cleaned and disinfected prior to each use.

e. No person will be served when infested with head lice but will be reported to the medical authority for appropriate care and treatment.

**2. Medical Operations**

An established uniform procedure will be provided for the safe handling and disposal of used needles and other potentially sharp objects to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, especially the hepatitis B virus (HBV) and the human immunodeficiency virus (HIV).

"Sharps" are all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. The following procedures will be observed when handling and disposing of needles and other hazardous sharp items:

a. Inventory

A perpetual/running inventory will be kept of those items that pose a security risk, such as sharp instruments, syringes, needles, and scissors. This inventory will be reconciled weekly by an individual designated by the medical facility Health Service Administrator (HSA) or equivalent.

b. Handling

Without removing the needles or replacing the needle covers, staff will place used (disposable) syringes in commercially available, biohazardous-waste sharps containers approved by the National Institute for Occupational Safety and Health.

1) Disposal

The container will be labeled with the words "infectious waste," or with the universal biohazard symbol, and placed in the proper area for removal and disposal. Sharps will be considered infectious waste and final disposal of the container and contents will be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The facility will make arrangements for disposal with an approved contractor. The facility is responsible for validating that the contractor's disposal methods comply with all infectious and hazardous waste disposal laws and regulations.

c. Accidental Needle Sticks

A written exposure-control plan will be followed in the event of a needle stick.

## I. General Environmental Health Guidelines

Environmental health conditions will be maintained at a level that meets recognized standards of hygiene. Recognized standards include those from the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the National Fire Protection Association (including the Life Safety Code (NFPA 101), and the Centers for Disease Control and Prevention (CDC).

The facility, in consultation with the HSA and the Environmental Health and Safety officer or equivalent, shall establish a housekeeping plan to ensure a high level of environmental sanitation. and shall consult with the HSA or equivalent in designing this program.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 73 of 157

## 1. Facility Conditions

The facility shall ensure appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with any applicable state and local jail/prison standards.

Under emergency circumstances, and only with ICE/ERO written approval, the facility may utilize emergency capacity/temporary bed space, to include triple bunks, on an as needed basis for an initial period not to exceed 90 days, with incremental 30-day extensions possible only with prior ICE/ERO authorization. Before using emergency capacity, the facility must certify to ICE/ERO that required medical, mental health, and security staffing are available to properly support the additional detainee population. The facility must stay within overall emergency capacity limits and ensure all local fire safety requirements are met.

## 2. Housekeeping

General: Facility cleanliness and sanitation shall be maintained. All surfaces, fixtures, and equipment shall be kept clean and in good repair.

Suitable and sufficient cleaning equipment and supplies shall be available throughout the facility.

Medical Areas: The medical facility will be kept clean and in working order. The HSA or equivalent, or designee, will make a daily visual inspection of the medical facility noting the condition of floors, walls, windows, horizontal surfaces, equipment, and furnishings.

## 3. Blood and Body Fluid Clean-up

Spills of blood and body fluids will be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms. A suitable cleanup kit will be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources.

## 4. Hazardous and Infectious Waste Disposal

Infectious and hazardous waste generated at a medical facility will be stored and disposed of safely and in accordance with all applicable federal and state regulations.

## 5. Universal Precautions

Staff will routinely take precautions to prevent contact with blood and other bodily fluids in accordance with the facility's policies and procedures, which should comply with CDC Universal Precautions. (See Standard 4.3 "Medical Care.")

### 6. Garbage and Refuse

Garbage and refuse will be collected, stored, and removed from common areas at least daily and as often as necessary to maintain sanitary conditions and to avoid creating health hazards. Refuse inside and outside of the facility must be handled and disposed of in a sanitary and safe manner that complies with applicable laws and regulations.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 75 of 157

# STANDARD 1.2

## TRANSPORTATION BY LAND

## I. POLICY

The facility will take all reasonable precautions to protect the lives, safety, and welfare of detainees, officers, other personnel, and the general public during ground transportation.

Detainees in transit from one facility to another institution or jurisdiction will be transported in a safe and humane manner under the supervision of trained and experienced personnel. Accommodations shall be made for detainees with disabilities in accordance with the standard on "Identification, Assessment, and Accommodation of Detainees with Disabilities." Accommodations shall be made for detainees with other special needs in accordance with security and safety needs and all applicable laws and regulations.

## II. STANDARDS AND PROCEDURES

### A. Transportation Planning

The facility administrator (or designee) has overall responsibility for all aspects of vehicle operations and is responsible for setting schedules and monitoring vehicular maintenance, making logistical arrangements to transport detainees, supervising and instructing personnel, and protecting detainee security. Before departure, plans shall be revised as necessary, based on weather and road conditions and any other relevant considerations.

Detainees should not be transported to/from any facility, including ICE/ERO detention facilities, unless a Form G-391, I-216, or I-203, or equivalent, is furnished to authorize the transportation. These forms must be properly signed and shall clearly indicate the name of the detainee(s), the place or places to be escorted, the purpose of the trip and other information necessary to carry out the detail efficiently.

When coordinating the transfer of detainees, originating facility staff shall electronically transmit a copy of Form I-216 or I-203, along with the following information about each detainee, to the receiving facility:

1. Name, date of birth, and sex;
2. Nationality;
3. A-number;
4. Health and general condition;
5. Special handling required, if any (violent, escape risk, medical, etc.);

6. Name and title of point(s) of contact at originating office; and

7. Property and baggage.

The receiving facility staff should confirm receipt of the documentation.

The following documents must accompany the transferee:

1. I-862, "Notice to Appear," if applicable;

2. I-203, "Order to Detain or Release Alien," if required by receiving facility;

3. I-216, "Record of Persons and Property Transferred," with G-589 and I-77 attached (see also Standard 2.1 "Admission and Release");

4. I-205, "Warrant of Deportation," original copy, if applicable;

5. I-385, "Booking Card," with photo attached;

6. Classification Sheet; and

7. Medical Transfer Summary.

Standard 7.2 "Detainee Transfers" requires a Medical Transfer Summary accompany the detainee. If official health records accompany the detainee, they are to be placed in a sealed envelope or other container labeled with the detainee's name and A-number and marked "Confidential Medical Records." Transportation staff may not transport a detainee without the documents required by Standard 7.2 "Detainee Transfers." Staff is responsible for delivering all required documents and the transfer summary to personnel at the receiving facility.

If the above paperwork is incomplete at the time of departure, the facility must notify ICE/ERO to take corrective action.

**B. <u>Transporting Officer Responsibilities</u>**

Transporting officers shall comply with all state and federal (including U.S. Department of Transportation (DOT), National Surface Transportation Board, and Environmental Protection Agency) motor vehicle regulations including, but not limited to, the following:

1. Wearing a seat belt when the vehicle is moving;

2. Holding a valid Commercial Driver's License (CDL), if applicable, from the state where employed;

3. Transporting detainees in a safe and humane manner that accommodates detainees with disabilities;

4. Verifying individual identities and checking documentation when transferring or receiving detainees; and

5. Driving defensively, taking care to protect the vehicle and occupants; obeying traffic laws; and reporting damage or accidents immediately.

Driving under the influence of drugs or alcohol is prohibited.

**C. Vehicle Safety**

The officers shall secure the vehicle before leaving it unattended.

**D. Vehicle Operation**

The driver must have the appropriate driver's license issued by the state in which he or she is employed.

The driver shall operate the vehicle in accordance with state and federal law, including all limitations on hours and maximum driving times.

DOT regulations apply to all vehicles on U.S. highways, including those used to transport detainees.

**E. Pre-Departure Security Check**

The vehicle crew must be present to ensure a complete and thorough search of the vehicle and each detainee. The crew may take certain precautionary measures with a detainee identified as a special-handling case (such as those who pose security, medical, or mental health concerns) while searches are in progress. (See Standard 4.7 "Disability Identification, Assessment, and Accommodation.")

**F. Movement to Vehicles**

The escorting officer/assistant driver will instruct detainees about rules of conduct during the trip.

**G. Vehicle Occupancy Requirement**

The number of detainees transported shall not exceed the occupancy level for which the vehicle is rated.

**H. Detainee Count and Identification**

Officers will confirm the identities of the detainees they are transporting.

**I. Seating of Detainees**

The facility will develop written policy and implementing procedures governing the seating of detainees in transportation vehicles.

1. Officers will seat each detainee with particular attention to detainees with disabilities, and to those who may need to be afforded closer observation for their own safety. (See Standard 4.7 "Disability Identification, Assessment, and Accommodation.")

2. The facility will establish separate procedures for transporting detainees whose physical or mental health conditions preclude prolonged travel.

3. In accordance with Standard 2.11 "Sexual Abuse and Assault Prevention and Intervention," when seating detainees, the facility shall assess all detainees to identify those likely to be sexual aggressors or sexual abuse victims and shall seat detainees in a manner designed to prevent sexual abuse, taking necessary steps to mitigate any such danger.

**J. Departure Scheduling and Security**

Before transferring detainees from one facility to another, a designated officer will contact the next receiving office or facility with the following information:

1. The estimated time of departure/arrival (ETD/ETA);

2. The number of detainees in each of the following categories: new arrivals (remaining at the facility); drop-offs; and overnighters;

3. The total number of detainees;

4. Special-handling cases, detailing medications, accommodations, restraints, and other relevant details for each; and

5. Notification of any actual or estimated delays in departure, and the accordingly revised ETA(s).

**K. Responsibilities En Route**

The receiving office serves as the contact point and is responsible for monitoring the vehicle's schedule.

Upon making contact with the arriving vehicle, the receiving officers will certify they are taking custody of each detainee by signing the accompanying Form I-216.

Each office will develop and post written guidelines for locating an overdue vehicle. If the vehicle does not arrive within a specified time period of the ETA, the contact point will set the tracing procedures in motion.

**L. Stops**

During stops, when the detainees disembark, the transport officers will keep them under constant observation to prevent external contact(s) and/or contraband smuggling. At least one officer will remain in the vehicle when one or more detainees are present.

**M. Meals**

Water, meals, and snacks shall be provided during any trip that exceeds six hours in duration. Consideration shall be given as to when detainees last ate before serving meals and snacks.

Meals must satisfy the nutritional requirements of the sending facility. Special dietary needs should be identified before departure so suitable meals can be arranged.

**N. Vehicle Supervision**

The officers must maintain a clear view of the entire vehicle compartment and remain alert for behavior that could jeopardize safety and security.

**O. Vehicle Communication**

The vehicle shall have sufficient equipment to allow for continuous communication during transport.

**P. Vehicle Sanitation**

Vehicles must be kept clean and sanitary at all times. The facility will establish the procedures and schedule for sanitizing facility vehicles.

**Q. Officer Conduct**

Officers will comply with all rules and procedures governing use of government vehicles. They shall not transport any personal items other than those needed to carry out their assigned duties during the trip. Alcoholic beverages and illegal drugs are strictly prohibited.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 80 of 157

**R. Transfer of Funds, Valuables, and Property**

The personal property of a detainee transferring from one facility to another will be inspected and inventoried upon release and arrival by respective facility personnel. The lead driver will check the manifest against the number of packages by detainee name and A-number before signing the I-216 or placing the baggage on the bus.

The following procedures apply to transferring detainees:

1. At the originating facility, staff will ask whether the detainee has in his or her possession all funds, valuables, and other property listed on the I-216.
    a. If the detainee answers "yes," he or she may board the vehicle.
    b. If the detainee claims missing property, including funds and valuables, he or she will remain at the facility until completion of the required paperwork (the SF-95 and I-387 or comparable forms). Photocopies of the completed forms are documentation sufficient for the delayed transfer to proceed.
2. The I-77 number(s) in the "checked baggage" section of the I-216 will identify the baggage to be verified by the receiving officer.

**S. Officer Uniform and Equipment**

All officers transporting detainees shall wear the prescribed uniforms or other attire authorized by the facility.

**T. Firearms Storage**

Firearms and weapons will be appropriately handled and stored.

**U. Use of Restraints**

Officers shall use authorized techniques and sound correctional judgment when applying restraints. (See Standard 2.8 "Use of Force and Restraints.") To ensure safe and humane treatment, the officers will check the fit of restraining devices immediately after application, at every relay point, and any time the detainee complains. Properly fitting restraints do not restrict breathing or blood circulation.

The officers will double-lock the restraining device(s). Under no circumstances will officers attach a restraining device to an immovable object, including, but not limited to, security bars, seats, steering wheel, or any other part of a vehicle. Officers carrying firearms shall exercise caution if close contact with a detainee becomes necessary.

The use of restraints for minors may be modified, as appropriate (e.g., restrained with hands in front instead of in back, use of no restraints).

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 81 of 157

A pregnant woman or woman in post-delivery recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary, as documented by a supervisor and directed by the on-site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention facility, or at an outside medical facility. Restraints are never permitted on women who are in active labor or delivery.

Restraints should not be considered as an option for pregnant women, except under the following extraordinary circumstances:

a. A medical officer has directed the use of restraints for medical reasons;

b. Credible, reasonable grounds exist to believe the detainee presents an immediate and serious threat of hurting herself, staff, or others; or

c. Reasonable grounds exist to believe the detainee presents an immediate and credible risk of escape that cannot be reasonably minimized through any other method.

In the rare event one of the above situations applies, medical staff shall determine the safest method and duration for the use of restraints and the least restrictive restraints necessary shall be used.

Even in the extraordinary circumstance when restraints are deemed necessary, handcuffing in the front should be used whenever possible to enable a pregnant detainee to break her fall, and no detainee known to be pregnant shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts will be made to ensure the detainee is placed on her left side if she is immobilized.

The use of restraints requires documented approval and guidance from the on-site medical authority. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's detention and medical file.

## V. <u>Emergency Situations</u>

The facility shall establish written procedures for transportation officers to follow in an emergency occurring during transport. The written procedures shall cover scenarios including attacks, escapes, hostages, illness, death, fire, traffic accidents, vehicle failures, and natural disasters.

If an emergency occurs within a reasonable distance of an ICE/ERO office, the transportation officers will make every effort to reach that office before taking extraordinary measures. However, if moving seems ill-advised or impossible, they will

contact the office, stating their location and the nature of the problem so the office can provide/secure assistance as quickly as possible.

If the situation is life-threatening and the vehicle crew cannot afford to wait for help from an ICE/ERO office, immediate action shall be taken.

### W. Non-Medical Emergency Escorted Trips

Facilities shall refer any request for a non-medical emergency escorted trip to ICE/ERO for consideration and approval.

### X. Transporting Minors, Females, and Opposite Gender Transports

Minors shall be separated from unrelated adults at all times during transport and seated in an area of the vehicle near officers and under their close supervision.

Assigned transportation staff shall search a detainee of the opposite gender only in extraordinary circumstances and only when a same-sex officer is not available.

The facility administrator shall develop procedures for vehicle crews transporting females. Except in emergency situations, a single transportation staff member may not transport a single detainee of the opposite gender. In the case of individual transports, when transporting detainees of the opposite gender, assigned transportation staff shall call in their time of departure and odometer reading, and then do so again upon arrival, to account for their time.

# Section 2: SECURITY

# STANDARD 2.1

## ADMISSION AND RELEASE

## I. POLICY

The procedures a facility follows in admitting and releasing detainees protect the health, safety, and welfare of each person. During the admissions process, detainees undergo screening for medical, sexual abuse prevention, and suicide risk evaluation purposes; have their files reviewed for classification purposes; submit to a standard body search; and personally observe and certify the examination, categorization, inventorying, and safeguarding of all personal belongings.

During the release process, detainees return clothing, bedding, and other facility-issued items; participate in identity-verification procedures; and complete documents in accordance with facility procedures, including certifying receipt of all inventoried personal property, including funds and valuables.

## II. STANDARDS AND PROCEDURES

### A. New Arrivals

Every new arrival shall undergo custody and medical screening interviews, which will include a determination as to whether the detainee is a victim of or at risk for sexual abuse or assault and a suicide risk screening; complete questionnaires and other forms; attend any site-specific orientation program; and comply with other facility admission procedures (issuance of clothing, towels, bedding, etc.).

