**B. Incident Reports**

Officers who witness a prohibited act, or have reason to suspect one has been committed, shall promptly report the incident per facility policy and identify the officer(s), the detainee(s), and all witness(es) to the incident.

Minor transgressions involving detainees may be settled informally and by mutual consent whenever possible.

**C. Investigations**

The facility shall have procedures in place to ensure that all alleged rule violations are reviewed within 24 hours of the time the violation is reported. The investigation shall be completed within 72 hours of receipt of the Incident Report, barring exceptional circumstances.

The investigating officer shall have had no prior involvement in the incident, either as witness or officer at the scene.

**D. Unit Disciplinary Committee (UDC)**

Facilities may establish an intermediate level of adjudication for low or moderate infractions known as the UDC. Before hearing a case, the UDC shall ensure that the detainee is afforded all the rights listed under "Notice of Rights," below.

The UDC will have authority to consider written reports, statements, and physical evidence, hear pleadings on the part of the detainee, make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence, and impose minor sanctions.

The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall:

1. Refer to the Institutional Disciplinary Panel (IDP) any incident involving a serious violation, with or without a UDC hearing, as appropriate.
2. Serve the detainee with:
   a. A copy of the UDC decision and sanctions imposed; or
   b. Written notification of charges and hearing before the IDP.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 2 of 157

3. If the detainee's case is being referred to the IDP, advise the detainee, in writing, of the right to:

   a. Call witnesses and present evidence before the IDP; and

   b. A staff representative before the IDP.

The detainee notifications listed above shall be communicated in a language or manner that the detainee understands.

**E. <u>Institutional Disciplinary Panel (IDP)</u>**

The facility shall have an IDP to adjudicate detainee incident reports. Only the IDP can place a detainee in disciplinary segregation. It shall be the responsibility of the IDP to ensure that the detainee does not have documentation in his or her medical record of suspected or diagnosed mental illness or cognitive impairment prior to placing the detainee in disciplinary segregation.

Barring extraordinary circumstances, the panel shall not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident.

The IDP shall have authority to:

1. Conduct hearings on all charges and allegations.

2. Call witnesses to testify.

3. Consider written reports, statements, physical evidence, and oral testimony.

4. Hear pleadings by detainee and staff representative.

5. Make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.

6. Impose sanctions as listed and authorized in each category.

**F. <u>Notice of Rights</u>**

The UDC or IDP will advise the detainee in a language or manner the detainee understands before the hearing of his or her right to:

1. Remain silent at any stage of the disciplinary process.

2. Due process, including a UDC hearing (or IDP hearing if the facility does not have a UDC) within 24 hours of the end of the investigation. If there is a UDC hearing, then the IDP hearing must be held within 48 hours after the conclusion of the UDC hearing.

3. Attend the entire hearing (excluding committee deliberations). If security considerations prevent the detainee's attendance, the committee must document the security considerations.

4. Present statements and evidence in his or her own behalf.

5. Have language services to be able to participate meaningfully in the hearing.

6. Appeal the committee's determination through the detainee appeal process, or waive the right to appeal.

## G. Detainee Assistance

A detainee may be provided staff assistance in preparing his or her defense. This assistance will automatically be offered for detainees who are illiterate, have limited English proficiency, have disabilities that prevent them from having equal access to the facility's discipline process, and/or are unable to collect or present evidence (including detainees in segregation).

## H. Postponement of Disciplinary Proceedings

The facility shall permit hearing postponements or continuances. Postponements beyond 72 hours from the time of referral to the IDP will be documented.

## I. Duration of Sanctions

The duration of punishment shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily or outside these limits.

1. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per incident, except in extraordinary circumstances.

2. Time served in segregation pending the outcome of the proceedings should be credited towards disciplinary segregation time.

3. The disciplinary report and accompanying documents shall not be placed in the file of a detainee who is found not guilty. However, the facility may retain the material in its own files for institutional uses such as statistical or historical recordkeeping, etc.

**J. Disciplinary Severity Scale and Prohibited Acts**

The facility shall have graduated scales of offenses and disciplinary consequences, as provided in this section.

**K. Documents**

All documents relevant to the incident, subsequent investigation, hearing(s), etc., will be completed and distributed in accordance with facility procedures.

**L. Confidential Information**

When a decision relies on information from a confidential informant, the UDC or IDP shall include in the hearing record the factual basis for finding the information reliable.

**M. Notice to Detainees**

The facility handbook shall provide notice of the facility's rules of conduct, and of the sanctions imposed for violations of the rules. Among other things, the handbook shall advise detainees of the following, and the contents shall be communicated to detainees in a language or manner that they understand:

1. The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage, and harassment;

2. The right to freedom from discrimination based on race, religion, national origin, color, gender, sex, age, sexual orientation, disability, or political beliefs; and

3. The right to due process, including the prompt resolution of a disciplinary matter in accordance with the rules, procedures, and sanctions and procedures for appealing disciplinary findings provided in the handbook.

# Section 4: CARE

# STANDARD 4.1

## FOOD SERVICE

## I. POLICY

The facility shall provide detainees with nutritious, attractively presented meals, prepared and served in a sanitary and hygienic food service operation.

## II. STANDARDS AND PROCEDURES

### A. Administration

#### 1. Food Service Administrator (FSA) or Equivalent

The food service program shall be under the direct supervision of a professional food service administrator (FSA). The FSA is responsible for planning, controlling, directing, and evaluating food service; training staff and detainees; managing budget resources; establishing standards of sanitation, safety, and security; developing nutritionally adequate menus and evaluating detainee acceptance; developing specifications for the procurement of food, equipment, and supplies; and ensuring a quality food service program.

### B. General Policy

#### 1. Custody and Security

The facility's custody and security policy and procedures shall address the buildings or portions of buildings housing the food service department; all types of detainee traffic in and out of the department; detainee behavior; control of utensils with a custodial hazard potential (knives, cleavers, saws, tableware, etc.); official counts and/or census; and any other matters having a direct or indirect bearing on custody and security.

The facility will devise and provide appropriate training to all food service personnel in detainee custodial issues.

#### 2. Knife Control

Knives must be physically secured to workstations or used only under direct staff supervision.

**3. Controlled Food Items/Hot Items**

All facilities shall have procedures for the storage and handling of food items that pose a security threat, including, but not limited to, yeast, mace, nutmeg, cloves, and alcohol-based flavorings.

**4. Detainee Clothing**

Detainees assigned to the food service department shall have a neat and clean appearance. Detainees will be issued appropriate safety and sanitation garments and protective coverings, for example, for freezers or garbage duty.

**5. Detainee Job Descriptions**

The FSA shall review detainee job descriptions annually to ensure they are accurate and up-to-date. Before starting work in the department, the detainee will sign for receipt of the applicable job description.

**6. Detainee Orientation and Training**

To ensure a quality food service program and instill good work habits, each FSA or designee shall instruct newly assigned detainee workers in the rules, safety measures, and procedures of the food service department.

**C. Food Service Dining Room/Satellite Feeding Operations**

**1. General Policy**

Ordinarily detainees shall be served three meals every day, at least two of which shall be hot meals; however, the facility administrator may approve variations in the food service schedule during religious and civic holidays, provided that basic nutritional goals are met. The dining room schedule must allow no more than 14 hours between the evening meal and breakfast.

Clean, potable drinking water must be available.

Meals shall always be prepared, delivered, and served under staff (or contractor) supervision.

**2. Display and Service**

The following procedures apply to the display, service, and transportation of food to mainline and satellite food service areas:

a. Food is fit for consumption and appropriately presented;

b. Sanitary guidelines are observed, with hot foods maintained at a temperature of at least 135 degrees F and foods that require refrigeration maintained at 41 degrees F or below.

c. Every open food item and beverage shall be protected from contaminants by clean sneeze-guards, cabinets, display cases, or other such equipment.

d. Servers must wear plastic gloves whenever direct contact with a food, ice, or beverage is possible. They must use tongs, forks, spoons, ladles, or other such utensils to serve any food or beverage.

e. Utensils shall be sanitized as often as necessary to prevent cross-contamination and other food-handling hazards during food preparation and service.

f. If the facility cannot maintain the minimum or maximum temperature required for food safety, the affected items (e.g., salad bar staples such as lettuce, meat, eggs, cheese) must be discarded after two hours at room temperature.

g. Food will be delivered from one place to another in covered containers. If the food carts do not have locking devices, they must be supervised by facility staff.

h. All food safety provisions (sanitation, safe-handling, storage, etc.) apply without exception to food in transit.

i. Soiled equipment and utensils must be transported to the appropriate receptacles in closed containers.

j. A member of the food service staff will oversee the loading of satellite-feeding carts. Staff shall inspect and secure all food carts before allowing their removal from the food service area.

## D. <u>Menu Planning</u>

### 1. General Policy

The FSA shall base menu selections on a nutritional program meeting or exceeding minimum U.S. recommended daily allowances. The FSA shall consider the ethnic and religious diversity of the facility's detainee population when developing menu cycles.

### 2. Nutritional Analysis

A registered dietitian shall conduct an annual complete nutritional analysis of every master-cycle menu planned by the FSA. Menus must be certified by the dietitian before implementation. If necessary, the FSA shall modify the menu in light of the nutritional analysis, to ensure nutritional adequacy.

## E. Food Preparation

### 1. General Policy

The FSA is responsible for ensuring that all items on the master-cycle menu are prepared and presented according to approved recipes. The FSA or designee has the authority to change menu items when necessary. Every such change/substitution must be documented and forwarded to the FSA. The FSA or designee shall exercise this menu-changing authority as infrequently as possible.

### 2. Preparation Guidelines

Food shall be prepared and served in compliance with the most recent version of the FDA food code and/or applicable local standards. Food shall be prepared with minimal manual contact. Food service workers shall thoroughly wash fruits and vegetables with fresh water before cooking or serving raw.

The FSA or designee shall use thermometers to ensure the attainment and maintenance of proper internal cooking, holding, or refrigeration temperatures of all potentially hazardous foods.

### 3. Food Protection - General Requirements

Food and ice will be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage, and other sources of contamination. Protection will be continuous, whether the food is in storage, in preparation/on display, or in transit.

All food storage units must be equipped with accurate easy-to-read thermometers. Refrigeration equipment shall be designed and operated to maintain temperature of 41 degrees F or below.

### 4. Leftovers

Prepared and properly maintained food items which have not been placed on the serving line may be retained for no more than 24 hours. Leftovers offered for service a second time shall not be retained but discarded immediately after offering. All saved prepared food shall be labeled to identify the product, preparation date, and time.

## F. Religious/Special Diets

### 1. General Policy

ICE/ERO requires all facilities to provide detainees requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of the security and orderly operations of the facility. While each request

for religious diet accommodation is to be determined on a case-by-case basis, ICE/ERO anticipates that facilities will grant these requests unless an articulable reason exists to disqualify someone for religious accommodation or the detainee's practice poses a significant threat to the secure and orderly operation of the facility.

To initiate or end a religious diet program, the detainee will provide a written statement articulating the religious motivation for participation in or termination of the religious diet program, as appropriate. Oral interpretation or written assistance shall be provided to illiterate or limited English proficient detainees as necessary in completing this statement. Auxiliary aids and services, accommodations, and/or staff assistance shall be provided to detainees with disabilities as needed in completing this statement to ensure their equal access to the facility's religious diet program. A copy of the request and decision granting or denying it should be kept in the detainee's detention file or in a retrievable electronic format.

When considering denying a request by a detainee to participate in the religious diet program, or removal of a detainee from the religious diet program, the facility administrator, or his or her designee, shall consult with ICE/ERO prior to denying the request or prior to removing a detainee from the program.

**2. Common-Fare Menu**

Facilities must make available a "common fare" menu, which serves as the foundation to which modifications may be made to accommodate the religious diets of various faiths (e.g., for the inclusion of halal flesh-food options). Common fare represents a no-flesh protein option, offering vegetables, starches, and other foods that are not seasoned with flesh, and must be provided whenever an entrée containing flesh is offered as part of a meal.

In addition, hot entrées should be available to accommodate detainee's religious dietary needs and should be purchased, prepared, and served in a manner that does not violate the religious requirements of any faith group.

Common fare is a no-flesh protein option intended to accommodate detainees whose religious dietary needs cannot be met on the main line. The common-fare menu is based on a 14-day cycle, with special menus for the 10 Federal holidays. The menus must be certified as exceeding minimum daily nutritional requirements, meeting or exceeding U.S. recommended daily allowances (RDAs).

**3. Changes to the Standard Common-Fare Menu**

Modifications of the standard common-fare menu may be made at the local level for various reasons, such as to meet the requirements of faith groups (e.g., for the inclusion of kosher and/or halal flesh-food options).

**4. Hot Entree Availability**

To the extent practicable, a hot entree shall be available to accommodate detainees' religious dietary needs, e.g., kosher and/or halal products. Hot entrees shall be offered five times a week and shall be purchased precooked, heated in their sealed containers, and served hot.

**5. Religious Requirements**

With the exception of fresh fruits and vegetables, the facility's kosher and/or halal food purchases shall be fully prepared, ready-to-use, and bearing the symbol of a recognized kosher and/or halal certification agency.

**6. Plates and Utensils**

Common-fare meals shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for common-fare service only. Separate cutting boards, knives, food scoops, food inserts, and other such tools, appliances, and utensils shall be used to prepare common-fare foods and shall be identified accordingly. Meat and dairy food items and the service utensils used with each group shall be stored in areas separate from each other.

**7. Ceremonial Meals, Religious Fasts, and Seasonal Observances**

The chaplain, in consultation with local religious leaders, if necessary, shall develop the ceremonial-meal schedule for the subsequent calendar year, providing it to the facility administrator. This schedule shall include the date, religious group, estimated number of participants, and special foods required. Ceremonial and commemorative meals shall be prepared in the food service facility unless otherwise approved by the facility administrator.

The common-fare program shall accommodate detainees abstaining from particular foods or fasting for religious purposes at prescribed times of the year.

## G. <u>Medical Diets</u>

**1. Therapeutic Diets**

Detainees with certain conditions–chronic or temporary; medical, dental, and/or psychological–shall be prescribed special (therapeutic) diets, supplemental meals, or snacks as appropriate by authorized medical staff. If a prescribed medical diet conflicts with a common-fare diet, the medical diet takes precedence.

Pregnant detainees may also have additional nutritional and caloric requirements. (See Standard 4.3 Medical Care.)

## H. Specialized Food Service Programs

### 1. Satellite Feeding

Food transported to housing units or other locations shall be transported in thermal containers that maintain cold items at temperatures below 41 degrees F and hot items at temperatures above 135 degrees F, excluding items served within the two-hour window for food safety.

### 2. Segregation Food Rations

Food rations shall not be reduced or changed or used as a disciplinary tool.

### 3. Sack Meals

Sack meals shall meet nutritional minimums and be provided for detainees being transported from the facility and detainees arriving/departing between scheduled meal hours. Detainee volunteers assigned to the food service department shall not be involved in preparing meals for transportation but may prepare sack meals for on-site consumption.

## I. Safety and Sanitation

### 1. General Policy

All food service employees are responsible for maintaining a high level of sanitation in the food service department in accordance with the most recent edition of the U.S. Food and Drug Administration (FDA) Food Code and/or applicable local standards.

### 2. Personal Hygiene of Staff and Detainees

a. All food service personnel shall wear clean garments, maintain a high level of personal cleanliness, and practice good hygiene while on duty. They shall wash hands thoroughly with soap or detergent before starting work, and as often as necessary during the shift to remove soil or other contaminants.

b. Staff and detainees shall not resume work after visiting the toilet facility without first washing their hands with soap or detergent.

c. All staff and detainees working in the food preparation and service area(s) shall use effective hair restraints. Personnel with hair that cannot be adequately restrained shall be prohibited from food service operations.

d. Staff and detainees who prepare or serve food shall not clean latrines, garbage cans, sewers, drains, grease traps, or for other duties during the period of food preparation.

e. Rubber soled safety shoes shall be provided and used by all detainees working in food service.

### 3. Medical Examination

a. All food service personnel (both staff and detainee) shall receive a documented pre-employment medical examination. Detainees who have been absent from work for any length of time for reasons of communicable illness (including diarrhea) shall be referred to Health Services for a determination as to fitness for duty prior to resuming work.

### 4. Daily Health Checks

Food Service staff will inspect all detainee food service workers daily at the start of each work period. Detainees who exhibit signs of illness, skin disease, diarrhea (admitted or suspected), or infected cuts or boils shall be removed from the work assignment and immediately referred to Health Services for determination of duty fitness. The detainees shall return to work only after the FSA has received written clearance from Health Services staff.

### 5. Environmental Sanitation and Safety

All facilities shall meet the following environmental standards:

a. Clean, well-lit, and orderly work and storage areas.

b. Overhead pipes removed or covered, to eliminate the food-safety hazard posed by leaking or dusty pipes.

c. Routinely cleaned walls, floors, and ceilings in all areas.

d. Ventilation hoods, to prevent grease buildup and wall/ceiling condensation that can drip into food or onto food-contact surfaces. Filters or other grease- extracting equipment shall be readily removable for cleaning and replacement.

e. Eighteen-inch clearance (minimum) underneath sprinkler deflectors.

f. Hazard-free storage areas:

1) Bags, containers, bundles, etc., stored in tiers; stacked, blocked, interlocked, and limited in height for stability/security against sliding or collapsing.

2) No flammable material; no loose cords, debris, or other obvious accident-causers (stumbling, tripping, falling, etc.); no pest-harborage.

g. Aisles and passageways shall be kept clear and in good repair, with no obstruction that could create a hazard or hamper egress.

h. To prevent cross-contamination, kitchenware and food-contact surfaces should be washed, rinsed, and sanitized after each use and after any interruption of operations during which contamination could occur.

i. A ready supply of hot water (105-120 degrees F).

j. Garbage and other trash shall be collected and removed as often as possible. The garbage/refuse containers shall have sufficient capacity for the volume, and shall be kept covered, cleaned frequently, and insect and rodent proof. The facility shall comply with all applicable regulations (local, state, and federal) on refuse-handling and disposal.

**6. Equipment Sanitation**

Information about the operation, cleaning, and care of equipment will be obtained from manufacturers or local distributors. The FSA shall develop a schedule for the routine cleaning of equipment. The facility will adhere to the health and safety standards of the FDA and/or state or local authorities with oversight of food service operations.

a. Manual Cleaning and Sanitizing

The FSA shall develop a cleaning schedule for each food service area and post it for easy reference. All areas (walls, windows, vent hoods, etc.) and equipment (chairs, tables, fryers, ovens, etc.) will be grouped by frequency of cleaning, e.g., After Every Use, Daily, Weekly, Monthly, Semi-annually, or Annually.

b. Mechanical Cleaning and Sanitizing

Spray- or immersion-dishwashers or devices, including automatic dispensers for detergents, wetting agents, and liquid sanitizer, shall be maintained in good repair.

**7. Lavatories**

Toilet facilities shall be provided for all food service staff and detainee workers. Toilet facilities, including rooms and fixtures, shall be kept clean and in good repair. Signs shall be prominently displayed directing all personnel to wash hands after using the toilet.

Soap or detergent and paper towels or a hand-drying device providing heated air shall be available at all times in each lavatory.

**8. Pest Control**

Good sanitation practices are essential to an effective pest control program. The facility is responsible for pest control in the food service department.

**9. Hazardous Materials**

a. Only those toxic and caustic materials required for sanitary maintenance of the facility, equipment, and utensils shall be used in the food service department.

b. All staff members shall know where and how much toxic, flammable, or caustic material is on hand, and be aware that their use must be controlled and accounted for daily.

c. All containers of toxic, flammable, or caustic materials shall be prominently and distinctively labeled for easy content identification.

d. All toxic, flammable, and caustic materials shall be segregated from food products and stored in a locked and labeled cabinet or room.

**10. General Safety Guidelines**

Machines shall be guarded in compliance with OSHA standards.

a. Light fixtures, vent covers, wall-mounted fans, decorative materials, and similar equipment and materials attached to walls or ceilings shall be maintained in good repair.

b. Lights in food-production areas, utensil- and equipment-washing areas, and other areas displaying or storing food, equipment, or utensils shall be equipped with protective shielding.

c. An approved, fixed, fire-suppression system shall be installed in ventilation hoods over all grills, deep fryers, and open flame devices. A qualified contractor shall inspect the system every six months. The fire-suppression system shall be equipped with a locally audible alarm and connected to the control room's annunciator panel.

d. Hood systems shall be cleaned after each use to prevent grease build-ups, which constitute fire risks. All deep-fryers and grills shall be equipped with automatic fuel or energy shut-off controls.

**11. Mandatory Inspections**

a. The facility shall implement written procedures for the administrative or food service, personnel conducting the weekly inspections of all food service areas, including dining, storage, equipment, and food-preparation areas and an annual

independent inspection ensuring that all governmental health and safety codes are being met. Staff shall check refrigerator and water temperatures daily, recording the results.

b. Daily checks of equipment temperatures shall follow this schedule:

1) Dishwashers: every meal;

2) Pot and pan-washers: daily, if water in the third compartment of a three-compartment sink is used for sanitation the required minimum temperature shall be maintained in accordance with the applicable local food code;

3) Refrigeration/freezer equipment (walk-in units): site-specific schedule, established by the FSA.

All temperature-check documentation shall be filed and accessible.

## J. <u>Food Storage, Receiving and Inventory</u>

### 1. General Policy

Since control and location of subsistence supplies are site-specific, each FSA shall establish procedures for storing, receiving, and inventorying food.

### 2. Food Receipt and Storage

The following procedures apply when receiving or storing food:

a. Inspect the incoming shipment for damage, contamination, and pest infestation. Rats, mice, or insects may be hiding in the middle of a pallet.

b. Do not store food in locker rooms, toilet rooms, dressing rooms, garbage rooms, mechanical rooms, or under sewer lines, potentially leaking water lines, open stairwells, or other sources of contamination.

### 3. Inventory

The FSA shall base inventory levels on facility needs; however, each facility will at all times stock a 3-day-minimum food supply. Inventory levels shall be established, monitored, and periodically adjusted to correct excesses or shortages.

# STANDARD 4.2

## HUNGER STRIKES

## I. POLICY

This detention standard protects detainees' health and well-being by monitoring, counseling, and providing appropriate treatment to any detainee who is on a hunger strike.

Nothing in this detention standard is intended to limit or override the exercise of sound medical judgment by the clinical medical authority (CMA) responsible for a detainee's medical care. Each case must be evaluated on its own merits and specific circumstances, and treatment shall be given in accordance with accepted medical practice.

## II. STANDARDS AND PROCEDURES

### A. Staff Training

All staff shall be trained initially and annually thereafter to recognize the signs of a hunger strike, and to implement the procedures for referral for medical assessment and for management of a detainee on a hunger strike.

### B. Initial Referral

Procedures for identifying and referring a detainee suspected or announced to be on a hunger strike to medical staff shall include obtaining from qualified medical personnel an assessment of whether the detainee's action is reasoned and deliberate, or the manifestation of a mental illness.

Facilities shall immediately notify ICE/ERO when a detainee begins a hunger strike.

1. Staff shall consider any detainee observed to have not eaten for 72 hours to be on a hunger strike and shall refer him or her to the CMA for evaluation and management.
2. Medical personnel shall document the reasons for placing a detainee in a single occupancy observation room. This decision shall be reviewed every 72 hours. Medical personnel shall monitor the detainee in a single-occupancy observation room, when medically advisable and taking into consideration the detainee's mental health needs. If measuring food and liquid intake/output becomes necessary, medical personnel shall make a decision about appropriate housing placement.

### C. Initial Medical Evaluation and Management

Medical staff shall monitor the health of a detainee on a hunger strike. If a detainee engaging in a hunger strike has been previously diagnosed with a mental condition or is

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 18 of 157

incapable of giving informed consent due to age or illness, appropriate medical and/or administrative action shall be taken in the best interest of the detainee.

1. During the initial evaluation of a detainee on a hunger strike, medical staff shall:

    a. Measure and record height and weight;

    b. Measure and record vital signs;

    c. Perform urinalysis;

    d. Conduct psychological/psychiatric evaluation;

    e. Examine general physical condition; and

    f. If clinically indicated, proceed with other necessary studies.

2. Medical staff shall measure and record weight and vital signs at least once every 24 hours during the hunger strike and repeat other procedures as medically indicated.

3. Qualified medical personnel may modify or augment standard treatment protocols when medically indicated.

4. Medical staff shall record all examination results in the detainee's medical file.

5. If the detainee refuses the initial medical evaluation or any treatment or other medical procedures, medical staff must attempt to secure the detainee's signature on a "Refusal of Treatment" form. If the detainee will not cooperate by signing, staff shall note this on the "Refusal of Treatment" form.

6. Any detainee refusing medical treatment shall be monitored by medical staff to evaluate whether the hunger strike poses a risk to the detainee's life or permanent health. See "E. Refusal to Accept Treatment" below in this standard.

7. If medically necessary, the detainee may be transferred to a community hospital or a detention facility appropriately equipped for treatment.

8. After the hunger strike, medical staff shall continue to provide appropriate medical and mental health follow-up.

9. Records shall be kept of all interactions with the striking detainee, the provision of food, attempted and successfully administered medical treatment, and communications between the CMA, facility administrator, and ICE/ERO regarding the striking detainee.

### D. Food and Liquid Intake and Output

After consultation with the CMA, the facility administrator may require staff to measure and record food and water intake and output as follows:

1. Record intake and output in the medical record using an IHSC "Hunger Strike Form" or equivalent;

2. Deliver three meals per day to the detainee's room unless otherwise directed by the CMA—staff shall physically deliver each meal regardless of the detainee's response to an offered meal;

3. Provide an adequate supply of drinking water or other beverages; and

4. Remove from the detainee's room all food items not authorized by the CMA. During the hunger strike, the detainee may not purchase commissary/vending machine food.

### E. Refusal to Accept Treatment

An individual has a right to refuse medical treatment. Before involuntary medical treatment is administered, staff shall make reasonable efforts to educate and encourage the detainee to accept treatment voluntarily. Involuntary medical treatment shall be administered in accordance with established guidelines and applicable laws and only after the CMA determines the detainee's life or health is at risk.

1. Medical staff shall explain to the detainee the medical risks associated with refusal of treatment and shall document treatment efforts in the detainee's medical record.

2. The physician may recommend involuntary treatment when clinical assessment and laboratory results indicate the detainee's weakening condition threatens the life or long-term health of the detainee.

   a. The facility administrator shall notify ICE/ERO if a detainee is refusing treatment, and the health services administrator shall notify ICE/ERO in writing of any proposed plan to involuntarily feed the detainee if the hunger strike continues. Under no circumstances may a facility administer involuntary medical treatment or sustenance without authorization from ICE/ERO.

   b. ICE/ERO, in consultation with the CMA, shall then contact the ICE Office of the Principal Legal Advisor and the U.S. Attorney's Office with jurisdiction. After discussing the case, the attorneys shall recommend whether or not to pursue a court order. ICE/ERO policy is to seek a court order to obtain authorization for involuntary medical treatment or sustenance. If a court determines that it does not have jurisdiction to issue such an order, or a hospital refuses to administer involuntary medical treatment or sustenance pursuant to a court order, ICE/ERO may consider other action if the hunger strike continues.

3. Medical staff shall:

   a. Document all treatment efforts and each treatment refusal in the detainee's medical record;

   b. Continue clinical and laboratory monitoring as necessary until the detainee's life or health is out of danger; and

   c. Continue medical and mental health follow-up as necessary.

## F. <u>Release from Treatment</u>

Only a physician may order the termination of hunger strike treatment. The order shall be documented in the detainee's medical record. A notation shall be made in the detention file or retrievable electronic record when the detainee has ended the hunger strike.

# STANDARD 4.3

## MEDICAL CARE

## I. POLICY

All detainees shall have access to appropriate medical, dental, and mental health care, including emergency services. Each medical facility will strive for accreditation with National Commission on Correctional Health Care.

## II. STANDARDS AND PROCEDURES

### A. General

Every facility shall directly or contractually provide its detainee population with the following:

1. Initial medical, mental health and dental screening;
2. Medically necessary and appropriate medical, dental and mental health care and pharmaceutical services at no cost to the detainee;
3. Comprehensive, routine and preventive health care, as medically indicated;
4. Emergency care;
5. Specialty health care;
6. Timely responses to medical complaints;
7. Hospitalization as needed within the local community; and
8. Staff or professional language services necessary to allow for meaningful access for detainees with limited English proficiency (LEP), and effective communication for detainees with disabilities, during any medical or mental health appointment, sick call, treatment, or consultation.

The health care program and the medical facilities will be under the direction of a Health Services Administrator (HSA) and/or Clinical Medical Authority (CMA). When the HSA is not a physician, final clinical judgment shall rest with the facility's designated CMA.

Facilities will employ sufficient medical staff to perform basic exams and treatments for all detainees. The HSA will negotiate and keep current arrangements with nearby medical facilities or health care providers to provide required health care not available within the

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 22 of 157

facility. These arrangements will include appropriate custodial officers to transport and remain with the detainee for the duration of any off-site treatment or hospital admission.

## B. Facilities

Adequate space and equipment will be furnished so that all detainees are provided basic health examination, treatment, and communication in private. Medical records will be kept separately from detainee records and stored in a securely locked area. All pharmaceuticals will be stored in a secure area and temperature controlled to ensure no alteration in potency.

## C. Health Care Staff

Health care staff shall have a valid professional licensure and/or certification for the jurisdiction in which they practice and will perform duties within the scope of their clinical license. The following terms apply to health care staff referred to throughout this standard.

1. Health Care Practitioner: Defined as an individual who is licensed, certified, or credentialed by a state, territory, or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

2. Mental Health Provider: Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker, or any other mental health professional who, by virtue of their education, credentials, and experience, are permitted by law to evaluate and care for the mental health needs of patients.

## D. Medical Screening (New Arrivals)

As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care practitioner or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute, emergent, or pertinent past or chronic medical conditions, including history of mental illness, particularly prior suicide attempts or current suicidal/homicidal ideation or intent, and any disabilities or impairments affecting major life activities. Any detainee responding in the affirmative shall be sent for evaluation to a qualified, licensed health care practitioner as quickly as possible, but no later than two working days. Detainees who appear upon arrival to raise urgent medical or mental health concerns shall receive priority in the intake screening process. For intra-system transfers, a health care practitioner will review each incoming detainee's health record or health summary within 12 hours of arrival, to ensure continuity of care.

Facilities shall have policies and procedures to ensure documentation of the initial health screening and assessment.

**1. Tuberculosis**

All new arrivals shall receive tuberculosis (TB) screening in accordance with the most current Centers for Disease Control and Prevention (CDC) guidelines, including, but not limited to, CDC Guidelines for Correctional Facilities, prior to being placed in general population. For detainees who have been in continuous law enforcement custody, symptom screening plus documented TB screening within one year of arrival may be accepted for intake screening purposes.

Detainees with symptoms suggestive of pulmonary TB disease and/or with suspected or confirmed TB disease based on historical, clinical and/or laboratory findings will be housed in an airborne infection isolation room with negative pressure ventilation and promptly evaluated for TB disease. Detainees with suspected pulmonary TB disease will remain in airborne infection isolation until determined by a health care practitioner to be noncontagious in accordance with CDC guidelines. All detainees with suspected or confirmed TB disease shall be evaluated for human immunodeficiency virus (HIV), and all detainees with HIV shall be evaluated for TB disease, which includes a chest x-ray. The CMA will consult with the local or state TB program on all aspects of health and public health care for detainees with suspected or confirmed TB disease, including testing, treatment, release from isolation, placement in general population, and public health actions.

**2. Infectious and Communicable Diseases**

The facility will have written plans that address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, and education. This also includes reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.

**E. Comprehensive Health Assessment**

The facility will conduct and document a comprehensive health assessment, including a physical examination and mental health screening, on each detainee within 14 days of the detainee's arrival at the facility. Health assessments shall be performed by a physician, physician assistant, nurse practitioner, registered nurse (RN) (with documented initial and annual training provided by a physician), or other health care practitioner, as permitted by law. When a physical examination is not conducted by a provider, it must be reviewed by a provider. If there is documented evidence of a comprehensive health assessment within the previous 90 days, the health care practitioner may determine that a new assessment is not required.

**F. Substance Dependence and Detoxification**

During the initial screening, all detainees shall be evaluated for their use of or dependence on mood and mind-altering substances including alcohol, opiates, hypnotics, and sedatives.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 24 of 157

Detainees reporting the use of such substances shall be evaluated for their degree of reliance and potential for withdrawal. The CMA shall establish guidelines for evaluation and treatment of new arrivals who require detoxification. If females are housed at the facility, guidelines will specifically address the treatment of pregnant women who are chemically dependent. Treatment and supportive measures shall be provided to permit withdrawal with minimal discomfort.

Where a detainee requires hospitalization, a physician's order will be obtained and ICE/ERO shall be notified. Detainees experiencing severe or life-threatening alcohol or drug withdrawal shall be immediately transferred to an emergency department for evaluation. Once evaluated, the detainee will be treated on-site if the facility is qualified to provide treatment and monitoring for withdrawal or transferred to an appropriate facility.

**G. <u>Translation, Interpretation, and Language Access for Detainees with Limited English Proficiency</u>**

Facilities shall provide appropriate interpretation and language services for LEP detainees related to medical and mental health care. When appropriate staff interpretation is not available, facilities will make use of professional interpretation services. Detainees shall not be used for interpretation services during any medical or mental health service. Interpretation and translation services by other detainees shall only be used in an emergency medical situation.

**H. <u>Dental Treatment</u>**

An initial dental screening exam shall be performed within 14 days of the detainee's arrival. If no on-site dentist is available, the initial dental screening may be performed by a physician, physician assistant, nurse practitioner, or registered nurse. Such non-dental clinicians shall be trained annually on how to conduct the exam by a dentist.

Detainees shall be afforded only authorized dental treatment, defined as follows:

1. Emergency dental treatment shall be provided for immediate relief of pain, trauma, and acute oral infection.

2. Routine dental treatment may be provided to detainees for whom dental treatment is inaccessible for prolonged periods because of detention for over six months. Routine dental treatment includes amalgam and composite restorations, prophylaxis, root canals, extractions, x-rays, the repair and adjustment of prosthetic appliances, and other procedures required to maintain the detainee's health.

**I. <u>Sick Call</u>**

The facility will have regularly scheduled times, in accordance with facility policy, when medical personnel are available to see detainees who have requested medical services, commonly known as sick call.

The facility will have a mechanism that allows detainees the opportunity to privately request health care services (including mental health and dental services) provided by a physician or other health care practitioner in a clinical setting. If necessary, detainees shall be provided assistance in filling out the request, especially detainees with a disability, or who are illiterate or LEP.

The facility shall have procedures to ensure that all request slips are received and triaged by the medical staff within 24 hours of receipt of the request. Request slips shall be provided in English and Spanish, at a minimum.

A health care practitioner will review the request and determine when the detainee will be seen based on the acuity of the problem and within a reasonable period of time.

All detainees, including those in Special Management Units, regardless of classification, will have access to sick call.

### J. 24-Hour Emergency Medical and Mental Health Treatment

The facility will have a written plan for the delivery of 24-hour emergency medical and mental health care when no medical personnel are on duty at the facility, or when immediate outside medical attention is otherwise required.

### K. First Aid and Medical Emergencies

The CMA will determine the availability and placement of first aid kits.

Detention staff and health care staff will be trained to respond to health-related emergencies within a 4-minute response time. This training will be provided by a responsible medical authority in cooperation with the facility and will include the following:

a. The recognition of signs of potential health emergencies and the required response;

b. The administration of first aid and cardiopulmonary resuscitation (CPR);

c. The recognition of signs and symptoms of mental illness; and

d. The facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services.

If a detainee requires emergency medical care, the first responding officer will immediately take steps to contact a health care practitioner through established procedures.

## L. Delivery of Medication

Medication will be distributed according to the specific instructions and procedures established by the health care provider. Health care providers and officers shall keep written records of all medication given to (or refused by) detainees.

Medication will not be delivered or administered by detainees. In facilities that are medically staffed 24 hours a day, a health care practitioner will distribute medication. In facilities that are not medically staffed 24 hours a day, medication may be distributed, consistent with state law and/or regulations, by detention officers who have received proper training, but only when medication must be delivered at a specific time when medical staff is not on duty. Distribution of medication by non-medical staff will be according to the specific instructions and procedures established by the CMA.

## M. Special Needs

The facility will notify ICE/ERO of any detainee who requires close medical supervision, including chronic and convalescent care. The facility shall develop a written treatment plan, including access to health care and other treatment, and coordination with non-medical personnel as necessary.

