UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

YAMIL LUNA GUTIERREZ, et al.,

Plaintiffs,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, et al.,

Defendants.

Civil Action No. 1:25-cv-01766-SLS

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 2

THE WITNESS TESTIMONY SUPPORTS DEFENDANTS' POSITION THAT THE NSGB DETENTION POLICY IS NOT ARBITRARY AND CAPRICIOUS .......... 2

CONCLUSION .......... 10

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) .......... 5

*Catawba Cnty., N.C. v. E.P.A.*,
571 F.3d 20 (D.C. Cir. 2009) .......... 7

*Ctr. for Auto Safety v. Peck*,
751 F.2d 1336 (D.C. Cir. 1985) .......... 8

*Ctr. for Biological Diversity v. Env't Prot. Agency*,
141 F.4th 153 (D.C. Cir. 2025) .......... 7

*D.A.M. v. Barr*,
474 F. Supp. 3d 45 (D.D.C. 2020) .......... 10

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) .......... 6

*Env't Def. Fund Inc. v. Costle*,
657 F.2d 275 (D.C. Cir. 1981) .......... 5

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 5

*Grand Trunk Corp. v. Transportation Sec. Admin*.,
153 F.4th 517 (7th Cir. 2025) .......... 7

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 7

*Motor Vehicle Mrfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*.,
463 U.S. 29 (1983) .......... 3

*N.C. Fisheries Ass'n v. Gutierrez*,
518 F. Supp. 2d 62 (D.D.C. 2007) .......... 10

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin*.,
374 F.3d 1251 (D.C. Cir. 2004) .......... 10

*Regents of the Univ. of California*,
591 U.S. 1 (2020) .......... 10

*Sale v. Haitian Centers Council, Inc*.,
509 U.S. 155 (1993) .......... 3

*Tourus Recs., Inc. v. Drug Enf't Admin.*,
259 F.3d 731 (D.C. Cir. 2001) .......... 8

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......... 9

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 7

*Yakima Valley Cablevision, Inc*. v. *F.C.C.*,
794 F.2d 737 (D.C. Cir. 1986) .......... 6

*Zadvydas v. Davis*,
533 U.S. 678 (2002) .......... 9

**<u>STATUTES</u>**

**Immigration and Nationality Act of 1952, as amended:**

8 U.S.C. § 1103(a)(3) .......... 9

8 U.S.C. § 1231 .......... 8

8 U.S.C. § 1231(e) .......... 7

8 U.S.C. § 1231(g)(1) .......... 7

8 U.S.C. § 1231(g)(2) .......... 7

8 U.S.C. § 6101 .......... 7

## INTRODUCTION

On October 14, 2026, after the parties cross moved for partial summary judgment, the Court held an evidentiary hearing and heard testimony from two witnesses from Defendant agencies: (1) John Schultz from the Department of Homeland Security ("Mr. Schultz"); and (2) Barry Coble from the Department of War ("Mr. Coble").[1] The Court stated that the "only goal" of the evidentiary hearing was to "permit agency representatives to provide explanations for both the contours of the challenge[d] policy and the contemporaneous reasons for the agency's decision-making" to aid in the determination of whether the policy is arbitrary and capricious. Transcript of October 14, 2026 Hearing ("Trans.") at 6:17-21. The testimony of both witnesses, considered alongside the existing administrative record, supports Defendants' position that the NSGB detention policy is both reasonable and reasonably explained as providing additional detention space for certain high-priority criminal aliens in service to the Administration's larger effort to increase immigration enforcement and protect the territorial integrity of the United States. *See* Defs. SJ Mot. at 30-38; Defs. SJ Rep. at 17-23. The Court should therefore grant Defendants' motion for summary judgment.[2]

---

[1] Defendants respectfully preserve their objection to witness testimony to supplement the record of a claim under the Administrative Procedure Act in the summary judgment posture. *See* ECF No. 121. Defendants additionally preserve their objection to this testimony as it relates to Count II (arbitrary and capricious) as the parties did not agree to discovery on Count II, there was no discovery on that claim, and the Court did not explore with Defendants less burdensome alternatives to fill any gaps in the administrative record. Trans. at 5, 10:2-6. Finally, Defendants object that their witnesses were not permitted to testify by answering questions posed by their own counsel. Trans. at 4:15-16 (Court stating, "I am the one questioning the witnesses"); *id*. at 7:9-10 ("I do not intend to have attorneys question any witnesses").

[2] Defendants respectfully request an opportunity to present oral argument in support of their motion for summary judgment. *See* Trans. at 46:9-10.

