UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YAMIL LUNA GUTIERREZ, *et al.*,<br><br>Plaintiffs-Petitioners,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, *et al.*,<br><br>Defendants-Respondents. | Civil Action No. 1:25-cv-01766-SLS |

**PLAINTIFFS-PETITIONERS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S OCTOBER 20, 2026 MINUTE ORDER**

## TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**ARGUMENT** .......... **2**

I. Witness Testimony Confirms that Defendants' Policy is Contrary to Law .......... 2

II. Witness Testimony Confirms that Defendants' Policy is Arbitrary and Capricious .......... 5

**CONCLUSION** .......... **9**

## INTRODUCTION

As Plaintiffs-Petitioners ("Plaintiffs") have established, Defendants-Respondents' ("Defendants") policy of transferring noncitizens from the United States for detention at Guantánamo is not only unprecedented but also unlawful, both because there is no authority to run a detention facility outside the United States and because Defendants' unexplained and unjustified policy is arbitrary and capricious. *See generally* ECF Nos. 108, 113. The testimony from Department of Homeland Security ("DHS") and Department of Defense ("DOD") witnesses on October 14, 2026, only confirms the existing record, which is sufficient on its own for the Court to grant partial summary judgment.[1]

The agencies' witnesses verified that: (1) Defendants transfer noncitizens to Guantánamo in an ad hoc manner and without determining whether there is any plan in place for their removal to their final destination; (2) the Guantánamo detention policy is a departure from longstanding practice; and, (3) even assuming the purpose of the policy is to expand bed space, the agencies failed to consider alternative detention facilities, costs, or the adverse impact on military staffing. *See generally* SJ Hr'g Tr. (Oct. 14, 2026), ECF No. 126 (attached at Exh. A). The testimony is thus consistent with the existing record demonstrating that detention at Guantánamo is not part and parcel of the execution of removal orders and that the policy has the hallmarks of arbitrary and capricious action by breaking from decades-long practice without considering relevant costs and logistical concerns.

The Court should grant Plaintiffs' motion, declare the policy to be unlawful, and vacate it.

[1] Thus, even assuming Defendants were correct that the Court could not hear witness testimony (which they are not), Plaintiffs would still be entitled to summary judgment under the record as it existed prior to the testimony. For purposes of appellate review, Plaintiffs therefore respectfully suggest that the Court make clear that it would have granted summary judgment to Plaintiffs even absent the witness testimony.

## ARGUMENT

### I. Witness Testimony Confirms that Defendants' Policy is Contrary to Law.

As the Court already held in denying Defendants' motion to dismiss, the Immigration and Nationality Act ("INA") does not authorize extraterritorial detention of noncitizens with final orders of removal. ECF No. 53 ("MTD Op.") at 44–46. Instead, it provides only a limited authority to maintain custody of noncitizens pursuant to 8 U.S.C. § 1103(a)(3) "while the government is in the midst of executing [an individual's] removal order." *Id.* at 45. The record already demonstrates that detention at Guantánamo is not occurring in the midst of executing noncitizens' removal orders. *See* U-DOW-CAR-129–130, 211, 647; ECF No. 108-4 ("Behr Decl.") ¶¶ 12–23. The two witnesses' testimony confirms this in at least three ways.

1. The DHS witness confirmed that Defendants select noncitizens to be detained at Guantánamo on an "ad hoc" basis, without screening for whether individuals are ready for removal to their final destination country. *See* SJ Hr'g Tr. 24:22. As the DHS witness explained, Defendants have adopted four basic criteria for noncitizens to be detained at Guantánamo as outlined in the DHS and DOD memorandum of understanding ("MOU"): (1) having a final order of removal; (2) having no significant medical concerns; (3) having "ties" to a transnational criminal organization ("TCO") and/or criminal drug activity; and, (4) being within 180 days from the date of final order of removal. SJ Hr'g Tr. 16:9–18:6.[2] While there were periods when Defendants considered other criteria—gender (males), Spanish speakers, and individuals from Venezuela or Haiti, *id*. at 21:7–

[2] The MOU reflects that the supposed nexus to a TCO is broadly defined to include situations where there is only a *presumed*, and not *actual*, connection between an individual to such an organization. *See* U-DOW-CAR-121–22 ("When the nature of an alien's entry into the United States is uncertain, DHS/ICE may assert a nexus where DHS/ICE reasonably believes that alien to have paid a TCO to be smuggled into the United States if the alien is from a country where the preponderance of aliens from the country enter the United States in that fashion.").

