# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| YAMIL LUNA GUTIERREZ, et al., | ) | Civil Action |
| Plaintiffs, | ) | No. 25-1766 |
| vs. | ) | |
| | ) | October 14, 2026 |
| MARKWAYNE MULLIN, et al., | ) | 10:02 a.m. |
| Defendants. | ) | Washington, D.C. |

* * * * * * * * * * * * * * * *

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE SPARKLE L. SOOKNANAN**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES**:

FOR THE PLAINTIFFS:
LEE GELERNT
NOOR ZAFAR
JUDY RABINOVITZ
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2616
lgelernt@aclu.org
nzafar@aclu.org
jrabinovitz@aclu.org

MY KHANH NGO
American Civil Liberties Union
425 California Street, 7th Floor
San Francisco, CA 94104
(718) 483-5885
mngo@aclu.org

FOR THE DEFENDANTS:
AUGUST FLENTJE
ALEXA PERLMUTTER
Assistant United States Attorneys
United States Attorney's Office
for the District of Columbia
601 D Street, NW
Washington, DC 20530
(202) 514-3309
august.flentje@usdoj.gov
alexa.perlmutter@usdoj.gov

(**Appearances Continued**)

**APPEARANCES (continued):**

FOR THE DEFENDANTS:

BRONWYN NAYCI
DOJ-Civil Division
450 5th Street NW, Suite 5543
Washington, DC 20001
(202) 598-6429
bronwyn.h.nayci@usdoj.gov

LESLIE M. MCKAY
DOJ-Civil Division
Poc Agostinho, Jean
1100 L St., N.W.
8142
Washington, DC 20530
(202) 307-0340
leslie.mckay@usdoj.gov

***This transcript is work product.*** ***This transcript shall be considered null and void if the transcript is edited, printed, disassembled, screenshot, and/or copied in any manner by any party without authorization of the signatory.***

Court Reporter: Elizabeth Davila, RPR, FCRR
Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY: Your Honor, we are on the record this morning in Civil Matter 25-1766, Yamil Luna Gutierrez, et al. versus Markwayne Mullin, et al.

Counsel for the parties, starting with the plaintiffs, please approach and note your appearances for the record.

MR. GELERNT: Good morning, Your Honor. Lee Gelernt from the ACLU for plaintiffs.

THE COURT: Good morning.

MS. ZAFAR: Good morning, Your Honor. Noor Zafar for plaintiffs.

MS. NGO: Good morning, Your Honor. My Khanh Ngo for plaintiffs.

THE COURT: Good morning.

MS. RABINOVITZ: Good morning, Your Honor. Judy Rabinovitz for the plaintiffs.

THE COURT: Good morning.

MS. ZAYCI: Good morning, Your Honor. Bronwyn Zayci for the defendants.

THE COURT: Good morning.

MR. FLENTJE: Good morning. August Flentje for the defendants.

THE COURT: Good morning.

MS. PERLMUTTER: Good morning.

Alexa Perlmutter for the defendants.

THE COURT: All right. Good to see you all.

Thank you all for being here. I know some of you may not have come exactly willingly.

This is an important case, and I want to get it right. And I do believe that the binding authority in this space requires me to hold a hearing based on what I have seen in the record in order to resolve the APA claims.

Let me just first address the defendants' request to close the courtroom. You saw my minute order on Friday, and I take seriously the presumption of public access to judicial proceedings.

I recognize that the defendants may not know whether this hearing will involve sensitive or classified information -- and that's fair, since I am the one questioning the witnesses. So if at any point during the hearing you believe what I am asking warrants protection from public disclosure, you should let me know; you should stop me right away, and we can have a discussion about that.

I will instruct your witnesses about that before they begin. And I will tell them that if they have any questions about whether their responses will touch on sensitive issues they can take a moment and confer with you.

My goal is not to elicit any of that type of information. And my goal here, as I said in my order, is

not to do fact-finding which, I agree, would not be appropriate. I do not expect this hearing to be very long.

I have some pretty specific questions based on what I have seen. As you all are aware, the administrative record in this case is quite thin, particularly given the significance of the issues involved.

Because you all agreed at the outset that discovery was necessary, I permitted discovery in this case. I anticipated, after resolving the motion to dismiss and the class cert motion, that there may be some dispute about whether we needed discovery in the first place; but you-all came in telling me that you agreed discovery was necessary.

Having now reviewed the administrative record, all of the discovery, and all of your briefing, in my view, the government still has not been able to identify a contemporaneous explanation for its actions and, without that, I cannot determine if the agency's action was arbitrary and capricious. It's not my job to make up the policy or tell you what I think it is based on what I see. I don't think the D.C. Circuit would appreciate that.

It's also not my job to speculate about why the agency did what it did. My job is to look at the record and determine if, based on the administrative record, the agency acted lawfully or if it acted arbitrarily and capriciously; and I can't do that based on what I have before me.

As I said in my prior order denying the government's motion for reconsideration of this hearing, I recognize that it is not ordinary. But this case does present the unusual circumstance, in my view, of the current record frustrating effective judicial review. Both the Supreme Court and the D.C. Circuit said that district courts can require agency decision-makers to testify where the record lacks a contemporaneous rationale for the agency action.

I understand the issues with the timing of the hearing. I did not want to schedule one unless I thought it was absolutely necessary; and so I thought it best to wait until I had received all of your submissions and reviewed them to determine whether I actually needed to do this.

So I have spent a lot of time with all of your briefing and everything I have, and now we're here.

My only goal at this hearing is to permit agency representatives to provide explanations for both the contours of the challenge policy and the contemporaneous reasons for the agency's decision-making. I do not intend to probe beyond that. And if the witnesses you have chosen to bring here today cannot answer those questions, I am not going to press them to do so. I believe the case law requires me to give you an opportunity to do that; and if you choose not to take it, if your witnesses don't have

answers, we will move on; and I will decide the motions appropriately.

Let's talk about the format.

I am going to ask questions of the witnesses. If they don't know the answers, they can tell me that and I will move on, as I said.

At the end of those questions, I will give the witnesses an opportunity to testify further if they wish on those two topics that I mentioned. I do not intend to have attorneys question any witnesses. As I said, I have pretty discreet questions. I do not expect this to be a long hearing.

Any objections to the format of how we're going to proceed today, understanding that the government would rather not be here at all?

MR. FLENTJE: Your Honor, we did have a few objections that I would like to, at least, get on the record.

THE COURT: Yes. Go ahead.

MR. FLENTJE: As you know, we think the two claims at issue can be decided based on the records submitted. And as recently as last week, plaintiffs -- we don't envision questioning from plaintiffs -- but plaintiffs who are charged with advocating their position confirmed they had no intention to question these witnesses.

As to the legality of the policy, we think the MOU can be compared to the INA, and that would allow a resolution of that claim. While we think witnesses are unnecessary, we have witnesses here from DoW and DHS who can speak to the contours of the MOU should the Court have questions, as you do.

As ordered, we also have a witness from the Department of State but maintain that that agency was not involved in the relevant decision-making process.

THE COURT: Let me stop you there. I was going to get to the witness from State, Mr. Rouse.

I looked at your status report, which is docketed at 123, that asked that I relieve the Department of State from testifying today on your representation that that agency played no role in the government's decision-making.

If that is your representation, that the Department of State is not positioned to provide explanations about the contours of the challenge policy or the contemporaneous reasons for the decision-making then, in my view, there is no need for that witness to testify. And so if you confirm for me that that's the government's position, that State played no role at all in the government's decision-making, then we can check that box and move on.

MR. FLENTJE: That is the government's position,

that the state department did not play a role in the development of the policy or, obviously, in describing how it compares to the INA.

THE COURT: Okay. And so -- and just to be clear, when I speak about the questions I have about the contours of the policy and the contemporaneous reasons for the policy, to me that goes to the arbitrary and capricious claim, not the contrary to law claim.

So it is, I take it, then, your position -- if I ask the Department of State to tell me more about the contours of the policy or the contemporaneous reasons for the policy, that witness would say: I don't have any information because our agency played no role?

MR. FLENTJE: Yes.

THE COURT: Okay. So then, in my view, there is no need for testimony from the Department of State.

MR. FLENTJE: Thanks.

A couple more things, and I --

THE COURT: Of course. Go ahead.

MR. FLENTJE: As you pointed out, you are going to look at the, kind of, arbitrary and capricious claim. We want to stress there was never discovery into the arbitrary and capricious claim. The discovery that the parties agreed to and the Court authorized had to do with determining what the policy was. In other words, whether it was a legal

policy, a legal claim.

And, of course, the Court and the parties bifurcated this issue of the detention authority claims from the other claims in the case. So we think it's unusual to jump into witness testimony on the arbitrary and capricious claim, and continue to object to that.

THE COURT: I have told you why.

Because when I look at the administrative record, which is where I am bound to look to decide if this policy is arbitrary and capricious, I have not been able to identify a contemporaneous explanation for the agency's actions. And if I don't have one -- in other words, if the administrative record doesn't show that there was a reason for why the agency did what it did, the policy is arbitrary and capricious.

So I am having this hearing to give the government the opportunity to tell me more about the contours of the policy and to provide its contemporaneous explanations for the policy.

If your witnesses don't have answers to those questions, then I can move on and decide the claim. But we are here because the record before me -- the administrative record on which I am to decide whether the policy is arbitrary and capricious frustrates effective judicial review because it does not say anything.

MR. FLENTJE: I appreciate that, Your Honor.

Our position is: If the record -- if the view of the Court is that the record establishes that the policy was arbitrary and capricious, that --

THE COURT: The record doesn't tell me anything, that's the view of the Court; and that's what I have said to you-all repeatedly.

I have looked at your briefs and I have looked at where you point to in the record, and none of that answers the questions. So I understand your objections.

As I said, I am doing this hearing because Supreme Court and D.C. Circuit precedent tells me that I need to when, in APA cases, the administrative record is such that it frustrates effective judicial review; and so that is why I am holding the hearing.

I am not holding the hearing for fact-finding. I am holding the hearing because your record is inadequate for me to do my job. I understand you think I am wrong, you can take that up with the Circuit; but that is why we are here.

I will say it again, I am not here to do fact-finding. I am here because I am not going to speculate about what your policy is and why you did it. So your witnesses can answer those questions, or they can choose not to and, then, I can make a decision. If the government has not taken me up on the opportunity to answer those

questions, then I can make a decision based on that.

Do you have anything else you want to put on the record that you have not already put on the record in the many filings? Otherwise, we will move on; and I will hear from the witnesses.

MR. FLENTJE: I do.

On the sealing of the hearing, there could be questions that would elicit sensitive classified information. We have instructed our witnesses not to share any information that is potentially classified.

THE COURT: How is that different than what I said at the top?

I said that you have not given me anything to seal this whole hearing from the public. I said specifically: I have no intent on having the government reveal sensitive information. I said I would also instruct your witnesses to this effect. But I told you: If you think I am eliciting anything that is sensitive, you could let me know immediately; your witnesses could ask for a break to talk to you if they are unsure. I don't know how that is an objection.

MR. FLENTJE: I just wanted to flag that that is a concern that could arise.

I think the discussion in the prior briefing was about closing the courtroom. But I wanted to make the point

that if there is a question that could elicit classified information, we would instruct the witness not to answer the question at all.

THE COURT: Is that an objection or isn't that consistent with how I said I am going to hold this hearing?

MR. FLENTJE: I hope it's consistent.

THE COURT: You are not sure if it's consistent?

MR. FLENTJE: Well, again, the Court's order suggested closing the hearing if classified information arose.

I think my point is: We would instruct the witness not to answer if classified information is implicated; that's the distinction. So I just wanted to flag that.

There is no objection on the record yet because we don't have a question of that nature. I wanted to forewarn the Court that that is our position.

THE COURT: Okay.

MR. FLENTJE: Thank you.

THE COURT: Anything else from anyone before we begin?

MR. GELERNT: No, Your Honor.

THE COURT: Okay. We will start with Mr. John Schultz.

Can you please come to the witness stand, sir.

(Whereupon, JOHN A. SCHULTZ, government witness, was sworn.)

THE COURTROOM DEPUTY: Thank you, sir.

Please be seated, then state and spell your name for the record.

THE WITNESS: John A. Schultz, J-O-H-N, A, Schultz, S-C-H-U-L-T-Z.

THE COURT: Okay. Mr. Schultz, thank you for taking the time to be here.

Let me say, as you have heard me say before: If at any time you think that my questions require you to testify about sensitive information, even if not classified, please do not answer. You can alert me. I will give you the chance to speak to counsel for the government, if you would like. And if you see counsel standing up at any point after I ask a question, give them a couple of seconds to see if they have something they would like to talk to me about before you answer. So, maybe, even a pause after I ask a question.

My goal is not to have you reveal any sensitive information, even if that information is not technically classified at this hearing.

Do you have any questions about how we're going to proceed?

THE WITNESS: No, Your Honor.

THE COURT: Okay. Can you tell me briefly what your job title is, and what you do at USCIS?

THE WITNESS: Sure.

So I am the assistant director for removal at -- enforcement removal operations within Immigration and Customs Enforcement.

So my role is: I manage domestic staff that assists the field offices in acquiring travel documents for individuals' deportations, as well as doing post-order custody reviews for aliens who have been detained 180 days post final order.

Additionally, I am in charge of our international footprint, who we have about 40 U.S. director hires that are deployed overseas who assist with liaising with foreign governments for the removal of aliens, so they fall under my purview.

And, also, I have the ICE area operations division, which is our flight management group. So I currently manage about 30 planes on a daily basis who are removing aliens or transferring them from detention center to detention center based on needs.

