UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

YAMIL LUNA GUTIERREZ, et al.,

Plaintiffs,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, et al.,

Defendants.

Civil Action No. 1:25-cv-01766-SLS

**DEFENDANTS' SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................ 1

ARGUMENT ........................................................ 1

I. THE AGENCY ACTION UNDER REVIEW IS DEFENDANTS' IMPLEMENTATION OF A PRESIDENTIAL DIRECTIVE TO DETAIN ALIENS AT NSGB ........................................................ 1

II. THE GUANTANAMO DETENTION POLICY IS NOT ARBITRARY AND CAPRICIOUS ........................................................ 7

CONCLUSION ........................................................ 15

# TABLE OF AUTHORITIES

## CASES

*Agatha v. Trump*,
151 F.4th 9 (1st Cir. 2025) .......... 2

*Appalachian Power Co. v. E.P.A.*,
208 F.3d 1015 (D.C. Cir. 2000) .......... 2

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 2, 3

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) .......... 7

*Burkhart v. Washington Metro. Area Transit Auth.*,
112 F.3d 1207 (D.C. Cir. 1997) .......... 5

*California Communities Against Toxics v. Env't Prot. Agency*,
934 F.3d 627 (D.C. Cir. 2019) .......... 2, 3

*Catawba Cnty., N.C. v. E.P.A.*,
571 F.3d 20 (D.C. Cir. 2009) .......... 14

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......... 2, 3

*Chamber of Com. v. DHS.*,
815 F. Supp. 3d 73 (D.D.C. 2025) .......... 2, 3

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) .......... 6

*Ctr. for Auto Safety v. Peck*,
751 F.2d 1336 (D.C. Cir. 1985) .......... 14

*Ctr. for Biological Diversity v. Env't Prot. Agency*,
141 F.4th 153 (D.C. Cir. 2025) .......... 13, 14

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 1, 3

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 6

*Env't Def. Fund Inc. v. Costle*,
657 F.2d 275 (D.C. Cir. 1981) .......... 7

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 7

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 3

*Garland v. Ming Dai*,
593 U.S. 357 (2021) .......... 7

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 2

*Grand Trunk Corp. v. Transportation Sec. Admin.*,
153 F.4th 517 (7th Cir. 2025) .......... 13

*Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*,
175 F.4th 1258 (11th Cir. 2026) .......... 11

*Kakar v. U.S. Citizenship & Immigr. Servs.*,
29 F.4th 129 (2d Cir. 2022) .......... 6

*MediNatura, Inc. v. Food & Drug Admin.*,
998 F.3d 931 (D.C. Cir. 2021) .......... 5

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 13, 14

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 12

*N.C. Fisheries Ass'n v. Gutierrez*,
518 F. Supp. 2d 62 (D.D.C. 2007) .......... 15

*Nat. Res. Def. Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) .......... 5

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
374 F.3d 1251 (D.C. Cir. 2004) .......... 15

*Rodriguez Vazquez v. Bostock*,
183 F.4th 1160 (9th Cir. 2026) .......... 11

*Sale v. Haitian Centers Council, Inc.*,
509 U.S. 155 (1993) .......... 8

*Soundboard Ass'n v. Fed. Trade Comm'n*,
888 F.3d 1261(D.C. Cir. 2018) .......... 3, 5

*Sw. Airlines Co. v. U.S. Dep't of Transp.*,
832 F.3d 270 (D.C. Cir. 2016) .......... 3, 4

*Tourus Recs., Inc. v. Drug Enf't Admin.*,
259 F.3d 731 (D.C. Cir. 2001) .......... 7

*Tulare Cnty. v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001) .......... 1, 2

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 14

*Yakima Valley Cablevision, Inc.* v. *F.C.C.*,
794 F.2d 737 (D.C. Cir. 1986) .......... 10

