UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

YAMIL LUNA GUTIERREZ, *et al.*,

Plaintiffs-Petitioners,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, *et al.*,

Defendants-Respondents.

Case No. 1:25-cv-01766-SLS

**PLAINTIFFS-PETITIONERS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S NOVEMBER 16, 2026 MINUTE ORDER**

# TABLE OF CONTENTS

**INTRODUCTION**..........1

**ARGUMENT**..........1

I. Witness Testimony Confirms That Defendants' Policy Is Contrary to Law..........1

II. Witness Testimony Confirms That Defendants' Policy Is Arbitrary and Capricious..........4

**CONCLUSION**..........10

## INTRODUCTION

The administrative record, independently and in conjunction with the October 14, 2026, agency testimony, already confirms that Defendants-Respondents ("Defendants") are unlawfully detaining noncitizens at Guantánamo without authority under the Immigration and Nationality Act ("INA") and adopted an arbitrary and capricious policy in violation of the Administrative Procedure Act ("APA"). At the government's insistence, the Department of Homeland Security ("DHS") witness provided further testimony that makes both violations even more stark. *See generally* ECF No. 138 ("SJ Cont. Hr'g Tr.") (attached as Exhibit A).

The DHS witness verified that: (1) detention at Guantánamo is functionally like a long-term detention facility in the United States where noncitizens are held before they are ready for transfer to their final destination country; (2) the agencies failed to consider important factors, like the availability of bed space in facilities with existing contracts (as an alternative to Guantánamo), and the costs associated with detention at Guantánamo as compared to the costs of detention at facilities inside the United States; and, (3) the agencies also failed to account for the differences between the way Guantánamo was used in the 1990s to house asylum seekers interdicted on the high seas and the way it is being used under the Guantánamo detention policy.

The Court should not entertain Defendants' invitation for any further delay of summary judgment. The Court should grant Plaintiffs-Petitioners' ("Plaintiffs") motion to declare the policy unlawful and vacate it.

## ARGUMENT

### I. Witness Testimony Confirms That Defendants' Policy Is Contrary to Law.

As this Court has explained, extraterritorial detention at Guantánamo is contrary to law to the extent it is like detention in the United States, rather than the custody "in the midst of the

execution of [detainees'] removal orders." ECF No. 53 ("MTD Op.") at 44–45. The record shows that detention at Guantánamo is *not* in the midst of executing removal orders, and the DHS witness's supplemental testimony only confirms that in at least two ways.

First, the witness testified that in the United States, detainees may be held at long-term detention facilities or be "staged for removal" in a short-term facility which are "generally limited to 72 hours." SJ Cont. Hr'g Tr. 24:16–25:8; *see also* ECF No. 108-3 ("SUF") ¶ 55. Both are authorized under 8 U.S.C. § 1231(g)'s authority for detention facilities "pending removal"—meaning before the individual has been transported out of the country, *see* 8 U.S.C. § 1101(g)—as opposed to the authority to maintain custody incident to carrying out a removal under 8 U.S.C. § 1103(a)(3). MTD Op. 44–45. Defendants have previously attempted to paint Guantánamo as a "[way] station" en route to their final destination, ECF No. 83 ("Status Conf. Tr.") at 12:18–20, but now seem to assert that *any* part of the removal process counts as being "amidst" the execution of the removal order, *see* ECF No. 115 ("Defs.' MSJ Reply") at 10. Indeed, the DHS witness not only testified that nothing in the Memorandum of Understanding limits detention at Guantánamo to only holding people for 72 hours, SJ Cont. Hr'g Tr. 24:12–14, he also agreed that "Guantánamo Bay detention facility [has] been used in a manner similar to a more general detention facility or a longer-term facility," rather than as a staging facility, *id.* at 24:18–21. But the Court has already concluded that detention at Guantánamo is unlawful if detainees are being detained at the military base "in the same manner as at any other detention facility where individuals are pending removal." MTD Op. 45. The witness testimony thus drives home what the record already reflected: Defendants have a policy of detaining noncitizens at Guantánamo in circumstances this Court has already identified as unlawful. *See* ECF No. 108-2 ("Plfs.' SJ Mot.") at 19–24.

