# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| YAMIL LUNA GUTIERREZ, et al., | ) | Civil Action |
| | ) | No. 25-1766 |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | November 16, 2026 |
| MARKWAYNE MULLIN, et al., | ) | 2:04 p.m. |
| | ) | Washington, D.C. |
| Defendants. | ) | |

* * * * * * * * * * * * * * * *

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE SPARKLE L. SOOKNANAN**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES**:

FOR THE PLAINTIFFS:
NOOR ZAFAR
LEE GELERNT
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2616
lgelernt@aclu.org
nzafar@aclu.org

FOR THE DEFENDANTS:
RUSSELL VERBY
ALEXA PERLMUTTER
JASON KYLE ZUBATA
Assistant United States Attorneys
US DOJ/Civil Division/OIL
PO Box 878
Ben Franklin Station
Washington, DC 20044
(202) 616-4892
russell.verby@usdoj.gov
alexa.perlmutter@usdoj.gov
jason.k.zubata@usdoj.gov

(**Appearances Continued**)

**APPEARANCES (continued):**

LESLIE M. MCKAY
DOJ-Civil Division
Poc Agostinho, Jean
1100 L St., N.W.
8142
Washington, DC 20530
(202) 307-0340
leslie.mckay@usdoj.gov

*This transcript is work product.*

*This transcript shall be considered null and void if the transcript is edited, printed, disassembled, screenshot, and/or copied in any manner by any party without authorization of the signatory.*

Court Reporter: Elizabeth Davila, RPR, FCRR
Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE COURTROOM DEPUTY: Your Honor, we are on the record this afternoon in Civil Matter 25-1766, Yamil Luna Gutierrez, et al. versus Markwayne Mullin, et al.

Counsel for the parties, beginning with the plaintiff, please approach and note your appearances for the record.

MS. ZAFAR: Good afternoon, Your Honor. Noor Zafar for plaintiffs.

THE COURT: Good afternoon.

MR. GELERNT: Good afternoon, Your Honor. Lee Gelernt for the plaintiffs.

THE COURT: Good afternoon.

MR. VERBY: Good afternoon, Your Honor. Russell Verby for the defense.

THE COURT: Good afternoon.

MR. ZUBATA: Jason Zubata for the defense.

THE COURT: Good afternoon.

MS. PERLMUTTER: Good afternoon. Alexa Perlmutter for the defendants.

THE COURT: Good afternoon.

MS. McKAY: Good afternoon. Leslie McKay for the defendants.

THE COURT: Okay. Before we begin, let me say a word about the fact that we are here for a second hearing.

My goal, in every case that is assigned to me, is to get to the right answer. I spend significant time with every case that is assigned to me; I give all parties a fair opportunity to be heard; and then I resolve the disputes applying the law that binds me as a district judge.

All of you have appeared before me. Some of you have worked alongside me, when I worked at DOJ earlier in my career. Not all of you who were at the last hearing are here today, but you should all know by now that I strive to be fair in every case; that I give you-all an opportunity to be heard.

You might think I am wrong, and that's fine. But you cannot fairly say that I do not give you an opportunity to make your arguments and be heard before I rule.

So imagine my surprise when I get supplemental briefs in this case, and I find out that the government had an objection to not being able to question the witnesses who testified at the last hearing despite never asking me for an opportunity to do that.

Plaintiffs' counsel emailed my chambers ahead of the hearing to confirm that I would be taking the testimony, the government was copied on that email; no objection. We show up here; the government spent a lot of time objecting to a lot of things, including whether I was going to seal the courtroom or not because I was going to elicit

classified information which, of course, never even came up. The government objected to issues before there were even issues to be raised when it came to that, but it never asked me once to question the witnesses.

I run my cases and my courtroom assuming that everyone appearing before me is operating in good faith. I don't play games.

So that footnote, which was, essentially, a preservation for appeal so that the government could go to the Circuit and say that I erred because I didn't give the government an opportunity to question the witnesses last time, in my view, was not made in good faith because the government never raised the issue.

I sincerely want to be able to continue assuming that everyone appearing before me is operating in good faith like I am. And whatever we may all think about this case or about the law, we should at least be able to do that.

We do not agree, that's why you-all are here; and I am here to resolve this dispute, and one side is not going to agree with how I do that. But as attorneys appearing before me, understanding my role, understanding how I have run this case from the beginning -- by giving all of you every opportunity to be heard, either in hearings or brief after brief after brief -- and taking a lot of time to review with care everything you have put before me, it is a

little bit disappointing that that is how the government chose to conduct itself.

So, with that, we are here for a second hearing so that I can resolve this objection that the government had and snuck into a footnote and give the government an opportunity to question the witnesses.

We will start with the first witness. You-all can question. If I have additional questions for the witness, I plan to ask them despite whatever agreement you have come to. If you are going to put a witness on the stand in my courtroom and ask questions, I will ask follow-up questions as I see fit. And if any of you sitting at the government's table would like any other opportunity to question the witness at any point, you are free to stand up, raise your hand, ask me before we leave the courtroom -- so that you are not wasting my time, you are not wasting counsel's time. Because now you will have to rebrief new supplemental briefs for me, and I have to read more briefs -- which I will do and which I have done throughout this case.

But I am perplexed as to why the government and all of the attorneys here and the attorneys not here, who were here last time -- and feel free to communicate that to them -- chose to conduct themselves in the way that they did.

I am not here for gotcha moments, and I am not

here to have you guys try to sneak stuff in. You will have an opportunity to appeal. Whoever loses will have an opportunity to appeal, that's how our system works. You get to make arguments, I have to resolve them. If you disagree with me, you can go to the Circuit.

But waiting, not raising objections, and sneaking them into footnotes to preserve your appeal on issues that we can deal with, is not operating in good faith.

Who is questioning the witnesses first?

Please call the witness, and let's get started.

MR. VERBY: The defense calls John Schultz to the stand.

THE COURTROOM DEPUTY: Sir, please raise your right hand.

(JOHN SCHULTZ, Government's witness, sworn.)

THE COURTROOM DEPUTY: Thank you, sir. Please be seated, then state and spell your name for the record.

THE WITNESS: John Schultz, J-O-H-N, S-C-H-U-L-T-Z.

DIRECT EXAMINATION

BY MR. VERBY:

Q. Mr. Schultz, can you just remind us how long you have worked for DHS, please.

A. 23 years.

Q. And all that time you have been in enforcement and removal operations?

A. That is correct.

Q. How long in your current position?

A. Officially in this position since October 4, 2026.

Q. That's an assistant director's position?

A. Yes, sir.

Q. In your current position as assistant director, do you also manage ICE air operations division?

A. That is correct.

Q. That includes also the flight management group as well?

A. ICE air operations covers all of the removal efforts through the ERO for either charter or commercial and, also, any domestic movements of aliens via planes.

Q. Thank you. Based on your 23 years of experience, how familiar are you with DHS removal operations?

A. Very.

Q. Does that familiarity include the basic steps in the removal process?

A. It does.

Q. And, also, does your familiarity extend to DHS practices with respect to detention of removable aliens?

A. Yes.

Q. Okay. In your previous testimony, you outlined the basic requirements for making a given detainee eligible for transfer to the Guantanamo Bay facility.

Do you remember that testimony?

A. I do.
Q. Can you just give us a quick, basic reminder of what those elements are.
A. Male, final order of removal, connection to a transnational criminal organization or drug conviction, and being in good health.
Q. Were there any sort of time limits imposed on the length of stay at Guantanamo Bay?
A. Yes. So they can't remain at Guantanamo Bay greater than 180 days post final order.
Q. During your previous testimony, do you recall explaining for the judge that the selection of detainees to be transferred to the Guantanamo Bay facility was ad hoc?
A. I do.
Q. Do you also recall mentioning that headquarters for DHS sent out an email solicitation to the field offices asking for the designation of potential detainees to be transferred to Guantanamo?
A. That is correct.
Q. Who in the field would those emails have gone to?
A. The field office directors.
Q. From the field office directors, where would those emails have filtered down to?
A. They would have filtered down to the individuals who were managing the cases.

Q. So those solicitation emails went to, generally, people who make normal detainee transfer decisions?
A. That is correct.
Q. What factors drive transfer decisions in your experience?
A. It may be lack of bed space, maybe, due to staging for final order of removal; maybe for -- to ensure that an alien gets appropriate medical care if they don't have that care at the current detention facility.
Q. Okay. You also said in your previous testimony that DHS also puts a premium on bed space.
Do you recall that statement?
A. I do.
Q. Why is DHS always putting a premium on bed space?
A. Because bed space is finite. So we need to be able to maximize our bed space when we have that ability to do so.
Q. Are all detention beds the same?
A. They are not.
Q. Are all detention beds controlled by DHS directly?
A. They are not.
Q. Who else controls beds for DHS?
A. It could be state or local governments, it could be a rider that we may have with the U.S. Marshals Service.
Q. Are contract facilities ever used?
A. Yes.

Q. So DHS would be, basically, renting beds from various sources?
A. That's true.
Q. Do local authorities ever limit DHS access to bed space?
A. They may limit access based on availability of their own need or based on changes in their administration.
Q. Does that create problems for DHS?
A. It does.
Q. How so?
A. It limits our ability to conduct enforcement operations in certain areas or necessitates us to have transportation available to move arrested aliens immediately.
Q. Okay. So transfers, are they sometimes used to alleviate those concerns?
A. Yes.
Q. Now, who has control over the bed space at the Guantanamo Bay detention facility?
A. United States government.
Q. Is U.S. government control over those bed spaces advantageous from a DHS perspective?
A. It is.
Q. How so?
A. Those beds are always available to us.
Q. In your experience during this time period, has the Department of War ever told DHS, You can't use any of the

bed spaces down at Guantanamo Bay?
A. No.
Q. I would also like to ask you, do you recall, in your testimony earlier before the judge, where you talked briefly about cost comparisons with respect to detention bed space?
Do you recall that testimony?
A. I do.
Q. Do all detention beds cost DHS the same?
A. They do not.
Q. What accounts for some of the differences?
A. Geographical location; the classification level of the facility and medical care that's available there.
Q. How about the quality standards of the particular facility?
A. All of our facilities have to meet a certain standard of quality of care.
Q. And the number of beds available, could that factor into the determination?
A. It could.
Q. So was cost the only basis on which these determinations are made?
A. No.
Q. Can the advantages a facility offers with respect to, say, location and security level overcome cost concerns?
A. Yes.

Q. Does the Guantanamo Bay facility offer advantages that outweigh any cost associated with that facility?
A. It does.
Q. And what would those be?
A. The beds are always available and accessible.
THE COURT: Can you repeat your last answer.
You said the beds are always available. And what's the second piece?
THE WITNESS: Accessible.
THE COURT: What does that mean?
THE WITNESS: It means we have the ability to access them and fly there, and we have a landing strip. We have no problem getting to the detention facility. The beds are always there where we can use them and we can always get to those.
BY MR. VERBY:
Q. What about the part about accessibility? You said you oversee the air operation division?
A. Yes.
Q. Is getting a removal charter flight in and out of Guantanamo Bay anymore difficult than getting one anywhere else in the continental United States?
A. No.
Q. Why is that?
A. It's a landing strip like anywhere else. We can land

there as easily as we can land in Alexandria, Louisiana; there is no difference.

Q. What are the cost differences with respect to getting a removal charter flight in and out of Guantanamo Bay versus any other facility in the continental United States?

A. Our flight hour cost rate is the same no matter where it's going.

Q. So no difference?

A. That is correct. No difference.

Q. Thank you.

In early 2025 you were a part of ERO, Enforcement and Removal Operations?

A. Yes.

Q. Remind us, what position did you hold back in early 2025?

A. Deputy assistant director for removal.

Q. At that point, had you become aware of the current administration's desire to step up immigration enforcement?

A. I did.

Q. Based on your experience back then, were ERO officials expressing concerns about bed space in light of the stepped-up enforcement?

A. Yes, they were.

Q. What sorts of concerns were you hearing?

A. I was hearing that there was a concern of reaching

100,000 beds.
Q. That was in early January 2025?
A. That is correct.
Q. You testified in court that using the Guantanamo facility for detention provides ERO and ICE with additional guaranteed bed space that is not always available in the U.S.
Do you recall that?
A. Yes.
Q. How does having that detention space at Guantanamo Bay help you with detention bed space in the United States?
A. It gives us the ability to free up the finite amount of beds that are in the United States, if needed.
Q. What could cause you to need more bed space in the United States at any given moment?
A. Enforcement operations.
Q. And using Gitmo, the Guantanamo Bay facility, to free up bed space in the U.S., it helps DHS with its detention operations in a couple of different ways, at least, would you say?
A. Yes.
Q. What would those be?
A. So we can -- our enforcement -- if we use Gitmo, it frees up the beds in the continental United States where we have greater flexibility to do further enforcement

operations.
Q. Please remind us, when was the decision made to use the Guantanamo Bay facility for detention?
A. The end of January 2025.
Q. When did the first detainees arrive in Guantanamo Bay, if you can remember?
A. February 4, 2025.
Q. So within a couple of days, a few days?
A. That is correct.
Q. In your 23 years at DHS, had you ever seen bed space acquired and used that quickly?
A. No.
Q. What usually slows down acquiring bed space and putting it to use?
A. The contracting process.
Q. From an ERO perspective, how was that ability to acquire that bed space and put it to use so quickly an advantage for DHS at that time frame?
A. Well, at that time frame, we were looking to ramp up bed space to about 100,000 beds. So this gave us an avenue to increase our detention population, if needed, quickly.
Q. Do you recall, from being in ERO in that time frame, whether all bed space in the U.S. was occupied?
A. I do not.
Q. Okay. Let me put it to you this way. Does bed space

only become a concern when all beds are occupied?
A. No. It's always a concern for ERO.
Q. Why is that?
A. Because we need beds -- it's been proven the most effective way to ensure somebody's removed from the United States is to have them detained, so we need detention bed space to successfully complete our mission.
Q. Are you familiar with the term "decompression"?
A. Yes.
Q. What does decompression mean?
A. It means to take a population from one detention location, say, maybe overcapacity or getting close to capacity, and we reduce that capacity by taking a number of aliens from that detention facility and moving them to another facility.
Q. Are there other reasons that DHS might decompress a given facility?
A. Well, we may do that if we know that we have got a large-scale enforcement operation coming up, so we create additional bed space within that area of operations.
Q. So decompression can be on a, let's say, facility basis?
A. It could be on a facility basis.
Q. How about a statewide basis?
A. It could be on a statewide basis.
Q. Regional basis?

A. If could be, if we're doing a regional operation.
Q. So how did having the Guantanamo Bay facility available help with decompression concerns?
A. Again, we can put final order of removals. We have got a nexus to the TCOs or drug criminal activity; and our males, who are healthy, we can move them over to Gitmo to free up bed space in the continental United States.
Q. Now, do you recall testifying in court earlier and describing the removal process itself as nuanced and having many steps?
Do you remember that?
A. Yes.
Q. What are the basic steps to move a given detained alien from a detention facility to their final country of removal?
A. Sure. So the first step is they need to have a final order of removal.
The second step is, they need to have a travel document if they are not from a country who has got an agreement for the electronic nationality verification process, which is, essentially, where we would send over a manifest, and they approve it for removal.
So if an individual doesn't have a travel document or a passport for the removal, we reach out to the foreign government, normally the consulate or embassy; we present our evidence to prove nationality or citizenship; a travel

document or a passport -- an emergency passport -- is issued, then we schedule a removal; either it's going to be a charter removal or a commercial removal. And then we await that removal date and then, hopefully, we remove them on that date.

Q. Is staging part of the removal process?

A. Staging is part of the removal process for -- primarily for commercial -- excuse me -- for charter flights. We'll stage them in hubs.

So it's, essentially, like an airport. For any of us going to the airport, everybody has got to get to a central location to meet the plane; the same thing happens with detainees. We bring them to a central location, that's called "staging"; and then we have the plane depart from there to the foreign destination.

Q. Do all of the steps you just described always occur in the same order?

A. They don't.

Q. Okay. Can two or more steps be working on the same track at the same time?

A. Sure. So we can be scheduling an individual's removal at the same time while trying to procure a travel document and getting a landing permit at the same time. So there could be three steps, there could be more steps going on at the same time.

Q. What can get in the way of completing all of the steps necessary to carry out a removal mission or remove a given alien?

A. So if a consulate or embassy has indicated that they would issue a travel document but a document isn't issued in time, if we believe a landing permit is going to be issued but that's not issued in time, if there is a mechanical issue on a charter flight or a commercial flight, if there is weather-related delays that would either cause a commercial removal to miss a connection or cause our charter to be delayed.

Also, if there is flight crew issues with our charters, that could also delay our missions. And if there is litigation, if the alien files a motion for a stay and that's granted or a motion for a temporary restraining order and that's granted, that will prevent us from removal at that time.

Q. What about health issues, can those get in the way of a removal?

A. Yes. All aliens are medically cleared for travel prior to going. So if the immigration health services corps deems them not healthy for removal, then they will not be removed at that time.

Q. You mentioned something called a landing permit. What is a landing permit?

A. A landing permit is, basically, a permission from a foreign government to the United States, or to ICE, to land our plane, our charter plane, in that country.
Q. So a landing permit can, sort of, fall under a diplomatic-type of problem?
A. Yes.
Q. So any of those issues we just discussed could delay the completion of a removal, correct?
A. That is correct.
Q. What happens to a given detainee when one of those issues comes into play and the removal is going to be delayed? What are the options for DHS?
A. So if a removal is delayed, then we maintain custody of the individual while we attempt to reschedule the removal.
Q. All right. So they can be held in place to wait for things to get cleared up?
A. Yes.
Q. Could they be moved to a different facility?
A. They could.
Q. Could they be moved to a different staging point?
A. They could be.
Q. So a person could, sort of, take a step back, in essence, in the process, if need be?
A. They could because, for instance -- Friday, with the ground stoppage, say somebody is on a commercial -- their

commercial flight gets canceled, you are scheduled to go on commercial on Saturday, you can't get on the next flight because there are already passengers for that flight, right?

So you may get bumped to, maybe, Sunday or Monday, right?

Same thing in our world. If a charter is canceled due to something on a Friday, the other charters already have deportees scheduled for the removal. So we may not be able to get another removal scheduled for three days, four days. In that time, we may not be able to hold that person at a staging center. So they will go back, and then they will come back for the removal.

Just like you would go -- if you were at Dulles on Friday and your commercial flight was canceled and it was rescheduled for Monday, you wouldn't remain at Dulles, you would go back home, and then you would come back to Dulles for the flight.

Q. Do you recall, in your prior testimony when answering some of the judge's questions, you indicated that the Guantanamo Bay facility has been used as an intermediary point or a way station?

Do you remember using those terms?