1. Newly arrived detainees shall receive a language access and disability screening to identify any necessary accommodations. The facility shall comply with federal laws to ensure meaningful access to facility programs, services, and activities for detainees with limited English proficiency, and provide accommodations for detainees with disabilities to ensure equal access to facility programs, services, and activities.

2. Staff will open a detainee detention file as part of the admissions process. This file will contain documentation generated during the detainee's stay at the facility, though additional documentation may be recorded and maintained electronically.

3. Detainee medical screenings shall occur as required by Standard 4.3 "Medical Care."

### B. Search of Detainee and Property

Each new arrival will be searched in accordance with Standard 2.7 "Searches of Detainees." Searches should be conducted in an intake area that affords as much privacy as possible. All items discovered during the search will be identified as funds, valuables,

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 85 of 157

or other personal property, to be kept in the detainee's possession or inventoried, receipted, and stored, or, if appropriate, classified as contraband. (See Standard 2.4 "Funds and Personal Property" and Standard 2.3 "Facility Security and Control.")

During intake, detainees shall be given the opportunity to shower, where possible, and be issued clean institutional clothing, bedding, towels, and personal hygiene items.

### C. Funds, Valuables, and Other Personal Property

Each facility shall institute procedures for inventory and receipt of detainee funds, valuables, and personal property in accordance with Standard 2.4 "Funds and Personal Property."

Identity documents, such as passports, birth certificates, etc., will be copied for the detention file, and the original forwarded to ICE/ERO. Detainees will receive a receipt for confiscated identity documents. Upon request, staff will provide the detainee with a copy of the document.

### D. Clothing and Bedding Issued to New Arrivals

Facility staff shall issue detainees clothing and bedding in quantities, sizes, and weights appropriate for the facility environment and local weather conditions.
(See Standard 4.4 "Personal Hygiene.")

### E. Personal Hygiene Items

Staff shall provide detainees with articles necessary for maintaining proper hygiene. The facility will replenish all hygiene supplies as needed at no cost to the detainee.

### F. Admissions Documentation

Official documentation from ICE/ERO (e.g. Form I-203, I-203a, or I-216) shall accompany each newly arriving detainee. Staff shall prepare specific documents in conjunction with each new arrival to facilitate timely processing, classification, medical screening, accounting of personal effects, and reporting of statistical data.

### G. Missing Detainee Property

The facility shall complete a Form I-387, "Report of Detainee's Missing Property," or equivalent, when any newly arrived detainee claims his or her property has been lost or left behind at a previous location. Facilities shall forward the completed forms to ICE/ERO.

### H. Orientation

All facilities shall provide detainees an orientation to the facility as soon as practicable, in a language or manner detainees can understand. The orientation must include facility

operations, programs and services, grievance process information, and other rules and requirements.

The facility orientation shall also include the following information:

1. Procedures for the detainee to contact the ERO deportation officer handling his/her case; and

2. How to use the telephone system to make telephone calls.

If ICE/ERO provides an orientation video, all reasonable efforts should be made to show it within 72 hours of a detainee's admission.

## I. Detainee Handbook

Upon admission, every detainee will receive an ICE/ERO National Detainee Handbook and a facility handbook. The facility handbook will fully describe all policies, procedures, and rules in effect at the facility, in accordance with Standard 6.1 "Detainee Handbook." The ICE/ERO National Detainee Handbook is available in a number of languages. These translated versions may be requested from ICE/ERO as necessary.

## J. Releases

Staff must complete certain procedures before any detainee's release, removal, or transfer from the facility. Necessary steps include completing and processing forms, closing files, fingerprinting, returning personal property, and reclaiming facility-issued clothing, bedding, etc.

The time, point, and manner of release shall be consistent with safety considerations and shall take into account special vulnerabilities. As appropriate and necessary, facilities shall transport detainees to local public transportation stations at a time when such public transportation is running. If public transportation is within walking distance of the facility, detainees shall be provided with an information sheet that gives directions to and describes the types of transportation services available. All releases must be coordinated with ICE/ERO.

Prior to release, the detainee shall be provided an opportunity to make a free phone call to facilitate release arrangements.

# STANDARD 2.2

## CUSTODY CLASSIFICATION SYSTEM

## I. POLICY

In accordance with the requirements and guidelines of this standard, each facility is required to have in place a formal detainee classification system that begins at admission and is based on interviews and verifiable and documented information. This process will assist in the management and separation of detainees to ensure safety and security.

## II. STANDARDS AND PROCEDURES

### A. Standards

The facility shall develop and implement a system for classifying detainees in accordance with the guidelines set forth in this Standard.

The classification system shall ensure:

1. All detainees are classified upon arrival, before being admitted into the general population.

2. All officers assigned to classification duties shall be trained in the facility's classification process. The initial classification process and initial housing assignment should be completed within 12 hours of admission to the facility.

3. If a detainee cannot be classified without certain information that is missing at the time of processing (e.g., results of criminal-record check), the detainee will be kept apart from the general population pending arrival of that information.

4. A supervisor will review each detainee's classification.

5. A detainee's classification level will determine his or her housing assignment, voluntary work assignment, and how his or her recreational activities, meals, and religious services are managed.

6. Each facility shall establish a system that readily identifies a detainee's classification level, for example, color-coded uniforms.

7. Detainees with special vulnerabilities will be identified and the appropriate accommodations provided.

**B. Classification Review**

A supervisor will review the intake/processing officer's classification file for each detainee for accuracy and completeness. Among other things, the reviewing officer shall ensure each detainee has been assigned to the appropriate housing unit.

**C. Classification Information**

Staff shall use the most reliable, objective information available during the classification process. "Objective" information refers to documented or discernible facts, such as gender identification, most recent and/or prior criminal offense(s), escapes, institutional disciplinary history, violent episodes/incidents, victimization, mental health and/or medical status, and age. ICE/ERO offices will provide the facility with any information available to ICE to assist the facility in classifying detainees.

**D. Classification Levels and Housing Assignments**

All facilities shall ensure detainees are housed according to their classification level.

The classification system shall assign detainees to the least restrictive housing consistent with facility safety and security.

**E. Special Vulnerabilities**

Special consideration shall be given to any factor that would raise a detainee's vulnerability, or risk of vulnerability, victimization, or assault in detention. Detainees with special vulnerabilities include those who are elderly, pregnant, or nursing; those with serious physical or mental illness, or other disability; those who would be susceptible to harm in general population due in part to their sexual orientation or gender identity; and those who have been victims of sexual assault, torture, trafficking, or abuse. This process should incorporate the requirements in Standard 2.11, "Sexual Abuse and Assault Prevention and Intervention," regarding assessment of risk for victimization or perpetration of sexual abuse or assault.

Consistent with Standard 4.7, "Disability Identification, Assessment, and Accommodation," the facility shall use any information about identified disabilities in making classification and housing decisions. Detainees with disabilities shall be housed in the least restrictive and most integrated setting possible consistent with facility safety and security and provided an equal opportunity to participate in or benefit from the facility's programs and activities.

When making classification and housing decisions for a transgender or intersex detainee, staff shall consider the detainee's gender self-identification and assess the effects of placement on the detainee's health and safety. A medical or mental health professional shall be consulted as soon as practicable on this assessment. Placement decisions of transgender or intersex detainees should not be based solely on the identity documents or

physical anatomy of the detainee, and a detainee's self-identification of his or her gender and self-assessment of his or her safety needs shall always be taken into consideration as well. The placement shall be consistent with the safety and security considerations of the facility, and placement and programming assignments for each transgender or intersex detainee shall be reassessed at least twice each year to review any threats to safety experienced by the detainee.

**F. Reclassification**

All facility classification systems shall ensure that a detainee is reassessed and/or reclassified at regular intervals and upon the occurrence of relevant events. Reclassification assessments shall consider, among other factors, the detainee's risk of victimization or abusiveness. Subsequent reclassification assessments shall be completed any other time when warranted based upon the receipt of additional, relevant information, or following an incident of abuse or victimization. A detainee may request reclassification at any time.

If it is documented, suspected, or reported that a detainee has been physically or sexually abused or assaulted, the victim's perception of his or her own safety and well-being shall be among the factors considered.

**G. Classification Appeal**

All facility classification systems shall include procedures by which new arrivals can appeal their classification levels. The facility shall respond to all appeals in a timely manner.

**H. Notice to Detainees**

The facility shall include a classification section in its detainee handbook which will include the following:

1. An explanation of the classification levels, with the conditions and restrictions applicable to each.

2. The procedures by which a detainee may appeal his or her classification.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 90 of 157

# STANDARD 2.3

## FACILITY SECURITY AND CONTROL

## I. POLICY

This standard protects communities, staff, contractors, volunteers, and detainees from harm by ensuring that facility security is maintained and that events which may pose a risk of harm are prevented. Facilities will have policy and procedures for conducting security inspections; the prevention, identification, and disposition of contraband; key and lock control; and population counts; as well as a comprehensive policy for tool control.

## II. STANDARDS AND PROCEDURES

### A. Facility Policy

The facility shall establish a comprehensive security policy, including procedures for the control and prevention of contraband inside the facility, complemented by policy and procedures regarding tool control, population counts, and key control.

Each facility shall ensure it maintains sufficient supervision of detainees, including through appropriate staffing levels and, where applicable, video monitoring, to protect detainees against sexual abuse and assault and other forms of violence or harassment, and to prevent significant self-harm and suicide. Security staffing shall be sufficient to maintain facility security and prevent or minimize events that pose a risk of harm to persons and property.

The facility shall develop and document comprehensive detainee supervision guidelines, as well as a comprehensive staffing analysis and staffing plan, to determine and meet the facility's detainee supervision needs; these shall be reviewed and updated at least annually. Essential posts and positions shall be filled with qualified personnel.

In determining adequate levels of detainee supervision and the need for video monitoring, the facility shall consider generally accepted detention and correctional practices, any judicial findings of inadequacy, the physical layout of the facility, the composition of the detainee population, the prevalence of substantiated and unsubstantiated incidents of sexual abuse as well as other incidents reflecting on facility security and detainee safety, the findings and recommendations of sexual abuse incident review reports or other findings reflecting on facility security and detainee safety, the length of time detainees spend in facility custody, and any other relevant factors.

### B. Security Inspections

Security inspections are necessary to control contraband, ensure facility safety, security and good order, prevent escapes, maintain sanitary standards, and eliminate fire and safety hazards.

Each facility shall establish a comprehensive security inspection system that addresses every area of the facility, including the perimeter fence line and other areas noted below in this standard.

Frequent unannounced security inspections shall be conducted on both day and night shifts to control contraband; identify and deter sexual abuse of detainees; ensure facility safety, security and good order; prevent escapes; maintain sanitary standards; and eliminate fire and safety hazards. Each facility shall prohibit staff from alerting others that these security inspections are occurring, unless such announcement is related to the legitimate operational functions of the facility.

**1. Search Log**

Each housing unit, including the Special Management Unit (SMU), will document cell and area searches including the date, time, and findings, including location(s) where contraband is found, type(s) of contraband, and the searching officers' names.

**2. Searches**

Every facility will establish written policy and procedures for housing unit and personal area searches.

**C. <u>Perimeter Security</u>**

The facility's front entrance shall be a controlled access point. Entrance into the secure perimeter shall be controlled by a sally port (or equivalent with electronic interlocking doors or grilles) to prevent unauthorized entry or exit.

**1. Identification**

The officer assigned to this post shall check the identification documents of every visitor, employee, and other person entering or leaving the facility. (See Standard 5.5 "Visitation.")

**2. Record**

a. The post officer will maintain the visitor logbook. Logbook entries of persons visiting detainees will be completed in accordance with Standard 5.5 "Visitation."

b. Every entry in the logbook will identify the person visiting; the person or department visited; date and time of visitor's arrival; purpose of visit; and time of departure.

**D. Key and Lock Control**

Every facility shall establish procedures for key and lock control in compliance with OSHA and National Fire Protection Association requirements. The facility shall develop and implement site-specific procedures for controlling gun-locker access.

**E. Population Counts**

Every facility shall implement an effective system for counting detainees. Formal and informal counts will be conducted as necessary to ensure around-the-clock accountability for all detainees.

**F. Tool Control**

Every facility will establish a tool-control policy with which all employees shall comply. The facility administrator shall designate the person responsible for developing and implementing tool-control procedures, along with an inventory and an inspection system to ensure accountability. These inventories shall be kept current and readily available.

**G. Private/Contract Repair and Maintenance Workers**

All visitors who are not ICE/ERO officials or facility employees, including repair and maintenance workers, shall submit to an inspection and inventory of all tools, tool boxes, and equipment that could be used as weapons before entering and leaving the facility.

**H. Contraband**

Staff will handle and properly dispose of contraband in accordance with the standard operating procedures of the facility. "Contraband" refers to all items that pose a threat to the security of people or property. Any facility-approved auxiliary aids, services, or other disability-related items used by a detainee with a disability shall not be considered contraband.

A contraband item is either "hard" contraband or "soft" contraband. Hard contraband includes any item that is inherently dangerous as a weapon or tool of violence, e.g., a knife, explosives, a "zip-gun," brass knuckles, etc. Because hard contraband presents an immediate physical threat in or to the facility, a detainee found in possession of hard contraband could face disciplinary action or criminal prosecution.

Soft contraband, on the other hand, comprises "nuisance" items that do not pose a direct and immediate threat to individual safety. Nonetheless, soft contraband has the potential to create dangerous or unsanitary conditions in the facility. Examples include excess papers that create a fire hazard, and food items that are spoiled or retained beyond the point of safe consumption. The facility administrator shall ordinarily consult a religious authority before confiscating a religious item that is deemed "soft" contraband.

1. The facility shall establish a procedure for the disposal and/or destruction of contraband items.

2. Every facility will establish written policy and procedures to secure the SMU from contraband.

Newspaper articles that depict or describe violence in a detainee's country of origin may be relevant to a detainee's legal case and should not automatically be considered contraband.

## I. Canine Units

Canine units may be used for contraband detection, but the use of dogs for force, control, or intimidation of detainees is prohibited, in accordance with Standard 2.8 "Use of Force and Restraints."

Any facility that has a canine unit shall establish a clear and detailed written policy and procedures governing the circumstances in which canine units may be used in searches. Canines shall not be used in the presence of detainees.

## J. Notice to Detainees

The facility handbook shall notify detainees in a language or manner they understand of the facility's rules and procedures governing pertinent security issues, e.g., counts and contraband.

# STANDARD 2.4

## FUNDS AND PERSONAL PROPERTY

### I. POLICY

All facilities will provide for the control and safeguarding of detainees' personal property. This will include the secure storage of funds, valuables, baggage, and other personal property; a procedure for documentation and receipting of surrendered property; and the initial and regularly scheduled inventories of all funds, valuables, and other property.

### II. STANDARDS AND PROCEDURES

#### A. General

The facility shall provide a secure area, accessible only by designated supervisors and/or property officers, to hold detainee property, valuables, and foreign currency. Detainees lacking baggage or luggage in which to store their property shall have their property placed in baggage or property bins owned by the facility and stored in the secured baggage area at no cost to the detainee. Staff shall inventory, and maintain a record of, detainee personal property being shipped from the facility. The record shall be maintained in the detention file or in a retrievable electronic format, and a copy of the record shall be provided to the detainee.

Any unauthorized personal property is contraband and will be surrendered to staff for securing and inventorying. (See Standard 2.3 "Facility Security and Control.")

The facility may make shipping arrangements for the excess personal property of detainees requiring such assistance. If the detainee refuses to cooperate by providing an appropriate mailing address or is financially able but unwilling to pay the postage, or is unable to pay for shipping, the facility will notify ICE/ERO for instructions for mailing or disposing of the property. In all cases, detainees shall be provided written notice prior to the destruction of their property.

#### B. Limitations on Possession of Detainee Personal Property

1. Detainees may keep a reasonable amount of personal property in their possession, provided the property poses no threat to facility security. Detainees shall have the opportunity to store excess property with a third party or, as applicable, in the facility's personal property storage area.

2. Identity documents, such as passports, birth certificates, etc., shall be copied for the detention file, and the original forwarded to ICE/ERO. Upon request, facility staff will provide the detainee with a copy of the document.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 95 of 157

3. Each housing area will designate an area for storing detainees' personal property.

**C. Admission**

All detention facilities shall have policies and procedures to account for and safeguard detainee property at time of admission. Medical staff will determine the disposition of all medicine accompanying an arriving detainee.