The facility will notify ICE/ERO of any self-identified transgender detainees and coordinate care with ICE/ERO based on medical needs.

## N. Bloodborne Pathogens

See also Standard 1.1 "Environmental Health and Safety" for additional information.

Information regarding infectious diseases shall be communicated on a regular basis to non-medical and medical staff, as well as detainees. Detainees exposed to potentially infectious bodily fluids (e.g., through needle sticks or bites) shall be afforded immediate medical assistance, and the incident shall be reported as soon as possible to the clinical director or designee and documented in the detainee's medical file. All detainees shall be assumed to be infectious for bloodborne pathogens, and standard precautions are to be used at all times when caring for all detainees.

The facility shall establish a written plan to address exposure to bloodborne pathogens and post-exposure intervention, including prophylactic administration of medication, as appropriate and according to facility policies; the management of hepatitis A, B, and C; and the management of HIV infection, including reporting.

### 1. Hepatitis

A detainee may request hepatitis testing at any time.

**2. HIV**

A detainee may request HIV testing at any time. Facilities shall develop a written plan to ensure the highest degree of confidentiality regarding HIV status. Staff training shall emphasize the need for confidentiality, and procedures shall be established to limit access to health records to only authorized individuals and only when necessary.

The accurate diagnosis and medical management of HIV infection among detainees is important. An HIV diagnosis may be made only by a qualified health care practitioner, based on a medical history, current clinical evaluation of signs and symptoms, and laboratory studies.

**3. Clinical Evaluation and Management**

Medical personnel shall provide all detainees diagnosed with HIV or acquired immunodeficiency syndrome (AIDS) appropriate medical care consistent with national recommendations and guidelines disseminated through the U.S. Department of Health and Human Services agencies, including the CDC, and the Infectious Diseases Society of America. Medical and pharmacy personnel shall ensure that all Food and Drug Administration (FDA) approved medications currently approved for the treatment of HIV/AIDS are accessible. Medical and pharmacy personnel shall develop and implement distribution procedures to ensure timely and confidential access to medications.

Any detainee with confirmed or suspected TB disease shall also be evaluated for possible HIV infection, and any detainee with HIV shall be evaluated for TB disease.

Medical and pharmacy personnel shall ensure the facility maintains access to adequate supplies of FDA-approved medications for the treatment of HIV/AIDS to ensure that newly admitted detainees are able to continue with their treatment without interruption. Upon release, detainees currently receiving anti-HIV therapy and other drugs shall receive up to a 30-day supply of their medications as medically appropriate.

When current symptoms suggest HIV infection, the following procedures shall be implemented.

a. Clinical evaluation shall determine the medical need for isolation, but HIV infection cannot be the sole reason for isolation. Segregation of HIV-positive detainees is not necessary for public health purposes. Detainees with HIV shall not be separated from the general population, either pending a test result or after a test report, unless clinical evaluation reveals a medical need for isolation.

b. Following a clinical evaluation, if a detainee manifests symptoms requiring treatment beyond the facility's capability, a qualified health care practitioner shall recommend the detainee's transfer to a local hospital or other appropriate facility

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 28 of 157

for further medical testing, final diagnosis, and acute treatment, as needed, and consistent with local and national standards.

c. New HIV-positive diagnoses must be reported to government bodies according to state and local laws and requirements; the HSA is responsible for ensuring that all applicable state requirements are met.

## O. Informed Consent

The facility health care practitioner will obtain specific signed and dated consent forms from all detainees before any medical examination or treatment, except in emergency circumstances. Prior to the administration of psychotropic medications, a separate documented informed consent, that includes a description of the medications side effects, shall be obtained.

As a rule, medical treatment shall not be administered against the detainee's will. If a detainee refuses treatment, ICE/ERO will be consulted in determining whether forced treatment will be administered, unless the situation is an emergency. In emergency situations or those that place other detainees or staff at risk of exposure to infectious agents, the facility shall take appropriate emergency measures and notify ICE/ERO as soon as possible.

If the detainee refuses to consent to treatment, medical staff will explain the medical risks to the detainee of declining treatment and make reasonable efforts to convince the detainee to voluntarily accept treatment in a language or manner that the detainee understands. Medical staff will document their treatment efforts and the refusal of treatment in the detainee's medical record. A detainee refusing examination or treatment may be segregated from the general population when recommended by the medical staff. Forced treatment is prohibited unless there is a valid court order authorizing involuntary medical treatment.

## P. Confidentiality and Release of Medical Records

All medical personnel, and in particular those who have access to medical records, shall protect the privacy of detainees' medical information to the maximum extent possible while permitting the exchange of health information required to fulfill program responsibilities and to provide for the well-being of detainees.

Detainees and their representatives shall be allowed to request and receive medical records pursuant to facility policy, which shall be communicated to the detainee in the facility handbook. Detainees and their representatives may also request medical records through the detainee's designated ICE officer or the ICE Freedom of Information Act (FOIA) process as described in the National Detainee Handbook.

Detainees who indicate that they wish to obtain copies of their medical records shall be provided with any appropriate forms. The facility will provide the detainee with assistance

in making the written request (if needed) and will assist in transmitting the request to the appropriate office or person.

Following the release of health information, the written authorization shall be retained in the health record, and a copy placed in the detainee's detention file or maintained in a retrievable electronic format.

## Q. <u>Transfer and Release of Detainees</u>

### 1. Medical/Psychiatric Alert

When a health care practitioner determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer to another facility, or requires medical escort during removal or transfer, the facility shall notify ICE/ERO in writing.

### 2. Notification of Transfers, Releases, and Removals

Medical personnel will be given advance notice prior to the release, transfer, or removal of a detainee, so that they may provide for any medical needs associated with the transfer or release.

### 3. Transfer of Medical Information

a. When a detainee is transferred to another detention facility, the sending facility shall ensure that a medical transfer summary accompanies the detainee. Upon request of the receiving facility, the sending facility shall transmit a copy of the full medical record within five business days or sooner if determined by the receiving facility to be a medically urgent matter.

b. Upon removal or release from ICE/ERO custody, the detainee shall be provided medication (in quantities specified below), referrals to community-based providers as medically appropriate, and a detailed medical care summary. This summary should include instructions that the detainee can understand and health history that would be meaningful to future medical providers. The summary shall include, at a minimum, the following items:

   1) Patient identification;

   2) Tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;

   3) Current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 30 of 157

4) Current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;

5) Any past hospitalizations or major surgical procedures;

6) Recent test results, as appropriate;

7) Known allergies;

8) Any pending medical or mental health evaluations, tests, procedures, or treatments for a serious medical condition scheduled for the detainee at the sending facility. In the case of patients with communicable disease and/or other serious medical needs, detainees being released from ICE/ERO custody are given a list of community resources, at a minimum;

9) Copies of any relevant documents as appropriate;

10) Printed instructions on how to obtain the complete medical record; and

11) The name and contact information of the transferring medical official.

**4. Medications**

The facility shall ensure that, at a minimum, a seven-day supply of medication (or, in the case of TB medications, 15 days; and in the case of HIV/AIDS medications, 30 days) accompanies the detainee upon transfer from the facility, as ordered by the prescribing authority.

Upon removal or release from ICE custody, the detainee shall receive up to a 30-day supply of medication as ordered by the prescribing authority and a medical care summary. If a detainee is on prescribed narcotics, the clinical health authority shall make a determination regarding continuation, based on assessment of the detainee.

**R. <u>Medical Experimentation and Research</u>**

Detainees shall not be used in any medical, pharmaceutical, or cosmetic experiments or research.

This will not preclude an individual detainee from receiving a medical treatment or procedure not generally available, but determined medically necessary by the CMA, such as medications and clinical trials. The administration of such investigational therapies shall follow relevant FDA or other national protocols and will be administered only with written consent from the detainee, which should be retained in the detainee's medical record. The facility shall notify ICE/ERO of all such situations.

## S. Mental Health Program

### 1. Details

The facility shall have a mental health program, approved by the appropriate medical authority, that provides:

a. Assistance with intake screening for mental health concerns;

b. Referral as needed for evaluation, diagnosis, treatment and monitoring of mental illness by a qualified mental health care provider;

c. Sufficient capacity to provide crisis intervention and management of acute mental health episodes;

d. Transfer to licensed mental health facilities of detainees whose mental health needs exceed the capabilities of the facility; and

e. Professional consultation for and assistance with the suicide prevention program.

### 2. Referrals and Treatment

Based on the intake screening, the comprehensive health assessment, medical documentation, or subsequent observations by detention staff or medical personnel, a detainee may be referred for mental health treatment or evaluation. Any detainee referred for mental health treatment shall be triaged for any emergency needs and receive an evaluation by a qualified mental health provider no later than seven days after the referral. The provider shall develop an overall treatment/management plan. If the detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility, a referral for an outside mental health facility shall be initiated and the facility shall notify ICE/ERO in a timely manner. Any detainee prescribed psychiatric medications must be regularly evaluated by a duly licensed and appropriate medical professional to ensure proper treatment and dosage.

### 3. Involuntary Administration of Psychotropic Medication

Involuntary administration of psychotropic medication to detainees shall comply with established guidelines and applicable laws, and shall be performed only pursuant to the specific, written, and detailed authorization of a physician. Absent a declared medical emergency, before psychotropic medication is involuntarily administered, the HSA shall contact ICE/ERO to facilitate a request for a court order.

### 4. Serious Mental Illness

The following non-exhaustive categories of conditions should be considered to constitute a serious mental illness:

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 32 of 157

a. conditions that a qualified medical provider has determined to meet the criteria for a "serious mental disorder or condition" pursuant to applicable ICE policies, including:

   1) A mental disorder that is causing serious limitations in communication, memory, or general mental and/or intellectual functioning (e.g., communicating, conducting activities of daily life, social skills); or a severe medical condition(s) (e.g., traumatic brain injury or dementia) that is significantly impairing mental function; or

   2) One or more of the following active psychiatric symptoms and/or behaviors: severe disorganization, active hallucinations or delusions, mania, catatonia, severe depressive symptoms, suicidal ideation and/or behavior, marked anxiety or impulsivity; or

   3) Significant symptoms of one of the following:

      i. Psychosis or Psychotic Disorder;

      ii. Bipolar Disorder;

      iii. Schizophrenia or Schizoaffective Disorder;

      iv. Major Depressive Disorder with Psychotic Features;

      v. Dementia and/or a Neurocognitive Disorder; or

      vi. Intellectual Development Disorder (moderate, severe, or profound);

   4) Any ongoing or recurrent conditions that have required a recent or prolonged hospitalization, typically for greater than 14 days, or a recent and prolonged stay in the medical clinic of a detention or correctional facility, typically for greater than 30 days;

   5) Any condition that would preclude the detainee from being housed, typically for greater than 30 days, in a non-restrictive setting (such as a general population housing unit, as opposed to a special management unit or a medical clinic); and

   6) Any other mental illness determined to be serious by IHSC.

**T. <u>Referrals for Sexual Abuse Victims or Abusers</u>**

If any security or medical intake screening or classification assessment indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical

practitioner or mental health provider for a medical and/or mental health evaluation and follow-up as appropriate.

When a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment. When a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

For the purposes of this section, a "qualified medical practitioner" or "qualified mental health practitioner" means a health or mental health professional, respectively, who in addition to being qualified to evaluate and care for patients within the scope of his or her professional practice, has successfully completed specialized training for treating sexual abuse victims.

## U. <u>Women's Medical Care</u>

Female detainees shall receive routine, age appropriate gynecological and obstetrical health care, consistent with recognized community and clinical guidelines for women's health services.

### 1. Initial Assessment

All initial health assessments of female detainees shall be conducted by a qualified health care practitioner. In addition to the criteria listed on the health assessment form, the evaluation shall inquire about and perform the following:

a. Pregnancy test for detainees aged 18-56 and deliver to the detainee and document the results;

b. If the detainee is currently nursing (breastfeeding);

c. Use of contraception;

d. Reproductive history (number of pregnancies, number of live births, number of spontaneous/elective abortions, pregnancy complications, etc.);

e. Menstrual cycle;

f. History of breast and gynecological problems;

g. Family history of breast and gynecological problems; and

h. Any history of physical or sexual victimization and when the incident occurred.

A pelvic and breast examination, pap test, baseline mammography and sexually transmitted disease (STD) testing shall be offered and provided as deemed appropriate or necessary by a health care practitioner.

**2. Preventive Services**

Contraception

Upon request, appropriately trained medical personnel within their scope of practice shall provide detainees with non-directive (impartial) advice and consultation about family planning and contraception, and where medically appropriate, prescribe and dispense medical contraception.

**3. Pregnancy**

Upon confirmation by health care practitioner that a detainee is pregnant, the detainee shall be provided close medical supervision. Pregnant detainees shall have access to prenatal and specialized care, and comprehensive counseling on topics including, but not limited to, nutrition, exercise, complications of pregnancy, prenatal vitamins, labor and delivery, postpartum care, lactation, family planning, abortion services and parenting skills.

The facility administrator shall ensure that ICE/ERO is notified as soon as practicable of any pregnant detainee, but no later than 72 hours after such determination.

A health care practitioner will identify any special needs (e.g., diet, housing, and other accommodations such as the provision of additional pillows) and inform all necessary security staff and facility authorities. If a pregnant detainee has been identified as high risk, the detainee shall be referred to a physician specializing in high risk pregnancies.

All chemically dependent pregnant detainees (e.g., detainees dependent on substances including alcohol, sedatives/hypnotics, anxiolytics, and opioids) are considered high risk and referred to qualified physician capable of addressing their needs immediately.

a. <u>Abortion Access</u>

In the event continued detention is necessary and appropriate, and consistent with the practice of ICE/ERO's federal partners, if the life of the mother would be endangered by carrying a fetus to term, or in the case of rape or incest, ICE/ERO will assume the costs associated with a female detainee's decision to terminate a pregnancy.

1) In this instance, or in a situation where a female detainee opts to fund the termination of her pregnancy, ICE/ERO will arrange for transportation at no cost to the detainee for the medical appointment and, if requested by the detainee, for access to religious counseling, and non-directive (impartial)

medical resources and social counseling, to include outside social services or women's community resources groups.

2) If a detainee requests to terminate her pregnancy, it will be documented in the detainee's medical records. The detainee's statement should be signed personally by the detainee and include clear language of the detainee's intent.

# STANDARD 4.4

## PERSONAL HYGIENE

## I. POLICY

Good hygiene is essential to the well-being of detainees in the custody of ICE/ERO. ICE/ERO requires that all facilities provide detainees with regular exchanges of suitable and clean clothing, linens, blankets, and towels for as long as they remain in detention.

## II. STANDARDS AND PROCEDURES

### A. Clothing, Bedding, Linen, Blanket and Towel Supply

The facility shall have a policy and procedure for the regular issuance and exchange of clothing, bedding, linens, and towels. The facility shall keep a supply of these items that exceeds the minimum amount required for the number of detainees to prevent delay in replacing the items.

### B. Issuance of Clothing

At no cost to the detainee, all new detainees shall be issued clean, indoor/outdoor, temperature-appropriate, presentable clothing during in-processing. Damaged or unusable shoes or clothing shall be replaced at no cost to the detainee.

The standard issue of clothing for detainees should be consistent with facility policy, but should include not less than one uniform shirt and one pair of uniform pants or one jumpsuit; one pair of socks; one pair of underwear; two brassieres, as appropriate; and one pair of footwear. Additional clothing shall be issued as necessary for changing weather conditions or as seasonally appropriate.

### C. Issuance of Bedding, Linen and Towels

All new detainees shall be issued clean bedding, linens, and a towel(s). Detainees shall be held accountable for these items.

### D. Special Uniforms and Protective Equipment for Detainees

Detainees assigned to special work areas shall be clothed in accordance with the requirements of the job and, when appropriate, provided with protective clothing and equipment in accordance with safety and security considerations.

**E. Exchange Requirements**

Detainees shall be provided with clean clothing, linens, and towels on a regular basis to ensure proper hygiene. Socks and undergarments will be exchanged daily, outer garments at least twice weekly and sheets, towels, and pillowcases at least weekly.

More frequent exchanges of outer garments may be appropriate, especially in hot and humid climates. Individual facilities may institute their own clothing, linen, and towel exchange policy and procedures, provided the standards in this policy are met.

**F. Personal Hygiene Items**

Distribution of hygiene items shall not be used as reward or punishment.

Each detainee shall receive, at a minimum, the following items:

1. One bar of bath soap, or equivalent;
2. One comb or equivalent;
3. One tube of toothpaste;
4. One toothbrush;
5. One bottle of shampoo, or equivalent; and
6. One container of skin lotion.

The facility administrator may modify this list as needed (e.g., to accommodate the use of bulk liquid soap and shampoo dispensers).

The distribution of razors shall be strictly controlled.

Female detainees shall be issued and may retain sufficient feminine hygiene items, including sanitary pads or tampons, for use during the menstrual cycle, and may be permitted brushes to replace combs.

The facility shall replenish personal hygiene items at no cost to the detainee on an as-needed basis, in accordance with written facility procedures.

**G. Bathing and Toilet Facilities**

Detainees shall be provided with a reasonably private bathing and toileting environment in accordance with safety and security needs. Detainees shall be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 38 of 157

or is otherwise appropriate in connection with a medical examination or monitored bowel movement.

Staff of the opposite gender shall announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing.

When operationally feasible, transgender and intersex detainees shall be given the opportunity to shower separately from other detainees.

Detainees with disabilities shall be provided the facilities and support needed for self-care and personal hygiene in a reasonably private environment in which the individual can maintain dignity. When necessary, assistance to detainees with disabilities who cannot perform basic life functions shall be provided by individuals who are trained and qualified to assist persons with physical and/or mental impairments. Such training may be provided by the health services authority and may involve the expertise of relevant community organizations and government agencies. Discrimination on the basis of disability is prohibited.

# STANDARD 4.5

## SIGNIFICANT SELF-HARM AND SUICIDE PREVENTION AND INTERVENTION

## I. POLICY

The facility shall have a written suicide prevention and intervention program that includes procedures to address suicidal detainees and detainees at risk of self-harm. Staff shall be trained to recognize signs, symptoms, and situations which indicate the potential for self-harm and/or suicide risk. Staff shall act to prevent suicides with appropriate sensitivity, supervision, and referrals. Any suicidal detainee shall receive preventive supervision and treatment.

## II. STANDARDS AND PROCEDURES

### A. General

The facility shall have policy and procedures for a comprehensive suicide prevention and intervention program.

### B. Training

All facility staff members who interact with and/or are responsible for detainees shall receive comprehensive suicide prevention training during orientation and refresher training at least annually thereafter.

All of the following topics shall be covered:

1. Potential stressors related to incarceration and how detention facilities can be conducive to suicidal behavior;
2. Standard first aid training, cardiopulmonary resuscitation (CPR) training, and training in the use of emergency equipment (that may be located in each housing area of the detention facility);
3. Liability issues associated with detainee suicide;
4. Recognizing verbal and behavioral cues that indicate potential suicide;
5. Demographic, cultural, and precipitating factors of suicidal behavior;
6. How to respond to suicidal and depressed detainees;
7. Effective communication between correctional and health care personnel;

8. Necessary referral procedures;
9. Suicide precautions, including constant observation and close observation;
10. Follow-up monitoring of detainees who have already attempted suicide; and
11. Reporting and written documentation procedures.

## C. Identification

All detainees shall receive an initial mental health screening within 12 hours of admission by a health care practitioner or a specially trained detention officer. Information regarding a history of suicidal behavior and current suicidal ideation shall be obtained. The results of the screening shall be documented on an intake screening form.

Detainees may be identified as being at risk for self-harm or suicide at any time. This identification may be the result of a self-referral, observation, or interaction with medical, mental health, or correctional staff.

If a detainee is observed to display or express any intent, threat, or gesture of self-harm, any custody official may place the detainee on suicide precautions. Only a mental health provider or a physician may remove the detainee from suicide precautions.

## D. Referral and Evaluation

Detainees identified as at risk for suicide or self-harm shall be immediately referred to a mental health provider. An evaluation shall take place within 24 hours. Until this evaluation takes place, security staff shall place the detainee in a secure environment on constant (one-to-one) visual observation.

The mental health provider's evaluation shall be documented in the medical record and must include the following information:

1. Relevant history;
2. Environmental factors;
3. Lethality of suicide plan;
4. Psychological factors;
5. Diagnoses;
6. A determination of seriousness of suicide risk;
7. Level of supervision needed;
8. Referral/transfer for inpatient care (if needed);
9. Instructions to medical staff for care; and
10. A treatment plan, including reassessment time frames.

Detainees placed on suicide precautions shall be reevaluated by a mental health provider (or a health care practitioner) on a daily basis to assess any changes that indicate a need for

change in the level of supervision (i.e., constant watch, close observation, or removal from suicide precautions). Each re-evaluation must be documented in the detainee's medical record.

**E. Treatment**

For a detainee who has been identified at risk for self-harm or suicide, a mental health provider will develop a treatment plan. This plan will be documented and placed in the detainee's medical record.

This treatment plan shall include strategies and interventions to be followed by staff and the detainee if suicidal ideation or intent reoccurs, and a plan for follow-up care. The timing of follow up appointments should be based on the level of acuity.

**F. Housing and Monitoring**

A mental health provider may place a detainee in a suicide-resistant cell with constant monitoring (one-to-one). A suicide-resistant cell must be free of objects and structural elements that could facilitate a suicide attempt and must be approved by a health care practitioner. The monitoring must be documented every 15 minutes or more frequently if necessary. A mental health provider will perform welfare checks every 8 hours.

Only a mental health provider may remove a detainee from constant monitoring (one-to-one). A mental health provider may immediately move or later place the detainee under close observation status. A detainee on close observation may be housed in general population or other medical or suicide-resistant housing, as appropriate. A detainee on close observation shall be regularly monitored. The monitoring shall consist of staggered checks at intervals not to exceed 15 minutes (e.g., every 5, 10, 7 minutes) and be documented. A mental health provider will perform welfare checks every 8 hours.

The facility administrator shall promptly report to ICE/ERO any detainee who is placed on constant observation or close observation status (suicide precautions).

**G. Hospitalization**

If a detainee faces an imminent risk of injury or death, appropriate staff will make a recommendation for hospitalization.

If the detainee refuses, it may be necessary to petition the appropriate court to intervene against the detainee's will for hospitalization and treatment. At a minimum, refusal of hospitalization should prompt immediate placement of the detainee in a suicide-resistant cell under one-to-one observation.

### H. No Excessive Deprivations

Deprivations and restrictions placed on suicidal detainees must be kept at a minimum. Suicidal detainees may be discouraged from expressing their intentions if the consequences of reporting those intentions result in punitive treatment. Placing suicidal detainees in conditions of confinement that are worse than those experienced by detainees in the general population may result in the detainee not discussing his or her suicidal intentions and falsely showing an appearance of a swift recovery.

### I. Clothing, Hygiene, and Privacy

The facility may allow suicidal detainees under constant (one-to-one) monitoring to wear the standard issue clothing, as long as extraneous items that could aid in self-harm are removed, such as shoe laces or belts.

A mental health provider shall assess the detainee to determine whether a suicide smock is necessary, and if so, whether to provide underwear. Under no circumstances shall detainees be held without clothing.

Suicidal detainees shall be allowed to shower, perform bodily functions, and change clothing with as much privacy as possible under the continuous observation of staff, and without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances. Although staff of the opposite gender may be assigned to suicide precautions, including constant observation, the facility must have procedures in place that enable a detainee on suicide precautions to avoid exposing himself or herself to nonmedical staff of the opposite gender. This may be accomplished, for example, by substituting medical staff or same gender security staff to observe the periods of time when a detainee is showering, performing bodily functions, or changing clothes. It may also be accomplished by providing a shower with a partial curtain or other privacy shields. The privacy standards apply whether the viewing occurs in a cell or elsewhere.

However, any privacy accommodations must be implemented in a way that does not pose a safety risk for the individual on suicide precautions. Safety is paramount when conducting suicide precautions, and if an immediate safety concern or detainee conduct makes it impractical to provide same gender coverage during a period in which the inmate is undressed, the detainee should continue to be observed, and any such incident should be documented.

### J. Intervention

Following a suicide attempt, security staff shall initiate and continue appropriate life-saving measures until relieved by arriving medical personnel. Arriving medical personnel shall perform appropriate medical evaluation and intervention. The CMA or designee shall be notified when a detainee requires transfer to a local hospital or emergency room.

**K. Notification and Reporting**

In the event of a suicide or suicide attempt, placement of a detainee on suicide precautions, or transfer of a detainee to a local hospital or emergency room, the facility shall immediately notify ICE/ERO and appropriate outside authorities.

Medical staff shall complete a preliminary Incident Report within 24 hours of any suicide or suicide attempt, and all staff who came into contact with the detainee immediately before the suicide attempt or death shall submit a statement describing their knowledge of the detainee and the incident.

The preliminary Incident Report must include detainee name, alien number, relevant medical history/diagnosis, reason for suicide placement (if applicable), date of death, and name and title of person providing information.

**L. Review**

The facility will cooperate with ICE/ERO on any mortality review process triggered by a death resulting from suicide.

**M. Debriefing**

Facilities are encouraged to offer a critical incident debriefing following a suicide or serious suicide attempt for all affected staff and detainees within 24 to 72 hours after the critical incident.

**N. Detainee Mental Health Follow-up**

Following a suicide or serious suicide attempt, the facility should offer appropriate mental health services to other detainees who may have been affected.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 44 of 157

# STANDARD 4.6

## TERMINAL ILLNESS AND DEATH

## I. POLICY

All facilities shall have policies and procedures addressing the issues of terminal illness, serious injury, advance directives, and detainee death, including prompt notification of ICE/ERO in all cases.

## II. STANDARDS AND PROCEDURES

### A. Terminal Illness

The facility's Clinical Medical Authority (CMA), assisted by the Health Services Administrator (HSA), shall arrange the transfer of chronically, critically, or terminally ill detainees to appropriate off-site medical facilities. The facility shall notify ICE/ERO as soon as practicable of the need for such transfer, ideally before the detainee leaves the facility.

When a detainee's medical condition becomes life-threatening, the following standards and procedures apply:

1. A seriously ill or dying detainee's care shall be consistent with Standard 4.3 "Medical Care."

2. A detainee in a community hospital remains in ICE/ERO custody. ICE/ERO retains the authority to make administrative decisions affecting the detainee (e.g., visitors, movement, authorizing/limiting services, etc.). The hospital assumes medical decision-making authority (e.g., drug regimen, lab tests, x-rays, treatments, etc.).

3. The facility and ICE/ERO will defer to the hospital's standard rules and procedures concerning the seriously ill, injured, and dying, including the hospital's procedures for determining and contacting next-of-kin.

### B. Death Occurring in ICE/ERO Custody

The facility shall immediately notify ICE/ERO of any detainee death, and where appropriate, the chaplain may provide advice about religious considerations that could influence the decision about the disposition of remains.

#### 1. Notification of Family

Written procedures will provide for the facility's direct coordination with ICE/ERO in communicating news of the serious illness or death of a detainee. The chaplain or

designee may coordinate requested religious rituals at the time of a detainee's serious illness, injury, or death.

**2. Disposition of Property**

The facility shall collect and return a deceased detainee's property and funds to ICE/ERO for processing and disposition.

**3. Disposition of Remains**

The detainee's family shall have the opportunity to claim the remains within seven calendar days of the date they received notification (in writing or in person) of the death. If the family chooses to claim the body, the family shall assume responsibility for making the necessary arrangements and paying all associated costs (transportation of body, burial, etc.).

ICE/ERO will coordinate the logistical details involved in returning the detainee's remains to the family.

If family members cannot be located or decline, orally or in writing, to claim the remains, ICE/ERO will notify the consulate of the detainee's country of nationality in writing. The consulate shall have seven calendar days in which to claim the remains.

In the event that neither family nor consulate claims the remains, the facility shall coordinate with ICE/ERO.

The facility shall not independently authorize cremation or donation of the remains for medical research.

**4. Death Certificate**

The facility shall coordinate with ICE/ERO on proper distribution of the death certificate.

**5. Authority to Order Autopsies**

The facility shall make autopsy arrangements in coordination with ICE/ERO.

# STANDARD 4.7

## DISABILITY IDENTIFICATION, ASSESSMENT, AND ACCOMMODATION

## I. POLICY

Facilities are required by federal law, including Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504), to ensure that detainees with a disability have an equal opportunity to participate in, access, and enjoy the benefits of the facility's programs, services, and activities. Such participation will be accomplished in the least restrictive and most integrated setting possible, through the provision of reasonable accommodations, modifications, and/or auxiliary aids and services, as necessary, and in a facility that is physically accessible.

## II. STANDARDS AND PROCEDURES

### A. Definitions

#### 1. Disability

For purposes of these detention standards, the term "disability" means either of the below:

a. A physical or mental impairment that substantially limits one or more of an individual's major life activities; or

b. A record of such a physical or mental impairment.

"Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain.

#### 2. Communication Impairments

Detainees with "communication impairments" include detainees with physical, hearing, vision, and speech impairments (e.g., detainees who have hearing loss or are deaf or blind, who have visual impairments, or who are nonverbal).

**3. Mobility Impairments**

Detainees with "mobility impairments" include detainees with physical impairments who require a wheelchair, crutches, prosthesis, cane, or other mobility device, or other assistance.

**4. Programs, Services, or Activities**

For purposes of these standards, the "programs," "services," "benefits," and/or "activities" of a detention facility include all aspects of the facility's operations that involve detainees. These include, but are not limited to, housing placements, medical care, safety and security protocols, food services, correspondence, visitation, grievance systems, transfers, and detainee programming and scheduled activities such as law and leisure libraries, religious services, educational or vocational classes, work programs, and recreation.

**5. Auxiliary Aids or Services**

"Auxiliary aids or services" are services or devices that allow for effective communication by affording individuals with impaired vision, hearing, speaking, sensory, and manual skills an equal opportunity to participate in, and enjoy the benefits of, programs and activities. Such aids or services include sign language interpreters, written materials, note-takers, video remote interpreting and/or video relay services, videophones, or other effective methods of making aurally delivered materials available to detainees with hearing impairments; readers, taped texts, materials or displays in Braille, secondary auditory programs, or other effective methods of making visually delivered materials available to detainees with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.

**6. Reasonable Accommodations**

For purposes of these standards, "reasonable accommodation" means any change or adjustment in detention facility operations, any modification to detention facility policy, practice, or procedure, or any provision of an aid or service that permits a detainee with a disability to participate in the facility's programs, services, activities, or requirements, or to enjoy the benefits and privileges of detention programs equal to those enjoyed by detainees without disabilities. Examples of "reasonable accommodations" include, but are not limited to, proper medication and medical treatment; accessible housing, toilet, and shower facilities; devices like bed transfer, accessible beds or shower chairs, hearing aids, or canes; and assistance with toileting and hygiene.

When considering requests for reasonable accommodations or modifications, the facility shall engage in an interactive and individualized process as outlined in section F below.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 48 of 157

For the purposes of this standard, and particularly section F below, reasonable accommodations, disability-related modifications, and auxiliary aids and services are collectively referred to as "accommodations" or "reasonable accommodations."

## B. Reasonable Accommodation Process and Compliance Coordinator

### 1. Reasonable Accommodation Process

The facility shall develop a process, which includes reasonable timelines, for reviewing detainees' requests for accommodations related to a disability and for providing accommodations (including interim accommodations), modifications, and reassessments.

### 2. Disability Compliance Coordinator

The facility or public entity shall designate a Disability Compliance Coordinator to assist facility personnel in ensuring compliance with this standard and all applicable federal, state, and local laws related to accommodation of detainees with disabilities. The Disability Compliance Coordinator may be a member of the medical staff, or anyone with relevant knowledge, education, and/or experience; this role may be filled by the county, locality, or agency's existing ADA coordinator.

## C. Identification

A detainee may identify him- or herself as having a disability and/or request a reasonable accommodation at any point during detention. Detainees may submit a formal or informal (i.e., verbal or written) request for accommodations or assistance. Requests should be reviewed in context, and do not need to include the words "disability" or "accommodation" to be considered a request for accommodations. The facility shall also consider information submitted by a third party, such as an attorney, family member, or other detainee identifying a detainee with a disability or a detainee's need for an accommodation.

Further, it is incumbent upon facility staff to identify detainees with impairments that are open, obvious, and apparent. Identification of detainees with potential disabilities (i.e., impairments that are open, obvious, and apparent) may occur through medical or intake screenings, or through direct observation. Staff should be particularly vigilant for impairments that affect a detainee's mobility or ability to communicate. Upon identifying a detainee with a potential disability, the facility shall review the need for any necessary accommodations pursuant to Section F below.

The processes described in this standard apply to any detainee who has requested an accommodation or auxiliary aid or service, or who has otherwise been identified as potentially needing an accommodation.

## D. Physical Accessibility and Most Integrated Setting Possible

### 1. Physical Accessibility

The facility shall comply with all applicable federal, state, and local laws and regulations related to the accessibility of safe and appropriate housing for detainees with disabilities.

The facility will ensure that detainees with disabilities are able to physically access its programs, services, and activities. This includes, for example, ensuring detainees with disabilities can access telephones, as well as toileting and bathing facilities.

### 2. Most Integrated Setting

Every detainee with a disability will be housed in a space that affords him or her safe, appropriate living conditions. Detainees with disabilities should be provided access to the facility's programs and services in the least restrictive setting possible and the most integrated setting appropriate to the needs of the detainee with a disability.

Detainees with disabilities shall generally be permitted to keep assistive devices (including such aids as canes and crutches) with them at all times, including in general population. Placement apart from the general population due to security concerns related to the use of any such item must be based on individualized review, and the justification for the placement must be documented, whether the detainee is placed in an SMU, medical clinic, or elsewhere. The justification shall set forth the individualized assessment of the safety or security concern created by the assistive device that could not be eliminated or mitigated by modification of policies or procedures.

A detainee's disability or need for accommodations may not provide the sole basis for a decision to place the detainee in an SMU. An individualized assessment must be made in each case, and the justification for the placement documented.

## E. Effective Communication

Throughout the facility's programs and activities, including at all stages of the reasonable accommodation process, the facility must take appropriate steps to allow for effective communication with detainees with disabilities to afford them an equal opportunity to participate in, and enjoy the benefits of, the facility's programs and activities. Steps to ensure effective communication may include the provision and use of auxiliary aids or services for detainees with vision, hearing, sensory, speech, and manual impairments, as needed. The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual detainee, the nature, length, and complexity of the communication involved, and the context in which the communication is taking place. In determining what types of auxiliary aids or services

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 50 of 157

are necessary, the facility shall give primary consideration to the request of the detainee with a disability.

Use of other detainees to interpret or facilitate communication with a detainee with a disability may only occur in emergencies.

## F. Reasonable Accommodations Process

The facility's process to appropriately accommodate a detainee with a disability will differ depending on the nature of the impairment or disability being addressed.

### 1. Immediate Accommodations

The facility shall provide detainees with disabilities with necessary accommodations in an expeditious manner. In many situations, the facility will be able to immediately grant a detainee's request for an accommodation.

### 2. Medical and Mental Health Treatment

Many detainees with disabilities will receive medical and/or mental health treatment from the facility's clinical medical authority. Where a detainee with a disability is fully able to access the facility's programs and activities through the provision of appropriate medical or mental health treatment, further interactive process may not be necessary. However, where the provision of accommodations depends on medical expenditures requiring ICE/ERO authorization, the facility shall consider whether there are any interim accommodations that would afford the detainee access to its programs and activities pending ICE/ERO authorization (for example, providing a wheelchair as an interim accommodation to allow for mobility while a prosthesis is repaired), and shall provide to the detainee any such interim accommodations it identifies.

### 3. Interactive Process

Requests or referrals that require an interactive process include (1) detainees with mobility impairments; (2) detainees with communication impairments; (3) detainees whose initial requests for accommodations or assistance have been denied; (4) detainees who have filed grievances about the accommodation of their disabilities or impairments; (5) detainees whose requests are complex or best addressed by staff from more than one discipline (e.g., security, programming, medical, or mental health, etc.); and (6) detainees whose cases are otherwise determined by facility staff to be appropriate for review.