# ARGUMENT

## THE WITNESS TESTIMONY SUPPORTS DEFENDANTS' POSITION THAT THE NSGB DETENTION POLICY IS NOT ARBITRARY AND CAPRICIOUS

The policy at issue in this case is the Defendants' decision to use NSGB as a detention facility for certain aliens subject to final orders of removal pending eventual transfer to their final destination countries. Defs. SJ Mot. at 31-33; *see also* Memorandum Opinion, ECF No. 53 ("Mem. Op.") at 13 (characterizing the challenged policy as Plaintiffs' "detention at Guantanamo pending departure to their destination country"); 22 (characterizing the policy as "the Defendants' recent designation of Guantanamo as a location to house immigration detainees"). As argued in Defendants' summary judgment motion, this policy arose out of a January 2025 Presidential Memorandum directing agencies to utilize NSGB to, among other things, "provide additional detention space for high-priority criminal aliens," and to "address attendant immigration enforcement needs." U-DOW-CAR-119; *see* Defs. SJ Mot. at 31. This Memorandum prompted the Department of Homeland Security ("DHS") to reach out to the Secretary of War on February 3, 2025, with "an emergent request" for aviation and operational assistance to support the "[i]mmediate expansion of the [Migrant Operations Center]," including the possibility of ultimately "housing 30,000 illegal aliens." DHS-000088-89.

Mr. Schultz's testimony reflects that, faced with the early concern of housing potentially tens of thousands of aliens, DHS recognized NSGB as a location that could "provide[] [Enforcement and Removal Operations] or [Immigration and Customs Enforcement] with additional guaranteed bed space that isn't always available in the United States." Trans. at 26:16-19. Indeed, a throughline of the early inter-agency planning process, *see* Defs. SJ Mot. at 32-33, was that NSGB would operate as a highly-populated detention facility. U-DOW-CAR-36 ("At Guantanamo, SOUTHCOM is in the process of expanding the Migrant

Operations Center's . . . capacity to 30,000—up from its current capacity of just 120."); U-DOW-CAR-176 ("[T]o include the housing of up to 30,000 illegal aliens."); U-DOW-CAR-178 (instructing Southern Guard to build Leeward camps "with the ability to secure, house, and feed up to a total of approximately 10,000 illegal aliens" and Windward Camps and golf course for "up to a total of approximately 30,000 illegal aliens"); U-DOW-CAR-193; U-DOW-CAR-196 (discussing the provision of water, sanitation, food, health and shelter); U DOW-CAR-586-87. This early planning process occurred amidst an anticipated increase in immigration enforcement in the early months of 2025, and included personnel who, "coordinate domestic/international flight missions for illegal alien decompression[.]" DHS-000092; *see* U-DOW-CAR-34-36 (Congressional representatives noting prioritization of immigration enforcement in early 2025); U-DOW-CAR-127 (memorandum stating that "supporting" immigration enforcement "is a top priority"); DHS-000081-87; DHS-000557-59.

As Mr. Schultz explained, DHS considered NSGB to be uniquely suited to meet this mission because of its "guaranteed bed space." Trans. at 26:16-19; *see Motor Vehicle Mrfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (asking whether there is a "rational connection between the facts found and the choice made"). The record establishes this was so for two reasons. First, NSGB has a proven history of providing "extended care and processing" for migrants in the 1990s, and its "migrant camps may be tailored as to size and the command and control structure to meet the situation." U-DOW-CAR-301, U-DOW-CAR-318; *see* U-DOW-CAR-294-95 (describing Operation Sea Signal between 1994-95); *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 163 (1993) (noting that NSGB housed a population of 12,500 migrants in 1991). Operation Sea Signal demonstrated that

NSGB and its military personnel showed "inherent flexibility" allowing for "rapid adaptation" to a changing mission. U-DOW-CAR-293; *see* U-DOW-CAR-302 (explaining that "at Guantanamo, the mission ranged from emergency care to transporting migrants to a third country, constructing living quarters, providing medical care, and processing migrants for eventual entry into the United States"); U-DOW-CAR-174-75 (2002 Executive Order contemplating NSGB as site to accommodate "mass migration"). Second, the NSGB facilities—and the bed space therein—are already within the exclusive command and control of the federal government. Trans. at 26:18; *see also* Trans. at 39:14 (noting that Camp VI is "one of [DOW]'s facilities"). Absent direct ownership and control, the government "must continue to rely on state and local facilities to house its detainees" due to the "scope of immigration enforcement." DHS-000275; *see also* Trans. at 29:13 (Mr. Schultz emphasizing importance of bedspace due to "ICE's enforcement posture"); DHS-000287 (2019 DHS National Detention Standards contemplating "emergency circumstances" allowing the agency to take measures designed to increase "capacity/temporary bed space").