24:10—outside of those situations, the selection process was "more ad hoc," *id*. at 24:19–22; *see also id*. at 25:6–15 (describing how DHS puts out "parameters that [detainees] needed to be males, healthy, final orders"). Thus, it is apparent that Defendants sent noncitizens to Guantánamo without requiring any inquiry into whether they had any necessary travel documents or did not need travel documents; whether travel arrangements were in place to get the detainees to their final destination; or even whether there were flights available from Guantánamo to get to their final destination. This lack of screening for removal readiness is consistent with existing data from discovery reflecting long periods of detention at Guantánamo and transfers back to the United States, *see, e.g.*, ECF No. 108-2 ("Plfs' MSJ") at 21–23, and only confirms that detainees are not in the midst of removal while being detained at Guantánamo.

2. The DHS witness confirmed that travel arrangements have not been made for every individual when they arrive at Guantánamo. *See* SJ Hr'g Tr. 32:17–19 ("[N]ot every alien who has been transferred to Gitmo has had onward travel scheduled by the time they arrive."). While the witness was not able to testify to the proportion or average of noncitizens who do have travel arranged before arrival, *id*. at 31:19–22, 32:22–24, Defendants' own data from discovery reflected that about *two-thirds* of noncitizens were transferred to Guantánamo *without* travel arrangements to their final destination at the time of their transfer to the military base. Behr Decl. ¶ 18. Moreover, when asked why travel arrangements had not been made, the witness stated that "the removal process is very nuanced and takes many steps," including diplomatic negotiations and arranging of charter flights. SJ Hr'g Tr. 33:2–34:21. This process described for transfers to Guantánamo is thus substantively similar to transfers between detention facilities inside the United States while an individual is merely awaiting removal—with the critical exception that Guantánamo is not within the United States. In other words, DHS confirmed that the detention at Guantánamo is, by

nature, detention in a permanent facility, not like a refueling pitstop or connecting flight in the midst of removal.

3. The DOD witness's testimony also corroborated that Guantánamo is not used en route to a final destination country. When asked to explain the basis for asserting that Guantánamo "serves as a temporary intermediate point or way station during an individual's route to the final destination of removal," the DOD witness pointed only to the MOU signed in March of 2025. SJ Hr'g Tr. 42:10–43:13. But the MOU contains nothing that limits detention at Guantánamo to the type of custody permitted under § 1103(a) while executing removal. *See generally* U-DOW-CAR-121–26; DHS-118–23. Indeed, as Plaintiffs have explained, rather than containing anything to support the contention that Guantánamo serves as a temporary intermediate point, the MOU allows for noncitizens to be detained up to *180 days* from the date of their final order. *See* U-DOW-CAR-123; DHS-120. Further, DOD's own testimony undermines Defendants' prior argument regarding the readiness of detainees for removal at the time of their transfer to Guantánamo. Specifically, in response to Plaintiffs' reliance on the fact that certain noncitizens had to be transferred back to the United States from Guantánamo for removal through commercial flights, *see* Plfs' MSJ at 22, Defendants argued that such transfers were not probative because "[t]here may have been military transport planned that had to be diverted." ECF No. 110-2 ("Defs' MSJ") at 26. Yet the DOD witness confirmed that DOD had no role in the process before noncitizens land at Guantánamo and no role in handling travel arrangements for people when they arrive at Guantánamo. SJ Hr'g Tr. 38:24–39:2, 43:15–20. Thus, DHS could not, in fact, have planned for those individuals' removals through military transport, as Defendants had suggested when trying to explain away these transfers.