THE COURT: Okay. Are you familiar with the government's decision to detain immigration detainees at Guantanamo Bay?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. So I am going to ask you some questions about that decision.

Is it your understanding that immigration detainees were first flown to Guantanamo Bay around February 4, 2025?

THE WITNESS: Yes, it is, Your Honor.

THE COURT: Okay. How does DHS determine which immigrants may be detained at Guantanamo?

THE WITNESS: So we have an MOU that is -- that was signed between DHS and Department of War in March 2025 that, sort of, outlines the parameters of which aliens would be -- which would go to Gitmo.

THE COURT: Just tell me which categories of immigrants are to be detained at Guantanamo according to DHS.

THE WITNESS: Aliens with final orders of removal, aliens with no significant medical concerns, aliens who are part of a transnational criminal organization or have some ties to a transnational criminal organization or have criminal activity. Regarding the transnational criminal organization --

THE COURT: Hang on. Let me just get all of that right. I want to make sure I understand.

So the first category is, anyone with final orders of removal; the second is, people with no medical

conditions; third is, anyone with ties to a transnational criminal organization?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Go ahead.

THE WITNESS: Or a drug criminal activity.

THE COURT: That's Category 3?

THE WITNESS: It goes -- with the TCO. TCO/or --

THE COURT: I'm sorry. Don't use acronyms because I am not as familiar as you.

THE WITNESS: I'm sorry.

THE COURT: So we are in Category 3 now. It's those with ties to transnational criminal organizations and drug activity?

THE WITNESS: And/or.

THE COURT: And/or drug activity, okay.

Are those the three categories?

THE WITNESS: Then the fourth, they shouldn't be at Gitmo past 180 days of their final order.

THE COURT: Okay. So let me just understand that. Past 100 [sic] days of the final order.

Does someone have to meet all four of these categories to be detained at Guantanamo, or is one enough?

So does someone have to have a final order of removal, no medical concerns, not have a final order within 100 days and be tied to a transnational criminal

organization and/or drug activity?

THE WITNESS: You need to have all four pieces of the puzzle, Your Honor.

THE COURT: So someone has to meet all four criteria in order to be detained at Guantanamo?

THE WITNESS: That is correct.

THE COURT: Okay. So are only detainees who meet all four criteria housed at Guantanamo in your view?

THE WITNESS: I know that there -- at some point there have been some aliens who have gone to Guantanamo who fell outside of those four parameters.

THE COURT: Okay. So tell me how that squares then. If you said that DHS determines which immigrants will be detained there by making sure that they fall into those four categories, how is it that detainees who do not fall into those four categories end up at Guantanamo?

THE WITNESS: So we had two or three medical cases that -- the medical situation didn't -- wasn't apparent at the time of transfer and, upon arrival at Gitmo, it became apparent. So they were transferred to ensure that they got appropriate care. Additionally --

THE COURT: All right. Let me make sure I am following.

So we're talking about why some people may have been detained at Guantanamo if they did not meet all four

criteria.

So you have said to me one scenario is: You transferred detainees there not knowing that they have a serious medical condition and, once you figured that out, you sent them back, right?

THE WITNESS: (Affirmative head nod.)

THE COURT: Okay. Is that it, or are there other immigration detainees who end up at Guantanamo who do not meet all four criteria?

THE WITNESS: There were a few cases that ended up having additional litigation -- immigration litigation due to court decisions, so their orders turned out to not be final orders; so they had to --

THE COURT: They had to be moved?

THE WITNESS: Yes.

THE COURT: Okay. So we have people who ended up having medical concerns and people who did not actually have final orders, and so you had to move them back?

THE WITNESS: That is correct.

THE COURT: Anything else?

THE WITNESS: That's all.

THE COURT: Okay. So it's your understanding, then, that every immigration detainee who has been transferred to Guantanamo then met the third of your criteria, which is -- they're connected to transnational

criminal organization and/or drug activity?

THE WITNESS: Yes.

THE COURT: Okay. So is everyone who meets all four of these criteria transferred to Guantanamo?

In other words, when you look at the whole pool of immigration detainees -- everyone who hits all four of these criteria, are they transferred, or only subset of that group?

THE WITNESS: Only -- only a subset, Your Honor.

THE COURT: Okay. And so how do you choose who to send to Guantanamo and who to retain at another detention facility -- of everyone who meets the four criteria?

THE WITNESS: We try and identify a population where it is going to be efficiently effective to maintain custody at Guantanamo.

THE COURT: How do you do that? What's the criteria?

So you have got -- say you have got 500 people who meet all four criteria, in your view; you send 300 of them, you leave 200 of them. To decide -- how do you pick the 300? How do you decide what is efficient and effective, I believe you said?

THE WITNESS: So, most recently, we are sending Haitian nationals.

THE COURT: Well, don't tell me about most

recently.

I just want to know -- dating back to February 4, 2025, DHS, according to you, decides they're going to send people who fall into these four criteria. You are not sending everyone who falls into the four criteria, so how do you decide which people to send?

THE WITNESS: So prior to March 2025, prior to the signing of the MOU, the operation was kind of dictated by another document that was sort of, like, a soft framework on sending aliens to Gitmo; and that outlined that they needed to be males, Spanish speakers, final orders --

THE COURT: Hang on. Hang on. Let me just get all of that.

We're now talking about how you decide which of the people in the four categories get sent to Guantanamo.

You said you apply certain criteria, they are male, Spanish speakers?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. What else?

THE WITNESS: Final orders.

THE COURT: Well, everyone has a final order -- right? -- because that's one of the four?

THE WITNESS: And limited medical issues.

THE COURT: Right. But that's also baked into the four.

Okay. So you look at everyone who meet the four criteria, and then -- to decide who goes versus who stays at a different detention facility, you are sending male Spanish speakers.

Ms. Perlmutter, did you have something for me?

MS. PERLMUTTER: If the Court is interested in the document in the record that he is referring to -- to this early period, we can provide that information for you.

THE COURT: It's okay. I have looked at it. I am trying to understand the decision-making. But thank you.

(Examination continues)

THE COURT: So you said this is the criteria you used prior to March 2025, right?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. So tell me what happens in March 2025. How are you deciding who goes and who stays at another detention facility?

THE WITNESS: So March 2025 is when the MOU was signed --

THE COURT: Right.

THE WITNESS: -- and that kind of outlined the process.

THE COURT: Yes. So walk me through it. I have looked at it. I want to make sure I understand -- the purpose of the hearing is to make sure that you have an

opportunity to give me any additional explanations that may not be in those documents and to walk me through that.

So we're now at March 2025. I am trying to figure out, of the population of people who meet the four criteria, how do you decide who goes and who stays at a different detention facility? How do you choose who is going to be detained at Guantanamo?

THE WITNESS: While I wasn't involved in the process between February and May, I did -- I did speak with some decision-makers who were involved in the process to prepare for this testimony.

My understanding was that in the beginning, in February, they had gotten some direction from the Homeland Security counsel on the populations to send to Gitmo.

THE COURT: What was the direction?

THE WITNESS: The first flight was all Venezuelan males.

THE COURT: Okay.

THE WITNESS: I was informed that the lists were created and the detainees were moved.

THE COURT: Okay. But I am just asking you generally.

We have talked about how does DHS determine which immigrants may go, right?

You told me they have got to hit all four

criteria, with the exceptions for things you don't know about, which I understand. So, then, I think you told me that not everyone who hits all four criteria goes to Guantanamo.

What criteria does DHS use to determine who goes to Guantanamo?

If there isn't criteria that the agency applies, and it's sort of ad hoc -- the first time you sent all Venezuelan males, you told me recently Haitian -- tell me that.

But if there is a way that the agency determines who to send once you hit all four criteria, I want to know what that is. If there isn't, you can tell me that too.

THE WITNESS: Sure. My understanding is outside of the direct -- outside the direction from the HSC, the --

THE COURT: Outside of what?

THE WITNESS: The direction from the Homeland Security counsel on the first few flights --

THE COURT: Okay. Which were -- so the first few flights, DHS decided to send all Venezuelan males. So outside of that?

THE WITNESS: Then it was more ad hoc.

THE COURT: Okay. So who is making that decision? Do you know who is making that decision?

THE WITNESS: So emails were sent from EURO [sic]

staff who was embedded at the -- I forget what it stands for, the National Incident Command Center [sic] -- I don't know -- NICC, to the field office director to the EURO officials who were in charge of the field offices. At the time we had 25 field offices. We needed to have a list of potential aliens to send to Gitmo. And sometimes they would specify -- they would put out the parameters that they needed to be males, healthy, final orders.

THE COURT: Okay. So just to make sure I am not missing anything, at certain points DHS decided to send male Spanish speakers, at certain points Venezuelan males. And other than that, it was ad hoc decision-making to decide who should go to Guantanamo if they met the four criteria we talked about earlier?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. And how do you -- how do you -- when you say "ad hoc," someone at the field level is just sending proposed lists. Who is making those final decisions?

THE WITNESS: So, again, prior to my direct engagement in May, my understanding, from what I have been told, is that solicitation went out to the field offices for potentials; a list would come back.

THE COURT: The solicitation just says -- it's not giving any direction? The solicitation says they must meet

the four criteria; and, otherwise, the field offices propose who gets sent?

THE WITNESS: That is correct.

THE COURT: Okay. And who decides?

THE WITNESS: From receipt of the list from the field to who went on the plane, I am unsure.

THE COURT: Okay. So your understanding is, then, that DHS did not make the decision to detain anyone at Guantanamo during this period who was not connected to a transnational criminal organization and/or drug activity?

THE WITNESS: That is correct, Your Honor.

THE COURT: Okay. So for the population of individuals who were detained at Guantanamo, why were they housed at Guantanamo as opposed to a detention facility in the United States?

THE WITNESS: They were housed at Guantanamo because Guantanamo provides EURO or ICE with additional guaranteed bed space that isn't always available in the United States.

THE COURT: So these individuals were all -- were they all sent there because there was not sufficient bed space in the United States?

THE WITNESS: They were sent there to free up additional bed space in the United States.

THE COURT: Tell me more about that. Were they

moved from facilities where there was not sufficient bed space?

THE WITNESS: I don't know the population of the facilities --

THE COURT: But you are telling me that the reason they were housed at Guantanamo is that the government wanted to create additional bed space; is that right?

THE WITNESS: That is correct, Your Honor.

THE COURT: Is that the government's only reason for determining -- sorry -- for detaining these individuals at Guantanamo, or are there other reasons?

THE WITNESS: That is my understanding; that it was for additional bed space.

THE COURT: Okay. So it's your testimony that the government decided to send immigration detainees to Guantanamo solely to create additional bed space?

I am not trying to trick you. I just want to make sure I understand. I am trying to understand the reason for why these individuals, immigration detainees, were sent to Guantanamo as opposed to a detention facility in the United States. And they -- obviously, they were moved from detention facilities in the United States.

And so is it your testimony that the reason the government sent these individuals to Guantanamo is to create additional bed space?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Did DHS consider any alternative detention site that would create additional bed space?

THE WITNESS: I do not know.

THE COURT: Okay. Just to be clear, I did not choose your witness, this is the witness testifying on behalf of DHS.

(Examination continues)

THE COURT: Did DHS conduct any type of cost comparison for detention at another facility versus Guantanamo?

THE WITNESS: I don't know if they -- I don't know if they did a cost comparison prior to using it, no.

THE COURT: Okay. By "they," you mean -- you work for DHS?

THE WITNESS: Correct.

THE COURT: So you don't know if the agency considered any alternatives to free up bed space other than Guantanamo?

THE WITNESS: I know the agency continues to look for additional bed space to support the immigration enforcement mission.

THE COURT: Okay. Did DHS look for additional bed space at other detention facilities before moving these

individuals to Guantanamo?

THE WITNESS: I don't know for certain.

THE COURT: Okay. Is it your testimony that these specific individuals who were all sent to Guantanamo needed to be sent to Guantanamo because of bed space?

THE WITNESS: They were sent to Guantanamo to free up bed space -- other bed space where they were housed prior to being transferred.

THE COURT: Were those facilities all full?

THE WITNESS: I don't know if they were all full.

THE COURT: Was bed space needed at those facilities for other individuals who needed to be detained?

THE WITNESS: ICE's enforcement posture is such that all bed space is at a premium.

THE COURT: That doesn't really answer my question. If you don't know, you can say you don't know.

But you are telling me you picked people in these four criteria and you sent them to Guantanamo because you needed to create additional bed space.

You told me you don't know whether you considered an alternative detention site to create additional bed space. You don't know whether the facilities where these individuals were housed had a bed space issue to begin with. So I am trying to understand whether that analysis was done before you moved individuals.

If your goal was creating bed space, did you move individuals only from facilities that had bed space issues?

THE WITNESS: I don't know that answer.

THE COURT: Okay. Is it your understanding, then, that only individuals with removal or expedited removal orders are housed in Guantanamo?

THE WITNESS: Could you repeat that, please?

THE COURT: Yes. Of course.

Are only individuals with removal or expedited removal orders housed in Guantanamo?

THE WITNESS: Yes. It's my understanding that only aliens with final orders of removal are housed there.

THE COURT: Okay. Is it your understanding that Guantanamo serves as a temporary intermediary point or a way station during an individual's route to the final destination for removal?

THE WITNESS: Gitmo is a detention center that is used en route to an individual's country.

THE COURT: So that's a yes?

Let me repeat my question so you can answer me yes or no.

Is it your understanding that Guantanamo serves as a temporary intermediary point or a way station during an individual's route to the final destination for removal?

THE WITNESS: Yes.