**STATUTES**

5 U.S.C. § 704 .......... 1

8 U.S.C. § 1103(a)(3) .......... 14

8 U.S.C. § 1231(e) .......... 14

8 U.S.C. § 1231(g)(1) .......... 14

8 U.S.C. § 1231(g)(2) .......... 14

41 U.S.C. § 6101(g)(2) .......... 14

## INTRODUCTION

On October 14, 2026, and November 16, 2026, after the parties cross-moved for partial summary judgment, the Court held evidentiary hearings and heard testimony from two witnesses from Defendant agencies: (1) John Schultz from the Department of Homeland Security ("Mr. Schultz"); and (2) Barry Coble from the Department of War ("Mr. Coble"). Although the parties' arguments in this case have developed over time in a somewhat piecemeal manner, Defendants' ultimate position is simply that the Guantanamo detention policy is neither contrary to law nor arbitrary and capricious. On that latter point, and without waiving any arguments in any prior filing, the testimony of both witnesses, considered alongside the existing administrative record, supports Defendants' position that the detention policy, which came to pass at a point in time when Defendants reasonably anticipated needing up to 100,000 detention beds, is both reasonable and reasonably explained. Utilizing Naval Station Guantanamo Bay ("NSGB") for certain aliens with final orders of removal immediately provided the necessary guaranteed, additional detention space and freed up detention space in the continental United States in service to the Administration's larger effort to increase immigration enforcement. *See* ECF No. 110 ("Defs. SJ Mot.") at 30-38; ECF No. 115 ("Defs. SJ Rep.") at 17-23; ECF No. 128 ("Defs. Sup Br.") The Court should therefore grant Defendants' motion for summary judgment.

## ARGUMENT

### I. THE AGENCY ACTION UNDER REVIEW IS DEFENDANTS' IMPLEMENTATION OF A PRESIDENTIAL DIRECTIVE TO DETAIN ALIENS AT NSGB

Under the APA, the Court may review only final agency action. 5 U.S.C. § 704. "The actions of the President cannot be reviewed under the APA because the President is not an 'agency' under that Act." *Dalton v. Specter*, 511 U.S. 462, 476 (1994); *see Tulare Cnty. v. Bush*,

185 F. Supp. 2d 18, 28 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002). However, "[p]residential action may be reviewed through APA challenges to final agency action by subordinates implementing the President's directives where such review is not otherwise precluded." *Glob. Health Council v. Trump*, 153 F.4th 1, 17 n.14 (D.C. Cir. 2025); *see Chamber of Com. v. DHS.*, 815 F. Supp. 3d 73, 108-10 (D.D.C. 2025) (collecting cases and explaining that whether "an agency's implementation of a presidential directive constitutes 'final agency action' reviewable under the APA" is "uncertain terrain"). The "line-drawing on whether APA review is available" may depend "on whether an agency's actions involved mere ministerial implementation of presidential action" or "independent decisionmaking that fleshed out a presidential directive." *Chamber of Com. v. DHS*, 815 F. Supp. 3d at 109 (citations omitted); *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (suggesting that regulations that "flesh out" an Executive Order are reviewable under the APA); *see Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025) (finding action reviewable because agency "made several independent determinations in formulating" the policy). And when there is independent decisionmaking involved," two conditions must be satisfied for agency action to be 'final'": (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "it must be one by which rights or obligations have been determined, or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *see Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022 (D.C. Cir. 2000).

Defendants respectfully maintain that there is no final agency action here because no legal consequences arise when an alien with a final order of removal is detained at one particular facility over another, as in either case the alien is detained under § 1231. *See California Communities Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019) (looking to "the concrete

consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."). But if the Court disagrees, *see* Mem. Op. at 24-25, then it is Defendants' decision regarding *how* to use Guantanamo, not whether to use it at all, that is the reviewable final agency action in this case. *See Soundboard Ass'n*, 888 F.3d at 1267-71. This is because it was the President who decided that Guantanamo would be used as a detention site for aliens unlawfully present in the United States. He did so by issuing a Memorandum on January 29, 2025, instructing the Secretaries of War and Homeland Security to "take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity[.]" U-DOW-CAR-119. That decision—the designation of NSGB as a site to house illegal aliens present in the United States—is unreviewable. *Dalton*, 511 U.S. at 476; *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see* Nov. Trans. at 68:13-19 (Mr. Schultz acknowledging that he did not know whether DHS could "choose not to send people to Guantanamo"). *Contra* ECF No. 129 ("Pls. Sup. Br.") at 5-6. The reviewable decisionmaking at issue in this case is, at most, the Department of Homeland Security ("DHS") and the Department of War's ("DOW") fleshing out of the President's directive into the Memorandum of Understanding ("MOU"), which played out over a roughly six-week period and reflects Defendants' ultimate implementation of the Presidential Memorandum. *See Chamber of Com v. DHS.*, 815 F. Supp. 3d at 109; *Reich*, 74 F.3d 1322, 1327; U-DOW-CAR-121-26; DHS 00118-23; *see also* ECF No. 53 ("Mem. Op.") (declining to decide at the motion to dismiss stage whether the MOU is the final agency action).