Additionally, the DHS witness's testimony also confirmed another reason that detainees are not amidst execution of the removal order: Under the challenged policy, they are transferred to Guantánamo before it is even feasible to remove them to their final destination country. *See, e.g.*, Plfs.' SJ Mot. 23 (discussing how 66% of noncitizens did not have travel arrangements to their final destination). The witness acknowledged that when the agency is removing someone to a different country with a pitstop along the way, "travel arrangements would be made *in the U.S.* before they depart" and that they would *not* "leave the U.S. without having travel arrangements to their final destination." SJ Cont. Hr'g Tr. 30:8–19 (emphasis added). This directly undermines Defendants' arguments against the relevance of travel arrangements, *see, e,g.*, Defs.' MSJ Reply at 14, because the lack of travel arrangements for more than two thirds of those transferred to Guantánamo reflects that Defendants are not yet able to transfer them to their final destination.

Indeed, the DHS witness expressed concerns that detention at Guantánamo "could delay the removals" of noncitizens transferred there, SJ Cont. Hr'g Tr. 31:5, underscoring not only that they were not held amidst execution of the removal orders, but also the arbitrariness of the policy, as discussed below. *Infra* at 9–10. Defendants may try to rely on the witness's testimony regarding the various steps in the removal process, *see* SJ Cont. Hr'g Tr. 18:13–22:17, but that is entirely consistent with Plaintiffs' argument that class members are unlawfully taken out of the United States for *detention* rather than removal, because the agency has not completed all the steps it needs to take to carry out the removal to the final destination.[1]

---

[1] Other assertions the witness made regarding comparative costs of flights and quality of care at Guantánamo are not in the administrative record and, indeed, inconsistent with other parts of the record. *Compare* SJ Cont. Hr'g Tr. 14:6–7 ("Our flight hour cost rate is the same no matter where it's going."), *and* 12:15–16 ("All of our facilities have to meet a certain standard of quality of care."), *with* SUF ¶¶ 31 (flights on military aircraft much more costly per flight hour) (citing U-DOW-CAR-037), 128–31 (limits on who can be detained at or deployed to Guantánamo due to lack of routine medical care and limited transportation) (citing DHS-104–10).

Because Defendants are detaining noncitizens at Guantánamo without authorization under the INA, the policy is contrary to law and violates the APA.

## II. Witness Testimony Confirms That Defendants' Policy Is Arbitrary and Capricious.

The barebones administrative record in this case establishes the second, independent basis that the policy violates the APA: the policy is arbitrary and capricious because, *inter alia*, the agencies failed to acknowledge or reasonably explain a change in longstanding policy, and failed to consider obvious alternatives or important factors, such as cost. *See* Plfs.' SJ Mot. 25–35. The witness's supplemental testimony only underscores this deficiency.

1. Witness testimony confirms that Defendants failed to consider the obvious alternative of housing detainees at detention facilities in the United States. *See* Plfs.' SJ Mot. 30–34. Defendants now claim that, faced with the need to create 30,000 beds expeditiously, Guantánamo was a reasonable choice given (1) its use in the past to house migrants and the fact that it provides federally controlled bed space that is immediately available, and (2) that facilities in the U.S. were not a reasonable alternative because many are operated by local authorities, slower to bring bed space online, and have more limited availability. SJ Cont. Hr'g Tr. 10:19–12:2; 37:10–18; *see also* ECF No. 128 ("Defs.' Suppl. Br.") at 3–4 (noting "benefits of [Guantánamo] as a site that can provide nearly immediate, federally controlled, guaranteed bedspace"). But the administrative record contains no support for this post hoc rationalization, which Defendants raised for the first time in supplemental briefing. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (judicial review is limited to "the grounds that the agency invoked when it took the action").