A. I do. I do.

Q. Is that kind of -- are those two terms that DHS uses in its parlance?

A. No. We don't use those terms.
Q. In the removal process, can a detainee be moved from one long-term detention facility to another long-term detention facility?
A. Yes.
Q. What circumstances would warrant that sort of move between detention facilities?
A. It just may be that we need the bed space at one facility and there is open bed space at another, and so we move that individual from one to another. We just -- there is a lot of moving pieces.
Q. So a detainee could go from one long-term detention facility to another long-term detention facility, and then to a staging facility?
A. That's correct.
Q. And then, if something falls through, they can be pushed back to another long-term detention facility?
A. That's correct.
Q. Now, you mentioned "staging" a few moments ago.
A. Yes.
Q. What is staging exactly?
A. So, in our removal terms, we say someone is being staged for removal to a short-term, typically, less than 72-hour facility, where we have groups of individuals going to one location on a charter flight so that they are at a hub, if

you will, and the flight goes directly from that location.
Q. Okay. Has the Guantanamo Bay facility been used in a manner similar to a staging facility?
A. Yes.
Q. Why are staging facilities generally limited to 72 hours?
A. They just don't have all of the resources as a long-term detention center.
Q. Did you have a chance to review the memorandum of understanding prior to testifying?
A. Yes.
Q. Does the memorandum limit the Guantanamo Bay facility to only holding people for 72 hours?
A. No. It does not.
Q. Does the memorandum specifically identify Guantanamo Bay as a staging facility?
A. No, it does not.
Q. In your experience, has Guantanamo Bay detention facility been used in a manner similar to a more general detention facility or a longer-term facility?
A. It has been.
Q. Is there anything in the memorandum of understanding that prevents the Guantanamo facility from being used in a manner similar to a more general detention facility?
A. Absent the alien can't be there greater than 180 days

post final order, no.
Q. So the only limit is the duration?
A. Yes.
Q. That limit is 180 days?
A. That's correct.
MR. VERBY: Your Honor, may I have a brief moment?
THE COURT: Sure.
(Whereupon, government counsel confer.)
MR. VERBY: Your Honor, no further questions at this time.
THE COURT: Thank you.
May I hear from the plaintiffs?
MS. ZAFAR: Your Honor, we do have a couple of questions, but I was wondering if we could get about 15 minutes to confer before we start?
THE COURT: Yes, of course. Not a problem.
MS. ZAFAR: Thank you.
THE COURT: We'll come back at 2:50.
MS. ZAFAR: Thank you.
THE COURT: No problem.
THE COURTROOM DEPUTY: All rise. This court will stand in recess for 15 minutes.
THE COURT: You can step down. Please don't speak with counsel during the break.
(Whereupon, a recess was taken.)

THE COURT: All right. Can the witness please re-take the stand.

All right. Mr. Schultz, you are still under oath.

May I have the plaintiffs' questions.

CROSS-EXAMINATION

BY MS. ZAFAR:

Q. Good afternoon, Mr. Schultz. I have just a couple of questions following up on your testimony from today.

Are you familiar with the administrative record in this case?

A. I am.

Q. In preparing for your testimony today, did you review the administrative record?

A. I did.

Q. Did you review any other documents in preparing for today?

A. My testimony from -- last time I was here.

Q. Did you speak to anyone other than your counsel in preparation for today?

A. No.

Q. Were you involved in creating and implementing the Guantanamo detention policy?

A. I was not.

Q. So how many people can currently be held at Guantanamo?

A. Just under 400 people.

Q. In creating and implementing the policy, did the decision-makers consider the cost of holding just a couple hundred people at Guantanamo?
A. I don't know if they considered the cost.
Q. Prior to moving people to Guantanamo, did you look into how much overall bed space there is in the U.S.?
A. No.
Q. Did you look at how much bed space there is at any particular facility in the U.S.?
A. No.
THE COURT: Can I just interject so that I am not repeating questions.
When you say "you," I assume you mean the agency and not Mr. Schultz personally?
MS. ZAFAR: Yes, Your Honor.
THE COURT: I just don't want to have to re-ask the questions from the perspective of the agency because he is, obviously, here representing the agency.
BY MS. ZAFAR:
Q. Did the agency consult with any state or local partners regarding creating bed space at U.S.-based facilities?
A. ICE has been working with all possible partners trying to find bed space.
Q. But did the agency specifically consult with partners to look into additional bed space that could be created at

U.S.-based facilities?
A. Could you repeat the question one more time.
Q. Sure. So prior to moving people to Guantanamo, did the agency consult with local partners, state partners, private partners who operate U.S. facilities -- whether additional bed space could be created at those facilities?
A. I am unaware of any discussions prior to moving individuals to Gitmo on February 4th.
Q. So you don't know if the agency consulted with local partners regarding bed space in the U.S.?
A. I cannot confirm.
Q. Did the agency consider using other facilities that are operated by the federal government that are inside the U.S.?
A. We -- yes.
Q. What facilities did the agency consider?
A. We have individuals detained at a military base.
Q. Prior to moving individuals to Guantanamo, did the agency consider creating bed space at those military facilities?
A. I am unaware of any discussions prior to moving the individuals to Guantanamo Bay on February 4th.
Q. Did the agency consider using military bases that are inside the U.S.?
A. Can you -- time period?
Q. Yes. Prior to moving people to Guantanamo during the

period when the decision-making was made as to how to implement the Guantanamo detention policy, did the agency consider housing people at military bases that are inside the U.S.?
A. I am not aware.
Q. Did you consider -- in your testimony earlier, you mentioned that one of the reasons that Guantanamo was selected was because of ease of accessibility.
Did you consider accessibility concerns or ease of accessibility at other facilities inside the U.S. prior to transferring people to Guantanamo?
A. When we look at bed space, ease of accessibility is one of the factors that we look at.
Q. So did you look at that factor with respect to facilities inside the U.S.?
A. It is one of the factors that we look at when we look at facilities.
Q. But prior to sending people to Guantanamo, did you consider that factor with respect to facilities in the U.S.?
A. That's been a factor that we consider in looking at facilities.
Q. Did you consider that factor as to any specific facilities in the U.S. prior to sending people to Guantanamo?
A. It's a factor that we look at when we look at the

facilities.

Q. Let me ask the question a little bit differently.

Is that information, that accessibility is a factor that you consider -- is that information contained in the administrative record?

A. I don't recall.

Q. Okay.

Now, with respect to travel arrangements, when you are removing someone to a different country and there is going to be a pit stop along the way, do they ever leave the U.S. without having travel arrangements to their final destination?

A. No.

Q. So you would -- they would never leave the U.S. and then make travel arrangements at the pit stop prior to their onward removal?

In other words, the travel arrangements would be made in the U.S. before they depart?

A. Yes.

Q. What are the terms that you use when a flight stops in one country en route to the final removal destination?

A. Transit.

Q. So that would be called a "transit stop"?

A. That's correct.

Q. Did you ever express any concerns about the

reasonableness of using Guantanamo for immigration detention?
A. I did.
Q. What were those concerns?
A. That it could delay the removals.
Q. I'm sorry. That it could delay the removals?
A. Yes.
Q. And how did you think it would delay removals?
A. We didn't -- if we didn't have the appropriate way to operationalize it -- if we didn't use it correctly, it would slow the operations down.
Q. And when you say "use it correctly" what do you mean by that?
A. If we didn't have an appropriate plan to use it efficiently, it would slow our removal operations down.
Q. When you expressed these concerns, were they addressed or were they taken into account as the policy was being implemented?
A. When we initially began using Guantanamo, we needed to quickly use the bed space that was available there. As our use evolved, we were able to make it so that it operationally made sense.
Q. When you say "operationally made sense," what does that mean?
A. So, for instance, we began removing individuals from one

nationality through Gitmo utilizing the bed space at Gitmo. These individuals, we had removal flights to their country that were operating once a month. So we were able to detain them at Gitmo while awaiting their removal flight that occurred on a cadence of one time per month.

We weren't slowing down the removal by placing them in Gitmo and slowing down the process. We were opening bed space in the continental United States by moving these individuals who had to be detained until that once-per-month flight at Gitmo. And then once that one-time-per-month flight occurred, we removed them from Gitmo. So we developed a plan that made sense operationally for us.

Q. And this operational concern that you have just articulated, is this reflected in the administrative record?

A. I don't recall.

Q. Did anyone else express concerns about the reasonability of using Guantanamo for immigration detention?

A. Some of my colleagues.

Q. Can you describe what their concerns were?

A. Just that it slowed down the process.

Q. Were there steps taken to address this concern; are they the same steps you have just mentioned?

A. Yes.

Q. And is this concern and the attempt to address it reflected in the administrative record?

A. I don't recall.

MS. ZAFAR: Thank you.

THE COURT: You can have a couple of minutes. Go ahead.

(Whereupon, plaintiffs' counsel confer.)

BY MS. ZAFAR:

Q. Just a couple more questions.

How many people are currently detained in the U.S.?

A. Roughly 68,000 people.

Q. 68,000?

A. That is correct.

Q. You mentioned a few dozen people are sent to Guantanamo, roughly?

A. Thirteen people.

Q. Thirteen people currently at Guantanamo?

A. That's correct.

Q. How does that, in your understanding, ease up bed space, when there are 68,000 people and 13 are being held at Guantanamo?

A. Because that gives us -- you know, again, we utilize Guantanamo to free up any bed space because it's all a valuable resource for the United States. There are parameters in place that we need to work through with the MOU -- again, their final orders, they are males, they are

in good health, they have a connection to a transnational criminal organization or a drug conviction. So since we operate within the MOU, we can't -- we can't take all final orders or all cases and move them to Gitmo.

Q. So given everything that you have detailed today in your testimony about the cost and the logistics and other factors that go into detaining people at Guantanamo, in your estimation, is it a reasonable choice to detain -- to use that to detain 13 people?

MR. VERBY: Your Honor, objection.

It's an argumentative question. It's up to the Court to decide whether the policy is reasonable. The witness is not here to do that.

THE COURT: Overruled.

THE WITNESS: Again, I think it gives ICE the ability -- any additional flexibility we have regarding bed space is a valuable resource to the United States government.

BY MS. ZAFAR:

Q. I am trying to understand the reasonableness of the policy and whether the individuals who were decision-makers and implementing the policy, such as yourself, believed it to be a reasonable solution to the bed space issue as one of the issues that you identified it was trying to solve for.

So given that it's currently holding 13 people and

the total detained population is 68,000, do you think it is a reasonable policy to address bed space concerns?
A. I think operating within the MOU as it is currently makes it difficult to address at a greater impact our bed space concerns. If we're able to operate outside the MOU, then we would have greater impact on our bed space concerns.
MS. ZAFAR: Okay. Thank you.
THE COURT: Okay. Do the defendants have any additional questions for this witness?
MR. VERBY: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. VERBY:
Q. Mr. Schultz, you said there are roughly about 68,000 detainees currently?
A. That's correct.
Q. What's the number of beds roughly?
A. The number of beds fluctuates, but I believe it's somewhere in the 73,000; possibility.
Q. Is that number today higher than it was back in January of 2025, when all of these decisions were being made?
A. It is.
Q. Now, the decision to use Guantanamo Bay came out of -- or the order to use Guantanamo Bay came out of a presidential declaration, correct?
A. That is correct.

Q. And as you said earlier, there were concerns that you were going to need 100,000 beds at that time frame?
A. That's correct.
Q. So that would have easily overwhelmed what was available?
A. Yes.
Q. Do you recall, from looking at the administrative record, whether there was any particular number of beds that might have become available at Guantanamo Bay?
A. 30,000.
Q. So you still would have been under water?
A. Yes.
Q. And, again, these beds came online and were able to be used quicker than any beds you have ever seen in your 23 years of experience?
A. That's correct.
Q. Now, you gave, a few moments ago, your personal opinion that you had some concerns initially with using Guantanamo Bay?
A. Correct.
Q. And that some other people in ERO expressed similar concerns?
A. That's correct.
Q. They were not the decision-makers, were they?
A. No.

Q. So this was just scuttlebutt, talking around the water cooler-type stuff?
A. That's correct.
Q. In your 23 years, has management at DHS ever made a decision that you didn't agree with or your colleagues didn't agree with?
A. Yes.
Q. But you carried out the decision?
A. That's correct.
Q. I will ask you one last thing. Based on your understanding, the facility at Guantanamo Bay historically had served a migrant detention operations function?
A. That's correct.
Q. And it had performed it very well, correct?
A. Yes.
Q. Natural choice to use when we needed 100,000 beds and could find 30,000 if we needed it, correct?
A. Correct.

MR. VERBY: Thank you.

No further questions at this time, Your Honor.

THE COURT: Okay.

Mr. Schultz, thank you for being here again. I have some questions for you, and let me just start with the timing of the decision that was made.

You testified that this decision was made at the

end of January. The President's memorandum, which prompted this decision, was issued on January 30; is that right?

THE WITNESS: I thought it was January 28, 29, but I could be wrong.

THE COURT: Okay. Let me double-check.

But whatever the date between the 28th or the 30th, and then this decision was made at the end of January, you said.

So this decision was made on January 31st then? In a matter of days, or one day?

Let me pull up the memorandum so I know exactly what we're talking about.

Can you answer my question?

THE WITNESS: I didn't understand.

THE COURT: The decision to send individuals to Guantanamo, that was made in a matter of days?

THE WITNESS: Yes. Individuals were there February 4th, so the decision was made shortly thereafter.

THE COURT: Well, the decision was made after you started sending people or before you started sending people?

THE WITNESS: After the memorandum was issued.

THE COURT: Just answer my question.

Okay. So let me pull up the date.

January 29 the memo comes down, the first flight is February 4th.

You testified earlier the decision was made in late January. So that leaves January 30 and January 31st as the potential dates the decision was made; is that right?

THE WITNESS: When I say the decision -- I'm sorry. When I say the decision was made to send people to Guantanamo, I was referencing the memorandum. I'm sorry.

THE COURT: Okay. When was the decision made in this case to send civil immigration detainees to Guantanamo?

THE WITNESS: The President issued a memorandum at the end of January, January 28th. So --

THE COURT: January 29th.

THE WITNESS: January 29th --

THE COURT: But I am not talking about the memorandum. I am asking you when the agency made the decision. Because the agency made its own decision to send individuals to Guantanamo; isn't that right?

THE WITNESS: Okay. I don't know the exact date between January 29th and the individuals getting moved there on February 4th.

THE COURT: Okay. But the decision, then, was made at some point between January 29th and February 4th?

THE WITNESS: I don't know when the decision was made.

THE COURT: You don't know when the decision that's being challenged was made?

Was the decision made before the first flight or after the first flight? How would people be sent to Guantanamo if a decision had not yet been made?

THE WITNESS: The decision was made before the individuals were sent there.

THE COURT: Okay. So then -- that's what I'm asking. I just want to make sure I am not missing anything.

The memorandum happens on January 29th, the first flight is on February 4th. So the decision was made between January 29th and February 4th?

THE WITNESS: That would be my understanding.

THE COURT: When were arrangements made for the February 4th flight, the first flight?

I mean, I assume they didn't just happen. You can't just wake up and get people on planes to Guantanamo. When were those arrangements made for the February 4th flight?

THE WITNESS: I do not know that.

THE COURT: Okay. You are familiar with the administrative record?

THE WITNESS: I looked through the administrative record.

THE COURT: And you are here to testify on behalf of DHS?

THE WITNESS: Yes.

THE COURT: You don't know when arrangements were made for that first flight that was on February 4?

THE WITNESS: I do not.

THE COURT: Okay. How long does it take to make arrangements to get individuals loaded on a plane and sent to Guantanamo, typically?

THE WITNESS: If I needed to get individuals to Guantanamo, I can get -- have them loaded and sent in a day or two.

THE COURT: In a day or two, okay. So maybe a day. So then the decision, then, was made at some point between January the 30th and February the 3rd, and then a day to get them there is your understanding of how this happened?

THE WITNESS: It could have been, yes.

THE COURT: What do you mean "it could have been"?

THE WITNESS: I can't speak for certain. I don't know the answer.

THE COURT: You don't know when the decision was made?

THE WITNESS: For that flight, I do not.

THE COURT: I don't mean for the flight. I am saying the decision to send these individuals to Guantanamo.

When did DHS make that decision? -- because it's the thing we're all here to talk about, is whether that

decision was lawful.

So I am asking you, that decision was made at some point between January 29th and February 4th; is that right?

THE WITNESS: I don't know when that decision was made. I would guess that it was made after the President's memorandum was issued on January 29th and prior to the aliens arriving on February 4.

THE COURT: Okay. I don't want you to guess because you are testifying under oath. If you don't know the answer, you can tell me you don't know the answer.

But the policy that's being challenged was adopted in response to the presidential memorandum that happened on January 29th, and the first flight executing that policy was on February 4th. So I look at those dates and, from that, I am asking you, as DHS's witness: Was the decision made between January 29th and February 4th?

Do you know or do you not know?

THE WITNESS: I don't know that answer.

THE COURT: Okay. So when was this consideration of bed space, which you previously told me was the sole reason for the adoption of this policy -- when were those discussions happening about bed space?

THE WITNESS: Well, at the beginning of the administration, the talk was that we needed to get space up to 100,000. And so, in the administrative record, it says

Guantanamo could, maybe, take up to 30,000 beds.

THE COURT: But DHS adopted this policy in response to a presidential memorandum that was issued on January 29th. And so I am not talking about general discussions because we're talking about the policy that's being challenged.

When did DHS have discussions about bed space that led to it adopting this policy? Is it in those couple of days, from January 29th to February 4th?

THE WITNESS: DHS has always had a discussion about bed space and trying to acquire bed space.

THE COURT: But you testified for me last time that you adopted this policy to create additional bed space.

So in connection with the adoption of this policy that is being challenged, when did DHS have discussions about bed space?

THE WITNESS: I said that bed space was always at a premium and having additional bed space created additional enforcement flexibilities.

THE COURT: Is it not your testimony that DHS adopted this policy to create additional bed space?

THE WITNESS: It gave us additional bed space, that's correct.

THE COURT: Last time you were here, you told me that was the sole reason for this policy. Is that still

your testimony?

THE WITNESS: Did I say it was the sole reason?

THE COURT: I can read your transcript back to you, Mr. Schultz, but I know you read it in preparation for today.

But I said to you: "But you are telling me that the reason they were housed at Guantanamo is that the government wanted to create additional bed space; is that right?

"ANSWER: That is correct, Your Honor."

"THE COURT: Is that the government's only reason for determining -- sorry -- for detaining these individuals at Guantanamo, or are there other reasons?

"ANSWER: That is my understanding; that it was for additional bed space.

"THE COURT: So it's your testimony that the government decided to send immigration detainees to Guantanamo solely to create additional bed space?

"I am not trying to trick you. I just want to make sure I understand. I am trying to understand the reason for why these individuals, immigration detainees, were sent to Guantanamo as opposed to a detention facility in the United States. And they -- obviously, they were moved from detention facilities in the United States.