1. Standard operating procedures will include obtaining a forwarding address from every detainee who has personal property.

2. Each facility shall have a written standard procedure for inventory and receipt of detainee funds and valuables. Each detainee shall be given a receipt for all property held until release.

**D. Inventory and Audit**

Each facility shall have a written procedure for inventory and audit of detainee funds, valuables, and personal property.

An inventory of detainee baggage and other non-valuable property will be conducted by the facility administrator or designee at least once each quarter.

The facility's logs will indicate the date, time, and name of the officer(s) conducting the inventory. Any discrepancies will be reported immediately to the facility administrator.

**E. Release or Transfer**

Each facility shall have a written procedure for returning funds, valuables, and personal property to a detainee being transferred or released. U.S. and foreign currency will be returned to the detainee as cash, when possible.

After a property check, the detainee will then sign a receipt for the property, indicating his or her receipt of all funds and personal property due him or her. Detainees who are limited English proficient shall be provided with foreign language services (written translation or oral interpretation) and, consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," detainees with disabilities shall be provided with appropriate accommodations, auxiliary aids or services, and modifications, as necessary, to ensure the detainee understands the information in the receipt. The property log and inventory sheets will reflect the transaction.

**F. Lost/Damaged Property**

Each facility shall have a written policy and procedure for detainee property reported missing or damaged.

1. All procedures for investigating and reporting property loss or damage will be implemented in a timely fashion;

2. Supervisory staff will conduct the investigation;

3. The facility will promptly reimburse detainees for all validated property losses caused by facility negligence; and

4. The facility will immediately notify ICE/ERO of all claims and outcomes.

**G. <u>Abandoned Property</u>**

Facilities shall report and surrender to ICE/ERO all detainee property that is abandoned or unclaimed.

**H. <u>Notice to Detainees</u>**

The facility handbook shall notify detainees of facility policies and procedures concerning personal property, including:

1. Which items they may retain in their possession;

2. That, upon request, they will be provided a copy of any identity document (passport, birth certificate, etc.) placed in their A-files or detention files;

3. The rules for storing or mailing property not allowed in their possession;

4. The procedures for claiming property upon release, transfer, or removal; and

5. The procedures for filing a claim for lost or damaged property.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 97 of 157

# STANDARD 2.5

## HOLD ROOMS IN DETENTION FACILITIES

### I. POLICY

Hold rooms may be used for the temporary detention of individuals awaiting removal, transfer, Executive Office of Immigration Review (EOIR) immigration court hearings, medical treatment, intra-facility movement, or other processing into or out of the facility.

### II. STANDARDS AND PROCEDURES

#### A. Physical Conditions

1. Hold rooms will be located within the secure perimeter.

2. Single-occupant hold rooms shall contain a minimum of 37 square feet (seven unencumbered square feet for the detainee, five square feet for a combination lavatory/toilet fixture, and 25 square feet for wheelchair turnaround). Multiple-occupant hold rooms shall provide an additional seven square feet of unencumbered space for each additional detainee.

3. Hold rooms shall be well ventilated, well lit, and allow for convenient visual checks.

4. Hold rooms will contain sufficient seating for the maximum room capacity, which shall be posted outside the hold room.

5. Bunks, cots, beds, and other sleeping apparatus are not permitted inside hold rooms. Exceptions shall be made for detainees who are ill, and for minors and pregnant women.

6. All hold rooms shall be equipped to provide handwashing and potable water. Hold rooms with toilets shall allow for an appropriate amount of privacy. If the hold room is not equipped with a toilet, the shift supervisor shall at all times position an officer within sight or earshot of the hold room to provide detainees with regular access to toilet facilities. Detainees using the restroom shall be appropriately monitored.

7. Facilities will be in compliance with the applicable federal and state accessibility standards.

#### B. Time Limits and Restrictions

A detainee may not be held in a hold room for more than 12 hours. The following procedures shall be adhered to:

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 98 of 157

1. Unaccompanied minors (under 18 years), persons over the age of 70, females with children, and family groups will not be placed in hold rooms, unless they have shown or threatened violent behavior, have criminal convictions involving violence, or have given staff articulable grounds to expect an escape attempt.

2. As soon as it is determined that a minor in ICE custody is unaccompanied, facilities must coordinate immediately with ICE/ERO. ICE/ERO will arrange with its Juvenile Family and Residential Management Unit (JFRMU) to move the minor within 72 hours to an approved facility designated for the placement of unaccompanied minors by U.S. Department of Health and Human Services Office of Refugee Resettlement (ORR).

3. While in ICE custody, juveniles shall be detained in the least restrictive setting appropriate to the juvenile's age and special needs, provided such a setting is consistent with the need to protect the juvenile's well-being and that of others, as well as with any other laws, regulations, or legal requirements.

4. Persons exempt from placement in hold rooms due to obvious illness; special medical, physical, and or psychological needs; or other documented reasons shall be seated in a designated area outside the hold room, under direct supervision and control, barring an emergency. If the physical layout of the facility precludes holding these individuals outside the hold room, they may be held in separate rooms, if available.

5. Adult males shall be segregated from adult females at all times (even if married).

6. Minors (under 18) will be held apart from adults, minimizing sight, sound, and physical contact, unless the adult is an immediate relative or recognized guardian and no other adult detainees are present in the hold room and there are no safety or security concerns with the arrangement.

7. Detainees shall be provided with basic personal hygiene items, e.g., water, disposable cups, soap, toilet paper, feminine hygiene items, diapers, and sanitary wipes.

### C. <u>Detainee Search</u>

Every detainee shall undergo a pat-down search for weapons or contraband before being placed in a hold room. Sharp objects, including pens, pencils, knives, nail files, and other objects that could be used as weapons, shall be removed from the detainee's possession.

Opposite gender pat-down searches of male detainees shall not be conducted unless, after reasonable diligence, male staff is not available at the time the pat-down search is required, or in exigent circumstances. Opposite gender pat-down searches of female detainees shall not be conducted unless in exigent circumstances. All opposite gender pat-down searches shall be documented. If the pat-down search indicates the need for a more thorough search, a strip search shall be conducted. This must be performed by an officer of the same gender as the detainee, or in the presence of another officer of the same gender (see Standard 2.7 "Searches of Detainees" for more detailed information).

**D. Basic Operational Procedures**

1. An officer will visually assess every individual before placing them in the hold room, checking for any open, obvious, or apparent disabilities, mental health concerns, or other special needs.

2. Each facility shall maintain a log which records custodial information about all detainees placed in and removed from hold rooms.

3. Officers shall provide a meal to any adult in the hold room for more than six hours. Juveniles will receive meal service regardless of time in custody. Juveniles, babies, pregnant women, and others for whom it is medically necessary shall have regular access to snacks, milk, juice, etc. Staff shall ensure that sanitation and temperatures in hold rooms are maintained at acceptable levels. Juveniles, pregnant women, and others with evident medical needs shall have access to temperature-appropriate clothing and blankets. The facility will record when food is provided.

4. Officers shall closely supervise the hold rooms through direct supervision, which involves irregular visual monitoring not to exceed 15 minutes between checks (each time recording the time and officer's name or identifier in the detention log). Staff shall conduct constant surveillance of any detainee exhibiting signs of hostility, depression, or similar behaviors. In such cases, the officer shall notify a supervisor.

5. Staff shall immediately notify the emergency medical provider or services when a detainee appears to be need of emergency medical treatment.

6. When the last detainee has been removed from the hold room, the room shall be given a thorough cleaning and safety inspection.

# STANDARD 2.6

## POST ORDERS

## I. POLICY

Each officer will have written post orders that specifically govern his or her current duties. The post orders will specify the duties of the post, along with instructions on how to perform those duties. The step-by-step procedures will include enough detail to guide an officer newly assigned to the post. The facility will also develop post orders for non-permanent assignments (details, temporary housing units, emergency changes, etc.). If events preclude advance planning, the facility will issue a post order as soon as possible after the need arises.

## II. STANDARDS AND PROCEDURES

### A. Post Orders

Written orders shall specify the duties of each post, along with the procedures to be followed in carrying out those duties. A master file which contains all post orders shall be available to all employees.

### B. Reading and Understanding of Post Orders

All facilities shall have written procedures to ensure that all officers read applicable post orders. The facility administrator or designee shall review and sign housing-unit orders.

All officers and supervisors shall use the post orders to familiarize themselves with the duties for which they are responsible, and to stay abreast of changes that occur in the operation and duties of the post. Supervisors shall ensure that officers understand the post orders of each post they are assigned, regardless of whether the assignment is temporary, permanent, or due to an emergency.

Prior to assuming a post, officers will sign and date the post order to indicate having read and understood its provisions.

### C. Maintenance of Post Orders

Post orders will be kept current at all times. Post orders will be reviewed and updated at least annually.

### D. Armed and Perimeter-Access Post Assignments

Post orders for armed and perimeter-access post assignments will, among other things, describe and explain:

1. The proper care and safe handling of firearms; and
2. Circumstances and conditions when use of firearms is authorized.

Post orders for armed posts, and for posts that control access to the institution perimeter, shall clearly state that any staff member who is taken hostage is considered to be under duress. Any order/directive issued by such a person, regardless of his or her position of authority, is to be disregarded.

Specific instructions for escape attempts shall be included in the post orders for armed posts.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 102 of 157

# STANDARD 2.7

## SEARCHES OF DETAINEES

## I. POLICY

This detention standard protects detainees and staff and enhances facility security and good order by detecting, controlling, and properly disposing of contraband.

Various terms used in this standard are defined in the Definitions Appendix.

## II. STANDARDS AND PROCEDURES

### A. Written Policy and Procedures

The facility shall have written policy and procedures for the following:

1. Body searches, including pat searches ("pat downs"), strip searches, body cavity searches, and x-rays;
2. Close observation in "dry cells" to detect contraband;
3. Employing the least intrusive method of search practicable, as indicated by the type of suspected contraband and the method of suspected introduction or concealment;
4. Avoiding unnecessary force during searches and preserving the dignity of the detainee being searched;
5. Handling of contraband; and
6. Preservation of evidence.

### B. Staff Training

All staff who conduct searches of housing, work areas, or of a detainee's body shall receive initial training regarding search procedures prior to entering on duty and shall receive annual, updated training in authorized and effective techniques thereafter.

Security staff shall be trained in proper procedures for conducting pat searches, including cross-gender pat searches and searches of transgender and intersex detainees.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 103 of 157

## C. Body Searches of Detainees

### 1. Pat Search

a. Description

A pat search (or "pat down") is a sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband.

All pat searches shall be conducted in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs including consideration of officer safety.

Officers shall be trained in proper procedures for conducting pat searches, including opposite gender pat searches and searches of transgender and intersex detainees.

b. Gender of Officer

Opposite gender pat-down searches of male detainees shall not be conducted unless, after reasonable diligence, male staff is not available at the time the pat-down search is required, or in exigent circumstances. Opposite gender pat-down searches of female detainees shall not be conducted unless in exigent circumstances.

All opposite gender pat-down searches shall be documented.

### 2. Strip Search

a. Description

A strip search is a search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia. Staff shall not routinely require a detainee to remove clothing or require a detainee to expose private parts of his or her body to search for contraband. To the extent reasonably possible, the inspector shall refrain from touching the skin surface of the detainee; however, the inspector may request that the detainee move parts of the body to permit visual inspection. A strip search is more intrusive than a pat search and shall be conducted in a manner designed to ensure as much privacy to the detainee as practicable.

If items are discovered that protrude from a body cavity, the removal of those items is governed by the procedures applicable to body-cavity searches, addressed below.

The facility shall not search or physically examine a detainee for the sole purpose of determining the detainee's genital characteristics. If the detainee's gender is unknown, it may be determined during conversations with the detainee, by

reviewing medical records, or, if necessary, learning that information as part of a standard medical examination that all detainees must undergo as part of intake or other processing procedure conducted in private, by a medical practitioner.

b. Gender of Officer

An officer of the same gender as the detainee shall perform the search. Special care should be taken to ensure that transgender detainees are searched in private.

In the case of an emergency, a staff member of the same gender as the detainee shall be present to observe a strip search performed by an officer of the opposite gender.

When an officer of the opposite gender conducts a strip search which is observed by a staff member of the same gender as the detainee, staff shall document the reasons for the opposite-gender search in any logs used to record searches and in either the detainee's detention file or a retrievable electronic format.

c. Guidelines

Facilities may perform a strip search when an articulable and reasonable suspicion exists that contraband is concealed on the detainee's person. Facilities may also conduct strip searches as a matter of course when a detainee is entering or re-entering the facility or in accordance with the facility's contact visitation procedures as outlined in Standard 5.5 "Visitation." All strip searches will be documented. Where a strip search is based on reasonable suspicion, the articulable facts supporting that conclusion will also be documented.

d. Reasonable Suspicion

"Reasonable suspicion" is based on the existence of specific and articulable facts that would lead a reasonable officer to believe that a specific detainee is in possession of contraband. It must be based on specific and articulable facts, along with reasonable inferences that may be drawn from those facts.

The lack of identity documents alone does not ordinarily constitute reasonable suspicion.

**3. Body Cavity Searches**

A body cavity search is an inspection for contraband or any other foreign item, in a body cavity of a detainee, by use of fingers or simple instruments, such as an otoscope, tongue blade, short nasal speculum, and simple forceps. A body cavity search is the most intrusive type of search. A body cavity search must be performed by a medical professional and take place in an area that affords privacy from other detainees and from facility staff who are not involved in the search.

a. A body cavity search may only be conducted by authorized medical personnel, upon approval of the facility administrator or acting facility administrator, and only if there is reasonable suspicion that contraband may be concealed in or on the detainee's person.

b. The articulable facts supporting the conclusion that reasonable suspicion exists shall be documented.

c. The detainee's health and welfare shall be considered prior to performance of any digital or simple instrument search.

d. Although a detainee's written consent should be obtained prior to conducting a digital or simple instrument search, such written consent is not required.

e. Whenever possible, transgender detainees shall be permitted to choose the gender of the staff member conducting a body-cavity search.

f. If located, the contraband or foreign item may be removed immediately by medical staff, if such removal can easily be affected by use of fingers or simple medical instruments.

g. IHSC staff is not authorized to collect or participate in the collection of specimens or other information that will be used for forensic purposes, including for toxicology studies, rape kits, and DNA testing.

Staff shall document all body cavity, digital, and simple instrument searches, the authorizations, and the reasons for the searches, in any logs used to record searches and in the detainee's detention file or retrievable electronic format.

## D. <u>Close Observation in a "Dry Cell"</u>

### 1. Description and Authorization

When an officer has reasonable suspicion to believe that a detainee may have ingested contraband or concealed contraband in a body cavity, and the methods of search specified above are inappropriate or likely to result in physical injury to the detainee, the facility administrator or designee may authorize that the detainee be placed in a room or cell to be closely observed by staff until the detainee has voided or passed the contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband.

### 2. Requirements for "Dry Cells"

One or more rooms or cells may be identified as dry cells; such rooms must meet the following requirements:

a. The room shall be free of hiding places and be equipped with only a bed.

b. Doors shall have proper observation panels to protect staff and to allow unobstructed observation.

c. If the designated area is equipped with a toilet and/or sink, the water to the cell shall be shut off for the duration of the dry cell process.

d. Prior to a detainee's placement in dry cell status, the room to be used shall be completely searched and determined to be free of contraband.

**3. Advising the Detainee**

The supervisor responsible for initiating the dry cell placement shall advise the detainee of the conditions and what is expected and shall document the notification on an Administrative Segregation Order. The detainee shall be advised of the reasons he or she is being placed in a dry cell, the purpose of this placement, the conditions he or she can expect, and the means by which he or she can request items and services including, but not limited to, food and water, medical care, hygiene products, and bedpans. This information shall be communicated in a language or manner that the detainee understands.