The interactive process will likely include participation from a healthcare professional and any additional facility staff with requisite knowledge of and/or responsibility for compliance with the facility's obligation to accommodate detainees with disabilities. When appropriate, the facility shall consult with ICE/ERO to obtain guidance, information, and/or resources for providing accommodations.

a. Interaction with the Detainee

Given the importance of considering information from the detainee, the interactive process shall include a good faith attempt to interview the detainee and determine the nature of the detainee's disability, any difficulties the detainee experiences in accessing the facility or its programs or services, and the detainee's specific requests or needs for accommodation, if any. The facility will respect any detainee's decision to decline to participate in the accommodation process. If a detainee declines such an invitation, the facility will document this declination.

b. Determinations

The facility will determine whether the detainee has a disability, whether the detainee requires an accommodation to meaningfully access the facility's programs and activities, and whether to grant or recommend denying the requested accommodation (if any) or propose an alternate, equally effective accommodation. The facility will issue a written decision within a reasonable time of the request or referral.

If there is a delay in determining whether to approve an accommodation request or in providing the detainee with an approved accommodation, the facility shall consider whether there are any interim accommodations that would afford the detainee access to its programs and activities pending the final disposition of the request or the provision of approved accommodations. The facility shall provide to the detainee any such interim accommodations it identifies.

Where the facility approves a request for an accommodation, but the recommended accommodation requires approval from ICE/ERO (i.e., expenditures on medical treatment, medication, and durable medical equipment that require IHSC authorization), the facility will inform the detainee of the decision and the status of the request with ICE/ERO and shall consider whether to provide an interim accommodation. The facility shall provide to the detainee any such interim accommodations it identifies.

Where the facility approves a request for accommodations, and can immediately provide the necessary accommodation, the facility will follow the notification procedures outlined below and implement the approved accommodations as quickly as possible.

c. Final Review of Any Denial by Facility Administrator or Assistant Facility Administrator

Any denial of a request for accommodation related to a disability must be approved by the facility administrator or assistant facility administrator. Such denials include all cases in which the facility determines that accommodations, including all

requested accommodations, should be denied; or that alternate, unrequested accommodation(s) should be provided.

d. Detainee Notification

The facility will provide the detainee with written notification of the facility's final decision on his or her request for accommodation, regardless of whether an accommodation was granted or denied, and regardless of whether the accommodation requires further approval by ICE/ERO. Notification of a denied accommodation, or provision of an alternate, unrequested accommodation will include a justification for the denial. Notification shall be provided in a language or manner the detainee can understand.

e. Staff Notification

Where an accommodation is granted, all relevant facility staff, including facility security staff, receive timely notification and, as needed, instructions for successful implementation of the accommodation. The provision of this information will also account for any applicable privacy and confidentiality considerations.

## G. Denial of an Accommodation

Permissible reasons for the facility to deny an accommodation to a detainee who has been determined to have a disability include: (1) the detainee is not denied access to the facility's programs or activities because of a disability; (2) there is not a nexus between the disability and the requested accommodation; (3) the requested accommodation would fundamentally alter the nature of the program, service, or activity; (4) the requested accommodation would result in an undue financial and administrative burden; or (5) the detainee poses a direct threat to staff or other detainees.

Both "fundamental alteration" and "undue financial and administrative burden" are generally high standards that are difficult to meet. Further, if a particular accommodation would result in an undue financial and administrative burden or fundamental alteration, the facility must take any other action that would not result in such an undue burden or fundamental alteration but would nevertheless ensure that, to the maximum extent possible, detainees with a disability receive the benefits and services of the program or activity. Similarly, determinations that individuals pose a "direct threat" are generally very rare, and require a careful, individualized assessment as described below.

### 1. Fundamental Alteration

A "fundamental alteration" to a facility's programs, services, or activities is a change that is so significant that it alters the essential nature of the program, service, or activity offered. Whether a change constitutes a fundamental alteration is a determination that must be made on a case-by-case basis, and that must consider the unique characteristics of each facility and each detainee with a disability.

### 2. Undue Financial and Administrative Burden

An "undue financial and administrative burden" is a significant difficulty or expense related to a facility's operations, programs, or activities. In evaluating whether a particular accommodation would result in an undue burden, the facility must consider all resources available for use in the funding and operation of the conducted program or activity *as a whole*.

### 3. Direct Threat

The facility may justify the denial of an accommodation to a detainee with a disability on the basis of the detainee posing a direct threat to staff or other detainees only if providing the accommodation would unavoidably exacerbate the threat. The determination that a detainee with a disability poses such a direct threat to staff or other detainees must be reached through an individualized assessment. The assessment must rely on reasonable judgment and current medical evidence, or the best available objective evidence, to determine the nature, duration, and severity of the risk, and whether any modifications of policies, practices, or procedures can mitigate or eliminate the risk. Detainees who are found to pose a direct threat are nevertheless entitled to auxiliary aids or services to allow for effective communication.

## H. External Notifications

### 1. Notification of a Detainee with a Communication or Mobility Impairment

The facility shall notify ICE/ERO as soon as practicable, but no later than 72 hours, after the facility has completed its interactive process to assess the needs of any detainee with a communication or mobility impairment. This notification must include, at a minimum,

a. The nature of the detainee's disability or impairment;

b. The accommodation requested by the detainee or required; and

c. The facility's plan to accommodate the detainee.

### 2. Notification of Facility Denials and Provision of Alternative Accommodations

The facility shall notify ICE/ERO in writing within 72 hours of any denial of any accommodation's requests. This notification must include, at a minimum,

a. The nature of the detainee's disability;

b. The accommodation requested by the detainee;

c. The reason for denial; and

d. Any steps the facility has taken to address the detainee's needs.

ICE/ERO may review the facility's denial of a request for an accommodation. The facility shall provide additional information as needed to further ICE/ERO's review and shall cooperate with ICE/ERO on any additional steps that may be necessary.

## I. Detainee Orientation

The facility orientation program shall notify and inform detainees about the facility's disability accommodations policy, including their right to request reasonable accommodations and how to make such a request, in a language and/or manner they can understand. The facility will post other documents for detainee awareness in detainee living areas and in the medical unit, as requested by ICE/ERO.

# Section 5:
# ACTIVITIES

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 56 of 157

# STANDARD 5.1

## CORRESPONDENCE AND OTHER MAIL

## I. POLICY

All facilities will ensure that detainees can send and receive correspondence in a timely manner, subject to limitations required for the safety, security, and orderly operation of the facility. Other mail will be permitted, subject to the same limitations. Each facility will make available its guidelines concerning correspondence and other mail.

## II. STANDARDS AND PROCEDURES

### A. General

The quantity of correspondence a detainee may receive or send at his or her own expense will not be limited. However, for reasons of safety, security, and the orderly operation of the facility, non-correspondence mail (such as packages and publications) may be subject to certain restrictions.

### B. Detainee Notification

The facility shall notify detainees in a language or manner that they understand of its policy on correspondence and other mail, and shall include information on sending and receiving correspondence in the facility handbook.

At a minimum, the notification shall specify:

1. That a detainee may receive mail, the mailing address of the facility, and instructions on how envelopes should be addressed;
2. That a detainee may send mail, the procedure for sending mail, and instructions on how outgoing mail must be addressed;
3. The process for inspecting general correspondence;
4. That special correspondence may only be opened in the detainee's presence, and may be inspected for contraband, but not read;
5. The definition of special correspondence, including instructions on the proper labeling for special correspondence;
6. Facility policy on packages;

7. A description of mail which may be rejected by the facility and which the detainee will not be permitted to keep in his or her possession;

8. How to obtain writing implements, paper, and envelopes; and

9. The procedure for purchasing postage (if any), and the rules for providing indigent and certain other detainees free postage.

## C. <u>Processing</u>

Detainee correspondence and other mail shall be delivered to the detainee and to the postal service on regular schedules.

Barring extraordinary circumstances, incoming correspondence shall be distributed to detainees within 24 hours of receipt by the facility. Outgoing correspondence shall be delivered to the postal service no later than the day after it is received by facility staff or placed by the detainee in a designated mail depository, excluding weekends and holidays. An exception may be made for correspondence or other mail that requires special handling for security purposes. For example, in exceptional circumstances, special correspondence may be held for 48 hours, to verify the addressee or sender.

## D. <u>Packages</u>

Each facility shall implement policies and procedures concerning detainee packages.

## E. <u>Inspection of Incoming and Outgoing Correspondence and Other Mail</u>

### 1. General Correspondence and Other Mail

All facilities shall implement procedures for the inspection of all incoming general correspondence and other mail (including packages and publications) for contraband.

Outgoing general correspondence and other mail may be inspected and/or read if the addressee is another detainee or if there is reason to believe the item might present a threat to the facility's secure or orderly operation, endanger the recipient or the public, or facilitate criminal activity.

### 2. Special Correspondence

"Special correspondence" is the term for detainees' written communications to or from private attorneys and other legal representatives; government attorneys; judges; courts; embassies and consulates; the president and vice president of the United States, members of Congress, the Department of Justice (including the immigration courts); the Department of Homeland Security (including ICE/ERO, IHSC, the DHS Office for

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 58 of 157

Civil Rights and Civil Liberties, and the DHS Office of the Inspector General); administrators of grievance systems; and representatives of the news media. Correspondence will only be treated as special correspondence if the title and office of the sender (for incoming correspondence) or addressee (for outgoing correspondence) are unambiguously identified on the envelope, clearly indicating that the correspondence is special.

All facilities shall implement procedures for inspecting incoming special correspondence for contraband. Any such inspection shall be in the presence of the detainee.

Outgoing special correspondence will not be opened, inspected, or read, consistent with facility policy. If a need exists, any inspection shall be undertaken in the presence of the detainee.

Staff shall neither read nor copy incoming or outgoing special correspondence. The inspection shall be limited to the purposes of detecting physical contraband and confirming that any enclosures qualify as special correspondence

**F. Rejection of Incoming and Outgoing Mail**

All facilities shall implement policies and procedures addressing the issue of acceptable and non-acceptable mail. Procedures shall cover the rejection of incoming and outgoing mail for reasons of facility order and security. Incoming and outgoing general correspondence and other mail may be rejected by the facility to protect the security, good order, or discipline of the institution; to protect the public; or to deter criminal activity.

The affected detainees shall be notified when incoming or outgoing mail is confiscated or withheld (in whole or in part). The detainee shall receive a receipt for the confiscated or withheld item(s).

**G. Contraband Recording and Handling**

When an officer finds an item that must be removed from a detainee's mail, he or she shall make a written record.

Prohibited items discovered in the mail will be handled in accordance with Standard 2.3, "Facility Security and Control." However, at the discretion of the facility, soft contraband may be returned to the sender.

Newspaper articles that depict or describe violence in a detainee's country of origin may be relevant to a detainee's legal case and should not automatically be considered contraband.

Identity documents (passports, birth certificates, etc.) shall be turned over to ICE/ERO. A copy shall be provided to the detainee and a copy shall be placed in the detainee's file.

**H. Postage Allowance**

The facility shall not limit the amount of correspondence detainees may send at their own expense, except to protect public safety or facility security and order.

The facility shall provide a postage allowance at government expense for indigent detainees. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten days. A facility shall make a timely effort to determine indigence.

The facility shall establish procedures to provide indigent detainees the ability to mail a reasonable amount of mail each week at government expense, including the following:

1. At least three pieces of general correspondence;
2. At least five pieces of special correspondence or legal mail; and
3. Packages containing personal property, when the facility determines that storage space is limited and that mailing the property is in ICE/ERO's best interest.

Free postage is generally limited to letters weighing one ounce or less, with exceptions allowed for special correspondence. In compelling circumstances, the facility may grant exceptions for general correspondence and other mail.

**I. Writing Implements, Paper, and Envelopes**

The facility shall provide writing paper, writing implements and envelopes at no cost to detainees.

**J. Detainees in Special Management Units**

Detainees in administrative or disciplinary segregation shall have the same correspondence privileges as detainees in the general population.

**K. Notaries, Certified Mail, and Miscellaneous Needs Associated with Legal Matters**

If a detainee without legal representation requests certain services in connection with a legal matter (notary public, certified mail, etc.) and has no family member, friend, or community organization to provide assistance, the facility shall assist the detainee.

If it is unclear whether the requested service is necessary in pursuit of a legal matter, the facility should consult with ICE/ERO.

# STANDARD 5.2

## RECREATION

## I. POLICY

The facility shall provide detainees with access to recreational programs and activities, within the constraints of the safety and security of the facility.

## II. STANDARDS AND PROCEDURES

### A. Requirements for Recreation

1. If outdoor recreation is available at the facility, it shall be offered at a reasonable time of day. Weather permitting, each detainee shall have access for at least one hour per day, five days per week; or, six or more hours per week, at least four days per week.

2. If only indoor recreation is available, detainees shall have access for at least one hour each day and shall have access to natural light.

3. All facilities shall provide equal access to recreational opportunities for detainees with disabilities.

4. Under no circumstances will the facility require detainees to forgo basic law library privileges for recreation privileges.

### B. Recreation Specialist

All facilities shall have an individual responsible for the development and oversight of the recreation program.

### C. Program Content

1. Exercise areas shall offer a variety of fixed and movable equipment.

2. Cardiovascular exercise shall be available to detainees for whom outdoor recreation is unavailable.

3. Recreational activities shall be based on the facility's size and location, and may include limited-contact sports, such as soccer, basketball, volleyball, table games, and may extend to competitions between units.

4. Dayrooms in general-population housing units will offer board games, television, leisure reading materials, and other sedentary activities.

5. All detainees participating in outdoor recreation shall have access to drinking water and toilet facilities.

6. Programs and activities are subject to the facility's security and operational guidelines and may be restricted.

7. Recreation areas shall be under continuous supervision by staff.

8. Where television or other broadcast programming is available to detainees, facilities are encouraged to provide these in Spanish and languages spoken by significant portions of the detainee population.

**D. Recreation for Special Management Unit (SMU)**

Recreation for detainees housed in the SMU shall occur separately from recreation for the general population.

Facilities are encouraged to maximize opportunities for group participation in recreation and other activities, consistent with safety and security considerations. Recreation for certain detainees may occur separate from other detainees when necessary or advisable to prevent assaults and reduce management problems.

Detainees in the SMU shall be offered at least one hour of recreation per day, scheduled at a reasonable time, at least five days per week. This privilege shall be waived only if the detainee's recreational activity would unreasonably endanger safety or security, as follows:

1. A detainee may be denied recreation privileges only with the facility administrator's written authorization.

2. The facility shall provide the detainee with written notification of the suspension of recreation privileges, the reason for the suspension, any conditions that must be met before restoration of privileges, and the duration of the suspension (assuming the requisite conditions are met).

3. Denial of recreation privileges for more than 15 days requires the concurrence of the facility administrator and a health care professional. The facility shall notify ICE/ERO when a detainee is denied recreation privileges in excess of 15 days.

### E. Volunteer Program Involvement

A volunteer group may provide special recreational or educational programs consistent with security considerations, availability of detention personnel to supervise participating detainees, and sufficient advance notification to the facility.

# STANDARD 5.3

## RELIGIOUS PRACTICES

## I. POLICY

This detention standard ensures that detainees of different religious beliefs are provided reasonable and equitable opportunities to participate in the practices of their respective faiths, limited only by a documented threat to safety, security and the orderly operation of the facility.

## II. STANDARDS AND PROCEDURES

### A. General

Detainees shall have the opportunity to engage in practices of their religious faith, limited only by a documented threat to safety, security, and the orderly operation of the facility.

Religious activities shall be open to the entire detainee population, without discrimination based on a detainee's race, ethnicity, religion, national origin, color, gender, sex, sexual orientation, age, or disability.

Language services shall be provided to detainees who have limited English proficiency to provide them with meaningful access to religious activities. As needed, and consistent with Standard 4.7 "Disability Identification, Assessment, and Accommodation," accommodations will be provided to detainees with disabilities to provide them with equal access to religious services.

No one may disparage the religious beliefs of a detainee, nor coerce or harass a detainee to change religious affiliation. Attendance at all religious activities is voluntary and, unless otherwise specified by the facility, open to all.

### B. Religious Opportunities and Limitations

When necessary for the security or good order of the facility, the facility administrator may discontinue a religious activity or practice or limit participation to a reasonable number of detainees or to members of a particular religious group after consulting with the chaplain or religious services coordinator (RSC). Facility records shall reflect the limitation or discontinuance of a religious practice, as well as the reason for such limitation or discontinuance.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 65 of 157

**C. Religious Preferences**

ICE/ERO does not require a detainee to profess a religious belief. The facility shall record any or no religious preference during in-processing. By notifying the chaplain or other RSC, in writing, a detainee may request to change this designation at any time, and the change will be affected in a timely fashion.

**D. Chaplain/ Religious Services Coordinator**

The chaplain or individual designated as the facility religious services coordinator is responsible for managing religious activities in the facility and providing information to detainees about how to request a religious practice accommodation.

**E. Schedules and Facilities**

All facilities shall designate adequate space for religious activities that can equitably meet the needs of the detainee population. Religious service areas shall be maintained in a neutral fashion suitable for use by various faith groups. The chaplain or religious services coordinator shall schedule and direct the facility's religious activities. Current program schedules shall be posted in living units, or otherwise made available to detainees.

**F. Community Involvement (Volunteers, Contractors)**

All facilities shall have resources available for community groups that provide religious services not provided by the chaplain or facility.

**G. Introduction of New and Unfamiliar Religious Components**

Detainees may request the introduction of new or unfamiliar religious components to the facility's religious services program. In those instances when information is required regarding a specific practice, the chaplain may ask the detainee or local or national offices of the relevant religion to provide additional information to inform the decision to include or exclude the practice from the religious services program.

**H. Religious Group Assemblies**

Detainees will have the opportunity to engage in group religious activities, limited only by a documented threat to the safety, security, and orderly operation of the facility.

**I. Religious Holy Days**

A policy consistent with maintaining safety, security and the orderly operation of the facility shall be in place to facilitate the observance of important religious holy days. The facility shall facilitate the observance of important religious holy days that involve special

fasts, dietary regulations, worship, or work proscription. The chaplain or RSC will work with requesting detainees to accommodate a proper observance of the holy day.

### J. Pastoral Visits

Detainees who belong to a religious faith different from the chaplain's will, if they prefer, have access to pastoral care and counseling from external clergy and religious service providers. The facility may request documentation of the person's religious credentials, as well as a criminal background check.

### K. Religious Property

Detainees shall have access to personal religious property, consistent with facility security. Any denial of access to personal religious property and the reason for it shall be documented and placed in the detention file or maintained in an retrievable electronic format. Limited only by a documented threat to safety, security, and orderly operation of the facility, the facility administrator shall ordinarily allow a detainee to wear or use personal religious items during religious services, ceremonies, and meetings in the chapel, and may, upon request of a detainee, allow a detainee to wear or use certain religious items throughout the facility. Religious literature should be permitted in accordance with the procedures governing incoming publications.

### L. Dietary Requirements

ICE/ERO requires all facilities to provide detainees requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of the secure and orderly running of the facility. See Standard 4.1 "Food Service."

### M. Detainees in Special Management Units

Detainees in the Special Management Units (administrative, disciplinary, protective custody, or medical housing) shall be permitted to participate in religious practices, limited only by a documented threat to safety, security, and orderly operation of the facility. The chaplain or RSC shall have physical access to all areas of the facility to serve detainees.

# STANDARD 5.4

## TELEPHONE ACCESS

## I. POLICY

Facilities shall provide detainees with reasonable and equitable access to telephones.

## II. STANDARDS AND PROCEDURES

### A. Detainee Access to Telephones

The facility shall provide detainees with reasonable and equitable access to telephones during established facility waking hours, limited only by the restrictions below.

Each facility shall provide detainees with access to reasonably priced telephone services. Contracts for such services shall comply with all applicable state and federal regulations and be based on rates and surcharges comparable to those charged to the general public.

### B. Detainee Notification

The facility shall provide telephone access rules in the facility handbook and shall post these rules where detainees may easily see them.

### C. Number of Telephones

To ensure sufficient access, the facility shall provide at least one operable telephone for every 25 detainees.

### D. Telephone Maintenance

The facility shall maintain detainee telephones in proper working order. Appropriate facility staff shall inspect the telephones daily, promptly report out-of-order telephones to the repair service, and ensure required repairs are completed quickly.

### E. Direct Calls and Free Calls

Even if telephone service is limited to collect calls, the facility shall permit detainees to make direct, free calls to the local immigration court and the Board of Immigration Appeals; federal and state courts where the detainee is or may become involved in a legal proceeding; consular officials; legal service providers, in pursuit of legal representation or to engage in consultation concerning his or her expedited removal case; legal service providers or organizations listed on the ICE/ERO free legal service provider list; government offices, to obtain documents relevant to his or her immigration case; DHS

OIG; ICE/OPR Joint Intake Center (JIC); the ICE/ERO DRIL; UNHCR; family or friends to address a personal or family emergency, or when the detainee can otherwise demonstrate a compelling need (to be interpreted liberally). If the limitations of its existing phone system will initially preclude the facility from meeting these requirements, the facility must report this to ICE/ERO. ICE/ERO will respond by providing some means of access, e.g., cell phones into which facility staff can pre-program authorized numbers (in the above categories) with all other numbers blocked. These phones will be maintained by ICE/ERO liaison officers or local officials and calls must be provided in an environment where the detainee's conversation may not be readily overheard.

ICE/ERO headquarters shall maintain and provide Field Offices a list of telephone numbers for current free legal service providers, consulates and embassies, and the Department of Homeland Security's (DHS) Office of the Inspector General (OIG), and the ICE/ERO DRIL. All Field Offices are responsible for ensuring facilities which house ICE detainees under their jurisdiction are provided with current pro bono legal service information.

ICE/ERO can also provide access to its detainee telephone service provider which enables detainees to make free calls to all numbers on the official pro bono legal services providers list, consulates and embassies, courts, DHS hotlines, and other entities.

Staff will allow detainees to make direct, free calls as described above as soon as possible after the request, factoring in the urgency expressed by the detainee. Generally, access will be granted within eight (facility-established) waking hours of the detainee's request, excluding the hours between lights-out and morning resumption of scheduled activities. The detainee shall always be granted access within 24 hours of his or her request.

Incidents of delays extending beyond eight (waking) hours must be documented and reported to ICE/ERO.

Indigent detainees may request a call to immediate family or others in personal or family emergencies or on an as-needed basis. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten days. The facility shall make a timely effort to determine indigence.

The facility shall enable all detainees to make calls to the ICE/ERO-provided list of pro bono legal service providers and consulates at no charge to the detainee or the receiving party. If the facility requires detainees to complete a request form to make direct or free calls, assistance must be provided for illiterate or limited English proficient detainees, and to detainees with disabilities.

Facilities will make efforts where necessary to allow detainees to make legal calls and to navigate decision trees and/or leave messages when those calls are answered by an automated system.

## F. Telephone Usage Restrictions

The facility shall not restrict the number of calls a detainee places to his or her legal representatives or to obtain representation. Similarly, the facility shall not limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones. If time limits are necessary for such calls, they shall be no shorter than 20 minutes, and the detainee shall be allowed to continue the call, if desired, at the first available opportunity.

The facility may place reasonable restrictions on the hours, frequency, and duration of the other direct and/or free calls listed above.

## G. Telephone Privileges in Special Management Unit

Staff shall permit detainees in the Special Management Unit for disciplinary reasons to make direct and/or free calls as described above, except under compelling security conditions. These conditions shall be documented.

Staff shall permit detainees in the Special Management Unit for administrative reasons (e.g., protective custody, suicide risk) to have telephone access similar to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units.

## H. Inter-facility Telephone Calls

Upon a detainee's request, the facility shall make special arrangements permitting the detainee to speak by telephone with an immediate family member detained in another facility. Immediate family members include the detainee's spouse, co-parent, mother, father, stepparents, foster parents, brothers and sisters, and children. Reasonable limitations may be placed on the frequency and duration of such calls.

The facility shall liberally grant requests for inter-facility family calls to discuss legal matters. For such calls, the detainee's conversations shall be afforded privacy to the extent possible, while maintaining adequate security.

## I. Incoming Calls

The facility shall take and deliver telephone messages to detainees as promptly as possible. When facility staff receives an emergency telephone call for a detainee, the caller's name and telephone number will be obtained and given to the detainee as soon as possible. The detainee shall be permitted to return the emergency call as soon as reasonably possible within the constraints of security and safety—normally within eight waking hours of the incoming call, as described above. The facility shall enable indigent detainees to make a free return emergency call.

## J. Privacy for Telephone Calls on Legal Matters

The facility shall ensure privacy for detainees' telephone calls regarding legal matters. For this purpose, the facility shall provide a reasonable number of telephones on which detainees can make such calls without being overheard by officers, other staff, or other detainees.

Facility staff shall not electronically monitor detainee telephone calls related to legal matters, absent a court order.

The facility shall inform detainees to contact a facility staff member if they have difficulty making a confidential call relating to a legal matter. If notified of such a difficulty, facility staff shall take measures to ensure that the call can be made confidentially. Privacy may be provided in a number of ways, including:

1. Telephones with privacy panels;
2. Placing telephones where conversations may not be readily overheard by other detainees or facility staff; or
3. Allowing detainees to use an office telephone to make confidential calls regarding their legal proceedings.

## K. Monitoring of Detainee Telephone Calls

The facility shall have a written policy on the monitoring of detainee telephone calls. If telephone calls are monitored, the facility shall notify detainees of this in a language or manner that they understand and in the facility handbook provided upon admission. The facility shall also place a notice at each monitored telephone stating:

1. That detainee calls are subject to monitoring; and
2. The procedure for obtaining an unmonitored call to a court, legal representative, or for the purposes of obtaining legal representation.

A detainee's call to a court, a legal representative, or for the purposes of obtaining legal representation will not be aurally monitored absent a court order. The facility retains the discretion to monitor other calls for security purposes.

## L. Telephone Access for Detainees with Disabilities

Consistent with Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall provide equal access to telephone services for individuals with disabilities. Such telephone services may include TTY devices, Accessible Telephones (telephones equipped with volume control and telephones that are hearing-aid

compatible for detainees who are deaf or hard of hearing), or videophones and video relay service or video remote interpretation service. Detainees with disabilities shall be provided access to accessible telephone services on the same terms as detainees without disabilities are provided access to telephones. Except to the extent that there are time limitations, detainees using accessible telephone services shall be granted additional time, consistent with safety and security concerns.

If accessible telephone services are not available in the same location as telephones used by detainees without disabilities, detainees with disabilities shall be allotted additional time to walk to and from the accessible telephone services location. Consistent with the order and safety of the facility, the facility shall ensure that the privacy of telephone calls by detainees using accessible telephone services is the same as other detainees using telephones.

# STANDARD 5.5

## VISITATION

## I. POLICY

Facilities holding detainees shall permit authorized persons to visit detainees within security and operational constraints. To maintain detainee morale and family relationships, ICE/ERO encourages visits from family and friends.

Facilities shall allow detainees to meet privately with their current or prospective legal representatives and legal assistants, and also with their consular officials.

In coordination with ICE/ERO, to better inform the public about ICE/ERO detention operations, facilities may permit authorized representatives of the news media and non-governmental organizations access to public information about facility operations; and with appropriate notice, to tour facilities; and, with permission from ICE/ERO and the detainee, to interview individual detainees.

Guidance regarding congressional visits to facilities can be found on ICE's public website: www.ice.gov.

## II. STANDARDS AND PROCEDURES

### A. General

The facility shall establish written visiting procedures, including a schedule and hours of visitation, taking into account the visitation requirements of family (including minors), friends, legal representatives, and consular officials.

The facility may temporarily restrict visiting when necessary to ensure the security and good order of the facility. Contact visits are encouraged but subject to the facility's detainee population and its physical conditions.

### B. Notification

The facility handbook shall include visitation rules and hours. The facility shall also post the rules and hours where detainees can easily see them, including in the housing units.

Each facility shall make the schedule and procedures available to the public, both in written form on the facility's website (if available) and posted in the visitors' waiting area, and telephonically. A live voice or recording shall provide telephone callers the rules and hours for all categories of visitation. The same information will be available in the public visitation room.

## C. Visitor Log

The facility shall maintain a log of all general visitors, and a separate log of legal visitors as described below. The visitation logs shall comply with local policy and procedures.

## D. Incoming Property and Money for Detainees

The facility shall have written procedures regarding incoming property and money for detainees. The facility shall allow a visitor to leave money for deposit in a detainee's account. The visitor will receive a receipt for all money or property left at the facility unless it is allowed to be given directly to the detainee.

Facilities are encouraged to allow visiting family members to bring detainees items such as legal documents and papers, prescription glasses, religious items and reading materials, and wedding rings.

## E. Sanctions for Violation of Visitation Rules

Any violation of the visitation rules may result in disciplinary action against the detainee, including loss of visitation privileges, through the formal disciplinary process.

Contraband introduction or violations may lead to criminal prosecution of the visitor, detainee, or both.

## F. Visits by Family and Friends

### 1. Hours and Time Limits

The facility shall establish a visiting schedule based on the detainee population and the demand for visits. Visits shall be permitted during set hours on Saturdays, Sundays, and holidays. To the extent practicable, the facility shall accommodate the scheduling needs of visitors for whom weekends and holidays pose a hardship. The facility may, for example, authorize special visits for family visitors unable to visit during regular hours.

Detainees will be allowed visits on at least one weekend day. However, to the extent practicable, ICE/ERO encourages the facility to establish visiting hours for each detainee on both days of the weekend, and to try to accommodate visitors who can only visit on a specific weekend day.

The facility's written rules shall specify time limits for visits: 30 minutes minimum, under normal conditions. ICE/ERO encourages more generous limits when possible, especially for family members traveling significant distances to visit. In unforeseen

circumstances, such as the number of visitors exceeding visiting room capacity, the facility may modify visiting periods.
Immediate family members detained at the same facility may visit with each other during normal visiting hours regardless of gender when practicable.

At facilities where there is no provision for contact visits by minors, upon request, ICE/ERO shall arrange for a contact visit by a detainee's children, stepchildren, and foster children within the first 30 days. After that time, upon request, ICE/ERO shall consider a request for transfer, when possible, to a facility that will allow such visitation. Upon request, ICE/ERO shall continue monthly visits, if transfer is not approved, or until an approved transfer can be effected.

**2. Visitor Identification and Search**

Staff shall verify each visitor's identity (through driver's license, photo identification, etc.) before admitting him or her to the facility. Photo identification must be a valid state or government-issued photo identification. No adult visitor shall be admitted without positive identification.

The facility may require a pat search as well as a visual inspection of purses, briefcases, packages and other containers. Any cancellation of visitation shall conform to facility policy and be documented.

**3. Contact Visits**

Written procedures shall detail the limits and conditions of contact visits in facilities permitting them.

A facility may only adopt a policy permitting strip searches after all contact visits in the absence of reasonable suspicion if detainees have the right to choose non-contact visitation instead. Detainees must be fully informed of that option and the policy generally in a language or manner they understand. The facility must document all strip searches that are performed based on such policy.

**4. Visits for Administrative and Disciplinary Segregation Detainees**

A detainee shall ordinarily retain visiting privileges while in administrative or disciplinary segregation. In a facility that allows contact visits, segregated detainees may use the visiting room during normal visiting hours.

Under no circumstances are detainees to participate in general visitation while in restraints. If the detainee's behavior warrants restraints, the visit will not be granted.

## G. Visits by Legal Representatives and Legal Assistants

### 1. General

During legal visitation, each detainee may meet privately with current or prospective legal representatives and their legal assistants.

### 2. Hours

The facility shall permit legal visitation seven days a week, including holidays. It shall permit legal visits for a minimum of eight hours per day on regular business days, and a minimum of four hours per day on weekends and holidays.

The facility shall provide notification of the rules and hours for legal visitation and post the rules prominently in the visiting room. On regular business days, legal visitations may proceed through a scheduled meal period. In such cases, the detainee shall receive a tray or sack meal after the visit.

### 3. Persons Allowed to Visit

Subject to the restrictions stated below, individuals in the following categories may visit detainees to discuss legal matters:

a. Attorneys and Other Legal Representatives

An attorney is any person who is a member in good standing of the bar of the highest court of any state, possession, territory, commonwealth or the District of Columbia, and is not under an order of any court suspending, enjoining, restraining, disbarring or otherwise restricting him or her in the practice of law.

A legal representative is an attorney or other person representing another in a matter of law, including law students or law graduates not yet admitted to the bar under certain conditions; Executive Office for Immigration Review accredited representatives; and accredited officials and attorneys licensed outside the United States. *See* 8 C.F.R. § 292.1 for more detailed definitions of these terms.

b. Legal Assistants

Upon presentation of a letter of authorization from the legal representative under whose supervision he or she is working, an unaccompanied legal assistant may meet with a detainee during legal visitation hours. The letter shall state that the named legal assistant is working on behalf of the supervising legal representative for purposes of meeting with the detainee(s).

c. Translators and Interpreters

The facility shall permit translators and interpreters to accompany legal representatives and legal assistants on legal visits. Translators and interpreters shall undergo the regular security clearance process.

d. Messengers

The facility shall permit messengers (who are not legal representatives or legal assistants) to deliver documents to and from the facility, but not to visit detainees.

**4. Identification of Legal Representatives and Assistants**

Prior to each visit, all legal representatives and assistants shall be required to provide appropriate identification, such as a bar card from any state, a document demonstrating partial or full accreditation from the U.S. Department of Justice (DOJ) Executive Office for Immigration Review (EOIR), or a letter of authorization from the legal representative or attorney under whose supervision the individual is working as detailed above.

If such documentation is not readily available to attorneys licensed in a particular state, they will be required to indicate where they are licensed as an attorney and how that fact may be verified.

Legal representatives and legal assistants shall not be asked to state the legal subject matter of the meeting.

A legal representative or legal assistant shall be subject to a search of his or her person and belongings for the purpose of ascertaining the presence of contraband at any time.

**5. Identification of Detainee to Be Visited**

The facility shall not require legal service providers to submit a detainee's A-number as a condition of visiting. The facility shall make a good-faith effort to locate a detainee if provided with other information about the detainee.

**6. Call-Ahead Inquiries**

Each facility shall establish a written procedure to allow legal service providers and legal assistants to telephone the facility in advance of a visit to determine whether a particular individual is detained in that facility.

**7. Pre-Representational and Other Legal Meetings**

During the regular hours for legal visitation, the facility shall permit detainees to meet with prospective and current legal representatives and legal assistants.

Legal service providers need not complete a Form G-28 (stating that they are the legal representatives of the detainee) to meet with a detainee.

**8. Private Meeting Room and Interruption for Head Counts**

Visits between legal service providers (or legal assistants) and an individual detainee are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings.

Facility staff may terminate attorney visits to maintain security. Routine official counts shall not terminate attorney visits.

Facility staff shall not be present in the confidential area during the attorney-detainee meeting unless the attorney requests the presence of an officer. However, staff may observe such meetings visually through a window or camera to the extent necessary to maintain security, as long as the staff member cannot overhear the conversation.

On occasion, a situation may arise where private conference rooms are in use and the attorney wishes to meet in a regular or alternate visiting room. Such requests should be accommodated to the extent practicable, and such meetings should be afforded the greatest degree of privacy possible under the circumstances.

**9. Materials Provided to Detainees by Legal Representatives**

The facility's written legal visitation procedures must provide for the exchange of documents between detainee and legal representative (or legal assistant) even when contact visitation rooms are unavailable.

Documents or other written material provided to a detainee during a visit with a legal representative shall be inspected, but not read. Detainees are entitled to retain legal material received for their personal use. Quantities of blank forms or self-help legal material in excess of that required for personal use may be held for the detainee in their property. The detainee will be permitted access to these documents utilizing the established avenues of communication.

**10. Detainee Search**

Generally, unless there is specific and articulable suspicion that contraband has been transferred to a detainee, detainees shall not be subjected to a strip search after a visit

by a consular representative, an attorney, a legal assistant working under the supervision of an attorney, or an accredited representative.

However, if standard operating procedures require strip searches after every contact visit with a legal representative, the facility must provide an option for non-contact visits with legal representatives in an environment that allows confidentiality. In that case, the facility will establish a mechanism for the detainee and his or her representative to exchange documents.

**11. Legal Visitation for Detainees in Administrative and Disciplinary Segregation**

Detainees in either administrative or disciplinary segregation shall be allowed legal visitation. If the facility administrator considers special security measures necessary, he or she will notify legal service providers of the security concerns prior to the meeting.

**12. Group Legal Meetings**

Upon the request of a legal service provider (or assistant), the facility may permit a confidential meeting (with no officer present) involving the requester and two or more detainees. This may be for various purposes: pre-representational, representational, removal-related, etc. The facility should grant such requests to the greatest extent practicable, i.e., if it has the physical capacity; if the meeting would not unduly interfere with security and good order, etc.

See also Standard 6.4 "Legal Rights Group Presentations."