In addition to the benefits of NSGB as a site that can provide nearly immediate, federally controlled, guaranteed bedspace, Mr. Schultz's testimony confirms that a distinct but closely related reason for using it as an immigration detention facility was that it "free[s] up additional bed space in the United States." Trans. at 26:23-24; *see* Trans. at 29:6-8 (referring to freeing up "other bed space where [the aliens] were housed prior to being transferred" to NSGB). The greater flexibility afforded by freeing up stateside bedspace is another reasonable explanation for the use of NSGB set against the backdrop of the myriad directives and executive orders in early 2025 calling for a rapid increase of immigration enforcement. DHS-000079-80 (Executive Order 14167); DHS-000081-83 (Procl. 10866), DHS-000084-87 (Procl. 10888),

DHS-000124-26 (NSGB Presidential Memorandum); *see also* DHS-000557-560 (Department of State's designation of international cartels). Indeed, Mr. Schultz explained that, due to the DHS's current "enforcement posture[,] . . . all bed space is at a premium." Trans. at 29:13-14. Plaintiffs' own statement of undisputed facts emphasizes this reality: "as of April 14, 2025, ICE's contractual detention capacity in the United States was 62,913 beds," and "48,056 beds were occupied." ECF No. 108-3 ¶ 134 (citing ECF No. 108-35). DHS thus had fewer than 25% of its bedspace available just as it was beginning to grapple with the prospect of imminently housing up to 30,000 more detainees, which would have well exceeded its then-existing capacity. *Id.*; DHS-000088-89.

Ultimately, Mr. Schultz's testimony is consistent with Plaintiffs' position regarding the explanation of the policy at issue. Pls. SJ Mot. at 17 ("[T]he Guantanamo detention policy is being undertaken to provide additional detention space for high-priority criminal aliens.") (citations omitted). The fact that Mr. Schultz could not recall whether DHS, which was at that time facing a potential influx equal to nearly half of ICE's entire contracted capacity, "look[ed] for additional bedspace at other detention facilities" or devoted time to conducting a "cost comparison" before utilizing NSGB, Trans. at 28:13-14, 28:24-25, 29:1-2, does not render Defendants' decision-making arbitrary and capricious. *See Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."); *Env't Def. Fund Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (describing the arbitrary-and-capricious standard as "highly deferential" and one that "presumes the agency's action to be valid"); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be

discerned"). *Contra* Pls. SJ Mot. at 17-18. The President's initial instruction was to expand capacity at NSGB to provide additional detention space for certain aliens, U-DOW-CAR-119, and the agencies planned for a population of up to 30,000 aliens with final orders of removal, given the anticipated enforcement posture. DHS-000088-89; *see Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("Agency policymaking is not a rarified technocratic process, unaffected by political considerations or the presence of Presidential power."). Scrambling to coordinate with state and local partners nationwide to organize a patchwork of existing facilities to meet what was anticipated to be an imminent need for up to 30,000 beds is not an "obvious alternative[]" to an existing, federally owned and operated detention site that had already been successful in meeting the needs of prior large-scale migrant operations missions. *Yakima Valley Cablevision, Inc*. v. *F.C.C.*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986). And a lesson gleaned from detaining migrants at NSGB during Operation Sea Signal was that, "[a]lthough military support is expensive, it has been the primary means of support in past migrant operations because of responsiveness and expediency." U-DOW-CAR-328; *see* Trans. at 33:4-5 (Mr. Schultz acknowledging that "the removal process is very nuanced and takes many steps."); ECF No. 108-8 Behr Decl. Exh. D ("Schultz Decl") ¶ 9-10 (discussing complexity of removal process with attendant operational and logistical hurdles).

Moreover, a cost-benefit analysis is not an appropriate focus here because nothing in the Immigration and Nationality Act (INA) requires it. To evaluate agency regulation of power plants under the arbitrary and capricious standard, the Supreme Court undertook a statutory analysis of a provision in the Clean Air Act and found that "in the present context, the [statutory] phrase 'appropriate and necessary' requires at least some attention to cost," noting that "there are undoubtedly settings in which the phrase 'appropriate and necessary' does not encompass cost."