In short, the agency witness testimony confirms what the record has reflected all along: Defendants are not transferring and detaining people at Guantánamo "in the midst of executing their removal order[s]," MTD Op. 45, but rather holding them there for detention like at any other long-term detention facility in the United States. As this Court already made clear, that violates the INA. *Id*. at 44–46.

**II. Witness Testimony Confirms that Defendants' Policy is Arbitrary and Capricious.**

Defendants' witness testimony additionally confirms what is already evident from the barebones administrative record in this case: the Guantánamo detention policy is arbitrary and capricious for several independent reasons. *First*, the agencies failed to acknowledge, let alone reasonably explain, a change from the longstanding policy of not holding immigration detainees at Guantánamo. *See* Plfs' MSJ at 26–27. *Second*, even assuming the purpose of the policy is to expand detention capacity, the agencies did not explain *how* detention at Guantánamo serves this purported goal. *Id*. at 27–28. *Third*, the agencies did not consider obvious alternatives—such as detention at facilities in the United States—or important factors—such as cost or other resourcing issues. *Id*. at 28–34.

1. The detention at Guantánamo of noncitizens first apprehended and detained inside the United States marks a break with longstanding agency practice. Both witnesses confirmed that immigration detainees were "first flown to Guantánamo Bay around February 4, 2025." SJ Hr'g Tr. 16:3–6; 36:17–20. Yet the administrative record contains no acknowledgement or reasonable explanation for this change in practice. "'[I]t is elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent.'" *Brisk Ins. Servs. LLC v. Fed. Crop Ins. Corp.*, No. CV 26-842 (SLS), 2026 WL 2185700, at *14 (D.D.C. July 29, 2026) (quoting *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017)) (citation modified). This

doctrine applies to "deviation from prior practice and precedent, even if there had been no previous formal policy." *CSL Plasma Inc. v. CBP*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022) (collecting cases). *Contra* Defs' MSJ at 34. The witness testimony provided no such explanation, thereby corroborating Plaintiffs' argument that the government failed to meet this requirement.[3]

2. The agencies also failed to reasonably explain how detention at Guantánamo serves their supposed goal of increasing detention capacity. The witness testimony asserted that "the government's *only* reason" for detaining individuals at Guantánamo was to create "additional bed space." SJ Hr'g Tr. 27:9–13 (emphasis added); *see also* DHS-124 (Presidential Memorandum instructing agencies to expand the Migrant Operations Center to "*provide additional detention space* for high-priority criminal aliens") (emphasis added). But if this is in fact the sole purpose, it contradicts Defendants' claim that Plaintiffs are "inappropriately" focusing on detention capacity "in isolation from the remainder of the [Presidential Memorandum] as well as from the remainder of the record," and that the purpose of the policy is to protect "against invasion, foreign terrorists and other national security and public safety threats." ECF No. 115 ("Defs' MSJ Reply") at 19–20.

Like the witness testimony, the administrative record is bereft of *any* evidence that Guantánamo meaningfully expanded detention capacity, or that additional capacity was even needed. Rather, the one piece of evidence addressing bed space shows that, as of January 2026,

[3] In their summary judgment briefing, Defendants pointed to older policies that they claimed show that Guantánamo was used in the past for "immigration-related purpose[s]," Defs' MSJ at 34, but those policies concerned individuals "intercepted . . . in the Caribbean" and are thus inapposite, as Plaintiffs previously explained, *see* ECF No. 113 ("Plfs' MSJ Reply") at 16–17. And even if merely citing these policies constituted acknowledgment of a change in position (which it does not), it comes nowhere close to offering a reasoned explanation for the change. *See FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (when changing positions, agencies must "offer 'good reasons for the new policy,'" *id.* at 570 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