THE COURT: Okay. And so have you made arrangements for travel to an individual's final destination for removal when that person arrives at Guantanamo?

THE WITNESS: Yes.

THE COURT: What arrangements have you typically made?

THE WITNESS: So we will have a charter flight scheduled. So, for instance, last week we had a group of individuals at Gitmo and we had scheduled their removal. So we procured a plane with the foreign country for the acceptance of the plane. We sent the plane from the U.S., from Alexandria to Gitmo, and then on to the country of origin.

THE COURT: So are those arrangements made for every individual when they arrive at Guantanamo?

THE WITNESS: Some of the arrangements are made after they arrive and some of them are made before they arrive.

THE COURT: What proportion of them are made by the time they arrive?

THE WITNESS: I can't speak to the whole 700-plus who have been detained at Gitmo. But, as I said recently, the individuals who have been sent there had the removal scheduled close to or at when they arrived at Gitmo.

THE COURT: Okay. Let me just break that down

because -- let's start over, because I want to make sure I am not misunderstanding your testimony.

So I have asked you: Have you made travel arrangements for individuals to their final destination of removal when they arrive at Guantanamo?

I believe you said yes.

Is that a yes, or is that sometimes?

THE WITNESS: Could I clarify?

When you asked when they arrive at Gitmo, is the question meaning: After we transfer them to Gitmo is travel made, or is travel made at some point in their lifecycle during -- you know, between one facility and another?

THE COURT: I mean before -- when they arrive there -- right? -- by the time they arrive at Guantanamo, have you already made arrangements for their travel to their final destination for removal by the time they arrive?

THE WITNESS: So the answer is not every alien who has been transferred to Gitmo has had onward travel scheduled by the time they arrive.

THE COURT: Okay. So not every individual has had their travel finalized when they arrive.

How many of them, on average, would you say, have had their travel arrangements made when they arrive?

THE WITNESS: I don't know the percentage.

THE COURT: Okay. And if you are only moving them

there as an intermediary point to their final destination for removal, why are their travel arrangements not made by the time they arrive?

THE WITNESS: So the removal process is very nuanced and takes many steps.

For instance, there was a population that was sent there who we had been trying to get authorization from their country to receive a charter flight. Unfortunately, we couldn't break down the diplomatic barriers to get the charter flight to be received. So those individuals -- while we were attempting to do the charter flight, their travel had not been scheduled.

THE COURT: I understand that. So that's one category.

Tell me in what other scenarios you would move someone to Guantanamo without making arrangements for them to be removed to their final destination.

You have given me one instance, which is you are working on the diplomatic process to get a charter flight.

In what other scenarios would you move individuals to Guantanamo before making arrangements for their final destination for removal?

THE WITNESS: Another case that comes to my mind is an individual from a country in Central America who, historically, we have no problem getting travel documents

for. But that case ended up being significantly difficult, so that was another case.

THE COURT: All right. So outside of the scenario of: You are going to remove that person and you are encountering difficulties with -- let's call it "international relations" to facilitate the final removal -- in which scenarios are individuals arriving to Guantanamo without having arrangements made for their removal to their final destination?

THE WITNESS: Outside of any legal --

THE COURT: Domestic international relations, talking to their foreign countries, charter flights -- outside of those types of international diplomatic relationship issues, what scenarios are individuals arriving there without travel arrangements?

THE WITNESS: They may not have had -- the officers may have been working on scheduling a charter flight, and that could have -- so at the time of arrival in Gitmo, maybe the individual didn't have charter flight scheduled but a charter flight was in the works; so that would be another instance.

THE COURT: Okay. So anything else?

THE WITNESS: I think that's probably about it.

THE COURT: Okay. Do you have anything else you would like to add regarding the contours of DHS's decision

to send immigration detainees to Guantanamo?

THE WITNESS: No, Your Honor.

THE COURT: Do you have anything else you want to add regarding the reasons why DHS decided to send immigration detainees to Guantanamo?

THE WITNESS: No, Your Honor.

THE COURT: Okay. Thank you very much for your time. You may be excused.

All right. Mr. Barry Coble, can I hear from you now.

(Whereupon, BARRY B. COBLE, government witness, was sworn.)

THE COURTROOM DEPUTY: Thank you, sir.

Please be seated and then state and spell your name for the record.

THE WITNESS: Barry B. Coble, B-A-R-R-Y, B, C-O-B-L-E.

THE COURT: All right. Good morning.

How are you?

THE WITNESS: Good morning, Your Honor. I am doing fine.

THE COURT: Thank you for being here today.

So you have heard me say this a couple of times, but I want to be extra sure. If anything I ask you would require you to reveal sensitive answers, please take a

moment, speak with government counsel before you do that.

If you see any government counsel attempting to get my attention, please give them a couple minutes to do that. My goal is not to have you reveal any sensitive, even if not classified, information at this hearing.

Any questions about how we are going to proceed?

THE WITNESS: No, Your Honor.

THE COURT: Okay. Tell me briefly what your job title is, and what you do at the agency.

THE WITNESS: I am a senior advisor on counterterrorism policy within the Office of the Secretary of War for policy at the Department of War. Specifically, I focus in on detention [sic] policy as well as operations worldwide. But, more importantly, I focus primarily on the law of war detention facility and operations down at Guantanamo Bay, Cuba.

THE COURT: Is it your understanding that immigration detainees were first flown to Guantanamo Bay around February 4, 2025?

THE WITNESS: At this time, yes, Your Honor.

THE COURT: Okay. The administrative record I have reviewed reflects that the Secretary of Defense verbally authorized flights to Guantanamo.

When did the Secretary of Defense provide verbal approval for support of flights of immigrants to Guantanamo?

THE WITNESS: From what I have read, it would have been early in February of 2025.

THE COURT: So the verbal authorization that's referenced in here, is, in your understanding, was in early February?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. Is that before February 4th, when the first immigration detainees were flown there or after?

THE WITNESS: I do not know the answer to that one, Your Honor.

I don't know the answer to that one.

THE COURT: Make sure you are speaking into the microphone. Thank you.

Tell me, how does DoD determine which immigrants may be detained at Guantanamo?

THE WITNESS: Department of Defense does not determine who is going to be detained at Guantanamo, to my knowledge.

THE COURT: Okay. So tell me DoD's role. Is it just to assist with the transportation of individuals to Guantanamo based on DHS's determination about who goes there?

THE WITNESS: Correct, Your Honor.

THE COURT: Okay. So DoD has no role at all to

play in who goes there, why certain groups of individuals go there, or anything along those lines?

THE WITNESS: That is correct, Your Honor.

THE COURT: Okay. Tell me DoD's role, then, in this process.

THE WITNESS: You mean when they arrive at Guantanamo Bay, Your Honor?

THE COURT: The policy -- as I am sure you are aware from discussions with counsel and others, the policy being challenged here is the decision to send immigration detainees to Guantanamo.

You have just heard testimony from the DHS witness talking about how they determine who to send to Guantanamo. Tell me DoD's role in the process of transferring immigration detainees to Guantanamo Bay.

THE WITNESS: DoD didn't play a role in transferring them other than providing aircraft when DHS --

THE COURT: Tell me what DoD's role is, period, start to finish, in this process of immigration detainees being housed at Guantanamo.

THE WITNESS: Upon arrival, the migrants are processed in, and the department provides a facility; in this case, Camp 6 --

THE COURT: So DoD is not involved in deciding who goes there, it's not involved in transporting them? DoD's

role starts when they arrive?

THE WITNESS: Correct.

THE COURT: Okay. Go ahead.

THE WITNESS: So when they arrive, they are processed in through a processing effort by DHS; that's when they make the determination as to where they are going to be held. There are two locations they can be held at on Guantanamo Bay. One is the migrant operations center. The Department of War provides outside security for that facility.

The other facility they can go to would be what is called Camp 6. Again, the Department of War provides outside security as well as helps operate the facility because it's one of our facilities.

THE COURT: Okay. So one document in the administrative record -- and I can show it to you, if you are not familiar with it -- says that: Joint Staff J3 noted that transfers of military personnel to Guantanamo caused military sourcing issues and recognized the need to find a longer-term sourcing solution for personnel at Guantanamo.

Are you familiar with that?

THE WITNESS: No, Your Honor.

THE COURT: Government counsel, do you have any objection to me showing the witness this document that is Department of War-CAR-658 [sic], that's where it starts; and

the paragraph I am referring to is at the bottom of 659?

I can give you a copy to look at before I give it to the witness if you don't have it handy; although, Ms. Perlmutter is on it.

MR. FLENTJE: We should have it.

THE COURT: Do plaintiffs have a copy?

It's DoW -- starts at 658.

MR. GELERNT: We're checking, Your Honor.

THE COURT: Thanks.

MS. PERLMUTTER: We have no objection.

THE COURT: Thank you.

MR. GELERNT: Special Orders Book?

THE COURT: Yes. The Special Orders Book. Just the first page of that.

MR. GELERNT: All right.

THE COURT: Okay. Great.

So if you turn to the first page of that book, it's marked page 659 at the bottom, and the text is under that table.

In the second sentence, it says: If you approve this tab -- I believe -- policy recommends that USINDOPACOM provide the impacts of this reallocation and the joint staff identify a longer-term sourcing solution ahead of the July 31st, 2025, end date. Finding skilled labor for construction projects is most acute in the INDOPACOM ADR,

and could have downstream impacts on our ability to build our war-fighting posture.

So that's what I have referring to.

What action, if any, did the agency take to find a longer-term sourcing solution?

THE WITNESS: I don't know what the longer-term solution was. But what I read here, it was up to INDOPACOM, which is located in the Pacific, obviously, to then determine what the impact would be to their mission if these forces were then to be moved from that -- that command over to this particular mission at Guantanamo Bay, Cuba.

THE COURT: Right. So do you know what action, if any, the agency took to find a longer-term sourcing solution?

THE WITNESS: I am not aware of those actions, no, Your Honor.

THE COURT: Did the agency consider whether sourcing issues would be similarly implicated by detention at a place other than Guantanamo?

THE WITNESS: I am not aware of that, Your Honor.

THE COURT: Okay.

Okay. Do you have any understanding about the individuals housed at Guantanamo and whether they're subject to removal or expedited removal orders?

THE WITNESS: I am not aware of that, Your Honor.

THE COURT: Is it your understanding that Guantanamo serves as a temporary intermediary point or way station during an individual's route to the final destination for removal?

THE WITNESS: Yes, Your Honor.

THE COURT: In your understanding, have travel arrangements been made for individuals when they arrive at Guantanamo?

THE WITNESS: I am not aware of that decision.

THE COURT: So what's your basis for saying that Guantanamo serves as a temporary intermediary point or way station during an individual's route to the final destination?

How do you know that to be true? You just told me that it is.

THE WITNESS: It is in the MOU that was signed back in March of 2025; that they could only stay there for a certain period of time.

THE COURT: That's not my question.

I believe you said yes, when I asked whether it's your understanding that Guantanamo serves as a temporary intermediary point, which means that these individuals are all en route to their final destination for removal.

Do you know that to be true?

THE WITNESS: Now that, I do not know the answer

to. What the MOU states --

THE COURT: Okay. You just said yes, that's why I am asking you again.

Let me ask the question and make sure.

Is it DoD's understanding that Guantanamo merely serves as a temporary intermediary point or way station during an individual's route to the final destination for removal?

THE WITNESS: What the MOU states --

THE COURT: Yes or no? Is that -- it's either yes, no, or I don't know.

THE WITNESS: I do not know the answer to that question.

THE COURT: Okay. Great.

Do you have any understanding about what arrangements -- travel arrangements are made for individuals when they arrive at Guantanamo to their final destination or is that all handled by DHS, and does DoD have no role?

THE WITNESS: I am not aware of DoD's role in that.

THE COURT: Okay.

Let me just make sure I have nothing else for you before I give you an opportunity to answer my last two questions. Because it sounds like most of this falls with DHS and not DoD.

Do you have anything at all you would like to add regarding the contours of the decision to send immigration detainees to Guantanamo from DoD's perspective?

THE WITNESS: No, Your Honor.

THE COURT: Do you have any information about the reasons why these individuals are sent to Guantanamo?

THE WITNESS: No, Your Honor.

THE COURT: Okay. Thank you very much. You are all done.

Okay. Counsel, I am not going to hear any argument on the implications of anything that came out in testimony. As I promised, you will have an opportunity to submit supplemental briefing.

Do you-all want to meet and confer and give me a proposal on when you want to submit supplemental briefing or do you want to set that schedule today?

MR. GELERNT: I think, from plaintiffs' --

THE COURT: Can you come to the podium or speak into the microphone.

MR. GELERNT: I think, from plaintiffs' standpoint, we want to move quickly, but we're happy to confer on an agreed-upon schedule.

THE COURT: Okay. You-all haven't talked about that yet?

MR. GELERNT: No, we haven't, Your Honor.

MR. FLENTJE: We haven't.

THE COURT: Okay. So go ahead and file a notice for me by Monday. It shouldn't take more than a couple of days proposing when you want to file supplemental briefs.

Can I also ask you-all to take a look at a couple of outstanding motions that seem to be open on sealing, which are docketed at 80, 91, 92, and 93; and let me know whether those still require resolution.

We had some back-and-forth with the administrative record, things were filed under seal. I then issued an order, which is docketed at 116, that was intended to clean up all of the sealing issues, but there are still those four outstanding motions.

Can you-all tell me, in that notice, your view on whether those are moot or whether they still need to be resolved so we can clean up the docket?

Then, let me ask the government: Based on the testimony that was elicited today, is it still your view that this transcript needs to stay under seal for you-all to confer on redactions?