The MOU is the final agency action because it "marks the consummation of the agency's decisionmaking process." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Bennett*, 520 U.S. at 177-78); *see Sw. Airlines Co. v. U.S. Dep't of*

*Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) ("An order must satisfy both prongs of the *Bennett* test to be considered final."). Beginning immediately after the January 29, 2025 Presidential Memorandum, Defendants began a joint-planning process during which they considered the types of aliens who should be detained at NSGB, how to transport them to NSGB, and how to provide needed services to detainees throughout their stay at NSGB, which drew upon prior joint missions, agency resources, and existing detentions standards and policies. *See* Defs. SJ Mot. at 31-33. As confirmed by Mr. Schultz, individuals within the Enforcement and Removal Operations ("ERO") division of DHS leadership were openly discussing the possibility of needing as many as 100,000 detention beds, a number far exceeding the existing detention capacity of roughly 35,000. Nov. Trans 17-18, 35-36, 46-48, 50-51. Within 24 hours of the Presidential Memorandum, the DOW directed the responsible commanders to begin planning to expand NSGB migrant detention capacity to 10,000 beds. U-DOW-CAR-210-11. By January 31, 2025, follow-on DOW messages raised the target NSGB detention capacity to 30,000. U-DOW-CAR-585-86.

On February 3, 2025, the Secretary of Homeland Security reached out to the Secretary of War with "an emergent request" for aviation and operational assistance to support the "[i]mmediate expansion of the [Migrant Operations Center]," including the possibility of ultimately "housing 30,000 illegal aliens." DHS-000088-89. Six days later, DHS issued interlocutory guidance on the "interagency coordination requirements for conducting the movement of illegal aliens" from the continental United States to NSGB, which listed several "critical considerations (as of 02/09/2025)" that it called "vital datapoints." DHS-000091-93. The next week, DHS issued a memorandum regarding the needs of certain aliens who "may be at increased risk for medical complications on flights to [NSGB] and may exceed the medical capacity at NSGB" such that "they should not be transported to NSGB nor transported to a collection point intended for transfer

to NSGB." DHS-000104-05. Meanwhile, on February 25, 2026, Joint Task Force Southern Guard ("JTF-SG") was instructed to build Leeward camps "with the ability to secure, house, and feed up to a total of approximately 10,000 illegal aliens" and Windward Camps and golf course for "up to a total of approximately 30,000 illegal aliens." U-DOW-CAR-193; U-DOW-CAR-196 (discussing the provision of water, sanitation, food, health and shelter on February 25, 2026). This interagency planning process consummated upon the signing of the MOU on March 7, 2025, which reflects Defendant agencies' decision to implement the President's directive by using Guantanamo as a detention facility for aliens (1) with final orders of removal, (2) who are adult males, (3) with no acute medical or psychological conditions, (4) an actual or presumed nexus to a transnational criminal organization, and (5) for no longer than 180 days following the entry of their final orders. U-DOW-CAR-121-23, U-DOW-CAR-127; *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (finding action was consummation of decisionmaking when it was "the culmination of EPA's consideration of the issue").

Any confusion at the November 16, 2026 hearing regarding the "date of the decision" is of no moment, as Mr. Schultz was Defendants' fact witness testifying to his knowledge of the NSGB detention policy, not the date upon which the agency action became final for purposes of APA review. *See* Nov. Trans. at 38-42. *Cf. Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (distinguishing between testimony on facts and legal conclusions). And while some aliens were transferred to Guantanamo prior to the signing of the MOU, that in itself does not render the agency's action final because the first prong of the *Bennett* test "directs courts to look at finality from the agency's perspective." *Soundboard Ass'n*, 888 F.3d at 1267; *see, e.g.*, *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 938 (D.C. Cir. 2021) (finding that "addition of MediNatura's Products to the Import Alert fails

*Bennett's* first prong" because even though drug was seized during shipment "[t]he action does not mark the consummation of agency's decisionmaking"). The joint coordination process here began in late January and continued through February and into early March, when the signing of the MOU clarified and finalized both how NSGB was to be used as an immigration detention facility and Defendants' respective roles in accomplishing the mission. U-DOW-CAR-121-26; DHS-00118-23; *see Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) ("[T]he Secretary's decision represents the final agency position on this issue").