There is nothing in the record suggesting that Guantánamo was selected because it provides immediate access to bed space that is under federal control, or that other facilities had limited availability. Indeed, witness testimony confirms that Defendants did not consider these factors at

all before they began transferring people to Guantánamo: The agencies did not assess overall bed space in the United States. Nor did they consider bed space at any particular facility that could have possibly been used as an alternative. SJ Cont. Hr'g Tr. 27:5–10. In fact, the DHS witness, who testified as to the agency's decisionmaking in promulgating and implementing the policy, did not know: (1) what the overall detained noncitizen population was in January 2025, right before DHS started flying people to Guantánamo, *id.* at 47:17–22; (2) how many free beds there were during that time period, *id.* at 47:23–48:3; (3) whether there was a bed space deficit, *id.* at 48:22–49:7; (4) whether the agency consulted with state, local, or private partners to determine whether additional bed space could be created at those facilities, *id.* at 28:3–11; 52:25–53:4; or, (5) whether the agency considered creating bed space at other facilities in the United States that, like Guantánamo, are also operated by the federal government, such as military bases, *id.* at 28:17–29:5. And despite claiming that beds came online "quicker than ever" at Guantánamo, the witness could not say whether this was actually quicker than creating bed space at existing detention facilities where DHS already has a contract. *Id.* at 63:24–65:25. Defendants did not even attempt to coordinate additional detention space at existing facilities with which DHS may already have contracts—and which likely had available bed space—before determining that detention at Guantánamo was the most reasonable option. *Cf.* Defs' Suppl. Br. at 6; *see also* SUF ¶ 134 (noting that as of April 14, 2025, "ICE's contractual detention capacity in the United States was 62,913" beds, of which only "48,056 beds were occupied") (citing ECF No. 108-35).

2. Witness testimony also confirms what is evident from the record: the agencies failed to consider important factors such as costs, and ignored the evidence in the record showing that detention costs are higher at Guantánamo than at U.S. facilities. The witness did not know basic information about cost that would have been important to consider prior to implementing the

policy. *See, e.g.*, SJ Cont. Hr'g Tr. 27:4 ("I don't know if [decisionmakers] considered the cost."); *id*. at 53:10–11 ("I don't know the average cost of detaining an individual" at Guantánamo); *id*. at 54:11–14 ("I don't know" whether "DHS consider[ed] the detention cost at Guantánamo versus detention in the United States."). The witness "[did not] know for certain" whether it costs more to detain someone at Guantánamo than at a facility in the U.S., *id*. at 58:8–11, but the record suggests that it does. *See, e.g.*, U-DOW-CAR-37 (noting that annually, ICE pays contractors "over $272,000 per detention bed to operate Guantánamo's MOC, compared to an average of about $57,000 per bed at ICE facilities in the United States").[2] The agencies' failure to assess costs, and their "complete failure" to "grapple with contrary evidence" in the record suggesting that Guantánamo detention costs many multiples more than U.S. detention, are each independent bases for vacating the policy as arbitrary and capricious. *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agencies must consider "important aspect[s] of the problem").

Defendants claim that they were not required to conduct a cost-benefit analysis, Defs' Suppl. Br. 6–7, and even if they were, it was outweighed by other concerns, SJ Cont. Hr'g Tr. 12:20–13:5. To start, Defendants have it backwards when they suggest that a statute must affirmatively require an agency to consider costs and, because neither 8 U.S.C. §§ 1231(e) or (g)

[2] Indeed, the Government Accountability Office just issued a report noting how "Guantanamo Bay involves substantially higher costs than facilities where ICE alone is paying for a similar number of beds." U.S. Gov't Accountability Off., *Immigration Detention: ICE Should Determine Cost Effectiveness of New Initiatives Before Continuing* 28 (Nov. 2026), https://perma.cc/LU3P-HZJP. The report also made other observations relevant to Plaintiffs' arbitrary and capricious claim, including the cost spent by the Department of Defense on flights; that ICE has "placed multiple noncitizens who had no criminal convictions or pending charges at Camp Six"; and, that "ICE officials stated that costs did not factor into the decision to use Guantanamo Bay and that conserving costs is not a goal for operation there." *Id.* at 27–29. While there is already ample evidence in the record, "the Court may take judicial notice of [a] GAO report." *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016).

contain such language, the agencies were not required to consider it. "To the contrary, cost-benefit analysis is a central part of the administrative process" and is "essential to reasoned" agency action. *Metlife, Inc. v. Fin. Stability Oversight Council*, 177 F. Supp. 3d 219, 240, 242 (D.C. Cir. 2016) (citing *Michigan v. EPA* 567 U.S. 743, 752–53 (2015) ("No regulation is 'appropriate' if it does significantly more harm than good.")). And the cases they cite do not support their broad proposition to the contrary. *See Michigan*, 567 U.S. at 752–53 (holding that the statutory term "appropriate" requires the agency to consider the cost of its action); *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 171–72 (D.C. Cir. 2025) (noting that the agency had in fact "analyzed … economic … considerations" and "reasonably found that the benefits outweighed the costs," and holding simply that the agency need not formally quantify that analysis).