"And so is it your testimony that the reason the

government sent these individuals to Guantanamo is to create additional bed space?

"ANSWER: Yes, Your Honor."

THE COURT: So I will ask the question again.

Did DHS adopt this policy solely to create additional bed space, as you testified under oath the last time you were here, or do you have additional reasons for me today?

THE WITNESS: No. It's my understanding that we had a need for additional bed space and to create -- increase enforcement flexibility.

THE COURT: So DHS's sole reason for adopting this policy was to create additional bed space; is that right?

THE WITNESS: Yes.

THE COURT: Okay. You testified earlier about -- when you talked about the advantages of Guantanamo, you talked about bed space, and you talked about the accessibility of Guantanamo.

Is that an additional reason why you adopted this policy, or is it just bed space? And was accessibility something else you are talking about that had nothing to do with why DHS adopted this policy?

Again, I am not trying to trick you.

I have to determine whether this policy is lawful or not. I need to understand the reason you adopted the

policy. That is the reason why we're having this hearing to begin with, is because in the administrative record it doesn't tell me what the reason is.

So the last time we were here, you told me the sole reason was bed space. Today you talked about accessibility. Is that a second reason, or were you just mentioning that as an aside?

THE WITNESS: I was mentioning that it was no different to get to Guantanamo than it was another place.

THE COURT: I understand that.

I am just asking you is that -- was that a reason that factored into why you adopted the policy or is the policy solely about bed space, and that just happens to be an advantage of the policy that you adopted?

THE WITNESS: I think it's solely about bed space.

THE COURT: It's solely about bed space. So accessibility just happened to be another advantage?

THE WITNESS: Yes.

THE COURT: Okay. So you testified that there are 68,000 people detained in the U.S. and 73,000 beds. The government asked whether that bed capacity was lower in January 2025; you said yes.

What was the capacity in January 2025?

THE WITNESS: I am not exactly certain what the number was. But I recall it being somewhere in the low 30s,

30,000 number, but I am not 100 percent certain.
THE COURT: So you are telling me -- I think you might be misunderstanding my question.
There are 68,000 people detained. You said there were 73,000 beds in the U.S.
Government counsel said to you: Was that number lower in January 2025?
You said yes.
What was that number in January 2025?
THE WITNESS: Again, it was somewhere around 35,000, I understand.
THE COURT: Wait. Additional beds available or total capacity?
THE WITNESS: Total beds.
THE COURT: So where are the 68,000 people?
THE WITNESS: That is today.
THE COURT: Okay. So how many people were detained in January 2025?
THE WITNESS: I don't know that number.
THE COURT: You don't know how many people were detained?
THE WITNESS: In January -- I don't, no.
THE COURT: And you don't know the number of beds; you know it's about in the 30,000s?
THE WITNESS: Yeah. I believe it was somewhere in

the mid-30,000 range.

THE COURT: How many free beds were there?

THE WITNESS: I don't know that number.

THE COURT: Okay. How did you know that there was a bed space problem if you didn't know how many free beds were available in the United States?

THE WITNESS: I know that they were talking about needing 100,000 beds. And I know at the time -- beginning in January 2025, we were nowhere close to 100,000 beds.

THE COURT: Okay. I want to talk about that in a second, too, but I just want to make sure I am understanding.

The reason you think there is a bed space problem is because you anticipated needing 100,000 additional beds, not that there was a bed space deficit at the time?

Was there a bed space deficit at the time?

THE WITNESS: If we increased --

THE COURT: In January -- Mr. Schultz, I need you to listen to my questions and I need you to answer them. If there are other things you want to say, counsel is free to elicit them after.

In January 2025 was there a bed space deficit in the United States?

Were there less beds than individuals who needed to be detained?

THE WITNESS: I don't know if people were being released from custody due to lack of bed space in January 2025.

THE COURT: You don't know whether there was a deficit, whether you had more people you wanted to hold than you had beds; is that correct?

THE WITNESS: That's correct.

THE COURT: Okay. So where did this 100,000 number come from?

THE WITNESS: That was a number that was being talked within ICE headquarters.

THE COURT: When? And who? Where did it -- who came up with that number?

THE WITNESS: I don't know who came up with that number. It was just a number that was being discussed at higher levels within ICE leadership, that 100,000 beds is what we were looking to have.

THE COURT: Why?

THE WITNESS: Due to the presidential mandate to secure the borders.

THE COURT: And when were these 100,000 people supposed to need bed space?

THE WITNESS: Once they're arrested.

THE COURT: But when? We're in January 2025. I am trying to understand the agency's decision-making.

Did you expect 100,000 people to be detained within a week, within a month, within a year?

Unpack the 100,000 number for me.

THE WITNESS: So the agency expected that the beds would come online, would become available --

THE COURT: That's not my question.

You said you needed 100,000 beds because the current administration was going to increase detention, immigration detention.

When were those 100,000 people supposed to be detained? Was it over the course of a week, a month, several months, a year? What was the timeline for needing the 100,000 beds?

THE WITNESS: So ERO -- the U.S. government granted title and authority to a number of federal agencies --

THE COURT: Can you answer my question?

What is the timeline for when you would need the 100,000 beds?

THE WITNESS: So there is no timeline for when the 100,000 beds --

THE COURT: So you don't know how the 100,000 number came up -- how you came up with the number, who came up with it, what it represented, or when you would actually need those beds; is that right?

THE WITNESS: That's right.

THE COURT: Okay. So anticipating that you would need 100,000 beds at some point in the future -- we don't know -- did you contact any facilities in the United States to see whether beds could be made available for these 100,000 people?

THE WITNESS: The agency was contacting facilities and trying to bring on beds.

THE COURT: Which agencies -- which facilities did the agency contact? And when?

THE WITNESS: I don't have a name list.

THE COURT: When did the agency make those calls?

THE WITNESS: Earlier in the administration, they began --

THE COURT: Where in the administrative record can you point me to to reflect that those calls were made?

THE WITNESS: I don't know if it's in the record.

THE COURT: Okay. The last time you were here, I asked you: Did DHS consider any alternative detention site that would create additional bed space?

You said, "I do not know."

So today you are telling me that you do know that the agency contacted other facilities to find out if there was bed space. Which is correct?

THE WITNESS: The agency has -- sorry. I don't

know for certain exactly who or when was contacted to look for additional bed space.

THE COURT: Answer my question, please.

The last time you told me you don't know. Today you told me you do know that facilities were contacted.

Do you know or do you not know if facilities were contacted about bed space before making this decision?

You are under oath. And you are continuously giving me answers that appear to contradict with the answers you gave me the last time we were here and that are not in the administrative record.

You are under oath, Mr. Schultz.

THE WITNESS: Right.

I don't know for certain.

THE COURT: You don't know for certain.

THE WITNESS: Right.

THE COURT: So why did you just tell me that the agency did contact other facilities to find out if they could accommodate bed space?

THE WITNESS: I misspoke.

THE COURT: You misspoke?

THE WITNESS: Yes.

THE COURT: Okay. Let me just be clear about your answer now.

With respect to my question, did the agency

contact other facilities to figure out if they could create bed space, what is your current answer?

Yes, no, or I don't know?

THE WITNESS: I do not know.

THE COURT: Okay.

You testified earlier that removal flights are as easy from Guantanamo and cost about the same from Guantanamo as U.S. detention facilities. Tell me, what is the average cost of detaining an individual at Guantanamo?

THE WITNESS: I don't know the average cost of detaining an individual.

THE COURT: You don't know the answer to that?

THE WITNESS: No.

THE COURT: You have worked at the agency for 23 years, I believe counsel said to me multiple times, and you are not familiar with the average cost of detaining an individual at Guantanamo?

THE WITNESS: I don't know the cost.

THE COURT: What is the average cost of detaining an individual at a detention facility in the United States?

THE WITNESS: It's $152.

THE COURT: Over what time period?

THE WITNESS: The average cost currently is $152 per day.

THE COURT: Per day, okay, in the U.S.

You are telling me that having been involved in and here to testify about the Guantanamo policy under oath, you have no idea what it costs to detain an individual at Guantanamo per day.

THE WITNESS: I don't know what the total -- I don't know what the dollar figure per day at Guantanamo is, no.

THE COURT: You have no idea about any costs with respect to individuals at Guantanamo?

THE WITNESS: I do not know the detention cost.

THE COURT: Okay. So let me ask you this. Did DHS consider the detention cost at Guantanamo versus detention in the United States?

THE WITNESS: I don't know.

THE COURT: Okay. I heard you testify earlier that it's not all about cost because detention is not the same everywhere, that you look at geographic locations, you look at classifications, you look at medical care, you look at quality of facilities; is that all right?

THE WITNESS: That's correct.

THE COURT: Okay. For the individuals who are transferred from Guantanamo -- sorry -- from detention facilities in the United States to Guantanamo, was there an issue with the facilities where they were detained such that they needed some different type of detention at Guantanamo?

Were there medical issues? Were there classifications issues? Was there a geographic need?

THE WITNESS: Not that I am aware of.

THE COURT: So when you moved individuals to Guantanamo, it was irrespective of whether their placements at the time were appropriate?

THE WITNESS: That's correct.

THE COURT: You didn't move people because you didn't have a detention facility in the United States that was appropriate for them based on their classifications and medical needs?

THE WITNESS: Could you repeat that?

THE COURT: You didn't move people from U.S. detention facilities to Guantanamo because they were not in an appropriate facility based on their classification, medical needs, geography?

THE WITNESS: No.

THE COURT: Okay. This initial estimate of 100,000 people that you needed to make space for -- we don't know across what timeline -- you eventually detained how many people at Guantanamo?

THE WITNESS: I believe there's been just under 900 people total.

THE COURT: Okay. Are there any facilities in the United States who could have accommodated 900 people, in

your 23 years of experience?

Were there places in the United States where you could find 900 beds to accommodate the 900 people who were sent to Guantanamo?

THE WITNESS: At the time that the aliens were placed in Gitmo?

THE COURT: Correct.

THE WITNESS: I don't know for certain.

THE COURT: You are telling me you don't know if at any given time there is a surplus of 900 beds at detention facilities in the United States?

THE WITNESS: I don't know if every single time an individual is transferred to Gitmo -- I don't know what kind of detention capacity was available at the time of the transfer.

THE COURT: When was the last time there was a bed deficit across the entire United States?

THE WITNESS: We were coming very close maybe two months ago.

THE COURT: What was the deficit then?

THE WITNESS: We weren't in a deficit, we were getting close to a deficit. We were --

THE COURT: What was the delta?

THE WITNESS: We were at 73 -- low 73,000; so we were getting very close to our top-end number.

THE COURT: And at that point, I guess -- you told me 68,000, so your delta was about -- you had -- getting low is about 5,000 beds?

THE WITNESS: No, no, no. We were at -- so we're currently, today, at 68,000.

THE COURT: Okay.

THE WITNESS: So a few months ago, we were at about 73,000 detained. So we were very close to our top-end number a few months ago. Not today. I am not talking 68,000 versus 73.

So a few months ago, we were very close to getting to the point where there was extreme concern that we were going to be at full capacity.

THE COURT: How many people did you send to Guantanamo amidst those concerns?

THE WITNESS: I don't know how many people were in Guantanamo two months ago.

THE COURT: How many of them are there today?

THE WITNESS: There's 13 people today.

THE COURT: Okay. You don't know anything about detention costs at Guantanamo.

Tell me about the costs of transporting people to Guantanamo.

THE WITNESS: So we pay our contract -- flight to do a travel to Guantanamo; we have planes that go from Miami

to Guantanamo. It's no more expensive than going from the same distance; going from Miami to, say, New Orleans.

THE COURT: So the transportation costs are the same, and you know that; but the detention costs you don't know?

Is it more expensive to detain someone at Guantanamo?

In your 23 years of experience, do you know if it costs more to detain someone at Guantanamo than at a facility in the United States?

THE WITNESS: I don't know for certain.

THE COURT: Well, you shouldn't testify about anything you don't know for certain, sir, because, again, you are under oath.

Tell me a little bit about your role with respect to Guantanamo. I am trying to understand how you can sit here knowing the cost to transport people there -- because you know it's the same, it's the same -- but you have no idea what it costs to detain someone at Guantanamo.

THE WITNESS: So my function, my role is -- I am the assistant director over removal. I manage the flight program, which is the planes and the transport of individuals from the United States to their countries, or movements of aliens throughout the United States; also, the procurement of travel documents for the removal and the

scheduling of the removal.

Absent and apart of my role, there is an assistant director who is over our custody management who is responsible for the contracting of bed space and costs, and that information. So that's why when you ask why I know the cost of the planes versus the cost of the beds, that's the reason.

THE COURT: Okay. And is there anything in the administrative record to show that DHS considered the cost of detention at Guantanamo versus U.S. detention?

THE WITNESS: I don't recall seeing it.

THE COURT: Okay. Is cost something that DHS takes into account at all?

Understanding that there are other concerns which I heard you testify about. I certainly understand a scenario where I have an individual who needs to be detained -- right? -- and Guantanamo has certain security levels that's needed for some individual -- some population of individuals. And so, in that scenario, the cost may not be determinative, right?

If there is not a detention facility in the United States that can appropriately house individuals based on their classifications, it doesn't matter.

But if you are detaining someone, you know, with no classification needs, where a U.S. detention facility can

detain that person in equally the same way, would it matter to DHS that it cost many, many multiples to detain someone at Guantanamo than it does at a detention facility in the United States?

THE WITNESS: I don't know the answer to that.

THE COURT: You don't know, okay.

You were not involved in the decision to adopt the policy being challenged at all?

THE WITNESS: I was not.

THE COURT: So how did you prepare for this hearing to come explain to me the reason for the decision and what alternatives, if any, the agency considered?

THE WITNESS: I reviewed the portions of the administrative record, the MOU, consulted with the attorneys.

THE COURT: And that's it?

THE WITNESS: That's correct.

THE COURT: Okay.

Let me make sure I don't have anything else for you because I do not want to have to bring you back here a third time.

Can you tell me a little bit more about these concerns you testified about earlier, about Guantanamo. So they seemed to all stem from it slowing down the process. I am not quite sure I understand how it would slow down the

process if it's just as easy to get someone to Guantanamo.

How would it slow down the process?

THE WITNESS: So if you look at the MOU -- right? -- it says that the individuals had to be on final orders of removal. We knew operationally it makes sense to send individuals who are removed via a charter flight -- right? -- because there is no commercial airfare from Guantanamo.

If we send people from Guatemala or Honduras to Gitmo, it slowed down the removal because they could easily go directly to their country rather than going to Gitmo first. So when I say my concern was it was slowing down the removal, we were sending a population where it didn't make sense, like, somebody from the Northern Triangle, from Guatemala, El Salvador, Honduras -- Guantanamo versus directly sending them home didn't operationally make sense. That's why -- started putting more thought into the process, identifying countries where our removal flights were spread out periodically, maybe once a month, where it wasn't slowing down, it wasn't creating additional time and detention for the aliens; and so that's what I meant.

Like -- you know, if it slowed down the removal -- if they were going to spend more time in detention by going to Gitmo versus going home, it didn't make sense.

THE COURT: It doesn't save you any time to send

someone from -- who is already detained at a U.S. facility to Guantanamo than it would to send a newly detained person to Guantanamo; is that right?

You testified earlier that, you know, it's just as easy and the same price to go from, say, Miami to New Orleans as Miami to Guantanamo. So it's not any easier to, say, move someone who is already detained in New Orleans to Guantanamo than it is to send a newly detained person in, say, Texas or New Orleans to Guantanamo; is that right?

THE WITNESS: Right. It would be the same if --

THE COURT: It's the same. So if there was this great concern about bed space, why move individuals who are already detained, already at their facilities to Guantanamo instead of sending newly detained individuals once there was a deficit to the additional bed space that was created at Guantanamo?

THE WITNESS: I don't know the answer to that.

THE COURT: Okay. You testified a couple of times about -- that it was quicker than ever. In your 23 years of experience at DHS, you had never seen beds come online that quickly; is that right?

THE WITNESS: That's right.

THE COURT: But you don't know if anyone called detention facilities in the United States to find out if they had beds that could come online?

THE WITNESS: I don't.

THE COURT: So then what's the basis for you saying that what happened here was quicker than ever, the beds coming online?

What is the basis for that testimony that you gave and, I think, both times counsel asked you about under oath?

What's the basis for the "quicker than ever"?

THE WITNESS: Just knowing the way that the contracting processing works in the government and everything is slow. No matter if it's doing a contract for a plane or a contract for a bed, everything takes --

THE COURT: But we're not asking -- I am not asking about the general contracting processing.

You were asked a very specific question under oath and you agreed that this process of getting beds at Guantanamo was quicker than ever than you had seen in your 23 years. In your 23 years of experience, how long does it take to get beds online at local detention facilities?

What's the comparison point?

THE WITNESS: A contract for beds, I have seen take a few months.

THE COURT: At facilities where you already have contracts?

If you have a detention facility where individuals are detained and you have a contract and you are simply

seeking additional bed space at that local facility, how long does that take?

THE WITNESS: I don't know the answer to that.

THE COURT: So what's the basis for the quicker than ever?

Again, I didn't make that statement. It's your statement and I want to understand how you got there because you are testifying. You are asking me to credit this statement that it happened quicker than ever. I want to understand what is the basis for you saying that.

What are the comparisons you compared? How did you get to that statement?

THE WITNESS: For a new facility.

THE COURT: So when you said "quicker than ever," you meant that, in your 23 years of experience, the time it took to get beds online at Guantanamo is quicker than it ever took to get a new facility online?

THE WITNESS: That's correct.

THE COURT: Okay. How long does it take to get additional beds at existing facilities?

THE WITNESS: I don't know.

THE COURT: You have no idea?

THE WITNESS: I do not.

THE COURT: How do you have a basis to know how long it takes to sign up a new facility versus how long it

takes to bring new beds on at an existing facility?

THE WITNESS: I don't know how long it takes to bring on new beds at a new facility.

THE COURT: You just told me it would -- if you don't know how long it takes to bring on new beds at a new facility, how can you use that as a comparison point to say what happened here was quicker than ever?

THE WITNESS: I was comparing it to a new contract.

THE COURT: A new contract for beds?

THE WITNESS: Yes.

THE COURT: At a new facility?

THE WITNESS: Yes.

THE COURT: So I am asking you -- you said that process takes months.

THE WITNESS: Yes.

THE COURT: How many months?

THE WITNESS: Three to four months.

THE COURT: If you know how long it takes to get a new contract for new beds at a new facility, three to four months, why don't you know how long it takes to get new beds in an existing facility where there is already a contract?

THE WITNESS: I don't know the answer.

THE COURT: Okay. Have you done contracts for beds at new facilities?

THE WITNESS: No.

THE COURT: How do you know it takes three to four months then?