**4. Conditions of "Dry Cell" Status**

a. For the detainee's safety, he or she shall be required to provide a urine sample within two hours of placement under close observation. A second urine sample shall be required prior to releasing the detainee from close observation.

b. The detainee shall have regular access to potable water.

c. The detainee may be provided telephone access.

d. The detainee may not be allowed to come in contact with other detainees.

e. Personal hygiene items shall be provided as necessary and controlled by staff.

f. The detainee shall not be permitted to leave the cell or room, except in case of extreme emergency.

g. The detainee shall be served the same meals as the general population, unless medically advice dictates otherwise. All meals are to be inspected for contraband prior to delivery to the detainee, and any food remaining after the meal, as well as the utensils and tray, are to be thoroughly inspected before their return to food service.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 107 of 157

h. Only medications prescribed and administered directly to the detainee by medical personnel may be given to the detainee.

i. When the detainee needs to urinate and/or defecate, he or she shall be furnished an empty hospital bedpan, which shall afterward be closely inspected to ascertain whether any contraband is present.

j. Since the detainee is in administrative segregation status even if not actually housed in the Special Management Unit (SMU), the requirements for medical and supervisory and staff visits in Standard 2.9 "Special Management Units" apply.

k. Dry cells must be cleaned in accordance with Standard 1.1 "Environmental Health and Safety."

**5. Post Orders**

The facility shall have post orders for closely observing a detainee in dry cell status. A video camera shall be used whenever possible and as appropriate.

**6. Requirements for Close Observation**

The detainee shall be constantly observed and supervised by a staff member of the same gender. Opposite gender observation shall only occur in in exigent circumstances, the occurrence of which must be documented.

It is the observer's responsibility to ensure the detainee does not dispose of any concealed item, and to prevent activity which would allow the detainee access to the concealed item, thereby jeopardizing the security and good order of the facility, staff, and detainees. Any questions, emergency, or other situation that arises shall immediately be brought to the attention of the shift supervisor.

a. Detainees in dry cells shall be monitored by medical staff for changes in medical and mental health status.

b. A daily log and SMU record shall be maintained on each detainee in dry cell status.

c. The shift supervisor shall provide periodic staff relief to the observer and at any other time the observer must leave the area. The detainee must not be left unattended.

d. Trash may not be allowed to accumulate, and each item shall be thoroughly searched before final disposal.

e. Periodic searches shall be conducted as follows:

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 108 of 157

1) A strip search of the detainee when he or she is placed in the dry cell, after which the detainee shall be issued a jump suit (or other suitable loose-fitting clothing);

2) A strip search of the detainee at least once each shift, if necessary; and

3) A search of the dry cell at least once each shift.

f. Staff shall notify the shift supervisor when contraband is found, secure the contraband in a properly documented evidence bag, and maintain the chain of custody for the evidence.

### 7. Length of Observation

The length of close-observation status must be determined on an individual basis. The facility administrator or designee, in consultation with qualified health personnel, shall determine when termination is appropriate.

a. The status of a detainee under close observation for as long as three days must be reviewed by the facility administrator or designee and medical staff in accordance with Standard 2.9 "Special Management Units."

b. Since the objective of dry cell status is likely to be achieved within seven days, maintaining a detainee under close observation beyond seven days requires prior approval of the facility administrator and medical staff.

## E. X-Ray

### 1. Medical

The facility physician may authorize use of an x-ray for medical reasons and only with the consent of the detainee.

### 2. Security

Only the facility administrator, upon approval by ICE/ERO, may authorize the facility physician to order a non-repetitive x-ray examination for the purpose of determining whether contraband is concealed in or on the detainee (e.g., in a cast or body cavity).

Such approval and authorization shall be based on the facility administrator and physician's determination that:

a. An x-ray examination is necessary for security, safety, good order, or health of the detainee;

b. No reasonable alternative exists; and

c. The examination is not likely to result in serious or lasting medical injury or harm to the detainee, based on the determination of qualified medical staff.

Staff shall place documentation of the examination, the authorizations, and the reasons for the examination in the detainee's detention file or other retrievable electronic format, as well as in the medical file.

An x-ray examination may not be performed on a detainee without the detainee's consent. Staff shall solicit the detainee's consent and cooperation prior to the x-ray examination. Force may not be used to gain consent and cooperation. If the detainee does not provide consent and fails to cooperate, an x-ray examination shall not be performed.

### F. Major Instrument, Fluoroscope, or Surgical Intrusion

Only a physician may authorize use of a fluoroscope, major instrument (including an anoscope or vaginal speculum), or surgical intrusion. Such use must be for medical reasons only, and only with the detainee's consent.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 110 of 157

# STANDARD 2.8

## USE OF FORCE AND RESTRAINTS

## I. POLICY

For the purpose of these standards, force is defined as the physical actions necessary to overcome resistance, to gain control, contain, or restrain a detainee. The use of force is authorized only after all reasonable efforts to resolve a situation have failed. Officers shall use only the force necessary to gain control of the detainee; to protect and ensure the safety of detainees, staff, and others; to prevent serious property damage; and to ensure the security and orderly operation of the facility. Physical restraints shall be used to gain control of an apparently dangerous detainee only under specified conditions.

## II. STANDARDS AND PROCEDURES

### A. Principles Governing the Use of Force and Application of Restraints

1. Under no circumstances shall force be used to punish a detainee.

2. Staff shall attempt to gain the detainee's willing cooperation, in a language or manner that the detainee understands, before using force.

3. Staff shall use only that amount of force necessary to gain control of the detainee.

4. Immediate use of restraints is warranted to prevent the detainee from harming self or others, or from causing serious property damage. If, after the detainee is under control, the continued use of restraints appears necessary, facility administrator approval is required.

5. Additional restraints may be applied to a detainee who continues to resist after staff achieves physical control. If a restrained detainee refuses to move or cannot move because of the restraints, staff may lift and carry the detainee to the appropriate destination. Restraints shall not be used for lifting or carrying a detainee.

6. The following uses of restraint equipment or devices (e.g., handcuffs) are prohibited:

   a. On a detainee's neck or face, or in any manner that restricts blood circulation or obstructs the detainee's airways (mouth, nose, neck, esophagus);

   b. To cause physical pain or extreme discomfort.

7. Staff will monitor all detainees placed in restraints.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 111 of 157

8. Medication shall not be used to subdue an uncooperative detainee for staff convenience. Medication must be prescribed and administered by licensed medical personnel, for medical purposes only.

**B. <u>Types of Force</u>**

When a detainee acts violently or appears on the verge of violent action(s), staff may use reasonable force and/or restraints to prevent him or her from harming self, others, and/or causing damage to property. ICE requires that all of use of force incidents be documented and the documentation forwarded to ICE/ERO for review.

**1. Immediate Use of Force**

An "immediate-use-of-force" situation is created when a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility. In that situation, staff may respond without a supervisor's direction or presence.

**2. Calculated Use of Force**

If a detainee is in an isolated location (e.g., a locked cell) where there is no immediate threat to the detainee or others, staff shall take the time to assess the possibility of resolving the situation without resorting to force. The calculated use of force is feasible in most cases.

a. <u>Confrontation Avoidance</u>

Before authorizing the calculated use of force, a supervisory detention official, a designated health professional, and others, as appropriate, shall assess the situation. This assessment shall take into account the detainee's history and the circumstances of the immediate situation to determine the appropriateness of using force.

The conferring officials may consider, in their assessment, the detainee's medical/mental history; recent incident reports involving the detainee, if any; and shocks or traumas that may be contributing to the detainee's state of mind (e.g., a pending criminal prosecution or sentencing, a recent removal order, divorce, illness, death, etc.). Interviews with staff members familiar with the detainee might yield insight into the detainee's current agitation, even pinpointing the immediate cause.

b. <u>Use-of-Force Team Technique</u>

When a detainee must be forcibly moved and/or restrained during a calculated use of force, the use-of-force team technique shall apply.

1) Calculated-use-of-force video recording will include the following:

a) Introduction by Team Leader, stating facility name, location, time, date, etc.; describing the incident that led to the calculated use of force; naming each team member and showing his or her face briefly, as well as naming the video camera operator, and other staff present.

b) Faces of all team members briefly appear (helmets removed, heads uncovered).

c) Team Leader offering detainee last chance to cooperate before team action in a language or manner the detainee understands, outlining use-of-force procedures, engaging in confrontation avoidance, and issuing use-of-force order.

d) Entire Use-of-Force Team operation, unedited, until detainee is in restraints.

e) Close-ups of detainee's body during medical exam, focusing on the presence/absence of injuries; staff injuries, if any, described but not shown.

2) Use-of-force recordings shall be available for ICE/ERO incident reviews. They may also be used for training, e.g., after-action review training.

## C. Prohibited Use-of-Force Acts and Techniques

Facility staff shall only use force, restraints, and non-lethal weapons that are approved by facility policy in a manner consistent with policy, procedure, and training requirements.

The following acts and techniques are prohibited when using non-deadly force:

1. Canines shall not be used for force, control, or intimidation of detainees;
2. Choke holds, using a baton to apply choke or "come-along" holds to the neck area, and other neck restraints;
3. Intentional baton strikes to the head, face, groin, solar plexus, neck, kidneys, or spinal column;
4. Striking a detainee for failing to obey an order;
5. Striking a detainee, when grasping or pushing him or her would achieve the desired result; and
6. Using force against a detainee offering no resistance.

**D. Use-of-Force Safeguards**

1. Compliance with the Use-of-Force procedures can prevent injury and exposure to communicable disease.

2. Use-of-Force Team members and others participating in a calculated use of force shall wear appropriate protective gear.

3. Whenever possible, staff shall use protective devices when entering a cell or area where blood or other body fluids could be present.

4. The shift supervisor shall inspect areas of blood or other body-fluid spillage after an incident. Unless he or she determines that the spillage must be preserved as evidence, staff shall immediately sanitize those areas. Articles of clothing and use-of-force equipment contaminated with body fluids will be immediately disinfected or destroyed, as appropriate. The medical department shall provide guidance on appropriate cleaning solutions and usage.

**E. Progressive and Ambulatory Restraints**

Whenever possible, staff shall apply ambulatory restraints. If the detainee's behavior makes use of more restrictive or secure restraints necessary, the facility administrator shall decide on the appropriate restraint method. Such methods might include hard restraints with/without waist chain or belt; four-point soft restraints, with hard restraints securing the detainee to his or her bed; four-point hard restraints; etc.

In situations involving highly assaultive and aggressive detainees, progressive restraints may be used as an intermediate measure while placing the detainee into, or removing a detainee from, four-point restraints.

**F. Use of Four- or Five-Point Restraints**

Staff shall follow the specified procedures:

1. Provide the detainee with temperature-appropriate clothing and a bed, mattress, sheet and/or blanket.

2. Under no circumstance shall a detainee remain naked or without cover (sheet or blanket) unless determined necessary by qualified health personnel.

3. Check and record the detainee's condition at least every 15 minutes to ensure that the restraints are not hampering circulation and to monitor the general welfare of the detainee. If the detainee is confined by bed restraints, staff shall periodically rotate the detainee's position to prevent soreness or stiffness.

4. A health professional shall test the detainee's breathing, other vital signs, and physical and verbal responses and, if the detainee is bed-restrained, determine how he or she should be placed. Qualified health personnel ordinarily visit the detainee at least twice per eight-hour shift. When qualified health personnel are not immediately available, staff shall place the detainee in a "face-up" position until the medical evaluation.

5. Use of four-point restraints beyond eight hours requires medical supervision.

6. The shift supervisor shall review a detainee in four-point restraints every two hours. If the restraints have had a calming effect, they may be removed and, if appropriate, replaced by a less restrictive device. At every two-hour review, the detainee will be afforded the opportunity to use the toilet, unless the detainee actively resists or becomes combative when released from restraints for this purpose.

7. The facility must inform ICE/ERO when a detainee has been in restraints for more than eight hours. The facility will provide updates every eight hours until the restraints are removed.

## G. Medical Attention in Use-of-Force and Application-of-Restraints Incidents

1. In immediate use-of-force situations, staff shall seek the assistance of mental health or other medical personnel immediately upon gaining physical control of the detainee.

2. In all calculated uses of force, the use-of-force team leader shall seek the guidance of qualified health personnel (based on a review of the detainee's medical record) to identify physical or mental health concerns. If the medical or mental health professional determines that the detainee requires continuing care, he or she shall make the necessary arrangements. Continuing care may involve such measures as admission to a hospital.

3. After any use of force or application of restraints, medical personnel shall examine the detainee, immediately treating any injuries. The medical services provided shall be documented.

4. Medical staff shall immediately examine any staff member involved in a use-of-force incident who reports an injury and, if necessary, provide initial emergency treatment.

## H. Use of Non-Lethal Weapons

The facility may authorize the use of non-lethal weapons if a detainee:

1. Is armed and/or barricaded; or

2. Cannot be approached without danger to self or others; and

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 115 of 157

3. A delay in controlling the situation would seriously endanger the detainee or others, or would result in a major disturbance or serious property damage.

Staff shall consult medical staff before using oleoresin capsicum (OC) spray or other non-lethal weapon(s) unless escalating tension make such action unavoidable. When possible, medical staff will review the detainee's medical file for any disease or condition that a non-lethal weapon could seriously exacerbate, including, but not limited to, asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure.

## I. Use of Force in Special Circumstances

Occasionally, after the failure or impracticability of confrontation-avoidance techniques, staff must make a judgment call as to whether to use force. In such cases, if the incident involves a detainee at high risk for injury to self or others, such as a pregnant detainee or an aggressive detainee with open cuts, sores, or lesions, staff shall consult with the on-site medical authority before deciding the situation is grave enough to warrant the use of physical force.

### 1. Special Needs

If a situation arises involving a detainee with special needs, the appropriate medical or mental health staff shall be consulted prior to the calculated use of force. A detainee with "special needs" is a detainee whose mental and/or physical condition requires different accommodations or arrangements than a detainee who does not have special needs would receive. Special needs detainees include, but are not limited to, those detainees who are chronically ill or infirm, those with disabilities, and those who are addicted to or in withdrawal from drugs or alcohol.

Pregnant and Post-Delivery Detainees

A pregnant woman or a woman in post-delivery recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary, as documented by a supervisor and directed by the on-site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention facility, or at an outside medical facility. Restraints are never permitted on women who are in active labor or delivery.

Restraints should not be considered as an option for these populations, except under the following extraordinary circumstances:

a. A medical officer has directed the use of restraints for medical reasons;

b. Credible, reasonable grounds exist to believe the detainee presents an immediate and serious threat of hurting herself, staff, or others; or

c. Reasonable grounds exist to believe the detainee presents an immediate and credible risk of escape that cannot be reasonably minimized through any other method.

In the rare event that one of the above situations applies, medical staff shall determine the safest method and duration for the use of restraints and the least restrictive restraints necessary shall be used.

Even in the extraordinary circumstance when restraints are deemed necessary, handcuffing in front should be used whenever possible to enable a pregnant detainee to break her fall, and no detainee known to be pregnant shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts will be made to ensure that the detainee is placed on her left side if she is immobilized.

The use of restraints requires documented approval and guidance from the on-site medical authority. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's detention and medical file.

**2. Detainees with Wounds or Cuts**

Staff shall wear protective gear when restraining aggressive detainees with open cuts or wounds. If use of force is deemed necessary, this gear will include a full-body shield.

**J. <u>Documentation of Use of Force and Application of Restraints Incidents</u>**

ICE/ERO requires that all use of force incidents involving detainees be documented and the documentation forwarded to ICE/ERO for review. Facility staff shall likewise document the use of restraints on a detainee who becomes violent or displays signs of imminent violence. A copy of the report shall be placed in the detainee's detention file or be maintained in and retrievable electronic format. A report is not necessary for the general unresisted use of restraints (for example, the routine movement or transfer of detainees).

All personnel who either use force or observe the use of force shall document their actions and observations in a written report before leaving shift. Supervisors who are present during a force incident shall document in a written report their observations and any orders given directing the use of force.

**1. Report of Incident**

Facility staff shall prepare a use of force report for each use of force incident. Each staff member who witnesses the use of force shall complete a memorandum for the record, to be attached to the use of force report. The facility administrator or designee will review all completed reports and memoranda for sufficiency and corrective action as necessary.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 117 of 157

**2. 4- or 5-Point Restraints Report**

Facilities shall document all 15-minute checks of detainees in four- or five-point restraints and report to ICE/ERO any detainee restrained for over eight hours, with additional reports every eight hours thereafter.