**13. Pro Bono List and Detainee Sign-Up**

ICE/ERO shall provide the facility with the official list of pro bono legal services providers on a regular basis. The facility shall post the current list in detainee housing units and other appropriate areas. Any legal organization or individual on the current list may write the facility to request the posting and/or general circulation of a sign-up sheet. The facility will then notify detainees of the sign-up sheet's availability in a language or manner that they understand and, according to established procedures, ensure coordination with the pro bono organization.

**14. Legal Visitation Log**

A separate log shall record all legal visitors, including those denied access to the detainee. The log shall include the reason(s) for denying access.

**15. Availability of Legal Visitation Policy**

The facility's written legal visitation policy shall be available upon request.

## H. Consultation Visits for Detainees Subject to Expedited Removal

### 1. General

A detainee subject to expedited removal who has been referred to an Asylum Officer is entitled by statute and regulation to consult with any persons of the detainee's choosing, both prior to the interview and while the Asylum Officer's decision is under review.

Because expedited removal procedures occur within short timeframes, each facility shall develop procedures that liberally allow the opportunity for consultation visitation in accordance with this standard.

### 2. Method of Consultation

The facility shall facilitate consultation visitation, both by telephone and face-to-face.

### 3. Persons Allowed to Visit for Consultation Purposes

Detainees subject to expedited removal may consult whomever they choose, in person or by phone, at any time, during the first 48 hours at the facility. Consultants might include, but are not limited to, attorneys and other legal representatives, prospective legal representatives, legal assistants, staff members of non-governmental organizations (NGOs), and friends and family.

All consultation visitors are subject to the same identification and security screening procedures as general visitors. If documented security concerns preclude an in-person visit with a particular individual, the facility shall arrange for consultation by telephone. If security reasons also preclude consultation by telephone, the facility shall immediately inform ICE/ERO.

### 4. Privacy

Consultation visits, in person or by telephone, receive the same privacy as communications between legal representatives and detainees.

### 5. Hours

Consultation visitation shall be allowed during legal visitation hours and during general visitation hours. However, the facility may ensure confidentiality during legal visitation hours only.

If necessary to meet demand, the facility will increase consultation visiting hours.

**6. Duration of Consultation Period**

As stated above, the consultation visitation period begins before any interview with an Asylum Officer and continues while the Asylum Officer's determination undergoes review by the Supervisory Asylum Officer or Immigration Judge.

The consultation visitation period ends with the issuance of a Notice to Appear, and the detainee's placement in removal proceedings before an Immigration Judge. However, the detainee retains legal and other visitation privileges, in accordance with this detention standard.

**7. Admittance for Asylum Officer Interview**

Detainees subject to Expedited Removal may bring and consult advisors during the Asylum Officer interview. The presence of persons to consult is also allowed during the Immigration Judge's review of a negative credible fear determination, at the judge's discretion.

**8. Log**

The legal visitation log shall record consultation visits.

**9. Form G-28**

Visitors are not required to file a Form G-28 as a condition of participating in a consultation visit or providing consultation during an Asylum Officer interview or Immigration Judge review of a negative credible fear determination. This applies even if the visitor is an attorney or legal representative.

## I. Consular Protection

In accordance with the Vienna Convention on Consular Relations of 1963 and 8 C.F.R. § 236.1(e), detainees must be advised of their right to consular access, and the ICE/ERO must facilitate this access. ICE/ERO policy and practice require that detention facilities provide all detained individuals with notice of their rights to contact their consular representative(s) and receive visits from their consular officer(s). Additional information about consular notification and access is available online at http://travel.state.gov/CNA.

The facility shall ensure that all detainees are notified of and afforded the right to contact and receive visits from their consular officers. Such notifications shall be provided in a language or manner the detainees understand. The same hours, privacy, and other conditions that govern legal visitation apply to consular visitation. Consular visits may be permitted at additional times outside normal visitation hours with the facility's prior authorization. To conduct such visits, consular officers must present identification issued by the U.S. Department of State.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 81 of 157

## J. Non-Government Organization Visitation with Detainees and Tours of Facilities

All requests by NGOs and other organizations for tours and/or visits must be submitted in writing to ICE/ERO. The request will state the exact reason for the visit and issues to be discussed. When deciding whether to approve or deny the request, ICE/ERO will take into consideration facility safety and security, and the availability of personnel to staff the tour, visitation, or tour with visitation. Access will not be denied based on the political or editorial viewpoint of the requestor.

If approved by ICE/ERO, the facility should accommodate requests in a timely manner. Tours will be scheduled at the convenience of the facility so as not to disrupt normal operations and will comply with facility security requirements.

All participants in tours or detainee visitation must provide personal information to facilitate a mandatory background check, allowing sufficient time for completion prior to entry to the facility.

## K. Visits from Representatives of Community Service Organizations

The facility, in coordination with ICE/ERO, may approve visits to one or more detainees by representatives of community service organizations, including civic, religious, cultural, therapeutic, and other groups. Visiting procedures shall conform with the facility's visitor policy.

## L. News Media Interviews of Detainees

### 1. General

ICE/ERO supports public access to non-classified and non-confidential information about its operations in the interest of an informed public and an accountable government.

Visits must be coordinated with ICE/ERO. Interviews by reporters, academics conducting research, and others not included in other visitation categories must be approved by ICE/ERO.

### 2. Detention Facility Visits/Tours

Media representatives may tour facilities that house detainees for the purpose of preparing reports about the facilities. Facility tours shall be approved by ICE/ERO and the facility. When deciding whether to approve or deny the request, ICE/ERO will take into consideration safety and security, and the availability of personnel to staff the tour or provide security for the interview. ICE/ERO and the facility will coordinate on final approvals. Access will not be denied based on the political or editorial viewpoint of the requestor.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 82 of 157

Following ICE/ERO approval, media representatives shall make advance appointments with the facility for visits/tours.

News organizations interested in detainee issues shall abide by the policies and procedures of the facility being visited or toured.

The facility shall advise both media representatives and detainees that use of any detainee's name, identifiable photo, or recorded voice requires his or her prior permission. Such notice to detainees shall be provided in a language or manner that they understand. Media representatives shall obtain a signed release from the detainee before photographing or recording his or her voice and the facility shall retain the signed release(s) in the detainee's detention file or retrievable electronic record.

Detainees have the right not to be photographed (still, movie, or video), and not to have their voices recorded by the media. If the presence of video, film, or audio equipment or personnel would likely cause a disruption within the facility, the facility may limit or prohibit such equipment or personnel. For example, ICE/ERO might limit the equipment to hand-held cameras or recorders.

**3. Personal Interviews**

A media representative planning to conduct a personal interview at a facility shall submit a written request to ICE/ERO, preferably 48 hours and no less than 24 hours prior to the time slot requested. ICE/ERO may waive the 24-hour rule if convinced of the need for urgency.

ICE/ERO will inform the detainee of the interview request; the detainee must indicate his or her willingness to be interviewed by signing a consent form before ICE/ERO begins to consider the request. The signed consent form shall be retained in the detainee's detention file or retrievable electronic record.

Interviews will take place during normal business hours in a location determined by the facility. The facility will provide a location conducive to the interviewing activity, consistent with security and good order. ICE/ERO may limit the number of interviews with a particular detainee to a reasonable number per month. Further, if interviews are imposing a serious strain on staff or facility resources, ICE/ERO may restrict the time allotted to interviews.

ICE/ERO reserves the right to monitor and/or supervise, but not participate in, detainee interviews.

A media representative interested in touring the facility and photographing or recording other detainees in conjunction with an individual interview must follow all applicable facility procedures.

**4. Press Pools**

When ICE/ERO and the facility determine the volume of interview requests warrants such action, a press pool may be established. All material generated from such a press pool shall be available to all news media, without right of first publication or broadcast.

The facility will notify all media representatives with pending interviews, tours/visits, or requests that, effective immediately and until further notice, all media representatives must comply with the press pool guidelines established by ICE/ERO.

ICE/ERO will, upon request, provide the media information about a detainee provided it is a matter of public record and not protected by privacy laws or ICE/ERO policy. Security and safety concerns for staff and detainee(s) require that removal-related data remain confidential.

**5. Special Conditions**

The media representative shall certify that he or she is familiar with, and accepts, the rules and regulations governing media conduct during facility interviews and visits.

Media representatives must comply with the facility's rules and regulations. The routine processing of detainees shall take precedence over media interviews. A media request shall not delay or otherwise interfere with the in-processing or departure of any detainee.

**M. Other Special Visits**

**1. Law Enforcement Officials' Visits**

Facility visitation procedures shall address law enforcement officials requesting interviews with detainees.

**2. Visitation by Former Detainees or Aliens in Proceedings**

Former ICE/ERO detainees, individuals with criminal records, and individuals in removal proceedings shall not be automatically excluded from visiting. Individuals in any of these categories must notify the facility before registering for visitation privileges. The facility shall weigh the nature and extent of an individual's criminal record and/or prior conduct against the benefits of visitation in determining visitation privileges.

**3. Business Visitors**

A detainee shall not actively engage in business or professional interests or activities. A detainee engaged in a business or profession prior to detention should assign

authority for its daily operation to a person in the community. However, in the event that a detainee must make a decision that will substantially affect the assets or prospects of a business, the facility may permit a special visit.

### 4. Examinations by Independent Medical Service Providers and Experts

A medical and/or psychological examination by a practitioner or expert not associated with ICE/ERO or the facility can provide a detainee with information useful in legal or administrative proceedings. Therefore, ICE/ERO will generally approve examinations for such purposes, if the requested examination would not present an unreasonable security risk.

If a detainee seeks an independent medical or physical examination, he or she (or the legal representative) shall submit a written request to ICE/ERO. The request must provide the reason(s) for requesting such an examination.

The facility shall provide a location for an independent examination approved by ICE/ERO, but will not provide medical equipment or supplies. Neither ICE/ERO nor the facility shall assume the costs of the examination, which shall be at the detainee's expense. The examination will be arranged and conducted in a manner consistent with security and good order. ICE/ERO will advise the requester, in writing, of any reasons for denying a request.

# STANDARD 5.6

## VOLUNTARY WORK PROGRAM

## I. POLICY

Where allowed by the facility, detainees may participate in a work program to earn money. While working, detainees shall have basic Occupational Safety and Health Administration (OSHA) protections.

## II. STANDARDS AND PROCEDURES

### A. Voluntary Work Program

Where available, detainees may participate voluntarily in any facility work program.

The detainee's classification level will determine the type of work assignment for which he or she is eligible.

### B. Voluntary Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, can involve digging trenches, removing topsoil, and other labor-intensive work. High custody detainees will not, under any circumstances, work outside the secure outer perimeter.

### C. Detainee Selection

The facility shall develop site-specific rules for selecting work detail volunteers.

### D. Discrimination in Hiring Detainee Workers

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, color, gender, sex, sexual orientation, age, or disability.

### E. Detainees with Disabilities

The facility shall allow, where possible, detainees with disabilities to participate in the voluntary work program in appropriate work assignments. Consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall provide reasonable accommodations and modifications to its policies, practices, and/or procedures to ensure that detainees with disabilities have an equal opportunity to access, participate in, and benefit from the voluntary work programs.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 86 of 157

**F. Hours of Work**

Detainees participating in the voluntary work program are required to work according to a fixed schedule of no more than 8 hours daily and 40 hours weekly.

**G. Work Restrictions**

The facility may restrict the number of work details permitted a detainee during one day.

**H. Compensation**

Detainees shall receive monetary compensation of not less than $1.00 per day for work completed in accordance with the facility's standard policy. Detainees will be paid owed wages prior to transfer or release.

**I. Removal of Detainee from Work Detail**

A detainee may be removed from a work detail for cause. Upon removing a detainee from a work detail, the facility shall place a written justification in the detainee's detention file or in a retrievable electronic record.

**J. Detainee Responsibility**

The facility will establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

Detainees will use safety equipment and other precautions in accordance with the work supervisor's instructions.

**K. Detainee Training and Safety**

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility shall ensure that all department heads develop appropriate training for all detainee workers.

1. Upon the detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials. The detainee shall undertake no assignment before signing a voluntary work program agreement. Among other things, by signing the agreement the detainee confirms he or she has received and understood training about the assigned job from the supervisor. This agreement will be placed in the detainee's detention file or retrievable electronic record.

2. Medical staff will ensure detainees are medically screened and certified before undertaking a food service assignment.

3. The facility will provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

## L. Detainee Injury and Reporting Procedures

The facility shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 88 of 157

# Section 6: JUSTICE

# STANDARD 6.1

## DETAINEE HANDBOOK

## I. POLICY

Each facility will develop a site-specific handbook to serve as an overview of, and guide to, the rules and procedures in effect at the facility. The handbook will also describe the services, programs, and opportunities available through various sources, including the facility. Every detainee will receive a copy of this handbook upon admission to the facility along with a copy of the ICE/ERO National Detainee Handbook.

Detainees are expected to behave in accordance with the rules articulated in the handbook and will be held accountable for violations. Therefore, the facility staff will advise every detainee to become familiar with the material in the handbook and ensure the information is provided in a language or manner the detainee can understand.

## II. STANDARDS AND PROCEDURES

A. The facility will have a local handbook known as the "facility handbook."

B. The facility handbook will specify in detail the rules, regulations, policies, and procedures with which every detainee must comply and include information about available services such as: personal hygiene rules, recreation, correspondence and other mail, visitation, library/legal access, telephone use, sexual abuse and assault prevention and intervention program, disability accommodations, restricted areas, contraband, housekeeping, disciplinary rules and sanctions, grievance and appeal procedures, health care access, religious services, canteen and commissary, property, and so forth.

C. The handbook will be written in English and translated into Spanish and other prevalent language(s) among the facility's detainee population, as appropriate. Oral interpretation or assistance shall be provided to any detainee who speaks another language into which written material has not been translated or who is illiterate. Consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall also provide auxiliary aids and services (e.g., qualified sign language interpreters) or other accommodations to ensure the effective communication of the content of the handbook to detainees with disabilities.

D. The facility will provide a copy of the handbook to every staff member who has contact with detainees. These staff members will also receive training focused on its contents.

E. The facility will review the handbook annually.

F. The facility will document and maintain a detainee acknowledgement of receipt of the ICE National Detainee Handbook and facility handbook.

# STANDARD 6.2

## GRIEVANCE SYSTEM

## I. POLICY

Every facility will develop and implement policy and procedures that address detainee grievances. Among other things, each facility must establish a process to review formal complaints and a reasonable time limit for processing, investigating, and responding to grievances and providing written responses to detainees who filed formal grievances, including the basis for the decision. The facility must also prescribe procedures applicable to emergency grievances. All grievances shall receive supervisory review. Facility policies must include guarantees against reprisal.

## II. STANDARDS AND PROCEDURES

### A. Grievance Procedure

#### 1. Informal/Oral Grievance

The facility shall make every effort to resolve a detainee's complaint or grievance at the lowest level possible, in an orderly and timely manner. Each facility will institute procedures for informal resolution of oral grievances.

The detainee is always free to bypass or terminate the informal grievance process and proceed directly to the formal grievance stage.

Facilities shall ensure that detainees with disabilities have equal opportunity to access and participate in the grievance system, including by allowing for effective communication, which can include the provision of auxiliary aids and services, throughout the process.

Facilities shall ensure meaningful access to the oral grievance process for LEP detainees who are filing oral grievances, including through the provision of interpretation and translation services.

#### 2. Formal/Written Grievance

The facility must allow the detainee to submit a formal, written grievance to the facility's grievance committee. The detainee may take this step because he or she is not satisfied with the outcome of the informal process, or because he or she decides to forgo the informal procedures. The detainee has the responsibility to use this process in good faith and in an honest and straightforward manner. The facility shall not impose a time

limit on when a detainee may submit a formal grievance regarding an allegation of sexual abuse.

The detainee shall be given the opportunity to obtain assistance from another detainee, the housing officer or facility staff, family members, or legal representatives in preparing a grievance. Staff shall take reasonable steps to expedite requests for assistance from these other parties.

a. Barring extraordinary circumstances, grievances shall be addressed within five business days.

b. Medical grievances shall be promptly referred to and answered by the medical department.

c. The facility shall provide accommodations and/or assistance with filling out a grievance for detainees with a disability, who are illiterate, or who are limited English proficient.

No one against whom a grievance is made shall be responsible for adjudicating the grievance.

**B. Emergency Grievances**

Each facility shall implement procedures for identifying and handling an emergency grievance. An emergency grievance involves an immediate threat to a detainee's health, safety, or welfare. When a staff member determines that a detainee is raising an issue requiring urgent attention, the facility's emergency grievance procedures apply.

**C. Appeal**

If the detainee does not accept the grievance decision, he or she may appeal it. All facilities shall implement procedures for addressing detainee appeals.

Facilities must allow any detainee dissatisfied with the facility's response to his or her grievance to communicate directly with ICE/ERO.

**D. Retaliation**

Staff will not harass, discipline, punish, disclose sensitive information about, or otherwise retaliate against a detainee lodging a complaint. However, if an individual establishes a pattern of filing nuisance complaints or otherwise abusing the grievance system, staff may refuse to process subsequent complaints, but will notify ICE/ERO of any detainee determined to be filing nuisance grievances.

**E. Recordkeeping and File Maintenance**

Each facility will devise a method for documenting detainee grievances. At a minimum, the facility will maintain a Detainee Grievance Log.

A copy of the grievance will remain in the detainee's detention file, or in a retrievable electronic archive, where appropriate, for at least three years.

**F. Allegations of Officer Misconduct**

The facility must forward all detainee grievances containing allegations of staff misconduct to ICE/ERO.

**G. Allegations of Sexual Abuse**

If a detainee files a grievance related to a sexual abuse claim, the facility shall issue a decision on the grievance within five days of receipt and shall respond to an appeal of the grievance decision within 30 days. (A report of all such grievances must be sent directly to the ICE/ERO FOD.)

Facilities shall not impose a time limitation for detainees to file a sexual abuse and assault grievance.

**H. Detainee Handbook**

The grievance section of the facility handbook will provide notice of the following:

1. The opportunity to file a grievance, both informal and formal.
2. The procedures for filing a grievance and appeal, including the availability of assistance in preparing a grievance.
3. The procedures for resolving a grievance or appeal, including the right to have the grievance referred to higher levels if the detainee is not satisfied that the grievance has been adequately resolved.
4. Notice that staff may not harass, discipline, punish, or otherwise retaliate against any detainee for filing a grievance.

# STANDARD 6.3

## LAW LIBRARIES AND LEGAL MATERIALS

## I. POLICY

Facilities shall permit detainees access to a law library, and provide legal materials, facilities, equipment, printing and copying privileges, and the opportunity to prepare legal documents.

## II. STANDARDS AND PROCEDURES

### A. Law Library

The facility shall provide a law library in a designated room, or if facility design prevents a specific room for a designated law library, a suitable area will be identified. The area or room will have sufficient space and resources to facilitate detainees' legal research and writing.

### B. Equipment

The law library shall provide the following to enable detainees to prepare documents and conduct research for legal proceedings:

1. An adequate number of computers for electronic legal research;
2. A printer or the ability to print.
3. A copier or the ability to make copies;
4. Writing implements and paper

The facility shall designate an employee with responsibility to inspect the equipment at least weekly and ensure that it is in good working order, and to stock sufficient supplies.

### C. Holdings

ICE/ERO shall provide each facility an electronic version of required ICE/ERO law library reference materials. The facility shall post a list of its holdings in the law library and/or make a list of holding available electronically.

**D. Materials from Outside Persons or Organizations**

Outside persons and organizations may submit published or unpublished legal material for inclusion in a facility's law library. If the material is in a language other than English, an English translation must be provided.

If the facility receives published and/or unpublished immigration-related material for inclusion in the law library, it must immediately forward the material to ICE/ERO for review and approval.

ICE/ERO, in coordination with the ICE Office of the Principal Legal Advisor, shall review materials and issue an approval or denial generally within 45 days. The submitter will be notified of denials.

**E. Updating/Replacing Legal Materials**

ICE/ERO will provide updated electronic materials to facilities on a regular basis.

The facility shall designate an employee with responsibility for updating legal materials, inspecting them weekly, maintaining them in good condition, and replacing them promptly as needed. The facility shall notify the designated contact person at ICE/ERO if anticipated updates are not received. The facility shall update electronic media when it receives new materials.

Damaged materials shall be promptly replaced. The facility may obtain replacements by contacting the designated coordinator at ICE/ERO.

If materials submitted by outside organizations need to be replaced, the facility will contact ICE/ERO to obtain replacements from the submitting organization.

**F. Hours of Access**

The facility shall devise a flexible schedule to permit all detainees, regardless of housing or classification, to use the law library on a regular basis. Each detainee shall be permitted to use the designated law library for a minimum of five (5) hours per week during a reasonable time of day. Detainees may not be forced to forgo their minimal recreation time, as provided in Standard 5.2 "Recreation," to use the law library. Detainee requests for additional time in the law library shall be accommodated to the extent possible, consistent with the orderly and secure operation of the facility. Special priority should be given to requests for additional library time when a detainee is facing an imminent court deadline.

**G. Requests for Additional Legal Material**

Detainees who require additional legal material not available in the law library may request additional information. The facility shall inform ICE/ERO of the request as quickly as possible.

Requests from detainees who are facing imminent deadlines will receive priority. Requests for copies of court decisions will normally be met within three business days, with reasonable time-frames for other requests.

## H. Photocopying and Printing Legal Documents

The facility shall ensure that detainees can obtain copies of legal material when such copies are reasonable and necessary for a legal proceeding involving the detainee. This may be accomplished by providing detainees with access to a copier or printer, or by making copies upon request. Detainees may not be charged for copying or printing a reasonable amount of legal material.

The number of copies of documents to be filed with a particular court, combined with the number required for ICE/ERO records and at least one copy for the detainee's personal use will determine the number of photocopies required. Requests for photocopies of legal material may be denied only if:

1. The document(s) might pose a risk to the security and orderly operation of the detention facility;
2. There are other legitimate security reasons;
3. Copying would constitute a violation of any law or regulation; or
4. The request is clearly abusive or excessive.

Staff may not read a document that on its face is clearly related to a legal proceeding involving the detainee.

## I. Assistance from Facility Staff and Other Detainees

### 1. Assistance from Facility Staff

Facility staff shall provide assistance to detainees in accessing legal materials where needed (e.g., orientation to written or electronic media and materials; assistance in accessing related programs, forms and materials).

### 2. Assistance from Other Detainees and Volunteers

The facility shall permit detainees to assist other detainees in researching and preparing legal documents upon request, except when such assistance poses a security risk. Such assistance is voluntary, and no detainee shall be allowed to charge a fee or accept anything of value for assistance.

Facilities may allow outside volunteers and programs to assist or help detainees access legal materials.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 97 of 157

**J. Assistance to Detainees with Disabilities, Limited English Proficient (LEP) Detainees, and Illiterate Detainees**

Detainees with disabilities, LEP detainees, and illiterate detainees who wish to pursue a legal claim related to their immigration proceedings or detention, and who request assistance or otherwise indicate difficulty accessing or comprehending the legal materials, must be provided assistance beyond access to a set of English-language law books.

The facility shall assist detainees who are illiterate, LEP, or have disabilities in using the law library. Facilities shall establish procedures to meet this requirement, such as:

1. Having the facility's law librarian assist the detainee with legal research;
2. Permitting the detainee to receive assistance from other detainees in using the law library;
3. Assisting the detainee in contacting pro bono legal-assistance organizations from the ICE/ERO-provided list; and
4. In securing interpretation or translation services for an LEP detainee;
5. in the case of detainees with disabilities, consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," providing reasonable accommodations and/or auxiliary aids and services identified through the facility's reasonable accommodation process.

If such attempts are unsuccessful in providing the detainee sufficient assistance, the facility shall contact ICE/ERO to determine appropriate further action.

**K. Personal Legal Materials**

The facility shall permit detainees to retain all personal legal material upon admittance to the general population or segregation, unless such material creates a safety, security, and/or sanitation hazard. The facility may require detainees with a large amount of personal legal material to place some of the material in a personal property storage area, with access permitted during designated hours. The facility shall grant requests for access to such stored legal material as soon as possible, but not later than 24 hours after receipt of the detainee request, unless documented security concerns preclude action within this time frame.

**L. Law Library Access for Detainees in Special Management Units**

Detainees housed in Administrative Segregation or Disciplinary Segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.

Facilities may supervise the library use by a detainee housed in a special management unit as warranted by the individual's behavior and attitude. Detainees segregated for protection may be required to use the law library separately or, if feasible, have legal material brought to them. Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, until such time as their behavior and attitude warrants resumed access. In some circumstances, legal material may be brought to individuals in disciplinary segregation.

Denial of access to the law library must be supported by compelling security concerns, must be for the shortest period required by security, and must be fully documented in the special management housing logbook. A detainee shall not be denied access to law libraries and legal materials as a disciplinary measure, reprisal, retaliation, or penalty. ICE/ERO must be notified every time access is denied.

**M. Envelopes and Stamps for Legal Documents**

The facility will provide indigent detainees with free envelopes and stamps for mail related to a legal matter, including correspondence to a legal representative, potential legal representative, or any court. Indigent detainees will be permitted to mail a reasonable amount of mail each week, including at least five pieces of special correspondence and three pieces of general correspondence.

**N. Notaries, Certified Mail, and Miscellaneous Needs Associated with Legal Matters**

The facility shall provide assistance to any detainee who requests a notary public, certified mail, or other such services to pursue a legal matter, and if the detainee is unable to meet the need through a family member, friend, or community organization.

**O. Retaliation Prohibited**

Detainees may not be subjected to reprisals, retaliation, or penalties because of a decision to seek judicial relief on any matter, including:

1. The legality of their confinement;
2. The legality of conditions or treatment while under detention;
3. An issue relating to their immigration proceedings; or
4. Any allegation that the Government is denying rights protected by law.

**P. Notice to Detainees**

The facility shall provide detainees with the rules and procedures governing access to legal materials, communicating their content in a language or manner the detainee understands. Such rules and procedures shall include the following information:

1. The scheduled hours of access to the law library;
2. The procedure for requesting access to the law library;
3. The procedure for requesting additional time in the law library (beyond the five hours per week minimum);
4. The procedure for requesting legal reference materials not maintained in the law library; and
5. The procedure for notifying the facility about concerns with legal access.

# STANDARD 6.4

## LEGAL RIGHTS GROUP PRESENTATIONS

## I. POLICY

Facilities shall permit authorized persons to make presentations to groups of detainees for the purpose of informing them of U.S. immigration law and procedures, consistent with the security and orderly operation of each facility. ICE/ERO encourages such presentations, which instruct detainees about the immigration system and their rights and options within it.

## II. STANDARDS AND PROCEDURES

### A. Requests to Make Group Presentations on Legal Rights

Attorneys and legal representatives (including EOIR accredited representatives) interested in making a group presentation on legal rights must submit a written request to ICE/ERO.

Legal assistants/paralegals may conduct a group presentation on legal rights, if the supervising attorney/legal representative is present or he/she prepares a letter identifying the presenter(s) and affirming that the supervisory relationship directly relates to the presentation. The authorizing letter must be presented to ICE/ERO before the presentation can take place.

### B. Scheduling Presentations

ICE/ERO will notify the facility upon approving a group presentation. The facility will contact the designated party to arrange a mutually acceptable date and time for the presentation. Presentations will be scheduled during normal legal visiting hours, excluding weekends and holidays. If feasible, group presentations may be conducted daily, immediately before detainees' first Immigration Court appearance.

The facility is not required to arrange presentations for detainees; however, facilities are required to coordinate ICE/ERO approved presentations

### C. Detainee Notification and Attendance

At least 48 hours before a scheduled presentation, informational posters shall be prominently displayed in detainee housing units, and each housing unit officer will maintain a sign-up sheet. Detainees planning to attend may register on the sign-up sheet kept by a designated employee.

Presentations are open to all detainees, regardless of the presenter's intended audience, except when a particular detainee's attendance would pose a security risk. If a detainee in segregation cannot attend for this reason, either the detainee or the presenter(s) may request alternative arrangements.

The facility may limit the number of detainees at a single session. Therefore, the presenter must be prepared to conduct several presentations, depending on the number of interested detainees or the need to separate groups of detainees for safety and security. The presenter may contact the facility the day before the presentation to determine the number of sessions required.

**D. Entering the Facility**

The facility shall require all persons seeking entry to present identification in accordance with local policy.

The facility shall admit interpreters to assist attorneys and other legal representatives. ICE/ERO will not be responsible for providing interpreters for presenters.

**E. Presentation Guidelines**

The facility shall select and provide an environment conducive to the presentation, consistent with security. Once detainees have assembled, the presenters will have a minimum of one hour to make the presentation and to conduct a question-and-answer session.

The facility may require presenters to abide by all rules and regulations for visitors to the facility. Presentations will be conducted in a manner consistent with the security and orderly operation of the facility. Presenters shall not charge a fee nor solicit business during any presentation.

**F. Written Materials**

Presenters may distribute brief written materials to detainees and to ICE/ERO and/or facility staff at the same time. These materials must have been approved in advance by ICE/ERO. Distribution of unapproved materials will constitute grounds for discontinuation of presentation privileges.

The volume of materials to be distributed must be kept to a minimum. If the facility determines that the written materials are too voluminous for distribution at the presentation, the materials shall be made available to detainees in the facility's law library.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 102 of 157

**G. Individual Counseling Following a Group Presentation**

The facility shall permit presenters to meet with small groups of detainees to discuss their cases following a group presentation, consistent with security and the orderly operation of the facility. ICE/ERO and facility staff shall not be present during these meetings. Standard 5.5 "Visitation" sets forth the rules and procedures governing one-on-one counseling.

**H. Suspension or Termination**

The facility may discontinue or temporarily suspend group presentations by any or all presenters, if:

1. They pose an unreasonable security risk;
2. They interfere substantially with the facility's orderly operation;
3. They deviate from approved material, procedures or presenters; or
4. The facility is operating under emergency conditions.

The facility shall notify the affected presenters, in writing, of the reasons for termination or suspension, and send a copy of the notice to ICE/ERO. The presenters may appeal this decision.

**I. Video Presentations**

The facility shall play ICE/ERO-approved video presentations on legal rights at the request of ICE/ERO. If technical difficulties arise, the facility shall contact ICE/ERO for equipment options.

The facility shall provide regular opportunities for detainees in the general population to view such videos. The facility shall provide at least one opportunity to view the video for detainees in administrative or disciplinary segregation, unless precluded by security concerns regarding a particular detainee.

# Section 7: ADMINISTRATION AND MANAGEMENT

# STANDARD 7.1

## DETENTION FILES

## I. POLICY

Facilities will create a detention file for each detainee booked into the facility for more than 24 hours. The detention file will contain copies and, in some cases, the originals of documents including but not limited to the classification sheet, initial medical screening, property inventory sheet, and disciplinary records. The detention file may be comprised of hard copy documents, retrievable electronic records, or a combination of both.

## II. STANDARDS AND PROCEDURES

### A. Policy

The creation of a detention file is essential to maintaining a complete record of a detainee's time in facility custody. The file will contain the classification level and any copies of receipts for items issued to/surrendered by the detainee. It will also document adverse behavior, special requests and complaints, and other information considered appropriate for the record by facility officials.

### B. Creation of a Detainee Detention File

When a detainee whose stay will exceed 24 hours is admitted into a facility, staff will create a detainee detention file as part of in-processing (admissions) procedures, including the date of file initiation.

### C. Required Contents of File

1. The detention file will contain either originals or copies of forms and other documents generated during the admissions process. If necessary, the detention file may include copies of material contained in the detainee's A-File.

2. The detention file will generally include the following information unless the information is maintained in a retrievable electronic format:

    a. Booking Record, with one or more original photograph(s) attached;

    b. Classification Work Sheet;

    c. Health Screening Form;

d. Personal Property Inventory Sheet;

e. Housing Identification Card;

f. Property Receipt;

g. Baggage Check(s);

h. Acknowledgment form, documenting receipt of handbook, orientation, etc.;

i. Work assignment sheet;

j. Identifying marks form; and

k. Any other documents, as appropriate.

3. The detention file shall also contain documents generated during the detainee's time in the facility. ICE/ERO may direct that certain documents be added to the detention file.

**D. Additions to File**

1. During the course of the detainee's stay at the facility, staff will maintain documents associated with normal operations in either the detainee's detention file or in a retrievable electronic format. Examples of documents typically maintained in the detention file include the following:

a. Special requests;

b. Any property or baggage form closed-out during the detainee's stay;

c. Disciplinary forms;

d. Grievances, complaints, and the disposition(s) of same;

e. All forms associated with disciplinary and/or administrative segregation;

f. Staff reports about the detainee's behavior, attitude, etc.;

g. Strip search documentation; and

h. Any privacy waivers, including release-of-information consent forms.

**E. Location of File**

Detention files will be located and maintained in a secured area.

**F. Active/Archived File**

1. The detention file will remain active during the detainee's stay. Upon the detainee's release from the facility, staff will add any final documents not available in a retrievable electronic format to the file before closing and archiving.

2. The officer closing the detention file will document the date the file was closed.

3. The closed detention file shall not be transferred to another facility with the detainee. However, staff may forward copies of documents in the file at the request of supervisory personnel at the receiving facility/office.

4. When forwarding documents, staff will accordingly notate the request in the archived file or electronic record.

5. The archived files may be purged after six years, with the material either shredded or, if possible, burned.

**G. Access to File**

1. The facility shall have procedures addressing the circumstances under which a detention file may be requested and accessed by both facility staff and outside officials, and the recording of the file's removal from storage in a logbook or retrievable electronic record.

2. Unless release of information is required by statute or regulation, a detainee must sign a release-of-information consent form prior to the release of information in his or her detention file. A copy of the form shall be maintained in the detainee's detention file. The content of the form shall be explained to the detainee in a language or manner he or she understands.

3. Upon request by the detainee, the detention file shall be provided to the detainee or his or her designated attorney of record. Prior to release of the detention file, ICE/ERO should be notified to confirm that there are no security or sensitivity concerns.

# STANDARD 7.2

## DETAINEE TRANSFERS

## I. POLICY

U.S. Immigration and Customs Enforcement (ICE) often transfers detainees from one facility to another for a variety of reasons. This standard prescribes the procedures and notification requirements to be followed when transferring a detainee.

ICE/ERO will make all necessary notifications when a detainee(s) is transferred. Transfers will not be retaliatory. In deciding whether to transfer a detainee, ICE/ERO will take into account whether the detainee is represented before the immigration court. In such cases, ICE/ERO will consider alternatives to transfer, especially where the attorney is located within reasonable driving distance of the detention facility and where immigration court proceedings are ongoing.

## II. STANDARDS AND PROCEDURES

### A. Notification Procedure

#### 1. Detainee

For security purposes, specific plans and time schedules shall never be discussed with the detainee involved. The detainee shall not be notified of the transfer until immediately prior to leaving the facility. At that time, the detainee shall be notified that he or she is being moved to a new facility within the United States, and not being deported. This information shall be communicated to the detainee in a language or manner he or she understands. Following transfer notification, the detainee shall normally not be permitted to make or receive any telephone calls or have contact with other detainees in the general population until the detainee reaches the destination facility. At the time of the transfer, ICE/ERO will provide the detainee, in writing, with the name, address and telephone number of the facility he or she is being transferred to and contact the attorney of record.

#### 2. Medical Procedures and Information Required for Transfer

a. Notification of Transfers, Releases, and Removals

The facility health care provider will be given advance notice prior to the release, transfer, or removal of a detainee, so that medical staff may determine and provide for any medical needs in accordance with Standard 4.3, "Medical Care," associated with the transfer or release of a detainee.

b. Transfer of Health Records

The facility will send the detainee with full medical records or a detailed medical transfer summary.

c. Transfer Summary

The sending facility's medical staff shall prepare a Medical Transfer Summary that must accompany the detainee and shall include, at a minimum:

1. Patient identification;
2. Tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;
3. Current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;
4. Current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;
5. Any past hospitalizations or major surgical procedures;
6. Known allergies; and
7. The name and contact information of the transferring medical official.

The transfer summary sheet is essential for detainee safety while in transit and must be in the escorting officer's possession during that time. The detainee cannot be moved without the required information from the releasing institution. The transferring officer will review the information for completeness and to ensure he or she has the supplies required to provide care as indicated during the transfer process.