*Michigan v. EPA*, 576 U.S. 743, 752 (2015); *see, e.g.*, *Ctr. for Biological Diversity v. Env't Prot. Agency*, 141 F.4th 153, 171 (D.C. Cir. 2025) ("The text of the [Clean Air Act] does not require EPA to monetize or otherwise quantify all of the factors it must consider, nor to conduct a cost-benefit analysis to set volumes."); *Grand Trunk Corp. v. Transportation Sec. Admin*., 153 F.4th 517, 526-27 (7th Cir. 2025) (denying arbitrary and capricious challenge in part because agency "was not required to undertake [cost-benefit] measure in the first place" given that there is no requirement in statute). Here, § 1231(e) provides the funding sources for different types of removals, but it nowhere instructs the Secretary *how* to carry out removals or that he must consider cost as a factor while doing so.[3] *See Ctr. for Biological Diversity*, 141 F.4th at 171.

Additionally, as argued in Defendants' motion, Defs. SJ Mot. at 18-26, § 1103(a)(3) provides that Secretary of Homeland Security shall "perform such other acts as he deems necessary for carrying out his authority under the provisions" of the INA, language that—unlike in *Michigan v. EPA*— "says nothing of what precisely will render [an action] necessary." *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 35 (D.C. Cir. 2009); *see Webster v. Doe*, 486 U.S. 592, 600 (1988) (deems necessary phrase "foreclose[s] the application of any meaningful judicial standard of review"). While Plaintiffs would obviously have preferred if Defendants had compared the costs and benefits of the chosen policy with any number of hypothetical alternatives and then explained why none could suffice, "such cost-benefit analyses

[3] To the extent that the text of § 1231(g) is relevant, Defs. SJ Rep. at 8-9 & n.4, it authorizes the Attorney General to spend appropriations to "operate facilities" "without regard" for 8 U.S.C. § 6101's requirements for government purchases when existing facilities are "unavailable" to meet detention needs, underscoring that the primary factor to be considered is detention needs, not financial efficiency. 8 U.S.C. § 1231(g)(1). And that provision only provides that the Secretary consider available alternatives when there are potential sites that would "suitable" to meet detention needs. 8 U.S.C. § 1231(g)(2). As discussed above, the contours of the original mission foreclosed that possibility.

epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency." *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (citation omitted). The law requires only "a brief statement" explaining "why [the agency] chose to do what it did." *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001). Mr. Schultz provided that. Trans. at 26:16-19.

Having provided contemporaneous explanations for the detention policy, Mr. Schultz's testimony also confirms Defendants' position that the policy's contours are embodied in the Memorandum of Understanding (MOU) between the Departments of War and Homeland Security. Trans. at 16:9-12; *see* U DOW CAR-121-26; DHS 00118-23; Defs. SJ Mot. at 33. The MOU makes DHS responsible for "transfers, releases, and removals" from the facility, and establishes that the NSGB detainee population would be composed of (1) adult aliens, (2) with final orders of removal; and (3) possessing an actual or presumed nexus to a transnational criminal organization (TCO) or having engaged in criminal drug activity. U-DOW-CAR-121-23; *see* U-DOW-CAR-127 (DOW memorandum issued on the same day the MOU was signed requesting a further narrowing of the class of NSBG detainees to males without acute medical or psychological conditions); Trans. at 16-18 (Mr. Schultz discussing criteria). The MOU additionally provides that alien detainees will not remain at NSGB beyond 180 days after the issuance of their final order of removal. U-DOW-CAR-121-23. The temporal limitation of 180 days is consistent with both post-removal order detention standards established by controlling Supreme Court precedent and with DHS's intent to use NSGB as "a detention center that is used en route to an individual's [final destination] country."[4] Trans. at 30:17-18, 22-25;

[4] While the Court signaled that the witness testimony is applicable to Count II of the Complaint, Trans. at 6:17-21, Defendants respectfully note that this testimony also supports Defendants' arguments regarding Count I, namely, that DHS understands that it is carrying out its removal

U-DOW-CAR-121; *Zadvydas v. Davis*, 533 U.S. 678 (2002). But no provision of the MOU—or the statute—requires that NSGB be used in the same manner as a United States staging facility. U-DOW-CAR-121-23; *see* Defs. SJ Mot. at 11-30; Defs. SJ Rep. at 6-10.