Guantánamo had a capacity of less than 300 immigration detainees. Answer, ECF No. 62, ¶ 56. And there have been many weeks where it has held *none*. *See* U.S. Senate Comm. on the Judiciary, *Congressional Oversight of Immigration Detention at Naval Station Guantánamo Bay* 4 (Oct. 9, 2026), https://perma.cc/7EST-CD9M. "[A]n agency must explain why it chose to do what it did," and "conclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation modified). DHS has "offered no 'satisfactory explanation' for how it looked at these facts and reasonably determined that" detention at Guantánamo increases detention capacity. *Bushireddy v. Lyons*, No. 25-1102 (SLS), 2026 WL 759480, at *10 (D.D.C. Mar. 18, 2026) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

3. Witness testimony only further underscores a glaring gap in the administrative record: DHS did not consider alternative detention sites in the United States that would have created sufficient additional bed space, and it did not consider costs, logistical hurdles, or other resource concerns stemming from the policy.

The DHS witness was unable to state whether (1) there even *was* insufficient bed space in the United States; (2) detainees were transferred from facilities where there was insufficient bed space; (3) detainees were transferred from facilities that were full; (4) the agency considered alternative detention sites prior to sending detainees to Guantánamo; *or* (5) the agency conducted a cost comparison between Guantánamo and another detention facility. *See* SJ Hr'g Tr. 26:12–30:3. In fact, the DHS witness confirmed that generally, once an individual meets the four criteria for transfer to Guantánamo, the decision to actually send them there is completely "ad hoc" and not based on any additional identifiable criteria at all, let alone bed space considerations. SJ Hr'g Tr. 25:9–15; *see also supra* 2–3. Moreover, as discussed above, individuals are often sent to

Guantánamo without onward travel arrangements, often resulting in their transfer *back* to the United States for further detention prior to removal. SJ Hr'g Tr. 32:17–19; *see also* Behr Decl. ¶ 13 (calculating that, from June 4, 2025, to February 2, 2026, 90 out of 227 detainees—roughly 40%—were transferred back to the United States). This again underscores that Defendants failed to account for an important factor—namely, the logistical challenges inherent in extraterritorial detention at Guantánamo. And while the record shows that shifting DOD personnel to assist with immigration detention at Guantánamo had a negative impact on military readiness, *see* U-DOW-CAR-659, the DOD witness acknowledged that the agency failed to take any action to find a longer-term staffing solution or analyze whether detention at other facilities would pose the same resource concerns. SJ Hr'g Tr. 41:4–21 (discussing U-DOW-CAR-659).

"The failure of an agency to consider obvious alternatives has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986); *see also Spirit Airlines, Inc. v. United States Dep't of Transportation & Fed. Aviation Admin.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (agency must "give a reasoned explanation for its rejection" of "responsible alternatives") (quoting *Am. Radio Relay League v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008)). And "[a]n agency's failure to consider an important aspect of the problem is one of the hallmarks of arbitrary and capricious reasoning." *Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 430 (D.C. Cir. 2018) (failure to consider risks to public health and environment engendered by new rule was arbitrary and capricious). Here, the agencies' failure to consider alternative detention facilities in the United States or account for important factors such as bed space at existing facilities, costs, and DOD staffing concerns renders the policy arbitrary and capricious.

## CONCLUSION

The Court should grant the Plaintiffs' motion for partial summary judgment and deny Defendants' cross motion for partial summary judgment.

Dated: October 26, 2026

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No. NY0224)
Judy Rabinovitz
Noor Zafar
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, Floor 7
New York, NY 10012
(212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

My Khanh Ngo (D.D.C. Bar No. CA00219)
Kyle Virgien
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org

Derek Poteet ±*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(703) 217-8374
dpoteet@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 420
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Kimberly Grano (D.D.C. Bar No. NY0512)
Pedro Sepulveda (D.D.C. Bar No. NY0637)
Ghita Schwarz (D.D.C. Bar No. NY0663)
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004

*Attorneys for Plaintiffs-Petitioners*

**Pro bono representation certificate forthcoming*
*± Not admitted in D.C.; practice limited to federal courts*

(646) 946-7453
kgrano@refugeerights.org
psepulveda@refugeerights.org
gschwarz@refugeerights.org

Megan Hauptman (D.C. Bar No. 1780749)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org