MR. FLENTJE: We don't think there is any need to seal the transcript.

THE COURT: Okay. Thank you.

So my order on Friday with respect to sealing is vacated, and the transcript -- there is no need for it to be

sealed.

Anything else before we close?

MR. GELERNT: Nothing from plaintiffs, Your Honor.

THE COURT: Anything from the government?

MR. FLENTJE: No, thank you.

THE COURT: Okay. So I will hear from you-all on Monday. I will put up an order. I will then await your supplemental briefs.

If I need argument on the legal issues on the APA claims, I will schedule it from there. Thank you, all.

(Whereupon, the proceeding concludes, 11:05 a.m.)

* * * * *

**CERTIFICATE**

I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is edited, printed, disassembled, screenshot, and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 14th day of October, 2026.

/s/ Elizabeth Davila, RPR, FCRR

Official Court Reporter

**/**

**/s** [1] - 46:21

**1**

**100** [2] - 17:20, 17:25
**10004** [1] - 1:12
**10:02** [1] - 1:5
**1100** [1] - 2:8
**116** [1] - 45:11
**11:05** [1] - 46:11
**123** [1] - 8:13
**125** [1] - 1:12
**14** [1] - 1:4
**14th** [1] - 46:20
**180** [2] - 15:10, 17:18
**18th** [1] - 1:12

**2**

**200** [1] - 20:20
**20001** [1] - 2:5
**202** [3] - 1:23, 2:5, 2:10
**2025** [12] - 16:5, 16:10, 21:3, 21:7, 22:13, 22:16, 22:18, 23:3, 36:19, 37:2, 40:24, 42:17
**2026** [2] - 1:4, 46:20
**20530** [2] - 1:23, 2:9
**212** [1] - 1:13
**25** [1] - 25:5
**25-1766** [2] - 1:3, 3:3

**3**

**3** [2] - 17:6, 17:11
**30** [1] - 15:19
**300** [2] - 20:19, 20:21
**307-0340** [1] - 2:10
**31st** [1] - 40:24

**4**

**4** [3] - 16:5, 21:2, 36:19
**40** [1] - 15:13
**425** [1] - 1:16
**450** [1] - 2:4
**483-5885** [1] - 1:17
**4th** [1] - 37:7

**5**

**500** [1] - 20:18
**514-3309** [1] - 1:23
**549-2616** [1] - 1:13
**5543** [1] - 2:4
**598-6429** [1] - 2:5
**5th** [1] - 2:4

**6**

**6** [2] - 38:23, 39:12
**601** [1] - 1:22
**658** [1] - 40:7
**659** [2] - 40:1, 40:18

**7**

**700-plus** [1] - 31:21
**718** [1] - 1:17
**7th** [1] - 1:16

**8**

**80** [1] - 45:7
**8142** [1] - 2:9

**9**

**91** [1] - 45:7
**92** [1] - 45:7
**93** [1] - 45:7
**94104** [1] - 1:17

**A**

**a.m** [2] - 1:5, 46:11
**ability** [2] - 41:1, 46:16
**able** [2] - 5:15, 10:10
**absolutely** [1] - 6:12
**acceptance** [1] - 31:11
**access** [1] - 4:11
**according** [2] - 16:14, 21:3
**accurate** [1] - 46:14
**ACLU** [1] - 3:9
**acquiring** [1] - 15:8
**acronyms** [1] - 17:8
**acted** [2] - 5:24
**Action** [1] - 1:3
**action** [4] - 5:17, 6:9, 41:4, 41:12
**actions** [3] - 5:16, 10:12, 41:15
**activity** [7] - 16:20, 17:5, 17:13, 17:15, 18:1, 20:1, 26:10
**acute** [1] - 40:25
**ad** [4] - 24:8, 24:22, 25:12, 25:17
**add** [3] - 34:25, 35:4, 44:1
**additional** [13] - 19:11, 23:1, 26:17, 26:24, 27:7, 27:13, 27:16, 27:25, 28:3, 28:22, 28:24, 29:19, 29:21
**additionally** [2] - 15:12, 18:21
**address** [1] - 4:9
**administrative** [10] - 5:4, 5:13, 5:23, 10:8, 10:13, 10:22, 11:13, 36:21, 39:16, 45:9
**ADR** [1] - 40:25
**advisor** [1] - 36:10
**advocating** [1] - 7:24
**agency** [17] - 5:22, 5:23, 6:7, 6:8, 6:17, 8:8, 8:15, 9:13, 10:14, 24:7, 24:11, 28:18, 28:21, 36:9, 41:4, 41:13, 41:17
**agency's** [3] - 5:17, 6:20, 10:11
**Agostinho** [1] - 2:8
**agree** [1] - 5:1
**agreed** [4] - 5:7, 5:12, 9:23, 44:22
**agreed-upon** [1] - 44:22
**ahead** [6] - 7:19, 9:19, 17:4, 39:3, 40:23, 45:2
**aided** [1] - 2:19
**aircraft** [1] - 38:17
**al** [4] - 1:3, 1:5, 3:4
**alert** [1] - 14:13
**Alexa** [1] - 4:1
**ALEXA** [1] - 1:20
**alexa.perlmutter@usdoj.gov** [1] - 1:24
**Alexandria** [1] - 31:12
**alien** [1] - 32:17
**aliens** [11] - 15:10, 15:15, 15:20, 16:11, 16:16, 16:17, 18:10, 21:10, 25:6, 30:12
**allow** [1] - 8:2
**alternative** [2] - 28:3, 29:21
**alternatives** [1] - 28:19
**America** [1] - 33:24
**American** [2] - 1:11, 1:16
**analysis** [1] - 29:24
**answer** [16] - 6:22, 11:23, 11:25, 13:2, 13:12, 14:13, 14:18, 29:15, 30:3, 30:20, 32:17, 37:10, 37:12, 42:25, 43:12, 43:23
**answers** [5] - 7:1, 7:5, 10:20, 11:9, 35:25
**anticipated** [1] - 5:9
**APA** [3] - 4:8, 11:13, 46:9
**apparent** [2] - 18:18, 18:20
**appearances** [2] - 1:25, 3:6
**APPEARANCES** [2] - 1:8, 2:1
**applies** [1] - 24:7
**apply** [1] - 21:16
**appreciate** [2] - 5:20, 11:1
**approach** [1] - 3:6
**appropriate** [2] - 5:2, 18:21
**appropriately** [1] - 7:2
**approval** [1] - 36:25
**approve** [1] - 40:20
**arbitrarily** [1] - 5:24
**arbitrary** [9] - 5:18, 9:7, 9:21, 9:22, 10:5, 10:10, 10:14, 10:24, 11:4
**area** [1] - 15:17
**argument** [2] - 44:11, 46:9
**arise** [1] - 12:23
**arose** [1] - 13:10
**arrangements** [15] - 31:2, 31:5, 31:14, 31:16, 32:4, 32:15, 32:23, 33:2, 33:16, 33:21, 34:8, 34:15, 42:7, 43:16
**arrival** [3] - 18:19, 34:18, 38:21
**arrive** [18] - 31:15, 31:17, 31:18, 31:20, 32:5, 32:9, 32:13, 32:14, 32:16, 32:19, 32:21, 32:23, 33:3, 38:6, 39:1, 39:4, 42:7, 43:17
**arrived** [1] - 31:24
**arrives** [1] - 31:3
**arriving** [2] - 34:7, 34:14
**assist** [2] - 15:14, 37:21
**Assistant** [1] - 1:21
**assistant** [1] - 15:4
**assists** [1] - 15:8
**attempting** [2] - 33:11, 36:2
**attention** [1] - 36:3
**Attorney's** [1] - 1:21
**attorneys** [1] - 7:10
**Attorneys** [1] - 1:21
**August** [1] - 3:23
**AUGUST** [1] - 1:20
**august.flentje@usdoj.gov** [1] - 1:24
**authority** [2] - 4:6, 10:3
**authorization** [4] - 2:14, 33:7, 37:3, 46:18
**authorized** [2] - 9:24, 36:23
**available** [1] - 26:18
**average** [1] - 32:22
**await** [1] - 46:7
**aware** [7] - 5:4, 38:9, 41:15, 41:20, 41:25, 42:9, 43:19

**B**

**back-and-forth** [1] - 45:9
**baked** [1] - 21:24
**barriers** [1] - 33:9
**Barry** [2] - 35:9, 35:16
**BARRY** [2] - 35:11, 35:16
**based** [10] - 4:7, 5:3, 5:19, 5:23, 5:25, 7:21, 12:1, 15:21, 37:22, 45:17
**basis** [2] - 15:19, 42:10
**Bay** [8] - 15:24, 16:4, 36:16, 36:18, 38:7, 38:15, 39:8, 41:11
**became** [1] - 18:19
**bed** [22] - 26:18, 26:21, 26:24, 27:1, 27:7, 27:13, 27:16, 27:25, 28:3, 28:19, 28:22, 28:24, 29:5, 29:7, 29:11, 29:14, 29:19, 29:21, 29:23, 30:1, 30:2
**BEFORE** [1] - 1:7
**begin** [3] - 4:21, 13:21, 29:23
**beginning** [1] - 23:12
**behalf** [1] - 28:8
**below** [1] - 46:18
**best** [2] - 6:12, 46:15
**between** [3] - 16:10, 23:9, 32:12
**beyond** [1] - 6:21
**bifurcated** [1] - 10:3
**binding** [1] - 4:6
**Book** [2] - 40:12, 40:13
**book** [1] - 40:17
**bottom** [2] - 40:1,

40:18
**bound** [1] - 10:9
**box** [1] - 8:23
**break** [3] - 12:19, 31:25, 33:9
**briefing** [5] - 5:14, 6:16, 12:24, 44:13, 44:15
**briefly** [2] - 15:1, 36:8
**briefs** [3] - 11:8, 45:4, 46:8
**bring** [1] - 6:22
**Broad** [1] - 1:12
**Bronwyn** [1] - 3:20
**BRONWYN** [1] - 2:3
**bronwyn.h.nayci@usdoj.gov** [1] - 2:6
**build** [1] - 41:1