Finally, the number of aliens ultimately transferred to NSGB over the time between the first flight and the present day is not the reviewable final agency action challenged here. *See* Compl. ¶¶ 65-69; *see* Nov. Trans. at 55-56 (discussing 900 aliens detained at NSGB between February 2025 and November 2026 and asking Mr. Schultz whether there were "places in the United States where you could find 900 beds to accommodate the 900 people who were sent to Guantanamo"). While Plaintiffs argue that "the administrative record is bereft of any evidence that Guantanamo meaningfully expanded detention capacity," Pls. Sup. Br. at 6, the Court's focus is simply whether the "contemporaneous explanation" for Defendants' decision—namely, the concern that needed detention bedspace would greatly exceed existing capacity—was arbitrary and capricious. Oct. Trans. at 5:16, 6:8, 6:19; *see also id.* at 22:25, 32:1-3 ("[D]on't tell me about most recently. I just want to know, dating back to February 4, 2025[.]"). Thus, Plaintiffs' continued attention to the later implementation of the policy and the way the mission evolved months and years after the decisionmaking is beside the point in this lawsuit because "[a]n agency must defend its actions based on the reasons it gave when it acted." *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020); *see Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (applying "the rule that judges generally must assess the lawfulness of an agency's

action in light of the explanations the agency offered for it rather than any ex post rationales a court can devise.") (quoting *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021)). If a court is prohibited from supplying a post hoc rationale for an agency's action, it stands to reason that the courts are equally restrained from judging agency decisionmaking based on facts and events that came to pass well after the government took the challenged action in the first place.

## II. THE GUANTANAMO DETENTION POLICY IS NOT ARBITRARY AND CAPRICIOUS

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Review under this standard is "deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*; *Env't Def. Fund Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (describing the arbitrary-and-capricious standard as "highly deferential" and one that "presumes the agency's action to be valid"). Instead, a reviewing court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423; *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). Mr. Schultz testified that the reason DHS adopted the Guantanamo detention policy was for additional bedspace. Nov. Trans. at 45:9-14; Oct. Trans. at 26:16-19; *see Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (requiring only "a brief statement" explaining "why [the agency] chose to do what it did"). His testimony and the administrative record establish that this reason for the policy is neither arbitrary nor capricious.

The new Administration's emphasis on stepped-up immigration enforcement in early 2025 prompted grave concern about DHS's bedspace capacity. Upon assuming office in January 2025, the President issued a myriad of directives and executive orders calling for a rapid increase in immigration enforcement. DHS-000079-80 (Executive Order 14167); DHS-000081-83 (Procl. 10866), DHS-000084-87 (Procl. 10888), DHS-000124-26 (NSGB Presidential Memorandum); *see also* DHS-000557-560 (Department of State's designation of international cartels). As a result of "the presidential mandate to secure the borders," officials in the Enforcement and Removal Operations division of U.S. Immigration and Customs Enforcement expected to reach a need for 100,000 beds. Nov. Trans. at 49:14-20; *see id.* at 14:20-25, 15:1-3, 16:19-20 ("We were looking to ramp up bed space to about 100,000 beds"). At that time, DHS had a detention capacity of approximately 30,000-40,000 beds, which was "nowhere close" to the 100,000 that they were expecting to need. Nov. Trans. at 47:10-11 (stating that total detention capacity in January 2025 was "somewhere around 35,000"), 48:1 ("[T]he mid-30,000 range"). Faced with the concern of increasing its detention capacity by approximately 70,000 beds, DHS reasonably determined that Guantanamo was uniquely suited to provide what proved to be nearly immediate access to guaranteed bedspace in large quantities.