The witness also suggested that the availability and accessibility of beds (how easily those beds can be utilized) outweighed any cost associated with using Guantánamo for detention. SJ Cont. Hr'g Tr. 13:1–14:9. Yet he could not state whether the agency considered accessibility and bed space at U.S. facilities before using Guantánamo, nor could he recall whether the administrative record contained information stating that accessibility is a factor the agency considers in making transfer decisions. *Id.* at 29:6–30:6. And when asked whether any of the other factors that DHS considers besides costs (such as medical care, geographic location, quality of facilities) necessitated transfer from U.S. facilities to Guantánamo, the witness stated that they did not. *Id.* at 54:21–55:3. In other words, people were moved to Guantánamo "irrespective of whether their placements [at U.S. facilities] at the time were appropriate." *Id.* at 55:4–7.

3. Defendants claim that Guantánamo was a reasonable choice because it was used in a similar manner in the 1990s to house migrants intercepted at sea. *See* Defs.' Suppl. Br. 3–4 (citing handbook on lessons learned from 1994-95 Operation Sea Signal); *see also* SJ Cont. Hr'g Tr.

37:10–18. And because it was used for "immigration related purpose[s]" in the past, Defendants argue there has been no change in policy. Defs' MSJ 34. They are wrong on both counts.

There are myriad, significant differences between Operation Sea Signal and the current policy, which Defendants fail to even acknowledge, let alone reasonably address. Operation Sea Signal was a "humanitarian assistance operation," that dealt with the specific, acute crisis of a mass influx of migrants fleeing their homes via sea. U-DOW-CAR-290, 295 (noting that thousands of migrants were rescued at sea and brought to the facility in a two-month span at the beginning of the emergency). The purpose of the operation was to quickly and safely house thousands of individuals interdicted on the high seas at a location outside of the United States where immigration officials could process them for repatriation or eventual entry into the United States. *See* U-DOW-CAR-290, 295, 297, 304, 333. Consistent with this humanitarian purpose, the migrants were housed in tent camps modeling a "village-type environment" and had a wide range of amenities and relative freedom of movement. U-DOW-CAR-318, 322–24, 313 (discussing support for self-governance of migrants in camps). They were not considered to be "detained" and were not in the legal custody of U.S. immigration authorities. *See* SUF ¶¶ 6–7; ECF No. 110-3 (Defs.' SUF) ¶ 7; *see also* U-DOW-CAR-304 (referring to mission as one of "housing" and "processing" migrants for admission, rather than "detention").

The current mission is starkly different. It is a detention operation that involves flying people who are already detained in facilities in the United States to Guantánamo for further detention. *Supra* at 2. Most detainees are held in the notorious Camp VI prison that was previously used to house law of war detainees, *see* U-DOW-CAR-124, 589-90; DHS-116, and they are in the custody of DHS, U-DOW-CAR-122 ¶ 4.1.1. And while Defendants may have contemplated housing 30,000 people in tents, nowhere remotely close to that number has ever been detained

there. *See* SJ Cont. Hr'g Tr. 55:18–23 (less than 900 people detained in Guantánamo *in total* since the beginning of policy); *id.* at 33:16–17 (13 people detained at time of hearing).