THE WITNESS: Because I have heard that from the people in the custody and management unit.

THE COURT: Who told you that?

THE WITNESS: The assistant director for the custody management unit.

THE COURT: In what context?

THE WITNESS: In a conversation on how long it takes for contracts to come up.

THE COURT: So you had conversations with someone in passing, you have no personal experience. And I take it, then, you didn't have conversations about how long it takes to get a contract for more beds in an existing facility?

THE WITNESS: No.

THE COURT: Just by coincidence you happen to know only this number that you needed to have this comparison for the statement you made?

THE WITNESS: I don't know the answer, how long it takes to add to a current contract.

THE COURT: When did you have this conversation about -- that yielded the three to four months answer?

THE WITNESS: Last week.

THE COURT: Last week, in preparation for this

hearing?

THE WITNESS: Last week.

THE COURT: Was it in preparation for this hearing?

THE WITNESS: Yes.

THE COURT: Okay. Earlier, when plaintiffs' counsel asked you what you did to prepare for this hearing, why didn't you mention that conversation?

THE WITNESS: I forgot.

THE COURT: Okay. Mr. Schultz, I am saying this again because it's really important that you understand what it means to be under oath.

I am going to ask my courtroom deputy clerk to remind you of that, again -- of the oath you took -- because I have had several instances of you saying, you "forgot," you "misspoke."

Do you understand that if you make untruthful statements under oath you can be prosecuted for perjury?

THE WITNESS: I do, Your Honor.

THE COURT: I will save my courtroom deputy clerk because I just did it myself.

Are there any other conversations you had leading up to today's hearing that you have forgotten about that you would like to tell me and counsel about?

THE WITNESS: No, Your Honor.

THE COURT: Okay. Do the plaintiffs have any questions about that conversation given the new revelation that the witness forgot?

You don't have to. I just want to give you a fair opportunity given the new information we all just learned.

MS. ZAFAR: Yes. Just one question, Your Honor.

THE COURT: Please come to the podium.

MS. ZAFAR: It's not related to the conversation but another question that came up in the course of this testimony.

EXAMINATION

BY MS. ZAFAR:

Q. After the President's memorandum was issued -- and I believe you said people were sent to Guantanamo a couple days after that -- did the agency believe that it could choose not to send people to Guantanamo?

In other words, did the agency believe that it had to act upon that memorandum?

A. I don't know the answer to that.

MS. ZAFAR: Okay. Thank you.

THE COURT: Okay. Going back to my line of questioning, because -- actually, let me ask you this, since I want to give you an opportunity.

Do you stand by your statement that beds came online quicker than you have ever seen in your 23 years of

experience based on the information that you know?

Because I have heard a lot of times you might not understand. I want to know if you have a factual basis for that statement or whether you would like to modify that statement.

THE WITNESS: Yes. I stand by that statement. I believe they came on faster; but I will qualify that statement and say in terms of a new contract.

THE COURT: Okay.

All right. That's all I have.

I am going to give everyone an opportunity to ask any additional questions you would like to ask before we adjourn.

So anything else from the government?

MR. VERBY: Nothing, Your Honor. Thank you.

THE COURT: Okay. I am going to go down the line and make sure every lawyer at your table agrees with that so I don't get another surprising footnote or more games from the government.

You can go one at a time and tell me if there are any other questions you want to ask of this witness or if there is anything else you object to about the nature of this hearing.

Ms. Perlmutter?

MS. PERLMUTTER: I have no further questions.

THE COURT: Is there anything you object to about the way I conducted today's hearing?

MS. PERLMUTTER: No.

THE COURT: Ms. McKay?

MS. McKAY: I have no further questions, and no objections.

THE COURT: Okay.

Mr. Zubata?

MR. ZUBATA: No further questions, and no objections.

THE COURT: Mr. Verby, just to be clear, you have no further questions.

Do you have any objections about the way in which I conducted today's hearing?

MR. VERBY: No objections, Your Honor.

THE COURT: Anything else from the plaintiffs? Any other questions for this witness or objections to the way I conducted this hearing?

MS. ZAFAR: Nothing further from plaintiffs, Your Honor.

THE COURT: Okay.

Mr. Schultz, you are excused.

THE WITNESS: Thank you.

THE COURT: Okay. So we have to do another round of supplemental briefing thanks to the government.

Can I ask the plaintiffs how long you need for your brief?

MS. ZAFAR: A week, Your Honor.

THE COURT: So briefs are going to be due on the 23rd of November for both parties.

Anything else before we adjourn?

MR. VERBY: Nothing from the defense, Your Honor.

MS. ZAFAR: Nothing from plaintiffs, Your Honor.

THE COURT: Okay. Thank you, all. I will look out for your briefs.

(Whereupon, the proceeding concludes, 3:51 p.m.)

* * * * *

**CERTIFICATE**

I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is edited, printed, disassembled, screenshot, and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 16th day of November, 2026.

/s/ Elizabeth Davila, RPR, FCRR

Official Court Reporter

## $

**$152** [2] - 53:21, 53:23

## /

**/s** [1] - 71:22

## 1

**100** [1] - 47:1
**100,000** [22] - 15:1, 16:20, 36:2, 37:16, 42:25, 48:8, 48:9, 48:14, 49:8, 49:16, 49:21, 50:1, 50:3, 50:7, 50:10, 50:13, 50:19, 50:21, 50:22, 51:3, 51:6, 55:19
**10004** [1] - 1:13
**1100** [1] - 2:4
**125** [1] - 1:13
**13** [4] - 33:19, 34:9, 34:25, 57:19
**15** [2] - 25:14, 25:22
**16** [1] - 1:5
**16th** [1] - 71:21
**180** [3] - 9:10, 24:25, 25:4
**18th** [1] - 1:13

## 2

**20044** [1] - 1:20
**202** [2] - 1:21, 2:5
**2025** [15] - 14:11, 14:15, 15:2, 16:4, 16:7, 35:20, 46:22, 46:23, 47:7, 47:9, 47:18, 48:9, 48:22, 49:3, 49:24
**2026** [3] - 1:5, 8:3, 71:21
**20530** [1] - 2:5
**212** [1] - 1:14
**23** [13] - 7:23, 8:13, 16:10, 36:14, 37:4, 53:14, 56:1, 58:8, 62:19, 63:17, 64:15, 68:25
**23rd** [1] - 71:5
**25-1766** [2] - 1:3, 3:3
**28** [1] - 38:3
**28th** [2] - 38:6, 39:10
**29** [2] - 38:3, 38:24
**29th** [12] - 39:11, 39:12, 39:18, 39:21, 40:8, 40:10, 42:3, 42:6, 42:13, 42:16, 43:4, 43:9
**2:04** [1] - 1:5
**2:50** [1] - 25:18

## 3

**30** [2] - 38:2, 39:2
**30,000** [4] - 36:10, 37:17, 43:1, 47:1
**30,000s** [1] - 47:24
**307-0340** [1] - 2:5
**30s** [1] - 46:25
**30th** [2] - 38:7, 41:12
**31st** [2] - 38:9, 39:2
**35,000** [1] - 47:11
**3:51** [1] - 71:11
**3rd** [1] - 41:12

## 4

**4** [4] - 8:3, 16:7, 41:2, 42:7
**400** [1] - 26:25
**4th** [14] - 28:8, 28:21, 38:18, 38:25, 39:19, 39:21, 40:9, 40:10, 40:13, 40:16, 42:3, 42:14, 42:16, 43:9

## 5

**5,000** [1] - 57:3
**549-2616** [1] - 1:14

## 6

**616-4892** [1] - 1:21
**68,000** [11] - 33:10, 33:11, 33:19, 35:1, 35:13, 46:20, 47:4, 47:15, 57:2, 57:5, 57:10

## 7

**72** [2] - 24:5, 24:13
**72-hour** [1] - 23:23
**73** [2] - 56:24, 57:10
**73,000** [5] - 35:18, 46:20, 47:5, 56:24, 57:8

## 8

**8142** [1] - 2:4
**878** [1] - 1:19

## 9

**900** [5] - 55:23, 55:25, 56:3, 56:10

## A

**ability** [7] - 10:16, 11:10, 13:11, 15:12, 16:16, 34:16, 71:16
**able** [10] - 4:17, 5:14, 5:17, 10:15, 22:9, 22:10, 31:21, 32:3, 35:5, 36:13
**absent** [2] - 24:25, 59:2
**access** [3] - 11:4, 11:5, 13:12
**accessibility** [10] - 13:17, 29:8, 29:9, 29:10, 29:12, 30:3, 45:18, 45:20, 46:6, 46:17
**accessible** [2] - 13:5, 13:9
**accommodate** [2] - 52:19, 56:3
**accommodated** [1] - 55:25
**account** [2] - 31:17, 59:13
**accounts** [1] - 12:10
**accurate** [1] - 71:15
**acquire** [2] - 16:16, 43:11
**acquired** [1] - 16:11
**acquiring** [1] - 16:13
**act** [1] - 68:18
**Action** [1] - 1:3
**activity** [1] - 18:5
**ad** [1] - 9:13
**add** [1] - 66:21
**additional** [30] - 6:8, 15:5, 17:20, 27:25, 28:5, 34:16, 35:9, 43:13, 43:18, 43:21, 43:22, 44:8, 44:15, 44:18, 45:2, 45:6, 45:7, 45:10, 45:13, 45:19, 47:12, 48:14, 51:20, 52:2, 61:20, 62:15, 64:1, 64:20, 69:12
**address** [4] - 32:21, 32:24, 35:2, 35:4
**addressed** [1] - 31:16
**adjourn** [2] - 69:13, 71:6
**administration** [4] - 11:6, 42:24, 50:8, 51:13
**administration's** [1] - 14:18
**administrative** [14] - 26:9, 26:13, 30:5, 32:14, 32:25, 36:7, 40:20, 40:21, 42:25, 46:2, 51:15, 52:11, 59:9, 60:14
**adopt** [2] - 45:5, 60:7
**adopted** [9] - 42:11, 43:2, 43:13, 43:21, 45:19, 45:22, 45:25, 46:12, 46:14
**adopting** [2] - 43:8, 45:12
**adoption** [2] - 42:21, 43:14
**advantage** [3] - 16:17, 46:14, 46:17
**advantageous** [1] - 11:20
**advantages** [3] - 12:23, 13:1, 45:16
**afternoon** [12] - 3:3, 3:8, 3:10, 3:11, 3:13, 3:14, 3:16, 3:18, 3:19, 3:21, 3:22, 26:7
**agencies** [2] - 50:16, 51:9
**agency** [26] - 27:13, 27:17, 27:18, 27:20, 27:24, 28:4, 28:9, 28:12, 28:15, 28:18, 28:22, 29:2, 39:14, 39:15, 50:4, 51:7, 51:10, 51:12, 51:23, 51:25, 52:18, 52:25, 53:14, 60:12, 68:15, 68:17
**agency's** [1] - 49:25
**ago** [7] - 23:19, 36:17, 56:19, 57:7, 57:9, 57:11, 57:17
**Agostinho** [1] - 2:3
**agree** [4] - 5:18, 5:20, 37:5, 37:6
**agreed** [1] - 63:15
**agreement** [2] - 6:9, 18:19
**agrees** [1] - 69:17
**ahead** [2] - 4:20, 33:4
**aided** [1] - 2:16
**air** [3] - 8:7, 8:10, 13:18
**airfare** [1] - 61:7
**airport** [2] - 19:10, 19:11
**al** [4] - 1:3, 1:5, 3:4
**alexa** [1] - 3:19
**ALEXA** [1] - 1:17
**alexa.perlmutter@usdoj.gov** [1] - 1:22
**Alexandria** [1] - 14:1
**alien** [5] - 10:7, 18:13, 20:3, 20:14, 24:25
**aliens** [9] - 8:12, 8:20, 11:12, 17:14, 20:20, 42:7, 56:5, 58:24, 61:21
**alleviate** [1] - 11:14
**alongside** [1] - 4:7
**alternative** [1] - 51:19
**alternatives** [1] - 60:12
**American** [1] - 1:12
**amidst** [1] - 57:15
**amount** [1] - 15:12
**answer** [21] - 4:2, 13:6, 38:13, 38:22, 41:18, 42:10, 42:18, 48:19, 50:17, 52:3, 52:24, 53:2, 53:12, 60:5, 62:17, 64:3, 65:23, 66:20, 66:23, 68:19
**ANSWER** [3] - 44:10, 44:14, 45:3
**answering** [1] - 22:18
**answers** [2] - 52:9
**anticipated** [1] - 48:14
**anticipating** [1] - 51:2
**apart** [1] - 59:2
**appeal** [4] - 5:9, 7:2, 7:3, 7:7
**appear** [1] - 52:9
**APPEARANCES** [2] - 1:10, 2:1
**appearances** [2] - 1:24, 3:6
**appeared** [1] - 4:6
**appearing** [3] - 5:6, 5:15, 5:20
**applying** [1] - 4:5
**approach** [1] - 3:6
**appropriate** [6] - 10:8, 31:9, 31:14, 55:6, 55:10, 55:15
**appropriately** [1] - 59:22
**approve** [1] - 18:21
**area** [1] - 17:20
**areas** [1] - 11:11
**argumentative** [1] - 34:11
**arguments** [2] - 4:14, 7:4
**arrangements** [8] - 30:8, 30:11, 30:15, 30:17, 40:12, 40:16, 41:1, 41:5
**arrested** [2] - 11:12, 49:23
**arrive** [1] - 16:5

**arriving** [1] - 42:7
**articulated** [1] - 32:14
**aside** [1] - 46:7
**assigned** [2] - 4:1, 4:3
**assistant** [6] - 8:4, 8:6, 14:16, 58:21, 59:2, 66:7
**Assistant** [1] - 1:18
**associated** [1] - 13:2
**assume** [2] - 27:13, 40:14
**assuming** [2] - 5:5, 5:14
**attempt** [2] - 21:14, 32:24
**attorneys** [4] - 5:20, 6:21, 60:15
**Attorneys** [1] - 1:18
**authorities** [1] - 11:4
**authority** [1] - 50:15
**authorization** [2] - 2:10, 71:19
**availability** [1] - 11:5
**available** [16] - 11:12, 11:23, 12:12, 12:17, 13:5, 13:7, 15:6, 18:2, 31:20, 36:5, 36:9, 47:12, 48:6, 50:5, 51:5, 56:14
**avenue** [1] - 16:20
**average** [5] - 53:8, 53:10, 53:16, 53:19, 53:23
**await** [1] - 19:4
**awaiting** [1] - 32:4
**aware** [3] - 14:17, 29:5, 55:3

## B

**base** [1] - 28:16
**based** [9] - 8:13, 11:5, 11:6, 14:20, 37:10, 55:10, 55:15, 59:22, 69:1
**bases** [2] - 28:22, 29:3
**basic** [4] - 8:16, 8:23, 9:2, 18:13
**basis** [13] - 12:20, 17:21, 17:22, 17:23, 17:24, 17:25, 63:2, 63:5, 63:7, 64:4, 64:10, 64:24, 69:3
**Bay** [25] - 8:24, 9:8, 9:9, 9:13, 11:17, 12:1, 13:1, 13:21, 14:4, 15:10, 15:17, 16:3, 16:5, 18:2, 22:20, 24:2, 24:12, 24:15, 24:18, 28:21, 35:22, 35:23, 36:9, 36:19, 37:11
**become** [4] - 14:17, 17:1, 36:9, 50:5
**bed** [89] - 10:6, 10:11, 10:14, 10:15, 10:16, 11:4, 11:16, 11:19, 12:1, 12:5, 14:21, 15:6, 15:11, 15:14, 15:18, 16:10, 16:13, 16:17, 16:19, 16:23, 16:25, 17:7, 17:20, 18:7, 23:8, 23:9, 27:6, 27:8, 27:21, 27:23, 27:25, 28:6, 28:10, 28:18, 29:12, 31:20, 32:1, 32:8, 33:18, 33:22, 34:16, 34:23, 35:2, 35:4, 35:6, 42:20, 42:22, 43:7, 43:11, 43:13, 43:16, 43:17, 43:18, 43:21, 43:22, 44:8, 44:15, 44:18, 45:2, 45:6, 45:10, 45:13, 45:17, 45:20, 46:5, 46:13, 46:15, 46:16, 46:21, 48:5, 48:13, 48:15, 48:16, 48:22, 49:2, 49:22, 51:20, 51:24, 52:2, 52:7, 52:19, 53:2, 56:16, 59:4, 62:12, 62:15, 63:11, 64:1
**beds** [67] - 10:17, 10:19, 10:21, 11:1, 11:23, 12:8, 12:17, 13:5, 13:7, 13:13, 15:1, 15:13, 15:24, 16:20, 17:1, 17:4, 35:16, 35:17, 36:2, 36:8, 36:13, 36:14, 37:16, 43:1, 46:20, 47:5, 47:12, 47:14, 47:23, 48:2, 48:5, 48:8, 48:9, 48:14, 48:24, 49:6, 49:16, 50:4, 50:7, 50:13, 50:19, 50:21, 50:25, 51:3, 51:5, 51:8, 56:3, 56:10, 57:3, 59:6, 62:20, 62:25, 63:4, 63:15, 63:18, 63:20, 64:16, 64:20, 65:1, 65:3, 65:5, 65:10, 65:20, 65:21, 65:25, 66:15, 68:24
**BEFORE** [1] - 1:8
**began** [3] - 31:19, 31:25, 51:14
**begin** [2] - 3:24, 46:2
**beginning** [4] - 3:5, 5:22, 42:23, 48:8
**behalf** [1] - 40:23
**below** [1] - 71:19
**Ben** [1] - 1:20
**best** [1] - 71:16
**between** [8] - 23:7, 38:6, 39:18, 39:21, 40:9, 41:12, 42:3, 42:16
**binds** [1] - 4:5
**bit** [4] - 6:1, 30:2, 58:15, 60:22
**borders** [1] - 49:20
**Box** [1] - 1:19
**break** [1] - 25:24
**brief** [5] - 5:23, 5:24, 25:6, 71:2
**briefing** [1] - 70:25
**briefly** [2] - 12:4, 35:10
**briefs** [5] - 4:16, 6:17, 6:18, 71:4, 71:10
**bring** [6] - 19:13, 51:8, 60:20, 65:1, 65:3, 65:5
**Broad** [1] - 1:13
**bumped** [1] - 22:4
**BY** [8] - 7:20, 13:16, 26:6, 27:19, 33:6, 34:19, 35:12, 68:12