**3. Recordings of Use-of-Force Incidents**

Staff shall immediately obtain and record with a video camera any use-of-force incident, unless such a delay in bringing the situation under control would constitute a serious hazard to the detainee, staff, or others, or would result in a major disturbance or serious property damage. Calculated use of force shall be video recorded as specified in part B.2.b. of this standard, "Use-of-Force Team Technique." Release of use-of-force audiovisual recordings to the news media may occur only if authorized by the Director of Enforcement and Removal Operations, in accordance with ICE/ERO procedures and rules of accountability.

**4. Record Keeping**

Facilities shall maintain all written use-of-force documentation for a minimum of six years.

Video, audio, and other recordings shall be catalogued and preserved until no longer needed, but for no less than 30 months after their last documented use. In the event of litigation, the facility will retain the recording for a minimum of six months after the conclusion/resolution of the litigation.

**5. Report Completion**

The facility review team shall complete and submit its report to the facility administrator within five working days of the incident or the detainee's release from restraints. The facility administrator shall review and sign the report, acknowledging its finding that the use of force was appropriate or inappropriate.

The review team shall determine whether the incident requires further investigation or referral to law enforcement. The facility shall forward a copy of the After-Action Report to the local ICE/ERO Field Office Director within seven days of completion.

**K. After-Action Review of Use of Force and Application of Restraints Incidents**

Written procedures shall govern the mandatory after-action review for use-of-force incidents (whether calculated or immediate), and for the application of restraints. The purpose of the review is, among other things, to assess the reasonableness of the actions taken (i.e., the proportionality of the force used to the detainee's actions).

No officer involved in the use of force shall be part of the review team.

1. The After-Action Review shall examine all relevant materials for facility staff's compliance with facility policy and these standards. For calculated use of force incidents, and incidents where video is available, recordings will be reviewed to examine, among other things:

   a. Application of only as much force as necessary to subdue the detainee. This includes responding appropriately to a subdued or cooperative detainee, i.e., one who discontinues his or her violent behavior;

   b. Protective gear worn inside cell/area until end of operation;

   c. Appropriate use of chemical agents, Oleoresin Capsicum (OC) spray, mace, etc., in accordance with written procedures;

   d. A medical professional promptly examines the detainee, with the findings reported on the recording;

   e. Continuous coverage from the time the camera starts recording until the incident is over. The review will investigate any breaks or sequences apparently missing from the recording.

## L. Training

Staff shall be trained in approved methods of self-defense, crisis intervention, conflict de-escalation, use of force techniques, recognizing signs and symptoms of mental illness, and reporting requirements. Staff will be made aware of prohibited use-of-force acts and techniques.

Specialized training shall be required for certain non-lethal equipment, e.g., OC spray and electronic devices. Training in the use of chemical agents shall include treatment of individuals exposed to them. Each officer must have been specifically certified to use a given device.

# STANDARD 2.9

## SPECIAL MANAGEMENT UNITS

## I. POLICY

This detention standard protects detainees, staff, contractors, volunteers, and the community from harm by segregating certain detainees from the general population in Special Management Units (SMUs) through Administrative Segregation for detainees segregated for administrative reasons and Disciplinary Segregation for detainees segregated for disciplinary reasons.

## II. STANDARDS AND PROCEDURES

### A. Placement in Administrative Segregation

Administrative Segregation status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility. For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in administrative segregation.

Each facility shall develop and follow written procedures, consistent with this standard, governing the management of its administrative segregation unit. These procedures must include documenting detailed reasons for placement of an individual in administrative segregation.

Prior to the detainee's placement in administrative segregation, the facility administrator or designee shall review the case to determine whether administrative segregation is in fact warranted.

#### 1. Reasons for Placement in Administrative Segregation

A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility; for medical reasons; or under other circumstances as set forth below.

A detainee's age, disability, sex, sexual orientation, gender identity, race, color, national origin, or religion may never provide the sole basis for a decision to place the detainee in involuntary segregation. An individualized assessment must be made in each case.

Some examples of reasons for a detainee's assignment to administrative segregation include, but are not limited to, the following:

a. A detainee is awaiting an investigation or a hearing for a violation of facility rules. Generally, a detainee should not remain in administrative segregation for a longer period of time than the maximum term of disciplinary segregation permitted for the most serious offense charged.

b. A detainee poses a threat to the security of the facility.

c. A detainee requires protection. Protective custody may be initiated at the detainee's request or by staff as needed to protect the detainee from harm. Each facility shall develop procedures to regularly review continued placement in protective custody as well as provisions for release from protective custody when appropriate.

   Use of administrative segregation to protect detainees with special vulnerabilities, including detainees vulnerable to sexual abuse or assault, shall be limited to those instances where reasonable efforts have been made to provide appropriate housing; where the placement is for the least amount of time practicable; and where no other viable housing options exist, and as a last resort.

   Detainees who have been placed in administrative segregation for protective custody shall have access to programs, services, visitation, counsel, and other services available to the general population to the maximum extent possible.

d. A detainee is scheduled for release, removal, or transfer within 24 hours. Such segregation may be ordered for security reasons or for the orderly operation of the facility.

e. The facility's Institutional Disciplinary Panel (IDP), or its equivalent, may recommend a detainee be placed in administrative segregation following disciplinary segregation if it determines that releasing the detainee into the general population would pose a threat to the detainee or to the security and orderly operation of the facility. However, a subsequent placement in administrative segregation requires an administrative segregation order justifying the placement after the completion of the term served in disciplinary segregation.

   A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all other detainees in administrative segregation, provided receipt of such privileges poses no threat to the safety, security, or orderly operation of the facility.

f. A medical professional who orders a detainee removed from the general population shall complete and sign an administrative segregation order (see below) unless the detainee is to stay in the medical department's isolation ward.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 121 of 157

### 2. Administrative Segregation Order

A written order shall be completed and approved by the facility administrator or designee before a detainee is placed in administrative segregation, except when exigent circumstances make such documentation impracticable. In such cases, an order shall be prepared as soon as possible.

a. The administrative segregation order shall be provided to the detainee within 24 hours of placement in administrative segregation, and its contents communicated to him or her in a language or manner the detainee can understand.

b. A copy of the administrative segregation order shall be immediately provided to ICE/ERO.

c. When the detainee is released from administrative segregation, the releasing officer shall indicate the date and time of release on the administrative segregation order. The completed order shall then be included in the detainee's detention file or maintained in a retrievable electronic format.

### 3. Review of Detainee Status in Administrative Segregation

All facilities shall implement written procedures for the regular placement review of all detainees held in administrative segregation, consistent with the procedures specified below.

a. A supervisor shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted.

   1) The review shall include an interview with the detainee.

   2) A written record shall be made of the decision and the justification.

   3) If the detainee has been segregated for his or her own protection, but not at the detainee's request, the signature of the facility administrator or assistant facility administrator is required to authorize the detainee's continued placement in administrative segregation.

b. A supervisor shall conduct an identical review after the detainee has spent seven days in administrative segregation, and every week thereafter for the first 30 days, and every 10 days thereafter, at a minimum.

c. A copy of the decision and justification in each review shall be given to the detainee unless, in exceptional circumstances, this provision would jeopardize the facility's safety, security, or orderly operations. The detainee shall also be given an opportunity to appeal a review decision to the facility administrator.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 122 of 157

d. After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal the conclusions and recommendations of any review conducted to the facility administrator. The detainee may use any standard form of written communication, to include a detainee request, to file the appeal.

e. If a detainee has been in administrative segregation for more than 30 days and objects to that status, the facility administrator shall review the case to determine whether that status should continue. This review shall take into account the detainee's views and shall result in a written record of the decision and its justification. A similar review shall take place each 30 days thereafter.

## B. Placement in Disciplinary Segregation

To provide detainees in the general population a safe and orderly living environment, facility authorities may discipline anyone whose behavior does not comply with facility rules and regulations. Such discipline may involve temporary confinement in disciplinary segregation, apart from the general population. A detainee may be placed in disciplinary segregation only by order of the Institutional Disciplinary Panel (IDP), or its equivalent, after a hearing in which the detainee has been found to have committed a prohibited act and only when alternative dispositions would inadequately regulate the detainee's behavior.

### 1. Duration

The maximum sanction is 30 days in disciplinary segregation per incident, except in extraordinary circumstances. After the first 30 days, and each 30 days thereafter, the facility administrator shall send a written justification for the continued segregation to ICE/ERO.

Time served in pre-disciplinary hearing detention shall be deducted from any time ordered by the IDP.

### 2. Disciplinary Segregation Order

A written order shall be completed and signed by the chair of the IDP (or disciplinary hearing officer) before a detainee is placed into disciplinary segregation.

a. Prior to a detainee's actual placement in disciplinary segregation, the IDP shall complete the disciplinary segregation order detailing the reasons for placing the detainee in disciplinary segregation. All relevant documentation must be attached to the order.

b. The completed disciplinary segregation order shall be immediately provided to the detainee and its contents communicated to him or her in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 123 of 157

c. When the detainee is released from disciplinary segregation, the releasing officer shall indicate the date and time of release on the disciplinary segregation order. The completed order shall then be included in the detainee's detention file or maintained in a retrievable electronic format.

**3. Review of Detainee Status in Disciplinary Segregation**

All facilities shall implement written procedures for the regular review of all disciplinary segregation cases, consistent with the following procedures:

a. A security supervisor, or equivalent, shall interview the detainee and review his or her status in disciplinary segregation every seven days. The review will confirm the detainee is being provided showers, meals, recreation, and other basic necessities, as required by this detention standard.

1) The supervisor may shorten, but not extend, the original sanction.

2) All review documents shall be placed in the detainee's detention file or maintained in a retrievable electronic format.

3) After each formal review, the detainee shall be given a written copy of the reviewing officer's decision and the basis for his or her finding, unless such a copy may result in a compromise of institutional security. If a written copy cannot be delivered, the detainee shall be advised of the decision orally, and the detention file, or retrievable electronic record, shall so note, identifying the reasons why the notice was not provided in writing. The review decision shall be communicated to detainees in a language or manner that they understand.

b. The facility administrator shall review the status of a detainee in disciplinary segregation after the first 30 days of segregation, and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

## C. <u>Notifying ICE/ERO of Segregation Placements and Facilitating ICE/ERO Review</u>

**1. Extended Segregation Placements**

The facility administrator must notify ICE/ERO in writing whenever a detainee has been held continuously in any form of segregation for:

a. 14 days, or 14 days out of any 21-day period;

b. 30 days; and

c. At every 30-day interval thereafter.

**2. Immediate Notifications**

The facility administrator must notify ICE/ERO in writing as soon as possible, but no later than 72 hours, after the initial placement of a detainee in segregation if:

a. The detainee has been placed in administrative segregation on the basis of a disability, medical or mental illness, or other special vulnerability, or because the detainee is an alleged victim of a sexual assault, is an identified suicide risk, or is on a hunger strike; or

b. A detainee placed in segregation for any reason has a mental illness, a serious medical illness, a serious physical disability, or is pregnant or recently had a miscarriage.

c. For the purposes of this standard, detainees with special vulnerabilities include those:

i. Who are known to be suffering from mental illness or serious medical illness;

ii. Who have a disability or are elderly, pregnant, or nursing;

iii. Who would be susceptible to sexual abuse or assault in the general population;

iv. Who would be susceptible to harm in the general population due in part to their sexual orientation or gender identity; or

v. Who have been victims – in or out of ICE/ERO custody – of sexual assault, torture, trafficking, or abuse.

**3. Updates to Segregation Status**

The facility administrator must also notify ICE/ERO in writing whenever a detainee who has been the subject of a prior notification pursuant to this section is subsequently released from segregation.

**4. Coordination with ICE/ERO in Reviewing Segregation Placements**

The facility administrator shall provide all information and supporting documentation regarding segregation placements as requested by ICE/ERO. The facility administrator shall also coordinate with ICE/ERO in:

a. considering whether a less restrictive housing or custodial option is appropriate and available, including return to the general population or options to limit isolation while housed in the SMU, such as additional out of cell time and the ability to participate in group activities; and

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 125 of 157

b. recommending whether transfer may be appropriate to a hospital or to another facility where the detainee can be housed in the general population or in an environment better suited to the needs of the detainee, such as a facility that has dedicated medical beds in its clinic, a medical observation unit, a facility that has a dedicated protective custody unit, or a facility that has a Special Management Unit with enhanced privileges.

### D. Logs and Records

#### 1. Permanent SMU Log

A permanent log shall be maintained in the SMU to record all activities concerning SMU detainees (e.g., meals served, recreational time, visitors, etc.).

The SMU log shall record the detainee's name, A-number, housing location, date admitted, reasons for admission, status review dates, tentative release date (for detainees in disciplinary segregation), the authorizing official, and date released. These logs shall also be used by supervisory staff and other officials to record their visits to the unit.

#### 2. Special Management Housing Unit Record

The Special Management Housing Unit Record or comparable form shall be prepared immediately upon the detainee's placement in the SMU.

a. The special housing unit officer shall immediately record:

1) Whether the detainee ate, showered, recreated and took any medication; and

2) Any additional information, such as whether the detainee has a medical condition, or has expressed or exhibited suicidal/assaultive ideation, intent, or behavior.

3) The officer that conducts the activity shall print his or her name and sign the record.

b. The facility medical staff shall sign each individual's record when the medical staff member visits a detainee in the SMU. The housing officer shall initial the record after the medical visits are completed, but no later than the end of the shift.

c. Upon a detainee's release from the SMU, the releasing officer shall attach that detainee's entire housing unit record to either the administrative segregation order or the disciplinary segregation order and ensure the record's inclusion in the detainee's detention file or retrievable electronic record.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 126 of 157

**E. Basic Requirements for All Special Management Units**

Conditions of confinement are based on the amount of supervision required to control a detainee and to safeguard the detainee, other detainees and facility staff.

In every instance, any exceptions to these requirements shall be:

1. Made only for the purpose of ensuring detainee and facility staff safety and security;
2. Approved by a supervisor (or higher official);
3. On a temporary and situational basis, continued only for as long as it is justified by threat to the safety or security of the facility, its staff, or detainee population; and
4. Documented in the Permanent SMU log and, under circumstances specified later in this detention standard, documented and placed in the detainee's detention file or retrievable electronic record.

When a detainee in an SMU is deprived of any usually authorized items or activity, a report shall be included in the detainee's detention file or retrievable electronic record.

Placement in an SMU does not constitute a valid basis for the use of restraints while in the SMU or during movement around the facility. Consistent with Standard 2.8 "Use of Force and Restraints," restraints should only be used when necessary as a precaution against escape during transfer, for medical reasons (when directed by the medical officer), or to prevent self-injury, injury to others, or serious property damage.

**F. Translation/Interpretation Services**

Detainees shall be provided translation and/or interpretation services and any necessary communication assistance while in the SMU, to assist with their understanding of the reasons for and conditions of their confinement as well as their rights and responsibilities while in confinement.

**G. Special Needs**

Detainees in the SMU shall be provided appropriate accommodations and professional assistance for disabilities and/or other special needs (e.g., medical, therapeutic, or mental health treatment), on an equal basis as those in the general population.

**H. Cell Condition**

Cells and rooms used for purposes of segregation must be well ventilated, adequately lit, appropriately heated/cooled, and maintained in a sanitary condition at all times, consistent with safety and security.

Ordinarily, the number of detainees confined to each cell or room may not exceed the capacity for which it was designed. Under exigent circumstances, before approving any additional cell occupancy on a temporary basis, the facility administrator shall consult with ICE/ERO, who shall consult with ICE/ERO legal counsel. If a decision is made to approve such additional cell occupancy, a report of the action shall be filed with the facility and with the ICE/ERO Field Office Director.

## I. Personal Property

Each facility shall issue guidelines in accordance with this standard concerning the property detainees may retain in each type of segregation. Generally, detainees in administrative segregation shall be subject to less stringent personal property restrictions and control than those in disciplinary segregation.

## J. Privileges

Each facility shall issue guidelines in accordance with this standard concerning the privileges detainees may have in each type of segregation.