Any officer who reviews the transfer summary shall protect the privacy of the detainee's medical information. Such information shall not be shared with other detainees and shall not be shared with other officers unless appropriate to fulfill responsibilities. See Standard 4.3 "Medical Care," part J. "Confidentiality and Release of Medical Records." The transferring officer is responsible for delivering the transfer summary materials to medical personnel at the receiving facility.

d. Medical/Psychiatric Alert

When the medical staff determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer,

or requires medical escort during deportation or transfer, ICE/ERO will be notified in writing.

e. Medications

Prior to transfer, medical personnel will provide the transporting officers with instructions and, if applicable, medication(s) for the detainee's care in transit in accordance with Standard 4.3 "Medical Care." Medications will be placed in a property envelope with the detainee's name and A-number on it. Medications will accompany the transfer and be turned over to an officer at the receiving field office.

**3. Other Transfer Paperwork**

A properly executed I-203/I-203A and I-216 by ICE/ERO will accompany the transfer.

**B. Property**

**1. Checkout of Funds and Small Valuables**

The following items shall always accompany a detainee to the receiving facility: cash, all legal material, and small valuables such as jewelry, address books, phone lists, correspondence, dentures, prescription glasses, small religious items, pictures, etc.

The detainee should ordinarily have these items in his or her possession during transport. Items that might present a security risk or that are particularly bulky shall be separated from the detainee during transport.

Before the detainee is transferred, the sending facility shall return all funds and small valuables to the detainee. All funds and valuable receipts shall be closed in accordance with Standard 2.4 "Funds and Personal Property." The receiving facility shall create a new funds and valuables receipt during in processing according to procedures established in Standard 2.4 "Funds and Personal Property."

**2. Large Valuables, Excess Luggage, and Other Bulky Items**

All items stored at the sending facility will accompany the transferee. If the receiving facility will not accept detainees' excess, oversized, or bulky belongings (including, but not limited to, suitcases, cartons, televisions, etc.), the sending facility will retain them, arrange to store them elsewhere, or may follow the procedures for disposing of excess property.
If the detainee refuses to cooperate by providing an appropriate mailing address or is financially able but unwilling to pay for shipping, the facility will coordinate with ICE/ERO to dispose of the property after providing the detainee with written notice. If, however, the detainee's failure to specify a shipping address is because an appropriate mailing address does not exist, the facility will coordinate with ICE/ERO for disposition of the property.

**3. Checkout of Luggage, Large Valuables, and Other Bulky Items**

If the property accompanies the detainee, the sending facility shall close out the existing G-589, or local funds and valuable receipts, in accordance with Standard 2.4 "Funds and Personal Property." The receiving facility shall create a new I-77 or local funds and valuable receipts during in processing.

**C. <u>Food During Transfer</u>**

During transfers, food shall be provided to detainees in accordance with the "Meals" section of Standard 1.2 "Transportation by Land."

# APPENDICES:

Appendix A: List of Required Staff Training

Appendix B: ICE Reporting Requirements

Appendix C: Contents of the Local Supplement

Appendix D: Definitions

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 112 of 157

# APPENDIX A

## LIST OF REQUIRED STAFF TRAINING

Detention facility staff, contractors, and volunteers shall receive sufficient initial and recurrent training to be competent in their job duties.

The following list includes general training in these standards where ICE has a specific requirement related to content, duration, or frequency.

Note: See the respective standards for additional, specific requirements for trainings.

**2.7 Searches of Detainees**

1. All staff who conduct searches of housing, work areas or of a detainee's body shall receive initial training regarding search procedures prior to entering on duty, and shall receive annual training in authorized and effective techniques thereafter. (See Standard 2.7 "Searches of Detainees," B. Staff Training)

2. Security staff shall be trained in proper procedures for conducting pat searches, including opposite gender pat searches and searches of transgender and intersex detainees. (See Standard 2.7 "Searches of Detainees," C. Body Searches of Detainees)

**2.8 Use of Force and Restraints**

1. All detention personnel shall be trained in approved methods of self-defense, crisis intervention and conflict de-escalation techniques, recognizing signs and symptoms of mental illness, reporting requirements, and the use of force to control detainees. Staff will be made aware of prohibited use-of-force acts and techniques.

2. Training in the use of chemical agents shall include treatment of individuals exposed to them. Training should also cover use of force in special situations. (See Standard 2.8 "Use of Force," N. Training)

**2.9 Special Management Units**

Security staff assigned to SMU shall receive specialized training in relevant topics, such as:

a. Identifying signs of mental health decompensation;
b. Techniques for appropriate interactions with mentally ill detainees;
c. The impact of isolation; and
d. De-escalation techniques.

(See Standard 2.9 "Special Management Units," L. Specialized Training)

**2.11 Sexual Abuse and Assault Prevention and Intervention**

1. Training on the facility's Sexual Abuse or Assault Prevention and Intervention Program shall be included in training for all employees, and shall also be included in biannual refresher training thereafter. Specific additional requirements are listed in the standards.

2. All volunteers and contractors who have contact with detainees must be trained on their responsibilities under the facility's sexual abuse prevention, detection, intervention and response policies and procedures. The level and type of training for volunteers and contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and contractors who have any contact with detainees must be notified of the facility's zero-tolerance policy and informed how to report such incidents.

3. Facility investigators must receive training on sexual abuse and effective cross-agency coordination.

4. Facility medical staff shall be trained in procedures for examining and treating victims of sexual abuse, in facilities where medical staff may be assigned these activities. (See Standard 2.11 "Sexual Abuse and Assault Prevention and Intervention," E. Staff Training)

**4.2 Hunger Strikes**

All staff shall be trained initially and annually thereafter to recognize the signs of a hunger strike, and to implement the procedures for referral for medical assessment and for management of a detainee on a hunger strike. (See Standard 4.2 "Hunger Strikes," A. Staff Training)

**4.3 Medical Care**

1. Registered Nurses who perform health assessments must have documented initial and annual training provided by a physician. (See Standard 4.3 "Medical Care," E. Comprehensive Health Assessment)

2. Registered Nurses who perform initial dental screenings must be trained how to conduct the exam by a dentist annually. (See Standard 4.3 "Medical Care," H. Dental Treatment)

3. Detention staff will be trained to respond to health-related emergencies within a 4-minute response time, and will include:

   a. The recognition of signs of potential health emergencies and the required response;
   b. The administration of first aid and cardiopulmonary resuscitation (CPR);
   c. The recognition of signs and symptoms of mental illness (including suicide risk), and chemical dependency; and
   d. The facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 114 of 157

(See Standard 4.3 "Medical Care," K. First Aid and Medical Emergencies)

**4.5 Significant Self-Harm and Suicide Prevention and Intervention**

1. All facility staff members who interact with and/or are responsible for detainees shall receive comprehensive suicide prevention training during orientation and refresher training at least annually thereafter. Subjects are listed in the standards. (See Standard 4.5 "Significant Self-Harm and Suicide Prevention and Intervention," B. Training)

2. If an officer evaluates a detainee for suicide potential and history of suicide risk as part of his or her initial health screening, that officer must have received special training to do so. (See Standard 4.5 "Significant Self-Harm and Suicide Prevention and Intervention," C. Identification)

**6.1 Detainee Handbook**

The facility will provide a copy of the handbook to every staff member who has contact with detainees. These staff members will also receive training focused on its contents. (See Standard 6.1 "Detainee Handbook," II. Standards and Procedures)

# APPENDIX B

## ICE REPORTING REQUIREMENTS

The facility shall immediately notify ICE/ERO of any and all of the incidents or circumstances listed below.

The local ICE/ERO Field Office may provide additional reporting instructions.

**Significant Events**

(These notifications are not otherwise listed in the standards.)

1. Activation of disturbance control team(s);
2. Disturbances (including gang activities, group demonstrations, food boycotts, work strikes, workplace violence, civil disturbances/protests);
3. Fires;
4. Citations or denied licensures related to federal, state and local health, life, safety, and fire codes;
5. Significant environmental problems that impact detention facility operations;
6. Full or partial lock down of the detention facility;
7. Escape(s) or escape attempts;
8. Weapons discharge;
9. Adverse incidents that attract unusual interest or significant publicity;
10. Adverse weather (e.g., hurricanes, floods, ice/snow storms, heat waves, tornadoes);
11. Fence damage;
12. Power outages;
13. Bomb threats;
14. Transportation (e.g., airlift, bus) accidents resulting in ICE detainee injuries, death, or detention facility property damage;

15. Detention facility evacuations;

16. Detainee (or Inmate)-on-Detainee Assault (i.e., any serious physical assault on an ICE detainee by another detainee or inmate);

17. Staff-on-Detainee Assaults (i.e., any incident or allegation of a physical assault on an ICE detainee perpetrated by staff, including the facility investigation); and

18. Staff Misconduct (i.e., any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE).

**Standards Notifications**

(The following notifications are listed in the standards.)

**1.2 Transportation by Land**

If a detainee's paperwork is incomplete prior to transfer. (See 1.2 Transportation by Land, A. Transportation Planning)

**2.1 Admission and Release:**

Any detainee claims of lost or damaged property and the outcomes of such claims. (See 2.1 Admission and Release, H. Missing Detainee Property, and 2.4 Funds and Personal Property, G. Lost/Damaged Property)

**2.8 Use of Force and Restraints:**

1. All uses of force involving detainees;

2. Uses of restraints; and

3. Detainees restrained using 4- or 5-point restraints for over eight hours, and every eight hours thereafter.

(These reports must be sent directly to the ICE/ERO Field Office Director (FOD).)

(See 2.8 Use of Force and Restraints, J. Documentation of Use of Force and Application of Restraints Incidents)

**2.9 Special Management Units**

1. When a detainee is placed in a Special Management Unit (SMU) for an administrative purpose, the administrative segregation order shall be immediately provided to ICE/ERO.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 117 of 157

2. When a detainee housed in a Special Management Unit (SMU) meets the following criteria, ICE/ERO shall be notified:

   a. Extended Segregation Placements: Housed in an SMU for 14 days, or 14 days out of any 21-day period; housed in an SMU for 30 days; and at every 30-day interval thereafter.

   b. Special Vulnerability Notifications: No later than 72 hours after the initial placement for any detainee who:

      i. Has been placed in administrative segregation **on the basis of** a disability, medical or mental illness, or other special vulnerability, or because the detainee is an alleged victim of a sexual assault (this report must be sent directly to the FOD), is an identified suicide risk, or is on a hunger strike; or

      ii. has been placed in segregation **for any reason** who has a mental illness, a serious medical illness, a serious physical disability, or is pregnant or recently had a miscarriage.

   (See 2.9 Special Management Units, C. Notifying ICE/ERO of Segregation Placements and Facilitating ICE/ERO Review)

3. Any denial of access to legal materials for a detainee housed in the SMU. (See 2.9 Special Management Units, U. Law Library and Legal Rights Group Presentations)

4. The denial of recreation privileges in excess of seven days. (See 2.9 Special Management Units, V. Recreation)

**2.10 Staff-Detainee Communication**

If there is a secure ICE/ERO drop box at a facility, and ICE/ERO has not collected detainee correspondence from the drop box for more than five days. (See 2.10 Staff-Detainee Communication, B. Requests to ICE/ERO Staff from ICE/ERO Detainees, 4. Additional Facility Responsibilities)

**2.11 Sexual Abuse and Assault Prevention and Intervention**

1. Any allegation that a detainee was sexually abused or assaulted at the current facility or elsewhere while in custody. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, L. Reporting, Notifications, and Confidentiality)

2. The final results of any facility sexual assault investigation. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 3. Procedures for Administrative Investigations)

3. The completed incident review for any allegation determined to be substantiated or unsubstantiated. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 5. Sexual Abuse Incident Reviews)

4. An annual review of all sexual abuse investigations to assess and improve sexual abuse and assault intervention, prevention and response efforts, or if there have been no reports, a negative report. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 5. Sexual Abuse Incident Reviews)

5. Any allegation involving a victim under the age of 18 or who is considered a vulnerable adult under a state or local vulnerable persons statute. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, L. Reporting, Notifications and Confidentiality).

**4.2 Hunger Strikes**

A detainee begins a hunger strike, refuses treatment related to the hunger strike, or when the facility plans to involuntarily feed the detainee. (See 4.1 Food Service, B. Initial Referral and E. Refusal to Accept Treatment)

**4.3 Medical Care (Special Medical Needs)**

1. A detainee requires close medical supervision, including chronic and convalescent care. (See 4.3 Medical Care, M. Special Needs)

2. A detainee self-identifies as transgender. (See 4.3 Medical Care, M. Special Needs)

3. Any plan for forced medical treatment. (See 4.3 Medical Care, O. Informed Consent)

4. A health care practitioner determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer to another facility, or requires medical escort during removal or transfer. (See 4.3 Medical Care, Q. Transfer and Release of Detainees)

5. A detainee receives a medical treatment or procedure not generally available, but determined to be medically necessary by a medical provider. (See 4.3 Medical Care, R. Medical Experimentation and Research)

6. A detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility and a referral for an outside mental health facility is initiated. (See 4.3 Medical Care, S. Mental Health)

7. A detainee is pregnant. (See 4.3 Medical Care, U. Women's Medical Care)

**4.5 Significant Self-Harm and Suicide Prevention and Intervention**

Any suicide attempt or suicide. (See 4.5 Significant Self-Harm and Suicide Prevention and Intervention, J. Notification and Reporting)

**4.6 Terminal Illness and Death**

1. A chronically, critically, or terminally ill detainee is to be transferred to an off-site medical facility. (See 4.6 Terminal Illness and Death, A. Terminal Illness)

2. A detainee death. (See 4.6 Terminal Illness and Death, B. Death Occurring in ICE/ERO Custody)

**4.7 Disability Identification, Assessment, and Accommodation**

1. The identification of a detainee with a communication or mobility impairment. (See 4.7 Disability Identification, Assessment, and Accommodation, H. External Notifications, 1. Notification of a Detainee with a Communication or Mobility Impairment)

2. The denial of any disability accommodations requests. (See 4.7 Disability Identification, Assessment, and Accommodation, H. External Notifications, 2. Notification of Facility Denials and Provision of Alternative Accommodations)

**5.2 Recreation**

A detainee is denied recreation privileges for a period exceeding 15 days. (See 5.2 Recreation, E. Recreation for Special Management Unit (SMU))

**5.3 Religious Practices**

Before denying a detainee's request to participate in a religious diet or removing a detainee from a religious diet program. (See 4.1 Food Service, F. Religious/Special Diets)

**5.4 Telephone Access**

A detainee is delayed beyond eight (waking) hours from making a direct call to legal service entities or to address a personal or family emergency or to address a compelling need. (See 5.4 Telephone Access, E. Direct Calls and Free Calls)

**5.5 Visitation**

Security reasons preclude any detainee from engaging in legal consultation in person and by telephone. (See 5.5 Visitation, H. Consultation Visits for Detainees Subject to Expedited Removal, 3. Persons Allowed to Visit for Consultation Purposes)

**5.6 Voluntary Work Program**

A detainee is injured while participating in a voluntary work program. (See 5.6 Voluntary Work Program, L. Detainee Injury and Reporting Procedures)

**6.2 Grievance System**

1. Any detainee grievance that contains an allegation of staff misconduct. (See 6.2 Grievance System, F. Allegations of Officer Misconduct and 2.3 Facility Security)
   (This report must be sent directly to the FOD.)

2. A detainee is determined to be filing nuisance grievances, or otherwise abusing the grievance system. (See 6.2 Grievance System, D. Retaliation)

**6.3 Law Libraries and Legal Materials**

1. If the facility does not receive anticipated updates to the electronic library. (See 6.3 Law Libraries and Legal Materials, E. Updating/Replacing Legal Materials)

2. A detainee requests additional legal material not available in the law library. (See 6.3 Law Libraries and Legal Materials, G. Requests for Additional Legal Materials)

**6.4 Legal Rights Group Presentations**

A legal rights group presentation is discontinued or temporarily suspended. (See 6.4 Legal Rights Group Presentations, H. Suspension or Termination)

**7.1 Detention Files**

Notification of any release of detainee medical or detention information. (See 7.1 Detention Files, F. Access to File)

# APPENDIX C

## CONTENTS OF THE LOCAL SUPPLEMENT

Upon admission to a facility, prior to placement in general population, each detainee shall be provided a copy of the ICE National Detainee Handbook and that facility's local supplement to the handbook. The contents of the National Detainee Handbook and any local supplement must be effectively communicated to each detainee in a language or manner he or she can understand.

Staff shall require each detainee to verify, by signature, receipt of the handbook, and shall maintain that signed acknowledgement in the detainee's detention file.

While all applicable topics in the ICE National Detainee Handbook must be addressed, the following topics are recommended for inclusion in the local supplement:

1. the rules, regulations, policies, and procedures with which every detainee must comply;
2. detainee rights and responsibilities;
3. procedures for requesting translation and interpretation services for meaningful access to facility programs, services, and activities;
4. procedures for requesting disability-related or other accommodations, including auxiliary aids or services to allow for effective communication;
5. the agency's and the facility's zero tolerance policies for all forms of sexual abuse and assault;
6. the facility's rules of conduct and prohibited acts, the disciplinary severity scale, the sanctions imposed for violations of the rules, the disciplinary process, the procedure for appealing disciplinary findings, and detainees' rights in the disciplinary system, as required by Standard 3.1 "Disciplinary System";
7. information about the facility's grievance system including medical grievances, as required by Standard 6.2 "Grievance System";
8. the facility's policies on telephone access and on the monitoring of telephone calls, if telephone calls are monitored;
9. the facility's visitation rules and hours;
10. rules and procedures governing access to the law library, as required by Standard 6.3 "Law Libraries and Legal Materials";
11. content and procedures of the facility's rules on legal rights group presentations, and the availability of legal orientation programs;

12. the facility's rules on correspondence and other mail, including information on correspondence procedures, as required by Standard 5.1 "Correspondence and Other Mail";
13. the facility's policies and procedures related to personal property, as required by Standard 2.4 "Funds and Personal Property";
14. the facility's marriage request procedures;
15. contact information for the ICE/ERO Field Office and the scheduled hours and days that ICE/ERO staff is available to be contacted by detainees at the facility, as well as the phone number for the Detention Reporting and Information Line (1-888-351-4024); and
16. procedures to submit written questions, requests, or concerns to ICE/ERO staff, as well as the availability of assistance to prepare such requests.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 123 of 157

# APPENDIX D

## DEFINITIONS

**A-FILE, ALIEN FILE** – The legal file maintained by DHS for each detainee. Contents include but are not limited to the detainee's identification documents (passport, driver's license, other identification cards, etc.), photographs, immigration history, prior criminal record if any, and all documents and transactions relating to the detainee's immigration case.

**ACA** – American Correctional Association.

**ACCREDITED REPRESENTATIVE** – A person whom the U.S. Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) has found qualified to represent individual aliens before DHS and/or the immigration courts, in accordance with federal regulations (see 8 C.F.R. §§ 292.1 and 292.2).

**ADMINISTRATIVE SEGREGATION** – A non-punitive form of separation from the general population used for administrative reasons. Administrative segregation is available only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility, as determined by a facility administrator or supervisor. Administrative segregation may be available, among other reasons, for detainees awaiting investigations or hearings for violations of facility rules; detainees scheduled for release, removal, or transfer within 24 hours; and, under more limited circumstances, detainees who require protective custody or separation from the general population for medical reasons. Generally, detainees housed in administrative segregation retain all the rights and privileges available to detainees in the general population.

**ADMISSION/ADMISSIONS PROCESS** – In-processing of newly arrived detainees, which includes an orientation to the policies, programs, rules, and procedures of the facility. Classification, assignment to living quarters, various inspections, medical screening, and safeguarding of funds, valuables and other personal property is completed during this process.

**AMBULATORY RESTRAINTS** – "Soft" or "hard" equipment used to restrict a detainee's movement but leaving him/her able to eat, drink, or attend to basic bodily functions without staff intervention.

**ATTORNEY** – A member in good standing of the bar of the highest court of any State, possession, territory, Commonwealth, or the District of Columbia; who is not under an order of any court suspending, enjoining, restraining, disbarring, or otherwise restricting him/her in the practice of law (see 8 C.F.R. § 1.1(f)).

**AUXILIARY AIDS AND SERVICES** – Services or devices that allow for effective communication by affording individuals with impaired vision, hearing, speaking, sensory, and manual skills an equal opportunity to participate in, and enjoy the benefits of, programs and activities. Such aids or services include interpreters, written materials, note-takers, video remote

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 124 of 157

interpreting services, or other effective methods of making aurally delivered materials available to detainees with hearing impairments; readers, taped texts, materials or displays in Braille, secondary auditory programs, or other effective methods of making visually delivered materials available to detainees with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.

**BODY-CAVITY SEARCH** – The visual inspection or physical probing of body openings (anus, vagina, ears, nose, mouth, etc.) where weapons, drugs, or other contraband could be secreted. This is the most intrusive means of searching an individual, reserved for instances where other search techniques have been considered but rejected as ineffective under the particular circumstances of the case. Body-cavity search procedures govern physical probes, but not visual inspections. For example, the procedures would not be appropriate for a visual inspection of the inside of the mouth, nose, or ears, unless contraband is found during the course of that inspection. Body-cavity procedures apply whenever contraband is found, because retrieving or seizing the item will involve physical entry into or probing within the cavity (in this example, the mouth, nose, or ear).

**CAUSTIC** – Capable of burning, corroding, eroding, or destroying by chemical action.

**CHAIN OF COMMAND** – Order of authority (rank): executive, senior management, senior staff, etc. The position titles may vary according to the type of facility and local facility titles. The on-site order of authority at a detention facility descends from the facility administrator to assistant or associate facility administrators to department heads to shift supervisors and other supervisors.

**CHEMICAL** – A substance with a distinct molecular composition produced by or used in a chemical process.

**CHIEF OF SECURITY** – A generic term for the department head in charge of a detention facility's security employees and operations. The position titles may vary according to the type of facility and local facility titles. Ordinarily, a Chief of Security (chief detention enforcement agent, captain, etc.) is organizationally directly under an assistant or associate facility administrator.

**CHRONIC DISEASE** – An illness or condition that affects an individual's well-being for an extended interval, usually at least six months, and generally is not curable but can be managed to provide optimum functioning within any limitations the condition imposes on the individual.

**CHRONIC DISEASE PROGRAM (CARE CLINIC)** – Incorporates a treatment plan and regular clinic visits. The clinician monitors the patient's progress during clinic visits and, when necessary changes the treatment. The program also includes patient education for symptom management.

**CLASSIFICATION** – A process used to make housing and program assignments by assessing detainees on the basis of objective information about past behavior, criminal records, special needs, etc.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 125 of 157

**CLINICAL DIRECTOR (CD)** – A designated individual licensed to practice medicine and provide health services with final responsibility for decisions related to medical judgments. A CD and CMA are equivalent positions.
**CLINICAL MEDICAL AUTHORITY (CMA)** – The medical authority is responsible for the delivery of all health care services to the detainee population. These services include, but are not limited to, medical, nursing, dental, mental health and nutritional services. A CD and CMA are equivalent positions.

**COMBUSTIBLE LIQUID** – A substance with a flash point at or above 100° Fahrenheit.

**COMMISSARY** – An area or system where detainees may purchase approved items.

**CONSULTATION VISITATION** – A discussion, either in person or by telephone, between a detainee subject to expedited removal and a person of the detainee's choosing.

**CONTACT VISIT** – A meeting between detainee and another person authorized to take place in an area free of obstacles or barriers that prevent physical contact.

**CONTAINER** – Any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or other vessel holding a hazardous chemical; does not include pipes or piping systems.

**CONTRABAND** – Any unauthorized item in the facility; an item that is illegal, prohibited by facility rules, or otherwise posing a threat to the security or orderly operation of the facility. This includes unauthorized funds.

**CONTRACTOR** – A person who or entity that provides services on a recurring basis pursuant to a contractual agreement with the agency or facility.

**CORRESPONDENCE** – Letters, postcards and other forms of written material not classified as packages or publications. Large envelopes containing papers qualify as correspondence, but boxes, sacks, and other shipping cartons do not. Books, magazines, newspapers and other incoming printed matter are not "correspondence."

**CRIMINAL ALIEN** – A foreign national convicted of one or more crimes.

**DHS** – Department of Homeland Security.

**DETAINEE HANDBOOK** – The policies and procedures governing detainee life in the facility: daily operations, rules of conduct, sanctions for rule violations, recreation and other programs, services, etc.; defined in writing and provided to each detainee upon admission to the facility.

**DETENTION FILE** – Contents include receipts for funds, valuables, and other personal property; documentation of disciplinary action; reports on detainee behavior; detainee's written requests, complaints, and other communications; official responses to detainee communications; records from Special Management Unit, etc. Applicable contents may also be maintained in a retrievable electronic format.

**DETENTION STANDARDS** – The detention standards are guidelines to establish consistent conditions of confinement, program operations, and management expectations within the ICE detention system.

**DIETICIAN** – A professional trained in foods and the management of diets (dietetics) who is credentialed by the Commission on Dietetic Registration of the American Dietetic Association, or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education.

**DISABILITY** – An individual with a disability is an individual who has a physical or mental impairment that substantially limits one or more major life activities, or an individual who has a history or record of such impairment. "Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain.

**DISCIPLINARY HEARING** – Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

**DISCIPLINARY COMMITTEE** – One or more impartial staff members who conduct and/or oversee a disciplinary hearing. A lower-level committee (Unit Disciplinary Committee) investigates a formal Incident Report and may impose minor sanctions or refer the matter to a higher-level disciplinary committee. A higher-level committee (Institution Disciplinary Panel) conducts formal hearings on Incident Reports referred from the lower level committee and may impose higher level sanctions for higher level prohibited acts. Also see Institution Disciplinary Panel.

**DISCIPLINARY SEGREGATION** – A punitive form of separation from the general population used for disciplinary reasons. Disciplinary segregation is available only after a finding by a disciplinary hearing panel that the detainee is guilty of a serious prohibited act or rule violation.

**DRY CELL** – A cell or room without running water where a detainee can be closely observed by staff until the detainee has voided or passed contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband. Dry cells may be used when there is reasonable suspicion that a detainee has ingested contraband or concealed contraband in a body cavity.

**EPA** – Environmental Protection Agency.

**EXIGENT CIRCUMSTANCES** – Any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility or a threat to the safety or security of any person.

**EMERGENCY CHANGES** – Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.
**ETA** – Estimated time of arrival.

**EXPOSURE/EXPOSED** – Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.).

**FACILITY ADMINISTRATOR** – A generic term for the chief executive officer of a detention facility. The formal title may vary (warden, Officer in Charge, sheriff, jail administrator, etc.).

**FIELD OFFICE DIRECTOR (FOD)** – ICE/ERO Officer with chief responsibility for facilities in an assigned geographic area.

**FLAMMABLE LIQUID** – A substance with a flash point below 100° Fahrenheit (37.8° Centigrade).

**FLASH POINT** – The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

**FOOD SERVICE ADMINISTRATOR (FSA)** – The official responsible for planning, controlling, directing and evaluating Food Service Department operations.

FORCE – The physical actions necessary to overcome resistance, to gain control, contain, or restrain a detainee.

**FOUR- / FIVE-POINT RESTRAINT** – A restraint system that confines an individual to a bed or bunk in either a supine or prone position. Ordered by the facility administrator when a detainee's unacceptable behavior appears likely to continue, risking injury to self or others.

**FUNDS** – Cash, checks, money orders, and other negotiable instruments.

**GENDER NONCONFORMING** – Having an appearance or manner that does not conform to traditional societal gender expectations.

**GENERAL CORRESPONDENCE** – All correspondence other than "special correspondence."

**GENERAL POPULATION** – Detainees whose housing and activities are not specially restricted. The term is ordinarily used to differentiate detainees in the "general population" from those in Special Housing Units.

**GRIEVANCE** – A complaint based on a circumstance or incident perceived as unjust.

**GROUP PRESENTATION ON LEGAL RIGHTS** – Informational session held in a detention facility by an attorney or other legal representative to inform all interested detainees about U.S. immigration law and procedures; not a forum for providing confidential or case-specific legal advice.

**HARD CONTRABAND** – Any item that poses a serious threat to the life, safety or security of the facility detainees or staff.

**HEALTH ASSESSMENT** – The process whereby an individual's health status is evaluated. This process will address the patient's physical, dental and mental health appropriate to the patient's condition and will include, as determined by the health care provider, questioning the patient about symptoms, a physical examination appropriate to the complaint and, as appropriate, review of screening information, collection of additional information relating to mental, dental and medical health issues, immunization histories, laboratory and diagnostic tests, other examinations, review of results, initiation of therapy and development of a treatment plan.

**HEALTH AUTHORITY** – The health services administrator (HSA), clinical director (CD), or agency responsible for the provision of health care services at a facility or system of facilities. The responsible physician may be the health authority. Health authority may also be referred to as the medical department.

**HEALTH CARE PRACTITIONER** – Defined as an individual who is licensed, certified, or credentialed by a state, territory or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

**HEALTH HAZARD** – Includes carcinogens, toxic agents, reproductive toxins, irritants, corrosives, sanitizers, hepatotoxins, nephrotoxins, neurotoxins, and other agents that act on the hemopoietic system or damage the lungs, skin, eyes, or mucous membranes.

**HEALTH SCREENING** – A system for preliminary screening of the physical and mental condition of individual detainees upon arrival at the facility; conducted by health care personnel or by a specially health trained officer. The combination of structured inquiry and observation is designed to obtain immediate treatment for new arrivals who are in need of emergency health care, identify and meet ongoing current health needs, and isolate those with communicable diseases.

**HEALTH SERVICES ADMINISTRATOR (HSA)** – Executive responsible for the facility's health care program; may also serve as Clinical Director.

**HOLD ROOM** – A secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation-related transportation.

**HOLY DAY** – A day specified for religious observance.

**HUNGER STRIKE** – A voluntary fast undertaken as a means of protest or manipulation. Whether

or not a detainee actually declares that he or she is on a hunger strike, staff are required to refer any detainee who is observed to not have eaten for 72 hours for medical evaluation and monitoring.

**ICE** – U.S. Immigration and Customs Enforcement.

**ILLEGAL CONTRABAND** – Any item prohibited by law, the possession of which constitutes grounds for felony or misdemeanor charges.
**ICE HEALTH SERVICES CORPS (IHSC)** – The U.S. Public Health Service division charged with advancing global disease prevention through the delivery of health care to ICE/ERO detainees. IHSC is responsible for all aspects of planning, policy formulation, and program direction and management, including coordination and liaison activities, for all health matters concerning ICE/ERO detainees.

**INDIGENT** – Without funds, or with only nominal funds. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten (10) days.

**INFORMAL COUNT** – Population count conducted according to no fixed schedule, when detainees are working, engaged in other programs, or involved in recreational activities. Unless a detainee is missing, these counts are not reported; also called "census check" or "irregular count."

**INFORMAL GRIEVANCE** – An oral complaint or concern received from a detainee. Informal grievances may be handled at the lowest level in the organization possible to effectively resolve the complaint with no written response.

**INFORMAL RESOLUTION** – Brings closure to a complaint or issue of concern to a detainee, satisfactory to the detainee and staff member involved; does not require filing of a written grievance.

**INFORMED CONSENT** – An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken.

**IN-PROCESSING** – Administrative processing of a detainee arriving at a detention facility (See "Admissions").

**INSTITUTIONAL DISCIPLINARY PANEL (IDP)** – Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing.

**INTERGOVERNMENTAL SERVICE AGREEMENT (IGSA)** – A cooperative agreement between ICE/ERO and any state, territory, or political subdivision for the construction, renovation, or acquisition of equipment, supplies, or materials required to establish acceptable conditions of confinement and detention services. ICE/ERO may enter into an IGSA with any such unit of government guaranteeing to provide bed space for ICE/ERO detainees, and to provide the clothing,

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 130 of 157

medical care, food and drink, security, and other services specified in the ICE/ERO detention standards; facilities providing such services are referred to as "IGSA facilities."

**INTERSEX** – Having sexual or reproductive anatomy or chromosomal pattern that does not seem to fit typical definitions of male or female. Intersex medical conditions are sometimes referred to as disorders of sex development.

**INVESTIGATING OFFICER** – An individual of supervisory or higher rank who conducts an investigation of alleged misconduct and was not involved in the incident; usually a supervisory detention enforcement officer or shift supervisor.

**JUVENILE** – Any person under the age of 18.

**LEAST INTRUSIVE** – In the context of a search, terminology used to refer to alternative means of finding contraband, such as questions, metal detectors, pat down searches and boss chairs, prior to conducting a strip search.

**LEGAL ASSISTANT** – An individual (other than an interpreter) who, working under the direction and supervision of an attorney or other legal representative, assists with group presentations and in representing individual detainees. Legal assistants may interview detainees, assist detainees in completing forms and deliver papers to detainees without the supervisory attorney being present.

**LEGAL CORRESPONDENCE** – See "special correspondence."

**LEGAL REPRESENTATIVE** – An attorney or other person representing another in a matter of law, including law students, law graduates not yet admitted to the bar; "reputable individuals"; accredited representatives; accredited officials; and attorneys outside the United States (see 8 CFR § 292.1, "Representation and Appearances").

**LIFE-SUSTAINING PROCEDURE (LIFE SUPPORT)** – A medical intervention or procedure that uses artificial means to sustain a vital function.

**LIMITED ENGLISH PROFICIENT/PROFICIENCY (LEP)** – A person who does not speak English as his or her primary language and who has a limited ability to read, speak, write, or understand English. LEP individuals may be competent in English for certain types of communication (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing).

**MAIL INSPECTION** – Examination of incoming and outgoing letters, packages, etc., for contraband, including cash, checks and money orders.

**MAINTENANCE SUPERVISOR** – Individual at the facility responsible for oversight and supervision of the general repairs and preventative maintenance.

**MASTER COUNT** – Total number of detainees housed at a facility.

**MEDICAL DISCHARGE PLAN** – The discharge plan includes: admission diagnosis; discharge diagnosis; brief medical history including the chief complaint and any essential physical findings discovered; all diagnostic test (e.g., x-rays, lab results, ECG's, etc.) results; list of any medications prescribed; a brief summary of care provided, the detainee's response to treatment, medical complications encountered, any outside health care referrals that may have interrupted the infirmary period or that be pending; and continuity of care plan.

**MEDICAL PERSONNEL** – Includes all qualified health care professionals as well as administrative and support staff (e.g. health record administrators, laboratory technicians, nursing and medical assistants, clerical workers).

**MENTAL HEALTH PROVIDER** – Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker or any other mental health professional who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

**MESSENGER** – A person (neither a legal representative nor a legal assistant) whose purpose is to deliver or convey documents, forms, etc., to and from the detainee; not afforded the visitation privileges of legal representatives and legal assistants.

**MINOR** – A juvenile; a person under the age of 18.

**NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE** (NCCHC) – Establishes the standards for health service in correctional facilities on which accreditation is based.

**NATIONAL FIRE PROTECTION ASSOCIATION** (NFPA) – Principal source of fire protection standards and codes.

**NON-CONTACT VISIT** – Visitation with a barrier preventing physical contact between the detainee and his or her visitors.

**NON-MEDICAL EMERGENCY ESCORTED TRIP** – Authorized detainee visit to a critically ill member of his/her immediate family, or to attend the funeral of a member of his/her immediate family. "Immediate family" member refers to a parent (including stepparent and foster parent), child, spouse, sister, or brother of the detainee.

**OSHA** – Occupational Safety and Health Administration.

**OUTDOOR RECREATION AREA** – Open-air space for exercise or other leisure activities, large enough to allow 15 square feet per detainee for the largest group expected to use the area at any one time; but not less than 1,500 square feet.

**PAT-DOWN SEARCH** – A sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband.

**PHYSICAL EXAMINATION** – A thorough evaluation of an individual's physical condition and medical history conducted by or under the supervision of a licensed medical professional acting within the scope of his or her practice.

**PLAN OF ACTION** – Describes steps the facility will take to convert a condition that has caused a determination of noncompliance with a standard.

**POST ORDERS** – Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

**PROGRESSIVE RESTRAINTS** – Control the detainee in the least restrictive manner required, until and unless the detainee's behavior warrants stronger and more secure means of inhibiting movement.

**PROTECTIVE CUSTODY (PC)** – Administrative segregation for the detainee's own safety.

**QUALIFIED HEALTH CARE PROFESSIONALS** – Include physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals and others who by virtue of their education, credentials and experience are permitted by law and within their scope of practice to evaluate and care for patients.