The Court did not ask Mr. Schultz or Mr. Coble to provide the agencies' reasoning for or the explanation behind the contours of the policy reflected in the MOU. *See* Trans. Instead, the Court asked Mr. Schultz how DHS decides which individual aliens who meet the policy's criteria are sent to NSGB and who is making that decision. Trans. at 20, 20-23. But, as the Court has explained, those individual decisions are beside the point. Mem. Op. at 24 (stating that "[t]he agencies' selection of individuals to be detained at Guantanamo" is "incident to the one discrete thing that the Plaintiffs challenge," which is the decision to "hold them in a detention facility at Guantanamo"). Plaintiffs have conceded the same. ECF No. 33, Pls. Opp. to Defs. Mot. to Dismiss at 16 ("[T]his case is not about individual discretionary decisions over where a noncitizen is detained"). Pls. SJ Resp. at 3 ("Plaintiffs challenge only the authority to detain them at a particular location"); *see also* Pls. SJ Mot. at 25 (challenging "[t]he policy of detaining noncitizens at Guantanamo").

Nor is the subsequent evolution of the mission or the agency's adherence to the MOU the subject of the Court's review here. At no point have Plaintiffs ever challenged the agency's adherence to the MOU. Compl. ¶¶ 65-69; Pls. SJ. Mot.; *United States v. Sineneng-Smith*,

---

authority under 8 U.S.C. § 1231 when it sends aliens to NSGB. Defs. SJ Mot. at 12-20; Defs. SJ Rep. at 6-10; *see also* Sept. 24, 2026 Minute Order ("The Court . . . does not intend to deprive the Parties of an opportunity to move for summary judgment on the entirety of the record."). Moreover, Mr. Schultz's testimony that DHS tries to make travel arrangements for aliens prior to their transfer to NSGB but it is not always successful due to "diplomatic barriers," Trans. at 33:9, unanticipated difficulty getting travel documents, Trans. at 33:25, 34:1, and the difficulty scheduling a charter flight, Trans. at 34:16-21, supports Defendants' alternative argument on Count I. *See* Defs. SJ Mot. at 21-26; Defs. SJ Rep. at 10-14; 8 U.S.C. § 1103(a)(3).

590 U.S. 371, 375 (2020) (discussing the party-presentation principle). And to the extent that Plaintiffs complain that the number of aliens detained at NSGB has fallen short of the initial estimation, Pls. SJ Mot. at 29, that was also not the claim they raised in their Complaint. Compl. ¶¶ 65-69; *cf. D.A.M. v. Barr*, 474 F. Supp. 3d 45, 66 (D.D.C. 2020) (discussing *Accardi* claim). Indeed, as the Court emphasized several times during the hearing, it must consider whether the "contemporaneous explanation" for Defendants' decision was arbitrary and capricious. Trans. at 5:16, 6:8, 6:19; *see also* Trans. 22:25, 32:1-3 ("[D]on't tell me about most recently. I just want to know, dating back to February 4, 2025[.]"). This is because "[a]n agency must defend its actions based on the reasons it gave when it acted," *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020), and the challenged action here is: "Defendants' recent designation of Guantanamo as a location to house immigration detainees." Mem. Op at 22. Activity post-dating that decision and the attendant planning process necessarily does not fall within the established scope of this litigation.

**CONCLUSION**

Ultimately, as demonstrated by the certified administrative record and witness testimony, the NSGB detention policy was both reasonable and reasonably explained. *See, e.g.*, *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) ("While [an agency's] conclusion may be debatable as a policy matter, mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful.") (citing *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin*., 374 F.3d 1251, 1263 (D.C. Cir. 2004)). Accordingly, the Court should either dismiss this action or grant Defendants' motion for partial summary judgment.

Dated: October 26, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

ANTHONY NICASTRO
*Director*

AUGUST E. FLENTJE
*Deputy Director*

LESLIE McKAY
*Assistant Director*

RUSSEL J.E. VERBY
*Senior Litigation Counsel*

JASON K. ZUBATA
*Trial Attorney*

By: *<u>/s/Alexa Perlmutter</u>*
ALEXA PERLMUTTER
*Trial Attorney*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
U.S. Department of Justice, Civil Division
Washington, DC 20044
Tel: 202-532-4665
Email: Alexa.S.Perlmutter@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on October 26, 2026, I electronically filed the foregoing Motion for Defendants with the Clerk of Court for the United States District Court of the District of Columbia using the CM/ECF system. I also certify that Plaintiffs will be served through their counsel, who are registered CM/ECF users, via the CM/ECF system.

By: */s/Alexa Perlmutter*
ALEXA PERLMUTTER
*Trial Attorney*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: 202-532-4665
Email: Alexa.S.Perlmutter@usdoj.gov