## C

**C-O-B-L-E** [1] - 35:17
**CA** [1] - 1:17
**California** [1] - 1:16
**Camp** [2] - 38:23, 39:12
**cannot** [2] - 5:17, 6:22
**capricious** [9] - 5:18, 9:7, 9:21, 9:23, 10:5, 10:10, 10:15, 10:24, 11:4
**capriciously** [1] - 5:24
**care** [1] - 18:21
**case** [10] - 4:5, 5:5, 5:8, 6:3, 6:23, 10:4, 33:23, 34:1, 34:2, 38:23
**cases** [3] - 11:13, 18:17, 19:10
**categories** [6] - 16:13, 17:16, 17:22, 18:15, 18:16, 21:15
**category** [2] - 16:24, 33:14
**Category** [2] - 17:6, 17:11
**caused** [1] - 39:18
**center** [4] - 15:20, 15:21, 30:17, 39:8
**Center** [1] - 25:2
**Central** [1] - 33:24
**cert** [1] - 5:10
**certain** [6] - 21:16, 25:10, 25:11, 29:2, 38:1, 42:18
**CERTIFICATE** [1] - 46:13
**certificate** [1] - 46:17
**certify** [1] - 46:14
**challenge** [2] - 6:19, 8:18
**challenged** [1] - 38:10
**chance** [1] - 14:14
**charge** [2] - 15:12, 25:4
**charged** [1] - 7:24
**charter** [9] - 31:7, 33:8, 33:10, 33:11, 33:19, 34:12, 34:17, 34:19, 34:20
**check** [1] - 8:23
**checking** [1] - 40:8
**choose** [5] - 6:25, 11:23, 20:10, 23:6, 28:7
**chosen** [1] - 6:21
**Circuit** [4] - 5:20, 6:6, 11:12, 11:19
**circumstance** [1] - 6:4
**Civil** [6] - 1:3, 1:11, 1:16, 2:4, 2:7, 3:3
**claim** [8] - 8:3, 9:8, 9:21, 9:23, 10:1, 10:6, 10:21
**claims** [5] - 4:8, 7:20, 10:3, 10:4, 46:10
**clarify** [1] - 32:8
**class** [1] - 5:10
**classified** [9] - 4:14, 12:8, 12:10, 13:1, 13:9, 13:12, 14:12, 14:22, 36:5
**clean** [2] - 45:11, 45:16
**clear** [2] - 9:4, 28:6
**close** [3] - 4:10, 31:24, 46:2
**closing** [2] - 12:25, 13:9
**Coble** [2] - 35:9, 35:16
**COBLE** [1] - 35:11
**Columbia** [1] - 1:22
**COLUMBIA** [1] - 1:1
**Command** [1] - 25:2
**command** [1] - 41:10
**compared** [1] - 8:2
**compares** [1] - 9:3
**comparison** [2] - 28:11, 28:14
**complete** [1] - 46:15
**computer** [1] - 2:19
**computer-aided** [1] - 2:19
**concern** [1] - 12:23
**concerns** [3] - 16:17, 17:24, 19:17
**concludes** [1] - 46:11
**condition** [1] - 19:4
**conditions** [1] - 17:1
**conduct** [1] - 28:10
**confer** [4] - 4:23, 44:14, 44:22, 45:20
**confirm** [1] - 8:21
**confirmed** [1] - 7:24
**connected** [2] - 19:25, 26:9
**consider** [2] - 28:2, 41:17
**considered** [4] - 2:13, 28:19, 29:20, 46:17
**consistent** [3] - 13:5, 13:6, 13:7
**constitutes** [1] - 46:14
**construction** [1] - 40:25
**contemporaneous** [8] - 5:16, 6:8, 6:19, 8:19, 9:6, 9:11, 10:11, 10:18
**continue** [1] - 10:6
**Continued** [1] - 1:25
**continued** [1] - 2:1
**continues** [3] - 22:11, 28:9, 28:21
**contours** [8] - 6:19, 8:5, 8:18, 9:5, 9:11, 10:17, 34:25, 44:2
**contrary** [1] - 9:8
**copied** [1] - 2:13
**copy** [2] - 40:2, 40:6
**correct** [9] - 18:6, 19:19, 26:3, 26:11, 27:8, 28:17, 37:24, 38:3, 39:2
**cost** [2] - 28:10, 28:14
**counsel** [10] - 3:5, 14:14, 14:15, 23:14, 24:18, 36:1, 36:2, 38:9, 39:23, 44:10
**counterterrorism** [1] - 36:11
**countries** [1] - 34:12
**country** [5] - 30:18, 31:10, 31:12, 33:8, 33:24
**couple** [6] - 9:18, 14:16, 35:23, 36:3, 45:3, 45:5
**course** [3] - 9:19, 10:2, 30:8
**COURT** [143] - 1:1, 1:7, 3:10, 3:15, 3:18, 3:21, 3:24, 4:2, 7:19, 8:10, 9:4, 9:15, 9:19, 10:7, 11:5, 12:11, 13:4, 13:7, 13:18, 13:20, 13:23, 14:8, 15:1, 15:22, 16:1, 16:7, 16:13, 16:22, 17:4, 17:6, 17:8, 17:11, 17:15, 17:19, 18:4, 18:7, 18:12, 18:22, 19:7, 19:14, 19:16, 19:20, 19:22, 20:3, 20:10, 20:16, 20:25, 21:12, 21:19, 21:21, 21:24, 22:9, 22:12, 22:15, 22:20, 22:23, 23:15, 23:18, 23:21, 24:16, 24:19, 24:23, 25:9, 25:16, 25:24, 26:4, 26:7, 26:12, 26:20, 26:25, 27:5, 27:9, 27:14, 28:2, 28:6, 28:10, 28:15, 28:18, 28:24, 29:3, 29:9, 29:11, 29:15, 30:4, 30:8, 30:13, 30:19, 31:1, 31:5, 31:14, 31:19, 31:25, 32:13, 32:20, 32:25, 33:13, 34:3, 34:11, 34:22, 34:24, 35:3, 35:7, 35:18, 35:22, 36:8, 36:17, 36:21, 37:3, 37:7, 37:13, 37:20, 37:25, 38:4, 38:8, 38:18, 38:24, 39:3, 39:15, 39:23, 40:6, 40:9, 40:11, 40:13, 40:16, 41:12, 41:17, 41:21, 42:1, 42:6, 42:10, 42:19, 43:2, 43:10, 43:14, 43:21, 44:5, 44:8, 44:18, 44:23, 45:2, 45:23, 46:4, 46:6
**Court** [12] - 2:16, 2:17, 6:6, 8:5, 9:24, 10:2, 11:3, 11:6, 11:12, 13:17, 22:6, 46:22
**court** [1] - 19:12
**Court's** [1] - 13:8
**courtroom** [2] - 4:10, 12:25
**COURTROOM** [3] - 3:2, 14:3, 35:13
**courts** [1] - 6:6
**create** [6] - 27:7, 27:16, 27:24, 28:3, 29:19, 29:21
**created** [1] - 23:20
**creating** [1] - 30:1
**criminal** [10] - 16:18, 16:19, 16:20, 17:2, 17:5, 17:12, 17:25, 20:1, 26:10
**criteria** [24] - 18:5, 18:8, 19:1, 19:9, 19:25, 20:4, 20:7, 20:12, 20:17, 20:19, 21:4, 21:5, 21:16, 22:2, 22:12, 23:4, 24:1, 24:3, 24:5, 24:7, 24:12, 25:13, 26:1, 29:18
**Cuba** [2] - 36:16, 41:11
**current** [1] - 6:4
**custody** [2] - 15:10, 20:15
**Customs** [1] - 15:6

## D

**D.C** [4] - 1:5, 5:20, 6:6, 11:12
**daily** [1] - 15:19
**date** [1] - 40:24
**Dated** [1] - 46:20
**dating** [1] - 21:2
**DAVILA** [1] - 46:14
**Davila** [2] - 2:16, 46:21
**days** [5] - 15:10, 17:18, 17:20, 17:25, 45:4
**DC** [3] - 1:23, 2:5, 2:9
**decide** [11] - 7:1, 10:9, 10:21, 10:23, 20:20, 20:21, 21:6, 21:14, 22:2, 23:5, 25:12
**decided** [5] - 7:21, 24:20, 25:10, 27:15, 35:4
**decides** [2] - 21:3, 26:4
**deciding** [2] - 22:16, 38:24
**decision** [20] - 6:7, 6:20, 8:9, 8:15, 8:19, 8:23, 11:24, 12:1, 15:23, 16:2, 22:10, 23:10, 24:23, 24:24, 25:12, 26:8, 34:25, 38:10, 42:9, 44:2
**decision-makers** [2] - 6:7, 23:10
**decision-making** [7] - 6:20, 8:9, 8:15, 8:19, 8:23, 22:10, 25:12
**decisions** [2] - 19:12, 25:19
**defendants** [4] - 3:20, 3:23, 4:1, 4:13
**DEFENDANTS** [2] - 1:19, 2:2
**Defendants** [1] - 1:5
**defendants'** [1] - 4:9
**Defense** [3] - 36:22,

36:24, 37:17
**denying** [1] - 6:1
**Department** [11] - 8:8, 8:13, 8:17, 9:10, 9:16, 16:10, 36:12, 37:17, 39:9, 39:12, 39:25
**department** [2] - 9:1, 38:22
**deployed** [1] - 15:14
**deportations** [1] - 15:9
**DEPUTY** [3] - 3:2, 14:3, 35:13
**describing** [1] - 9:2
**destination** [14] - 30:16, 30:24, 31:2, 32:4, 32:16, 33:1, 33:17, 33:22, 34:9, 42:4, 42:13, 42:23, 43:7, 43:17
**detain** [2] - 15:23, 26:8
**detained** [13] - 15:10, 16:8, 16:14, 17:22, 18:5, 18:14, 18:25, 23:7, 26:13, 29:12, 31:22, 37:16, 37:18
**detainee** [1] - 19:23
**detainees** [18] - 15:23, 16:4, 18:7, 18:15, 19:3, 19:8, 20:6, 23:20, 27:15, 27:19, 35:1, 35:5, 36:18, 37:8, 38:11, 38:15, 38:19, 44:3
**detaining** [1] - 27:10
**detention** [18] - 10:3, 15:20, 15:21, 20:11, 22:3, 22:17, 23:6, 26:14, 27:20, 27:22, 28:3, 28:11, 28:25, 29:21, 30:17, 36:13, 36:15, 41:18
**determination** [2] - 37:22, 39:6
**determine** [10] - 5:17, 5:23, 6:14, 16:7, 23:23, 24:5, 37:15, 37:18, 38:13, 41:9
**determines** [2] - 18:13, 24:11
**determining** [2] - 9:24, 27:10
**development** [1] - 9:2
**DHS** [22] - 8:4, 16:7, 16:10, 16:15, 18:13, 21:3, 23:23, 24:5, 24:20, 25:10, 26:8, 28:2, 28:8, 28:10, 28:16, 28:24, 35:4, 38:12, 38:17, 39:5, 43:18, 43:25
**DHS's** [2] - 34:25, 37:22
**dictated** [1] - 21:8
**different** [3] - 12:11, 22:3, 23:5
**difficult** [1] - 34:1
**difficulties** [1] - 34:5
**diplomatic** [3] - 33:9, 33:19, 34:13
**direct** [2] - 24:15, 25:20
**direction** [5] - 23:13, 23:15, 24:15, 24:17, 25:25
**director** [3] - 15:4, 15:13, 25:3
**disassembled** [2] - 2:13, 46:17
**disclosure** [1] - 4:18
**discovery** [7] - 5:8, 5:11, 5:12, 5:14, 9:22, 9:23
**discreet** [1] - 7:11
**discussion** [2] - 4:19, 12:24
**discussions** [1] - 38:9
**dismiss** [1] - 5:9
**dispute** [1] - 5:10
**distinction** [1] - 13:13
**District** [1] - 1:22
**district** [1] - 6:6
**DISTRICT** [3] - 1:1, 1:1, 1:7
**division** [1] - 15:18
**Division** [2] - 2:4, 2:7
**docket** [1] - 45:16
**docketed** [3] - 8:12, 45:7, 45:11
**document** [4] - 21:9, 22:7, 39:15, 39:24
**documents** [3] - 15:8, 23:2, 33:25
**DoD** [6] - 37:15, 37:25, 38:16, 38:24, 43:18, 43:25
**DoD's** [8] - 37:20, 38:4, 38:14, 38:18, 38:25, 43:5, 43:19, 44:3
**DOJ** [2] - 2:4, 2:7
**DOJ-Civil** [2] - 2:4, 2:7
**domestic** [2] - 15:7, 34:11
**done** [2] - 29:24, 44:9
**DoW** [2] - 8:4, 40:7
**down** [3] - 31:25, 33:9, 36:15
**downstream** [1] - 41:1
**drug** [6] - 17:5, 17:13, 17:15, 18:1, 20:1, 26:10
**due** [1] - 19:11
**during** [8] - 4:16, 26:9, 30:15, 30:23, 32:12, 42:3, 42:12, 43:7

## E

**early** [3] - 22:8, 37:2, 37:4
**edited** [2] - 2:13, 46:17
**effect** [1] - 12:17
**effective** [5] - 6:5, 10:24, 11:14, 20:14, 20:21
**efficient** [1] - 20:21
**efficiently** [1] - 20:14
**effort** [1] - 39:5
**either** [1] - 43:10
**elicit** [3] - 4:24, 12:8, 13:1
**elicited** [1] - 45:18
**eliciting** [1] - 12:17
**Elizabeth** [2] - 2:16, 46:21
**ELIZABETH** [1] - 46:14
**emails** [1] - 24:25
**embedded** [1] - 25:1
**en** [2] - 30:18, 42:23
**encountering** [1] - 34:5
**end** [4] - 7:7, 18:16, 19:8, 40:24
**ended** [3] - 19:10, 19:16, 34:1
**enforcement** [3] - 15:5, 28:23, 29:13
**Enforcement** [1] - 15:6
**engagement** [1] - 25:21
**ensure** [1] - 18:20
**envision** [1] - 7:22
**establishes** [1] - 11:3
**et** [4] - 1:3, 1:5, 3:4
**EURO** [3] - 24:25, 25:3, 26:17
**exactly** [1] - 4:4
**examination** [2] - 22:11, 28:9
**exceptions** [1] - 24:1
**excused** [1] - 35:8
**expect** [2] - 5:2, 7:11
**expedited** [3] - 30:5, 30:9, 41:24
**explanation** [2] - 5:16, 10:11
**explanations** [4] - 6:18, 8:18, 10:18, 23:1
**extra** [1] - 35:24

## F

**facilitate** [1] - 34:6
**facilities** [9] - 27:1, 27:4, 27:22, 28:25, 29:9, 29:12, 29:22, 30:2, 39:14
**facility** [13] - 20:12, 22:3, 22:17, 23:6, 26:14, 27:20, 28:11, 32:12, 36:15, 38:22, 39:10, 39:11, 39:13
**fact** [3] - 5:1, 11:16, 11:21
**fact-finding** [3] - 5:1, 11:16, 11:21
**fair** [1] - 4:15
**fall** [4] - 15:15, 18:14, 18:15, 21:4
**falls** [2] - 21:5, 43:24
**familiar** [4] - 15:22, 17:9, 39:17, 39:21
**FCRR** [3] - 2:16, 46:14, 46:21
**February** [8] - 16:5, 21:2, 23:9, 23:13, 36:19, 37:2, 37:5, 37:7
**fell** [1] - 18:11
**few** [4] - 7:16, 19:10, 24:18, 24:19
**field** [8] - 15:8, 25:3, 25:4, 25:5, 25:17, 25:22, 26:1, 26:6
**fighting** [1] - 41:2
**figure** [1] - 23:3
**figured** [1] - 19:4
**file** [2] - 45:2, 45:4
**filed** [1] - 45:10
**filings** [1] - 12:4
**final** [30] - 15:11, 16:16, 16:24, 17:18, 17:20, 17:23, 17:24, 19:13, 19:18, 21:11, 21:20, 21:21, 25:8, 25:18, 30:12, 30:15, 30:24, 31:2, 32:4, 32:16, 33:1, 33:17, 33:21, 34:6, 34:9, 42:3, 42:12, 42:23, 43:7, 43:17
**finalized** [1] - 32:21
**fine** [1] - 35:21
**finish** [1] - 38:19
**first** [12] - 4:9, 5:11, 16:4, 16:24, 23:16, 24:8, 24:18, 24:19, 36:18, 37:8, 40:14, 40:17
**flag** [2] - 12:22, 13:14
**Flentje** [1] - 3:23
**FLENTJE** [18] - 1:20, 3:22, 7:16, 7:20, 8:25, 9:14, 9:17, 9:20, 11:1, 12:6, 12:22, 13:6, 13:8, 13:19, 40:5, 45:1, 45:21, 46:5
**flight** [10] - 15:18, 23:16, 31:7, 33:8, 33:10, 33:11, 33:19, 34:18, 34:19, 34:20
**flights** [5] - 24:18, 24:20, 34:12, 36:23, 36:25
**Floor** [2] - 1:12, 1:16
**flown** [3] - 16:4, 36:18, 37:8
**focus** [2] - 36:13, 36:14
**following** [1] - 18:23
**footprint** [1] - 15:13
**FOR** [4] - 1:1, 1:9, 1:19, 2:2
**forces** [1] - 41:10
**foregoing** [1] - 46:14
**foreign** [3] - 15:14, 31:10, 34:12
**forewarn** [1] - 13:16
**forget** [1] - 25:1
**format** [2] - 7:3, 7:13
**forth** [1] - 45:9
**four** [27] - 17:21, 18:2, 18:4, 18:8, 18:11, 18:15, 18:16, 18:25, 19:9, 20:4, 20:6, 20:12, 20:19, 21:4, 21:5, 21:15, 21:22, 21:25, 22:1, 23:4, 23:25, 24:3, 24:12, 25:13, 26:1, 29:18, 45:12
**fourth** [1] - 17:17
**framework** [1] - 21:9
**Francisco** [1] - 1:17
**free** [3] - 26:23, 28:19, 29:6
**Friday** [2] - 4:10, 45:24
**frustrates** [2] - 10:24, 11:14
**frustrating** [1] - 6:5
**full** [3] - 29:9, 29:10,