First, as the record confirms, NSGB has a proven history of providing "extended care and processing" for migrants in the 1990s, and its "migrant camps may be tailored as to size and the command and control structure to meet the situation," making the facility suited for a mission that required tens of thousands of additional beds. U-DOW-CAR-301, U-DOW-CAR-318; *see* U-DOW-CAR-294-95 (describing Operation Sea Signal between 1994-95); *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 163 (1993) (noting that NSGB housed a population of 12,500 migrants in 1991); *see also* Trans. at 37:10-15. Indeed, Operation Sea Signal demonstrated that

NSGB and its military personnel showed "inherent flexibility" allowing for "rapid adaptation" to a changing mission. U-DOW-CAR-293; *see* U-DOW-CAR-302 (explaining that "at Guantanamo, the mission ranged from emergency care to transporting migrants to a third country, constructing living quarters, providing medical care, and processing migrants for eventual entry into the United States"); U-DOW-CAR-174-75 (2002 Executive Order contemplating NSGB as site to accommodate "mass migration"). Defendants could therefore be confident that NSGB could operate as a highly-populated detention facility, and they planned for up to 30,000 beds. U-DOW-CAR-36 ("At Guantanamo, SOUTHCOM is in the process of expanding the Migrant Operations Center's . . . capacity to 30,000—up from its current capacity of just 120."); U-DOW-CAR-176 ("[T]o include the housing of up to 30,000 illegal aliens."); U-DOW-CAR-178 (instructing Southern Guard to build Leeward camps "with the ability to secure, house, and feed up to a total of approximately 10,000 illegal aliens" and Windward Camps and golf course for "up to a total of approximately 30,000 illegal aliens").

Second, the NSGB facilities—and the bed space therein—are already within the exclusive command and control of the federal government, meaning that beds at that facility "are always available" to DHS. Nov. Trans. at 11:23; Oct. Trans. at 26:16-18; *see also* Oct. Trans. at 39:14 (noting that Camp VI is "one of [DOW]'s facilities"); *see* Nov. Trans. at 12:1-2 (confirming that since using NSGB for detention of aliens in 2025, DOW has never told DHS that it could not use beds). This is not the case at other detention facilities not directly under DHS control. Nov. Trans. at 10:20-25. Based on the needs of these other entities and changes in administration, DHS does not always have access to the beds at those facilities, which "limits [DHS's] ability to conduct enforcement operations in certain areas or necessitates [DHS] to have transportation available to move arrested aliens immediately." Nov. Trans. at 11:5-12; Nov. Trans. at 63:20-21 ("A contract

for beds, I have seen take a few months"); *see* DHS-000275 (noting that government "must continue to rely on state and local facilities to house its detainees" due to the "scope of immigration enforcement."). Moreover, federal control over NSGB made it possible to begin executing the President's directive immediately, as aliens first arrived at Guantanamo on February 4, 2025, only six days following the Presidential Memorandum. Nov. Trans. at 16:5-12, 63:20-21; *see id.* at 13:20-25, 14:1-7 (confirming that "there is no difference" in difficulty landing at NSGB than any other facility and the flight cost is the same). Given that DHS was "looking to ramp up bed space to about 100,000 beds," using NSGB "gave [the agency] an avenue to increase [its] detention population, if needed, quickly." Nov. Trans. at 16:19-21; *see* Trans. at 31 ("When we initially began using Guantanamo, we needed to quickly use the bed space that was available there.").

While Plaintiffs repeatedly maintain that the failure to consider "obvious alternatives" makes the Guantanamo policy arbitrary and capricious, they fail to identify any. Pls. Sup. Br. at 8 (referring generally to "alternative detention facilities in the United States"). In any event, scrambling to coordinate with state and local partners nationwide to organize a patchwork of existing facilities to meet what was anticipated to be an imminent need for up to 100,000 beds is not an "obvious alternative[]" to an existing, federally owned and operated detention site that had already been successful in meeting the needs of prior large-scale migrant operations missions. *Yakima Valley Cablevision, Inc.* v. *F.C.C.*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

In addition to the benefits of NSGB as a site that can provide nearly immediate, federally controlled, guaranteed bedspace, Mr. Schultz's testimony confirms that the policy also "free[s] up the beds in the continental United States" for "greater flexibility to do further enforcement operations." Nov. Trans. at 15:23-25, 16:1; Oct. Trans. at 26:23-24, 29:6-8. Indeed, spurred by the President's directives and priorities, DHS-000079-80; DHS-000081-83, DHS-000084-87,