Defendants considered none of these differences. For instance, they did not consider the different costs or logistics involved in bringing ashore people who were picked up at sea, versus flying them over from the United States. They did not consider whether and which detention standards applied to migrants held at Guantánamo in the 1990s, and how those may be different than the detention standards that would apply to the current detainee population. They did not consider the difference between housing migrants in makeshift tents versus hard structure facilities such as the Migrant Operations Center and Camp VI. They did not consider whether the impact on military readiness may be different now, given changed geopolitical realities, compared to the 1990s. *See, e.g.*, ECF No. 129-1 ("SJ Hr'g Tr.") at 40:20–41:20. And they did not consider whether additional security considerations would be necessary given that the current detainees allegedly include "high-priority criminal aliens." U-DOW-CAR-119. Defendants cannot meet their burden of reasoned decisionmaking by simply pointing to a document that recounts lessons learned from a past, very different use of the same facility. They must "explain[] their decisionmaking"; their reasoning simply cannot "reasonably be discerned" "from the sparse administrative record" here. *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 145 (D.D.C. 2025).

4. The failure to consider important factors or obvious alternatives is not the only deficiency underscored by the DHS witness's testimony. The witness also revealed that he and others at the agency personally expressed concerns to decisionmakers that detention at Guantánamo could potentially make the removal process *more* difficult, SJ Cont. Hr'g Tr. 30:25–33:1; yet, the record is silent as to whether the agency considered that concern. Indeed, the witness gave two examples of how detention at Guantánamo slows down the removal process: because

there are no commercial flights out of Guantánamo, and relatedly, because it "didn't operationally make sense" to remove people from countries like Guatemala, El Salvador and Honduras from Guantánamo rather than directly from the United States. *Id*. at 61:2–16. But the discovery confirms that Defendants *have* transferred people from those Northern Triangle countries to be detained at Guantánamo. *See generally* ECF No. 108-5.[3] And when asked whether detaining only 13 people at Guantánamo was a reasonable solution to the bed space concerns that supposedly animated the policy, the witness testified that "operating within the MOU … makes it difficult to address … bed space concerns." SJ Cont. Hr'g Tr. 34:20–35:6. And the witness could not confirm whether the agency believed it actually had the choice *not* to act upon the Presidential memorandum if it believed that the policy it engendered was unreasonable. *Id*. at 68:13–19. In short, the DHS official's testimony, which was riddled with gaps and contradictions, did nothing to supplement the equally deficient administrative record in this case.

5. Finally, the witness believed that the Guantánamo detention policy was implemented within just a few days after the Presidential memorandum was issued on January 29, 2025, before the first flight executed the policy on February 4, 2025. SJ Cont. Hr'g Tr. 42:2–18. The barebones record reflects how little consideration went into the agencies' decisionmaking in that time.

For all of these reasons, both independently and (certainly) when taken together, the Guantánamo detention policy is the very archetype of an arbitrary and capricious decision.

## CONCLUSION

The Court should grant the Plaintiffs' motion for partial summary judgment and deny Defendants' cross motion for partial summary judgment.

---

[3] Plaintiffs have redacted the countries of origin from the chart produced on the docket as they are personal identifying information but can provide the Court an unredacted version upon request.

Dated: November 23, 2026

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Brett Max Kaufman (D.D.C. Bar No. NY0224)
Judy Rabinovitz
Noor Zafar
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
bkaufman@aclu.org
jrabinovitz@aclu.org
nzafar@aclu.org
ojadwat@aclu.org

My Khanh Ngo (D.D.C. Bar No. CA00219)
Kyle Virgien
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
mngo@aclu.org
kvirgien@aclu.org

Derek Poteet ±*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(703) 217-8374
dpoteet@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 420
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Kimberly Grano (D.D.C. Bar No. NY0512)
Pedro Sepulveda (D.D.C. Bar No. NY0637)
Ghita Schwarz (D.D.C. Bar No. NY0663)
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 946-7453
kgrano@refugeerights.org
psepulveda@refugeerights.org
gschwarz@refugeerights.org

Megan Hauptman (D.C. Bar No. 1780749)
INTERNATIONAL REFUGEE

Baher Azmy*
Shayana D. Kadidal (D.C. Bar No. 454248)
J. Wells Dixon
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, Floor 7
New York, NY 10012
(212) 614-6427
bazmy@ccrjustice.org
shanek@ccrjustice.org
wdixon@ccrjustice.org

*Attorneys for Plaintiffs-Petitioners*

**Pro bono representation certificate forthcoming*
*± Not admitted in D.C.; practice limited to federal courts*

ASSISTANCE PROJECT
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
(646) 939-7329
mhauptman@refugeerights.org