## C

**cadence** [1] - 32:5
**canceled** [3] - 22:1, 22:6, 22:14
**cannot** [2] - 4:13, 28:11
**capacity** [7] - 17:13, 46:21, 46:23, 47:13, 56:14, 57:13
**care** [6] - 5:25, 10:8, 12:12, 12:16, 54:18
**career** [1] - 4:8
**carried** [1] - 37:8
**carry** [1] - 20:2
**case** [9] - 4:1, 4:3, 4:10, 4:16, 5:16, 5:22, 6:19, 26:10, 39:8
**cases** [3] - 5:5, 9:25, 34:4
**center** [2] - 22:11, 24:8
**central** [2] - 19:12, 19:13
**certain** [12] - 11:11, 12:15, 41:17, 46:24, 47:1, 52:1, 52:14, 52:15, 56:8, 58:11, 58:13, 59:17
**certainly** [1] - 59:15
**CERTIFICATE** [1] - 71:13
**certificate** [1] - 71:18
**certify** [1] - 71:14
**challenged** [5] - 39:25, 42:11, 43:6, 43:15, 60:8
**chambers** [1] - 4:20
**chance** [1] - 24:9
**changes** [1] - 11:6
**charter** [11] - 8:11, 13:20, 14:4, 19:3, 19:8, 20:8, 20:10, 21:3, 22:6, 23:25, 61:6
**charters** [2] - 20:13, 22:7
**check** [1] - 38:5
**choice** [2] - 34:8, 37:16
**choose** [1] - 68:16
**chose** [2] - 6:2, 6:23
**Circuit** [2] - 5:10, 7:5
**circumstances** [1] - 23:6
**citizenship** [1] - 18:25
**civil** [1] - 39:8
**Civil** [4] - 1:3, 1:12, 2:3, 3:3
**classification** [3] - 12:11, 55:15, 59:25
**classifications** [4] - 54:18, 55:1, 55:10, 59:23
**classified** [1] - 5:1
**clear** [2] - 52:23, 70:11
**cleared** [2] - 20:20, 21:16
**clerk** [2] - 67:13, 67:20
**close** [7] - 17:12, 48:9, 56:18, 56:22, 56:25, 57:8, 57:11
**coincidence** [1] - 66:17
**colleagues** [2] - 32:18, 37:5
**COLUMBIA** [1] - 1:1
**coming** [3] - 17:19, 56:18, 63:4
**commercial** [10] - 8:11, 19:3, 19:8, 20:8, 20:10, 21:25, 22:1, 22:2, 22:14, 61:7
**communicate** [1] - 6:22
**compared** [1] - 64:11
**comparing** [1] - 65:8
**comparison** [3] - 63:19, 65:6, 66:18
**comparisons** [2] - 12:5, 64:11
**complete** [2] - 17:7, 71:16
**completing** [1] - 20:1
**completion** [1] - 21:8
**computer** [1] - 2:16
**computer-aided** [1] - 2:16
**concern** [9] - 14:25, 17:1, 17:2, 32:13, 32:21, 32:24, 57:12, 61:12, 62:12
**concerns** [20] - 11:14, 12:24, 14:21, 14:24, 18:3, 29:9, 30:25, 31:4, 31:16, 32:16, 32:19, 35:2, 35:5, 35:6, 36:1, 36:18, 36:22, 57:15, 59:14, 60:23
**concludes** [1] - 71:11
**conduct** [3] - 6:2, 6:23, 11:10
**conducted** [3] - 70:2, 70:14, 70:18
**confer** [3] - 25:8, 25:15, 33:5
**confirm** [2] - 4:21, 28:11
**connection** [4] - 9:4, 20:10, 34:1, 43:14
**consider** [14] - 27:2, 28:12, 28:15, 28:18, 28:22, 29:3, 29:6, 29:9, 29:19, 29:20, 29:22, 30:4, 51:19, 54:12
**consideration** [1] - 42:19
**considered** [5] - 2:9, 27:4, 59:9, 60:12, 71:18
**constitutes** [1] - 71:15
**consulate** [2] - 18:24, 20:4
**consult** [3] - 27:20, 27:24, 28:4
**consulted** [2] - 28:9, 60:14
**contact** [4] - 51:4, 51:10, 52:18, 53:1
**contacted** [4] - 51:23, 52:1, 52:5, 52:7
**contacting** [1] - 51:7
**contained** [1] - 30:4

**context** [1] - 66:9
**continental** [5] - 13:22, 14:5, 15:24, 18:7, 32:8
**continue** [1] - 5:14
**Continued** [1] - 1:24
**continued** [1] - 2:1
**continuously** [1] - 52:8
**contract** [13] - 10:24, 57:24, 63:10, 63:11, 63:20, 63:25, 65:9, 65:10, 65:20, 65:22, 66:15, 66:21, 69:8
**contracting** [4] - 16:15, 59:4, 63:9, 63:13
**contracts** [3] - 63:23, 65:24, 66:11
**contradict** [1] - 52:9
**control** [2] - 11:16, 11:19
**controlled** [1] - 10:19
**controls** [1] - 10:21
**conversation** [5] - 66:10, 66:22, 67:8, 68:2, 68:8
**conversations** [3] - 66:12, 66:14, 67:22
**conviction** [2] - 9:5, 34:2
**cooler** [1] - 37:2
**cooler-type** [1] - 37:2
**copied** [2] - 2:10, 4:22
**corps** [1] - 20:21
**correct** [38] - 8:1, 8:8, 9:19, 10:3, 14:9, 15:3, 16:9, 21:8, 21:9, 23:15, 23:18, 25:5, 30:24, 33:12, 33:17, 35:15, 35:24, 35:25, 36:3, 36:16, 36:20, 36:23, 37:3, 37:9, 37:13, 37:14, 37:17, 37:18, 43:23, 44:10, 49:6, 49:7, 51:24, 54:20, 55:7, 56:7, 60:17, 64:18
**correctly** [2] - 31:10, 31:12
**cost** [27] - 12:5, 12:8, 12:20, 12:24, 13:2, 14:3, 14:6, 27:2, 27:4, 34:6, 53:7, 53:9, 53:10, 53:16, 53:18, 53:19, 53:23, 54:10, 54:12, 54:16, 58:17, 59:6, 59:9, 59:12, 59:19, 60:2
**costs** [9] - 54:3, 54:8, 57:21, 57:22, 58:3, 58:4, 58:9, 58:19, 59:4
**counsel** [12] - 3:5, 4:20, 25:8, 25:24, 26:18, 33:5, 47:6, 48:20, 53:15, 63:6, 67:7, 67:24
**counsel's** [1] - 6:16
**countries** [2] - 58:23, 61:18
**country** [7] - 18:14, 18:18, 21:3, 30:9, 30:21, 32:2, 61:11
**couple** [10] - 15:19, 16:8, 25:13, 26:7, 27:2, 33:3, 33:7, 43:8, 62:18, 68:14
**course** [4] - 5:1, 25:16, 50:11, 68:9
**Court** [4] - 2:13, 2:13, 34:12, 71:23
**COURT** [163] - 1:1, 1:9, 3:10, 3:13, 3:16, 3:18, 3:21, 3:24, 13:6, 13:10, 25:7, 25:11, 25:16, 25:18, 25:20, 25:23, 26:1, 27:11, 27:16, 33:3, 34:14, 35:8, 37:21, 38:5, 38:15, 38:19, 38:22, 39:7, 39:11, 39:13, 39:20, 39:24, 40:6, 40:12, 40:19, 40:23, 41:1, 41:4, 41:10, 41:16, 41:19, 41:22, 42:8, 42:19, 43:2, 43:12, 43:20, 43:24, 44:3, 44:11, 44:16, 45:4, 45:12, 45:15, 46:10, 46:16, 46:19, 47:2, 47:12, 47:15, 47:17, 47:20, 47:23, 48:2, 48:4, 48:10, 48:18, 49:4, 49:8, 49:12, 49:18, 49:21, 49:24, 50:6, 50:17, 50:22, 51:2, 51:9, 51:12, 51:15, 51:18, 52:3, 52:15, 52:17, 52:21, 52:23, 53:5, 53:12, 53:14, 53:19, 53:22, 53:25, 54:8, 54:11, 54:15, 54:21, 55:4, 55:8, 55:13, 55:18, 55:24, 56:7, 56:9, 56:16, 56:20, 56:23, 57:1, 57:6, 57:14, 57:18, 57:20, 58:3, 58:12, 59:8, 59:12, 60:6, 60:10, 60:16, 60:18, 61:25, 62:11, 62:18, 62:23, 63:2, 63:12, 63:22, 64:4, 64:14, 64:19, 64:22, 64:24, 65:4, 65:10, 65:12, 65:14, 65:17, 65:19, 65:24, 66:2, 66:6, 66:9, 66:12, 66:17, 66:22, 66:25, 67:3, 67:6, 67:10, 67:20, 68:1, 68:7, 68:21, 69:9, 69:16, 70:1, 70:4, 70:7, 70:11, 70:16, 70:21, 70:24, 71:4, 71:9
**court** [3] - 15:4, 18:8, 25:21
**courtroom** [6] - 4:25, 5:5, 6:11, 6:15, 67:13, 67:20
**COURTROOM** [4] - 3:2, 7:13, 7:16, 25:21
**covers** [1] - 8:10
**create** [12] - 11:7, 17:19, 43:13, 43:21, 44:8, 44:18, 45:1, 45:5, 45:10, 45:13, 51:20, 53:1
**created** [4] - 27:25, 28:6, 43:18, 62:15
**creating** [5] - 26:21, 27:1, 27:21, 28:18, 61:20
**credit** [1] - 64:8
**crew** [1] - 20:12
**criminal** [3] - 9:5, 18:5, 34:2
**CROSS** [1] - 26:5
**CROSS-EXAMINATION** [1] - 26:5
**current** [7] - 8:2, 8:6, 10:9, 14:17, 50:8, 53:2, 66:21
**custody** [5] - 21:13, 49:2, 59:3, 66:5, 66:8

## D

**D.C** [1] - 1:6
**date** [5] - 19:4, 19:5, 38:6, 38:23, 39:17
**Dated** [1] - 71:21
**dates** [2] - 39:3, 42:14
**DAVILA** [1] - 71:14
**Davila** [2] - 2:13, 71:22
**days** [11] - 9:10, 16:8, 22:9, 22:10, 24:25, 25:4, 38:10, 38:16, 43:9, 68:15
**DC** [2] - 1:20, 2:5
**deal** [1] - 7:8
**decide** [1] - 34:12
**decided** [1] - 44:17
**decision** [42] - 16:2, 27:2, 29:1, 34:21, 35:22, 36:24, 37:5, 37:8, 37:24, 37:25, 38:2, 38:7, 38:9, 38:15, 38:18, 38:19, 39:1, 39:3, 39:4, 39:5, 39:7, 39:15, 39:20, 39:22, 39:24, 40:1, 40:3, 40:4, 40:9, 41:11, 41:19, 41:23, 41:24, 42:1, 42:2, 42:4, 42:15, 49:25, 52:7, 60:7, 60:11
**decision-makers** [3] - 27:2, 34:21, 36:24
**decision-making** [2] - 29:1, 49:25
**decisions** [3] - 10:2, 10:4, 35:20
**declaration** [1] - 35:24
**decompress** [1] - 17:16
**decompression** [4] - 17:8, 17:10, 17:21, 18:3
**deems** [1] - 20:21
**defendants** [3] - 3:20, 3:23, 35:8
**Defendants** [1] - 1:6
**DEFENDANTS** [1] - 1:16
**defense** [4] - 3:15, 3:17, 7:11, 71:7
**deficit** [9] - 48:15, 48:16, 48:22, 49:5, 56:17, 56:20, 56:21, 56:22, 62:15
**delay** [5] - 20:13, 21:7, 31:5, 31:6, 31:8
**delayed** [3] - 20:11, 21:12, 21:13
**delays** [1] - 20:9
**delta** [2] - 56:23, 57:2
**depart** [2] - 19:14, 30:18
**Department** [1] - 11:25
**deportees** [1] - 22:8
**DEPUTY** [4] - 3:2, 7:13, 7:16, 25:21
**deputy** [3] - 14:16, 67:13, 67:20
**describe** [1] - 32:19
**described** [1] - 19:16
**describing** [1] - 18:9
**designation** [1] - 9:17
**desire** [1] - 14:18
**despite** [2] - 4:18, 6:9
**destination** [3] - 19:15, 30:12, 30:21
**detailed** [1] - 34:5
**detain** [9] - 32:3, 34:8, 34:9, 54:3, 58:6, 58:9, 58:19, 60:1, 60:2
**detained** [24] - 17:6, 18:13, 28:16, 32:9, 33:8, 35:1, 46:20, 47:4, 47:18, 47:21, 48:25, 50:1, 50:11, 54:24, 55:20, 57:8, 59:17, 62:1, 62:2, 62:7, 62:8, 62:13, 62:14, 63:25
**detainee** [5] - 8:23, 10:2, 21:10, 23:2, 23:12
**detainees** [8] - 9:12, 9:17, 16:5, 19:13, 35:14, 39:8, 44:17, 44:21
**detaining** [7] - 34:7, 44:12, 53:9, 53:11, 53:16, 53:19, 59:24
**detention** [62] - 8:20, 10:9, 10:17, 10:19, 11:17, 12:5, 12:8, 13:13, 15:5, 15:10, 15:11, 15:18, 16:3, 16:21, 17:6, 17:11, 17:14, 18:14, 23:3, 23:7, 23:12, 23:13, 23:17, 24:8, 24:18, 24:20, 24:24, 26:22, 29:2, 31:2, 32:17, 37:12, 44:22, 44:24, 50:8, 50:9, 51:19, 53:8, 53:20, 54:10, 54:12, 54:13, 54:16, 54:22, 54:25, 55:9, 55:14, 56:11, 56:14, 57:21, 58:4, 59:10, 59:21, 59:25, 60:3, 61:21, 61:23, 62:24, 63:18, 63:24
**determination** [1] - 12:18
**determinations** [1] - 12:20
**determinative** [1] -

59:20
**determine** [1] - 45:24
**determining** [1] - 44:12
**developed** [1] - 32:12
**DHS** [36] - 7:22, 8:14, 8:19, 9:15, 10:10, 10:14, 10:19, 10:21, 11:1, 11:4, 11:7, 11:20, 11:25, 12:8, 15:18, 16:10, 16:18, 17:16, 21:12, 22:24, 37:4, 40:24, 41:24, 43:2, 43:7, 43:10, 43:15, 43:20, 45:5, 45:22, 51:19, 54:12, 59:9, 59:12, 60:2, 62:20
**DHS's** [2] - 42:15, 45:12
**difference** [3] - 14:2, 14:8, 14:9
**differences** [2] - 12:10, 14:3
**different** [6] - 15:19, 21:18, 21:20, 30:9, 46:9, 54:25
**differently** [1] - 30:2
**difficult** [2] - 13:21, 35:4
**diplomatic** [1] - 21:5
**diplomatic-type** [1] - 21:5
**DIRECT** [1] - 7:19
**directly** [4] - 10:19, 24:1, 61:11, 61:16
**director** [5] - 8:6, 14:16, 58:21, 59:3, 66:7
**director's** [1] - 8:4
**directors** [2] - 9:21, 9:22
**disagree** [1] - 7:4
**disappointing** [1] - 6:1
**disassembled** [2] - 2:10, 71:18
**discussed** [2] - 21:7, 49:15
**discussion** [1] - 43:10
**discussions** [6] - 28:7, 28:20, 42:22, 43:5, 43:7, 43:15
**dispute** [1] - 5:19
**disputes** [1] - 4:4
**distance** [1] - 58:2
**DISTRICT** [3] - 1:1, 1:1, 1:9
**district** [1] - 4:5
**division** [2] - 8:7, 13:18
**Division** [1] - 2:3
**Division/OIL** [1] - 1:19
**document** [6] - 18:18, 18:22, 19:1, 19:22, 20:5
**documents** [2] - 26:15, 58:25
**DOJ** [2] - 2:3, 4:7
**DOJ-Civil** [1] - 2:3
**DOJ/Civil** [1] - 1:19
**dollar** [1] - 54:6
**domestic** [1] - 8:12
**done** [2] - 6:19, 65:24
**double** [1] - 38:5
**double-check** [1] - 38:5
**down** [19] - 9:23, 9:24, 12:1, 16:13, 25:23, 31:11, 31:15, 32:6, 32:7, 32:20, 38:24, 60:24, 60:25, 61:2, 61:10, 61:12, 61:20, 61:22, 69:16
**dozen** [1] - 33:13
**drive** [1] - 10:4
**drug** [3] - 9:5, 18:5, 34:2
**due** [5] - 10:6, 22:7, 49:2, 49:19, 71:4
**Dulles** [3] - 22:13, 22:15, 22:16
**duration** [1] - 25:2
**during** [4] - 9:11, 11:24, 25:24, 28:25


## E


**early** [3] - 14:11, 14:14, 15:2
**ease** [4] - 29:8, 29:9, 29:12, 33:18
**easier** [1] - 62:6
**easily** [3] - 14:1, 36:4, 61:10
**easy** [3] - 53:7, 61:1, 62:5
**edited** [2] - 2:10, 71:18
**effective** [1] - 17:5
**efficiently** [1] - 31:15
**efforts** [1] - 8:10
**either** [4] - 5:23, 8:11, 19:2, 20:9
**El** [1] - 61:15
**electronic** [1] - 18:19
**elements** [1] - 9:3
**elicit** [2] - 4:25, 48:21
**eligible** [1] - 8:23
**ELIZABETH** [1] - 71:14
**Elizabeth** [2] - 2:13, 71:22
**email** [2] - 4:22, 9:16
**emailed** [1] - 4:20
**emails** [3] - 9:20, 9:23, 10:1
**embassy** [2] - 18:24, 20:4
**emergency** [1] - 19:1
**en** [1] - 30:21
**end** [6] - 16:4, 38:1, 38:7, 39:10, 56:25, 57:8
**Enforcement** [1] - 14:11
**enforcement** [10] - 7:24, 11:10, 14:18, 14:22, 15:16, 15:23, 15:25, 17:19, 43:19, 45:11
**ensure** [2] - 10:7, 17:5
**entire** [1] - 56:17
**equally** [1] - 60:1
**ERO** [9] - 8:11, 14:11, 14:20, 15:5, 16:16, 16:22, 17:2, 36:21, 50:14
**erred** [1] - 5:10
**essence** [1] - 21:23
**essentially** [3] - 5:8, 18:20, 19:10
**estimate** [1] - 55:18
**estimation** [1] - 34:8
**et** [4] - 1:3, 1:5, 3:4
**eventually** [1] - 55:20
**everywhere** [1] - 54:17
**evidence** [1] - 18:25
**evolved** [1] - 31:21
**exact** [1] - 39:17
**exactly** [4] - 23:21, 38:11, 46:24, 52:1
**EXAMINATION** [4] - 7:19, 26:5, 35:11, 68:11
**excuse** [1] - 19:8
**excused** [1] - 70:22
**executing** [1] - 42:13
**existing** [4] - 64:20, 65:1, 65:22, 66:15
**expect** [1] - 50:1
**expected** [1] - 50:4
**expensive** [2] - 58:1, 58:6
**experience** [13] - 8:13, 10:5, 11:24, 14:20, 24:18, 36:15, 56:1, 58:8, 62:20, 63:17, 64:15, 66:13, 69:1
**explain** [1] - 60:11
**explaining** [1] - 9:11
**express** [2] - 30:25, 32:16
**expressed** [2] - 31:16, 36:21
**expressing** [1] - 14:21
**extend** [1] - 8:19
**extreme** [1] - 57:12