### 1. Administrative Segregation

Generally, these detainees shall receive the same privileges available to detainees in the general population, consistent with any safety and security considerations for detainees and facility staff.

When space and resources are available, detainees in administrative segregation may be provided opportunities to spend time outside their cells (in addition to the required recreation periods) for such activities as socializing, watching TV and playing board games, and may be assigned to voluntary work details (e.g., as orderlies in the SMU).

### 2. Disciplinary Segregation

Generally, these detainees shall have fewer privileges than other detainees in either the general population or in administrative segregation. More specifically, they are subject to more stringent personal property control.

## K. Close Supervision

SMU staff shall observe and log observations at least every 30 minutes on an irregular schedule. For cases that warrant increased observation, the SMU staff shall observe detainees accordingly.

## L. Specialized Training

Security staff assigned to SMU shall receive training in relevant topics, such as:

1. Identifying signs of mental health decompensation;

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 128 of 157

2. Techniques for appropriate interactions with mentally ill detainees;

3. The impact of isolation; and

4. De-escalation techniques.

**M. Health Care**

Detainees must be evaluated by a health care professional prior to placement in an SMU (or when that is infeasible, as soon as possible and no later than within 24 hours of placement). The assessment should include a review of whether the detainee has a suspected or diagnosed mental illness, prior suicide attempts or self-harm, or any other special needs.

Health care personnel shall conduct face-to-face medical assessments at least once daily for detainees in an SMU. Where reason for concern exists, assessments shall be followed up with a complete evaluation by a qualified health care or mental health provider, and a treatment plan developed.

Health care visits shall be recorded on the SMU housing record or comparable form. The facility shall provide out-of-cell, confidential assessments and visits for detainees whenever possible, to ensure patient privacy and to eliminate barriers to treatment.

At a minimum of every 30 days, a qualified mental health care provider shall conduct a face-to-face psychological evaluation and record the review.

Detainees with a medical or mental illness, or identified as being a suicide risk or on a hunger strike, shall be removed from segregation if IHSC or facility medical staff determine that the segregation placement has resulted in deterioration of the detainee's medical or mental health, and an appropriate alternative is available.

**1. Detainees with Serious Mental Illnesses (SMI)**

Detainees with a serious mental illness (SMI), as defined in Standard 4.3 "Medical Care," should not be automatically placed in an SMU on the basis of such mental illness. Every effort shall be made to place detainees with an SMI in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU.

The facility shall coordinate with ICE/ERO in seeking alternatives to SMU housing for detainees with an SMI, potentially including transfer to a hospital or to another facility.

For any detainee with an SMI placed in restrictive housing:

a. Mental health staff shall conduct a mental health consultation within 72 hours of the detainee's placement in restrictive housing;

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 129 of 157

b. A multi-disciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review all detainees with SMI who are in restrictive housing;

c. At least weekly, a qualified mental health provider shall conduct face-to-face clinical contact with the detainee to monitor the detainee's mental health status, identify signs of deterioration, and recommend additional treatment as appropriate.

The facility shall seek to develop enhanced opportunities for in-cell and out-of-cell therapeutic activities and additional unstructured out-of-cell time for detainees with an SMI, to the extent such activities can be conducted while ensuring the safety of the detainee, staff, and other detainees.

**2. Pregnant Detainees**

Women who are pregnant, who are post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy should as a general matter not be placed in an SMU. In very rare situations, a woman who is pregnant, is postpartum, recently had a miscarriage, or recently had a terminated pregnancy may be placed in an SMU as a response to behavior that poses a serious and immediate risk of physical harm to self or others, or if the detainee has requested to be placed in protective custody administrative segregation and there are no more appropriate alternatives available. Even in such cases, this decision must be approved by a representative of the detention facility administration, in consultation with a medical professional, and must be reviewed every 48 hours.

**N. Meals**

Detainees in SMU shall be provided three nutritionally adequate meals per day, according to the general population meal schedule and ordinarily from the same menu.

**O. Clothing and Personal Hygiene**

Detainees in SMU may shave and shower at least three times weekly and receive other basic services—such as laundry, clothing, bedding, and linen—equivalent to general population detainees and consistent with safety and security of the facility.

A detainee may be denied such items as clothing, mattress, bedding, or linens for medical or mental health reasons if his or her possession of such items raises concerns for detainee safety and/or facility security. All denials of such items shall be documented and justified.

**P. Correspondence**

Detainees in an SMU may write, send, and receive letters and other correspondence in a manner similar to those housed in the facility's general population.

**Q. Visitation**

Detainees in an SMU ordinarily retain visiting privileges.

Segregated detainees may ordinarily use the visiting room during normal visiting hours. However, the facility may restrict or disallow visits for a detainee who violates visitation rules or whose behavior otherwise indicates the detainee poses a threat to the security or the good order of the visiting room.

**R. Legal Visits**

Detainees in SMU may not be denied legal visitation. However, the facility administrator or designee may implement security precautions to protect the detainee and visitors and maintain good order. In such cases, staff shall advise legal service providers and assistants of any security concerns.

**S. Religious Guidance**

Detainees in an SMU shall be permitted to participate in religious practices, consistent with the safety, security, and orderly operation of the facility.

**T. Legal Materials**

Detainees in SMU shall have access to legal materials in accordance with Standard 6.3 "Law Libraries and Legal Materials."

Detainees may retain all personal legal material upon placement in an SMU, provided such material does not create a safety, security, or sanitation hazard.

Detainees with a large amount of personal legal material may be required to place a portion with their stored personal property, with access permitted during scheduled hours. Requests for access to such legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except in the event of documented security reasons.

**U. Law Library and Legal Rights Group Presentations Access**

Detainees housed in administrative segregation or disciplinary segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.
The facility administrator shall notify ICE/ERO every time access to legal materials is denied, with documentation of the denial and the justification placed in the detention file or retrievable electronic record.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 131 of 157

## V. Recreation

Facilities are encouraged to maximize opportunities for group participation during recreation and other activities, consistent with safety and security considerations. Recreation for certain individuals may occur separate from other detainees when necessary or advisable to prevent assaults and to reduce management problems.

Detainees in the SMU shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week.

1. When recreation privileges are suspended, the institutional disciplinary panel or facility administrator shall provide the detainee written notification, including the reason(s) for the suspension, any conditions that must be met before restoration of privileges, and the anticipated duration of the suspension (provided the requisite conditions are met for restoration of privileges).

2. Denial of recreation privileges for more than seven days requires the concurrence of the facility administrator and a health care professional. It is expected that such denials shall rarely occur, and only in extreme circumstances.

3. The facility shall notify ICE/ERO in writing when a detainee is denied recreation privileges in excess of seven days.

## W. Telephone Access

Detainees in SMU shall have access to telephones in a manner that is consistent with the special safety and security requirements of SMU placement. In general, any detainee in an SMU may be reasonably restricted from using or having access to a phone if that access has been or is likely to be used for criminal purposes, or would endanger any person, or if the detainee damages the equipment provided. In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security, and good order of the facility. Such documentation shall be placed in the detainee's detention file or be maintained in a retrievable electronic format.

Detainees in disciplinary segregation may be restricted, as part of the disciplinary process, from using telephones to make general calls. However, even in disciplinary segregation, detainees shall have telephone access for family or personal emergencies, and for calls to attorneys, other legal representatives, courts, and government offices as described below.

All detainees, including those in disciplinary segregation, shall be permitted to place calls to attorneys, other legal representatives, courts, and government offices (including the DHS Office of the Inspector General, DHS Office for Civil Rights and Civil Liberties, ICE/OPR Joint Intake Center, and embassies or consulates), according to the facility schedule.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 132 of 157

# STANDARD 2.10

## STAFF-DETAINEE COMMUNICATION

## I. POLICY

Procedures must be in place to allow for formal and informal contact between detainees, ICE staff, and facility staff. Procedures shall permit detainees to make written requests to ICE staff and receive an answer in an acceptable time frame. Detainees may make marriage requests that will be reviewed on a case-by-case basis.

## II. STANDARDS AND PROCEDURES

### A. Facility Staff and Detainee Contact

Detainees shall have frequent opportunities for formal and informal contact with facility staff, including managerial and supervisory staff. Facility staff will address detainees in a professional and respectful manner. The facility shall also allow detainees to file grievances and communicate directly with ICE/ERO. Facility staff shall immediately refer any questions related to a detainee's immigration removal processes to ICE/ERO.

### B. ICE/ERO Access and Detainee Contact

#### 1. Unannounced Contacts with Detainees

ICE/ERO shall have access to conduct regular unannounced (not scheduled) visits to the facility's living and activity areas to encourage informal communication with detainees and informally observe conditions.

#### 2. Scheduled Visits

The facility shall accommodate ICE and DHS components' access to the facility and its detainee population upon request from ICE.

#### 3. ICE/ERO Staff Presence

ICE/ERO may place dedicated ICE staff at the facility. Such ICE staff shall have unimpeded access to all areas of the facility 24 hours a day, 7 days a week as well as access to any records associated with detainees.

#### 4. Documenting ICE visits

Each facility shall develop a method to document ICE visits.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 133 of 157

## C. Requests to ICE/ERO from Detainees

All detainees shall have the opportunity to submit written questions, requests, or concerns to ICE/ERO staff. The facility must ensure that adequate supplies of detainee request forms and writing implements are available.

The facility shall have written procedures to route detainee requests to the appropriate ICE/ERO official(s).

Detainee request forms shall be delivered to ICE/ERO staff without reading, altering, or delaying such requests. The detainee may, if he or she chooses, seal the request in an envelope and clearly mark the envelope with the name, title or office to which the request is to be forwarded.

A detainee may obtain assistance from another detainee, housing officer, or other facility staff in preparing a request form. The facility shall ensure that procedures enable detainees with special needs, including detainees with disabilities, illiterate detainees, and limited English proficient detainees, to complete and submit request forms on an equal basis to detainees without special needs. The facility will accommodate the special assistance needs of such detainees in making a request.

### 1. Response Times

Detainee requests shall be forwarded to ICE/ERO within 72 hours. The facility will provide ICE/ERO's returned response to the detainee within 24 hours.

### 2. Record Keeping and File Maintenance

The date the request was forwarded to ICE/ERO and the date it was returned shall be recorded.

All completed detainee request documents will be retained in the detainee's detention file or a retrievable electronic archive.

### 3. ICE/ERO Informational Posters

The facility administrator shall ensure that all ICE/ERO posters or other information are provided in every housing unit and in appropriate common areas (e.g., recreation areas, dining areas, processing areas).

### 4. Additional Facility Responsibilities

The facility shall provide contact information for ICE/ERO and the scheduled hours and days that ICE/ERO staff is available to be contacted by detainees at the facility. Contact information shall be updated quarterly or more frequently as necessary to reflect changes in ICE/ERO personnel.

ICE/ERO may provide a secure drop box for detainees to correspond directly with ICE/ERO management. Only ICE/ERO personnel shall have access to the drop-box. If ICE/ERO does not collect information from the drop box for more than five days, the facility will notify ICE/ERO.

**D. Marriage Requests**

ICE/ERO will review and approve detainee marriage requests on a case-by-case basis.

When a request is approved, the detainee, legal representative, or other individual(s) acting on his or her behalf must make all arrangements for the marriage. Arrangements may include, but are not limited to, taking a blood test, obtaining a marriage license, and retaining an official to perform the marriage ceremony.

The marriage may take place inside the facility, or ICE/ERO may take temporary custody for marriage arrangements.

# STANDARD 2.11

## SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION

## I. POLICY

This detention standard requires that facilities that house detainees act affirmatively to prevent sexual abuse and assaults on detainees; provide prompt and effective intervention and treatment for victims of sexual abuse and assault; and control, discipline and prosecute the perpetrators of sexual abuse and assault.

## II. STANDARDS AND PROCEDURES

### A. Written Policy and Procedures Required

The facility's policy and procedures shall reflect the unique characteristics of the facility, including factors such as the availability of specialized community-based services, including rape crisis/trauma units in local medical centers, clinics, and hospitals.

The facility shall have written policy and procedures for a Sexual Abuse and Assault Prevention and Intervention Program. This policy must mandate zero tolerance toward all forms of sexual abuse and assault, outline the facility's approach to preventing, detecting, and responding to such conduct, and include, at a minimum:

1. Procedures on preventing sexual abuse and assault, including:
   a. Procedures for assessing all detainees for their risk of sexual abusiveness or victimization;
   b. Procedures for housing detainees in accordance with their classification assessment;
   c. Training of all employees, contractors, and volunteers on the agency's and facility's zero tolerance policies and their responsibilities under those policies; and
   d. Notification to detainees of the facility's Sexual Abuse and Assault Prevention and Intervention Program.
2. Procedures for immediate reporting of sexual abuse and assault allegations, including:
   a. Procedures for immediate reporting of sexual abuse and assault allegations through the facility's chain of command, from the reporting official to the highest facility official, including also procedures for notifying ICE/ERO (this notification must be

sent directly to the FOD) and a method by which staff can report outside the chain of command;

b. Responsibility of all staff to report allegations or suspicions of sexual abuse and assault;

c. Referrals to law enforcement agencies;

d. Written documentation requirements to ensure that each allegation or suspicion is properly reported and addressed; and

e. A method to receive third-party reports of sexual abuse and assault in its facility, with information made available to the public regarding how to report sexual abuse and assault on behalf of a detainee.

3. Procedures for prompt and effective intervention to address the safety and treatment needs of detainee victims if an allegation is made or an assault occurs, including:

   a. Procedures for offering immediate protection, including prevention of retaliation and medical and mental health referrals;

   b. Plan to coordinate actions taken by staff first responders, medical and mental health practitioners, investigators, and facility leadership in response to an incident of sexual abuse and assault; and

   c. Methods for addressing the alleged victim's future safety, medical, and mental health needs;

4. Procedures to include victim advocate services in sexual abuse and assault prevention and intervention programs, if such resources are available;

5. Procedures for investigation and discipline of assailants, including:

   a. Coordinating with ICE/ERO and other appropriate investigative agencies to ensure that an administrative and/or criminal investigation is completed for all allegations of sexual abuse and assault;

   b. Following a uniform evidence protocol, including access to a forensic medical exam, which maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions;

   c. Procedures for coordination of internal administrative investigations with the assigned criminal investigative entity to ensure non-interference with criminal investigations, as well as coordination with the ICE Office of Professional Responsibility; and

d. Disciplinary sanctions for staff, up to and including termination, when there is a substantiated allegation of sexual abuse and assault, or when staff has violated agency sexual abuse and assault policies.

6. Procedures for data collection and reporting; and

7. the facility's requirement to cooperate with all ICE/ERO audits and monitoring of facility compliance with sexual abuse and assault policies and standards.

The facility's written policy and procedures must be reviewed and approved by ICE/ERO.

The facility administrator shall ensure that, within 90 days of the adoption of this detention standard, written policy and procedures are in place and that the facility is in full compliance with its requirements and guidelines. The facility must meet all other requirements in this standard which do not require written policy or procedure on the date the standard is adopted.

Each facility shall also post its protocols on its website, if it has one, or otherwise make the protocols available to the public.

## B. Acts of Sexual Abuse and Assault

For the purposes of this standard, the following definitions apply:

### 1. Detainee-on-detainee Sexual Abuse and Assault

Sexual abuse of a detainee by another detainee includes any of the following acts by one or more detainees who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:

a. Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b. Contact between the mouth and the penis, vulva or anus;

c. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;

d. Touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or

e. Threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 138 of 157

**2. Staff-on-detainee Sexual Abuse and Assault**

Sexual abuse and assault of a detainee by a staff member, contractor, or volunteer includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:

a. Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b. Contact between the mouth and the penis, vulva or anus;

c. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

d. Intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

e. Threats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications aimed at coercing or pressuring a detainee to engage in a sexual act;

f. Repeated verbal statements or comments of a sexual nature to a detainee;

g. Any display of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, or,

h. Voyeurism, which is defined as the inappropriate visual surveillance of a detainee for reasons unrelated to official duties. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring an inmate detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions.