**REASONABLE ACCOMMODATIONS** – Any change or adjustment in detention facility operations, any modification to detention facility policy, practice, or procedure, or any provision of an aid or service that permits a detainee with a disability to participate in the facility's programs, services, activities, or requirements, or to enjoy the benefits and privileges of detention programs equal to those enjoyed by detainees without disabilities. Examples of "reasonable accommodations" include, but are not limited to, proper medication and medical treatment; accessible housing, toilet, and shower facilities; devices like bed transfer, accessible beds or shower chairs, hearing aids, or canes; and assistance with toileting and hygiene. In these standards, reasonable accommodations, disability-related modifications, and auxiliary aids and services are collectively referred to as "accommodations" or "reasonable accommodations."

**REASONABLE SUSPICION** – Not intuition, but specific, articulable facts that would cause a reasonable law enforcement officer to suspect that a particular person is concealing a weapon, contraband, or evidence of a crime.

**RELIGIOUS PRACTICES** – Worship, observances, services, meetings, ceremonies, etc., associated with a particular faith; access to religious publications, religious symbolic items, religious counseling and religious study classes; and adherence to dietary rules and restrictions.

**SAFETY DATA SHEET (SDS)** – Basic information about a hazardous chemical, prepared and issued by the manufacturer, in accordance with Occupational Safety and Health Administration

regulations (see 29 CFR 1910.1200; see also OSHA Form 174); among other things, specifies precautions for normal use, handling, storage, disposal and spill cleanup. (Formerly referred to as Material Safety Data Sheets (MSDS).)

**SALLY PORT** – An enclosure situated in the perimeter wall or fence surrounding the facility, containing double gates or doors, of which one cannot open until the other has closed, to prevent a breach in the perimeter security; handles pedestrian and/or vehicular traffic.

**SANITATION** – The creation and maintenance of hygienic conditions; in the context of food, involves handling, preparing, and storing items in a clean environment, eliminating sources of contamination.
**SATELLITE FEEDING** – Food served and consumed in a location other than where prepared.

**SEGREGATION** – Confinement in an individual cell isolated from the general population; for administrative, disciplinary, or protective reasons.

**SHIFT SUPERVISOR** – A generic term for the detention security supervisor in charge of operations during a shift. The position titles may vary according to the type of facility and local facility titles. Ordinarily, a shift supervisor (detention operations supervisor, lieutenant, etc.) is, organizationally, directly under the Chief of Security (chief detention enforcement agent, captain, etc.).

**SOFT CONTRABAND** – Any unauthorized item that does not constitute hard contraband, i.e., does not pose a serious threat to human safety or facility security; includes that quantity of an item possessed in an amount exceeding the established limit.

**SPECIAL CORRESPONDENCE OR LEGAL MAIL** – Detainees' written communications to or from any of the following:

a. private attorneys and other legal representatives;
b. government attorneys;
c. judges and courts;
d. embassies and consulates;
e. the president and vice president of the United States;
f. members of Congress;
g. the Department of Justice (including the DOJ Office of the Inspector General);
h. the Department of Homeland Security (including U.S. Immigration and Customs Enforcement, ICE Health Services Corps, ICE Enforcement and Removal Operations, ICE Office of Professional Responsibility, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of the Inspector General);
i. outside health care professionals;
j. administrators of grievance systems; and
representatives of the news media.

**SPECIAL MANAGEMENT UNIT (SMU)** – A housing unit for detainees in administrative or disciplinary segregation.

**SPECIAL NEEDS DETAINEE** – A detainee with special needs is a detainee whose mental and/or physical condition requires different accommodations or arrangements than a detainee who does not have special needs would receive. Special needs detainees include, but are not limited to, those detainees who are chronically ill or infirm, those with disabilities, and those who are addicted to or in withdrawal from drugs or alcohol.

**SPECIAL VULNERABILITIES** – Detainees with special vulnerabilities include those who are elderly, pregnant, or nursing; those with serious physical or mental illness, or other disability; those who would be susceptible to harm in general population due in part to their sexual orientation or gender identity; and those who have been victims of sexual assault, torture, trafficking, or abuse.

**STRIP SEARCH** – A search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

**TERMINALLY ILL DETAINEE** – A detainee whose physical condition has deteriorated to the point where the prognosis is less than a year to live.

**TOXIC** – Poisonous; capable of causing injury or death.

**TRAINED INVESTIGATORS** – A person who has been trained in investigative techniques to include interview techniques for victims and proper procedures for collecting and storing evidence.

**TRAINING** – An organized, planned, and evaluated activity designed to achieve specific learning objectives and enhance personnel performance. Training may occur on site, at an academy or training center, an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training. Training programs usually include requirements for completion, attendance records, and certification of completion. Meetings of professional associations are considered training where there is clear evidence of the direct bearing on job performance. In all cases, the activity must be part of an overall training program.

**TRANSGENDER** – A person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth.

**UNENCUMBERED SPACE** – Open, usable space measuring at least seven feet in at least one dimension, free of plumbing fixtures, desk, locker, bed, and other furniture and fixtures (measured in operational position).

**UNAUTHORIZED FUNDS** – Negotiable instruments (checks, money orders, etc.) or cash in a detainee's possession exceeding the facility-established limit.

**UNAUTHORIZED PROPERTY** – Not inherently illegal, but against the facility's written rules.

**UNIT DISCIPLINARY COMMITTEE** – See **DISCIPLINARY COMMITTEE**.

**VOLUNTEER** – An individual who donates time and effort on a recurring basis to enhance the

activities and programs of the agency or facility.

**VOLUNTEER GROUP** – Individuals who collectively donate time and effort to enhance the activities and programs offered to detainees; selected on basis of personal qualities and skills (recreation, counseling, education, religion, etc.).

**WORK ASSIGNMENT** – Carpentry, plumbing, food service, and other operational activities included in the facility's Voluntary Work Program, for which a detainee may volunteer.

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 136 of 157



## LIMITATIONS ON THE DETENTION AUTHORITY OF THE IMMIGRATION AND NATURALIZATION SERVICE

*The Immigration and Nationality Act by its terms grants the Attorney General a full 90 days to effect an alien's removal after the alien is ordered removed under section 241(a) of the Act, and it imposes no duty on the Attorney General to act as quickly as possible, or with any particular degree of dispatch, within the 90-day period. This reading of the Act raises no constitutional infirmity.*

*It is permissible for the Attorney General to take more than the 90-day removal period to remove an alien even when it would be within the Attorney General's power to effect the removal within 90 days. The Attorney General can take such action, however, only when the delay in removal is related to effectuating the immigration laws and the nation's immigration policies. Among other things, delays in removal that are attributable to investigating whether and to what extent an alien has terrorist connections satisfy this standard.*

February 20, 2003

### MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

Your Office has asked us to address two questions concerning the timing of removal of an alien subject to a final order of removal under section 241(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(a) (2000). First, your Office has asked us to determine whether the Attorney General is under an obligation to act with reasonable dispatch in effecting an alien's removal within the 90-day removal period established by section 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A). We conclude that the INA by its terms grants the Attorney General a full 90 days to effect an alien's removal after the alien is ordered removed and imposes no duty on the Attorney General to act as quickly as possible, or with any particular degree of dispatch, within the 90-day period. We also conclude that this reading of the Act raises no constitutional infirmity. In particular, even under the Supreme Court's recent decisions, such as *Zadvydas v. Davis*, 533 U.S. 678 (2001), the "substantive" component of the Due Process Clause does not impose a requirement that the Attorney General act with particular dispatch *within* the 90-day removal period. To the extent that the INS General Counsel's Office has issued advice to the contrary, suggesting that there is such a constitutionally based timing obligation, we disagree with that analysis. While the Attorney General's ability to delay removal of an alien within the 90-day period is not constrained by a particular timing requirement (*i.e.*, an obligation to act with dispatch), it is also not entirely unconstrained. We conclude that an express decision to postpone removal of an alien until later in the 90-day period likely must be supported by purposes related to the proper implementation of the immigration laws. We need not definitively resolve that question here because the delays in the particular case your Office inquired about were clearly supported by purposes related to proper implementation of the immigration laws.

Second, your Office has asked -- in a situation where it would be logistically possible to remove an alien within the 90-day removal period -- whether and for what purposes the Attorney General may nonetheless refrain from removing the alien within the removal period and instead detain him beyond the 90-day period with a view to removing him at a later time. We conclude, under each of two alternative readings of the statute, that it is permissible for the Attorney General to take more than the 90-day removal period to remove an alien even when it would be within the Attorney General's power to effect the removal within 90 days. The Attorney General can take such action, however, only when the delay in removal beyond the 90-day period is related to effectuating the immigration laws and the nation's immigration policies.

This memorandum confirms oral advice we have given your Office over the course of the last three months.

### Background

These issues arose in the context of the case of a particular alien who received a final order of removal on October 1, 2002, and whose 90-day removal period thus expired on December 30, 2002. This alien has significant connections to a known al Qaida operative who was seized in Afghanistan and who is now held at the naval base at Guantanamo Bay, Cuba. It was deemed a substantial possibility that the alien himself was a sleeper agent for al Qaida. Insufficient information existed at first, however, to press criminal charges or to transfer the alien to military custody as an enemy combatant. When it became apparent that it would be logistically possible to remove the alien very early within the 90-day removal period to the country that had been specified at the removal hearing (*i.e.*, travel documents were obtained), the question arose whether his removal could be delayed to permit investigations concerning his al Qaida connections to continue. Several avenues remained for developing further information about the alien, and such information would have been relevant for several purposes. For example, at first, your Office had been informed by the INS that the alien had designated a particular country of removal under section 241(b)(2)(A) of the INA, 8 U.S.C. § 1231(b)(2)(A). In that case, the Attorney General would have had statutory authority to disregard that designation if he determined that removing the alien to that country would have been "prejudicial to the United States." *Id.* § 1231(b)(2)(C)(iv). Obviously, in order for him to make that determination, it would have been important for the Attorney General to have the fullest information possible about the alien's terrorist connections, the extent of the threat he posed, and the ability (and willingness) of the law enforcement or security services of the destination country to deal appropriately with the alien. On further examination of the record, the INS later informed your Office that the alien had not, in fact, designated any country of removal. That situation raised unresolved questions of statutory interpretation concerning the Attorney General's DISA

under the statute to determine the country of removal -- a decision that, again, depending upon the scope, if any, of the Attorney General's discretion, could obviously benefit from the fullest information possible about the alien's terrorist connections. In addition, even apart from the question of the country to which the alien would be removed, full information about the alien's terrorist connections was critical for ensuring coordination with the law enforcement and security services in the country of removal before removing the alien. Ensuring such coordination based upon the fullest information about the threat posed by the alien would have promoted both the national security interests of the United States (by perhaps providing a basis for law enforcement officials in the destination country to detain the alien) and the foreign policy interests of the United States in maintaining good relations with the country. Other countries ordinarily would prefer not to have potential terrorists sent to their shores without adequate warning. Finally, if enough further information had been developed concerning the alien, a different course of action might have been taken with respect to him, such as criminal prosecution or detention as an enemy combatant.

These circumstances also raised the possibility that significant information might be developed concerning the alien at or near the end of the 90-day period. As a result, if it were lawful to do so, the Attorney General might have wanted to take more than 90 days to execute the removal order and thus to detain the alien beyond the 90-day removal period.

**Analysis**

**I.**

Whether the Attorney General is required to effect an alien's removal as quickly as possible within the 90-day removal period established by section 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A), is a question of statutory interpretation. In determining the meaning of a statute, we begin by examining its text. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 n.29 (1978). "[W]e begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000) (quoting *Connecticut National Bank v. Germain*, 503 U.S. 249, 254 (1992)). Section 241(a)(1)(A) of the INA states that "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')." Section 241(a)(2) provides that "[d]uring the removal period, the Attorney General shall detain the alien." The meaning of the statute is plain on its face: the Attorney General is granted a full 90 days after an alien has been ordered removed to effect the alien's removal. During that period, the Attorney General is to detain the alien. The statute does not impose a duty on the Attorney General to remove aliens as quickly as possible within the 90-day removal period, nor does it purport to prescribe the reasons for which the Attorney General might decide to act more quickly or more slowly in effectuating a particular removal within the 90-day period.

Where, as here, the language of a statute is clear, there is no need to resort to legislative history to elucidate the meaning of the text. *See, e.g.*, *Hill*, 437 U.S. at 184 n.29. Nevertheless, we note that the legislative history here is consistent with the reading of the plain text given above -- it confirms that Congress intended to give the Attorney General a full 90 days as a reasonable period of time within which to effect an alien's removal. The predecessor provision to the current section 241(a)(1) appeared at 8 U.S.C. § 1252(c) (1994), and provided that:

> When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States . . . . Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or other release during such six-month period upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to effect such alien's departure from the Untied States within such six-month period.

When Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, it shortened the removal period from six months to 90 days and eliminated any reference from the INA to a requirement that the Attorney General proceed with "reasonable dispatch" in effecting an alien's deportation. Congress seems to have viewed its newly-established 90-day time frame as a *per se* reasonable period of time in which to effect an alien's deportation, rendering judicial inquiry into the dispatch with which the Attorney General performed the duty unnecessary. Neither the text of the statute nor its legislative history provides any reason to believe that Congress intended to impose on the Attorney General an implicit requirement that he remove aliens from the country as quickly as possible within the 90-day removal period.

It might be argued that the plain-text reading outlined above raises constitutional issues that require a narrowing construction of the statute to limit the Attorney General's authority to use the full 90-day period for effecting removal. It is settled, of course, that where there are two or more plausible constructions of a statute, a construction that raises serious constitutional concerns should be avoided. *See, e.g.*, *Crowell v. Benson*, 285 U.S. 22, 62 (1932). There are two arguments that might be raised for a constitutional narrowing construction here.

First, in light of the Supreme Court's decision in *Zadvydas*, it might be claimed that the government is under an obligation, even within the 90-day statutory period, to act with reasonable dispatch to remove the alien as quickly as possible. The claim would be, in other words, that it would be unconstitutional for Congress to grant the Attorney General 90 days in which to effect an alien's removal without any obligation that he act quickly within those 90 days. We reject this view and conclude that the Constitution imposes no obstacle to such a grant of authority.

DISA

Second, also in light of the decision in *Zadvydas*, it might be argued that, if it becomes clear at a point during the removal period that an alien *can* be removed, the Constitution imposes some constraints on the *purposes* for which removal may nevertheless be delayed (and detention continued) until later in the 90-day period. The *Zadvydas* Court explained that detention under the INA must be related to the purpose for which detention is authorized -- securing the alien's removal. It thus might be argued that an express decision to delay an alien's removal until the end of the 90-day period must be based upon some purpose related to the proper execution of the immigration laws. As explained below, we conclude that the Constitution may require that the statute be read to include such a limitation. We need not definitively resolve the hypothetical question whether removal could be delayed for a reason wholly unrelated to executing the immigration laws, however, because in the instant case multiple bases existed for delaying the removal of the alien in question that were directly related to the broad considerations the Attorney General is charged with taking into account in enforcing the immigration laws. (1)

1. Reasonable dispatch. It is doubtful that the terms of section 241(a)(1)(A) could plausibly be construed to include a reasonable-dispatch requirement, particularly in light of Congress's explicit deletion of any such requirement from the statute when it enacted the IIRIRA in 1996. *Cf. Salinas v. United States*, 522 U.S. 52, 60 (1997) (principle of constitutional avoidance does not permit pressing statutory construction "to the point of disingenuous evasion"). We need not resolve that particular issue, however, because reading the statute not to include a reasonable-dispatch requirement -- which, as we have outlined above, is the best reading of the text -- does not raise any serious constitutional questions.

In *Zadvydas*, the Supreme Court held that the Constitution required reading an implicit limitation into section 241(a)(6) of the INA, 8 U.S.C. § 1231(a)(6), restricting the detention of an alien beyond the 90-day removal period "to a period reasonably necessary to bring about that alien's removal from the United States." 533 U.S. at 689. The Court read this limitation into the statute because, in its view, "[a] serious constitutional problem [would arise] out of a statute that . . . permits an indefinite, perhaps permanent, deprivation of human liberty without any [procedural] protection." *Id.* at 692. Thus, the Court ruled that if a habeas court determines that "removal is not reasonably foreseeable [during post-removal-period detention], the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699-700.

It could be argued that a constitutional limitation restricting the government's authority to detain an alien to a period "reasonably necessary to bring about that alien's removal" necessarily entails an obligation that the government proceed with reasonable dispatch in effecting removal and remove the alien as soon as reasonably practicable to do so. Even if that were a valid interpretation of the limitation imposed by *Zadvydas* on post-removal-period detention under section 241(a)(6) -- an issue that we need not definitively decide in this portion of our analysis -- that limitation is inapplicable to detention *within* the 90-day removal period established by section 241(a)(1)(A). The constitutional concerns that motivated the *Zadvydas* Court simply do not arise in the context of detention within the removal period.

In *Zadvydas*, the Court made clear that the central concern informing its constitutional analysis was that the detention it was addressing was "not limited, but potentially permanent." 533 U.S. at 691. *See also id.* at 692 (stressing the "indefinite, perhaps permanent deprivation of human liberty" at stake). The 90-day removal period, by contrast, is of a fixed and relatively short duration. Indeed, the *Zadvydas* Court expressly distinguished detention during the 90-day removal period from the detention it was addressing on precisely this ground, stating that "importantly, post-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90-day removal period, has no obvious termination point." *Id.* at 697. At least one lower court has ruled that *Zadvydas* is inapplicable to the 90-day removal period on precisely these grounds. *Shehata v. Ashcroft*, No. 02 CIV. 2490(LMM), 2002 WL 538845 at *2 (S.D.N.Y. April 11, 2002) ("Here, on the other hand, the 90 day period is quite limited in time, and serves a rational purpose, to allow INS to effect removal of a person already determined to be removable."); *see also Badio v. United States*, 172 F. Supp. 2d 1200, 1205 (D. Minn. 2001) ("*Zadvydas* does not apply to petitioner's claim because pre-removal-order proceedings do have a termination point.").

The relatively short detention period under section 241(a)(1)(A) makes a critical difference because the holding in *Zadvydas* rests upon considerations of substantive due process. Although the Court did not expressly label its decision as one based on "substantive due process," it made it clear that this was the foundation of its reasoning as it explicitly invoked the Fifth Amendment's Due Process Clause, *see Zadvydas*, 533 U.S. at 690, and at the same time disavowed any concern with procedural deficiencies:

> [W]e believe that an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, *irrespective of the procedures used*, the Constitution permits detention that is indefinite and potentially permanent.

*Id.* at 696 (citation omitted) (emphasis added). The grounding of the decision in substantive due process is important because, as a general rule, government conduct violates substantive due process constraints only when it is so extreme and intrusive that it can be said to "shock the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). The prospect of "indefinite and potentially permanent" detention may shock the conscience of the courts, *Zadvydas*, 533 U.S. at 696, but detention for a limited period of 90 days clearly does not. In fact, several courts called upon to review early immigration statutes that did not specify a fixed period for the government's detention authority settled upon similar time frames in specifying the permissible length of a "reasonable" detention. *See, e.g., United States ex rel. Janavaris v. Nicolls*, 47 F. Supp. 201, 202 (D. Mass. 1942) ("The period of time which judges have found to be appropriate in peace-time varies from one month . . . to four months."); *United States ex rel. Ross v. Wallis*, 279 F. 401, 404 (2d Cir. 1922) (holding that four months is a reasonable time); *Caranica v. Nagle*, 28 F.2d 955, 957 (9th Cir. 1928) (holding that two months is a reasonable time); *Saksagansky v. Weedin*, 53 F.2d 13, 16 (9th Cir. 1931) (authorizing the detention of an alien already held for five months for an additional 30 days).

DISA

More important, the *Zadvydas* Court expressly held that the detention of an alien for a period of up to six months is presumptively constitutionally reasonable and does not violate substantive due process constraints. *See Zadvydas*, 533 U.S. at 701. If detention for a period of six months to effect removal is presumptively reasonable and does not violate an alien's substantive due process rights, it follows *a fortiori* that detention during the shorter 90-day removal period cannot be constitutionally problematic. *See Borrero v. Aljets*, 178 F. Supp. 2d 1034, 1039 (D. Minn. 2001) ("*Zadvydas* confirms that a legally admitted alien can always be detained during the 90-day 'removal period' contemplated by the statute. But after that, the Court held, the alien can be held for only a 'reasonable period,' which is presumed to be six months . . . ."). Where conduct that "shocks the conscience" is the ultimate touchstone for constitutional analysis, if six months' detention is reasonable, detention for 90 days is simply below the threshold for substantive due process constitutional concerns. Indeed, *Zadvydas* makes the constitutionality of detention during the 90-day removal period even clearer than this, because the six-month "presumptively reasonable" period established by that decision may very well not begin to run until *after* an alien has already been detained for the 90-day removal period.(2) Substantive due process constraints thus do not afford any basis for reading a "reasonable dispatch" requirement into section 241(a)(1)(A).

In addition, because this particular case involves removal of an alien with demonstrated ties to members of a terrorist organization with which the United States is currently at war, it is even plainer that detention for 90 days without any obligation on the government to act quickly cannot be a concern of constitutional dimensions under the reasoning in *Zadvydas*. In outlining the constitutional problems with potentially indefinite detention, the Supreme Court made it express that the principles it was applying might very well not apply to the government's actions dealing with aliens suspected of involvement in terrorism. The Court distinguished that context, saying that "we [do not] consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security." 533 U.S. at 696. Indeed, the Court implied that the government's interest in preventing terrorism is sufficiently great that detention measures specifically targeting "suspected terrorists" are deserving of heightened judicial deference. *See id.* at 691. Thus, the Court suggested that, in the context of an alien suspected of involvement in terrorism, detention might well be justified beyond the six-month period of detention that the Court deemed presumptively constitutionally reasonable for any case. As a result, where as here, investigation to determine whether an alien is connected to a terrorist organization is part of the justification for prolonging detention and the detention remains confined *within the 90-day removal period*, there can be no basis for concluding that substantive due process constraints are implicated.

Although we conclude, based on the reasoning of *Zadvydas*, that the Constitution does not require that a "reasonable dispatch" obligation be read into section 241(a)(1)(A), one line of lower court decisions regarding the substantive due process implications of prolonged detention should be briefly distinguished. Certain lower courts addressing pretrial detention in the criminal justice system have held that lengthy detention may violate substantive due process constraints under certain circumstances and that evaluating a claimed violation "requires assessment on a case-by-case basis, since due process does not necessarily set a bright line limit for length of pretrial confinement." *United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986). *See also United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986). It might be thought that those cases call into question our blanket conclusion that detaining aliens for a period of 90 days does not violate substantive due process guarantees, even where the Attorney General fails to act with reasonable dispatch. The purpose for the case-by-case inquiry engaged in by the courts in those cases, however, is to examine factors *other* than length of confinement that the courts deemed relevant to the substantive due process inquiry -- such as which party is primarily responsible for any delays. *See, e.g., Gonzales Claudio*, 806 F.2d at 340 ("we also consider the extent to which the prosecution bears responsibility for the delay that has ensued"). If the factor of length of confinement is viewed in isolation, applicable case law makes it crystal clear that a 90-day detention period is not constitutionally objectionable, and that no case-by-case inquiry into the length of confinement is therefore required. As we have already mentioned, *Zadvydas* explicitly states that civil detention for a period of six months in the context of deportation is presumptively constitutionally reasonable, *see* 533 U.S. at 701, and even cases examining the constitutionality of prolonged pretrial detention have typically begun their analysis by presuming that the 90-day period established by the Speedy Trial Act is a reasonable detention period. *See, e.g., Gonzales Claudio*, 806 F.2d at 340-41 (citing 18 U.S.C. § 3164(b)).

Moreover, precedents relating to preventive pretrial detention in criminal cases are not directly applicable to the context of detention incident to removal. In distinguishing its own pretrial detention precedent from the context of immigration proceedings, the Second Circuit noted that "a deportation proceeding is not a criminal proceeding . . . and the full trappings of legal protections that are accorded to criminal defendants are not necessarily constitutionally required in deportation proceedings." *Dor v. INS*, 891 F.2d 997, 1003 (2d Cir. 1989). In a later decision, the Second Circuit elaborated on this distinction:

> It is axiomatic, however, that an alien's right to be at liberty during the course of deportation proceedings is circumscribed by considerations of the national interest. Control over matters of immigration and naturalization is the "inherent and inalienable right of every sovereign and independent nation." *Fong Yue Ting v. United States*, 149 U.S. 698, 711, 13 S.Ct. 1016, 1021, 37 L.Ed. 905 (1893). . . . In exercising its broad power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 80, 96 S.Ct. at 1891. Governmental conduct that may be considered "shocking" when it serves to deprive the life, liberty or property of a citizen may not be unconstitutional when directed at an alien.

*Doherty v. Thornburgh*, 943 F.2d 204, 209 (2d Cir. 1991) (citations omitted), *cert. dismissed*, 503 U.S. 901 (1992). Thus, the Second Circuit considers the detention of an alien prior to removal to be constitutionally permissible unless the alien can show that "his continuing detention was the result of an 'invidious purpose, bad faith or arbitrariness.'" *Ncube v. INS*, No. 98 Civ. 0282 HB AJP, 1998 WL 842349, at *16 (S.D.N.Y. Dec. 2, 1998), *citing Doherty*, 943 F.2d at 212. Especially where the Supreme Court has already established that detention of an alien for a period of six months is presumptively constitutionally reasonable, detention for a period of 90 days in itself cannot possibly satisfy that exacting standard for establishing a violation. Thus, lower court decisions that hav

the substantive due process implications of pretrial detention do not call into question our conclusion that the Constitution does not require that the Attorney General act with reasonable dispatch during the 90-day removal period.

Finally, we note that in January 2002, the INS General Counsel's Office issued an opinion in which it advised that, during the 90-day removal period, the INS is constitutionally required to "proceed[] with reasonable dispatch to arrange removal." *See* Memorandum for Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations from Dea Carpenter, Deputy General Counsel, *Re: Authority to Detain During the 90-Day Removal Period* at 1 (Jan. 28, 2002) ("*INS Memorandum*"). Based on the analysis outlined above, we disagree with the INS's conclusion.

The INS derived the reasonable-dispatch requirement from language in *Zadvydas* construing section 241(a)(6) and stating that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *INS Memorandum* at 2, *citing Zadvydas*, 533 U.S. at 689. The INS reasoned that, "while the *Zadvydas* opinion is technically limited to post-removal period detention, and while the statute provides authority to detain an alien with a final order of removal for up to the 90-day removal period, the INS should not continue to detain an alien during the removal period beyond the point at which the alien could be removed except to the extent that the INS is taking necessary actions to process the alien for removal." *INS Memorandum* at 3. In our view, this conclusion was in error because it mistakenly applies the limitations on post-removal period detention under section 241(a)(6) to removal-period detention under section 241(a)(1)(A). As explained above, neither the plain language of section 241(a)(1)(A) nor its legislative history allows any inference that Congress intended to impose a reasonable-dispatch obligation on the INS during the 90-day removal period. Moreover, the constitutional concerns that impelled the Supreme Court to read such an obligation into section 241(a)(6) simply are not applicable to detention during the 90-day removal period. In *Zadvydas*, the Supreme Court reasoned that because indefinite civil detention of lawfully admitted aliens would raise serious constitutional questions, detention must be limited to a period reasonably necessary to effect removal. The *Zadvydas* court expressly distinguished the 90-day removal period, however, on the grounds that it has a defined termination point. *See* 533 U.S. at 697. Lower courts, accordingly, have held that *Zadvydas*'s constitutional reasoning is inapplicable to detention during the removal period. *See Shehata*, 2002 WL 538845, at *2. In short, we disagree with the INS's reading of *Zadvydas*, and reaffirm our conclusion that the Constitution does not impose a reasonable-dispatch obligation during the 90-day removal period.[(3)]

2. Purposes for which removal may be delayed. The second argument that might be raised for a constitutionally based narrowing construction of section 241(a)(1)(A) would rest on the theory that, once all of the mechanical steps that are necessary to effectuate an alien's removal have been taken, the Constitution imposes some limitations on the purposes for which it is permissible to further delay the alien's removal while keeping the alien in detention. In *Zadvydas*, the Supreme Court explained that the reasonableness of an alien's detention must be measured "primarily in terms of the statute's basic purpose," which the Court identified as securing the alien's removal. *Zadvydas*, 533 U.S. at 699. Similarly, in the wake of *Zadvydas*, the Third Circuit has stated that "[t]he requirements of substantive due process are not met unless there is a close nexus between the government's goals and the deprivation of the interest in question." *Patel v. Zemski*, 275 F.3d 299, 311 (3d Cir. 2001). Thus, the INS has taken the position, both in the *INS Memorandum* and in some instances of prior litigation, that it does not have the power to detain aliens for any purpose other than the effectuation of removal.[(4)] *See INS Memorandum* at 1; *United States v. Restrepo*, 59 F. Supp. 2d 133, 138 (D. Mass. 1999).[(5)] Even before *Zadvydas*, in fact, several district courts had expressed the view that, once it has become apparent that an alien cannot be deported, his detention can no longer be said to be for purposes of effecting his removal. *See United States ex rel. Blankenstein v. Shaughnessy*, 117 F. Supp. 699, 703-04 (S.D.N.Y. 1953) ("courts have the power to release on habeas corpus an alien held for deportation on a showing . . . that the detention cannot in truth be said to be for deportation"); *United States ex rel. Kusman v. INS*, 117 F. Supp. 541, 544-45 (S.D.N.Y. 1953); *Rodriguez v. McElroy*, 53 F. Supp. 2d 587, 591 n.6 (S.D.N.Y. 1999) ("[d]etention is intended for the sole purpose of effecting deportation"); *Fernandez v. Wilkinson*, 505 F. Supp. 787, 793 (D. Kan. 1980), *aff'd*, 654 F.2d 1382 (10th Cir. 1981); *Williams v. INS*, No. 01-043 ML, 2001 WL 1136099, at *4 (D.R.I. Aug. 7, 2001).

There is support in the cases for the general principle suggested by the INS to this extent: the detention of an alien -- perhaps even during the 90-day removal period -- likely must be related to enforcing the immigration laws and properly effecting the alien's removal in accordance with the nation's immigration laws and policies. Thus, in the abstract, it might raise difficult constitutional questions if the Attorney General were expressly to delay the removal of an alien (and thereby prolong his detention) solely for a purpose that was -- by hypothesis -- entirely unrelated to any legitimate interest in the enforcement of the immigration laws.[(6)] We need not definitively decide whether such a hypothetical scenario would raise constitutional infirmities, however, because in the present case there are reasons directly related to the enforcement of the immigration laws that justify any delay in the alien's removal.[(7)] Of course, acknowledging (as we do for purposes of analysis here) that the reason for an alien's detention must be related to legitimate interests in enforcing the immigration laws does not in itself provide much concrete guidance for determining precisely what activities meet that test. Rather, it merely frames the next step of the inquiry. Here, we cannot purport by any means to provide a comprehensive assessment of all the tasks or all the inquiries that may meet that standard in the myriad scenarios that may arise. Given the numerous broad objectives that underlie the nation's regulation of immigration -- many of which relate to protecting our citizens from harm at the hands of aliens -- there are potentially a vast array of interests legitimately related to policing immigration that may have a bearing on the Attorney General's decision (effected through the INS) concerning exactly when during the removal period an alien should be removed.[(8)] For present purposes, we limit our discussion to the interests relevant in this case.

At a bare minimum, of course, administrative tasks such as making transportation arrangements, securing travel documents, communicating with domestic and foreign law enforcement agencies, and making internal administrative arrangements for escorts and security are all legitimately related to removal. *Accord INS Memorandum* at 4.

DISA

In our view, moreover, there is a substantially broader range of immigration-related considerations that the Attorney General is permitted to take into account in effecting the removal of an alien, and thus deciding whether and exactly when to remove an alien. For example, as the Supreme Court acknowledged in *Zadvydas*, the immigration policy of the United States is inextricably intertwined with complex and important issues of foreign policy. *Zadvydas*, 533 U.S. at 700. *See also Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). Every removal of an alien necessarily involves an act affecting foreign policy because it requires sending the alien to another country. In some cases, the foreign policy implications of that act may be significant. As the Supreme Court has recognized, enforcement priorities in the immigration context may reflect "foreign-policy objectives" and it is even possible that the Executive might wish "to antagonize a particular foreign country by focusing on that country's nationals." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 491 (1999). *See also Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (noting that decisions relating to immigration "may implicate our relations with foreign powers"); *cf. Fong Yue Ting v. United States*, 149 U.S. 698, 705 (1893) (grounding federal control over ingress and egress of aliens in part in federal government's "entire control of international relations"). More importantly here, releasing criminal or terrorist aliens into another country without providing adequate warning to the appropriate law enforcement or other officials in the receiving country can have adverse consequences for the security of that country, which can lead to the souring of diplomatic relationships or other negative results for foreign policy. Similarly, releasing aliens from United States custody who are suspected of involvement with terrorism can have a profound impact on our own national security. National security is also a concern inherently relevant to policing the flow of persons across our borders under the immigration laws. *See generally Carlson v. Landon*, 342 U.S. 524, 534-36 (1952).

It is not only common sense that makes clear the inherent relationship between enforcing the immigration laws and considerations of both foreign policy and national security; rather, those considerations are embedded in the text of the immigration laws themselves. For example, the fact that an alien's presence in the United States could result in "adverse foreign policy consequences" is *in itself* a grounds for removal under the INA. *See* INA § 237(a)(4)(C)(i), 8 U.S.C. § 1227(a)(4)(C)(i) (2000). Similarly, in certain circumstances, the Attorney General may block the departure of an alien from the United States when it would be deemed prejudicial to national security interests to permit him to depart. *See* 8 C.F.R. § 215.3(b), (c) (2002).

More importantly here, the INA expressly gives the Attorney General authority in many instances to make discretionary decisions bearing upon the removal of an alien based on broad considerations of policy. For example, section 241(b)(2)(C)(iv), provides that "[t]he Attorney General may disregard [an alien's designation of a country to which he would like to be removed] if the Attorney General decides that removing the alien to the country is prejudicial to the United States." Similarly, section 241(b)(2)(E)(vii) provides that the Attorney General is not to remove an alien to certain countries, even if they are willing to accept the alien, if he determines that it is "impracticable" or "inadvisable." By granting the Attorney General authority to make such determinations, Congress made it clear that the broad considerations of foreign policy or national security that might underlie such decisions are directly related to -- indeed, are an integral part of -- the enforcement of the immigration laws. Where more time is needed for the Attorney General to receive further information bearing on such decisions, the investigation to generate such information is legitimately related to enforcing the immigration laws and can justify delaying the alien's departure.

Thus, at a minimum, where the Attorney General has a statutorily prescribed decision to make concerning the removal of an alien -- such as whether it would be "prejudicial to the United States" to remove him to a particular country -- developing the information needed for the Attorney General to make that determination wisely is a task that is related to proper implementation of the immigration laws. It would thus be justifiable to delay an alien's removal while an investigation to develop that information (including information about whether the alien has terrorist or criminal connections) is pursued.

In addition, even where the Attorney General does not have such an express statutory determination to make, we conclude that efforts to investigate an alien's background to determine, for example, ties to terrorist organizations are legitimately related to the process of removal. Full information on such aspects of an alien's background may be critical for a number of purposes. It permits the United States to coordinate appropriately with law enforcement officials in the receiving country to ensure that they are aware of any threats the alien might pose and might potentially benefit the national security interests of both the United States and the receiving country by providing officials in the receiving country a basis for arresting upon arrival an alien who poses a serious threat. Taking such steps to coordinate with the receiving country is part and parcel of the proper implementation of the immigration laws. Delaying departure of an alien until later in the 90-day period in order to continue pursuing such investigations into terrorist ties is thus entirely permissible.[(9)] It is true that, as a purely mechanical matter, the physical removal of an alien and his transportation might be arranged without thoroughly investigating his background and without taking the time to appropriately inform countries that may be willing to accept him about the results of our investigations. But there can be no question that time spent on such efforts is nevertheless reasonably related to the enforcement of the immigration laws.

## II.

Your Office has also asked us to determine whether (and under what circumstances) the Attorney General may decide to take longer than the 90-day removal period to remove an alien even where it would be logistically possible to accomplish the removal before the expiration of the 90 days. We conclude, under either of two alternative readings of the statute, that at least certain categories of removable aliens may be held by the INS beyond the 90-day removal period, at least where there are reasons for the delay that are

DISA

Case 1:25-cv-01766-SLS Document 102-4 Filed 06/03/26 Page 142 of 157

related to carrying out the immigration laws. We note, however, that under the Supreme Court's decision in *Zadvydas*, an obligation to act with "reasonable dispatch" will attach at some point after the expiration of the 90-day removal period.