46:15

## G

**GELERNT** [10] - 1:10, 3:8, 13:22, 40:8, 40:12, 40:15, 44:17, 44:20, 44:25, 46:3
**Gelernt** [1] - 3:9
**generally** [1] - 23:22
**Gitmo** [15] - 16:12, 17:18, 18:19, 21:10, 23:14, 25:6, 30:17, 31:9, 31:12, 31:22, 31:24, 32:9, 32:10, 32:18, 34:19
**given** [3] - 5:5, 12:13, 33:18
**goal** [6] - 4:24, 4:25, 6:17, 14:20, 30:1, 36:4
**government** [16] - 5:15, 7:14, 10:16, 11:24, 12:15, 14:1, 14:14, 27:6, 27:15, 27:24, 35:11, 36:1, 36:2, 39:23, 45:17, 46:4
**government's** [7] - 6:2, 8:15, 8:21, 8:23, 8:25, 15:23, 27:9
**governments** [1] - 15:15
**great** [2] - 40:16, 43:14
**group** [3] - 15:18, 20:8, 31:8
**groups** [1] - 38:1
**Guantanamo** [76] - 15:24, 16:4, 16:8, 16:14, 17:22, 18:5, 18:8, 18:10, 18:16, 18:25, 19:8, 19:24, 20:4, 20:11, 20:15, 21:15, 23:7, 24:4, 24:6, 25:13, 26:9, 26:13, 26:14, 26:16, 26:17, 27:6, 27:11, 27:16, 27:20, 27:24, 28:12, 28:20, 29:1, 29:4, 29:5, 29:6, 29:18, 30:6, 30:10, 30:14, 30:22, 31:3, 31:15, 32:5, 32:14, 33:16, 33:21, 34:7, 35:1, 35:5, 36:16, 36:18, 36:23, 36:25, 37:16, 37:18, 37:22, 38:7, 38:11, 38:13, 38:15, 38:20, 39:8, 39:18, 39:20, 41:11, 41:19, 41:23, 42:2, 42:8, 42:11, 42:21, 43:5, 43:17, 44:3, 44:6
**guaranteed** [1] - 26:18
**GUTIERREZ** [1] - 1:3
**Gutierrez** [1] - 3:4

## H

**Haitian** [2] - 20:24, 24:9
**handled** [1] - 43:18
**handy** [1] - 40:3
**hang** [3] - 16:22, 21:12
**happy** [1] - 44:21
**head** [1] - 19:6
**healthy** [1] - 25:8
**hear** [4] - 12:4, 35:9, 44:10, 46:6
**heard** [3] - 14:10, 35:23, 38:12
**HEARING** [1] - 1:6
**hearing** [20] - 4:7, 4:14, 4:17, 5:2, 6:2, 6:11, 6:17, 7:12, 10:16, 11:11, 11:15, 11:16, 11:17, 12:7, 12:14, 13:5, 13:9, 14:22, 22:25, 36:5
**held** [2] - 39:7
**helps** [1] - 39:13
**hereby** [1] - 46:14
**hires** [1] - 15:13
**historically** [1] - 33:25
**hit** [2] - 23:25, 24:12
**hits** [2] - 20:6, 24:3
**hoc** [4] - 24:8, 24:22, 25:12, 25:17
**hold** [2] - 4:7, 13:5
**holding** [3] - 11:15, 11:16, 11:17
**Homeland** [2] - 23:13, 24:17
**Honor** [41] - 3:2, 3:8, 3:11, 3:13, 3:16, 3:19, 7:16, 11:1, 13:22, 14:25, 15:25, 16:6, 17:3, 18:3, 20:9, 21:18, 22:14, 25:15, 26:11, 27:8, 28:1, 35:2, 35:6, 35:20, 36:7, 36:20, 37:6, 37:11, 37:24, 38:3, 38:7, 39:22, 40:8, 41:16, 41:20, 41:25, 42:5, 44:4, 44:7, 44:25, 46:3
**HONORABLE** [1] - 1:7
**hope** [1] - 13:6
**housed** [11] - 18:8, 26:14, 26:16, 27:6, 29:7, 29:23, 30:6, 30:10, 30:12, 38:20, 41:23
**HSC** [1] - 24:15

## I

**ICE** [2] - 15:17, 26:17
**ICE's** [1] - 29:13
**identify** [4] - 5:15, 10:11, 20:13, 40:23
**immediately** [1] - 12:19
**immigrants** [6] - 16:8, 16:14, 18:13, 23:24, 36:25, 37:15
**Immigration** [1] - 15:5
**immigration** [17] - 15:23, 16:3, 19:8, 19:11, 19:23, 20:6, 27:15, 27:19, 28:22, 35:1, 35:5, 36:18, 37:8, 38:10, 38:15, 38:19, 44:2
**impact** [1] - 41:9
**impacts** [2] - 40:22, 41:1
**implicated** [2] - 13:13, 41:18
**implications** [1] - 44:11
**important** [1] - 4:5
**importantly** [1] - 36:14
**INA** [2] - 8:2, 9:3
**inadequate** [1] - 11:17
**Incident** [1] - 25:2
**individual** [4] - 31:15, 32:20, 33:24, 34:19
**individual's** [7] - 30:15, 30:18, 30:24, 31:2, 42:3, 42:12, 43:7
**individuals** [27] - 26:13, 26:20, 27:10, 27:19, 27:24, 29:1, 29:4, 29:12, 29:23, 29:25, 30:2, 30:5, 30:9, 31:9, 31:23, 32:4, 33:10, 33:20, 34:7, 34:14, 37:21, 38:1, 41:23, 42:7, 42:22, 43:16, 44:6
**individuals'** [1] - 15:9
**INDOPACOM** [2] - 40:25, 41:7
**information** [15] - 4:15, 4:25, 9:13, 12:9, 12:10, 12:16, 13:2, 13:9, 13:12, 14:12, 14:21, 22:8, 36:5, 44:5
**informed** [1] - 23:19
**instance** [4] - 31:8, 33:6, 33:18, 34:21
**instruct** [4] - 4:20, 12:16, 13:2, 13:11
**instructed** [1] - 12:9
**intend** [2] - 6:20, 7:9
**intended** [1] - 45:11
**intent** [1] - 12:15
**intention** [1] - 7:25
**interested** [1] - 22:6
**intermediary** [7] - 30:14, 30:23, 33:1, 42:2, 42:11, 42:22, 43:6
**international** [4] - 15:12, 34:6, 34:11, 34:13
**involve** [1] - 4:14
**involved** [6] - 5:6, 8:9, 23:8, 23:10, 38:24, 38:25
**issue** [3] - 7:21, 10:3, 29:23
**issued** [1] - 45:10
**issues** [10] - 4:23, 5:6, 6:10, 21:23, 30:2, 34:14, 39:19, 41:18, 45:12, 46:9

## J

**J3** [1] - 39:17
**Jean** [1] - 2:8
**job** [6] - 5:18, 5:21, 5:22, 11:18, 15:2, 36:8
**John** [2] - 13:23, 14:6
**JOHN** [2] - 14:1, 14:6
**Joint** [1] - 39:17
**joint** [1] - 40:22
**jrabinovitz@aclu.org** [1] - 1:14
**JUDGE** [1] - 1:7
**judicial** [4] - 4:12, 6:5, 10:24, 11:14
**Judy** [1] - 3:17
**JUDY** [1] - 1:11
**July** [1] - 40:24
**jump** [1] - 10:5

## K

**KHANH** [1] - 1:15
**Khanh** [1] - 3:14
**kind** [3] - 9:21, 21:8, 22:21
**knowing** [1] - 19:3
**knowledge** [1] - 37:19

## L

**labor** [1] - 40:24
**lacks** [1] - 6:8
**last** [3] - 7:22, 31:8, 43:23
**law** [3] - 6:23, 9:8, 36:15
**lawfully** [1] - 5:24
**least** [1] - 7:17
**leave** [1] - 20:20
**lee** [1] - 3:9
**LEE** [1] - 1:10
**legal** [4] - 9:25, 10:1, 34:10, 46:9
**legality** [1] - 8:1
**LESLIE** [1] - 2:7
**leslie.mckay@usdoj.gov** [1] - 2:10
**level** [1] - 25:17
**lgelernt@aclu.org** [1] - 1:13
**liaising** [1] - 15:14
**Liberties** [2] - 1:11, 1:16
**lifecycle** [1] - 32:11
**limited** [1] - 21:23
**lines** [1] - 38:2
**list** [3] - 25:5, 25:23, 26:5
**lists** [2] - 23:19, 25:18
**litigation** [2] - 19:11
**located** [1] - 41:8
**locations** [1] - 39:7
**longer-term** [5] - 39:20, 40:23, 41:5, 41:6, 41:13
**look** [10] - 5:22, 9:21, 10:8, 10:9, 20:5, 22:1, 28:21, 28:24, 40:2, 45:5
**looked** [5] - 8:12, 11:8, 22:9, 22:24
**Luna** [1] - 3:3
**LUNA** [1] - 1:3

## M

**machine** [1] - 2:19
**maintain** [2] - 8:8, 20:14
**makers** [2] - 6:7, 23:10
**male** [3] - 21:17, 22:3, 25:10
**males** [6] - 21:11,

23:17, 24:9, 24:20, 25:8, 25:11
**manage** [2] - 15:7, 15:19
**management** [1] - 15:18
**manner** [2] - 2:13, 46:18
**March** [7] - 16:10, 21:7, 22:13, 22:16, 22:18, 23:3, 42:17
**marked** [1] - 40:18
**Markwayne** [1] - 3:4
**MARKWAYNE** [1] - 1:5
**Matter** [1] - 3:3
**MCKAY** [1] - 2:7
**mean** [3] - 28:15, 32:13, 38:6
**meaning** [1] - 32:10
**means** [1] - 42:22
**medical** [8] - 16:17, 16:25, 17:24, 18:17, 18:18, 19:4, 19:17, 21:23
**meet** [10] - 17:21, 18:4, 18:7, 18:25, 19:9, 20:19, 22:1, 23:4, 25:25, 44:14
**meets** [2] - 20:3, 20:12
**mentioned** [1] - 7:9
**merely** [1] - 43:5
**met** [2] - 19:24, 25:13
**microphone** [2] - 37:14, 44:19
**migrant** [1] - 39:8
**migrants** [1] - 38:21
**military** [2] - 39:18, 39:19
**mind** [1] - 33:23
**minute** [1] - 4:10
**minutes** [1] - 36:3
**missing** [1] - 25:10
**mission** [3] - 28:23, 41:9, 41:11
**misunderstanding** [1] - 32:2
**mngo@aclu.org** [1] - 1:18
**moment** [2] - 4:23, 36:1
**Monday** [2] - 45:3, 46:7
**moot** [1] - 45:15
**morning** [15] - 3:3, 3:8, 3:10, 3:11, 3:13, 3:15, 3:16, 3:18, 3:19, 3:21, 3:22, 3:24, 3:25, 35:18, 35:20
**most** [4] - 20:23, 20:25, 40:25, 43:24
**MOTION** [1] - 1:6
**motion** [3] - 5:9, 5:10, 6:2
**motions** [3] - 7:1, 45:6, 45:13
**MOU** [8] - 8:1, 8:5, 16:9, 21:8, 22:18, 42:16, 43:1, 43:9
**move** [10] - 7:1, 7:6, 8:24, 10:21, 12:4, 19:18, 30:1, 33:15, 33:20, 44:21
**moved** [6] - 19:14, 23:20, 27:1, 27:21, 29:25, 41:10
**moving** [2] - 28:25, 32:25
**MR** [26] - 3:8, 3:22, 7:16, 7:20, 8:25, 9:14, 9:17, 9:20, 11:1, 12:6, 12:22, 13:6, 13:8, 13:19, 13:22, 40:5, 40:8, 40:12, 40:15, 44:17, 44:20, 44:25, 45:1, 45:21, 46:3, 46:5
**MS** [6] - 3:13, 3:16, 3:19, 3:25, 22:6, 40:10
**MULLIN** [1] - 1:5
**Mullin** [1] - 3:4
**must** [1] - 25:25
**MY** [1] - 1:15