DHS planned to step up its immigration enforcement nationwide by charging aliens with removability, placing them into removal proceedings, and efficiently moving aliens through their proceedings, including by detaining them during the pendency of their proceedings. *See* Nov. Trans. at 14:20-25, 15:1-3, 16:19-20, 49:14-20; *see also Rodriguez Vazquez v. Bostock*, 183 F.4th 1160, 1170 (9th Cir. 2026) (noting that "thousands of aliens" filed habeas petitions seeking release from immigration detention pending a decision on whether they are to be removed); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, 175 F.4th 1258, 1264 (11th Cir. 2026) (same). Given the prospect of enforcement increasing everywhere within the continental United States, NSGB—a site distant from those ongoing enforcement operations with a prospect of quickly accommodating 30,000 aliens—was believed to be a significant tool to decompress facilities throughout the country prior to and amidst placing additional aliens in detention. *See* Nov. Trans. at 17:18-20 (Mr. Schultz stating that DHS will decompress a facility "if we know that we have got a large-scale enforcement operation coming up, so we create additional bed space within that area of operations").

It is logical that that DHS sought to prioritize bedspace within the continental United States for newly-arrested aliens given the need for them to appear in immigration courts for their removal proceedings. *See* Nov. Trans. at 62:11-16; *see* U-DOW-CAR-121 (establishing NSGB as a facility for aliens with final orders of removal). And the specific criteria spelled out in the MOU show that not every alien in ICE detention was made eligible for transfer to Guantanamo—only those who fit a particular profile qualified. On top of that, the MOU allowed the Guantanamo facility to be used interchangeably in a manner similar to both a staging facility and a longer-term detention facility, albeit with a time limit of no more than 180 days. Nov. Trans. at 23-25. In short, Defendants' implementation of the decision to expand detention operations at Guantanamo is far

from arbitrary, but rather, marked by multiple discriminating factors and several layers of operational considerations.

Plaintiffs argue that it is significant that Mr. Shultz was "unable to state" whether "there even was insufficient bed space in the United States," when the decision was made to utilize NSGB, Pls. Sup. Br. at 7, but bedspace is "always a concern" for DHS, Nov. Trans. at 17:1-2, and was especially so in early 2025 when there was expected to be a dramatic increase in immigration enforcement and the need for 100,000 beds. Nov. Trans. at 14:20-25, 15:1-3, 16:19-20, 49:14-20. While Plaintiffs may disagree with the government's allocation of resources toward immigration enforcement, it was not unreasonable, in light of the potential need for 100,000 beds and many newly-detained aliens, to extend post-order detention to a federally-owned facility with a proven history of meeting large scale detention missions. *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("Agency policymaking is not a rarified technocratic process, unaffected by political considerations or the presence of Presidential power."); *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (assessing whether there is a "rational connection between the facts found and the choice made").

Plaintiffs also argue that instances wherein aliens lacked travel documents at the time they were transferred to NSGB or were ultimately transferred back to the continental United States mean that Defendants must not have considered "logistical challenges." Pls. Sup. Br. at 8. Not so. The steps to execute a removal order—travel documents, diplomatic correspondence, scheduling, and staging—do not necessarily occur sequentially; rather, "there could be more steps going on at the same time," such as scheduling an alien for a removal flight while attempting to acquire a travel document. Nov. Trans. at 18-19. And it is not the case that pauses in the removal process—either continued detention or transfer back to the continental United States—are the result of a lack of

forethought given the myriad reasons for these delays, including an untimely travel document or landing permit from another country's government, weather events, flight crew issues, reopened or additional litigation, and medical concerns. Nov. Trans. at 20-21. When any of these issues arises, DHS "maintains custody of the individual" until their removal can be scheduled, which often involves transfer to different facility, Nov. Trans. at 21:13-14, as the alien may not be able to embark on the next scheduled removal flight, given that those flights are already filled.[1] Nov. Trans. at 22:1-17.