## F


**facilities** [40] - 10:24, 12:15, 23:7, 24:5, 27:21, 28:1, 28:5, 28:6, 28:12, 28:15, 28:19, 29:10, 29:15, 29:17, 29:19, 29:21, 29:23, 30:1, 44:24, 51:4, 51:7, 51:9, 51:23, 52:5, 52:6, 52:18, 53:1, 53:8, 54:19, 54:23, 54:24, 55:14, 55:24, 56:11, 62:13, 62:24, 63:18, 63:22, 64:20, 65:25
**facility** [63] - 8:24, 9:13, 10:9, 11:17, 12:12, 12:14, 12:23, 13:1, 13:2, 13:13, 14:5, 15:5, 15:17, 16:3, 17:14, 17:15, 17:17, 17:21, 17:22, 18:2, 18:14, 21:18, 22:20, 23:3, 23:4, 23:9, 23:13, 23:14, 23:17, 23:24, 24:2, 24:3, 24:12, 24:16, 24:19, 24:20, 24:23, 24:24, 27:9, 37:11, 44:22, 53:20, 55:9, 55:15, 58:10, 59:21, 59:25, 60:3, 62:1, 63:24, 64:1, 64:13, 64:17, 64:25, 65:1, 65:3, 65:6, 65:12, 65:20, 65:22, 66:15
**fact** [1] - 3:25
**factor** [7] - 12:17, 29:14, 29:19, 29:20, 29:22, 29:25, 30:4
**factored** [1] - 46:12
**factors** [4] - 10:4, 29:13, 29:16, 34:6
**factual** [1] - 69:3
**fair** [3] - 4:3, 4:10, 68:4
**fairly** [1] - 4:13
**faith** [4] - 5:6, 5:12, 5:15, 7:8
**fall** [1] - 21:4
**falls** [1] - 23:16
**familiar** [5] - 8:14, 17:8, 26:9, 40:19, 53:16
**familiarity** [2] - 8:16, 8:19
**faster** [1] - 69:7
**FCRR** [3] - 2:13, 71:14, 71:22
**February** [18] - 16:7, 28:8, 28:21, 38:18, 38:25, 39:19, 39:21, 40:9, 40:10, 40:13, 40:16, 41:2, 41:12, 42:3, 42:7, 42:14, 42:16, 43:9
**federal** [2] - 28:13, 50:15
**few** [8] - 16:8, 23:19, 33:13, 36:17, 57:7, 57:9, 57:11, 63:21
**field** [4] - 9:16, 9:20, 9:21, 9:22
**figure** [2] - 53:1, 54:6
**files** [1] - 20:14
**filtered** [2] - 9:23, 9:24
**final** [12] - 9:4, 9:10, 10:7, 18:4, 18:14, 18:15, 25:1, 30:11, 30:21, 33:25, 34:3, 61:4
**fine** [1] - 4:12
**finite** [2] - 10:15, 15:12
**first** [12] - 6:7, 7:9, 16:5, 18:15, 38:24, 40:1, 40:2, 40:8, 40:13, 41:2, 42:13, 61:12
**fit** [1] - 6:12
**flexibilities** [1] - 43:19
**flexibility** [3] - 15:25, 34:16, 45:11
**flight** [32] - 8:9, 13:20, 14:4, 14:6, 20:8, 20:12, 22:1, 22:2, 22:3, 22:14, 22:17, 23:25, 24:1, 30:20, 32:4, 32:10, 32:11, 38:24, 40:1, 40:2, 40:9, 40:13, 40:17, 41:2, 41:21, 41:22, 42:13, 57:24, 58:21, 61:6
**flights** [4] - 19:8, 32:2, 53:6, 61:18
**Floor** [1] - 1:13
**fluctuates** [1] - 35:17
**fly** [1] - 13:12

**follow** [1] - 6:11
**follow-up** [1] - 6:11
**following** [1] - 26:8
**footnote** [3] - 5:8, 6:5, 69:18
**footnotes** [1] - 7:7
**FOR** [3] - 1:1, 1:11, 1:16
**foregoing** [1] - 71:15
**foreign** [3] - 18:23, 19:15, 21:2
**forgot** [3] - 67:9, 67:15, 68:3
**forgotten** [1] - 67:23
**four** [5] - 22:9, 65:18, 65:20, 66:2, 66:23
**frame** [4] - 16:18, 16:19, 16:22, 36:2
**Franklin** [1] - 1:20
**free** [9] - 6:14, 6:22, 15:12, 15:17, 18:7, 33:22, 48:2, 48:5, 48:20
**frees** [1] - 15:24
**Friday** [3] - 21:24, 22:7, 22:14
**full** [2] - 57:13, 71:15
**function** [2] - 37:12, 58:20
**future** [1] - 51:3

## G

**games** [2] - 5:7, 69:18
**Gelernt** [1] - 3:12
**GELERNT** [2] - 1:12, 3:11
**general** [4] - 24:19, 24:24, 43:4, 63:13
**generally** [2] - 10:1, 24:5
**geographic** [2] - 54:17, 55:2
**geographical** [1] - 12:11
**geography** [1] - 55:16
**Gitmo** [16] - 15:17, 15:23, 18:6, 28:8, 32:1, 32:4, 32:7, 32:10, 32:11, 34:4, 56:6, 56:13, 61:10, 61:11, 61:24
**given** [11] - 8:23, 15:15, 17:17, 18:13, 20:2, 21:10, 34:5, 34:25, 56:10, 68:2, 68:5
**goal** [1] - 4:1
**gotcha** [1] - 6:25
**government** [28] - 4:16, 4:22, 4:23, 5:2, 5:9, 5:11, 5:13, 6:1, 6:4, 6:5, 6:20, 11:18, 11:19, 18:24, 21:2, 25:8, 28:13, 34:18, 44:8, 44:17, 45:1, 46:21, 47:6, 50:14, 63:9, 69:14, 69:19, 70:25
**Government's** [1] - 7:15
**government's** [2] - 6:12, 44:11
**governments** [1] - 10:22
**granted** [3] - 20:15, 20:16, 50:15
**great** [1] - 62:12
**greater** [5] - 9:9, 15:25, 24:25, 35:4, 35:6
**ground** [1] - 21:25
**group** [1] - 8:9
**groups** [1] - 23:24
**Guantanamo** [110] - 8:24, 9:8, 9:9, 9:13, 9:18, 11:17, 12:1, 13:1, 13:21, 14:4, 15:4, 15:10, 15:17, 16:3, 16:5, 18:2, 22:20, 24:2, 24:12, 24:15, 24:18, 24:23, 26:22, 26:24, 27:3, 27:5, 28:3, 28:17, 28:21, 28:25, 29:2, 29:7, 29:11, 29:18, 29:24, 31:1, 31:19, 32:17, 33:13, 33:16, 33:20, 33:22, 34:7, 35:22, 35:23, 36:9, 36:18, 37:11, 38:16, 39:6, 39:8, 39:16, 40:3, 40:15, 41:6, 41:8, 41:23, 43:1, 44:7, 44:13, 44:18, 44:22, 45:1, 45:16, 45:18, 46:9, 53:7, 53:9, 53:17, 54:2, 54:4, 54:6, 54:9, 54:12, 54:22, 54:23, 54:25, 55:5, 55:14, 55:21, 56:4, 57:15, 57:17, 57:21, 57:23, 57:25, 58:1, 58:7, 58:9, 58:16, 58:19, 59:10, 59:17, 60:3, 60:23, 61:1, 61:8, 61:15, 62:2, 62:3, 62:6, 62:8, 62:9, 62:13, 62:16, 63:16, 64:16, 68:14, 68:16
**guaranteed** [1] - 15:6
**Guatemala** [2] - 61:9, 61:15
**guess** [3] - 42:5, 42:8, 57:1
**Gutierrez** [1] - 3:4
**GUTIERREZ** [1] - 1:3
**guys** [1] - 7:1

## H

**hand** [2] - 6:15, 7:14
**headquarters** [2] - 9:15, 49:11
**health** [4] - 9:6, 20:18, 20:21, 34:1
**healthy** [2] - 18:6, 20:22
**hear** [1] - 25:12
**heard** [8] - 4:4, 4:11, 4:14, 5:23, 54:15, 59:15, 66:4, 69:2
**HEARING** [1] - 1:8
**hearing** [17] - 3:25, 4:8, 4:18, 4:21, 6:3, 14:24, 14:25, 46:1, 60:11, 67:1, 67:4, 67:7, 67:23, 69:23, 70:2, 70:14, 70:18
**hearings** [1] - 5:23
**held** [3] - 21:15, 26:24, 33:19
**help** [2] - 15:11, 18:3
**helps** [1] - 15:18
**hereby** [1] - 71:14
**higher** [2] - 35:19, 49:16
**historically** [1] - 37:11
**hoc** [1] - 9:13
**hold** [3] - 14:14, 22:10, 49:5
**holding** [3] - 24:13, 27:2, 34:25
**home** [3] - 22:16, 61:16, 61:24
**Honduras** [2] - 61:9, 61:15
**Honor** [22] - 3:2, 3:8, 3:11, 3:14, 25:6, 25:9, 25:13, 27:15, 34:10, 35:10, 37:20, 44:10, 45:3, 67:19, 67:25, 68:6, 69:15, 70:15, 70:20, 71:3, 71:7, 71:8
**HONORABLE** [1] - 1:8
**hopefully** [1] - 19:4
**hour** [1] - 14:6
**hours** [2] - 24:6, 24:13
**house** [1] - 59:22
**housed** [1] - 44:7
**housing** [1] - 29:3
**hub** [1] - 23:25
**hubs** [1] - 19:9
**hundred** [1] - 27:3

## I

**ICE** [8] - 8:7, 8:10, 15:5, 21:2, 27:22, 34:15, 49:11, 49:16
**idea** [4] - 54:3, 54:8, 58:19, 64:22
**identified** [1] - 34:24
**identify** [1] - 24:15
**identifying** [1] - 61:18
**imagine** [1] - 4:15
**immediately** [1] - 11:12
**immigration** [8] - 14:18, 20:21, 31:1, 32:17, 39:8, 44:17, 44:21, 50:9
**impact** [2] - 35:4, 35:6
**implement** [1] - 29:2
**implemented** [1] - 31:18
**implementing** [3] - 26:21, 27:1, 34:22
**important** [1] - 67:11
**imposed** [1] - 9:7
**include** [1] - 8:16
**includes** [1] - 8:9
**including** [1] - 4:24
**increase** [3] - 16:21, 45:11, 50:8
**increased** [1] - 48:17
**indicated** [2] - 20:4, 22:19
**individual** [11] - 18:22, 21:14, 23:10, 53:9, 53:11, 53:17, 53:20, 54:3, 56:13, 59:16, 59:18
**individual's** [1] - 19:21
**individuals** [33] - 9:24, 23:24, 28:8, 28:16, 28:17, 28:21, 31:25, 32:2, 32:9, 34:21, 38:15, 38:17, 39:16, 39:18, 40:5, 41:5, 41:7, 41:23, 44:12, 44:21, 45:1, 48:24, 54:9, 54:21, 55:4, 58:23, 59:19, 59:22, 61:4, 61:6, 62:12, 62:14, 63:24
**information** [6] - 5:1, 30:3, 30:4, 59:5, 68:5, 69:1
**initial** [1] - 55:18
**inside** [5] - 28:13, 28:23, 29:3, 29:10, 29:15
**instance** [2] - 21:24, 31:25
**instances** [1] - 67:15
**instead** [1] - 62:14
**interject** [1] - 27:11
**intermediary** [1] - 22:20
**involved** [3] - 26:21, 54:1, 60:7
**irrespective** [1] - 55:5
**issue** [5] - 5:13, 20:5, 20:8, 34:23, 54:24
**issued** [10] - 19:2, 20:5, 20:6, 20:7, 38:2, 38:21, 39:9, 42:6, 43:3, 68:13
**issues** [10] - 5:2, 5:3, 7:7, 20:12, 20:18, 21:7, 21:11, 34:24, 55:1, 55:2
**itself** [2] - 6:2, 18:9

## J

**January** [38] - 15:2, 16:4, 35:19, 38:1, 38:2, 38:3, 38:7, 38:9, 38:24, 39:2, 39:10, 39:11, 39:12, 39:18, 39:21, 40:8, 40:10, 41:12, 42:3, 42:6, 42:13, 42:16, 43:4, 43:9, 46:22, 46:23, 47:7, 47:9, 47:18, 47:22, 48:9, 48:18, 48:22, 49:2, 49:24
**Jason** [1] - 3:17
**JASON** [1] - 1:18
**jason.k.zubata@usdoj.gov** [1] - 1:22
**Jean** [1] - 2:3
**John** [1] - 7:11
**JOHN** [2] - 7:15, 7:18
**john** [1] - 7:18
**JUDGE** [1] - 1:9
**judge** [3] - 4:5, 9:12, 12:4
**judge's** [1] - 22:19

## K

**kind** [2] - 22:24, 56:13
**knowing** [2] - 58:17,

63:8
**KYLE** [1] - 1:18

## L

**lack** [2] - 10:6, 49:2
**land** [3] - 13:25, 14:1, 21:2
**landing** [8] - 13:12, 13:25, 19:23, 20:6, 20:24, 20:25, 21:1, 21:4
**large** [1] - 17:19
**large-scale** [1] - 17:19
**last** [18] - 4:8, 4:18, 5:11, 6:22, 13:6, 26:17, 37:10, 43:12, 43:24, 45:6, 46:4, 51:18, 52:4, 52:10, 56:16, 66:24, 66:25, 67:2
**late** [1] - 39:2
**law** [2] - 4:5, 5:17
**lawful** [2] - 42:1, 45:24
**lawyer** [1] - 69:17
**leadership** [1] - 49:16
**leading** [1] - 67:22
**learned** [1] - 68:5
**least** [2] - 5:17, 15:19
**leave** [3] - 6:15, 30:10, 30:14
**leaves** [1] - 39:2
**led** [1] - 43:8
**lee** [1] - 3:12
**LEE** [1] - 1:12
**length** [1] - 9:7
**LESLIE** [1] - 2:2
**Leslie** [1] - 3:22
**leslie.mckay@usdoj.gov** [1] - 2:6
**less** [2] - 23:23, 48:24
**level** [2] - 12:11, 12:24
**levels** [2] - 49:16, 59:18
**lgelernt@aclu.org** [1] - 1:14
**Liberties** [1] - 1:12
**light** [1] - 14:21
**limit** [5] - 11:4, 11:5, 24:12, 25:2, 25:4
**limited** [1] - 24:5
**limits** [2] - 9:7, 11:10
**line** [2] - 68:21, 69:16
**list** [1] - 51:11
**listen** [1] - 48:19
**litigation** [1] - 20:14
**loaded** [2] - 41:5, 41:8
**local** [7] - 10:22, 11:4, 27:20, 28:4, 28:9, 63:18, 64:1
**location** [7] - 12:11, 12:24, 17:12, 19:12, 19:13, 23:25, 24:1
**locations** [1] - 54:17
**logistics** [1] - 34:6
**long-term** [6] - 23:3, 23:12, 23:13, 23:17, 24:7
**longer-term** [1] - 24:20
**look** [18] - 27:5, 27:8, 27:25, 29:12, 29:13, 29:14, 29:16, 29:25, 42:14, 52:1, 54:17, 54:18, 61:3, 71:9
**looked** [1] - 40:21
**looking** [4] - 16:19, 29:20, 36:7, 49:17
**loses** [1] - 7:2
**Louisiana** [1] - 14:1
**low** [3] - 46:25, 56:24, 57:2
**lower** [2] - 46:21, 47:7
**LUNA** [1] - 1:3
**Luna** [1] - 3:3

## M

**machine** [1] - 2:15
**maintain** [1] - 21:13
**makers** [3] - 27:2, 34:21, 36:24
**male** [1] - 9:4
**males** [2] - 18:6, 33:25
**manage** [2] - 8:7, 58:21
**management** [5] - 8:9, 37:4, 59:3, 66:5, 66:8
**managing** [1] - 9:25
**mandate** [1] - 49:19
**manifest** [1] - 18:21
**manner** [5] - 2:10, 24:3, 24:19, 24:24, 71:19
**Markwayne** [1] - 3:4
**MARKWAYNE** [1] - 1:5
**Marshals** [1] - 10:23
**matter** [6] - 14:6, 38:10, 38:16, 59:23, 60:1, 63:10
**Matter** [1] - 3:3
**maximize** [1] - 10:16
**MCKAY** [1] - 2:2
**McKay** [4] - 3:22, 70:4, 70:5
**mean** [8] - 13:10, 17:10, 27:13, 31:12, 31:24, 40:14, 41:16, 41:22
**means** [3] - 13:11, 17:11, 67:12
**meant** [2] - 61:21, 64:15
**mechanical** [1] - 20:7
**medical** [6] - 10:8, 12:12, 54:18, 55:1, 55:11, 55:16
**medically** [1] - 20:20
**meet** [2] - 12:15, 19:12
**memo** [1] - 38:24
**memorandum** [16] - 24:9, 24:12, 24:15, 24:22, 38:1, 38:11, 38:21, 39:6, 39:9, 39:14, 40:8, 42:6, 42:12, 43:3, 68:13, 68:18
**mention** [1] - 67:8
**mentioned** [5] - 20:24, 23:19, 29:7, 32:22, 33:13
**mentioning** [3] - 9:15, 46:7, 46:8
**Miami** [4] - 57:25, 58:2, 62:5, 62:6
**mid-30,000** [1] - 48:1
**might** [5] - 4:12, 17:16, 36:9, 47:3, 69:2
**migrant** [1] - 37:12
**military** [4] - 28:16, 28:18, 28:22, 29:3
**minutes** [3] - 25:15, 25:22, 33:3
**miss** [1] - 20:10
**missing** [1] - 40:7
**mission** [2] - 17:7, 20:2
**missions** [1] - 20:13
**misspoke** [3] - 52:20, 52:21, 67:16
**misunderstanding** [1] - 47:3
**modify** [1] - 69:4
**moment** [2] - 15:15, 25:6
**moments** [3] - 6:25, 23:19, 36:17
**Monday** [2] - 22:4, 22:15
**month** [7] - 32:3, 32:5, 32:9, 32:10, 50:2, 50:11, 61:19
**months** [13] - 50:12, 56:19, 57:7, 57:9, 57:11, 57:17, 63:21, 65:15, 65:17, 65:18, 65:21, 66:3, 66:23
**most** [1] - 17:4
**MOTION** [1] - 1:8
**motion** [2] - 20:14, 20:15
**MOU** [6] - 33:25, 34:3, 35:3, 35:5, 60:14, 61:3
**move** [10] - 11:12, 18:6, 18:13, 23:6, 23:10, 34:4, 55:8, 55:13, 62:7, 62:12
**moved** [6] - 21:18, 21:20, 23:2, 39:18, 44:24, 55:4
**movements** [2] - 8:12, 58:24
**moving** [9] - 17:14, 23:11, 27:5, 28:3, 28:7, 28:17, 28:20, 28:25, 32:8
**MR** [16] - 3:11, 3:14, 3:17, 7:11, 7:20, 13:16, 25:6, 25:9, 34:10, 35:10, 35:12, 37:19, 69:15, 70:9, 70:15, 71:7
**MS** [23] - 3:8, 3:19, 3:22, 25:13, 25:17, 25:19, 26:6, 27:15, 27:19, 33:2, 33:6, 34:19, 35:7, 68:6, 68:8, 68:12, 68:20, 69:25, 70:3, 70:5, 70:19, 71:3, 71:8
**MULLIN** [1] - 1:5
**Mullin** [1] - 3:4
**multiple** [1] - 53:15
**multiples** [1] - 60:2