## C. Compliance Manager

The facility administrator shall designate a Prevention of Sexual Assault (PSA) Compliance Manager who shall serve as the facility point of contact for the ICE/ERO PSA Coordinator and who has sufficient time and authority to oversee facility efforts to comply with facility sexual abuse and assault prevention and intervention policies and procedures. The PSA Compliance Manager shall:

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 139 of 157

1. Assist with the development of written policies and procedures for the Sexual Abuse and Assault Prevention and Intervention Program, as specified above in this standard, and with keeping them current;

2. Assist with the development of initial and ongoing training protocols;

3. Serve as a liaison with other agencies;

4. Coordinate the gathering of statistics and reports on incidents of sexual abuse or assault, as detailed in "O. Data Collection" in this standard;

5. Review the results of every investigation of sexual abuse and assault and assist in conducting an annual review of all investigations in compliance with the Privacy Act to assess and improve prevention and response efforts;

6. Review facility practices to ensure required levels of confidentiality are maintained; and

7. Be notified of every allegation.

**D. <u>Sexual Conduct Between Detainees Prohibited</u>**

In addition to the forms of sexual abuse and assault defined above, all other sexual conduct – including consensual sexual conduct – between detainees is prohibited and subject to disciplinary sanctions. However, staff should be sensitive to the possibility that seemingly consensual behavior may have involved coercion by either person involved.

Consensual sexual conduct between detainees and staff, volunteers, or contract personnel is included within the definition of staff-on-detainee sexual abuse and/or assault above.

**E. <u>Staff Training</u>**

Training on the facility's Sexual Abuse and Assault Prevention and Intervention Program shall be included in training for all employees and shall also be included in biannual refresher training thereafter.

Employee training shall ensure facility staff are able to fulfill their responsibilities under this standard and shall include:

1. The facility's zero-tolerance policies for all forms of sexual abuse and assault;

2. Definitions and examples of prohibited and illegal sexual behavior;

3. The right of detainees and staff to be free from sexual abuse and assault, and from retaliation for reporting sexual abuse and assault;

4. Instruction that sexual abuse and assault is never an acceptable consequence of detention;
5. Recognition of situations where sexual abuse and assault may occur;
6. How to avoid inappropriate relationships with detainees;
7. Working with vulnerable populations and addressing their potential vulnerability in the general population;
8. Recognition of the physical, behavioral and emotional signs of sexual abuse and assault and ways to prevent and respond to such occurrences;
9. The requirement to limit reporting of sexual abuse and assault to personnel with a need to know in order to make decisions concerning the detainee-victim's welfare, and for law enforcement/investigative purposes;
10. The investigation process and how to ensure that evidence is not destroyed;
11. Prevention, recognition and appropriate response to allegations or suspicions of sexual abuse and assault involving detainees with mental or physical disabilities;
12. How to communicate effectively and professionally with detainees, including lesbian, gay, bisexual, transgender, intersex, or gender nonconforming detainees;
13. Instruction on reporting knowledge or suspicion of sexual abuse and assault; and
14. Instruction on documentation and referral procedures for all allegations or suspicions of sexual abuse and assault.

The facility shall ensure that all volunteers and other contractors who have contact with detainees have been trained on their responsibilities under the facility's sexual abuse and assault prevention, detection, intervention and response policies and procedures. The level and type of training for volunteers and contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and contractors who have any contact with detainees must be notified of the facility's zero-tolerance policy and informed how to report such incidents. In this paragraph "other contractor" means a person who provides services on a non-recurring basis to the facility pursuant to a contractual agreement with the agency or facility.

The facility must maintain written documentation verifying employee, volunteer, and contractor training. In addition to the general training provided to all facility employees, the facility shall provide specialized training on sexual abuse and assault and effective cross-agency coordination to facility investigators who conduct investigations into allegations of sexual abuse and assault. This training must cover, at a minimum,

interviewing sexual abuse and assault victims, sexual abuse and assault evidence collection in confinement settings, the criteria and evidence required for administrative action or prosecutorial referral, and information about effective cross-agency coordination in the investigation process. The facility must maintain written documentation verifying specialized training provided to investigators pursuant to this paragraph.

Facility medical staff shall be trained in procedures for examining and treating victims of sexual abuse in facilities where medical staff may be assigned these activities. This training shall be subject to the review and approval of ICE/ERO.

## F. Detainee Notification, Orientation and Instruction

The facility administrator shall ensure that the orientation program, required by Standard 2.1 "Admission and Release" notifies and informs detainees about the agency's and the facility's zero tolerance policies for all forms of sexual abuse and assault.

Following the intake process, the facility shall provide instruction to detainees on the facility's Sexual Abuse and Assault Prevention and Intervention Program and ensure that such instruction includes (at a minimum):

1. The facility's zero-tolerance policy for all forms of sexual abuse and assault;
2. Prevention and intervention strategies;
3. Definitions and examples of detainee-on-detainee sexual abuse and assault, staff-on-detainee sexual abuse and assault and coercive sexual activity;
4. Explanation of methods for reporting sexual abuse and assault, including one or more staff members other than an immediate point-of-contact line officer, the ICE Detention and Reporting Information Line (DRIL), the DHS Office of Inspector General and the ICE Office of Professional Responsibility;
5. Information about self-protection and indicators of sexual abuse and assault;
6. Prohibition against retaliation, including an explanation that reporting sexual abuse and assault shall not negatively impact the detainee's immigration proceedings; and
7. Right of a detainee who has been subjected to sexual abuse and assault to receive treatment and counseling.

Detainee notification, orientation, and instruction must be in a language or manner that the detainee understands, including for those who are limited English proficient, deaf, visually impaired, or who otherwise have a communication impairment, as well as to detainees who have limited reading skills. The facility shall maintain documentation of detainee participation in the instruction session.

The facility shall develop policies and procedures to ensure that detainees have multiple ways to privately report sexual abuse and assault, retaliation for reporting sexual abuse and assault, or staff neglect or violations of responsibilities that may have contributed to such incidents:

1. Each facility's Sexual Abuse and Assault Prevention and Intervention program shall provide detainees who are victims of sexual abuse and assault the option to report the incident or situation to a designated staff member other than an immediate point-of-contact line officer (e.g., the program coordinator or a mental health specialist). The facility shall provide detainees with the name of the program coordinator or designated staff member and information on how to contact him or her. Detainees will also be informed that they can report any incident or situation regarding sexual abuse and assault, or intimidation, to any staff member (as outlined above), the DHS Office of Inspector General, and the DHS Joint Intake Center.

2. The facility shall provide instructions on how detainees may contact their consular official, the DHS Office of Inspector General, or as appropriate, another designated office, to confidentially and, if desired, anonymously report these incidents.

3. The facility shall inform the detainees of at least one way for detainees to report sexual abuse and assault to a public or private entity or office that is not part of the facility, and that is able to receive and immediately forward detainee reports of sexual abuse and assault to facility officials, allowing the detainee to remain anonymous upon request. ICE/ERO will provide a sexual abuse and assault awareness notice to be posted on all housing-unit bulletin boards, as well as a "Sexual Assault Awareness Information" pamphlet to be distributed. The facility shall post with this notice the name of the facility PSA Compliance Manager and information about local organizations that can assist detainees who have been victims of sexual abuse and assault, including mailing addresses and telephone numbers (including toll-free hotline numbers where available). If no such local organizations exist, the facility shall make available the same information about national organizations. This information will be provided in English and Spanish, and to other segments of the detainee population with limited English proficiency through translations or oral interpretation.

## G. <u>Accommodating Detainees with Disabilities or Limited English Proficiency (LEP)</u>

Consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall take appropriate steps to ensure detainees with disabilities (including, for example, detainees who are deaf or hard of hearing, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities) have an equal opportunity to participate in or benefit from all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse and assault. Such steps shall include, when necessary to ensure effective communication with detainees who are deaf or hard of hearing, or detainees who have intellectual, psychiatric, or speech disabilities, limited reading skills, or who are blind or have low vision.

1. Providing access to in-person, telephonic, or video interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.

2. Providing access to written materials related to sexual abuse and assault in formats or through methods that ensure effective communication.

The facility shall take steps to ensure meaningful access to all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse and assault for detainees who are LEP, including steps to provide in-person or telephonic interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.

In matters relating to allegations of sexual abuse and assault, the facility shall employ effective expressive and receptive verbal communication techniques while communicating with detainees with disabilities in accordance with professionally accepted standards of care. The facility shall provide detainees with disabilities and detainees with limited English proficiency with in-person or telephonic interpretation services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary. Interpretation services shall be provided by someone other than another detainee, unless the detainee expresses a preference for another detainee to provide interpretation and the facility determines that such interpretation is appropriate and consistent with DHS policy. The provision of interpretation services by minors, alleged abusers, detainees who witnessed the alleged abuse, and detainees who have a significant relationship with the alleged abuser is not appropriate in matters relating to allegations of sexual abuse and assault.

Where practicable, provisions for written translation of materials related to sexual abuse and assault shall be made for significant segments of the population with limited English proficiency other than Spanish speakers. Oral interpretation or assistance shall be provided to any detainee who speaks another language into which written material has not been translated or who is illiterate.

### H. <u>Victim Advocate Services</u>

The facility shall utilize available community resources and services to provide valuable expertise and support in the areas of crisis intervention, counseling, investigation and the prosecution of sexual abuse perpetrators to most appropriately address victims' needs. The facility administrator shall establish procedures to make available, to the full extent possible, outside victim services following incidents of sexual abuse and assault. The facility shall also attempt to make available such victim services for any detainees identified as having experienced sexual victimization prior to entering DHS custody.

The facility administrator shall maintain or attempt to enter into memoranda of understanding (MOU) or other agreements with community service providers or, if local

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 144 of 157

providers are not available, with national organizations that provide legal advocacy and confidential emotional support services for immigrant victims of crime. The facility shall enable reasonable communication between detainees and these organizations and agencies, in as confidential a manner as possible. The facility shall also inform detainees, prior to giving them access to outside resources, of the extent to which such communications will be monitored and the extent to which reports of abuse will be forwarded to authorities in accordance with mandatory reporting laws.

## I. <u>Prevention</u>

All staff and detainees are responsible for being alert to signs of potential situations in which sexual abuse and assaults might occur, and for making reports and intervention referrals as appropriate. If a staff member has a reasonable belief that a detainee is subject to a substantial risk of imminent sexual abuse and assault, he or she shall take immediate action to protect the detainee.

### 1. Classification and Screening

In accordance with Standards 2.1 "Admission and Release" and 2.2 "Custody Classification System," the facility shall assess all detainees on intake to identify those likely to be sexual aggressors or sexual abuse and assault victims and shall house detainees to prevent sexual abuse and assault, taking necessary steps to mitigate any such danger. The facility shall also use the assessment to inform assignment of detainees to recreation and other activities, and voluntary work.

Each new arrival shall be kept separate from the general population until he or she is classified and housed accordingly.

The facility shall consider, to the extent that the information is available, the following criteria to assess detainees for risk of sexual victimization:

a. Whether the detainee has a mental, physical, or developmental disability;

b. The age of the detainee;

c. The physical build and appearance of the detainee;

d. Whether the detainee has previously been incarcerated or detained;

e. The nature of the detainee's criminal history;

f. Whether the detainee has any convictions for sex offenses against an adult or child;

g. Whether the detainee has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 145 of 157

h. Whether the detainee has self-identified as having previously experienced sexual victimization; and

i. The detainee's own concerns about his or her physical safety.

The initial screening shall consider prior acts of sexual abuse and assault, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse and assault, as known to the facility, in assessing detainees for risk of being sexually abusive.

Detainees shall not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to items a, g, h, or i above. The facility shall implement appropriate controls on the dissemination within the facility of responses to questions asked pursuant to this screening in order to ensure that sensitive information is not exploited to the detainee's detriment by staff or other detainees or inmates. Detainees who are considered at risk shall be placed in the least restrictive housing that is available and appropriate. Such detainees should be assigned to administrative segregation for protective custody only until an alternative means of separation from likely abusers can be arranged, and such an assignment shall not ordinarily exceed a period of 30 days.

**2. Transportation**

Detainees identified as being "at risk" for sexual victimization shall be transported in accordance with that special safety concern. The section on "Seating of Detainees," found in Standard 1.2 "Transportation by Land," requires that transportation staff seat each detainee in accordance with written procedures from the facility administrator, with particular attention to detainees who may need to be afforded closer observation for their own safety.

**3. Upgrades to Facilities and Technologies**

When designing or acquiring any new facility and in planning any substantial expansion or modification of existing facilities, the facility shall consider the effect of the design, acquisition, expansion, or modification upon its ability to protect detainees from sexual abuse and assault.

When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology in a facility, the facility shall consider how such technology may enhance its ability to protect detainees from sexual abuse and assault.

## J. <u>Prompt and Effective Intervention</u>

Staff sensitivity toward detainees who are victims of sexual abuse and assault is critical.

Staff shall take seriously all statements from detainees claiming to be victims of sexual abuse and assaults, and shall respond supportively and non-judgmentally. Any detainee who alleges that he or she has been sexually abused and assaulted shall be offered immediate protection and separation from the assailant and shall be referred for a medical examination and/or clinical assessment for potential negative symptoms. Staff members who become aware of an alleged assault shall immediately follow the reporting requirements set forth in the written policies and procedures.

If a victim is transferred between detention facilities, the sending facility shall, as permitted by law, inform the receiving facility of the incident and the victim's potential need for medical or social services (unless, in the case of transfer to a non-ICE facility, the victim requests otherwise). If the receiving facility is unknown to the sending facility, the sending facility shall notify ICE/ERO, so that he or she can notify the receiving facility.

Facilities should use a coordinated, multidisciplinary team approach to responding to sexual abuse and assault, such as a sexual abuse and assault response team (SART), which, in accordance with community practices, includes a medical practitioner, a mental health practitioner, a security staff member and an investigator from the assigned investigative entity, as well as representatives from outside entities that provide relevant services and expertise. The facility shall attempt to make available to the victim a victim advocate from a rape crisis center. If a rape crisis center is not available to provide victim advocate services, ICE/ERO will provide these services by making available a qualified staff member from a community-based organization, or a qualified agency staff member. A qualified agency staff member or a qualified community-based staff member means an individual who has received education concerning sexual assault and forensic examination issues in general. The outside or internal victim advocate shall provide emotional support, crisis intervention, information, and referrals.

Care shall be taken to place the detainee in a supportive environment that represents the least restrictive housing option possible (e.g., in a different housing unit, transfer to another facility, medical housing, or protective custody), and that takes into account any ongoing medical and mental health needs of the alleged victim.

Victims shall not be held for longer than five days in any type of administrative segregation, except in highly unusual circumstances or at the request of the detainee. A detainee victim who is in protective custody after having been subjected to sexual abuse shall not be returned to the general population until completion of a proper re-assessment, taking into consideration any increased vulnerability of the detainee as a result of the sexual abuse.

Where an alleged victim of sexual abuse and assault that occurred elsewhere in ICE/ERO custody is subsequently transferred to the facility, the facility shall comply with all applicable response and intervention requirements in this standard, as appropriate based on the nature and status of the case.

### K. Protection Against Retaliation

Staff, contractors, volunteers, and detainees shall not retaliate against any person, including a detainee, who reports, complains about, or participates in an investigation into an allegation of sexual abuse and assault, or for participating in sexual abuse and assault as a result of force, coercion, threats, or fear of force.

The facility shall employ multiple protection measures, such as housing changes, removal of alleged staff or detainee abusers from contact with victims, and emotional support services for detainees or staff who fear retaliation for reporting sexual abuse and assault or for cooperating with investigations.

For at least 90 days following a report of sexual abuse and assault, the facility shall monitor to see if there are facts that may suggest possible retaliation by detainees or staff, and shall act promptly to remedy any such retaliation. Items the facility should monitor include any detainee disciplinary reports, housing, or program changes, or negative performance reviews or reassignments of staff. The facility shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need.

### L. Reporting, Notifications and Confidentiality

The facility shall require all staff to report immediately any knowledge, suspicion, or information regarding an incident of sexual abuse and assault that occurred in a facility; retaliation against detainees or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

Staff members who become aware of alleged sexual abuse and assault shall immediately follow the reporting requirements set forth in the facility's written policies and procedures.