### A.

Section 241(a) of the INA directs that the Attorney General "shall remove" aliens within 90 days of the date on which they are ordered removed. INA § 241(a)(1)(A). It also indicates, however, that section 241 elsewhere provides exceptions to that general rule. *Id.* [(10)] Section 241(a)(6) on its face provides such an exception. It states that "[a]n alien ordered removed who is inadmissible under section 212 [1182], removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) [1227] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period."

The plain text of the provision expressly states, in language indicating a grant of authority, that listed classes of aliens "may be detained beyond the removal period." By its terms it thus grants the Attorney General the power to refrain from removing an alien -- and instead to keep him in detention -- after the removal period has expired. The statute does not provide any preconditions for the exercise of this authority, other than that the alien must belong to one of the listed categories. Thus, in the *Zadvydas* litigation the United States took the position that "by using the term 'may,' Congress committed to the discretion of the Attorney General the ultimate decision whether to continue to detain such an alien and, if so, in what circumstances and for how long." Brief of the United States in *Ashcroft v. Kim Ho Ma*, 2000 WL 1784982 at *22 (Nov. 24, 2000).

Nothing in the Supreme Court's decision in *Zadvydas* casts any doubt on the validity of the plain-text reading of section 241(a)(6) as an express authorization for the Attorney General to detain -- and thus refrain from removing -- the listed classes of aliens beyond the removal period. The *Zadvydas* Court held that it would raise serious constitutional questions for Congress to authorize the *indefinite* detention of aliens falling into the listed classes. It thus read into the statute an implicit limitation on the allowable *duration* of post-removal-period detention. 533 U.S. at 689 ("the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States"). The Court also implied that detention beyond the 90-day removal period must be in furtherance of removal-related purposes, as it stated that the reasonableness of a detention should be measured "primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal." *Id.* at 699. Nothing in the Court's decision, however, calls into question the central point that section 241(a)(6) constitutes an express source of authority to detain aliens in the listed classes beyond the removal period, albeit subject to the above limitations.

This plain-text reading, moreover, does not lead to an absurd or an unconstitutional result. The statute limits the authority to prolong detention beyond the removal period to particular classes of aliens designated by Congress. The aliens listed in the statute include aliens who were never legally admitted to the country, *see* INA § 212, aliens who violate their nonimmigrant status or their conditions of entry, *see* INA § 237(a)(1)(C), criminal aliens, *see* INA § 237(a)(2), aliens who are a potential threat to national security, *see* INA § 237(a)(4), and aliens deemed by the Attorney General to constitute a flight risk or a danger to the community. *See* INA § 241(a)(6). Congress could reasonably have anticipated that in many instances additional time beyond the 90-day removal period would be required to remove these classes of aliens, perhaps because of heightened security concerns, the need to conduct especially thorough background investigations, or the difficulty that might be encountered in finding foreign countries willing to accept such aliens. *Zadvydas* confirms the constitutionality of holding such aliens beyond the 90-day removal period, and establishes that it is constitutionally permissible to hold aliens in confinement "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701. Our plain text reading of section 241(a)(6) is thus constitutionally unproblematic.

It might be argued that section 241(a)(6) does not itself constitute an exception to the 90-day rule, but rather merely empowers the Attorney General to *detain*, rather than *release*, aliens who *happen*, for some other reason, to still be in the country at the expiration of the 90-day removal period (for example, because no country would accept them or because their removal was delayed based upon some other source of authority that provides an exception to the command to remove aliens within 90 days). Under this view, section 241(a)(6) would be understood as a parallel provision to section 241(a)(3). Section 241(a)(3) gives authority to impose supervised release when it happens that an alien has not been removed within the 90-day period. Section 241(a)(6), the argument would go, should be understood as simply a parallel authority to detain the alien in the same circumstance. The difficulty with that approach to the statute is that the two sections are not drafted in parallel terms. Congress demonstrated in enacting section 241(a)(3) that it knows how to phrase language that does not grant an authority to delay removal of an alien beyond the 90-day period, but at the same time does give a power that can be exercised when it happens (for some other reason) that an alien has not been removed by the deadline. Section 241(a)(3) empowers the Attorney General to impose terms of supervised release on an alien "[i]f the alien does not leave or is not removed within the removal period." The quoted language makes it clear that section 241(a)(3) does not itself constitute authorization to delay removal beyond the removal period, but rather merely establishes an authority to impose supervised release in a certain situation -- the situation where it happens that alien has not been removed within the 90 days. The reasons *why* the alien has not been removed are not specified, and presumably could include the impossibility of removal or the exercise of some *other* authority to delay removal. The absence of similar conditional language triggering the application of section 241(a)(6) -- just three paragraphs later in the same subsection -- is a strong textual indication that section 241(a)(6) is not similarly limited. Instead, it was intended to serve as a general authorization for the Attorney General to refrain from removing the listed classes of aliens and to detain them beyond the removal period. It is well settled, after all, that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion and exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

DISA

Finally, we note that there is further textual support for the conclusion that section 241(a)(6) cannot properly be read as applying solely to a situation where it has proven impossible to remove an alien within the 90-day removal period. Here again, Congress knows how to express such a limitation when it wants to impose one, and it did so in the very next subsection of the statute. Section 241(a)(7) allows the Attorney General to authorize employment for those aliens who, although ordered removed, "cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien." That provision explicitly limits a grant of employment authorization to situations where it is impossible to remove an alien because no country is willing to accept him. The absence of similar language from section 241(a)(6) demonstrates that Congress did not intend similarly to limit the Attorney General's discretion in determining when and under what circumstances to detain aliens falling within the listed classes beyond the 90-day removal period.

**B.**

Even if section 241(a)(6) did *not* authorize the Attorney General to delay removal of an alien beyond the removal period and instead provided solely authority to detain aliens who happen, for some other reasons, to still be in the country after the removal period, we would still conclude that the Attorney General has statutory authority to delay removal of at least some aliens until beyond the 90-day deadline.

We start with the observation that the text of section 241 makes it clear that Congress did not intend to obligate the Attorney General to remove aliens within the removal period in *all* instances. Despite the mandatory language directing that the Attorney General "shall remove" aliens within the removal period, numerous provisions in section 241 expressly contemplate that aliens who have been ordered removed will still be in the country after the expiration of the removal period. For example, as noted above, section 241(a)(3) establishes standards for supervised release of aliens that apply "[i]f the alien does not leave or is not removed within the removal period." Similarly, under the reading of section 241(a)(6) that we are assuming for this portion of our analysis, that provision provides authority for the Attorney General to detain an alien who has not been removed within the removal period. Both of these provisions assume a situation in which an alien has not been removed by the end of the removal period. They would make no sense if the INA imposed an ironclad legal obligation to effect the removal of all aliens before the removal period ended. Similarly, section 241(a)(7) permits the Attorney General to grant work authorizations to aliens who have been ordered removed and applies only in limited circumstances (such as where no country will accept the alien) that suggest the alien will be in the country well beyond the 90 days.

Other provisions in section 241 reinforce the conclusion that Congress understood that, in at least some instances, aliens would not be removed within the removal period. Section 241(b) establishes a detailed decision tree that the Attorney General must follow in determining to which country an alien should be removed. In some instances, the statute contemplates that the Attorney General may have to negotiate sequentially with as many as nine or more separate countries to secure permission to remove an alien, with each round of negotiations taking as many as 30 days.[(11)] *See* INA § 241(b)(2). It might simply be impossible to complete this entire process within the 90-day removal period, even without taking into account the time that the Attorney General and his agents must devote to such administrative tasks as securing necessary travel documents and making appropriate security arrangements. Thus, as the Supreme Court acknowledged in *Zadvydas*, "we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time." 533 U.S. at 701.

While the text of section 241 thus makes it clear that there may be instances in which an alien is not removed within the removal period, that in itself does not explain the circumstances that would make it permissible for the Attorney General to fail to accomplish removal within the allotted time. The discussion above does suggest one such circumstance -- namely, the situation where it is simply not possible to remove an alien within 90 days because a country has not yet been found that will accept him. As explained above, the detailed decision tree established in section 241(b) sets out a process for finding a country of removal that has various timing provisions built in and that may very well take more than 90 days to complete in some cases. And section 241(a)(7), in permitting the Attorney General to grant employment authorization in some circumstances, acknowledges that there may be instances in which "the alien cannot be removed due to the refusal of all countries" to accept him. It is significant, however, that the statute nowhere provides an express exception to the command to remove aliens within 90 days for such cases of impossibility. Instead, that exception must be implied based on the explicit textual references acknowledging that aliens may, in fact, be in the country past the 90-day period, the nature of the process Congress established for choosing the country of removal (a process that, on its face, may take longer than 90 days), and the assumption that Congress would not extend its command about timing to require the Attorney General to do the impossible.

The question here is whether a similar exception may also be implied under the statute that would permit the Attorney General under certain conditions to *choose* to delay removal of an alien even where it would be possible to remove him by the deadline. It could be argued that impossibility of removal -- a circumstance beyond the Attorney General's control -- is the *only* circumstance that makes it permissible for the Attorney General to fail to accomplish removal by the 90-day mark. Such a limited exception to the 90-day rule, however, would not be consistent with the nature of the decisions that are entrusted to the Attorney General under the immigration laws. Rather, a similar exception to the 90-day deadline should be understood as implicit in the statute where the time deadline would conflict with the Attorney General's ability properly to enforce the immigration laws, taking into account the full range of considerations he is charged with weighing in accomplishing removal of an alien. The Attorney General is charged by different provisions of section 241, for example, with determining whether it would be "prejudicial to the United States" to remove an alien to the country of his choosing, *see* INA § 241(b)(2)(C)(iv), and with determining whether it would be "inadvisable" to remove aliens to other countries designated by the statutory decision tree, *see* INA § 241(b)(1)(C)(iv); INA § 241(b)(2)(E)(vii); INA § 241(b)(2)(F). *Cf.* INA § 241(a)(7)(B) (noting circumstances in which Attorney General may make a finding that "removal of the alien is otherwise impracticable or cont

DISA

public interest"). As explained above, in making these and other similar determinations an essential part of the operation of the immigration laws, Congress has embedded considerations of foreign policy and national security in the decisions that the Attorney General must make in accomplishing the removal of aliens. *See Zadvydas*, 533 U.S. at 700-01. And even where a specific statutory determination is not required, in any situation involving removal of an alien with terrorist connections, weighty considerations of foreign policy and national security bear upon efforts to provide the fullest information possible to the receiving country to promote both its security and the security of the United States. At other times, the health and well-being of an alien, including human rights that are protected by the United States' treaty obligations, must be considered. *See, e.g.*, Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Apr. 18, 1988, S. Treaty Doc. No. 100-20 (1988); INA § 241(b)(3)(A).

In entrusting the Attorney General with the responsibility to make determinations that could have such serious implications, Congress surely did not intend to require him to make determinations in undue haste and without taking the necessary time to conduct thorough investigations, seriously deliberate, confer with other executive agencies, and make an informed decision. If the 90-day deadline were considered an inexorable command, however, it might require precisely such uninformed decisionmaking. For example, under the decision tree provided by section 241(b), a country willing to accept a particular alien might not be found until late in the removal period, and the Attorney General might then be faced with deciding whether it would be "inadvisable" to remove the alien to that particular country in a matter of days. Where the Attorney General has such a role to perform -- and particularly where his decision may rest upon grave concerns for national security -- there is no reason to understand the 90-day deadline as an overriding imperative in the statute that may force a premature decision based on incomplete information or lack of deliberation. Similarly, where the removal of an alien with terrorist connections is at stake and the United States is in the process of investigating information that, if passed along to a receiving country, could have a profound impact on the measures that country could take to ensure both its security and the national security of the United States, there is no reason for thinking that the 90-day deadline was meant to trump due deliberation on such proper considerations under the immigration laws.

In short, in our view, Congress did not intend a rigid time deadline to take precedence in situations where the proper administration of the immigration laws requires additional time. The statute gives no indication that Congress attributed any less importance to discretionary immigration-related determinations entrusted to the Attorney General and his designees than it did to non-discretionary functions such as securing travel documents and finding a country willing to accept an alien. Thus, in our view, the Attorney General is not rigidly bound by the 90-day requirement even in situations where it theoretically would be possible to remove an alien and a foreign country has already signaled its willingness to accept him.

Our conclusion that such an implicit exception to the 90-day deadline should be understood under the statute is also buttressed by the INS's longstanding conclusion that it has implied authority under the statute to refrain from removing aliens within the removal period essentially as a matter of prosecutorial discretion. *See* Memorandum to Regional Directors, etc., from Doris Meissner, Commissioner, Immigration and Naturalization Service, *Re: Exercising Prosecutorial Discretion* ("*INS Prosecutorial Discretion Memorandum*") at 1 (Nov. 12, 2000). The INS exercises this discretion even with respect to "executing a removal order," *id.* at 2, despite the fact that doing so will often result in non-compliance with the directive of section 241(a)(1)(A) requiring the Attorney General to remove all aliens within 90 days of the time that a removal order becomes final.

The INS typically exercises its prosecutorial discretion with respect to the execution of final orders of removal through two means. First, 8 CFR § 241.6 provides that an alien "under a final order of deportation or removal" may apply for a stay of removal by filing form I-246. The regulation further provides that "in his or her discretion and in consideration of factors listed in 8 CFR 212.5 and section 241(c) of the Act," certain INS officials "may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate." Although the statutory factors referenced by the regulation appear in provisions that apply only to aliens "applying for admission" and "arriving at a port of entry of the United States" respectively, *see* INA §§ 212(d)(5)(A), 241(c)(2), the INS appears to construe its authority to grant stays to extend more broadly to *all* aliens under a final order of deportation or removal. The instructions accompanying form I-246 state, without limitation, that "[y]ou may file this application if you have been ordered deported or removed from the United States and you wish to obtain a stay of deportation or removal under the provisions of 8 CFR 241.6." Moreover, it is clear that the regulation's cross-references to statutory provisions are intended only to borrow lists of relevant factors to be considered, not to limit the scope of the regulation to the scope of the statutory provisions. Thus, broad stay authority exercised by the INS pursuant to 8 CFR § 241.6 cannot be derived from any statutory source, but rather is derived from the INS's extra-statutory prosecutorial discretion authority. *See INS Prosecutorial Discretion Memorandum* at 6 (referring to "whether to stay an order of deportation" as one potential exercise of prosecutorial discretion).

Second, the INS may at times exercise its prosecutorial discretion authority by granting a longer-term "deferred action" with respect to the order of removal. The power to grant such deferred action has been "developed [by the INS] without express statutory authorization." 6 Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, Immigration Law and Procedure § 72.03[2][h] (rev. ed. 2002). Nevertheless, it has been acknowledged by, and appears to have received the blessing of, the courts. *See Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999) (noting that "[a]t each stage the Executive has discretion to abandon the endeavor" of immigration proceedings, at any time up to and including the execution of removal orders); *Johns v. Department of Justice*, 653 F.2d 884, 890 (5th Cir. 1981) ("The Attorney General is given discretion by express statutory provisions, in some situations, to ameliorate the rigidity of the deportation laws. In other instances, as the result of implied authority, he exercises discretion nowhere granted expressly. By express delegation, and by practice, the Attorney General has authorized the INS to exercise his discretion. . . . The Attorney General also determines whether (1) to refrain from (or, in administrative parlance, to defer in) executing an outstanding order of deportation, or (2) to stay the order of deportation. Although such a stay is usually designed to give a deportee a reasonable amount of time to make any necessary business or personal arrangements, both the length of and reason for the stay lie entirely within the discretion of the Attorney General or his delegate.").

DISA

The INS thus has long treated the apparent statutory mandate that aliens be removed within the removal period as having implied exceptions and has long exercised its prosecutorial discretion in such a manner as to refrain from removing aliens within the removal period. If that approach is correct (which we need not decide here), and if deferral and stay considerations such as the conservation of limited INS resources, humanitarian concerns, and law-enforcement needs constitute sufficient grounds to refrain from removing an alien within the removal period as directed by section 241(a)(1)(A), then it would seem to follow *a fortiori* that the considerations described above (which are directly relevant to the proper execution of the immigration laws) certainly provide a sufficient basis for a similar implicit exception from the 90-day removal deadline.

Thus, we conclude that the statute permits the Attorney General to delay the removal of an alien beyond the removal period when the failure to effect removal is directly related to the administration of the immigration laws and policies of the United States. This does not give the Attorney General *carte blanche* to delay an alien's removal excessively. The delay must be based upon reasons related to the proper implementation of the immigration laws. And as the Court established in *Zadvydas*, where the alien is detained, the Attorney General must complete the removal process within "a period reasonably *necessary* to secure removal," 533 U.S. at 699-700 (emphasis added), a period that the Court concluded presumptively runs for 180 days.[(12)] This reading of the statute accords the Attorney General the time that he reasonably requires to carry out his immigration-related duties thoroughly and effectively. We could not purport here to define in the abstract a comprehensive list of all the activities that are related to the enforcement of the immigration laws and the completion of which could justify delaying an alien's removal beyond the 90-day time period. At a minimum, delays in removal that are attributable to actions taken by the Attorney General for the purposes discussed at pages 12-14 above relating to delays *within* the 90-day period -- namely, investigating whether and to what extent an alien has terrorist connections -- satisfy this standard.

Whether an alien can be *detained* after the expiration of the 90-day removal period is determined by section 241(a)(6). As explained above, under the reading of section 241(a)(6) that we have assumed for purposes of this portion of our analysis, that provision authorizes the Attorney General to detain aliens who fall into the listed classes and who, despite an order of removal, are still in the country beyond the removal period. Among the classes of aliens who may be detained are aliens who pose a threat to national security or the foreign policy of the United States as set forth in section 237(a)(4) and aliens who are otherwise determined by the Attorney General to be a risk to the community or unlikely to comply with an order of removal. Again, as noted above, *Zadvydas* makes clear that if an alien is detained pending removal beyond the removal period, the Attorney General must act within a period "reasonably *necessary* to secure removal." *Zadvydas*, 533 U.S. at 699-700 (emphasis added). Presumptively, a reasonable period lasts for six months, but the Court made clear that in cases involving suspected terrorism, the same limitations would likely not apply. We cannot attempt here to provide bright-line guidance in the abstract concerning the permissible duration of detention. That may well depend on facts in a particular case.

Patrick F. Philbin
Deputy Assistant Attorney General
Office of Legal Counsel

1. Of course, it is also implicit in the granting of any authority to an executive officer that it may not be exercised in a manner that is expressly constitutionally proscribed. Thus, the Attorney General could not, for example, delay the removal of an alien solely as a mechanism for imposing punishment on the alien. *See, e.g., Wong Wing v. United States*, 163 U.S. 228, 238 (1896).

2. *Zadvydas* does not make it clear whether the six month "presumptively reasonable" period begins at the end of, or encompasses, the 90-day removal period. *Zadvydas*, 533 U.S. at 700-01. The lower courts appear to be split on the issue. *Compare Borrero v. Aljets*, 178 F. Supp. 2d 1034, 1040-41 (D. Minn. 2001) ("As interpreted by the Supreme Court in *Zadvydas*, § 1231(a)(6) authorizes the INS to detain aliens for six months *after the expiration* of the 90-day removal period.") (emphasis added) *with Malainak v. INS*, No. 3-01-CV-1989-P, 2002 WL 220061 at *2 (N.D. Tex. Feb. 11, 2002) ("the Court opined that a presumptively reasonable period of detention was *between* the ninety days provided for by the IIRIRA and six months") (emphasis added). In November 2001, the Department issued regulations reflecting an assumption that the presumptively reasonable six-month period from *Zadvydas* includes the 90-day removal period. *See* 8 C.F.R. § 241.13(b)(2)(ii) (2002). The choice to treat the six-month period in that fashion in the regulation, of course, is not definitive on constitutional *requirements* for measuring the six-month period.

3. The *INS Memorandum* also cites at length several decisions addressing the impact of INS detention on triggering the Speedy Trial Act where it appears that the INS has held an alien solely for the purpose of allowing a criminal investigation (into the same conduct that forms the basis for deportation) to proceed. *See INS Memorandum* at 3-4. It is unclear to what extent, if at all, the INS intends to rely on these cases for the proposition that the INS must act with reasonable dispatch. Instead, the INS relies on them primarily for the proposition that the INS can detain an alien solely for purposes of effecting removal, an issue we address below. *See infra* pp. 10-14. In any event, the Speedy Trial Act cases provide no support for any general obligation on the INS to act with dispatch. Rather, they establish solely that, when an alien is prosecuted for the same conduct that formed the basis for the immigration violation on which he was held and when the INS has delayed deportation (and prolonged detention) solely to permit the criminal investigation to proceed, the INS detention may trigger the deadlines of the Speedy Trial Act. That, in turn, may lead to a Speedy Trial Act violation that may be raised *in the criminal trial* to seek dismissal of the indictment. *See, e.g., United States v. Garcia-Martinez*, 254 F.3d 16 (1st Cir. 2001); *see also United States v. De La Pena-Juarez*, 214 F.3d 594, 598-99 (5th Cir.), *cert. denied* 531 U.S. 983 (2000) *and cert. denied*, 531 U.S. 1026 (2000). That consequence for the criminal trial does not mean by any stretch that the INS lacks *power* to detain the alien for the full 90 days prior to removal or that the INS has a general obligation to act with dispatch during that time. It is true that, in explaining how INS detention solely for purposes of criminal investigation may trigger the Speedy Trial Act, one district court stated in dicta that "[i]n essence, the INS has an obligation to act with all deliberate speed to remove from the United States a detained alien who has been finally determined to be deportable." *United States v. Restrepo*, 59 F. Supp. 2d 133, 138 (D. Mass. 1999). In context, it is clear that all the court was indicating was that, when the sole purpose of detention is providing time for criminal investigation, there may be consequences under the Speedy Trial Act for the prosecution. To the extent that this dicta might be construed to suggest anything further concerning a general obligation to act with dispatch, there is no support in the court's Speedy Trial Act analysis for such a conclusion and it is not a correct statement of the law.

4. In coming to this conclusion, the INS relies heavily on several cases holding that when aliens detained by the INS are held solely for the purpose of facilitating a criminal investigation, the detention triggers the provisions of the Speedy Trial Act. *See INS Memorandum* at 3-4. As noted above, however, those cases merely interpret the Speedy Trial Act and the guarantees it provides a defendant *in the context of his criminal case*. It might well be the case that if the INS were to hold DISA

for the purpose of permitting a criminal investigation to proceed there would be a Speedy Trial Act problem in the criminal prosecution. That does not mean, however, that the INS lacked legal authority to detain the alien while the criminal investigation proceeded. We therefore do not view those cases as useful for determining the scope of the INS's authority under section 241(a)(1) of the INA to delay removal of an alien during the 90-day removal period.

5. *See also INS Memorandum* at 5 ("While nothing in the language of the statute requires that the INS expedite an alien's removal during the 90-day removal period, or that the INS remove an alien at the very earliest point at which travel arrangements can be made . . . detention beyond that point must be related to removing the alien.").

6. Of course, as noted above, *see supra* n.1, it is also clear that the INS could not prolong an alien's detention for a constitutionally impermissible purpose.

7. Even if other motivations exist in addition to the need to develop information relevant to decisions in the deportation process, to our knowledge it has never been suggested that the existence of additional governmental motivations can undermine or invalidate a detention that is supported by a lawful purpose. *See, e.g., United States ex rel. Zapp v. INS*, 120 F.2d 762, 764 (2d Cir. 1941) (ongoing criminal investigations do not affect the INS's removal authority); *cf. Whren v. United States*, 517 U.S. 806, 811-13 (1996) (holding that subjective motive of officers for traffic stop is irrelevant where stop is supported by probable cause and thus rejecting "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 491 (1999) (explaining that where an alien's presence in this country is a violation of the immigration laws, he may be deported and the possible existence of additional reasons for the government's focus of enforcement efforts on him is irrelevant; indeed the "Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat").

8. For example, 8 U.S.C. § 1231(c)(2)(A)(ii) makes it express that the Attorney General may stay the removal of an alien stopped upon arriving at a port of entry (who otherwise would be removed "immediately," *id.* § 1231(c)(1)) if the "alien is needed to testify in [a criminal] prosecution." A similar need for an alien's presence in a criminal or civil trial may well be a legitimate concern justifying a delay in removal. We need not decide such questions here.

9. We note that the INS appears to agree in principle with the understanding we have outlined here concerning the factors that are legitimately considered in effecting an alien's removal. In discussing "critical aspects of the removal process," the INS has stated as follows:

It is clearly a legitimate governmental interest that the INS communicate with other law enforcement agencies, both domestic and foreign, and make sure that a particular alien is not wanted for prosecution or needed as part of an investigation, in which case the alien could be transferred into the legal custody of another law enforcement agency. In the context of the investigation into the September 11, 2001 attacks on the Pentagon and the World Trade Center, the United States and the country of removal also have a legitimate interest *in ensuring to the extent possible that a particular alien has no connection with any terrorist organization or activity.*

*INS Memorandum* at 4 (emphasis added). The full scope of the conclusions that the INS drew from this analysis is not entirely clear. As the text above explains, we conclude that if investigations into an alien's terrorist connections are ongoing during the 90-day removal period, postponing removal until later in the period in order to permit such investigations to continue is permissible. Such investigations are legitimately related to effectuating the removal properly under the immigration laws.

10. The provision reads: "Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days . . . ."

11. For example, an alien who is to be removed under section 241(b)(2) first has the opportunity to designate the country to which he would like to be removed. *See* INA § 241(b)(2)(A). Once the alien has designated a country, that country is accorded a minimum of 30 days to decide whether to accept the alien. *See* INA § 241(b)(2)(C)(ii). The Attorney General may also override the alien's designation if he determines that removing the alien to the designated country would be "prejudicial to the United States." *See* INA § 241(b)(2)(C)(iv). If the designated country declines to accept the alien, or if the Attorney General overrides the designation, the Attorney General is instructed by the statute to attempt to remove the alien to the country of his nationality or citizenship. *See* INA § 241(b)(2)(D). That country is then accorded a presumptive 30 days by the statute to decide whether to accept the alien, but here the Attorney General is further vested with discretion to alter that time period, raising the possibility that this step could take even longer. *See* INA § 241(b)(2)(D)(i). If the country of the alien's citizenship or nationality declines to accept the alien, the Attorney General is instructed to attempt to remove the alien to one of six listed countries, including the country in which the alien was born and the country from which the alien was admitted to the United States. *See* INA § 241(b)(2)(E)(i)-(vi). Each of those countries, of course, would have to be separately negotiated with by the United States, and would also have to be given an appropriate amount of time -- presumably 30 days -- to decide whether to accept or reject the alien. Finally, if none of the six listed countries is willing to accept the alien, or if the Attorney General decides that it would be "inadvisable" to send the alien to any of the listed countries that is willing to accept him, the Attorney General is instructed to remove the alien to any country of the Attorney General's choice whose government is willing to accept the alien. *See* INA § 241(b)(2)(E)(vii). Needless to say, following this decision tree through to its very last step -- which Congress must have contemplated would be necessary in at least some cases -- would take considerably longer than the 90 days allotted to the Attorney General by section 241(a)(1)(A).

12. We address here solely a decision to refrain from removing an alien by the 90-day deadline with a view to effecting removal at a later date. A decision in the exercise of prosecutorial discretion not to execute an order of removal *at all* need not be subject to the same limitations and might be subject to almost absolute discretion of the Attorney General. *See generally INS Prosecutorial Discretion Memorandum*; *see also Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483 (1999) ("[a]t each stage the Executive has discretion to abandon the endeavor" of pursuing removal). We express no view on that issue here.

DISA

Secretary of Defense Hegseth,

Please find this email as an emergent request in advance of a formal written Request for Assistance (RFA) from DHS to DOD for military support to U.S. Immigration and Customs Enforcement (ICE) operations and the broader mission to secure the border and maintain the territorial integrity of the United States pursuant to the following Executive Orders: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the U.S. (20 Jan 2025), section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the U.S. (20 Jan 2025); (3) Executive Order Guaranteeing the States Protection Against Invasion (20 Jan 2025) and the Presidential Directive on Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity (29 Jan 2025).

DHS requests immediate assistance, to commence as soon as you receive this email, to augment existing ICE resources categorized into four broad support categories: 1-Aviation; 2-Naval Station Guantanamo Bay (NSGB) Migrant Operation Center (MOC) Expansion, 3-Use and Expansion of the Joint Task Force Guantanamo (JTF-GTMO) Detention Facility , 4-Other operational support to ICE.

For initial planning purposes, this request includes:

**Aviation**

- Immediate aviation transportation assistance to remove aliens from interior locations within the United States to repatriation sites including El Salvador, Guatemala, Honduras, or other extraterritorial locations to be determined, such as NSGB.
- Additionally, while ICE will provide at least one officer on each flight, DHS requests that DOD provides in-flight security and on-board medical personnel, for all DOD-provided flights. The required medical and security staffing will be determined by DOD in consultation with ICE.

**NSGB MOC Expansion**

- Immediate expansion of the MOC on the leeward side of GTMO, including soft-sided facilities capable of housing 30,000 illegal aliens with all appropriate logistical support capabilities, including staff and security. The initial expansion should begin at the leeward camp, with future areas for expansion to be identified by DOD. The specific requirements will be coordinated directly with ICE in accordance with DOD CONPLAN 6120 requirements. DOD should anticipate use of this facility to begin within 7-10 days.

**Use and Expansion of JTF-GTMO Detention Facility**

- Beginning 31 January 2025, immediate access, to and use of, the JTF-GTMO Detention Facility to house approximately 300 high-priority criminal aliens

unlawfully present in the United States. DOD should anticipate additional requirements to expand this facility and to work with ICE on specific capacity and detention requirements including security and medical capabilities.

**Other Operational Support to ICE**

- DOD personnel capable of executing the following functions to be stationed across all 25 ICE areas of responsibility with specific locations to be determined by ICE.

[redacted]

DHS requests this support on a non-reimbursable basis.

DHS understands the need to coordinate this request to generate a task order through the Joint Staff for execution and will reflect the same with greater detail in the formal RFA. Further, DHS understands that this RFA is expansive and will provide additional refinement in the form of required capabilities and presence in the formal submission.

Mr. Garrett Ripa (cc'd) at U.S. Immigration and Customs Enforcement will be my POC to assist in coordination with your team; Director, Joint Staff; and others as you identify to provide further detail for the utilization and deployment of these resources.

I appreciate your timely consideration of this emergent request. My formal RFA will be transmitted in the coming days.

Respectfully,
Secretary of Homeland Security Noem



~~Protected Material -- Subject to Protective Order~~

# USSOUTHCOM EXORD TO EXPAND MIGRANT OPERATIONS AT NAVAL STATION GUANTANAMO BAY

**Originator:** CDR USSOUTHCOM MIAMI FL//SCJ35

**Office:** SCJ35

**DTG:** 312353Z Jan 25

**Prec:** Routine

**To:** CDR USARSO FT SAM HOUSTON TX, AFSOUTH 12AF A2 DAVIS MONTHAN AFB AZ, AFSOUTH CAOC DAVIS MONTHAN AFB AZ, AFSOUTH WATCHCTR DAVIS MONTHAN AFB AZ, COMUSNAVSOUTH, COMMARFORSOUTH, COMSOCSOUTH, CDR JTF-BRAVO, JTF GTMO, HQ USSOUTHCOM J1 MIAMI FL, HQ USSOUTHCOM J2 MIAMI FL, HQ USSOUTHCOM J3 MIAMI FL, HQ USSOUTHCOM J4 MIAMI FL, HQ USSOUTHCOM J5 MIAMI FL, HQ USSOUTHCOM J6 MIAMI FL, HQ USSOUTHCOM J7 MIAMI FL, HQ USSOUTHCOM J8 MIAMI FL, HQ USSOUTHCOM J9 MIAMI FL, HQ USSOUTHCOM MIAMI FL, CCGDSEVEN MIAMI FL, HOMELAND SECURITY TASK FORCE SE MIAMI FL, NAVSTA GUANTANAMO BAY CU, NAVFAC SOUTHEAST JACKSONVILLE FL, JOINT STAFF J3 WASHINGTON DC, JOINT STAFF J5 WASHINGTON DC, USCIS WASHINGTON DC, HQ ICE ERO WASHINGTON DC

**CC:** DIRJIATF SOUTH, CDR USTRANSCOM SCOTT AFB IL, CDR USSOCOM MACDILL AFB FL, CDR USNORTHCOM PETERSON AFB CO, JOINT STAFF J3 DEP-DIR REGIONAL OPS WASHINGTON DC, JOINT STAFF J35 JFC WASHINGTON DC, DLA FT BELVOIR VA

---

TIMEZONE/Z//

MSGID/GENADMIN/DJ-3//
REF/A/DOC/PRES MEMO/YMD:20250129//
REF/B/VOCO/SECDEF/YMD:20250130//
REF/C/EMAIL/JS DJ3/YMD: 20250130//
REF/D/DOC/JCS/YMD: 20250130//

AMPN/
REF A IS THE PRESIDENTIAL MEMORANDUM FOR THE SECRETARY OF DEFENSE AND

THE SECRETARY OF HOMELAND SECURITY, EXPANDING MIGRANT OPERATIONS CENTER AT NAVAL STATION GUANTANAMO BAY TO FULL CAPACITY.//
REF B IS THE SECRETARY OF DEFENSE (SECDEF) VERBAL ORDER OF THE COMMANDING OFFICER (VOCO) FOR CDRUSSOUTHCOM TO EXPAND MIGRANT OPERATIONS AT NAVAL STATION GUANTANAMO BAY.//
REF C IS EMAIL FROM JOINT STAFF DIRECTOR OF OPERATIONS (DJ3) MEMORIALIZING REF B.//
REF D GENADMIN: SECRETARY OF DEFENSE VOCO TO EXPAND MIGRANT OPERATIONS
AT NAVAL STATION GUANTANAMO BAY.//

MSGID/ORDER/CDRUSSOUTHCOM//

NARR ~~(CUI)~~ THIS IS A USSOUTHCOM EXECUTION ORDER DIRECTING CDR JTF-MIGRANT OPERATIONS (MIGOPS) TO EXPAND MIGRANT OPERATIONS AT NAVAL STATION GUANTANAMO BAY (NSGB) IN SUPPORT OF REF A TO INCLUDE THE HOUSING OF UP TO 30,000 ILLEGAL ALIENS OF VARYING STATUS INCLUDING THOSE THAT POSE A HEIGHTENED SECURITY THREAT AS EARLY AS 30 JAN 2025.

1. (U) SITUATION.
1.A. (U) ON 29JAN25, POTUS SIGNED AN EXECUTIVE ORDER DIRECTING THE SECRETARY OF DEFENSE AND THE SECRETARY OF HOMELAND SECURITY TO TAKE ALL APPROPRIATE ACTIONS TO EXPAND THE MIGRANT OPERATIONS CENTER AT NAVAL STATION GUANTANAMO BAY TO FULL CAPACITY TO PROVIDE ADDITIONAL HOLDING SPACE FOR HIGH-PRIORITY CRIMINAL ALIENS UNLAWFULLY PRESENT IN

THE UNITED STATES, AND TO ADDRESS ATTENDANT IMMIGRATION ENFORCEMENT NEEDS IDENTIFIED BY THE DEPARTMENT OF DEFENSE AND THE DEPARTMENT OF HOMELAND SECURITY.



~~Protected Material -- Subject to Protective Order~~

1.B. [redacted] IAW REF B, CDRUSSOUTHCOM IS DIRECTED TO CONDUCT ILLEGAL ALIEN HOLDING OPERATIONS FOR UP 10,000 ILLEGAL ALIENS PENDING RELOCATION WITH SUBSEQUENT EXPANSION TO ACCOMMODATE A TOTAL OF 30,000

ILLEGAL ALIENS PENDING RELOCATION.
1.C. [redacted] IAW REF B, CDRUSSOUTHCOM IS AUTHORIZED TO TAKE ACTIONS NECESSARY TO EFFECTUATE REF B, INCLUDING MOVEMENT OF PERSONNEL, EQUIPMENT, AND THE EXPENDITURE OF FUNDS FOR REF A MISSION AS ORDERED IN REF B.
1.D. [redacted] C-DAY IS 30 JAN 2025 AND D-DAY IS 31 JAN 2025.

2. [redacted] MISSION. USSOUTHCOM CONDUCTS ILLEGAL ALIEN HOLDING OPERATIONS
(IAHO) IN SUPPORT OF THE DEPARTMENT OF HOMELAND SECURITY (LEAD FEDERAL
AGENCY) TO PROVIDE FOR THE CARE, SAFETY, AND TRANSPORTATION OF ILLEGAL
ALIENS AT NAVAL STATION GUANTANAMO BAY NLT 31 JAN 2025.