## N

**N.W** [1] - 2:8
**name** [2] - 14:4, 35:15
**National** [1] - 25:2
**nationals** [1] - 20:24
**nature** [1] - 13:16
**NAYCI** [1] - 2:3
**necessary** [3] - 5:8, 5:12, 6:12
**need** [9] - 8:20, 9:16, 11:12, 18:2, 39:19, 45:15, 45:21, 45:25, 46:9
**needed** [9] - 5:11, 6:14, 21:10, 25:5, 25:8, 29:4, 29:11, 29:12, 29:19
**needs** [2] - 15:21, 45:19
**never** [1] - 9:22
**New** [1] - 1:12
**Ngo** [1] - 3:14
**NGO** [2] - 1:15, 3:13
**NICC** [1] - 25:3
**none** [1] - 11:9
**NOOR** [1] - 1:10
**Noor** [1] - 3:12
**note** [1] - 3:6
**noted** [1] - 39:17
**notes** [1] - 46:15
**nothing** [2] - 43:22, 46:3
**notice** [2] - 45:2, 45:14
**nuanced** [1] - 33:5
**null** [2] - 2:13, 46:17
**NW** [2] - 1:22, 2:4
**NY** [1] - 1:12
**nzafar@aclu.org** [1] - 1:14

## O

**object** [1] - 10:6
**objection** [5] - 12:21, 13:4, 13:15, 39:24, 40:10
**objections** [3] - 7:13, 7:17, 11:10
**obviously** [3] - 9:2, 27:21, 41:8
**October** [2] - 1:4, 46:20
**OF** [2] - 1:1, 1:6
**office** [1] - 25:3
**Office** [2] - 1:21, 36:11
**officers** [1] - 34:17
**offices** [5] - 15:8, 25:4, 25:5, 25:22, 26:1
**Official** [1] - 2:17
**official** [1] - 46:22
**officials** [1] - 25:4
**once** [2] - 19:4, 24:12
**one** [14] - 4:15, 6:11, 10:12, 17:22, 19:2, 21:22, 32:12, 33:13, 33:18, 37:11, 37:12, 39:8, 39:14, 39:15
**onward** [1] - 32:18
**open** [1] - 45:6
**operate** [1] - 39:13
**operation** [1] - 21:8
**operations** [5] - 15:5, 15:17, 36:13, 36:15, 39:8
**opportunity** [7] - 6:24, 7:8, 10:17, 11:25, 23:1, 43:23, 44:12
**opposed** [2] - 26:14, 27:20
**order** [16] - 4:8, 4:10, 4:25, 6:1, 13:8, 15:9, 15:11, 17:18, 17:20, 17:23, 17:24, 18:5, 21:21, 45:11, 45:24, 46:7
**ordered** [1] - 8:7
**orders** [12] - 16:16, 16:24, 19:12, 19:13, 19:18, 21:11, 21:20, 25:8, 30:6, 30:10, 30:12, 41:24
**Orders** [2] - 40:12, 40:13
**ordinary** [1] - 6:3
**organization** [7] - 16:18, 16:19, 16:21, 17:2, 18:1, 20:1, 26:10
**organizations** [1] - 17:12
**origin** [1] - 31:13
**otherwise** [2] - 12:4, 26:1
**outlined** [2] - 21:10, 22:21
**outlines** [1] - 16:11
**outset** [1] - 5:7
**outside** [10] - 18:11, 24:14, 24:15, 24:16, 24:21, 34:3, 34:10, 34:13, 39:9, 39:13
**outstanding** [2] - 45:6, 45:13
**overseas** [1] - 15:14

## P

**Pacific** [1] - 41:8
**page** [3] - 40:14, 40:17, 40:18
**paragraph** [1] - 40:1
**parameters** [3] - 16:11, 18:11, 25:7
**part** [1] - 16:18
**particular** [1] - 41:11
**particularly** [1] - 5:5
**parties** [3] - 3:5, 9:23, 10:2
**party** [2] - 2:14, 46:18
**past** [2] - 17:18, 17:20
**pause** [1] - 14:18
**people** [10] - 16:25, 18:24, 19:16, 19:17, 20:18, 21:4, 21:6, 21:15, 23:4, 29:17
**percentage** [1] - 32:24
**period** [4] - 22:8, 26:9, 38:18, 42:18
**PERLMUTTER** [4] - 1:20, 3:25, 22:6, 40:10
**Perlmutter** [3] - 4:1, 22:5, 40:4
**permit** [1] - 6:17
**permitted** [1] - 5:8
**person** [2] - 31:3, 34:4
**personnel** [2] - 39:18, 39:20
**perspective** [1] - 44:3
**photocopied** [1] - 46:18
**pick** [1] - 20:20
**picked** [1] - 29:17
**pieces** [1] - 18:2
**place** [2] - 5:11, 41:19
**Plaintiffs** [1] - 1:3
**plaintiffs** [10] - 3:6, 3:9, 3:12, 3:14, 3:17, 7:22, 7:23, 40:6, 46:3
**PLAINTIFFS** [1] - 1:9
**plaintiffs'** [2] - 44:17, 44:20
**plane** [4] - 26:6, 31:10, 31:11
**planes** [1] - 15:19
**play** [3] - 9:1, 38:1, 38:16
**played** [3] - 8:15, 8:22, 9:13
**Poc** [1] - 2:8
**podium** [1] - 44:18
**point** [14] - 4:16, 11:9, 12:25, 13:11, 14:15, 18:9, 30:14, 30:23, 32:11, 33:1, 42:2, 42:11, 42:22, 43:6
**pointed** [1] - 9:20
**points** [2] - 25:10, 25:11
**policy** [24] - 5:19, 6:19, 8:1, 8:18, 9:2, 9:6, 9:7, 9:11, 9:12, 9:25, 10:1, 10:9, 10:14, 10:18, 10:19, 10:23, 11:3, 11:22, 36:11, 36:12, 36:13, 38:8, 38:9, 40:21
**pool** [1] - 20:5
**population** [5] - 20:13, 23:4, 26:12, 27:3, 33:6
**populations** [1] - 23:14
**position** [6] - 7:24, 8:22, 8:25, 9:9, 11:2, 13:17
**positioned** [1] - 8:17
**post** [2] - 15:9, 15:11
**post-order** [1] - 15:9
**posture** [2] - 29:13,

41:2
**potential** [1] - 25:6
**potentially** [1] - 12:10
**potentials** [1] - 25:23
**precedent** [1] - 11:12
**premium** [1] - 29:14
**prepare** [1] - 23:11
**present** [1] - 6:4
**press** [1] - 6:23
**presumption** [1] - 4:11
**pretty** [2] - 5:3, 7:10
**primarily** [1] - 36:14
**printed** [2] - 2:13, 46:17
**probe** [1] - 6:21
**problem** [1] - 33:25
**proceed** [3] - 7:14, 14:24, 36:6
**proceeding** [1] - 46:11
**proceedings** [2] - 4:12, 46:15
**Proceedings** [1] - 2:19
**process** [9] - 8:9, 22:22, 23:9, 23:10, 33:4, 33:19, 38:5, 38:14, 38:19
**processed** [2] - 38:22, 39:5
**processing** [1] - 39:5
**procured** [1] - 31:10
**produced** [1] - 2:19
**product** [1] - 2:12
**projects** [1] - 40:25
**promised** [1] - 44:12
**proportion** [1] - 31:19
**proposal** [1] - 44:15
**propose** [1] - 26:1
**proposed** [1] - 25:18
**proposing** [1] - 45:4
**protection** [1] - 4:17
**provide** [6] - 6:18, 8:17, 10:18, 22:8, 36:24, 40:22
**provides** [4] - 26:17, 38:22, 39:9, 39:12
**providing** [1] - 38:17
**public** [3] - 4:11, 4:18, 12:14
**purpose** [1] - 22:25
**purview** [1] - 15:16
**put** [4] - 12:2, 12:3, 25:7, 46:7
**puzzle** [1] - 18:3

## Q

**questioning** [2] - 4:16, 7:23
**questions** [18] - 4:22, 5:3, 6:22, 7:4, 7:7, 7:11, 8:6, 9:5, 10:21, 11:10, 11:23, 12:1, 12:8, 14:11, 14:23, 16:2, 36:6, 43:24
**quickly** [1] - 44:21
**quite** [1] - 5:5

## R

**Rabinovitz** [1] - 3:17
**RABINOVITZ** [2] - 1:11, 3:16
**rather** [1] - 7:15
**rationale** [1] - 6:8
**read** [2] - 37:1, 41:7
**reallocation** [1] - 40:22
**really** [1] - 29:15
**reason** [5] - 10:13, 27:5, 27:9, 27:18, 27:23
**reasons** [7] - 6:20, 8:19, 9:6, 9:11, 27:11, 35:4, 44:6
**receipt** [1] - 26:5
**receive** [1] - 33:8
**received** [2] - 6:13, 33:10
**recently** [5] - 7:22, 20:23, 21:1, 24:9, 31:22
**recognize** [2] - 4:13, 6:3
**recognized** [1] - 39:19
**recommends** [1] - 40:21
**reconsideration** [1] - 6:2
**record** [29] - 3:3, 3:7, 4:8, 5:5, 5:13, 5:22, 5:23, 6:5, 6:8, 7:18, 10:8, 10:13, 10:22, 10:23, 11:2, 11:3, 11:5, 11:9, 11:13, 11:17, 12:3, 13:15, 14:5, 22:7, 35:15, 36:21, 39:16, 45:10
**records** [1] - 7:21
**redactions** [1] - 45:20
**referenced** [1] - 37:4
**referring** [3] - 22:7, 40:1, 41:3
**reflects** [1] - 36:22
**regarding** [4] - 16:20, 34:25, 35:4, 44:2
**relations** [2] - 34:6, 34:11
**relationship** [1] - 34:14
**relevant** [1] - 8:9
**relieve** [1] - 8:13
**removal** [28] - 15:4, 15:5, 15:15, 16:16, 16:25, 17:24, 30:5, 30:9, 30:10, 30:12, 30:16, 30:24, 31:3, 31:9, 31:23, 32:5, 32:16, 33:2, 33:4, 33:22, 34:6, 34:8, 41:24, 42:4, 42:23, 43:8
**remove** [1] - 34:4
**removed** [1] - 33:17
**removing** [1] - 15:20
**repeat** [2] - 30:7, 30:20
**repeatedly** [1] - 11:7
**report** [1] - 8:12
**reported** [1] - 2:19
**Reporter** [3] - 2:16, 2:17, 46:22
**representation** [2] - 8:14, 8:16
**representatives** [1] - 6:18
**request** [1] - 4:9
**require** [4] - 6:7, 14:11, 35:25, 45:8
**requires** [2] - 4:7, 6:24
**resolution** [2] - 8:3, 45:8
**resolve** [1] - 4:8
**resolved** [1] - 45:16
**resolving** [1] - 5:9
**respect** [1] - 45:24
**responses** [1] - 4:22
**retain** [1] - 20:11
**reveal** [4] - 12:15, 14:20, 35:25, 36:4
**review** [3] - 6:5, 10:25, 11:14
**reviewed** [3] - 5:13, 6:13, 36:22
**reviews** [1] - 15:10
**role** [14] - 8:15, 8:22, 9:1, 9:13, 15:7, 37:20, 37:25, 38:4, 38:14, 38:16, 38:18, 39:1, 43:18, 43:19
**rouse** [1] - 8:11
**route** [7] - 30:15, 30:18, 30:24, 42:3, 42:12, 42:23, 43:7
**RPR** [3] - 2:16, 46:14, 46:21

## S

**S-C-H-U-L-T-Z** [1] - 14:7
**San** [1] - 1:17
**saw** [1] - 4:10
**scenario** [2] - 19:2, 34:3
**scenarios** [4] - 33:15, 33:20, 34:7, 34:14
**schedule** [4] - 6:11, 44:16, 44:22, 46:10
**scheduled** [6] - 31:8, 31:9, 31:24, 32:19, 33:12, 34:20
**scheduling** [1] - 34:17
**Schultz** [4] - 13:24, 14:6, 14:7, 14:8
**SCHULTZ** [1] - 14:1
**screenshot** [2] - 2:13, 46:18
**seal** [4] - 12:13, 45:10, 45:19, 45:22
**sealed** [1] - 46:1
**sealing** [4] - 12:7, 45:6, 45:12, 45:24
**seated** [2] - 14:4, 35:14
**second** [2] - 16:25, 40:20
**seconds** [1] - 14:16
**Secretary** [3] - 36:11, 36:22, 36:24
**security** [2] - 39:9, 39:13
**Security** [2] - 23:14, 24:18
**see** [5] - 4:2, 5:19, 14:15, 14:16, 36:2
**seem** [1] - 45:6
**send** [15] - 20:11, 20:19, 21:3, 21:6, 23:14, 24:12, 24:20, 25:6, 25:10, 27:15, 35:1, 35:4, 38:10, 38:13, 44:2
**sending** [5] - 20:23, 21:5, 21:10, 22:3, 25:18
**senior** [1] - 36:10
**sensitive** [9] - 4:14, 4:23, 12:8, 12:15, 12:18, 14:12, 14:20, 35:25, 36:4
**sent** [17] - 19:5, 21:15, 24:8, 24:25, 26:2, 26:21, 26:23, 27:19, 27:24, 29:4, 29:5, 29:6, 29:18, 31:11, 31:23, 33:6, 44:6
**sentence** [1] - 40:20
**serious** [1] - 19:4
**seriously** [1] - 4:11
**serves** [6] - 30:14, 30:22, 42:2, 42:11, 42:21, 43:6
**set** [1] - 44:16
**shall** [2] - 2:12, 46:17
**share** [1] - 12:9
**shorthand** [1] - 2:19
**show** [2] - 10:13, 39:16
**showing** [1] - 39:24
**sic** [5] - 17:20, 24:25, 25:2, 36:13, 39:25
**signatory** [2] - 2:14, 46:18
**signed** [3] - 16:10, 22:19, 42:16
**significance** [1] - 5:6
**significant** [1] - 16:17
**significantly** [1] - 34:1
**signing** [1] - 21:8
**similarly** [1] - 41:18
**site** [2] - 28:3, 29:21
**situation** [1] - 18:18
**skilled** [1] - 40:24
**soft** [1] - 21:9
**solely** [1] - 27:16
**solicitation** [3] - 25:22, 25:24, 25:25
**solution** [5] - 39:20, 40:23, 41:5, 41:7, 41:14
**someone** [5] - 17:21, 17:23, 18:4, 25:17, 33:16
**sometimes** [2] - 25:6, 32:7
**SOOKNANAN** [1] - 1:7
**sorry** [3] - 17:8, 17:10, 27:10
**sort** [3] - 16:11, 21:9, 24:8
**sounds** [1] - 43:24
**sourcing** [6] - 39:19, 39:20, 40:23, 41:5, 41:13, 41:18
**space** [23] - 4:7, 26:18, 26:22, 26:24, 27:2, 27:7, 27:13, 27:16, 27:25, 28:4, 28:19, 28:22, 28:25, 29:5, 29:7, 29:11, 29:14, 29:19, 29:22, 29:23, 30:1, 30:2
**Spanish** [4] - 21:11, 21:17, 22:3, 25:11
**SPARKLE** [1] - 1:7
**speakers** [4] - 21:11,