A focus on detention costs is also misplaced. *See* Nov. Trans. at 54. As discussed in Defendants' first supplemental brief, a cost-benefit analysis is not an appropriate focus here because nothing in the Immigration and Nationality Act requires it. *See* Defs. Sup. Br. at 6-8. To evaluate agency regulation of power plants under the arbitrary and capricious standard, the Supreme Court undertook a statutory analysis of a provision in the Clean Air Act and found that "in the present context, the [statutory] phrase 'appropriate and necessary' requires at least some attention to cost," while also recognizing that "there are undoubtedly settings in which the phrase 'appropriate and necessary' does not encompass cost." *Michigan v. EPA*, 576 U.S. 743, 752 (2015); *see, e.g.*, *Ctr. for Biological Diversity v. Env't Prot. Agency*, 141 F.4th 153, 171 (D.C. Cir. 2025) ("The text of the [Clean Air Act] does not require EPA to monetize or otherwise quantify all of the factors it must consider, nor to conduct a cost-benefit analysis to set volumes."); *Grand Trunk Corp. v. Transportation Sec. Admin.*, 153 F.4th 517, 526-27 (7th Cir. 2025) (denying arbitrary and capricious challenge in part because agency "was not required to undertake [cost-benefit] measure

[1] In light of Mr. Schultz's testimony, Nov. Trans. at 61:9-21, Defendants respectfully clarify that removals from NSGB to certain countries participating in the Electronic Verification Program are expedited because there is no requirement to wait for the issuance of travel documents. *See* Defs. SJ Rep. at 13.

in the first place" given that there is no requirement in statute). Here, § 1231(e) provides the funding sources for different types of removals, but nowhere does it instruct the Secretary on *how* to carry out removals or that he must consider cost as a factor while doing so. *See Ctr. for Biological Diversity*, 141 F.4th at 171. To the extent that the text of § 1231(g) is relevant, Defs. SJ Rep. at 8-9 & n.4, it authorizes the Attorney General to spend appropriations to "operate facilities" "without regard" for 41 U.S.C. § 6101's requirements for government purchases when existing facilities are "unavailable" to meet detention needs, underscoring that the primary factor to be considered is detention needs, not financial efficiency. 8 U.S.C. § 1231(g)(1). And that provision only provides that the Secretary consider available alternatives when there are potential sites that would "suitable" to meet detention needs. 8 U.S.C. § 1231(g)(2). As discussed above, the contours of the original mission foreclosed that possibility.

Additionally, as argued in Defendants' motion, Defs. SJ Mot. at 18-26, § 1103(a)(3) provides that Secretary of Homeland Security shall "perform such other acts as he deems necessary for carrying out his authority under the provisions" of the INA, language that—unlike in *Michigan v. EPA*—"says nothing of what precisely will render [an action] necessary." *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 35 (D.C. Cir. 2009); *see Webster v. Doe*, 486 U.S. 592, 600 (1988) (deems necessary phrase "foreclose[s] the application of any meaningful judicial standard of review"). While Plaintiffs would obviously have preferred if Defendants had compared the costs and benefits of the chosen policy with any number of hypothetical alternatives and then explained why none could suffice, "such cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency." *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (citation omitted).

## **CONCLUSION**

Ultimately, as demonstrated by the certified administrative record and witness testimony, the NSGB detention policy was both reasonable and reasonably explained. *See, e.g.*, *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) ("While [an agency's] conclusion may be debatable as a policy matter, mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful.") (citing *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004)). Accordingly, the Court should either dismiss this action or grant Defendants' motion for partial summary judgment.

Dated: November 23, 2026

Respectfully submitted,

JONATHAN D. GUYNN
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

ANTHONY P. NICASTRO
*Director*

By: */s/August E. Flentje*
AUGUST E. FLENTJE
*Deputy Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
U.S. Department of Justice, Civil Division
Washington, DC 20044
Tel: 202-514-3309
Email: August.Flentje@usdoj.gov

LESLIE McKAY
*Assistant Director*

RUSSEL J.E. VERBY
*Senior Litigation Counsel*

JASON K. ZUBATA
ALEXA PERLMUTTER
*Trial Attorneys*

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on November 23, 2026, I electronically filed the foregoing Motion for Defendants with the Clerk of Court for the United States District Court of the District of Columbia using the CM/ECF system. I also certify that Plaintiffs will be served through their counsel, who are registered CM/ECF users, via the CM/ECF system.

By: */s/August E. Flentje*
AUGUST E. FLENTJE
*Deputy Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
U.S. Department of Justice, Civil Division
Washington, DC 20044
Tel: 202-514-3309
Email: August.Flentje@usdoj.gov