## N

**N.W** [1] - 2:4
**name** [2] - 7:17, 51:11
**nationality** [3] - 18:19, 18:25, 32:1
**natural** [1] - 37:16
**nature** [1] - 69:22
**necessary** [1] - 20:2
**necessitates** [1] - 11:11
**need** [21] - 10:15, 11:6, 15:14, 17:4, 17:6, 18:15, 18:17, 21:23, 23:8, 33:24, 36:2, 45:10, 45:25, 48:18, 48:19, 49:22, 50:18, 50:25, 51:3, 55:2, 71:1
**needed** [13] - 15:13, 16:21, 31:19, 37:16, 37:17, 41:7, 42:24, 48:24, 50:7, 54:25, 55:19, 59:18, 66:18
**needing** [3] - 48:8, 48:14, 50:12
**needs** [4] - 55:11, 55:16, 59:16, 59:25
**never** [6] - 4:18, 5:1, 5:3, 5:13, 30:14, 62:20
**New** [5] - 1:13, 58:2, 62:5, 62:7, 62:9
**new** [20] - 6:17, 64:13, 64:17, 64:25, 65:1, 65:3, 65:5, 65:8, 65:10, 65:12, 65:20, 65:21, 65:25, 68:2, 68:5, 69:8
**newly** [3] - 62:2, 62:8, 62:14
**next** [1] - 22:2
**nexus** [1] - 18:5
**Noor** [1] - 3:9
**NOOR** [1] - 1:11
**normal** [1] - 10:2
**normally** [1] - 18:24
**Northern** [1] - 61:14
**note** [1] - 3:6
**notes** [1] - 71:15
**nothing** [5] - 45:21, 69:15, 70:19, 71:7, 71:8
**November** [3] - 1:5, 71:5, 71:21
**nowhere** [1] - 48:9
**nuanced** [1] - 18:9
**null** [2] - 2:9, 71:18
**number** [25] - 12:17, 17:13, 35:16, 35:17, 35:19, 36:8, 46:25, 47:1, 47:6, 47:9, 47:19, 47:23, 48:3, 49:9, 49:10, 49:13, 49:15, 50:3, 50:15, 50:23, 56:25, 57:9, 66:18
**NY** [1] - 1:13
**nzafar@aclu.org** [1] - 1:15

## O

**oath** [12] - 26:3, 42:9, 45:6, 52:8, 52:12, 54:2, 58:14, 63:6, 63:14, 67:12, 67:14, 67:18
**object** [2] - 69:22, 70:1
**objected** [1] - 5:2

**objecting** [1] - 4:23
**objection** [4] - 4:17, 4:22, 6:4, 34:10
**objections** [6] - 7:6, 70:6, 70:10, 70:13, 70:15, 70:17
**obviously** [2] - 27:18, 44:23
**occupied** [2] - 16:23, 17:1
**occur** [1] - 19:16
**occurred** [2] - 32:5, 32:11
**October** [1] - 8:3
**OF** [2] - 1:1, 1:8
**offer** [1] - 13:1
**offers** [1] - 12:23
**office** [2] - 9:21, 9:22
**offices** [1] - 9:16
**Official** [1] - 2:13
**official** [1] - 71:23
**officially** [1] - 8:3
**officials** [1] - 14:20
**once** [7] - 5:4, 32:3, 32:9, 32:10, 49:23, 61:19, 62:14
**once-per-month** [1] - 32:9
**one** [22] - 5:19, 13:21, 17:11, 21:10, 23:2, 23:8, 23:10, 23:12, 23:24, 28:2, 29:7, 29:12, 29:16, 30:21, 31:25, 32:5, 32:10, 34:23, 37:10, 38:10, 68:6, 69:20
**one-time-per-month** [1] - 32:10
**online** [9] - 36:13, 50:5, 62:20, 62:25, 63:4, 63:18, 64:16, 64:17, 68:25
**onward** [1] - 30:16
**open** [1] - 23:9
**opening** [1] - 32:7
**operate** [3] - 28:5, 34:3, 35:5
**operated** [1] - 28:13
**operating** [5] - 5:6, 5:15, 7:8, 32:3, 35:3
**operation** [3] - 13:18, 17:19, 18:1
**operational** [1] - 32:13
**operationalize** [1] - 31:10
**operationally** [5] - 31:22, 31:23, 32:12, 61:5, 61:16
**Operations** [1] - 14:12
**operations** [12] - 7:25, 8:7, 8:10, 8:14, 11:10, 15:16, 15:19, 16:1, 17:20, 31:11, 31:15, 37:12
**opinion** [1] - 36:17
**opportunity** [13] - 4:4, 4:10, 4:13, 4:19, 5:11, 5:23, 6:6, 6:13, 7:2, 7:3, 68:5, 68:23, 69:11
**opposed** [1] - 44:22
**options** [1] - 21:12
**order** [9] - 9:4, 9:10, 10:7, 18:4, 18:16, 19:17, 20:15, 25:1, 35:23
**orders** [3] - 33:25, 34:4, 61:5
**organization** [2] - 9:5, 34:2
**Orleans** [4] - 58:2, 62:6, 62:7, 62:9
**outlined** [1] - 8:22
**outside** [1] - 35:5
**outweigh** [1] - 13:2
**overall** [1] - 27:6
**overcapacity** [1] - 17:12
**overcome** [1] - 12:24
**overruled** [1] - 34:14
**oversee** [1] - 13:18
**overwhelmed** [1] - 36:4
**own** [2] - 11:5, 39:15

**P**

**p.m** [2] - 1:5, 71:11
**parameters** [1] - 33:24
**parlance** [1] - 22:25
**part** [4] - 13:17, 14:11, 19:6, 19:7
**particular** [3] - 12:13, 27:9, 36:8
**parties** [3] - 3:5, 4:3, 71:5
**partners** [7] - 27:20, 27:22, 27:24, 28:4, 28:5, 28:10
**party** [2] - 2:10, 71:19
**passengers** [1] - 22:3
**passing** [1] - 66:13
**passport** [3] - 18:23, 19:1
**pay** [1] - 57:24
**people** [54] - 10:1, 24:13, 26:24, 26:25, 27:3, 27:5, 28:3, 28:25, 29:3, 29:11, 29:18, 29:23, 33:8, 33:10, 33:13, 33:15, 33:16, 33:19, 34:7, 34:9, 34:25, 36:21, 38:20, 39:5, 40:2, 40:15, 46:20, 47:4, 47:15, 47:17, 47:20, 49:1, 49:5, 49:21, 50:1, 50:10, 51:6, 55:8, 55:13, 55:19, 55:21, 55:23, 55:25, 56:3, 57:14, 57:16, 57:19, 57:22, 58:17, 61:9, 66:5, 68:14, 68:16
**per** [7] - 32:5, 32:9, 32:10, 53:24, 53:25, 54:4, 54:6
**percent** [1] - 47:1
**performed** [1] - 37:14
**period** [4] - 11:24, 28:24, 29:1, 53:22
**periodically** [1] - 61:19
**perjury** [1] - 67:18
**Perlmutter** [2] - 3:19, 69:24
**PERLMUTTER** [4] - 1:17, 3:19, 69:25, 70:3
**permission** [1] - 21:1
**permit** [6] - 19:23, 20:6, 20:24, 20:25, 21:1, 21:4
**perplexed** [1] - 6:20
**person** [5] - 21:22, 22:10, 60:1, 62:2, 62:8
**personal** [2] - 36:17, 66:13
**personally** [1] - 27:14
**perspective** [3] - 11:20, 16:16, 27:17
**photocopied** [1] - 71:19
**piece** [1] - 13:8
**pieces** [1] - 23:11
**pit** [2] - 30:10, 30:15
**place** [3] - 21:15, 33:24, 46:9
**placed** [1] - 56:6
**placements** [1] - 55:5
**places** [1] - 56:2
**placing** [1] - 32:6
**plaintiff** [1] - 3:6
**Plaintiffs** [1] - 1:4
**plaintiffs** [8] - 3:9, 3:12, 25:12, 68:1, 70:16, 70:19, 71:1, 71:8
**PLAINTIFFS** [1] - 1:11
**plaintiffs'** [4] - 4:20, 26:4, 33:5, 67:6
**plan** [3] - 6:9, 31:14, 32:12
**plane** [6] - 19:12, 19:14, 21:3, 41:5, 63:11
**planes** [5] - 8:12, 40:15, 57:25, 58:22, 59:6
**play** [2] - 5:7, 21:11
**PO** [1] - 1:19
**Poc** [1] - 2:3
**podium** [1] - 68:7
**point** [13] - 6:14, 14:17, 21:20, 22:21, 39:21, 41:11, 42:3, 51:3, 51:16, 57:1, 57:12, 63:19, 65:6
**policy** [29] - 26:22, 27:1, 29:2, 31:17, 34:12, 34:21, 34:22, 35:2, 42:11, 42:13, 42:21, 43:2, 43:5, 43:8, 43:13, 43:14, 43:21, 43:25, 45:5, 45:13, 45:20, 45:22, 45:24, 46:1, 46:12, 46:13, 46:14, 54:2, 60:8
**population** [5] - 16:21, 17:11, 35:1, 59:18, 61:13
**portions** [1] - 60:13
**position** [5] - 8:2, 8:3, 8:4, 8:6, 14:14
**possibility** [1] - 35:18
**possible** [1] - 27:22
**post** [2] - 9:10, 25:1
**potential** [2] - 9:17, 39:3
**practices** [1] - 8:19
**premium** [3] - 10:11, 10:14, 43:18
**preparation** [4] - 26:19, 44:4, 66:25, 67:3
**prepare** [2] - 60:10, 67:7
**preparing** [2] - 26:12, 26:15
**present** [1] - 18:24
**preservation** [1] - 5:9
**preserve** [1] - 7:7
**President** [1] - 39:9
**President's** [3] - 38:1, 42:5, 68:13
**presidential** [4] - 35:24, 42:12, 43:3, 49:19
**prevent** [1] - 20:16
**prevents** [1] - 24:23
**previous** [3] - 8:22, 9:11, 10:10
**previously** [1] - 42:20
**price** [1] - 62:5
**primarily** [1] - 19:7
**printed** [2] - 2:10, 71:18
**private** [1] - 28:4
**problem** [6] - 13:13, 21:5, 25:16, 25:20, 48:5, 48:13
**problems** [1] - 11:7
**proceeding** [1] - 71:11
**Proceedings** [1] - 2:15
**proceedings** [1] - 71:16
**process** [16] - 8:17, 16:15, 18:9, 18:20, 19:6, 19:7, 21:23, 23:2, 32:7, 32:20, 60:24, 61:1, 61:2, 61:17, 63:15, 65:15
**processing** [2] - 63:9, 63:13
**procure** [1] - 19:22
**procurement** [1] - 58:25
**produced** [1] - 2:16
**product** [1] - 2:8
**program** [1] - 58:22
**prompted** [1] - 38:1
**prosecuted** [1] - 67:18
**prove** [1] - 18:25
**proven** [1] - 17:4
**provides** [1] - 15:5
**pull** [2] - 38:11, 38:23
**pushed** [1] - 23:16
**put** [5] - 5:25, 6:10, 16:17, 16:25, 18:4
**puts** [1] - 10:11
**putting** [3] - 10:14, 16:13, 61:17

**Q**

**qualify** [1] - 69:7
**quality** [3] - 12:13, 12:16, 54:19
**questioning** [2] - 7:9, 68:22
**questions** [23] - 6:8, 6:11, 22:19, 25:9, 25:14, 26:4, 26:8, 27:12, 27:17, 33:7, 35:9, 37:20, 37:23, 48:19, 68:2, 69:12, 69:21, 69:25, 70:5,

70:9, 70:12, 70:17
**quick** [1] - 9:2
**quicker** [11] - 36:14, 62:19, 63:3, 63:7, 63:16, 64:4, 64:9, 64:14, 64:16, 65:7, 68:25
**quickly** [5] - 16:11, 16:17, 16:21, 31:20, 62:21
**quite** [1] - 60:25

**R**

**raise** [2] - 6:14, 7:13
**raised** [2] - 5:3, 5:13
**raising** [1] - 7:6
**ramp** [1] - 16:19
**range** [1] - 48:1
**rate** [1] - 14:6
**rather** [1] - 61:11
**re** [2] - 26:2, 27:16
**re-ask** [1] - 27:16
**re-take** [1] - 26:2
**reach** [1] - 18:23
**reaching** [1] - 14:25
**read** [3] - 6:18, 44:3, 44:4
**really** [1] - 67:11
**reason** [18] - 42:21, 43:25, 44:2, 44:7, 44:11, 44:21, 44:25, 45:12, 45:19, 45:25, 46:1, 46:3, 46:5, 46:6, 46:11, 48:13, 59:7, 60:11
**reasonability** [1] - 32:16
**reasonable** [4] - 34:8, 34:12, 34:23, 35:2
**reasonableness** [2] - 31:1, 34:20
**reasons** [4] - 17:16, 29:7, 44:13, 45:7
**rebrief** [1] - 6:17
**recess** [2] - 25:22, 25:25
**record** [18] - 3:3, 3:7, 7:17, 26:9, 26:13, 30:5, 32:14, 32:25, 36:8, 40:20, 40:22, 42:25, 46:2, 51:15, 51:17, 52:11, 59:9, 60:14
**REDIRECT** [1] - 35:11
**reduce** [1] - 17:13
**referencing** [1] - 39:6
**reflect** [1] - 51:16
**reflected** [2] - 32:14, 32:25
**regarding** [3] - 27:21, 28:10, 34:16
**regional** [2] - 17:25, 18:1
**related** [2] - 20:9, 68:8
**released** [1] - 49:2
**remain** [2] - 9:9, 22:15
**remember** [4] - 8:25, 16:6, 18:11, 22:22
**remind** [4] - 7:21, 14:14, 16:2, 67:14
**reminder** [1] - 9:2
**removable** [1] - 8:20
**Removal** [1] - 14:12
**removal** [51] - 7:25, 8:10, 8:14, 8:17, 9:4, 10:7, 13:20, 14:4, 14:16, 18:9, 18:14, 18:16, 18:21, 18:23, 19:2, 19:3, 19:4, 19:6, 19:7, 19:21, 20:2, 20:10, 20:16, 20:19, 20:22, 21:8, 21:11, 21:13, 21:14, 22:8, 22:9, 22:12, 23:2, 23:22, 23:23, 30:16, 30:21, 31:15, 32:2, 32:4, 32:6, 53:6, 58:21, 58:25, 59:1, 61:5, 61:10, 61:13, 61:18, 61:22
**removals** [4] - 18:4, 31:5, 31:6, 31:8
**remove** [2] - 19:4, 20:2
**removed** [4] - 17:5, 20:22, 32:11, 61:6
**removing** [2] - 30:9, 31:25
**renting** [1] - 11:1
**repeat** [3] - 13:6, 28:2, 55:12
**repeating** [1] - 27:12
**reported** [1] - 2:15
**Reporter** [3] - 2:13, 2:13, 71:23
**represented** [1] - 50:24
**representing** [1] - 27:18
**requirements** [1] - 8:23
**reschedule** [1] - 21:14
**rescheduled** [1] - 22:15
**resolve** [4] - 4:4, 5:19, 6:4, 7:4
**resource** [2] - 33:23, 34:17
**resources** [1] - 24:7
**respect** [10] - 8:20, 12:5, 12:23, 14:3, 29:14, 29:19, 30:8, 52:25, 54:9, 58:15
**response** [2] - 42:12, 43:3
**responsible** [1] - 59:4
**restraining** [1] - 20:15
**revelation** [1] - 68:2
**review** [4] - 5:25, 24:9, 26:12, 26:15
**reviewed** [1] - 60:13
**rider** [1] - 10:23
**rise** [1] - 25:21
**role** [4] - 5:21, 58:15, 58:20, 59:2
**roughly** [4] - 33:10, 33:14, 35:13, 35:16
**round** [1] - 70:24
**route** [1] - 30:21
**RPR** [3] - 2:13, 71:14, 71:22
**rule** [1] - 4:14
**run** [2] - 5:5, 5:22
**RUSSELL** [1] - 1:17
**Russell** [1] - 3:15
**russell.verby@usdoj.gov** [1] - 1:21