Apart from such reporting, staff shall not reveal any information related to a sexual abuse and assault report to anyone other than to the extent necessary to help protect the safety of the victim or prevent further victimization of other detainees or staff in the facility, or to make medical treatment, investigation, law enforcement, or other security and management decisions.

If the alleged victim is under the age of 18 or considered a vulnerable adult under a state or local vulnerable persons statute, the facility shall report that information to ICE/ERO so that the agency can report the allegation to the designated state or local services agency under applicable mandatory reporting laws.

Staff shall accept reports made verbally, in writing, anonymously, and from third parties, and promptly document any verbal reports.

The facility shall establish a method to receive third-party reports of sexual abuse and assault in its facility and shall make available to the public information on how to report sexual abuse and assault on behalf of a detainee.

**1. Alleged Detainee Perpetrator**

When a detainee(s) is alleged to be the perpetrator, it is the facility administrator's responsibility to ensure that the incident is promptly referred to the appropriate law enforcement agency having jurisdiction for investigation (if the incident is potentially criminal) and reported to ICE/ERO (this notification must go directly to the FOD), which shall report it to the OPR Joint Intake Center.

**2. Alleged Staff Perpetrator**

When an employee, contractor or volunteer is alleged to be the perpetrator of detainee sexual abuse and assault, it is the facility administrator's responsibility to ensure that the incident is promptly referred to the appropriate law enforcement agency having jurisdiction for investigation (if the incident is potentially criminal) and reported to ICE/ERO, which shall report it to the OPR Joint Intake Center. The local government entity or contractor that owns or operates the facility shall also be notified.

Staff, contractors, and volunteers suspected of perpetrating sexual abuse and assault shall be removed from all duties requiring detainee contact pending the outcome of an investigation.

Upon receiving an allegation that a detainee was sexually abused and assaulted while confined at another facility, the facility whose staff received the allegation shall notify ICE/ERO and the appropriate administrator of the facility where the alleged abuse occurred. The notification provided in this section shall be provided as soon as possible, but no later than 72 hours after receiving the allegation. The facility shall document that it has provided such notification. The facility where the alleged abuse occurred shall then ensure the allegation is referred for investigation and reported to ICE/ERO (this notification must go directly to the FOD) in accordance with this standard.

**M. Investigation, Discipline and Incident Reviews**

If a detainee alleges sexual abuse and assault, a sensitive and coordinated response is necessary. The facility shall coordinate with ICE/ERO and other appropriate investigative agencies to ensure that an administrative and/or criminal investigation is completed for all allegations of sexual abuse and assault.

All investigations of alleged sexual abuse and assault must be prompt, thorough, objective, and fair and conducted by specially trained, qualified investigators.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 149 of 157

Where an alleged victim of sexual abuse and assault that occurred elsewhere is subsequently transferred to the detention facility, the facility shall cooperate with any administrative or criminal investigative efforts arising from the incident.

**1. Preservation of Evidence**

The first security staff member to respond to a report of sexual abuse and assault, or his or her supervisor, shall preserve and protect, to the greatest extent possible, any crime scene until appropriate steps can be taken to collect any evidence. If the abuse occurred within a time period that still allows for the collection of physical evidence, the responder shall request the alleged victim not to take any actions, and shall ensure that the alleged abuser does not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating. If the first staff responder is not a security staff member, the responder shall be required to request that the alleged victim not take any actions that could destroy physical evidence and then notify security staff.

**2. Forensic Examinations**

Where evidentiarily or medically appropriate, at no cost to the detainee, and only with the detainee's consent, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination by qualified health care personnel, including a Sexual Assault Forensic Examiner (SAFE) or Sexual Assault Nurse Examiner (SANE) where practicable. If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified health care personnel.

As requested by a victim, the presence of his or her outside or internal victim advocate, including any available victim advocacy services offered by a hospital conducting a forensic exam, shall be allowed for support during a forensic exam and investigatory interviews.

The results of the physical examination and all collected physical evidence are to be provided to the investigative entity. Part of the investigative process may also include an examination and collection of physical evidence from the suspected assailant(s).

In the event the investigation is being conducted by a non-federal investigating agency, the facility shall request that the investigating agency follow the applicable requirements of this standard, including subsections 1 and 2 of this section.

**3. Procedures for Administrative Investigations**

Upon conclusion of a criminal investigation where the allegation was substantiated, or in instances where no criminal investigation has been completed, an administrative investigation shall be conducted. Upon conclusion of a criminal investigation where the allegation was unsubstantiated, the facility shall review any available completed

criminal investigation reports to determine whether an administrative investigation is necessary or appropriate. Substantiated allegation means an allegation that was investigated and determined to have occurred. Unsubstantiated allegation means an allegation that was investigated, and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred.
Administrative investigations shall be conducted after consultation with the appropriate investigative office within DHS and the assigned criminal investigative entity. The ICE Office of Professional Responsibility will typically be the appropriate investigative office within DHS, as well as the DHS OIG in cases where the DHS OIG is conducting an investigation.

The facility shall develop written procedures for administrative investigations, including provisions requiring:

a. Preservation of direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data;

b. Interviewing alleged victims, suspected perpetrators, and witnesses;

c. Reviewing prior complaints and reports of sexual abuse and assault involving the suspected perpetrator;

d. Assessment of the credibility of an alleged victim, suspect, or witness, without regard to the individual's status as detainee, staff, or employee, and without requiring any detainee who alleges sexual abuse and assault to submit to a polygraph;

e. An effort to determine whether actions or failures to act at the facility contributed to the abuse;

f. Documentation of each investigation by written report, which shall include a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings; and

g. Retention of such reports for as long as the alleged abuser is detained or employed by the agency or facility, plus five years.

Such procedures shall govern the coordination and sequencing of administrative and criminal investigations, in accordance with the first paragraph of this section, to ensure that the criminal investigation is not compromised by an internal administrative investigation.

When an administrative investigation is undertaken, the facility shall impose no standard higher than a preponderance of the evidence in determining whether allegations of sexual abuse and assault are substantiated.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 151 of 157

The departure of the alleged abuser or victim from the employment or control of the facility shall not provide a basis for terminating an investigation.

When outside agencies investigate sexual abuse and assault, the facility shall cooperate with outside investigators and shall endeavor to remain informed about the progress of the investigation.

Following an investigation conducted by the facility into a detainee's allegation of sexual abuse and assault, the facility shall notify ICE/ERO of the results of the investigation and any responsive actions taken so that the information can be reported to ICE/ERO headquarters and to the detainee.

**4. Discipline**

a. Disciplinary sanctions for staff

Staff shall be subject to disciplinary or adverse action up to and including removal from their position for substantiated allegations of sexual abuse and assault or for violating agency or facility sexual abuse rules, policies or standards. Removal from their position is the presumptive disciplinary sanction for staff who have engaged in or attempted or threatened to engage in those acts of sexual abuse and assault defined in paragraphs a-d and g-h of "Staff on Detainee Sexual Abuse and/or Assault" in "B. Acts of Sexual Abuse and/or Assault" in this standard.

The facility shall report all incidents of substantiated sexual abuse and assault by staff, and all removals of staff, or resignations in lieu of removal, for violations of agency or facility sexual abuse and assault policies, to appropriate law enforcement agencies unless the activity was clearly not criminal.

The facility shall also report all such incidents of substantiated abuse, removals, or resignations in lieu of removal to ICE/ERO, regardless of whether the activity was criminal, and shall make reasonable efforts to report such information to any relevant licensing bodies, to the extent known.

b. Corrective action for contractors and volunteers

Any contractor or volunteer who has engaged in sexual abuse and assault shall be prohibited from contact with detainees. The facility shall take appropriate remedial measures and shall consider whether to prohibit further contact with detainees by contractors or volunteers who have not engaged in sexual abuse but have violated other provisions within these standards.

Incidents of substantiated sexual abuse and assault by a contractor or volunteer shall be reported to law enforcement agencies, unless the activity was clearly not criminal. The facility shall also report such incidents to ICE/ERO regardless of whether the

activity was criminal, and shall make reasonable efforts to report such incidents to any relevant licensing bodies, to the extent known.

c. Disciplinary sanctions for detainees

Detainees shall be subjected to disciplinary sanctions pursuant to a formal disciplinary process following an administrative or criminal finding that the detainee engaged in sexual abuse and assault, consistent with the requirements of Standard 3.1 "Disciplinary System." The facility shall not discipline a detainee for sexual contact with staff unless there is a finding that the staff member did not consent to such contact. For the purpose of disciplinary action, a report of sexual abuse and assault made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation.

**5. Sexual Abuse Incident Reviews**

The facility shall conduct a sexual abuse and assault incident review at the conclusion of every investigation of sexual abuse and assault and, where the allegation was not determined to be unfounded, prepare a written report within 30 days of the conclusion of the investigation recommending whether the allegation or investigation indicates that a change in policy or practice could better prevent, detect, or respond to sexual abuse and assault. Unfounded allegation means an allegation that was investigated and determined not to have occurred. The facility shall implement the recommendations for improvement or shall document its reasons for not doing so in a written response. Both the report and response shall be forwarded to ICE/ERO for transmission to the ICE/ERO PSA Coordinator. The facility shall also provide any further information regarding such incident reviews as requested by the ICE/ERO PSA Coordinator.

The review team shall consider whether the incident or allegation was motivated by race; ethnicity; gender identity; lesbian, gay, bisexual, transgender, or intersex identification, status, or perceived status; or gang affiliation; or was motivated or otherwise caused by other group dynamics at the facility.

The facility shall conduct an annual review of all sexual abuse and assault investigations and resulting incident reviews to assess and improve sexual abuse and assault intervention, prevention, and response efforts. If the facility has not had any reports of sexual abuse and assault during the annual reporting period, then the facility shall prepare a negative report. The results and findings of the annual review shall be provided to the facility administrator and ICE/ERO for transmission to the ICE PSA Coordinator (this notification must be sent directly to the FOD).

## N. Medical and Mental Health Care

Detainee victims of sexual abuse and assault shall be provided emergency medical and mental health services and ongoing care. All treatment services, both emergency and ongoing, shall be provided to the victim without financial cost and regardless of whether the victim names the abuser or cooperates with any investigation arising out of the incident.

### 1. Access to emergency medical and mental health services

a. Detainee victims of sexual abuse and assault shall have timely, unimpeded access to emergency medical treatment and crisis intervention services, including emergency contraception and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care.

b. Where evidentiarily or medically appropriate, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination, in accordance with the requirements of "M. Investigation, Discipline and Incident Reviews" of this standard.

c. Transportation of an alleged victim for emergency care or other services provided off-site shall be arranged in a manner that takes into account the special needs of victimized detainees.

### 2. Ongoing medical and mental health care for sexual abuse and assault victims and abusers

a. The facility shall offer medical and mental health evaluation and, as appropriate, treatment to all detainees who have been victimized by sexual abuse and assault while in immigration detention.

b. The evaluation and treatment of such victims shall include, as appropriate, follow-up services, treatment plans, and, when necessary, referrals for continued care following their transfer to, or placement in, other facilities, or their release from custody.

c. The facility shall provide such victims with medical and mental health services consistent with the community level of care.

d. Detainee victims of sexually abusive vaginal penetration by a male abuser while incarcerated shall be offered pregnancy tests. If pregnancy results from an instance of sexual abuse and assault, the victim shall receive timely and comprehensive information about lawful pregnancy-related medical services and timely access to all lawful pregnancy-related medical services.

Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 154 of 157

e. Detainee victims of sexual abuse and assault while detained shall be offered tests for sexually transmitted infections as medically appropriate.

f. The facility shall attempt to conduct a mental health evaluation of all known detainee-on-detainee abusers within 60 days of learning of such abuse history and offer treatment when deemed appropriate by mental health practitioners.

## O. Data Collection

The facility shall maintain, in a secure area, all case records associated with claims of sexual abuse and assault, including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings, and recommendations for post-release treatment, if necessary, and/or counseling shall be maintained in appropriate files in accordance with these detention standards and applicable policies, and retained in accordance with established schedules.

Particularly applicable to the storage, confidentiality and release of case records are the requirements of the "Confidentiality and Release of Medical Records" section of Standard 4.3 "Medical Care" and the requirements of Standard 7.1 "Detention Files," especially in regard to the Privacy Act of 1974. Because of the very sensitive nature of information about victims and their medical condition, including infectious disease testing, staff must be particularly vigilant about maintaining confidentiality and releasing information only for legitimate need-to-know reasons.

Monitoring and evaluation are essential for assessing both the rate of occurrence of sexual abuse and assault and agency effectiveness in reducing sexually abusive behavior. Accordingly, the facility administrator must maintain two types of files of sexual abuse and assault incidents which include the following minimum information:

1. General files include:

   a. The victim(s) and assailant(s) of a sexual abuse and assault;

   b. The date, time, location, and nature of the incident;

   c. The demographic background of the victim and perpetrator (including citizenship, age, gender, and whether either has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming);

   d. Detailed reporting timeline, including the names of the individuals who reported the incident and received the report of sexual assault, date and time the report was received, and steps taken to communicate the report up the chain of command;

   e. Any injuries sustained by the victim;

f. All formal and/or informal action taken, including all post-report follow up response taken by the facility (e.g., housing placement/custody classification, medical examination, mental health counseling, etc.);

g. All reports;

h. Medical forms or other relevant medical information;

i. Supporting memos and videotapes, if any;

j. Any sanctions imposed on the perpetrator; and

k. Any other evidentiary materials pertaining to the allegation.

The facility administrator shall maintain these files chronologically in a secure location.

In addition, the facility administrator shall maintain a listing of the names of sexual abuse and assault victims and assailants, along with the dates and locations of all sexual abuse and assault incidents occurring within the facility, on his or her computerized incident reporting system. Such information shall be maintained on a need-to-know basis in accordance with the Standards 4.3 "Medical Care" and 7.1 "Detention Files," which includes protection of electronic files from unauthorized access. At no time may law enforcement sensitive documents or evidence be stored at the facility. Access to this designation shall be limited to those staff involved in the treatment of the victim or the investigation of the incident. The authorized designation shall allow appropriate staff to track the detainee victim or assailant of sexual abuse and assault across the system.

On an ongoing basis, the facility PSA Compliance Manager and facility administrator must work with ICE/ERO and the ICE/ERO PSA Coordinator to share data regarding sexual abuse and assault incidents and response.

### P. <u>Facility Audits</u>

Facilities shall cooperate with all DHS audits of the facility's compliance with this standard, including by making available relevant documents, records, and other information as requested (including available videotapes and other electronically available data). Upon request, facilities shall also provide to DHS the results of any audits conducted of the facility against the DOJ "National Standards to Prevent, Detect, and Respond to Prison Rape," 28 C.F.R. Part 115.

Facilities shall permit auditors access to all areas of the facility and shall make available space suitable for interviews of detainees and staff. Detainees shall be permitted to have private interviews with auditors, and to send confidential information or correspondence to the auditor.

# Section 3: ORDER



Case 1:25-cv-01766-SLS Document 102-3 Filed 06/03/26 Page 157 of 157

# STANDARD 3.1

## DISCIPLINARY SYSTEM

## I. POLICY

The facility shall promote a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions on those who do not comply.

## II. STANDARDS AND PROCEDURES

### A. Guidelines

1. Facilities holding detainees will have a detainee disciplinary system with progressive levels of reviews, appeals, procedures, and documentation. Disciplinary policy and procedures shall clearly define detainee rights and responsibilities.

2. Disciplinary action may not be capricious or retaliatory.

3. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deviations from food services or availability of water; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal visitation, legal mail, access to the law library, and the removal of legal papers; or deprivation of physical exercise unless such activity creates an unsafe condition.

4. The facility shall not hold a detainee accountable for his or her conduct if a medical authority finds him or her mentally incompetent.

5. When a detainee has a suspected or diagnosed mental illness or cognitive impairment, a mental health professional shall be consulted to provide input as to the detainee's competence to participate in the disciplinary hearing and any impact the detainee's mental illness may have had on his or her responsibility for the charged behavior.

6. The disciplinary process shall consider whether a detainee's cognitive impairment, disability, or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed.

7. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.