3. (U) EXECUTION.
3.A. (U) COMMANDER'S INTENT.
3.A.1. [redacted] PURPOSE. MY INTENT IS TO DEPLOY FORCES TO NAVAL STATION

GUANTANAMO BAY TO EXPAND MIGRANT OPERATIONS TO FULL CAPACITY AND TO PROVIDE ADDITIONAL HOLDING SPACE FOR HIGH-THREAT ILLEGAL ALIENS.
3.A.2. [redacted] METHOD. THIS OPERATION WILL RAPIDLY PROJECT FORCES TO ACHIEVE NECESSARY REQUIREMENTS FOR CAMP OPERATIONS. ESTABLISH CAMP OPERATIONS AND EXPANSION OF CAMPS ON THE LEEWARD SIDE OF NSGB AND SUPPORT OPERATIONS ON THE WINDWARD SIDE TO MEET IAHO POPULATION REQUIREMENTS. CONTRACT SOLUTIONS WILL REPLACE DOD CAPABILITIES WHERE FEASIBLE IN ORDER TO MINIMIZE THE DOD FOOTPRINT OVER TIME.
3.A.3. [redacted] ENDSTATE. ALL MIGRANTS HELD AT GUANTANAMO BY ARE SAFELY

REMOVED AS DIRECTED BY LEAD FEDERAL AGENCY AND BASE OPERATIONS RETURN

TO NORMAL.

3.B. (U) CONCEPT OF THE OPERATION.
3.B.1. (U) THIS OPERATION WILL BE CONDUCTED IN FOUR PHASES: PHASE I -

MIGRANT OPERATIONS CENTER (MOC)EXPANSION; PHASE II - LEEWARD INTIAL OPERATIONAL CAPACITY (IOC); PHASE III - LEEWARD FULL OPERATIONAL CAPACITY (FOC); AND PHASE IV - WINDWARD EXPANSION. USSOUTHCOM WILL DESIGNATE JTF-MIGOPS AS THE JOINT FORCE COMMANDER (JFC) WITH RESPONSIBILITY AND AUTHORITY TO LEAD THE OPERATIONAL EFFORT FOR IAHO IN SUPPORT OF DHS.

3.C. (U) TASKS.
3.C.1. (U) CDR JTF- MIGOPS.
3.C.1.A. (U) ASSUME OPCON OF INBOUND FORCES
3.C.1.A.1. (U) COMMENCE CRISIS ACTION PLANNING INCLUDING REQUIRED PERSONNEL AND EQUIPMENT AUGMENTATION TO DEVELOP SUPPORTING PLAN FOR NSGB IAHO.
3.C.1.B. (U) CONDUCT IAHO AT NSGB TO PROVIDE CARE, SAFETY, AND TRANSPORTATION AS REQUIRED.
3.C.1.C. (U) COORDINATE WITH USNAVSOUTH FOR BOS-I SUPPORT AT NSGB.
3.C.1.D. (U) EXECUTE CONSTRUCTION AND EXPANSION OF CAMPS FOR DEPLOYED

FORCES AND ILLEGAL ALIENS.
3.C.1.E. (U) ESTABLISH LEEWARD CAMP L1 WITH THE ABILITY TO SECURE, HOUSE AND FEED APPROXIMATELY 1000 ILLEGAL ALIENS NLT D+10.
3.C.1.F. (U) ESTABLISH LEEWARD CAMPS L2-L6 WITH THE ABILITY TO



~~Protected Material – Subject to Protective Order~~

SECURE,
HOUSE AND FEED UP TO A TOTAL OF APPROXIMATELY 10,000 ILLEGAL ALIENS
NLT D+21.
3.C.1.G. (U) ON ORDER, ESTABLISH WINDWARD CAMPS (PHILLIPS, MCCALLA
AND
NSGB GOLF COURSE) WITH THE ABILITY TO SECURE, HOUSE, AND FEED UP TO A

TOTAL OF APPROXIMATELY 30,000 ILLEGAL ALIENS ON NSGB.
3.C.1.H. (U) DEVELOP A DISTINCT PLAN WITH SUPPORTING LOGISTICAL
REQUIREMENTS FOR HOUSING OF HIGH THREAT ILLEGAL ALIENS (HTIA).
3.C.1.I. (U) COORDINATE WITH CDRUSSOUTHCOM, NSGB, AND OTHER
USSOUTHCOM
STAFF (AS REQUIRED) TO FACILITATE WINDWARD CAMP EXPANSION.
3.C.1.J. (U) CONDUCT JOINT RECEPTION, STAGING, ONWARD MOVEMENT, AND
INTEGRATION (JRSOI) OF ALL ELEMENTS DEPLOYED IN SUPPORT OF THIS
OPERATION.
3.C.1.K. (U) BPT ESTABLISH A JOINT INTELLIGENCE SUPPORT ELEMENT
(JISE)
AS NECESSARY.
3.C.1.L. (U) BPT ESTABLISH A HUMINT AND/OR CI COORDINATION CELL (J2X)

WITH A HUMINT OPERATIONS CELL (HOC) AND TASK FORCE
COUNTERINTELLIGENCE
COORDINATING AUTHORITY (TFCICA) TO EXECUTE COORDINATION AND
DECONFLICTION OF HUMINT AND COUNTERINTELLIGENCE ACTIVITIES WITH NAVAL

FORCES OPERATING IN THE MARITIME AREA OF OPERATION. KEEP USG
CIVILIAN
AGENCIES INFORMED.
3.C.1.M (U) ESTABLISH METOC CELL WITH A DESIGNATED JOINT METOC
OFFICER
(JMO), RESPONSIBLE FOR SUPPORT OF JOINT OPERATIONS AND PLANNING.
3.C.1.N. (U) COORDINATE WITH USSOUTHCOM J6 AND PARTICIPATING FORCES
TO
ESTABLISH A COMMUNICATIONS ARCHITECTURE THAT MAXIMIZES C2,
INTEROPERABILITY, FUNCTIONALITY, AND SECURITY FOR ALL JTF NETWORKS
AND
SERVICES IAW ANNEX K GUIDANCE.
3.C.1.O. (U) PROVIDE OPERATIONAL ASSESSMENT UPDATES ON PROGRESS
TOWARDS DIRECTED OBJECTIVES AND EFFECTS TO CDRUSSOUTHCOM.
3.C.1.P. (U) DESIGNATE FORCES FOR THE ACCOMPLISHMENT OF EQUIPMENT
RETROGRADE AND BASE RESTORATION MISSIONS AT THE HOLDING CAMP.
3.C.1.Q. (U) ICW COMMANDER, NAVY REGION SOUTHEAST (CNRSE) AND NSGB
CONDUCT ACTIONS TO RETURN FACILITIES AND GROUNDS TO AN ACCEPTABLE
STATE UPON COMPLETION OF OPERATIONS.
3.C.1.R. (U) ESTABLISH JOINT REQUIREMENTS REVIEW BOARD (JRRB) TO
IDENTIFY AND PROVIDE REQUIREMENTS TO LEAD SERVICE FOR CONTRACTING,
TRANSITIONING HOLDING CAMP LOGISTICAL FUNCTIONS FROM MILITARY TO
COMMERCIAL SOLUTIONS AS EARLY AS D+90. PARTICIPATE IN THE LSC'S OCS
INTEGRATION CELL (OCSIC).
3.C.1.S. (U) COORDINATE WITH DOJ AND DHS FOR CAMP DISPOSITION NEEDS
FOR ILLEGAL ALIENS OF INTEREST OR PERSONS UNDER CRIMINAL
INVESTIGATION.
3.C.1.T. (U) ESTABLISH COMMON ACCOUNTABILITY AND ACCESS PROCEDURES
FOR
ILLEGAL ALIEN POSSESSIONS, ESPECIALLY MOBILE PHONES.
3.C.1.U. (U) PROVIDE SUSTAINMENT FOR ILLEGAL ALIENS AND JTF MEMBERS.
3.C.1.V. (U) ASSUME TACON OF JTF-GTMO GUARD FORCES IN DIRECT SUPPORT
OF DHS/ICE FOR CONTROL OF HTIA AT JTF-GTMO CAMP 6. DHS/ICE WILL
MAINTAIN CUSTODY OF HTIA. NOTHING IN THIS ORDER SHALL DETRACT FROM
JTF-GTMO PRIMARY RESPONSIBILITY TO PROVIDE CUSTODY AND CONTROL OF LAW

OF WAR DETAINEES.

3.C.2. (U) COMMANDER, U.S. ARMY SOUTH (CDRUSARSOUTH).
3.C.2.A. (U) IMMEDIATELY DEPLOY SSAT AND ADVANCE PARTY TO NSGB TO COORDINATE WITH NSGB AND INTERAGENCY PERSONNEL.
3.C.2.B. (U) ESTABLISH JTF-MIGOPS AND SERVE AS THE INITIAL JOINT FORCE COMMANDER (JFC) AT NSGB NLT 01 FEB 2025.
3.C.2.C. (U) ICW USNAVSOUTH, CNRSE AND USSOUTHCOM J4 (ENGINEERS), REVIEW ILLEGAL ALIEN CAMP CONSTRUCTION PLAN.
3.C.2.D. (U) ESTABLISH A JOINT NETWORK CONTROL CENTER TO MONITOR AND REPORT ALL JTF COMMUNICATION ITEMS OF INTEREST TO USSOUTHCOM'S JOINT DEFENSE OPERATIONS CENTER.
3.C.2.E. (U) MAINTAIN A DETAILED CONCEPT OF LOGISTICS SUPPORT INCLUDING DECISION POINTS AND TIMELINES FOR INITIATING THE CIVIL AUGMENTATION PLAN (CAP).
3.C.2.F. (U) PROVIDE STATEMENTS OF WORK/STATEMENTS OF REQUIREMENTS TO THE NAVY AS LEAD SERVICE FOR CONTRACTING (LSC). COMPLY WITH DIRECTIONS PUBLISHED BY THE LSC TO INCLUDE STANDARDS FOR REQUIREMENTS REGISTRATION, B2C2WG REPRESENTATION, AND REPORTING.
3.C.2.G. (U) CONDUCT COORDINATION WITH USNAVSOUTH TO INTEGRATE ILLEGAL ALIEN CAMP REQUIREMENTS INTO THE BOS-I FOR NSGB.
3.C.2.H. (U) BPT SERVE AS THE FINANCIAL MANAGEMENT ISO JTF-MIGOPS.
3.C.2.I. (U) ASSESS REQUIREMENT FOR A CIVIL AFFAIRS TEAM (CAT) TO MONITOR MEASURES OF EFFECTIVENESS FOR HUMANITARIAN ASSISTANCE AND INFORMATION OPERATIONS KEY INDICATORS FOR PROVISION OF WATER, SANITATION, FOOD, HEALTH, SHELTER AND NON-FOOD ITEMS, AND DRIVERS CONTRIBUTING TO INCREASE ILLEGAL ALIEN FLOW, AND BPT PLACE A CIVIL MILITARY OPERATIONS CENTER (CMOC) AT SOURCE COUNTRY OF MIGRATION OR, IF DIRECTED, AT NSGB.
3.C.2.J. (U) COORDINATE WITH ARMY MATERIAL COMMAND TO DRAW AND RECEIVE OPERATIONAL PROJECT STOCKS REQUIRED ISO HOLDING CAMP OPERATIONS.

3.C.3. (U) COMMANDER, U.S. NAVAL FORCES SOUTH (COMUSNAVSOUTH).
3.C.3.A. (U) BPT PROVIDE A DEPUTY COMMANDER (PROPOSED RANK O6) TO JTF-MIGOPS, WHEN FORMED.
3.C.3.B. (U) ACCEPT OPCON OF U.S. NAVAL MARITIME FORCES.
3.C.3.C. (U) SUPPORT ARSOUTH IN REVIEWING OPERATIONAL REQUIREMENTS INCLUDING FACILITY, EQUIPMENT, AND SUPPLY REQUIREMENTS ON NSGB.
3.C.3.D. (U) DESIGNATED AS LEAD SERVICE FOR CONTRACTS. COORDINATE WITH CNRSE TO ASSUME BOS-I FUNCTIONS AT NSGB.
3.C.3.E. (U) DEVELOP CONTRACTS TO SUPPORT HOLDING CAMP OPERATIONS TO INCLUDE LIFE SUPPORT SUPPLIES AND SERVICES OF ILLEGAL ALIENS AND CAMP MANAGEMENT AT NSGB WITH ASSOCIATED TIMELINES AND COST. DETERMINE TIME OF TRANSITION TO CAP CONTRACTS NLT D+90 DAYS.
3.C.3.F. (U) COORDINATE FOR THE NAVY TO SERVE AS LSC. ESTABLISH THE OCS INTEGRATION CELL (OCSIC) WITH JTF-MIGOPS, IN COORDINATION WITH THE USSOUTHCOM OCSIC FOR THE DURATION. PUBLISH PROCEDURES FOR REQUIREMENT DEVELOPMENT, REVIEW AND APPROVAL FOR SUPPORTED COMMANDERS.
3.C.3.H. (U) PROVIDE RECOMMENDED CONTINGENCY CONTRACTING OFFICER (CCO) AUGMENTATION REQUIREMENTS TO SCJ4 FOR INCORPORATION INTO RFF TO



~~Protected Material – Subject to Protective Order~~

ENHANCE FLEET LOGISTICS CENTER JACKSONVILLE CONTRACTING CAPABILITY/CAPACITY.
3.C.3.I. (U) COORDINATE WITH SCJ4 AND ARSOUTH ON EXECUTION-READY CONTRACTS, TO INCLUDE FULL CAMP OPERATIONS.
3.C.3.J. (U) IDENTIFY INFRASTRUCTURE IMPROVEMENTS REQUIRED TO SUSTAIN

U.S. OPERATIONS ON NAVAL STATION WINDWARD SIDE.

3.C.4. (U) COMMANDER, U.S. MARINE CORPS FORCES, SOUTH (COMUSMARFORSOUTH).
3.C.4.A. (U) SUPPORT ARSOUTH/CDR JTF-MIGOPS, IN PLANNING FOR INITIAL HOLDING CAMP SURGE OPERATIONS.
3.C.4.B. (U) BPT PROVIDE LIAISONS TO ARSOUTH/JTF-MIGOPS, USNAVSOUTH, AND HSTF-SE IN THE EVENT USMC FORCES ARE SOURCED TO SUPPORT THIS PLAN

IN ORDER TO FACILITATE COMMUNICATIONS AND SUPPORT TO ASHORE AND/OR AFLOAT PLANNING AND EXECUTION OF IAHO.
3.C.4.C. (U) BPT ACCEPT OPERATIONAL CONTROL OF USMC FORCES ALLOCATED TO EXECUTE TASKS RELATING TO CAMP OPERATIONS AND SECURITY.
3.C.4.D. (U) BPT SUPPORT JTF-MIGOPS WITH CIVIL AFFAIRS ASSETS.

3.C.5. (U) COMMANDER, U.S. AIR FORCES SOUTH (COMUSAFSOUTH)
3.C.5.A. (U) DESIGNATED AS THEATER JOINT FORCE AIR COMPONENT COMMANDER (JFACC).
3.C.5.B. (U) SUPPORT ARSOUTH/JTF-MIGOPS.
3.C.5.C. (U) BPT EXECUTE INTRA-THEATER AIR MOBILITY OPERATIONS AS DIRECTED TO INCLUDE INTEGRATING ADDITIONAL ALLOCATED AIR ASSETS.

3.C.6. (U) COMMANDER, U.S. SPECIAL OPERATIONS SOUTH (COMSOCSOUTH).
3.C.6.A. (U) BPT PROVIDE PLANNING PERSONNEL AND SUPPORT TO CDR JTF-MIGOPS.
3.C.6.B. (U) BPT PROVIDE SOF RECOMMENDATIONS NECESSARY TO SUPPORT THIS PLAN. SPECIFICALLY, RECOMMENDATIONS FOR THE COMMAND AND CONTROL OF SOF PERSONNEL.
3.C.6.C. (U) BPT SUPPORT WITH SELECT IN-THEATER CIVIL AFFAIRS AND/OR MISO ASSETS TO JTF-MIGOPS.

3.C.6.D. (U) DIRECTOR, JOINT INTERAGENCY TASK FORCE SOUTH (JIATF-S).

BE PREPARED TO RELINQUISH TACON OF U.S. DOD AIR AND MARITIME ASSETS TO SUPPORT AMIO UNTIL PHASE 4 OR FURTHER NOTICE.

3.C.7. (U) COMMANDER, JOINT TASK FORCE GUANTANAMO.
3.C.7.A. (U) BPT PROVIDE PLANNING PERSONNEL AND SUPPORT TO CDR JTF-MIGOPS.
3.C.7.B. (U) PROVIDE ENGINEERING ASSESSMENT OF INFRASTRUCTURE IMPROVEMENTS REQUIRED TO HOLD HIGH THREAT ILLEGAL ALIENS (HTIA) IN JTF-GUANTANAMO FACILITIES.
3.C.7.C. (U) DIRLAUTH AUTHORIZED TO COORDINATE AND CONDUCT INTERAGENCY HOLDING OPERATIONS TRAINING WITH IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) PERSONNEL AT NSGB.
3.C.7.D. (U) WHEN DIRECTED, CONSOLIDATE NON-HIGH VALUE DETAINEES FROM

CAMP VI TO CAMP V.
3.C.7.E. PROVIDE JTF-GTMO GUARD FORCES TACON TO JTF-MIGOPS IN DIRECT SUPPORT OF DHS/ICE FOR CONTROL OF HTIA AT JTF-GTMO CAMP VI. DHS/ICE WILL MAINTAIN CUSTODY OF HTIA. NOTHING IN THIS ORDER SHALL DETRACT FROM JTF-GTMO PRIMARY RESPONSIBILITY TO PROVIDE CUSTODY AND CONTROL

OF
LAW OF WAR DETAINEES.

3.C.8. (U) USSOUTHCOM STAFF.
3.C.8.A. (U) USSOUTHCOM J1 (SCJ1).
3.C.8.A.1. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.A.2. (U) COORDINATE PERSONNEL SUPPORT IN SUPPORT OF THE JTF.
3.C.8.A.3. (U) DEVELOP, MAINTAIN, AND COORDINATE FILLS FOR THE JTF-MIGOPS JOINT MANNING DOCUMENT (JMD) POSITIONS.

3.C.8.B. (U) USSOUTHCOM J2 (SCJ2).
3.C.8.B.1. (U) PROVIDE INDICATIONS AND WARNING OF IMPENDING CARIBBEAN MARITIME MASS MIGRATION ICW USCG MIFC-LANT.
3.C.8.B.2. (U) DEVELOP AND REFINE PRIORITY INTELLIGENCE REQUIREMENTS (PIRS) AND ESSENTIAL ELEMENTS OF INFORMATION (EEIS) IN SUPPORT OF THE COMMANDER'S CRITICAL INFORMATION REQUIREMENTS (CCIRS) AND DECISION POINTS (DPS).
3.C.8.B.3. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.B.4. (U) ICW DHS, BPT ESTABLISH AN INTELLIGENCE FUSION CELL (IFC) AND STAND UP AN INTELLIGENCE COMMUNITY OF INTEREST (COI) TO FUNCTION AS FOCAL POINT AND LEAD FOR COORDINATION, COLLABORATION, AND FACILITATION OF INTELLIGENCE SUPPORTING THIS MISSION ICW WITH ALL MEMBERS OF THE INTELLIGENCE COMMUNITY (IC) AND ANY OTHER STAKEHOLDERS INVOLVED IN SUPPORTING THE CRISIS EVENT(S).
3.C.8.B.5. (U) COORDINATE THEATER AND REQUEST NATIONAL INTELLIGENCE COLLECTION AND OTHER SUPPORT AS REQUIRED SUPPORTING MARITIME SUPPORT AND HOLDING CAMP OPERATIONS.
3.C.8.B.6. (U) COORDINATE WITH HSTF-SE/DHS TO DEVELOP A COLLECTION STRATEGY AND REFINE ISR CONOP FOR P1+ OPERATIONS; IDENTIFY REQUIREMENTS FOR ADDITIONAL THEATER ISR ASSETS (RFF) AND PED SUPPORT (RFS).
3.C.8.B.7. (U) PROVIDE THREAT ASSESSMENT TO THE JOINT PLANNING GROUP (JPG), JTF, AND DEPLOYING FORCES.
3.C.8.B.8. (U) BPT REDIRECT AND REQUEST AVAILABLE TRADITIONAL AND NON-STANDARD INTELLIGENCE, SURVEILLANCE, AND RECONNAISSANCE (ISR) ASSETS AS REQUIRED TO ACTION THE COLLECTION STRATEGY AND ADDRESS INTELLIGENCE GAPS.
3.C.8.B.9. (U) COORDINATE WITH DIA, DHS, AND OTHER STAKEHOLDERS TO UTILIZE ENHANCED DOMAIN AWARENESS (EDA) TO INCREASE INFORMATION SHARING WITH PARTNER NATIONS AND ALLIES, AS WELL AS PROVIDE A COMMON INTELLIGENCE PICTURE (CIP) / COMMON OPERATING PICTURE (COP) THAT FOCUSES ON LAND AND MARITIME MIGRATION.
3.C.8.B.10. (U) BPT REFINE AND COORDINATE HUMAN INTELLIGENCE (HUMINT) AND COUNTERINTELLIGENCE (CI) STRATEGIES TO OPTIMIZE THE EMPLOYMENT OF DOD, SERVICE FORCE PROTECTION AND CI COLLECTION ASSETS.
3.C.8.B.11 (U) BPT PROVIDE 1 X INTELLIGENCE LNO TO HSTF-SE INTELLIGENCE SECTION OF THIS OPERATION UNTIL NO LONGER REQUIRED.
3.C.8.B.12. (U) HQ USSOUTHCOM J2 INTELLIGENCE FOREIGN DISCLOSURE OFFICE (FDO) WILL BE RESPONSIBLE FOR THE REVIEW AND APPROVAL/DISAPPROVAL OF USSOUTHCOM ORIGINATED ISR CLASSIFIED MILITARY INFORMATION (CMI) AND CONTROLLED UNCLASSIFIED INFORMATION (CUI)

PRODUCTS (NDP CATEGORY 8; MILITARY INTEL). SANITIZATION OR DOWNGRADING REQUESTS OF ISR INFORMATION WILL BE COORDINATED VIA SCJ2 INTEL FDO FOR REVIEW AND APPROVAL/DISAPPROVAL PRIOR TO FOREIGN RELEASE.
3.C.8.B.13. (U) ESTABLISH A SCJ2 INTELLIGENCE COMMUNITY (IC) OF INTEREST TO FUNCTION AS FOCAL POINT AND LEAD FOR COORDINATION, COLLABORATION, AND FACILITATION OF INTELLIGENCE SUPPORTING THIS MISSION ICW WITH ALL IC AGENCIES AND ORGANIZATIONS PARTICIPATING IN THE CRISIS EVENT(S).
3.C.8.B.14. (U) BPT SUPPORT ENHANCED VETTING OF ILLEGAL ALIENS TO ASSIST THE LEAD FEDERAL AGENCY IN IDENTIFYING AND CHARACTERIZING THE THREAT.

3.C.8.C. (U) USSOUTHCOM J3 (SCJ3).
3.C.8.C.1. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.C.2. (U) ACTIVATE THE USSOUTHCOM CRISIS ACTION TEAM (CAT) AND THE FUTURE OPERATIONS (FUOPS) OPT.
3.C.8.C.3. (U) TASK COMPONENT COMMANDS AS REQUIRED TO SUPPORT HOLDING

OPERATIONS.
3.C.8.C.4. (U) VALIDATE JTF-MIGOPS JMD REQUIREMENTS.
3.C.8.C.5. (U) BPT SUBMIT PTDO/RFF (INCLUDING ENGINEER SUPPORT FOR THE
CONSTRUCTION OF HOLDING CAMPS) TO THE JOINT STAFF.
3.C.8.C.6. (U) COORDINATE WITH SCJ2 FOR ISR COVERAGE AND COLLECTIONS REQUIREMENTS.
3.C.8.C.7. (U) BPT REQUEST JECC MISSION-TAILORED PACKAGE TO AUGMENT USSOUTHCOM AND JTF-MIGOPS.
3.C.8.C.8. (U) REQUEST AIRLIFT AS REQUIRED.
3.C.8.C.9. (U) ISSUE PLANS AND ORDERS AS REQUIRED.
3.C.8.C.10. (U) PROVIDE SPECIFIC AUGMENTATION TO JTF-MIGOPS, AS REQUIRED.
3.C.8.C.11. (U) DEVELOP, VALIDATE, AND GAIN APPROVAL OF TPFDD.
3.C.8.C.12. (U) THROUGH THE SENIOR METOC OFFICER SERVES AS THE FOCAL POINT FOR JOINT FORCE METOC SUPPORT. ENSURES ALL METOC CAPABILITY REQUIREMENTS ARE VALIDATED.
3.C.8.C.13. (U) SUPPORT NSGB FOR ANY EVACUATION OF NON-ESSENTIAL PERSONNEL AND FAMILY MEMBERS, IF REQUIRED FOR SAFETY/SECURITY REASONS

AS CAMPS EXPAND.
3.C.8.C.14. (U) PRODUCE AND TRANSMIT APPLICABLE ORDERS NECESSARY TO SUPPORT THE OPERATION. ALERT SUBORDINATE COMMAND HEADQUARTERS OF AN IMPENDING REQUIREMENT TO PROVIDE PERSONNEL AND SUPPORT FOR THE EXECUTION OF HOLDING OPERATIONS.
3.C.8.C.15. (U) RECEIVE A COMPREHENSIVE AFTER ACTION REVIEW FROM THE JTF, FOR USE WITH USSOUTHCOM AND FOR DISSEMINATION TO OTHER COMBATANT

COMMANDS.
3.C.8.C.16. (U) COLLECT AND PRESERVE ALL RECORDS ASSOCIATED WITH THE OPERATION.
3.C.8.C.17. (U) ASSIST JTF-MIGOPS IN EXECUTING FORCE PROTECTION (FP) RESPONSIBILITIES. RECOMMEND FP POLICIES, INCLUDING WEAPONS POLICY, AND ROE/RUF TO CDRUSSOUTHCOM IN COORDINATION WITH SCJ2 AND SCSJA.
3.C.8.C.18. (CUI) SET PRIORITY OF MISSION AND PRIORITY OF SUPPORT FOR

OPERATIONS IN EXECUTION AT NSGB.
3.C.8.C.19. (CUI) DETERMINE DEPLOYMENT CRITERIA FOR DEPLOYING FORCES TO NSGB.
3.C.8.C.20. (U) COORDINATE PREPARATION OF NSGB FOR HOLDING CAMP OPERATIONS (USSOUTHCOM STAFF, USARSOUTH AND USNAVSOUTH).
3.C.8.C.21. (U) GENERATE AND MAINTAINS A ROSTER FOR A[redacted]SUPPORT



~~Protected Material – Subject to Protective Order~~

ELEMENT TO AUGMENT NSGB PREPARATION TO ASSIST TF MIGOPS PRIOR TO IOC.
3.C.8.C.22. ASSIGN LNO SUPPORT FROM SOUTHCOM TO IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) IN WASHINGTON DC.

3.C.8.D. (U) USSOUTHCOM J4 (SCJ4).
3.C.8.D.1. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.D.2. (U) SUPPORT PLANNING AND EXECUTION OF LOGISTICS SERVICES, MAINTENANCE, SUPPLY, DEPLOYMENT AND DISTRIBUTION, ENGINEERING, AND OPERATIONAL CONTRACT SUPPORT.
3.C.8.D.3. (U) ICW USARSOUTH, JTF-GTMO, AND USNAVSOUTH, IDENTIFY EMERGENT REQUIREMENTS TO DEVELOP LEEWARD AND WINDWARD INFRASTRUCTURE TO INCLUDING FACILITY, EQUIPMENT, AND SUPPLY REQUIREMENTS ON NSGB.
3.C.8.D.4. (U) SYNCHRONIZE ACTIONS OF ALL LOGISTICS ENABLERS INVOLVED

IN THIS OPERATION VIA THE JOINT LOGISTICS COORDINATION BOARD, TO INCLUDE ADJACENT CCMDS, FUNCTIONAL CMDS, SERVICE COMPONENTS, COMBAT SUPPORT AGENCIES, AND INTERAGENCY (DHS, ICE).
3.C.8.D.5. (U) COORDINATE WITH DLA AS REQUIRED TO MAINTAIN SUPPORT TO

HOLDING CAMP OPERATIONS AT NSGB.
3.C.8.D.6. (U) COORDINATE STRATEGIC MOVEMENTS IN SUPPORT OF DEPLOYMENT
OPERATIONS.
3.C.8.D.7. (U) BE PREPARED TO COORDINATE AND SYNCHRONIZE ENGINEERING RESOURCES AS REQUIRED.
3.C.8.D.8. (U) BE PREPARED TO FACILITATE ENGINEER REACH BACK SUPPORT FOR TECHNICAL EXPERTISE AS REQUIRED.
3.C.8.D.9. (CUI) SET PRIORITY OF MOVEMENT FOR LOGISTICS SUPPORTING OPERATIONS AT NSGB.
3.C.8.D.10 (U) ICW NSGB PROVIDE AN ASSESSMENT OF HARDENED FACILITIES ON NSGB, TO INCLUDE CAPACITY AND CAPABILITIES TO SUPPORT JTF-MIGOPS AND ILLEGAL ALIENS DURING SEVERE WEATHER.
3.C.8.D.11. (U) IN COORDINATION WITH NAVSOUTH, CREATE A POAM TO TRANSITION HOLDING CAMP LOGISTICAL FUNCTIONS FROM MILITARY TO CONTRACTED SOLUTIONS AS EARLY AS D+180.
3.C.8.D.12. (U) ESTABLISH THE USSOUTHCOM OCS INTEGRATION CELL (OCSIC).

3.C.8.E. (U) USSOUTHCOM J5(SCJ5).
3.C.8.E.1. (U) PROVIDE PLANNING REPRESENTATION AND PERSONNEL IN SUPPORT OF USSOUTHCOM'S B2C2WG.
3.C.8.E.2. U) AS REQUIRED, CONDUCT SEQUEL PLANNING VIA THE FUTURE PLANS JOINT PLANNING GROUP (FUPLANS JPG).
3.C.8.E.3. (U) AS REQUIRED, UPDATE THE USSOUTHCOM CAMPAIGN PLAN (SCP).

3.C.8.F. (U) USSOUTHCOM J6 (SCJ6).
3.C.8.F.1. (U) PARTICIPATE IN ASSIGNED B2C2WGS, AS REQUIRED.
3.C.8.F.2. (U) HOST COMMUNICATION WORKING GROUP, INCLUSIVE OF ALL INTERNAL AND EXTERNAL STAKEHOLDERS AND IAW GUIDANCE PROVIDED IN CONPLAN 6120, TO PLAN AND COORDINATE MISSION COMMUNICATION REQUIREMENTS ISO OPERATIONS.
3.C.8.F.3. (U) ASSIST LEAD COMPONENT WITH PLANNING AND EXECUTING A ROBUST COMMUNICATIONS INFRASTRUCTURE THAT ENSURES INTEROPERABILITY BETWEEN ALL MISSION PARTNERS FOR JTF AND SSAT EQUITIES.
3.C.8.F.4. (U) ENSURE NETWORKS, SERVICES, AND APPLICATIONS MEET OPERATIONAL REQUIREMENTS FOR SECURE AND NON-SECURE VOICE, VIDEO, AND DATA COMMUNICATIONS, TO INCLUDE ACCESS TO NIPRNET/ SIPRNET/ INTERNET ENCLAVES AND DHS' INTERNET-BASED HOMELAND SECURITY INFORMATION NETWORK
(HSIN), AS REQUIRED.



~~Protected Material – Subject to Protective Order~~

3.C.8.F.5. (U) ASSIST JTF AND/OR LEAD COMPONENT WITH VETTING/PROCESSING ALL COMMUNICATION RFF/RFS REQUIREMENTS THROUGH SCJ35 GFM.
3.C.8.F.6. (U) ENSURE LEAD COMPONENT INCLUDES PACE PLANNING FOR ALL NETWORKS, SERVICES, AND TRANSPORTS, AS AVAILABLE.
3.C.8.F.7. (U) ENSURE THE JTF J6 STANDS UP A JOINT NETWORK COORDINATION CENTER (JNCC) TO MONITOR, TRACK AND REPORT COMMUNICATION

STATUS, FOR ALL MISSION FORCES, TO THE SCJ6 JOINT DODIN OPERATIONS CENTER (JDOC).
3.C.8.F.8. (U) ENSURE JNCC PROVIDES DAILY COMMUNICATION STATUS (COMSTAT) AND SITUATIONAL UPDATES TO THE JDOC IAW WRITTEN OR VERBAL GUIDANCE PROVIDED BY THE SCJ6 AND JDOC.
3.C.8.F.9. (U) BPT ASSIST LEAD COMPONENT /JTF WITH SOURCING COMMERCIAL
SATELLITE (COMSAT) SOLUTIONS (I.E. [redacted], AS REQUIRED.
3.C.8.F.10. (U) BPT PLAN AND EXECUTE SURGE COMMUNICATION REQUIREMENTS

FOR WINDWARD BUILD-OUT, AS REQUIRED.
3.C.8.F.11. (U) ASSIST LEAD COMPONENT WITH PROCESSING SPECTRUM AND COMMUNICATION SECURITY (COMSEC) REQUESTS FOR DOD FORCES, AS REQUIRED.
3.C.8.F.12. (U) ENSURE LEAD COMPONENT IS PREPARED TO PROVIDE COMMUNICATIONS SUPPORT TO INTERAGENCY AND NGO MISSION PARTNERS, AS REQUIRED.
3.C.8.F.13. (U) COORDINATE PHONES AND FIBER TRANSPORT CONNECTIVITY REQUIREMENTS WITH NSGB BASE COMMUNICATIONS OFFICE (BCO) AND/OR COMMERCIAL VENDORS.
3.C.8.F.14. (U) COORDINATE JTF-GTMO J6 COMMUNICATIONS SUPPORT TO ASSIGNED JTF.

3.C.8.G. (U) USSOUTHCOM J7/9 (SCJ7/9).
3.C.8.G.1. (U) IDENTIFY AND MAINTAIN CONTINUAL COORDINATION LINKS WITH
ALL USG AGENCIES, INTERGOVERNMENTAL ORGANIZATIONS (SUCH AS THE UN, UNHCR, IOM, OAS, AND THE PAN AMERICAN HEALTH ORGANIZATION (PAHO)), AND
NGOS, AS PERMISSIBLE.
3.C.8.G.2. (U) REQUEST SUPPORT (INCLUDING PLANNING, INFORMATION SHARING AND EXECUTION) FROM ALL RELEVANT USG AGENCIES.
3.C.8.G.3. (U) TRANSITION JOIN INTERAGENCY COORDINATION GROUP (JIACG)

TO CRISIS BATTLE RHYTHM TO MAINTAIN COORDINATION LINKS WITH THE INTERAGENCY. IT SHOULD INCLUDE BUT IS NOT LIMITED TO THE FOLLOWING AGENCIES: NATIONAL SECURITY COUNCIL (NSC), DOS, DOD, DHS, DEPARTMENT

OF TRANSPORTATION (DOT), CIA, DOJ, NSA, DIA, DLA, DEPARTMENT OF TREASURY (TREAS), JCS, UN, AND OAS, AS WELL AS REPRESENTATION FROM IOS
AND NGOS WHEN APPROPRIATE. EMPHASIZE WITH THE INTERAGENCY THAT PRODUCTS CLASSIFIED AND RELEASABLE TO THE LOWEST LEVEL WOULD BE MOST USEFUL IN THIS ANTICIPATED SCENARIO.
3.C.8.G.4. (U) BPT SUPPORT JTF MIGOPS WITH CIVIL AFFAIRS PLANNING CAPABILITY AND/OR INITIAL CAPABILITY OF DEPLOYABLE CMOC ORGANIZATION.

3.C.8.H. (U) USSOUTHCOM J8 (SCJ8).
3.C.8.H.1. (U) AS REQUIRED, PROVIDE ADVOCACY TO COMPONENTS WHILE THEY

WORK WITH THEIR SERVICE HEADQUARTERS TO SECURE FUNDING AND AUTHORITIES
TO PREPARE NSGB FOR HOLDING CAMP OPERATIONS.
3.C.8.H.2. (U) PROVIDE FINANCIAL GUIDANCE AND, WHEN NECESSARY,



~~Protected Material – Subject to Protective Order~~