21:17, 22:4, 25:11
**speaking** [1] - 37:13
**special** [1] - 40:12
**Special** [1] - 40:13
**specific** [2] - 5:3, 29:4
**specifically** [2] - 12:14, 36:12
**specify** [1] - 25:7
**speculate** [2] - 5:21, 11:21
**spell** [2] - 14:4, 35:14
**spent** [1] - 6:15
**squares** [1] - 18:12
**St** [1] - 2:8
**Staff** [1] - 39:17
**staff** [3] - 15:7, 25:1, 40:22
**stand** [1] - 13:25
**standing** [1] - 14:15
**standpoint** [1] - 44:21
**stands** [1] - 25:1
**start** [3] - 13:23, 32:1, 38:19
**starting** [1] - 3:5
**starts** [3] - 39:1, 39:25, 40:7
**State** [7] - 8:8, 8:11, 8:13, 8:17, 8:22, 9:10, 9:16
**state** [3] - 9:1, 14:4, 35:14
**states** [2] - 43:1, 43:9
**STATES** [2] - 1:1, 1:7
**States** [8] - 1:21, 1:21, 26:15, 26:19, 26:22, 26:24, 27:21, 27:22
**station** [5] - 30:15, 30:23, 42:3, 42:12, 43:6
**status** [1] - 8:12
**stay** [2] - 42:17, 45:19
**stays** [3] - 22:2, 22:16, 23:5
**stenographic** [1] - 46:15
**steps** [1] - 33:5
**still** [5] - 5:15, 45:8, 45:12, 45:15, 45:18
**stop** [2] - 4:19, 8:10
**Street** [4] - 1:12, 1:16, 1:22, 2:4
**stress** [1] - 9:22
**subject** [1] - 41:23
**submissions** [1] - 6:13
**submit** [2] - 44:13, 44:15
**submitted** [1] - 7:21
**subset** [2] - 20:7, 20:9
**sufficient** [2] - 26:21, 27:1
**suggested** [1] - 13:9
**Suite** [1] - 2:4
**supplemental** [4] - 44:13, 44:15, 45:4, 46:8
**support** [2] - 28:22, 36:25
**Supreme** [2] - 6:6, 11:11
**sworn** [2] - 14:2, 35:12

## T

**tab** [1] - 40:21
**table** [1] - 40:19
**TCO** [1] - 17:7
**TCO/or** [1] - 17:7
**technically** [1] - 14:21
**temporary** [6] - 30:14, 30:23, 42:2, 42:11, 42:21, 43:6
**term** [5] - 39:20, 40:23, 41:5, 41:6, 41:13
**testify** [4] - 6:7, 7:8, 8:20, 14:12
**testifying** [2] - 8:14, 28:7
**testimony** [10] - 9:16, 10:5, 23:11, 27:14, 27:23, 29:3, 32:2, 38:12, 44:12, 45:18
**text** [1] - 40:18
**THE** [257] - 1:1, 1:7, 1:9, 1:19, 2:2, 3:2, 3:10, 3:15, 3:18, 3:21, 3:24, 4:2, 7:19, 8:10, 9:4, 9:15, 9:19, 10:7, 11:5, 12:11, 13:4, 13:7, 13:18, 13:20, 13:23, 14:3, 14:6, 14:8, 14:25, 15:1, 15:3, 15:22, 15:25, 16:1, 16:6, 16:7, 16:9, 16:13, 16:16, 16:22, 17:3, 17:4, 17:5, 17:6, 17:7, 17:8, 17:10, 17:11, 17:14, 17:15, 17:17, 17:19, 18:2, 18:4, 18:6, 18:7, 18:9, 18:12, 18:17, 18:22, 19:6, 19:7, 19:10, 19:14, 19:15, 19:16, 19:19, 19:20, 19:21, 19:22, 20:2, 20:3, 20:9, 20:10, 20:13, 20:16, 20:23, 20:25, 21:7, 21:12, 21:18, 21:19, 21:20, 21:21, 21:23, 21:24, 22:9, 22:12, 22:14, 22:15, 22:18, 22:20, 22:21, 22:23, 23:8, 23:15, 23:16, 23:18, 23:19, 23:21, 24:14, 24:16, 24:17, 24:19, 24:22, 24:23, 24:25, 25:9, 25:15, 25:16, 25:20, 25:24, 26:3, 26:4, 26:5, 26:7, 26:11, 26:12, 26:16, 26:20, 26:23, 26:25, 27:3, 27:5, 27:8, 27:9, 27:12, 27:14, 28:1, 28:2, 28:5, 28:6, 28:10, 28:13, 28:15, 28:17, 28:18, 28:21, 28:24, 29:2, 29:3, 29:6, 29:9, 29:10, 29:11, 29:13, 29:15, 30:3, 30:4, 30:7, 30:8, 30:11, 30:13, 30:17, 30:19, 30:25, 31:1, 31:4, 31:5, 31:7, 31:14, 31:16, 31:19, 31:21, 31:25, 32:8, 32:13, 32:17, 32:20, 32:24, 32:25, 33:4, 33:13, 33:23, 34:3, 34:10, 34:11, 34:16, 34:22, 34:23, 34:24, 35:2, 35:3, 35:6, 35:7, 35:13, 35:16, 35:18, 35:20, 35:22, 36:7, 36:8, 36:10, 36:17, 36:20, 36:21, 37:1, 37:3, 37:6, 37:7, 37:10, 37:13, 37:17, 37:20, 37:24, 37:25, 38:3, 38:4, 38:6, 38:8, 38:16, 38:18, 38:21, 38:24, 39:2, 39:3, 39:4, 39:15, 39:22, 39:23, 40:6, 40:9, 40:11, 40:13, 40:16, 41:6, 41:12, 41:15, 41:17, 41:20, 41:21, 41:25, 42:1, 42:5, 42:6, 42:9, 42:10, 42:16, 42:19, 42:25, 43:2, 43:9, 43:10, 43:12, 43:14, 43:19, 43:21, 44:4, 44:5, 44:7, 44:8, 44:18, 44:23, 45:2, 45:23, 46:4, 46:6
**thin** [1] - 5:5
**third** [2] - 17:1, 19:24
**three** [2] - 17:16, 18:17
**tied** [1] - 17:25
**ties** [3] - 16:19, 17:1, 17:12
**timing** [1] - 6:10
**title** [2] - 15:2, 36:9
**today** [6] - 6:22, 7:14, 8:14, 35:22, 44:16, 45:18
**took** [1] - 41:13
**top** [1] - 12:12
**topics** [1] - 7:9
**touch** [1] - 4:22
**Transcript** [1] - 2:19
**transcript** [9] - 2:12, 2:13, 45:19, 45:22, 45:25, 46:15, 46:15, 46:17
**TRANSCRIPT** [1] - 1:6
**transcription** [1] - 2:19
**transfer** [2] - 18:19, 32:10
**transferred** [7] - 18:20, 19:3, 19:24, 20:4, 20:7, 29:8, 32:18
**transferring** [3] - 15:20, 38:14, 38:17
**transfers** [1] - 39:18
**transnational** [8] - 16:18, 16:19, 16:20, 17:1, 17:12, 17:25, 19:25, 26:10
**transportation** [1] - 37:21
**transporting** [1] - 38:25
**travel** [15] - 15:8, 31:2, 32:3, 32:10, 32:11, 32:15, 32:18, 32:21, 32:23, 33:2, 33:12, 33:25, 34:15, 42:6, 43:16
**trick** [1] - 27:17
**true** [4] - 42:14, 42:24, 46:14, 46:15
**try** [1] - 20:13
**trying** [6] - 22:10, 23:3, 27:17, 27:18, 29:24, 33:7
**turn** [1] - 40:17
**turned** [1] - 19:12
**two** [5] - 7:9, 7:20, 18:17, 39:7, 43:23
**type** [2] - 4:24, 28:10
**types** [1] - 34:13
**typically** [1] - 31:5

## U

**U.S** [2] - 15:13, 31:11
**under** [4] - 15:15, 40:18, 45:10, 45:19
**unfortunately** [1] - 33:8
**Union** [2] - 1:11, 1:16
**United** [8] - 1:21, 1:21, 26:15, 26:19, 26:22, 26:24, 27:21, 27:22
**UNITED** [2] - 1:1, 1:7
**unless** [1] - 6:11
**unnecessary** [1] - 8:4
**unsure** [2] - 12:20, 26:6
**unusual** [2] - 6:4, 10:4
**up** [16] - 5:18, 11:19, 11:25, 14:15, 18:16, 19:8, 19:10, 19:16, 26:23, 28:19, 29:7, 34:1, 41:7, 45:12, 45:16, 46:7
**USCIS** [1] - 15:2
**USINDOPACOM** [1] - 40:21

## V

**vacated** [1] - 45:25
**Venezuelan** [4] - 23:16, 24:9, 24:20, 25:11
**verbal** [2] - 36:24, 37:3
**verbally** [1] - 36:23
**versus** [3] - 3:4, 22:2, 28:11
**view** [10] - 5:14, 6:4, 8:20, 9:15, 11:2, 11:6, 18:8, 20:19, 45:14, 45:18
**void** [2] - 2:13, 46:17
**vs** [1] - 1:4

## W

**wait** [1] - 6:12
**walk** [2] - 22:23, 23:2
**war** [2] - 36:15, 41:2
**War** [5] - 16:10, 36:12, 39:9, 39:12
**War-CAR-658** [1] - 39:25
**war-fighting** [1] - 41:2
**warrants** [1] - 4:17
**Washington** [4] - 1:5, 1:23, 2:5, 2:9
**week** [2] - 7:22, 31:8

**whole** [3] - 12:14, 20:5, 31:21
**willingly** [1] - 4:4
**wish** [1] - 7:8
**witness** [15] - 8:7, 8:11, 8:20, 9:12, 10:5, 13:2, 13:12, 13:25, 14:1, 28:7, 35:11, 38:12, 39:24, 40:3
**WITNESS** [108] - 14:6, 14:25, 15:3, 15:25, 16:6, 16:9, 16:16, 17:3, 17:5, 17:7, 17:10, 17:14, 17:17, 18:2, 18:6, 18:9, 18:17, 19:6, 19:10, 19:15, 19:19, 19:21, 20:2, 20:9, 20:13, 20:23, 21:7, 21:18, 21:20, 21:23, 22:14, 22:18, 22:21, 23:8, 23:16, 23:19, 24:14, 24:17, 24:22, 24:25, 25:15, 25:20, 26:3, 26:5, 26:11, 26:16, 26:23, 27:3, 27:8, 27:12, 28:1, 28:5, 28:13, 28:17, 28:21, 29:2, 29:6, 29:10, 29:13, 30:3, 30:7, 30:11, 30:17, 30:25, 31:4, 31:7, 31:16, 31:21, 32:8, 32:17, 32:24, 33:4, 33:23, 34:10, 34:16, 34:23, 35:2, 35:6, 35:16, 35:20, 36:7, 36:10, 36:20, 37:1, 37:6, 37:10, 37:17, 37:24, 38:3, 38:6, 38:16, 38:21, 39:2, 39:4, 39:22, 41:6, 41:15, 41:20, 41:25, 42:5, 42:9, 42:16, 42:25, 43:9, 43:12, 43:19, 44:4, 44:7
**witnesses** [16] - 4:16, 4:20, 6:21, 6:25, 7:4, 7:8, 7:10, 7:25, 8:3, 8:4, 10:20, 11:23, 12:5, 12:9, 12:16, 12:19
**words** [3] - 9:25, 10:12, 20:5
**works** [1] - 34:20
**worldwide** [1] - 36:14

## Y

**Yamil** [1] - 3:3
**YAMIL** [1] - 1:3
**York** [1] - 1:12
**you-all** [8] - 5:11, 11:7, 44:14, 44:23, 45:5, 45:14, 45:19, 46:6

## Z

**Zafar** [1] - 3:12
**ZAFAR** [2] - 1:10, 3:11
**ZAYCI** [1] - 3:19
**Zayci** [1] - 3:20