**S**

**S-C-H-U-L-T-Z** [1] - 7:18
**Salvador** [1] - 61:15
**Saturday** [1] - 22:2
**save** [2] - 61:25, 67:20
**scale** [1] - 17:19
**scenario** [2] - 59:16, 59:19
**schedule** [1] - 19:2
**scheduled** [3] - 22:1, 22:8, 22:9
**scheduling** [2] - 19:21, 59:1
**Schultz** [13] - 7:11, 7:18, 7:21, 26:3, 26:7, 27:14, 35:13, 37:22, 44:4, 48:18, 52:12, 67:10, 70:22
**SCHULTZ** [1] - 7:15
**screenshot** [2] - 2:10, 71:19
**scuttlebutt** [1] - 37:1
**seal** [1] - 4:24
**seated** [1] - 7:17
**second** [6] - 3:25, 6:3, 13:8, 18:17, 46:6, 48:11
**secure** [1] - 49:20
**security** [2] - 12:24, 59:17
**see** [2] - 6:12, 51:5
**seeing** [1] - 59:11
**seeking** [1] - 64:1
**selected** [1] - 29:8
**selection** [1] - 9:12
**send** [14] - 18:20, 38:15, 39:5, 39:8, 39:15, 41:23, 44:17, 57:14, 61:6, 61:9, 61:25, 62:2, 62:8, 68:16
**sending** [7] - 29:18, 29:23, 38:20, 61:13, 61:16, 62:14
**sense** [7] - 31:22, 31:23, 32:12, 61:5, 61:14, 61:16, 61:24
**sent** [10] - 9:16, 33:13, 40:2, 40:5, 41:5, 41:8, 44:22, 45:1, 56:4, 68:14
**served** [1] - 37:12
**Service** [1] - 10:23
**services** [1] - 20:21
**several** [2] - 50:12, 67:15
**shall** [2] - 2:9, 71:18
**short** [1] - 23:23
**short-term** [1] - 23:23
**shorthand** [1] - 2:15
**shortly** [1] - 38:18
**show** [2] - 4:23, 59:9
**side** [1] - 5:19
**sign** [1] - 64:25
**signatory** [2] - 2:11, 71:19
**significant** [1] - 4:2
**similar** [4] - 24:3, 24:19, 24:24, 36:21
**simply** [1] - 63:25
**sincerely** [1] - 5:14
**single** [1] - 56:12
**sit** [1] - 58:16
**site** [1] - 51:19
**sitting** [1] - 6:12
**slow** [5] - 31:11, 31:15, 60:25, 61:2, 63:10
**slowed** [3] - 32:20, 61:10, 61:22
**slowing** [5] - 32:6, 32:7, 60:24, 61:12, 61:20
**slows** [1] - 16:13
**sneak** [1] - 7:1
**sneaking** [1] - 7:6
**snuck** [1] - 6:5
**sole** [5] - 42:20, 43:25, 44:2, 45:12, 46:5
**solely** [5] - 44:18, 45:5, 46:13, 46:15, 46:16
**solicitation** [2] - 9:16, 10:1
**solution** [1] - 34:23
**solve** [1] - 34:24
**someone** [11] - 23:22, 30:9, 58:6, 58:9, 58:19, 59:24, 60:2, 61:1, 62:1, 62:7, 66:12
**sometimes** [1] - 11:13
**somewhere** [4] - 35:18, 46:25, 47:10, 47:25
**SOOKNANAN** [1] - 1:8
**sorry** [6] - 31:6, 39:5, 39:6, 44:12, 51:25, 54:22
**sort** [4] - 9:7, 21:4, 21:22, 23:6
**sorts** [1] - 14:24
**sources** [1] - 11:2
**space** [87] - 10:6, 10:11, 10:14, 10:15, 10:16, 11:4, 11:16, 12:5, 14:21, 15:6, 15:10, 15:11, 15:14, 15:18, 16:10, 16:13, 16:17, 16:20, 16:23, 16:25, 17:7, 17:20, 18:7, 23:8, 23:9, 27:6, 27:8, 27:21, 27:23, 27:25, 28:6, 28:10, 28:18, 29:12, 31:20, 32:1, 32:8, 33:18, 33:22, 34:17, 34:23, 35:2, 35:5, 35:6, 42:20, 42:22, 42:24, 43:7, 43:11, 43:13, 43:16, 43:17, 43:18, 43:21, 43:22, 44:8, 44:15, 44:18, 45:2, 45:6, 45:10, 45:13, 45:17, 45:20, 46:5, 46:13, 46:15, 46:16, 48:5, 48:13, 48:15, 48:16, 48:22, 49:2, 49:22, 51:20, 51:24, 52:2, 52:7, 52:19, 53:2, 55:19, 59:4, 62:12, 62:15, 64:1
**spaces** [2] - 11:19, 12:1
**SPARKLE** [1] - 1:8
**specific** [2] - 29:22, 63:14
**specifically** [2] -

24:15, 27:24
**spell** [1] - 7:17
**spend** [2] - 4:2, 61:23
**spent** [1] - 4:23
**spread** [1] - 61:18
**St** [1] - 2:4
**stage** [1] - 19:9
**staged** [1] - 23:22
**staging** [12] - 10:6, 19:6, 19:7, 19:14, 21:20, 22:11, 23:14, 23:19, 23:21, 24:3, 24:5, 24:16
**stand** [7] - 6:10, 6:14, 7:12, 25:22, 26:2, 68:24, 69:6
**standard** [1] - 12:15
**standards** [1] - 12:13
**start** [3] - 6:7, 25:15, 37:23
**started** [4] - 7:10, 38:20, 61:17
**state** [4] - 7:17, 10:22, 27:20, 28:4
**statement** [11] - 10:12, 64:6, 64:7, 64:9, 64:12, 66:19, 68:24, 69:4, 69:5, 69:6, 69:8
**statements** [1] - 67:18
**States** [33] - 1:18, 11:18, 13:22, 14:5, 15:11, 15:13, 15:15, 15:24, 17:6, 18:7, 21:2, 32:8, 33:23, 34:17, 44:23, 44:24, 48:6, 48:23, 51:4, 53:20, 54:13, 54:23, 55:9, 55:25, 56:2, 56:11, 56:17, 58:10, 58:23, 58:24, 59:22, 60:4, 62:24
**STATES** [2] - 1:1, 1:9
**statewide** [2] - 17:23, 17:24
**station** [1] - 22:21
**Station** [1] - 1:20
**stay** [2] - 9:8, 20:14
**stem** [1] - 60:24
**stenographic** [1] - 71:15
**step** [5] - 14:18, 18:15, 18:17, 21:22, 25:23
**stepped** [1] - 14:22
**stepped-up** [1] - 14:22
**steps** [10] - 8:16, 18:10, 18:13, 19:16, 19:19, 19:24, 20:1, 32:21, 32:22
**still** [3] - 26:3, 36:11, 43:25
**stop** [3] - 30:10, 30:15, 30:23
**stoppage** [1] - 21:25
**stops** [1] - 30:20
**Street** [1] - 1:13
**strip** [2] - 13:12, 13:25
**strive** [1] - 4:9
**stuff** [2] - 7:1, 37:2
**successfully** [1] - 17:7
**Sunday** [1] - 22:4
**supplemental** [3] - 4:15, 6:17, 70:25
**supposed** [2] - 49:22, 50:10
**surplus** [1] - 56:10
**surprise** [1] - 4:15
**surprising** [1] - 69:18
**sworn** [1] - 7:15
**system** [1] - 7:3

## T

**table** [2] - 6:13, 69:17
**TCOs** [1] - 18:5
**temporary** [1] - 20:15
**term** [9] - 17:8, 23:3, 23:12, 23:13, 23:17, 23:23, 24:7, 24:20
**terms** [6] - 22:22, 22:24, 23:1, 23:22, 30:20, 69:8
**testified** [12] - 4:18, 15:4, 37:25, 39:1, 43:12, 45:6, 45:15, 46:19, 53:6, 60:23, 62:4, 62:18
**testify** [5] - 40:23, 54:2, 54:15, 58:12, 59:15
**testifying** [4] - 18:8, 24:10, 42:9, 64:8
**testimony** [19] - 4:21, 8:22, 8:25, 9:11, 10:10, 12:4, 12:6, 22:18, 26:8, 26:12, 26:17, 29:6, 34:6, 43:20, 44:1, 44:16, 44:25, 63:5, 68:10
**Texas** [1] - 62:9
**THE** [299] - 1:1, 1:8, 1:11, 1:16, 3:2, 3:10, 3:13, 3:16, 3:18, 3:21, 3:24, 7:13, 7:16, 7:18, 13:6, 13:9, 13:10, 13:11, 25:7, 25:11, 25:16, 25:18, 25:20, 25:21, 25:23, 26:1, 27:11, 27:16, 33:3, 34:14, 34:15, 35:8, 37:21, 38:3, 38:5, 38:14, 38:15, 38:17, 38:19, 38:21, 38:22, 39:4, 39:7, 39:9, 39:11, 39:12, 39:13, 39:17, 39:20, 39:22, 39:24, 40:4, 40:6, 40:11, 40:12, 40:18, 40:19, 40:21, 40:23, 40:25, 41:1, 41:3, 41:4, 41:7, 41:10, 41:15, 41:16, 41:17, 41:19, 41:21, 41:22, 42:4, 42:8, 42:18, 42:19, 42:23, 43:2, 43:10, 43:12, 43:17, 43:20, 43:22, 43:24, 44:2, 44:3, 44:11, 44:16, 45:4, 45:9, 45:12, 45:14, 45:15, 46:8, 46:10, 46:15, 46:16, 46:18, 46:19, 46:24, 47:2, 47:10, 47:12, 47:14, 47:15, 47:16, 47:17, 47:19, 47:20, 47:22, 47:23, 47:25, 48:2, 48:3, 48:4, 48:7, 48:10, 48:17, 48:18, 49:1, 49:4, 49:7, 49:8, 49:10, 49:12, 49:14, 49:18, 49:19, 49:21, 49:23, 49:24, 50:4, 50:6, 50:14, 50:17, 50:20, 50:22, 51:1, 51:2, 51:7, 51:9, 51:11, 51:12, 51:13, 51:15, 51:17, 51:18, 51:25, 52:3, 52:13, 52:15, 52:16, 52:17, 52:20, 52:21, 52:22, 52:23, 53:4, 53:5, 53:10, 53:12, 53:13, 53:14, 53:18, 53:19, 53:21, 53:22, 53:23, 53:25, 54:5, 54:8, 54:10, 54:11, 54:14, 54:15, 54:20, 54:21, 55:3, 55:4, 55:7, 55:8, 55:12, 55:13, 55:17, 55:18, 55:22, 55:24, 56:5, 56:7, 56:8, 56:9, 56:12, 56:16, 56:18, 56:20, 56:21, 56:23, 56:24, 57:1, 57:4, 57:6, 57:7, 57:14, 57:16, 57:18, 57:19, 57:20, 57:24, 58:3, 58:11, 58:12, 58:20, 59:8, 59:11, 59:12, 60:5, 60:6, 60:9, 60:10, 60:13, 60:16, 60:17, 60:18, 61:3, 61:25, 62:10, 62:11, 62:17, 62:18, 62:22, 62:23, 63:1, 63:2, 63:8, 63:12, 63:20, 63:22, 64:3, 64:4, 64:13, 64:14, 64:18, 64:19, 64:21, 64:22, 64:23, 64:24, 65:2, 65:4, 65:8, 65:10, 65:11, 65:12, 65:13, 65:14, 65:16, 65:17, 65:18, 65:19, 65:23, 65:24, 66:1, 66:2, 66:4, 66:6, 66:7, 66:9, 66:10, 66:12, 66:16, 66:17, 66:20, 66:22, 66:24, 66:25, 67:2, 67:3, 67:5, 67:6, 67:9, 67:10, 67:19, 67:20, 67:25, 68:1, 68:7, 68:21, 69:6, 69:9, 69:16, 70:1, 70:4, 70:7, 70:11, 70:16, 70:21, 70:23, 70:24, 71:4, 71:9
**themselves** [1] - 6:23
**thereafter** [1] - 38:18
**third** [1] - 60:21
**thirteen** [2] - 33:15, 33:16
**three** [6] - 19:24, 22:9, 65:18, 65:20, 66:2, 66:23
**throughout** [2] - 6:19, 58:24
**timeline** [4] - 50:12, 50:18, 50:20, 55:20
**timing** [1] - 37:24
**title** [1] - 50:15
**today** [17] - 4:9, 26:8, 26:12, 26:16, 26:19, 34:5, 35:19, 44:5, 45:8, 46:5, 47:16, 51:22, 52:4, 57:5, 57:9, 57:18, 57:19
**today's** [3] - 67:23, 70:2, 70:14
**took** [3] - 64:16, 64:17, 67:14
**top** [2] - 56:25, 57:8
**top-end** [2] - 56:25, 57:8
**total** [5] - 35:1, 47:13, 47:14, 54:5, 55:23
**track** [1] - 19:20
**transcript** [7] - 2:8, 2:9, 2:10, 44:3, 71:15, 71:16, 71:18
**Transcript** [1] - 2:16
**TRANSCRIPT** [1] - 1:8
**transcription** [1] - 2:16
**transfer** [4] - 8:24, 10:2, 10:4, 56:15
**transferred** [4] - 9:13, 9:17, 54:22, 56:13
**transferring** [1] - 29:11
**transfers** [1] - 11:13
**transit** [2] - 30:22, 30:23
**transnational** [2] - 9:5, 34:1
**transport** [2] - 58:17, 58:22
**transportation** [2] - 11:11, 58:3
**transporting** [1] - 57:22
**travel** [12] - 18:17, 18:22, 18:25, 19:22, 20:5, 20:20, 30:8, 30:11, 30:15, 30:17, 57:25, 58:25
**Triangle** [1] - 61:14
**trick** [2] - 44:19, 45:23
**true** [3] - 11:3, 71:15, 71:15
**try** [1] - 7:1
**trying** [11] - 19:22, 27:22, 34:20, 34:24, 43:11, 44:19, 44:20, 45:23, 49:25, 51:8, 58:16
**two** [6] - 19:19, 22:24, 41:9, 41:10, 56:18, 57:17
**type** [3] - 21:5, 37:2, 54:25
**typically** [2] - 23:23, 41:6

## U

**U.S** [29] - 10:23, 11:19, 15:7, 15:18, 16:23, 27:6, 27:9, 28:5, 28:10, 28:13, 28:23, 29:4, 29:10, 29:15, 29:19, 29:23, 30:11, 30:14, 30:18, 33:9, 46:20, 47:5, 50:14, 53:8, 53:25, 55:13, 59:10, 59:25, 62:1
**U.S.-based** [2] - 27:21, 28:1

**unaware** [2] - 28:7, 28:20
**under** [15] - 21:4, 26:3, 26:25, 36:11, 42:9, 45:6, 52:8, 52:12, 54:2, 55:22, 58:14, 63:6, 63:14, 67:12, 67:18
**Union** [1] - 1:12
**unit** [2] - 66:5, 66:8
**United** [33] - 1:18, 11:18, 13:22, 14:5, 15:11, 15:13, 15:15, 15:24, 17:6, 18:7, 21:2, 32:8, 33:23, 34:17, 44:23, 44:24, 48:6, 48:23, 51:4, 53:20, 54:13, 54:23, 55:9, 55:25, 56:2, 56:11, 56:17, 58:10, 58:23, 58:24, 59:22, 60:4, 62:24
**UNITED** [2] - 1:1, 1:9
**unpack** [1] - 50:3
**untruthful** [1] - 67:17
**up** [31] - 4:23, 5:1, 6:11, 6:14, 14:18, 14:22, 15:12, 15:17, 15:24, 16:19, 17:19, 18:7, 21:16, 26:8, 33:18, 33:22, 34:11, 38:11, 38:23, 40:15, 42:24, 43:1, 49:13, 49:14, 50:23, 50:24, 64:25, 66:11, 67:23, 68:9
**US** [1] - 1:19
**uses** [1] - 22:24
**utilize** [1] - 33:21
**utilizing** [1] - 32:1

## V

**valuable** [2] - 33:23, 34:17
**various** [1] - 11:1
**verby** [1] - 70:11
**Verby** [1] - 3:15
**VERBY** [14] - 1:17, 3:14, 7:11, 7:20, 13:16, 25:6, 25:9, 34:10, 35:10, 35:12, 37:19, 69:15, 70:15, 71:7
**verification** [1] - 18:19
**versus** [9] - 3:4, 14:4, 54:12, 57:10, 59:6, 59:10, 61:15, 61:24, 64:25
**via** [2] - 8:12, 61:6
**view** [1] - 5:12
**void** [2] - 2:9, 71:18
**vs** [1] - 1:4

## W

**wait** [2] - 21:15, 47:12
**waiting** [1] - 7:6
**wake** [1] - 40:15
**War** [1] - 11:25
**warrant** [1] - 23:6
**Washington** [3] - 1:6, 1:20, 2:5
**wasting** [2] - 6:16
**water** [2] - 36:11, 37:1
**ways** [1] - 15:19
**weather** [1] - 20:9
**weather-related** [1] - 20:9
**week** [6] - 50:2, 50:11, 66:24, 66:25, 67:2, 71:3
**witness** [13] - 6:7, 6:8, 6:10, 6:14, 7:10, 7:15, 26:1, 34:13, 35:9, 42:15, 68:3, 69:21, 70:17
**WITNESS** [130] - 7:18, 13:9, 13:11, 34:15, 38:3, 38:14, 38:17, 38:21, 39:4, 39:9, 39:12, 39:17, 39:22, 40:4, 40:11, 40:18, 40:21, 40:25, 41:3, 41:7, 41:15, 41:17, 41:21, 42:4, 42:18, 42:23, 43:10, 43:17, 43:22, 44:2, 45:9, 45:14, 46:8, 46:15, 46:18, 46:24, 47:10, 47:14, 47:16, 47:19, 47:22, 47:25, 48:3, 48:7, 48:17, 49:1, 49:7, 49:10, 49:14, 49:19, 49:23, 50:4, 50:14, 50:20, 51:1, 51:7, 51:11, 51:13, 51:17, 51:25, 52:13, 52:16, 52:20, 52:22, 53:4, 53:10, 53:13, 53:18, 53:21, 53:23, 54:5, 54:10, 54:14, 54:20, 55:3, 55:7, 55:12, 55:17, 55:22, 56:5, 56:8, 56:12, 56:18, 56:21, 56:24, 57:4, 57:7, 57:16, 57:19, 57:24, 58:11, 58:20, 59:11, 60:5, 60:9, 60:13, 60:17, 61:3, 62:10, 62:17, 62:22, 63:1, 63:8, 63:20, 64:3, 64:13, 64:18, 64:21, 64:23, 65:2, 65:8, 65:11, 65:13, 65:16, 65:18, 65:23, 66:1, 66:4, 66:7, 66:10, 66:16, 66:20, 66:24, 67:2, 67:5, 67:9, 67:19, 67:25, 69:6, 70:23
**witnesses** [5] - 4:17, 5:4, 5:11, 6:6, 7:9
**wondering** [1] - 25:14
**word** [1] - 3:25
**words** [2] - 30:17, 68:17
**works** [2] - 7:3, 63:9
**world** [1] - 22:6

## Y

**YAMIL** [1] - 1:3
**Yamil** [1] - 3:3
**year** [2] - 50:2, 50:12
**years** [13] - 7:23, 8:13, 16:10, 36:15, 37:4, 53:15, 56:1, 58:8, 62:19, 63:17, 64:15, 68:25
**yielded** [1] - 66:23
**York** [1] - 1:13
**you-all** [3] - 4:10, 5:18, 6:7
**yourself** [1] - 34:22

## Z

**ZAFAR** [19] - 1:11, 3:8, 25:13, 25:17, 25:19, 26:6, 27:15, 27:19, 33:2, 33:6, 34:19, 35:7, 68:6, 68:8, 68:12, 68:20, 70:19, 71:3, 71:8
**Zafar** [1] - 3:9
**ZUBATA** [3] - 1:18, 3:17, 70:9
**Zubata** [2] - 3:17, 70:8